## CROWN THEATRES' EXPANSION PROGRAM

42. In an effort to expand its theatre operations, Crown Theatres entered into seven leases from 1997 to 1999, which required Crown Theatres to contribute certain architectural and construction services to the properties covered by the leases, in addition to work performed by the respective landlords.

43. In anticipation of these construction projects, Milton Daly, in his capacity as Crown Theatres' COO, retained Beacher and B.B. Construction to act as Crown Theatres' construction consultant. Beacher of B.B. Construction was to provide consulting and construction-related services, including, without limitation, supervision and inspection.

44. Milton Daly retained Martino and the Martino firm as its architect to provide architectural drawings and construction supervision and inspection for each of Crown Theatres' new locations, among other things.

## OVERVIEW OF THE RACKETEERING SCHEMES

45. Beginning on or before October 7, 1996, Milton Daly and Beacher developed a scheme by which they would submit fraudulent invoices to Crown Theatres, in order to cause Crown Theatres to issue payments for consulting and construction work that was not performed, or overpayments for work actually performed, among other things.

46. To implement the scheme, Milton Daly and Beacher arranged for invoices to be submitted to Crown Theatres for the payment of services which were never rendered, or for payment in excess of the value of services actually rendered, or for payment for goods in excess of the actual price of those goods.

47. In most instances (other than invoices from B.B. Construction), Martino attested that the work represented in the invoices had been completed by signing the Architect's

Certificate, or, in other instances, by allowing others to sign his name on the Architect's Certificate. Crown Theatres relied upon Martino's attestation and was injured as a result.

48. Milton Daly knowingly concealed this fraud, including, without limitation, the conduct described in paragraphs 45 through 47 above, with the intent to mislead Crown Theatres into relying on these invoices; and at the direction of Milton Daly, Crown Theatres did rely on the fraudulent invoices and was injured as a result.

49. After Crown Theatres received the fraudulent invoices, Milton Daly caused checks to be drawn on Crown Theatres' accounts for payment to B.B. Construction and other Beacher-controlled entities, among other entities. Milton Daly did so with knowledge that the payments were for services that were never rendered, or made in excess of the value of services actually rendered or goods actually provided.

50. As part of this scheme, Milton Daly and Beacher generally agreed to split the proceeds from Crown Theatres on an approximate 70%/30% basis over the relevant period of time from 1996 to 2001, with Beacher retaining approximately 30% of the funds received and remitting approximately 70% to Taylor-Leigh, which in turn provided those funds to Milton Daly (hereinafter the "70/30 Agreement").

51. On information and belief, over the relevant period of time from 1996 to 2001, Beacher entities, in receipt of these fraudulently-obtained funds, did retain approximately 30% of the funds, and did remit approximately 70% to Milton Daly-controlled entities, specifically Taylor-Leigh.

52. Taylor-Leigh's only relationship to Crown Theatres was indirectly to receive these fraudulently-obtained funds after the funds had flowed through one of the Beacher entities.

53. Milton Daly converted such funds from Beacher entities and Taylor-Leigh to his and his wife Anne Daly's personal use with the knowledge that these funds were fraudulently obtained.

54. Milton Daly and Anne Daly used these fraudulently obtained funds to make equity and other investments in Odyssey, to invest in the stock market, and to make payments to Kangaroo Pouch Kids, among other things.

55. Milton Daly and Taylor-Leigh, aiding and abetting one another, having devised the above-described scheme to defraud and to obtain money by means of false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme, caused to be sent and delivered by the United States Postal Service and other private or commercial interstate courier services, including, without limitation, Federal Express, many of the invoices, payments, or kickbacks.

56. Milton Daly and Taylor-Leigh, aiding and abetting one another, having devised the above-described scheme to defraud and to obtain money by means of false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme, did transmit and cause to be transmitted by means of wire in interstate commerce numerous writings, signs, signals, and sounds constituting the conversations and financial transactions described above.

57. Milton Daly and Taylor-Leigh conducted numerous financial transactions affecting interstate commerce which involved the proceeds of specified unlawful activity, that is, mail and wire fraud, felonies under 18 U.S.C. §§ 1341 and 1343, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of such unlawful activity. Milton Daly and Taylor-Leigh knew that

the funds involved in such financial transactions represented the proceeds of some form of unlawful activity as defined in 18 U.S.C. § 1956(c)(1).

