111. Yet another example: a fraudulently inflated invoice for payment was submitted to Crown Theatres by B.B. Construction on July 28, 1999 for $10,350. After Milton Daly approved the invoice, Crown Theatres issued a check, number 124782, to B.B. Construction for $10,350 on August 4, 1999. On September 30, 1999, B.B. Construction issued a check, number 4772, to Taylor-Leigh for $7,000 from its Chase Manhattan Bank account. On October 1, 1999, the same $7,000 check was deposited in Taylor-Leigh's Citibank account. On October 7, 1999, Milton Daly wrote a check to himself for the same amount, $7,000, from the Taylor-Leigh Citibank account, check number 1567.

112. Milton Daly and Taylor-Leigh, aiding and abetting one another, having devised the above-described scheme to defraud and to obtain money by means of false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme, caused to be sent and delivered by the United States Postal Service and other private or commercial interstate courier services, including Federal Express, many of the invoices, payments, or kickbacks.

113. Milton Daly and Taylor-Leigh, aiding and abetting one another, having devised the above-described scheme to defraud and to obtain money by means of false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme, did transmit and cause to be transmitted by means of wire in interstate commerce numerous writings, signs, signals, and sounds constituting the conversations and financial transactions described above.

114. Milton Daly and Taylor-Leigh conducted numerous financial transactions affecting interstate commerce which involved the proceeds of specified unlawful activity, that is mail and wire fraud, felonies under 18 U.S.C. §§ 1341 and 1343, knowing that the transactions

-24-

were designed in whole or in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of such unlawful activity. Milton Daly and Taylor-Leigh knew that the funds involved in such financial transactions represented the proceeds of some form of unlawful activity as defined in 18 U.S.C. § 1956(c)(1).

### RACKETEERING SCHEME 4: THE SKOKIE PROJECT

115.   On November 6, 1998, Crown Theatres entered into a lease with Skokie Development, LLC ("Skokie"), for an 18-screen stand alone multiplex theatre in Skokie, Illinois ("Skokie Project"). Skokie was to provide site improvements including soil compaction, grading, and bringing utilities to within five feet of the theatre building, as well as a parking garage and other common area improvements, a bridge from the garage to the theatre, and landscaping. Crown Theatres was to obtain a general contractor to construct a multiplex building structure and to provide for all interior improvements excluding FF&E, which Crown Theatres provided.

116.   Milton Daly knowingly approved invoices for work that was never performed or overstated at the Skokie Project, and caused Crown Theatres to pay Beacher entities on these fraudulent invoices.

117.   After receiving payment from Crown Theatres on the fraudulent invoices, Beacher entities paid Taylor-Leigh pursuant to the 70/30 Agreement, and Taylor-Leigh provided funds to Milton Daly for the use and benefit of Milton Daly and Anne Daly, resulting in a loss to Crown Theatres.

118.   In furtherance of this scheme, Beacher prepared invoices for payments for work which was outside the scope of Crown Theatres' construction operation, and for work which was never actually undertaken at the Skokie Project. Some of these invoices were for

payments to B.B. Construction, while other invoices were made for payments to Tiger, a Beacher entity.

119. Tiger provided no legitimate services to Crown Theatres, and was incorporated for the sole purpose of defrauding Crown Theatres and enriching Beacher and Milton Daly and Taylor-Leigh.

120. As an example, on or about April 27, 2000, Beacher caused Tiger to issue an invoice to Crown Theatres in the amount of $270,000 as part of a $1,561,000 order for "foundation work" at the Skokie Project.

121. The work that Tiger invoiced as described in the foregoing paragraph was outside of the scope of Crown Theatres' responsibilities at this location, and no such work was done by Tiger or any firm or entity on its behalf. The general contractor was responsible for all foundation work and through its own contractors, at its sole cost and expense, performed such work.

122. The fraudulent invoice bears the approval of Martino on the Architect's Certificate.

123. In most instances (other than invoices from B.B. Construction), Martino attested that the work represented in the invoices had been completed by signing the Architect's Certificate, or, in other instances, by allowing others to sign his name on the Architect's Certificate.

124. On or before May 3, 2000, in detrimental reliance on the invoice and on the Architect's Certificate, and at the direction of Milton Daly, Crown Theatres issued a check to Tiger in the amount of $270,000 for payment for foundation work, check number 128604.

125. On or about May 17, 2000, Beacher caused Tiger and other Beacher entities to issue checks to Taylor-Leigh pursuant to the 70/30 Agreement. Tiger issued check number 87 to Taylor-Leigh from a Chase Manhattan Bank account for $189,000.

