1

1       IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF CONNECTICUT
2                   -   -   -
    CROWN THEATRES, L.P.,    :    CIVIL ACTION
3            Plaintiff,      :
                            :
4            V.              :
                            :
5   MILTON L. DALY,          :
    TAYLOR-LEIGH, INC.,      :
6   JAMES C. CELLA, G.U.S.   :
    DEVELOPMENT, INC.,       :
7   JAMES T. MARTINO and     :
    JAMES THOMAS MARTINO,    :
8   ARCHITECT, P.C.,         :    CASE NO.
            Defendants.      :    3:02CV2272AVC
9                   -   -   -
10              December 23, 2003
11                  -   -   -
12
                    Oral deposition of
13  FREDERICK C. HAMILTON, CPA, CFE, held in
    the offices of Esquire Deposition
14  Services, 1880 John F. Kennedy
    Boulevard, Philadelphia, Pennsylvania
15  19103 commencing at 10:05 a.m., on the
    above date, before Harvey Krauss, a
16  Federally-Approved Registered
    Professional Reporter and a Commissioner
17  of the Commonwealth of Pennsylvania.
                    -   -   -
18
19
20
            ESQUIRE DEPOSITION SERVICES
21              15th Floor
        1880 John F. Kennedy Boulevard
22      Philadelphia, Pennsylvania 19103
            (215) 988-9191
23
24

2

```
 1   A P P E A R A N C E S :
 2         JENNER & BLOCK, L.L.C.
           BY: ADAM HIRSCH, ESQUIRE
 3               and
           LAWRENCE S. SCHANER, ESQUIRE
 4         One IBM Plaza
           Chicago, Ill 60611-7603
 5         (312) 222-9350
           Co-counsel for the Plaintiff
 6
           WEINSTEIN & WISSER, P.C.
 7         BY: KERRY MARK WISSER, ESQUIRE
           29 South Main Street
 8         Suite 207
           West Hartford, Connecticut 06107
 9         (860) 561-2628
           Counsel for the Defendants,
10         Milton Daly and Taylor-Leigh,
           Inc.
11
           MILBER, MAKRIS, PLOUSADIS &
12         SEIDEN, L.L.P.
           BY:  MARISA LANZA, ESQUIRE
13         108 Corporate Drive
           Suite 200
14         White Plains, NY 10604
           (914) 681-8700
15         Counsel for the Defendants,
           James Martino and James Thomas
16         Martino, Architect, P.C.
17
18
19
20
21
22
23
24
```

47

1    improper payments deposited into a bank

2    account that was owned by the Dalys,

3    correct?

4            A.    Correct.

5            Q.    Now, it's your claim that

6    Anne Daly benefited from the scheme

7    because her name was on the accounts in

8    which money passed through; is that

9    right?

10           A.    That's part of the basis,

11   correct.

12           Q.    What other basis is there

13   for your claim that Anne Daly benefited

14   from this 4.2 million dollar scheme of

15   her husband's?

16           A.    Actually, a few points.

17   Five different points, I believe.

18           Q.    And you're referring to a

19   particular document, correct?

20           A.    I am.  It's -- I'll call it

21   a work paper that I've put together

22   during my preparation the last day or

23   two just compiling all the different

24   points that came to mind as part of my

48

1   analysis.

2            Q.      That's not a document

3   that's been disclosed as of this moment

4   in time, correct?

5            A.      Correct.

6            Q.      All right.  Let's mark that

7   before you go through it.

8            A.      Sure.

9            (Marked as Exhibit Number 8

10           for identification.)

11  BY MR. WISSER:

12           Q.      All right, sir.  And

13  Exhibit 8 for which you claim you have

14  another copy in front of you, this

15  represents a document created in the

16  last few days for the purposes of you

17  identifying the basis for your opinions

18  relating to the benefit conferred upon

19  Anne Daly because of the activities of

20  her husband Milt; is that correct?

21           A.      Well, it includes more than

22  the issues involving Anne Daly.  It's

23  issues for the bases for many of my

24  opinions in the report.

49

1          Q.    Okay.  And is this some

2   sort of synopsis that assists you in

3   identifying what you rely upon?

4          A.    It is.

5          Q.    Rather than try to commit

6   all of these issues to memory, this is

7   what to say for a better term a little

8   cheat sheet.  We'll call it a thumbnail

9   outline, how is that?

10         A.    That works.

11         Q.    I see that there are some

12  yellow lined papers with your notes on

13  them.  Does those represent handwritten

14  notes that were utilized to create

15  Exhibit 8?

16         A.    No, these were just some

17  notes I took regarding four of the

18  projects, Annapolis, Jupiter, Skokie and

19  Miami as I was reviewing the AIA forms

20  and the contract documents.  You know,

21  again, as part of my analysis just

22  making notes.

