## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CROWN THEATRES, L.P., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:02CV2272AVC |
| | ) | Jury Trial Demanded |
| MILTON L. DALY, TAYLOR-LEIGH, | ) | |
| INC., ANNE E. DALY, JAMES C. | ) | |
| CELLA, G.U.S. DEVELOPMENT, INC., | ) | March 4, 2004 |
| JAMES T. MARTINO AND JAMES | ) | |
| THOMAS MARTINO, ARCHITECT, | ) | |
| P.C., and RCD HUDSON, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

### PLAINTIFF CROWN THEATRES, L.P.'S MEMORANDUM IN
### OPPOSITION TO MARTINO DEFENDANTS' MOTION TO QUASH

In their motion to quash and for a protective order, defendants James T. Martino and James Thomas Martino, Architect, P.C. (the "Martino Defendants") seek to prevent plaintiff Crown Theatres, L.P. ("Crown Theatres") from discovering crucial evidence on at least two key points: (1) Martino and his architectural firm paid tens of thousands of dollars in kickbacks to secure lucrative commissions for the design of the movie theatre complexes that are at issue in this case; and (2) Martino lied during the first day of his deposition when he denied that he had made any such payments.

Crown Theatres' subpoena to Citigroup (the "Citigroup subpoena") is without question reasonably calculated to lead to the discovery of admissible evidence. Crown Theatres has alleged that Martino and his firm, James Thomas Martino, Architect, P.C. (the "Martino Firm"), breached their common law and contractual duties to Crown Theatres in rendering architectural services in connection with the six movie theatre complexes. By making large,

undisclosed payments to win the commissions, Martino departed from the standard of care expected of an architect, violated the ethical rules of the American Institute of Architects ("AIA") and the National Council for Architects Registration Board ("NCARB"), and committed flagrant breaches of his duties to his client, Crown Theatres. Martino's gross negligence and breaches of contract are confirmed by Crown Theatres' architectural expert. The payments in question were made to Robert Beacher ("Beacher"), a consultant retained by Crown Theatres to act as its "owner's representative." While Crown Theatres has already obtained some evidence of Martino's payments to Beacher, it needs the Martino Firm's banking records to determine the full extent of the payments and to piece together a story that Martino has sought – and continues to seek – to suppress.

The Martino Firm's banking records are also relevant to explain why Martino was willing to sign off on millions of dollars worth of payment applications without making required site visits or otherwise fulfilling his duties as the architect of record. Martino's negligence enabled his co-defendants to steal more than $6 million from Crown Theatres through the submission of phony payment applications. Martino's dependence on Beacher for work goes a long way towards explaining why Martino was willing to look the other way while Beacher and Daly looted Crown Theatres. The jury is entitled to know the details regarding Martino's relationship to Beacher, including the vast amounts of money he paid to him.

The Martino Firm's bank records are also critical to assessing Martino's credibility. Martino testified falsely during the first day of his deposition that he did not make payments to Beacher. Over three weeks later, after Martino learned that Crown Theatres was seeking various bank records, Martino changed his tune and admitted that he had indeed made payments to Beacher. Martino's recall, however, was sketchy. Crown Theatres should be

permitted to obtain the Martino Firm's bank records to learn the extent to which Martino's testimony at the first day of his deposition was not truthful and, also, to learn whether his testimony the second day was accurate. In addition, as explained below, the requested discovery is reasonably calculated to lead to the discovery of admissible evidence concerning Crown Theatres' RICO, fraud, conspiracy and conversion claims against Martino's co-defendants, Milton L. Daly and James C. Cella.

Further, the Citigroup subpoena imposes no burden on the Martino Defendants. The task of responding is for Citigroup, which has voiced no objection.

Finally, not only should the Martino Defendants' motion be denied but this Court should award Crown Theatres its reasonable attorneys' fees incurred in opposing this motion. As demonstrated herein, the Martino Defendants interposed this motion after Martino lied at his deposition, in a transparent effort calculated to prevent Crown Theatres from learning the truth. Despite Martino's attempted interference, records obtained from other sources demonstrate that Martino testified falsely at his deposition and that he, in fact, had made substantial payments to Beacher in exchange for business. The Martino Defendants knew these facts when they made this motion. Accordingly, the motion was made without substantial justification and sanctions should be imposed. See Fed. R. Civ. P. 37(a)(B)(4).

