Martino, Jim - January 15, 2004 00:00:00 a.m.

1:1

2  UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT

3  ---------------------------------------------X CROWN THEATRES, L.P.,

4  PLAINTIFF,

5  -against-

6  MILTON L. DALY, TAYLOR-LEIGH,

7  INC., ANNE E. DALY, JAMES C. CELLA, G.U.S. DEVELOPMENT, INC.,

8  JAMES T. MARTINO AND JAMES THOMAS MARTINO, ARCHITECT, P.C.,

9  DEFENDANTS.

10  ---------------------------------------------X

11                        DATE: January 15, 2004

12                        TIME: 11:21 a.m.

13

14          EXAMINATION BEFORE TRIAL of the

15  Defendant, JAMES T. MARTINO, taken by the

16  Plaintiff, pursuant to a Court Order, held at the

17  offices of Milber, Makris, Plousadis & Seiden,

18  L.L.P., 108 Corporate Park Drive, Suite 200, White

19  Plains, New York 10604, before a Notary Public of

20  the State of New York.

21

22

23

24

25

Martino, Jim - January 15, 2004 00:00:00 a.m.

2:1

2   A P P E A R A N C E S:

3

4

5

6        JENNER & BLOCK, L.L.C. Attorneys for the Plaintiff

7            One IBM Plaza Chicago, Illinois 60611-7603

8            BY: LAWRENCE S. SCHANER, ESQ. MATTHEW RICE

9

10

11

12       WEINSTEIN & WISSER, P.C. Attorneys for the Defendants

13           Milton L. Daly, Taylor-Leigh, Inc. and Anne E. Daly,

14           29 South Main Street, Suite 207 West Hartford, Connecticut 06107

15           BY: KERRY MARC WISSER, ESQ.

16

17

18   MILBER MAKRIS PLOUSADIS & SEIDEN, L.L.P.

19           Attorneys for the Defendants James T. Martino and James

20           Thomas Martino, Architect, P.C. 108 Corporate Park Drive, Suite 200

21           White Plains, New York 10604 BY: MARK SEIDEN, ESQ.

22           File #: 112163

23

24

25               *          *          *

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
3:1

  2

  3        F E D E R A L    S T I P U L A T I O N S

  4

  5

  6             IT IS HEREBY STIPULATED AND AGREED

  7    by and between the counsel for the respective

  8    parties hereto, that the filing, sealing, and

  9    certification of the within deposition shall

 10    be and the same are hereby waived;

 11

 12             IT IS FURTHER STIPULATED AND AGREED

 13    that all objections, except as to the form

 14    of the question, shall be reserved to the times

 15    of the trial.

 16

 17             IT IS FURTHER STIPULATED AND AGREED

 18    that the within deposition may be signed before

 19    any Notary Public with the same force and effect

 20    as if signed and sworn to before this court.

 21

 22

 23

 24             *    *    *    *

 25
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
4:1
   2    J A M E S    M A R T I N O, called as a witness,
   3    having been first duly sworn by a Notary Public of
   4    the State of New York, was examined and testified
   5    as follows:
   6    EXAMINATION BY
   7    MR. SCHANER:
   8         Q.    Please state your name for the record.
   9         A.    James Martino.
  10         Q.    What is your address?
  11         A.    14 Vanderventer Avenue, Port
  12    Washington, New York 11050.
  13         Q.    Mr. Martino, good morning.  We are
  14    starting late this morning for weather related
  15    reasons.  Have you had your deposition taken
  16    before?
  17         A.    Yes.
  18         Q.    How many times?
  19         A.    Once.
  20         Q.    When was that?
  21         A.    Do you want the year that it was done?
  22         Q.    Approximately?
  23         A.    I would say probably around '91.
  24         Q.    Let me ask you this.  Please state your
  25    full name for the record?
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
5:1                    MARTINO

  2        A.    James Thomas Martino.

  3        Q.    And Mr. Martino, where do you live?

  4        A.    75 Nassau Avenue, Manhasset, New York.

  5        Q.    Where are you employed?

  6        A.    James Thomas Martino architect P C.

  7        Q.    What is the address of that business?

  8        A.    14 Vanderventer Avenue, Port

  9   Washington, New York.

 10        Q.    Since you haven't been deposed for a

 11   while, let me remind you of a couple of the ground

 12   rules.  You understand that you are under oath?

 13        A.    Yes, I do.

 14        Q.    I'm going to be asking you questions

 15   throughout day.  If at any time you don't

 16   understand one of my questions, please let me know

 17   and I will rephrase it.  Is that okay?

 18        A.    Yes, it is.

 19        Q.    It's important, because we have a Court

 20   Reporter here that your answers be audible, so no

 21   nods of the head, shrugs of the shoulder and so

 22   forth.  Do you understand?

 23        A.    Yes, I do.

 24        Q.    If at some point during the day you

 25   would like to take a break, let me know, for any
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

6:1                    MARTINO

2    reason, and we could arrange to take a break, okay?

3         A.    Yes.

4         Q.    It's important to remember that the

5    Court Reporter can take down only one of us at a

6    time so we should avoid talking over one another.

7    Now, Mr. Martino, what is your educational

8    background?

9         A.    How far back do you want to go?

10        Q.    Well, how about college?

11        A.    Graduated from Syracuse University in

12   1977 with a bachelors of architecture degree.

13        Q.    After that?

14        A.    No further college education.

15        Q.    Do you have any professional licenses?

16        A.    Besides architect tour.

17        Q.    You have a license in architecture?

18        A.    That's correct.

19        Q.    Who issues the license?  You mean

20   various -- what kind of license in architecture do

21   you have?

22        A.    I don't understand that question.

23             MR. SEIDEN:  Are you asking whether he

24        is a registered architect in any states.

25        Q.    Are you a registered architect in any

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
7:1                    MARTINO

  2    states?

  3         A.    Yes, I am.

  4         Q.    How many states?

  5         A.    I couldn't tell you off the top of my

  6    head right now.  I was at one point in time

  7    licensed as in as many as 18 states, but I would

  8    say, over the past two years, I probably let some

  9    of the licenses lapsed that I was not doing much

 10    practice in.

 11         Q.    After you graduated from Syracuse in

 12    1977, did you go to work?

 13         A.    Yes, I did.

 14         Q.    Where did you go to work?

 15         A.    The first architectural firm I worked

 16    for was a partnership.  The name of the partnership

 17    was Terzis.

 18         Q.    Can you spell that?

 19         A.    T E R Z I S -- Anastasi A N A S T A S

 20    I.

 21         Q.    Where was that located?

 22         A.    In Manhattan.

 23         Q.    How long were you with Terzis Anastasi?

 24         A.    Approximately a year.

 25         Q.    After working for them, where did you
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

8:1                    MARTINO

2    work?

3        A.    I then worked for Angelo Francis Corva

4    C OR VA and associates architects.

5        Q.    How long did you work for Angelo

6    Francis Corva?

7        A.    Approximately two and a half to three

8    years.

9        Q.    After that?

10        A.    Michael Harris speck for, S P E CT OR

11    and associates architects.

12        Q.    How long were you with Michael Harris

13    inspector?

14        A.    Approximately a year and a half.  After

15    that, the huh land /TKAOE I can't group H A L A N D

16    I A group, and they were located in ocean side,

17    New York.

18        Q.    How long were you with huh /HRAPB

19    /TKAOE I can't?

20        A.    Approximately a year.

21        Q.    After huh /HRAPB /TKAOE I can't?

22        A.    I opened my own practice.

23        Q.    What year was that?

24        A.    Approximately, I think it was 1983.

25        Q.    What was the name of your practice when

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
9:1                      MARTINO
  2     you opened it?
  3          A.     James Thomas Martino architect.
  4          Q.     Have you worked for your own firm ever
  5     since?
  6          A.     Yes.
  7          Q.     Are you a member of the American
  8     Institute of Architects?
  9          A.     Yes.
 10          Q.     How long have you been a member of the
 11     American institute of Architects?
 12          A.     I believe it's 16 years.
 13          Q.     Do you have any other professional
 14     affiliations?
 15          A.     N C A R B.
 16          Q.     What is that?
 17          A.     National counsel of architectural
 18     registration boards.
 19          Q.     How long have you been a member of the
 20     N C A R B?
 21          A.     I would be guessing.  I don't know
 22     exactly.
 23          Q.     More than ten years?
 24          A.     I believe it's more than ten years,
 25     yes.
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
10:1                    MARTINO
   2      Q.      Do the American Institute of architect
   3   and the N C A R B have rules of professional
   4   ethics?
   5      A.      Yes.
   6      Q.      Do you consider yourself bound by those
   7   rules?
   8            MR. SEIDEN:  Objection.  That's a
   9        question of law that is not a factual
  10        question.
  11      Q.      You could answer?
  12      A.      Repeat the question, please.
  13      Q.      Do you consider yourself bound by the
  14   rules of the American institute of architecture and
  15   the national -- the N C A R B?
  16            MR. SEIDEN:  For the record, the same
  17        objection.  The question is asking for a
  18        conclusion of law not an inquiry of fact.
  19        It's an improper question.  If you can know
  20        you could answer?
  21      A.      Could you please describe for me what
  22   you mean by bound.
  23      Q.      Well, what do you understand the word
  24   bound to mean?
  25      A.      I'm not too sure what that word is
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
11:1                    MARTINO

   2   supposed to mean.

   3        Q.     Do you understand that you should

   4   comply with the rules of the American institute of

   5   architecture?

   6             MR. SEIDEN:  Same objections.  It's a

   7        question of law?

   8        A.     Yes.

   9        Q.     What about the rules of the N C A R B,

  10   do you feel that you should comply with those

  11   rules?

  12             MR. SEIDEN:  The same objection.

  13        A.     Yes.

  14        Q.     Let me show you -- let's mark this as

  15   Exhibit Number 1.

  16             (Whereupon, the aforementioned

  17   ^ document ^ photograph ^ was ^ were marked as

  18   ^ Plaintiff's ^ Defendant's Exhibit ^Replace for

  19   identification as of this date by the Reporter.)

  20        Q.     Mr. Martino I'm placing before you

  21   what's been marked as Martino Exhibit Number 1.  Do

  22   you recognize this document?

  23        A.     Yes, I do.

  24        Q.     What is it?

  25        A.     It looks like it's a copy of one of the
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
12:1                    MARTINO
    2    pages from my website.
    3         Q.    Does it appear to layout your
    4    background?
    5         A.    Yes, it does.
    6         Q.    Would you say that this is your CV?
    7         A.    Yes, I would.
    8         Q.    Take a moment and review it and let me
    9    know whether it is accurate?
   10         A.    I believe it's accurate, with the
   11    exception of the 18 states, because this has not
   12    been update today reflect the states that have
   13    possibly been since lapsed.
   14         Q.    Other than that,?
   15         A.    Other than that, I believe it's
   16    accurate.
   17         Q.    How large is your architectural firm
   18    today?
   19         A.    Four people.
   20         Q.    Including yourself?
   21         A.    That is correct.
   22         Q.    Who are the other members -- who -- are
   23    the four people principals in the firm?
   24         A.    No.
   25         Q.    Who are the other individuals?
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

13:1                      MARTINO

2        A.    A CADD operator.

3        Q.    What is his or her name?

4        A.    Carlos Perrera.

5        Q.    Who are the other employees of your

6    firm?

7        A.    Joseph LaMonte, bookkeeper Patricia

8    Martino, administrative assistant.

9        Q.    Is Patricia Martino any relation?

10        A.    My wife.

11        Q.    Has your firm, in the past, employed

12    larger numbers of people?

13        A.    That is correct.

14        Q.    What is the maximum number of employees

15    you've had?

16        A.    I believe it was 11.

17        Q.    What year was that?

18        A.    1992 or '93.

19        Q.    Have you ever employed other

20    architects?

21        A.    Yes.

22        Q.    Who?

23        A.    One's name was a gentleman named Greg

24    Basmagian.

25        Q.    How do you spell his last name?

Martino, Jim - January 15, 2004 00:00:00 a.m.

14:1                    MARTINO

2        A.    I don't know.  I'm not sure how to

3    spell his last name.

4        Q.    Anyone else?

5        A.    There was another gentleman earlier

6    than him and I can't remember his name.

7        Q.    That's it?

8        A.    That's correct.

9        Q.    What were your firm's annual revenues

10   for 2002?

11              MR. SEIDEN:  Objection.  You could

12       answer?

13       A.    I couldn't tell you that.

14       Q.    2003?

15              MR. SEIDEN:  The same objection.

16       A.    I could not tell you.

17       Q.    Is that because you don't know?

18       A.    That's right.

19       Q.    Is there any document that would show

20   the annual revenues of your firm for each of the

21   last five years?

22       A.    I would assume that the tax returns

23   would say it.

24       Q.    Anything else?

25       A.    Not that I could think of.

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
15:1                    MARTINO

   2        Q.    Who prepares your firm's tax returns?

   3        A.    Joseph LaMonte.

   4        Q.    Does your firm have areas of

   5   specialization?

   6        A.    I think that that would be construed

   7   as, does your firm do a tremendous amount of work

   8   in one type of --

   9             MR. SEIDEN:  Do you understand the

  10       question?

  11             THE WITNESS:  No.

  12             MR. SEIDEN:  Okay.

  13       Q.    You don't understand the question?

  14       A.    No.

  15       Q.    Does your firm have areas of

  16   concentration?

  17       A.    No.

  18       Q.    Are there particular areas in which

  19   your firm has substantial amounts of experience?

  20       A.    Yes.

  21       Q.    What areas would those be?

  22       A.    Movie theaters.

  23       Q.    Anything else?

  24       A.    Residential.

  25       Q.    What else?
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
16:1                     MARTINO

   2        A.      That's all I could think of right now.

   3        Q.      When did you begin work on movie

   4   theaters?

   5        A.      1978 or 79.

   6        Q.      That was before you founded your own

   7   firm?

   8        A.      That is correct.

   9        Q.      Over the years, how many movie theaters

  10   have you worked on?

  11        A.      I couldn't tell you.

  12        Q.      What is your best estimate?

  13        A.      Fifty.

  14        Q.      What work do you do in connection with

  15   movie theaters?

  16             MR. SEIDEN:  Objection.  Any movie

  17        theater at any time.  He told you an estimated

  18        50.  I mean that's --

  19        Q.      You've done work on 50.  Have you

  20   designed 50?

  21        A.      No.

  22        Q.      What kinds of work have you done on the

  23   50 theaters?

  24        A.      Well.

  25             MR. WISSER:  Objection to the form.
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

17:1                    MARTINO

2        When you say theaters, do you mean theater

3        project, not theater screens.

4            MR. SCHANER:  That's a fair

5        clarification.

6        Q.    I'm talking about theater projects?

7        A.    I was a draftsman and I would not say I

8    was actually doing design until I opened my own

9    firm.

10       Q.    How many theaters have you designed

11   since opening your own firm?

12       A.    It's going to be a guess because I

13   cannot tell you accurately.

14           MR. SEIDEN:  Don't guess.  You could

15       give your best estimate.

16       Q.    What is your best estimate?

17           MR. SEIDEN:  I don't want you to

18       guess.

19       A.    I would guess 30.

20       Q.    Of the 30 theater projects that you

21   have designed, have they all been built?

22       A.    No.

23       Q.    How many have been built?

24       A.    I would guess, about 20.

25       Q.    How many different clients have you had

Martino, Jim - January 15, 2004 00:00:00 a.m.

18:1                    MARTINO

2   for the design of movie theaters?

3        A.     Off the top of my head, I would say,

4   four or five.

5        Q.     Who have they been?

6        A.     Crown theaters, cineplex Odeon, general

7   cinema, national theaters of Ohio?

8        A.     K B theaters.

9             MR. WISSER:  Is that A B or?

10            THE WITNESS:  K, K B.

11            MR. WISSER:  Thank you?

12       A.     I can't think of anybody else off the

13  top of my head.

14       Q.     How many theaters have you designed for

15  crown theaters?

16       A.     It's another guess because you know,

17  I'm sure we have it somewhere written do you know

18  how many theaters were actually designed.

19       Q.     I don't want you to guess.  Let me see

20  if I could help you.

21            MR. SCHANER:  Let's mark this as

22       exhibit number two.

23            (Whereupon, the aforementioned

24       ^ document ^ photograph ^ was ^ were marked as

25       ^ Plaintiff's ^ Defendant's Exhibit ^Replace

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
19:1                      MARTINO

  2        for identification as of this date by the

  3        Reporter.)

  4        Q.      Mr. Martino, you should have before you

  5    a copy of what has been marked as Martino exhibit

  6    number two.  I will represent that these are pages

  7    taken off your firm's website.  Do you recognize

  8    them?

  9        A.      Yes, I do.

 10        Q.      If you turn towards the back of the

 11    exhibit, there is a section called body of work.

 12    And behind that there is a heading titled movie

 13    theaters.  Let me know when you've found that page?

 14        A.      I found that page.

 15        Q.      If you look at that page, there is a

 16    column called Cineplex/Odeon.  There is another

 17    column for K B theaters do you see that?

 18        A.      Yes, I do.

 19        Q.      On the next page there is a general

 20    cinemas corporation, after that is crown theaters.

 21    Do these two pages provide accurate and complete

 22    listings of the movie theater projects that you've

 23    designed for each of those clients?

 24        A.      I believe it does, yes.

 25        Q.      Are these projects that were in fact
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
20:1                    MARTINO

  2   built?

  3            MR. SEIDEN:  Put a clarification, which

  4        are you referring to, crown or.

  5        Q.    Well, for all of them.  If we look at

  6   Cineplex/Odeon, we have a list of one, two -- we

  7   appear to have a list of eight theater projects,

  8   would you agree?

  9        A.    Yes, there is eight.

 10        Q.    How many theaters have you built for

 11   Cineplex/Odeon?

 12            MR. SEIDEN:  Objection.  There is no

 13        foundation that he built any theaters.

 14        Q.    Have you built any theaters for

 15   Cineplex/Odeon?

 16        A.    No.

 17        Q.    What work did you do for

 18   Cineplex/Odeon, if any?

 19        A.    I was the design architect.

 20        Q.    Fair enough.  Were the theaters that

 21   are -- how many theaters for Cineplex/Odeon

 22   ^ have you ^ you have designed?

 23        A.    I could not tell you that as we sit

 24   here today.

 25        Q.    What is your best estimate?
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

21:1                    MARTINO

2        A.    It's probably another two or three that
3    were not on this list.
4        Q.    Which would bring it to a total of 11,
5    12?
6        A.    If you add two to three to eight, yes.
7        Q.    Are the projects that are listed on
8    your website projects that were actually built?
9        A.    I believe so, yes.
10        Q.    During what years did you design
11    theaters for Cineplex/Odeon?
12        A.    I would be guessing.
13        Q.    What is your best estimate?
14        A.    '89 to '94.
15        Q.    How many theaters have you designed for
16    K B theaters?
17        A.    I believe what's listed here is all
18    that I did for them.
19        Q.    How many theaters is that?
20        A.    Seven.
21        Q.    Were all seven built?
22        A.    Yes.
23        Q.    During what years did you perform work
24    for K B theaters?
25        A.    I don't recall.

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
22:1                    MARTINO

   2      Q.     What is your -- is it prior to or after

   3   your work for Cineplex/Odeon?

   4      A.     I don't recall.

   5      Q.     Has it been within the last five years?

   6      A.     No, sir.

   7      Q.     How many theaters ^ have you ^ you have

   8   designed for general cinemas corporation?

   9      A.     Nine.

  10      Q.     Were all nine built?

  11      A.     Yes.

  12      Q.     During what years did you perform

  13   services for general cinemas corporation?

  14      A.     Counselor, I don't recall.

  15      Q.     What is your best recollection?

  16      A.     Probably '87 to '92.

  17      Q.     By the way, with respect to

  18   Cineplex/Odeon, have you performed any work for

  19   them within the last ten years?

  20      A.     I believe I did, yes.

  21      Q.     But not within the last five?

  22      A.     That's correct.

  23      Q.     How many theaters have you designed for

  24   crown theaters?

  25      A.     I could not tell you.
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

23:1                        MARTINO

2          Q.     Do you have a best estimate?

3          A.     I'm assuming when you say design, you

4      are talking about whether it was built or not?

5          A.

6          Q.     Yes.

7          A.     Well, without looking back on my master

8      list on the jobs for crown, I would have to guess

9      that it was probably another five or six above this

10     list here.

11         Q.     How many are on this list?

12         A.     Nine.

13         Q.     So, you estimate that you have designed

14     approximately 15 movie theaters for crown theaters?

15         A.     Asking me to answer that question while

16     I sit here without my documents in fronts of you,

17     yes, that's the best estimate I could give you.

18         Q.     Of the approximately 15, how many were

19     built?

20         A.     These nine on this list (indicating).

21         Q.     During what years did you perform work

22     for crown?

23         A.     '96 to 2001.

24         Q.     You also mentioned that you did work

25     for K B theaters.  Did you design theaters for

Martino, Jim - January 15, 2004 00:00:00 a.m.

24:1                     MARTINO

   2   them?

   3        A.    Yes, I did.

   4        Q.    How many?

   5        A.    Same answer as before counselor,

   6   without being able to go back and look at my master

   7   list of projects, it's very hard to answer that.

   8        Q.    Have you done any work for K B theaters

   9   in the last ten years -- I'm sorry.  Have you done

  10   any work for national theaters in the last ten

  11   years?

  12        A.    No.

  13        Q.    During the time you were working for

  14   crown theaters, did you have any other movie

  15   theater assignments?

  16        A.    Other than crown theaters?

  17        Q.    Yes.

  18        A.    Not that I recall.

  19        Q.    From 2001 to the present, have you

  20   performed any work for movie -- relating to movie

  21   theaters?

  22        A.    Relating to movie theaters, yes.

  23        Q.    What work?

  24        A.    I have a client that wants to put a

  25   movie theater in his home.

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
25:1                    MARTINO

  2        Q.     Other than that?

  3        A.     No.

  4        Q.     During the years 1996 to 2001 when you

  5   were doing work for crown theaters, would you agree

  6   that crown theaters was an important client of

  7   yours?

  8        A.     Yes.

  9        Q.     During that time period, would you

 10   agree that they were your most important client?

 11        A.     Yes.

 12        Q.     What percentage of your firm's annual

 13   revenues during the 1996 to 2001 period was crown

 14   theaters responsible for?

 15        A.     I couldn't answer that question.

 16        Q.     More than half?

 17        A.     I would assume, yes.

 18               MR. SEIDEN:  Don't.  We -- no one is

 19        asking you to assume what you know.

 20        Q.     Was it more than three-quarters of your

 21   firm's annual revenues?

 22        A.     I can't answer that.

 23        Q.     Why not?

 24        A.     Because I'm not in a position.  I don't

 25   know what that answer is.  Again, I would be
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

26:1                    MARTINO

2    guessing.

3         Q.    Are there documents that would help you

4    answer the question?

5         A.    I would assume the tax returns might be

6    able to tell.

7         Q.    Anything else?

8         A.    (indicating).

9         Q.    Do you keep records that breakdown

10   revenues by clients?

11        A.    I don't know if my accountant or my

12   bookkeeper does or not.

13        Q.    Is it correct that you were the only

14   architect from your firm who performed design work

15   that your firm was doing for crown theaters?

16             MR. SEIDEN:  Objection.  Can you

17        clarify what you mean by design work.

18        Q.    You were the only architect at your

19   firm working on crown theater's matters, correct?

20             MR. SEIDEN:  Objection to form.  You

21        could answer?

22        A.    What is your definition of architect.

23        Q.    You were the only architect at your

24   firm in the year 1996 to 2001 period, correct?

25        A.    What is your definition of architect.

Martino, Jim - January 15, 2004 00:00:00 a.m.

27:1                    MARTINO

2        Q.     Well, let me turn that back to you and

3    ask you how you would define architect?

4        A.     If you mean licensed architect with a

5    seal, yes.

6        Q.     You were the only licensed architect at

7    your firm during the period 1996 to 2001 working on

8    crown theaters matters?

9        A.     That is correct.

10       Q.     Were there other individuals with

11   architectural training working on crown theaters

12   matters?

13       A.     That is correct.

14       Q.     Who were those individuals?

15       A.     Gary Scheide.  I don't know if I will

16   spell his last name correctly but I believe it's S

17   C H E I D E, Marciano Stanco, S T A N C O, Don Kim,

18   Laura milk spar /REPB, Peter Nicolosi and there

19   might have been some others that I can't remember

20   their names right now.

21       Q.     What was Gary Scheide's training, if

22   any, in architecture?

23       A.     He graduated from college, I'm not too

24   sure what degree he had.

25       Q.     Where did he attend college?

Martino, Jim - January 15, 2004 00:00:00 a.m.

28:1                    MARTINO

2        A.    New York institute of technology.

3        Q.    What was his background in

4    architecture, if any?

5        A.    I don't follow that question.

6        Q.    Did he have an architecture background?

7        A.    I still don't follow what you are

8    asking.

9        Q.    You told me that he was graduate of --

10    he graduated college from the New York institute of

11    technology.  Did he study architecture?

12        A.    Yes.

13        Q.    Where?

14        A.    New York institute of technology.

15        Q.    How many years?

16        A.    I couldn't tell you.

17        Q.    And you don't know whether he received

18    a degree in architecture -- strike that.

19              Did he receive an architectural degree?

20        A.    I believe he did.

21        Q.    In what year?

22        A.    I could not tell you.

23        Q.    In what years did Mr. Scheide work for

24    you?

25        A.    I couldn't tell you that off the top of

Martino, Jim - January 15, 2004 00:00:00 a.m.

29:1                    MARTINO

2    my head either.

3         Q.      When did he stop working for you?

4         A.      I believe it was 2001.

5         Q.      Where is Mr. Scheide today?

6         A.      I could only tell you where the last

7    employment was that he went to.  I'm not too sure

8    if he is still there today.

9         Q.      What was that?

10        A.      Burton Barren Smith.

11        Q.      What kind of -- what is Burton, Barren,

12   Smith?

13        A.      An architectural and engineering firm.

14        Q.      Where is /PWUR ton Barren Smith

15   located?

16        A.      On Long Island.

17        Q.      When is the last time you heard from

18   Mr. Scheide?

19        A.      I saw him at an A I A program, American

20   Institute of Architects program.

21        Q.      When was that?

22        A.      I don't recall.

23        Q.      In the last year?

24        A.      Yeah, I would say it was within the

25   last year.

