Martino, James - February 10, 2004 00:00:00 a.m.

224:1

2            IN THE UNITED STATES DISTRICT COURT

3              FOR THE DISTRICT OF CONNECTICUT

4     CROWN THEATRES, L.P.,      )

5                                ) Plaintiff,   )

6                                ) vs.            )

7                                ) MILTON L. DALY, TAYLOR-   )

8     LEIGH, INC., ANNE E. DALY,) JAMES C. CELLA, G.U.S.   )

9     DEVELOPMENT, INC., JAMES  ) T. MARTINO and JAMES     )

10    THOMAS MARTINO, ARCHITECT,) )

11             Defendants.  ) --------------------------)

12

13

14

15        CONTINUED DEPOSITION OF JAMES MARTINO

16             Garden City, New York

17           Tuesday, February 10, 2004

18

19

20

21

22

23

24    Reported by: DEBORAH A. HANLON

25    JOB NO. 157283

Martino, James - February 10, 2004 00:00:00 a.m.

```
225:1

    2

    3

    4                    February 10, 2004

    5                    10:05 A.M.

    6

    7           Continued deposition of JAMES

    8      MARTINO, held at the offices of Milber,

    9      Makris, Plousadis & Seiden, LLP, 990

   10      Stewart Avenue, Garden City, New York,

   11      pursuant to Adjournment, before Deborah

   12      A. Hanlon, a Notary Public of the State

   13      of New York.

   14

   15

   16

   17

   18

   19

   20

   21

   22

   23

   24

   25
```

Martino, James - February 10, 2004 00:00:00 a.m.

```
226:1

   2   A P P E A R A N C E S:

   3

   4        JENNER & BLOCK, LLP

   5        Attorneys for Plaintiff

   6             One IBM Plaza

   7             Chicago, Illinois 60611

   8        BY:  LAWRENCE S. SCHANER, ESQ.

   9

  10        WEINSTEIN & WISSER, P.C.

  11        Attorneys for Milton L. Daly and Anne

  12        E. Daly

  13             29 South Main Street, Suite 207

  14             West Hartford, Connecticut 06107

  15        BY:  KERRY MARC WISSER, ESQ.

  16

  17        MILBER, MAKRIS, PLOUSADIS & SEIDEN, LLP

  18        Attorneys for James T. Martino

  19             108 Corporate Park Drive, Suite 200

  20             White Plains, New York 10604

  21        BY:  MARK SEIDEN, ESQ.

  22

  23

  24

  25
```

Martino, James - February 10, 2004 00:00:00 a.m.

227:1                      Martino

2    J A M E S   M A R T I N O ,   called as a

3          witness, having resworn by a Notary

4          Public, was examined and testified as

5          follows:

6    EXAMINATION BY

7    MR. SCHANER:

8          Q.   Good morning, Mr. Martino.  This

9    is the continuation of your deposition

10   which began on January 15, 2004.

11              Since the first day of your

12   deposition, have you done anything to

13   prepare for today's deposition?

14         A.   Yes.

15         Q.   What have you done?

16         A.   I reviewed the contracts that the

17   general contractors submitted, and I

18   reviewed my fees.

19         Q.   Anything else?

20         A.   Not that I can recall.

21         Q.   Have you met with anybody?

22         A.   Mr. Seiden.

23         Q.   When did you do that?

24         A.   Yesterday.

25         Q.   For how long?

Martino, James - February 10, 2004 00:00:00 a.m.

```
228:1              Martino
     2        MR. SEIDEN:  Objection.  The same
     3     as last time.  I deem that privilege,
     4     the length of time the witness meets
     5     with counsel.
     6        MR. SCHANER:  Are you instructing
     7     the witness not to answer?
     8        MR. SEIDEN:  Yes, same as last
     9     time.
    10        MR. SCHANER:  Can I have a
    11     standing agreement that we're going to
    12     instruct the witness not to answer if I
    13     were to ask him, will you answer the
    14     question, he will say he won't answer?
    15        MR. SEIDEN:  I think that's fair.
    16        MR. SCHANER:  That way I won't
    17     have to keep objecting.
    18        MR. SEIDEN:  Just so we're clear,
    19     I deem that attorney/client and
    20     attorney work product privilege.
    21        MR. SCHANER:  As far as our
    22     agreement goes so I don't have to go
    23     back and ask him some of the questions
    24     I asked him last time that you
    25     instructed him not to answer, do you
```

Martino, James - February 10, 2004 00:00:00 a.m.

229:1                Martino

2        agree that he would have followed your

3        advice whenever you instructed him not

4        to answer?

5            MR. SEIDEN:  In the last

6        transcript?

7            MR. SCHANER:  Yes.

8            MR. SEIDEN:  Yes, we can agree on

9        that.

10       Q.   Mr. Martino, did you review the

11   transcript of the first day of your

12   deposition?

13       A.   No, sir, I did not.

14       Q.   Which general contractors'

15   contracts did you review?

16       A.   The Hartford contract, the

17   Jupiter contract, the Miami contract, the

18   Trumbull contract and the Annapolis

19   contract.

20       Q.   Why did you review those

21   contracts?

22       A.   I wanted to get a better

23   understanding of what their original

24   construction contract costs were.

25       Q.   What did you determine?

Martino, James - February 10, 2004 00:00:00 a.m.

230:1               Martino

2       A.   I determined what their original

3    costs were.

4       Q.   Did you determine your fees on

5    each of the projects?

6       A.   Yes, I did.

7       Q.   What did you look at to determine

8    your fees?

9       A.   I looked at original fee

10   proposal.

11      Q.   Did you determine what your fee

12   was for the Hartford projects?

13      A.   Yes, as a percentage.

14      Q.   How much was it?

15      A.   I don't recall off the top of my

16   head.

17      Q.   Do you recall as a percentage?

18      A.   I don't recall the exact number

19   off the top of my head.

20      Q.   Can you give me an estimate?

21      A.   I believe it was about three

22   percent off the top of my head.

23      Q.   Three percent of what?

24      A.   The original construction costs.

25      Q.   What was the original

Martino, James - February 10, 2004 00:00:00 a.m.

231:1              Martino

2    construction cost on Hartford?

3          A.   I don't recall the exact number.

4          Q.   What was the approximate number?

5          A.   The approximate number, off the

6    top of my head, was about 8.6 million.

7          Q.   What was your fee on the Jupiter

8    contract?

9          A.   $216,000.

10         Q.   What was your fee on the Miami

11   project?

12         A.   $265,000.

13         Q.   What was your fee on the Trumbull

14   contract?

15         A.   I think it was 175.

16         Q.   175,000?

17         A.   That's correct.

18         Q.   What was your fee on the

19   Annapolis project?

20         A.   I was mistaken.  I think the

21   Annapolis project was 175.

22         Q.   What was Trumbull?

23         A.   I don't recall.

24         Q.   What about Skokie?

25         A.   I think it was -- I don't recall

Martino, James - February 10, 2004 00:00:00 a.m.

232:1                 Martino

2      the exact number while I am sitting here

3      right now.

4          Q.  Do you have an estimate?

5          A.  I think it was 350.

6          Q.  These amounts that you are

7      providing me, are these the flat fee

8      amounts that you were paid?

9              MR. SEIDEN:  Paid or -- my

10             understanding of the question,

11             Mr. Schaner, was what was the original

12             fee proposal?  I think that's what you

13             asked and what he answered.

14         A.  That was my proposal to Crown

15     Theatres.

16         Q.  Did the amounts that Crown

17     Theatres paid you vary?

18         A.  Yes.

19         Q.  Do you know how much Crown

20     Theatres paid you on each check?

21         A.  I don't know the exact number,

22     no.

23         Q.  Do you know an approximate

24     number?

25         A.  Not right now I don't, no.  Not

Martino, James - February 10, 2004 00:00:00 a.m.

233:1                    Martino

2    while I'm sitting here.  I can't recall the

3    number.

4        Q.   If I wanted to determine the

5    number, how could I do that?

6        A.   Crown would be able to probably

7    determine it by going back and looking at

8    the checks that they issued to me.

9        Q.   Since January 15, the first day

10   of your deposition, have you had any

11   conversations with Bob Beacher?

12       A.   Yes, sir.

13       Q.   How many?

14       A.   I don't recall how many.

15       Q.   Approximately how many?

16       A.   Five or six.

17       Q.   Have these all been by telephone?

18       A.   Yes.

19       Q.   When did you last speak with

20   Mr. Beacher?

21       A.   This past weekend.

22       Q.   Did you call him, or did he call

23   you?

24       A.   I don't recall.

25       Q.   What did you and Mr. Beacher

Martino, James - February 10, 2004 00:00:00 a.m.

234:1              Martino

2    discuss?

3         A.   Well, besides discussing our

4    families and those other issues, we talked

5    briefly about the depositions that took

6    place of Waas and Tim Harmon.

7         Q.   What did you say to Mr. Beacher

8    and what did he say to you about the

9    depositions of Waas and Tim Harmon?

10        A.   I told Bob that although I didn't

11   know the entire essence of the deposition

12   in its detail, that it is my understanding

13   that both contractors said that Bob was

14   involved with the pay reqs and change

15   orders and not Jim Martino.

16        Q.   What is the basis of your

17   understanding of what took place at the

18   depositions of Mr. Waas and Mr. Harmon?

19        A.   I don't understand what you are

20   asking me.

21        Q.   How do you know about what

22   happened at those two depositions?

23        A.   My attorney Marisa Lanza informed

24   me.

25        Q.   When was that?

Martino, James - February 10, 2004 00:00:00 a.m.

235:1                    Martino

2          A.   I believe it was on Friday.

3          Q.   What else did Ms. Lanza tell you

4     about the depositions of Mr. Waas and

5     Mr. Harmon?

6               MR. SEIDEN:   Objection.

7               I instruct the witness not to

8          answer on the grounds of

9          attorney/client privilege.

10         Q.   Did you talk to Mr. Beacher in

11    any of your five or six conversations with

12    him since January 15 about your deposition?

13         A.   No.

14         Q.   You didn't tell him what happened

15    during the first day of your deposition?

16         A.   No.

17         Q.   In your other conversations with

18    Mr. Beacher, what did you and he discuss?

19         A.   I don't recall exactly.

20         Q.   Did the other conversations

21    include discussions of Crown's lawsuit?

22         A.   I don't recall.

23         Q.   Do you recall any topics that you

24    discussed with Mr. Beacher in your other

25    conversations with him?

Martino, James - February 10, 2004 00:00:00 a.m.

236:1                    Martino

2          A.   No.

3          Q.   Since this lawsuit was filed,

4     Mr. Martino, how many conversations about

5     this lawsuit have you had with Mr. Beacher?

6          A.   It is impossible to tell.

7          Q.   Why is that?

8          A.   I can't put a number on it.

9          Q.   Can you give me an estimate?

10          A.   No, I don't like giving

11     estimates.

12          Q.   How frequently have you spoken

13     with Mr. Beacher about this lawsuit since

14     it was filed?

15          A.   I can't tell you that either.

16          Q.   Why not?

17          A.   Because you are asking me to give

18     you a guess, and I can't do that.

19          Q.   Too many times for you to guess?

20              MR. SEIDEN:  Objection.  That

21          mischaracterizes his testimony.

22          Q.   You can answer.

23          A.   I can't guess, sir.

24          Q.   Do you have any business ventures

25     of any kind with Mr. Beacher?

Martino, James - February 10, 2004 00:00:00 a.m.

237:1                    Martino

    2        A.   I don't understand that question.

    3        Q.   What about the question don't you

    4   understand?

    5        A.   What do you mean by "business

    6   ventures"?

    7        Q.   Again, I don't understand why you

    8   don't understand business ventures.

    9             MR. SEIDEN:   OK.

   10        Q.   Do you have any business dealings

   11   with Mr. Beacher today?

   12        A.   No.

   13        Q.   Are you working on any projects

   14   together?

   15        A.   No.

   16        Q.   Do you invest any money together?

   17        A.   No.

   18        Q.   At any time in the last five

   19   years, have you invested money with

   20   Mr. Beacher?

   21        A.   I think you need to clarify what

   22   you mean by invested money.

   23        Q.   Why?

   24        A.   Because I'm not too sure what

   25   invested money means with Mr. Beacher.

Martino, James - February 10, 2004 00:00:00 a.m.

238:1                    Martino

2        Q.   Is there something that you have

3    done jointly with Mr. Beacher that might

4    involve investing money?

5             MR. SEIDEN:  Objection, form.

6        A.   I am not following, Mr. Schaner,

7    what you mean by "investing money."

8        Q.   Have you given any of your money

9    to Mr. Beacher so that he could invest it

10   in any business?

11       A.   Have I given any money to

12   Mr. Beacher so he could invest it?  Is that

13   what you are asking me?

14       Q.   Yes.

15       A.   I don't know if any of the money

16   I have given to Mr. Beacher he has used for

17   investments.

18       Q.   You have given money to

19   Mr. Beacher in the last five years?

20       A.   Yes.

21       Q.   How much money did you give him?

22       A.   I don't know what amount.

23       Q.   For what purpose?

24       A.   I gave him money as a referral

25   fee for the work that came to me from Crown

Martino, James - February 10, 2004 00:00:00 a.m.

239:1                    Martino

    2    Theatres.

    3        Q.   On how many occasions did you

    4    give money to Mr. Beacher as a referral

    5    fee?

    6        A.   I don't know the exact number on

    7    that either.

    8        Q.   What is your best estimate?

    9        A.   Seven to eight times.

    10       Q.   Did you pay him a referral fee

    11   for each theater project that you worked

    12   on?

    13       A.   No.

    14       Q.   In what years did you pay the

    15   referral fees?

    16       A.   1999 and 2000.

    17       Q.   How did you make the payments?

    18       A.   By check.

    19       Q.   Did you ever give him cash?

    20       A.   For the Crown Theatre projects,

    21   no.

    22       Q.   How was the amount of the

    23   referral fee determined?

    24       A.   It was never really determined.

    25       Q.   What do you mean?

Martino, James - February 10, 2004 00:00:00 a.m.

240:1                     Martino

    2         A.   You are asking me how was it

    3    determined.

    4         Q.   How did you know how much to pay

    5    Mr. Beacher as a referral fee?

    6         A.   It was an understanding between

    7    me and Bob that this work was given to me

    8    from Crown, and I gave him what I felt was

    9    appropriate.

   10         Q.   Did Beacher suggest to you the

   11    amount you should give him?

   12         A.   No.

   13         Q.   Did he tell you how much to give

   14    him?

   15         A.   No.

   16         Q.   How did you determine what amount

   17    was appropriate?

   18         A.   I honestly don't recall.

   19         Q.   Did you look at the overall size

   20    of the engagement and pay Mr. Beacher a

   21    percentage?

   22         A.   No.  It was not a percentage.

   23         Q.   Did you tell Crown Theatres that

   24    you were paying referral fees to

   25    Mr. Beacher?

Martino, James - February 10, 2004 00:00:00 a.m.

241:1            Martino

2        A.   No, I did not.

3        Q.   Is there anything in writing

4    regarding your payment of referral fees?

5        A.   No, there is not.

6        Q.   You don't have a written

7    agreement with Mr. Beacher concerning

8    payment of referral fees?

9        A.   No, sir.  There is none.

10        Q.   Were the payments the same dollar

11    amount?

12        A.   No.

13        Q.   Did they range in dollar amounts?

14        A.   Yes.

15        Q.   What was the range?

16        A.   I was waiting to see if he was

17    objecting.  I am sorry.

18            MR. SEIDEN:  No.  I was scratching

19        my head.  I did not object to that

20        question.

21        A.   I would be giving an estimate of

22    the range.

23        Q.   What's the estimate?

24        A.   I think it was between 10,000 and

25    30,000.

Martino, James - February 10, 2004 00:00:00 a.m.

242:1                    Martino

2        Q.   Did you pay the referral fees

3    before work began on the projects?

4        A.   I don't know what you mean by

5    before the work began.  Which work?  My

6    work, construction work?  I am sorry.

7            MR. SEIDEN:  Objection to form on

8        the grounds the witness articulated.

9        Q.   Did you pay the referral fees

10   before your work began?

11       A.   No.

12       Q.   Did you pay before the

13   construction work began?

14       A.   To the best of my knowledge, yes.

15   I believe that was true.

16       Q.   Which account or accounts did you

17   use to pay the referral fees?

18       A.   My business account.

19       Q.   Was that an account with EAB?

20       A.   I don't recall if it was EAB at

21   the time or not.

22       Q.   Did you provide Mr. Beacher with

23   any tax records regarding your payment of

24   referral fees?

25       A.   I don't know if that was done or

Martino, James - February 10, 2004 00:00:00 a.m.

243:1                    Martino

2      not.

3           Q.   Why don't you know?

4                Is that something for your

5      bookkeeper?

6           A.   Yes.

7           Q.   Did you pay Mr. Beacher referral

8      fees for work on projects you did for

9      clients other than Crown Theatres?

10          A.   Yes.

11          Q.   Which clients?

12          A.   I don't recall off the top of my

13     head.

14          Q.   Did you pay him referral fees for

15     work you did for other movie theater

16     clients?

17          A.   Yes.

18          Q.   Did you pay Mr. Beacher referral

19     fees for all projects that he referred to

20     you?

21          A.   In one form or another, yes.

22          Q.   When did you begin paying

23     referral fees to Mr. Beacher?

24          A.   I don't recall.

25          Q.   Over the years, how much in

Martino, James - February 10, 2004 00:00:00 a.m.

244:1                   Martino

2    referral fees have you paid to Mr. Beacher?

3        A.   I don't recall that either.

4        Q.   Did you ever discuss the payment

5    of referral fees with Mr. Beacher?

6        A.   In what sense are you asking

7    that?  I am not following that question.

8        Q.   Did you have any conversations

9    with Mr. Beacher concerning your payment to

10   him of referral fees?

11       A.   Yes.

12       Q.   How many discussions did you have

13   with him?

14       A.   I can't -- I don't recall that.

15       Q.   Did you have discussions with him

16   about the payment of referral fees on the

17   Crown Theatres projects?

18       A.   It was understood.  We worked

19   together for 25 years.  I have always

20   compensated Bob in one fashion or another

21   for the work that he has brought to me.

22       Q.   In addition to paying him

23   referral fees, did you compensate him in

24   other ways?

25       A.   Yes.

Martino, James - February 10, 2004 00:00:00 a.m.

245:1            Martino

2        Q.   How?

3        A.   Bought him dinner, depending on

4    the size of the project.

5        Q.   Any other ways?

6        A.   Not that I can think of off the

7    top of my head.

8        Q.   At any time in the past five

9    years, have you entered into any

10   partnership with Mr. Beacher?

11       A.   Not that I recall.

12       Q.   Over any time in the past five

13   years, have you entered into any joint

14   ventures with Mr. Beacher?

15       A.   Not that I recall.

16       Q.   On which of the Crown Theatre

17   projects did you pay referral fees to

18   Mr. Beacher?

19       A.   I did not pay Mr. Beacher

20   specific referral fees for a specific

21   project.

22       Q.   When you made a payment of a

23   referral fee to him, how did you do it?

24       A.   By check.

25       Q.   Did you hand it to him?  Did you

Martino, James - February 10, 2004 00:00:00 a.m.

246:1                    Martino

2    put it in the mail?

3          A.   I don't recall.

4          Q.   When Mr. Beacher received the

5    check, did you make clear to him that it

6    was for a particular project?

7          A.   No.

8          Q.   Did you communicate to him that

9    it was for -- withdrawn.

10              Did you make the payments of

11   referral fees on a regular basis?

12         A.   What's a regular basis,

13   counselor?

14         Q.   For example, did you make the

15   payments on a monthly basis?

16         A.   I don't think it happened that

17   regularly, no.

18         Q.   Was there a schedule for making

19   the payments?

20         A.   No.

21         Q.   How did you determine when you

22   should make them?

23         A.   When cash flow permitted me to do

24   so.

25         Q.   Did Mr. Beacher ever encourage

Martino, James - February 10, 2004 00:00:00 a.m.

247:1                    Martino

2    you to make payments?

3         A.   He would ask if I could make a

4    payment, how my cash flow was, if that's

5    what you are asking me.

6         Q.   Yes.

7              And when Mr. Beacher would make

8    that request, what would you do?

9         A.   I would discuss with my

10   bookkeeper to see if in fact whether we

11   could make a payment.

12        Q.   If your cash flow would permit

13   it, what did you do?

14        A.   I wrote him a check.

15        Q.   And if your cash flow would not

16   permit making a payment, what would you do?

17        A.   I would inform Bob I couldn't pay

18   him.

19        Q.   Under those circumstances, what

20   would Bob say?

21        A.   "When you can, you can, Jimmy."

22        Q.   I am going to turn back to an

23   exhibit we looked at last time which was

24   Martino Exhibit 2, and this was a section

25   from your firm's web site.

Martino, James - February 10, 2004 00:00:00 a.m.

248:1                 Martino

2              If you recall in the back

3       section, there was a division called, Body

4       of Work."

5              A.   Uh-huh.

6              Q.   I would like to turn you to the

7       last page of the exhibit entitled, "Single

8       Family Residences."

9              Do you see that Mr. Martino?

10             A.   Yes.

11             Q.   There are eight projects listed

12      on this page.

13             Did you charge any of the people

14      who received your services that are listed

15      on this page for your services?

16             A.   Yes.

17             Q.   Of the eight projects listed

18      under single-family residences, for which

19      ones did you charge for your services?

20             A.   All except for Beacher and Daly.

21             Q.   Did you, in fact, get paid for

22      your work on all of the projects except for

23      Beacher and Daly?

24             A.   Yes.

25             Q.   Mr. Beacher's house is listed in

Martino, James - February 10, 2004 00:00:00 a.m.

```
249:1                    Martino

     2   West Palm Beach, Florida.

     3              Did you visit that residence?

     4        A.   Yes.

     5        Q.   Where in West Palm Beach is the

     6   home?  It is in West Palm Beach?

     7        A.   It is in West Palm Beach.

     8        Q.   Why did you visit Mr. Beacher's

     9   house?

    10        A.   Because he wanted me to do some

    11   drawings for his built-in's in that space,

    12   and he was looking for also some electrical

    13   drawings to be done in terms of the space.

    14        Q.   What year did you do the work?

    15        A.   I don't recall.

    16        Q.   What's your best estimate?

    17        A.   I would rather not guess.

    18        Q.   Mr. Beacher also had a house in

    19   New York, correct?

    20        A.   That is correct.

    21        Q.   Where is that located?

    22        A.   Woodmere.

    23        Q.   Did you ever visit Mr. Beacher's

    24   Woodmere house?

    25        A.   Yes.
```

Martino, James - February 10, 2004 00:00:00 a.m.

250:1            Martino

    2     Q.   On how many occasions?

    3     A.   I don't recall, Mr. Schaner.

    4     Q.   More than ten?

    5     A.   I would say more than ten, yes.

    6     Q.   More than 50?

    7     A.   I can't say that.

    8     Q.   Did you do any work on

    9 Mr. Beacher's Woodmere, New York,

   10 residence?

   11     A.   Yes.

   12     Q.   What work did you do?

   13     A.   There was a fire in a house

   14 behind his -- actually, a gas explosion --

   15 which damaged his house.  And we prepared

   16 drawings to remedy the damage that happened

   17 to his house because of the gas explosion.

   18     Q.   When did you perform that work?

   19     A.   I don't recall when that was.

   20     Q.   Did Mr. Beacher have other

   21 residences to your knowledge?

   22     A.   No.

   23     Q.   What is the name of the bank in

   24 which you and your wife have a checking

   25 account?

Martino, James - February 10, 2004 00:00:00 a.m.

251:1                    Martino

2            MR. SEIDEN:  Objection.

3        A.  You asked me that question once

4   before, and I told you I don't know because

5   my wife deals with that.

6        Q.  Do you have an ATM card?

7        A.  No.

8        Q.  Do you have a visa card?

9        A.  Yes.

10       Q.  What bank issued your visa card?

11           MR. SEIDEN:  Objection.

12       A.  I have to go into my wallet to

13   show it to you.

14       Q.  Please do.

15           MR. SEIDEN:  Same objection.

16       A.  MBNA.

17       Q.  Do you invest in stocks?

18           MR. SEIDEN:  Objection.

19       A.  Yes.

20       Q.  Do you have a brokerage account?

21       A.  Yes.

22           MR. SEIDEN:  Objection.

23       Mr. Schaner, as you know, there has

24       been a motion filed with regard to the

25       subpoena that was propounded.  As you

Martino, James - February 10, 2004 00:00:00 a.m.

252:1                Martino

2        are going down this line of questions,

3        I would like some proffer as to how

4        this line of questions bears any

5        relevancy under the federal rules to

6        the allegations against Martino in this

7        claim?

8            MR. SCHANER:  I would be prepared

9        to do it but at an appropriate time.

10       Not now.

11           MR. SEIDEN:  I think this is an

12       appropriate time.

13           MR. SCHANER:  I don't agree.

14           MR. SEIDEN:  What's the question?

15           (A portion of the record was read.)

16           MR. SEIDEN:  Objection.

17       Q.  You can answer.

18       A.  I don't think it is any of your

19   business.

20       Q.  Are you refusing to answer the

21   question?

22       A.  Based on counsel's objection.

23       Q.  Do you have a stockbroker?

24           MR. SEIDEN:  Objection.  There has

25       been no proffer as to any relevance.

Martino, James - February 10, 2004 00:00:00 a.m.

253:1                    Martino

2          And absent that, I have to presume that

3          these questions are in bad faith and

4          bear no relevance to the case and are

5          outside the scope of permissible

6          discovery in the federal rules.

7          Q.   Will you answer the question,

8     Mr. Martino?

9          A.   I have a stockbroker.

10         Q.   What is his or her name?

11              MR. SEIDEN:  Objection.

12         A.   I am not going to give you that.

13         Q.   Why not?

14         A.   There is a motion right now that

15    affects that.

16         Q.   All right.

17              We may then come back here on

18    another time and ask you questions in the

19    future.

20              MR. SEIDEN:  Understood.

21              MR. SCHANER:  Off the record for a

22         minute.

23              (Document marked Martino 25 for

24         identification, this date.)

25         Q.   Do you recognize Martino 25?

Martino, James - February 10, 2004 00:00:00 a.m.

254:1                    Martino

2          A.   Yes, I do.

3          Q.   This is the written contract that

4    you said you had for the Trumbull,

5    Connecticut, theater contract.

6          A.   Yes.

7          Q.   It is dated July 8, 1998, and it

8    is between your firm and R.D. Scinto, Inc.

9          A.   That's correct.

10         Q.   Now, the re line on the document

11   says, "Agreement for Architectural

12   Services."  The document we are looking at,

13   Martino Exhibit 25, was not with Crown

14   Theatres, correct?

15         A.   This document was originally

16   submitted to Robert Scinto, and he was

17   going to assume my responsibilities.  It

18   was transferred, then, to Crown Theatres.

19         Q.   What was Mr. Scinto's role with

20   respect to the Trumbull, Connecticut,

21   theater?

22         A.   He was the owner of the property.

23         Q.   When you say the agreement was

24   transferred to Crown Theatres, how was that

25   done?

Martino, James - February 10, 2004 00:00:00 a.m.

255:1                    Martino

2          A.   I'm not too sure.  That's really

3     a basis between Crown and R.D. Scinto how

4     that was done.

5          Q.   Is it your understanding that the

6     terms of your agreement with R.D. Scinto

7     became the terms of your agreement with

8     Crown Theatres?

9          A.   Yes.

10         Q.   These were the terms for your

11    agreement on the Trumbull project, correct?

12         A.   Yes.

13         Q.   And on the other theater projects

14    that you did for Crown Theatres; is that

15    right?

16         A.   That's what I recall, yes.

17         Q.   Why is it you are of the view

18    that the R.D. Scinto project also was to

19    apply to the other projects that you worked

20    on for Crown Theatres?

21         A.   Because I recall Mr. Daly stating

22    at one of the construction meetings that

23    this would then be the basis by which my

24    services would be rendered on the other

25    projects.

Martino, James - February 10, 2004 00:00:00 a.m.

256:1                Martino

     2        Q.   Take a look at the second

     3    paragraph of the first page under the

     4    heading, "Basic Services" where it says,

     5    "Note.  This agreement specifically

     6    excludes any site development work, i.e.,

     7    site drainage, site lighting, landscaping,

     8    contour designs, et cetera."

     9            Do you have an understanding as

    10    to the reason why the agreement excluded

    11    site development work?

    12        A.   Yes, I do.  Because the site work

    13    outside of the footprint of the building

    14    was to still be done by R.D. Scinto

    15    separately.

    16        Q.   And the work within the footprint

    17    of the building was to be done by whom?

    18        A.   Well, when this was done, it was

    19    going to be R.D. Scinto.

    20            Obviously, when Crown took it

    21    over, then Crown was doing that work.

    22        Q.   Now I'm not quite sure I follow.

    23    What work was Crown going to be doing when

    24    Crown took it over?

    25        A.   The building footprint.

Martino, James - February 10, 2004 00:00:00 a.m.

257:1              Martino

2        Q.    With respect to site development

3     work, was Crown doing any?

4        A.    Outside of the footprint of the

5     building, no.

6        Q.    Look at the next paragraph

7     preconstruction phase.

8              It states, "This firm shall

9     prepare bid documents in accordance with

10    Crown Theatres' lease requirements and

11    shall assist R.D. Scinto, Inc., in

12    providing information and assistance to all

13    bidders during the bidding process."

14             What were the bid documents that

15    are referred to in what I just read you?

16       A.    My drawings, a specification book

17    and an invitation to bid.  That's what I

18    recall.

19       Q.    The passage I read to you refers

20    to Crown Theatres' lease requirements.

21             Were those the requirements set

22    out in the Crown Theatres' lease with the

23    project landlord?

24       A.    I'm not too sure.  I believe so.

25       Q.    What is your understanding of

Martino, James - February 10, 2004 00:00:00 a.m.

258:1                    Martino

2    what the lease requirements that the

3    passage I read to you refers to?

4        A.   I don't recall.

5        Q.   Did you review Crown Theatres'

6    lease requirements in preparing the bid

7    documents?

8        A.   I don't recall that either.

9        Q.   It says that your firm would

10   prepare bid documents in accordance with

11   Crown Theatres' lease requirements.

12               Did you do that?

13       A.   I don't recall if I myself did

14   that.

15       Q.   Somebody at your firm did?

16       A.   I would think so.

17       Q.   Who did on the Trumbull project?

18       A.   I don't recall which one of my

19   staff members was working on the Trumbull

20   project.

21       Q.   In order to prepare the bid

22   documents in accordance with Crown

23   Theatres' lease requirements, somebody at

24   your firm would need to have reviewed Crown

25   Theatres' lease, correct?

Martino, James - February 10, 2004 00:00:00 a.m.

259:1                    Martino

    2        A.   I would think so.

    3        Q.   In fact, it was you, right?

    4        A.   No.  I don't know that.

    5        Q.   Did you work on the drawings on

    6    the Crown Theatres' projects?

    7        A.   When you say did I work on them,

    8    what do you mean did I work on them?

    9        Q.   Did you have anything to do with

   10    their preparation?

   11        A.   Yes.

   12        Q.   What about the spec book?

   13        A.   Yes.

   14        Q.   The invitation to bid?

   15        A.   Yes.

   16        Q.   Did you review these documents to

   17    ensure that they were in conformity to

   18    Crown Theatres' lease requirements?

   19        A.   I don't recall.

   20        Q.   Do you think you did?

   21            MR. SEIDEN:  Objection.  Asked and

   22    answered.

   23        A.   I answered the question, counsel.

   24        Q.   You can answer the question.

   25            Do you think that you reviewed

Martino, James - February 10, 2004 00:00:00 a.m.

260:1                Martino

2   the lease requirements?

3         MR. SEIDEN:  Asked and answered.

4      A.   Again, I don't recall.

5      Q.   Did you have an ordinary practice

6   with respect to the preparation of bid

7   documents?

8      A.   Mr. Schaner, what do you mean by

9   ordinary practice?

10      Q.   As part of your ordinary practice

11   in preparing bid documents, did you review

12   lease requirements?

13      A.   I don't know.

14      Q.   To prepare the bid documents,

15   what work did you do?

16      A.   I would frequently review the

17   drawings that were being produced by my

18   staff.  I would ascertain what sections

19   needed to be in the specification book.

20   That's what I recall off the top of my

21   head.

22      Q.   How did you determine what

23   sections needed to be in the specification

24   book?

