1. Assisting the owner in determining the needs for the project during the Pre-Design and Design Phases.
2. Advising the architect on behalf of the owner.
3. Preparing estimating and scheduling data during the Design Phase.
4. Providing value engineering and constructability reviews during the design phase.
5. Devising bid packages and managing bids or negotiations for construction.
6. Preparing and managing construction contracts.
7. Directing the contractor(s) during construction.

These are all of the duties that were performed by B.B. Construction Consultants, Ltd., and Beacher was referred to as a construction manager by Milton Daly.[8] Since this was the construction delivery method being used by Crown, Martino was directed by Crown to accept the certifications prepared by B.B. Construction Consultants as the "owner's authorized representative." Although these projects were established as design/bid/build projects with a distinct general contractor retained at each respective theater site, they functioned more closely to a construction management project where the construction manager is an agent of the owner. This "agent" role was the function of B.B. Construction who was established, through the construction documents, as "Crown's Authorized Representative." In responding to the contractual arrangements, as established for the project by Crown Theatres, and by performing his professional services in conjunction with those related duties, Martino did comply with the applicable Standard of Care.

The fact that Applications for Payment, AIA Document G702, were signed at or before weekly job meetings in Connecticut, and were not necessarily concurrent with Martino's construction phase site visits, further reflects that he was directed by Crown to accept the certification by B.B. Construction Consultants, Ltd., as the owner's full time authorized project representative. Further, Crown knew and/or should have known when and how often Martino visited each of the theater projects during the construction phase. The visits were discussed and were sometimes reflected on Martino's invoices. Crown was privy to his signatures accepting the certification by B.B. Construction, and never questioned his performance or services with regard to this aspect of the work.

AIA Document B141, Standard Form of Agreement Between Owner and Architect - 1987 Edition, is one of the standard contract documents prepared under the auspices of the American Institute of Architects and is considered a standard within the construction industry. This document, within Article 2.6.10, indicates, "The issuance of a Certificate of Payment shall further constitute a representation that the contractor is entitled to payment in the amount certified." This certification, as made by Martino, was predicated on information provided to him by the owner's authorized representative. Article 2.6.10 further states, "However, the issuance of a Certificate for Payment shall not be a representation that the architect has (1) made exhaustive or continuous on-site inspections to check the quality or quantity of the work ... or (3) reviewed copies of requisitions received from Subcontractors

---

[8] Deposition of Milton Daly, Page 115; dated August 5, 2003.

14

**Robson Lapina**

and material suppliers and other data requested by the Owner to substantiate the Contractor's right to payment or (4) ascertained how or for what purpose the Contractor has used money previously paid on account of the Contract Sum." Lastly, Article 4.8, of AIA Document B141, states, "The Owner shall furnish all legal, accounting, and insurance counseling services as may be necessary at any time for the project, including auditing services the Owner may require to verify the Contractor's Applications for Payment or to ascertain how or for what purpose the Contractor has used the money paid by or on behalf of the Owner." Although this document was not utilized as the Owner Architect Agreement with respect to the performance of work in conjunction with the Crown Theatre projects; as a recognized standard of the construction industry, it does provide guidance in that it is not the architect's responsibility to audit payments or to determine how or for what purposes monies being paid to contractors are being used. This is further corroboration that Martino did perform his professional services in compliance with the applicable Standard of Care.

G.     STEFFIAN REPORTS:

The letter from P. Steffian to L. Schaner, dated February 13, 2004, indicates in the "Conclusion," on page 2 of 6, "that Martino has agreed to perform conventional Standard Basic Services." Steffian does not define what he means as "Standard Basic Services." Within the confines of an agreement between an architect and his or her client, the professional services to be provided, during any specific phase of the project, are only those that the architect and the client agree to have provided within the scope and fee structure for the project.

On page 5 of 6 in this same letter, Steffian references the <u>American Institute of Architect's 1997 Code of Ethics and Professional Conduct</u>. In quoting Ethical Standard E.S.3.2., Steffian alleges that Martino had a conflict of interest with regard to the projects. Steffian does not demonstrate a conflict of interest within his letter.

Ethical Standards, within the <u>AIA Code of Ethics and Professional Conduct</u>, are more specific goals toward which members should aspire in professional performance and behavior. These Ethical Standards amplify the Canons. Canons are broad principals of conduct. However, only the Rules of Conduct (Rule) are mandatory and violation of a Rule is grounds for disciplinary action by the American Institute of Architects. Rules of Conduct, in some instances, implement more than one Canon or Ethical Standard. Therefore, it should be noted that Ethical Standard 3.2 is not a mandatory provision of conduct by a member of the American Institute of Architects.

