1  work into in this firm?
2     A.    I just think of my knowledge of the
3  people that work here and the closeness of the
4  principals, that that does not occur.
5     Q.    Is it your testimony -- let me ask you
6  this question -- withdrawn.
7           Have you ever taken a client out to
8  dinner?
9     A.    Yes.
10    Q.    You've taken a client out to dinner?
11    A.    Yes.
12    Q.    And was the purpose of your taking the
13 client out to dinner to get more work from that
14 client?
15    A.    I wouldn't say necessarily.
16    Q.    Was one of your motivations for taking a
17 client to dinner to get more work out of that
18 client?
19    A.    No.  We develop a personal relationship
20 with many of our clients, and I don't think taking
21 somebody out to dinner is going to at least
22 influence my clients.  It's just a courtesy.
23    Q.    Just a courtesy.  Do you ever take a
24 client to a sporting event?

1  A. Yes.
2  Q. Okay. Who paid for the tickets?
3  A. Steffian Bradley.
4  Q. Okay. Is that a kickback to your client?
5  A. No.
6  Q. No. Did you take your client to a
7  sporting event for the purpose of trying to get in
8  the good graces with your client so that you can
9  get more work or more money from that client?
10 A. That's not the motivation.
11 Q. Was that a kickback?
12 A. No. And in --
13 Q. So Steffian --
14
15     MR. SCHANER: Let him finish his
16     answer.
17     THE WITNESS: I haven't finished.
18     And, quite frankly, in most cases, the
19     client then buys dinner.
20
21 BY MR. SEIDEN:
22 Q. Is it the case that in the course of your
23 career as an architect, you've taken your clients
24 to dinners, shows, sporting events, hundreds of

1  times?

2  A.   Not hundreds of times.

3  Q.   How many times?

4  A.   Well, we do have Red Sox tickets.  So

5  during the baseball season we will take clients or

6  give the tickets to clients, friends, other

7  architects, what have you, all kinds of different

8  people.

9  Q.   Do you ever give those Red Sox tickets to

10 clients and they go to the game with their family

11 or friends and no one from this office goes with

12 them?

13 A.   Yes.

14 Q.   Okay.  Is that a kickback to your client?

15 A.   I don't think so.

16 Q.   How do you distinguish between your

17 kickback and what you allege is a kickback that

18 Mr. Martino paid to a non-client?

19

20      MR. SCHANER:  Object to the form of

21      the question.  It misstates his testimony.

22      THE WITNESS:  For one, I wouldn't

23      call Mr. Beacher a non-client.

24

BY MR. SEIDEN:

Q. Was Beacher Martino's client on any of these jobs?

A. He was the owner's representative.

Q. Was he Martino's client on those jobs?

A. He acted for the owner as the owner's representative, and I think he had a great deal of influence at one time in that respect.

Q. Did Martino have a contract with Beacher on any of these six projects?

A. No; he had a contract called the Trumbull agreement.

Q. With the owner -- with Crown Theaters.

A. Which was assigned to Crown Theaters, and he says Crown Theaters accepted.

Q. Okay. Now, do you ever -- have you ever used a business broker?

Has SBA ever engaged a business broker for any purpose; to acquire another firm?

A. Well, the only thing we've ever done is use a headhunter to find employees, but I don't think we've ever used anybody.

We have in-house marketing people. We haven't even used an outside marketing consultant

