UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CROWN THEATRES, L.P., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 3:02CV2272AVC** |
| | ) | **Jury Trial Demanded** |
| MILTON L. DALY, TAYLOR-LEIGH, | ) | |
| INC., ANNE E. DALY, JAMES C. | ) | |
| CELLA, G.U.S. DEVELOPMENT, INC., | ) | **April 21, 2004** |
| JAMES T. MARTINO AND JAMES | ) | |
| THOMAS MARTINO, ARCHITECT, | ) | |
| P.C., and RCD HUDSON, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF CROWN THEATRES' MEMORANDUM IN OPPOSITION TO
DEFENDANT ANNE DALY'S MOTION FOR SUMMARY JUDGMENT AND IN
SUPPORT OF CROWN THEATRES' CROSS-MOTION FOR SUMMARY JUDGMENT**

If the arguments raised by Anne Daly in her motion for summary judgment sound familiar, there is a good reason why that is so. The arguments she presents here are the same as those she advanced in her opposition to Crown Theatres' application for the entry against her of a prejudgment remedy. This Court granted Crown Theatres' application, finding probable cause that Crown Theatres would prevail on its claims for unjust enrichment and conversion. Anne Daly's motion for summary judgment should be denied because this Court has already found that Crown Theatres can make a substantial factual showing as to each of the elements of its claims.

In addition, this Court should grant Crown Theatres' cross-motion for summary judgment against Anne Daly as to its Count XIV claim for conversion and its Count XVI claim for unjust enrichment. The evidence is undisputed that Anne Daly's husband, Milton Daly, engineered a scheme pursuant to which Crown Theatres was defrauded of over $6 million. At least $4.2 million of the misappropriated funds were transferred into accounts and investments that belonged to the Dalys. In moving for summary judgment, Anne Daly – repeating arguments

JZG/32310/2/675708v1
04/21/04-HRT/

that this Court has already considered and rejected – contends that she was an innocent bystander; that she exercised no ownership or control over the improperly obtained funds and that she derived no benefit from them.

But the undisputed facts belie Anne Daly's assertions. Anne was an account holder, and, therefore, an owner, of at least five accounts through which the stolen funds passed; she had signature authority on all of the accounts; and she wrote more than 1,150 checks on four accounts using misappropriated funds. At the same time, her husband used Crown Theatres' money to make payments which benefited her as well as the entire Daly family – payments for items such as the mortgages on their home, credit card payments, home remodeling expenses, home furnishings, groceries, etc. In addition, the Dalys jointly used more than $2 million of the misappropriated funds to invest in the stock market; they channeled over $1 million of the money into an investment in a movie theatre complex in Alabama; and Milton wrote a check to Anne for $325,000.

Anne Daly's access to, use of and benefit from the money stolen from Crown Theatres should come as no surprise. Throughout the more than thirty-eight years of their marriage, the Dalys pooled their assets and treated their finances jointly. When asked at his deposition whether Anne received the benefit of the $4.2 million, Milton replied, "Yes." (Deposition of Milton Daly, May 21, 2003 ("M. Daly Dep. I") at 126 (Exhibit A).)[1]

Anne Daly also seeks summary judgment with respect to three fraudulent transfer claims. But whether the transfers were made with fraudulent intent presents questions of fact which preclude the entry of summary judgment on those counts. Accordingly, Anne Daly's motion for summary judgment should be denied in its entirety. At the same time, this Court

---

[1] The exhibits to Crown Theatres' memorandum are contained in its separate appendix.

-2-

should grant summary judgment to Crown Theatres and against Anne Daly on its Count XIV claim for conversion and its Count XVI claim for unjust enrichment.

## STATEMENT OF FACTS

Milton and Anne Daly have been married since 1965. (Deposition of Milton L. Daly, August 5-6, 2003 ("M. Daly Dep. II") at 7 (Exhibit B).) Their finances are intertwined and they operate as a single economic unit. As Milton Daly attested at his deposition, "[e]verything in our name basically belongs to both of us . . . ." (M. Daly Dep. I at 85-86.) He added, "[e]verything in our lives is joint . . . ." (Id. at 104.)

