The <u>Federal Insurance</u> case plainly demonstrates that Anne Daly is liable for conversion. Like the wife in that case, Anne handled the proceeds of the theft given to her by her husband, namely, the check he wrote to her for $325,000 and the $84,000 wire transfer. She also used the stolen money to write over 1,100 checks, on four different accounts, for purchases that benefited her as well as her family. Moreover, even if Anne had not come in direct contact with the stolen funds, she would still be liable because Milton used the money to pay bills and expenses for which she was jointly, if not solely, responsible, <u>e.g.</u>, the family's mortgage payments.

There are no genuine issues of disputed fact as to the elements of Crown Theatres' conversion claim. It is undisputed that $6 million was wrongfully taken from Crown Theatres and that at least $4.2 million of this amount was deposited into accounts in which Anne Daly had an ownership interest, exercised control and from which she derived benefit. Plainly, Crown Theatres has been deprived of its money for an indefinite period of time. The taking of the $6 million, including the $4.2 million that wound up with Anne and Milton, was unauthorized -- to say the least. Lastly, Crown Theatres has been harmed by virtue of having been deprived of the use and benefit of its money. Accordingly, this Court should grant summary judgment in favor of Crown Theatres on its Count XIV conversion claim.

### IV. THIS COURT SHOULD GRANT SUMMARY JUDGMENT IN FAVOR OF CROWN THEATRES AND AGAINST ANNE DALY ON COUNT XVI – CROWN THEATRES' CLAIM FOR UNJUST ENRICHMENT.

In Count XVI, Crown Theatres contends that Anne and Milton were unjustly enriched by virtue of their receipt of at least $4.2 million via the construction kickback scheme. Under Connecticut law, a claim for unjust enrichment requires the plaintiff to prove (1) defendant received a benefit from the plaintiff, (2) for which the defendant did not pay, and (3) that the failure to make payment was to the plaintiff's detriment. See <u>Fitzpatrick v. Scalizi</u>, 72

-16-

Conn. App. 779, 786, 806 A.2d 593, 599 (App. Ct. 2002). "[I]t is not necessary that the party unjustly enriched was guilty of fraud or any tortious act. 'The question is: Did he, to the detriment of someone else, obtain something of value to which he was not entitled?'" A.B. Realty Corp. v. Metro. Life Ins. Co., 164 F. Supp. 2d 296, 309 (D. Conn. 2001, vacated in part on other grounds, 4 Fed. Appx. 34 (2d Cir. 2002). The doctrine of unjust enrichment provides recourse in situations where "it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another." Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co., 231 Conn. 276, 282, 649 A.2d 518, 521 (1994).

In moving for summary judgment, Anne contends that she cannot be liable for unjust enrichment because she did not benefit from the diversion of money from Crown Theatres. (Anne Daly Br. 13-14.) Anne's argument is a non-starter. When asked at his deposition whether Anne "receive[d] the benefit of the $4.2 million that you got from Taylor-Leigh," Milton gave the obvious answer, "Yes." (Daly Dep. I at 126.) The undisputed facts confirm that Anne benefited from the deposit of funds into Taylor-Leigh's Citibank Account. Over $900,000 of the funds were used to pay down the mortgages on her home, and most of the remaining funds were transferred to accounts she owned jointly with her husband. (Hamilton Decl. ¶¶ 6-11.)

She benefited further when the funds were moved from the Taylor-Leigh Account to the Dalys' other accounts and investments. Approximately $1 million was transferred to one of the Dalys' personal accounts – the Dalys' Personal Citibank Account. Anne wrote 1,162 checks on this account and spent over $183,000. (Hamilton Decl. ¶¶ 6, 8.) Milton wrote checks on the account, too, many of which covered purchases and payments that plainly benefited Anne as well as the rest of the Daly family. (Id. ¶ 12.) Approximately $2.7 million of the looted

monies were transferred to another of the Dalys' personal accounts – the Dalys' Fleet Account, account number 9424792102. Anne wrote numerous checks on this account as well, and she also derived the benefit of checks written on the account by her husband. (Id. ¶¶ 9, 12.) Anne also wrote checks on two additional Fleet Accounts, account numbers 9440987478 and 9446000989. (Hamilton Decl. ¶¶ 9-10.) Anne further benefited by jointly investing over $2 million of the stolen money in the stock market, through the Raymond James Investment Account and the Dalys' Personal Citibank Account; by receiving a check from Milton for $325,000; by jointly investing in the Odyssey movie theatre business; and by receiving funds from Odyssey. (Id. ¶ 12; Wood Decl. ¶¶ 10, 13.)