## DIAGRAM OF THE RACKETEERING SCHEMES

58. The racketeering schemes are generally represented by the following diagram:



59. Defendants engaged in the following specific racketeering schemes.

## RACKETEERING SCHEME 1: THE HARTFORD AND TRUMBULL PROJECTS

60. On June 18, 1998, Crown Theatres entered into a lease with Starwood Ceruzzi Hartford, LLC, as landlord ("Starwood"), and Crown Theatres as tenant, for a seventeen-screen theatre in Hartford, Connecticut ("Hartford Project"). Starwood agreed to provide site improvements, including soil compaction, grading, bringing utilities to within five feet of the theatre building, parking lot improvements and landscaping. Crown Theatres

-12-

obtained a general contractor, RCD Hudson, to construct a multiplex building structure and to provide for all interior improvements (excluding furniture, fixtures and equipment ("FF&E")). Crown Theatres also agreed to provide for the installation by its own subcontractors of the theatres' FF&E, which includes theatre screens, seats, sound systems, aisle lighting, floor carpet, concession stands and equipment, box office stands and equipment, projection equipment, wall drapery and signage.

61. On April    , 1999, Crown Theatres entered into a lease with Quarry Road Lot 2, LLC, providing for the       on of six stadium-style auditoriums in Trumbull, Connecticut, which lease repla    he pre-existing lease for a conventional 10-screen multiplex theatre ("Trumbull Project"). The landlord was to provide a parking lot and miscellaneous site work on an adjacent lot. Crown Theatres had hired a contractor, RCD Hudson, to provide for site improvements on the theatre lot, construction of a building addition, and all interior improvements, excluding FF&E, which Crown Theatres also provided directly through its own subcontractors.

62. As a means of further expanding their fraud, Milton Daly and Beacher agreed with Cella that Cella would submit fraudulent invoices to Crown Theatres, receive payments from Crown Theatres in connection therewith, and make payments to B.B. Construction, who would then make payments to Taylor-Leigh, which would then make payments to Milton Daly for the benefit and use of Milton Daly and Anne Daly.

63. On information and belief, Cella caused GUS or other entities to issue fraudulently inflated invoices to B.B. Construction, which then submitted the fraudulent invoices to Crown Theatres in or around June and July 1999, with the knowledge and approval of Milton Daly.

64. Crown Theatres paid for work represented in the fraudulent invoices in reliance upon the Architect's Certificates, which certify that "based on on-site observations and the data comprising this application, the Architect certifies to the Owner that to the best of the Architect's knowledge, information and belief the Work has progressed as indicated, the quality of the Work is in accordance with the Contract Documents, and the Contractor is entitled to payment of the AMOUNT CERTIFIED."

65. In most instances (other than invoices from B.B. Construction), Martino attested that the work represented in the invoices had been completed by signing the Architect's Certificate, or in other instances, by allowing others to sign his name on the Architect's Certificate.

66. Milton Daly knowingly approved invoices to Crown Theatres for work that was never performed or overstated at the Hartford and Trumbull Projects, and caused Crown Theatres to pay these fraudulent invoices.

67. At the direction of Milton Daly and in reliance on the Architect's Certificate, Crown Theatres issued payments to GUS in reliance on the fraudulent invoices, which were billed as part of the construction of the Hartford and Trumbull Projects. Neither GUS nor any other firm or entity acting on its behalf ever performed any work on the Hartford or Trumbull Projects. On information and belief, GUS and Cella profited from these payments.

68. The payments made by Crown Theatres to GUS as referred to in the foregoing paragraph were for a total of $576,500, which included a check for $451,500 on June 16, 1999, check number 124133, and a check for $125,000 on July 28, 1999, check number 124697.

69. GUS then made payments to Beacher entities for a total of $535,000, which included checks to B.B. Construction for $225,000 on June 23, 1999, check number 87, for $185,000 on June 29, 1999, check number 98, and for $72,000 on July 31, 1999, check number 97, and a check to Marlin for $53,000 on August 3, 1999, check number 96, all from an account maintained at Chase Manhattan Bank.