126. This payment represents a kickback to Milton Daly and Taylor-Leigh pursuant to the 70/30 Agreement.

127. On several other occasions, Tiger submitted similar fraudulent invoices bearing Martino's approval on the Architect's Certificate to Crown Theatres purporting to represent work on the Skokie Project.

128. Acting in detrimental reliance on such invoices and Architect's Certificates, and at the direction of Milton Daly, Crown Theatres paid each invoice in full.

129. Beacher caused the Tiger entity to issue checks to Taylor-Leigh pursuant to the 70/30 Agreement for the fraudulently induced payments to Tiger, and, in turn, Taylor-Leigh made subsequent payments or kickbacks to Milton Daly.

130. Payments made to Taylor-Leigh associated with these transactions were effectively kickbacks to Milton Daly for the use and benefit of Milton Daly and Anne Daly.

131. As another example of the scheme, a fraudulently inflated invoice for payment was submitted to Crown Theatres by B.B. Construction on December 2, 1999 for $89,614. After Milton Daly approved the invoice, Crown Theatres issued a check, number 126607, to B.B. Construction for $95,229.88 on December 15, 1999, which included $89,614 on the December 2 invoice. On January 13, 2000, B.B. Construction issued a check, number 5049, to Taylor-Leigh for $17,500 from its Chase Manhattan Bank account. On January 19, 2000, the same $17,500 check was deposited into Taylor-Leigh's Citibank account. On January 31, 2000, Milton Daly wrote himself a check for $29,500 from the Taylor-Leigh account, check number

1573. This amount is equal to the sum of the check from B.B. Construction on January 19 for $17,500 and the check for $12,000 relating to the Miami Project.

132.   In addition, a fraudulently inflated invoice for payment was submitted to Crown Theatres by B.B. Construction on September 22, 1999 for $43,935. After Milton Daly approved the invoice, Crown Theatres issued a check, number 125522, to B.B. Construction for $18,000 on September 29, 1999, which included $18,000 for the September 22 invoice. On October 6, 1999, B.B. Construction issued a check, number 4787, to Taylor-Leigh for $14,000 from its Chase Manhattan Bank account. On October 7, 1999, the same $14,000 check was deposited into Taylor-Leigh's Citibank account. On October 15, 1999, Milton Daly wrote a check to himself for $7,000 from the Taylor-Leigh Citibank account, check number 1569. On October 18, 1999, Milton Daly wrote a check to Taylor-Leigh for $7,000 from the Taylor-Leigh Citibank account, check number 1568, which was deposited into the Kangaroo Pouch Kids account.

133.   Milton Daly and Taylor-Leigh, aiding and abetting one another, having devised the above-described scheme to defraud and to obtain money by means of false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme, caused to be sent and delivered by the United States Postal Service and other private or commercial interstate courier services, including Federal Express, many of the invoices, payments, or kickbacks.

134.   Milton Daly and Taylor-Leigh, aiding and abetting one another, having devised the above-described scheme to defraud and to obtain money by means of false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme, did transmit and cause to be transmitted by means of wire in interstate commerce

numerous writings, signs, signals, and sounds constituting the conversations and financial transactions described above.

135. Milton Daly and Taylor-Leigh conducted numerous financial transactions affecting interstate commerce which involved the proceeds of specified unlawful activity, that is, mail and wire fraud, felonies under 18 U.S.C. §§ 1341 and 1343, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of such unlawful activity. Milton Daly and Taylor-Leigh knew that the funds involved in such financial transactions represented the proceeds of some form of unlawful activity as defined in 18 U.S.C. § 1956(c)(1).

## RACKETEERING SCHEME 5: THE ANNAPOLIS PROJECT

136. On July 20, 1998, Crown Theatres entered into a lease agreement with Annapolis Mall Limited Partnership ("Annapolis") for an eleven-screen multiplex theatre to be built on the second floor of a new addition to the then-existing Annapolis Mall in Annapolis, Maryland ("Annapolis Project"). Annapolis was to provide the two-story mall addition, meaning the building shell and certain interior improvements including structural steel, concrete, stadium seating platforms, vertical transportation, life safety systems and utilities to within five feet of the leased premises. Crown Theatres obtained a general contractor to install mechanical (i.e., HVAC), electrical and plumbing systems, interior drywall and framing, acoustical ceilings, finishes, painting, tile, wallpaper, wall carpet and certain of the FF&E. Crown Theatres installed all of the remaining FF&E.