23         Q.    All right.  May I see that

24  for a moment?

50

1          A.      Sure.

2          Q.      I understand.

3                  Okay.  I had asked you a
4      question regarding your opinions as to
5      why Anne Daly benefited from the alleged
6      scheme entered into by her husband Milt.
7      One of them was the fact that her name
8      was on the bank accounts for which these
9      funds passed through, and you said there
10     were other bases and you said there were
11     five of them.  Was the name on the
12     account one of those five?

13         A.      Actually, that would be in
14     addition.  So there are -- I think there
15     are five listed on this Exhibit 8, and
16     there are a couple of others I could
17     probably add to it.

18         Q.      On Exhibit 8, show me the
19     ones that are actually listed so that I
20     don't have to in great detail write the
21     notes.

22         A.      If you could go over to the
23     specific job category column and go down
24     where there's a notation that says Anne

51

1    Daly, it's about two-thirds of the way

2    down the page.

3            Q.    Yes.

4            A.    Those are some items that I

5    picked out.

6            Q.    All right.  The first one

7    that I see talks about a May 21st, 2003

8    Daly deposition.  Did I miss one?

9            A.    Actually.  The first one

10   under Anne Daly is a second

11   Interrogatory.  That's the source right

12   there.

13           Q.    Oh, I'm sorry.  I see.

14   Okay.  All right.

15               And the basis that you are

16   relying upon there to find culpability

17   against Anne Daly is that Taylor-Leigh,

18   Inc., TLI used the money to pay bills

19   and dividends to Milt Daly; is that

20   right?

21           A.    Correct.

22           Q.    What is that an indication

23   of?

24           A.    Well, I think you need to

1    go -- what I did is looked at all five

2    of the points together with the fact

3    that both Anne and Milt Daly were

4    signatories to these accounts.  That

5    Interrogatory says "TLI used the money

6    to pay bills and dividends to Milt Daly.

7    If you take that to one of the next

8    points Mr. Daly's deposition, he says

9    everything in our name basically belongs

10   to both of us.  And he also says later

11   in his deposition it didn't matter to

12   Milt whose name it was in.  It was

13   jointly or it was owned jointly, and

14   that is the way their marriage was

15   conducted for 38 years.  And Mr. Daly

16   agreed with that.  If you kind of tie

17   those statements in to also a second

18   point in the Interrogatory that says any

19   additional funds from TLI were used to

20   pay mortgages and bills, and then along

21   with what I thought was Mr. Daly's own

22   admission that Anne does receive the

23   benefit of the 4.2 million, those facts

24   combined with her signatory authority on

53

1    the accounts, and basically the use of

2    the proceeds according to Mr. Daly,

3    that's my basis.

4         Q.    All right.  Going back to

5    this second Interrogatory response where

6    it said TLI used the money to pay bills

7    and dividends to Milt Daly.  Did you

8    understand that that response to the

9    Interrogatory indicated that monies that

10   went into the TLI account were used to

11   pay TLI bills?

12        A.    It's not clear from this

13   Interrogatory, no.

14        Q.    Did you make the assumption

15   that those funds in the TLI accounts

16   were utilized to pay personal bills of

17   Mr. Daly?

18        A.    That would be correct, yes.

19        Q.    What evidence do you have

20   to substantiate that assumption?

21        A.    This just this

22   Interrogatory.

23        Q.    Okay.  So --

24        A.    Along with Mr. Daly's

54

1  testimony later on that she does or Anne

2  Daly receives the benefit of the 4.2

3  million.

4           Q.      All right.  Well, that

5  testimony that you are relying on you

6  read the both question and the answer,

7  didn't you, sir?

8           A.      Yes, I did.

9           Q.      The question was posed to

10 Mr. Daly as to whether or not he

11 believed Anne Daly benefited from these

12 funds, correct?

13          A.      I don't recall

14 specifically.  This is -- I know that

15 this is the ultimate response.

16          Q.      Okay.  Whether or not Anne

17 Daly actually benefits from these funds

18 under your opinion.  Do you believe that

19 is something that is determined by a

20 layperson or something that's determined

21 by either expert opinion or legal

22 opinion, if you know?

23          A.      I was asked to look at the

24 issue, and I think based on, I don't

1   know if it's my expert opinion or my

2   opinion, looking at the records looking

3   at the flow of funds and the testimony

4   and the Interrogatories, I mean, it's my

5   opinion she had to have the benefit of

6   some of these funds.

7           Q.      All right.  Now, the TLI

8   account that you reviewed, you reviewed

9   multiple checks going in and out of that

10  account, correct?

11          A.      Correct.

12          Q.      Do you remember any check

13  that was signed by Anne Daly?