## BACKGROUND

Crown Theatres embarked on a movie theatre renovation and expansion program in 1996. (Plaintiff's Second Amended Complaint ("Compl.") ¶ 2, attached to Defendant's Motion as Exhibit A.) As part of this program, Crown Theatres retained Martino and his firm to provide architectural services for the six theatre construction projects which are the subject of this lawsuit. (Id. at ¶ 17.) Martino was hired by defendant Milton L. Daly, Crown Theatres'

former chief operating officer.  (Id. at ¶¶ 37, 40.)  He had been introduced to Daly by Robert L. Beacher, Crown Theatres' construction consultant and "owners' representative."  (Id. at ¶ 26; Deposition of James T. Martino ("Martino Dep."), January 15 and February 10, 2004, attached hereto as Exhibit 1, at 83.)

Daly abused his position of trust and responsibility to perpetrate a massive, organized, and long-term fraud on Crown Theatres.  (E.g., Compl. ¶ 45.)  The fraud ran from approximately 1996 until its detection in 2001.  (Id. at ¶¶ 45, 168.)  There were various components of the fraud.  Among other things, Daly colluded with Beacher and also with co-defendant James C. Cella ("Cella") to cause phony invoices to be submitted to Crown Theatres. (Id. at ¶¶ 45, 62.)  Under the scheme, Beacher and Cella, under Daly's direction, prepared applications for payment on behalf of non-existent construction contractors.  (Id. at ¶¶ 46, 62.) They then submitted the payment applications to Daly who caused Crown Theatres to issue payments.  (Id. at ¶¶ 49, 66.)  Beacher and Cella kicked back the bulk of the payments to Daly. (Id. at ¶¶ 50, 69-70.)  The kickbacks were paid into the account of a business that Daly owned jointly with his wife, defendant Anne Daly.  (Id.)  For the most part, the fraudulently obtained funds were split according to an arrangement between Daly and Beacher in which Beacher retained 30% of the monies received from Crown Theatres and transmitted the remaining 70% to the Dalys.  (Id. at ¶ 50.)

Martino contributed to the fraud by attesting that the work described in the payment applications had been completed.  (Compl. ¶ 47.)  The payment applications used on the theatre construction projects were standard AIA forms which included an Architect's Certificate. (E.g., Id. at ¶ 64.)  Martino signed the Architect's Certificates or allowed others to sign his name to the Architect's Certificates for dozens of phony payment applications.  (Id. at ¶ 47.)  By

signing off on the false payment applications, Martino helped to enable Daly, Beacher, Cella and possibly others to steal millions of dollars from Crown Theatres. (Id.) As a result of these various schemes, Crown Theatres lost in excess of $10 million. (Id. at ¶ 3.)

In its Second Amended Complaint, dated June 30, 2003, Crown Theatres alleged that Martino and the Martino Firm committed professional negligence and breached their contractual duties to Crown Theatres. (Compl. ¶¶ 243-56.) In addition, Crown Theatres alleged that defendants Daly and Cella were liable for, among other things, fraud, conspiracy, RICO violations, conversion, statutory theft and violations of the Connecticut Unfair Trade Practices Act. (Id. at ¶ 1.)

On January 15, 2004, Crown Theatres commenced the deposition of defendant Martino. During the first day of his deposition, Martino revealed that he had a longstanding relationship with Beacher that spanned more than 25 years, and that, over the years, Beacher was responsible for a very high percentage of all of the work performed by Martino. (Martino Dep. at 56-62, 83-84, 243.) Crown Theatres also learned that Martino provided free architectural services in connection with Beacher's homes in Florida and New York. (Id. at 248-50.)

In attempting to explore the relationship between Beacher and Martino, counsel for Crown Theatres asked Martino a series of questions regarding whether Martino had made any payments to Beacher in exchange for business. Martino specifically denied that he had done so:

> Q:  Let me ask you this question:  Did you or your firm ever pay any
>     money to Mr. Beacher in exchange for business?
>
> A:  No.
>
> Q:  Did you or your firm ever pay any money to Mr. Beacher for any purpose?
>     . . . . .
>
> A:  I don't remember.
>     . . . . .