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
30:1                    MARTINO

  2        Q.      Did you and he talk at that program?

  3        A.      Sure.

  4        Q.      What did you discuss?

  5        A.      How are you, is everything fine?

  6   Getting married soon.

  7        Q.      Anything else?

  8        A.      How is your ^ new ^ knew job, do you

  9   like it.

 10        Q.      Did you tell him about this lawsuit?

 11        A.      No.

 12        Q.      What was Mr. Scheide's -- what were

 13   Mr. Scheide's responsibilities when he was your

 14   employee?

 15        A.      It varied because of his experience.

 16   He had to grow.

 17        Q.      What was his initial job title?

 18        A.      Simply a CADD operator.

 19        Q.      Did his position change over time?

 20        A.      His role and responsibilities changed,

 21   yes.

 22        Q.      How did they change?

 23        A.      His responsibilities increased as he

 24   showed to me his abilities to handle the

 25   responsibility.
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
31:1                    MARTINO

  2        Q.    How many years did he serve as a CADD

  3   operator?

  4        A.    I don't recall.

  5        Q.    How did his responsibilities increase?

  6        A.    He was able to pretty much take a job

  7   and do a good set of construction drawings.

  8        Q.    What other tasks did he perform for

  9   you?

 10        A.    He answered questions from contractors,

 11   responded to some R F I's, visited some job sites

 12   for me.  I think that's the extend of it.

 13        Q.    Was he a member of the A I A?

 14        A.    Not while he was employed by me, no.

 15        Q.    Was he a member of the N C A R B?

 16        A.    If he was, he didn't share that with

 17   me.

 18              MR. SEIDEN:  The answer is you don't

 19        know?

 20              THE WITNESS:  I don't know.

 21              MR. SEIDEN:  Okay.

 22        Q.    What is Marciano Stanco's educational

 23   background?

 24        A.    College graduate, same school.

 25        Q.    New York institute of technology?
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
32:1                    MARTINO

    2        A.     That's correct.

    3        Q.     In what year did he graduate?

    4        A.     I don't know.

    5        Q.     What years did Mr. Stanco work for you?

    6        A.     I couldn't tell you that off the top of

    7    my head either.

    8        Q.     In what year did Mr. Stanco stop

    9    working for you?

   10        A.     I don't recall.

   11        Q.     Did he work for you last year?

   12        A.     No.

   13        Q.     Did he work for you in 2002?

   14        A.     No.

   15        Q.     2001?

   16        A.     I don't recall now.

   17        Q.     Who left your employment first,

   18    Mr. Stain could or Mr. Scheide?

   19        A.     Mr. Stain could.

   20        Q.     What were Mr. Stanco's

   21    responsibilities?

   22        A.     Similar to Mr. Scheide's.

   23        Q.     Did he begin as a CADD operator?

   24        A.     That is correct.

   25        Q.     Did he have a title?
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
33:1                    MARTINO
    2       A.    No.
    3       Q.    What degree did he earn in college?
    4       A.    I don't know.
    5       Q.    Did he graduate?
    6       A.    I don't know.
    7       Q.    Do you know if Mr. Scheide graduated
    8   from college?
    9       A.    Yes.
   10       Q.    Was Mr. Stanco a member of the American
   11   Institute of Architects?
   12       A.    No.
   13       Q.    He was not a licensed architect?
   14       A.    That is correct.
   15       Q.    Was he a member of the N C A R B?
   16       A.    No.
   17       Q.    Mr. Scheide was not a licensed
   18   architect, correct?
   19       A.    That is correct.
   20       Q.    Who was Don Kim?
   21       A.    A CADD operator.
   22       Q.    What year did Mr. Kim begin working for
   23   you?
   24       A.    I don't recall.
   25       Q.    What year did Mr. Kim leave your
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

34:1                    MARTINO

2    employment?

3         A.    I don't recall that either.

4         Q.    Did he leave before or after

5    Mr. Scheide?

6         A.    Before.

7         Q.    Did he leave before Mr. Stanco?

8         A.    Yes.

9         Q.    Did Mr. Kim attend college?

10        A.    I don't know.

11        Q.    Do you know whether he had any formal

12   architectural training?

13              MR. SEIDEN:  Objection to form.  I

14        don't know what you mean by formal.

15        Q.    Are you aware of any courses that he

16   took in architecture?

17        A.    I don't recall.

18        Q.    Do you know if Mr. Stanco had any

19   architectural training?

20        A.    What do you mean by architectural

21   training.

22        Q.    Course work?

23        A.    Course work?

24        Q.    Classes?

25        A.    Beyond college years are you speaking.

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
35:1                    MARTINO

    2      Q.      During college?

    3      A.      He went to college.

    4      Q.      You don't know what he studied?

    5      A.      He obviously -- well, I shouldn't say

    6   that.  He told me that he studied architecture.

    7      Q.      Now, what were Mr. Kim's

    8   responsibilities?

    9      A.      CADD operator.

   10      Q.      Anything else?

   11      A.      No.

   12      Q.      What does CADD operator do?

   13      A.      CADD operator draws the floor plans,

   14   building sections, building elevations and his or

   15   her role is limited basically to producing

   16   drawings.

   17      Q.      What does the word CADD?

   18      A.      Computer aided design and drafting.

   19      Q.      Was Mr. Kim a member of the American

   20   Institute of architect?

   21      A.      I don't know.

   22      Q.      Was he a licensed architect?

   23      A.      No.

   24      Q.      Was he a member of the N C A R B?

   25      A.      I don't know.
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

36:1                        MARTINO

    2        Q.    Who is Laura milk /SPER ran?

    3        A.    Sparron.

    4        Q.    How do you spell her last name?

    5        A.    I believe ^ it was ^ was it S P A R R O

    6    N.

    7        Q.    What work did she do for you?

    8        A.    Same as Don Kim.

    9        Q.    She was a CADD operator?

   10        A.    Correct.

   11        Q.    What year did she join your firm?

   12        A.    I don't recall.

   13        Q.    When did she leave?

   14        A.    I don't recall.

   15        Q.    Before or after Mr. Kim?

   16        A.    I don't recall that either.

   17        Q.    Before or after Mr. Scheide?

   18        A.    Before.

   19        Q.    So, sometime before 2001?

   20        A.    Yes.

   21        Q.    What is Ms. Sparron's educational

   22    background?

   23        A.    I couldn't tell you that as I'm sitting

   24    here today.

   25        Q.    Was she a licensed architect?

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
37:1                    MARTINO

    2       A.     No.

    3       Q.     A member of the N C A R B?

    4       A.     No.

    5       Q.     A member of the American Institute of

    6   Architects?

    7       A.     No.

    8       Q.     Who was Peter Nicolosi?

    9       A.     Another CADD operator.

   10       Q.     What year did he join your firm?

   11       A.     I don't recall.

   12       Q.     What year did he leave?

   13       A.     This year, 2000 -- well, 2003.

   14       Q.     What month?

   15       A.     I don't recall.

   16       Q.     What is Mr. Nicolosi's educational

   17   background?

   18       A.     Graduate from New York tech.

   19       Q.     What degree, if any, did he earn?

   20       A.     I don't recall.

   21       Q.     Is he a member of the American

   22   Institute of Architects?

   23       A.     I don't know.

   24       Q.     Is he a licensed professional

   25   architect?
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

38:1                          MARTINO

2          A.     I don't know that either.

3          Q.     Is he a member of the N C A R B?

4          A.     I don't know that.

5          Q.     With respect to Mr. Stanco, when is the

6    last time you saw him?

7          A.     I saw him at the awards program in

8    2003.

9          Q.     What awards program?

10         A.     The Long Island chapter of the A I A.

11         Q.     Did he tell you what he is doing these

12   days?

13                MR. SEIDEN:  Professionally?

14                MR. SCHANER:  Yes.

15         A.     No, we really didn't speak that much.

16         Q.     Where is Mr. Stanco working today?

17         A.     I don't know.

18         Q.     What is the last job -- where did he

19   last work, to your knowledge?

20         A.     I don't recall the name of the firm.

21         Q.     After he left your employment, did he

22   obtain another job?

23         A.     Yes.

24         Q.     Where?

25         A.     On Long Island.

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
39:1                    MARTINO

  2        Q.     For whom?

  3        A.     I don't recall the name of the firm.

  4        Q.     You mentioned that you had given your

  5    deposition once previously.  I believe you said it

  6    was in 1991.  What was subject of that deposition?

  7              MR. SEIDEN:  ^ we will ^ well

  8    objection.  You could answer.

  9        A.     A gentleman fell on some stairs in a

 10    movie theater complex in Paramus New Jersey and he

 11    sued a litany of firms and individuals.

 12        Q.     Did he sue you?

 13        A.     Yes.

 14        Q.     You were a Defendant?

 15        A.     That's correct.

 16        Q.     All right.  Was there a trial?

 17        A.     No.

 18        Q.     What was the result of the case?

 19              MR. SEIDEN:  Objection.  It's

 20    completely irrelevant.

 21        A.     The insurance carrier, C N A, made a

 22    settlement offer of $5,000.

 23        Q.     On your behalf?

 24        A.     That's correct.

 25        Q.     Was that accepted?
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
40:1                    MARTINO

  2        A.      Yes, it was.

  3        Q.      Other than this one case,

  4   ^ have you ^ you have ever been sued personally or

  5   professionally?

  6        A.      Yes.

  7        Q.      How many times?

  8             MR. SEIDEN:  I'm sorry, can I here the

  9        question back.

 10             (Whereupon, the referred to

 11        ^ question ^ answer ^ question and answer

 12        ^ was ^ were read back by the Reporter.)

 13             MR. SEIDEN:  Objection.  You could

 14        answer?

 15        A.      This case, meaning the crown case.

 16        Q.      In addition to the crown case and in

 17   addition to the 1991?

 18             MR. SEIDEN:  Bodily injury case.

 19        Q.      Bodily injury case, have you ever been

 20   a Defendant in a lawsuit?

 21        A.      Yes, I have.

 22        Q.      On how many occasions?

 23        A.      Two other -- off the top of my head two

 24   other times.

 25        Q.      When was the first?
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
41:1                    MARTINO

   2      A.    I don't recall the year.

   3      Q.    Approximately?

   4      A.    '87.

   5      Q.    Who sued you?

   6      A.    I don't remember the person's name.

   7      Q.    What did the lawsuit concern?

   8      A.    It concerned an individual driving a

   9  car who hit a fire hydrant.

  10      Q.    What is the -- what were the

  11  individual's allegations as to you?

  12            MR. SEIDEN:  Objection.  Are you going

  13       to ask him to recite what the complaint is.

  14      Q.    What is your understanding of what the

  15  individual was suing you was alleging?

  16            MR. SEIDEN:  Objection.

  17      A.    I don't recall that.

  18      Q.    How did the '87 lawsuit conclude?

  19            MR. SEIDEN:  Objection.

  20      A.    I was dismissed.  No claims against me.

  21      Q.    Did you testify in that matter?

  22      A.    No.

  23      Q.    You mentioned that there was another

  24  lawsuit, when was that?

  25      A.    '94, '95.
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
42:1                    MARTINO
   2       Q.    What kind of lawsuit was that?
   3       A.    I wrote a report about an structure for
   4   the town of Hempstead as an outside independent
   5   architect as to the structural stability of the
   6   structure and the property owner objected, sued the
   7   town, sued me and sued numerous other people.
   8       Q.    Have you or your firm ever been sued
   9   for professional negligence?
  10       A.    No.
  11       Q.    Have you or your firm ever been subject
  12   to any form of disciplinary proceeding?
  13       A.    No.
  14       Q.    Have you ever testified in court?
  15       A.    No.
  16       Q.    Have you done anything to prepare for
  17   your deposition today?
  18       A.    I met with my attorney, reviewed some
  19   documents here.
  20       Q.    How much time did you spend meeting
  21   with your attorney?
  22           MR. SEIDEN:  Objection.  Privileged.
  23   Don't answer?
  24       A.    My attorney told me just not to answer.
  25           MR. SEIDEN:  If I say don't answer, you
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
43:1                 MARTINO
   2      don't have to say anything.  Just don't
   3      answer?
   4              THE WITNESS:  Okay.
   5      Q.    When you met with your attorney was
   6  anyone else present?
   7              MR. SEIDEN:  Objection.  No, you could
   8      answer that question?
   9      A.    His assistant, Marissa Lensor.
  10              MR. SEIDEN:  Just yes or no?
  11              THE WITNESS:  Sorry.
  12      Q.    When you met with your attorney, where
  13  was it?
  14      A.    Here.
  15      Q.    Aside from meeting with your attorney,
  16  did you talk with anyone else about the deposition
  17  today -- let me rephrase that.  Aside from meeting
  18  with your attorney, have you spoken to anybody else
  19  about this deposition?
  20      A.    Could you rephrase that.
  21      Q.    ^ have you ^ you have told anyone else
  22  about today's deposition?
  23      A.    Yes.
  24      Q.    Who?
  25      A.    My wife.
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

44:1                        MARTINO

2        Q.     Anyone else?

3        A.     Bob beach err.

4        Q.     Anyone else?

5        A.     My previous attorney to mark side den.

6        Q.     Who was that?

7        A.     Anthony Batiste.

8        Q.     Anyone else?

9        A.     No.

10       Q.     When did you speak with Mr. Beach err?

11       A.     Today is what.

12       Q.     Today is Thursday?

13       A.     Monday.

14       Q.     Was that a telephone call?

15       A.     Yes.

16       Q.     Did you call him or did he call you?

17       A.     He called me.

18       Q.     What did Mr. Beach err say

19    ^ you to ^ to you during that call?

20       A.     Relax, don't be nervous.

21       Q.     How long did your conversation with

22    Mr. Beach err last?

23       A.     I don't recall.

24       Q.     Did you say anything to Mr. Beach err?

25       A.     Yes.

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
45:1                    MARTINO
    2        Q.     What did you say to Mr. Beach err?
    3        A.     My deposition is coming up.
    4        Q.     Did you say anything else to Mr. Beach
    5   err?
    6        A.     Not that I recall.
    7        Q.     Did Mr. Beach err know that your
    8   deposition was coming up before you told him?
    9               MR. SEIDEN:  Objection.  How could he
   10          know the answer to that question.  You are
   11          asking him to go inside somebody else's head.
   12        Q.     Had you told Mr. Beach err previously
   13   that you were going to have your deposition taken?
   14        A.     No.
   15        Q.     What did Mr. Beach err say to you
   16   before you told him, in your call on Monday, that
   17   you were going to have your deposition taken?
   18        A.     Probably just idle conversation.
   19        Q.     Do you speak with Mr. Beach err
   20   regularly?
   21        A.     What is regularly.
   22        Q.     Once a week?
   23        A.     I don't know if it's that frequent.
   24        Q.     How many times, in the last six months,
   25   ^ have you ^ you have spoken with Mr. Beach err?
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
46:1                    MARTINO
   2        A.    I couldn't tell ^ you that ^ that you
   3   off the top of my head.
   4        Q.    More than once a month?
   5        A.    Probably.
   6        Q.    Twice a month?
   7        A.    It's a guess.
   8              MR. SEIDEN:  Don't guess.
   9        Q.    Are you and Mr. Beach err doing
  10   business together currently?
  11        A.    No.
  12        Q.    When is the last time you and Mr. Beach
  13   err did business together?
  14              MR. SEIDEN:  What do you mean by doing
  15        business together?  Working on the same
  16        project -- define what you mean.
  17              MR. SCHANER:  That would be fair.
  18        Q.    When is the last time you worked on a
  19   project with Mr. Beach err?
  20        A.    I don't recall.
  21        Q.    Was it in 2003?
  22        A.    I couldn't tell you.  That doesn't ring
  23   a bell.
  24        Q.    What about 2002?
  25        A.    I don't recall that either.
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

47:1                    MARTINO

2        Q.      When is the last time you saw Mr. Beach

3   err in person?

4        A.      Probably about a year ago.

5        Q.      Where was that?

6        A.      Here on Long Island.

7        Q.      Was it a meeting?

8        A.      No.  I think it was at a golf outing,

9   if I recall correctly.

10       Q.      You were both participating in the golf

11   outing?

12       A.      Yes.

13       Q.      Did somebody invite you to the golf

14   outing?

15       A.      I don't recall that, to be honest with

16   you.

17       Q.      Did Mr. Beach err invite

18   ^ you to ^ to you go golfing?

19       A.      No.

20       Q.      Was it at a golf course?

21       A.      Yes.

22       Q.      Which one?

23       A.      I don't remember the name of it.

24       Q.      Did you and Mr. Beach err, at that

25   time, discuss crown theater's lawsuit?

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
48:1                    MARTINO
   2        A.     No.
   3        Q.     Did you discuss work for crown
   4    theaters?
   5        A.     I don't recall discussing that, no.
   6        Q.     When did you last speak with Anthony
   7    Batiste?
   8        A.     Last week.
   9        Q.     Was Mr. Batiste still serving as your
  10    attorney?
  11        A.     Yes.
  12        Q.     Did you meet with Mr. Batiste in
  13    person?
  14        A.     No.
  15        Q.     You spoke to him by telephone?
  16        A.     That's correct.
  17        Q.     When is the last time you spoke with
  18    Milton Daly?
  19               MR. WISSER:  Objection to the form.
  20               MR. SEIDEN:  Objection to the form.
  21        There is no foundation.
  22               MR. WISSER:  It assumes he ever spoke
  23        to him.
  24               MR. SCHANER:  I will ask that
  25        question.
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
49:1                        MARTINO

  2        Q.     Have you ever spoken to Milton Daly?

  3        A.     Sure.

  4        Q.     Who was Milton Daly?

  5        A.     He was the CEO of crown theaters.

  6        Q.     When did you first meet Mr. Daly?

  7        A.     I don't recall when I first met

  8   Mr. Daly.

  9        Q.     When is the last time you spoke with

 10   Mr. Daly?

 11        A.     Shortly after he resigned from crown

 12   theaters.

 13        Q.     Was that a face-to-face meeting?

 14        A.     No.

 15        Q.     Was that by telephone?

 16        A.     Yes.

 17        Q.     Did he call you or did you call him?

 18        A.     He called me.

 19        Q.     What did he say?

 20        A.     He was asking me about a size of a

 21   skylight in his house because he wanted to buy a

 22   blind.

 23        Q.     Did he say anything else?

 24        A.     No.

 25        Q.     Did he tell you he had resigned from
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

50:1                    MARTINO

2    crown theaters?

3         A.    No.

4         Q.    Are you familiar with a man name James

5    Cella?

6         A.    Yes.

7         Q.    C E L L A.  Who was Mr. Cella?

8         A.    Mr. Cella was partners with stew

9    Koshner who owned a company, I believe, R C Hudson.

10        Q.    When is the last time you spoke with

11   Mr. Cella -- let me ask you this question:  Have

12   you ever spoken with Mr. Cella?

13        A.    Yes.

14        Q.    When was the last time you spoke with

15   him?

16        A.    I don't recall.

17        Q.    ^ have you ^ you have spoken to him

18   within the last year?

19        A.    No.

20        Q.    Have you ever spoken with Mr. Koshner?

21        A.    No.

22        Q.    Let's talk about Mr. Bob beach err,

23   when did you first meet Mr. Beach err?

24        A.    I believe it was in 1978 or 79.

25        Q.    What was the occasion or what were the

Martino, Jim - January 15, 2004 00:00:00 a.m.

51:1                    MARTINO

2    circumstances which ^ led ^ lead to your meeting

3    Mr. Beach err in 1978 or 79?

4        A.    I was employed by the architect Angelo

5    Corva at the time.  Angelo was doing united artists

6    theaters and Bob beach err owned a construction

7    company at the time and he was -- his firm was one

8    of the bidders on that project.

9        Q.    Bob beach err is somebody you worked

10   with when you did work for crown theaters, correct?

11               MR. SEIDEN:  Objection.  What do you

12        mean by worked with.

13       Q.    Do you understand the question?

14       A.    No.

15       Q.    Did Bob beach err, to your knowledge,

16   have any involvement in crown theaters theater

17   construction project?

18       A.    Yes.

19       Q.    What was his role?

20       A.    Owners rep construction manager.

21       Q.    Did you speak with Mr. Beach err while

22   you were doing work for crown theaters?

23       A.    Yes.

24       Q.    Let's talk about the time before you

25   did work for crown theaters.  Did you have contact

Martino, Jim - January 15, 2004 00:00:00 a.m.

52:1                    MARTINO

2    with Bob beach err before working for crown?

3          A.     Yes, I did.

4          Q.     You mentioned one project.  Did you

5    have others?

6          A.     I'm not following your question.

7          Q.     Did you work on jobs involving Bob

8    beach err before you did work for crown?

9          A.     Yes.

10         Q.     What jobs did you work with Mr. Beach

11   err on?

12         A.     Well, there are movie theater

13   complexes.

14         Q.     Anything else?

15         A.     We did an office building together.

16   That's what comes to mind right now.

17         Q.     Which movie theater complexes did you

18   work with Bob beach err on before you did work for

19   crown theaters?

20         A.     K B theaters, national theaters of

21   Ohio.  That's it.

22         Q.     How many theaters for K B theaters did

23   you design where Bob beach err was involved?

24              MR. SEIDEN:  Just let record reflect

25         the witness is referring to Exhibit 2.

Martino, Jim - January 15, 2004 00:00:00 a.m.

53:1                      MARTINO

2        A.      Four.

3        Q.      The same question with respect to

4    national theaters of Ohio?

5        A.      Off the top of my head, three.

6        Q.      Where was the office building that you

7    worked on with Mr. Beach err?

8        A.      On Long Island.

9        Q.      What kind of office building was this?

10   How large an office building was it?

11       A.      Approximately 15,000 square feet.

12       Q.      While you were doing work for crown

13   theaters, did you also work on other projects which

14   involved Bob beach err?

15       A.      I don't recall.

16       Q.      After you concluded your work with

17   crown theaters, did you work on other projects

18   which involved Bob beach err?

19       A.      Not that they come to my mind though.

20       Q.      On the movie theater complexes that

21   you've testified about, which you worked on and

22   which involved Bob beach err, what was Mr. Beach

23   err's role?

24            MR. SEIDEN:  All of them, one of them?

25       Objection.

Martino, Jim - January 15, 2004 00:00:00 a.m.

54:1                    MARTINO

2        A.      You have to be more specific about

3    which clientele, first of all.

4        Q.      Let's start with K B theaters?

5        A.      Okay.

6        Q.      What was Mr. Beach err's role with

7    respect to the K B theater projects?

8        A.      He was the general contractor.

9        Q.      What was his role with respect to the

10   national theaters project?

11       A.      He was general contractor.

12       Q.      What was your role in connection with

13   the K B theaters projects?

14       A.      I was the architect.

15       Q.      What was your role with respect to the

16   national theaters of Ohio projects?

17       A.      I was the architect.

18       Q.      Who hired ^ you to ^ to you work on

19   those jobs?

20       A.      The owners of those two companies.

21               MR. SEIDEN:  For clarification, those

22          companies being K B theaters an national

23          theaters of Ohio?

24               THE WITNESS:  That's correct.

25       Q.      What was Mr. Beach err's role with

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
55:1                    MARTINO
  2   respect to the Long Island office building?
  3        A.      The general contractor.
  4        Q.      What was your role?
  5        A.      Architect.
  6        Q.      I would like to refer you back to
  7   exhibit number two.  If you would look at the body
  8   of work section?
  9              MR. SEIDEN:  What page is that.
 10              MR. SCHANER:  Unfortunately, they
 11        aren't page numbered.
 12              MR. SEIDEN:  Is it in the back, front.
 13              MR. SCHANER:  It's in the middle.  It's
 14        a body of work.
 15              MR. SEIDEN:  I got it.
 16        Q.      If you turn to the page behind that, it
 17   says commercial and corporate, do you see that?
 18        A.      Mm-hmm.
 19        Q.      Did Mr. Beach err have any involvement
 20   with respect to any of the projects listed on that
 21   page?
 22        A.      Yeah, crown theaters L P.
 23        Q.      Anything else?
 24        A.      Loss and properties.
 25        Q.      Anything else?
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

56:1                         MARTINO

2        A.      Deutsch Marin.

3        Q.      What was Mr. Beach err role with

4    respect to the Deutsch Marin company project?

5        A.      I don't know what his role was.

6        Q.      What was his involvement?

7        A.      That's I don't know what you are asking

8    me.

9        Q.      Did Mr. Beach err have anything to do

10   with the Deutsch Marin corporate headquarters

11   project?

12       A.      He introduced them to me so I did the

13   drawings for them.

14       Q.      What relation -- did he introduce you

15   to loss and properties as ^ we will ^ well?

16       A.      Yes.

17       Q.      What work did you do for loss and

18   properties?

19       A.      I did the architectural drawings.

20       Q.      What kind of project was that?

21       A.      That is the office building I was

22   speaking of.

23       Q.      That is the Long Island office

24   building?

25       A.      Right.

Martino, Jim - January 15, 2004 00:00:00 a.m.

57:1                         MARTINO

2        Q.      What work did you do for Deutsch Marin?

3        A.      An architectural floor plan.

4        Q.      What year did you do that work?

5        A.      I don't recall.

6        Q.      What year did the do the work for loss

7    an properties?

8        A.      I don't recall that either.

9        Q.      Turn to the next page.  The head

10   something health care facilities?

11       A.      Mm-hmm.

12       Q.      Did Mr. Beach err have any involvement

13   in any of the projects listed on this page?

14       A.      Yes.

15       Q.      Which ones?

16       A.      Under podiatry, Fred beach err and

17   Roslyn breech err.  That is his brother and

18   sister.

19       Q.      What work did you do with respect to

20   the podiatry facilities?

21       A.      Floor plans.

22       Q.      Turn to the next page.  Housing an

23   condominiums, did Mr. Beach err have any

24   involvement in any of the projects listed on this

25   page?

Martino, Jim - January 15, 2004 00:00:00 a.m.

58:1                    MARTINO

2        A.     One.

3        Q.     Which one?

4        A.     Royal Sentul S E N T U L, housing.

5        Q.     What kind of project was royal Sentul

6    housing?

7        A.     Housing project.

8        Q.     Where?

9        A.     Jakarta Indonesia.

10        Q.     How large, how many units?

11        A.     It was not determined.

12        Q.     What work did you perform?

13        A.     Preliminary design.

14        Q.     What was Mr. Beach err's involvement?

15        A.     He introduced me to the contact person

16    there.