25      A.   Well, you look at the drawings,

Martino, James - February 10, 2004 00:00:00 a.m.

261:1                     Martino

2    and you see that you need a section on

3    concrete.  You need a section on masonry,

4    you need a section on steel, you need a

5    section on roofing.  You need a section on

6    electrical, you need a section on HVAC,

7    that sort of stuff.

8         Q.   Did you review the lease in order

9    to determine what sections you needed in

10   the spec book?

11        A.   I don't recall doing that.

12        Q.   Going back to the last section on

13   the first page of Martino Exhibit 25, that

14   paragraph states, "This firm will

15   participate in preparing a construction

16   contract between the general contractor and

17   the developer."

18             What work did you do to prepare

19   the construction contract?

20        A.   I didn't do any.

21        Q.   Who did the work for your firm?

22             MR. SEIDEN:  Objection.

23        A.   Nobody on my firm did that work.

24        Q.   Did your firm participate in

25   preparing the construction contract?

Martino, James - February 10, 2004 00:00:00 a.m.

262:1                    Martino

2        A.   No.

3        Q.   The agreement states, "This firm

4   will participate in preparing the

5   construction contract."

6        A.   Uh-huh.

7        Q.   Which firm does this refer to?

8        A.   It means my firm.

9        Q.   And, in fact -- is it your

10   testimony that your firm, in fact, did not

11   participate in preparing the construction

12   contract?

13            MR. SEIDEN:  Objection.  Asked and

14       answered.

15            You can answer again.

16       A.   Yes.

17       Q.   Did your firm participate in

18   preparing the construction contract on any

19   of the contracts with Crown Theatres?

20       A.   No, sir.

21       Q.   Why not?

22       A.   It was made clear that it was not

23   going to be my responsibility.

24       Q.   Who made that clear to you?

25       A.    Milt Daly.

Martino, James - February 10, 2004 00:00:00 a.m.

263:1                   Martino

2          Q.   When did he communicate that to

3      you?

4          A.   At one of the construction

5      meetings.

6          Q.   Did he tell you who would

7      participate in preparing the construction

8      contracts?

9          A.   Yes, Bob Beacher.

10         Q.   Did you express any concern or

11     disagreement when Mr. Daly told you that

12     Bob Beacher would be preparing the

13     construction contracts?

14         A.   No, sir.

15         Q.   Please turn to page 2 of Martino

16     25.

17              In the first paragraph second

18     sentence, it states, "An authorized

19     representative of James Thomas Martino

20     Architect, P.C., shall visit the site at an

21     interval of one per month for the purposes

22     of verifying that the as-built conditions

23     are in full compliance with the

24     construction documents."

25              From this, Mr. Martino, you

Martino, James - February 10, 2004 00:00:00 a.m.

264:1                    Martino

2     understood that you or someone from your

3     firm was to make one site visit per month,

4     correct?

5          A.   Yes, sir.

6          Q.   What was the purpose of the site

7     visits?

8          A.   To ascertain that the work that

9     was being performed was in accordance with

10    our drawings.

11         Q.   But, in fact, you didn't visit

12    the sites once a month, did you?

13              MR. SEIDEN:  On which projects are

14         you referring?

15         A.   I am assuming you are speaking

16    about this Trumbull project in your

17    question.

18         Q.   In this question, sir, let's

19    answer it regarding Trumbull.

20         A.   I submitted dates of when I went

21    there.  Could there have been dates when

22    someone from my staff might have went there

23    also, yes.

24              So I can't say, sitting here

25    right now, whether we did every month or

Martino, James - February 10, 2004 00:00:00 a.m.

265:1                  Martino

2    not.  I believe we did.

3         Q.   Mr. Martino, I am handing you

4    what we marked at the first day of your

5    deposition as Martino Exhibit 3 which was

6    your responses to Crown Theatres' first set

7    of interrogatories.

8              Reviewing your responses to Crown

9    Theatres' first set of interrogatories, can

10   you tell me whether you or someone from

11   your firm made monthly visits to the

12   Trumbull site?

13        A.   Not by reviewing this document I

14   cannot, no.

15        Q.   Can you tell me whether you made

16   monthly site visits on the other theater

17   projects that you did for Crown Theatres?

18        A.   Are you asking me now to review

19   the other five projects that are listed

20   here to ascertain whether I made monthly

21   site visits?

22             Is that what you are asking me to

23   do?

24        Q.   I would like you to tell me

25   whether you made monthly visits to each of

Martino, James - February 10, 2004 00:00:00 a.m.

266:1                    Martino

2    the Crown Theatres' projects.  And if

3    reviewing your interrogatory answers would

4    help, go ahead.

5         A.   Well, I know that in Jupiter and

6    Miami I did not, or anybody from my office,

7    make specific monthly site visits.

8         Q.   What about the other projects?

9         A.   It appears that Skokie, based on

10   this document in front of me, that monthly

11   site visits were not made.  And looking at

12   the Hartford project, based on this, I

13   think we did make monthly site visits.

14        Q.   What about Annapolis, Maryland?

15        A.   No.  Annapolis, Maryland, monthly

16   site visits were not made.

17        Q.   Let's go back to Martino

18   Exhibit 25 for a moment.

19             On page 2, the last sentence

20   reads, "Should additional site visits be

21   required, each site visit will be billed

22   monthly."

23             Did your firm ever bill for

24   additional site visits?

25        A.   On the Trumbull project?

Martino, James - February 10, 2004 00:00:00 a.m.

267:1                    Martino

2        Q.   On the Trumbull project.

3        A.   I can't recall off the top of my

4    head.

5        Q.   Did your firm bill for additional

6    site visits on any of the other site

7    projects?

8        A.   I can't recall that either.

9        Q.   On the first day of your

10   deposition, I believe that you testified

11   that Bob Beacher would hand copies of the

12   payment requisitions to you either in his

13   car on the way to the Friday construction

14   meetings or at the Friday meetings, that

15   you would sign them either in the car or at

16   the Friday meetings.

17            Have I got that right?

18            MR. SEIDEN:  Objection.  The

19        testimony speaks for itself.

20       A.   I think that's a fair synopsis of

21   what I was trying to portray.

22       Q.   Did you discuss the payment

23   requisitions with Mr. Beacher before you

24   signed them?

25       A.   I cannot say that I discussed

Martino, James - February 10, 2004 00:00:00 a.m.

268:1                    Martino

    2    specifically each payment requistion before

    3    I signed them, no.

    4        Q.   What would Mr. Beacher say to you

    5    when he gave you the payment requisitions?

    6        A.   I reviewed them, signed the

    7    fucking things.

    8             Excuse my mouth, ma'am.

    9        Q.   And after you signed them, what

   10    did you do with them?

   11        A.   Gave them back to Bob.

   12        Q.   What did Mr. Beacher do with the

   13    payment applications after you signed them

   14    and gave them back to him?

   15        A.   I believe he then gave them to

   16    Mr. Daly.

   17        Q.   Mr. Martino, do you understand

   18    the terms payment requistion and payment

   19    application to mean the same thing?

   20        A.   Yes, I do.

   21        Q.   Do you remember that you met with

   22    investigators for Crown Theatres on July

   23    11, 2003?

   24        A.   I don't remember that specific

   25    date, but I do remember meeting with people

Martino, James - February 10, 2004 00:00:00 a.m.

269:1                    Martino

2    from Kroll.

3         Q.    They were from Kroll and they

4    were two gentlemen, Bill Jennings and Mike

5    Pace.

6              Do you remember that?

7         A.    Yes, I do.

8         Q.    Do you remember telling them that

9    at the construction meetings Mr. Beacher

10   would slide a stack of payment requisitions

11   to you and you would sign them?

12        A.    I don't remember specifically

13   that statement, no.

14        Q.    Does that statement -- is that

15   statement accurate?

16        A.    If we arrived -- if we were at

17   the construction site meeting -- at the

18   Friday morning meetings, and he put them

19   down in front of me, I think that's what we

20   were talking about.

21        Q.    Do you remember you also told the

22   investigators from Kroll that you believed

23   in your heart that the AIA architects'

24   certification form required the architect

25   to make an on-site inspection before

Martino, James - February 10, 2004 00:00:00 a.m.

270:1              Martino

2    signing?

3         A.   I don't recall exactly saying

4    that either.

5         Q.   You agree with that statement,

6    don't you?

7              MR. SEIDEN:  Objection to form.

8         A.   Say it again, please.

9         Q.   You believe in your heart that

10   the AIA architects' certification form

11   required the architect to make an on-site

12   inspection before signing?

13        A.   If it was the architect's

14   responsibility, yes.

15        Q.   You also told Mr. Jennings and

16   Pace that other than your work for Crown,

17   if you were required by another client to

18   sign payment requistion certifications, you

19   would make an on-site inspection of the

20   work and an independent determination that

21   the work had been completed, correct?

22        A.   I don't recall exactly saying

23   that, counselor.  But I don't recall.  I

24   don't recall exactly saying that.

25        Q.   Do you agree with that statement?

Martino, James - February 10, 2004 00:00:00 a.m.

271:1                    Martino

2              MR. SEIDEN:  I'm sorry.  Can I

3       hear the statement back?

4              MR. SCHANER:  Would the court

5       reporter please read it back.

6              (A portion of the record was read.)

7              MR. SEIDEN:  You can answer.

8       A.   If I was in the role of the full

9       responsibility, yes.

10        Q.   You would also compare the prior

11      payment requests to the current payment

12      requests to confirm that the prior amount

13      was paid, correct?

14             MR. SEIDEN:  Objection to the

15      form.

16        A.   If it was my role and

17      responsibility to do so.

18        Q.   In addition, you would confirm

19      that all necessary lien waivers had been

20      obtained, right?

21             MR. SEIDEN:  Objection to form.

22        A.   If it was my responsibility to do

23      so.

24        Q.   And in the case of the Crown

25      Theatres' projects, it was your

Martino, James - February 10, 2004 00:00:00 a.m.

```
272:1                Martino

   2    responsibility, correct?

   3            MR. SEIDEN:  What was his

   4        responsibility?  Lien waivers?

   5        Q.   Do you understand the question?

   6        A.   No.

   7        Q.   You were the architect of record

   8    on the Crown Theatres' construction

   9    projects, correct?

  10        A.   Yes, sir, I was.

  11        Q.   It was your responsibility as the

  12    architect of record to make on-site

  13    inspections of the work and an independent

  14    determination that the work had been

  15    completed, correct?

  16            MR. SEIDEN:  Objection to form.

  17        A.   That was a long question.

  18            Could you restate that, please.

  19            MR. SCHANER:  Can we have the

  20        question read back, please.

  21            (A portion of the record was read.)

  22        A.   It was my responsibility to

  23    verify that the work was completed in

  24    accordance with my drawings.

  25        Q.   It was also your responsibility
```

Martino, James - February 10, 2004 00:00:00 a.m.

273:1                    Martino

2    to determine that the work had progressed,

3    as indicated on the requisition form,

4    correct?

5         A.   To my best belief and knowledge,

6    correct.

7         Q.   It was also your responsibility

8    to determine that the quality of the work

9    was in accordance with the contract

10   documents, correct?

11        A.   To my best belief and knowledge,

12   correct.

13        Q.   It was also your responsibility

14   to determine that the contractor was

15   entitled to payment of the amount

16   certified?

17        A.   To my best belief and knowledge,

18   yes.

19        Q.   Now, we talked earlier about your

20   payments of what you called referral fees

21   to Mr. Beacher.

22             Did you make payments to

23   Mr. Beacher other than referral fees?

24        A.   Mr. Beacher -- I asked

25   Mr. Beacher to review my drawings on

Martino, James - February 10, 2004 00:00:00 a.m.

274:1              Martino

2    occasion; and I compensated him what I

3    thought was a fair amount for his service

4    to do that.

5        Q.   On which projects did Mr. Beacher

6    review your drawings?

7        A.   I think he reviewed each of the

8    projects that were constructed.

9        Q.   And did you pay him a fee for

10   reviewing your drawings?

11       A.   Yes.

12       Q.   And that was a separate fee from

13   what you termed referral payments?

14       A.   I don't know how we can

15   definitively define the difference.  I mean

16   we never really -- or I should say I never

17   specifically said, "Bob, this is for your

18   referral fee for getting me the work for

19   Crown.  And by the way, this payment over

20   here is because you reviewed my drawings."

21   We worked together for 25 years.

22       Q.   When Mr. Beacher would review

23   your drawings, would he send you a bill for

24   his services?

25       A.   No, sir.

Martino, James - February 10, 2004 00:00:00 a.m.

275:1                    Martino

    2        Q.   Do you have a written agreement

    3    with Mr. Beacher covering work that he did

    4    for you such as the review of your

    5    drawings?

    6        A.   No, sir.

    7        Q.   In what form did you make

    8    payments to Mr. Beacher for work such as

    9    reviewing your drawings?

   10        A.   Via check.

   11        Q.   And from which account did you

   12    write the check?

   13        A.   My business account.

   14        Q.   When you would pay Mr. Beacher

   15    for work like reviewing your drawings,

   16    would the payment be accompanied by

   17    anything in writing?

   18        A.   I don't recall anything being

   19    done like that, no.

   20        Q.   There was no cover letter?

   21        A.   I don't believe so, no.

   22        Q.   How much did you pay Mr. Beacher

   23    for reviewing your drawings?

   24        A.   I don't recall.

   25        Q.   He reviewed them -- withdrawn.

Martino, James - February 10, 2004 00:00:00 a.m.

```
276:1                 Martino
     2          Would it be fair to say that he
     3    reviewed your drawings for each of the
     4    Crown Theatres' projects?
     5          MR. SEIDEN:  Objection.  Asked and
     6      answered.
     7      A.   Yes.
     8      Q.   And would it be fair to say that
     9    you paid him a fee for those services in
    10    each case?
    11      A.   No.  I don't think that's a fair
    12    way to say it.
    13      Q.   For which of the Crown Theatre
    14    projects did you pay Mr. Beacher for
    15    reviewing your drawings?
    16      A.   I don't recall, sir.
    17      Q.   In addition to reviewing your
    18    drawings, did Mr. Beacher provide any other
    19    services for you?
    20      A.   Not that I recall.
    21      Q.   Did you ever make any payments to
    22    any of Mr. Beacher's businesses?
    23      A.   Not that I recall, no.
    24      Q.   B.B. Construction was one of his
    25    businesses.
```

Martino, James - February 10, 2004 00:00:00 a.m.

277:1              Martino

2              Did you make payments to B.B.

3    Construction?

4         A.   I am sorry.  I misunderstood.

5    Yes.  I did make payments to B.B.

6    Construction.

7         Q.   What were those for?

8         A.   The referral fees and the

9    consulting fees.

10         Q.   How much in addition to the

11    referral fees did you pay in consulting

12    fees?

13         A.   It is not an easy thing to

14    subdivide.

15         Q.   Were the payments separate?

16              MR. SEIDEN:  Objection.  Vague.

17         A.   I think I testified earlier that

18    I made, like, seven or some odd number of

19    payments.  That's all I can tell you.

20         Q.   Do the seven or eight payments

21    that you referred to before include both

22    referral fee payments and payments for

23    reviewing your drawings?

24         A.   Yes.

25         Q.   Did you make any payments to

Martino, James - February 10, 2004 00:00:00 a.m.

```
278:1              Martino

     2   Marlin Consulting?

     3        A.   No.

     4        Q.   Hewlett Consulting?

     5        A.   No.

     6        Q.   Hewlett Contracting?

     7        A.   No.

     8        Q.   Tiger Contracting?

     9        A.   No.

    10             MR. SCHANER:  Mark that as 26,

    11        please.

    12             (Document marked Martino 26 for

    13        identification, this date.)

    14        Q.   Mr. Martino, I have had placed

    15   before you Martino Exhibit 26.  This is the

    16   monthly statement from Marlin Consulting's

    17   Nations Bank account for the period

    18   September 1, 1999, through September 30,

    19   1999?

    20             MR. SEIDEN:  Let me just make an

    21        objection for the record.  I don't

    22        believe that's what this exhibit says.

    23        It says Marlin Consulting, Inc., care

    24        of B.B. Construction Consultants, LTD.

    25        Q.   Under deposits and credits on the
```

Martino, James - February 10, 2004 00:00:00 a.m.

279:1          Martino

2    first page of the exhibit, and the exhibit

3    is Bates numbered BOA 3 through BOA 4,

4    there is an entry for September 20, 1999

5    showing a wire transfer from James Thomas

6    Martino in the amount of $21,500.

7          Does this refresh your

8    recollection that you made a wire transfer

9    in the amount of $21,500?

10    A.   No, sir.

11    Q.   Does it refresh your recollection

12    that on September 20, 1999 you made a wire

13    transfer to Bob Beacher or a business that

14    Bob Beacher owned?

15    A.   No, sir.

16    Q.   Does this refresh your

17    recollection that you made a wire transfer

18    on September 20, 1999 in the amount of

19    $21,500?

20    A.   No, sir.

21    Q.   Did Marlin Consulting do any work

22    for you --

23    A.   No.

24    Q.   -- or your firm?

25    A.   No.

Martino, James - February 10, 2004 00:00:00 a.m.

280:1                    Martino

2        Q.   Did you ever make any wire

3    transfers to Mr. Beacher?

4        A.   Not that I am aware of.

5             MR. SCHANER:  Mark this as Martino

6        27.

7             (Document marked Martino 27 for

8        identification, this date.)

9        Q.   Mr. Martino, Martino Exhibit 27

10   is two pages in length.  The Bates numbers

11   are F 16 through F 17.  The first page is a

12   copy of a deposit ticket dated March 25,

13   1999 for the deposit of $27,000 into B.B.

14   Construction Consultants' Fleet Bank

15   account.

16             The second page shows copies of

17   the front and back of a check, check number

18   1697, in the amount of $27,000 drawn on the

19   EAB account of James Thomas Martino,

20   Architect, P.C., and made payable to B.B.

21   Construction Consultants.

22             Is that your signature on check

23   number 1697?

24       A.   Yes, sir, it is.

25       Q.   What was this check for?

Martino, James - February 10, 2004 00:00:00 a.m.

281:1               Martino

2          A.   It was part of the referral or

3     consulting fee that I paid Mr. Beacher.

4          Q.   You gave this check to

5     Mr. Beacher?

6          A.   That's correct.

7          Q.   Are there any records showing

8     what this payment was for?

9          A.   No.

10         Q.   B.B. Consultants didn't submit a

11    bill?

12         A.   No.

13         Q.   It didn't submit an invoice?

14         A.   No.

15         Q.   You never received time records

16    from Mr. Beacher?

17         A.   No.

18              Can we take a break for a minute?

19    I have to use the boy's room.

20              MR. SCHANER:  Sure.

21              (A recess was taken.)

22              (Document marked Martino 28 for

23         identification, this date.)

24         Q.   Mr. Martino, this is a copy of

25    Martino Exhibit 28.  It is two pages long.

Martino, James - February 10, 2004 00:00:00 a.m.

```
282:1              Martino
     2   The Bates numbers are F 19 and F 20.
     3           The first page bears copies of a
     4   check and a deposit ticket.  The check is
     5   1789.  It is in the amount of $17,500 and
     6   it is made payable to B.B. Construction
     7   Consultants.  It is drawn on the EAB bank
     8   account of James Martino, Architect, P.C.
     9           The deposit ticket shows a
    10   deposit of $17,500 into B.B. Construction
    11   Consulting LTD's Fleet Bank account.  Page
    12   2 shows copies of the back sides of the
    13   check and deposit ticket.
    14           Mr. Martino, is that your
    15   signature on check 1789?
    16      A.   Yes, sir, it is.
    17      Q.   Did you give a copy of check 1789
    18   to B.B. Construction Consultants?
    19      A.   Did I give a copy?
    20      Q.   Did you give the check to Bob
    21   Beacher?
    22      A.   Yes.
    23      Q.   If you look on the first page in
    24   the box under the words, "Remittance
    25   Visit," says, "Consulting Miami Gardens."
```

Martino, James - February 10, 2004 00:00:00 a.m.

283:1                    Martino

2              Do you see that?

3         A.   Yes, I do.

4         Q.   What does that refer to?

5         A.   To the best of my knowledge, it

6    refers to me paying Mr. Beacher for

7    consulting on Miami Gardens.

8         Q.   What consulting work did

9    Mr. Beacher do?

10        A.   I don't recall right now.

11        Q.   Is there anything that would help

12   refresh your recollection?

13        A.   I am not following what you are

14   asking me.

15        Q.   You said you don't recall right

16   now.  I would like to know if there is

17   anything that would help you recall?

18        A.   I don't know.

19        Q.   Is there any document that you

20   could look at that would help you recall?

21        A.   I don't know.

22        Q.   Would talking with anyone help

23   you recall?

24        A.   I don't know that either.

25        Q.   Did Mr. Beacher submit an invoice

Martino, James - February 10, 2004 00:00:00 a.m.

284:1              Martino

2    for the consulting work -- withdrawn.

3              Did you receive an invoice from

4    Mr. Beacher in exchange for a check number

5    1789?

6         A.   To the best of my knowledge, no.

7         Q.   Did you tell Crown Theatres that

8    you paid Mr. Beacher 17,500 for consulting

9    on the Miami Gardens' project?

10        A.   No.

11        Q.   Did you disclose to Crown

12   Theatres that you made any payments to

13   Mr. Beacher for consulting work?

14             MR. SEIDEN:  Objection.  Asked and

15        answered.

16        A.   No.

17        Q.   And you never disclosed to Crown

18   Theatres that you paid Mr. Beacher a

19   referral fee, correct?

20        A.   That is correct.

21             MR. SCHANER:  Mark this as

22        Exhibit 29, please.

23             (Document marked Martino 29 for

24        identification, this date.)

25        Q.   Mr. Martino, Martino Exhibit 29

Martino, James - February 10, 2004 00:00:00 a.m.

```
285:1              Martino

     2    is a two-page document Bates labeled F 21

     3    through F 22.

     4          The first page shows a deposit

     5    ticket dated May 26, 1999, and it shows a

     6    deposit of $17,500 into B.B. Construction

     7    Consulting LTD's Fleet Bank account.

     8          The second page is the front and

     9    back of a check in the amount of $17,500.

    10    It is check number 1870, and it is drawn on

    11    EAB account of James Thomas Martino

    12    Architect, P.C., and it is made payable to

    13    B.B. Construction.  In the description box

    14    on the page, on the second page, which

    15    shows the check, there is the word "Miami."

    16          Mr. Martino, is that your

    17    signature on check number 1870?

    18        A.   Yes, sir, it is.

    19        Q.   Did you give this check to

    20    Mr. Beacher?

    21        A.   Yes, I did.

    22        Q.   What was this check for?

    23        A.   I believe it was part of the

    24    referral fee.

    25        Q.   When you say a referral fee, what
```

Martino, James - February 10, 2004 00:00:00 a.m.

286:1                    Martino

2    exactly did Mr. Beacher do to earn the

3    referral fee?

4         A.   He brought me into Crown

5    Theatres.

6         Q.   Anything else?

7         A.   No.

8         Q.   Did Mr. Beacher submit a bill in

9    exchange for the $17,500 reflected on check

10   number 1870?

11        A.   Not that I recall.

12        Q.   Would it be fair to say,

13   Mr. Martino, that your payments of referral

14   fees and consulting fees to Mr. Beacher

15   were in reality kickbacks?

16             MR. SEIDEN:  Objection.

17        A.   I wouldn't use that terminology

18   in this case.

19        Q.   Why not?

20        A.   Because kickback has a dirty term

21   to it.  It is a referral fee just like

22   attorneys give other attorneys referral

23   fees.

24        Q.   Wasn't this really a kickback?

25             MR. SEIDEN:  Objection.  Asked and

Martino, James - February 10, 2004 00:00:00 a.m.

287:1                    Martino

2        answered.

3            A.   No.

4            Q.   Would it be fairer to call this a

5        bribe?

6                 MR. SEIDEN:  Objection.

7            A.   No, sir.

8            Q.   Wouldn't you agree that the

9        payments that you were making to

10       Mr. Beacher were done under the table?

11                MR. SEIDEN:  Objection.

12           A.   No.

13           Q.   They weren't disclosed to anyone,

14       were they?

15           A.   So why does that make it under

16       the table?

17           Q.   Who in your office knew about the

18       payments you were making to Mr. Beacher?

19           A.   My bookkeeper.

20           Q.   What did you tell your bookkeeper

21       the payments were for?

22           A.   Referral fee.

23           Q.   What is your bookkeeper's name?

24           A.   Joseph Lomonte.

25           Q.   How long has he been with you?

Martino, James - February 10, 2004 00:00:00 a.m.

```
288:1              Martino

    2       A.   I don't know when he first

    3   started.

    4       Q.   Has he been working for you since

    5   you began working for Crown Theatres?

    6       A.   I'm not too sure if that's true

    7   or not.

    8       Q.   What year did he start working?

    9       A.   I don't recall.

   10       Q.   Did you discuss the referral fees

   11   and consulting fees you paid to Mr. Beacher

   12   with Gary Sheide?

   13       A.   No.

   14       Q.   Did you discuss them with

   15   Marciano Stanco?

   16       A.   No.

   17       Q.   Did you discuss the payments with

   18   Mr. Beacher's wife, Brenda Beacher?

   19       A.   No.

   20       Q.   Other than you, Mr. Beacher and

   21   your bookkeeper, who else knew about the

   22   referral fees and consulting fees that you

   23   were paying?

   24       A.   I have no idea.

   25       Q.   Do you keep a check register in
```

Martino, James - February 10, 2004 00:00:00 a.m.

289:1                    Martino

2    your office?

3         A.   I'm not too sure if he does or he

4    doesn't.

5         Q.   Mr. Lomonte would know?

6         A.   Yes.

7         Q.   How do you spell Mr. Lomonte's

8    last name?

9         A.   L-o-m-o-n-t-e.

10         Q.   Mr. Martino, I would like to

11    refer you back to Exhibit 22, which we

12    looked at the first day of your deposition.

13              Exhibit 22 is payment application

14    number 5 submitted by Marlin Contracting

15    for work on the Jupiter, Florida, job; and

16    it is for the period June 1, 2000.

17              Did Marlin Contracting do any

18    work on the Jupiter, Florida, project?

19         A.   I don't know.

20         Q.   Did you ever meet any Marlin

21    employees on the Jupiter project job site?

22         A.   I don't recall meeting anybody.

23         Q.   Did you ever speak with any

24    Marlin personnel regarding the Jupiter

25    project?

Martino, James - February 10, 2004 00:00:00 a.m.

290:1                Martino

2        A.   I don't recall that either.

3        Q.   If you look at the contractor's

4    signature line, it looks like it says Jerry

5    M. Marlin.

6             Did you ever meet a Mr. Marlin?

7        A.   I don't recall meeting a

8    Mr. Marlin, no.

9        Q.   Look at the address for Marlin

10   Contracting.  It says 123 Orchid Kay Drive,

11   Palm Beach Gardens, Florida.  Zip code is

12   33420.

13            Now, Mr. Martino, Marlin's

14   address is the same as Mr. Beacher's

15   address, isn't it?

16       A.   Yes, it is.

17       Q.   You knew that when you signed

18   this architect certificate, didn't you?

19       A.   No, I did not.

20       Q.   Why not?

21       A.   How could you draw that

22   conclusion?

23       Q.   I asked you why you didn't know.

24       A.   I wasn't paying attention to it.

25       Q.   You signed the architect's

Martino, James - February 10, 2004 00:00:00 a.m.

291:1                    Martino

2    certificate on June 1, 2000, correct?

3         A.   That's what it states.

4         Q.   As of that date, you knew that

5    Mr. Beacher lived at 123 Orchid Kay Drive,

6    correct?

7         A.   I don't recall that.

8         Q.   When did you learn where

9    Mr. Beacher lived?

10        A.   I don't recall that either.

11        Q.   You have been to Mr. Beacher's

12   house before you signed this, didn't you?

13        A.   Mr. Schaner, I don't recall that

14   either.

15        Q.   Mr. Martino, Marlin Contracting,

16   according to the payment applications here,

17   had a contract in the amount of $1.070,000,

18   correct?

19        A.   That's what it states.

20        Q.   You knew, sir, that by signing

21   this architect's certificate you were

22   approving a payment that was going to

23   Mr. Beacher, correct?

24             MR. SEIDEN:  Objection to form.

25        A.   No, sir, I did not.

Martino, James - February 10, 2004 00:00:00 a.m.

292:1             Martino

2      Q.  Why not?

3      A.  How would you draw that

4  conclusion?

5      Q.  You knew that Mr. Beacher and

6  Marlin Contracting were the same thing,

7  correct?

8      A.  No, sir, I did not.

9      Q.  Why not?

10     A.  How would I know that?

11     Q.  Same address, correct?

12     A.  So.

13     Q.  Did you review Marlin

14  Contracting's pay applications before you

15  signed them?

16     A.  This exhibit you are speaking of?

17     Q.  Yes.

18         Did you review Exhibit 22 before

19  you signed it?

20     A.  I reviewed it in terms of the

21  scope of work on the second page.

22     Q.  Did you review the first page?

23     A.  No, I did not.  Not in its

24  entirety.

25     Q.  Which parts didn't you review?

Martino, James - February 10, 2004 00:00:00 a.m.

293:1               Martino

2           A.   The parts I did review was that

3      it was approved already by Bob Beacher, and

4      I looked at the second page to ascertain

5      the work that was being performed.

6           Q.   Here is a copy of Martino Exhibit

7      21 that we looked at at the first day of

8      your deposition.

9                It has got your signature on it,

10     correct?

11          A.   It has my signature on it, yes.

12          Q.   Did you review Exhibit 21 before

13     you signed it?

14          A.   Yes, I did.

15          Q.   Did you review the whole thing?

16          A.   I reviewed it in the same fashion

17     I reviewed the previous one.

18          Q.   You signed it even though Marlin

19     Contracting's address is the same as Bob

20     Beacher's, correct?

21          A.   That's correct.

22          Q.   I am handing you what we marked

23     at your deposition earlier as Martino

24     Exhibit 18.

25               That's a copy of Marlin

Martino, James - February 10, 2004 00:00:00 a.m.

294:1                    Martino

2        Contracting's pay application Number 1 for

3        work on the Jupiter project, correct?

4            A.   That's what it states.

5            Q.   And you testified that that's not

6        your signature on this document, correct?

7            A.   That is correct.  I testified to

8        that.

9            Q.   I am handing you now Martino

10       Exhibit Number 19, which is a copy of

11       Marlin's second pay application for work on

12       the Jupiter project.

13                Correct?

14           A.   That's what it claims, yes.

15           Q.   And you signed that one?

16           A.   Yes, I did.

17           Q.   From payment application Number 2

18       submitted by Marlin, you knew that there

19       was a payment application Number 1,

20       correct?

21           A.   Did not realize it.

22           Q.   If you had noticed that it was

23       application Number 2, you would have known

24       that there must have been an application

25       Number 1, correct?

Martino, James - February 10, 2004 00:00:00 a.m.

295:1                    Martino

2          A.   That's fair to say.

3          Q.   And Exhibit 19, Marlin

4     application Number 2, shows that there was

5     a previous payment to Marlin for $155,000,

6     correct?

7          A.   That's what it states.

8          Q.   If you had been paying attention,

9     you would have known from Exhibit 19 that

10    on application Number 1 payment had been

11    approved for $155,000, correct?

12             MR. SEIDEN:  Objection to the

13        form.

14         A.   Could you rephrase that, please.

15         Q.   You knew from Exhibit 19 that

16    $155,000 had been paid on requistion Number

17    1 submitted by Marlin?

18         A.   Not necessarily true.

19         Q.   Why not?

20         A.   Dollars were not my

21    responsibility.

22         Q.   If you had been looking at

23    dollars, you would have known that $155,000

24    was paid on application Number 1, correct?

25             MR. SEIDEN:  Objection.

Martino, James - February 10, 2004 00:00:00 a.m.

296:1                    Martino

2        Hypothetical.

3        A.   Yes.

4        Q.   And when you say dollars were not

5   your responsibility, why was that?

6        A.   Because it was the responsibility

7   of Bob Beacher.

8        Q.   Would it be fair to say that you

9   did not pay attention to dollars on the

10  payment requisitions that you signed?

11           MR. SEIDEN:   Objection to form.

12       A.   Are you speaking specific about

13  Jupiter now?

14       Q.   No, all of them.  All of them for

15  Crown.

16       A.   Restate that, please.

17       Q.   Would it be fair to say that you

18  did not pay attention to the dollar amounts

19  on the payment requisitions that you

20  signed?

21       A.   No.  That is not a true

22  statement.