Steffian references Rule 3.201, of the Code, by stating, "A Member shall not render professional services if the Member's professional judgement would be affected by responsibilities to another project or person, or by the Member's own interest, unless all those who rely on the Member's judgement consent after full disclosure." Martino did not have responsibilities to any other person or project other than his contractual responsibility to Crown and the Crown Projects. His judgement, in rendering professional services with regard to the Crown Theatre Projects, was not affected as a result of his relationship with Beacher.

15

**Robson Lapina**

Both Martino and Crown relied on Beacher's expertise with regard to the theater projects. They had a long standing relationship on theater projects and other projects. The relationship between Martino and Beacher was a long standing professional and personal relationship. The sums of money that were issued by Martino to Beacher were unilaterally funded by Martino, as a form of gratitude, for Beacher's assistance in recommending Martino for the Crown Projects, consistent with Martino's practice on other projects referred by Beacher. These were not "stipulated sums or fees" with specific amounts determined by either Beacher or Martino prior to the checks being written by Martino. They were not "secret" payments, but instead were in the form of checks written by Martino's firm to Beacher's firm. Rule 3.201 is intended to embrace the full range of situations that may present a member of the American Institute of Architects with a conflict between his interests or responsibilities and the interest of others with whom he is in contract. Such was not the case with regard to the money issued by Martino to Beacher. They were not bound by any contractual relationship of the Crown Projects.

Steffian also references, in the February 13, 2004, letter, the NCARB Rules of Conduct, Rule 5.3, states, "An architect shall neither offer nor make any gifts, other that of nominal value (including for example, reasonable entertainment and hospitality), with the intent of influencing the judgement of an existing or prospective client in connection with a project in which the architect is interested." Beacher was not a client of Martino in conjunction with the Crown Projects.

Steffian supplemented his February 13, 2004, letter to L. Schaner with a letter dated March 2, 2004. In this letter, Steffian refers to his review of the laws, rules, regulations, and codes of ethics and professional conduct for the States of New York, Connecticut, Illinois, Maryland, and Florida. Steffian alleges that Martino violated the provisions of State Law and the requirements of each State Board of Registration of Architects in those states as a result of his providing services in conjunction with the Crown Theatre Projects and in conjunction with his payments to Beacher.

New York Rule 29.1.b.3., references offering or giving a fee or other consideration for the referral of a client or in connection with the performance of professional services. The money given by Martino to Beacher was not a fee. At no time did Beacher stipulate that a "Referral Fee" in a specific amount was required. Further, the monies issued by Martino to Beacher were not in connection with the performance of professional services.

With regard to New York Rule 29.3.a.1. and 2., at no time during the conduct of the professional services provided by Martino, was he cognizant of any fraudulent or dishonest practice being furthered by either Beacher or Daly. Under Rule 29.3.a.3., Martino affixed his signature to a document whereby he had performed the services for which he was retained as an architect.

Rules and regulations further addressed by Steffian, within the States of Connecticut, Illinois, Maryland, and Florida are similar, and in many cases have been directly drawn from either the American Institute of Architect's Code of Ethics and Professional Conduct or the NCARB Rules of Conduct. Nowhere in Steffian's Reports does he indicate that a conflict of interest occurred. Further, Martino had no knowledge of any fraudulent activities of Beacher or Daly during the performance of his services on any of the projects in any of the states. Martino worked with Beacher since 1979 on several other projects where there were no fidelity problems.[9]

H.   STATEMENT OF FINDINGS:

Within the bounds of reasonable architectural and technical certainty and subject to revisions should additional information become available, it is my professional opinion that James T. Martino, AIA, Architect, doing business as James Thomas Martino, Architect, P.C., did comply with the Standard of Reasonable Professional Care in furnishing architectural services to Crown Theatres. During the performance of his professional services:

1.   Martino provided a proposal to Crown Theatres delineating the services that were to be performed. This proposal was accepted by Crown and became the basis for their agreement.

2.   The proposal delineated the construction administration services, which were to include site visits for observation of the work. Site visits were performed by the Martino firm and accepted by Crown. On the Annapolis, Jupiter, and Skokie projects, Martino was directed not to make regular site visits as duplicative of Beacher's service, and therefore, unnecessary. Crown was fully aware of the frequency of Martino's site visits and interposed no objections.[10]

3.   Martino made on-site visits, discussed the progress and quality of the projects at weekly meetings, reviewed progress photos, discussed construction phase issues with contractors and Beacher, processed RFI's and reviewed project correspondence. In doing so, he certified to the best of his knowledge, information and belief that the work was in accordance with the contract documents by signing AIA Form G-702. Martino relied on Beacher's certifications as to the quantity of work completed and amount of money due to the contractors since Beacher negotiated the construction contracts and schedules of value, in certifying that "the contractor is entitled to payment of the amount certified" per Form G-702. Beacher was designated by Daly, as construction manager, and performed services consistent with those performed by a construction manager-agent.