1  that I can think of.
2       We have used outside graphic designers to
3  help us with brochures.
4       Q.   If I asked you to take a poll of the
5  personnel in your office to find out whether
6  they've ever paid a fee to anyone that's referred
7  business to this office and you found out that they
8  did, would they be fired the next day?
9       A.   I can't say one way or the other.  It
10 depends on a lot of different things:  Who it was,
11 what it was, how much it was.
12      Q.   Have you ever sent any Christmas gifts to
13 your clients; holiday gifts?
14      A.   I'd say very, very rarely.
15      Q.   Have you ever sent holiday gifts to your
16 clients?
17      A.   Not that -- I can not think of one.  We
18 get them from clients all the time.
19      Q.   Do you ever have holiday parties in which
20 clients are invited?
21      A.   That's part of our marketing procedure,
22 yes.
23      Q.   Do you ask them to pay to come to those
24 parties?

```
1      A.    No.
2      Q.    Do you give them free food?
3      A.    We sure do.
4      Q.    Give them free entertainment?
5      A.    Not entertainment.  I don't recall
6  anybody, no.  I don't think so.  I don't think
7  we've ever had entertainment, per se.
8      Q.    When you invite clients to your parties,
9  is it your hope and expectation that they will
10 remain clients of your firm and that by socializing
11 with them they'll give you more business?
12     A.    That's part of the overall concept of
13 marketing, yes.
14     Q.    And you pay for those parties; right?
15     A.    Yeah.
16     Q.    And they can be a pretty penny, can't
17 they?
18     A.    We work to a budget.
19     Q.    Okay.  Now, by inviting your clients to
20 your parties with the hope and expectation that
21 you're going to get more business out of them,
22 isn't that a kickback?
23     A.    I don't think you would find that in any
24 industry referred to as a kickback.
```

```
 1        Q.    Let's -- let me refer you to ES 3.2 in
 2   the exhibit that you have before you, the AIA Code
 3   of Ethics.  Do you have that before you?
 4        A.    Yes.
 5        Q.    Okay.  Now, that --
 6        A.    Oh, wait.  I was reading something else.
 7        Q.    3.2.
 8        A.    Here we go.
 9        Q.    That ethical standard speaks of conflict
10   of interest, does it not?
11        A.    Yes.
12        Q.    Okay.  And can you define for me what a
13   conflict of interest is?
14        A.    Well, I think a conflict of interest is
15   when a person rendering professional services might
16   find his professional judgment compromised by
17   responsibilities to somebody other than his client
18   when he has an interest in a project.
19        Q.    Let me ask you this question,
20   Mr. Steffian.
21              Isn't it true that neither the AIA Code
22   of Ethics and Professional Conduct nor the Rules of
23   Conduct of the National Counsel of Architectural
24   Registration Boards has a prohibition against
```

1  paying referral fees?

2     A.   Well, I think the NCARB Rules of Conduct

3  Number 5.3 that says:  An architect shall neither

4  offer nor make any gifts other than that of nominal

5  value, including, for example, reasonable

6  entertainment and hospitality, with the intent of

7  influencing the judgment of an existing or

8  prospective client in connection with a project of

9  which the architect is interested.

10         I think that's exactly what happened

11 between Mr. Martino and Mr. Beacher.

12    Q.   Okay.  So an architect shall neither --

13 I'm reading Rule 5.3.

14         An architect shall neither offer nor make

15 any gifts other than a gift of nominal value,

16 including, for example, reasonable entertainment

17 and hospitality, with the intent of influencing a

18 judgment of an existing or prospective client in

19 connection with a project in which the architect is

20 interested.

21         Now, is Bob Beacher an existing or

22 prospective client of Jim Martino?

23    A.   He is an existing and prospective

24 client's representative; and in, I think a real

1  sense and act, on Mr. Martino's behalf in that --
2  that relationship.
3      Q.   So is it your testimony that an owner's
4  rep is a client of an architect?
5      A.   I think the owner's rep acting -- acts as
6  the client, and he certainly did in this case, of
7  the architect.
8      Q.   I'll ask it again.  Is it your opinion on
9  each and every project in which there is an owner's
10 rep, that the owner's rep is a client of the
11 architect?
12     A.   Not in each and every project.
13     Q.   No.  Only the ones you choose for the
14 purpose of forming an opinion?
15     A.   No.
16     Q.   Does the NCARB define who a client is?
17     A.   I don't believe so; but you have the
18 document.
19     Q.   When, in your selective judgment --
20
21          MR. SCHANER:  Objection.
22
23 BY MR. SEIDEN:
24     Q.   -- is an owner's rep a client of the

```
 1   architect versus not a client of the architect?
 2
 3           MR. SCHANER:  Object to the form of
 4       the question.
 5           THE WITNESS:  I will concede that,
 6       technically, an owner's rep is probably
 7       not a client of the architect.
 8           But, in this case, Mr. Beacher
 9       certainly yielded -- or wielded, excuse me
10       -- wielded a tremendous amount of
11       authority and influence, especially with
12       his relationship to Mr. Milton Daly who
13       was the chief operating officer of Crown;
14       and I'm sure he influenced the future work
15       of Mr. Martino for Crown.
16
17   BY MR. SEIDEN:
18       Q.   So are you saying that Beacher is not a
19   client of Martino?
20       A.   I said, technically, I agree with you,
21   yes.
22       Q.   Now, in the AIA Code of Ethics, is there
23   any expressed prohibition of paying a referral fee
24   to a third party?
```