From approximately 1996 to 2001, Milton Daly served as chief operating officer and executive vice president of plaintiff Crown Theatres, L.P. (M. Daly Dep. II at 52, 244.) The evidence is undisputed – and, indeed, Milton Daly admits – that he abused that position to wrongfully take more than $6 million of Crown Theatres' money. (Id. at 207; M. Daly Dep. I at 139-41; Report of Frederick C. "Kip" Hamilton, September 30, 2003 ("Hamilton Report") at 1, 10 (Exhibit C).) The theft occurred in connection with a series of movie theatre construction projects, for which Milton had been responsible. (M. Daly Dep. II at 87-91; Hamilton Report at 7.)

Milton Daly accomplished the theft with the aid of Robert Beacher, a construction consultant, retained by Crown Theatres. (M. Daly Dep. I at 134-6; Deposition of Robert L. Beacher, February 25-26, 2003 ("Beacher Dep.") at 11-14 (Exhibit D); Hamilton Report at 7.) Pursuant to their agreement, Beacher submitted false construction invoices to Crown Theatres which Milton – with full knowledge of the falsity of the invoices – approved and caused Crown Theatres to pay. (Beacher Dep. at 11-14; Hamilton Report at 7-10.) The proceeds were divided 70/30, with 70 percent going to Milton and 30 percent to Beacher. (M. Daly Dep. I at 134-36; Beacher Dep. at 17; Milton L. Daly and Taylor-Leigh, Inc.'s Responses to Crown Theatres'

-3-

Second Set of Interrogatories and Requests for Production, dated May 25, 2003 ("Daly Resp. to 2nd Interrog.") No. 15 (Exhibit E).) The scheme netted in excess of $6 million before its detection by Crown Theatres in Spring 2001. (Hamilton Report at 10; M. Daly Dep. II at 207; Beacher Dep. at 13-16.)

**The Dalys' Accounts**

Most of Milton Daly's share of the misappropriated funds, approximately $4.2 million, was deposited initially into the Citibank business checking account of defendant Taylor-Leigh, Inc. (the "Taylor-Leigh Citibank Account"). (Testimony of Frederick C. "Kip" Hamilton, Prejudgment Remedy Hearing, September 18, 2003 ("Hamilton PJR Testimony") at 25-6 (Exhibit G).) Taylor-Leigh was a closely-held Connecticut corporation, whose sole officers and directors were Milton and Anne Daly. (M. Daly Dep. I at 31; Deposition of Anne E. Daly, October 28, 2003 ("A. Daly Dep.") at 55 (Exhibit F).) Both Dalys had authority to write checks on the Taylor-Leigh Citibank Account. (Hamilton Report at 5.) The Dalys used funds from the account to pay family expenses. (M. Daly Dep. I at 66-67.) For example, Milton Daly used over $900,000 of the funds to pay down the Dalys' mortgages. (Declaration of Frederick C. "Kip" Hamilton, dated April 21, 2004 ("Hamilton Decl.") ¶ 12 (Exhibit H).) Most of the remaining funds were subsequently transferred to other accounts, owned jointly by the Dalys. (Id. ¶¶ 5-10.)

The Dalys transferred $824,000 from the Taylor-Leigh Citibank Account to their personal Citibank checking account (the "Dalys' Personal Citibank Account"). (Hamilton Decl. ¶ 6.)[2] An additional $193,800 of the funds kicked back by Beacher was deposited directly into the account. (Id.) Milton and Anne jointly owned the account and each had signature authority. (Hamilton Report at 5.) Between 1996 and 2001, Anne wrote 1,162 checks on the Dalys'

---

[2] $230,000 was subsequently transferred back to the Taylor-Leigh Citibank Account. (Hamilton Decl. p. 3 n. 1.)

-4-

Personal Citibank Account. (Hamilton Decl. ¶ 6.) The 25-page list of checks written by Anne includes payments to, among others, The Burlington Coat Factory, Super Food Mart, Winn Dixie, Macy's, Sears, Express, The Gap, Lane Bryant, Lord & Taylor, Home Depot, K-Mart, The Grand Union Co., Victoria's Secret, Bath & Body Works, American Eagle, Bradlees, Linens & Things, and Bed, Bath & Beyond. (Exhibit 2 to Hamilton Decl.) The combined value of the checks written by Anne on the Dalys' Personal Citibank Account totaled over $146,000. (Hamilton Decl. ¶ 8.) Milton also wrote checks on this account, many of which were for matters that plainly benefited the entire family, including credit card payments, groceries, car repair and/or payments, and utilities. (Hamilton Decl. ¶ 11.) In addition, Milton used funds from the Dalys' joint account to purchase nearly $500,000 of stock in companies such as Philip Morris, Compaq, Monsanto, and WorldCom. (Exhibit 4 to Hamilton Decl. at 2.)