Anne next contends that she cannot be liable for unjust enrichment because she allegedly had no knowledge of her husband's wrongful conduct. (Anne Daly Br. 13-14.) But whether Anne knew that the $4.2 million was obtained illicitly is immaterial. As noted above, under Connecticut law, the defendant's knowledge is not an element of a claim for unjust enrichment.

Claybeth Associates L.P. v. Lepore, No. CV 91-7019805, 1992 WL 170666, at *1 (Conn. Super. Ct. Jul. 1, 1992), is on point. In Claybeth, a husband fraudulently issued checks from a partnership account and endorsed them to his wife without receiving any consideration in return. Id. Even though the wife did not have knowledge that the funds were fraudulently acquired, the court found that the plaintiff had pled the necessary facts to survive a motion to dismiss. Id. at *2. Similarly, Anne Daly's alleged ignorance as to Milton Daly's actions is not a defense to a claim of unjust enrichment.[8]

---

[8] Anne Daly cites Vanacore v. Kennedy, 86 F. Supp. 2d 42, 52 (D. Conn. 1998), aff'd sub nom Vanacore v. Space Realty, Inc., 208 F.3d 204 (2d Cir. 2000), for the proposition that "a beneficiary of another's wrongful conduct who has no knowledge of that conduct is not

-18-

The evidence of Anne Daly's unjust enrichment is undisputed. As shown above, Anne benefited from the receipt of the $4.2 million of Crown Theatres' money; she paid no consideration for the money; and Crown Theatres has been injured by the deprivation of its money. Crown Theatres is entitled to judgment on its Count XVI unjust enrichment claim against Anne Daly as a matter of law.

## V.  ISSUES OF DISPUTED FACT PRECLUDE ANNE DALY'S MOTION FOR SUMMARY JUDGMENT ON CROWN THEATRES' FRAUDULENT TRANSFER CLAIMS.

The Second Amended Complaint pleads four counts against Anne Daly for the avoidance of actual fraudulent transfers. Anne Daly seeks summary judgment on three of the counts (Counts XVII, XIX and XX). Her motion should be denied because of the existence of genuine issues of disputed fact.

Under the Connecticut Uniform Fraudulent Transfer Act, "[a] transfer made . . . by a debtor is fraudulent as to a creditor, if the creditor's claim arose before the transfer was made . . . and if the debtor made the transfer . . . with actual intent to hinder, delay or defraud any creditor of the debtor." Conn. Gen. Stat. § 52-552e. The Act sets forth a series of factors that may be considered in determining whether a transfer was made with the requisite fraudulent intent, including, among others: whether the transfer was made to an insider; whether the transferor retained possession or control of the transferred property after the transfer; whether the transfer was disclosed or concealed; whether, before the transfer was made, the transferor had been threatened with a lawsuit; whether the debtor removed or concealed assets; whether the transfer was made without the transferor receiving reasonably equivalent value in exchange for

---

'unjustly' enriched." (Anne Daly Br. 14.) The case, however, says nothing of the sort. In <u>Vanacore</u>, the unjust enrichment claim failed not because of a lack of knowledge, but because the beneficiary paid a fair price for the benefit that he received. 86 F. Supp. 2d at 52.

the transfer; and whether the transfer occurred shortly before or shortly after a substantial debt was incurred. Conn. Gen. Stat. § 52-552b.