70. From the proceeds paid from Crown Theatres to GUS, GUS paid B.B. Construction; from those proceeds, B.B. Construction paid Taylor-Leigh $302,000, by a check in the amount of $225,000 dated June 25, 1999, check number 4517, and a check in the amount of $77,000 dated August 5, 1999, check number 4630.

71. On information and belief, from those proceeds received from B.B. Construction, Taylor-Leigh paid Milton Daly.

72. Payments made to Taylor-Leigh associated with these transactions were effectively kickbacks to Milton Daly for the use and benefit of Milton Daly and Anne Daly.

73. Milton Daly and Taylor-Leigh, aiding and abetting one another, having devised the above-described scheme to defraud and to obtain money by means of false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme, caused to be sent and delivered by the United States Postal Service and other private or commercial interstate courier services, including Federal Express, many of the invoices, payments, or kickbacks.

74. Milton Daly and Taylor-Leigh, aiding and abetting one another, having devised the above-described scheme to defraud and to obtain money by means of false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme, did transmit and cause to be transmitted by means of wire in interstate commerce

numerous writings, signs, signals, and sounds constituting the conversations and financial transactions described above.

75. Milton Daly and Taylor-Leigh conducted numerous financial transactions affecting interstate commerce which involved the proceeds of specified unlawful activity, that is, mail and wire fraud, felonies under 18 U.S.C. §§ 1341 and 1343, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of such unlawful activity. Milton Daly and Taylor-Leigh knew that the funds involved in such financial transactions represented the proceeds of some form of unlawful activity as defined in 18 U.S.C. § 1956(c)(1).

76. This scheme is represented by the following diagram:



77. In addition to the scheme depicted in the diagram above, Milton Daly knowingly approved invoices to Crown Theatres for work that was overstated. For example, a fraudulently inflated invoice for payment was submitted to Crown Theatres by B.B. Construction on August 5, 1999 for $21,500. After Milton Daly approved the invoice, Crown Theatres issued a check, number 124819, to B.B. Construction for $39,039 on August 11, 1999, which included $21,500 for the August 5 invoice. On August 23, 1999, B.B. Construction issued a check, number 4671, to Taylor-Leigh for $5,000 drawn on a Chase Manhattan Bank account. On August 25, 1999, the same $5,000 check was deposited into Taylor-Leigh's Citibank account. On August 27, 1999, Milton Daly wrote a check to himself for the same amount, $5,000, from the Taylor-Leigh Citibank account, check number 1563.

78. Further, Cella's company, Hudson Equities, received the benefit of certain funds from Crown Theatres, which were transferred by Crown Theatres check number 124819, in the amount of $39,039 dated August 11, 1999, to B.B. Construction, and B.B. Construction in turn made payment to Hudson Equities on August 23, 1999, by check number 4672, in the amount of $12,500.

**RACKETEERING SCHEME 2: THE JUPITER PROJECT**

79. On August 5, 1998, Crown Theatres entered into a lease with Town Center II Theatre, Ltd. ("Town Center"), for a 17-screen stand-alone multiplex theatre in Jupiter, Florida ("Jupiter Project"). As part of the agreement, Town Center agreed to provide site improvements, construction of a multiplex building structure, and all interior improvements, excluding FF&E, which Crown Theatres provided.

80. Milton Daly knowingly approved invoices to Crown Theatres for work that was never performed or overstated at the Jupiter Project, and caused Crown Theatres to pay Beacher entities on these fraudulent invoices.

81. After receiving payment from Crown Theatres on the fraudulent invoices, Beacher entities paid Taylor-Leigh pursuant to the 70/30 Agreement, and, in turn, Taylor-Leigh paid funds to Milton Daly for the use and benefit of Milton Daly and Anne Daly, resulting in a loss to Crown Theatres.

82. In furtherance of this scheme, Beacher prepared invoices for payments for work which was outside the scope of Crown Theatres' construction operation, and for work which was never actually undertaken at the Jupiter Project. Some of these invoices were for payments to B.B. Construction, while other invoices were made for payments to Marlin, a Beacher entity. These fraudulent invoices were prepared with the knowledge and approval of Milton Daly.