137. Milton Daly knowingly approved invoices for work that was never performed or overstated at the Annapolis Project, and caused Crown Theatres to pay Beacher entities on these fraudulent invoices.

138. After receiving payment from Crown Theatres on the fraudulent invoices, Beacher entities paid Taylor-Leigh pursuant to the 70/30 Agreement, and Taylor-Leigh provided funds to Milton Daly for the use and benefit of Milton Daly and Anne Daly, resulting in a loss to Crown Theatres.

139. In furtherance of this scheme, Beacher prepared invoices for payments for work which was outside the scope of Crown Theatres' construction operation, and for work which was never actually undertaken at the Annapolis Project. Some of these invoices were for payments to B.B. Construction, while other invoices were made for payments to Hewlett, another Beacher entity.

140. On information and belief, Hewlett provided no legitimate services to Crown Theatres and was incorporated for the sole purpose of defrauding Crown Theatres and enriching Beacher and Defendants Milton Daly and Taylor-Leigh.

141. As an example of this scheme, on or about August 4, 2000, Hewlett issued an invoice to Crown Theatres including $851,500 for "additional stadium steel & structural supports for girders & beams" at the Annapolis Project.

142. Crown Theatres was not responsible for purchasing or installing any structural steel at the Annapolis Project, and, on information and belief, neither Hewlett nor any firm or entity on its behalf conducted such work. Steel work at the Annapolis Project was performed by the landlord, using subcontractors hired by the landlord and paid at the landlord's sole cost and expense.

143. The fraudulent invoice bears the approval of Martino on the Architect's Certificate.

144. In most instances (other than invoices from B.B. Construction), Martino attested that the work represented in the invoices had been completed by signing the Architect's Certificate, or, in other instances, by allowing others to sign his name on the Architect's Certificate.

145. On or before August 9, 2000, in detrimental reliance on the invoice and on the Architect's Certificate, and at the direction of Milton Daly, Crown Theatres issued a check to Hewlett in the amount of $911,000, including $851,500 for the structural steel work, check number 129893.

146. Beacher caused Hewlett to issue a check to Taylor-Leigh on or about August 16, 2000 for $216,650 from a Chase Manhattan Bank account, check number 1015, pursuant to the 70/30 Agreement, based on a portion of the payment received by Hewlett on this fraudulent invoice.

147. This payment represents a kickback to Milton Daly and Taylor-Leigh pursuant to the 70/30 Agreement.

148. On several other occasions, Hewlett submitted additional fraudulent invoices bearing Martino's approval on the Architect's Certificate to Crown Theatres, purporting to represent work on the Annapolis Project.

149. Acting in detrimental reliance on such invoices and the Architect's Certificates, and at the direction of Milton Daly, Crown Theatres paid each invoice in full.

150. Beacher caused Beacher entities to issue checks to Taylor-Leigh pursuant to the 70/30 Agreement for the fraudulently induced payments to Hewlett, and, in turn, Taylor-Leigh made subsequent payments or kickbacks to Milton Daly.

151. Payments made to Taylor-Leigh associated with these transactions were effectively kickbacks to Milton Daly for the use and benefit of Milton Daly and Anne Daly.

152. As another example of this scheme, a fraudulently inflated invoice for payment was submitted to Crown Theatres by B.B. Construction on September 9, 1999, for $58,450. After Milton Daly approved the invoice, Crown Theatres issued a check, number 125301, to B.B. Construction on September 15, 1999, for $64,131, including $58,450 for the September 9 invoice. On September 22, 1999, B.B. Construction issued a check to Taylor-Leigh for $21,000, check number 4747, from its Chase Manhattan Bank account. On September 24, 1999, the same $21,000 check was deposited into Taylor-Leigh's Citibank account. On September 30, 1999, Milton Daly wrote a check to himself for the same amount, $21,000, check number 1566.

153. Milton Daly and Taylor-Leigh, aiding and abetting one another, having devised the above-described scheme to defraud and to obtain money by means of false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme, caused to be sent and delivered by the United States Postal Service and other private or commercial interstate courier services, including Federal Express, many of the invoices, payments, or kickbacks.

154. Milton Daly and Taylor-Leigh, aiding and abetting one another, having devised the above-described scheme to defraud and to obtain money by means of false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme, did transmit and cause to be transmitted by means of wire in interstate commerce numerous writings, signs, signals, and sounds constituting the conversations and financial transactions described above.