14          A.      No.

15          Q.      In fact, there are no

16  checks out of the TLI account signed by

17  Anne Daly, correct?

18          A.      None that I have reviewed

19  to date, that's correct.

20          Q.      Although, Anne Daly had the

21  ability to sign checks on that account,

22  you have seen no checks in which she

23  exercised that authority regarding the

24  funds that you believed were improperly

56

1    taken from Crown, correct?

2         A.      To date we have not.

3    That's correct.

4         Q.      Okay.

5         A.      But our investigation is

6    still ongoing.

7         Q.      Well, you know, I keep

8    hearing this, that your investigation is

9    still ongoing.  How is it ongoing

10   regarding the TLI checks?

11        A.      Well, I received a large

12   packet of checks and statements this

13   week or, actually, I think Thursday or

14   Friday of last week and other bank

15   information has been provided.

16        Q.      From Taylor-Leigh, Inc.?

17        A.      You know, I'm not certain,

18   but bank information that we had

19   requested looking at different account

20   numbers.

21        Q.      All right.  As you sit here

22   now, having testified once, rendered a

23   report and now testifying in this

24   deposition, does the fact that Anne

57

1    Daly, to your knowledge, as you sit here

2    now, never signed any checks from TLI

3    regarding the funds that you believe

4    improperly went into that account.  Does

5    that still lead you to believe that she

6    benefited from the mere fact that she

7    was a signatory on the account?

8           A.    Yes, because obviously

9    there's transfers into other accounts to

10   which Anne Daly had signature authority.

11          Q.    How is it that Anne Daly's

12   ability to sign checks on a

13   Taylor-Leigh, Inc. account, although she

14   signed none, how does that represent a

15   benefit to her if she never signed any

16   checks?

17          A.    Well, as Mr. Daly

18   testified, basically what's mine is

19   hers.  This is the way we conduct our

20   marriage.  So, if he signed the check

21   and those funds were used for whatever,

22   the household, you know, the groceries

23   and mortgage on the home, I mean, in the

24   simple terms, that's the benefit to her.

58

1    The same way I get a salary and I write

2    the checks there's -- my wife derives a

3    benefit from that and that I believe --

4    I mean, that's how I analyze and look at

5    this situation.  She doesn't necessarily

6    have to write a check to derive a

7    benefit.

8           Q.    So then, sir, taking your

9    opinion to its fullest logical

10   conclusion, if you engaged in illegal

11   activity in your business and took money

12   from your business that your wife had no

13   idea about, because you would deposit

14   money in your account that your wife has

15   signature authority on and because you

16   would pay some of the household bills,

17   it would be your opinion that your wife

18   would be responsible for the monies that

19   you took from your business; is that

20   correct?

21          A.    Well, no, two different

22   things.  In that scenario my wife would

23   benefit.  She ate the meat loaf and she

24   lived, you know, she was -- we pay the

1    heating bill and she kept warm.  Whether

2    there's responsibility I believe will be

3    a legal issue.  I'm just making the

4    connection of the benefit.  I'm not

5    addressing the responsibility or the

6    liability issue.

7           Q.     Okay.  So, it is not your

8    opinion that Anne Daly bears any

9    responsibility for this 4.2 million

10   dollars; is that correct?

11          A.     Well, I'll make sure that I

12   was clear in my report.  I believe what

13   I said is, in my opinion Anne Daly

14   benefitted from this scheme.  I don't

15   believe I said responsible.  I think

16   that is a legal issue.  My opinion is as

17   to the benefit.

18          Q.     Okay.  You have no

19   knowledge and you've reviewed no

20   evidence or documentation that suggests

21   that Anne Daly had any knowledge about

22   the activities that Mr. Daly was

23   engaging in that you claim to be

24   improper, correct?

60

1      A.    I have not reviewed

2  anything, correct.

3      Q.    Now, again, these five or

4  six things that you mentioned represent

5  your opinion as to why Anne Daly

6  benefited; one, that her name is on

7  accounts where money passed through,

8  correct?

9      A.    Right.  And more clearly

10  shown in the chart that I used at my

11  PJR, the flow of funds into the various

12  accounts, not just the TLI account.

13      Q.    And the statements from Mr.

14  Daly that TLI used the money it received

15  to pay bills and dividends to Milt Daly.

16  That's something else you relied upon,

17  correct?

18      A.    Correct.

19      Q.    And the fact that Mr. Daly

20  said, "Everything in our name basically

21  belongs to both of us," referring to his

22  wife; is that correct?

23      A.    Correct.

24      Q.    And the fact that Mr. Daly

61

1  testified that it didn't matter to him

2  whose name was on any of the accounts.

3  If it was owned it was owned jointly and

4  that was the way their marriage was

5  conducted for 38 years; is that correct?

6          A.      Correct.

7          Q.      Is there anything else that

8  you relied upon for the purposes of

9  claiming that Anne Daly benefitted from

10  the activities that Mr. Daly allegedly

11  engaged in?