Q:    Did you or your firm ever write a check to Mr. Beacher for any amount of money?

. . . . .

A:    No.

. . . .

Q:    Did you or your firm ever write a check to any business owned or controlled by Bob Beacher?

A.    I don't remember that.

(Martino Dep. at 70-73.)[1]  Martino also testified that his firm's bank account was with Citibank. (Id. at 75.)  He claimed that he did not know where he and his wife maintained their personal checking account.  (Martino Dep. at 76.)  He also testified that he was not familiar with the firm Marlin Contracting, one of the fictitious entities whose name appeared on the phony payment applications.  (Id. at 42.)  In reality, Marlin Contracting was a front for Beacher, and Martino paid Marlin at least $21,500.  (Exhibit 2, Compl. ¶ 82.)

Martino's testimony during the first day of his deposition was not truthful. Through Beacher, Crown Theatres obtained bank records for an account at Bank of America (formerly Nationsbank) in the name of Marlin Consulting, Inc.  The records disclosed that Marlin Consulting received a wire transfer on September 20, 1999, from the Martino Firm.  The wire transfer was made from European American Bank account no. 2500017043449, in the amount of $21,500.  (Exh. 2.)  Sometime after September 1999, European American Bank was acquired by Citigroup.

On January 21, 2004, Crown Theatres issued a subpoena to Citigroup (the "Citigroup subpoena"), requesting production for the period January 1, 1996 to the present of: (1) "All documents relating to European American Bank account number 2500017043449 . . . .";

───────────────────

[1] The objections interposed by counsel for defendants Martino and Daly have been deleted from the quoted text.

(2) "All documents relating to any checking, savings, money market, brokerage or other account in the name of James Thomas Martino . . . ."; (3) "All documents relating to any checking, savings, money market, brokerage or other account in the name of James Thomas Martino, Architect, P.C. . . . ."; and (4) "All letters, memoranda, notes, correspondence or other communications to, from or relating to James Thomas Martino or James Thomas Martino, Architect, P.C." (Crown Theatres' Subpoena to Citigroup, at 3, a copy of which is attached to Defendants' Motion as Exhibit D.)

On February 6, 2004, the Martino Defendants filed the pending motion in an attempt to quash the Citigroup subpoena. They contended that the Martino Firm's bank records were not relevant and that the subpoena was overbroad and called for the production of "privileged" information. The Martino Defendants did not mention in their motion that Martino had in fact made sizeable payments to Beacher – a fact that contradicted his deposition testimony.

On the same day, the Martino Defendants moved to quash the Citigroup subpoena, Crown Theatres obtained records from a Fleet Bank account in the name of Beacher's company, B.B. Construction Consultants, Ltd. The records included deposit slips and copies of three checks from 1999 drawn on the European American Bank account of the Martino Firm. The checks showed payments from the Martino Firm to B.B. Construction Consultants in the amounts of $27,000, $17,500 and $17,500. (Exhibit 3.)

Martino's deposition resumed on February 10, 2004. The reasons for Martino's alleged unavailability to complete his deposition earlier have not been explained. During the more than three week interval between the first and second days of his deposition, Martino and Beacher had at least five or six conversations. (Martino Dep. at 233.) Beacher knew that Crown

Theatres was actively seeking bank records that would disclose Martino's payments. In addition, during the time between the first and second days of his deposition, the Martino Defendants took the position that Crown Theatres' architectural expert, Peter Steffian, should be required to give his deposition prior to the conclusion of Martino's deposition. By deposing Mr. Steffian, Martino could learn the extent to which Crown Theatres had found out about Martino's payments to Beacher. On January 26, 2004, Crown Theatres moved for a protective order to require that Martino complete his deposition before the deposition of Mr. Steffian. Crown Theatres contended that such an order was required, for among other reasons, to prevent Martino from tailoring his testimony.[2]

At the second day of his deposition, Martino's story changed. Contradicting his prior testimony, Martino admitted that he had made payments to Beacher in exchange for Beacher's assistance in procuring business from Crown Theatres:

Q:     You have given money to Mr. Beacher in the last five years?
A:     Yes.
Q:     How much money did you give him?
A:     I don't know what amount.
Q:     For what purpose?
A:     I gave him money as a referral fee for the work that came to me
       from Crown Theatres.
Q:     On how many occasions did you give money to Mr. Beacher as a referral fee?
A:     I don't know the exact number on that either.