17        Q.     What year did you work on the royal

18    Sentul housing project?

19        A.     I don't recall.

20        Q.     Turn the page, international facilities

21    is the title of the next page do you see that?

22        A.     Yes.

23        Q.     Did Mr. Beach err have any involvement

24    in any of the project listed on this page?

25        A.     The three royal Sentul projects.

Martino, Jim - January 15, 2004 00:00:00 a.m.

59:1                          MARTINO

2        Q.      One is a royal Sentul ice rink correct?

3        A.      That's correct.

4        Q.      Another is a royal Sentul housing

5    project?

6        A.      That's correct.

7        Q.      And there is also a royal Sentul movie

8    theater; is that right?

9        A.      That's correct.

10       Q.      What work did you do on each of those?

11       A.      Preliminary design.

12       Q.      And Mr. Beach err introduced you to the

13   client?

14       A.      That's correct.

15       Q.      Turn the page.  We come to the heading

16   movie theaters?

17       A.      Mm-hmm.

18       Q.      Two clients are listed, Cineplex/Odeon

19   and K B theaters.  You mentioned that Mr. Beach err

20   was the general contractor when you were the

21   architect on K B theaters that's correct?

22       A.      That's right.

23       Q.      Did Mr. Beach err introduce you to K B

24   theaters?

25       A.      That's correct.

Martino, Jim - January 15, 2004 00:00:00 a.m.

60:1                    MARTINO

2       Q.     Did Mr. Beach err introduce you to

3    Cineplex/Odeon?

4       A.     That's correct.

5       Q.     In what year did Mr. Beach err

6    introduce ^ you to ^ to you K B theaters?

7       A.     I don't recall.

8       Q.     What about Cineplex/Odeon?

9       A.     Same.  I don't recall.

10      Q.     Turn the page.  Next page is headed

11   movie theaters and there are two columns, one is

12   headed general cinemas corporation and other is

13   crown theaters?

14      A.     Mm-hmm.

15      Q.     Did Mr. Beach err introduce

16   ^ you to ^ to you general cinemas corporation?

17      A.     Yes, he did.

18      Q.     Did he introduce you to crown theaters?

19      A.     Yes, he did.

20      Q.     Turn the page, public and civic

21   facilities is the title of that page?

22      A.     Yes.

23      Q.     Did Mr. Beach err have any involvement

24   in any of these projects?

25      A.     We have the royal Sentul ice rink

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
61:1                    MARTINO

 2   listed here under civic.

 3        Q.    Anything else on this page?

 4        A.    No.

 5        Q.    Next page is religious facilities is

 6   the heading do you see that?

 7        A.    Yes.

 8        Q.    Did Mr. Beacher have any involvements

 9   with any of these projects?

10        A.    No, he did not.

11        Q.    He didn't introduce ^ you to ^ to you

12   any of those clients?

13        A.    No.

14        Q.    Turn the page the heading is

15   restaurants.  Did Mr. Beach err have any

16   involvement in your work on any of these projects?

17        A.    Just choke late.

18        Q.    In Bethesda Maryland?

19        A.    That's correct.

20        Q.    What is just chocolate?

21        A.    A retail store in a mall

22   ^ was that ^ that was owned by K B theaters.

23        Q.    What work did you do for just

24   chocolate?

25        A.    Architectural drawings.
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
62:1                    MARTINO
    2        Q.     And Mr. Beach err introduced you to the
    3    client?
    4        A.     Same client was K B, yes.
    5        Q.     Turn the page, retail facilities
    6    ^ did, ^ , did Mr. Beach err have any involvement
    7    in your work on any of these projects?
    8        A.     No.
    9        Q.     Turn to the next page the head
   10    something single family residences do you see that?
   11        A.     Yes.
   12        Q.     Did Mr. Beach err have any involvement
   13    with any of these projects?
   14        A.     Sure.
   15        Q.     Which ones?
   16        A.     Beach err residence.
   17        Q.     Any others?
   18        A.     ^ we will ^ well, the second one down
   19    is Daly restoration.  That's Milt Daly's house.
   20        Q.     That was in New Fairfield Connecticut?
   21        A.     Mm-hmm.
   22        Q.     That's yes?
   23        A.     Yes.
   24        Q.     And Mr. Beach err residence was West
   25    Palm Beach Florida?
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

63:1                    MARTINO

2          A.     That's correct.

3          Q.     What work did you do with respect to

4     the beach err residence?

5          A.     In West Palm Beach you are speaking

6     of?

7          Q.     Yes.

8          A.     We did some interior design work in

9     terms of some custom built-ins that he wanted to

10    have done.

11         Q.     Anything else?

12         A.     No.

13         Q.     What was the value of your services on

14    Mr. Beach err's house?

15         A.     I don't recall.

16         Q.     Did you bill Mr. Beach err for your

17    work?

18         A.     I don't recall that.

19         Q.     What is your best recollection?

20                MR. SEIDEN:  He answered he said he

21         doesn't recall.

22         Q.     You don't recall if you submitted a

23    bill?

24         A.     That's correct.

25         Q.     In what year did you perform work in

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
64:1                    MARTINO

  2    connection with the beach err residence?

  3         A.     I don't recall that either.

  4         Q.     Within the last five years?

  5         A.     I don't recall.

  6         Q.     What work did you do with regard to the

  7    Daly restoration, Milt Daly's house?

  8         A.     Architectural construction drawings.

  9         Q.     What year or years did you provide

 10    those services?

 11         A.     I don't recall.

 12         Q.     What was the value of those services?

 13         A.     I don't recall that off the top of my

 14    head either.

 15         Q.     Did you or your firm submit a bill or

 16    invoice to Mr. Daly for that work?

 17         A.     I don't recall.

 18         Q.     Did Mr. Daly pay you any money for the

 19    work on his house?

 20         A.     No.

 21         Q.     Did Mr. Beach err pay you any money for

 22    work on his house?

 23         A.     No.

 24         Q.     Did you work on any residences for

 25    Mr. Beach err in addition to the residence located
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
65:1                    MARTINO

  2   in West Palm Beach Florida?

  3        A.     Say that again.

  4        Q.     Does Mr. Beach err to your knowledge,

  5   have residences other than West Palm Beach Florida?

  6        A.     He previously owned a house on Long

  7   Island.

  8        Q.     Did you to any work in relation to that

  9   house?

 10        A.     Yes, I did.

 11        Q.     What work did you do?

 12        A.     His residence suffered a damage from a

 13   house that exploded because of a gas explosion so

 14   we did the restoration drawings for that house.

 15        Q.     That's Mr. Beach err or Mr. Daly?

 16        A.     Mr. Beach err.

 17        Q.     Mr. Beach err.  In what year did you do

 18   that work?

 19        A.     I don't recall.

 20        Q.     How long did it take you to perform

 21   those services?

 22        A.     I don't recall that either.

 23        Q.     Did you submit a bill to Mr. Beach err

 24   for the restoration of his house?

 25        A.     I don't recall that.
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

66:1                    MARTINO

2        Q.     Did Mr. Beach err pay you any money for

3    that work?

4        A.     I don't recall that either.

5        Q.     Are you saying he didn't pay you any

6    money?

7        A.     No, I'm not saying that.

8        Q.     You just don't know?

9        A.     That's right.

10              MR. SEIDEN:  Let's take a two-minute

11          restroom break.

12              MR. SCHANER:  That's a good idea.

13              (Whereupon, a brief recess was agreed

14          upon and taken by all.)

15       Q.     Mr. Martino, we are back on the record

16   after lunch.  During the 1996 to 2001 period when

17   you were working for crown theaters, what was your

18   relationship on those projects to Bob beach err?

19              MR. SEIDEN:  Objection to the form.

20              MR. WISSER:  Objection to the form.

21       A.     There was no relationship.

22       Q.     Did you speak with Mr. Beach err in

23   connection with the crown theaters projects?

24       A.     Yes.

25       Q.     What role, to your understanding, did

Martino, Jim - January 15, 2004 00:00:00 a.m.

67:1                     MARTINO

2   Mr. Beach err play with respect to the crown

3   theaters construction projects?

4        A.     He was the owners rep construction

5   manager.

6        Q.     Did you interact with him on the -- in

7   connection with your work on crown?  Did you

8   interact with him?

9        A.     Communicate.

10       Q.     Did you report to him?

11              MR. SEIDEN:  Objection.  I don't know

12       what that means?

13       A.     I don't know what you mean by report to

14   him.

15       Q.     Who was your point of contact at crown

16   theaters?

17       A.     Milt Daly was the CEO.

18       Q.     Did you report to Milt Daly?

19              MR. SEIDEN:  Objection to the form of

20       the question.

21              MR. WISSER:  I don't know what you mean

22       by report objection.

23              MR. SEIDEN:  I don't know what you mean

24       by report either.  It's vague?

25       A.     I don't know what you mean by report.

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
68:1                    MARTINO

   2        Q.    Did you keep Mr. Daly apprised of your

   3    work in connection with the crown theater's

   4    projects?

   5        A.    Yes.

   6        Q.    How did you do that?

   7        A.    Phone calls.

   8        Q.    Would you call him or would he call

   9    you?

  10        A.    A combination of both.

  11        Q.    Approximately how often did you speak

  12    by telephone with Mr. Daly?

  13        A.    I don't recall.

  14        Q.    Once a week?

  15        A.    I don't recall.

  16        Q.    Every day?

  17        A.    No, it was not every day.

  18        Q.    It could have been once a week?

  19              MR. WISSER:  Objection to the form.

  20              MR. SEIDEN:  Objection.  He answered he

  21    didn't know.

  22        Q.    More than once -- multiple times a

  23    month?

  24        A.    That's fair.

  25              MR. WISSER:  Objection to the form.
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

69:1                     MARTINO

2        Q.    Did you communicate with Mr. Beach err

3    during the course of the crown theaters

4    construction program?

5        A.    Yes, I did.

6        Q.    How often did you communicate with

7    Mr. Beach err?

8        A.    Multiple times each day.

9        Q.    Over the course of your work for crown

10   theaters?

11       A.    Mm-hmm.

12       Q.    From 1996 to 2001?

13       A.    Correct.

14       Q.    Were these communications by telephone?

15       A.    Yes.

16       Q.    Were they also in person?

17       A.    Yes.

18       Q.    How often would you -- did you meet

19   with them him in person for the 1996 2001 time

20   frame?

21       A.    That's impossible to answer.

22       Q.    Weekly?

23       A.    I don't recall.

24       Q.    Between 1996 and 2001, where were you

25   living?

Martino, Jim - January 15, 2004 00:00:00 a.m.

70:1                    MARTINO

2        A.      Same address I live at right now.

3        Q.      Where did Mr. Beach err live, if you

4   know?

5        A.      Wood mere, New York.

6        Q.      How close to your residence did

7   Mr. Beach err live?

8        A.      By car it's approximately about 45

9   minutes drive.

10        Q.      Did Mr. Beach err have an office?

11        A.      Yes.

12        Q.      Where was that located?

13        A.      Lynbrook.

14        Q.      Did you beat meet with Mr. Beach err at

15   his office?

16        A.      Yes.

17        Q.      How often?

18        A.      It fluctuates.  It's not a simple

19   answer.

20        Q.      Let me ask you this question:  Did you

21   or your firm ever pay any money to Mr. Beach err in

22   exchange for business?

23        A.      No.

24        Q.      Did you or your firm ever pay any money

25   to Mr. Beach err for any purpose?

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
71:1                    MARTINO
   2           MR. SEIDEN:  Objection.
   3           MR. WISSER:  Objection to the form.
   4           MR. SEIDEN:  That -- the with the
   5       implication that you are trying to race with
   6       that question, I would ask that it be
   7       rephrased.  That's a very vague question for
   8       any purpose.
   9           MR. WISSER:  It could include
  10       reimbursement of phone bills, gasoline,
  11       anything?
  12       A.    Could you rephrase it.
  13       Q.    I would like ^ you to ^ to you answer
  14   the question.
  15       A.    Could you repeat the question.
  16           MR. SCHANER:  Would you read the
  17       question back, please.
  18           (Whereupon, the referred to
  19       ^ question ^ answer ^ question and answer
  20       ^ was ^ were read back by the Reporter.)
  21           MR. SEIDEN:  Same objection.
  22           MR. WISSER:  Same objection.
  23       A.    I don't remember.
  24       Q.    In the fall of 1999, did you or your
  25   firm write a check to Bob beach err for $50,000?
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
72:1                    MARTINO

  2        A.    I don't remember that.

  3        Q.    Union way or another?

  4        A.    I don't remember.

  5        Q.    It could have happened?

  6              MR. SEIDEN:  He answered the question.

  7        Anything is possible.  Could, should, would.

  8        He answered your question.

  9        Q.    You are saying you might have written a

 10   check for $50,000?

 11              MR. SEIDEN:  That's not what he said.

 12              MR. WISSER:  Objection to form.

 13              MR. SEIDEN:  You are trying to put

 14        words in his mouth, Counselor.  That's not

 15        what he said.  He said I don't remember.

 16        Q.    Did you do it or didn't you do it?

 17        A.    I said I don't remember, counselor.

 18        Q.    Did you or your firm ever write a check

 19   to Mr. Beach err for any amount of money?

 20              MR. WISSER:  Objection to the form.

 21              MR. SEIDEN:  Objection to form.

 22        A.    No.

 23        Q.    Did you, or your firm, ever write a

 24   check to any business, owned or controlled by Bob

 25   beach err?
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

73:1                    MARTINO
     2        A.     I don't remember that.
     3        Q.     Have you provided any gifts to Bob
     4    beach err over the years?
     5        A.     Yes.
     6        Q.     What gifts?
     7        A.     Holiday gifts.
     8        Q.     Anything else?
     9        A.     Not that I recall.
    10        Q.     When you say holiday gifts, what gifts
    11    do you recall?
    12        A.     Hanukkah.
    13        Q.     Did you give Mr. Beach err a Hanukkah
    14    gift every year?
    15               MR. SEIDEN:  From when to when.
    16        Q.     Let's say 1996 to 2001?
    17        A.     I don't recall doing that every year.
    18        Q.     What Hanukkah gifts do you recall
    19    providing Mr. Beach err?
    20        A.     A flower vase.
    21        Q.     Anything else?
    22        A.     That's the only one that comes to my
    23    mind right now.
    24        Q.     Have you, or your firm, provided
    25    Mr. Beach err with any professional services?

Martino, Jim - January 15, 2004 00:00:00 a.m.

74:1                    MARTINO

2        A.      Yes.

3        Q.      You mentioned work on his residence in

4    Florida?

5        A.      Mm-hmm.

6        Q.      Anything else your answer was yes?

7        A.      Yes.

8        Q.      Anything else?

9        A.      Professional services on his house in

10   wood mere after the explosion that took place

11   anything else?

12       A.      Not that I recall, no.

13       Q.      Have you, or your firm, at any time

14   given cash to Bob beach err?

15               MR. WISSER:  Objection to the form.

16               MR. SEIDEN:  Objection to the form.

17       A.      Not that I recall.

18       Q.      ^ have you ^ you have or your firm, at

19   any time, given cash to any business or entity

20   controlled by Bob beach err?

21               MR. SEIDEN:  Objection to the form?

22       A.      Not that I recall.

23       Q.      Where does your architectural firm

24   maintain its bank accounts?

25       A.      I'm sorry, it's what accounts.

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
75:1                    MARTINO
   2      Q.     Bank accounts?
   3      A.     I believe it's Citibank.
   4      Q.     Which branch?
   5      A.     Port Washington.
   6      Q.     Has your firm maintained other accounts
   7   over the last five years?
   8      A.     No.
   9      Q.     What about other the last ten years?
  10      A.     I believe we have, yes.
  11      Q.     Where?
  12      A.     E A B.
  13      Q.     Where is E A B based?
  14      A.     I don't know.
  15      Q.     Which branch?
  16      A.     Port Washington.
  17      Q.     Anything else?
  18      A.     Not that I can recall.
  19      Q.     Where do you personally maintain your
  20   banking or checking account?
  21            MR. SEIDEN:  Objection to form.
  22      Q.     Do you have a personal banking account?
  23      A.     Yes.
  24      Q.     Where?
  25      A.     I don't know.
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
76:1                    MARTINO

  2        Q.     Why not?

  3        A.     My wife knows.

  4        Q.     Which bank?  Which bank do you use?

  5   You don't know?

  6        A.     I don't know.

  7        Q.     Does your wife handle your family

  8   finances?

  9        A.     That's correct.

 10        Q.     How long has she handled your family

 11   finances?

 12        A.     Since we are married.

 13        Q.     Have you ever had a bank account in

 14   your own name since you were married?

 15        A.     No.

 16        Q.     In what year were you married?

 17        A.     1983.

 18        Q.     Is your -- do you have a joint account

 19   with your wife?  Do you know?

 20        A.     Yes.

 21        Q.     You do have a joint checking account?

 22        A.     That's correct.

 23        Q.     You don't know where it's located?

 24        A.     That's right.

 25               MR. SCHANER:  Let's mark this as
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
77:1                    MARTINO

    2        Martino Exhibit Number 3.

    3              (Whereupon, the aforementioned

    4        ^ document ^ photograph ^ was ^ were marked as

    5        ^ Plaintiff's ^ Defendant's Exhibit ^Replace

    6        for identification as of this date by the

    7        Reporter.)

    8        Q.    Mr. Martino, you have before you

    9   Martino Exhibit Number 3.  It's a 12 page document

   10   titled defendants James T Martino and James Thomas

   11   Martino, architects, P C's answers to Plaintiff

   12   crown theaters, P C's first set of interrogatories?

   13        A.    Yes, I have.

   14        Q.    If you turn to page 11 at the top of

   15   the page it says verification.  There is a

   16   signature on the page.  Is that your signature?

   17        A.    That is my signature.

   18        Q.    Did you sign that on or about April 24,

   19   2003?

   20        A.    That's what the document says.

   21        Q.    Do you have any reason to disagree?

   22        A.    No.

   23        Q.    Mr. Martino, did you have any

   24   involvement in preparing the answers to crown

   25   theaters first set of interrogatories?
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
78:1                    MARTINO
    2      A.     Could you state that question again,
    3   counselor, please.
    4      Q.     Did you participate in preparing the
    5   answers to crown theaters first set of
    6   interrogatories?
    7      A.     Yes, I did.
    8      Q.     Did you review -- strike that.
    9             Are the answers in Defendant's Exhibit
   10   number -- strike that.
   11             Are the answers in Martino Exhibit
   12   Number 3 complete and accurate?
   13      A.     Yes, I believe they are.
   14      Q.     Turn, please, to page number three.
   15   Where you see interrogatory number two at the top
   16   of the page.  Are you there?
   17      A.     Yes, I am.
   18      Q.     Interrogatory two states separately for
   19   each the theater projects in which you were
   20   retained, performed work or provided services,
   21   state for each visit to the project site and under
   22   that it says A, the date of your visit and you have
   23   a response which follows.  Below, you've provided
   24   in response to 2A under Hartford, Connecticut upon
   25   information and believe Martino visited this
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

79:1                    MARTINO

2    location on the following dates, do you see the

3    list?

4         A.    Yes, I do.

5         Q.    How is this list of dates compiled?

6         A.    I believe my bookkeeper put that list

7    together for me.

8         Q.    What information did your bookkeeper

9    use to compile the list of dates on which you

10   visited the Hartford, Connecticut site?

11        A.    The invoices.

12        Q.    Which invoice?

13        A.    The invoices we submitted, I believe,

14   for those dates when I appeared.

15        Q.    And by -- your bookkeeper, who are you

16   referring to?

17        A.    Joseph LaMonte.

18        Q.    Did Mr. LaMonte review your invoices to

19   compile the information for your visits to the

20   Trumbull Connecticut sites, the Jupiter Florida

21   site, the Miami site and Skokie Illinois site and

22   the Annapolis Maryland site?

23        A.    Yes.

24        Q.    Mr. Martino is your answer accurate and

25   complete with respect to your site visits for each

Martino, Jim - January 15, 2004 00:00:00 a.m.

80:1                     MARTINO

    2    of the crown theaters locations?

    3              MR. SEIDEN:  I don't understand the

    4         question.  Objection.  Answer complete as to

    5         what.

    6         Q.     With respect to the Hartford,

    7    Connecticut theater project, ^ have you ^ you have

    8    accurately and completely listed all of your site

    9    visits in response to interrogatory number two on

   10    page three of Exhibit Number 3?

   11         A.     I can't sit here and say today that

   12    that is accurate and complete, from what I

   13    understand what you are saying.  I think you are

   14    asking me did I visit these number of times or

   15    could there possibly have been more times or less

   16    times.

   17         Q.     Yes.

   18         A.     I couldn't answer your question here.

   19         Q.     Is this your best answer to the

   20    question on what dates did you visit the Hartford,

   21    Connecticut theater project?

   22         A.     That's our best estimate.

   23         Q.     Same question for the Trumbull

   24    project.  Are the dates reflected in your response

   25    to crown theaters interrogatories, your best

Martino, Jim - January 15, 2004 00:00:00 a.m.

81:1                    MARTINO

2    understanding of the dates on which you visited

3    that project?

4            MR. SEIDEN:  I'm sorry.  Point of

5        clarification.  When you say you and maybe

6        it's a defined term, are you referring to

7        Mr. Martino individually or his company.

8            MR. SCHANER:  Mr. Martino individually.

9            MR. SEIDEN:  Okay.  Thank you.

10   A.     I relied upon Joseph LaMonte to put

11   this together.

12   Q.     As you sit here now?

13   A.     Those are the dates that he had

14   recorded on me traveling to these locations.  Could

15   there have been other dates that I went that were

16   not recorded, possibly.

17   Q.     As you currently understand the

18   situation, these are the dates on which you visited

19   the Trumbull Connecticut site, correct?

20   A.     Yes.

21   Q.     As you currently understand the

22   situation, the dates listed for Jupiter Florida in

23   your interrogatory answer are the dates when you

24   made site visits to the Jupiter Florida project?

25   A.     I believe so, yes.

Martino, Jim - January 15, 2004 00:00:00 a.m.

82:1                         MARTINO

2          Q.     Same thing for Miami Florida?

3          A.     I believe, yes.

4          Q.     Also for Skokie Illinois?

5          A.     Yes.

6          Q.     I believe so.

7          Q.     And Annapolis Maryland?

8          A.     I believe so, yes.

9          Q.     Mr. Martino, when were you first hired

10   to perform work for crown theaters?

11         A.     It was either late December '95 or

12   early '96.

13         Q.     Who hired you?

14         A.     Milt Daly.

15         Q.     What did Mr. Daly ^ hire ^ higher you

16   to do?

17         A.     I recall it being a lobby alteration to

18   the Greenwich theater.

19         Q.     What work in connection with the lobby

20   alteration did Mr. Daly request that you perform?

21         A.     Architectural and structural

22   construction drawings.

23         Q.     Now, you testified earlier that

24   Mr. Beach err was involved in introducing you to

25   crown theaters.  How did Mr. Beach err introduce

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
83:1                    MARTINO

    2    ^ you to ^ to you crown theaters?

    3            MR. SEIDEN:  Objection to the form to

    4        the extent that it purports to characterize

    5        prior testimony.  It speaks for itself?

    6    A.      Could you repeat that question.

    7    Q.      Let me see if I could make it clearer.

    8    You testified earlier that Mr. Beach err introduced

    9    you to crown theaters; is that right?

   10    A.      Yes.

   11    Q.      What did Mr. Beach err do to introduce

   12    you to crown theaters?  To whom at crown theaters

   13    did Mr. Beach err introduce you?

   14    A.      To Mr. Daly.

   15    Q.      When was that?

   16    A.      November or December of '95.

   17    Q.      Where did the introduction take place?

   18    A.      In crown theater's office in South

   19    Norwalk.

   20    Q.      When you were introduced to Milton

   21    Daly, did you have a meeting with him?

   22    A.      Yes.

   23    Q.      How long did your first meeting with

   24    Mr. Daly -- had you met Mr. Daly before?

   25    A.      Yes.
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

84:1                    MARTINO

2       Q.      When did you first meet Milton Daly?

3       A.      I don't recall exactly.

4       Q.      Do you have an approximate date?

5       A.      1980.

6       Q.      Where was Mr. Daly working at the time?

7       A.      United artists theaters.

8       Q.      Between 1980 and 1995, did you work on

9   projects which involved Milton Daly?

10              MR. WISSER:  Objection to the form.

11              MR. SEIDEN:  I join in the objection.

12              MR. WISSER:  Just for clarification, do

13          you mean did he work on projects for a company

14          in which Milton Daly was an employee.

15              MR. SCHANER:  Sure, I will accept that?

16      A.      That is what I was interpreting you to

17   say but you didn't say that.

18      Q.      Okay.  With that clarification?

19      A.      Yes.

20      Q.      Which projects?

21      A.      There was an office building for united

22   artist theaters ^ was that ^ that was being

23   constructed in east meadow.

24      Q.      Anything else?

25      A.      No.

Martino, Jim - January 15, 2004 00:00:00 a.m.

85:1                    MARTINO

2        Q.     That was in approximately 1980?

3        A.     1980, yes, 1981, somewhere -- no, 1980.

4        Q.     Did you remain in touch with Mr. Daly

5    after the construction of that office building

6    conclude?

7        A.     No.

8        Q.     When you met with Mr. Daly in crown

9    theater's offices in November or December of 1995,

10   what did you discuss?

11       A.     We discussed the possibilities of me

12   becoming the architect for crown theaters.

13       Q.     Did Mr. Daly tell you what work crown

14   theaters wanted done?

15       A.     That's a very vague question.  I'm not

16   sure what you are asking me.

17       Q.     Did he tell you the crown theaters was

18   about to embark on a substantial theater

19   construction or renovation program?

20       A.     Yes.

21       Q.     What did he tell you about the theater

22   construction or renovation program?

23       A.     I can't recall the exact words what

24   were discussed at that meeting.  That's almost

25   eight years ago.

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
86:1                    MARTINO

  2        Q.     Do you have a general recollection?

  3        A.     Basically that crown was going to be

  4    doing an expansion program and they are looking for

  5    sites, in essence.

  6        Q.     Who else was present at the meeting?

  7        A.     Bob beach err?

  8        A.     Did Mr. Daly agree to use your services

  9    at the end of that meeting.

 10             MR. WISSER:  Objection to the form.

 11             When you refer to Mr. Daly in that regard, do

 12             you mean Mr. Daly on behalf of crown.