23       Q.   In some cases you did pay

24  attention to the dollar amounts?

25       A.   When it was my responsibility.

Martino, James - February 10, 2004 00:00:00 a.m.

297:1                 Martino

2        Q.   When was it your responsibility?

3        A.   Somewhere around January or

4    February of 2001, Bob was -- I will use the

5    word -- removed but I don't know if that's

6    a fair way of saying it.  But

7    responsibilities for all pay reqs and

8    change orders became more my responsibility

9    and not Bob's anymore.  From that point to

10   the end of the Jupiter and Skokie projects,

11   I paid more attention.

12       Q.   Prior to January or February

13   2001, would it be fair to say you did not

14   pay attention to the dollar amounts on the

15   payment applications that you signed?

16            MR. SEIDEN:  Objection to form.

17       A.   Yes, I believe that's fair to

18   say.

19       Q.   Were you informed by someone that

20   the dollar amounts on the payment

21   applications would not be your

22   responsibility?

23       A.   Yes.

24       Q.   Who?

25       A.   Mr. Daly.

Martino, James - February 10, 2004 00:00:00 a.m.

298:1                    Martino

2        Q.   When did Mr. Daly do that?

3        A.   At more than one of the

4   construction meetings that took place on

5   Friday mornings.

6        Q.   When was the first one?

7        A.   I don't recall, Mr. Schaner,

8   exactly when that was.

9        Q.   What did Mr. Daly tell you?

10       A.   He made a statement that

11  Mr. Beacher would be his eyes and ears at

12  the construction site in terms of all

13  payment requisitions, bidding negotiating

14  with the contractor, subcontractors, and he

15  would be the owner's rep construction

16  manager.

17       Q.   Did Mr. Daly tell you to not be

18  concerned about the dollar amounts that

19  appeared on the payment requisitions?

20       A.   No.  He did not say those

21  specific words.

22       Q.   Do you have a written agreement

23  or document that you can point to that

24  confirms that Mr. Daly told you that

25  Mr. Beacher would be the eyes and ears for

Martino, James - February 10, 2004 00:00:00 a.m.

299:1              Martino

2    Crown Theatres on the construction

3    projects?

4        A.   I don't believe so.

5        Q.   Did you have any conversations

6    with anybody about this arrangement outside

7    of the construction meetings at Crown

8    Theatres' offices?

9        A.   I don't recall, no.

10       Q.   When you signed the requistion

11   forms prior to January or February of 2001,

12   did you believe that you were certifying

13   that the contractor was entitled to payment

14   of the amount certified?

15       A.   Yes.

16       Q.   Did you also believe that you

17   were certifying that work had progressed as

18   indicated?

19       A.   Yes.

20       Q.   And that the quality of the work

21   was in accordance with the contract

22   documents?

23       A.   Yes.

24       Q.   Mr. Martino, I am handing you

25   Exhibits Martino 5, 6 and 7 which we looked

Martino, James - February 10, 2004 00:00:00 a.m.

300:1                    Martino

2    at at the first day of your deposition.

3              These are Marlin Contracting's

4    payment applications on the Miami project,

5    and they are payment applications 1, 2 and

6    3.

7              Now, you testified that you did

8    not sign Exhibits 5, 6 and 7, correct?

9        A.   That's correct, that's correct.

10       Q.   Now, here is a copy of Martino

11   Exhibit 8.  This is Marlin's fourth pay

12   application for work on the Miami project,

13   and you did sign this one?

14       A.   That's my signature on this

15   document, which is a photocopy.

16       Q.   And you can tell from --

17   withdrawn.

18             You knew that when you received

19   Marlin's application Number 4, Exhibit 8,

20   that there had been three prior pay

21   applications submitted by Marlin

22   Contracting, correct?

23       A.   No.

24       Q.   Why not?

25       A.   Because this was the first one I

Martino, James - February 10, 2004 00:00:00 a.m.

301:1                    Martino

2       saw for the Miami project as best as I can

3       tell you.

4           Q.   If the number of the application

5       was 4, that would indicate to you that

6       there had been three prior applications,

7       correct?

8           A.   Yes.

9           Q.   Do you know who certified the

10      three prior applications for payment?

11          A.   Looking at these exhibits?

12          Q.   Well, let's ask it a different

13      way.

14               Back on January 27, 2000, when

15      you signed Marlin's pay application Number

16      4, which is Exhibit 8, did you know who had

17      certified Marlin's first three pay

18      applications?

19          A.   No, I did not.

20          Q.   Did it concern you that you

21      didn't know?

22          A.   No, it did not.

23          Q.   Why not?

24          A.   Because -- well, first of all,

25      this is only one page.  Isn't there a

Martino, James - February 10, 2004 00:00:00 a.m.

302:1                    Martino

2    second page to this?

3         Q.   There probably is.

4         A.   But we don't have it here today?

5         Q.   I will look for it, but we don't

6    have it before you right now.

7         A.    It is difficult for me to respond

8    to this.

9              MR. SEIDEN:  Let the record

10             reflect that Exhibit Martino 8 that was

11             marked on January 15, '04 appears to be

12             a single sheet and apparently is not

13             the entirety of Marlin's pay

14             application Number 4 on the Miami

15             project.

16             MR. SCHANER:  That statement is

17             already on the record from the first

18             day.

19             MR. SEIDEN:  Now we have got it on

20             for the second day.

21        Q.   Why weren't you concerned that

22    somebody else had signed application

23    numbers 1, 2 and 3 that were submitted by

24    Marlin Contracting for work on the Miami

25    project?

Martino, James - February 10, 2004 00:00:00 a.m.

303:1            Martino

2        A.   Because I didn't know that.

3        Q.   You just testified that from

4    seeing application Number 4, that would

5    have tipped you off that there were three

6    prior applications, correct?

7        A.   I don't recall.  Could she read

8    that back?

9            MR. SCHANER:  Sure, go ahead.

10           (A portion of the record was read.)

11           MR. SCHANER:  Let's mark this as

12       Exhibit 30.

13           (Document marked Martino 30 for

14           identification, this date.)

15       Q.   Mr. Martino, Exhibit 30 is a

16   payment application and certificate for

17   payment which is the same as Exhibit 8

18   except that it has the second page, the

19   continuation sheet.

20           It is Marlin's pay application

21   Number 4 on the Miami project; is that

22   correct?

23       A.   No, it is not the same.

24       Q.   In what way is it different?

25       A.   It has got Milt's signature on

Martino, James - February 10, 2004 00:00:00 a.m.

304:1                    Martino

    2    it.  It has got some other markings on it.

    3    It is the first time I am looking at it.

    4    You want me to make the decision that it is

    5    the same sitting here.

    6        Q.   You agree it is Marlin's

    7    application Number 4 on the payment of the

    8    Miami project?

    9        A.   Yes.

    10       Q.   There is a continuation page

    11   which is page 2.

    12       A.   Yes.

    13       Q.   And that's your signature on the

    14   document, correct?

    15       A.   Yes, it is.

    16       Q.   You signed the document on

    17   January 27, 2000, correct?

    18       A.   Yes.

    19       Q.   Now, with the benefit of the

    20   complete document, you knew that Marlin's

    21   application Number 4 was preceded by

    22   applications one, two and three at the time

    23   you signed it, correct?

    24       A.   No, I would not say that.

    25       Q.   Why not?

Martino, James - February 10, 2004 00:00:00 a.m.

305:1            Martino

2        A.   Because I didn't pay attention to

3    that.

4             My responsibility was verifying

5    that the work was done in accordance with

6    my drawings.

7        Q.   Now, Exhibit 30 shows that Marlin

8    had previously received certification for

9    payment in the amount of $585,000.

10            Do you see that?

11       A.   Yes, I do.

12       Q.   So you knew at the time you

13   signed Exhibit 30 that someone had

14   certified payment for $585,000 to Marlin,

15   correct?

16       A.   I can't say that with

17   definitive -- that I knew that at the time

18   that I certified this.

19       Q.   You could have known it, right?

20            MR. SEIDEN:  Objection,

21       speculative.

22       A.   I could have known it.

23       Q.   In fact, it is apparent from the

24   face of the document, correct?

25            MR. SEIDEN:  Objection to the

Martino, James - February 10, 2004 00:00:00 a.m.

306:1                      Martino

    2        form.

    3            A.    What's apparent?

    4            Q.    That Marlin had received payment

    5        in the amount of $585,000 on its first

    6        three payment applications.

    7            A.    Yes.

    8            Q.    Now, were you concerned that the

    9        first three of Marlin's pay requisitions on

   10        the Miami project had not been presented to

   11        you for signature?

   12            A.    No.

   13            Q.    Why not?

   14            A.    Dollars and cents were not my

   15        responsibility.  They were the

   16        responsibility of Robert Beacher.

   17            Q.    But on the first three payment

   18        applications, someone also was certifying

   19        that the work had been done, right?

   20                  MR. SEIDEN:  Objection.

   21        Speculative.

   22            A.    I don't know that.

   23            Q.    Is it possible that

   24        certifications were made without an

   25        approval of the work?

Martino, James - February 10, 2004 00:00:00 a.m.

307:1              Martino

2         MR. SEIDEN:  Objection.

3      Speculative.

4      A.   I really don't understand what

5   you are asking, Mr. Schaner.

6      Q.   Could pay applications in your

7   experience be approved without anybody

8   certifying that the work had been

9   performed?

10         MR. SEIDEN:  Objection.  You can

11      answer.

12      A.   Say that again because you lost

13   me.  I didn't understand that one either.

14      Q.   Didn't an architect have to

15   sign-off on the first three pay

16   applications?

17         MR. SEIDEN:  The three pay

18      applications that you marked on Marlin

19      for Jupiter?

20         MR. SCHANER:  Yes.

21      A.   Because it said application and

22   it says Marlin up there, that is not

23   automatic indication that the first three

24   payments were from Marlin.

25      Q.   Could have been for somebody

Martino, James - February 10, 2004 00:00:00 a.m.

308:1                    Martino

2    else?

3          A.   Could have been for somebody

4    else.  This was the one that was put in

5    front of me, and this is the one I

6    certified.

7          Q.   What happened before, if

8    anything, you weren't concerned about?

9               MR. SEIDEN:  Objection.

10         Mischaracterizes his testimony.

11         A.   I was responsible for what I

12   certified.

13         Q.   You weren't concerned about what

14   preceded application Number 4 that Marlin

15   submitted, correct?

16         A.   I think you are trying to put

17   words in my mouth.

18         Q.   Let me ask you this.

19              Did you ever discuss the payment

20   applications that Marlin submitted for

21   either Miami or Jupiter with anyone?

22         A.   No.

23         Q.   Did you ever talk to Milt Daly

24   about the payment applications on the

25   Jupiter projects?

Martino, James - February 10, 2004 00:00:00 a.m.

309:1                 Martino

2        A.   Yes, when it became my

3    responsibility.

4        Q.   And that was somewhere in the

5    January and February 2001 time frame?

6        A.   That is correct.

7        Q.   When you assumed responsibility

8    for the payment applications, did you

9    review the prior payment applications that

10   had been approved earlier?  I didn't say

11   that very well.  Let me restate that.

12           In January or February 2001, did

13   you look back at the earlier pay

14   requisitions for the Jupiter job?

15           (Interruption in proceedings.)

16       A.   I would say what I did was once I

17   took over responsibility at that point in

18   time, when the first pay reqs came in, I

19   contacted Bob to find out where he left

20   off.

21           MR. SEIDEN:  Let's take a break

22       for a second.

23           (A recess was taken.)

24       Q.   Did you ever have any discussions

25   about payment requisitions on the Miami

Martino, James - February 10, 2004 00:00:00 a.m.

310:1                    Martino

2       project with Richard Waas?

3             A.   I don't recall, no.

4             Q.   Do you remember any discussions

5       with Richard Waas regarding the Miami

6       project?

7             A.   Sure.

8             Q.   How many conversations did you

9       have with Mr. Waas?

10            A.   I don't recall that, Mr. Schaner.

11            Q.   How often did you talk with

12      Mr. Waas about the Miami project?

13            A.   I don't recall that either.

14            Q.   Did you have conversations with

15      him throughout the process?

16            A.   Yes.

17            Q.   Did you have conversations with

18      anybody at Coastal regarding the Jupiter

19      projects?

20            A.   Yes.

21            Q.   Who at Coastal?

22            A.   I remember speaking to a Jeff

23      Lee.  I remember speaking to a Goran

24      Justina.  Don't ask me to spell his last

25      name.  There was a Chuck Dennis and a

Martino, James - February 10, 2004 00:00:00 a.m.

311:1              Martino

2    Dennis Jardan.  Those are the individuals

3    from Coastal that I recall that I spoke to.

4        Q.   How often did you speak to

5    Mr. Lee?

6        A.   Mr. Jeff Lee?

7        Q.   Yes.

8        A.   I don't recall.

9        Q.   Did you speak with him throughout

10   the course of the project?

11       A.   No.  I don't think he was

12   involved at the beginning of the project.

13       Q.   Did you speak with him about the

14   payment applications?

15       A.   Yes.  When it became my

16   responsibility, yes.

17       Q.   What did you and Mr. Lee discuss

18   regarding the payment applications?

19       A.   I don't recall exactly what we

20   discussed.

21       Q.   Do you recall any of your

22   discussions with Mr. Lee?

23       A.   We discussed a lot of change

24   orders.

25       Q.   Do you recall discussing anything

Martino, James - February 10, 2004 00:00:00 a.m.

312:1                    Martino

2      else with Mr. Lee?

3            A.    Not off the top of my head, no.

4            Q.    Did you discuss payment

5      applications with Mr. Waas on the Miami

6      job?

7            A.    I don't recall doing that, no.

8            Q.    You did architectural work for

9      Crown Theatres on a project in Annapolis

10     Maryland, correct?

11           A.    Yes, sir.

12           Q.    What was the project?

13           A.    It was an addition to the mall.

14           Q.    Was it in what was called the

15     Annapolis Mall?

16           A.    That is correct.

17           Q.    Was the landlord on the projects

18     Westfield Corporation?

19           A.    Yes.

20           Q.    And Crown Theatres had a general

21     contractor?

22           A.    Yes.

23           Q.    Who was Crown Theatres' general

24     contractor for the Annapolis contract?

25           A.    Heffner & Weber.

Martino, James - February 10, 2004 00:00:00 a.m.

313:1                    Martino

    2        Q.   You were Crown Theatres'

    3    architect for the Annapolis project,

    4    correct?

    5        A.   Yes.

    6        Q.   What was the division of work

    7    between Crown and Westfield on the

    8    Annapolis theater project?

    9        A.   I don't recall.

   10        Q.   Do you recall that Crown Theatres

   11    was responsible for the interior of the

   12    theater and Westfield built the structure

   13    and everything else?

   14        A.   I think that was the original

   15    intent.

   16        Q.   Did that change?

   17        A.   I'm not too sure.

   18        Q.   Did anybody, besides yourself

   19    from your firm, work on the Annapolis

   20    project?

   21        A.   Yes.

   22        Q.   Who?

   23        A.   Gary Sheide.

   24        Q.   How do you spell Mr. Sheide's

   25    name?

Martino, James - February 10, 2004 00:00:00 a.m.

```
314:1              Martino

    2        A.  I'm not too sure.  I'm not sure

    3    whether it is S-c-h-e-i-d-e or without the

    4    C.

    5        Q.  What work did Mr. Sheide do on

    6    the Annapolis project?

    7        A.  Did the construction drawings,

    8    answered phone calls with the contractors,

    9    responded to RFI's, reviewed shop drawings.

   10    That's the extent of what I recall.

   11        Q.  What work did you personally

   12    perform?

   13        A.  Myself?

   14        Q.  On the Annapolis project, yes.

   15        A.  I was involved with the

   16    instruction specification book, the

   17    invitation to bid.  I reviewed my firm's

   18    drawings.  That's what I recall off the top

   19    of my head.

   20            MR. SCHANER:  Mark this please as

   21        Martino 31.

   22            (Document marked Martino 31 for

   23        identification, this date.)

   24        Q.  Mr. Martino, that's your

   25    signature on Martino Exhibit 31, isn't it?
```

Martino, James - February 10, 2004 00:00:00 a.m.

315:1                Martino

2          A.   Yes, sir, it is.

3          Q.   You signed the document on March

4    2nd, 2000, correct?

5          A.   That's correct.

6          Q.   And Exhibit 31 is an application

7    and certificate for payment submitted by

8    Hewlett Contracting for work on the

9    Annapolis Mall, correct?

10         A.   Yes.

11         Q.   And this is Hewlett's application

12   Number 1 for the period March 3, 2000,

13   correct?

14         A.   Correct.

15         Q.   Exhibit 31 certifies payment in

16   the amount of $154,000, correct?

17         A.   Yes.

18         Q.   Now the contractor submitting the

19   form was Hewlett Contracting, right?

20         A.   That's the name on this, right.

21         Q.   You never saw anyone from Hewlett

22   on the job site, right?

23         A.   I don't recall seeing anyone.

24         Q.   Did you ever meet anyone from

25   Hewlett?

Martino, James - February 10, 2004 00:00:00 a.m.

316:1                    Martino

2          A.   I don't recall meeting anyone.

3          Q.   Below the name of the contractor,

4     there is a signature line, and it appears

5     there is a signature of Mr. Ronald Hewlett.

6               Did you ever meet a Ronald

7     Hewlett?

8          A.   Does not ring a bell.

9          Q.   Did you ever see anyone from

10    Hewlett do any work on the Annapolis Mall

11    project?

12         A.   Not that I recall.

13         Q.   The first page of the document

14    states that there was an original contract

15    sum in the amount of $516,000.

16              Did you ever see a contract with

17    Hewlett for $516,000?

18         A.   No.

19         Q.   Are you aware of any contract

20    with Hewlett Contracting in connection with

21    the Annapolis Mall project?

22         A.   No.

23         Q.   Do you know whether Hewlett was a

24    real construction company?

25              MR. WISSER:  Objection to the

Martino, James - February 10, 2004 00:00:00 a.m.

```
317:1                  Martino
     2     form.
     3          MR. SEIDEN:  Objection to the
     4     form.
     5     A.  No.
     6          MR. SEIDEN:  No, they are not a
     7     real construction company; or, no, you
     8     don't know?
     9     A.  I am not aware.
    10     Q.  The address for Hewlett
    11     Contracting is listed as 640 Barnard
    12     Avenue, Woodmere, New York.
    13          That's the same address as
    14     Mr. Beacher's New York address, isn't it?
    15     A.  Yes, it is.
    16     Q.  You had been to Mr. Beacher's
    17     home, correct?
    18     A.  Yes, I have.
    19     Q.  You knew, Mr. Martino, when you
    20     signed on March 2nd, 2000, Hewlett
    21     Contracting payment application Number 1,
    22     that you were certifying payment of money
    23     that was going to Mr. Beacher, correct?
    24          MR. SEIDEN:  Objection.
    25     A.  No.
```

Martino, James - February 10, 2004 00:00:00 a.m.

318:1                    Martino

2        Q.   Why not?

3        A.   Just because it has his address

4    there doesn't necessarily mean when you say

5    or imply that it was going to Mr. Beacher

6    that it was going to Mr. Beacher.

7        Q.   The original contract sum was for

8    $516,000, and you knew that eventually up

9    to $516,000, if not more, would be paid to

10    Hewlett Contracting on this job, correct?

11            MR. SEIDEN:  Objection to form.

12            MR. WISSER:  Objection to form.

13        A.   I'm not sure about that either,

14    sir.

15        Q.   You knew that $516,000 was

16    eventually going to be paid to Mr. Beacher,

17    correct?

18            MR. SEIDEN:  Objection.  Asked and

19            answered.

20        A.   No, I do not.

21        Q.   If you had known that Mr. Beacher

22    was receiving the payments, would you agree

23    that Mr. Beacher's participation in the

24    approval process of the payment

25    applications would be improper?

Martino, James - February 10, 2004 00:00:00 a.m.

319:1             Martino

2         MR. SEIDEN:  Objection

3    hypothetical.

4         MR. WISSER:  Objection.

5    A.  I prefer not to speculate on

6    that, counselor.

7    Q.  You don't know?  It would be OK

8    if Mr. Beacher approved payment

9    applications to himself.  Is that your

10    testimony?

11         MR. SEIDEN:  Objection.

12    A.  I am not saying yes or no to

13    that.

14    Q.  You don't have a view?

15    A.  I don't have a view.

16    Q.  Now, you signed the architect's

17    certificate on March 2nd, 2000.

18         When was the work performed that

19    appears in Exhibit 31?

20    A.  It says to period March 3, 2000.

21    Q.  What would that indicate to you?

22         What would the period be in your

23    experience?

24    A.  It doesn't say when it started.

25    It just says that this period was up to

Martino, James - February 10, 2004 00:00:00 a.m.

320:1              Martino

2     March 3, 2000.

3         Q.    Aren't the periods for billing

4     normally 30 days?

5         A.    Yes, normally.

6         Q.    When did you make a site visit

7     last before you signed Exhibit 31?

8              If you want refer to Exhibit 3,

9     which are your interrogatory answers?

10              MR. SEIDEN:  Can I just hear the

11         question.

12              (A portion of the record was read.)

13         A.    Referring to this document, the

14     previous date appears to be February 8,

15     2000.

16         Q.    When you made your visit to the

17     Annapolis site on February 8, 2000, it was

18     not for the purpose of certifying payment

19     requisitions, was it?

20         A.    I couldn't -- I don't recall

21     exactly what transpired on that date.

22         Q.    You were not checking on that

23     date to determine whether the work

24     reflected on Exhibit 31 had been performed,

25     right?

Martino, James - February 10, 2004 00:00:00 a.m.

321:1                    Martino

2              MR. SEIDEN:  Objection.

3         A.   I don't know.

4         Q.   You never discussed payment

5    requisitions with anyone at Heffner &

6    Weber, correct?

7         A.   I would say that's correct.

8              MR. SCHANER:  Mark this as Exhibit

9         32.

10             (Document marked Martino 32 for

11        identification, this date.)

12        Q.   Mr. Martino, that's your

13   signature in the lower right-hand corner of

14   the first page of Martino Exhibit 32,

15   correct?

16        A.   Yes, it is.

17        Q.   And you signed on April 4, 2000,

18   correct?

19        A.   Yes, I did.

20        Q.   Exhibit 32 is payment application

21   Number 2 submitted from Hewlett Contracting

22   for work on the Annapolis Mall contract,

23   correct?

24        A.   Yes.

25        Q.   And it certifies payment in the

Martino, James - February 10, 2004 00:00:00 a.m.

322:1                    Martino

    2    amount of $180,000 to Hewlett Contracting,

    3    correct?

    4              MR. SEIDEN:  Objection to form.

    5        A.   Would you repeat that question,

    6    please.

    7        Q.   Exhibit 32 certifies for payment

    8    $180,000 to Hewlett Contracting.

    9        A.   Yes.

   10        Q.   Application Number 2 is for the

   11    period April 1, 2000.

   12              Now, that would indicate that it

   13    was for work between March 3rd, 2000, the

   14    date of application Number 1, and April 1,

   15    2000, correct?

   16        A.   Customarily, yes.

   17        Q.   You didn't make any visits to the

   18    Annapolis site between March 3rd, 2000 and

   19    April 1, 2000, correct?

   20              Withdrawn.

   21              You made a visit to the site in

   22    Annapolis on April 5, 2000, correct?

   23        A.   Yes.

   24        Q.   That's the day after you signed

   25    application Number 2 submitted by Hewlett

Martino, James - February 10, 2004 00:00:00 a.m.

```
323:1              Martino
   2   Contracting, correct?
   3          MR. SEIDEN:  Objection.  I don't
   4       know if you are purposely trying to
   5       mischaracterize the record,
   6       Mr. Schaner.  We just looked at the
   7       interrogatory answers reflecting a date
   8       of 8/3/00.
   9          MR. SCHANER:  I ask that you not
  10       coach the witness.  If you have
  11       questions you want to ask him, there
  12       will be a proper time at the end.
  13       A.   Yes.  I made a site visit on
  14   April 5, 2000.  I also made a site visit on
  15   March 15, 2000.
  16          MR. SCHANER:  Move to strike the
  17       last sentence of the witness' answer as
  18       unresponsive.
  19       Q.   Why did you not wait to sign the
  20   architect's certificate until after you
  21   made the site visits on April 5, 2000?
  22       A.   The payment applications came to
  23   me from Mr. Beacher on or about the date of
  24   April 4, 2000.
  25       Q.   So when you visited the site in
```

Martino, James - February 10, 2004 00:00:00 a.m.

324:1                    Martino

    2    the middle of March, 2000, you hadn't seen

    3    the payment application Number 2 which is

    4    Exhibit 32, correct?

    5        A.   I believe that's correct.

    6            MR. SCHANER:  Mark this, please,

    7        as Martino 33.

    8            (Document marked Martino 33 for

    9        identification, this date.)

   10        Q.   Mr. Martino, Exhibit 33 is

   11    Hewlett Contracting's third payment

   12    application for work on the Annapolis Mall

   13    project and it is for the period may 1,

   14    2000.

   15            Is that your signature in the

   16    lower right-hand corner?

   17        A.   Yes, it is.

   18        Q.   You signed on April 26, 2000?

   19        A.   That's correct.

   20        Q.   Exhibit 33 certified payment to

   21    Hewlett Contracting in the amount of

   22    $182,000, correct?

   23        A.   Yes, it does.

   24        Q.   The pay application was for the

   25    period to May 1st, 2000, correct?

Martino, James - February 10, 2004 00:00:00 a.m.

325:1                    Martino

2        A.    To May 1st, 2000, correct.

3        Q.    You did not make a site visit to

4    determine whether you could properly sign

5    this pay application, correct?

6        A.    No.  The way you asked that

7    question it is no.  My answer to your

8    question is no the way you phrased it.

9        Q.    Your last previous site visit in

10    Annapolis was on April 5, 2000, correct?

11        A.    Correct.

12        Q.    Had the work on pay application

13    Number 3, which is Exhibit 33, been

14    performed by April 5, 2000?

15        A.    I don't recall.

16        Q.    For Hewlett's first three pay

17    applications on the Annapolis Mall project,

18    which are Exhibits 31, 32 and 33, did you

19    review contract documents before you signed

20    these documents?

21        A.    Contract documents meaning my

22    drawings?

23        Q.    Well, did you review your

24    drawings before signing Exhibits 31, 32 and

25    33?

Martino, James - February 10, 2004 00:00:00 a.m.

326:1                    Martino

2        A.   Yes.

3        Q.   Did you review any other

4   documents before signing Exhibits 31, 32

5   and 33?

6        A.   I believe we reviewed shop

7   drawings.

8        Q.   Anything else?

9        A.   Not that I can recall right now

10  sitting here.

11       Q.   Take a look at the continuation

12  page on Exhibit 33 which is Hewlett's pay

13  application Number 3.

14            Under the heading "Description of

15  Work," it reads, "Switch gear controls and

16  mechanical devices."

17            Were switch gear controls and

18  mechanical devices actually installed on

19  the Annapolis Mall project?

20       A.   Yes.

21       Q.   How do you know that switch gear

22  controls and mechanical devices were

23  installed on the Annapolis project?

24       A.   By virtue of shop drawings that

25  were submitted, by virtue of discussions

Martino, James - February 10, 2004 00:00:00 a.m.

327:1                    Martino

2    that took place at the Friday morning

3    meetings, by virtue of progress

4    photographs.

5         Q.   Who took the progress

6    photographs?

7         A.   I remember Tom Becker taking

8    project photographs.

9         Q.   How often did Mr. Becker take

10    project photographs?

11        A.   I don't recall.

12        Q.   Did Mr. Becker make copies of the

13    progress photographs available to you?

14        A.   I don't know.

15        Q.   Did you see them?

16        A.   Yes.

17        Q.   When did you see them?

18        A.   During the course of construction

19    on this project.

20        Q.   Did Mr. Becker send copies of the

21    project's photographs to your office?

22        A.   Yes.

23        Q.   Do you have copies of progress

24    photos in your files?

25        A.   You have copies in my files,

Martino, James - February 10, 2004 00:00:00 a.m.

```
328:1              Martino
     2   counselor.  I don't know what's in there
     3   anymore.
     4       Q.   Who reported to you on work done
     5   on the Annapolis site at the Friday
     6   meetings?
     7       A.   Who reported to me?
     8       Q.   Let me rephrase the question.
     9            You said that you found out that
    10   switch gear controls and mechanical devices
    11   had been installed in part based on
    12   something that happened at the Friday
    13   construction meetings, right?
    14       A.   Yes, sir.
    15       Q.   What happened at the Friday
    16   construction meetings that would inform you
    17   about the installation of switch gear
    18   controls and mechanical devices?
    19       A.   Bob would normally have a few
    20   minutes to speak about what the progress of
    21   the jobs were, what the stages were, what
    22   work was being done, what possible
    23   conflicts have come up.
    24       Q.   Do you remember Mr. Beacher
    25   talking?
```

Martino, James - February 10, 2004 00:00:00 a.m.

329:1                Martino

2          MR. SEIDEN:  Are you finished?

3      A.   Issues that were arising during

4   the course of construction during those

5   periods of times.

6      Q.   Did Mr. Beacher report to you

7   that switch gear controls and mechanical

8   devices had been installed on the Annapolis

9   Mall project?

10      A.   Mr. Beacher never reported to me,

11   first of all.  I mean he had the

12   opportunity to speak at the construction

13   meetings.

14      Q.   Did he tell you at the

15   construction meetings that switch gear

16   controls and mechanical devices had been

17   installed?

18      A.   Yes.

19      Q.   Do you remember him saying that?

20      A.   Those specific words, no.  Did he

21   report that switch gear was going in, yes.

22   Did he report that HVAC mechanical devices

23   were going in, yes.  Was it all said just

24   like you asked me, no.

25      Q.   Who did the work?

Martino, James - February 10, 2004 00:00:00 a.m.

330:1                    Martino

2        A.   I don't know.

3        Q.   Who installed the switch gear?

4        A.   I don't know that either.

5        Q.   Who installed the controls?

6        A.   I don't know that either.

7        Q.   Mechanical devices?

8        A.   I don't know that either.

9        Q.   Did you determine whether the

10   quality of the work was in accordance with

11   the contract documents?

12            MR. WISSER:  Objection to the

13       form.

14       A.   Yes.

15       Q.   How did you determine that the

16   quality of the installation of the switch

17   gear at the Annapolis site was in

18   accordance with the contract documents?

19       A.   Again, based on the shop drawings

20   that were submitted, which were -- the shop

21   drawing that's submitted is a sample of

22   what's supposed to be going into the

23   building.

24       Q.   Based on the shop drawings?

25       A.   That's one issue.  Based again on

Martino, James - February 10, 2004 00:00:00 a.m.

331:1               Martino

    2    the progress photographs.

    3         Q.   Anything else?

    4         A.   Not that I can recall right at

    5    this moment.

    6         Q.   How did you determine that the

    7    quality of the installation of the controls

    8    was in accordance with the contract

    9    documents?

    10        A.   I would have to say the same way

    11   I said the previous answer.

    12        Q.   What about the quality of the

    13   installation of the mechanical devices?

    14        A.   I would have to rely upon the

    15   same answer.

    16        Q.   What are the mechanical devices

    17   that were installed on the Annapolis

    18   project?

    19        A.   Could be duct work, diffusers,

    20   controls of the mechanical equipment.

    21        Q.   What was it that is being

    22   referred to in Exhibit 31, 32 and 33 by

    23   mechanical devices?

    24        A.   I just said what I believe they

    25   are.

Martino, James - February 10, 2004 00:00:00 a.m.

332:1            Martino

2      Q.   Did you make a determination --

3  withdrawn.

4            MR. SCHANER:  Exhibit 34, please.

5            (Document marked Martino 34 for

6       identification, this date.)

7      Q.   Mr. Martino, you signed

8  Exhibit 34, didn't you?

9      A.   Yes, I did.

10           I just also want to say that this

11  is another photocopy not the originals we

12  discussed last time.

13     Q.   Looks like your signature on the

14  bottom of the first page, right-hand

15  corner, doesn't it?

16     A.   Yes, it does.

17     Q.   You signed on August 3rd, 2000,

18  correct?

19     A.   That's correct.

20     Q.   This is a payment application

21  from Hewlett Contracting for remedial

22  requirements; is that right?

23     A.   That's what it says, yes.

24     Q.   And it is application Number 1

25  for the period to August 1, 2000, for work

Martino, James - February 10, 2004 00:00:00 a.m.