---

[9]   Deposition of James Martino, Pages 450-454; dated February 10, 2004.

[10]  Deposition of James Martino, Pages 467-468; dated February 10, 2004.

4. Martino never received notification from Crown, during the construction phase of any theater project, that they were dissatisfied with his services or that he was not performing services as contractually required.

5. Martino did not violate any rules, laws, or regulations of any State Board governing the practice of architecture within any of the states in which he provided services to Crown Theatres. Martino did not violate the American Institute of Architects Code of Ethics and Professional Conduct or the National Council of Architectural Registration Board's Rules of Conduct in the performance of professional architectural services provided to Crown Theatres.

_____
Ronald P. Bertone, FAIA

# Robson Lapina

Forensic Engineers, Architects, Scientists & Fire Investigators

PHONE: 732-671-7101
800-613-6736

8 TINDALL ROAD, SUITE 2
MIDDLETOWN, NJ 07748

FAX: 732-671-7050
WWW.ROBSONLAPINA.COM

## RONALD P. BERTONE; FAIA, PP, FACHA
### Architect and Planner

## PROFESSIONAL EXPERIENCE

**1997 to present**  **Robson Lapina, Inc.**
*Associate and Technical Manager* for the Professional Liability aspects of the firm's cases. Review of agreement forms, project contract documents, and other project records necessary toward the resolution of litigation involving professional liability. Performance of site investigations, preparation of reports, and testimony with regard to professional liability issues, along with premises liability, facility and materials failures, and code violations.

**1986 to present**  **Bertone Associates, P.C.**
*President* with design and construction administration expertise in varied architectural building types for both new and renovation projects. Facility types include retail and commercial space, restaurants, schools, office facilities, single and multi-family residential, laboratories, animal shelters, and food processing facilities. Approximately, 60% of the projects are renovations and/or adaptive reuse of existing buildings.

**1997 to present**  **Bertone Cozzarelli Architects**
*Managing Partner* involved in all phases of new and renovation health care projects including skilled nursing facilities, assisted living residences, , sub-acute care facilities, MRI suites, and adult medical day care. Other project types include restaurants, fitness centers, and community centers.

**1986 to 1997**  **Bertone/Sclare Associates**
*Managing partner* involved in all phases of health care projects including hospital renovations, radiology facilities, MRI and CT suites, voluntary and involuntary psychiatric units, facilities for mentally and physically challenged children and adults, skilled nursing facilities, assisted living, and aids clinical trials units. These projects included new and renovated buildings, fire and life safety upgrading with fire sprinkler systems and egress studies, code analysis, and Fire Safety Evaluation Studies (FSES) pursuant to the NFPA Life Safety Code 101.

**1978 to 1986**  **Bertone-Pineles**
*Partner* in charge of all phases of architecture on projects for state and federal government agencies. The firm was also involved in design build for numerous private clients. Project types included health care, residential, and indoor tennis and racquetball facilities.

**1970 to 1978**  **Becker Bendixon Murphy Architects**
*Associate* involved in all phases of varied projects. Professional expertise in programming, design, construction monitoring, and post construction evaluation. Project types include indoor ice arenas, public housing, banks, and schools.

# Robson Lapina
Forensic Engineers, Architects, Scientists & Fire Investigators

## RONALD P. BERTONE, FAIA, PP, FACHA
### Architect and Planner

### RELEVANT PRESENTATIONS

"Assisted Living Environmental Design and Codes Symposium," New Jersey Association of Health Care Facilities, 1996

"Designing the Assisted Living Environment," Gerontology Institute of New Jersey, 1996

"Construction Contracts and Related Documents," State Construction Association of Belarus, Russia, 1994

"Waterfront Development," Long Branch, NJ, Town Meeting, 1994


### RELEVANT COMMITTEE/TASK FORCE PARTICIPATION

#### AIA National Ethics Council (2000-2003)

Members of the American Institute of Architects are dedicated to the highest standards of professionalism, integrity, and competence. The Code of Ethics and Professional Conduct, arranged by Canons, Ethical Standards, and Rules of Conduct establishes guidelines for the conduct of members. Enforcement of this code is administered through the AIA National Ethics Council.