Exhibit C

Page 1

```
 1         UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF CONNECTICUT
 2           CASE NO. 3:02CV2272AVC
 3   CROWN THEATRES, L.P.,
 4
          Plaintiff,
 5
     vs.
 6
     MILTON L. DALY, TAYLOR-LEIGH, INC.,
 7   ANNE E. DALY, JAMES C. CELLA, G.U.S.
     DEVELOPMENT, INC., JAMES T. MARTINO and
 8   JAMES THOMAS MARTINO, ARCHITECT, P.C.,
 9
          Defendants.
10   _____/
11
12
13      VIDEOTAPED DEPOSITION OF ROBERT L. BEACHER
14           VOLUME I, PAGES 1 - 124
15
16        Wednesday, February 25, 2004
          10:24 a.m. - 5:19 p.m.
17        Suite 1500
          200 East Broward Boulevard
18        Fort Lauderdale, Florida 33301
19
20
21
22   Reported By:
     Theresa Tomaselli, RPR, RMR
23   Notary Public, State of Florida
     Esquire Deposition Services
24   Fort Lauderdale Office
     Phone - 800.211.3376
25       954.331.4400
```

Page 2

```
 1   APPEARANCES:
 2   On behalf of the Plaintiff:
 3     JENNER & BLOCK, LLP
       One IBM Plaza
 4     Chicago, Illinois 60611
       BY: CRAIG C. MARTIN, ESQUIRE
 5     AND  MATTHEW H. RICE, ESQUIRE
       AND  LAWRENCE S. SCHANER, ESQUIRE
 6
 7   On behalf of the Defendants, Milton L. Daly,
     Anne E. Daly and Taylor-Leigh, Inc.:
 8
       WEINSTEIN & WISSER, P.C.
 9     Suite 207
       29 South Main Street
10     West Hartford, Connecticut 06107
       BY: KERRY M. WISSER, ESQUIRE
11
12   On behalf of the Defendants, James T. Martino, and
     James Thomas Martino, Architect, P.C.:
13
       MILBER, MAKRIS, PLOUSADIS & SEIDEN, L.L.P.
14     Suite 200
       108 Corporate Park Drive
15     White Plains, New York 10604
       BY: MARISA LANZA, ESQUIRE
16
17   ALSO PRESENT:
18     DANIEL CROWN
       GARY FISHER, Videographer
19
20
21
22
23
24
25
```

Page 3

```
 1              - - -
                I N D E X
 2              - - -
 3
     DIRECT (ROBERT L. BEACHER)
 4   BY MR. MARTIN................................ 5
 5
                - - -
 6           E X H I B I T S
                - - -
 7
 8   Deposition I.D. Exhibit No. 1.................. 8
 9   Deposition I.D. Exhibit No. 2.................. 9
10   Deposition I.D. Exhibit No. 3.................. 9
11   Deposition I.D. Exhibit Nos. 4 & 5............ 27
12   Deposition I.D. Exhibit No. 6................. 42
13   Deposition I.D. Exhibit No. 7................. 52
14   Deposition I.D. Exhibit No. 8................. 76
15   Deposition I.D. Exhibit No. 9................. 86
16   Deposition I.D. Exhibit No. 10................ 86
17   Deposition I.D. Exhibit No. 11................ 86
18   Deposition I.D. Exhibit No. 12................ 89
19   Deposition I.D. Exhibit No. 13................ 99
20   Deposition I.D. Exhibit No. 14................ 99
21   Deposition I.D. Exhibit Nos. 15 - 21.......... 102
22
23
24
25
```