Approximately $2.7 million from the Taylor-Leigh Citibank Account was transferred to one of the Dalys' Fleet Bank accounts, account number 9424792102. (Hamilton Decl. ¶ 9.) Anne and Milton were joint owners of the Fleet account and each had authority to write checks. (Id.; A. Daly Dep. at 66.) Anne wrote numerous checks on the account, including 27 for amounts in excess of $1,000, and an unknown (presumably far larger) number of checks for amounts less than $1,000.[3] (For reasons of economy, Crown Theatres did not obtain by its subpoena copies of checks in amounts less than $1,000 on this account. The Dalys failed to produce any bank records in response to Crown Theatres' document request.) (Hamilton Decl. ¶ 9; A. Daly Dep. at 66, 111.) Payments by Anne Daly from this account included, for example, over $32,000 to Danbury Furniture; over $20,000 to Connecticut Kitchen & Bath; and over

---

[3] At her deposition, Anne Daly testified that she wrote checks from the Fleet account "on occasion," for "every day household things." (A. Daly Dep. at 66, 111.) She testified that she never made any "large transactions." (Id. at 111.)

JZG/32310/2/675708v1
04/21/04-HRT/

$29,000 to NeSa Masonry. (Exhibit 3 to Hamilton Decl.) Milton also wrote checks on the Fleet

Account, many of which were for family expenses such as the Dalys' mortgage payments,

payments on the Dalys' cars, payments to the Internal Revenue Service, American Express and

Sears, and various home improvements. (Hamilton Decl. ¶ 12.)

Milton and Anne Daly maintained another joint Fleet Bank account, account

number 9440987478, into which $145,357 was transferred from the Taylor-Leigh Citibank

Account. (Hamilton Decl. ¶ 10.) An additional $728,466 was shifted into this account from

Fleet account number 9424792102. (Id.) Anne Daly wrote at least $4,566.33 in checks on this

account. (Id.) (Crown Theatres did not obtain checks for amounts less than $1,000 on this

account.) The Dalys opened a third joint Fleet Bank account, number 9446000989, from which

Anne wrote a check for $100,000 to Milton. (Id. ¶ 11.)

Over $2 million of the funds stolen from Crown Theatres were used by the Dalys

to play the stock market. (Hamilton Decl. ¶ 12; Hamilton PJR Testimony at 28.) In addition to

their stock purchases through their Personal Citibank Account, they purchased securities through

an account with Raymond James (the "Raymond James Investment Account"). (Id.) The Dalys

primarily funded the account by transferring approximately $2 million between February and

September 2000 from Fleet Account number 9424792102. (Exhibit 4 to Hamilton Decl.) Anne

and Milton were joint owners of the Raymond James Investment Account. (M. Daly Dep. I at

104; A. Daly Dep. at 67-68.)

**Crown Theatres Begins to Investigate**

Milton resigned from Crown Theatres on June 1, 2001, following Crown

Theatres' discovery that the movie theatre construction projects were experiencing large cost

overruns. (M. Daly Dep. II at 20, 174-76.) Crown Theatres launched an internal investigation to

determine the causes, which Milton says he learned about in late June 2001. (M. Daly Dep. II at 244.)

Soon thereafter, the Dalys began moving assets. In July 2001, Milton wrote checks for $10,000 to each of the couple's four children. (M. Daly Dep. II at 254-58.) He testified that these checks, dated in July, were "Christmas presents." (Id. at 258.) In September 2001, he wrote a check from one of the Fleet Accounts to Anne for $325,000. (Id. at 253-54.) The same month, the Dalys sold their home in Connecticut. (M. Daly Dep. II at 248.) They moved to a condominium they already owned in Georgia before purchasing a new residence in Pensacola, Florida. (M. Daly Dep. II at 249-50.)