Actual fraudulent transfer claims are generally ill-suited for motions for summary judgment because of the need to show the actual intent of the transferor. See Citizen's Bank of Clearwater v. Hunt, 927 F.2d 707, 711-12 (2d Cir. 1991) (applying Connecticut law) ("[I]ntent of the parties to the transaction is purely a question of fact" which is ordinarily "inappropriate for summary judgment."); Colonial Realty Co. v. Hirsch, 210 B.R. 921, 923 (Bankr. D. Conn. 1997) ("Courts generally find summary judgment to be ill-suited for resolving cases involving allegations of intent to defraud.").

### A.  Count XVII: Odyssey Note.

In 2001, the Dalys used stolen funds to invest in Odyssey Entertainment, Inc. ("Odyssey"), which owns a movie theatre complex in Foley, Alabama. (M. Daly Dep. I at 109.) In exchange for their investment, the Dalys received a $2.9 million promissory note payable to them jointly. (Id. at 67.) The note earned interest at a rate of 7.75% per annum and was to be paid on a monthly basis. (Id. at 11; Hamilton PJR Testimony at 31.) Interest payments on the note are approximately $18,000 per month. Milton Daly, who controls Odyssey, caused the treatment of the monthly note payments to change following the entry of a prejudgment remedy against him. Prior to the entry of the prejudgment remedy, Milton caused Odyssey to make its payments on the note to him. After the entry of the prejudgment remedy and after Crown Theatres demanded that the funds be escrowed and paid to it, Milton caused Odyssey to make the monthly checks payable to Anne. (Wood Decl. ¶ 13.) According to Anne, Milton caused her to deposit the checks into her Warrington Bank account – an account in which he had no ownership interest or signature authority. Anne stated that he then caused her to make large cash withdrawals. (A. Daly Dep. 39-40, 43-44.) Crown Theatres alleges in Count XVII that the

-20-

change in payee on the Odyssey note, following the entry of the prejudgment remedy, was a fraudulent transfer intended to frustrate Crown Theatres' efforts to secure Milton Daly's assets.

In her motion for summary judgment, Anne contends that the change in payee cannot constitute a fraudulent transfer because she was an owner of the note, and, therefore, she was entitled to receive payment on the note all along. (Anne Daly Br. 15.) The monthly note payments, however, belonged to both Milton and Anne Daly, not simply to one or the other. By causing the note payments to be paid solely to Anne, Milton clearly made a transfer as defined by the broad definition contained in the Connecticut Uniform Fraudulent Transfer Act. The Act defines a transfer as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, at disposing or parting with an asset or in interest in an asset . . ." Conn. Gen. Stat. § 52-552(b)(12). Contrary to Anne's assertion, the statute does not require that Anne gain anything that she did not already have. Rather, Milton must "dispose of or part with" an interest in an asset, which he did by relinquishing to Anne at least five checks which she deposited into her own personal bank account.

The relevant factors strongly support the conclusion that the transfer was in fact intentionally fraudulent. First, the transfer was made to an insider. Second, Milton continued to derive benefit from and exert control over the assets after the transfer. Among other things, Anne used the money to pay his legal bills and, apparently, certain of the couple's joint expenses. (Wood Decl. ¶ 10.) Third, the transfer was concealed. The Dalys did not advise Crown Theatres that the payee on the note was being switched. Fourth, the transfer was made without Milton receiving reasonably equivalent value in exchange for his interest in the proceeds of the promissory note. Fifth, the transfer immediately followed the entry of the prejudgment

-21-

remedy against Milton. Sixth, Milton caused Anne to deposit the checks into her own personal account and turn the funds into cash.

At a minimum, there are genuine issues of disputed fact concerning Milton Daly's intent in causing payments on the Odyssey note to be switched from himself to his wife. Summary judgment as to Count XVII is, therefore, not appropriate.

### B. Counts XIX and XX: Joint Accounts and Other Payments.

Anne Daly also seeks summary judgment as to Counts XIX and XX, which allege claims for additional fraudulent transfers. Crown Theatres contends in Count XIX that Milton made a fraudulent transfer when he moved $250,000 from the Taylor-Leigh Citibank Account to the Daly's joint Raymond James Investment Account. It alleges in Count XX that Milton made an additional fraudulent transfer when he took $2.7 million from the Taylor-Leigh Citibank Account and deposited it into one the Dalys' joint Fleet accounts.