83. The fraudulent invoices bear the approval of the architect, Martino, on the Architect's Certificate.

84. In most instances (other than invoices from B.B. Construction), Martino attested that the work represented in the invoices had been completed by signing the Architect's Certificate, or in other instances, by allowing others to sign his name on the Architect's Certificate.

85. As an example of this scheme, on or about January 27, 2000, Beacher caused Marlin to issue an invoice to Crown Theatres in the amount of $155,000 for site preparation and site preparation-related work at a Crown Theatres location in Jupiter, Florida. Site preparation work was outside of the scope of Crown Theatres' responsibilities at this

location, and neither Marlin nor any entity acting on its behalf conducted any such work. Town Center, Crown Theatres' landlord, and Town Center's contractors performed all site preparation work at Town Center's sole cost and expense.

86. On February 2, 2000, in detrimental reliance on the invoice and on the Architect's Certificate, and at the direction of Milton Daly, Crown Theatres issued a check to Marlin in the amount of $155,000, check number 127329. On February 15, 2000, Beacher caused Marlin to pay Taylor-Leigh approximately 70% of this amount, check number 1050, from a NationsBank account. This check was deposited in the Taylor-Leigh Citibank account on February 17, 2000. This payment represents a kickback to Milton Daly and Taylor-Leigh pursuant to the 70/30 Agreement.

87. On several other occasions, Marlin submitted additional fraudulent invoices bearing Martino's approval on the Architect's Certificates to Crown Theatres purporting to represent work on the Jupiter Project.

88. Acting in detrimental reliance on such invoices and the Architect's Certificates, and at the direction of Milton Daly, Crown Theatres paid each invoice in full.

89. Beacher caused Marlin to issue checks to Taylor-Leigh pursuant to the 70/30 Agreement for each of the fraudulently induced payments to Marlin and, in turn, Taylor-Leigh made subsequent payments to Milton Daly.

90. Payments made to Taylor-Leigh associated with these transactions were effectively kickbacks to Milton Daly for the use and benefit of Milton Daly and Anne Daly.

91. Another example: a fraudulently inflated invoice for payment was submitted to Crown Theatres by B.B. Construction on August 19, 1999 for $75,683. After Milton Daly approved the invoice, Crown Theatres issued a check, number 125020, to B.B.

Construction for $105,000.46 on August 25, 1999, which included $75,683 for the August 19 invoice. On September 1, 1999, B.B. Construction issued a check, number 4699, to Taylor-Leigh for $24,500, from a Chase Manhattan Bank account. On September 2, 1999, the same $24,500 check was deposited into Taylor-Leigh's Citibank account. On September 7, 1999, Milton Daly wrote a check to himself for the same amount, $24,500, from the Taylor-Leigh Citibank account, check number 1565.

92.     Milton Daly and Taylor-Leigh, aiding and abetting one another, having devised the above-described scheme to defraud and to obtain money by means of false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme, caused to be sent and delivered by the United States Postal Service and other private or commercial interstate courier services, including Federal Express, many of the invoices, payments, or kickbacks.

93.     Milton Daly and Taylor-Leigh, aiding and abetting one another, having devised the above-described scheme to defraud and to obtain money by means of false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme, did transmit and cause to be transmitted by means of wire in interstate commerce numerous writings, signs, signals, and sounds constituting the conversations and financial transactions described above.

94.     Milton Daly and Taylor-Leigh conducted numerous financial transactions affecting interstate commerce which involved the proceeds of specified unlawful activity, that is, mail and wire fraud, felonies under 18 U.S.C. §§ 1341 and 1343, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of such unlawful activity. Milton Daly and Taylor-Leigh knew that

the funds involved in such financial transactions represented the proceeds of some form of unlawful activity as defined in 18 U.S.C. § 1956(c)(1).

## RACKETEERING SCHEME 3: THE MIAMI PROJECT

95. On April 30, 1999, Crown Theatres entered into a lease with the Randall Benderson 1993-1 Trust ("Benderson") for an 18-screen stand-alone multiplex theatre in Hialeah, Florida ("Miami Project"). Benderson agreed to provide site improvements, including soil compaction, grading, bringing utilities to within five feet of the theatre building, parking lot improvements, and landscaping. Crown Theatres obtained a general contractor to construct a multiplex building structure and to provide for all interior improvements (excluding certain FF&E). Crown Theatres also agreed to provide for the installation of the theatres' FF&E.