155. Milton Daly and Taylor-Leigh conducted numerous financial transactions affecting interstate commerce which involved the proceeds of specified unlawful activity, that is, mail and wire fraud, felonies under 18 U.S.C. §§ 1341 and 1343, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of such unlawful activity. Milton Daly and Taylor-Leigh knew that the funds involved in such financial transactions represented the proceeds of some form of unlawful activity as defined in 18 U.S.C. § 1956(c)(1).

## OTHER FRAUD: THE DALYS' PERSONAL RESIDENCE

156. On or about January 24, 1996, Milton Daly and Anne Daly (collectively, the "Dalys") purchased the residence and property at 6 Heritage Island Road, New Fairfield, Connecticut 06812 ("Heritage Island Home") for approximately $600,000.

157. The Dalys owned and resided in the Heritage Island Home from approximately January 24, 1996 until approximately October 2, 2001.

158. On or about October 2, 2001, the Dalys sold the Heritage Island Home for approximately $1,575,000.

159. During the period in which they owned the Heritage Island Home, the Dalys had arranged for extensive work to be performed on the property, including the installation of a swimming pool, landscaping, painting and remodeling.

160. The contractors who performed the work on the Heritage Island Home submitted their invoices to Beacher of B.B. Construction. Beacher then submitted bills to Crown Theatres, which Milton Daly approved and caused Crown Theatres to pay. Milton Daly was not authorized to cause Crown Theatres to pay for work on the Dalys' Heritage Island Home.

161. Anne Daly was aware of the work on the Heritage Island Home and accepted the benefits of it.

162. The Dalys caused Crown Theatres to pay for approximately $81,000 in improvements to the Heritage Island Home.

## OTHER MISCONDUCT

163. The Dalys opened an investment portfolio account with Raymond James Financial Services, Inc. in or about May 1999 (the "Investment Account"). The Investment Account was in the names of both Anne Daly and Milton Daly. The Dalys' Heritage Island Home address was the address they used for the Investment Account. Statements and other correspondence relating to the Investment Account were sent to the Dalys' Heritage Island Home address.

164. The Dalys also maintained accounts at Fleet Bank (the "Fleet Accounts") between December 1999 and September 2002. The Fleet Accounts were in the names of both Anne Daly and Milton Daly, and used the Heritage Island Home address. Statements and other correspondence relating to the Fleet Accounts were sent to the Dalys' Heritage Island Home.

165. The Fleet Accounts, the Investment Account and other accounts were used to further conceal and divert proceeds from the theft of funds from Crown Theatres. Money stolen from Crown Theatres was deposited into the Taylor-Leigh Citibank Account. Milton Daly, as Taylor-Leigh's sole shareholder, caused Taylor-Leigh to pay him in excess of $3,000,000 for nothing in return.

166. In turn, Milton Daly deposited the stolen monies from Taylor-Leigh into the Fleet Accounts, Investment Account, or other accounts for the use and benefit of the Dalys. The Dalys transferred certain of the funds from the Fleet Accounts to the Investment Account.

Between May 1999 and May 2002, the Dalys transferred at least $3,000,000 from the Taylor-Leigh Citibank account to the Investment Account, either directly or through the Fleet Accounts or other accounts. The Dalys used the Investment Account to make various investments, including investments in stocks and mutual funds.

167.    Milton Daly acquired a 1999 Four Winns thirty-two foot boat (the "Boat"). The value of the Boat exceeded $100,000. In or about April 2000, Milton Daly sold the Boat to Anne Daly for $100.

## CONTINUING MISCONDUCT

168.    In May 2001, Crown Theatres directed inquires to Milton Daly about cost overruns on the Theatre Projects. Later in May 2001, Milton Daly resigned his position as COO of Crown Theatres. Subsequently, the Dalys made further efforts to conceal the funds stolen from Crown Theatres.

169.    In or about July 2001, Milton Daly transferred $10,000 from the Fleet Accounts to each of his sons, William Daly, Jeffrey Daly, and Jason Daly, and $10,000 to his daughter Traci Daly.

170.    In or about September 2001, Milton Daly transferred $325,000 from the Fleet Accounts to the sole possession of Anne Daly.

171.    On or about September 18, 2001, Milton Daly and Robert Abramsky incorporated Odyssey, which operates a movie theatre complex in Foley, Alabama. The Dalys contributed over $2,900,000 to the business in exchange for the Odyssey Note, as defined below. Their contribution included all of Odyssey's original working capital. The Dalys used money stolen from Crown Theatres to finance their investment in Odyssey. In excess of $1 million of

the funds used to finance Odyssey were transferred from the Taylor-Leigh Citibank account or the Investment Account.