12          A.      Just the last item on there

13  which is also Mr. Daly's own testimony

14  or admission that Anne basically

15  received the benefit of the 4.2 million.

16          Q.      Okay.  All right.  That's

17  the universe we're dealing with in

18  regard to the background information

19  that you are relying upon to form your

20  opinions in regard to Anne Daly,

21  correct?

22          A.      Currently that is the

23  population, yes.

24          Q.      Okay.  The theory that is

1  based on, or that opinion that is based

2  upon those five or six matters that we

3  just discussed, has that theory or

4  opinion been tested in the forensic

5  accounting community, to your knowledge?

6          A.      Not to my knowledge.

7          Q.      Okay.  Has that theory --

8  I'm sorry, is there more?

9          A.      Yeah.  I mean, not to my

10  knowledge.  There is thousands of cases

11  and -- and I'm sure these types of

12  things don't get published, but, no, I'm

13  not aware of any.

14          Q.      Okay.  Do you know whether

15  that theory or opinion has been subject

16  to peer review or publication, to your

17  knowledge?

18          A.      This very specific opinion?

19          Q.      Yes.

20          A.      Not to my knowledge, no.

21          Q.      Okay.  Has there been an

22  identified or known potential rate of

23  error regarding this particular opinion

24  or theory?

63

1          A.      Has there been a rate or --

2    a rate in other cases?  I'm not sure I

3    understand the question.

4          Q.      Ordinarily, theories that

5    are utilized for the purposes of expert

6    testimony can be subject to a plus or

7    minus rate of error, that notwithstanding

8    the fact that all of these factors

9    exist, in some instances plus or minus,

10   you can be accurate or inaccurate, even

11   if you keep those norms.  This may not

12   even apply regarding this particular

13   theory, but I want to ask the question

14   is there any rate of error that you're

15   aware of that has been applied to this

16   type of theory, that being a signature

17   on accounts being treated as a single

18   unit in a marriage?  Having a claim that

19   you're the benefit of funds that your

20   husband had, is there any rate of error

21   that's been applied to that type of

22   theory to determine whether the

23   conclusion reached is accurate or

24   inaccurate based on those circumstances?

64

1          A.      I have not seen one.

2          Q.      So, there are no standards

3    or controlling techniques that exist

4    regarding this type of theory as it

5    relates to the benefit conferred upon

6    Anne Daly; is that correct?

7          A.      Not that I'm aware of.

8          Q.      All right.  And this theory

9    that Anne Daly benefitted under the

10   circumstances that you indicated or that

11   any spouse would benefit under the

12   circumstances that you indicated, is

13   that theory generally accepted in the

14   forensic accounting community, to your

15   knowledge?

16         A.      I'm not sure I understand

17   the question.  I mean --

18         Q.      Can you read in a book

19   somewhere in a publication, a treatise,

20   a journal, an article, are you taught

21   anything that establishes that this type

22   of theory that a spouse can benefit

23   under the circumstances that you have

24   identified of wrongdoing of another

1  spouse, is that generally accepted as a

2  theory that exists in the forensic

3  accounting community?

4         A.    No.  All of the

5  publications and the treatise, what have

6  you, I'm aware of are much more in a

7  general nature, and I'm really not

8  authoritative.  So, I have not seen

9  anything at this detailed level.

10         Q.    As far as you know, there

11  is no place that I can go to read any

12  document, book, treatise, article,

13  journal that you deem to be

14  authoritative, that would support this

15  theory that you have rendered in regard

16  to the benefit conferred upon Anne Daly

17  by virtue of the factors that you have

18  taken into account; is that correct?

19         A.    Not that I'm aware of.

20         Q.    Okay.  Is it fair to say,

21  sir, then that this is your subjective

22  opinion regarding Anne Daly based on

23  your experience?

24         A.    Yeah, it's based on my --

1    it's my opinion based on my experience

2    and based on the review of the documents

3    and information.

4            Q.    Okay.  Now, looking at the

5    back of page one of your report, which

6    is Exhibit 8, you indicated that it's

7    your opinion that Mr. Martino's

8    negligence in connection with the

9    certification of the architect's

10   certificates for payment submitted on

11   six theater projects caused Crown to

12   suffer a loss at least in the amount of

13   5.6 million dollars.  Is that correct?

14           A.    That's correct.

15           Q.    And it's your opinion that

16   Crown relied upon those architect

17   certificates, for the most part, in

18   paying invoices or bills that you deemed

19   to be improper, correct?

20           A.    I would assume that Mr.

21   Daly relied on those certificates, yes.

22           Q.    All right.  And it's your

23   opinion that because of Mr. Martino's

24   negligence, Mr. Daly was capable of