(Martino Dep. at 237-38.) Martino estimated that he made "seven to eight" payments to Beacher in amounts that ranged from $10,000 to $30,000. (Id. at 238, 241.) Martino authenticated three checks in the following amounts: $17,500, $17,500 and $27,000. The checks were from James

---

[2]This Court directed that the deposition of Martino resume on February 10, 2004, and the deposition of Mr. Steffian take place on February 17, 2004.

Thomas Martino, Architect, P.C. to B.B. Construction Consultants, Ltd. (Id. at 279-84.) He further acknowledged that he paid Beacher so-called "referral fees" for work on other projects prior to working for Crown Theatres. (Id. at 243.)

Martino was vague in his testimony about when the payments were made, and how the amounts were determined:

Q:    Was there a schedule for making the payments?

A:    No.

Q:    How did you determine when you should make them?

A:    When cash flow permitted me to do so.

Q:    Did Mr. Beacher ever encourage you to make payments?

A:    He would ask if I could make a payment, how my cash flow was, if that's what you are asking me.

Q:    Yes. And when Mr. Beacher would make that request, what would you do?

A:    I would discuss with my bookkeeper to see if in fact whether we could make a payment.

Q:    If your cash flow would permit it, what did you do?

A:    I wrote him a check.

Q:    And if your cash flow would not permit making a payment, what would you do?

A:    I would inform Bob I couldn't pay him.

Q:    Under those circumstances, what would Bob say?

A:    "When you can, you can, Jimmy."

(Martino Dep. at 246-47).

Martino did not disclose to Crown Theatres that he was making payments to Beacher. (Martino Dep. at 240-41.) Only Martino, Beacher and Martino's bookkeeper knew about the payments. (Id. at 286-87.) The so-called referral fee arrangement was not in writing,

and Martino did not keep written records of the payments. (Id. at 240-41.)[3] At his recent

deposition, Beacher testified that he performed no work for the payments that he received from

Martino.

On February 13, 2004, Peter Steffian, Crown Theatres' architectural expert,

issued a supplemental report in which he opined that Martino's payments to Beacher violated the

AIA and NCARB ethical rules and constituted gross violations of Martino's duties to Crown

Theatres:

> These referral fees or kickbacks were unknown to Crown
> Theatres, Martino's client, and thus would be characterized as
> unethical conduct by both the American Institute of Architects
> (AIA) and the National Council of Architects Registration Board
> (NCARB) of which Mr. Martino is a member.
>
> . . . .
>
> In my opinion, Mr. Martino has severely broken the trust of his
> client Crown Theatres and thus violated the ethical standards of
> the profession of architecture. . . .

(Expert Report of Peter Steffian ("Steffian Rep.") September 25, 2003, attached hereto as

Exhibit 4, at 5-6.) Mr. Steffian added in his March 2, 2004 supplement that Martino's payments

to Beacher violated the codes of ethics and professional conduct and the requirements of the

Board of Registration of Architects of each state in which the theatre projects were located.

(Supplemental Expert Report of Peter Steffian ("Suppl. Steffian Rep."), March 2, 2004, attached

hereto as Exhibit 5 at 12.)

---

[3]Notwithstanding the revelations regarding his payments to Beacher, Mr. Martino denied that he
ever made any wire transfers to Beacher, to Marlin Consulting, Inc. or to any business owned by
Beacher. (Martino Dep. at 277-79.)

## ARGUMENT

**I.    CROWN THEATRES' SUBPOENA SEEKS DOCUMENTS THAT ARE
REASONABLY CALCULATED TO LEAD TO THE DISCOVERY OF
ADMISSIBLE EVIDENCE.**

Martino asserts that the discovery sought by the Citigroup subpoena is "not

relevant to any issue set forth in Crown Theatres' Complaint against the Martino defendants."