 13             MR. SCHANER:  Sure.

 14        A.     He agreed, at that point in time, to

 15    try my services out on this first project.

 16        Q.     Now, the first project was the lobby

 17    alteration for the Greenwich, Connecticut theater,

 18    correct?

 19        A.     Correct.

 20        Q.     Did you have a written contract for

 21    that project?

 22        A.     I don't believe so, no.

 23        Q.     You went onto work on a number of other

 24    theater projects for crown theaters.  Did you have

 25    written contracts for any of those projects?
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
87:1                     MARTINO

  2        A.    Yes.

  3        Q.    Which ones?

  4        A.    Trumbull.

  5        Q.    Any others?

  6        A.    Not that I recall -- wait, Minneapolis.

  7        Q.    Do you have copies of those contracts

  8   in your files?

  9        A.    They should be here.

 10              MR. SEIDEN:  I'm sure everything was

 11        produced to you.

 12        Q.    Why didn't you have written contracts

 13   for the other theater projects for crown

 14   ^ you that ^ that you worked on?

 15        A.    Because Mr. Daly stated at one of the

 16   Friday morning construction meetings that there

 17   would be no need for any further contracts.

 18        Q.    When did the Friday construction

 19   meeting take place.  I know it was on a Friday.

 20   Can you be more specific?  Can you tell me the year

 21   or the month?

 22        A.    Not off the top of my head, no.

 23        Q.    Was it early on in your work for crown

 24   theaters?

 25        A.    No.  I think the first period of time
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

88:1                    MARTINO

   2    there was no construction meetings.

   3         Q.     At some point you began having regular

   4    construction meetings?

   5         A.     That's correct.

   6         Q.     What year did the construction meetings

   7    begin?

   8         A.     I can't tell you.  I don't know.

   9         Q.     Were they on Fridays?

  10         A.     Yes.

  11         Q.     Where did the Friday construction

  12    meetings take place?

  13         A.     Crown's corporate offices conference

  14    room on the second floor.

  15         Q.     Was there any event that precipitated

  16    the start of the Friday construction meetings?

  17         A.     I believe it was because the projects

  18    were starting to gear up for going into design and

  19    Mr. Daly wanted the input of Mr. Becker and

  20    Mr. Dugger to review my drawings the independent

  21    concession stand contractor to review it and have

  22    their input and so forth.

  23         Q.     If I understand your testimony, did you

  24    not have a written contract for work on theater

  25    project in Skokie Illinois; is that correct?

Martino, Jim - January 15, 2004 00:00:00 a.m.

89:1                    MARTINO

2        A.      That is correct.

3        Q.      And you didn't have a written contract

4    for the theaters in Annapolis Maryland, Jupiter

5    Florida or Miami, Florida, correct?

6            MR. SEIDEN:  Objection.  It calls for a

7        conclusion of law.  You could answer.

8        A.      There was no different or specific

9    written contract for those projects.  It was

10   understood that the contract that was used for

11   Trumbull would hold the same for those other

12   projects.

13       Q.      Hartford, Connecticut as well?

14       A.      Yes, sir.

15       Q.      What were the terms of your

16   compensation for the projects where you did not

17   have a separate written contract?

18       A.      Mr. Daly just asked me to submit in

19   writing what my fee would be for those projects.

20       Q.      Were you paid a flat fee for your

21   services on the theater projects where you did not

22   have a specific separate written contract?

23           MR. WISSER:  Objection to the form.

24           MR. SEIDEN:  Objection to the form.

25       Q.      Was it a flat fee arrangement?

Martino, Jim - January 15, 2004 00:00:00 a.m.

90:1                          MARTINO

2               MR. WISSER:  Objection to the form.

3         A.    It was a flat fee arrangement, but it

4    also had provisions in there for revisions.

5         Q.    How was the flat fee determined?

6         A.    I determined it in my office.

7         Q.    And you submitted your proposed flat

8    fee to Mr. Daly, correct?

9         A.    Yes.

10        Q.    And did Mr. Daly negotiate with you

11   over the flat fee?

12        A.    Yes.

13        Q.    He advocated reducing the flat fee?

14        A.    Mm-hmm.

15              MR. WISSER:  Wait.  Is that a yes?

16              THE WITNESS:  I'm sorry.  That's a

17        yes.  I apologize.

18              MR. SEIDEN:  For clarity.  Can you

19        kindly read back the last question and

20        answer.

21              (Whereupon, the referred to

22        ^ question ^ answer ^ question and answer

23        ^ was ^ were read back by the Reporter.)

24        Q.    Did you ever charge for your services

25   at a specific hourly rate?

Martino, Jim - January 15, 2004 00:00:00 a.m.

91:1                     MARTINO

2          A.    Yes.

3          Q.    I'm talking about crown theaters?

4          A.    Yes.

5          Q.    Under what circumstances did you charge

6    crown theaters an hourly rate?

7          A.    For revisions and changes.

8          Q.    Were your hourly rate charges in

9    addition to your flat fee?

10         A.    Yes.

11         Q.    What was your hourly rate for work that

12   you did for crown theaters?

13               MR. WISSER:  Objection to the form.

14         You have years from '96 to '01.

15               MR. SCHANER:  Well, if it changed over

16         time, I would like the witness to tell me?

17         A.    It was $235 an hour.

18         Q.    Initially?

19         A.    No.

20         Q.    The entire period?

21         A.    No, it did change at one period of

22   time.  I don't remember when it changed.

23         Q.    In 2001 when your work for crown

24   theaters ended, were you charging 200 $35.00 an

25   hour?

Martino, Jim - January 15, 2004 00:00:00 a.m.

92:1                    MARTINO

2          A.    Yes.

3          Q.    Prior to that time, did you charge by

4    the hour at a lower rate?

5          A.    Yes.

6          Q.    Do you recall the rate?

7          A.    No.

8          Q.    Now, in connection with the crown

9    theaters construction projects, what types of work

10   did you do?

11               MR. SEIDEN:  Any and all projects?

12         A.    Yes?

13         A.    Well, I think my --

14               MR. SEIDEN:  So the record is clear,

15         Mr. Martino, if it differed from project to

16         project, make that clear?

17         A.    The Trumbull contract speaks to my

18   services that I was retained to perform.

19         Q.    Were you retained to perform those same

20   services on other theater projects you did for

21   crown?

22         A.    Yes.

23         Q.    Which ones?

24         A.    Annapolis, Hartford, Skokie, Jupiter,

25   Minneapolis.

Martino, Jim - January 15, 2004 00:00:00 a.m.

93:1                    MARTINO

2        Q.    What about Miami?

3        A.    I'm sorry, yes, and Miami.

4        Q.    Generally, what were those services?

5        A.    Design, preparation of construction

6    documents, preparation of construction

7    specification book, preparation of bid documents

8    and contract administration included responding to

9    R F I's, site visits, answering questions from the

10   contractors.

11       Q.    Now, when you testified that you

12   performed design services, was that the design of

13   the movie theater?

14       A.    Yes.

15       Q.    You referred to the preparation of

16   construction documents.  Which documents?

17       A.    Well, under my contract was a

18   preparation of the architectural, the structural,

19   mechanical, electrical and plumbing.

20       Q.    What was the construction spec book

21   that you referred to?  What was it used for?

22       A.    It's an attachment to the construction

23   drawings that is issued to the contractors.

24       Q.    What were the bid documents used for?

25       A.    The bid documents are the documents

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
94:1                    MARTINO

 2    that the contractors would fill in the dollar

 3    amount that they proposed to do the construction

 4    that movie theater complex for.

 5         Q.    What are R F I's?

 6         A.    Request for information.

 7         Q.    Did you keep a log of request for

 8    information that you received or any other record?

 9              MR. SEIDEN:  Or any other record with

10         regard to R F I.

11              MR. SCHANER:  Yes.

12         Q.    Did you keep track of the R F I's that

13    you received?

14         A.    Yes.

15         Q.    Is there a book that lists them?

16         A.    I don't think we had a log.

17         Q.    How did you keep track of them?

18         A.    In the files.

19         Q.    The R F I's come to you in writing?

20         A.    Yes.

21         Q.    Did you respond in writing?

22         A.    Yes.

23         Q.    What about the questions from

24    contractors, were those in writing?

25         A.    No.
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
95:1                    MARTINO

    2      Q.      Did you keep --

    3      A.      Not always.

    4      Q.      Did you keep track of the responses to

    5    questions from contractors?

    6      A.      Yes.

    7      Q.      That you gave?

    8      A.      Oh, yes.

    9      Q.      In what form did you give your

   10    responses?

   11      A.      Sometimes they would fax us a question

   12    and we would write back on that faction and send it

   13    back to the contractor.

   14      Q.      Did you keep copies of those faxes?

   15      A.      I believe we did, yes.

   16      Q.      Did you keep other records of questions

   17    from contractors that you received?

   18      A.      Sure, correspondence in terms of

   19    letters, yes.

   20      Q.      Was it your understanding that there

   21    was a division of labor between crown theaters and

   22    its landlords with respect to the construction

   23    projects?

   24             MR. WISSER:  Objection to the form.

   25      A.      No.
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

96:1                    MARTINO

2        Q.    You didn't understand that the landlord

3    was responsible for some work on the construction

4    project and crown theaters was responsible for

5    other work?

6             MR. WISSER:  Objection to the form.

7             MR. SEIDEN:  Asked and answered?

8        A.    No.

9        Q.    Did you ever see leases between crown

10   theaters and landlords for the construction

11   locations?

12       A.    Yes.

13       Q.    Did you have any involvement in

14   negotiating the land -- the leases with the

15   landlords?

16       A.    No.

17       Q.    Did you review the drafts of the leases

18   between crown theaters and landlords?

19       A.    No.

20       Q.    Did you offer comments to crown

21   theaters for leases with landlords?

22       A.    No.

23       Q.    Did crown theaters provide you with

24   copies of its leases on -- for the theater

25   construction projects?

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
97:1                    MARTINO
    2           MR. WISSER:  Objection to the form.
    3           MR. SEIDEN:  Objection.  Asked and
    4      answered.
    5      Q.    You did receive copies?
    6      A.    I did receive copies, yes.
    7      Q.    Did you have any role in the selection
    8 of contractors who did work on the theater projects
    9 for crown theaters?
   10      A.    No, sir.
   11      Q.    Did you monitor the progress of the
   12 construction on the theater construction projects
   13 for crown theaters?
   14           MR. SEIDEN:  Objection.  Can you define
   15      what you mean by monitor the progress.
   16           MR. SCHANER:  I think it's clear.
   17           MR. SEIDEN:  No, it's not clear.  It's
   18      very vague what do you mean by monitor
   19      progress.
   20      Q.    Did you report on progress of the --
   21 you don't understand the question?
   22      A.    No, I don't.
   23      Q.    Did you report on progress of the
   24 theater construction projects to anyone at crown
   25 theaters?
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
98:1                    MARTINO
     2        A.     Yes.
     3        Q.     Who?
     4        A.     When we would sit together at the
     5    construction meetings, Milt Daly, Bob beach err,
     6    Tom Becker, Chris Dugger, Glenn Garfinkel, I would
     7    report to them.
     8        Q.     And you would do that at the weekly,
     9    the Friday construction meetings?
    10        A.     My knowledge of what I knew of the
    11    progress.
    12        Q.     Did you approve pay applications?
    13               MR. SEIDEN:  Objection.  What do you
    14        mean by approve.
    15        Q.     Did you sign architect certificates?
    16        A.     Yes.
    17        Q.     Who at crown theaters did you discuss
    18    the theater construction projects with?
    19               MR. WISSER:  Objection to the form.
    20               MR. SEIDEN:  Objection.  Asked and
    21        answered.
    22        Q.     You mentioned Milton Daly?
    23        A.     Milt ton Daly, Tom Becker, Chris
    24    Dugger, Glenn Garfinkel.
    25        Q.     Anyone else?
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
99:1                   MARTINO

  2            MR. WISSER:  Objection to the form.

  3        Again, he answered this before.  There was

  4        another name.  The issue is whether or not you

  5        are connecting beach err with crown or not.

  6        Q.    You talked about beach err about the

  7    construction projects for crown theaters?

  8        A.    That's correct.

  9        Q.    Anyone else?

 10        A.    Not that I can remember.

 11        Q.    What was your understanding of Tom

 12    Becker role in connection with the theater

 13    construction projects?

 14        A.    I'm not sure what Tom Becker's role

 15    was.

 16        Q.    What was your understanding of Chris

 17    dug err's role?

 18        A.    Chris dug err was in charge of the

 19    staff that worked at the theaters once they opened

 20    up.

 21        Q.    What did you understand Mr. Garfinkel's

 22    role was in connection with the theater projects?

 23        A.    Glenn Garfinkel was in-house attorney.

 24        Q.    Now, you talked about the -- you've

 25    referred to the Friday construction meetings at
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
100:1                    MARTINO
    2    crown theaters.  Did you take notes at those
    3    meetings?
    4        A.    Yes, I did.
    5        Q.    Where are those notes today?
    6        A.    They should be here.
    7        Q.    Did the same people attend the meetings
    8    every week?
    9        A.    No, not every week.
   10        Q.    Did you attend all of the meetings?
   11        A.    No.
   12        Q.    Under -- who head the the discussion at
   13    the meetings, if anyone?
   14              MR. WISSER:  Objection to the form.
   15        Q.    Who ran the meetings?
   16              MR. WISSER:  Objection to the form.
   17        There are multiple meetings.  You can't ask a
   18        question like that.
   19        Q.    Was there a standard format for the
   20    meetings?
   21        A.    Mr. Daly chaired the meetings.
   22        Q.    How long did the Friday meetings
   23    typically last?
   24        A.    About an hour and a half.
   25        Q.    Did you ever sign architect
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

101:1                    MARTINO

2    certificates at the Friday construction meetings?

3         A.    Absolutely.

4         Q.    Mr. Martino, are you familiar with the

5    American Institute of Architects form that is

6    titled application and certificate for payment?

7         A.    Yes, I am.

8         Q.    It's also known as an A I A document G

9    seven '02; is that right?

10        A.    Yes.

11        Q.    It's a document that you worked with

12   extensively over the years?

13        A.    I would not use the word extensively.

14        Q.    Frequently, regularly?

15             MR. SEIDEN:  What is the question.

16        Q.    Have you worked with the document

17   regularly, the G702?

18        A.    No.

19        Q.    Had you worked with it prior to your

20   work for crown theaters?

21        A.    Yes.

22             MR. SCHANER:  Let's mark this as

23        Martino exhibit number four.

24             (Whereupon, the aforementioned

25        ^ document ^ photograph ^ was ^ were marked as

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
102:1                    MARTINO
    2        ^ Plaintiff's ^ Defendant's Exhibit ^Replace
    3        for identification as of this date by the
    4        Reporter.)
    5        Q.     Mr. Martino, do you recognize Martino
    6    exhibit number four as an application and
    7    certificate for payment, an A I A document G702?
    8        A.     Yes, I do.
    9        Q.     You understand that it includes an
   10    architect certificate for payment?
   11        A.     Yes, I do.
   12        Q.     There is also a contractors application
   13    for payment on the form?
   14        A.     Yes.
   15        Q.     Under the heading architects
   16    certificate for payment, it states in accordance
   17    with the contract documents, based on on site
   18    observations and the data compromising this
   19    application, the architect certifies to the to the
   20    owner that to the best of the architect's
   21    knowledge, information and belief the work has
   22    progressed as indicated, the quality of the work is
   23    in accordance with the contract documents and the
   24    contractor is entitled to payment of the amount
   25    certified.  Have I read that correctly?
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

103:1                    MARTINO

2        A.    Yes you did.

3        Q.    Do you have an understanding of the

4    purpose of the architects certificate?

5              MR. SEIDEN:  Objection.  In what

6         context any job in the world ever.  I object.

7         I think that's a question that can't be

8         answered.

9              MR. SCHANER:  I think it can be?

10       A.    I don't understand question.

11       Q.    Do you have an understanding of an A I

12   A document G702 architect certificate for payment

13   document?

14             MR. SEIDEN:  Objection.

15       A.    You need to be more specific.

16       Q.    What is it about the question that you

17   don't understand?

18       A.    It sounds to global for me from what

19   I'm understanding what you are saying.

20       Q.    What is the purpose for an architect

21   certificate?

22             MR. SEIDEN:  Same objection?

23       A.    Repeat the question again, please.

24             MR. SCHANER:  Please read back the

25        question.

Martino, Jim - January 15, 2004 00:00:00 a.m.

104:1                    MARTINO

2               (Whereupon, the referred to

3          ^ question ^ answer ^ question and answer

4          ^ was ^ were read back by the Reporter.)

5          A.

6               MR. SEIDEN:  Objection.  It's vague

7          over broad and calls for an opinion.  You

8          could answer subject to my objection?

9          A.      The architect certificate for payment

10    in this case relates to work that was performed.

11         Q.      What is the purpose of the architect

12    certificate?

13              MR. SEIDEN:  Same objection.

14         Q.      In general, what is the purpose of an

15    architect certificate?

16              MR. SEIDEN:  Now it's even more broad

17         and calling for opinions.  Objection.

18         A.      The purpose is the architect's

19    certification.

20         Q.      That's the purpose of the architect

21    certificate?  Do you have an understanding as to

22    why an architect certificate is a requirement on A

23    I A document G702?

24              MR. SEIDEN:  Objection.

25         A.      For the processing of the payment

Martino, Jim - January 15, 2004 00:00:00 a.m.

105:1                    MARTINO

2    application.

3         Q.    Mr. Martino, do you have a standard

4    practice for handling architect certificates?

5         A.    No.

6         Q.    You don't?

7         A.    No.

8         Q.    Does your practice for handling

9    architect certificates vary from job to job?

10              MR. SEIDEN:  Objection.  Your question

11         assumes that there are architect certificates

12         on every job.  I object.  It's an improper

13         question.

14        A.    Most of the projects that I've been

15   involved with do not have the need for me to sign

16   pay req's.

17        Q.    For the projects where you were

18   required to sign pay req's, did you have a standard

19   procedure for determining whether or not you were

20   sign the architect certificate?

21              MR. SEIDEN:  Asked and answered?

22        A.    I really don't understand what you are

23   asking me.

24        Q.    What steps did you take -- what steps

25   would you normally take before signing an architect

Martino, Jim - January 15, 2004 00:00:00 a.m.

106:1                    MARTINO

2    certificate for payment?

3         A.

4              MR. SEIDEN:  Objection.  Over broad?

5         A.    You would either make an on site

6    observation, or in this case, we had a construction

7    manager owners rep who was performing that service.

8         Q.    Are there any other?

9              MR. SEIDEN:  Were you finished with

10        your answer?

11             THE WITNESS:  Yes, for that question

12        I'm finished with that answer.

13        Q.    With respect to the crown theaters

14   construction projects, was it your practice to make

15   on-site inspection is prior to signing architect

16   certificates?

17        A.    My responsibilities were to make

18   on-site inspection is.

19        Q.    Did you, in fact, make on-site

20   inspection is prior to signing architect

21   certificates for payments on crown theaters

22   construction jobs?

23        A.    Yes and no.

24        Q.    What do you mean by yes?

25        A.    Yes, I was at the sites prior to

Martino, Jim - January 15, 2004 00:00:00 a.m.

107:1               MARTINO

2    signing these payment requisitions.

3         Q.     When you say no?

4         A.     No, I was not there prior to signing

5    the payment requisition.

6         Q.     In some cases you signed payment

7    requisitions without making on-site inspection is,

8    correct?

9         A.     That's correct.

10        Q.     How often did that happen?

11        A.     Fending on the project.

12        Q.     Let's talk about the projects

13   appropriately then.  With respect to the Annapolis

14   project, did you make on-site inspection is before

15   signing architect certificates?

16        A.     Yes.

17        Q.     Trumbull?

18        A.     Yes.

19        Q.     Miami?

20        A.     Yes.

21        Q.     Skokie?

22        A.     Yes.

23        Q.     Hartford?

24        A.     Yes.

25        Q.     On which projects did you not make

Martino, Jim - January 15, 2004 00:00:00 a.m.

108:1                    MARTINO

2      on-site inspection is before signing architect

3      certificates?

4           A.      Annapolis, Miami and Skokie.

5           Q.      On those projects, if I understand what

6      your testimony is, it's sometimes you made on-site

7      inspection is before signing architect certificates

8      and sometimes you didn't; is that correct?

9           A.      That's correct.

10          Q.      Why didn't you always make on-site

11     inspection is at Annapolis, Miami and Skokie before

12     signing architect certificates?

13          A.      Because one of the Friday morning

14     meetings, Mr. Daly made the announcement that Bob

15     beach err would be the eyes and ears for crown

16     theaters at the job sites?

17          A.      And therefore Martino will not be going

18     because crown feels it's a duplication of

19     services.  And since Bob is going to be there, Bob

20     will take care of that service.

21          Q.      The Friday meeting you've just referred

22     to, when did that take place?

23          A.      I don't recall exactly.

24          Q.      What year?

25          A.      I don't recall.

Martino, Jim - January 15, 2004 00:00:00 a.m.

109:1                    MARTINO

     2        Q.      Do you have a best recollection as to

     3    what year?

     4        A.      No.

     5        Q.      Who was present at the meeting?

     6        A.      Milt Daly, Bob beach err, myself, Glenn

     7    Garfinkel, Tom Becker, Chris Dugger -- I'm not

     8    sure, but maybe Steve Scott.

     9        Q.      Steve Scott?

    10        A.      Yeah.

    11        Q.      After Mr. Daly said that you would not

    12    be making site visits, did you say anything in

    13    response?

    14        A.      No.

    15        Q.      Did you argue with him?

    16        A.      No.

    17              MR. WISSER:  Objection to the form?

    18        A.      No, I did not.

    19        Q.      Did you comply?

    20              MR. SEIDEN:  Comply with what.

    21              MR. SCHANER:  His request not to make

    22    site visits?

    23        A.      Yes.

    24        Q.      After Mr. Daly made this announcement

    25    at a Friday meeting in which he said you should not

Martino, Jim - January 15, 2004 00:00:00 a.m.

110:1                    MARTINO

2   make site visits to Annapolis, Miami and Skokie,

3   did you sign architect certificates on those jobs

4   without making site visits?

5        A.    Yes.

6        Q.    Did you have any concerns that by

7   signing architect certificates without making site

8   visits, you were violating the literal terms of the

9   architect certificate?

10             MR. SEIDEN:  Objection.

11       A.    No.

12       Q.    You didn't have any concerns?

13       A.    I did not have any concerns in the

14  literal interpretation.  Whose literal

15  interpretation.

16       Q.    Did you have any concerns with respect

17  to the procedure that you were being asked to

18  follow?

19       A.    No.

20       Q.    Did you discuss the procedure that

21  Mr. Daly had proposed with anyone outside of the

22  Friday construction meeting?

23       A.    No.

24       Q.    Did you seek to talk to anybody at the

25  A I A about it?

Martino, Jim - January 15, 2004 00:00:00 a.m.

111:1                    MARTINO

2        A.    No.

3        Q.    Did you talk to any of your colleagues

4    back at your firm about it?

5        A.    No.

6        Q.    Do ^ have you ^ you have any written

7    record that Mr. Daly gave you the direction not to

8    make site visits?

9        A.    No.

10       Q.    Prior to the direction that Mr. Daly

11   gave you, what was your practice with respect to

12   making site visits in connection with architect

13   certificates?

14            MR. SEIDEN:  For any job or these jobs.

15       Q.    The crown theaters jobs?

16       A.    I'm not following that.

17       Q.    What was your practice before Mr. Daly

18   told you not to make site visits?

19       A.

20            MR. WISSER:  Objection to form?

21       A.    I don't recall whether I was involved

22   with signing pay req's prior to that or not.

23       Q.    In your work for crown theaters, who

24   provided you with copies of the payment

25   requisitions that you signed?

Martino, Jim - January 15, 2004 00:00:00 a.m.

112:1                    MARTINO

2       A.    They came to me from Bob beach err?

3       A.

4       Q.    When you say they came to you, how did

5  he transmit them to you?

6       A.    It would either be ^ weld ^ we would be

7  together in the car driving up on a Friday to the

8  construction meetings or he would have them in his

9  briefcase and then give them to me at the

10  construction meetings on Fridays.

11       Q.    Where did you sign the architect

12  certificates?

13       A.    Either in the car as we were driving to

14  the construction meetings on Fridays or in crown's

15  conference room.

16       Q.    And you signed the architect

17  certificates without making on-site inspection is?

18            MR. SEIDEN:  That's not what he said.

19       Objection.  Mischaracterizes the record?

20       A.    That's right that's not what I said.

21            MR. SCHANER:  Explain why I'm wrong.

22            MR. SEIDEN:  He has answered your

23       questions.  Ask a question and he will answer

24       it.

25       Q.    After you signed the architect

Martino, Jim - January 15, 2004 00:00:00 a.m.

113:1                    MARTINO

2      certificates, what did you do with them?

3          A.    I gave them back to Bob.

4          Q.    Do you understand what Bob did with

5      them?

6          A.    My understanding is that he gave them

7      to Mr. Daly.

8               MR. WISSER:  Objection to the form.  I

9          move to strike based on lack of foundation.

10         Q.    Did you ever witness Mr. Beach err hand

11     the payment applications with the architect

12     certificates on them to Mr. Daly?

13         A.    No.

14         Q.    You never -- was there any discussion

15     of the architect certificates at the Friday

16     construction meetings?

17         A.    The only discussions that took place

18     was Milt's or Mr. Daly's announcement that this was

19     going to be the procedure and once Glenn Garfinkel

20     raced an objection of concern asking me if I was

21     okay with this.

22         Q.    When did Mr. Garfinkel race that

23     objection.

24         A.    At one of these construction meetings.

25     I don't recall which date.

Martino, Jim - January 15, 2004 00:00:00 a.m.

114:1                    MARTINO

2        Q.     What did you say in response?

3        A.     I'm comfortable with it.

4        Q.     Did he say anything else?

5        A.     Well, I then said to him, are you

6   comfortable with it and Glenn said, Jimmy, if you

7   are comfortable with it, I'm comfortable with it.

8        Q.     Was anyone else present when the

9   conversation occurred?

10       A.     The same people that I've described

11  before.

12       Q.     On which of your other jobs over the

13  years were you required to complete architect

14  certificates?