333:1              Martino

2    on the Annapolis Mall project, right?

3         A.   Yes.

4         Q.   Exhibit 34 certifies payment to

5    Hewlett in the amount of $911,000, correct?

6         A.   That's what it states.

7         Q.   The original contract sum is

8    stated as $2,151,000.

9              Did you ever see a contract for

10   $2,151,000 with Hewlett?

11        A.   That does not ring a bell, no.

12        Q.   Were you aware of a contract with

13   Hewlett for remedial requirements on the

14   Annapolis Mall project?

15        A.   No.

16        Q.   Turn to the second page which is

17   the continuation sheet.  There are five

18   tasks listed under the description of work.

19             The first one is additional

20   stadium steel and structural supports for

21   girders and beams.

22             What work does this refer to?

23        A.   I don't recall.

24        Q.   Who did the work?

25        A.   I don't know that either.

Martino, James - February 10, 2004 00:00:00 a.m.

334:1                    Martino

2        Q.   The second description -- the

3    second item under description of work is

4    additional power requirements.

5             Were there additional power

6    requirements on the Annapolis Mall project?

7        A.   I don't recall as we sit here.

8        Q.   Who did the work?

9        A.   Sir, I don't know that either.

10       Q.   It wasn't Hewlett, was it?

11       A.   I don't know.

12       Q.   The third item under description

13   of work is SR interior walls.

14            Do you know what SR stands for?

15       A.   I would be guessing, but I think

16   I know what it means.

17       Q.   Would it be sheet rock?

18       A.   I would think that.

19       Q.   Who did the sheet rock on the

20   interior walls of the Annapolis Mall

21   project?

22       A.   I don't know.

23       Q.   It wasn't Hewlett, correct?

24       A.   I don't know that.

25       Q.   The fourth item under description

Martino, James - February 10, 2004 00:00:00 a.m.

335:1                    Martino

2    of work is additional stadium concrete with

3    reinforcing.

4              What kind of work is that?

5      A.   I don't recall.

6      Q.   Who did that work?

7      A.   I don't know that either.

8      Q.   The fifth item under description

9    of work is modify FA panel and sprinkler

10   systems.

11             Does FA stand for fire alarm?

12     A.   I think it does.

13     Q.   Who did that work?

14     A.   I don't know.

15     Q.   Mr. Martino, you signed the

16   architect's certificate for payment on

17   August 3rd, 2000.

18             When was your last site visit?

19     A.   Referring to this document, it

20   says 6/28/2000.

21     Q.   By this document you are

22   referring to your interrogatory answers

23   which is Exhibit 3?

24     A.   Yes, sir.  That's correct.

25     Q.   If the work reflected on

Martino, James - February 10, 2004 00:00:00 a.m.

336:1                    Martino

2      Exhibit 34 was performed, you would expect

3      it would have been performed after June 28,

4      2000, correct?

5              MR. SEIDEN:  Objection to form.

6          A.  I am sorry.  Could you say that

7      one more time.

8              MR. SCHANER:  Could we have the

9          question read back.

10             (A portion of the record was read.)

11         A.  I don't think the word expect is

12     the right word in the question that you are

13     asking.

14         Q.  Yes.  It would be your

15     expectation that the work was performed

16     some time after June 28, 2000, the work

17     that is reflected on Exhibit 34, right?

18         A.  OK.  That's fair to say.  That's

19     fair to say.

20         Q.  Mr. Martino, did you make a

21     determination that the quality of the work

22     reflected in Exhibit 34 was in accordance

23     with the contract documents?

24         A.  Yes, I did.

25         Q.  How did you do that?

Martino, James - February 10, 2004 00:00:00 a.m.

337:1                    Martino

2        A.   Based upon the conversations that

3    took place, based upon the progress

4    photographs, based upon basically the same

5    things we talked about in the past.

6        Q.   Mr. Martino, how can that be

7    given that you can't tell me what the work

8    that was performed was?

9        A.   Mr. Schaner, you are asking me

10   while I am sitting here do I know what that

11   work was?  And I can't say for certain.

12       Q.   But are you certain that you made

13   a determination that the quality of the

14   work was in accordance with the contract

15   documents?

16       A.   Yes, I am.

17       Q.   Did you make a determination that

18   Hewlett Contracting was entitled to the

19   payment of the amount certified?

20       A.   I made a determination that the

21   quality of the work was done satisfactorily

22   in accordance with the contract documents.

23       Q.   That was not my question.

24            Did you make a determination that

25   Hewlett Contracting was entitled to payment

Martino, James - February 10, 2004 00:00:00 a.m.

338:1                    Martino

2    of the amount certified?

3         A.   If they were the ones -- they are

4    the ones on the application.  In all cases

5    these applications came with different

6    subcontractors' names on them.

7              So whatever I certified -- it

8    didn't matter to me who the subcontractor

9    was.  I was certifying that the work was

10   performed.

11        Q.   Did you make a determination that

12   the work had progressed as indicated in the

13   payment application?

14        A.   I am not following your question.

15   I am sorry.

16        Q.   Did you make a determination that

17   work had progressed as indicated?

18        A.   To the best of my knowledge and

19   belief, yes.

20        Q.   How did you do that?

21        A.   Similar to the statements I have

22   given you in the past.

23        Q.   You don't know who the contractor

24   was who actually did the work, correct?

25        A.   That's true.

Martino, James - February 10, 2004 00:00:00 a.m.

339:1                    Martino

    2        Q.   As you sit here today, you can't

    3    tell me what the work was?

    4        A.   I can't recall, while we're

    5    sitting here today, that's correct.

    6        Q.   Are you certain that you made a

    7    determination that work had progressed as

    8    indicated?

    9            MR. SEIDEN:  Objection.  Asked and

   10        answered.

   11        A.   I answered that question already,

   12    counselor.

   13        Q.   What's your answer?

   14        A.   Same answer as I gave you before.

   15        Q.   What was it?

   16        A.   I don't recall it.

   17        Q.   Are you certain that you

   18    certified that work had progressed as

   19    indicated --

   20            MR. SEIDEN:  Objection.  Asked and

   21        answered.

   22        Q.   -- on payment application Number

   23    1?

   24        A.   To the best of my knowledge and

   25    belief, yes.

Martino, James - February 10, 2004 00:00:00 a.m.

340:1                    Martino

2        Q.   Did you have any discussions with

3    Bob Beacher regarding Hewlett's payment

4    requisitions?

5        A.   I don't recall that.

6        Q.   Did you have any discussions with

7    Mr. Daly regarding Hewlett Contracting's

8    payment requisitions?

9        A.   I don't recall that either.

10       Q.   Do you remember any discussions

11   with anybody about Hewlett Contracting's

12   payment requisitions?

13       A.   No, sir.

14       Q.   You performed architectural

15   services in connection with a Crown

16   Theatres' project in Skokie, Illinois?

17       A.   Yes, sir.

18       Q.   What kind of project was the

19   Skokie project?

20       A.   A new free standing multi-theater

21   complex.

22       Q.   Do you remember how many screens?

23       A.   I believe it was 18 screens.

24       Q.   Who was Crown Theatres' landlord

25   on the project?

Martino, James - February 10, 2004 00:00:00 a.m.

```
341:1              Martino
     2      A.  I don't recall their names.
     3      Q.  Did the landlord have a general
     4  contractor?
     5          Was it Graycor.
     6          MR. SEIDEN:  Objection.  I'm not
     7      sure what the question is.  Was what
     8      Graycor?
     9          MR. SCHANER:  Let's take this one
    10      step at a time.
    11      Q.  Was there a general contractor
    12  for the landlord on the Skokie project?
    13      A.   I don't recall that.
    14      Q.  Do you recall that the landlord's
    15  general contractor was Graycor,
    16  G-r-a-y-c-o-r?
    17      A.  No, I don't recall that.
    18      Q.  Does the name Graycor ring a
    19  bell?
    20      A.  No.
    21      Q.  Who was Crown Theatres'
    22  contractor on the Skokie project?
    23      A.  Was E.W. Howell.
    24      Q.  Did the Crown Theatres'
    25  contractor have another contractor in
```

Martino, James - February 10, 2004 00:00:00 a.m.

342:1                    Martino

2      connection with work on Skokie?

3           A.   Not that I am aware of.

4           Q.   You were Crown Theatres'

5      architect for the Skokie project?

6           A.   Yes, sir.

7           Q.   Did anybody else from your firm

8      work on the Skokie project?

9           A.   Yes.

10          Q.   Who?

11          A.   Marciano Stanco.

12          Q.   What did Mr. Stanco do in

13     connection with the Skokie project?

14          A.   Similar responsibilities that

15     Gary Sheide did.

16          Q.   What work did you do on the

17     Skokie project?

18          A.   Similar to the responsibilities I

19     described to you recently.

20          Q.   For which project?

21          A.   I don't recall which project you

22     asked me.  I think it was --

23          Q.   The Annapolis project?

24          A.   Previously you asked me what?

25          Q.   Jupiter.

Martino, James - February 10, 2004 00:00:00 a.m.

343:1                    Martino

2          A.   Probably the Jupiter project.  I

3     don't recall.

4          Q.   Were your responsibilities pretty

5     much the same on all the theater projects?

6          A.   Pretty much.

7          Q.   Were the roles of Mr. Sheide and

8     Mr. Stanco similar depending on which one

9     was working on the project?

10         A.   That's fair to say.

11         Q.   Mr. Martino, I am showing you

12    what has previously been marked as Martino

13    Exhibit 4.

14              This is Tiger Contracting's

15    payment application Number 1 for work on

16    the Skokie project for the period to May 1,

17    2000.

18              That's your signature on the

19    first page of Exhibit 4, correct?

20         A.   Yes, sir, it is.

21         Q.   You signed on April 26, 2000?

22         A.   Yes, sir, I did.

23         Q.   Exhibit 4 certifies payment to

24    Tiger Contracting in the amount of

25    $270,000, correct?

Martino, James - February 10, 2004 00:00:00 a.m.

344:1                   Martino

2        A.   Yes, sir.

3        Q.   You never met anyone from Tiger

4   Contracting, correct?

5        A.   I don't recall meeting anyone.

6        Q.   You never saw anyone from Tiger

7   Contracting on the Skokie job site, right?

8        A.   I don't recall seeing anyone.

9        Q.   There is a signature on the page

10   under the heading contractor, Tiger

11   Contracting.  It appears to read D. Tiger.

12           Did you ever meet a Mr. D. Tiger?

13       A.   No.

14           MR. WISSER:  Objection to the

15       form.  I'm not sure if that's a D or an

16       S or something else.

17       Q.   Did you ever meet a Mr. Tiger?

18       A.   I don't recall meeting a

19   Mr. Tiger, no.

20       Q.   Did you see anyone from Tiger

21   Contracting doing work on the Skokie

22   project?

23       A.   I thought you asked me that

24   before, but the answer is I don't recall

25   seeing anybody doing any work.

Martino, James - February 10, 2004 00:00:00 a.m.

345:1                    Martino

2        Q.   Exhibit 4 refers to an original

3    contract sum of $1,561,000.

4             Have you ever seen a contract

5    with Tiger Contracting for $1,561,000?

6        A.   No.

7        Q.   Are you aware of any contracts

8    with Tiger Contracting in connection with

9    the Skokie project?

10       A.   No, sir, I am not.

11       Q.   Mr. Martino, you know that

12   Mr. Beacher has a daughter, don't you?

13       A.   He has two daughters.

14       Q.   And you have met them both,

15   correct?

16       A.   Yes, sir.

17       Q.   Do you recall that one of

18   Mr. Beacher's daughters attended school at

19   Michigan State University?

20       A.   I recall that she attended school

21   in the State of Michigan.  I don't recall

22   exactly the college.

23       Q.   Which daughter of Mr. Beacher's

24   went to school in Michigan?

25       A.   Heather.

Martino, James - February 10, 2004 00:00:00 a.m.

346:1                    Martino

2        Q.   Are you aware that Michigan State

3    is located in East Lansing, Michigan?

4        A.   No.

5        Q.   Have you ever been to the campus

6    of Michigan State University?

7        A.   No, sir.

8        Q.   Mr. Martino, at the top of the

9    first page, the document states,

10   "Foundation work.  Contract for foundation

11   work."

12            Do you see that?

13       A.   Yes, I do.

14       Q.   Who performed the foundation work

15   on the Crown Theatres' Skokie project?

16       A.   I don't know.

17       Q.   Turn to the continuation page and

18   there is a list of work.  There are nine

19   items listed.  The first item is excavation

20   and backfill.

21            Who performed excavation and

22   backfill on the Skokie project?

23       A.   I don't know.

24       Q.   Was it performed?

25       A.   Yes, it was.

Martino, James - February 10, 2004 00:00:00 a.m.

347:1                    Martino

2        Q.   How do you know?

3        A.   Because I was there at one point

4   when that work was performed.

5        Q.   Was footing and reinforcing work

6   performed on the Skokie project?

7        A.   Yes, sir, it was.

8        Q.   Who performed it?

9        A.   I'm not too sure.

10       Q.   The third item on the

11   continuation sheet is pier and column

12   reinforcing; is that right?

13       A.   Yes.  That was interpreted COL to

14   mean column.

15       Q.   Was that work done on the Skokie

16   project?

17       A.   That I don't recall.

18       Q.   If it was done, who would have

19   done it?

20            MR. SEIDEN:  Objection,

21       speculative.

22       A.   I don't know, Mr. Schaner.

23       Q.   Was foundation and reinforcing

24   work done, the fourth item under

25   description of work?

Martino, James - February 10, 2004 00:00:00 a.m.

348:1                Martino

2        A.   Yes, it was.

3        Q.   Who performed that work?

4        A.   I don't know who performed that

5    work.

6        Q.   Moving to the fifth item on the

7    continuation sheet, gravel based footing.

8    Who performed that work?

9        A.   I don't know who performed that

10   work.

11       Q.   Was that work performed?

12       A.   I believe it was performed, yes.

13       Q.   Did you see the work performed?

14       A.   I remember the issue of gravel

15   being, yes, being an issue out there, yes.

16       Q.   The sixth item under description

17   of work is gravel based piers.

18            Were gravel based piers installed

19   on the Skokie project?

20       A.   I cannot say specifically if

21   gravel based piers were installed.  I know

22   that gravel base was installed in general

23   on the project.

24       Q.   Who installed the gravel base?

25       A.   I don't know, sir.

Martino, James - February 10, 2004 00:00:00 a.m.

349:1              Martino

2        Q.   Under description of work item

3    seven it says, gravel base SOG.

4             What does SOG stand for?

5        A.   I believe it stands for slab on

6    grade.

7        Q.   Was a gravel based slab on grade

8    installed on the Skokie project?

9        A.   I believe it was, yes.

10       Q.   Who did that?

11       A.   I don't know who did that.

12       Q.   Was that work done by Tiger

13   Contracting?

14       A.   I don't know that for sure.

15       Q.   Item eight under description of

16   work is waterproof foundation.

17            What is a waterproof foundation?

18       A.   I think that's an abbreviation

19   for waterproofing of the foundation.

20       Q.   Was the Skokie project's

21   foundation waterproofed?

22       A.   I don't recall sitting here right

23   now without going back to my paperwork.

24       Q.   Item nine under description of

25   work refers to utility encasement.

Martino, James - February 10, 2004 00:00:00 a.m.

350:1                    Martino

2              Was that work performed?

3        A.   Honestly I don't recall that one

4    either without going back and reviewing my

5    documents.

6        Q.   Which documents would you need to

7    look at?

8        A.   My boxes that are somewhere here.

9        Q.   If utility and encasement was

10   performed, which contractor would have done

11   the work?

12             MR. SEIDEN:  Objection,

13        speculative.

14       A.   I don't know, sir.

15       Q.   Now, you signed Exhibit 4 on

16   April 26, 2000.

17             When was your last visit to the

18   Skokie work site prior to April 26, 2000?

19       A.   Reviewing this document, it says

20   12/15/98 if I am reading it correctly.

21       Q.   Which is December 15, 1998,

22   correct?

23       A.   Yes, sir.

24       Q.   The document you are referring to

25   is Exhibit 3 in your answers to

Martino, James - February 10, 2004 00:00:00 a.m.

```
351:1                 Martino
    2   interrogatories, correct?
    3        A.   Yes, sir.
    4             MR. SCHANER:  Mark this, please,
    5        as Exhibit 35.
    6             MR. SEIDEN:  It is about 1:00.
    7             Do this exhibit and then take a
    8        break?
    9             MR. SCHANER:  Sure.
   10             (Document marked Martino 35 for
   11        identification, this date.)
   12        Q.   Mr. Martino, Exhibit 35 is before
   13   you, correct?
   14             You have a copy of Exhibit 35?
   15        A.   Exhibit 35, yes.
   16        Q.   That's your signature in the
   17   lower right-hand corner of Exhibit 35,
   18   correct?
   19        A.   Yes.
   20        Q.   And you signed Exhibit 35 on June
   21   1st, 2000, right?
   22        A.   That is correct.
   23        Q.   And Exhibit 35 is a one-page
   24   document in this form, correct?
   25        A.   In this form, yes.
```

Martino, James - February 10, 2004 00:00:00 a.m.

352:1                    Martino

2          Q.   And it is application number 2

3     submitted by Tiger Contracting for work on

4     the Skokie project for the period June 1,

5     2000, right?

6          A.   Yes, sir.

7          Q.   Exhibit 35 certifies payment to

8     Tiger Contracting in the amount of

9     $302,000, correct?

10         A.   Yes, sir.

11             MR. SEIDEN:  With respect to

12         Exhibit 35, it is a single sheet of

13         paper.  It does not contain a

14         continuation sheet, and the original of

15         this document, I believe on the basis

16         of off-the-record discussions, would

17         have contained a continuation sheet

18         which was not presented as part of

19         Exhibit 35 to Mr. Martino.

20             MR. SCHANER:  Whether there is a

21         second page or not, we're not sure.

22             MR. SEIDEN:  Fair enough.

23             (Lunch recess was taken from 1:04 P.M.

24         to 1:50 P.M.)

25             (Document marked Martino 36 for

Martino, James - February 10, 2004 00:00:00 a.m.

353:1              Martino

2        identification, this date.)

3        Q.   We are back from lunch.

4             Mr.  Martino, you have before you

5   Exhibit 36.

6             Is that your signature on the

7   bottom right-hand corner of the document?

8        A.   On this photocopy, yes, that's my

9   signature.

10       Q.   You signed on July 6, 2000,

11  correct?

12       A.   That is correct.

13       Q.   This is an application for

14  payment from Tiger Contracting for work on

15  the Skokie project for the period July 1,

16  2000, correct?

17       A.   Yes.

18       Q.   It certifies payment in the

19  amount of $357,329, correct?

20       A.   Yes.

21       Q.   Mr. Martino, you will note that

22  the signature line for the contractor is

23  blank, correct?

24       A.   Yes.

25       Q.   Why did you sign the document in

Martino, James - February 10, 2004 00:00:00 a.m.

354:1                    Martino

2    light of the fact that the signature line

3    for the contractor is blank?

4        A.   Because I relied upon the

5    signature from Bob Beacher that he executed

6    it and authorized it.

7        Q.   Would it be fair to say that it

8    was not proper for you to sign Exhibit 36

9    given that the contractor had not signed?

10            MR. SEIDEN:  Objection to the

11       form.

12            MR. WISSER:  Objection to the

13       form.

14       A.   No, it would not be fair to say

15    that.

16       Q.   Has it been your practice as an

17    architect to sign payment requisitions

18    where the contractor submitting the payment

19    application has not signed the document?

20            MR. SEIDEN:  Objection to form.

21       A.   Could you ask that question

22    again, please?

23            MR. SCHANER:  Can we have the

24       question read back.

25            (A portion of the record was read.)

Martino, James - February 10, 2004 00:00:00 a.m.

355:1                    Martino

    2          A.   No.

    3               MR. SCHANER:  Let's mark this as

    4          Martino Exhibit 37.

    5               (Document marked Martino 37 for

    6          identification, this date.)

    7               MR. SEIDEN:  The witness has

    8          pointed out with respect to Martino 36,

    9          as with certain other exhibits, it is a

   10          single page without any continuation

   11          sheet; and we don't know whether there

   12          was a continuation sheet or not with

   13          respect to this document, whether 36 is

   14          a true and correct copy of what was

   15          Tiger application Number 3.

   16          Q.   You signed Exhibit 37, correct?

   17          A.   This photocopy has my signature

   18     on it, yes.

   19          Q.   And you signed it on August 2nd,

   20     2000?

   21          A.   Yes.

   22          Q.   Exhibit 37 is a payment

   23     requisition submitted by Tiger Contracting.

   24     It is application Number 4 for the period

   25     August 1, 2000, correct?

Martino, James - February 10, 2004 00:00:00 a.m.

356:1                    Martino

2          A.   Yes.

3          Q.   It certifies payment in the

4     amount of $54,929?

5          A.   No.

6          Q.   What amount does Exhibit 37

7     certify payment in?

8          A.   $545,929.

9          Q.   If I misspoke I apologize.

10         A.   You did.

11         Q.   Now, you signed on August 2nd,

12    2000.

13              When was your last visit to the

14    Skokie site before signing Exhibit 37?

15         A.   Referring to this document, it

16    says May 16, 2000.

17         Q.   And you are referring to Exhibit

18    3?

19         A.   Yes, sir.

20              MR. SCHANER:  Mark this please as

21         Exhibit 38.

22              (Document marked Martino 38 for

23         identification, this date.)

24         Q.   Exhibit 38 is Tiger Contracting's

25    application Number 5 for payment for work

Martino, James - February 10, 2004 00:00:00 a.m.

357:1                    Martino

      2    on the Skokie project, correct?

      3         A.   Yes.

      4         Q.   And it is for the period to

      5    September 1, 2000?

      6         A.   Yes.

      7         Q.   That's your signature in the

      8    lower right-hand corner?

      9         A.   On this photocopy, yes.

     10         Q.   And you signed on September 7,

     11    2000?

     12         A.   Yes.

     13              MR. SCHANER:  Let's mark this as

     14         Exhibit 39.

     15         A.   I would like to point out again

     16    it is a single page.

     17              (Discussion off the record.)

     18              (Document marked Martino 39 for

     19         identification, this date.)

     20         Q.   Mr. Martino, did you sign Exhibit

     21    39 on the front page in the lower

     22    right-hand corner?

     23         A.   That's my signature on this

     24    photocopy, yes.

     25         Q.   And you signed Exhibit 39 on

Martino, James - February 10, 2004 00:00:00 a.m.

358:1               Martino

2   September 14, 2000?

3        A.   That is correct.

4        Q.   Exhibit 39 is application Number

5   5-A for payment submitted by Tiger

6   Contracting for work on the Skokie project,

7   correct?

8        A.   Correct.

9        Q.   It is for the period September 1,

10   2000?

11        A.   Yes.

12        Q.   Exhibit 39 certifies payment to

13   Tiger of $181,495?

14        A.   Yes.

15        Q.   Turn to the continuation sheet

16   which is the second page.

17             There are nine change orders

18   listed under the description of work.

19        A.   Yes.

20        Q.   Who approved these change orders?

21        A.   Bob did.

22        Q.   Bob Beacher?

23        A.   Yes.

24        Q.   Did you have any involvement in

25   the approval of change orders on the Skokie

Martino, James - February 10, 2004 00:00:00 a.m.

359:1                  Martino

    2    project?

    3        A.   Yes.

    4        Q.   What was your involvement?

    5        A.   Around January or February of

    6    2001, I assumed the responsibilities for

    7    the Jupiter and Skokie projects, and that's

    8    when I had involvement in terms of change

    9    orders to the end of the project.

    10       Q.   Did you have involvement with

    11   change orders on the Jupiter or Skokie

    12   project before January or February of 2001?

    13       A.   No.

    14       Q.   The nine change orders that are

    15   referenced on Exhibit 39, what are they

    16   for?

    17       A.   I don't know.

    18       Q.   Did you make a determination as

    19   the work had progressed as indicated with

    20   respect to the nine change orders?

    21       A.   Yes, I did.

    22       Q.   How did you make that

    23   determination?

    24       A.   I can't answer that today.

    25       Q.   Who did the work that is

Martino, James - February 10, 2004 00:00:00 a.m.

360:1                    Martino

2    reflected in the nine change orders on

3    Exhibit 39?

4        A.   I don't know that either.

5        Q.   Do you know if any work was in

6    fact performed?

7        A.   Not while I am sitting here

8    today.

9        Q.   Did you ever discuss Tiger's

10   payment applications with Bob Beacher?

11       A.   I don't recall.

12       Q.   Did you ever discuss Tiger's

13   payment applications with Milton Daly?

14       A.   I don't recall that either.

15       Q.   Did you discuss Tiger's payment

16   applications with anybody from E.W. Howell?

17       A.   I don't recall that either.

18       Q.   You performed architectural

19   services in connection with a movie theater

20   project of Crown Theatres in Hartford,

21   Connecticut?

22       A.   Yes, sir, we did.

23       Q.   What was the project?

24       A.   It was a new free-standing

25   multi-movie theater complex.

Martino, James - February 10, 2004 00:00:00 a.m.

361:1                    Martino

2          Q.   Did it have 17 screens?

3          A.   Yes, sir, it did.

4          Q.   And it was located in Hartford?

5          A.   Yes.

6          Q.   Was Starwood Ceruzzi involved?

7          A.   I recall that Starwood Ceruzzi is

8     the property owner, if I remember

9     correctly.

10         Q.   Did the property owner have its

11    own general contractor on this project?

12         A.   I don't recall that.

13         Q.   Do you recall a Kessler

14    Construction?

15         A.   That name rings a bell.

16         Q.   What was Kessler's role in

17    connection with the Hartford theater

18    project?

19         A.   I think Kessler Construction did

20    the site work for the parking and the site

21    lighting and the landscaping.

22         Q.   Mr. Martino, you were the

23    architect for the Hartford Connecticut

24    project?

25              MR. SEIDEN:  Objection, asked and

Martino, James - February 10, 2004 00:00:00 a.m.

362:1                    Martino

2       answered.

3       A.   Yes, sir.

4       Q.   Is it your understanding that

5    Crown performed some of the work on the

6    Hartford project and the landlord was

7    responsible for some of the work on the

8    Hartford project?

9            MR. WISSER:  Objection to form.

10           MR. SEIDEN:  I object to the form

11      too.

12      A.   Yes, it was my understanding.

13      Q.   What was the division between

14   Crown's work and Starwood Ceruzzi's work?

15      A.   That I don't recall.

16      Q.   Did you see the lease on the

17   Hartford project?

18      A.   I don't recall that either.

19      Q.   During the course of the Hartford

20   project, did you have contact with anybody

21   from the Kessler firm?

22      A.   I don't remember that.

23      Q.   Did you have any contact with

24   anyone from RCD Hudson?

25      A.   Yes.

Martino, James - February 10, 2004 00:00:00 a.m.

363:1                    Martino

2        Q.   Who?

3        A.   Stu Koshner.

4        Q.   Anyone else?

5        A.   Jamie Cella, and there were two

6    supers on the job, and I don't recall their

7    names.

8        Q.   What was RCD Hudson's role with

9    respect to the Hartford, Connecticut

10   projects?

11       A.   They were the general contractor

12   for the theater.

13       Q.   How many times did you speak with

14   Mr. Koshner regarding the Hartford

15   projects?

16       A.   I couldn't recall how many times.

17       Q.   How often did you speak with

18   Mr. Koshner?

19       A.   Could not recall that either.

20       Q.   How many conversations did you

21   have with Mr. Cella regarding the Hartford

22   projects?

23       A.   I don't recall how many.

24       Q.   More than 20?

25       A.   If I had to guess, I would say

Martino, James - February 10, 2004 00:00:00 a.m.

364:1                    Martino

2    yes more than 20.

3         Q.   Did you speak with him everyday?

4         A.   No.  I don't recall speaking to

5    him everyday.

6         Q.   Was anybody other than yourself

7    involved in the Hartford project from your

8    firm?

9         A.   Yes.

10        Q.   Who?

11        A.   Marciano Stanco.

12        Q.   What was Mr. Stanco's role?

13        A.   He was similar to the previous

14   roles in terms of preparing the

15   construction drawings, answering RFI's,

16   doing shop drawings, making site visits.

17        Q.   And your work was similar to the

18   work you performed on the projects you have

19   previously told me about?

20        A.   Yes, sir.

21             MR. SCHANER:  Mark this, please,

22        as Exhibit 40.

23             (Document marked Martino 40 for

24        identification, this date.)

25        Q.   Mr. Martino, that's your

Martino, James - February 10, 2004 00:00:00 a.m.

365:1                    Martino

2    signature on the first page of Exhibit 40?

3        A.   Yes.

4        Q.   And you signed on June 9, 1999?

5        A.   Yes.

6        Q.   Exhibit 40 is a payment

7    application from G.U.S. Development, Inc,

8    for work on the Hartford, Connecticut,

9    project for the period June 4, 1999,

10   correct?

11       A.   Yes.

12       Q.   While it is somewhat cut off on

13   the copy, it appears to state that this is

14   application Number 1.

15           Would you agree?

16           MR. WISSER:  Objection to the

17       form.

18           MR. SEIDEN:  I object to the form.

19           MR. WISSER:  I don't know what he

20       is agreeing to that it is application

21       one or that it is cut off.

22           MR. SCHANER:  I will represent

23       that this is application one.

24           MR. SEIDEN:  The continuation

25       sheet references an application Number

Martino, James - February 10, 2004 00:00:00 a.m.

```
366:1                 Martino

     2      1.

     3              MR. SCHANER:  Right.  The

     4         continuation page, the second page of

     5         the exhibit, refers to application

     6         Number 1.

     7         Q.  Mr. Martino, Exhibit 40 certifies

     8    payment to G.U.S. Development in the amount

     9    of $451,500, correct?

    10         A.  Yes, sir.

    11         Q.  Did you ever see anyone from

    12    G.U.S. Development on the Hartford job

    13    site?

    14         A.  I don't recall that.

    15         Q.  Have you ever met anyone from

    16    G.U.S. Development?

    17         A.  I don't recall meeting anyone

    18    either.

    19         Q.  There is a signature under the

    20    word contractor on the first page.

    21              Do you know who signed on behalf

    22    of G.U.S.?

    23         A.  No, sir, I do not.

    24         Q.  The exhibit refers to an original

    25    contract sum in the amount of $451,500 for
```

Martino, James - February 10, 2004 00:00:00 a.m.

367:1                    Martino

     2    site preparation work.

     3              Are you aware of a contract with

     4    G.U.S. Development for $451,500?

     5         A.   No, sir.

     6         Q.   Are you aware of any contract

     7    with G.U.S. Development in connection with

     8    the Hartford, Connecticut project?

     9         A.   No, sir.

    10         Q.   Who did the site preparation work

    11    on the Hartford project?

    12         A.   I really don't know.

    13         Q.   Take a look at the continuation

    14    page, page 2 of the exhibit.

    15         A.   Uh-huh.

    16         Q.   There are five tasks under the

    17    description of work.  The first one is

    18    excavation to ten inches.

    19              Have I read that correctly?

    20         A.   Minus ten inches.

    21         Q.   Who performed that work?

    22         A.   I don't know.

    23         Q.   Was that work, in fact, performed

    24    at the Hartford site?

    25         A.   Yes.

Martino, James - February 10, 2004 00:00:00 a.m.

368:1                    Martino

2        Q.   How do you know?

3        A.   I was there.

4        Q.   The second item description of

5    work is purchase of gravel.

6             Was gravel, in fact, purchased

7    for the Hartford site?

8        A.   Yes.

9        Q.   Who purchased the gravel?

10       A.   Do not know, sir.

11       Q.   The third item under description

12   of work is placement of gravel.

13            Was gravel placed?

14       A.   Absolutely.

15       Q.   What does it mean to place

16   gravel?

17       A.   Deliver it to the job site and

18   spread it out through the foundations of

19   the building.

20       Q.   What contractor or subcontractor

21   placed the gravel?

22       A.   I don't know that.

23       Q.   The fourth item is site grading.

24            Was there site grading performed

25   at the Hartford site?

Martino, James - February 10, 2004 00:00:00 a.m.

369:1                    Martino

       2          A.    Yes.

       3          Q.    By whom?

       4          A.    I don't recall that either.

       5          Q.    The fifth item under description

       6     of work is permits.

       7                Who obtained permits for the

       8     Hartford projects?

       9          A.    I don't know, sir.

      10          Q.    Were permits, in fact, obtained?

      11          A.    Yes.

      12          Q.    You know that because permits

      13     generally are obtained for construction

      14     projects?