#### AIA Codes & Standards Committee (2000-2004)

Reviews and evaluates new codes or modifications to existing codes with regard to their impact on the health, safety, and welfare of the public.

#### AIA Codes Task Force (Oct./Dec. 1999)

The AIA Board of Directors issued a resolution, in September 1999, authorizing the creation of this Task Force. The formation of this body was necessitated because of concerns that two separate model construction codes were being developed against each other, and that this would negatively impact the public interest, the construction industry, and AIA member architects. The group was charged to study these developments and assess how they would affect the AIA's longstanding policy for a single set of model codes.

The Task Force received presentations from the leadership of all three model code organizations comprising the ICC, the International Association of Plumbing and Mechanical Officials, NFPA, federal government representatives, and AIA members representing Building Codes and Standards, Architecture for Health, and Architecture for Justice. The Task Force issued a "Report of Findings" to the AIA Board and subsequently the entire membership.

**Robson Lapina**
Forensic Engineers, Architects, Scientists & Fire Investigators

## RONALD P. BERTONE; FAIA, PP, FACHA
### Architect and Planner

**American Institute of Architects Washington DC (1997)**

"Universal Accessibility Conference"; Moderator for "Requirements for Existing Facilities under ADA Title II".

**AIA Liaison to State and Local Government Affairs Network (1996-1997)**

This group of AIA Leaders, Lobbyists, and Component Executive Directors from across the country monitored legislative and code issues at the individual state level with regard to national implications effecting architects and the public.

**New Jersey Association of Health Care Facilities (1993-Present)**

This group strives to assure that persons in Assisted Living, Residential Health Care Facilities, and Skilled Nursing Facilities receive professional care in state of the art environments.

## GOVERNMENT TESTIMONY

NJ State Assembly: <u>Certification of Interior Designers</u>, A-1301, 1995
NJ State Assembly: <u>Qualifications Based Selection Procedures</u>, A-364, 1994
New Jersey Senate: <u>Certificate of Merit Legislation</u>, S-1493, 1994
US Congress: <u>Anti-recession Infrastructure Jobs Act</u>, H.r.475, 1992

## HONORS

Elected as a Fellow of the American College of Healthcare Architects - 2001
Distinguished Alumnus 2000 - Texas Tech University
Business News New Jersey; "1999, Who's Who 10 Most Notable New Jersey Architects."
Herman C. Litwack, FAIA, Award for "Lifetime Service to the Architectural Profession" by the Newark and Suburban Architects of AIA New Jersey; 1999 recipient
Invested into the College of Fellows of the American Institute of Architects (FAIA), May 1997
NJ Society of Architects (AIA/NJ) Distinguished Service Medal, 1997
Tau Sigma Delta, National Architectural Honor Society, 1968

## EDUCATION

Bach. Architecture Cum Laude, 1970, Texas Tech. University

**Robson Lapina**
Forensic Engineers, Architects, Scientists & Fire Investigators

## RONALD P. BERTONE; FAIA, PP, FACHA
### Architect and Planner

### NATIONAL ARCHITECTURAL ACCREDITATION BOARD

Accreditation Visit - University of Colorado, 1998
Accreditation Visit - University of North Carolina, Charlotte, 1999
Accreditation Visit - Southern University and A & M College, 2000

### PROFESSIONAL CREDENTIALS

Fellow of the American College of Healthcare Architects, 2001
Fellow of the American Institute of Architects, 1997
Certification by the National Council of Architectural Registration Boards; 1973
Registered Architect: State of New Jersey; 1971
Registered Architect: State of New York; 1975
Registered Architect: State of Connecticut; 1978
Registered Architect: State of Pennsylvania; 1982
Registered Architect: State of Florida; 1984
Registered Architect: State of Maryland, 2003
Licensed Professional Planner: State of New Jersey; 1985

### PROFESSIONAL SERVICE

Elected Member, Board of Directors, National Fire Protection Association (NFPA), 2000-2004
National Vice President, American Institute of Architects; 1999
Member, National Board of Directors, American Institute of Architects; 1996-1998
President, AIA/NJ, New Jersey Society of Architects; 1994
Woodbridge Township Downtown Revitalization Task Force (Mayoral Appointment); 1992
Regional Environmental Coordinator, AIA; 1986-1992
Appointed Member, AIA Architecture for Health Committee; 1984-1987, 1992
President, Board of Education, Holy Cross School; 1985
Member, Monmouth County Construction Board of Appeals; 1982-1985
Municipal Chairperson, Boy Scouts of America; 1982
Chairperson, Zoning Board of Adjustment, Borough of Atlantic Hlds.; 1974-1981
President, AIA/NJ, Newark-Suburban Section; 1980