Page 4

```
 1              P R O C E E D I N G S
 2         THE VIDEOGRAPHER: We are now going on
 3    the video record. The time on the monitor is
 4    10:24 a.m. Today is Wednesday, the 25th day
 5    of February, 2004.
 6         We are here at 200 South Broward
 7    Boulevard, Fort Lauderdale, Florida, for the
 8    purpose of taking the videotaped deposition
 9    of Robert L. Beacher, Crown Theatres versus
10    Daly, et al., which is filed in the United
11    States District Court in Connecticut.
12         The videographer is Gary Fisher of
13    Esquire. The court reporter is Terry
14    Tomaselli of Esquire.
15         Will counsel announce their appearances
16    for the record and swear in the witness.
17         MR. MARTIN: Craig Martin, Larry
18    Schaner, and Matthew Rice for Crown Theatres.
19         MR. WISSER: Kerry Wisser, W-i-s-s-e-r,
20    on behalf of Milt Daly, Anne Daly, and
21    Taylor-Leigh, Inc.
22         MS. LANZA: Marisa Lanza from Milber,
23    Makris, Plousadis & Seiden for the
24    Defendants, James T. Martino and James Thomas
25    Martino, Architect, P.C.
```

Page 81

1  Q. Did he say anything?
2  A. No, no. He laughed. He put his M on
3  it. He approved it and couldn't wait to get the
4  money.
5     MR. WISSER: Objection. Move to strike.
6  BY MR. MARTIN:
7  Q. When you say "he couldn't wait to get
8  the money," did he say anything to you in that
9  regard?
10 A. Yeah -- not that I recall exactly on a,
11 you know, a particular instance, but in most
12 instances, he approved it and sent it down that
13 same day for payment.
14 Q. Turn to the third page of Exhibit 8.
15 And what is that document?
16 A. That was a cover letter that I wrote to
17 Jim Martino telling Jim that I reviewed and I
18 approved the -- it was a normal type of cover
19 letter that I would put together.
20 Q. And --
21 A. In most instances, just to have Jimmy
22 sign off on the paperwork.
23 Q. Does this document contain your
24 signature?
25 A. Yes, it does.

Page 82

1  Q. Does it contain Mr. Daly's signature?
2  A. Yes, it does.
3  Q. Did you send it to Mr. Martino?
4  A. I don't think I sent it to Mr. Martino,
5  no.
6  Q. Did you hand-deliver it?
7  A. Jimmy probably would have gotten the
8  whole package, and this was either done in my car
9  while we were driving up to Crown office, because
10 that's how we normally did it; or, I would have the
11 whole stacks of pay applications, of which I would
12 give it all to Jimmy to sign. You know, just --
13 you know, just major stacks.
14    Speaking out of turn, Jimmy had nothing
15 to do with what transpired with this -- with these
16 actions. I told Jimmy, because if Jimmy would ask
17 me a question, I would say: Jimmy, it's on a
18 need-to-know basis what we are doing and you just
19 don't need to know.
20 Q. Well, okay.
21 A. All right. So --
22 Q. With regard to Mr. -- let's pause on
23 that for a moment.
24    With regard to Mr. Martino, you've
25 looked -- in preparing for your deposition, you've

Page 83

1  looked through a lot of documents, correct?
2  A. Yes, I certainly have.
3  Q. The -- and you've looked through a lot
4  of these AIA forms just like -- similar to the one
5  that's marked as Deposition Exhibit Number 8,
6  correct?
7  A. Correct.
8  Q. And it's fair to say that most of those
9  AIA forms have either Mr. Martino's signature on it
10 or a signature, your signature, which Mr. Martino
11 gave you authority to sign on his behalf, correct?
12    MS. LANZA: Objection to form.
13    THE WITNESS: That's correct.
14 BY MR. MARTIN:
15 Q. And the -- you and Mr. Martino had
16 discussions with regard -- with regard to the
17 subject matter here today, correct?
18    Let me ask you in a different way,
19 Mr. Beacher.
20    Mr. Martino from time to time came to
21 you and told you that he thought things were
22 suspicious with regard to some of these invoices?
23    MS. LANZA: Objection. Leading.
24    MR. WISSER: Join in the objection.
25    THE WITNESS: I don't know if we ever

Page 84

1  had that kind of a discussion.
2  BY MR. MARTIN:
3  Q. Did Mr. Martino ever ask you what some
4  of these invoices were for?
5     MS. LANZA: Same objection.
6     THE WITNESS: When they were submitted?
7  No, never asked me about any invoice, whether
8  it was legitimate or it was fictitious. Just
9  sign it off and let's get going because, you
10 know, we have so much work to do.
11 BY MR. MARTIN:
12 Q. The -- when does the conversation -- you
13 just told us about a conversation with Mr. Martino
14 in which he asks you about invoices and you say:
15 Jimmy, it's on a need-to-know basis?
16 A. It would -- it would --
17 Q. How did that conversation come about?
18    MR. WISSER: Hold on.
19    MS. LANZA: It mischaracterizes his
20 prior testimony.
21    MR. WISSER: Leading, and it is
22 mischaracterization of testimony. Also, so
23 that we have a clear record, let's make sure
24 you finish before he answers.
25    THE WITNESS: I apologize.