The Dalys also made a major investment. In or before September 2001, Milton and a partner began negotiating to purchase a movie theatre business. (M. Daly Dep. II at 260.) Shortly thereafter, they incorporated Odyssey Entertainment, Inc., which they used to acquire a 12-screen multiplex movie theatre in Foley, Alabama. (M. Daly Dep. I at 109.) The Dalys contributed approximately $2.9 million to the venture. (M. Daly Dep. I at 65.) According to Milton, approximately $1.2 million of the Dalys' investment came from their Raymond James Investment Account. (Id. at 66-67.)[4] Odyssey issued a promissory note to Anne and Milton in the amount of $2.9 million. (Id. at 67.) The note paid interest at a rate of 7.75% per annum, with interest payments due monthly. (M. Daly Dep. I at 11; Hamilton PJR Testimony at 31.)

**Crown Theatres Files Suit**

Crown Theatres filed this action on December 20, 2002. The ten-count complaint alleged claims for RICO violations, fraud, conversion, and civil conspiracy. The complaint

---

[4] There are factual issues regarding the source of the additional money invested by the Dalys into Odyssey. These issues, however, are not material to Crown Theatres' Cross-Motion for Summary Judgment.

-7-

referred to the Dalys' Odyssey investment and indicated that Crown Theatres knew that proceeds of the theft had been funneled into Odyssey.  (See Complaint ¶ 20.)

Ten days later, on December 30, 2002, Anne opened a checking account in her own name at The Warrington Bank, in Pensacola, Florida.  (Declaration of Lisa Wood, dated September 4, 2003 ("Wood Decl.") ¶ 10 (Exhibit I).)  The account was the only account that Anne had ever had solely in her own name at any time during the course of the Dalys' marriage.  (A. Daly Dep. at 116.)  The day after she opened the account, Milton caused Odyssey to wire transfer $84,311 into it.  (Wood Decl. ¶ 10.)  The same day, Milton wire transferred $100,000 from an Odyssey bank account to himself.  (Declaration of Robert Abramsky, dated January 22, 2003 ("Abramsky Decl.") ¶ 14 (Exhibit J).)[5]

**Prejudgment Remedy Against Milton Daly**

On January 22, 2003, Crown Theatres applied for a prejudgment remedy against Milton, which this Court granted the next day.  This Court found that "there is probable cause that a judgment in the amount of Six Million Two Hundred Thousand Dollars ($6,200,000.00) will be rendered in the matter in favor of Crown Theatres, L.P. . . ." (Order for Prejudgment Remedy of January 23, 2003.)  This Court further found that "there is a reasonable likelihood that the defendant has fraudulently hidden or withheld money, property or effects which should be liable to the satisfaction of his debts and is continuing to do so . . . ." (Id.)  It also granted an order compelling Milton to disclose assets sufficient to satisfy the prejudgment remedy.  (Order for Disclosure of Assets of January 23, 2003.)  On February 3, 2003, this Court held a hearing at

---

[5] Additional attempts to move money followed.  On January 16, 2003, Milton tried to transfer $226,071.76 from Odyssey to Star Coast Cinemas, LLC, a company he controlled.  (Abramsky Decl. ¶ 20.)  Between January 14 and 16, 2003, he diverted over $5,000 of Odyssey's daily receipts to another account.  (Id. ¶¶ 21-22.)  On January 13, in a letter to his partner, Milton stated his intent to withdraw from Odyssey, to have Odyssey dissolved, and to have the assets distributed.  (Id. ¶ 17.)

-8-

which Milton, through counsel, agreed that the prejudgment remedy would remain in place

indefinitely. (Transcript of Prejudgment Remedy Hearing, February 3, 2003, at 4-5 (Exhibit K).)

The Dalys looked to circumvent the prejudgment remedy almost at once. On

February 21, 2003, the same day Milton mailed his disclosure of assets, the Dalys sold a

condominium in Lawrenceville, Georgia, for $117,000. (Wood Decl. ¶ 12.) The condominium

was one of the assets Milton had listed on his asset disclosure. (Exhibit L.) On March 10, the

sale was revealed by Daly's counsel, who pledged to keep the proceeds in a trust account.

(Letter from K. Wisser to C. Martin, March 10, 2003 (Exhibit M).)