Anne Daly argues that the movement of these funds could not constitute fraudulent transfers because Milton merely shifted money from one account in which he had an interest to another. He, therefore, did not "dispose of or part with" an asset or interest in an asset. (Anne Daly Br. 18.) But Anne asserts that she had no interest in the funds in the Taylor-Leigh Citibank Account. If that is so (which Crown Theatres denies), then Milton did part with an interest in the money by transferring the funds into the Dalys' joint accounts. As a result of the transactions, Milton was no longer the sole owner of the funds; he conveyed to Anne an undivided half interest in them. Accordingly, there were "transfers." Whether the transfers were "fraudulent" raises issues of fact which preclude the entry of summary judgment.

In Count XX, Crown Theatres also seeks to avoid two additional transfers: (1) the check Milton wrote to Anne for $325,000 from the Dalys' Fleet Account, soon after Crown Theatres began its investigation; and (2) the $84,000 wire transfer that Milton caused Odyssey to

-22-

make immediately after Crown Theatres filed suit. Anne asserts that in each case Milton's motives for making the transfers were innocent. The circumstances, however, suggest otherwise. See supra 6-10. In any event, Milton's intent in making the transfers presents factual questions which are not appropriate for summary judgment treatment.

## VI. THIS COURT SHOULD NOT BAR THE OPINIONS OF CROWN THEATRES' EXPERT FORENSIC ACCOUNTANT.

Embedded in Anne Daly's motion is a Daubert challenge to Frederick C. "Kip" Hamilton, a forensic accountant retained by Crown Theatres to provide expert testimony in this matter. (Anne Daly Br. 7-9.) Mr. Hamilton's opinions were set forth in his report, at his deposition and during his testimony before this Court at the hearing on Crown Theatres' application for a prejudgment remedy against Anne Daly. Although Anne Daly now refers to Mr. Hamilton as a "so-called expert," she stipulated to his qualifications to offer expert testimony at the prejudgment remedy hearing. (Hamilton PJR Testimony at 8.)

Mr. Hamilton's work on this matter has included tracing the money stolen from Crown Theatres through the Dalys' various accounts and investments, determining the ownership of the various accounts, determining who had check writing authority, analyzing who wrote checks on the accounts and the uses to which the funds were put. Among other things, he has concluded that Milton Daly and Robert Beacher obtained in excess of $6 million from Crown Theatres by means of a kickback scheme, and that at least $4.2 million of those funds were deposited into the Dalys' accounts. (Hamilton Report at 1.) Anne Daly asserted at her deposition that she made little or no use of the stolen funds. (A. Daly Dep. at 66, 111.) Mr. Hamilton, however, found that Anne used the stolen money to write more than 1,100 checks on four different accounts. (Hamilton Report, ¶¶ 5-11.) He also found that large portions of the stolen funds were spent on purchases and payments that benefited her. (Id. ¶ 12.)

Anne Daly objects to Mr. Hamilton's opinion that she "benefited" from the $4.2 million that was diverted to the Dalys' accounts and investments, and argues that the opinion should be excluded because it does not satisfy the so-called "Daubert factors," e.g., whether the expert's work was properly tested, whether it was peer reviewed, whether it had an acceptable error rate, and whether the methodology is accepted in the relevant scientific community. See Daubert v. Merrel Dow Pharmaceuticals, Inc., 509 U.S. 579, 593-94 (1993). But the Supreme Court explained in Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999), that the Daubert factors are flexible, and their application is more or less appropriate depending on the type of expert opinion at issue. Id. at 150 ("[T]he factors identified in Daubert may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony.").