96. Milton Daly knowingly approved invoices for work that was never performed or overstated at the Miami Project, and caused Crown Theatres to pay Beacher entities on these fraudulent invoices.

97. After receiving payment from Crown Theatres on the fraudulent invoices, Beacher entities paid Taylor-Leigh pursuant to the 70/30 Agreement, and Taylor-Leigh paid those funds to Milton Daly for the use and benefit of Milton Daly and Anne Daly, resulting in a loss to Crown Theatres.

98. In furtherance of this scheme, Beacher prepared invoices for payments for work which was outside of the scope of Crown Theatres' construction operation, and for work which was never actually undertaken at the Miami Project. Some of these invoices were for payments to B.B. Construction, while other invoices were made for payments to Marlin, a Beacher entity.

99. For example, on or about January 4, 2000, Beacher caused Marlin to issue an invoice to Crown Theatres in the amount of $160,000, which purported to represent site preparation work allegedly performed at the Miami Project.

100. Site preparation work was outside of the scope of Crown Theatres' responsibilities at this location, and, on information and belief, no such site preparation work was performed by Marlin or by other entities or firms on its behalf. Site preparation work was, in fact, done by the landlord, Benderson, and Benderson's contractors, at Benderson's sole cost and expense.

101. The fraudulent invoice from Marlin bears the approval of the architect, Martino, on the Architect's Certificate.

102. In most instances (other than invoices from B.B. Construction), Martino attested that the work represented in the invoices had been completed by signing the Architect's Certificate, or, in other instances, by allowing others to sign his name on the Architect's Certificate.

103. On January 5, 2000, in detrimental reliance on the invoice and on the Architect's Certificate, and at the direction of Milton Daly, Crown Theatres issued a check to Marlin for site preparation work in the amount of $160,000, check number 126838.

104. On or about January 20, 2000, Beacher caused Marlin to issue check number 1043 to Taylor-Leigh for approximately 70% of this amount, that is, approximately $112,000. Milton Daly made a deposit of this amount on January 21, 2000 into the Taylor-Leigh Citibank account.

105. This payment represents a kickback to Milton Daly and Taylor-Leigh pursuant to the 70/30 Agreement.

106. On several other occasions, Marlin submitted additional fraudulent invoices bearing Martino's approval on the Architect's Certificates to Crown Theatres during 1999 and 2000, purporting to represent work for the Miami Project.

107. Acting in detrimental reliance on these invoices and Architect's Certificates, and at the direction of Milton Daly, Crown Theatres paid each invoice in full.

108. Beacher caused Marlin to issue checks to Taylor-Leigh pursuant to the 70/30 Agreement for the fraudulently induced payments to Marlin, and, in turn, Taylor-Leigh made subsequent payments or kickbacks to Milton Daly.

109. Payments made to Taylor-Leigh associated with these transactions were effectively kickbacks to Milton Daly for the use and benefit of Milton Daly and Anne Daly.

110. Another example: a fraudulently inflated invoice for payment was submitted to Crown Theatres by B.B. Construction on December 9, 1999 for $23,378. After Milton Daly approved the invoice, Crown Theatres issued a check, check number 126700, to B.B. Construction for $35,542 on December 8, 1999, which included $23,378 for the December 9 invoice. On January 4, 2000, B.B. Construction issued a check, number 5026, to Taylor-Leigh for $12,000 from a Chase Manhattan Bank account, which included $7,000 from the Miami Project and $5,000 from another project. On January 10, 2000, the same check for $12,000 was deposited into Taylor-Leigh's Citibank account. On January 31, 2000, Milton Daly wrote himself a check for $29,500 from the Taylor-Leigh account, check number 1573. This amount is equal to the sum of the $12,000 check from B.B. Construction deposited on January 10, 2000 and a $17,500 deposit relating to the Skokie Project as defined herein, which was made on January 19, 2000.