172. Daly is Odyssey's controlling shareholder. He owns a seventy percent interest in Odyssey.

173. On or about May 24, 2002, Odyssey issued a promissory note in the principal amount of $2,930,000 (the "Odyssey Note"). Pursuant to the Odyssey Note, Odyssey undertook to repay Milton Daly and Anne Daly the principal plus 7 3/4% interest annually. Both Dalys appear as holders of the Odyssey Note.

174. Prior to April 9, 2003, payments from Odyssey on the note were payable to Milton Daly. Since April 9, 2003, the payments from Odyssey have been made to Anne Daly.

175. The Dalys changed the payee of the Odyssey Note in order to circumvent the Prejudgment Remedy and other orders.

176. In or about December 2002, Milton Daly wire transferred over $84,000 from an Odyssey bank account to an account in the name of Anne Daly.

### COUNT I: RICO § 1962(c)
(Against Milton Daly and Taylor-Leigh)

177. The allegations of paragraphs 1 through 176 are incorporated herein by reference.

178. Crown Theatres is an enterprise engaged in and whose activities affect interstate commerce, by managing and constructing theatres in seven states, and purchasing materials such as concessions and film from multiple states.

179. Milton Daly was employed by the Crown Theatres enterprise, and Taylor-Leigh was associated with the same enterprise.

180. In the alternative, Milton Daly, Taylor-Leigh, Cella, GUS and Beacher are "associated in fact" and formed an enterprise within the meaning of 18 U.S.C. § 1961(4). The association in fact enterprise is engaged in interstate commerce by transmitting fraudulent invoices, receiving payment for the same, and transmitting kickbacks, all across state lines.

181. The association in fact enterprise incorporated multiple entities, including Tiger and Hewlett, for the purpose of defrauding Crown Theatres.

182. Defendants Milton Daly, Taylor-Leigh, Cella, and GUS, along with other related parties and their associated and controlled entities, agreed to and did conduct or participate in the operation and management of the affairs of the enterprise through a pattern of racketeering activity and for the unlawful purpose of defrauding Crown Theatres.

183. Specifically, from October 1996 through at least May 2001, Defendants Milton Daly and Taylor-Leigh engaged in multiple instances of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, caused the transportation of stolen goods in violation of 18 U.S.C. § 2314, and laundered monetary instruments in violation of 18 U.S.C. § 1956 (a)(1)(B)(i).

184. Milton Daly and Beacher agreed that Beacher would use his position as construction consultant and on-site construction representative of Crown Theatres to submit fraudulent invoices.

185. Milton Daly and Beacher further agreed that Milton Daly would use his position as COO of Crown Theatres to assure that such payments were made, and to cause Crown Theatres to fail to discover such fraud. Crown Theatres in fact relied on Milton Daly's representations, and did in fact make such payments.

186. Milton Daly and Beacher worked with Cella, using his knowledge of the Hartford and Trumbull projects as a principal of RCD Hudson, and Cella doing business as GUS, who agreed to provide a further conduit for such racketeering activity to progress.

187. Milton Daly and Beacher further assured payment by Crown Theatres through Martino's omissions in providing construction supervision and inspection and his negligence in providing architectural certification for work that was never performed.

188. Milton Daly, Beacher, and Taylor-Leigh further associated in fact by developing, agreeing to, and perpetrating a scheme of racketeering activity, and by causing the incorporation of Hewlett, Marlin and Tiger in furtherance of that scheme.

189. Through Milton Daly, Taylor-Leigh participated in the racketeering scheme by receiving funds from the Beacher entities.

190. Pursuant to and in furtherance of their fraudulent schemes, Milton Daly and Taylor-Leigh committed multiple related acts of mail and wire fraud. Many of the fraudulently transmitted invoices, payments on those invoices, and kickbacks detailed in paragraphs 1 through 155 were transmitted by the Postal Service or interstate commercial carrier, including, without limitation, Federal Express, and many of the transmissions were arranged, caused, and coordinated by interstate wire communications.

191. The acts of mail and wire fraud set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(1).

192. Milton Daly and Taylor-Leigh also committed multiple related acts of interstate transportation of stolen property pursuant to and in furtherance of their fraudulent schemes. Milton Daly and Taylor-Leigh devised a scheme to defraud Crown Theatres and