(Memorandum of Law in Support of Defendant/Third-Party Plaintiffs' Motion to Quash Plaintiff

Crown Theatres's L.P.'s Subpoena served on Citigroup, or, in the Alternative, for a Protective

Order ("Martino Br.") at 3.)  The facts, however, demonstrate that the bank records of the

Martino Firm are of enormous relevance.  As discussed below, the subpoena is reasonably

calculated to lead to the discovery of admissible evidence concerning (1) Crown Theatres'

claims against Martino for negligence and breach of contract, (2) Martino's credibility, and (3)

Crown Theatres' claims against Martino's co-defendants.

The scope of permissible discovery under Rule 26 of the Federal Rules of Civil

Procedure is broad.  "Parties may obtain discovery regarding any matter, not privileged, that is

relevant to the claim or defense of any party . . . . Relevant information need not be admissible at

the trial if the discovery appears reasonably calculated to lead to the discovery of admissible

evidence."  Fed. R. Civ. P. 26(b)(1).  Relevancy is to be broadly construed and is not limited to

the precise issues set out in the pleadings or to information that would be admissible at trial.  In

Re Subpoena Issued to Dennis Friedman, Esq., 350 F.3d 65, 69 (2d Cir. 2003).  The broad scope

of permissible discovery applies equally to subpoenas issued under Fed. R. Civ. P. 45.  C. Wright

& A. Miller, 9A Federal Practice and Procedure: Civil 2d § 2459 (1994).

The Citigroup subpoena easily satisfies the Rule 26 standard.

A.     **The Subpoenaed Documents Are Relevant To Crown Theatres' Claims Against Martino For Negligence And Breach Of Contract.**

Regardless of whether they are termed "kickbacks," "bribes," or "referral fees," the payments by Martino to Beacher constitute clear-cut evidence of Martino's negligence in the performance of his professional duties. As explained by Peter Steffian, Crown Theatres' architectural expert, where an architect makes undisclosed payments of substantial sums of money in exchange for work, he violates the ethical rules of the AIA, NCARB, and applicable state rules and regulations, and he breaches his duties to his client and to the architectural profession. (Steffian Rep. at 5-6, Suppl. Steffian Rep. at 12-16.)

Violations of ethical standards have repeatedly been held to constitute evidence of negligence. See, e.g., Depape v. Trinity Health Systems, Inc., 242 F. Supp. 2d 585, 609 (N.D. Iowa 2003) (attorney's violation of Iowa Code of Professional Responsibility for Lawyers was evidence of negligence); Stanley v. Richmond, 35 Cal. App. 4th 1070 (Cal. Ct. App. 1995) (attorney's violation of California Code of Professional Responsibility for Lawyers was evidence of negligence); Taylor, Thon Thompson & Peterson v. Cannaday, 230 Mont. 151, 155 (1988) (violation of professional codes governing the architectural profession was evidence of negligence).

The Citigroup subpoena is reasonably calculated to turn up crucial evidence regarding the extent of Martino's breach of his duties to Crown Theatres. Among other things, Crown Theatres seeks to determine the number of payments made by Martino, the dates of the payments and the amounts – information that Martino was not able or willing to furnish at his deposition. The checks may also yield additional relevant evidence: there may, for example, be notations on the checks indicating the purpose of the payments.

The payments to Beacher are also relevant to explain Martino's conduct.  The evidence shows that Martino looked the other way or failed to perform his professional obligations because he was wholly beholden to Beacher.  Martino owed his career to Beacher, who introduced him to virtually every client that he ever worked for (including Crown Theatres).  (Martino Dep. at 56-62, 84.)  As a result, Martino signed payment applications without making requisite site visits and without asking questions.  (Martino Dep. at 109-10, 266-67.)  Evidence of the enormous sums of money that Martino paid to Beacher in exchange for his "referrals" is key evidence that Crown Theatres could use to explain to a jury how an experienced professional like Martino could possibly be so derelict in his professional duties.