15       A.     Two projects that come to mind are bay

16  plaza, general cinema and bridge water commons.

17       Q.     Is that two projects?

18       A.     Yes.

19       Q.     There was one for general cinema?

20       A.     No, both for general cinema.  The first

21  one was Bay Plaza.

22       Q.     And the second was bridge water

23  commons?

24       A.     Correct.

25       Q.     In the Bay Plaza project, did you make

Martino, Jim - January 15, 2004 00:00:00 a.m.

115:1                    MARTINO

2    on-site inspection is prior to signing architect

3    certificates?

4         A.    Yes.

5         Q.    Did you make on-site inspection is in

6    the bridge water commons project before you signed

7    architect certificates?

8         A.    Yes.

9         Q.    In those jobs, how regularly did you --

10   strike that.

11              How close this time to receiving the

12   contractors application for payment did you

13   formally make a site visit.

14              MR. SEIDEN:  Objection.  Lack of

15       foundation.

16        Q.    In those jobs, in those cases was it

17   your practice to make a site visit prior to signing

18   all architect certificates for payment?

19        A.    Yes.

20        Q.    Is it your testimony, just so I'm

21   clear, with respect to crown theaters, that you

22   made site visits prior to signing all certificates

23   for payment on projects other than Annapolis, Miami

24   and Skokie?

25        A.    I would not be able to answer that

Martino, Jim - January 15, 2004 00:00:00 a.m.

116:1                    MARTINO

2    without going back and looking at the pay req's and

3    dates and the dates of my visits to the job site.

4    That's too vague.

5        Q.    Is it your testimony that you made site

6    visits before signing all architect certificates

7    for Trumbull?

8        A.    Again, same answer.  Without going back

9    and looking at the dates of the pay req's and the

10    dates I was there, I can't answer that right now.

11        Q.    Jupiter?

12        A.    The same answer.

13        Q.    Hartford?

14        A.    Same answer.

15        Q.    Mr. Martino, as an architectural

16    professional, in your view, would it be improper

17    for an architect to sign an architect certificate

18    if you knew that the work had not progressed as

19    indicated?

20            MR. SEIDEN:  Objection.

21            MR. WISSER:  Objection.

22            MR. SEIDEN:  I direct the witness not

23        to answer it calls for an expert opinion.

24            MR. SCHANER:  What opinion.

25            MR. SEIDEN:  It calls for an expert

Martino, Jim - January 15, 2004 00:00:00 a.m.

117:1                      MARTINO

2      opinion.

3              MR. SCHANER:  Can he answer the

4      question.

5              MR. SEIDEN:  I directed him not to

6      answer.

7      Q.      And you won't answer?

8      A.      That's correct.

9      Q.      And as an architectural professional,

10   in your view, would it be proper for an architect

11   to sign an architect certificate if the work had

12   not been performed?

13             MR. WISSER:  Objection to the form.

14             MR. SEIDEN:  Objection.  Direct the

15      witness not to answer.  It calls for an expert

16      opinion.

17   Q.      As an architectural professional in

18   your review, would it be proper to sign and

19   architect certificate if the quality of the work

20   was not of the quality specified in the contract

21   documents?

22             MR. WISSER:  Objection to the form.

23             MR. SEIDEN:  Same objection.

24             MR. SCHANER:  Are you also going to

25      direct him not to answer.

Martino, Jim - January 15, 2004 00:00:00 a.m.

118:1                          MARTINO

     2              MR. SEIDEN:  You are asking for

     3         opinions.  You could ask him facts as to what

     4         he did, saw, heard with respect to this

     5         project.  If you are asking him what is his

     6         opinion as to what the standard of care in the

     7         architectural profession.  I suggest

     8         ^ you that ^ that you ask that to the expert

     9         ^ you that ^ that you engaged, not to the fact

    10         witness.

    11              MR. SCHANER:  I think the state of mind

    12         is relevant.

    13              MR. SEIDEN:  It's not state of mind.

    14              MR. SCHANER:  I'm not going to argue

    15         with you.

    16              MR. SEIDEN:  I've stated my objection.

    17         There is a procedure if you disagree.

    18              MR. WISSER:  I join in the objection

    19         that if he hasn't been disclosed as an expert,

    20         standard of care issues are inappropriate.

    21         Q.    In your view, would it be proper for an

    22    architect to sign an architect certificate if you

    23    knew that the contractors application for payment

    24    was false?

    25              MR. SEIDEN:  Same objection, same

Martino, Jim - January 15, 2004 00:00:00 a.m.

119:1                    MARTINO

2        direction.

3        Q.      Would it be improper Mr. Martino to

4    sign an architect certificate if you knew that the

5    pay application contained inflated charges?

6            MR. SEIDEN:  Same objection.  Same

7        direction.

8        Q.      Mr. Martino before being served with

9    the complaint in this case, and you were served

10   with a complaint in approximately December 2002; is

11   that right?

12       A.      Yes.

13       Q.      Before being served with a complaint in

14   this case, were you aware of any plan to defraud

15   crown theaters?

16       A.      No.

17       Q.      Before being served with the complaint

18   in this case, did you think there -- did it occur

19   ^ you to ^ to you that there might be a plan to

20   defraud crown theaters?

21           MR. WISSER:  Objection to the form.

22           MR. SEIDEN:  Objection to the form.

23       A.      No.

24       Q.      Before being served with the complaint

25   in this case, were you aware of any scheme to cause

Martino, Jim - January 15, 2004 00:00:00 a.m.

120:1                    MARTINO

2    crown theaters to pay falls invoices?

3        A.      No.

4        Q.      Before December 2002, were you aware of

5    any scheme toe cause crown theaters to pay falls

6    payment applications?

7        A.      No.

8        Q.      Falls change orders?

9        A.      No.

10       Q.      At any time, Mr. Martino, did you speak

11   with anybody about the subject of false payment

12   applications or invoices involving crown theaters

13   prior to December 2002?

14       A.      My attorney.

15       Q.      Prior to December 2002?

16       A.      That's correct.

17       Q.      Anybody other than your attorney?

18       A.      No.

19       Q.      When did you first have that -- when

20   did you speak with your attorney?

21       A.      Sometime after my meeting with Glenn --

22   no, Craig Martin when I was called into the offices

23   at crown's conference room and everything was

24   explained to me what was transpiring.

25       Q.      Did you ever talk to anyone before

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
121:1                    MARTINO

  2    December 2002 about the subject of payment

  3    applications or invoices for work

  4    ^ was that ^ that was not the responsibility of

  5    crown theaters?

  6                MR. WISSER:  Objection to form.

  7                MR. SEIDEN:  I object to the form?

  8    A.       I don't understand that question.

  9    Q.       Did you ever speak with anybody about

 10    the subject of payment applications or invoices for

 11    work ^ was that ^ that was not the responsibility

 12    of crown theaters prior to December 2002?

 13                MR. SEIDEN:  Objection to form.

 14    A.       No.

 15    Q.       Are you aware, Mr. Martino, of the

 16    submission by anybody of false payment applications

 17    to crown theaters?

 18                MR. WISSER:  Objection to the form.

 19                MR. SEIDEN:  Objection to form.

 20    A.       I'm aware there is allegations to that

 21    effect.

 22    Q.       That's it?

 23    A.       Yes.

 24    Q.       Have you ever suspected that anyone

 25    submitted falls invoices or payment applications to
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
122:1                    MARTINO

    2   crown theaters?

    3                MR. WISSER:  Objection to the form.

    4                MR. SEIDEN:  Objection to the form.

    5   A.      No.

    6   Q.      Did you ever talk Bob beach err about

    7   the submission of anyone of inflated invoices,

    8   payment applications or change orders relating to

    9   crown theaters?

   10                MR. SEIDEN:  Compound.  Objection to

   11       form.

   12                MR. SCHANER:  I could ask it three

   13       times.

   14                MR. SEIDEN:  It's okay?

   15   A.      No.

   16   Q.      Did you ever talk to Bob beach err

   17   about the submission of inflated invoices from

   18   contractors that did no work?

   19   A.      No.

   20   Q.      Did you ever talk to Bob beach err

   21   about the submission of pay applications from

   22   contractors that did no work?

   23   A.      No.

   24   Q.      Change orders?

   25   A.      No.
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

123:1                      MARTINO

2          Q.      Let's talk about the Miami, Florida

3    project.  What was your assignment on the Miami,

4    Florida theater construction project for crown

5    theaters?

6          A.      Spelled out the same way, identical as

7    it says in the Trumbull contract.

8          Q.      What was the project.  What was crown

9    building?

10         A.      Agree standing 18 theater movie theater

11   complex.

12         Q.      Where was the theater located?

13         A.      Miami lakes Florida.

14         Q.      Who was crown's general contractor?

15         A.      Waas construction.

16         Q.      Was there a principal person at Waas at

17   the time?

18         A.      Richard Waas.

19         Q.      Do you know who crown theaters landlord

20   was?

21         A.      Benderson development.

22         Q.      Did Benderson development have a

23   general contractor on the Miami project?  Was it

24   Benderson?

25         A.      Not that I know of.

Martino, Jim - January 15, 2004 00:00:00 a.m.

124:1                      MARTINO

2        Q.    Did Benderson development act as a

3    general contractor?

4        A.    I don't know.

5        Q.    Who hired you to work on the Miami

6    project?

7        A.    Crown theaters.

8        Q.    Did you -- who were your contact at

9    crown theaters with respect to your work on Miami

10   project?

11       A.    Milt Daly, Bob beach err, Glenn

12   Garfinkel, Tom Becker, Chris Dugger, Steve Scott.

13       Q.    What was Mr. Beach err's role, as you

14   understood it, in connection with the Miami

15   project?

16       A.    He was the owners rep construction

17   manager.

18       Q.    What was Mr. Daly's role?

19       A.    ^ he is ^ is he CEO of the company.

20       Q.    What was Mr. Dug err's role?

21            MR. WISSER:  Let's go off the record

22       for a second.

23            (Whereupon, an off-the-record

24       discussion was held.)

25            MR. WISSER:  I believe we have a

Martino, Jim - January 15, 2004 00:00:00 a.m.

125:1                    MARTINO

2         stipulation by and between counsel that while

3         the witness has referred to Mr. Daly as

4         maintaining the position at crown of CEO, that

5         it is more factually accurate to indicate that

6         he was a C O O, chief operating officer and

7         not CEO, chief executive officer; is that fair

8         counsel.

9              MR. SCHANER:  That is fair.

10      Q.    Mr. Martino, after the conversation we

11  just had off the record, is your recollection

12  refreshed that Mr. Daly was in fact the chief

13  operating officer as opposed to the chief executive

14  officer of crown theaters?

15      A.    Yes.

16      Q.    From your firm, Mr. Martino, who worked

17  on the crown theaters Miami project?

18      A.    Myself, Gary Scheide and I'm -- I

19  honestly don't recall which CADD operators worked

20  with him on that project.

21      Q.    What was Mr. Scheide's role?

22      A.    He was the lead inputing together the

23  drawings.

24      Q.    Did he do anything else?

25      A.    Took phone calls from Richard Waas,

Martino, Jim - January 15, 2004 00:00:00 a.m.

126:1                MARTINO

2    responded to the R F I's, prepared explanatory

3    drawings, reviewed shop drawings with me.

4         Q.    Can you think of anything else?

5         A.    Not off the top of my head.

6              MR. SCHANER:  I would like to now take

7         a minute and mark five exhibits we will talk

8         about together.

9              (Whereupon, the aforementioned

10        ^ document ^ photograph ^ was ^ were marked as

11        ^ Plaintiff's ^ Defendant's Exhibit ^Replace

12        for identification as of this date by the

13        Reporter.).

14        Q.    Mr. Martino, you should have before you

15   Martino exhibit number five.  I will give copies to

16   your counsel and the others:  Martino exhibit

17   number five is a payment application and

18   certificate of payment it purports to be from

19   contractor Marlin contracting via architect James

20   Thomas Martino P C, the project at the top of the

21   page says Miami lakes theater, application number

22   one for the period ten, one, '99.  Have I stated

23   that correctly, Mr. Martino?

24              MR. SEIDEN:  There is more on the

25        document but it speaks for itself?

Martino, Jim - January 15, 2004 00:00:00 a.m.

127:1                    MARTINO

    2        A.    Yes.

    3        Q.    Now, with respect to this payment

    4    application, there is an architects certificate for

    5    payment and there is a signature.  Do you recognize

    6    that signature?

    7        A.    There is a lot of scribble down there.

    8    I'm not too sure which.  It looks like three

    9    different signatures there.

    10       Q.    Do you recognize any of the three

    11   signatures?

    12       A.    No.

    13       Q.    There is a signature on the line

    14   contractor and in writing it says Marlin

    15   contracting d/b/a Marlin consulting Inc. there is a

    16   date September 29, 1999.  Do you recognize the

    17   signature on the line next to the date?

    18       A.    No.

    19       Q.    Have you seen exhibit number five,

    20   Martino Exhibit 5 before today?

    21       A.    Yes.

    22       Q.    When?

    23       A.    When I was here with counsel.

    24       Q.    Did you see it back around the time

    25   that it is dated, October 1, 1999?

Martino, Jim - January 15, 2004 00:00:00 a.m.

128:1                    MARTINO

2          A.     No.

3          Q.     Let's put Exhibit 5 to the side for a

4     moment:  Actually, let's go back to Exhibit 5 just

5     for one other question.  If you turn to the second

6     page of Exhibit 5, there appear to be some stamps,

7     one says approved B B construction consultants and

8     there is another that has a date, October 1, 1999,

9     B B C O N S T period consultants and there looks to

10    be a signature or marking.  Do you recognize that

11    signature or marking?

12         A.     That looks like Bob's, Bob beach err?

13         A.     Yes.

14         Q.     Let's take a look at what we have

15    marked as Exhibit 6.  I will hand your counsel a

16    copy?

17              MR. SEIDEN:  Martino six.

18              MR. SCHANER:  Martino six.  Exactly.

19         Q.     Just to introduce the document, among

20    other things, at the top of the document, Martino

21    six states that it is an application and

22    certificate for payment from contractor Marlin

23    contracting, via architect James Thomas Martino P

24    C, the project is listed as Miami lakes theater.

25    For the period 11, one, '99, meaning November one,

Martino, Jim - January 15, 2004 00:00:00 a.m.

129:1                    MARTINO

2      1999, application number two.  Have I stated that

3      correctly?

4           A.     Yes.

5           Q.     There is a signature on the line for

6      the architect certificate next to the date, October

7      23, 1999, and it appears to certify the amount of

8      $180,000.  Do you recognize the signature on the

9      line?

10          A.     It looks like Bob's.

11          Q.     That would be on the line for the

12     architect certificate?

13               MR. SEIDEN:  I'm sorry, counsel which

14          line are you referring to.

15          Q.     The line in the lower right-hand corner

16     of the document, next to the date October, it

17     appears to be 23, 1999?

18               MR. SEIDEN:  Okay.

19          Q.     It could be October 28, 1999.  Is it

20     your testimony that that appears to be Bob beach

21     err's signature?

22          A.     That's correct.

23               MR. WISSER:  I just want to object to

24          the form and state for the record that this

25          individual can't opine as to whether or not

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
130:1                    MARTINO

       2        that is on a line or not on a line.  It

       3        certainly also appears below a stamp but your

       4        question suggests that that signature is on an

       5        architect's line.

       6        Q.     Well, with Mr. Wisser's qualification,

       7   the signature that appears on the lower right hand

       8   portion of the page, appears to be Mr. Beach err's

       9   signature; is that right?

      10        A.     That is correct.

      11        Q.     Now, there appears to be a signature on

      12   the left side of the page, under the contractor's

      13   application for payment on a line for the

      14   contractor which is listed as Marlin contracting

      15   d/b/a Marlin consulting Inc. dated October 28th

      16   1999, do you recognize that signature?

      17        A.     No.

      18        Q.     If you turn to the next page, it states

      19   approve B B construction consultants and there a

      20   marking to the right do you recognize that marking?

      21        A.     No.

      22        Q.     Have you seen Martino exhibit number

      23   six prior to today?

      24        A.     Yes.

      25        Q.     Other than in the meeting with your
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

131:1                        MARTINO

2    lawyer, have you seen it before?

3        A.    No.

4        Q.    Mr. Martino, in reparation for today's

5    deposition**NOTE:  In preparation.

6        Q.    How long did you meet with your

7    attorneys?

8             MR. SEIDEN:  Objection.  I already

9        directed him not to answer that question when

10       you asked him the first time.

11       Q.    Mr. Martino, you have before you

12   Martino exhibit number seven.  I'm providing copies

13   to counsel:  For the record, Martino Exhibit 7 is

14   an application and certificate for payment to owner

15   crown theaters L P from contractor Marlin

16   contracting via architect James Thomas Martino P C,

17   the project is listed as the Miami lakes theater.

18   It purports to be application number three for the

19   period January 1, 2000.  I stated that accurately?

20       A.    Yes.

21       Q.    Mr. Martino in the lower right-hand

22   corner of this document there appear to be one or

23   more signatures.  Do you recognize any of those

24   signatures?

25       A.    No.

Martino, Jim - January 15, 2004 00:00:00 a.m.

132:1                    MARTINO

2        Q.    On the line or near the line where it

3    says architect, you don't recognize any of those

4    signatures?

5        A.    It doesn't look like Bob's signature

6    there to me.

7        Q.    Now, under the contractors application

8    for payment, it says contractor by and it in

9    typewritten words Marlin contracting d/b/a Marlin

10    consulting Inc..  Date January three, 2000, do you

11    recognize the signature to the left of the date,?

12        A.    No.

13        Q.    Have you seen Martino exhibit number

14    seven prior to your meeting with your lawyer in

15    preparation for today's deposition?

16        A.    No.

17        Q.    You have before you exhibit Martino

18    exhibit number eight.  I'm providing copies to your

19    counsel.  For the record, Martino exhibit number

20    eight is an application and certificate for payment

21    to owner crown theaters L P from contractor Marlin

22    contracting via architect James Thomas Martino P

23    C.  The project is listed as Miami lakes theater.

24    This was shown as application number four for the

25    period February one, 2000.  Have I stated that

Martino, Jim - January 15, 2004 00:00:00 a.m.

133:1                    MARTINO

2    accurately?

3         A.    Yes.

4         Q.    In the lower right-hand corner of

5    Martino exhibit number eight, in the block for the

6    architect certificate of payment next to the date

7    January 27th 2000, there appears to be a

8    signature.  Do you recognize that signature?

9         A.    That looks like Bob beach /ERS.

10        Q.    Can you read what the signature appears

11   to state.  Can you read the name?

12        A.    Are you speaking of this.

13        Q.    No, I'm speaking of that?

14        A.    Oh, my apologize.

15             MR. SEIDEN:  Let's clarify that.

16             MR. SCHANER:  I will clarify the

17        record.  This and that doesn't clear it up in

18        written form.

19             MR. SEIDEN:  That's true.

20        Q.    Mr. Martino, do you recognize any of

21   the signatures which appear on exhibit Martino

22   Exhibit 8?

23        A.    Yes.

24        Q.    Which signatures do you recognize?

25        A.    My signature.

Martino, Jim - January 15, 2004 00:00:00 a.m.

134:1                    MARTINO

2        Q.    Where is your signature located on the

3   document?

4        A.    On the line next to the word by which

5   is just below the word architect.

6        Q.    Is there a date near your signature?

7        A.    Yes.

8        Q.    What is the date?

9        A.    One, 27, 00.

10        Q.    When did you sign this document?

11        A.    One, 27, 00.

12        Q.    January 27th of 2000?

13        A.    Mm-hmm.

14        Q.    That's yes?

15        A.    Yes.

16        Q.    Do you recognize any other signatures

17   on Martino exhibit number eight?

18        A.    Yes, I recognize Bob's.

19        Q.    Where is Mr. Beach err's signature?

20        A.    Scribbled on the line between the word

21   amount certified and the dollar amount.

22        Q.    What is the amount certified?

23        A.    $115,000.

24        Q.    You should have before you a copy of

25   Martino Exhibit 9.  Do you see that?

Martino, Jim - January 15, 2004 00:00:00 a.m.

135:1                     MARTINO

2          A.     Yes.

3          Q.     For the record, Martino exhibit number

4     nine is an application an certificate for payment

5     to owner crown theaters L P from contractor Marlin

6     contracting via architect James Thomas Martino P

7     C.  The project is shown as Miami lakes theater

8     application number five for the period July one,

9     2000.  Have I stated that accurately?

10         A.     Yes.

11         Q.     Mr. Martino, do you recognize any of

12    the signatures on the first page of Martino exhibit

13    number nine?

14         A.     Yes, I recognize my signature and Bob

15    beach err's signature.

16         Q.     Where is your signature on the page?

17         A.     My signature is on the line to the

18    right of the word by which is just below the word

19    architect.

20         Q.     When did you sign the document?

21         A.     Seven, six, 00.

22         Q.     And you said you recognize Mr. Beach

23    err's signature?

24         A.     Yes.

25         Q.     Where is that?

Martino, Jim - January 15, 2004 00:00:00 a.m.

136:1                    MARTINO

2        A.      His signature is on the line between

3    the word amount certified and the dollar amount.

4        Q.      What is the amount certified?

5        A.      100 13,000 800 45.

6        Q.      There appears to be a signature for the

7    contractor Marlin contracting.  It says by, it

8    appears to be a signature.  Do you recognize that

9    signature?

10       A.      No.

11       Q.      Was that signature on the document when

12   you signed it?

13       A.      I don't recall.

14       Q.      Would it have been proper for

15   ^ you to ^ to you sign the document if the

16   contractor had not signed the payment application?

17               MR. SEIDEN:  Objection to the form.

18               MR. WISSER:  Objection to the form.

19       A.      Say the question again.

20       Q.      Would it have been proper for you to

21   have signed Martino exhibit number nine if the

22   contractor had not previously signed the document?

23               MR. SEIDEN:  Objection to form?

24       A.      No.

25       Q.      It would not have been proper?

Martino, Jim - January 15, 2004 00:00:00 a.m.

137:1                    MARTINO

2        A.    It would not have been proper.

3        Q.    If you turn to page two of exhibit

4   number nine, there is some handwriting.  Do you

5   recognize the handwriting?

6        A.    It appears to be Bob's.

7        Q.    Bob beach err?

8        A.    Yes.

9        Q.    You should have before you a copy of

10   Exhibit 10, do you see that?

11        A.    Yes.

12        Q.    For the record, Exhibit 10 is title

13   application and certificate for payment to owner

14   crown theaters L P from contractor Marlin

15   contracting.  Via architect James Thomas Martino, P

16   C, for the Miami lakes theater project.  It's

17   application number six for the period July one,

18   2000.  Have I accurately stated that?

19        A.    Yes.

20        Q.    Mr. Martino, do you see your signature

21   anywhere on Martino Exhibit 10?

22        A.    No.

23        Q.    Do you recognize any of the signatures

24   on this page?

25        A.    It appears to be Bob's signature.

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
138:1                    MARTINO
   2        Q.    Where do you see Bob's signature?
   3        A.    On the line between the word amount
   4   certified and the dollar sign.
   5        Q.    What is the amount certified?
   6        A.    Seventy thousand 480.
   7        Q.    On the line under the word architect to
   8   the right of the word by and to the left of the
   9   date which appears to be July 6th of 2000, there
  10   appears to be a signature.  Is it your testimony
  11   that you don't recognize that signature?
  12        A.    That's correct.
  13        Q.    There is a contractor signature
  14   apparently under the words Marlin contracting d/b/a
  15   Marlin consulting Inc. to the left of the date July
  16   five, 2000.  Do you recognize that signature?
  17        A.    No.
  18        Q.    Prior to today, had you seen this
  19   document -- strike that.
  20              Before meeting with your lawyer to
  21   prepare for the deposition, had you seen Martino
  22   exhibit number ten?
  23        A.    No.
  24        Q.    I would like to draw your attention
  25   back to Martino Exhibit 8.  Do you have that in
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
139:1                    MARTINO
      2   front of you?  This document is application number
      3   four, which purports to be submitted from
      4   contractor Marlin contracting.  Do you see under
      5   the word contractor?
      6               MR. SEIDEN:  Just give me a second.
      7               MR. SCHANER:  Sure.
      8       Q.    If you look at the top of the document
      9   toward the upper left corner, under the words from
     10   contractor, there are the words site prep and under
     11   that contract four, do you see that?
     12       A.    Yes, I do.
     13       Q.    Do you have an understanding as to what
     14   the term site prep refers to?
     15       A.    As it relates to this pay req?
     16       A.    Yes.
     17       Q.    There.
     18       Q.    Yes?
     19       A.    There should be a second page to this
     20   that would spell out what the site prep is.  It's
     21   not attached to this exhibit that I'm looking at.
     22       Q.    This is a document
     23   ^ you that ^ that you saw back around January 27th
     24   of 2000, correct?
     25               MR. SEIDEN:  Well,.
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

140:1                        MARTINO
     2            MR. SCHANER:  It has his signature on
     3       it.
     4            MR. SEIDEN:  ^ we will ^ well the
     5       witness just suggested that this document may
     6       not be complete.
     7            MR. SCHANER:  He said that.
     8            MR. SEIDEN:  I understand.  When you
     9       say this document in this form or in any
    10       form.  In this form as marked, one page.
    11            MR. SCHANER:  ^ he is ^ is he
    12       suggesting that there might be a second page.
    13            MR. SEIDEN:  I don't know.
    14            MR. SCHANER:  Let's ask him.
    15            MR. SEIDEN:  I don't want to mislead?
    16       A.    You don't have the original do to this,
    17   do you.
    18       Q.    We have what we've been provided.
    19   There is a reference in the upper left-hand corner
    20   to site prep, Mr. Martino, to what does site prep
    21   refer?
    22       A.    What does.
    23       Q.    What was the site prep that this pay
    24   req refers to?
    25       A.    I can't answer that.

Martino, Jim - January 15, 2004 00:00:00 a.m.

141:1                    MARTINO

2        Q.      Why is it that you can't answer the

3   question?

4        A.      Because normally there is a second page

5   attached to it that brakes out some delineation of

6   what site prep work is being paid for.

7        Q.      Do you understand site prep to be an

8   abbreviation for preparation?

9        A.      Yes I will, I will say that.

10        Q.      Do you know what contractor performed

11   the site preparation work for the Miami lakes work?