      15          A.    That's correct.

      16          Q.    You signed Exhibit 40 on June 9,

      17     1999.

      18                When was your last visit prior to

      19     June 9, 1999 to the Hartford, Connecticut

      20     job site?

      21          A.    Did you ask me prior to this

      22     date?

      23          Q.    Yes.

      24          A.    Referring to this document it

      25     says 9/23/98.

Martino, James - February 10, 2004 00:00:00 a.m.

370:1                   Martino

2        Q.   That's September 23, 1998?

3        A.   That's what it is saying, yes.

4        Q.   And you are referring to Exhibit

5   3?

6        A.   Yes, I am.

7        Q.   Was the work referenced on

8   Exhibit 40 performed after September 23rd,

9   1998?

10        A.   Was it performed after September

11   23rd, '98?

12             Is that what you asked me?

13        Q.   Yes.

14        A.   Yes, I believe it was.

15        Q.   Did you make a determination that

16   the quality of the work was in accordance

17   with the contract documents?  And I am

18   referring to the work that's referenced in

19   Exhibit 40.

20        A.   Yes, I did.

21        Q.   How did you make that

22   determination?

23        A.   Based upon the submissions

24   because of the fact that there was an issue

25   with the gravel on this project.  There was

Martino, James - February 10, 2004 00:00:00 a.m.

```
371:1                    Martino
    2      a submission of a product that was rejected
    3      by Bob, and Bob had us go through a
    4      tremendous amount of research of what
    5      product had to be used.
    6              We then issued a written document
    7      of what the gravel had to be.  And I know
    8      that Mr. Stanco had visited the job site on
    9      my behalf.
   10              And based upon Bob's
   11      recommendations or approval by this, that's
   12      how I made that determination.
   13          Q.   You had a gravel issue.
   14              What about the determination as
   15      to the excavation, the site grading and the
   16      permits.
   17              How did you determine the quality
   18      of that work was in accordance with the
   19      contract documents?
   20          A.   I don't recall now while we're
   21      sitting here today.
   22          Q.   Did you make the determination
   23      that G.U.S. Development was entitled to
   24      payment of the amount certified?
   25          A.   Yes.
```

Martino, James - February 10, 2004 00:00:00 a.m.

```
372:1              Martino
    2      Q.  How did you make that
    3  determination?
    4      A.  Based on what I previously said
    5  for those same reasons because of the site
    6  visits from Marciano and from the approvals
    7  from Mr. Beacher.
    8      Q.  And by approvals of Mr. Beacher,
    9  you are talking about the signatures of
   10  Mr. Beacher and the stamps of Mr. Beacher
   11  on Exhibit 40?
   12          MR. SEIDEN:  Objection to form.
   13      A.  I don't see any stamps on here
   14  first of all.
   15      Q.  What are you referring to by
   16  approvals?
   17      A.  Mr. Beacher's signature.
   18      Q.  Did you discuss the payment
   19  application submitted by G.U.S. on the
   20  Hartford project with Milton Daly?
   21      A.  No, sir.
   22      Q.  Did you ever discuss payment
   23  applications submitted by G.U.S. with
   24  anyone?
   25      A.  I don't recall it.
```

Martino, James - February 10, 2004 00:00:00 a.m.

373:1                    Martino

   2        Q.   Did you have discussions with

   3   Jamie Cella about payment applications

   4   submitted in connection with the Hartford

   5   project?

   6        A.   I don't recall that either.

   7        Q.   Did you have discussions with

   8   Jamie Cella regarding payment applications

   9   submitted on the Trumbull, Connecticut

  10   project?

  11        A.   I don't remember that, sir.

  12             MR. SCHANER:  Please mark this as

  13        Exhibit 41.

  14             (Document marked Martino 41 for

  15        identification, this date.)

  16        Q.   Mr. Martino, Crown Theatres had a

  17   theater construction project in Trumbull,

  18   Connecticut?

  19        A.   Yes, sir.

  20        Q.   You were the architect?

  21        A.   Yes, sir, I was.

  22        Q.   What was the theater project in

  23   Trumbull, Connecticut?

  24        A.   It was an addition and alteration

  25   to the existing theater complex.

Martino, James - February 10, 2004 00:00:00 a.m.

374:1              Martino

2        Q.   What was the addition?

3        A.   A lobby and if I recall correctly

4    it was three auditoriums, three or four

5    auditoriums.

6        Q.   Was Trumbull the first theater

7    project you worked on for Crown?

8        A.   That was constructed, yes.

9        Q.   What was R.D. Scinto's role; and

10   if you told me this before, I apologize.

11       A.   He was the owner and developer of

12   the property.

13       Q.   Did Crown Theatres have a general

14   contractor?

15       A.   Yes.

16       Q.   Who was Crown Theatres' general

17   contractor for the Trumbull, Connecticut,

18   project?

19       A.   I believe it was the same one as

20   Hartford, R C. Hudson.

21       Q.   Did you have contact with anyone

22   from R.D. Hudson regarding the Trumbull

23   theater project?

24       A.   Yes.

25       Q.   Who?

Martino, James - February 10, 2004 00:00:00 a.m.

375:1              Martino

2       A.  The same individuals as Hartford.

3    It was Stu Koshner, Jamie Cella, and he had

4    a different super on that project, and I

5    don't recall his name.

6       Q.  Was anyone other than yourself

7    from your firm involved with the Trumbull

8    project?

9       A.  Yes, sir.

10      Q.  Who?

11      A.  Marciano.

12      Q.  Marciano Stanco?

13      A.  That's correct.

14      Q.  And were the roles of Mr. Stanco

15    and yourself similar to the roles you

16    performed on the other theater projects?

17      A.  Yes, sir.

18      Q.  Now, you have before you a copy

19    of Martino Exhibit 41.

20        Do you recognize your signature

21    in the lower right-hand corner of the first

22    page?

23      A.  Yes, I do.

24      Q.  You signed on July 26, 1999?

25      A.  Yes, sir, I did.

Martino, James - February 10, 2004 00:00:00 a.m.

376:1              Martino

2        Q.   This exhibit, Exhibit 41, is

3    application Number 1 from G.U.S.

4    Development for payment on the Trumbull

5    Connecticut, project for the period to July

6    31, 1999, correct?

7        A.   Yes.

8        Q.   Exhibit 41 certifies payment to

9    G.U.S. Development in the amount of

10   $125,000?

11       A.   Yes.

12       Q.   You never saw anyone from G.U.S.

13   Development on the Trumbull job?

14       A.   I don't recall that, no.

15       Q.   The original contract sum is

16   listed on Exhibit 41 as $125,000 and the

17   exhibit states that it is a contract for

18   site preparation.

19            Did you ever see a contract with

20   G.U.S. Development for site preparation on

21   the Trumbull project?

22       A.   No, sir.

23       Q.   Are you aware of any contract

24   involving G.U.S. Development on the

25   Trumbull, Connecticut, theater project?

Martino, James - February 10, 2004 00:00:00 a.m.

377:1              Martino

    2        A.   No, I'm not aware of any.

    3        Q.   Please turn to the continuation

    4    page, the second page of Exhibit 41.  There

    5    are five items listed under description of

    6    work.

    7             Were each of the five items in

    8    fact performed on the Trumbull project?

    9        A.   I believe they were.

   10        Q.   Who performed the site

   11    preparation work, the first item?

   12        A.   I'm not too sure.

   13        Q.   Who performed the purchase of

   14    gravel, the second item?

   15        A.   I don't know.

   16        Q.   The third item placement of

   17    gravel, who performed that?

   18        A.   I don't know.

   19        Q.   Site grading, who did the site

   20    grading on the Trumbull project?

   21        A.   I'm not too sure about that

   22    either.

   23        Q.   Who got the permits, the fifth

   24    item, on the continuation sheet?

   25        A.   I do not know.

Martino, James - February 10, 2004 00:00:00 a.m.

378:1                    Martino

2          Q.   Now, you signed on July 26, 1999

3      Exhibit 41, correct?

4          A.   Yes, sir.

5          Q.   You did not make a site visit to

6      determine whether the work that is

7      reflected on Exhibit 41 was performed,

8      right?

9          A.   Again, referring to this

10     document, the last time I was there prior

11     to that date was 9/1/98.

12         Q.   September 1st, 1998?

13         A.   That's correct.

14              MR. SEIDEN:  The witness was

15         referring to Exhibit 3.

16         Q.   That was over ten months prior to

17     the date you signed Exhibit 41?

18         A.   That's correct.

19         Q.   Did you ever discuss the payment

20     applications submitted by G.U.S.

21     Development on the Trumbull project with

22     anybody?

23         A.   Not that I recall.

24         Q.   Mr. Martino, were you aware that

25     B.B. Construction submitted invoices to

Martino, James - February 10, 2004 00:00:00 a.m.

379:1                 Martino

2    Crown Theatres directly?

3         A.   Did you say B.B.?

4         Q.   Were you aware that B.B.

5    Construction submitted invoices for work to

6    Crown Theatres?

7         A.   Yes, I was aware of that.

8         Q.   Did you see copies of B.B.'s

9    invoices?

10        A.   No.

11        Q.   How did you become aware that

12   B.B. was submitting invoices to Crown?

13        A.   Bob made me aware of it.

14        Q.   Did Bob tell you what he was

15   invoicing Crown for?

16        A.   I was going to make an

17   assumption, but I have to say no, I don't

18   recall what he said.

19        Q.   When did Bob Beacher make you

20   aware that he was invoicing Crown?

21        A.   Mr. Schaner, I don't recall that

22   either.

23        Q.   Did you have a conversation with

24   Mr. Beacher regarding the invoices he

25   submitted to Crown on behalf of B.B.

Martino, James - February 10, 2004 00:00:00 a.m.

```
380:1              Martino

    2    Construction?

    3         A.   No.  I don't recall that.

    4         Q.   Did Mr. Beacher discuss with you

    5    the payments he received from Crown on

    6    invoices that he submitted to them?

    7         A.   I don't recall that either.

    8         Q.   Did you ask Mr. Beacher for the

    9    opportunity to review the invoices that he

   10    was submitting to Crown?

   11         A.   I don't recall ever doing that.

   12         Q.   In your experience, is it a usual

   13    and customary practice for the architect to

   14    review all invoices relating to the

   15    construction process?

   16              MR. SEIDEN:  Objection to the

   17         form.

   18              MR. WISSER:  Objection to the

   19         form.

   20         A.   No.

   21              MR. SCHANER:  Please mark this as

   22         Exhibits 42 and 43.

   23              (Documents marked Martino 42 and

   24         43 for identification, this date.)

   25         Q.   Mr. Martino, do you recognize
```

Martino, James - February 10, 2004 00:00:00 a.m.

381:1                    Martino

2    Exhibits 42 and 43?

3         A.   Yes.  These appear to be

4    photocopies of my calendars.

5         Q.   And Exhibit 42 is for what time

6    period?

7         A.   The year 2000.

8         Q.   And Exhibit 43?

9         A.   The year 2001.

10        Q.   What did you use Exhibits 42 and

11   43 for?

12        A.   Basically for my staff to keep a

13   calendar of the traveling and what meetings

14   to be attended.

15        Q.   Who maintained the calendars?

16        A.   My secretary at the time.

17        Q.   What was her name?

18        A.   Danielle.

19        Q.   What was her last name?

20        A.   Koudropoulos.

21        Q.   Who had access to your calendars

22   which are Exhibits 42 and 43?

23        A.   It was on her desk.  So it was

24   not like on my desk personally.  She kept

25   it on her desk.

Martino, James - February 10, 2004 00:00:00 a.m.

382:1                    Martino

2          Q.   If you look at Exhibit 42 which

3     was the calendar for the year 2000.  Turn

4     to January 2000 page.

5          A.   Uh-huh.

6          Q.   Can you tell me whose handwriting

7     appears on this page?

8          A.   No, I really can't.

9          Q.   Is any of it yours?

10         A.   No, it does not appear to be

11    mine.

12         Q.   Take a look at February 2000, the

13    next page.

14              Is any of the handwriting on this

15    page your handwriting?

16         A.   The date on February 29 may be

17    mine in the middle, the darker handwriting

18    may be mine.

19         Q.   Do you recognize the handwriting

20    for any of the other entries on the

21    February 2000 calendar?

22         A.   Probably Danielle's and I can't

23    recognize if it is anybody else's though.

24         Q.   Take a look at Exhibit 43 and

25    turn to March 2001.

Martino, James - February 10, 2004 00:00:00 a.m.

383:1                    Martino

   2              Can you tell me whose handwriting

   3    appears on that page?

   4         A.   No, I'm not sure.

   5         Q.   Is any of it yours?

   6         A.   No, it doesn't appear to be mine.

   7         Q.   Has it been your practice to keep

   8    calendars as part of your business?

   9              MR. SEIDEN:  Objection to form.

  10         A.   Yes, it has been my practice.

  11         Q.   And you have -- have you had

  12    calendars similar to Exhibits 42 and 43 for

  13    years other than 2000 and 2001?

  14         A.   We have.

  15         Q.   Do you have copies or the

  16    originals of calendars for the years other

  17    than 2000, 2001?

  18         A.   2002, 2000.

  19         Q.   Do you have anything for 1999?

  20         A.   Couldn't find them.

  21         Q.   Did you look?

  22         A.   Yes, I was asked to look.

  23         Q.   Did you look for 1998?

  24         A.   Yes.

  25         Q.   1997?

Martino, James - February 10, 2004 00:00:00 a.m.

384:1              Martino

2        A.   Yes.

3        Q.   1996?

4        A.   Yes.

5        Q.   Did you find anything?

6        A.   No.

7        Q.   Do you personally keep an

8    appointment book?

9        A.   No.

10        Q.   Do you have an electronic

11    calendar?

12        A.   No, sir.

13        Q.   Does your firm have other

14    calendars or appointment books?

15        A.   No, sir.

16            MR. WISSER:  Objection to the

17        form.

18        Q.   Do you know what happened to the

19    1999 calendar that your firm used to have?

20        A.   No.

21        Q.   Do you have a document retention

22    policy at your firm?

23        A.   I'm not following what you are

24    asking me.

25        Q.   Do you have a written policy that

Martino, James - February 10, 2004 00:00:00 a.m.

385:1               Martino

2    discusses how long your firm will keep

3    types of documents?

4        A.   No, sir, I do not.

5        Q.   Do you have an informal policy

6    that you will keep documents for only a

7    certain length of time?

8        A.   No.

9        Q.   Do you know what happened to the

10    calendars for 1996, 1997 and 1998?

11        A.   No, sir.

12        MR. SCHANER:  Let's mark this as

13        Exhibit 44.

14        (Document marked Martino 44 for

15        identification, this date.)

16        Q.   Mr. Martino, do you recognize

17    Exhibit 44?

18        A.   No, I don't.

19        Q.   Have you seen a copy -- let me

20    rephrase that.

21        Did you receive a copy of Crown

22    Theatres' lease for the Jupiter theater

23    project?

24        MR. SEIDEN:  Objection to the

25        form.  At what time?

Martino, James - February 10, 2004 00:00:00 a.m.

386:1                    Martino

2            MR. SCHANER:  Any time.

3       Q.  Have you ever received a copy of

4    Crown Theatres' lease for the Jupiter

5    project?

6       A.  I may have, but I don't recall

7    what is sitting here today.

8       Q.  Did you review a copy of Crown

9    Theatres' lease for the Jupiter theater

10   projects in connection with the preparation

11   of bid documents?

12      A.  I don't recall doing that.

13      Q.  Did you prepare bid documents for

14   the Jupiter project?

15      A.  Yes, sir, I did.

16           MR. SCHANER:  Mark this, please,

17       as Exhibit 45.

18           (Document marked Martino 45 for

19       identification, this date.)

20      Q.  Mr. Martino, Exhibit 45 has a

21   Bates labeled JTM 8071 through JTM 8073.

22   It is a memo from Bob Beacher to

23   DeGuardiola Development, dated October 11,

24   1999.

25           Did you receive a copy of this

Martino, James - February 10, 2004 00:00:00 a.m.

387:1                    Martino

    2    document?

    3         A.   I can only assume I did.

    4              MR. SEIDEN:  Don't make

    5    assumptions.

    6         Q.   It shows you as a cc recipient

    7    along with Milt Daly and Curtis Cupp,

    8    correct?

    9         A.   Yes.

   10         Q.   You did, in fact, did receive a

   11    copy of this exhibit?

   12         A.   I don't recall it.

   13         Q.   The documents with the JTM Bates

   14    numbers are documents we found in your

   15    files?

   16         A.   I don't disagree with that.

   17         Q.   Who is Curtis Cupp?

   18         A.   Curtis Cupp was an employee of

   19    the DeGuardiola Development Company.

   20         Q.   Exhibit 45 is to the attention of

   21    Scott Hedge.

   22              Was Mr. Hedge with DeGuardiola

   23    Development?

   24         A.   Yes, he was.

   25         Q.   What was his position?

Martino, James - February 10, 2004 00:00:00 a.m.

388:1                    Martino

2          A.   I don't recall his title.

3          Q.   For whom was DeGuardiola

4     Development doing work on the Jupiter

5     project?

6              MR. SEIDEN:  Objection to the

7          form.

8          Q.   What role did DeGuardiola play in

9     the Jupiter project?

10         A.   DeGuardiola was the owner of the

11    project and the developer.  It was supposed

12    to be the builders on the project also.

13         Q.   In the first line of the letter

14    it states, "Attached you will find the bid

15    tabulation sheet along with the

16    subcontractors that bid the various trades

17    to the general contractor."

18              Does the bid tabulation sheet

19    show the bids that were submitted by three

20    general contractors for work on the Jupiter

21    project?

22         A.   I can't make that determination.

23         Q.   If you look at the third page, it

24    shows that Coastal, Padula and Keene

25    submitted this.

Martino, James - February 10, 2004 00:00:00 a.m.

389:1                    Martino

    2        A.   On the third page, yes.

    3        Q.   And the third page sets out the

    4   amounts bid by the subcontractors for each

    5   general contractor.

    6             MR. SEIDEN:  I am sorry.  Can I

    7        hear the question back?

    8             (A portion of the record was read.)

    9             MR. SEIDEN:  Objection.

   10        A.   I don't know that.

   11        Q.   What does the third page show

   12   that's page JTM 8073?

   13        A.   It just gives you a line item

   14   carried by each of those three contractors

   15   for the description on the left column.

   16        Q.   Next to the description for

   17   excavation and fill under the names of the

   18   general contractors are the initials NIC.

   19             Do you see that?

   20        A.   Yes, I do.

   21        Q.   What does NIC stand for?

   22        A.   I believe it stands for not in

   23   contract.

   24        Q.   What is the reason that next to

   25   excavation and fill the entry is not in

Martino, James - February 10, 2004 00:00:00 a.m.

390:1                    Martino

2    contract?  Let me rephrase that.

3               You understood that excavation

4    and fill were not part of the contract,

5    correct?

6               MR. SEIDEN:  Objection.

7               MR. WISSER:  Objection to form.

8         What contract?

9               MR. SEIDEN:  What contract, is

10        right.

11        A.   No, sir, no.

12        Q.   Now, you understood that Coastal

13    Construction was awarded the work, right?

14        A.   Yes, I am aware that Coastal

15    Construction was awarded the project.

16        Q.   They were the general contractor

17    on the project?

18               MR. WISSER:  Objection to the

19        form.

20        A.   For Crown Theatres.

21        Q.   And excavation and fill was not

22    in Coastal's contract, right?

23               MR. SEIDEN:  Objection to form.

24        A.   I don't know that.

25        Q.   From Exhibit 45, can't you tell

Martino, James - February 10, 2004 00:00:00 a.m.

391:1                    Martino

2    that excavation and fill was not in

3    Coastal's contract?

4         A.   No, I cannot.

5             MR. WISSER:  Objection to the

6         form.

7         A.   Because this is a bid tabulation

8    form of the people that bid the project.

9             What was negotiated afterwards

10   between Crown and Coastal, I am not aware

11   of.

12        Q.   Whose responsibility on the

13   Jupiter project was excavation and fill?

14        A.   Ask that question again.  I am

15   sorry.

16        Q.   Was it Crown's responsibility to

17   provide for excavation and fill on the

18   Jupiter project?

19        A.   I am not aware of it.  I am

20   unaware of whose responsibility it was.

21        Q.   You understand from Exhibit 45

22   that Coastal did not submit a price for

23   excavation and fill on the Jupiter project,

24   right?

25        A.   I understand that by looking at

Martino, James - February 10, 2004 00:00:00 a.m.

392:1            Martino

2    this document, based on this date, Coastal

3    did not carry a dollar amount for that.

4        Q.   Thank you.

5            MR. SCHANER:  Let's mark this as

6        Exhibit 46.

7            (Document marked Martino 45 for

8        identification, this date.)

9        Q.   Exhibit 46 has the Bates numbers

10   JTM 3366 through JTM 5377.  It is a

11   memorandum from Gordon Lunt to J. Martino

12   regarding Bob Beacher's request.

13           Did you receive a copy of Exhibit

14   46?

15       A.   Yes, I did.

16       Q.   Did you review it at the time?

17       A.   I don't recall.

18       Q.   In the first sentence it reads,

19   "Bob, ask that I forward the attached break

20   out of numbers and addenda items for your

21   use in preparing revisions to the contract

22   documents as soon as possible."

23           What is your understanding of the

24   contract documents to which Mr. Lunt was

25   referring?

Martino, James - February 10, 2004 00:00:00 a.m.

```
393:1              Martino
      2         MR. SEIDEN:  Objection.  Objection
      3      to form.
      4         A.  My drawings.
      5         Q.  And what do the attached break
      6   out of numbers and addenda items show?
      7         A.  It shows dollar amounts for each
      8   of the line items and then it shows a post
      9   tender addendum document that was prepared
     10   by me, submitted to the bidders.  And
     11   Coastal has attached this with their dollar
     12   amounts for each of those items.
     13         Q.  Did you prepare drawings for
     14   excavation and fill in connection with the
     15   Jupiter project?
     16         A.  Specifically I cannot say yes we
     17   did.
     18         Q.  What's your best recollection?
     19         A.  I don't recall.
     20         Q.  Now, as of November 12, 1999,
     21   excavation and fill was not in Coastal
     22   Construction's contract.
     23             Would you agree?
     24         MR. SEIDEN:  Objection to form.
     25         Q.  If you want to look at page 2,
```

Martino, James - February 10, 2004 00:00:00 a.m.

394:1                    Martino

    2    table 1, go ahead.

    3        A.   Simply basing it on this

    4    document, Coastal Construction did not

    5    carry excavation and fill.

    6        Q.   In the second paragraph of the

    7    document it states, "So you know we will be

    8    meeting on November 15, 1999 at 3:00 P.M.

    9    with Coastal Construction, the successful

    10   bidder negotiator."

    11           Mr. Martino, did you attend the

    12   meeting on November 15, 1999?

    13       A.   I don't recall.

    14       Q.   Did you attend any meetings with

    15   Coastal Construction before Coastal entered

    16   into its contract with Crown?

    17       A.   I don't recall that either.

    18       Q.   Do you recall any discussions

    19   with anyone at Coastal regarding its

    20   contract with Crown?

    21       A.   No, I do not.

    22       Q.   In the third paragraph it states,

    23   "Please forward the plan list by Monday

    24   November 15, 1999 if possible.  If not,

    25   please call."

Martino, James - February 10, 2004 00:00:00 a.m.

395:1                    Martino

2              What is a plan list?

3         A.   I don't recall what he meant by

4    that.

5         Q.   Did you call Mr. Lunt to discuss

6    it?

7         A.   Mr. Schaner, I don't recall.

8         Q.   What was Mr. Lunt's position at

9    DeGuardiola Development?

10        A.   I don't recall that either, sir.

11        Q.   Do you remember any discussions

12   with Mr. Lunt?

13        A.   No, I do not.

14             MR. SCHANER:  Mark this, please as

15        Martino Exhibit 47.

16             (Document marked Martino 47 for

17        identification, this date.)

18        Q.   Exhibit 47 is Bates numbered JTM

19   35 through JTM 111.  There is a one-page

20   memo from Glenn T. Garfinkel to David

21   Clifford regarding Annapolis Mall lease.

22   It attaches the draft of a lease between

23   Annapolis Mall Limited Partnership and

24   Crown Theatres, LP.

25             Mr. Martino, you are shown as one

Martino, James - February 10, 2004 00:00:00 a.m.

396:1                    Martino

2    of the carbon copy recipients of Exhibit

3    47.  Did you receive, in fact, a copy of

4    Exhibit 47?

5          A.   Yes, I did.

6          Q.   There is a received stamp on the

7    first page of the document indicating

8    receipt by your office, correct?

9          A.   That is correct.

10         Q.   You, in fact, received an initial

11    draft of the Annapolis Mall lease, correct?

12         A.   Yes.

13         Q.   And that's the document which is

14    attached to the first page of Exhibit 47?

15         A.   I assume so.

16         Q.   There is -- there are notes in

17    the margins.  Let's go to JTM 40 which is

18    page 2 of the draft.

19              Do you see that handwriting in

20    the margin?

21         A.   On page JTM -- yes.

22         Q.   Is that your handwriting?

23         A.   Yes, it appears to be my

24    handwriting.

25              MR. WISSER:  A couple of questions

Martino, James - February 10, 2004 00:00:00 a.m.

397:1                    Martino

2        ago you referred to this lease as a

3        draft lease.

4                Did I get that correct?

5                MR. SCHANER:  It is an initial

6        draft of the Annapolis Mall lease.

7        Q.   At page JTM 42 there is

8    additional handwriting.  It says verify, it

9    looks like, square foot.

10               Is that your handwriting?

11       A.   Yes.

12       Q.   Turn to JTM 44.  There is

13   additional handwriting in the right-hand

14   margin.

15               Do you recognize that as your

16   handwriting?

17       A.   Yes.

18       Q.   I would like you to page through

19   the document -- actually go to JTM 54.

20               The handwriting on this page is

21   yours, correct?

22       A.   Yes.

23       Q.   The handwriting on page JTM 55 is

24   yours?

25               MR. SEIDEN:  Objection to form.

Martino, James - February 10, 2004 00:00:00 a.m.

398:1                    Martino

    2        A.    That appears to be mine, yes.

    3        Q.    Turn to JTM 50.

    4        A.    Yes.

    5        Q.    The handwritten notes on this

    6    page, is that your handwriting?

    7        A.    That doesn't appear to be my

    8    handwriting, no.

    9        Q.    What about on page JTM 51.

   10            Is that your handwriting?

   11        A.    No.  That does not appear to be

   12    my handwriting either.

   13        Q.    Do you recognize whose

   14    handwriting appears on pages JTM 50 and 51?

   15        A.    No, sir.

   16        Q.    For what purpose did you make

   17    notes on the initial draft of the Annapolis

   18    Mall lease?

   19        A.    I think that what took place was

   20    that I got a phone call from Glenn

   21    Garfinkel asking me to look into these

   22    particular paragraphs.

   23        Q.    Did you have a discussion with

   24    anybody regarding the draft of the lease

   25    regarding Exhibit 47?

Martino, James - February 10, 2004 00:00:00 a.m.

399:1                    Martino

2        A.   Only on issues that they wanted

3    me to follow up on.

4        Q.   Were there any issues for you to

5    follow up on?

6        A.   Reviewing this now, I see it said

7    verify square footage.  Without going

8    through each page, I mean.

9        Q.   Were you asked to review drafts

10   of the leases other theater projects for

11   Crown?

12       A.   I don't recall.  I mean when you

13   show it to me like this, obviously, yes,

14   there were occasions when I was asked to

15   check some things.

16           MR. SCHANER:  Mark this, please,

17       as Martino Exhibit 48.

18           (Document marked Martino 48 for

19       identification, this date.)

20           MR. SCHANER:  Back on the record.

21       Q.   Mr. Martino, do you have a copy

22   before you of Exhibit 48?

23       A.   Yes, I do.

24       Q.   Exhibit 48 has the Bates numbers

25   JTM 159 through JTM 214.

Martino, James - February 10, 2004 00:00:00 a.m.

```
400:1                    Martino

    2              Have you seen a copy of Exhibit

    3    48 before?

    4         A.   I don't recall.

    5         Q.   It is a lease between Annapolis

    6    Mall Limited Partnership and Crown Theatres

    7    LP?

    8              MR. SEIDEN:  Objection.  That

    9         mischaracterizes the exhibit.

   10              MR. SCHANER:  I think it appears

   11         to be a draft.

   12              MR. SEIDEN:  Unless you are

   13         representing it as a lease.

   14              MR. SCHANER:  I will represent it

   15         as a draft of the lease between

   16         Annapolis Mall Limited Partnership and

   17         Crown Theatres.

   18         Q.   Mr. Martino, please turn to JTM

   19    170, which is page 9 of the document.

   20              On the right-hand margin there is

   21    some handwriting.

   22              Do you recognize that as your

   23    handwriting?

   24         A.   Yes.

   25         Q.   Can you read what those words
```

Martino, James - February 10, 2004 00:00:00 a.m.

```
401:1                  Martino

    2    say?

    3         A.    Needs more definition.

    4         Q.    That's to the right of a

    5    paragraph under section 3.3, "Cost of

    6    Landlord's Work," correct?

    7         A.    Yes.

    8         Q.    And turn to page JTM 208.

    9              MR. SEIDEN:  What page?

   10              MR. WISSER:  208.

   11              MR. SCHANER:  208.

   12         Q.    The heading of this page is

   13    Exhibit E, "Landlord's Work," and there is

   14    an asterisk in the right-hand margin three

   15    quarters of the way down the page.

   16              Do you recognize that as an

   17    asterisk you placed on the page?

   18         A.    I don't recall.

   19         Q.    Turn to the next page JTM 209.

   20              Can you read to me what it states

   21    at the bottom of that page in handwriting?

   22         A.    "Landlord's work not specific

   23    enough to defend Crown Theatres."

   24         Q.    And that's in your handwriting?

   25         A.    That's in my handwriting.
```

Martino, James - February 10, 2004 00:00:00 a.m.

402:1                    Martino

2        Q.   What did you mean by the comment,

3    "Landlord's work not specific enough to

4    defend crown theatres"?

5        A.   I wish I could remember.  I don't

6    recall.

7             MR. SCHANER:  Let's mark this as

8        Exhibit 49.

9             (Document marked Martino 49 for

10        identification, this date.)

11       Q.   Exhibit 49 has the Bates numbers

12    JTM 266 through JTM 268.  The first page is

13    a fax transmittal form from Sheldon A.

14    Halpern to Glenn T. Garfinkel, Rory Packer,

15    and Dimitri Vazelakis, V-a-z-e-l-a-k-i-s

16    and it is dated November 13, 1997.

17             In the upper right-hand corner it

18    appears to state J. Martino.

19             Is that your handwriting in the

20    upper right-hand corner?

21       A.   No, it is not.

22       Q.   Did you receive a copy of Exhibit

23    49?

24       A.   Yes.

25       Q.   Turn to the second page of the

Martino, James - February 10, 2004 00:00:00 a.m.

403:1                  Martino

2    exhibit.

3              Is that your handwriting on this

4    page under the heading Exhibit E

5    "Landlord's Work"?

6         A.   No, sir.

7         Q.   Do you recognize whose

8    handwriting it is?

9         A.   No, I do not.

10        Q.   Did you review the landlord's

11   work that appears in Exhibit 49?

12        A.   I don't recall reviewing it.

13        Q.   Why was Exhibit E the landlord's

14   work session of the lease sent to you?  Why

15   was this sent to you?

16             MR. SEIDEN:  Objection to form.

17        Q.   Do you have any understanding as

18   to why you were sent this exhibit?

19             MR. SEIDEN:  Objection to form.

20        A.   No, not in the form that it is

21   in.

22             MR. SCHANER:  Please mark this as

23        Exhibit 50.

24             (Document marked Martino 50 for

25        identification, this date.)

Martino, James - February 10, 2004 00:00:00 a.m.

404:1                    Martino

2        Q.   Exhibit 50 has the Bates numbers

3    JTM 122 through JTM 142.

4             The first page is a fax cover

5    sheet from Rory Packer to Bob Beacher.  The

6    date of the document is May 28, 1998.

7             Mr. Martino, you received a copy

8    of Exhibit 50, correct?

9        A.   Yes, I did.

10       Q.   Do you recognize your fax number

11   at the very top of the exhibit?

12       A.   No, I don't.

13       Q.   It says received 5/29/98.  Next

14   to that it says, there is a number and

15   James Martino.

16       A.   I do not recognize that number.

17       Q.   What about the fax number or the

18   number to the right of that 1-203-846-9828.