Forensic Engineers, Architects, Scientists & Fire Investigators

## RONALD P. BERTONE; FAIA, PP, FACHA
### Architect and Planner

**REPRESENTATIVE CONTINUING EDUCATION**

"New Trends in Assisted Living Housing," AIA National Convention, May, 1995

"Project Administrator," AIA NationalConvention, May, 1995

"Owner/ Architect Agreements & Other Contracts," Professional Seminars Group, Nov. 1995

"Concept of Universal Accessibility," AIA National Convention, June, 1997

"Timber Construction," AIA Newark & Suburban Architects, June, 1999

"Sprinkler Systems & Design," NFPA, Nov. 2000

"Health Facilities & 2000 Life Safety Code," NFPA, Nov. 2000

"NFPA 5000 Building Code," NFPA, Nov. 2000

"Everyday Ethical Violations," AIA National Convention, May 2001

"Demystifying Building Codes," NFPA, May 2002

"Firestopping," NFPA, May 2002

"Code Provisions for Existing Buildings," NFPA, May 2002

Exhibit B

```
 1                                        VOLUME:   I
                                          PAGES:    248
 2

 3
                UNITED STATES DISTRICT COURT
 4             FOR THE DISTRICT OF CONNECTICUT

 5

 6           CASE NO.:  3:02 CV 2272 (AVC)

 7

 8   CROWN THEATRES, L.P.,                     )
                                               )
 9              Plaintiff,                     )
                                               )
10   vs.                                       )
                                               )
11   MILTON L. DALY, DALY TAYLOR-LEIGH,        )
     INC., JAMES C. CELLA, G.U.S.              )
12   DEVELOPMENT, INC., JAMES T. MARTINO,      )
     JAMES THOMAS MARTINO, ARCHITECT,          )
13   P.C. and RCD HUDSON, LLC,                 )
                                               )
14              Defendants.                    )
                                               )
15   ------------------------------------------)
                                               )
16   JAMES T. MARTINO, and JAMES THOMAS        )
     MARTINO, ARCHITECT, P.C.                  )
17                                             )
                Third-Party Plaintiffs,        )
18                                             )
     vs.                                       )
19                                             )
     B.B. CONSTRUCTION CONSULTANTS,            )
20   LTD., DAVID CLIFFORD, and                 )
     GLEN GARFINKEL,                           )
21                                             )
                Third-Party Defendants.        )
22

23

24
```

```
 1
 2
 3
 4
 5
 6        DEPOSITION OF PETER STEFFIAN,
 7   a witness called on behalf of the
 8   Defendants before Dawn Mack-Boaden,
 9   Court Reporter and Notary Public in
10   and for the Commonwealth of
11   Massachusetts, held at the offices
12   of Steffian Bradley Architects, 100
13   Summer Street, Boston,
14   Massachusetts, on Tuesday, February
15   17, 2004, commencing at 10:10 a.m.
16
17
18
19
20
21
22
23
24
```

```
 1   APPEARANCES:

 2

     Mark Seiden, Esquire
 3     MILBER MAKRIS PLOUSADIS & SEIDEN, LLP
       108 Corporate Park Drive
 4     Suite 200
       White Plains, New York  10604
 5     (914) 681-8700
       Counsel on behalf of the Defendant James Martino
 6

 7   Lawrence S. Schaner, Esquire
       JENNER & BLOCK
 8     One IBM Plaza
       Chicago, Illinois  60611-7603
 9     (312) 222-9350
       Counsel on behalf of the Plaintiff
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

INDEX

| Witness | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| **PETER STEFFIAN** | | | | |
| (By Mr. Seiden) | 5 | | | |

EXHIBITS

| No. | Description | Page |
|---|---|---|
| 1 | Cover Letter of November 12, 2003 | 67 |
| 2 | Letter Dated September 17, 2003 | 72 |
| 3 | Letter Dated September 17, 2003 | 74 |
| 4 | Four-page Series of Notes; Jan. 26, '04 | 79 |
| 5 | Notes of September 23, 2003 | 80 |
| 6 | Report of September 25, 2003 | 88 |
| 7 | Audit Report | 190 |
| 8 | AIA Code of Ethics and Professional Conduct | 206 |
| 9 | Report of February 13, 2004 | 224 |
| 10 | NCARB Rules of Conduct | 224 |

\* Exhibits were retained by Attorney Schaner.