21 (Pages 81 to 84)

Page 85

1  I don't know -- I don't remember really
2  ever having any discussions with Jimmy on any
3  invoice in particular.
4       Yes, we would have discussions on
5  invoices based upon the penciled copies, but
6  once we resolved the amount on the penciled
7  copies, it was just a formality because they
8  were already reviewed, they were already
9  checked, we knew how much everything was.
10      It was just a formality. Let's just run
11 it through and get rid of the paperwork. We
12 had a tremendous amount of work to do.
13      When I would get a stack of requisitions
14 and we had three or four projects going on, I
15 would literally have a hundred, 150
16 applications that could be 8, 10, 15 pages
17 each one. You multiply it through, you have
18 stacks of papers.
19      I had already performed my function,
20 approved all the invoices, reviewed them with
21 the contractors, did everything I was
22 responsible for doing, certified the amounts.
23      I handled the money end of it. I
24 certified the amounts on every application
25 that came through until the very end of the

Page 86

1  project.
2       MR. MARTIN: Let's go to Deposition
3  Exhibit Number 9.
4       (The document was marked Deposition I.D.
5  Exhibit No. 9.)
6       THE WITNESS: Yes.
7  BY MR. MARTIN:
8    Q. Okay. What is Deposition Exhibit
9  Number 9?
10   A. Deposition Number 9 is a check made
11 payable to G.U.S. Development in the amount of
12 $451,500, which is the payment for the application
13 that I approved on June 9th, '99 for the same
14 $451,500.
15   Q. Okay. And so Exhibit Number 9
16 represents the payment of Exhibit 8, correct?
17   A. That's correct.
18   Q. Okay.
19      MR. MARTIN: This will be 10.
20      (The document was marked Deposition I.D.
21 Exhibit No. 10.)
22      MR. MARTIN: This will be 11.
23      (The document was marked Deposition I.D.
24 Exhibit No. 11.)
25

Page 87

1  BY MR. MARTIN:
2    Q. Mr. Beacher, we have put in front of you
3  Exhibit Number 10.
4    A. Yes, sir.
5    Q. Okay. Would you describe what
6  Exhibit 10 is?
7    A. 10 is application number 1, dated July
8  31 of '99 -- oh, no -- for the pay period to July
9  31, '99. That was received by me on July 26 of '99
10 for site preparation work at the Trumbull project,
11 Crown Marquis Theatre, Trumbull, Connecticut.
12   Q. On the second page it describes what the
13 site preparation work was?
14   A. Yes, it does.
15   Q. Was this real work or fake work?
16   A. This was fictitious work.
17   Q. And who -- who filled in the
18 descriptions on this?
19   A. Jamie Cella.
20   Q. Okay. And did you know -- you approved
21 this, correct?
22   A. Yes, I did.
23   Q. And it has your signature on the first
24 page, correct?
25   A. Yes, for $125,000.

Page 88

1    Q. And it has your stamp on the second
2  page?
3    A. It has my "received" stamp on the first
4  and second page.
5    Q. Okay. And at the time you approved
6  this, did you know it was for fictitious work?
7    A. Yes, I did.
8    Q. And does this contain the signature of
9  Mr. Martino?
10   A. I believe it does, but you know -- it
11 appears to be very similar to the other signature,
12 but I'm not a thousand percent sure if that's Jim's
13 signature or not.
14   Q. But your best testimony is that it is,
15 correct?
16   A. I believe it is.
17   Q. And the -- did you discuss this
18 particular invoice with Mr. Daly?
19   A. I don't believe so. I think I just
20 submitted the invoice.
21   Q. Now, if you would turn to the next
22 Deposition Exhibit, which is Deposition Exhibit
23 Number 11, I believe.
24   A. Yes, sir.
25   Q. What is that?