The Dalys also sought to shield the payments from Odyssey on the $2.9 million

note. Prior to the entry of the prejudgment remedy, Odyssey's monthly payments on the note

were made by check to Milton. (Wood Decl. ¶ 13.) After the entry of the prejudgment remedy,

Crown Theatres demanded that Milton escrow the payments. (Letter from C. Martin to

K. Wisser, April 2, 2003 (Exhibit N).) Instead of complying, Milton caused Odyssey to begin

making the interest payment checks – approximately $18,000 per month – payable solely to

Anne, who deposited the checks into her Warrington Bank account. (Wood Decl. ¶ 13.) Anne

used the funds to write checks totaling $145,000 to "Cash." (Wood Decl. ¶ 10.) She used

$35,000 of the money to make payments to her husband's attorney. (Id.)

After determining that Milton was attempting to use his wife to hide assets, on

July 25, 2003, Crown Theatres sought leave to amend its complaint to add Anne Daly as a party

defendant. Leave was granted, and Crown Theatres alleged claims against Anne for conversion,

unjust enrichment and the avoidance of fraudulent transfers.

**Prejudgment Remedy Against Anne Daly**

On September 5, 2003, Crown Theatres applied for a prejudgment remedy against

Anne. The Court held an evidentiary hearing on September 16, 2003, at which Frederick ("Kip")

-9-

C. Hamilton, a forensic accountant, testified on behalf of Crown Theatres. Counsel for the Dalys stipulated that Mr. Hamilton was qualified as an expert in forensic accounting. (Hamilton PJR Testimony at 8.) Mr. Hamilton, whose credentials are set out more fully in his CV (Exhibit O), testified in detail regarding the kickback scheme which led to the theft from Crown Theatres of over $6 million and to the flow of the stolen money to the Dalys' various accounts and investments. On September 26, 2003, this Court granted Crown Theatres' application. It found that "there is probable cause that a judgment will be rendered in this matter in the plaintiff's favor in the amount of Four Million Two Hundred Thousand Dollars ($4,200,000). . . ." (Order of September 26, 2003.)

## ARGUMENT

### I.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure where, taking the facts and inferences in the light most favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Soares v. Univ. of New Haven, 175 F. Supp. 2d 326, 329 (D. Conn. 2001); Fed. R. Civ. P. 56(c). The moving party bears the burden of demonstrating "that no genuine issue of material fact exists and that the undisputed facts establish her right to judgment as a matter of law." Rodriguez v. City of New York, 72 F.3d 1051, 1060 (2d Cir. 1995).

Once the moving party meets its burden of establishing that there is no genuine issue of material fact, the non-moving party may not rest on the mere allegations contained in the pleadings. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The non-moving party's response, "by affidavits or as otherwise provided . . . must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Fed. R. Civ. P. 56(e). As long as a

-10-

reasonable factfinder could find for the non-moving party, summary judgment is inappropriate. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); Soares, 175 F. Supp. 2d at 329.

## II.    IN GRANTING A PREJUDGMENT REMEDY, THIS COURT HAS ALREADY FOUND THE EXISTENCE OF FACTS WHICH DEFEAT ANNE DALY'S MOTION FOR SUMMARY JUDGMENT.

Anne Daly has taken the parties and the Court down this road before. In opposing Crown Theatres' application for a prejudgment remedy, she argued that Crown Theatres could not prevail on its claims against her as a matter of law. She made virtually the identical arguments that she makes in her motion for summary judgment, and she cited the same case law. (Memorandum in Opposition to Plaintiff's Application for a Prejudgment Remedy Against Defendant Anne Daly, dated September 6, 2003 at 6-11; Supplemental Memorandum of Law in Opposition to Plaintiff's Application for Prejudgment Remedy Against Defendant Anne Daly, dated September 19, 2003 at 3-6.) Specifically, she contended that she could not be found liable for conversion because she did not exercise control over the misappropriated funds, and she could not be liable for unjust enrichment because she did not derive any benefit from those funds. This Court rejected Anne Daly's arguments and granted Crown Theatres' application. In particular, this Court found probable cause that judgment would be entered against Anne Daly on Crown Theatres' claims in the amount of $4.2 million.