The Daubert factors are of limited utility as applied to a forensic accountant, such as Mr. Hamilton. In performing their work, forensic accountants do not perform scientific tests, their theories are not tested, and they are not the subject of analyses to determine error rates. Instead, the ability of a forensic accountant to testify is properly assessed by reference to his education, training and experience. See United States v. Tarwater, 308 F.3d 494, 513 (6th Cir. 2002) (Daubert factors met where forensic accountant's testimony based on education training knowledge and experience); United States v. Majors, 196 F.3d 1206, 1215-16 (11th Cir. 1999) (approximately nine years of experience investigating fraud gave investigator special knowledge and skill not available to lay witnesses); Wechsler v. Hunt Heath Systems, Ltd., No. 94 Civ. 8294 (PKL), 2003 WL 22358807, at *3-*4 (S.D.N.Y. Oct. 16, 2003) (accountant's 17 years of experience was qualification enough to testify under flexible standard of Rule 702).

Mr. Hamilton is eminently qualified by his education, training and experience to offer forensic accounting testimony. (Exhibit O.) Moreover, there are ample indicia of reliability to permit him to offer the opinion – which seems obvious under the circumstances – that Anne Daly benefited from the stolen funds. In performing his work, Mr. Hamilton used standard forensic accounting methods and techniques. (Hamilton Decl. ¶¶ 2-4.) He explained at his deposition that he used "accepted forensic accounting techniques" that he has "used for twenty years." (Deposition of Frederick C. "Kip" Hamilton, December 23, 2003 and January 26, 2004 at 532 (Exhibit P).) He further explained that these were "standard, basic forensic accounting procedures" that are "used by practically every other forensic accounting firm or person that does fraud analysis." (Id. at 533.)

Anne Daly offers nothing to contradict Mr. Hamilton's testimony. She has failed to show that he is unqualified or that his methods are anything but reliable. Anne Daly's Daubert challenge should be denied.[9]

---

[9] There was no objection to Mr. Hamilton's testimony at the prejudgment remedy hearing that Anne Daly benefited. (Hamilton PJR Testimony at 34 ("Mrs. Daly as an officer and signatory of the account of Taylor-Leigh, Inc. received 4.2 million [sic], and as a result received the benefit of 4.2 million [sic] as result [sic] of the 70/30 deal set up by Mr. Beacher and Mr. Daly.").) Anne's failure to object constitutes a waiver. See Questar Pipeline Co. v. Grynberg, 201 F.3d 1277, 1289-90 (10th Cir. 2000) ("[A] party may waive the right to object to evidence on Kumho/Daubert grounds by failing to make its objection in a timely manner.").

## CONCLUSION

For the foregoing reasons, Anne Daly's motion for summary judgment should be denied, and this Court should grant summary judgment in favor of Crown Theatres and against Anne Daly on Counts XIV and XVI of the Second Amended Complaint.

CROWN THEATRES, L.P.

By: _____
H. James Pickerstein (Bar No. Ct 05094)
Jodi Zils Gagné (Bar No. Ct 24376)
PEPE & HAZARD, LLP
30 Jelliff Lane
Southport, CT 06490
(203) 319-4000
(203) 259-0251 (fax)
hpickerstein@pepehazard.com
jgagne@pepehazard.com

and

Craig C. Martin (Bar No. Ct 12198)
Lawrence S. Schaner (Bar No. Ct 24756)
JENNER & BLOCK LLP
One IBM Plaza
Chicago, IL 60611
(312) 222-9350
312) 840-7776 (fax)
cmartin@jenner.com
lschaner@jenner.com

April 21, 2004

## CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that I have served all counsel of record in this action with a copy of the **Memorandum of Law in Opposition to Anne Daly's Motion for Summary Judgment,** by mailing a copy of the same by United States Mail, postage prepaid, to the following:

Kerry M. Wisser
Weinstein & Wisser, P.C.
29 South Main Street
Suite 207
West Hartford, CT 06107

Mark Seiden
Marisa Lanza
Milber, Makris, Plousadis & Seiden, L.L.P.
3 Barker Ave.
6th Floor
White Plains, NY 10601

Robert M. Frost
Zeldes, Needle & Cooper
1000 Lafayette Blvd.
P.O. Box 1740
Bridgeport, CT 06601-1740

_____
Harold James Pickerstein

Dated: April 21, 2004

(CHICAGO)_1053758_7 4/21/04 1:07 PM