The Martino Firm's banking records also are relevant to whether Martino knew or should have known that he was signing off on millions of dollars of bogus payment applications.  (E.g., Martino Dep. at 135, 136, 191, 200.)  Martino contends that he was unaware that the contractors were fictitious.  (E.g., Martino Dep. at 143, 144)  But the wire transfer by Martino to Marlin Consulting, one of the phony contractors, suggests Martino knew that Marlin and Beacher were one and the same.  Crown Theatres should be permitted to discover the Martino Firm's bank records to determine whether Martino made payments to any of the other fictitious entities.  Such payments would tend to show that Martino in fact knew or should have known that the payment applications that he certified were phony.

The payments between Martino and Beacher are also relevant to Crown Theatres' breach of contract claim.  Crown Theatres engaged Martino to render professional architectural services.  (Compl. ¶ 244.)  The agreement included the understanding that Martino would exercise reasonable care in the performance of his duties.  (Compl. ¶ 246.)  Martino's violation

of ethical standards evidenced a lack of reasonable care and constituted a breach of his

contractual obligations.

At bottom, Crown Theatres needs Martino's banking records in order to piece

together what really happened. This Court should permit Crown Theatres to learn the truth

regarding Martino's payments to Beacher.

**B.     The Documents Sought Are Relevant To Martino's Credibility.**

Martino's credibility is very much at issue in this case. During the first session of

his deposition, Martino testified falsely that he had not paid money to Beacher in exchange for

business. (Martino Dep. at 71-73.) Then, after it had become apparent that Crown Theatres may

have obtained evidence of payments, Martino admitted to paying so-called "referral fees" to

Beacher "seven to eight times" in connection with his work for Crown Theatres. (Martino Dep.

at 238-39.) He further admitted that the payments were for amounts between $10,000 and

$30,000. (Martino Dep. at 241.) Whether Martino has "come clean" is very much in doubt.

Crown Theatres should not have to take Martino's word for it.

Documents or other evidence which go to establishing or impeaching a party's

credibility are always relevant. C. Wright, A. Miller & R. Marcus, 8 Federal Practice &

Procedure 2d. § 2015 (1994) ("Information showing that a person having knowledge of

discoverable facts may not be worthy of belief is always relevant to the subject matter of the

action."); see also Davidson Pipe Company v. Laventhol & Horwath, 120 F.R.D. 455 (S.D.N.Y.

1988) (allowing discovery for impeachment purposes where disclosure may reveal information

affecting the credence afforded to trial testimony).[4]

---

[4] The Davidson court outlined five factors to consider when determining whether to allow
discovery for the purposes of attacking a witness' credibility: 1) the extent to which prior acts in
question demonstrate a propensity for deception; 2) the extent to which the prior act occurred in

The requested discovery goes directly to Martino's credibility. Only by learning the truth regarding the Martino Firm's payments to Beacher will Crown Theatres, the Court and the jury be able to discern the full extent to which Martino testified untruthfully at the first session of his deposition. Moreover, the Martino Firm's bank records are crucial to ascertaining whether Martino's testimony during the second day of his deposition was truthful – or whether it too was tainted by lies. This requested discovery should be permitted.

C.    **The Documents Sought Are Relevant To Crown Theatres' Claims Against Martino's Co-Defendants.**

In addition, the Citigroup subpoena is appropriate because it seeks documents that are relevant to Crown Theatres' claims for fraud, conspiracy and RICO violations against Martino's co-defendants, Daly and Cella. Crown Theatres contends that Daly, Cella and co-conspirator Beacher, concocted a series of schemes to steal more than $6 million from Crown Theatres. (Compl. ¶¶ 45, 62.) The Citibank subpoena is necessary to enable Crown Theatres to discover whether any of the stolen money flowed through Martino or his firm.

The possibility that Daly, Beacher and Cella funneled money through Martino is very real. Martino was the architect of record on each of the six theatre projects in which funds were stolen. (Compl. ¶ 17.) The amount which Martino was paid on the various jobs was determined, according to Martino, by negotiation with Daly. (Martino Dep. 90-91.) Martino signed off on the phony payment applications submitted to Crown Theatres by Beacher and Cella. (Compl. ¶ 47.) According to Martino, Beacher would present him with stacks of payment applications and Martino would simply sign them. (Martino Dep. at 266-68.)

a context where there was a premium on veracity; 3) the lapse of time between the prior act and the trial testimony; 4) the relationship between the subject matter of the prior deceptive act and that of the instant litigation; and 5) whether there is a reasonable likelihood that any pertinent evidence will be elicited. Davidson, 120 F.R.D. at 462-64. Each of these factors weighs in favor of allowing the discovery sought by Crown Theatres.