12        A.      No.

13        Q.      Why not?

14        A.      Because it wasn't my responsibility.

15        Q.      Who was it?

16        A.      Bob /PWOEFP err acting as owner rep he

17   negotiateed all the subcontractors, not I.

18        Q.      Were you aware of the identities of any

19   of the subcontractors who performed work on any of

20   the Miami lakes project?

21        A.      Occasionally I would gets a letter that

22   Bob would write to Milt spelling out that these are

23   the subcontractors that ^ I've ^ identify approved

24   but not for every subcontractor, no.

25        Q.      ^ have you ^ you have ever met anyone

Martino, Jim - January 15, 2004 00:00:00 a.m.

142:1                    MARTINO

2    from Marlin contracting?

3         A.     No.

4         Q.     Are you familiar with the firm Marlin

5    contracting?

6         A.     No.

7         Q.     Was Marlin contracting a subcontractor

8    on the Miami lakes theater projects?

9         A.     I don't know.

10        Q.     That is your signature on the lower

11   corner of the document, that being exhibit number

12   eight?

13        A.     Yes, sir, it is.

14        Q.     To your knowledge, was Marlin

15   contracting a real company?

16        A.     Not to my knowledge, no.

17        Q.     Are you saying that to your knowledge

18   it is not a real company?

19             MR. WISSER:  Objection to the form.

20        When are you asking this question.

21             MR. SEIDEN:  Right.

22             MR. WISSER:  That he has such

23        knowledge.

24             MR. SEIDEN:  I agree.

25        Q.     At the time that you signed exhibit

Martino, Jim - January 15, 2004 00:00:00 a.m.

143:1                         MARTINO

2      number eight, were you aware that Marlin

3      contracting was a fictitious company?

4           A.      No.

5           Q.      Have you since that time become aware

6      that Marlin contracting was a fictitious company?

7                   MR. WISSER:  Objection to the form?

8           A.      Yes.

9           Q.      When did you become aware of that?

10                  MR. WISSER:  Objection to the form.

11              It's a foundation issue obviously this is

12              based on hearsay but I will race it later as

13              long as it's on the records?

14          A.      The first indication that Marlin was a

15      fictitious company was during my meating with Craig

16      Martin way back in July when I was called into the

17      crown corporate offices.

18          Q.      Again, what is your best recollection

19      of when that occurred, that is your meeting with

20      Mr. Martin?

21          A.      June or July of 2001.

22          Q.      In Martino Exhibit 8, your -- you've

23      certified for payment what amount?

24          A.      What amount did I certify is that what

25      you just asked me.

Martino, Jim - January 15, 2004 00:00:00 a.m.

144:1                    MARTINO

2        Q.      Yes?

3        A.      $115,000.

4        Q.      Now there is a reference to an original

5   contract sum of 700 thousand.  Do you see that?

6        A.      Yes, I do.

7        Q.      There was no 700 thousand dollar

8   contract with Marlin contracting for site

9   preparation, correct?

10               MR. WISSER:  Objection to the form.

11       A.      I don't know that.

12               MR. SEIDEN:  Objection he answered the

13       question?

14       A.      I don't know.

15       Q.      You don't know?

16       A.      No.

17       Q.      To your knowledge, there might have

18   been?

19               MR. SEIDEN:  That's not what he said.

20       He said he didn't know.

21       Q.      Was there a contract with Marlin

22   contracting for $700,000 for site preparation?

23       A.      I don't know that.

24       Q.      Who, in fact, performed the site

25   preparation work on Miami theater?

Martino, Jim - January 15, 2004 00:00:00 a.m.

145:1                        MARTINO

2          A.    I don't know that.

3          Q.    Please turn back to Martino exhibit

4    number nine.  Do you have that in front of you?

5          A.    Yes.

6          Q.    On the left side of the page, there is

7    a reference to change order of summary.  Was there

8    a procedure for change orders on the Miami project?

9          A.    Bob beach err, as the construction

10   manager was responsible for all change orders.

11         Q.    Do you know how Mr. Beach err handled

12   change orders?

13         A.    No.

14         Q.    Did Mr. -- were you involved in the

15   change order process?

16         A.    No, sir.

17         Q.    Did you ever see copies of change

18   orders?  Did you see copies of change orders on the

19   Miami project?

20         A.    Not that I remember.

21         Q.    Did you see copies of change orders on

22   the other theater projects on which you worked?

23         A.    No.

24               MR. SEIDEN:  The other theater projects

25         for crown.

Martino, Jim - January 15, 2004 00:00:00 a.m.

146:1                      MARTINO

2               MR. SCHANER:  That's a fine

3          clarification, yes.

4          Q.    Did you see?

5          A.    No, no.

6          Q.    Copies of change orders on the other

7     theater projects you worked on for crown?

8          A.    No I don't think so.

9          Q.    Was it your understanding Mr. Beach err

10    was responsible?

11         A.    Yes.

12              MR. SEIDEN:  For.

13         Q.    Change orders?

14         A.    Yes.

15         Q.    Was it your understanding that

16    Mr. Beach err was responsible for all change orders

17    on crown movie theater construction projects?

18         A.    Yes.

19         Q.    Did you have discussions with the

20    general contractor on the Miami project or Waas,

21    regarding change orders?

22         A.    No.

23         Q.    You never talked to Mr. Waas about

24    change orders on the Miami project?

25         A.    I don't recall talking to him about it.

Martino, Jim - January 15, 2004 00:00:00 a.m.

147:1                        MARTINO

2        Q.      Do you recall having discussions with

3    any of the other general contractors regarding

4    change orders on crown theaters projects?

5        A.      No, I don't.

6        Q.      Ever discuss the subject with James

7    Cella?

8        A.      Not that I recall.

9        Q.      Anybody at Hefner and Weber?

10       A.      Not that I recall.

11       Q.      Did you ever discuss change orders with

12   anybody from E and W Howell?

13       A.      At the end of the project for Skokie,

14   when I assumed responsibilities and Bob beach err

15   was no longer involved, yes, I was involved with

16   discussing change orders with E W Howell.

17       Q.      Did you -- who did you talk to at E W

18   Howell?

19       A.      Paul O'Rourke.

20       Q.      How often did you talk with Paul

21   O'Rourke regarding change orders?

22       A.      I can't answer that.

23       Q.      Over what period of time did you have

24   conversations with Mr. O'Rourke regarding change

25   orders on the Skokie project?

Martino, Jim - January 15, 2004 00:00:00 a.m.

148:1                    MARTINO

2        A.      From the time that Bob was relieved of

3    that responsibility to the end of the project,

4    which was probably a period of four, five months.

5        Q.      Did you learn from Mr. O'Rourke what

6    Mr. Beach err's practice had been with respect to

7    change orders?

8                MR. WISSER:  Objection to the form.

9        A.      No.

10       Q.      I'm sorry, your answer was?

11               MR. SEIDEN:  He said no?

12       A.      I said no.

13       Q.      Did you learn from anybody, Mr. Beach

14   err's practice on the Skokie project with respect

15   to handling change orders?

16               MR. WISSER:  Objection to the form.

17       A.      No.

18       Q.      How did you handle change orders on the

19   Skokie project?

20               MR. SEIDEN:  After he assumed the

21       responsibility when beach err left the job.

22               MR. SCHANER:  Yes?

23       A.      E W Howell would write up a change

24   order and I would normally sit with Tom Becker and

25   review it for its value, to the extent of the work

Martino, Jim - January 15, 2004 00:00:00 a.m.

149:1                    MARTINO

2      that was involved, whether it was a fair amount.

3            Q.     If the change orders were approved and

4      paid, how did money flow from crown theaters to the

5      entity that did the work?

6                  MR. WISSER:  Objection to the form.

7            You mean how did it get paid?

8            A.     Are you talking about when I assumed

9      the responsibility?

10           Q.     Yes.  Yes?

11           A.     Well, you didn't say that.

12                 MR. SEIDEN:  Let's get a clear question

13           on the record.  It's all muddled now.

14           Q.     After you assumed responsibility on the

15     Skokie job how did crown theaters go about paying

16     for change orders?

17           A.     I have no idea.

18           Q.     Did you ever see the checks?

19           A.     No.

20           Q.     Do you know to who crown theaters sent

21     the checks?

22           A.     No.

23           Q.     Mr. Martino, turning your attention

24     back to Martino Exhibit 9, Mr. Martino, the

25     document lists a number of change orders with dates

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
150:1                    MARTINO
    2    approved.  There appear to be six.  Listed under
    3    the contractors application for payments.  They
    4    appear to be dated June 28th 2000, and, my question
    5    is, did you approve those change orders for
    6    payment?
    7        A.    No.
    8        Q.    Do you have an understanding as to who
    9    did?
   10        A.    Bob beach err.
   11        Q.    Now, if you turn to the continuation
   12    sheet, which is page two of Martino exhibit number
   13    nine, there is a list of six change orders.  Do you
   14    have an understanding as to what work was done for
   15    each of those six change orders?
   16        A.    I can't tell you sitting here now what
   17    those were.  I can only tell you that most likely
   18    at like these construction meetings and so forth,
   19    possibly Bob then described what these change
   20    orders were or some of what these change orders
   21    could have been, if you follow what I'm saying.
   22    We've had these Friday meetings where we would
   23    discuss the progress of the jobs.
   24        Q.    Yes.
   25        A.    And all I could say is that globally
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

151:1                    MARTINO

2    that's possibly where we learned what these change

3    orders were.

4         Q.    As you sit here right now, do you know

5    what the change orders were for?

6         A.    Ace sit here right now, I do not recall

7    what those change orders are for.

8              MR. WISSER:  Counsel I have to state

9         for the record that Exhibit 9 in the form that

10        it's been provided and marked for

11        identification, includes handwriting on page

12        two which I believe was identified by your

13        expert, Mr. Hamilton, as representing notes

14        made much later on by Mr. Beach err, which I

15        do not believe you are claiming to be part of

16        this exhibit is that accurate.

17             MR. SCHANER:  That is accurate.

18        Q.    Mr. Martino, would you except that

19   clarification?

20             MR. SEIDEN:  He doesn't know.  If that

21        is what you are representing.

22             MR. SCHANER:  I represent that.

23             MR. SEIDEN:  Then how does he know.

24             MR. SCHANER:  We will represent that.

25             MR. WISSER:  Just so the record is

Martino, Jim - January 15, 2004 00:00:00 a.m.

152:1                    MARTINO

    2        clear, there was no continuation sheet

    3        contemporaneously existing on the date that is

    4        referencing on this Exhibit 9 that has Milt's

    5        name and dollar amounts.

    6        Q.      Back on July 6, 2000, Mr. Martino, when

    7    you signed the architect certificate on Martino

    8    Exhibit 9, did you know what the work reflected by

    9    the six change orders was for?

   10        A.      I'm not in position to answer that

   11    now.  You are asking me to verify that I knew

   12    exactly what those six change orders were and I

   13    can't do that.  You are asking -- I can't remember.

   14        Q.      You can't remember?

   15        A.      Right.

   16        Q.      Did you ever discuss the payment

   17    application submitted by Marlin contracting with

   18    anyone, while you were doing work for crown

   19    theaters?

   20        A.      No.

   21        Q.      How much money did crown theaters pay

   22    you or your firm for work in connection with the

   23    Miami project?

   24        A.      I couldn't sit here and tell you that

   25    right now.

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
153:1                    MARTINO
    2        Q.    Is there any document that would show
    3    it?
    4        A.    Not that I know of while I'm sitting
    5    here.
    6              MR. WISSER:  Off the record for a
    7        second.
    8              (Whereupon, an off-the-record
    9        discussion was held.)
   10              MR. SCHANER:  Let's mark this as
   11        Martino Exhibit 11.
   12              (Whereupon, the aforementioned
   13        ^ document ^ photograph ^ was ^ were marked as
   14        ^ Plaintiff's ^ Defendant's Exhibit ^Replace
   15        for identification as of this date by the
   16        Reporter.)
   17        Q.    Mr. Martino, do you have before you a
   18    copy of Martino Exhibit 11?
   19        A.    Yes, I do.
   20        Q.    It appears with the bate number J T M 1
   21    two six zero through J T M 1 two six one five and
   22    it is titled crown theater Miami lakes in quotes
   23    the grand qualifications to contract September 7,
   24    1999.  Mr. Martino, did you receive a copy of this
   25    document on or about September 7, 1999?
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

154:1                    MARTINO

2        A.    I don't recall receiving this.

3        Q.    I will represent to you that we

4   received it from your file because of the J T M

5   baits number on the bottom?

6        A.    Okay.

7        Q.    Do you have any reason to believe that

8   did you not receive a copy of the document?

9        A.    No, if it was in my file, then

10  obviously I received it.

11       Q.    It refers to qualifications to

12  contract.  What are qualifications to contract?

13            MR. WISSER:  Objection to form.  Are

14       you asking what this document says or are you

15       asking him what he believes qualifications to

16       contract are generally.

17            MR. SCHANER:  What does this document

18       mean by qualification to contract.

19            MR. WISSER:  Objection to form.  The

20       document speaks for itself.

21            MR. SEIDEN:  I join in the objection.

22       Q.    What do you understand qualifications

23  to contract to refer to?

24       A.    As it pertains to this particular

25  document that is in front of me.

Martino, Jim - January 15, 2004 00:00:00 a.m.

155:1                    MARTINO

2        Q.      Yes.

3        A.      This was a document

4    ^ was that ^ that was going to be issued out to the

5    bidding contractors of either changing or value

6    engineering items that was requested forbidding on

7    the Miami lakes project.

8        Q.      Did you have any role in preparing

9    Martino exhibit number 11?

10       A.      I don't recall preparing anything, no.

11       Q.      Do you know who prepared it?

12       A.      Who prepared this?

13       Q.      Yes.

14       A.      It appears like ^ it was ^ was it

15   prepared by Waas construction although I don't know

16   that for a fact.

17       Q.      If you look at the top of the page you

18   could see the very top it says received and it says

19   received James Martino, do you see that?

20              MR. SEIDEN:  I don't see that.

21              MR. WISSER:  I don't have that.

22              MR. SCHANER:  Look at the very top

23          edge.  Take a look at mine.  Look at the very

24          top of the document?

25       A.      Okay, it was received at my office.

Martino, Jim - January 15, 2004 00:00:00 a.m.

156:1                    MARTINO

2        Q.    What is the date?

3        A.    Ten, four, '99.

4              MR. SEIDEN:  Let me make a point.

5              MR. SCHANER:  For the record.

6              MR. SEIDEN:  You are referring to a fax

7        receipt that is not on the exhibit that is

8        marked.  If you want to substitute your copy

9        with the copy that is marked, otherwise.

10             MR. SCHANER:  I would suggest that

11       after the deposition I will substitute a clean

12       one and.

13             MR. SEIDEN:  Not a problem.

14       Q.    Mr. Martino, there is some handwriting

15       on the right side of the first page which is

16       actually marked page two of Martino Exhibit 11 do

17       you recognize the handwriting?

18       A.    It looks like Bob's.

19       Q.    Read what it says?

20       A.    Jim, use this for a guide to the

21       Jupiter, it looks like V period, E period, work.

22       These are the items we accepted on Miami.

23       Q.    What do you understand V period E

24       period?

25       A.    Value engineering I believe it means.

Martino, Jim - January 15, 2004 00:00:00 a.m.

157:1                          MARTINO

2        Q.      What does that mean?

3        A.      Cost savings.

4        Q.      By Jim, do you understand that to refer

5    ^ you to ^ to you?

6        A.      Yes, I believe that was meant for me.

7        Q.      Mr. Martino, where Mr. Beach err says

8    these are the items we accepted on Miami, what do

9    you understand Mr. Beach err to be selling telling

10   you?

11               MR. SEIDEN:  Objection to form.

12       A.      Say the question one more time, please.

13       Q.      What was Mr. Beach err asking you to do

14   when he sent you Martino exhibit number 11?

15               MR. SEIDEN:  Objection to the form.  It

16          calls for beach err's state of mind.

17       Q.      What did you understand Mr. Beach err

18   was asking you to do?

19       A.      I think he was looking for me to do was

20   to incorporate these items into the bid documents

21   for Jupiter.

22       Q.      And he tells you that these were the

23   items that were accepted on the Miami project,

24   right?

25       A.      Yes.

Martino, Jim - January 15, 2004 00:00:00 a.m.

158:1                    MARTINO

2        Q.     If you go to page number seven, the

3    last item on the page reads as follows.  The

4    contractor specifically excludes all site

5    development work, underground utilities, site

6    preparation as well as any work not indicated in

7    the construction documents prepared by James

8    Martino architect, have I read that correctly?

9        A.     Yes, you have.

10       Q.     Do you have an understanding as to what

11   is referred to here by the term site preparation?

12       A.     No.

13       Q.     Do you have an understanding as to why

14   site preparation work and site development work

15   were excluded on the Miami construction project?

16       A.     No.

17       Q.     Does this document indicate to you that

18   site preparation work and site development work

19   were not the responsibility of crown theaters on

20   the Miami lakes project?

21               MR. WISSER:  Objection to the form.

22               MR. SEIDEN:  Objection to form?

23       A.     No, it doesn't.

24       Q.     Why not?

25       A.     It just says that this particular

Martino, Jim - January 15, 2004 00:00:00 a.m.

159:1                    MARTINO

2    contractor has elected to exclude it.

3        Q.      What was Waas's role?

4        A.      Weighs was the general contractor.

5        Q.      So, the general contractor on Miami had

6    excluded site development work and site preparation

7    work on the Miami project?

8        A.      That's what it appears to say.

9        Q.      And you are being instructed that site

10   preparation and site development work should be

11   excluded on the value engineering work on the

12   Jupiter project correct?

13       A.      That is what the paper is indicating

14   for me to do.

15              MR. SCHANER:  Let's mark this as

16       Martino Exhibit 12.

17              (Whereupon, the aforementioned

18       ^ document ^ photograph ^ was ^ were marked as

19       ^ Plaintiff's ^ Defendant's Exhibit ^Replace

20       for identification as of this date by the

21       Reporter.)

22       Q.      Mr. Martino, you should have before you

23   a copy of Martino exhibit number 12 do you have

24   that?

25       A.      Yes, I do.

Martino, Jim - January 15, 2004 00:00:00 a.m.

160:1                    MARTINO

2        Q.     The document appears to be a memo from

3    Bob beach err to the Waas company's attention,

4    attention Richard Waas where C C's to Milt Daly,

5    Jim Martino, Bob Spanos and Carl Skiles.

6    Mr. Martino did you receive a copy of Martino

7    Exhibit 12?

8        A.     I don't recall if I did or didn't, to

9    be honest with you.

10       Q.     Do you have any reason to believe you

11   didn't?

12              MR. WISSER:  Objection to the form.

13              MR. SEIDEN:  Objection he doesn't know.

14       Q.     Do you have any reason to believe you

15   haven't received a copy?

16       A.     No, I have no reason that I did not.

17       Q.     I will represent that this is a

18   document that we received from your files.  It

19   bears bate stamp J T M 1 '01 four five.  You've

20   testified that Waas was the general contractor on

21   the Miami project.  Did you ever meet with Richard

22   Waas regarding the Miami project?

23       A.     Yes.

24       Q.     How often did you meet with him?

25       A.     Not that frequently.

Martino, Jim - January 15, 2004 00:00:00 a.m.

161:1                    MARTINO

2        Q.    How many times?

3        A.    I couldn't tell you right now.

4        Q.    When was the first time?

5        A.    I don't recall.

6        Q.    What was the purpose of your meeting

7    with him?

8        A.    I don't recall that either.

9        Q.    Do you recall anything about your

10   meetings with Mr. Waas?

11       A.    Probably -- no, sitting here I can't

12   tell you.

13       Q.    Do you recall anything he said to you

14   or anything you said to him?

15       A.    No.

16       Q.    Now, who was Bob Spanos?

17       A.    Bob Spanos worked for the Benderson

18   development company.

19       Q.    Who was Carl Skiles?

20       A.    Carl Skiles was an independent

21   surveyor.

22       Q.    Who did he work for?  He was an

23   independent surveyor.  Who employed him?

24            MR. SEIDEN:  He is independent.

25       Q.    Who was he employed by?

Martino, Jim - January 15, 2004 00:00:00 a.m.

162:1                    MARTINO

2        A.     He was retained by the Benderson

3    development company.

4        Q.     If you look at the first paragraph of

5    the letter, it reads please be advised that as of

6    this date I received notification from Bob Spanos

7    of the Benderson development I think that they

8    completed the clearing of the site an have turned

9    over the site to us.  I would appreciate it if you

10   visit the site and advice me if you find anything

11   to the contrary.  Mr. Martino, what was your

12   understanding of the work that Benderson

13   development was doing that is referred to in

14   Martino Exhibit 12?

15            MR. SEIDEN:  Objection.  Lack of

16        foundation.

17            MR. WISSER:  Attorney objection.

18       A.     Repeat the question, please.

19       Q.     Do you have an understanding of the

20   work that Benderson development was doing?

21       A.     No.

22       Q.     Did you understand that they were

23   clearing the site?

24       A.     Yes.

25       Q.     What is your understanding of what

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
163:1              MARTINO

    2   clearing the site involved?

    3        A.    Level he willing the property or at

    4   least taking await weeds that exists there so that

    5   the contractor could come in and start his own site

    6   preparation work.

    7        Q.    Is clearing the site part of site

    8   preparation?

    9              MR. WISSER:  Objection to form.

   10              MR. SEIDEN:  Pursuant to what.

   11              MR. WISSER:  That depends?

   12        A.    It depends on what the contractor is

   13   scheduled to do as far as site preparation.  In

   14   this case here it sounds to me like the site

   15   clearing was done by Benderson.

   16        Q.    Is that -- that's consistent with your

   17   recollection?

   18              MR. SEIDEN:  Is that a question.

   19              MR. SCHANER:  Yes.

   20              MR. SEIDEN:  Objection to form.

   21        Q.    Do you recall that Benderson did the

   22   site clearing?

   23        A.    Now that I see this document.

   24        Q.    The answer is yes?

   25        A.    Now that I see this document, yes.
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
164:1                    MARTINO
    2        Q.
    3            MR. SCHANER:  Let's mark this as
    4        Martino Exhibit 13.
    5            (Whereupon, the aforementioned
    6        ^ document ^ photograph ^ was ^ were marked as
    7        ^ Plaintiff's ^ Defendant's Exhibit ^Replace
    8        for identification as of this date by the
    9        Reporter.)
   10        Q.    Mr. Martino, do you have a copy of
   11   Martino Exhibit 13?
   12        A.    Yes, I do.
   13        Q.    For the record, it's baits number J T M
   14   1 one nine five five through J T M 1 196 eight.  It
   15   purports to be -- let me ask you, do you recognize
   16   this document?
   17        A.    Yeah, I recognize it.
   18        Q.    What is it?
   19        A.    It's a letter from Bob beach err to
   20   Milt Daly.
   21        Q.    Did you receive a copy?
   22        A.    I would imagine I did.
   23            MR. SEIDEN:  Don't imagine.
   24        Q.    Did you receive a copy?
   25        A.    I don't recall whether I did or didn't.
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

165:1                    MARTINO

2        Q.    Your name is a shown as a C C

3   recipient; is that correct?

4        A.    That's correct.

5        Q.    This was from your files?

6        A.    Okay.

7        Q.    Did you receive it on or about the date

8   which is January 5, 2000?

9        A.    I don't recall what date I received it.

10       Q.    Do you have any reason to believe you

11  did not receive the document on or about January

12  five 2000?

13       A.    I don't know.

14             MR. SEIDEN:  Objection.  He said he

15       didn't recall the date that he received it.

16       Q.    Turn to the page that is baits number J

17  T M 1 one nine five seven.  If you look on the

18  document?

19       A.    Okay.

20       Q.    There are numbers.  Do you see that?

21       A.    Yes, I do.

22       Q.    For the record, the page appears to be

23  an application and certificate for payment,

24  application number three from Waas construction

25  company on the crown theaters, the grand project,

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
166:1                    MARTINO
   2    for the period December 31, 1999, there is a
   3    contract date of September 27, 1999.  Have I stated
   4    that accurately?
   5        A.    Yes.
   6        Q.    If you look in the lower right hand --
   7    strike that.
   8              Do you recognize any of the signatures
   9    on this page, J T M 1 one nine five seven?
  10        A.    I recognize my signature.
  11        Q.    Where is that?
  12        A.    On the line to the right of the word
  13    by, B Y, which is directly below the word
  14    architect.
  15        Q.    When did you sign this document, this
  16    page?
  17        A.    January 5th, 00.
  18        Q.    How much did you certify payment for?
  19        A.    543,532, it appears, if I'm reading it
  20    correctly.
  21        Q.    Now, is the work ^ you that ^ that you
  22    certified listed on the continuation page that
  23    follows J T M 1 one nine five seven and runs
  24    through J T M 1 196 0?
  25        A.    Yes.
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

167:1                      MARTINO

2        Q.      If you look at the first continuation

3    page, J T M 1 one nine five eight, do you see the

4    first two item numbers, number one is excavation an

5    fill and number two was soil treatment.  Do these

6    entries tell you that Waas construction performed

7    the excavation and fill and soil treatment on the

8    Miami lakes project?

9        A.      Well doesn't that say that Waas

10   construction performed that services.  It was

11   subcontractors that performed that service.

12       Q.      It would have been one of Waas'

13   subcontractor services; is that correct?

14               MR. WISSER:  Objection to form?

15       A.      I would say, yes.

16       Q.      Turn to page baits number J T M 1 196

17   one.  For the record, this page is an application

18   and certificate for payment to crown theaters from

19   contractor M H W general contractors, Inc. on the

20   crown theater Miami lakes Florida project for the

21   period December 25, 1999, application number three,

22   have I stated that correctly?

23       A.      Three revised.

24               MR. SEIDEN:  Three revised.

25       Q.      Three revised does your signature

Martino, Jim - January 15, 2004 00:00:00 a.m.

168:1                    MARTINO

    2   appear then page?

    3        A.    Yes, it does.

    4        Q.    Where is your signature?

    5        A.    To the right of the word by and

    6   directly below the word architect.

    7        Q.    When did you sign?

    8        A.    January 5th, 00.

    9        Q.    How much did you certify payment for?

   10        A.    200 and 14,000 and 18 dollars.

   11        Q.    What role on the Miami lakes project

   12   did M H W contractors perform general contractors

   13   perform?

   14        A.    I don't know.

   15        Q.    Did you ever speak with anybody who

   16   works for M H W general contractors?