19             Is that your fax number?

20       A.   No, sir.  I don't recognize that

21   fax number.

22             MR. WISSER:  That's the same

23         number that's represented underneath

24         Crown Theatres in Norwalk.

25       Q.   Mr. Martino, turn to the second

Martino, James - February 10, 2004 00:00:00 a.m.

```
405:1              Martino
     2    page Bates number JTM 123.
     3           At the top of the page, it says
     4    attachment 1 to Exhibit E "Landlord's Work
     5    Crown Theatres at Annapolis Mall,
     6    Annapolis, Maryland."
     7           Mr. Martino, do you have an
     8    understanding as to why you were sent
     9    Exhibit 50?
    10    A.   No, I don't.
    11    Q.   It was important that you
    12    understand the scope of the landlord's work
    13    on the Annapolis project, correct?
    14           MR. SEIDEN:  Objection to form.
    15           MR. WISSER:  Objection to form.
    16    A.   This document may not be the
    17    final document.
    18    Q.   I am asking you whether you would
    19    agree that it was important that you
    20    understand the scope of the landlord's work
    21    on the Annapolis project?
    22           MR. SEIDEN:  Objection to the
    23        form.
    24           MR. WISSER:  Objection to the
    25        form.
```

Martino, James - February 10, 2004 00:00:00 a.m.

406:1                    Martino

2        A.   No.

3        Q.   You don't believe?

4        A.   No, I do not.

5        Q.   Do you believe you could perform

6    your job without knowing the scope of the

7    landlord's work?

8        A.   Yes.

9        Q.   Do you believe you could sign

10   architect's certificates without knowing

11   the scope of the landlord's work on the

12   Annapolis job?

13           MR. SEIDEN:  Objection to the

14       form.

15       A.   Yes.

16           MR. SCHANER:  Please mark this as

17       Exhibit 51.

18           (Document marked Martino 51 for

19       identification, this date.)

20       Q.   Exhibit 51 has the Bates label

21   JTM 1870 through JTM 1891.

22           The first page is a memo from Bob

23   Beacher to Milt Daly dated May 5, 2000, cc

24   recipients are shown as Jim Martino and Tim

25   Harmon.

Martino, James - February 10, 2004 00:00:00 a.m.

407:1                    Martino

2            Mr. Martino you received a copy

3      of Martino Exhibit 51, correct?

4            A.   Yes, I did.

5            Q.   The first sentence of the memo

6      reads, "Attached please find Heffner &

7      Weber's application Number 2 dated April 5,

8      2000 for payment in the amount of

9      390,903.30.  Jim Martino and myself have

10     reviewed and approved application Number 2

11     for payment."

12           Mr. Martino, did you review

13     Heffner & Weber's application Number 2 for

14     payment?

15           A.   Yes, I did.

16           Q.   And you approved it?

17           A.   Yes, I did.

18           Q.   Turn to the page that is Bates

19     numbered JTM 1881.

20                This page shows a payment

21     requistion from Alason Electrical

22     Contractors, Inc., for the period to March

23     31, 2000 for work on the Annapolis theater

24     project, correct?

25           A.    Yes.

Martino, James - February 10, 2004 00:00:00 a.m.

408:1                Martino

2        Q.   And that's your signature in the

3    lower right-hand corner of the page?

4        A.   Yes.

5        Q.   And you signed on April 5, 2000,

6    correct?

7        A.   Yes.

8        Q.   And you certified payment in the

9    amount of $39,600?

10        A.   Yes.

11        Q.   Turn to page JTM 1883.  This is

12    the continuation sheet to Alason Electrical

13    Contractors' payment requistion.

14            If you look at the middle of the

15    page, items 89, 89-1, 90 and 90-1, can you

16    tell me what the description of work is.

17        A.   F and ISW gear material, F and

18    ISW gear labor, SWGR power wiring material.

19            Is that all that you asked me

20    for?

21        Q.   And the next one?

22        A.   SWGR power wiring labor.

23        Q.   With respect to the F and ISW

24    gear material, what does F and ISW stand

25    for?

Martino, James - February 10, 2004 00:00:00 a.m.

409:1              Martino

2        A.   I'm not sure what the F and I

3    stands for.  SW would be in my opinion

4    switch gear.

5        Q.   Would F and I be furnish and

6    install?

7        A.   It could be.

8        Q.   Is it fair to say that you knew

9    that Alason Electrical Contractors

10    furnished and installed the switch gear on

11    the Annapolis project?

12        A.   No.

13        Q.   Who installed the switch gear on

14    the Annapolis project?

15        A.   I'm not sure.

16        Q.   Does this entry that we just

17    looked at indicate to you that it was

18    Alason Electrical Contractors?

19        A.   Not necessarily.

20        Q.   If Alason Electrical Contractors

21    did not furnish and install the switch gear

22    on the Annapolis project, what work do

23    items 89 and 89-1 refer to?

24           MR. SEIDEN:  Objection to form.

25        A.   It is impossible for me to answer

Martino, James - February 10, 2004 00:00:00 a.m.

410:1                    Martino

2    that now after all these years.

3         Q.    And items 90 and 91, SW gear PWR

4    wiring, does that look like switch gear

5    power wiring?

6         A.    Could be.

7         Q.    Does that indicate to you, again,

8    that Alason Electrical Contractors

9    installed the switch gear on the Annapolis

10   Mall project?

11        A.    No.

12        Q.    Did you know at the time you

13   signed off on Alason Electrical

14   Contractors' pay requisition Number 2 what

15   the items we have just been looking at

16   refer to?

17        A.    I don't follow that question.

18        Q.    Did you know at the time what

19   items 89, 89-1, 90 and 90-1 referred to?

20        A.    I don't recall.

21        Q.    What was the work that Alason

22   Electrical did that is represented by items

23   89, 89-1, 90 and 90-1?

24            MR. SEIDEN:  Objection to form.

25        A.    Mr. Schaner, it is not that easy

Martino, James - February 10, 2004 00:00:00 a.m.

411:1                    Martino

    2    to try to remember those kinds of things

    3    after all these years that you are asking

    4    me to do.

    5        Q.  Turn to JTM 1885.

    6            This is a payment requistion from

    7    Sagamore Mechanical Construction, Inc.

    8    application Number 4 for the period to

    9    March 31, 2000 for work for Crown Theatres.

   10            That's your signature in the

   11    lower right-hand corner?

   12        A.  On this photocopy, yes.

   13        Q.  You signed on April 5, 2000,

   14    correct?

   15        A.  That's correct.

   16        Q.  What work on the Annapolis

   17    project did Sagamore Mechanical

   18    Construction, Inc., perform?

   19        A.  Ask that question again.

   20        Q.  What work on the Annapolis

   21    project did Sagamore Mechanical perform?

   22            MR. SEIDEN:  Objection to form.

   23        A.  It is very vague.

   24        Q.  What is, the question?

   25        A.  Yes.

Martino, James - February 10, 2004 00:00:00 a.m.

412:1              Martino

2        Q.  What was the scope of work for

3    Sagamore Mechanical?

4        A.  I don't know that.

5        Q.  Turn to page JTM 1886, the first

6    continuation page.

7              Item number 13 reads, "Controls,

8    material," and item 14 reads, "Controls

9    labor."

10             As of April 5, 2000, you knew

11   that Sagamore Mechanical did the controls

12   work on the Annapolis project, correct?

13             MR. SEIDEN:  Objection to form.

14       A.  I don't know which controls we

15   are talking about.

16       Q.  What controls are referred to in

17   items number 13 and 14?

18       A.  I can't answer that at this time.

19       Q.  Did you ever know?

20       A.  I can't answer that either.

21             MR. SCHANER:  Mark this, please,

22        as Exhibit 52.

23             (Document marked Martino 52 for

24        identification, this date.)

25       Q.  Exhibit 52 is a one-page document

Martino, James - February 10, 2004 00:00:00 a.m.

413:1             Martino

2    with the Bates number JTM 472.  It is a

3    memorandum from Alan Tomlinson to Milt

4    Daly.  There are copies to Chris Dugger and

5    Tom Becker; and, Mr. Martino, in the upper

6    right-hand portion of the memo there

7    appears to be your name, correct?

8        A.   Yes.

9        Q.   And you received a copy of

10   Exhibit 52, correct?

11       A.   Yes.

12       Q.   The subject of the document is

13   construction update.

14            By the way, are you familiar with

15   Alan Tomlinson?

16       A.   At the time he was employed by

17   Crown Theatres.

18       Q.   In the first paragraph, it reads,

19   "On Tuesday 26 October I met with Searci

20   Baker, the Westfield project manager

21   handling the Annapolis Mall construction,

22   and walked the site with him.  He explained

23   that he has completed the steel framing of

24   four out of fourteen sections."

25            Mr. Martino, does Exhibit 52 help

Martino, James - February 10, 2004 00:00:00 a.m.

414:1                    Martino

2    you recall that you knew that it was

3    Westfield that was responsible for the

4    steel framing at the Annapolis Mall

5    project?

6              MR. SEIDEN:  Objection to form.

7         A.   No.

8         Q.   Mr. Searci Baker was the

9    Westfield project manager, correct?

10        A.   Yes.

11        Q.   You knew that back in October

12   1999?

13        A.   Yes.

14        Q.   And you understood that he was

15   overseeing the steel framing at the

16   Annapolis project, right?

17        A.   No, sir.

18        Q.   You were aware that steel was

19   going up at the Annapolis site in October

20   1999, correct?

21        A.   Some form of steel was being

22   erected.

23        Q.   And it was the steel frame of

24   auditoriums, right?

25        A.   I don't know that.

Martino, James - February 10, 2004 00:00:00 a.m.

415:1            Martino

2       Q.   You did receive a copy of Exhibit

3    52, correct?

4       A.   Yes.

5       Q.   The exhibit states, "We walked

6    through and around the steel shell of

7    auditoriums 5 and 6, the ones located

8    farthest from the lobby.  He said that as

9    he moves forward towards the lobby erecting

10   the steel frame of the next two

11   auditoriums, he will be finishing off the

12   floor walls and roof of number 5 and 6 as

13   well."

14           From this you knew that steel was

15   going up on the Annapolis project in

16   October of 1999, correct?

17      A.   Yes.

18      Q.   And you knew that Westfield was

19   doing the work?

20           MR. SEIDEN:  Objection.  Asked and

21      answered.

22      A.   No, I'm not sure of that.

23           MR. SCHANER:  Exhibit 53, please.

24           (Document marked Martino 53 for

25      identification, this date.)

Martino, James - February 10, 2004 00:00:00 a.m.

416:1                    Martino

2        Q.   Exhibit 53 bears the Bates

3    numbers JTM 10578 through JTM 10642.  It is

4    entitled, "Master List Subcontractor" and

5    dated January 17, 2001.

6             Mr. Martino, do you know who

7    prepared Exhibit 53?

8        A.   No.

9        Q.   Is this prepared by your office?

10       A.   No.

11       Q.   Did you review this document in

12   or about January 2001?

13       A.   I don't recall.

14       Q.   Do you recognize this document as

15   a list of Heffner & Weber's subcontractors

16   for work on the Annapolis Mall project?

17             MR. SEIDEN:  Objection to form.

18             MR. WISSER:  Objection to form.

19       A.   No, I do not.

20             MR. SCHANER:  Mark this as Exhibit

21       54.

22             (Document marked Exhibit 54 for

23        identification, this date.)

24       Q.   Exhibit 54 is Bates numbered JTM

25   15227 through JTM 15252.

Martino, James - February 10, 2004 00:00:00 a.m.

417:1                    Martino

2              The first page has a cover memo

3      from Bob Beacher to Milt Daly dated June 1,

4      2000 with carbon copies to Jim Martino and

5      Kevin Seyco.

6              Mr. Martino, you received a copy

7      of Exhibit 54?

8          A.   Yes, I did.

9          Q.   It reads in the first paragraph,

10     "Attached please find E.W. Howell Company,

11     Inc., application Number 2 dated May 30,

12     2000 for payment in the amount of $222,083.

13     Jim Martino and myself have reviewed and

14     approved application Number 2 for payment."

15             Mr. Martino, did you review and

16     approve E.W. Howell's application Number 2

17     for payment?

18         A.   I don't recall actually doing it,

19     but obviously it has my signature on it.

20         Q.   So you believe you did?

21         A.   I believe I did.

22         Q.   Please turn to page Bates number

23     JTM 15237.

24             This is an application and

25     certificate for payment submitted by

Martino, James - February 10, 2004 00:00:00 a.m.

418:1                    Martino

2    Everhard Concrete Construction.  It is

3    application Number 2 for the period March 1

4    to May 30.

5            Is that your signature in the

6    lower right-hand corner?

7        A.   Yes, it is.

8        Q.   And you signed on June 1st, 2000?

9        A.   Yes.

10        Q.   What work did Everhard Concrete

11   Construction perform on the Skokie

12   projects?

13        A.   I'm not too sure what work they

14   performed.

15        Q.   It says under -- it says on the

16   first page of -- withdrawn.

17            Page JTM 15237 states that

18   Everhard's contract was for excavation and

19   concrete.

20            You understood that Everhard

21   performed the excavation and concrete work

22   on the Skokie project, right?

23            MR. SEIDEN:  Objection.  Asked and

24        answered.

25        A.   We don't know what scope of work

Martino, James - February 10, 2004 00:00:00 a.m.

419:1                   Martino

2   they performed, or I don't recall what

3   scope of work they performed I should say.

4        Q.   Now, from Everhard's pay

5   application, you can tell that they had a

6   contract for excavation and concrete,

7   right?

8            MR. SEIDEN:  Objection, form.

9        A.   I don't know if they had a

10  contract.

11       Q.   Does reviewing Everhard's payment

12  application refresh your recollection that

13  Everhard had a contract for excavation and

14  concrete?

15       A.   No.

16       Q.   Turn to the first continuation

17  page JTM 15238.

18            Under the description of work, it

19  states excavation.

20            Does this refresh your

21  recollection that the excavation work on

22  the Skokie project was performed by

23  Everhard?

24       A.   No, sir.

25       Q.   Underneath excavation, it states

Martino, James - February 10, 2004 00:00:00 a.m.

420:1                    Martino

2    building work.  And there are some specific

3    entries, wall footings and concrete

4    reinforcement.

5            Does this refresh your

6    recollection that the wall footings and

7    concrete reinforcement was done by Everhard

8    on the Skokie project?

9        A.   No, sir.

10       Q.   You actually knew, Mr. Martino,

11   that the wall footings and concrete

12   reinforcement were performed by Everhard on

13   the Skokie project, didn't you?

14           MR. SEIDEN:  Objection.  Asked and

15       answered.

16       A.   With all due respect, no, sir.

17       Q.   Do you know if the excavation

18   work was done on the Skokie project?

19       A.   Yes.

20       Q.   Do you know if the wall footings

21   and concrete reinforcement were installed

22   on the Skokie project?

23       A.   Yes.

24       Q.   You just don't know who did it?

25       A.   Thank you.

Martino, James - February 10, 2004 00:00:00 a.m.

421:1                    Martino

2            MR. WISSER:  That's a yes, right?

3            THE WITNESS:  That's a yes.

4            MR. SCHANER:  Mark this as Exhibit

5       55.

6            (Document marked Martino 55 for

7       identification, this date.)

8       Q.   Exhibit 55 has the Bates numbers

9   JTM 15297 through 15318.  There is a cover

10  memo from Bob Beacher to Milt Daly, dated

11  August 2, 2000 with carbon copies showing

12  to Jim Martino and Kevin Seyco.

13            By the way, who was Kevin Seyco?

14  A.   He was with E.W. Howell.

15  Q.   Mr. Martino, you received a copy

16  of Exhibit 55?

17  A.   Yes.

18  Q.   Exhibit 55 attaches E.W. Howell's

19  application Number 4, dated July 31, 2000

20  for payment in the amount of $584,497.

21            Mr. Beacher writes in his cover

22  memo that Jim Martino and myself have

23  reviewed and approved application Number 4

24  for payment.

25            Mr. Martino, did you review and

Martino, James - February 10, 2004 00:00:00 a.m.

422:1                    Martino

2    approve E.W. Howell's application Number 4

3    for payment?

4        A.   I don't actually recall doing it,

5    but it has my signature on it.  So I have

6    to assume that I did.

7        Q.   Turn to page number page JTM

8    15311.

9             This page shows a payment

10   application from M.G. Electric Service

11   Company, application Number 2 for the

12   period July 31, 2000.

13             Is that your signature in the

14   lower right-hand corner?

15       A.   Yes.

16       Q.   And you signed on August 2nd,

17   2000?

18       A.   Yes.

19       Q.   Turn to the first continuation

20   page JTM 15312.

21             If you look at items 120, 130,

22   140, 150 and 151, can you tell me what work

23   those items refer to?

24       A.   Underground feeders, underground

25   branch.  I don't know what the next one

Martino, James - February 10, 2004 00:00:00 a.m.

423:1                    Martino

    2    says, underground branch conduit.

    3        Q.   You knew that those items of work

    4    were performed by M.G. Electric Service

    5    Company, correct?

    6        A.   No, I don't know that.

    7        Q.   Do you know who did perform that

    8    work?

    9        A.   No, sir.

   10        Q.   Do you know whether that work was

   11    performed?

   12        A.   Not as we sit here today, I don't

   13    recall it, to be honest with you.

   14            MR. SCHANER:  Mark this as Exhibit

   15            56, please.

   16            (Document marked Martino 56 for

   17            identification, this date.)

   18        Q.   Exhibit 56 has the Bates number

   19    JTM 15319 to JTM 15334.  The first page has

   20    a cover memo from Bob Beacher to Milt Daly

   21    dated August 30, 2000.  Carbon copies are

   22    shown to Jim Martino and Kevin Seyco.

   23            Mr. Martino, you received a copy

   24    of Exhibit 56?

   25        A.   Yes, sir, I did.

Martino, James - February 10, 2004 00:00:00 a.m.

424:1              Martino

2        Q.   Exhibit 56 attaches E.W. Howell's

3    application 5 for payment in the amount of

4    $559,934, correct?

5        A.   I don't see that in here.

6        Q.   That's what it says the first

7    page of the exhibit, right, in

8    Mr. Beacher's cover memo?

9        A.   Yes.

10       Q.   It also says that you and

11   Mr. Beacher reviewed and approved

12   application Number 5 for payment.

13            Did you review and approve E.W.

14   Howell's application Number 5?

15       A.   I don't recall doing it; but

16   obviously, if there is a document that has

17   my signature on it, I would believe that I

18   did.

19            MR. SEIDEN:  What document are we

20       talking about?

21       A.   I am assuming application Number

22   5, but it doesn't appear that it is in

23   here.

24            MR. SEIDEN:  Don't make that

25       assumption.

Martino, James - February 10, 2004 00:00:00 a.m.

425:1            Martino

2      Q.   Turn to JTM 15333.

3           This is a requisition from All

4    Sealants, Inc., for water proofing/dam

5    proofing.  It is application Number 1.

6           Is that your signature in the

7    lower right-hand corner?

8      A.   Yes, sir, it is.

9      Q.   You signed on September 7, 2000?

10     A.   Yes, I did.

11     Q.   What is waterproofing or dam

12   proofing?

13          MR. WISSER:  Damp proofing.

14          MR. SEIDEN:  Damp proofing.

15     Q.   What is water proofing or damp

16   proofing?

17     A.   It could mean numerous things.

18   But normally in a nutshell what it is

19   talking about is some sort of product that

20   is applied to either the foundations or the

21   outside of the building to prevent rain

22   water or snow from penetrating inside.

23     Q.   Was waterproofing or damp

24   proofing performed on the Skokie theaters'

25   project?

Martino, James - February 10, 2004 00:00:00 a.m.

426:1                    Martino

   2          A.   I don't recall.

   3          Q.   What work did All Sealants

   4     perform on the Skokie theaters' project?

   5          A.   Sorry.  I don't know that either.

   6               MR. SCHANER:  Mark this, please,

   7          as Exhibit 57.

   8               (Document marked Martino 57 for

   9          identification, this date.)

   10         Q.   Exhibit 57 bears the Bates

   11     numbers JTM 15625 through JTM 15720.  The

   12     cover page is a letter from Milt Daly to

   13     James Martino with a carbon copy to Bob

   14     Beacher, dated June 24, 1998.

   15               Mr. Martino, you received a copy

   16     of Exhibit 57?

   17         A.   Yes, sir, I did.

   18         Q.   There is a stamp from your office

   19     indicating receipt --

   20         A.   Yes.

   21         Q.   -- on July 1, 1998?

   22         A.   It appears that's what it says.

   23         Q.   Now, the cover letter states, "I

   24     am transmitting here with one complete copy

   25     of our executed lease on the above

Martino, James - February 10, 2004 00:00:00 a.m.

427:1                 Martino

2   project."

3           That project is the Hartford

4   theater project, correct?

5       A.   Yes, that's what it is

6   referencing.

7       Q.   You, in fact, did receive a copy

8   of the lease for the Hartford project?

9       A.   Yes.

10      Q.   Which is attached to the first

11  page of Exhibit 57?

12      A.   Yes.

13      Q.   Turn to page Bates number JTM

14  15698.

15      A.   698, you said?

16      Q.   15698.  The heading of this page

17  is attachment 2 to Exhibit E.

18          In you look back to Exhibit E,

19  which is at JTM 15683, you will see that

20  this section is entitled, "Landlord's

21  Work."

22          Do you see that?

23      A.   I am on 15683.

24      Q.   15683 at the top of the page.

25      A.   Landlord's work, I see that.

Martino, James - February 10, 2004 00:00:00 a.m.

428:1                 Martino

2        Q.   Going back to 15698, the second

3    paragraph second sentence reads, "The

4    landlord's scope of work will include but

5    not be limited to site excavation, cuts and

6    fill."

7             You knew, Mr. Martino, that the

8    landlord on the Hartford project was

9    responsible for site excavation, cuts and

10   fill, correct?

11           MR. SEIDEN:  Objection to form.

12       A.   No, I did not.

13       Q.   Is it your understanding, from

14   reading the provision I just referenced in

15   the lease, that somebody else was

16   responsible for site excavation, cuts and

17   fill other than the landlord?

18           MR. SEIDEN:  Objection to the

19       form.

20       A.   I'm not too sure who was

21   responsible.

22       Q.   Looking farther down that

23   paragraph, there are references to the

24   purchase and placement of any off site fill

25   required, all testing, compaction and

Martino, James - February 10, 2004 00:00:00 a.m.

```
429:1              Martino

    2  grading of all site work.

    3          Do you see that?

    4      A.  I don't see that.

    5      Q.  Second full paragraph just before

    6  the last sentence.

    7          MR. SEIDEN:  Sentence beginning

    8      fire hydrants?  Is that the sentence

    9      you are talking about?

   10      Q.  The sentence beginning fire

   11  hydrants, and it goes on to list purchase

   12  and placement of any off-site fill

   13  required, all testing, compaction and

   14  grading of all site work.

   15          Do you see that?

   16      A.  Yes, I do.

   17      Q.  You knew, Mr. Martino, that the

   18  landlord was responsible for the purchase

   19  and placement of fill, compaction and

   20  grading for the Hartford project?

   21          MR. SEIDEN:  Objection to the

   22      form.

   23      A.  No.

   24      Q.  Did you review the lease that

   25  Mr. Daly sent you which is attached as part
```

Martino, James - February 10, 2004 00:00:00 a.m.

430:1                    Martino

2    of Exhibit 57?

3          A.   I don't recall, Mr. Schaner.

4              MR. SCHANER:  Mark this, please,

5          as Exhibit 58.

6              (Document marked Martino 58 for

7          identification, this date.)

8          Q.   Exhibit 58, Mr. Martino, has a

9    transmittal letter and attaches to it a

10   document.

11             Let me ask you if you can -- if

12   you recognize the attached document?

13         A.   Yes, I do.

14         Q.   What is it?

15         A.   Specification book prepared by my

16   firm.

17         Q.   And the document is dated

18   February 2, 1999?

19             MR. SEIDEN:  The spec book is

20         dated.

21         Q.   The spec book is dated February

22   2, 1999.

23             The cover memo has a signature

24   that says Jim Martino on the cover memo.

25             Do you see that?

Martino, James - February 10, 2004 00:00:00 a.m.

431:1              Martino

2       A.   That's correct.

3       Q.   And it forwards a copy of the

4   specification book to Glenn Garfinkel, and

5   the copy was forwarded on June 14, 2001,

6   correct?

7       A.   Yes.

8       Q.   Now, who prepared -- your firm

9   prepared this spec book, correct?  Your

10  firm prepared this specification?

11      A.   Yes, sir.

12      Q.   What was the specification book

13  used for?

14      A.   Specification book is used for --

15  as a supplement to the drawings.  Many

16  times you can't get all the necessary

17  information on the drawings.  So then you

18  put it in written form, and it becomes a

19  specification book.

20      Q.   Please turn to section 2210, site

21  clearing and grading.

22           MR. WISSER:  Which section,

23      please?

24      Q.   2210.

25           What was the site clearing, and

Martino, James - February 10, 2004 00:00:00 a.m.

432:1                     Martino

2    grading work for the Hartford project?

3         A.   On the date that this document

4    was submitted, the scope of work is to fall

5    under the requirements of the site

6    development contractor.

7         Q.   Who was the site development

8    contractor for Hartford?

9         A.   Sorry.  I don't recall.

10        Q.   It goes on to say the developer

11   is to provide a pad for this building.

12             Who was the developer?

13        A.   Starwood Ceruzzi.

14        Q.   The site development contractor

15   was not Crown Theatres, correct?

16        A.   I don't know that.

17             MR. SCHANER:  Mark this as Exhibit

18        59, please.

19             (Document marked Martino 59 for

20        identification, this date.)

21        Q.   Mr. Martino, Exhibit 59 is a copy

22   of the theater lease for the Trumbull,

23   Connecticut theater project.

24             Did you receive a copy of Exhibit

25        59?

Martino, James - February 10, 2004 00:00:00 a.m.

```
433:1                 Martino
    2        A.   I'm sorry.  I don't recall,
    3   counsel.
    4        Q.   Do you recall if you ever saw a
    5   copy not only of Exhibit 59 -- let me
    6   rephrase the question.
    7             Did you ever see a copy of the
    8   lease for the Trumbull theater projects?
    9        A.   I don't recall seeing it.
   10        Q.   Let's talk about something
   11   different for a few minutes.
   12             Mr. Martino, do you believe that
   13   David Clifford owes you money for work on
   14   his home in Connecticut?
   15        A.   Yes, I do.
   16        Q.   What work did you perform on
   17   Mr. Clifford's home?
   18        A.   What I recall, while sitting here
   19   right now, is when I did drawings for a
   20   deck out the back of his house, and I did
   21   drawings, I think, for a basement
   22   alteration.
   23        Q.   You knew at the time that
   24   Mr. Clifford worked for Crown Theatres?
   25        A.   Yes, sir.
```

Martino, James - February 10, 2004 00:00:00 a.m.

```
434:1              Martino

  2       Q.   What position did he hold with

  3   Crown Theatres?

  4       A.   It is my understanding he held

  5   the position of CFO.

  6       Q.   And you understood that to be a

  7   high ranking position at Crown Theatres?

  8       A.   Yes, sir.

  9       Q.   Do you have any -- let me

 10   rephrase that.

 11            Did you have any written contract

 12   for work with Mr. Clifford for work on his

 13   house?

 14       A.   No, sir.

 15       Q.   Did you have any written

 16   agreement with Mr. Clifford of any kind for

 17   work on his house?

 18       A.   No, sir.

 19       Q.   Did you have an oral agreement

 20   for work on Mr. Clifford's house?

 21       A.   No, sir.

 22       Q.   Did you tell Mr. Clifford that

 23   you would do the work for free?

 24       A.   No, sir.

 25       Q.   Did you ever send Mr. Clifford an
```

Martino, James - February 10, 2004 00:00:00 a.m.

435:1                    Martino

2      invoice for work on his house?

3          A.   No, sir.

4          Q.   Did you ever have discussions

5      with Mr. Clifford regarding payment for

6      work on his house?

7          A.   No, sir.

8          Q.   How much do you believe

9      Mr. Clifford owes you for work on his

10     house?

11         A.   I don't recall off the top of my

12     head.  I think we submitted some number

13     that I felt was a fair and equitable

14     amount.

15         Q.   Did you ever ask Mr. Clifford to

16     pay you for work on his house?

17         A.   No.

18         Q.   Do you believe that Glenn

19     Garfinkel owes you money for work on his

20     home in Connecticut?

21         A.   Yes, sir.

22         Q.   You understood that Mr. Garfinkel

23     was employed by Crown Theatres?

24         A.   Yes, sir.

25         Q.   What was Mr. Garfinkel position?

Martino, James - February 10, 2004 00:00:00 a.m.

436:1               Martino

2        A.   In-house counsel.

3        Q.   What work did you do on

4    Mr. Garfinkel?

5        A.   Expansion on his kitchen and

6    expansion out of the back of the house and

7    also a basement alteration.  That's what I

8    recall.

9        Q.   When was the work on

10   Mr. Garfinkel's house performed?

11       A.   I am sorry, sir.  I don't recall.

12       Q.   When did you do the work on

13   Mr. Clifford's house?

14       A.   I don't recall that either.

15       Q.   Do you have a written agreement

16   with Mr. Garfinkel for work on

17   Mr. Garfinkel's house?

18       A.   No, sir.

19       Q.   Do you have any kind of writing

20   that describes the work you did on

21   Mr. Garfinkel's house?

22       A.   No, sir.

23       Q.   Did you ever ask Mr. Garfinkel to

24   pay you for the work on his house?

25       A.   No, sir.

437:1 Martino

Q. Did you ever submit an invoice to him?

A. No, sir.

Q. Did you tell Mr. Clifford --

MR. SEIDEN: Garfinkel.

Q. Did you ever tell Mr. -- let me rephrase.

Did you tell Mr. Garfinkel that you were doing the work for no charge?

A. Yes.

Q. How much do you believe that Mr. Garfinkel owes you?

A. Again, counselor, I don't know the number off the top of my head. I know my attorneys put in a number for me.

Q. Let me refer back to --

A. Maybe I said that wrong.

Q. Let me refer back to the work you did for Mr. Clifford.

Did you tell Mr. Clifford that you would not charge him for work on his house?

A. No, sir.

Q. Do you believe that you were owed

Martino, James - February 10, 2004 00:00:00 a.m.

438:1                Martino

2    money for work performed on Crown Theatres'

3    offices in New York?

4        A.   Yes.

5        Q.   How much?

6        A.   Again, I don't recall off the top

7    of my head.

8        Q.   Do you have a written agreement

9    for work that you did on Crown Theatres'

10   office in New York?

11       A.   No, sir.

12       Q.   What work did you do for Crown

13   Theatres' offices in New York?

14       A.   What I remember is that Crown

15   offices were moving into the Seagram's

16   buildings, and they needed a floor plan

17   from me showing the layout, and I know

18   there were several meetings I attended.

19   And I don't recall anything else right now.

20   I think there was some other work, but I

21   don't recall it right at this moment.

22       Q.   Did you have an oral agreement

23   with Crown by which Crown would pay you for

24   the work that you did on its New York

25   offices?

Martino, James - February 10, 2004 00:00:00 a.m.

439:1                    Martino

2          A.   No, sir.

3          Q.   Did you ever submit a bill to

4     Crown Theatres for the work on its New York

5     offices?

6          A.   No, sir.

7          Q.   Did you ever ask Crown Theatres

8     to pay you for work on its New York

9     offices?

10         A.   No, sir.

11         Q.   Did you tell Crown Theatres that

12    there would be no charge for your work on

13    its New York offices?

14         A.   No, sir.

15         Q.   Did Crown Theatres make any

16    payments to you for work on its New York

17    offices?

18         A.   No.

19         Q.   Let me ask the same question for

20    Mr. Clifford.

21              Did he make any payment to you

22    for work on his house?

23         A.   No, sir.

24         Q.   What about Mr. Garfinkel?

25              Did he ever pay you any money for

Martino, James - February 10, 2004 00:00:00 a.m.

440:1                  Martino

     2    work on his house?

     3         A.   No, sir.

     4         Q.   Do you believe that Dan Crown

     5    owes you money for work on his New York and

     6    Connecticut homes?

     7         A.   Yes.

     8         Q.   Both of them?

     9         A.   Yes.

    10         Q.   Did you -- you understood that

    11    Mr. Crown was in charge of Crown Theatres?

    12         A.   Yes.

    13         Q.   He was the chief executive

    14    officer?