Page 236

```
 1      UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF CONNECTICUT
 2           CASE NO. 3:02CV2272AVC
 3   CROWN THEATRES, L.P.,
 4
           Plaintiff,
 5
         vs.
 6
     MILTON L. DALY, TAYLOR-LEIGH, INC.,
 7   ANNE E. DALY, JAMES C. CELLA, G.U.S.
     DEVELOPMENT, INC., JAMES T. MARTINO and
 8   JAMES THOMAS MARTINO, ARCHITECT, P.C.,
 9
           Defendants.
10   _____/
11
12
13      VIDEOTAPED DEPOSITION OF ROBERT L. BEACHER
14           VOLUME III, PAGES 236 - 370
15
16           Thursday, February 26, 2004
             10:16 a.m. - 5:29 p.m.
17           Suite 1500
             200 East Broward Boulevard
18           Fort Lauderdale, Florida 33301
19
20
21
22   Reported By:
     Theresa Tomaselli, RPR, RMR
23   Notary Public, State of Florida
     Esquire Deposition Services
24   Fort Lauderdale Office
     Phone - 800.211.3376
25        954.331.4400
```

Page 237

```
 1   APPEARANCES:
 2   On behalf of the Plaintiff:
 3     JENNER & BLOCK, LLP
       One IBM Plaza
 4     Chicago, Illinois 60611
       BY: CRAIG C. MARTIN, ESQUIRE
 5     AND: MATTHEW H. RICE, ESQUIRE
 6
     On behalf of the Defendants, Milton L. Daly,
 7   Anne E. Daly and Taylor-Leigh, Inc.:
 8     WEINSTEIN & WISSER, P.C.
       Suite 207
 9     29 South Main Street
       West Hartford, Connecticut 06107
10     BY: KERRY M. WISSER, ESQUIRE
11
     On behalf of the Defendants, James T. Martino, and
12   James Thomas Martino, Architect, P.C.:
13     MILBER, MAKRIS, PLOUSADIS & SEIDEN, L.L.P.
       Suite 200
14     108 Corporate Park Drive
       White Plains, New York 10604
15     BY: MARISA LANZA, ESQUIRE
16
     ALSO PRESENT:
17
       DANIEL CROWN
18     GARY FISHER, Videographer
19
20
21
22
23
24
25
```

Page 238

```
 1                  - - -
                  I N D E X
 2                  - - -
 3
     CONTINUED DIRECT (ROBERT L. BEACHER)
 4   BY MR. MARTIN................................ 239
 5
     CROSS (ROBERT L. BEACHER)
 6   BY MR. WISSER................................ 269
 7
                    - - -
 8              E X H I B I T S
                    - - -
 9
10   Deposition I.D. Exhibit No. 74................ 240
11   Deposition I.D. Exhibit No. 75................ 242
12   Deposition I.D. Exhibit No. 76................ 257
13   Deposition I.D. Exhibit No. 77................ 258
14   Deposition I.D. Exhibit No. 78................ 259
15   Deposition I.D. Exhibit No. 79................ 260
16   Deposition I.D. Exhibit No. 80................ 261
17   Deposition I.D. Exhibit No. 81................ 340
18
19
20
21
22
23
24
25
```

Page 239

```
 1         P R O C E E D I N G S
 2         THE VIDEOGRAPHER:  We are going on the
 3   video record.  The time on the monitor is
 4   10:16.  Today is Thursday, the 26th day of
 5   February, 2004.
 6         This is the continuation from Wednesday,
 7   February 25th, 2004.  The deponent is Robert
 8   Belcher -- Beacher.
 9         CONTINUED DIRECT (ROBERT L. BEACHER)
10   BY MR. MARTIN:
11      Q.  Mr. Beacher, you understand you're still
12   under oath?
13      A.  Yes, I do.
14      Q.  Are you feeling -- how is your back this
15   morning?
16      A.  I'm feeling much better than yesterday.
17      Q.  Okay.  As we go through the deposition
18   today, if you feel uncomfortable or if you need to
19   take a break, you should tell -- tell us so that
20   you can take a break, because it's not our intent
21   to make you feel uncomfortable or have your back
22   feel uncomfortable.
23      A.  I understand.
24      Q.  The -- yesterday we were speaking about
25   exhibits.  We ended talking about Exhibits 70
```