In finding probable cause, this Court necessarily found at least some evidence – certainly enough to defeat a motion for summary judgment – as to each element of Crown Theatres' claims. See Walpole Woodworkers, Inc. v. Atlas Fencing, Inc., 218 F. Supp. 2d 247, 249 (D. Conn. 2002) (to obtain a prejudgment remedy, the plaintiff must establish a "bona fide belief in the existence of the facts essential under the law for the action . . . ."). The evidence on which this Court granted Crown Theatres' application for a prejudgment remedy precludes Anne Daly's summary judgment motion. Indeed, this Court's prior rejection of Anne Daly's

-11-

arguments is not merely persuasive; it constitutes "law of the case." See Remington Prods., Inc.

v. N. Am. Philips Corp., 755 F. Supp. 52, 54 (D. Conn. 1991) (under "law of the case" doctrine,

"a decision made at one stage of the case becomes binding precedent to be followed during the

rest of the litigation"). See also Sheff v. O'Neill, 42 Conn. Supp. 172, 179, 609 A.2d 1072, 1076

(Super. Ct. 1992) (quoting Hillyer v. Winsted, 77 Conn. 304, 306, 59 A. 40 (1904)) ("Parties

cannot be permitted to waste the time of courts by the repetition in new pleadings of claims

which have been set up on the record and overruled at an earlier stage of the proceedings."). In

addition, Anne Daly's motion should be denied for the reasons set forth in Sections III and IV,

and V below.

### III.  THIS COURT SHOULD GRANT SUMMARY JUDGMENT IN FAVOR OF CROWN THEATRES AND AGAINST ANNE DALY ON COUNT XIV – CROWN THEATRES' CLAIM FOR CONVERSION.

Crown Theatres alleges in Count XIV of the Second Amended Complaint that

Anne Daly converted $4.211 million as the result of the diversion of its funds into accounts and

investments which Anne Daly owned, had authority over and from which she derived benefits.

Anne Daly contends that she is entitled to summary judgment on this count, asserting that she

did not exercise ownership or control over Crown Theatres' money. (Anne Daly Br. 10-14.) As

this Court has already found in granting Crown Theatres' application for a prejudgment remedy,

Anne Daly's argument is incorrect as a matter of fact and law. Further, the undisputed facts

establish that it is Crown Theatres that is entitled to summary judgment against Anne Daly on

Count XIV.

Conversion is defined as "an unauthorized assumption and exercise of the right of

ownership over goods belonging to another, to the exclusion of the owner's rights." Aubin v.

Miller, 64 Conn. App. 781, 796, 781 A.2d 396, 407 (App. Ct. 2001). To prove a claim of

conversion, plaintiff has the burden of establishing: (1) the funds taken by defendant belonged to

plaintiff; (2) defendant deprived plaintiff of its funds for an indefinite period of time;

(3) defendant's conduct was unauthorized; and (4) defendant's conduct harmed plaintiff. Id. It

is well-settled that money may be converted. Omar v. Mezvinsky, 13 Conn. App. 533, 536, 537

A.2d 1039, 1041 (App. Ct. 1988).

      Anne Daly posits that she cannot be liable for conversion because she lacked

knowledge of her husband's misdeeds. But, whether Anne Daly knew that the funds were stolen

is immaterial: "The intent required for a conversion is merely an intent to exercise dominion or

control over an item even if one reasonably believes that the item is one's own." Plikus v.

Plikus, 26 Conn. App. 174, 180, 599 A.2d 392, 395 (App. Ct. 1991). See also Luciani v. Stop &

Shop Co., 15 Conn. App. 407, 411-12, 544 A.2d 1238, 1240 (App. Ct. 1988) (quoting

Restatement (Second) of Torts § 224 cmt. c) ("[T]he defendant may be liable for conversion

where he has in fact exercised dominion or control, although he may be quite unaware of the

existence of the rights with which he interferes. Thus, he may be a converter when he

dispossesses another of a chattel in the entirely reasonable belief that it is his own, or where he

innocently buys stolen goods."); Restatement (Second) of Torts § 229 (1965) (receiver of stolen

property with intent to keep property commits conversion, even without knowledge of fraud).[6]

      Repeating an argument previously considered and rejected by this Court, Anne

also asserts that she cannot be liable for conversion because she lacked ownership and control

over the stolen funds. (Anne Daly Br. 10-14.) The undisputed facts, however, demonstrate that

---

[6] Furthermore, a finder of fact could readily infer that Anne Daly must have known that the funds
were obtained improperly, when millions of dollars suddenly appeared in her bank and
investment accounts. And, if she did not know at the time, she certainly knew after this lawsuit
was filed; yet, she continues to avail herself of Crown Theatres' money.