The possibility that money flowed through Martino or the Martino Firm is heightened by the fact that Martino's relationship with Beacher was and remains extremely close. The two men have worked on projects together for over 25 years. (Martino Dep. at 243.) A high percentage of all of Martino's work over the years, not just for Crown Theatres, came to him via Beacher. (Id. at 56-62, 84.) Martino performed work for no charge on Beacher's homes in New York and Florida. (Id. at 248-49.) According to Martino, he signed the payment applications because Beacher told him that he should do so. (Id. at 267.) He also testified that he signed without making site visits because Beacher was making site visits and supposedly reporting to him on the progress of the work. Throughout the course of the projects for Crown Theatres, Martino and Beacher spoke on the telephone "multiple times each day." (Id. at 243.) Indeed, Martino and Beacher have been in regular communication with one another regarding this lawsuit. (Id. at 232-35.) They speak on the telephone about the case frequently. (Id.)

Under the circumstances, there is good reason to believe that additional evidence relevant to Crown Theatres' existing claims against Martino's co-defendants may be found in the Martino Firm's banking records.

## II.    CROWN THEATRES' SUBPOENA IS NOT OVERBROAD.

The Martino Defendants contend that the subpoena is "grossly overbroad" because it seeks financial records for the past eight years and does not limit its scope to "any particular transaction or third-party involvement." (Martino Br. 5-6.) But Crown Theatres' subpoena to Citigroup is not overbroad. The subpoena is targeted to the bank from which Martino made the wire transfer to Marlin Contracting, one of Beacher's sham companies. The subpoena's request for documents going back to January 1, 1996 is reasonable given that Martino was first hired to work for Crown Theatres in December 1995, and Crown Theatres has

determined that the fraud was underway no later than October 1996. (Martino Dep. at 85; Compl. ¶ 45.)

This Court should also reject the Martino Defendants' suggestion that the subpoena be limited to documents relating to particular transactions or parties. Martino has already lied about the fact of his payments to Beacher. Crown Theatres should not be required to take his word for the names of the entities to which he wrote checks or from which he received payments. Furthermore, the Citigroup subpoena does not impose any burden on the Martino Defendants. The task of complying is for Citigroup, which is not complaining. Martino's overbreadth objection lacks merit.

## III.    THE REQUESTED DOCUMENTS ARE NOT PRIVILEGED.

The Martino Defendants assert that the subpoena should be quashed because it "seeks disclosure of privileged and protected documents." (Martino Br. 6-8.) The Martino Defendants, however, fail to identify any privilege that could apply to their banking records – and there is none. Alternatively, Martino suggests that defendants may have a "privacy interest" in the Martino Firm's bank records. There is nothing in the cases cited by the Martino Defendants to support the proposition that a purported privacy interest in financial records is grounds to quash or limit a valid subpoena issued under Fed. R. Civ. P. 45 that seeks documents within the permissible scope of discovery. In Chemical Bank v. Jeannie-Marie Dana, 149 F.R.D. 11, 13-14 (D. Conn. 1993), the court merely limited the scope of a subpoena to exclude documents relating to personal financial affairs and unrelated litigation because they were not relevant to a collection action. Unlike the situation in that case, the details of Martino's personal and business financial transactions are clearly relevant to determine the extent of Martino's violation of his duties to Crown Theatres. Similarly, Blue Cross & Blue Shield of Connecticut,

Inc. v. Reuter, 1990 Conn. Super. LEXIS 284 (Conn. Super. Ct., July 11, 1990), is easily

distinguishable.  The case concerns a Connecticut state statute regarding personal financial

records, which cannot serve to limit this Court's power to issue subpoenas under Rule 45.

Martino also asserts that Crown Theatres is engaged in "post-judgment discovery"

and argues that such discovery should not be permitted on the grounds that it is premature.