   17        A.    I don't recall speaking to them.

   18        Q.    If you turn to the first continuation

   19   sheet, J T M 1 196 two, if you look at the second

   20   line, it states excavation.  Is does that entry

   21   tell you that M H W general contractors performed

   22   excavation work on the Miami project?

   23        A.    Yes, it does.

   24        Q.    That's all for this document.

   25              MR. SCHANER:  Please mark this as

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
169:1                    MARTINO
    2        Martino exhibit number 14.
    3             (Whereupon, the aforementioned
    4        ^ document ^ photograph ^ was ^ were marked as
    5        ^ Plaintiff's ^ Defendant's Exhibit ^Replace
    6        for identification as of this date by the
    7        Reporter.)
    8        Q.    Mr. Martino, you have before you a copy
    9   of Martino Exhibit 14.  It's baits number J T M 1
   10   one eight four 0 through J T M 1 one eight seven
   11   one.  Do you recognize Martino Exhibit 14?
   12        A.    Yes.
   13        Q.    What is it?
   14        A.    It's a letter from Bob beach tore Milt
   15   Daly in regards to the crowns my ram me lakes
   16   project and Waas construction application number
   17   four.
   18        Q.    And the document is dated January 28th
   19   of 2000, it shows as C C recipients Jim Martino and
   20   Richard Waas, correct?
   21        A.    That's correct.
   22        Q.    And there is a stamp on the document
   23   that says received January 29, 2000 is that your
   24   stamp?
   25        A.    I can't tell for sure.
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

170:1                    MARTINO

2        Q.    If you look in the second line of the

3    letter on the first page, it reads Jim Martino and

4    myself have reviewed and approved application

5    number four for payment.  With respect to you,

6    Mr. Martino, is it correct that you reviewed and

7    approved application number four for payment?

8        A.    His review and my review are two

9    different approvals.

10        Q.    Yes.

11        A.    His approval is as the owners rep

12    construction manager for quantities an dollar

13    values.  Mine is for quality of work.

14        Q.    Where is that distinction spelled out

15    in the contract documents?

16              MR. SEIDEN:  Which contract documents.

17              MR. SCHANER:  Any contract documents we

18        are not here to debate.

19              MR. SEIDEN:  No, I don't think I

20        understand what you mean by contract

21        documents.  Are you talking about the

22        construction documents, a contract that he

23        has.

24        Q.    Do you understand the question?

25              MR. SEIDEN:  I don't understand it.

Martino, Jim - January 15, 2004 00:00:00 a.m.

171:1                    MARTINO

2              MR. SCHANER:  I don't care if you

3         understand it.

4              MR. SEIDEN:  Objection if I don't

5         understand it, it's vague.

6         Q.    The question is to the witness?

7         A.    I don't understand it.

8         Q.    You are entitled to questions that you

9    understand, Mr. Martino?

10        A.    Thank you.

11        Q.    The separation in responsibilities with

12   respect to reviewing payment applications between

13   yourself and Mr. Beach err, is there any written

14   documents that you are aware of that spells out the

15   distinction.

16        A.    The only documents that spells out my

17   responsibilities is the Trumbull contract.  I don't

18   know if there is any written document that

19   specifically spells out beach err's role.

20        Q.    Now, is it accurate that you reviewed

21   and approved application number four for payment.

22   I'm referring to the second line of Mr. Beach err's

23   memo on the first page of Martino Exhibit 14?

24        A.    Yes.

25        Q.    Now, if you turn to the second page of

Martino, Jim - January 15, 2004 00:00:00 a.m.

172:1                    MARTINO

2    the Exhibit J T M 1 one eight four one, is the

3    baits number, it's an application and certificate

4    for payment from Waas construction, application

5    number four for the period of January 13, 2000.  Do

6    you see your signature on this page?

7         A.    Yes, I do.

8         Q.    Where is it?

9         A.    To the right of the word by and

10   directly below the word architect.

11        Q.    When did you sign that document?

12        A.    January 27, 00.

13        Q.    What amount did you certify payment

14   for?

15        A.    There isn't a total on this?

16        A.    Unless.

17        Q.    It says --

18        A.    I'm sorry.  There is two numbers.

19        Q.    All right.

20        A.    I don't recall.

21        Q.    What is the first number?

22        A.    241,878.30.

23        Q.    And the second number?

24        A.    48,378.30.

25        Q.    Which amount were you certifying for

Martino, Jim - January 15, 2004 00:00:00 a.m.

173:1                    MARTINO

2    payments?

3        A.    I can't tell you today which number it

4    was.

5        Q.    Turn to page J T M 1 one eight four

6    five.  This is an application certificate for

7    payment to crown theaters from contractor M H W

8    general contractors through the period to January

9    25, 2000, application number four, revised, on the

10   crown theater Miami lakes project is that accurate?

11       A.    Yes.

12       Q.    Is that your signature in the lower

13   right-hand corner?

14       A.    Yes, it is.

15       Q.    Under the word architect and next to

16   the date January 27th of 2000?

17       A.    Mm-hmm.

18       Q.    Is that yes?

19       A.    Yes.

20             MR. SCHANER:  Let's mark this as

21       Martino 15.

22             (Whereupon, the aforementioned

23       ^ document ^ photograph ^ was ^ were marked as

24       ^ Plaintiff's ^ Defendant's Exhibit ^Replace

25       for identification as of this date by the

Martino, Jim - January 15, 2004 00:00:00 a.m.

174:1                    MARTINO

2        Reporter.)

3        Q.     You should have, Mr. Martino, a copy of

4    Martino 15.  In front of you it's for the record

5    baits number J T M 1 00 eight seven?

6        A.     Yes.

7        Q.     What is it?

8        A.     It's a memo from Bob beach err to rich

9    Waas.

10       Q.     Did you receive a copy?

11       A.     Yes.

12       Q.     It's dated April 17, 2000.  Did you

13   receive a copy on or about that date?

14       A.     Yes.

15       Q.     Who -- there -- on the C C line it

16   refers to Gary Owens.  Who is he?

17       A.     Gary Owens was the project manager in

18   the field for the Waas construction.

19       Q.     There is another name, lane /PWERG.

20   Who is Mr. /PWERG?

21       A.     I can't recall who he was.

22       Q.     It refers to American engineering.  Did

23   American engineering have a role on the Miami

24   project?

25       A.     I don't recall.

Martino, Jim - January 15, 2004 00:00:00 a.m.

175:1                    MARTINO

2        Q.      In the first paragraph it states that

3    it is my understanding that the back filling

4    operations around the perimeter of the building has

5    not been completed due to your failure to have the

6    area prepared.  It goes on to say that you are

7    directed to immediately cleanup around the building

8    as you indicated you already did last week.  I'm

9    authorizing American engineering to proceed in the

10   completion of the back filling operation this

11   coming Monday, April 24, 2000.  What was the back

12   filling operation on the Miami project?

13       A.      I wouldn't make an assumption of what I

14   think they are talking about.

15       Q.      What is your understanding?

16       MR. SEIDEN:  Objection if you have an

17       understanding give it if it's an assumption.

18       Q.      Do have understandsing?

19       A.      No.

20       Q.      Do you have an assumption?

21       MR. WISSER:  Objection.

22       MR. SEIDEN:  Objection.

23       A.      Am I answering.

24       MR. SEIDEN:  If ^ have you ^ you have

25       an assumption you can answer otherwise if you

Martino, Jim - January 15, 2004 00:00:00 a.m.

176:1                    MARTINO

2        don't know you don't know?

3        A.    My assumption is they were doing back

4    filling around the back area back filling of this

5    building.

6        Q.    Whose responsibility was the back

7    filling if you know?

8        A.    It's not clear in this letter.

9        Q.    ^ it was ^ was it your -- is it your

10    understanding that Waas was to have the area

11    prepared?

12              MR. SEIDEN:  Objection.  Lack of

13        foundation?

14        A.    It's not my understanding.

15        Q.    Do you have an understanding as to

16    who's responsibility ^ it was ^ was it to have the

17    area prepared?

18              MR. WISSER:  Objection to the form.

19        A.    Not by that memo.

20        Q.    Do you have an understanding,

21    irrespective of this memo?

22        A.    There is pay req's back there that show

23    some site prep work was to be done by a

24    subcontractor.

25        Q.    Which one?

Martino, Jim - January 15, 2004 00:00:00 a.m.

177:1                    MARTINO

2      A.    We would have to go back and find it.

3      Q.    It wasn't Marlin?

4      A.    I don't know that.

5      Q.    Today you believe that Marlin is a

6   fictitious entity?

7            MR. SEIDEN:  Objection that's not what

8       he said.  He said Craig Martin told him.

9       Marlin that's a lot different.

10           MR. SCHANER:  Now you are testifying.

11           MR. WISSER:  That's what he said.

12           MR. SEIDEN:  That's what he said.

13           MR. SCHANER:  And now Mr. Wisser you

14      are testifying, too.

15           MR. SEIDEN:  Okay.

16      Q.    Mr. Martino, is back filling part of

17   site preparation?

18           MR. WISSER:  Objection to the form.

19           MR. SEIDEN:  Objection to the form.

20      A.    Yes.

21           MR. SCHANER:  Let's take a look at

22      another document.  Let's mark this as

23      deposition Martino Exhibit 16.

24           (Whereupon, the aforementioned

25      ^ document ^ photograph ^ was ^ were marked as

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
178:1                    MARTINO
    2        ^ Plaintiff's ^ Defendant's Exhibit ^Replace
    3        for identification as of this date by the
    4        Reporter.)
    5        Q.    For the record, Martino deposition
    6   exhibit with baits number J T M 0 nine two eight
    7   six.  It's a one-page document.  It says the grand
    8   crown theater, Miami gardens Florida, may 31, 2000
    9   at the top.  Under that it says distribution list.
   10   Mr. Martino, have you seen a copy of this documents
   11   before?
   12        A.    I'm assuming by the J T M it came from
   13   my documents.
   14        Q.    I will represent it came are your
   15   documents?
   16        A.    Thank you.
   17        Q.    Do you recognize this document?
   18        A.    No.
   19        Q.    It's title distribution list on the
   20   left column do you see reference to James Thomas
   21   Martino, architect?
   22        A.    Under the company column?
   23        Q.    Yes.
   24        A.    No, I do not see -- there it is.  I'm
   25   sorry, there it is.
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

179:1                    MARTINO

2      Q.    Under person it says James Martino?

3      A.    That's correct.

4      Q.    Do you have an understanding of the

5    purposes of the document?

6      A.    No.

7      Q.    Do you see a Marlin contracting listed

8    on distribution list?

9      A.    No.

10          MR. SCHANER:  I'm going have this

11        collection of documents marked as a group

12        exhibit.  Because it's bulky, I only have two

13        copies to share.  Let's mark this as group

14        exhibit number 17.

15              (Whereupon, the aforementioned

16        ^ document ^ photograph ^ was ^ were marked as

17        ^ Plaintiff's ^ Defendant's Exhibit ^Replace

18        for identification as of this date by the

19        Reporter.)

20      Q.    Mr. Martino, I'm handing you what the

21    Court Reporter has marked as group Exhibit 17 I

22    will say for the record that group exhibit 17 is a

23    collection of progress reports.  It appears to be

24    prepared by Waas construction company, it states

25    references the grand country club commons, Miami

Martino, Jim - January 15, 2004 00:00:00 a.m.

180:1                    MARTINO

2    gardens Florida on the cover page and they are

3    progress reports in group Exhibit 17 for the

4    following dates.  October 28, 1999, November 11,

5    1999, November 24, 1999, December 9, 1999, December

6    20, 1999, January 12, 2000, January 26, 2000,

7    February 9, 2000, February 23, 2000, February 28,

8    2000, March?

9             MR. SEIDEN:  Time out?

10       A.    We don't have a February 28th in here.

11   Here it is.  It was out of sync.

12       Q.    We have a February 28, 2000?

13       A.    Mm-hmm.

14       Q.    A March eight, 2000, March 22, 2000,

15   April five, 2000, April 19, 2000, may three, 2000,

16   may 17, 2000, may 31, 2000, June 4, 2000?

17            MR. SEIDEN:  June 14.

18       Q.    I'm sorry, June 14, 2000?

19       A.    Okay.

20       Q.    June 28, 2000, July 12, 2000, July 26,

21   2000 and August 9, 2000.

22       Q.    Mr. Martino, I will represent to you

23   that each of the documents has a J T M baits number

24   on it and we obtained it from your files?

25       A.    Thank you.

Martino, Jim - January 15, 2004 00:00:00 a.m.

181:1                    MARTINO

2        Q.      Do you recognize those documents?  Do

3    you recognize Martino Exhibit 17?

4        A.      Yes, I do.

5        Q.      What is Exhibit 17?

6        A.      These were monthly progress reports

7    that came from Waas construction.  I know I

8    received it.  I don't really recall who else might

9    have received it.

10       Q.      Did you discuss these progress reports

11   with anyone?

12       A.      Probably discussed it somewhere with

13   Bob beach err.

14       Q.      Did you review them at the time that

15   you received them?

16       A.      I did not review each one.

17       Q.      Did you review some of them?

18       A.      Yes.

19       Q.      Turn to the second page of the October

20   28, 1999 progress report baited J T M 1 three one

21   one one.  The document states at the top the job

22   coordination meeting was held at the field offices

23   of Waas construction company and it lists meeting

24   participants.  Do you see that?

25       A.      Yes.

Martino, Jim - January 15, 2004 00:00:00 a.m.

182:1                          MARTINO

2          Q.      What was the job coordination meeting?

3          A.

4                  MR. SEIDEN:  Objection to form.

5          A.      I don't know.

6          Q.      Do you know what a job coordination

7     meeting is in a general manner?

8                  MR. SEIDEN:  Objection to form.

9          Q.      Do you have an understanding as to what

10    the job coordination meeting was?

11         A.      I could offer for you what I think he

12    meant to happen.

13         Q.      What do you think?

14         A.      I think Richard Waas and his super were

15    meeting with these people at this point in time.  I

16    don't know what stage the job was at on that date,

17    but I believe they were getting together to workout

18    the trades so that they could coordinate this.

19         Q.      Now, at the bottom of the page it

20    states that all active and near active

21    subcontractors are required to attend.  Do you have

22    an understanding of the term near active

23    subcontractors?

24         A.      No.

25         Q.      What is an active subcontractor?

Martino, Jim - January 15, 2004 00:00:00 a.m.

183:1                         MARTINO

        2              MR. WISSER:  Objection to form.

        3              MR. SEIDEN:  Objection to form?

        4        A.     I can only assume that it means the

        5   contractors that are presently on the job site.

        6        Q.     Now, Mr. Martino, would you agree that

        7   if someone was a subcontractor on the Miami

        8   project, you would expect that subcontractor's name

        9   to appear in Waas' progress reports?

       10              MR. SEIDEN:  Objection to form?

       11        A.     I can't draw that conclusion.

       12        Q.     Why not?

       13        A.     Because I don't know if this is the

       14   entire list of subcontractors and those

       15   subcontractors may not necessarily have to be there

       16   on this date.

       17        Q.     Now, the progress report does state

       18   that all active and near active subcontractors are

       19   required to attend.  In light of that language,

       20   would it be your expectation that all

       21   subcontractors, active or near active, would be

       22   listed as meeting attendees in the progress

       23   reports?

       24              MR. WISSER:  Objection to the form.

       25              MR. SEIDEN:  Objection to the form.

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
184:1              MARTINO
    2         MR. WISSER:  It assumes it was sent to
    3    everyone?
    4    A.    No.
    5    Q.    Why would it not be your assumption?
    6    A.    Why should I make the assumption that
    7    rich /AOE Waas is going to list all near -- active
    8    and near active contractors on this form.  That's
    9    what you are asking me to do.
   10    Q.    Would you agree that that is what the
   11    form represents that ^ he is ^ is he doing?
   12         MR. WISSER:  Objection to the form.
   13         MR. SEIDEN:  Objection to the form?
   14    A.    No.
   15    Q.    Do you see Marlin subcontracting listed
   16    among the attendees in the progress report for
   17    October 28, 1999?
   18    A.    I do not.
   19    Q.    Now, if you would like to take a few
   20    minutes, that would be fine, but the question to
   21    you is is Marlin subcontracting to you listed as
   22    attending any of the job coordination meetings
   23    described in the progress reports contained in
   24    Martino Exhibit 17?
   25         MR. SEIDEN:  Can I make a suggestion it
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

185:1                    MARTINO

2      would be a lot faster if you want to make a

3      representation that they are not in there I'm

4      okay with that otherwise he has a mountain of

5      paper to go through.

6           MR. WISSER:  And he could assume that

7      for these questions and if the record ends up

8      being different at trial or any other time

9      that the assumption is invalid.

10     Q.    I will represent to you that Marlin

11 contracting doesn't show up in any of these

12 progress reports?

13     A.    Okay.

14     Q.    Will you accept that representation?

15          MR. SEIDEN:  We will accept it for the

16     purposes of this deposition and move forward

17     as Mr. Wisser said if it turns out to be

18     otherwise, we reserve our right to suggest

19     that.

20          MR. SCHANER:  That's fine off the

21     record for a second.

22          (Whereupon, an off-the-record

23     discussion was held.)

24     Q.    Let's talk about, Mr. Martino, we are

25 back on the record.  You provided, sir,

Martino, Jim - January 15, 2004 00:00:00 a.m.

186:1                    MARTINO

2    architectural services for crown theaters in

3    Jupiter Florida?

4        A.    That's correct.

5        Q.    Can you describe the project in Jupiter

6    Florida?

7        A.    It's a ^ new ^ knew, I think it was a

8    16 theater complex.  I don't remember the exact

9    number of the theaters.  Across the street from the

10   minor league baseball field in Jupiter Florida.

11       Q.    Did crown theaters have a general

12   contractor on the project?

13       A.    Yes, coastal construction.

14       Q.    Was there a person or persons at

15   coastal who were responsible for the project?

16            MR. SEIDEN:  Objection to form.

17       Q.    Let me rephrase it was there anybody at

18   coastal that you met in connection with the

19   project?

20       A.    Yes.

21       Q.    Who?

22       A.    Jeff Lee.

23       Q.    What was Mr. Lee's position?

24       A.    I don't know what his title was.

25       Q.    And you were about to mention another

Martino, Jim - January 15, 2004 00:00:00 a.m.

187:1                    MARTINO

2    person?

3        A.    Goren and I think Justina or something

4    like that.  J US T I N A, I believe it was

5    spelled.  There was another two guys there.  I

6    can't remember their names, Dennis something.

7        Q.    What role was Mr. Lee performing for

8    coastal?

9        A.    I don't know.

10        Q.    What about Mr. Juice Stein in a?

11        A.    When you say what role, I mean.

12        Q.    What was their job, to your knowledge?

13        A.    They weren't the supers on the job

14    because they came and went from the jobs.  They are

15    a notch up from the supers because they would be

16    there and leave and look at other jobs so whatever

17    title may be attached though that that's what they

18    were.

19        Q.    Who was crown theater landlord at

20    Jupiter Florida?

21            MR. SEIDEN:  Objection to form.

22        Q.    Do you know?

23        A.    I don't know exactly the name, the

24    corporate name.  That might have been the

25    landlords.

Martino, Jim - January 15, 2004 00:00:00 a.m.

188:1                    MARTINO

2        Q.      Was there any person who represented

3    the landlord that you met with?

4        A.      Larry Juran.

5        Q.      Can you spell that?

6        A.      J U R A N.

7        Q.      Was there a division of --

8        A.      Scott hedge, also H E D GE.

9        Q.      What was the division of work between

10   crown and the landlord?

11              MR. WISSER:  Objection to the form.

12              MR. SEIDEN:  Objection to the form.

13       A.      I don't know.

14       Q.      Who hired you to perform architectural

15   services at the Jupiter work site?

16       A.      Crown theaters.

17       Q.      Was there anyone in particular at crown

18   theaters who hired you to do the work?

19       A.      Milt Daly of crown theaters.

20       Q.      What work, in connection with the

21   Jupiter project did you perform?

22       A.      Same work as it's spelled out in my

23   Trumbull contract.

24       Q.      Who, from your firm, worked on the

25   Jupiter project?

Martino, Jim - January 15, 2004 00:00:00 a.m.

189:1                    MARTINO

2       A.      Gary Scheide was the lead.  I don't

3   recall who the guys were that were CADD operators

4   under Gary.

5       Q.      What did Mr. Scheide do on the Jupiter

6   project?

7       A.      He did the construction drawings.  He

8   did the answered the phone calls, assisted me in

9   answering R F I's.  Did explanatory drawings.

10  Reviewed some shop drawings with me.

11              MR. SCHANER:  Let's mark this as

12       Martino exhibit number 18.

13              (Whereupon, the aforementioned

14       ^ document ^ photograph ^ was ^ were marked as

15       ^ Plaintiff's ^ Defendant's Exhibit ^Replace

16       for identification as of this date by the

17       Reporter.)

18      Q.      Mr. Martino, you have before you

19  Martino Exhibit 18.  For the record, let me

20  introduce it as an application and certificate for

21  payment to crown theaters L P from Marlin

22  contracting.  The project is crown theaters at

23  Abacoa town center, Jupiter Florida, via architect

24  James Thomas Martino, it's application number one

25  for the period February 2000 -- February one 2000;

Martino, Jim - January 15, 2004 00:00:00 a.m.

190:1                    MARTINO

2    is that correct?

3         A.     Yes.

4         Q.     Do you recognize any signatures on the

5    first page of Martino Exhibit 18?

6         A.     Yeah.  It appears to be Bob beach err's

7    signature.

8         Q.     Where?

9         A.     On the line next to the word by, below

10   the word architect.  Also it appears to be Bob's

11   signature on the line next to the words amount

12   certified.

13        Q.     Do you recognize the signature on the

14   line under the word contractor under the name

15   Marlin contracting d/b/a Marlin consulting Inc.

16        A.     No.

17        Q.     There is what appears to be a signature

18   on the continuation sheet which is the second page

19   of the exhibit.  Do you recognize that signature or

20   marking?

21        A.     It appears to be Bob's.

22        Q.     Did you see a copy of Exhibit 18 on or

23   about January 27, 2000?

24        A.     No.

25        Q.     When is the first time you saw Exhibit

Martino, Jim - January 15, 2004 00:00:00 a.m.

191:1                    MARTINO

2    18?

3         A.     When I met with counsel in preparation

4    of this deposition.

5         Q.     Let's mark this as exhibit -- Martino

6    Exhibit 19.

7              (Whereupon, the aforementioned

8    ^ document ^ photograph ^ was ^ were marked as

9    ^ Plaintiff's ^ Defendant's Exhibit ^Replace for

10   identification as of this date by the Reporter.)

11        Q.     For the record, exhibit Martino Exhibit

12   19 is an application and certificate for payment

13   from crown theaters L P from Marlin contracting,

14   the project is crown theaters at Abacoa town center

15   Jupiter Florida via architect James Thomas Martino

16   P C, it's application 2 the period March one,

17   2000.  Have I stated that correctly?

18        A.     Yes.

19        Q.     Does your signature appear on the first

20   page of Exhibit 19?

21        A.     Yes.

22        Q.     Where is it located?

23        A.     On the line next to the right of the

24   word by and below the word architect.

25        Q.     Whether did you sign Exhibit 19?

Martino, Jim - January 15, 2004 00:00:00 a.m.

192:1                    MARTINO

2        A.      According to this document, it says

3    three, two, 00.

4        Q.      Indicating March second, 2000?

5        A.      Yes.

6        Q.      What is the amount

7    ^ you that ^ that you certified for payment?

8        A.      I did not certify that amount.  Bob

9    beach err certified that amount.

10       Q.      When you say Bob beach err certified

11   that amount, why do you say that?

12       A.      Because he was responsible for the

13   subcontractors and their line items of cost.  I was

14   not involved with any of the costs.

15       Q.      When you say that Mr. Beach err was

16   responsible for the subcontractors line items and

17   costs, what is the basis for that statement?

18       A.      His role as an owners reps construction

19   manager.

20       Q.      Is it your testimony that the owners

21   rep and construction manager always is responsible

22   for the subcontractors and the line items of cost?

23           MR. SEIDEN:  Always or always on the

24       crown theaters jobs.

25           MR. SCHANER:  Always across the board.

Martino, Jim - January 15, 2004 00:00:00 a.m.

193:1                        MARTINO

2              MR. SEIDEN:  Always regardless.

3              MR. SCHANER:  Yes.

4              MR. SEIDEN:  Objection.

5              MR. WISSER:  Objection to form?

6         A.    I can't answer that.

7         Q.    What about on this job?

8         A.    Yes.

9         Q.    Why do you believe that Mr. Beach err

10    was responsible for certifying the work of the

11    subcontractors an line items of costs?

12         A.    Because he was appointed that position,

13    number one by Milt Daly as the owners rep, it was

14    made clear that Bob beach err would be the eyes and

15    ears for the crown theaters on all the job sites

16    when he came to -- when it came to pay

17    requisitions, bidding an negotiating with the

18    subcontractors and contractors and negotiating all

19    the line items.  ^ it was ^ was it not my

20    responsibility.

21         Q.    When was that made clear to you?

22         A.    At several of the construction

23    meetings, Friday morning construction meetings at

24    crown's office.

25         Q.    When was the first of those meetings?

Martino, Jim - January 15, 2004 00:00:00 a.m.

194:1                         MARTINO

2        A.    I couldn't tell you the dates.

3        Q.    Who attend?

4        A.    The same principals I told you in the

5   past.

6        Q.    Can you give me a best estimate of when

7   the meeting took place?

8        A.    No.

9        Q.    When was the second meeting?

10       A.    I can't tell ^ you that ^ that you

11  either.

12       Q.    You don't know how many meetings you

13  were told that Bob beach err was responsible for

14  the subcontractors and lined items of cost relating

15  to subcontractors?

16             MR. WISSER:  Objection to form?

17       A.    That was going on so long I lost what

18  the actual question was.

19       Q.    At which -- I think you may have

20  answered the question.  At which meetings were you

21  told that Bob beach err was responsible for the

22  subcontractors and certifying the subcontractors

23  costs?

24       A.    I don't recall exactly which meeting.

25       Q.    Do you have any notes reflecting that

Martino, Jim - January 15, 2004 00:00:00 a.m.

195:1                    MARTINO

2    you were told to keep your hands off matters relate

3    together subcontractors and their costs?