    15         A.   Nice man.

    16         Q.   What work did you perform on

    17    Mr. Crown's New York home?

    18         A.   I don't recall.

    19         Q.   What work did you perform on his

    20    Connecticut home?

    21         A.   It was some consultation work.

    22    He was considering doing an addition or an

    23    expansion.

    24         Q.   When did you do work on

    25    Mr. Crown's New York home?

Martino, James - February 10, 2004 00:00:00 a.m.

441:1                Martino

2        A.  I am sorry.  I do not recall.

3        Q.  When did you do work on his

4    Connecticut home?

5        A.  I don't recall the dates.

6        Q.  How much do you believe you were

7    owed for work on Mr. Crown's New York home?

8        A.  I think we put in a number.  I

9    don't recall it off the top of my head.

10       Q.  How much do you believe you were

11   owed for work on Mr. Crown's Connecticut

12   home?

13       A.  Same answer.

14       Q.  Did you have a written contract

15   for Mr. Crown for work on his Connecticut

16   home?

17       A.  No, sir.

18       Q.  For work on his New York home?

19       A.  No.

20       Q.  Did you have an oral agreement

21   with Mr. Crown for work on his Connecticut

22   home?

23       A.  No, sir.

24       Q.  For work on his New York home?

25       A.  No.

Martino, James - February 10, 2004 00:00:00 a.m.

442:1              Martino

2         Q.   Did you ever submit a bill to

3    Mr. Crown for work on either of his homes?

4         A.   No.

5         Q.   Did Mr. Crown pay you money for

6    work on either of his homes?

7         A.   No, sir.

8         Q.   Did you ever ask Mr. Crown to pay

9    you money for either work on his New York

10   or Connecticut homes?

11        A.   No, sir.

12        Q.   Did you do work on Milton Daly's

13   Connecticut home?

14        A.   Yes, sir.

15        Q.   What work did you perform?

16        A.   I prepared architectural drawings

17   to reconstruct the portions of the house

18   that sustained a significant fire.

19        Q.   Anything else?

20        A.   That's all I recall off the top

21   of my head.

22        Q.   Did you make visits to Mr. Daly's

23   home as part of your work?

24        A.   As part of my work?

25        Q.   Did you visit Mr. Daly's work --

Martino, James - February 10, 2004 00:00:00 a.m.

443:1                    Martino

2    let me rephrase that.

3              Did you visit Mr. Daly's home in

4    connection with your preparation of

5    architectural drawings?

6         A.   Yes.

7         Q.   How many times?

8         A.   I don't recall.

9         Q.   When did you perform work in

10   connection with Mr. Daly's home?

11        A.   I am sorry.  I don't recall that

12   either.

13        Q.   Did you charge Mr. Daly for the

14   work that you performed on his home?

15        A.   No, sir.

16        Q.   Did you submit a bill to Mr. Daly

17   for work on his home?

18        A.   No, sir.

19        Q.   Did Mr. Daly pay you for work on

20   his home?

21        A.   No, sir.

22        Q.   Did you have a contract with

23   Mr. Daly for work on his home?

24        A.   No, sir.

25        Q.   Did you have an oral agreement

Martino, James - February 10, 2004 00:00:00 a.m.

444:1                    Martino

2   for work on his home?

3        A.   No, sir.

4        Q.   Do you recall that at some point,

5   Mr. Martino, Crown Theatres terminated your

6   services as an architect?

7        A.   I don't recall actually getting a

8   termination letter, now that you say it

9   that way to me.

10       Q.   Were you ever told to stop

11  working on Crown Theatres' projects?

12       A.   I don't recall that either.

13       Q.   Were you told that you would not

14  receive future work from Crown Theatres?

15       A.   No, I don't recall that either.

16       Q.   Did you have a discussion with

17  Crown Theatres about concluding the work

18  that you were performing?

19       A.   No, I don't recall that

20  discussion happening.

21       Q.   Do you believe that Crown

22  Theatres owes you money on theater

23  projects?

24       A.   Yes, sir, I do.

25       Q.   How much?

Martino, James - February 10, 2004 00:00:00 a.m.

```
445:1                Martino
     2      A.  I don't recall the number.
     3      Q.  Have you had discussions with
     4   anybody at Crown Theatres regarding the
     5   amounts of money that you believe are owed
     6   to you?
     7      A.  No, sir.
     8          MR. SCHANER:  Can we go off the
     9      record?
    10          (A recess was taken.)
    11          MR. SCHANER:  Back on the record.
    12      Q.  Mr. Martino, did you expect to be
    13   paid for the work that you did on Milton
    14   Daly's house?
    15      A.  Yes.
    16      Q.  Why is that?
    17      A.  I performed a service just like I
    18   performed a service for all the other
    19   individuals.
    20          MR. SCHANER:  I see.
    21          I have no further questions.
    22      A.  Thank you.
    23          MR. WISSER:  I have a few
    24      questions, Mr.  Martino.
    25
```

Martino, James - February 10, 2004 00:00:00 a.m.

```
446:1                Martino

    2   EXAMINATION BY

    3   MR. WISSER:

    4       Q.   Again, my name is Kerry Wisser.

    5   You know I represent Mr. and Mrs. Daly.

    6            Mr. Martino, good afternoon.  I

    7   represent Ann Daly, Milton Daly and

    8   Taylor-Leigh, Inc.  I have some follow-up

    9   questions that I want to ask you.

   10   Unfortunately, the nature of doing

   11   follow-up questions is I am going to be

   12   jumping from subject to subject including

   13   what occurred during the original

   14   deposition.

   15            So if I ask you any question and

   16   you don't understand the question, please

   17   let me know, and I will attempt to rephrase

   18   it and key you into where I am.

   19            Do you understand that?

   20       A.   Yes, I do.

   21       Q.   If I ask you any question that

   22   you don't hear, just let me know and I will

   23   repeat it.

   24            Do you understand that?

   25       A.   Yes, I do.
```

Martino, James - February 10, 2004 00:00:00 a.m.

```
447:1              Martino
    2      Q.  Back to some preliminary
    3  discussions.
    4          You had indicated during the
    5  first deposition that between the years of
    6  1996 to 2001 your work for Crown Theatres
    7  represented approximately one half of your
    8  firm's revenues.
    9          Do you remember that testimony?
   10      A.  Yes, sir, I do.
   11      Q.  Your firm won the 2001, I believe
   12  it is pronounced Archi, A-r-c-h-i, Color
   13  Design Award?
   14      A.  That's correct.
   15      Q.  You won that for the Crown
   16  Theatre project in Jupiter, correct?
   17      A.  That is correct.
   18      Q.  And when that award was won, you
   19  had done work on that project together with
   20  a number of the individuals that you named
   21  previously including Gary Sheide, Marciano
   22  Stanco, Don Kim, Laura, I think it is,
   23  McSperin?
   24      A.  Correct.
   25      Q.  And Peter Nicolosi, correct?
```

Martino, James - February 10, 2004 00:00:00 a.m.

448:1            Martino

2        A.   Yes.

3        Q.   Some of those individuals helped

4    you on the Jupiter project --

5        A.   That's right.

6        Q.   -- in calendar year 2000.

7             You won the 2000 award the Archi

8    Color Design Award for the Crown project in

9    Annapolis, correct?

10       A.   No.  Not the color award.  I won

11   an award for excellence in architecture or

12   excellence in design, may I say.

13       Q.   Again, that award was won for

14   your firm as a result of work you performed

15   in addition to some of the individuals I

16   named, correct?

17       A.   Yes, sir.

18       Q.   Skipping to a new subject.  You

19   indicated that Mr. Beacher spoke to you

20   about three days before the initial session

21   of your deposition; is that correct?

22       A.   I don't recall exactly saying

23   that; but if that's in my previous

24   deposition, then so be it.

25       Q.   It is whatever you might

Martino, James - February 10, 2004 00:00:00 a.m.

449:1                    Martino

2    remember.

3         A.   OK.

4         Q.   I believe you testified, however,

5    that Mr. Beacher called you and told you to

6    be relaxed and not to be nervous.

7              Do you remember that testimony?

8         A.   Yes, I do.

9         Q.   Was this a random social call?

10        A.   I'm not sure exactly what you

11   mean by a random social call.

12        Q.   Did Mr. Beacher call you --

13   withdrawn.

14             At the time that Mr. Beacher

15   called you, did he represent to you that he

16   was aware you were being deposed, or did

17   that topic of conversation come up during

18   the telephone conversation?

19        A.   Came up during the telephone

20   conversation.

21        Q.   So the initial purpose of the

22   call -- now my question again is -- was

23   that a random social call?

24        A.   From what I recall, yes.

25        Q.   Did he call you at home?

Martino, James - February 10, 2004 00:00:00 a.m.

450:1                    Martino

    2          A.   I don't recall.

    3          Q.   You indicated that you speak with

    4     Mr. Beacher fairly regularly, and I believe

    5     you said more than once a month.

    6               Do you remember that testimony?

    7          A.   Yes, I do.

    8          Q.   Who usually calls whom?

    9          A.   I would say he calls me more than

   10     I call him.

   11          Q.   And are those generally social

   12     calls?

   13          A.   Yes.

   14          Q.   Has Mr. Beacher ever shared with

   15     you the terms of his settlement agreement

   16     that he reached with Crown Theatres in

   17     regard to this litigation?

   18          A.   No.

   19          Q.   Did he ever tell you that he and

   20     his wife were able to save approximately

   21     one half of their net worth in return for

   22     Mr. Beacher assisting in the prosecution of

   23     this claim on behalf of Crown?

   24          A.   No, sir.

   25          Q.   Prior to RCD Hudson acting in the

Martino, James - February 10, 2004 00:00:00 a.m.

```
451:1                 Martino
    2   capacity as a general contractor for Crown
    3   on one of the projects, had you ever worked
    4   on a project with Mr. Cella before?
    5       A.   No.
    6       Q.   How about Mr. Koshner?
    7       A.   No.
    8       Q.   You indicated that you met
    9   Mr. Beacher in 1978 or 1979.
   10            Is that accurate?
   11       A.   Yes, sir, that is.
   12       Q.   At that time, '78 or '79, you did
   13   not know Mr. Milton Daly, correct?
   14       A.   No, I don't believe I did.
   15       Q.   You indicated that Mr. Beacher's
   16   role in regard to all of the Crown projects
   17   was -- and I believe you used this
   18   terminology -- the owner's representative
   19   and construction manager.
   20            Is that accurate?
   21       A.   Yes, sir, it is.
   22       Q.   It is not unusual in theater
   23   construction projects for an owner to have
   24   an owner's representative on site; is that
   25   correct?
```

Martino, James - February 10, 2004 00:00:00 a.m.

452:1                Martino

2        A.   That is correct.

3        Q.   Or a construction manager,

4   correct?

5        A.   That is correct.

6        Q.   At the time that you worked with

7   Mr. Beacher together to -- I don't know if

8   it is develop an office building in Long

9   Island this 15,000 square foot building --

10  did you at the end of the project have any

11  fidelity issues with Mr. Beacher that

12  indicated to you that he couldn't be

13  honest.

14            I will withdraw that.

15            You were involved in a

16  construction project with Mr. Beacher

17  relating to an office building that was

18  built in Long Island, correct?

19       A.   Yes.

20       Q.   At the end of the project, did

21  any information come to your attention that

22  suggested to you that Mr. Beacher couldn't

23  be trusted?

24       A.   Not that I recall.

25       Q.   You also indicated that you

Martino, James - February 10, 2004 00:00:00 a.m.

453:1                    Martino

2    worked with Mr. Beacher on K.B. Theater

3    projects and National Theaters of Ohio

4    projects before you worked for Crown,

5    correct?

6        A.   Yes, sir.  That's correct.

7        Q.   Those are two different theater

8    companies, correct?

9        A.   Yes, sir.

10        Q.   And I believe there were four

11    theater projects for the K.B. company,

12    correct?

13        A.   OK, yes, correct.

14        Q.   And three for the National

15    Theaters of Ohio, correct?

16        A.   Correct.

17        Q.   So you had worked on

18    approximately seven projects with

19    Mr. Beacher regarding construction of

20    theater projects before you worked together

21    with him as Crown's owner representative,

22    correct?

23        A.   That's correct.

24        Q.   In all of those seven prior

25    construction projects of theaters, at the

Martino, James - February 10, 2004 00:00:00 a.m.

454:1                    Martino

2    end of those projects, no issues that arose

3    that led you to believe that Mr. Beacher

4    was untrustworthy, correct?

5        A.    Not that I was aware of.

6        Q.    You were not made aware by the

7    owners of those construction projects that

8    there were any issues relating to fidelity

9    or theft or anything of that nature,

10   correct?

11       A.    Not that I am aware.

12       Q.    So you had quite a background

13   with Mr. Beacher in terms of knowing how he

14   acted as a construction manager and owner's

15   representative prior to the time that you

16   dealt with him with Crown, correct?

17       A.    No.

18       Q.    No?

19       A.    He was a contractor during those

20   periods of times.  He was not acting as an

21   owner's rep construction manager.  There is

22   a difference.

23       Q.    As a contractor on those

24   projects, you did not become aware of any

25   issues regarding the billing that he

Martino, James - February 10, 2004 00:00:00 a.m.

455:1                    Martino

2    submitted for work performed, correct?

3        A.   Correct.

4        Q.   There was no indication on those

5    seven projects that Mr. Beacher had

6    submitted any inflated invoices, correct?

7        A.   Correct.

8        Q.   And no indication that

9    Mr. Beacher had submitted any fraudulent

10   invoices, correct?

11       A.   Correct.

12       Q.   And as a result of your

13   experience with Mr. Beacher on those seven

14   theater construction projects, you came to

15   learn that Mr. Beacher had quite a bit of

16   knowledge in regard to the construction

17   aspect of theaters, correct?

18       A.   Absolutely.

19            MR. WISSER:  Off the record.

20            (Discussion off the record.)

21       Q.   On the seven theater projects in

22   which you were the architect, this being

23   the K.B. and National Theater Ohio projects

24   and Mr. Beacher was acting in some

25   contracting capacity, did it appear to you

Martino, James - February 10, 2004 00:00:00 a.m.

456:1              Martino

2    that Mr. Beacher adequately performed his

3    obligations?

4         A.   Yes.

5         Q.   To your knowledge on any of those

6    seven projects, did Mr. Beacher have the

7    responsibility of monitoring work that was

8    performed by any subcontractors he was

9    utilizing, do you know?

10        A.   I am not following what you mean

11   by monitoring the work.

12        Q.   Do you know -- withdrawn.

13             In any of the seven projects in

14   which Mr. Beacher was supplying a certain

15   aspect of the construction, do you know

16   whether he in turn subcontracted out some

17   of his responsibilities to other

18   subcontractors, sub-subcontractors?

19        A.   I am unaware of that.

20        Q.   During any of those seven

21   projects, were you ever requested to sign

22   pay applications that were submitted by

23   Mr. Beacher's contracting company for work

24   that was performed on those theater sites?

25        A.   I only recall once.

Martino, James - February 10, 2004 00:00:00 a.m.

457:1                    Martino

2          Q.   In that circumstance you never

3     were made aware of any concerns regarding

4     that pay application as not being accurate,

5     correct?

6          A.   That is correct.

7          Q.   You indicated that you did work

8     on Mr. Daly's home and did I misunderstand.

9     I thought you said there was no charge to

10    Mr. Daly; is that correct?

11         A.   I don't think I used those words.

12         Q.   Did you ever submit a bill to

13    Mr. Daly?

14         A.   No, sir.

15         Q.   Did you ever tell him you would

16    charge him?

17         A.   No, sir.

18         Q.   Were you ever paid directly by

19    Mr. Beacher's company for the plans you did

20    on Mr. Daly's home?

21         A.   No, sir.

22         Q.   You indicated that -- withdrawn.

23    Now switching subjects to the Crown

24    projects.

25              I believe you indicated that you

Martino, James - February 10, 2004 00:00:00 a.m.

458:1                    Martino

2       kept Mr. Daly apprised of the work that you

3       were performing on the various projects

4       through multiple phone calls each month.

5               Is that an accurate statement?

6       A.   I don't recall saying that.

7       Q.   Did you keep Mr. Daly apprised of

8       the work that you were performing through

9       multiple phone calls each month?

10      A.   I didn't have -- I don't think I

11      had that much contact with Mr. Daly only

12      until the end when Mr. Beacher's role

13      stepped back, and I took on more of a

14      substantive role.

15      Q.   But you were speaking with

16      Mr. Beacher between the years of '96 and

17      2001 multiple times each day regarding the

18      various projects?

19      A.   Absolutely.

20      Q.   Now, I believe you indicated that

21      you attended construction meetings on many

22      Fridays of each month at Crown's offices in

23      South Norwalk, Connecticut; is that

24      correct?

25      A.   Yes, sir, that is.

Martino, James - February 10, 2004 00:00:00 a.m.

459:1                    Martino

2          Q.   Who was usually in attendance --

3     I believe you answered that.  Withdrawn.

4          The discussions that occurred

5     during those meetings would relate to

6     construction progress on the various

7     theater projects, correct?

8          A.   Yes.

9          Q.   Was it Mr. Beacher who ordinarily

10    had the information to supply what stage

11    the progress was in?

12         A.   Yes.

13         MR. SCHANER:  I object to the form

14    of the question.

15         MR. WISSER:  What's wrong with the

16    form?

17         MR. SCHANER:  It assumes Beacher's

18    knowledge.

19         Q.   Was it Mr. Beacher who was the

20    individual who was ordinarily reciting

21    information regarding the progress of each

22    of the construction projects?

23         A.   Yes.

24         Q.   You indicated that the first time

25    you met Mr. Daly was when Mr. Daly was at

Martino, James - February 10, 2004 00:00:00 a.m.

460:1                    Martino

2      United Artist Theaters some time around

3      1980, correct?

4           A.   Yes, sir.

5           Q.   You were involved or your company

6      was involved in the construction of an

7      office building for United Artist Theaters

8      at the time that Mr. Daly worked for them

9      around 1980; is that correct?

10          A.   The firm that I was with at that

11     time.

12          Q.   Yes.

13          A.   Was the architect doing the

14     project.

15          Q.   Thank you.

16               Now, between 1980 and 1995, you

17     didn't have any further contact with

18     Mr. Daly, correct?

19          A.   No, sir.

20          Q.   That's correct, isn't it?

21          A.   That's correct.

22          Q.   Was it 1995 that you met again

23     with Mr. Daly and he explained to you that

24     Crown was embarking on an expansion project

25     for the Trumbull project, and he agreed to

Martino, James - February 10, 2004 00:00:00 a.m.

461:1                    Martino

2    try you out for the lobby construction as

3    the architect?

4         A.   You have got it mixed up a little

5    bit.

6         Q.   OK.

7         A.   Mr. Daly came on around 1995.

8    Crown had just released their previous

9    architectural firm.  Bob was already

10   involved with Crown Theatres.

11        Q.   Mr. Beacher?

12        A.   Mr. Beacher.

13        Q.   Yes.

14        A.   And Mr. Beacher brought me up to

15   introduce me to Mr. Daly.  The first

16   project I did was a lobby renovation at the

17   Greenwich Theater not at the Trumbull

18   Theater.

19        Q.   Mr. Daly didn't initially tell

20   you you were going to be the architect on

21   all projects?

22        A.   Initially he didn't say that.

23        Q.   He indicated he would try you out

24   on the Greenwich lobby alterations?

25        A.   Yes, sir.

Martino, James - February 10, 2004 00:00:00 a.m.

462:1                    Martino

2        Q.   That went well?

3        A.   Yes.

4        Q.   And you were granted this further

5    work?

6        A.   Yes.

7        Q.   There were no issues with regard

8    to -- withdrawn.

9             During the Greenwich lobby

10   alteration, was Mr. Beacher the owner's rep

11   for Crown at that time?

12       A.   No.  I think actually what I

13   recall is that Bob acted as a general

14   contractor on that project.

15       Q.   And when that project was

16   completed, there were no issues regarding

17   claims of inflated invoices from

18   Mr. Beacher's company, correct?

19       A.   Not that I am aware of.

20       Q.   No issues regarding claims of

21   fraudulent invoices, correct?

22       A.   That is correct.

23       Q.   And at the time that Mr. Beacher

24   was acting in the capacity of general

25   contractor for the Greenwich lobby

Martino, James - February 10, 2004 00:00:00 a.m.

463:1                    Martino

2    alteration, Mr. Daly was COO of Crown,

3    correct?

4         A.   Yes, sir.

5         Q.   And was Mr. Daly the individual

6    that approved payment by Crown of pay

7    applications?

8         A.   I'm not too sure about that.

9         Q.   Were there similar pay

10   applications as have been placed in

11   exhibits here.

12             These form G 702 documents, were

13   they utilized for the Greenwich?

14        A.   I don't recall seeing them.

15        Q.   Now, you said there that you had

16   a contract for the Trumbull architectural

17   services but Mr. Daly said there was no

18   need for any further contracts, correct?

19        A.   Yes.

20        Q.   It was your understanding that

21   the contract for the Trumbull project was

22   to apply to all other projects that are at

23   issue in this case, correct?

24        A.   Yes, sir.

25        Q.   You indicated that you took notes

Martino, James - February 10, 2004 00:00:00 a.m.

```
464:1              Martino

   2   at the Friday construction meetings that

   3   occurred at Crown's offices in Norwalk,

   4   correct?

   5        A.   Yes.

   6        Q.   And you said you didn't attend

   7   all of them.

   8             Were there times in which you

   9   sent other representatives from your firm

  10   to attend?

  11        A.   Yes, sir.

  12        Q.   You indicated that you signed

  13   certain architectural certificates at some

  14   of these Friday meetings.

  15             Do you remember that testimony?

  16        A.   Yes, sir.

  17        Q.   This only occurred when the

  18   owner's representative, Mr. Beacher, told

  19   you that he had inspected the site and

  20   previously approved the payment, correct?

  21        A.   Yes, sir.

  22        Q.   In fact, he utilized his stamp on

  23   these applications and his signature before

  24   you would sign, correct?

  25        A.   That is correct.
```

Martino, James - February 10, 2004 00:00:00 a.m.

465:1                    Martino

2        Q.   Since you had a history of seven

3   projects that you had worked on with

4   Mr. Beacher as well as Mr. Beacher being

5   general contractor for the Greenwich

6   project for Crown, you believed you could

7   rely upon Mr. Beacher's inspection and

8   signature on the pay applications as

9   evidence that those pay applications was

10  valid?

11       A.   Amongst other things.

12       Q.   But from the owner's point of

13  view, that was the owner's representative

14  telling you these were valid, correct?

15       A.   That is correct.

16       Q.   Looking at Exhibit 4, Exhibit 4

17  is the Tiger Contracting application Number

18  1 for the Skokie project in an a amount of

19  $270,000, correct?

20       A.   Yes, sir.

21       Q.   The signature for Tiger

22  Contracting -- withdrawn.

23            There is a signature from a

24  representative purportedly for Tiger

25  Contracting as the contractor, correct?

Martino, James - February 10, 2004 00:00:00 a.m.

```
466:1                  Martino

    2         A.  Yes.

    3         Q.  And that signature is notarized

    4    by the stamp of someone named Debora ,

    5    D-e-b-o-r-a, Meyer, M-e-y-e-r, correct?

    6         A.  Yes.

    7         Q.  I noted that in some of the

    8    applications, there is a notary's

    9    acknowledgment; in others there isn't.

   10              Do you know whether there is any

   11    requirement that the contractor's signature

   12    be notarized?

   13         A.  It asks for it here.

   14         Q.  You had no reason to believe

   15    based on the notary stamp that the

   16    signature of this contractor was anything

   17    but valid, correct?

   18         A.  Yes.

   19         Q.  In your experience of over 30

   20    years as an architect, was it unusual to

   21    see a contractor or a subcontractor whose

   22    company's name included the name of one of

   23    the principals?

   24              MR. SCHANER:  I am not sure I

   25          understand the question.
```

Martino, James - February 10, 2004 00:00:00 a.m.

467:1                     Martino

     2          A.   I don't understand that question.

     3          Q.   As an example, have you seen in

     4     the past Smith Contracting in which the

     5     principal is Tom Smith?

     6          A.   Yes.

     7          Q.   Things similar like that?

     8          A.   OK.

     9          Q.   So it is not unusual, in your 30

    10     years of practice, to see the name of a

    11     contractor in which the name includes one

    12     of the principals that would sign on behalf

    13     of it, correct?

    14          A.   Yes.

    15          Q.   There is nothing about the fact

    16     that there was a signature from someone

    17     named Tiger from Tiger Construction that

    18     raised any red flags for you, correct?

    19          A.   Correct.

    20          Q.   In fact, we had Waas Construction

    21     as one of the general contractors in this

    22     case, correct?

    23          A.   Yes, we did.

    24          Q.   And Richard Waas was the

    25     principal, correct?

Martino, James - February 10, 2004 00:00:00 a.m.

468:1                 Martino

    2        A.   Yes.

    3        Q.   Do you remember any pay

    4    applications that were signed on behalf of

    5    Richard Waas on behalf of Waas

    6    Construction?

    7        A.   I don't recall.

    8        Q.   If you saw one, that wouldn't

    9    suggest to you that there was some concern

   10    about the veracity of the signature, would

   11    it, sir?

   12        A.   No, it would not.

   13        Q.   So the signature on Exhibit 4

   14    gave you no reason to be suspicious at all,

   15    correct?

   16        A.   That's correct.

   17        Q.   Now, I believe you indicated that

   18    there were some times when you signed pay

   19    applications without actually having been

   20    on site contemporaneous with the time that

   21    the pay application was signed, correct?

   22        A.   Yes.

   23        Q.   And this occurred because you had

   24    been told at some of these Friday

   25    construction meetings that it was

Martino, James - February 10, 2004 00:00:00 a.m.

469:1                    Martino

2    duplicative to have you on site because

3    Mr. Beacher was the eyes and ears of Crown,

4    correct?

5         A.   That is correct.

6         Q.   And Crown didn't want to pay for

7    both you and Mr. Beacher to do the same

8    type of inspections, correct?

9         A.   That was what I was told, yes.

10        Q.   And at this Friday meeting when

11   this was stated, it was stated by Mr. Daly;

12   is that right?

13        A.   It was stated by Mr. Daly.

14        Q.   That was stated in the presence

15   of Crown's general counsel Glenn Garfinkel,

16   correct?

17        A.   That's correct.

18        Q.   Another Crown representative Tom

19   Becker, correct?

20        A.   Yes.

21        Q.   Another Crown representative

22   Chris Dugger, correct?

23        A.   Yes.

24        Q.   And possibly an individual named

25   Steven Scott, correct?

Martino, James - February 10, 2004 00:00:00 a.m.

```
470:1              Martino
     2      A.   Yes.
     3      Q.   None of those individuals who
     4  were all Crown's representatives objected
     5  when you were told by Mr. Daly that you
     6  should not duplicate the work of
     7  Mr. Beacher for the site visits, correct?
     8      A.   Glenn Garfinkel raised an issue
     9  at one of the times that Mr. Daly mentioned
    10  it.
    11      Q.   And then he asked you if you were
    12  comfortable, correct?
    13      A.   That is correct.
    14      Q.   When you said you were, then he
    15  was, correct?
    16      A.   That is correct.
    17      Q.   And then Mr. Garfinkel never
    18  raised the issue again, correct?
    19      A.   That is correct.
    20      Q.   This type of request is not
    21  unusual in the industry when an owner has a
    22  representative and construction manager on
    23  site; is that correct?
    24      A.   That's 100 percent correct.
    25      Q.   All of the pay applications that
```

Martino, James - February 10, 2004 00:00:00 a.m.

471:1                    Martino

2    you signed came to you directly from

3    Mr. Beacher, correct?

4          A.   Yes.

5          Q.   They were either given to you by

6    Mr. Beacher in the car riding up to the

7    Friday meetings or they were actually

8    provided at the Friday meetings, correct?

9          A.   That is correct.

10         Q.   None of the pay applications were

11   provided to you by Mr. Daly, correct?

12         A.   Absolutely not, never.

13         Q.   It was only after Mr. Beacher

14   affirmed to you that these were valid pay

15   applications that you would sign, correct?

16         A.   Yes.

17         Q.   To your knowledge, they were

18   submitted to Mr. Daly as Crown's

19   representative for payment, correct?

20         A.   Yes.

21         Q.   You never witnessed Mr. Beacher

22   give any pay applications to Mr. Daly, did

23   you?

24         A.   No.

25         Q.   The reason why you told

Martino, James - February 10, 2004 00:00:00 a.m.

472:1                    Martino
      2    Mr. Garfinkel that you were comfortable in
      3    not duplicating the work of Mr. Beacher was
      4    because you had complete confidence in
      5    Mr. Beacher's ability to properly inspect
      6    the sites to determine that the work was
      7    adequately performed, correct?
      8         A.   Yes.
      9         Q.   You had no reason, at this point
     10    in time, to doubt Mr. Beacher, correct?
     11         A.   That's correct.
     12         Q.   As a matter of fact, quite the
     13    opposite, correct?
     14         A.   Yes.
     15         Q.   And you had no factual knowledge
     16    at the time that you signed any pay
     17    application that any pay application was
     18    false, correct?
     19         A.   That's correct.
     20         Q.   Or overinflated, correct?
     21         A.   Correct.
     22         Q.   And as you sit here now, you have
     23    not investigated any of the pay
     24    applications to determine if any of them
     25    you signed were false, correct?

Martino, James - February 10, 2004 00:00:00 a.m.

473:1                    Martino

2        A.    That's correct.

3        Q.    Or overinflated, correct?

4        A.    That's correct.

5        Q.    Just take a look at Exhibit 7 for

6    a moment.

7              Exhibit 7 is a pay application

8    for Marlin Contracting application Number 3

9    regarding the Miami Lakes project, correct?

10       A.    Yes, sir.

11       Q.    On this pay application there is

12   an approved B.B. Construction Consultants'

13   stamp, correct?

14       A.    Yes, sir.

15       Q.    Underneath that, there is a

16   signature of Mr. Beacher, correct?

17       A.    Yes.

18       Q.    You recognize Mr. Beacher's

19   signature, correct?

20       A.    Yes.

21       Q.    Above that, however, there is

22   also another stamp that says, "Reviewed,"

23   which I believe appears on almost all of

24   these pay applications.

25              Do you know whose stamp that is?

Martino, James - February 10, 2004 00:00:00 a.m.

474:1              Martino

2        A.   I believe it is Bob's.

3        Q.   Do you know what that meant or

4    what do you believe that meant?

5        A.   I never questioned it.  I just

6    accepted it.  I accepted that Bob reviewed

7    it.

8        Q.   Do you know whether Mr. Beacher

9    had a process in which he would review pay

10   applications and at times seek to modify

11   them or negotiate prices with various

12   subcontractors or general contractors?

13       A.   I know there were many times that

14   the subcontractors or the contractors would

15   submit to Bob penciled reqs and Bob would

16   review them and either say, "This is fine.

17   Submit your formal pay req, or he would say

18   you are asking for too much," or something

19   like that.

20       Q.   Do you know whether this reviewed

21   stamp was stapled to any of these penciled

22   requisitions?

23       A.   No, sir, I don't know.

24       Q.   Did the double stamp, if you

25   will, both the reviewed stamp and the

Martino, James - February 10, 2004 00:00:00 a.m.

475:1              Martino

2    approved stamp, indicate to you that

3    Mr. Beacher looked at this document at

4    least in your mind on more than one

5    occasion?

6        A.   Yes.

7        Q.   And you relied on that in

8    approving and signing them yourself,

9    correct?

10       A.   Amongst other things.

11       Q.   Sir, just looking at 7 again for

12   a moment.  And then I just want you for a

13   moment to take a look at Exhibit 51.

14           Do you have that one?

15       A.   Yes.

16       Q.   Turning to page JTM 01871.

17   That's a pay application for Heffner &

18   Weber for the Annapolis project, correct?

19       A.   Yes, sir.

20       Q.   It is a similar form to the form

21   that's used in Exhibit 7, correct?

22       A.   Similar, yes.

23       Q.   Exhibit 51, that second page, is

24   entitled AIA Document G 72; is that

25   correct?

Martino, James - February 10, 2004 00:00:00 a.m.

476:1              Martino

2        A.   Yes, sir.

3        Q.   Exhibit 7 is AIA Document G 702?

4        A.   Yes.

5        Q.   Is one of the forms just a later

6   or earlier rendition than the other?