Page 256

1    A.    No, I didn't. Thank God.
2    Q.    Do you know if Mr. Daly ultimately
3 participated in this opportunity?
4       MR. WISSER: Objection. Foundation.
5       THE WITNESS: The theater that he now
6    owns was one of the theaters that was part of
7    that grouping.
8 BY MR. MARTIN:
9    Q.    And what theater is it?
10    A.    I think it was the Foley Theatre. I'm
11 not a thousand percent sure, but I believe it was
12 the Foley Theatre.
13    Q.    In Foley, Alabama?
14    A.    Yes, sir.
15    Q.    Mr. Beacher, did Mr. Martino ever make
16 any payments to you?
17    A.    Yes, he did.
18    Q.    And what were they for?
19    A.    Referral fees.
20    Q.    And what do you mean by "referral fee"?
21    A.    Call it a finder's fee if you may. This
22 went on for a period of approximately 25 years that
23 I worked with Mr. Martino. When I would introduce
24 him to clients, he would get work from clients, and
25 from time to time, he would pay me a referral fee.

Page 257

1    Q.    And for the referral fee, did you
2 perform any consulting work or any work for
3 Mr. Martino?
4    A.    No, none whatsoever.
5    Q.    So this was purely a referral fee?
6    A.    Purely a referral fee.
7    Q.    Let me show you what we have marked as
8 Deposition Exhibit 76.
9       (The document was marked Deposition I.D.
10       Exhibit No. 76.)
11       THE WITNESS: Yes, I identified that.
12 BY MR. MARTIN:
13    Q.    Yes. Please identify that.
14    A.    Front page on 76 is a deposit slip into
15 B.B. Construction account in the amount of $27,000.
16 Page 2 is a copy of James Martino Architect, P.C.'s
17 check in equal amount.
18    Q.    For $27,000?
19    A.    Yes, sir.
20    Q.    So this is a check from Mr. Martino to
21 B.B. Construction Consultants?
22    A.    Yes, it is.
23    Q.    And did you deposit it?
24    A.    Yes, I did.
25    Q.    The -- was this a referral fee?

Page 258

1    A.    Yes, it was.
2       (The document was marked Deposition I.D.
3       Exhibit No. 77.)
4 BY MR. MARTIN:
5    Q.    Let me show you what we have marked as
6 Deposition Exhibit Number 77 and if you would
7 please identify that as well.
8    A.    I could identify the deposit slip on
9 page 1 in the amount of $17,500.
10    Q.    It is a deposit slip into B.B.
11 Construction Consultants?
12    A.    Yes, it is.
13    Q.    Okay.
14    A.    And the top part of that is a copy of
15 James Martino Architect, P.C.'s check number 1789.
16    Q.    So, again, this is a check from
17 Mr. Martino to B.B. for 17,500 that you deposited,
18 correct?
19       MS. LANZA: Objection. That's not what
20    he testified to. He didn't give the amount
21    as to the check. It's unclear how much the
22    actual check was. That's the deposit slip.
23 BY MR. MARTIN:
24    Q.    On Exhibit 77, Mr. Beacher, how much is
25 the amount of the check?

Page 259

1    A.    The check is very unclear. You can't --
2 I'm identifying it by the deposit slip.
3       I could see --
4    Q.    How much is the deposit slip for?
5    A.    17,500.
6    Q.    Okay. And did you deposit this check
7 into B.B. Construction Consultants, Mr. Beacher?
8    A.    Based upon the documents I have, yes.
9    Q.    And was this a referral fee?
10    A.    Yes, it was.
11    Q.    Was this a referral fee for Miami
12 Gardens?
13    A.    Yes, it was.
14    Q.    The Crown project?
15    A.    Crown project, yes.
16    Q.    Okay.
17       (The document was marked Deposition I.D.
18       Exhibit No. 78.)
19 BY MR. MARTIN:
20    Q.    If you would look at Exhibit Number 78,
21 and if you would identify Exhibit Number 78 for the
22 record.
23    A.    $17,500 deposit slip into B.B.
24 Construction Consultants account. On page 2 is a
25 check number 1870 in the amount of $17,500.