JZG/32310/2/675708v1
04/21/04-HRT/

Anne did exercise ownership and control over the funds. She was the joint owner[7] of the banking and investment accounts into which the stolen money was transferred, she had signature authority on the accounts, and, indeed, she exercised that authority by writing more than 1,160 checks on no less than four different accounts. (Hamilton Decl. ¶¶ 6-11.) She also received $325,000 of stolen funds in the form of a check written by Milton to her personally. (A. Daly Dep. at 90; Hamilton Decl. ¶ 10.)

   With respect to Taylor-Leigh's Citibank Account, Anne stresses that she did not technically own the account because she was not a Taylor-Leigh shareholder. (Anne Daly Br. at 10-11.) The undisputed facts, however, establish that Anne Daly did exercise ownership and control over the Taylor-Leigh account. She was an officer of Taylor-Leigh, one of its two directors; she enjoyed signature authority on its checking account; and money from the account was used to make payments that benefited her, such as her mortgage. (M. Daly Dep. I at 31; Hamilton Report at 5.) And the Dalys viewed Taylor-Leigh as a joint asset. As Milton acknowledged, "[e]verything in our name basically belongs to both of us . . . ." (M. Daly Dep. I at 85.) Moreover, Anne's argument is a red-herring because the stolen money was moved into other accounts which she unquestionably owned or co-owned. See Fed. Ins. Co., 144 F. Supp. 2d 507, 519 (E.D. Va. 2001) ("It is well-settled that one who receives property from a thief is also liable to the rightful owner of the property for conversion, at least where, as here, the receiving person is not a bona fide purchaser or the property for value with no notice."). Money from the account was used to make payments that benefited her, such as her mortgage.

---

[7] As a joint account holder, she was an "owner" of the funds as a matter of law. See Masotti v. Bristol Sav. Bank, 43 Conn. Supp. 360, 364, 653 A.2d 836, 838 (Super. Ct. 1994) (joint account holders are considered owners of the account and either may withdraw), aff'd, 232 Conn. 172, 653 A.2d 179 (1995); Conn. Gen. Stat. § 36a-290(a) (2003).

Federal Insurance Co. v. Smith, 144 F. Supp.2d 507 (E.D. Va. 2001), is a well-reasoned decision that is closely analogous to this case. There, defendant's husband perpetrated an insurance fraud scheme pursuant to which he collected $300,000 in insurance benefits from false claims he submitted under bogus insurance policies. The insurance benefits were paid by checks that the husband deposited into a joint account in his name and his father's name. The funds were transferred out of the account as follows: The husband wrote checks from the account to satisfy his wife's individual and joint obligations; he gave her a check with instructions to deposit the funds into the couple's joint account; he issued another check that was deposited (presumably by him) into their joint account; and he gave his wife a check made out to her that she deposited into their joint account. A significant portion of the stolen money was ultimately used to pay the wife's personal debts or debts for which she and her husband were jointly liable and to pay for the wife's personal expenses.

Following detection of the fraud, the fidelity insurer of the victim of the fraud sued the wife for conversion of the stolen insurance proceeds. The wife contended that she could not be liable because she did not exercise dominion or control over the stolen money. The district court disagreed. It held that the wife converted funds when she physically took checks given to her by her husband and deposited them into the couple's joint account. It also found that she was liable for conversion for funds that her husband transferred to their joint account:

> It is immaterial that defendant did not physically handle these funds; it suffices that these converted funds were used to satisfy defendant's sole or joint obligations for they were thus effectively transferred to defendant's possession through the agency by which defendant chose to receive the funds. By accepting the stolen insurance proceeds in the form of payments to her creditors on her behalf, and because she gave no consideration in return, defendant became no less a converter of the proceeds than if she had directly appropriated the funds for her own use.

Id. at 521-22.

-15-