(Martino Br. 7-8.)  The Citigroup subpoena, however, was not served for the purpose of

identifying assets that could be used to satisfy a judgment.  Nor was it served for purposes of

uncovering new causes of action.  Rather, it seeks discovery of matters that are clearly relevant

to claims already alleged in the Second Amended Complaint.

## IV.     THE MARTINO DEFENDANTS SHOULD PAY CROWN THEATRES' COSTS AND ATTORNEYS' FEES INCURRED IN OPPOSING THIS MOTION.

The Martino Defendants should be made to pay Crown Theatres' costs in

opposing their motion because it was not substantially justified.  Under the Federal Rules of

Civil Procedure, motions for protective orders are subject to the sanctions provisions of

Rule 37(a)(4).  See Fed. R. Civ. P. 26(c).  If a motion for a protective order is denied, Rule 37

provides that the court "shall" require the moving party or his counsel to pay the expenses

incurred by the non-moving party in opposing the motion unless the making of the motion was

substantially justified or other circumstances make an award of expenses unjust.  Fed. R. Civ. P.

37(a)(4)(B); see also D. Conn. Rule 37(a)(4).

Here, the Martino Defendants' motion was not substantially justified.  The motion

was brought in a bad faith effort  to prevent Crown Theatres from learning that Martino perjured

himself during the first day of his deposition; and it was brought in a failed effort to prevent

Crown Theatres from learning the truth about the kickbacks paid by Martino to Beacher.

Moreover, the Martino Defendants persisted in their motion even after Martino admitted that he

made payments to Beacher in exchange for business. They also persisted in their motion after

Crown Theatres' architectural expert offered the opinion that the payments to Beacher

constituted a breach of Martino's duties to Crown Theatres. This is precisely the type of

situation where the award of fees and costs is appropriate. See, e.g., Alexander v. FBI, 186

F.R.D. 144, 148 (D. D.C. 1999) (awarding costs to defendant under Rule 37(a)(4)(B) because

plaintiff's motion for protective order was not substantially justified); Gladbelter v. Wal-Mart

Stores, Inc., 162 F.R.D. 589 (D. Neb. 1995) (same); SJ Berwin & Co. v. Evergreen

Entertainment Grp., 1994 U.S. Dist. LEXIS 12897 (S.D.N.Y., Sept. 13, 1994) (same) (Exh. 6).

## CONCLUSION

For the foregoing reasons, plaintiff Crown Theatres, L.P. respectfully requests

that the Martino Defendants' Motion to Quash or, in the Alternative, for a Protective Order be

denied and that the Martino Defendants be ordered to pay the reasonable costs and attorney's

fees incurred by Crown Theatres in opposing this motion.

CROWN THEATRES, L.P.

By: _____
     Lawrence S. Schaner (CT 24756)

Craig C. Martin (CT 12198)
Lawrence S. Schaner (CT 24756)
JENNER & BLOCK, LLP
One IBM Plaza
Chicago, IL 60611
(312) 222-9350
(312) 840-7776 (fax)
cmartin@jenner.com
lschaner@jenner.com

H. James Pickerstein (CT 05094)
Jodi Zils Gagne (CT 24376)
PEPE & HAZARD, LLP
30 Jelliff Lane
Southport, CT  06490
(203) 319-4000
(203) 259-0251 (fax)
hpickerstein@pepehazard.com
jgagne@pepehazard.com

Dated:  March 4, 2004

## CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that I have served all counsel of record in

this action with a copy of **Plaintiff Crown Theatres, L.P.'s Memorandum in Opposition to**

**Martino Defendants' Motion to Quash,** by facsimile and by mailing a copy of the same by

United States Mail, postage prepaid, to the following:

> Kerry M. Wisser
> Weinstein & Wisser, P.C.
> 29 South Main Street
> Suite 207
> West Hartford, CT  06107
>
> Mark Seiden
> Marisa Lanza
> Milber, Makris, Plousadis & Seiden, L.L.P.
> 108 Corporate Park Drive
> Suite 200
> White Plains, NY  10604
>
> Robert M. Frost
> Zeldes, Needle & Cooper, P.C.
> 1000 Lafayette Blvd.
> P.O. Box 1740
> Bridgeport, CT  06601

_____
Adam N. Hirsch

Dated:  March 4, 2004