4             MR. SEIDEN:  Objection to the form.

5             MR. WISSER:  Objection to the form.

6    A.    No.

7    Q.    Do you have any notes reflecting this

8    division of certification between yourself and

9    Mr. Beach err?

10   A.

11            MR. SEIDEN:  Objection.  The

12            certification with respect to the architect

13            speaks for itself.

14   Q.    Let me ask.  Can you answer my

15   question?

16   A.    These certifications, Bob is

17   responsible for all the dollars and cents.  My

18   certification was for the quality of the work

19   performed and that the work was completed.

20   Q.    Is there a document which states that

21   your certification was for the quality of the work?

22   A.    This document.

23   Q.    Is there a document that states that

24   Bob beach err's certification was for the dollars

25   and cents?

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
196:1                    MARTINO

    2        A.    Not that I'm aware of.

    3        Q.    Was Bob beach err an architect?

    4        A.    No.

    5        Q.    Now, tell me, sir, what is it that you

    6   believe that you were certifying when you signed

    7   the architects certificate on Martino Exhibit 19?

    8              MR. SEIDEN:  Do you want him to read

    9        it.

   10              MR. SCHANER:  I want to know what work

   11        he believes he was certifying or what -- what

   12        work were you certifying?

   13        A.    On this pay req that I'm looking at.

   14        Q.    Yes?

   15        A.    Exhibit 19?

   16        Q.    Yes.

   17        A.    I was certifying that a partial payment

   18   was being made, the amounts was determined by Bob,

   19   not by me for the site preparation what you see on

   20   the back, unsuitable soil, removal, encasement of

   21   underground utilities, support and hanging of

   22   underground utilities, replacement fill and

   23   compaction, aquatic removal and stabilization.

   24        Q.    What as to those descriptions of work

   25   were you certifying?
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

197:1              MARTINO

2      A.    I'm not -- your wording --

3      Q.    What were you certifying to crown by

4   your signature, what did you certify?

5            MR. SEIDEN:  Again, do you want him to

6        read it.  It says what he certified?

7      A.    I was certifying that to the best of my

8   knowledge and belief that this work took place.

9      Q.    Did you make a site visit prior to

10   certifying the work which appears on the

11   continuation sheet of Martino Exhibit 19?

12      A.    I made numerous site visits.

13      Q.    Is it your testimony --

14      A.    My contract did not require me to be

15   there to certify this document.

16      Q.    If you didn't make a site visit, how

17   did you know that the work was done?

18      A.    Very easy.

19      Q.    How?

20            MR. SEIDEN:  Objection.  His testimony

21        was that he did make numerous site visits.

22        You just said if you did not, it's

23        inconsistent with the testimony.

24      Q.    Mr. Martino, I would like

25   ^ you to ^ to you turn back to what was marked as

Martino, Jim - January 15, 2004 00:00:00 a.m.

198:1                    MARTINO

2    Martino Exhibit 3, which were your answers to crown

3    theaters interrogatories:  I'm handing you that

4    copy.  Do you see that, turn please, to page 4 were

5    you provided your answer with respect to Jupiter?

6        A.    Yes.

7        Q.    Looking at your Jupiter answer to

8    interrogatories, when did you make a site visit

9    last prior to the date that you signed Exhibit 19,

10   which is March two, 2000?

11               MR. SEIDEN:  When you say you, are you

12          referring to Jim personally or Jim or anyone

13          from his office.

14       Q.    When did you personally make a site

15   visit -- let me rephrase it.  Mr. Martino, when was

16   your last site visit to the Jupiter site prior to

17   March second of 2000?

18       A.    According to this document, it says

19   January 11, 1999.

20       Q.    Now, would you agree, sir, that you

21   signed Exhibit 19 without making a site visit?

22               MR. SEIDEN:  Objection.  He just said

23          that he made a site visit on one, one, '99, in

24          the interrogatory.  It's what it says.

25       Q.    Did you make a site visit on one, one,

Martino, Jim - January 15, 2004 00:00:00 a.m.

199:1                  MARTINO

    2   '99 to confirm that the work had been performed

    3   that is reflected on Martino Exhibit 19?

    4        A.     That work was not performed on that

    5   date.

    6        Q.     When was the work performed?

    7        A.     It was performed for the period of

    8   three, one, 2000.

    9        Q.     Now, sir, it's true that you did not

   10   make a site visit to confirm that the work

   11   reflected in Exhibit 19 had been performed, right?

   12        A.     Go ahead.

   13        Q.     ; is that right?

   14        A.     Yes, go ahead.

   15        Q.     It is correct, my statement is correct?

   16        A.     I made a site visit, yes.

   17        Q.     But, you did not make a site visit to

   18   confirm that the work had been done that is

   19   reflected in Exhibit 19, right?

   20        A.     Correct.

   21        Q.     Did you rely on input from anybody else

   22   in deciding whether to sign Exhibit 19 on the line

   23   for the architect certificate?

   24        A.     Yes.

   25        Q.     Who?

Martino, Jim - January 15, 2004 00:00:00 a.m.

200:1                    MARTINO

2        A.    I relied on, first of all, the shop

3    drawings that were submitted, R F I's that came

4    about, progress photographs, discussions that took

5    place on the Friday morning construction meetings

6    where everybody was there, which gave us the

7    description of the work that was being performed

8    and based on Bob beach err's certification

9    ^ was that ^ that was put in front of me.

10            MR. SCHANER:  Let's mark the next

11        exhibit.  This would be Martino 20.

12            (Whereupon, the aforementioned

13        ^ document ^ photograph ^ was ^ were marked as

14        ^ Plaintiff's ^ Defendant's Exhibit ^Replace

15        for identification as of this date by the

16        Reporter.)

17            MR. SCHANER:  For the record, Martino

18        exhibit 20 is from is an application and

19        certificate for payment from crown theaters --

20        strike that.  The application -- it's an

21        application an certificate for payment to

22        crown theaters from Marlin contracting the

23        project is crown theaters Abacoa town center,

24        Jupiter Florida via architect James Thomas

25        Martino P C it's application number three for

Martino, Jim - January 15, 2004 00:00:00 a.m.

201:1                    MARTINO

2        the period of January 31, 2000.

3        Q.    Mr. Martino; is that correct?

4        A.    Yes.

5        Q.    Do you recognize your signature on the

6    page?

7        A.    Yes, I do.

8        Q.    Is that your signature under the word

9    architect?

10       A.    Yes, it is.

11       Q.    And next to the date April 4, 2000?

12       A.    Yes, it is.

13       Q.    Do you recognize any of the other

14   signatures?

15       A.    Yes.  I recognize Bob beach err's

16   signature on the space between the words amount

17   certified and the dollar amount.

18       Q.    Do you recognize the signature under

19   the word contractor and next to that Marlin

20   contracting d/b/a Marlin consulting Inc.

21       A.    No, I do not.

22       Q.    Do you recognize the signature marking

23   on the continuation sheet?

24       A.    Yes, that appears to be Bob's

25   signature.

Martino, Jim - January 15, 2004 00:00:00 a.m.

202:1                    MARTINO

2        Q.    Mr. Martino, did you sign this

3    architect certificate without making a site visit

4    yourself to determine whether the work reflected on

5    the contractor's application for payment had been

6    performed?

7        A.    Say that again, please.

8            MR. SCHANER:  Can we have the question

9        read back

10            (Whereupon, the referred to

11        ^ question ^ answer ^ question and answer

12        ^ was ^ were read back by the Reporter.)

13        A.    That is correct.

14        Q.    In fact, you did not make any site

15    visits to the Jupiter Florida project in the

16    calendar year 2000, did you?

17        A.    If we are just using this as a

18    reference at this moment, I guess that would be

19    true.

20            MR. SCHANER:  Let's mark this as

21        Martino 21.

22            (Whereupon, the aforementioned

23        ^ document ^ photograph ^ was ^ were marked as

24        ^ Plaintiff's ^ Defendant's Exhibit ^Replace

25        for identification as of this date by the

Martino, Jim - January 15, 2004 00:00:00 a.m.

203:1                    MARTINO

2        Reporter.)

3        Q.    You have before you, Martino exhibit

4    21.  For the record, it is an application and

5    certificate for payment to crown theaters L P from

6    Marlin contracting the project is crown theaters at

7    Abacoa town center, Jupiter Florida, via architect

8    James Thomas Martino P C application number four

9    for the period may one, 2000.  Is that your

10   signature in the lower right-hand corner of the

11   document?

12       A.    Yes, it is.

13       Q.    When did you sign it?

14       A.    We don't have any originals of these

15   documents do we.

16       Q.    I'm afraid we are working with copies

17   today, do you believe that this is not your

18   signature?

19       A.    No.

20       Q.    When did you sign the document?

21       A.    This document says I signed it on four,

22   26, 00.

23       Q.    Do you have any reason to doubt

24   ^ you that ^ that you signed it on that date?

25       A.    I would prefer to look at the original.

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
204:1                    MARTINO

  2        Q.    Do you have any reason to doubt

  3   ^ you that ^ that you signed on that date?

  4             MR. SEIDEN:  Objection to form.

  5        A.    I would prefer to look at an original.

  6        Q.    Why?

  7        A.    Because who knows if somebody made any

  8   changes to this document.

  9        Q.    Okay.  What is the amount for payment

 10   ^ you that ^ that you certified?

 11        A.    I didn't certify that amount.  Bob

 12   beach err certified that amount.

 13        Q.    Do you recognize other signatures on

 14   the first page of exhibit 21?

 15        A.    Bob beach err's.

 16        Q.    That would be just above your

 17   signature; is that right?

 18        A.    That is correct.

 19        Q.    Do you recognize the signature on the

 20   line for the contractor?

 21        A.    No, I do not.

 22        Q.    Mr. Martino, you signed exhibit 21 --

 23   the contractors application for payment that is

 24   reflected in exhibit 21 without making a site visit

 25   to determine whether the work had been performed,
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
205:1                    MARTINO
      2    correct?
      3             MR. SEIDEN:  Objection.  Again.  The
      4        interrogatory answer, counsel, that you showed
      5        to the witness reflected a site visit on one,
      6        11, '99, by Mr. Martino.
      7        Q.    Can you answer the question -- you
      8    could answer the question?
      9        A.    I would have to here the question.
     10             MR. SCHANER:  Please repeat the
     11        question.
     12             (Whereupon, the referred to
     13        ^ question ^ answer ^ question and answer
     14        ^ was ^ were read back by the Reporter.)
     15        A.     Well, that is incorrect because I did
     16    make site visits.  My site visits were for simply
     17    making sure that the work that is being performed
     18    is in strict accordance with my construction
     19    documents.
     20        Q.    When did you -- when was the last site
     21    visit you made prior to signing exhibit 21?  If you
     22    want to refer to your interrogatory answers, go
     23    ahead?
     24        A.    I'm going to refer to this document for
     25    lack of any other information that we can put on
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

206:1                    MARTINO

2    the table at the moment and say that it was one,

3    11, '99.

4        Q.    You would agree that that site visit

5    was more than a year and three months before you

6    signed the architect certificate on exhibit 21; is

7    that right?

8        A.    That's correct.

9        Q.    Would you agree that you signed the

10   architects certificate and certified the

11   contractors application for payment without

12   visiting the site to determine that the work that

13   is listed in the contractor's application had been

14   performed?

15       A.    No.

16       Q.    Had you -- are you saying that you had

17   made a site visit and determined that the work had

18   been done?

19            MR. SEIDEN:  Why don't you let him

20       answer in his words?

21       A.    My determination that the work was done

22   was based on other variables besides the on site

23   observation of myself.

24       Q.    Answer this question.  In determineding

25   -- in making your determination that the work had

Martino, Jim - January 15, 2004 00:00:00 a.m.

207:1                    MARTINO

2    been done, did you make a site visit?

3        A.      On this date, no.

4        Q.      That's all I'm asking.

5              MR. SCHANER:  Let's mark this as

6        Martino exhibit 22.

7              (Whereupon, the aforementioned

8        ^ document ^ photograph ^ was ^ were marked as

9        ^ Plaintiff's ^ Defendant's Exhibit ^Replace

10       for identification as of this date by the

11       Reporter.)

12             MR. SCHANER:  For the record Martino

13       exhibit 22 is an application an certificate

14       for payment to crown theaters from Marlin

15       contracting on the crown theaters Abacoa town

16       center Jupiter Florida project, via architect

17       James Thomas Martino.  It's application number

18       five for the period June one, 2000 have I said

19       that correctly?

20       A.      Yes you have.

21       Q.      Is that your signature on the bottom

22   right-hand corner of the first page of exhibit 22?

23       A.      Yes, it is.

24       Q.      When did you sign the document

25   ^ we will ^ well looking at this photograph we do

Martino, Jim - January 15, 2004 00:00:00 a.m.

208:1                    MARTINO

2    not have an original here again, it says six, one,

3    2000.

4         Q.    Do you recognize any other signatures?

5         A.    Yes.  It looks like Bob beach err's

6    signature.

7         Q.    Where would that be on the page?

8         A.    Along the line, it says amount

9    certified.

10        Q.    Did you make a site visit to determine

11   whether the work that is reflected in the

12   contractors application for payment on exhibit 22

13   was performed?

14        A.

15             MR. SEIDEN:  Objection to the form.

16        A.    Yes, I made a site visit.

17        Q.    Did you make a site visit for the

18   purpose of determining whether the work shown on

19   exhibit 22 had in fact been performed?

20             MR. SEIDEN:  Objection.

21        A.    I'm not following how -- the way you

22   are saying has got me confused you have to rephrase

23   it.

24        Q.    You made a site visit in January of

25   1999, correct?

Martino, Jim - January 15, 2004 00:00:00 a.m.

209:1                    MARTINO

2        A.     Yes.

3        Q.     You didn't make any site visits for the

4   rest of 1999, correct, to the Jupiter project?

5        A.     Based on the interrogatories document.

6        Q.     Which you verified, correct?

7        A.     I verified that these were submitted

8   based on the -- based on the invoices that my

9   accountant or bookkeeper put together.

10       Q.     Do you have any reason to believe that

11  this information is not true in your interrogatory

12  answer?

13       A.     I'm just saying there is potential for

14  human error.

15       Q.     Assuming that it's true, you didn't

16  make any visits to the site after January 1, 1999,

17  for the rest of the year in 1999; is that correct?

18       A.     That is correct.

19       Q.     And you didn't make any visits to the

20  Jupiter site at any time in the calendar year of

21  2000?

22       A.     Based on that document, that is

23  correct.

24       Q.     When was the work performed that is

25  reflected in Martino exhibit 22?

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
210:1                   MARTINO
    2        A.    June of 2000 -- no, I'm sorry, the work
    3    would have been performed in May of 2000.
    4        Q.    You didn't make a site visit between
    5    April 2000 and June first 2000, did you?
    6        A.    No.
    7        Q.    You don't know from making a personal
    8    site visit that the work that is reflected on
    9    exhibit 22 was performed?
   10        A.    Not solely on a site visit, no.
   11        Q.    Not at all on a site visit, correct?
   12        A.    That's not the only reason why you make
   13    a decision.
   14        Q.    That's not my question?
   15        A.    But, you are trying to make it sound
   16    like that's the only reason why I made that
   17    decision.
   18        Q.    My question stands in determining
   19    whether to sign the architect certificate on
   20    exhibit 22, you didn't make a site visit to see
   21    whether the work had been done, correct?
   22        A.    Between those dates, no, I did not.
   23        Q.    By those dates, April 2000 through the
   24    date you signed, June first, 2000, correct?
   25        A.    That's correct, I was not there on
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

211:1                    MARTINO

2    those dates.

3              MR. SCHANER:  Let's mark this as

4         exhibit 23,.

5              (Whereupon, the aforementioned

6         ^ document ^ photograph ^ was ^ were marked as

7         ^ Plaintiff's ^ Defendant's Exhibit ^Replace

8         for identification as of this date by the

9         Reporter.)

10             MR. SCHANER:  For the record, exhibit

11        23 is an application and certificate for

12        payment to crown theaters from Marlin

13        contracting.  The project is crown theaters at

14        Abacoa town center Jupiter Florida via

15        architect James Thomas Martino.  It's

16        application number six for the period July

17        one, 2000.  Is that right have I read that

18        correctly?

19        A.    Correct.

20        Q.    Does your signature appear on the page?

21        A.    Yes.

22        Q.    Where is it?

23        A.    To the right of the word by and below

24   the word architect.

25        Q.    When did you sign it?

Martino, Jim - January 15, 2004 00:00:00 a.m.

212:1                         MARTINO

2        A.      I can't tell by this photocopy.

3        Q.      Would you agree it appears to say

4    indicate July to some date in 2000?

5        A.      I'm sorry.

6        Q.      It looks like a seven?

7        A.      Well, it looks like, but.

8        Q.      Followed by a six and two zeroes?

9        A.      He I don't see two zero's on this.

10       Q.      Whose handwriting is this and the date?

11       A.      I'm not too sure.

12       Q.      You don't recognize it?  Is it yours?

13       A.      I don't know.

14       Q.      Now, you'll see that the contractor

15   appears to have signed it on June 26 2000, do you

16   see that?

17       A.      That's what it appears to say, yes.

18       Q.      Do you recognize the signature of the

19   contractor?

20       A.      No, I do not.

21       Q.      Do you recognize any other signatures

22   on this page?

23       A.      It appears to be Bob's signatures on

24   this.

25       Q.      Above your signature?

Martino, Jim - January 15, 2004 00:00:00 a.m.

213:1                    MARTINO

2        A.      Above my signature on the amount line

3    where it says amount certified.

4        Q.      Do you recognize the dates on which

5    ^ it was ^ was it signed?

6        A.      It's hard to read.

7        Q.      Does it look like ^ you to ^ to you

8    July five, 2000?

9        A.      It looks like that, yes.

10       Q.      Now, toward the upper left there is a

11   reference to site prep, do you see that?

12       A.      Yes.

13       Q.      Who did the site prep work on the

14   Jupiter Florida project?

15       A.      I don't know.

16       Q.      Was it crown theater's responsibility?

17       A.      I don't know that.

18       Q.      Why don't you know?

19       A.      Because it wasn't my responsibility.

20   This was Bob beach err's responsibility.

21       Q.      Now, the document, exhibit 23

22   references three change orders.  Numbers one, two

23   and three.  Do you know what work was performed

24   pursuant to those change orders?

25       A.      No.

Martino, Jim - January 15, 2004 00:00:00 a.m.

214:1                    MARTINO

2        Q.    Who approved change orders, one, two,

3    three?

4        A.    Bob.

5        Q.    How do you know?

6        A.    His signature is on there.

7        Q.    If you turn to the continuation sheet,

8    there are various tasks listed on the description

9    of work one is unsuitable soil removable.  Who

10   performed unsuitable soil removable on the Jupiter

11   Florida project?

12       A.    I don't know.

13       Q.    Who performed the encasement of

14   underground utilities work on the Jupiter Florida

15   project?

16       A.    I do not know.

17       Q.    Who performed the support and hanging

18   of underground utilities work on the Jupiter

19   Florida project?

20       A.    I do not know.

21       Q.    Who performed the replacement fill and

22   compaction work on the Jupiter Florida project?

23       A.    I do not know.

24       Q.    Who performed the aquatic removal and

25   stabilization work on the Jupiter Florida project?

Martino, Jim - January 15, 2004 00:00:00 a.m.

215:1              MARTINO

2        A.     I do not know.

3        Q.     There is a reference to first page of

4    one and three to an original contract sum of one

5    million $70,000.  Do you see that?

6        A.     Yes, I do.

7        Q.     Was there in fact a contract for one

8    million $70,000 between crown theaters an Marlin

9    contracting?

10       A.     Counselor, I do not know that.

11       Q.     You never saw a contract for one

12   million $70,000 to Marlin tracting; is that

13   correct?

14       A.     That's correct.

15       Q.     Did you make a site visit between may

16   2000 and July 6, 2000?

17       A.     No.

18       Q.     To Jupiter Florida?

19       A.     No.

20              MR. SCHANER:  Let's mark this as

21       Martino exhibit 24.

22              (Whereupon, the aforementioned

23       ^ document ^ photograph ^ was ^ were marked as

24       ^ Plaintiff's ^ Defendant's Exhibit ^Replace

25       for identification as of this date by the

Martino, Jim - January 15, 2004 00:00:00 a.m.

216:1                    MARTINO

2        Reporter.)

3        Q.      For the record, Martino exhibit 24 is

4    an application and certificate for payment to crown

5    theaters from Marlin contracting the project is

6    crown theaters at Abacoa town center, Jupiter

7    Florida, via architect James Thomas Martino P C.

8    It's application number seven for the period

9    September 1, 2000.  Have you seen this exhibit

10   before, Mr. Martino?

11       A.      No.

12       Q.      Let's go back to exhibit 23 for a

13   moment.  With respect to the information which

14   appears on exhibit 23?

15              MR. SEIDEN:  Which information.

16              MR. SCHANER:  Well, all of the

17       information.

18       Q.      What information did you provide on

19   this page.  You've told me you signed, you may have

20   dated it.  Do you -- did you make any other

21   markings on exhibit 23?

22       A.      I can't recall if I put any markings on

23   this from three years ago counselor.

24       Q.      So, to your knowledge, if I understand

25   what you are saying, you are not aware of any other

Martino, Jim - January 15, 2004 00:00:00 a.m.

217:1                    MARTINO

2    markings that you placed on exhibit 23?

3        A.    I'm trying to recall three years ago.

4    No, I can't.  I don't recall.

5        Q.    Did you fill in any of the numbers

6    which appear on exhibit 23?

7        A.    I never filled in any numbers on any

8    papers, counselor.

9        Q.    How much compensation did you receive

10    for work on the Jupiter project?

11        A.    I couldn't tell ^ you that ^ that you

12    off the top of my head.

13        Q.    Do you have an estimate?

14        A.    (indicating).

15        Q.    What is your best estimate?

16        A.    Sitting here right now it's unfair for

17    ^ you to ^ to you put me in that position.

18            MR. SEIDEN:  If you know, you know?

19            THE WITNESS:  ^ he is ^ is he asking me

20        for an estimate.  I don't know.

21            MR. SCHANER:  Let's go off the record

22        for a second.

23            (Whereupon, an off-the-record

24        discussion was held.)

25            MR. SCHANER:  Let the record reflect

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
218:1                    MARTINO

    2        that we are keeping the original exhibits.

    3        Ended at 5:30 five.

    4               (Whereupon, at ^replace ^ a.m. ^ p.m.,

    5        the Examination of this Witness was

    6        concluded.)

    7

    8                    _____ ^REPLACE WITNESS

    9         Subscribed and sworn to before me

   10        this _____ day of _____, 2004.

   11        _____ NOTARY PUBLIC

   12

   13

   14

   15

   16

   17

   18

   19

   20

   21

   22

   23

   24

   25
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
219:1                    MARTINO

   2                E X H I B I T S

   3

   4   ^ PLAINTIFF'S ^ DEFENDANT'S EXHIBITS:

   5

   6   EXHIBIT    EXHIBIT                      PAGE

   7   ^ NUMBER ^ LETTER DESCRIPTION

   8   ^ 1 ^ A          ^ Document ^ Photograph        ^

   9   ^ 2 ^ B          ^ Document ^ Photograph        ^

  10   ^ 3 ^ C          ^ Document ^ Photograph        ^

  11   ^ 4 ^ D          ^ Document ^ Photograph        ^

  12   ^ 5 ^ E          ^ Document ^ Photograph        ^

  13   ^ 6 ^ F          ^ Document ^ Photograph        ^

  14   ^ 7 ^ G          ^ Document ^ Photograph        ^

  15   ^ 8 ^ H          ^ Document ^ Photograph        ^

  16   ^ 9 ^ I          ^ Document ^ Photograph        ^

  17   ^ 10 ^ J         ^ Document ^ Photograph        ^

  18   ^ 11 ^ K         ^ Document ^ Photograph        ^

  19   ^ 12 ^ L         ^ Document ^ Photograph        ^

  20   ^ 13 ^ M         ^ Document ^ Photograph        ^

  21   ^ 14 ^ N         ^ Document ^ Photograph        ^

  22   ^ 15 ^ O         ^ Document ^ Photograph        ^

  23   ^ 16 ^ P         ^ Document ^ Photograph        ^

  24   ^ 17 ^ Q         ^ Document ^ Photograph        ^

  25   ^ 18 ^ R         ^ Document ^ Photograph        ^
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
220:1                   MARTINO
    2   ^ 19 ^ S        ^ Document ^ Photograph          ^
    3   ^ 20 ^ T        ^ Document ^ Photograph          ^
    4
    5
    6
    7
    8
    9
   10
   11
   12
   13
   14
   15
   16
   17
   18
   19
   20
   21
   22
   23
   24
   25
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

```
221:1                    MARTINO

   2                  I N D E X

   3

   4   EXAMINATION BY                      PAGE

   5   ^REPLACE ATTORNEY              ^

   6   ^REPLACE ATTORNEY              ^

   7   ^REPLACE ATTORNEY              ^

   8   ^REPLACE ATTORNEY              ^

   9

  10       INFORMATION AND/OR DOCUMENTS REQUESTED

  11   INFORMATION AND/OR DOCUMENTS         PAGE

  12   ^REPLACE                             ^

  13   ^REPLACE                             ^

  14   ^REPLACE                             ^

  15   ^REPLACE                             ^

  16   ^REPLACE                             ^

  17   ^REPLACE                             ^

  18   ^REPLACE                             ^

  19

  20            QUESTIONS MARKED FOR RULINGS

  21              PAGE        LINE

  22               ^           ^

  23               ^           ^

  24               ^           ^

  25               ^           ^
```

Martino, Jim - January 15, 2004 00:00:00 a.m.

222:1                    MARTINO

2                     C E R T I F I C A T E

3

4    STATE OF NEW YORK       )  :  SS.:

5    COUNTY OF KINGS         )

6

7

8              I, MICHAEL A. RANITA, a Notary Public

9    for and within the State of New York, do hereby

10   certify:

11             That the witness whose examination is

12   hereinbefore set forth was duly sworn and that such

13   examination is a true record of the testimony given

14   by that witness.

15             I further certify that I am not related

16   to any of the parties to this action by blood or by

17   marriage and that I am in no way interested in the

18   outcome of this matter.

19             IN WITNESS WHEREOF, I have hereunto set

20   my hand this ^Replace day of ^Replace, 2004.

21

22                   _____  MICHAEL A. RANITA

23

24