7        A.   Yes.

8        Q.   Looking at page 2 of Exhibit 51,

9   do you see the same stamp reviewed that

10   Mr. Beacher utilized on that document?

11        A.   Yes, sir.

12        Q.   And do you see the same stamped

13   approved B.B. Construction Consultants that

14   Mr. Beacher used on this document?

15        A.   Yes, sir.

16        Q.   And I don't know.  Is there a

17   signature of Mr. Beacher on this one

18   somewhere?

19        A.   I don't see it on this photocopy.

20        Q.   Comparing the two exhibits, page

21   2 of Exhibit 51 and Exhibit 7, is there

22   anything different in the methodology that

23   Mr. Beacher utilized that would suggest to

24   you that one pay application is valid and

25   another one is fraudulent?

Martino, James - February 10, 2004 00:00:00 a.m.

477:1              Martino

2        A.   No.

3        Q.   In fact, sir, it is the same

4    process that Mr. Beacher used in both to

5    indicate that they were both valid,

6    correct?

7        A.   Yes.

8        Q.   And there is nothing about these

9    two documents that would identify to you

10   that one is valid and one is invalid,

11   correct?

12       A.   That is correct.

13       Q.   And it is your understanding that

14   once you signed these documents, these were

15   the types of documents that were submitted

16   to Mr. Daly with all of these approvals for

17   payment, correct?

18       A.   Yes.

19       Q.   Thank you.

20            Now, I believe you indicated that

21   Craig Martin, counsel for Crown Theatres in

22   this case, called you in June or July of

23   2001 and told you that Marlin Contracting

24   was not a real company; is that correct?

25       A.   No, I don't recall that.

Martino, James - February 10, 2004 00:00:00 a.m.

```
478:1              Martino

  2      Q.   No.

  3           Did you ever get a call from

  4  Mr. Martin in which he told you that Marlin

  5  Contracting was not a real company?

  6      A.   No, sir.  I don't recall that.

  7      Q.   Do you know, as you sit here now,

  8  whether Marlin is a real contracting firm

  9  or not?

 10      A.   No, I do not.

 11      Q.   After Mr. Beacher was discharged

 12  by Crown, is that the time when if a change

 13  order was received by the general

 14  contractor E.W. Howell that you would sit

 15  with Mr. Becker, review it for fairness and

 16  then approve it?

 17      A.   Yes, sir.

 18      Q.   Prior to the time that

 19  Mr. Beacher was discharged, it was

 20  Mr. Beacher's responsibility to review and

 21  approve change orders, correct?

 22      A.   100 percent correct.

 23      Q.   Are you aware of the fact that

 24  Mr. Beacher advised Richard Waas, the

 25  general contractor for the Miami Lakes
```

Martino, James - February 10, 2004 00:00:00 a.m.

479:1                    Martino

2    project, that Mr. Waas was expressly

3    prohibited from discussing change orders

4    with you?

5         A.   I learned that recently upon the

6    deposition.

7         Q.   Until that deposition, you were

8    unaware of that, correct?

9         A.   That's correct.

10        Q.   But you do know, as you sit here

11   now, that you were not involved in the

12   change order process that Mr. Waas engaged

13   in with Mr. Beacher, correct?

14        A.   Correct.

15        Q.   Similarly, are you aware, as you

16   sit here now, even if it is as a result of

17   a deposition, that Mr. Beacher expressly

18   told Mr. Harmon, a representative of

19   Heffner & Weber on the Annapolis project,

20   that Mr. Weber -- withdrawn -- that

21   Mr. Harmon was expressly prohibited from

22   discussing change orders with you on that

23   project?

24        A.   I know that now.

25        Q.   You were not aware of that at the

Martino, James - February 10, 2004 00:00:00 a.m.

480:1                  Martino

2     time, correct?

3          A.   That is correct.

4          Q.   But you were aware of the fact

5     that the general contractor, Heffner &

6     Weber, was not discussing change orders

7     with you during the scope of that project,

8     correct?

9          A.   Yes.

10          Q.   Take a look at Exhibit 11,

11     please.

12               Sir, showing you what was marked

13     as Exhibit 11, it is entitled, "Crown

14     Theatre Miami Lakes, The Grand,

15     Qualifications to Contracts," dated

16     September 7, 1989; is that correct?

17          A.   Yes, sir.

18          Q.   Paragraph 69, that paragraph says

19     that the contractor specifically excludes

20     all site development work, underground

21     utilities, site preparation as well as any

22     work not indicated in the construction

23     documents prepared by James Martino

24     architect.

25               Do you see that?

Martino, James - February 10, 2004 00:00:00 a.m.

481:1              Martino

2        A.   Yes, sir, I do.

3        Q.   Based on this document, if

4    Mr. Beacher approved a pay application for

5    site preparation and site development that

6    listed the name of a contractor other than

7    Waas Contracting, that would be consistent

8    with this paragraph, correct?

9        A.   Yes.

10        Q.   Because this paragraph said Waas

11    wasn't going to do that work, correct?

12        A.   That's correct.

13        Q.   And it was not within the scope

14    of your responsibility to determine whether

15    or not Crown as the tenant and the various

16    landlords may have modified obligations to

17    determine if Crown would actually perform

18    certain work and then the landlord would

19    subsequently reimburse, correct?

20        A.   You are 100 percent correct.

21        Q.   That's never anything you had to

22    worry about, correct?

23        A.   Correct.

24        Q.   If you got a pay application from

25    a contractor for site development work, it

Martino, James - February 10, 2004 00:00:00 a.m.

```
482:1                Martino
   2    was beyond the scope of your knowledge and
   3    responsibility to determine whether Crown
   4    was paying for it upfront and was going to
   5    get paid later back by the landlord,
   6    correct?
   7         A.   100 percent correct.
   8         Q.   As long as it was approved by the
   9    owner's representative Mr. Beacher, you
  10    relied on it, correct?
  11         A.   Yes.
  12         Q.   And you believed you had a right
  13    to rely on it, correct?
  14         A.   That's correct.
  15         Q.   And that's why you signed your
  16    portion that told Crown pay this, correct?
  17         A.   Yes.
  18         Q.   And with every single one, if I
  19    can move this along more quickly, with
  20    every single one of these pay applications
  21    that Mr. Schaner asked you about in which
  22    he intimated that they were fraudulent,
  23    every single one of those pay applications
  24    utilized the same procedure of approval by
  25    Mr. Beacher as the owner's representative,
```

Martino, James - February 10, 2004 00:00:00 a.m.

```
483:1                    Martino

    2    correct?

    3         A.   Yes, sir.

    4         Q.   There wasn't one scintilla of

    5    evidence on any of those pay applications

    6    that suggested to you that they should not

    7    be approved in the same fashion that all

    8    the other ones that are not in issue in

    9    this case were approved, correct?

   10              MR. SCHANER:  Objection to the

   11         form of the question.

   12         A.   That's 100 percent correct.

   13         Q.   As a matter of fact, they were

   14    all consistent with the payment procedure

   15    utilized by the owner's representative

   16    Mr. Beacher such that you believed they had

   17    to be valid, correct?

   18         A.   Yes, sir.

   19         Q.   And having had that belief, you

   20    signed the ones that you have indicated you

   21    signed expecting that Crown would pay them

   22    through its payment representative Mr.

   23    Daly, correct?

   24         A.   Yes.

   25         Q.   And at the time that you signed
```

Martino, James - February 10, 2004 00:00:00 a.m.

484:1                    Martino

     2    them, knowing they were going to be

     3    submitted, you fully believed they were

     4    valid and accurate and approved by the

     5    owner's representative, correct?

     6        A.   Yes, sir.

     7        Q.   There was absolutely no

     8    indication to you that there was any reason

     9    to question them, correct?

    10        A.    100 percent correct.

    11            MR. SCHANER:  Objection to the

    12        form of the question.

    13            MR. WISSER:  What's wrong with the

    14        form?

    15            MR. SCHANER:  It is leading and

    16        suggestive for one thing.

    17            MR. WISSER:  He is on

    18        cross-examination.

    19            MR. SCHANER:  Your interests are

    20        aligned on many points, and I think

    21        this crosses over the line.  I think

    22        you are testifying through this

    23        witness.

    24            MR. WISSER:  Even if you call my

    25        client, I can cross-examine him under

Martino, James - February 10, 2004 00:00:00 a.m.

485:1                  Martino

2        the federal rules exactly the same way

3        I am doing now.

4            MR. SCHANER:  I would like a

5        standing objection to your approach as

6        leading questions.

7            MR. SEIDEN:  For the record, I

8        fully disagree with what Mr. Schaner

9        has stated with regard to the form of

10       the questioning and concur 100 percent

11       with Mr. Wisser.

12           MR. SCHANER:  Mr. Wisser, can I

13       have a standing objection?

14           MR. WISSER:  You put it on the

15       record.  It would be up to the court

16       whether they would allow such a

17       standing objection.

18           MR. SCHANER:  Otherwise, I might

19       object a lot.

20           MR. WISSER:  I understand.

21       Q.   Sir, look at Exhibit 14, please.

22           Exhibit 14 is a memo dated

23       January 28, 2000 to Mr. Daly from

24       Mr. Beacher which attaches various pay

25       applications.

Martino, James - February 10, 2004 00:00:00 a.m.

486:1                    Martino

2          Sir, looking at JTM 11841, do you

3    recognize that as a pay application from

4    Waas Construction?

5          A.   Yes, I do.

6          Q.   And you understood that Waas

7    Construction was a general contractor for

8    Crown for the Miami project, correct?

9          A.   Yes, that's correct.

10         Q.   Look at JTM 11845.

11              The name of that contractor is

12   MHW General Contractors, Inc., correct?

13         A.   Yes, it is.

14         Q.   At least at face value we had two

15   entities that purportedly represented

16   themselves as general contractors, correct?

17              MR. SCHANER:  I object to the form

18         of the question.

19         A.   They both have the names general

20   contractors in their names.

21         Q.   You indicated that you were

22   provided with job site photos showing

23   progress of the Jupiter project on some of

24   the Friday construction meetings, correct?

25         A.   No.  I was provided job site

Martino, James - February 10, 2004 00:00:00 a.m.

487:1                    Martino

2    photos, progress photos that came directly

3    to my office not specifically on Friday

4    construction meetings did that occur.  They

5    came directly to my office.

6         Q.   Oh, all right.

7              So you were provided with job

8    site photos showing progress of various

9    sites including the Jupiter project,

10   correct?

11        A.   Yes.

12        Q.   And these were one of the types

13   of documents that you relied upon to

14   approve pay applications, correct?

15        A.   That is a correct statement.

16        Q.   Did you ever observe a period of

17   time when Mr. Daly had an opportunity to

18   review any of these photographs?

19        A.   I don't believe he did.

20        Q.   Did you ever bring him to any

21   Friday construction meetings?

22        A.   I don't recall doing that, no.

23        Q.   Did you advise Mr. Daly and

24   others at Crown during any Friday

25   construction meetings that you had reviewed

Martino, James - February 10, 2004 00:00:00 a.m.

488:1                Martino

2     job site photos showing progress?

3          A.   I informed them that I was in

4     possession of job site photos, yes.

5          Q.   Did you ever make Mr. Daly or

6     other Crown representatives at these Friday

7     construction meetings aware of the fact

8     that certain job site photos advised you

9     regarding construction progress?

10         A.   Yes.

11         Q.   Looking at Exhibit 23, I will

12    show you mine.  This is a pay application

13    for Marlin Contracting on the Jupiter

14    project application Number 6; is that

15    correct?

16         A.   Yes.

17         Q.   And the continuation sheet

18    discusses, among other things, the fact

19    that some of the description of work was

20    for unsuitable soil, correct?

21         A.   Yes.

22         Q.   And aquatic removal and

23    stabilization, correct?

24         A.   Yes.

25         Q.   Jupiter is located in Florida?

Martino, James - February 10, 2004 00:00:00 a.m.

489:1              Martino

    2        A.  Yes.

    3        Q.  In your experience, is it unusual

    4    to encounter unsuitable soil and water when

    5    excavating in places like Florida?

    6        A.  No.  We actually did encounter

    7    that situation on this project.

    8        Q.  And, in fact, much of Florida is

    9    at sea level, correct?

   10        A.  Yes.

   11        Q.  So there is nothing about this

   12    pay application that suggested to you that

   13    it would be unusual for this type of

   14    project, correct?

   15        A.  That's correct.

   16           MR. SCHANER:  Objection to the

   17        form of the question.

   18           MR. WISSER:  Is that the leading

   19        nature?

   20           MR. SCHANER:  That was garbled and

   21        ambiguous.  Also leading.

   22        Q.  To your knowledge, Florida has

   23    vast amounts of wetlands, correct?

   24        A.  Yes.

   25        Q.  Go to Exhibit 33, please.  That's

Martino, James - February 10, 2004 00:00:00 a.m.

490:1                      Martino

2    in today's pile.

3                Exhibit 33 is a pay application

4    application Number 3 for Hewlett

5    Contracting at the Annapolis Mall and the

6    continuation sheet identifies that the work

7    performed was switch gear controls and

8    mechanical devices; is that correct?

9          A.   Yes, that's correct.

10         Q.   No one from Crown ever claimed

11   that the quality of the switch gear

12   controls or mechanical devices was

13   defective, correct?

14         A.   That's correct.

15         Q.   Looking at pay application --

16   Exhibit 34, while he is finding it -- for

17   the record that is pay application Number 1

18   from Hewlett Contracting for the Annapolis

19   Mall that has a description of work that

20   relates to additional stadium steel and

21   power requirements and sheet rocking of

22   interior walls.

23               You have it in front of you,

24   correct?

25         A.   Yes, I do.

Martino, James - February 10, 2004 00:00:00 a.m.

491:1                    Martino

2        Q.   Were you made aware from

3    Mr. Harmon, as a representative of Heffner

4    & Weber who was the general contractor on

5    this project, that the stadium stair risers

6    had been poured improperly by the

7    landlord's general contractor?

8        A.   I don't recall that.

9        Q.   Do you recall Heffner & Weber

10   having to do some remedial work in regard

11   to those stadium stairs?

12       A.   I remember some remedial work

13   they had to perform, yes.

14       Q.   And on this Exhibit 34

15   continuation sheet Number 4 that says,

16   "Additional stadium concrete with

17   reinforcing," this line item is not

18   sufficiently articulated to you to suggest

19   that it would not relate to those stadium

20   stairs; is that correct?

21          MR. SCHANER:  Objection, leading

22       and ambiguous.

23       A.   I would agree with that.

24       Q.   Regarding Exhibit 34 one more

25   time if we will, Number 2 line item on the

Martino, James - February 10, 2004 00:00:00 a.m.

492:1                    Martino

    2   continuation page is additional power

    3   requirements.

    4           Are you aware that there were

    5   multiple change orders for electrical work?

    6       A.   I don't recall that.

    7       Q.   And, again, you were kept out of

    8   the loop with regard to change orders,

    9   correct?

   10       A.   Yes.

   11       Q.   In regard to the line item that

   12   deals with modifying the fire alarm panel

   13   and sprinkler systems, are you aware that

   14   the fire alarm system at this project had

   15   to be modified from a master servant system

   16   with the mall to an independent system for

   17   the theater only?

   18       A.   Yes, I am aware of that.

   19       Q.   And this line item Number 5 that

   20   talks about modifying the fire alarm panel,

   21   it is your belief that that would encompass

   22   the same type of fire alarm modification

   23   that we just discussed, correct?

   24       A.   Yes.

   25           MR. SCHANER:  Objection.  Leading.

Martino, James - February 10, 2004 00:00:00 a.m.

493:1              Martino

2        Q.   Now, on any one of the pay

3    applications that you signed, you were

4    never certifying as to which particular

5    subcontractor performed the work only that

6    the work was performed, correct?

7        A.   100 percent correct.

8        Q.   The important prerequisite to you

9    in approving any pay application was that

10   the work was done not which subcontractor

11   did it, correct?

12            MR. SCHANER:   Objection, leading.

13       A.   That is correct.

14       Q.   And for you to feel comfortable

15   about supplying the certification of

16   payment to Crown to actually pay, you just

17   wanted to assure yourself through the

18   sources that you discussed previously, that

19   the work was done not that A company did it

20   versus B company, correct?

21       A.   100 percent correct.  I am tired.

22       Q.   Ten minutes and we will be done.

23   I promise.

24            Back to Exhibit 4 for a minute

25   which was the Tiger pay application for the

Martino, James - February 10, 2004 00:00:00 a.m.

```
494:1                    Martino

     2    Skokie project and the continuation sheet

     3    deals with foundation work and various line

     4    items.

     5              Do you have that, sir?

     6         A.   Yes, sir, I do.

     7         Q.   This type of foundation work is

     8    all work that would reasonably be performed

     9    as part of a construction of a theater

    10    project, correct?

    11         A.   Yes.

    12         Q.   And, in fact, before you can put

    13    up walls, you have to do all this work,

    14    correct?

    15         A.   That is correct.

    16         Q.   Let's look at Exhibit 37.

    17              Exhibit 37 is a pay application

    18    Number 4 from Tiger Contracting.  It

    19    doesn't say which project, but this is the

    20    same project as Exhibit 4, correct?

    21         A.   Same project as Exhibit 4.

    22         Q.   Which Exhibit 4 is the other

    23    Tiger one we just looked at?

    24              MR. SEIDEN:  Let me get Exhibit 4.

    25              MR. WISSER:  I will withdraw the
```

Martino, James - February 10, 2004 00:00:00 a.m.

495:1                  Martino

2      question.

3          Q.   On Exhibit 37, below and to the

4      right of the signature from the contractor

5      Tiger Contracting, there appears to be some

6      sort of signature or notation with a date

7      of August 8, 2000.

8              Do you see that?

9          A.   Yes, I do.

10         Q.   Do you know what it is?

11         A.   This right here?

12         Q.   No.  That's the approved B.B.

13     Construction.  I am looking at that.

14         A.   No, I do not know what that is.

15         Q.   And similarly on Exhibit 39 just

16     showing you there appears to be a similar

17     signature with a date of 9/19/2000.

18              Do you know who that signature

19     is?

20         A.   No, sir, I do not.

21         Q.   Was it another indication to you

22     that someone else had approved this pay

23     application, Exhibit 39?

24         A.   No.

25         Q.   And on Exhibit 39 the

Martino, James - February 10, 2004 00:00:00 a.m.

496:1                    Martino

    2    continuation sheet lists nine change

    3    orders, correct?

    4         A.   Yes, it does.

    5         Q.   And since you were expressly

    6    prohibited from being involved in --

    7    withdrawn.

    8             Were you involved at all with the

    9    change order process on the Skokie project?

   10         A.   Not at this point in time.

   11         Q.   So was it Mr. Beacher's

   12    responsibility at that point in time?

   13         A.   Yes, it was.

   14         Q.   Since it was his sole

   15    responsibility, was there any reason for

   16    you to believe that you had to question any

   17    of those change orders if it was, in fact,

   18    approved by Mr. Beacher?

   19             MR. SCHANER:  Objection, leading.

   20             MR. WISSER:  You can answer.

   21         A.   No.

   22         Q.   Looking at Exhibit 40, this is

   23    the pay application Number 1 from G.U.S.

   24    Development regarding which project, sir?

   25         A.   This, I believe, is Hartford.

Martino, James - February 10, 2004 00:00:00 a.m.

497:1                    Martino

2    Yes.  It is the Hartford site.

3         Q.   Now, the continuation sheet talks

4    about excavation and purchase and placement

5    of gravel and site grading and permits,

6    correct?

7         A.   That is correct.

8         Q.   And you indicated that all of

9    this work was, in fact, performed, correct?

10        A.   I wasn't too sure about the

11   permits.  I don't remember saying that I

12   indicated the permit work was done.

13        Q.   OK.  But in order to do

14   construction in Connecticut, you are aware

15   that you have to pull a construction

16   permit, correct?

17        A.   Yes, that's correct.

18        Q.   It is reasonable to assume

19   somebody has to pull a permit, correct?

20        A.   Yes.

21        Q.   In order to construct a theater

22   project you first have to perform

23   excavation, correct?

24        A.   Yes.

25        Q.   And then purchase and place

Martino, James - February 10, 2004 00:00:00 a.m.

498:1                    Martino

2    gravel, correct?

3         A.   Yes.

4         Q.   And grade the site, correct?

5         A.   Yes.

6         Q.   And since all of this work was

7    done, it was your expectation that Crown

8    would have to pay for this work, correct?

9         A.   Yes.

10        Q.   And you observed at some point in

11   time that this work had been done, correct?

12             MR. SCHANER:  Objection.

13        A.   I don't recall whether it was

14   myself or someone from my office.

15        Q.   OK.  And for you, once again, the

16   issue of your approval was whether the work

17   was performed not who in fact performed it,

18   correct?

19        A.   That is correct.

20        Q.   And looking at Exhibit 41, these

21   would be very similar questions.  This is

22   G.U.S.'s pay application Number 1 for the

23   Trumbull project.  Again, this is site work

24   with gravel and site grading, correct?

25        A.   Yes, it is.

Martino, James - February 10, 2004 00:00:00 a.m.

499:1                    Martino

   2         Q.   And someone within your firm or

   3    you determined this work had been

   4    performed, correct?

   5         A.   Yes.

   6         Q.   And, again, because this work was

   7    done, that's why you would approve this pay

   8    application and expect that Crown would pay

   9    for it, correct?

   10             MR. SCHANER:  Objection, leading.

   11        A.   Following also that it had Bob

   12   Beacher's approval already on it.

   13        Q.   Once again, your concern wasn't

   14   who did it but rather that it was done?

   15             MR. SCHANER:  Objection, leading.

   16             MR. WISSER:  I will give you your

   17             standing objection because the federal

   18             rules are absolutely clear on this

   19             issue.  So let's not muddy up the

   20             record.

   21        Q.   Pull out 51, 31, 32 and 33.

   22             In Exhibit 51, turn to page JTM

   23   01883.

   24        A.   Yes.

   25        Q.   This is an application or

Martino, James - February 10, 2004 00:00:00 a.m.

```
500:1                  Martino

    2   continuation sheet from Alason Electric

    3   regarding switch gear work and switch gear

    4   power wiring, correct?

    5        A.   Yes.

    6        Q.   The first page of Exhibit 51 is a

    7   memorandum dated April 5, submitted by

    8   Mr. Beacher to Mr. Daly for payment

    9   including Alason Electric's work, correct?

   10        A.   Yes.

   11        Q.   If you look at Exhibit 31, that's

   12   a pay application for Hewlett Contracting

   13   application Number 1 of which the

   14   continuation sheet says it is for work for

   15   switch gear controls and mechanical

   16   devices, correct?

   17        A.   Yes.

   18        Q.   Is it fair to say that these

   19   applications are duplicative, in other

   20   words, 51 for Alason Electric and 31 for

   21   Hewlett arguably cover the same work?

   22        A.   Yes.

   23        Q.   The date of Exhibit 31 that you

   24   signed is for work for a period up to March

   25   3, 2000, correct?
```

Martino, James - February 10, 2004 00:00:00 a.m.

501:1                    Martino

2          A.   Yes.

3          Q.   So the first indication you

4     received that switch gear work had been

5     partially performed, was before there was a

6     pay application from Alason Electric,

7     correct?

8          A.   Yes.

9          Q.   If you look at Exhibit 32, that's

10    another pay application to Hewlett for

11    switch gear control and mechanical devices

12    work, correct?

13         A.   Yes.

14         Q.   It is for a period of April 1,

15    2001, correct?

16         A.   Yes.

17         Q.   And the application from Alason

18    is for a period to March 31, 2000, correct?

19         A.   I am sorry.  Please say that

20    again.

21         Q.   The application for Alason

22    Electric is for March 31, 2000, correct?

23         A.   March 31, yes.

24         Q.   So about the same time that

25    Alason is performing work, you also,

Martino, James - February 10, 2004 00:00:00 a.m.

502:1                    Martino

2    whether you are aware or not, you had

3    signed the document indicating that Hewlett

4    was doing some work for switch gear,

5    correct?

6        A.   Yes.

7        Q.   But the first company that you

8    were told by Mr. Beacher that was doing

9    this work was Hewlett Contracting not

10   Alason, correct?

11       A.   Not specifically told.  The first

12   document that I had placed in front of me

13   was from Hewlett, yes.

14       Q.   And you relied on Mr. Beacher to

15   determine whether or not this was some

16   concerted effort of two individuals to do

17   this work or not in terms of approving this

18   pay application, correct?

19       A.   Yes, that's correct.

20       Q.   But clearly Alason Electric was

21   not the first contractor for which you had

22   documentation suggesting this work was

23   being performed, correct?

24       A.   That is correct.

25       Q.   To your knowledge, the work was

Martino, James - February 10, 2004 00:00:00 a.m.

503:1                    Martino

2    performed because no one complained that it

3    wasn't, correct?

4        A.   The work was performed.

5        Q.   Exhibit 57 was a lease that was

6    sent to you which is the executed lease for

7    Hartford.  Whether you pull it or not, you

8    don't know whether you ever read this lease

9    in its entirety, do you?

10       A.   I doubt very strongly I read it

11   in its entirety.

12       Q.   You were going to rely on

13   Mr. Beacher to make sure that the pay

14   applications for specific work was in fact

15   proposed -- performed by the proper

16   subcontractor, correct?

17           MR. SCHANER:  Objection, leading.

18       A.   That's correct.

19           MR. WISSER:  Nothing further.

20           MR. SEIDEN:  Thank you.

21           MR. WISSER:  Very briefly.  I am

22   sorry.

23       Q.   As you sit here now, you have no

24   reason to believe that Mr. Daly would have

25   any reason to know that any pay

Martino, James - February 10, 2004 00:00:00 a.m.

504:1                    Martino

2     applications were fraudulent, correct?

3          A.   I think that's correct.

4               MR. SCHANER:  Objection, leading.

5          Q.   Or fictitious, correct?

6          A.   Correct.

7               MR. SCHANER:  Objection, leading.

8          Q.   Did you observe specific times

9     throughout these various construction

10    projects that the relationship between

11    Mr. Daly and Mr. Beacher was extremely

12    contentious and acrimonious?

13         A.   That was true of many people.

14         Q.   But with Mr. Daly specifically?

15         A.   Between Mr. Daly and Mr. Beacher?

16         Q.   Yes.

17         A.   Yes.

18         Q.   And at times you were asked by

19    Mr. Daly to intervene between fights that

20    he was having with Mr. Beacher, correct?

21         A.   No.  I don't ever recall that.

22         Q.   Are you aware of the fact that

23    Mr. Daly actually fired Mr. Beacher at one

24    point in time because Mr. Beacher was too

25    difficult to deal with general contractors

Martino, James - February 10, 2004 00:00:00 a.m.

505:1                    Martino

2    and the subcontractors?

3        A.   I think that was what happened

4    when I took over the projects.

5        Q.   Did you ever suggest to Mr. Daly

6    that Mr. Beacher be rehired because of how

7    far the projects had progressed?

8        A.   I don't recall that.

9        Q.   As far as you know, though, there

10   were times when the relationship between

11   Mr. Beacher and Mr. Daly was not a good

12   one, correct?

13       A.   Yes.

14           MR. WISSER:  Nothing further.

15   Thank you.

16           (Continued on next page.)

17

18

19

20

21

22

23

24

25

Martino, James - February 10, 2004 00:00:00 a.m.

506:1            Martino

2          MR. SCHANER:  I have no further

3      questions subject to the possibility

4      that we may apply to the court to

5      require the witness to answer certain

6      questions that he refused to answer

7      today and at the first session of his

8      deposition.

9          (Time noted: 5:35 P.M.)

10

11          _____

12              JAMES MARTINO

13

14  Subscribed and sworn to before me

15  this ____ day of _____, 2004.

16

17  _____

18

19

20

21

22

23

24

25

Martino, James - February 10, 2004 00:00:00 a.m.

507:1

2                    C E R T I F I C A T E

3    STATE OF NEW YORK    )

4                         : ss.

5    COUNTY OF NEW YORK    )

6

7           I, DEBORAH A. HANLON, a Notary

8    Public within and for the State of New

9    York, do hereby certify:

10          That JAMES MARTINO, the witness

11   whose deposition is hereinbefore set

12   forth, was resworn by me and that such

13   deposition is a true record of the

14   testimony given by the witness.

15          I further certify that I am not

16   related to any of the parties to this

17   action by blood or marriage, and that I

18   am in no way interested in the outcome

19   of this matter.

20          IN WITNESS WHEREOF, I have

21   hereunto set my hand this 12th day of

22   February, 2004.

23

24          _____

25                    DEBORAH A. HANLON

Martino, James - February 10, 2004 00:00:00 a.m.

```
508:1

   2   ------------------ I N D E X ------------------

   3   WITNESS             EXAMINATION BY        PAGE

   4   JAMES MARTINO        MR. SCHANER          226

   5                       MR. WISSER           445

   6

   7

   8

   9   ------------- INFORMATION REQUESTS -------------

  10   INSTRUCTIONS: 227, 234, 251

  11

  12   -------------------- EXHIBITS ------------------

  13   MARTINO                          FOR ID.

  14    25 7/8/98 letter                252

  15    26 Document Bates BOA 3 and 4   277

  16    27 Document Bates F 16 and 17   279

  17    28 Document Bates F 19 and 20   280

  18    29 Document Bates F 21 and 22   283

  19    30 Application and Certificate for Payment, dated 1/27/00      302

  20    31 Application and Certificate for

  21       Payment, dated 3/2/00        313

  22    32 Application and Certificate for Payment, dated 4/4/00       320

  23    33 Application and Certificate for

  24       Payment, dated 4/26/00       323

  25    34 Application and Certificate for
```

Martino, James - February 10, 2004 00:00:00 a.m.

```
509:1   ------------------- EXHIBITS ------------------

    2   MARTINO                          FOR ID.

    3   35 Application and Certificate for Payment, dated 6/1/01          350

    4   36 Application and Certificate for

    5      Payment, dated 7/6/00          351

    6   37 Application and Certificate for Payment, dated 8/2/00          354

    7   38 Application and Certificate for

    8      Payment, dated 9/7/00          355

    9   39 Application and Certificate for Payment, dated 9/14/00         356

   10   40 Application and Certificate for

   11      Payment, dated 6/9/99          363

   12   41 Application and Certificate for Payment, dated 7/26/99         372

   13   42  2000 Monthly Planning Guide     379

   14   43  2000 Desk Calandar              379

   15   44  Jupiter Theater Project Lease   384

   16   45  Document Bates JTM 8071 to 73   385

   17   46  Document Bates JTM 5366 to 77   391

   18   47  Document Bates JTM 35 to 111    394

   19   48  Document Bates JTM 159 to 214   398

   20   49  Document Bates JTM 266 to 268   401

   21   50  Document Bates JTM 122 to 142   402

   22   51  Document Bates JTM 1870 to 1891 405

   23   52  Document Bates JTM 472          411

   24   53  Document Bates JTM 10578 to 642 414

   25
```

Martino, James - February 10, 2004 00:00:00 a.m.

```
510:1    -------------------- EXHIBITS ------------------

    2    MARTINO                              FOR ID.

    3     55  Document Bates JTM 15297 to 318    420

    4     56  Document Bates JTM 15319 to 334    422

    5     57  Document Bates JTM 15625 to 720    425

    6     58  Spec book for Hartford             429

    7     59  Trumbull Project Lease             431

    8

    9

   10

   11

   12

   13

   14

   15

   16

   17

   18

   19

   20

   21

   22

   23

   24

   25
```

Martino, James - February 10, 2004 00:00:00 a.m.

511:1   *** ERRATA SHEET  ***

2            ESQUIRE DEPOSITION SERVICES 216 EAST 45TH STREET

3               NEW YORK, NEW YORK 10017 (212) 687-8010

4    NAME OF CASE:  CROWN V. DALY

5    DATE OF DEPOSITION:  FEBRUARY 10, 2004 NAME OF WITNESS:  JAMES MARTINO

6    PAGE  LINE      FROM       TO

7    ___|_____|_____|_____

8    ___|_____|_____|_____

9    ___|_____|_____|_____

10   ___|_____|_____|_____

11   ___|_____|_____|_____

12   ___|_____|_____|_____

13   ___|_____|_____|_____

14   ___|_____|_____|_____

15   ___|_____|_____|_____

16   ___|_____|_____|_____

17   ___|_____|_____|_____

18   ___|_____|_____|_____

19

20                  _____

21                     JAMES MARTINO

22   Subscribed and sworn to before me

23   this _____ day of _____, 2004.

24   _____

25   (Notary Public)        My Commission Expires: