## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **CROWN THEATRES, L.P.** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:02CV2272AVC** |
| | ) | **Jury Trial Demanded** |
| **MILTON L. DALY, TAYLOR-LEIGH,** | ) | |
| **INC., ANNE E. DALY, JAMES C.** | ) | |
| **CELLA, G.U.S. DEVELOPMENT, INC.,** | ) | **April 30, 2004** |
| **JAMES T. MARTINO AND JAMES** | ) | |
| **THOMAS MARTINO, ARCHITECT,** | ) | |
| **P.C., and RCD HUDSON, LLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### CROWN THEATRES' MEMORANDUM OF LAW IN
### SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON THE
### MARTINO DEFENDANTS' FIRST AND THIRD COUNTERCLAIMS

Confronted with the complaint filed by plaintiff Crown Theatres, L.P., defendants James T. Martino ("Martino") and James Thomas Martino, Architect, P.C. (collectively, the "Martino Defendants") manufactured a series of counterclaims. While none has merit, the First and Third Counterclaims are ripe for summary adjudication. The First Counterclaim is incoherent and unintelligible, and it should be dismissed because it violates Fed. R. Civ. P. 8's requirement of "a short and plain statement of the claim." Alternatively, it fails because it is either a mislabeled affirmative defense or an attempt to plead claims that are blatantly inapplicable.

The Third Counterclaim is equally infirm. It purports to state a claim for unjust enrichment. But the facts are undisputed that Crown Theatres had no reason to expect to pay for the "services" at issue. There was no agreement, either written or oral, that Crown Theatres would pay for these matters; and the Martino Defendants did not once ask for payment or submit

a bill at any time prior to this lawsuit.  The undisputed facts further show that Martino regularly

provided similar advice and assistance to others without charge.

Summary judgment should be entered on these make-weight counterclaims.

## STATEMENT OF FACTS

From 1996 to 2001, plaintiff Crown Theatres, L.P., retained James Martino

("Martino") and his firm, James Thomas Martino, Architects, P.C., (collectively, the "Martino

Defendants"), to serve as its architect and to provide architectural services in connection with a

large theatre construction and renovation program.  (Deposition of James T. Martino ("Martino

Dep." at 24 (attached hereto as Exhibit A).)  The projects were located throughout the United

States and included, among others, the six multiplex theatres that are the subject of this lawsuit.

(Martino Defs.' Ans. Pl.'s 1st Interrogs. ¶ 2 (attached hereto as Exhibit B).) [1] Crown Theatres

paid the Martino Defendants substantial fees for their work on the theatre projects.  For the 1996-

2001 period, Crown Theatres was far and away the Martino Defendants' largest client.  (Martino

Dep. at 23-25.)

In evident appreciation of the business that he received from Crown Theatres,

Martino provided limited amounts of architectural services to Crown Theatres and some of its

officers for which he did not charge a fee and for which he never requested payment.  (Martino

Dep. at 247-49, 432-43.)

Work for Daniel Crown.  Daniel Crown was Crown Theatres' chief executive

officer.  Martino recalled at his deposition that Mr. Crown "was considering doing an addition or

an expansion" on his home in Connecticut, and that in connection with that project, Martino

provided "some consultation work."  (Id. at  439.)  Martino may also have provided services

---

[1] The six theatres were located in Hartford, Connecticut; Trumbell, Connecticut; Jupiter, Florida; Miami, Florida; Skokie, Illinois; and Annapolis, Maryland.

-2-

regarding Mr. Crown's home in New York; although when asked what work he had performed, Martino replied, "I don't recall." (Id.) Martino did not recall when he performed work concerning either of Mr. Crown's residences, and he did not know the value of the work. (Id. at 439-40.) In addition, he did not have a written or oral agreement for the work; he never submitted a bill for the work; he never asked Mr. Crown for payment; and (not surprisingly) he did not receive any payment from Mr. Crown. (Id. at 440-41.)

Work on Crown Theatres' Offices. When Crown Theatres moved its New York office to a new building, Martino attended meetings regarding the layout and floor plan of the new offices. (Id. at 437.)[2] There was no written or oral agreement between Crown Theatres and Martino for work relating to Crown Theatres' new office; Martino never submitted a bill for the work; and he never asked Crown Theatres to pay for it. (Id. at 437-38.)

Work for Others. Martino performed similar types of services for Milton Daly, Crown Theatres' executive vice president and chief operating officer;[3] David Clifford, Crown Theatres' chief financial officer;[4] Glenn Garfinkel, Crown Theatres' in-house counsel;[5] and Robert Beacher, a consultant retained by Crown Theatres to serve as its owners' representative on the theatre construction projects.[6] The work for these persons was not subject to any written

_____

[2] Although Martino did not know the value of the work in question at his deposition, in the Martino Defendants' answers to Crown Theatres' interrogatories, the Martino Defendants valued the work relating to Mr. Crown's New York and Connecticut homes at $1,880 and $3,290, respectively, and they placed the value of the work relating to Crown Theatres' offices at $9,400. (Martino Defs.' Ans. Pl.'s 1st Interrogs. ¶¶ 6-7.)

[3] Martino prepared drawings to reconstruct portions of the Connecticut home of Milton and his wife, defendant Anne E. Daly, after it had been damaged by fire. (Martino Dep. at 441.)

[4] Martino prepared drawings for deck and basement alternations for Clifford's house. (Id. at 432.)

[5] Martino worked on the kitchen, basement, and rear addition of Garfinkel's house. (Id. at 435.)

[6] For Beacher, Martino prepared drawings regarding built-ins and electrical drawings for his house in West Palm Beach, Florida, and drawings for Beacher's house in Woodmere, New York, after it had been damaged by fire. (Id. at 248-49.)

-3-

or oral agreement; Martino never submitted bills for the work; he never requested that they pay him for the work; and they did not pay him for it. (Id. at 247-49, 432-36, 438-39, 441-43.) Martino recalls that he told Mr. Garfinkel that he was doing the work on Garfinkel's house for no charge. (Id. at 436.)

In December 2003, Crown Theatres commenced this action against the Martino Defendants and others. It asserted claims against the Martino Defendants for breach of contract and professional negligence. (Pl.'s 2d Am. Compl. ¶¶ 243-56.) As set forth in the complaint, Crown Theatres was the victim of a multimillion dollar fraud in connection with the six theatre projects referenced above. As part of the fraud, millions of dollars of phony applications for payment were submitted to Crown Theatres on behalf of fictitious contractors that performed no work. As the architect on the project, Martino was required to review the payment applications and, if appropriate, certify them for payment. However, Martino did not perform his job. He signed the sham architects' certificates without visiting the job sites in order to determine whether the work had been completed or performed in accordance with specifications. He did not check to determine whether the amounts on the payment applications were correct. He failed to detect that the applications were submitted by entities that were not contractors on any of the jobs. He overlooked obvious indications that the payment applications were improper. He did virtually nothing to insure that the payment applications were valid and should be paid. Indeed, at his deposition, he testified that he would be handed stacks of payment applications that he would simply sign. (Martino Dep. at 266-67.)[7]

The Martino Defendants responded with three counterclaims against Crown Theatres, of which the first and third are the subject of this motion. The counterclaims, and the

---

[7] Crown Theatres has filed a separate motion for summary judgment on its claims against the Martino Defendants.

JZG/32310/2/676990v1
04/30/04-HRT/

reasons for which they are ripe for summary judgment, are discussed in the Argument section below.

## ARGUMENT

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure where the moving party demonstrates that no genuine issue of material fact exists and the undisputed facts establish that party's right to judgment as a matter of law. Rodriguez v. City of New York, 72 F.3d 1051, 1060-61 (2d Cir. 1995); Fed. R. Civ. P. 56(c). The Rule 56 standard applies equally to both claims and counterclaims. Fed. R. Civ. P. 56(a), (c). Crown Theatres satisfies this test for the Martino Defendants' First and Third Counterclaims.

**I.    SUMMARY JUDGMENT SHOULD BE GRANTED ON THE FIRST COUNTERCLAIM BECAUSE IT IS UNINTELLIGEIBLE AND, IN ANY EVENT, IT DOES NOT STATE A CLAIM.**

The Martino Defendants' First Counterclaim is less than a model of clarity. Indeed, the type of claim that the Martino Defendants seek to assert is uncertain. The First Counterclaim reads:

1.  Martino Defendants allege upon information and belief that if the Plaintiff Crown Theatres was caused to sustain damages as alleged in the Amended Complaint, all of which is specifically denied, then such damages were sustained in whole or in part by reason of the affirmative, active, primary and reckless acts and omissions, negligence and breaches of duty and/or obligations and/or statute and/or warranty and/or contract in fact or implied by law of the Plaintiff herein.

2.  If the Plaintiff recovers judgment on the Amended Complaint against Martino Defendants then the Plaintiff shall be liable on the basis of apportionment of responsibility and Martino Defendants will be entitled to contribution, apportionment and/or indemnification from and judgment over against Plaintiff for all or part of any verdict or judgment which Plaintiff in the underlying action or Plaintiff may recover herein.

(Martino Defs.' Ans. Pl.'s 2d Am. Compl. at 64.)   This "claim" fails on multiple grounds.

JZG/32310/2/676990v1
04/30/04-HRT/

As an initial matter, the First Counterclaim violates Rule 8 of the Federal Rules of Civil Procedure, which mandates that a counterclaim shall contain "(2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment for the relief the pleader seeks." Fed. R. Civ. P. 8(a). The purpose of Rule 8 is to insure that the responding party has adequate notice of what is being alleged. Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir. 1988) ("The statement should be plain because the principal function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted . . . ."). The First Counterclaim is hopelessly garbled and fails to provide a "statement of the claim" or of the "relief" sought. It should be dismissed. See id. (dismissal appropriate where "the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised"); Heart Disease Research Found. v. General Motors Corp., 463 F.2d 98, 100 (1972) ("Even under the liberal Federal Rules of Civil Procedure, there is a limit to how much a court may be called upon to divine in assessing the sufficiency of the complaint before it . . . ."); Kashins v. Keystone Lamp Mfg. Corp., 135 F. Supp. 681, 681 (S.D.N.Y. 1955) (holding that "unnecessary allegations" that "serve to confuse" should be eliminated from the complaint); Poindexter v. Bd. of Supervisors, County of Roanoke, 177 F. Supp. 852, 852 (W.D. Va. 1959) (dismissing a complaint that presented a "veritable entanglement of loose allegations generously embellished with verbosity [which] is repugnant to good pleading and in defiance of the federal rule").

Even if the Court were to make an educated guess as to what the Martino Defendants were attempting to plead, summary judgment would still be warranted. Read generously, the First Counterclaim could possibly be an attempt to plead a claim against Crown Theatres for contributory negligence, contribution, or indemnification. Of course, none of these

-6-

theories can stand as a counterclaim against Crown Theatres. Contributory negligence is not a claim for relief; it is an affirmative defense. See Fed. R. Civ. P. 8(c). It is insufficient as a matter of law. See Alton Mem'l Hosp. v. Metro. Life Ins. Co., 656 F.2d 245, 250 (7th Cir. 1981) (affirming dismissal of mislabeled counterclaim that pleaded affirmative defense of contributory negligence).

Contribution and indemnification are both affirmative claims, but they are not applicable here. Contribution seeks to hold a joint tortfeasor liable for its share of any judgment. See Ingham v. Eastern Air Lines, Inc., 373 F.2d 227, 240 n.12 (2d Cir. 1967) ("[C]ontribution . . . is the distribution of the loss proportionately among the tortfeasors."). The plaintiff cannot be held liable for contribution for his own injuries. See Crotta v. Home Depot, Inc., 249 Conn. 634, 640, 732 A.2d 767, 771 (1999) ("The contribution defendant must be a tortfeasor and originally liable to the plaintiff."; "[The] common liability of both tortfeasors to the injured person [is] essential to the right of contribution . . . .") (internal quotation marks omitted; emphasis in original). Claims for indemnification seek to hold other tortfeasors liable for an injury sustained by the defendant. It does not apply as to the plaintiff. See Ingham, 373 F.2d at 240 n.12 ("[T]he right to indemnity [is] the shifting of the entire loss from one tortfeasor to another . . . ."); Crotta, 249 Conn. at 642, 732 A.2d at 772 ("[T]he common law doctrine of indemnification permits a tortfeasor to assert a claim only against another liable tortfeasor.") (emphasis in original).

There are no issues of disputed fact and the First Counterclaim fails as a matter of law. Summary judgment, therefore, should be granted. Fed. R. Civ. P. 56(c).

JZG/32310/2/676990v1
04/30/04-HRT/

**II.   SUMMARY JUDGMENT SHOULD BE GRANTED ON THE THIRD COUNTERCLAIM, WHICH ALLEGES UNJUST ENRICHMENT, BECAUSE THE EVIDENCE IS UNDISPUTED THAT MARTINO NEVER SOUGHT TO BE PAID FOR THE SERVICES IN QUESTION AND THE RECIPIENTS OF THE SERVICES NEVER AGREED TO PAY FOR THEM.**

In their Third Counterclaim, the Martino Defendants assert that Crown Theatres has been unjustly enriched because the Martino Defendants performed work for which they did not receive payment. They base their claim on the relatively minor amounts of uncompensated work that Martino provided in connection with Crown Theatres' new office in New York City, and Daniel Crown's homes in New York and Connecticut. At his deposition, Martino could not recall when the work was performed and was unaware of its value. (Martino Dep. at 437, 439-40.)

To show unjust enrichment under Connecticut law, it is necessary to prove "(1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment." Fitzpatrick v. Scalzi, 72 Conn. App. 779, 786-87, 806 A.2d 593, 599 (2002). Where the plaintiff seeks compensation for services rendered, "it is essential to show that they were rendered under such circumstances as to make it fairly presumable that the party allowing them to be rendered and receiving the benefit to be derived from them expected, or at least ought to have expected that they were to be paid for." Connors v. Wilkinson, 34 Conn. Supp. 270, 274, 387 A.2d 568, 571 (C.P. 1978) (quoting State v. Newman, 140 Conn. 214, 218, 99 A.2d 110, 112 (1953)). There can be no unjust enrichment where the party performing the services relies upon a mere "uncommunicated expectation of remuneration," leaving the question of payment to "the unfettered discretion of the recipient." Bloomgarden v. Coyer, 479 F.2d 201, 211-12 (D.C. Cir. 1973) (affirming summary judgment against a plaintiff seeking compensation for services where

-8-

the circumstances indicated that compensation was not contemplated by the parties). See also 13 Samuel Williston & Walter H.E. Jaeger, A Treatise on the Law of Contracts § 1575, at 500 (3d ed. 1970) ("Recovery for the value of services which have inured to another's benefit is not generally allowed unless they were received with reason to know that compensation was expected for them.").

The Third Counterclaim is fatally defective. The undisputed evidence establishes that Crown Theatres had no notice that compensation was expected for the work in question. There was never any agreement, either written or oral, that Crown Theatres would pay for the work. The quantities of work involved were relatively insignificant. At the same time, Martino and his firm were doing large amounts of work for Crown Theatres on the theatre construction projects for which they were being paid significant fees. Perhaps most importantly, Martino never submitted a bill for the work on Mr. Crown's homes or for Crown Theatres' new offices; and he never requested payment.

Moreover, Martino regularly performed similar services for other business associates and friends without charge. Tellingly, it was only after Martino was sued by Crown Theatres that he filed a counterclaim in which he suggested for the first time that Crown Theatres should pay for the work in question. Plainly, Martino did not expect to be paid, and Crown Theatres had no reason to think that he did. Given the undisputed facts, Crown Theatres is entitled to judgment as a matter of law. See Bloomgarden 479 F.2d at 211-12.

A final point: The Third Counterclaim is also defective because Crown Theatres cannot be liable for work on Daniel Crown's homes. If a benefit was received, it was received by Mr. Crown, not Crown Theatres. Judgment should be entered against the Martino Defendants on the Third Counterclaim for this reason as well. See Fitzpatrick, 72 Conn. App. at 786-87, 806

-9-

A.2d at 599 (benefit to defendant is an essential element of a claim of unjust enrichment).  See

also MVB Custom Design & Constr., LLC v. Jones, No. CV010183779, 2002 WL 241298, at *4

(Conn. Super. Ct. Jan. 29, 2002) (attached hereto as Exhibit C) (striking plaintiff's claim of

unjust enrichment for failing "to clearly allege the defendant's purported benefit"); Morgan

Bldgs. and Spas, Inc. v. Dean's Stoves and Spas, Inc., 58 Conn. App. 560, 563-64, 567, 753 A.2d

957, 960, 962 (2000) (affirming judgment denying unjust enrichment claim where plaintiff failed

to prove that defendant received any benefit).

## CONCLUSION

For the foregoing reasons, this Court should grant summary judgment in favor

Crown Theatres and against the Martino Defendants on their First and Third Counterclaims.

CROWN THEATRES, L.P.

By: _____

H. James Pickerstein (Bar No. Ct 05094)
Jodi Zils Gagné (Bar No. Ct 24376)
PEPE & HAZARD, LLP
30 Jelliff Lane
Southport, CT  06490
(203) 319-4000
(203) 259-0251 (fax)
hpickerstein@pepehazard.com
jgagne@pepehazard.com

and

Craig C. Martin (Bar No. Ct 12198)
Lawrence S. Schaner (Bar No. Ct 24756)
JENNER & BLOCK LLP
One IBM Plaza
Chicago, IL  60611
(312) 222-9350
312) 840-7776 (fax)
cmartin@jenner.com
lschaner@jenner.com

Dated:  April 30, 2004

JZG/32310/2/676990v1
04/30/04-HRT/

## CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that I have served all counsel of record in

this action with a copy of the foregoing Memorandum of Law by mailing a copy of the same by

United States Mail, postage prepaid, this 30th day of April, 2004 to the following:

Kerry M. Wisser
Weinstein & Wisser, P.C.
29 South Main Street
Suite 207
West Hartford, CT  06107

Mark Seiden
Marisa Lanza
Milber, Makris, Plousadis & Seiden, L.L.P.
3 Barker Ave.
6th Floor
White Plains, NY  10601

Robert M. Frost
Zeldes, Needle & Cooper
1000 Lafayette Blvd.
P.O. Box 1740
Bridgeport, CT 06601-1740

Jodi Zils Gagné

JZG/32310/2/676990v1
04/30/04-HRT/

Exhibit A

**01/15/04 CROWN THEATRES vs DALY    WITNESS: JAMES T.MARTINO**

**Diamond Reporting**

**Page 1 to Page 223**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*DIAMOND REPORTING*
*Suite 907*
*16 Court Street*
*Brooklyn, NY    11241*
*Phone:    (718) 624-7200*
*FAX:    (718) 855-1772*

Page 1

(1)
(2) UNITED STATES DISTRICT COURT
    FOR THE DISTRICT OF CONNECTICUT
(3) ------------------------------------X
    CROWN THEATRES, L.P.,
(4)
    PLAINTIFF,
(5)
    -against-
(6)
    MILTON L. DALY, TAYLOR-LEIGH,
(7) INC., ANNE E. DALY, JAMES C.
    CELLA, G.U.S. DEVELOPMENT, INC.,
(8) JAMES T. MARTINO AND JAMES
    THOMAS MARTINO, ARCHITECT, P.C.,
(9)
    DEFENDANTS.
(10) ------------------------------------X
     **DATE:**    January 15, 2004
(11) **TIME:**    11:21 a.m.
(12)
(13) EXAMINATION BEFORE TRIAL of the
(14) Defendant, JAMES T. MARTINO, taken by the
(15) Plaintiff, pursuant to a Court Order, held at the
(16) offices of Milber, Makris, Plousadis & Seiden,
(17) L.L.P., 108 Corporate Park Drive, Suite 200, White
(18) Plains, New York 10604, before a Notary Public of
(19) the State of New York.
(20)
(21)
(22)
(23)
(24)
(25)

Page 2

(1)
(2) A P P E A R A N C E S :
(3)
(4)
(5)
(6) JENNER & BLOCK, L.L.C.
    Attorneys for the Plaintiff
(7) One IBM Plaza
    Chicago, Illinois 60611-7603
(8) BY: LAWRENCE S. SCHANER, ESQ.
    MATTHEW RICE
(9)
(10)
(11)
(12) WEINSTEIN & WISSER, P.C.
    Attorneys for the Defendants
(13) Milton L. Daly, Taylor-Leigh,
    Inc. and Anne E. Daly,
(14) 29 South Main Street, Suite 207
    West Hartford, Connecticut 06107
(15) BY: KERRY MARC WISSER, ESQ.
(16)
(17)
(18)

MILBER MAKRIS PLOUSADIS & SEIDEN, L.L.P.
(19) Attorneys for the Defendants
    James T. Martino and James
(20) Thomas Martino, Architect, P.C.
    108 Corporate Park Drive, Suite 200
(21) White Plains, New York 10604
    BY: MARK SEIDEN, ESQ.
(22) File #: 112163
(23)
(24)
(25) * * *

Page 3

(1)
    F E D E R A L S T I P U L A T I O N S
(2)
(3)
(4) IT IS HEREBY STIPULATED AND AGREED
(5) by and between the counsel for the respective
(6) parties hereto, that the filing, sealing, and
(7) certification of the within deposition shall
(8) be and the same are hereby waived;
(9)
(10) IT IS FURTHER STIPULATED AND AGREED
(11) that all objections, except as to the form
(12) of the question, shall be reserved to the times
(13) of the trial.
(14)
(15) IT IS FURTHER STIPULATED AND AGREED
(16) that the within deposition may be signed before
(17) any Notary Public with the same force and effect
(18) as if signed and sworn to before this court.
(19)
(20)
(21)
(22) * * * *
(23)
(24)
(25)

Page 4

(1)
(2) J A M E S M A R T I N O, called as a witness,
(3) having been first duly sworn by a Notary Public of
(4) the State of New York, was examined and testified
(5) as follows:
(6) EXAMINATION BY
(7) **MR. SCHANER:**
(8) Q.   *Please state your name for the record.*
(9) A.   **James Martino.**
(10) Q.   *What is your address?*
(11) A.   **14 Vanderventer Avenue, Port**
(12) **Washington, New York 11050.**
(13) Q.   *Mr. Martino, good morning. We are*
(14) *starting late this morning for weather related*
(15) *reasons.*
(16) *Have you had your deposition taken*
(17) *before?*
(18) A.   **Yes.**
(19) Q.   *How many times?*
(20) A.   **Once.**
(21) Q.   *When was that?*

Page 21

(18) for Crown Theatres?

(19) A. It's another guess because, you know,

(20) I'm sure we have it somewhere written down how

(21) many theaters were actually designed.

(22) Q. I don't want you to guess. Let me see

(23) if I could help you.

(24) MR. SCHANER: Let's mark this as

(25) Exhibit Number 2.

Page 19

(1)

(2)

(3) (Whereupon, the aforementioned Document

(4) were marked as Martino Exhibit 2 for

(5) identification as of this date by the

(6) Reporter.)

(7)

(8) Q. Mr. Martino, you should have before you

(9) a copy of what has been marked as Martino Exhibit

(10) number 2. I will represent that these are pages

(11) taken off your firm's website. Do you recognize

(12) them?

(13) A. Yes, I do.

(14) Q. If you turn towards the back of the

(15) exhibit, there is a section called body of work.

(16) And behind that there is a heading titled movie

(17) theaters. Let me know when you've found that

(18) page.

(19) A. I found that page.

(20) Q. If you look at that page, there is a

(21) column called Cineplex/Odeon. There is another

(22) column for K.B Theaters. Do you see that?

(23) A. Yes, I do.

(24) Q. On the next page there is a General

(25) Cinemas Corporation, after that is Crown Theatres.

Page 20

(1)

(2) Do these two pages provide accurate and complete

(3) listings of the movie theater projects that you've

(4) designed for each of those clients?

(5) A. I believe it does, yes.

(6) Q. Are these projects that were in fact

(7) built?

(8) MR. SEIDEN: Put a clarification,

(9) which are you referring to, Crown or –

(10) Q. Well, for all of them. If we look at

(11) Cineplex/Odeon, we have a list of one, two – we

(12) appear to have a list of eight theater projects,

(13) would you agree?

(14) A. Yes, there is eight.

(15) Q. How many theaters have you built for

(16) Cineplex/Odeon?

(17) MR. SEIDEN: Objection. There is no

(18) foundation that he built any theaters.

(19) Q. Have you built any theaters for

(20) Cineplex/Odeon?

(21) A. No.

(22) Q. What work did you do for

(23) Cineplex/Odeon, if any?

(24) A. I was the design architect.

(25) Q. Fair enough. Were the theaters that

Page 21

(1)

(2) are – how many theaters for Cineplex/Odeon have

(3) you designed?

(4) A. I could not tell you that as we sit

(5) here today.

(6) Q. What is your best estimate?

(7) A. It's probably another two or three

(8) that were not on this list.

(9) Q. Which would bring it to a total of 11,

(10) 12?

(11) A. If you add two to three to eight, yes.

(12) Q. Are the projects that are listed on

(13) your website projects that were actually built?

(14) A. I believe so, yes.

(15) Q. During what years did you design

(16) theaters for Cineplex/Odeon?

(17) A. I would be guessing.

(18) Q. What is your best estimate?

(19) A. '89 to '94.

(20) Q. How many theaters have you designed

(21) for K.B Theaters?

(22) A. I believe what's listed here is all

(23) that I did for them.

(24) Q. How many theaters is that?

(25) A. Seven.

Page 22

(1)

(2) Q. Were all seven built?

(3) A. Yes.

(4) Q. During what years did you perform work

(5) for K.B Theaters?

(6) A. I don't recall.

(7) Q. What is your – is it prior to or

(8) after your work for Cineplex/Odeon?

(9) A. I don't recall.

(10) Q. Has it been within the last five

(11) years?

(12) A. No, sir.

(13) Q. How many theaters have you designed

(14) for General Cinemas Corporation?

(15) A. Nine.

(16) Q. Were all nine built?

(17) A. Yes.

(18) Q. During what years did you perform

(19) services for General Cinemas Corporation?

(20) A. Counselor, I don't recall.

(21) Q. What is your best recollection?

(22) A. Probably '87 to '92.

(23) Q. By the way, with respect to

(24) Cineplex/Odeon, have you performed any work for

(25) them within the last ten years?

Page 23

(1)

(2) A. I believe I did, yes.

(3) Q. But not within the last five?

(4) A. That's correct.

(5) Q. How many theaters have you designed

(6) for Crown Theatres?

(7) A. I could not tell you.

01/15/04 CROWN THEATRES vs DALY   WITNESS: JAMES T. MARTINO   16 of 43
BSA
Case 3:02-cv-02272-AVC   Document 126   Filed 04/30/2004   Page 16 of 43   XMAX(6/6)

(8)  Q.   Do you have a best estimate?

(9)  A.   I'm assuming when you say design, you

(10) are talking about whether it was built or not.

(11) Q.   Yes.

(12) A.   Well, without looking back on my

(13) master list on the jobs for Crown, I would have

(14) to guess that it was probably another five or six

(15) above this list here.

(16) Q.   How many are on this list?

(17) A.   Nine.

(18) Q.   So, you estimate that you have

(19) designed approximately 15 movie theaters for Crown

(20) Theatres?

(21) A.   Asking me to answer that question

(22) while I sit here without my documents in fronts of

(23) you, yes, that's the best estimate I could give

(24) you.

(25) Q.   Of the approximately 15, how many were

Page 24

(1)

(2)  built?

(3)  A.   These nine on this list (indicating).

(4)  Q.   During what years did you perform work

(5)  for Crown?

(6)  A.   '96 to 2001.

(7)  Q.   You also mentioned that you did work

(8)  for K.B Theaters. Did you design theaters for

(9)  them?

(10) A.   Yes, I did.

(11) Q.   How many?

(12) A.   Same answer as before counselor,

(13) without being able to go back and look at my

(14) master list of projects, it's very hard to answer

(15) that.

(16) Q.   Have you done any work for K.B

(17) Theaters in the last ten years – I'm sorry. Have

(18) you done any work for National Theaters in the

(19) last ten years?

(20) A.   No.

(21) Q.   During the time you were working for

(22) Crown Theatres, did you have any other movie

(23) theater assignments?

(24) A.   Other than Crown Theatres?

(25) Q.   Yes.

Page 25

(1)

(2)  A.   Not that I recall.

(3)  Q.   From 2001 to the present, have you

(4)  performed any work for movie – relating to movie

(5)  theaters?

(6)  A.   Relating to movie theaters, yes.

(7)  Q.   What work?

(8)  A.   I have a client that wants to put a

(9)  movie theater in his home.

(10) Q.   Other than that.

(11) A.   No.

(12) Q.   During the years 1996 to 2001 when you

(13) were doing work for Crown Theatres, would you

(14) agree that Crown Theatres was an important client

(15) of your's?

(16) A.   Yes.

(17) Q.   During that time period, would you

(18) agree that they were your most important client?

(19) A.   Yes.

(20) Q.   What percentage of your firm's annual

(21) revenues during the 1996 to 2001 period was Crown

(22) Theatres responsible for?

(23) A.   I couldn't answer that question.

(24) Q.   More than half?

(25) A.   I would assume, yes.

Page 26

(1)

(2)  MR. SEIDEN:   Don't – we – no one is

(3)  asking you to assume what you know.

(4)  Q.   Was it more than three-quarters of your

(5)  firm's annual revenues?

(6)  A.   I can't answer that.

(7)  Q.   Why not?

(8)  A.   Because I'm not in a position. I

(9)  don't know what that answer is. Again, I would be

(10) guessing.

(11) Q.   Are there documents that would help

(12) you answer the question?

(13) A.   I would assume the tax returns might

(14) be able to tell.

(15) Q.   Anything else?

(16) A.   (Indicating).

(17) Q.   Do you keep records that breakdown

(18) revenues by clients?

(19) A.   I don't know if my accountant or my

(20) bookkeeper does or not.

(21) Q.   Is it correct that you were the only

(22) architect from your firm who performed design work

(23) that your firm was doing for Crown Theatres?

(24) MR. SEIDEN:   Objection. Can you

(25) clarify what you mean by design work?

Page 27

(1)

(2)  Q.   You were the only architect at your

(3)  firm working on Crown Theatres' matters, correct?

(4)  MR. SEIDEN:   Objection to form. You

(5)  could answer.

(6)  A.   What is your definition of architect?

(7)  Q.   You were the only architect at your

(8)  firm in the year 1996 to 2001 period, correct?

(9)  A.   What is your definition of architect?

(10) Q.   Well, let me turn that back to you and

(11) ask you how you would define architect?

(12) A.   If you mean licensed architect with a

(13) seal, yes.

(14) Q.   You were the only licensed architect

(15) at your firm during the period 1996 to 2001

(16) working on Crown Theatres' matters?

(17) A.   That is correct.

(18) Q.   Were there other individuals with

(19) architectural training working on Crown Theatres'

(20) matters?

(21) A.   That is correct.

(22) Q.   Who were those individuals?

(23) A.   Gary Scheide. I don't know if I will

1

2          IN THE UNITED STATES DISTRICT COURT

3        - - FOR THE DISTRICT OF CONNECTICUT

4

CROWN THEATRES, L.P.,          )
5                              )
                Plaintiff,     )
6                              )
            vs.                )
7                              )
MILTON L. DALY, TAYLOR-        )
8   LEIGH, INC., ANNE E. DALY, )
JAMES C. CELLA, G.U.S.         )
9   DEVELOPMENT, INC., JAMES    )
T. MARTINO and JAMES           )
10  THOMAS MARTINO, ARCHITECT, )
                              )
11              Defendants.    )
    - - - - - - - - - - - - - - - - - - - - - - - - -)

12

13

14

15        CONTINUED DEPOSITION OF JAMES MARTINO

16              Garden City, New York

17           Tuesday, February 10, 2004

18

19

20

21

22

23

24   Reported by:
     DEBORAH A. HANLON
25   JOB NO. 157283

Page 224

1
2
3
4          February 10, 2004
5          10:05 A.M.
6          .- -
7          Continued deposition of JAMES
8     MARTINO, held at the offices of Milber,
9     Makris, Plousadis & Seiden, LLP, 990
10    Stewart Avenue, Garden City, New York,
11    pursuant to Adjournment, before Deborah
12    A. Hanlon, a Notary Public of the State
13    of New York.
14
15
16
17
18
19
20
21
22
23
24
25

Page 225

1
2    A P P E A R A N C E S:
3
4     JENNER & BLOCK, LLP
5     Attorneys for Plaintiff
6        One IBM Plaza
7        Chicago, Illinois 60611
8     BY: LAWRENCE S. SCHANER, ESQ.
9
10    WEINSTEIN & WISSER, P.C.
11    Attorneys for Milton L. Daly and Anne
12    E. Daly
13       29 South Main Street, Suite 207
14       West Hartford, Connecticut 06107
15    BY: KERRY MARC WISSER, ESQ.
16
17    MILBER, MAKRIS, PLOUSADIS & SEIDEN, LLP
18    Attorneys for James T. Martino
19       108 Corporate Park Drive, Suite 200
20       White Plains, New York 10604
21    BY: MARK SEIDEN, ESQ.
22
23
24
25

Page 226

1                    Martino
2     J A M E S   M A R T I N O,  called as a
3        witness, having resworn by a Notary
4        Public, was examined and testified as
5        follows:
6     EXAMINATION BY
7     MR. SCHANER:
8        Q.  Good morning, Mr. Martino.  This
9     is the continuation of your deposition
10    which began on January 15, 2004.
11        Since the first day of your
12    deposition, have you done anything to
13    prepare for today's deposition?
14        A.  Yes.
15        Q.  What have you done?
16        A.  I reviewed the contracts that the
17    general contractors submitted, and I
18    reviewed my fees.
19        Q.  Anything else?
20        A.  Not that I can recall.
21        Q.  Have you met with anybody?
22        A.  Mr. Seiden.
23        Q.  When did you do that?
24        A.  Yesterday.
25        Q.  For how long?

Page 227

1                    Martino
2        MR. SEIDEN:  Objection.  The same
3     as last time.  I deem that privilege,
4     the length of time the witness meets
5     with counsel.
6        MR. SCHANER:  Are you instructing
7     the witness not to answer?
8        MR. SEIDEN:  Yes, same as last
9     time.
10       MR. SCHANER:  Can I have a
11    standing agreement that we're going to
12    instruct the witness not to answer if I
13    were to ask him, will you answer the
14    question, he will say he won't answer?
15       MR. SEIDEN:  I think that's fair.
16       MR. SCHANER:  That way I won't
17    have to keep objecting.
18       MR. SEIDEN:  Just so we're clear,
19    I deem that attorney/client and
20    attorney work product privilege.
21       MR. SCHANER:  As far as our
22    agreement goes so I don't have to go
23    back and ask him some of the questions
24    I asked him last time that you
25    instructed him not to answer, do you

2 (Pages 224 to 227)

Page 244

**Martino**

1
2    Q.   How?
3    **A.   Bought him dinner, depending on**
4    **the size of the project.**
5    Q.   Any other ways?
6    **A.   Not that I can think of off the**
7    **top of my head.**
8    Q.   At any time in the past five
9    years, have you entered into any
10   partnership with Mr. Beacher?
11   **A.   Not that I recall.**
12   Q.   Over any time in the past five
13   years, have you entered into any joint
14   ventures with Mr. Beacher?
15   **A.   Not that I recall.**
16   Q.   On which of the Crown Theatre
17   projects did you pay referral fees to
18   Mr. Beacher?
19   **A.   I did not pay Mr. Beacher**
20   **specific referral fees for a specific**
21   **project.**
22   Q.   When you made a payment of a
23   referral fee to him, how did you do it?
24   **A.   By check.**
25   Q.   Did you hand it to him?  Did you

Page 245

Martino

1
2    put it in the mail?
3    **A.   I don't recall.**
4    Q.   When Mr. Beacher received the
5    check, did you make clear to him that it
6    was for a particular project?
7    **A.   No.**
8    Q.   Did you communicate to him that
9    it was for -- withdrawn.
10       Did you make the payments of
11   referral fees on a regular basis?
12   **A.   What's a regular basis,**
13   **counselor?**
14   Q.   For example, did you make the
15   payments on a monthly basis?
16   **A.   I don't think it happened that**
17   **regularly, no.**
18   Q.   Was there a schedule for making
19   the payments?
20   **A.   No.**
21   Q.   How did you determine when you
22   should make them?
23   **A.   When cash flow permitted me to do**
24   **so.**
25   Q.   Did Mr. Beacher ever encourage

Page 246

Martino

1
2    you to make payments?
3    **A.   He would ask if I could make a**
4    **payment, how my cash flow was, if that's**
5    **what you are asking me.**
6    Q.   Yes.
7        And when Mr. Beacher would make
8    that request, what would you do?
9    **A.   I would discuss with my**
10   **bookkeeper to see if in fact whether we**
11   **could make a payment.**
12   Q.   If your cash flow would permit
13   it, what did you do?
14   **A.   I wrote him a check.**
15   Q.   And if your cash flow would not
16   permit making a payment, what would you do?
17   **A.   I would inform Bob I couldn't pay**
18   **him.**
19   Q.   Under those circumstances, what
20   would Bob say?
21   **A.   "When you can, you can, Jimmy."**
22   Q.   I am going to turn back to an
23   exhibit we looked at last time which was
24   Martino Exhibit 2, and this was a section
25   from your firm's web site.

Page 247

Martino

1
2        If you recall in the back
3    section, there was a division called, Body
4    of Work."
5    **A.   Uh-huh.**
6    Q.   I would like to turn you to the
7    last page of the exhibit entitled, "Single
8    Family Residences."
9        Do you see that Mr. Martino?
10   **A.   Yes.**
11   Q.   There are eight projects listed
12   on this page.
13       Did you charge any of the people
14   who received your services that are listed
15   on this page for your services?
16   **A.   Yes.**
17   Q.   Of the eight projects listed
18   under single-family residences, for which
19   ones did you charge for your services?
20   **A.   All except for Beacher and Daly.**
21   Q.   Did you, in fact, get paid for
22   your work on all of the projects except for
23   Beacher and Daly?
24   **A.   Yes.**
25   Q.   Mr. Beacher's house is listed in

7 (Pages 244 to 247)

Page 248

1           Martino
2   West Palm Beach, Florida.
3       ·   Did you visit that residence?
4       **A.  Yes..  .   _**
5       Q.   Where in West Palm Beach is the
6   home?  It is in West Palm Beach?
7       **A.  It is in West Palm Beach.**
8       Q.   Why did you visit Mr. Beacher's
9   house?
10      **A.  Because he wanted me to do some**
11  **drawings for his built-in's in that space,**
12  **and he was looking for also some electrical**
13  **drawings to be done in terms of the space.**
14      Q.   What year did you do the work?
15      **A.  I don't recall.**
16      Q.   What's your best estimate?
17      **A.  I would rather not guess.**
18      Q.   Mr. Beacher also had a house in
19  New York, correct?
20      **A.  That is correct.**
21      Q.   Where is that located?
22      **A.  Woodmere.**
23      Q.   Did you ever visit Mr. Beacher's
24  Woodmere house?
25      **A.  Yes.**

Page 249

1           **Martino**
2       Q.   On how many occasions?
3       **A.  I don't recall, Mr. Schaner.**
4       Q.   More than ten?
5       **A.  I would say more than ten, yes.**
6       Q.   More than 50?
7       **A.  I can't say that.**
8       Q.   Did you do any work on
9   Mr. Beacher's Woodmere, New York,
10  residence?
11      **A.  Yes.**
12      Q.   What work did you do?
13      **A.  There was a fire in a house**
14  **behind his -- actually, a gas explosion --**
15  **which damaged his house.  And we prepared**
16  **drawings to remedy the damage that happened**
17  **to his house because of the gas explosion.**
18      Q.   When did you perform that work?
19      **A.  I don't recall when that was.**
20      Q.   Did Mr. Beacher have other
21  residences to your knowledge?
22      **A.  No.**
23      Q.   What is the name of the bank in
24  which you and your wife have a checking
25  account?

Page 250

1           Martino
2       MR. SEIDEN:  Objection.
3       **A.  You asked me that question once**
4   **before, and I told you I don't know because**
5   **my wife deals with that.**
6       Q.   Do you have an ATM card?
7       **A.  No.**
8       Q.   Do you have a visa card?
9       **A.  Yes.**
10      Q.   What bank issued your visa card?
11      MR. SEIDEN:  Objection.
12      **A.  I have to go into my wallet to**
13  **show it to you.**
14      Q.   Please do.
15      MR. SEIDEN:  Same objection.
16      **A.  MBNA.**
17      Q.   Do you invest in stocks?
18      MR. SEIDEN:  Objection.
19      **A.  Yes.**
20      Q.   Do you have a brokerage account?
21      **A.  Yes.**
22      MR. SEIDEN:  Objection.
23  Mr. Schaner, as you know, there has
24  been a motion filed with regard to the
25  subpoena that was propounded.  As you

Page 251

1           Martino
2   are going down this line of questions,
3   I would like some proffer as to how
4   this line of questions bears any
5   relevancy under the federal rules to
6   the allegations against Martino in this
7   claim?
8       MR. SCHANER:  I would be prepared
9   to do it but at an appropriate time.
10  Not now.
11      MR. SEIDEN:  I think this is an
12  appropriate time.
13      MR. SCHANER:  I don't agree.
14      MR. SEIDEN:  What's the question?
15  (A portion of the record was read.)
16      MR. SEIDEN:  Objection.
17      Q.   You can answer.
18      **A.  I don't think it is any of your**
19  **business.**
20      Q.   Are you refusing to answer the
21  question?
22      **A.  Based on counsel's objection.**
23      Q.   Do you have a stockbroker?
24      MR. SEIDEN:  Objection.  There has
25  been no proffer as to any relevance.

Page 264

Martino

1    not. I believe we did.
2    
3    Q.  Mr. Martino, I am handing you
4    what we marked at the first day of your
5    deposition as Martino Exhibit 3 which was
6    your responses to Crown Theatres' first set
7    of interrogatories.
8         Reviewing your responses to Crown
9    Theatres' first set of interrogatories, can
10   you tell me whether you or someone from
11   your firm made monthly visits to the
12   Trumbull site?
13       A.  Not by reviewing this document I
14   cannot, no.
15       Q.  Can you tell me whether you made
16   monthly site visits on the other theater
17   projects that you did for Crown Theatres?
18       A.  Are you asking me now to review
19   the other five projects that are listed
20   here to ascertain whether I made monthly
21   site visits?
22       Is that what you are asking me to
23   do?
24       Q.  I would like you to tell me
25   whether you made monthly visits to each of

Page 265

Martino

1    the Crown Theatres' projects.  And if
2    reviewing your interrogatory answers would
3    help, go ahead.
4        A.  Well, I know that in Jupiter and
5    Miami I did not, or anybody from my office,
6    make specific monthly site visits.
7        Q.  What about the other projects?
8        A.  It appears that Skokie, based on
9    this document in front of me, that monthly
10   site visits were not made. And looking at
11   the Hartford project, based on this, I
12   think we did make monthly site visits.
13       Q.  What about Annapolis, Maryland?
14       A.  No. Annapolis, Maryland, monthly
15   site visits were not made.
16       Q.  Let's go back to Martino
17   Exhibit 25 for a moment.
18       On page 2, the last sentence
19   reads, "Should additional site visits be
20   required, each site visit will be billed
21   monthly."
22       Did your firm ever bill for
23   additional site visits?
24       A.  On the Trumbull project?

Page 266

Martino

1    
2        Q.  On the Trumbull project.
3        A.  I can't recall off the top of my
4    head.
5        Q.  Did your firm bill for additional
6    site visits on any of the other site
7    projects?
8        A.  I can't recall that either.
9        Q.  On the first day of your
10   deposition, I believe that you testified
11   that Bob Beacher would hand copies of the
12   payment requisitions to you either in his
13   car on the way to the Friday construction
14   meetings or at the Friday meetings, that
15   you would sign them either in the car or at
16   the Friday meetings.
17       Have I got that right?
18       MR. SEIDEN: Objection. The
19   testimony speaks for itself.
20       A.  I think that's a fair synopsis of
21   what I was trying to portray.
22       Q.  Did you discuss the payment
23   requisitions with Mr. Beacher before you
24   signed them?
25       A.  I cannot say that I discussed

Page 267

Martino

1    
2    specifically each payment requistion before
3    I signed them, no.
4        Q.  What would Mr. Beacher say to you
5    when he gave you the payment requisitions?
6        A.  I reviewed them, signed the
7    fucking things.
8        Excuse my mouth, ma'am.
9        Q.  And after you signed them, what
10   did you do with them?
11       A.  Gave them back to Bob.
12       Q.  What did Mr. Beacher do with the
13   payment applications after you signed them
14   and gave them back to him?
15       A.  I believe he then gave them to
16   Mr. Daly.
17       Q.  Mr. Martino, do you understand
18   the terms payment requistion and payment
19   application to mean the same thing?
20       A.  Yes, I do.
21       Q.  Do you remember that you met with
22   investigators for Crown Theatres on July
23   11, 2003?
24       A.  I don't remember that specific
25   date, but I do remember meeting with people

12 (Pages 264 to 267)

1            Martino
2      **A. I'm sorry. I don't recall,**
3  **counsel.**
4      Q.  Do you recall if you ever saw a
5  copy not only of Exhibit 59 -- let me
6  rephrase the question.
7           Did you ever see a copy of the
8  lease for the Trumbull theater projects?
9      **A.  I don't recall seeing it.**
10     Q.  Let's talk about something
11  different for a few minutes.
12          Mr. Martino, do you believe that
13  David Clifford owes you money for work on
14  his home in Connecticut?
15     **A.  Yes, I do.**
16     Q.  What work did you perform on
17  Mr. Clifford's home?
18     **A.  What I recall, while sitting here**
19  **right now, is when I did drawings for a**
20  **deck out the back of his house, and I did**
21  **drawings, I think, for a basement**
22  **alteration.**
23     Q.  You knew at the time that
24  Mr. Clifford worked for Crown Theatres?
25     **A.  Yes, sir.**

1           **Martino**
2      Q.  What position did he hold with
3  Crown Theatres?
4      **A.  It is my understanding he held**
5  **the position of CFO.**
6      Q.  And you understood that to be a
7  high ranking position at Crown Theatres?
8      **A.  Yes, sir.**
9      Q.  Do you have any -- let me
10  rephrase that.
11          Did you have any written contract
12  for work with Mr. Clifford for work on his
13  house?
14     **A.  No, sir.**
15     Q.  Did you have any written
16  agreement with Mr. Clifford of any kind for
17  work on his house?
18     **A.  No, sir.**
19     Q.  Did you have an oral agreement
20  for work on Mr. Clifford's house?
21     **A.  No, sir.**
22     Q.  Did you tell Mr. Clifford that
23  you would do the work for free?
24     **A.  No, sir.**
25     Q.  Did you ever send Mr. Clifford an

1            Martino
2  invoice for work on his house?
3      **A.  No, sir.**
4      Q.  Did you ever have discussions
5  with Mr. Clifford regarding payment for
6  work on his house?
7      **A.  No, sir.**
8      Q.  How much do you believe
9  Mr. Clifford owes you for work on his
10  house?
11     **A.  I don't recall off the top of my**
12  **head. I think we submitted some number**
13  **that I felt was a fair and equitable**
14  **amount.**
15     Q.  Did you ever ask Mr. Clifford to
16  pay you for work on his house?
17     **A.  No.**
18     Q.  Do you believe that Glenn
19  Garfinkel owes you money for work on his
20  home in Connecticut?
21     **A.  Yes, sir.**
22     Q.  You understood that Mr. Garfinkel
23  was employed by Crown Theatres?
24     **A.  Yes, sir.**
25     Q.  What was Mr. Garfinkel position?

1            Martino
2      **A.  In-house counsel.**
3      Q.  What work did you do on
4  Mr. Garfinkel?
5      **A.  Expansion on his kitchen and**
6  **expansion out of the back of the house and**
7  **also a basement alteration. That's what I**
8  **recall.**
9      Q.  When was the work on
10  Mr. Garfinkel's house performed?
11     **A.  I am sorry, sir. I don't recall.**
12     Q.  When did you do the work on
13  Mr. Clifford's house?
14     **A.  I don't recall that either.**
15     Q.  Do you have a written agreement
16  with Mr. Garfinkel for work on
17  Mr. Garfinkel's house?
18     **A.  No, sir.**
19     Q.  Do you have any kind of writing
20  that describes the work you did on
21  Mr. Garfinkel's house?
22     **A.  No, sir.**
23     Q.  Did you ever ask Mr. Garfinkel to
24  pay you for the work on his house?
25     **A.  No, sir.**

54 (Pages 432 to 435)

Page 436

**Martino**

1
2    Q.  Did you ever submit an invoice to
3    him?
4    **A.  No, sir.**
5    Q.  Did you tell Mr. Clifford --
6        MR. SEIDEN:  Garfinkel.
7    Q.  Did you ever tell Mr. -- let me
8    rephrase.
9        Did you tell Mr. Garfinkel that
10   you were doing the work for no charge?
11   **A.  Yes.**
12   Q.  How much do you believe that
13   Mr. Garfinkel owes you?
14   **A.  Again, counselor, I don't know**
15   **the number off the top of my head. I know**
16   **my attorneys put in a number for me.**
17   Q.  Let me refer back to --
18   **A.  Maybe I said that wrong.**
19   Q.  Let me refer back to the work you
20   did for Mr. Clifford.
21       Did you tell Mr. Clifford that
22   you would not charge him for work on his
23   house?
24   **A.  No, sir.**
25   Q.  Do you believe that you were owed

Page 437

Martino

1
2    money for work performed on Crown Theatres'
3    offices in New York?
4    **A.  Yes.**
5    Q.  How much?
6    **A.  Again, I don't recall off the top**
7    **of my head.**
8    Q.  Do you have a written agreement
9    for work that you did on Crown Theatres'
10   office in New York?
11   **A.  No, sir.**
12   Q.  What work did you do for Crown
13   Theatres' offices in New York?
14   **A.  What I remember is that Crown**
15   **offices were moving into the Seagram's**
16   **buildings, and they needed a floor plan**
17   **from me showing the layout, and I know**
18   **there were several meetings I attended.**
19   **And I don't recall anything else right now.**
20   **I think there was some other work, but I**
21   **don't recall it right at this moment.**
22   Q.  Did you have an oral agreement
23   with Crown by which Crown would pay you for
24   the work that you did on its New York
25   offices?

Page 438

Martino

1
2    **A.  No, sir.**
3    Q.  Did you ever submit a bill to
4    Crown Theatres for the work on its New York
5    offices?
6    **A.  No, sir.**
7    Q.  Did you ever ask Crown Theatres
8    to pay you for work on its New York
9    offices?
10   **A.  No, sir.**
11   Q.  Did you tell Crown Theatres that
12   there would be no charge for your work on
13   its New York offices?
14   **A.  No, sir.**
15   Q.  Did Crown Theatres make any
16   payments to you for work on its New York
17   offices?
18   **A.  No.**
19   Q.  Let me ask the same question for
20   Mr. Clifford.
21       Did he make any payment to you
22   for work on his house?
23   **A.  No, sir.**
24   Q.  What about Mr. Garfinkel?
25       Did he ever pay you any money for

Page 439

Martino

1
2    work on his house?
3    **A.  No, sir.**
4    Q.  Do you believe that Dan Crown
5    owes you money for work on his New York and
6    Connecticut homes?
7    **A.  Yes.**
8    Q.  Both of them?
9    **A.  Yes.**
10   Q.  Did you -- you understood that
11   Mr. Crown was in charge of Crown Theatres?
12   **A.  Yes.**
13   Q.  He was the chief executive
14   officer?
15   **A.  Nice man.**
16   Q.  What work did you perform on
17   Mr. Crown's New York home?
18   **A.  I don't recall.**
19   Q.  What work did you perform on his
20   Connecticut home?
21   **A.  It was some consultation work.**
22   **He was considering doing an addition or an**
23   **expansion.**
24   Q.  When did you do work on
25   Mr. Crown's New York home?

55 (Pages 436 to 439)

Page 440

```
1                 Martino
2     A.  I am sorry.  I do not recall.
3     Q.  When did you do work on his
4  Connecticut home?
5     A.  I don't recall the dates.
6     Q.  How much do you believe you were
7  owed for work on Mr. Crown's New York home?
8     A.  I think we put in a number.  I
9  don't recall it off the top of my head.
10    Q.  How much do you believe you were
11 owed for work on Mr. Crown's Connecticut
12 home?
13    A.  Same answer.
14    Q.  Did you have a written contract
15 for Mr. Crown for work on his Connecticut
16 home?
17    A.  No, sir.
18    Q.  For work on his New York home?
19    A.  No.
20    Q.  Did you have an oral agreement
21 with Mr. Crown for work on his Connecticut
22 home?
23    A.  No, sir.
24    Q.  For work on his New York home?
25    A.  No.
```

Page 441

```
1                 Martino
2     Q.  Did you ever submit a bill to
3  Mr. Crown for work on either of his homes?
4     A.  No.
5     Q.  Did Mr. Crown pay you money for
6  work on either of his homes?
7     A.  No, sir.
8     Q.  Did you ever ask Mr. Crown to pay
9  you money for either work on his New York
10 or Connecticut homes?
11    A.  No, sir.
12    Q.  Did you do work on Milton Daly's
13 Connecticut home?
14    A.  Yes, sir.
15    Q.  What work did you perform?
16    A.  I prepared architectural drawings
17 to reconstruct the portions of the house
18 that sustained a significant fire.
19    Q.  Anything else?
20    A.  That's all I recall off the top
21 of my head.
22    Q.  Did you make visits to Mr. Daly's
23 home as part of your work?
24    A.  As part of my work?
25    Q.  Did you visit Mr. Daly's work --
```

Page 442

```
1                 Martino
2  let me rephrase that.
3     Q.  Did you visit Mr. Daly's home in
4  connection with your preparation of
5  architectural drawings?
6     A.  Yes.
7     Q.  How many times?
8     A.  I don't recall.
9     Q.  When did you perform work in
10 connection with Mr. Daly's home?
11    A.  I am sorry.  I don't recall that
12 either.
13    Q.  Did you charge Mr. Daly for the
14 work that you performed on his home?
15    A.  No, sir.
16    Q.  Did you submit a bill to Mr. Daly
17 for work on his home?
18    A.  No, sir.
19    Q.  Did Mr. Daly pay you for work on
20 his home?
21    A.  No, sir.
22    Q.  Did you have a contract with
23 Mr. Daly for work on his home?
24    A.  No, sir.
25    Q.  Did you have an oral agreement
```

Page 443

```
1                 Martino
2  for work on his home?
3     A.  No, sir.
4     Q.  Do you recall that at some point,
5  Mr. Martino, Crown Theatres terminated your
6  services as an architect?
7     A.  I don't recall actually getting a
8  termination letter, now that you say it
9  that way to me.
10    Q.  Were you ever told to stop
11 working on Crown Theatres' projects?
12    A.  I don't recall that either.
13    Q.  Were you told that you would not
14 receive future work from Crown Theatres?
15    A.  No, I don't recall that either.
16    Q.  Did you have a discussion with
17 Crown Theatres about concluding the work
18 that you were performing?
19    A.  No, I don't recall that
20 discussion happening.
21    Q.  Do you believe that Crown
22 Theatres owes you money on theater
23 projects?
24    A.  Yes, sir, I do.
25    Q.  How much?
```

56 (Pages 440 to 443)

Exhibit B

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CROWN THEATRES, LP, | : | CIVIL ACTION NO. |
| | : | 3:02-CV-2272 (AVC) |
| Plaintiff, | : | |
| | : | |
| - vs – | : | |
| | : | |
| MILTON L. DALY, et al. | : | |
| | : | |
| Defendants, | : | |
| | : | |

## DEFENDANTS JAMES T. MARTINO and JAMES THOMAS MARTINO, ARCHITECTS, P.C.'S ANSWERS TO PLAINTIFF CROWN THEATRES, P.C.'S FIRST SET OF INTERROGATORIES

The defendants James T. Martino and James Thomas Martino Architects, P.C. in

the above-referenced action hereby responds to plaintiff Crown Theatres, LP First Set of

Interrogatories.

## GENERAL OBJECTIONS

1.      Martino Defendants specific objection to each interrogatory are in addition to the general limitations and objections set forth in this Section. These limitations and objections form a part of the response to each and every interrogatory. Thus, the absence of a reference to a general objection in response to a specific interrogatory should not be construed as a waiver of the general objection to a specific request.

2.      Martino Defendants object to each and every interrogatory to the extent it seeks information protected by the attorney-client privilege, the work-product doctrine or any other application privilege or immunity.

3.      Martino Defendants object to each and every interrogatory to the extend it seeks information concerning claims or matters not pleaded on the grounds that such a request is overly broad, unduly burdensome, and seeks information which is neither relevant to the subject matter of the Pleadings nor reasonably calculated to lead to the discovery of admissible evidence.

4.      Martino Defendants object to each and every interrogatory to the extent it seeks information already in the possession of Plaintiff or in the possession of third parties, which can be as easily obtained by Plaintiff.



5.    Martino Defendants object to each and every interrogatory to the extent that it seeks a legal conclusion or calls for an expert opinion.

6.    Martino Defendants object to each and every interrogatory to the extent that it seeks to impose obligations beyond the scope of Federal Rules of Civil Procedure.

7.    Martino Defendants expressly reserve the right to supplement or amend these answers as additional responsive information is developed during the course of discovery or otherwise.

8.    Martino Defendants expressly reserve the right to object at any state of this litigation to the introduction into evidence at trial, or at any stage of this action, or documents or information subject to the attorney-client privilege, the work-product doctrine, or any other applicable privileges or immunities, and which may have been inadvertently produced.

## RESPONSES TO INTERROGATORIES

1.    Identify all persons with knowledge of or input into your decisions to approve work on the Theatre Projects, including without limitation your decision to provide executed architect's certificates.

**RESPONSE**

Martino Defendants relied upon the representations of Robert Beacher, the construction manager and agent for Crown Theatres on the Theatre Projects as well as certain officers and employees of Crown Theatre, including but not limited to Milton Daly, David Clifford, Glenn Garfinkel, Daniel Crown, Thomas Becker, Chris Bugger and Steven Scott, regarding approval of work performed on the Theatre Projects.

By way of a further response, the Martino defendants reserve their right to amend and/or supplement this response up to and including the time of trial based on what may be disclosed and/or determined during discovery and the depositions of all parties.

2

2.    Separately for each of the Theatre Projects on which you were retained,

performed work or provided services, state for each visit to the project site:

a.    The date of your visit;
b.    The purpose of your visit;
c.    The name of any person accompanying you; and
d.    The name of each person with whom you met.

**RESPONSE**

Hartford, Connecticut
(a)    Upon information and belief, Martino visited this project on the following
       dates:

| | | |
|---|---|---|
| 6/23/98 | 8/27/98 | 9/23/98 |
| 6/25/99 | 7/31/99 | 8/13/99 |
| 8/25/99 | 9/8/99 | 9/15/99 |
| 10/31/99 | 11/30/99 | 1/3/00 |
| 2/26/00 | 3/8/00 | 3/15/00 |
| 3/22/00 | 3/29/00 | 4/5/00 |
| 4/17/00 | 4/19/00 | 4/26/00 |
| 5/3/00 | 5/9/00 | 5/16/00 |
| 9/18/00 | 11/20/00 | 12/8/00 |

(b)    To ascertain if the completed work performed was generally in accordance
       with the intent of the construction documents.
(c)    Martino was typically accompanied by Robert Beacher.
(d)    During site visits Martino generally met with numerous individuals at the
       job site, including but not limited to the project superintendent and
       representatives of the general contractor and/or certain subcontractors.

Trumbell, Connecticut
(a)    Upon information and belief, Martino visited this project on the following
       dates:

| | | |
|---|---|---|
| 8/4/98 | 9/1/98 | 8/31/99 |
| 10/31/99 | 11/30/99 | 1/5/00 |
| 1/31/00 | 9/18/00 | |

(b)    To ascertain if the completed work performed was generally in accordance
       with the intent of the construction documents.
(c)    Martino was typically accompanied by Robert Beacher
(d)    During site visits Martino generally met with numerous individuals at the
       job site, including but not limited to the project superintendent and
       representatives of the general contractor and/or certain subcontractors.

Jupiter, Florida

(a) Upon information and belief, Martino visited this project on the following dates:

| | | |
|---|---|---|
| 1/11/99 | 1/8/01 | 1/10/01 |
| 1/14/01 | 1/25/01 | 1/31/01 |
| 2/6/01 | 2/13/01 | 2/20/01 |
| 3/1/01 | 3/5/01 | 3/20/01 |
| 3/26/01 | 4/2/01 | 4/10/01 |
| 4/25/01 | 5/10/01 | 5/24/01 |
| 6/29/01 | | |

(b) To ascertain if the completed work performed was generally in accordance with the intent of the construction documents.

(c) Martino was typically accompanied by Robert Beacher

(d) During site visits Martino generally met with numerous individuals at the job site, including but not limited to the project superintendent and representatives of the general contractor and/or certain subcontractors.

Miami, Florida

(a) Upon information and belief, Martino visited this project on the following dates:

| | | |
|---|---|---|
| 1/28/99 | 2/10/99 | 2/11/99 |
| 2/26/99 | 7/26/00 | 9/5/00 |
| 8/16/00 | 10/27/00 | 11/21/01 |
| 12/12/01 | | |

(b) To ascertain if the completed work performed was generally in accordance with the intent of the construction documents.

(c) Martino was typically accompanied by Robert Beacher

(d) During site visits Martino generally met with numerous individuals at the job site, including but not limited to the project superintendent and representatives of the general contractor and/or certain subcontractors.

Skokie, Illinois

(a) Upon information and belief, Martino visited this project on the following dates:

| | | |
|---|---|---|
| 12/15/98 | 5/16/00 | 8/29/00 |
| 10/17/00 | 10/31/00 | 11/30/00 |
| 1/16/01 | 2/24/00 | 3/13/01 |
| 2/5/01 | 4/17/01 | 4/24/01 |

(b) To ascertain if the completed work performed was generally in accordance with the intent of the construction documents.

(c) Martino was typically accompanied by Robert Beacher

(d) During site visits Martino generally met with numerous individuals at the job site, including but not limited to the project superintendent and representatives of the general contractor and/or certain subcontractors.

Annapolis, Maryland

(a) Upon information and belief, Martino visited this project on the following dates:

| | | |
|---|---|---|
| 7/29/98 | 3/10/99 | 1/26/00 |
| 2/8/00 | 3/15/00 | 4/5/00 |
| 6/28/00 | | |

(b) To ascertain if the completed work performed was generally in accordance with the intent of the construction documents.

(c) Martino was typically accompanied by Robert Beacher

(d) During site visits Martino generally met with numerous individuals at the job site, including but not limited to the project superintendent and representatives of the general contractor and/or certain subcontractors.

By way of a further response, the Martino defendants reserve their right to amend and/or supplement this response up to and including the time of trial based on what may be disclosed and/or determined during discovery and the depositions of all parties.

3.  Identify all persons with knowledge of your work on behalf of Crown Theatres.

**RESPONSE**

- Robert Beacher
- Daniel Crown
- Milton Daly
- David Clifford
- Glenn Garfinkel
- Thomas Becker
- Chris Dugger
- Steven Scott

By way of a further response, the Martino defendants reserve their right to amend and/or supplement this response up to and including the time of trial based on what may be disclosed and/or determined during discovery and the depositions of all parties.

5

4.    Separately for each theatre project, identify all persons with knowledge relating to the allegations in your Second Counterclaim that Crown Theatres wrongfully failed and refused to pay you for work in connection with theatres in Minneapolis, Minnesota; Jupiter, Florida; Skokie, Illinois; and Hartford, Connecticut.

**RESPONSE**

- James T. Martino
- Joseph LoMonte (bookkeeper for James Thomas Martino Architects, P.C.)
- Robert Beacher
- Milton Daly
- David Clifford
- Glenn Garfinkel

By way of a further response, the Martino defendants reserve their right to amend and/or supplement this response up to and including the time of trial based on what may be disclosed and/or determined during discovery and the depositions of all parties.


5.    Identify all persons with knowledge relating to the allegations in your Third Counterclaim that Crown Theatres, its agents, servants, or employees have been unjustly enriched at your expense in connection with work on Crown Theatres' offices in New York, New York or Daniel M. Crown's homes in New York, New York or Connecticut.

**RESPONSE**

- James T. Martino
- Robert Beacher
- Daniel Crown
- Milton Daly
- David Clifford
- Glenn Garfinkel

6

By way of a further response, the Martino defendants reserve their right to amend and/or supplement this response up to and including the time of trial based on what may be disclosed and/or determined during discovery and the depositions of all parties.

    6.    For any work for which you contend that you have not been paid by Crown Theatres, state (a) the project on which you claim not to have been paid; (b) the specific task that you alleged you performed; (c) the dates of the work; (d) the date of any invoice or bill reflecting or relating to the work; and (e) the amount of money you contend you are owed:

**RESPONSE**

1(a)    Minneapolis, Minnesota.
  (b)    Architectural services.
  (c)    Approximately 2001 to 2002.

| (d) | Invoice | Date | Amount outstanding |
|---|---|---|---|
| | | 7/25/02 | $63,211.72 |

  (e)    $63,211.75

2(a)    Jupiter, Florida.
  (b)    Architectural services.
  (c)    Approximately 2001 to 2002.

| (d) | Invoice | Date | Amount outstanding |
|---|---|---|---|
| | # 3506 | 5/8/01 | $16,980.00 |
| | # 3493 | 5/12/01 | $10,680.00 |
| | # 3513 | 6/13/01 | $ 6,920.00 |
| | # 3617 | 1/9/02 | $   930.30 |

  (e)    $35,510.30

3(a)    Skokie, Illinois.
  (b)    Architectural services.
  (c)    Approximately 2001

| (d) | Invoice | Date | Amount outstanding |
|---|---|---|---|
| | # 3505 | 5/8/01 | $ 600.00 |
| | # 3496 | 5/12/01 | $ 3,760.00 |
| | # 3519 | 6/13/01 | $ 3,760.00 |
| | # 3527 | 7/13/01 | $ 3,407.50 |
| | # 3573A | 10/7/01 | $ 1,554.00 |

  (e)    $13,081.50

4(a)   Hartford, Connecticut.
 (b)   Architectural services.
 (c)   Approximately 2001 and 2002.
 (d)   Invoice          Date          Amount outstanding
        #3619           1/9/02             $475.65
 (e)   $475.65

5(a)   Crown Theatres' New York Office
 (b)   Architectural and/or consulting services
 (c)   To be provided.
 (d)   To be provided.
 (e)   Approximately $ 9,400.00

By way of a further response, the Martino defendants reserve their right to amend and/or supplement this response up to and including the time of trial based on what may be disclosed and/or determined during discovery and the depositions of all parties.

<u>7</u>.     For all work you allege you performed on behalf of Daniel M. Crown for which you contend you wrongfully were not paid, state (a) the project on which you claim not to have been paid; (b) the specific task that you allege you performed; (c) the date of work; (d) the date of the invoice or bill reflecting or relating to the work; and (e) the amount of money you contend you are owed.

**RESPONSE**

1(a)   Daniel M. Crown's home in New York, New York
 (b)   Architectural and/or consulting services
 (c)   To be provided.
 (d)   To be provided.
 (e)   Approximately $1,880.00.

2(a)   Daniel M. Crown's home in Connecticut
 (b)   Architectural and/or consulting services
 (c)   To be provided.
 (d)   To be provided.
 (e)   Approximately $ 3,290.00.

8

By way of a further response, the Martino defendants reserve their right to amend and/or supplement this response up to and including the time of trial based on what may be disclosed and/or determined during discovery and the depositions of all parties.

8. Identify all lawsuits to which you are or have been a party, witness, deponent, or for which you have been subpoenaed.

**RESPONSE**

Martino Defendants object to this interrogatory on the ground that it is not reasonably calculated to lead to admissible evidence and is designed to harass.

9. Identify all persons with knowledge relating to invoices submitted to Crown Theatres for work performed or allegedly performed in connection with the Theatre Projects.

**RESPONSE**

Martino Defendants object to this interrogatory on the ground that it is vague in not identifying the issuer of the invoices. However, without waiving their objection, the persons having knowledge as to Martino's invoices are the following:

- James T. Martino
- Milton Daly
- David Clifford
- Kathy Nonemacher, Comptroller
- Crown Theatres' accounting department
- Other individuals involved in Crown Theatres' procedure for processing invoices.

By way of a further response, the Martino defendants reserve their right to amend and/or supplement this response up to and including the time of trial based on what may be disclosed and/or determined during discovery and the depositions of all parties.

DEFENDANTS JAMES T. MARTINO
and JAMES THOMAS MARTINO
ARCHITECTS, P.C.


By: _____
Marisa Lanza (CT 24554)
MILBER MAKRIS PLOUSADIS
& SEIDEN, L.L.P.
108 Corporate Park Drive, Suite 200
White Plains, New York 10604
(914) 681-8700
(914) 681-8709 (fax)
mlanza@milbermakris.com

10

## VERIFICATION

STATE OF NEW YORK )
)ss.:
COUNTY OF NASSAU )

I am the Defendant James T. Martino and the principal of Defendant James Thomas Martino Architects, P.C. in this action (hereinafter "Martino Defendants"). I have read Martino Defendants' Answers to Plaintiff Crown Theatres, LP's First Set of Interrogatories and know its contents. Martino Defendants' Answers to Plaintiff Crown Theatres, LP's First Set of Interrogatories are true to my knowledge, except as to matters alleged upon information and belief, and as to those matters, I believe them to be true.

DEFENDANTS
JAMES T. MARTINO and JAMES
THOMAS MARTINO ARCHITECTS, P.C.

_____
James T. Martino

Sworn to before me
this 24 day of April 2003

_____
Notary Public

SAL MILAZZO
Notary Public, State of New York
No. 01MI6460450
Qualified in Nassau County
Commission Expires August 31, 2006

11

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing Defendants James T. Martino and James Thomas Martino Architects, P.C.'s Responses to Plaintiff Crown Theatres' First Set of Interrogatories was served by first class mail, postage prepaid, on the 25th day of April 2003, upon:

> Craig C. Martin, Esq.
> Jenner & Block, LLC
> One IBM Plaza
> Chicago, Illinois 60611
>
> H. James Pickerstein, Esq.
> Pepe & Hazard, LLP
> 30 Jelliff Lane
> Southport, CT 06490
>
> Kerry M. Wisser, Esq.
> Weinstein & Wisser, P.C.
> 29 South Main Street, Suite 207
> West Hartford, CT 06107
>
> S. Dave Vatti, Esq.
> Law Offices of S. Dave Vatti
> 375 Bridgeport Avenue, 3rd Floor
> Shelton, CT 06484-3964

Marisa Lanza

Exhibit C



Not Reported in A.2d
**(Cite as: 2002 WL 241298 (Conn.Super.))**

Page 1

**c**
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Connecticut.

MVB CUSTOM DESIGN & CONSTRUCTION, LLC et al.,
v.
Ruth Leblanc JONES et al.

**No. CV010183779.**

Jan. 29, 2002.

Builder brought action against real estate agent alleging that agent failed to abide by her contractual and fiduciary obligations in connection with parties' joint venture to develop and market residential dwellings. On agent's motion to strike various counts, the Superior Court, William B. Lewis, J., held that: (1) builder stated claim for fraud; (2) builder stated claim for breach of fiduciary duty; (3) builder stated claim for diversion of corporate opportunities; (4) builder stated claim for tortious interference with business expectancy; (5) builder stated claim under Connecticut Unfair Trade Practices Act (CUTPA); (6) builder failed to state claim of unjust enrichment; and (7) builder stated claim of defamation.

Motion granted in part and denied in part.

**[1] Joint Adventures** 5(2)

224k5(2) Most Cited Cases

Builder's allegations that real estate agent, with whom builder formed joint venture to develop and market residential dwellings, made misrepresentations regarding financing and

marketing of a particular project, that agent's representations were made to deceive and defraud builder, and that builder believed and relied on the representations to its financial detriment were adequate to plead a claim for fraud.

**[2] Joint Adventures** 5(2)
224k5(2) Most Cited Cases

Builder's allegations that real estate agent, with whom builder formed joint venture to develop and market residential dwellings, owed fiduciary duty of loyalty, good faith, and fair dealing as well as a duty to refrain from usurping business opportunities, and that agent breached its duty by selling one property below market price, sharing confidential information with competitor, inadequately marketing sale of another home, disparaging builder, and failing to contribute its rightful share of costs of constructing certain projects, were adequate to plead a fiduciary duty and violation of that duty.

**[3] Corporations** 320(7)
101k320(7) Most Cited Cases

Builder's allegation that real estate agent, with whom builder formed joint venture to develop and market residential dwellings, diverted potential home buyers away from builder's projects to other homes in which agent had financial interest was adequate to plead claim for diversion of corporate opportunities.

**[4] Torts** 10(3)
379k10(3) Most Cited Cases

Builder's allegation that real estate agent, with whom builder formed joint venture to develop and market residential dwellings, diverted potential home buyers away from builder's projects to other homes in which agent had financial interest was adequate to plead claim for tortious interference with business expectancy.

**[5] Trade Regulation** 864
382k864 Most Cited Cases

Builder's allegation that real estate agent, with

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d                                                                                    Page 2
**(Cite as: 2002 WL 241298 (Conn.Super.))**

whom builder formed joint venture to develop and market residential dwellings, engaged in unfair or deceptive practices in the conduct of commerce and trade that included failing to disclose agent's financial interests in other properties and diverting potential customers to other sales, and that such conduct was amoral, unethical, oppressive and unscrupulous, and caused substantial injury to consumers, competitors, or other businesses, adequately pleaded claim under the Connecticut Unfair Trade Practices Act (CUTPA). C.G.S.A. § 42-110b(a).

**[6] Implied and Constructive Contracts** ☞3
205Hk3 Most Cited Cases

Real estate agent's alleged failure to abide by her contractual and fiduciary obligations, in connection with joint venture with builder to develop and market residential dwellings, did not support builder's claim of unjust enrichment, absent allegation as to agent's purported benefit from such conduct.

**[7] Libel and Slander** ☞9(7)
237k9(7) Most Cited Cases

Builder's allegation that real estate agent, with whom builder formed joint venture to develop and market residential dwellings, made injurious and false statements about builder's business practices, including that builder's principal had committed criminal acts involving embezzlement, fraud, and incompetence in his business as a builder, was adequate to plead claim of defamation.

MEMORANDUM OF DECISION

WILLIAM B. LEWIS, Judge.

**\*1** The plaintiff builder [FN1] and the defendant realtor [FN2] formed a joint venture to develop and market residential dwellings in New Canaan, but the plaintiff alleges that the defendant failed to abide by its contractual and fiduciary obligations. The plaintiff has filed an amended complaint dated June 21, 2001 containing eleven counts.

> FN1. There is also an individual plaintiff, Michael C. Buzzeo, the principal of the named plaintiff, a limited liability company, but plaintiff in the singular is

used in this memorandum of decision to refer to both plaintiffs.

> FN2. Additional defendants are the named defendant's husband, Burton F. Jones and the latter's limited liability company, BFJ, but again the singular includes all defendants.

Although the defendant did not object to the counts alleging breach of contract and the duty of acting in good faith, the defendant has filed motion # 129 to strike the other eight counts. Each of the challenged counts will be examined in turn to decide whether they should be stricken.

"The purpose of a motion to strike is to contest ... the legal sufficiency of the allegations of any complaints ... to state a claim upon which relief can be granted." (Internal quotation marks omitted.) *Peter-Michael, Inc. v. Sea Shell Associates,* 244 Conn. at 269, 270, 709 A.2d 558 (1998). "In ruling on a motion to strike, the court is limited to the facts alleged in the complaint. The court must construe the facts in the complaint most favorably to the plaintiff." (Internal quotation marks omitted.) *Faulkner v. United Technologies Corp.,* 240 Conn. at 576, 580, 693 A.2d 293 (1997). "The role of the trial court [is] to examine the [complaint], construed in favor of the [plaintiff], to determine whether the [pleading party has] stated a legally sufficient cause of action." (Internal quotation marks omitted.) *Dodd v. Middlesex Mutual Assurance Co.,* 242 Conn. at 375, 378, 698 A.2d 859 (1997).

Second Count--Fraud

**[1]** The plaintiff alleges that the defendant made a number of misrepresentations about the financing and marketing of a particular project. The plaintiff alleges that the defendant's representations were made to deceive and defraud the plaintiff and that the plaintiff believed and relied on the representations to its financial detriment.

"The elements of a fraud action are: (1) a false representation was made as a statement of fact; (2) the statement was untrue and known to be so by its maker; (3) the statement was made with the intent of inducing reliance thereon; and (4) the other party relied on the statement to his detriment." (Internal

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d
(Cite as: 2002 WL 241298 (Conn.Super.))

Page 3

quotation marks omitted.) *Giulietti v. Giulietti*, 65
Conn.App. a t 813, 836, 784 A .2d 905, cert. d enied,
258 Conn. at 946, 788 A.2d 95 (2001).

Applying the allegations in the second count to the
elements of a cause of action for fraud, this court
finds that the allegations sufficiently plead a cause
of action for fraud and the motion to strike as to the
second count is denied.

Fourth Count--Breach of Fiduciary Duty
[2] The plaintiff has alleged that the defendant
owed a fiduciary duty of loyalty, good faith and fair
dealing as well as a duty to refrain from usurping
business opportunities. The plaintiff further alleges
that the defendant breached its duty i n a number of
ways, by selling one property below market price,
sharing confidential information with a competitor,
inadequately marketing the sale of another home,
disparaging the plaintiff and failing to contribute its
rightful share of the costs of constructing certain
projects.

*2 As the Supreme Court noted in *Beverly Hills
Concepts, Inc. v. Schatz & Schatz, Ribicoff &
Kotkin*, 2 47 Conn. a t 4 8, 5 7, 717 A .2d 724 ( 1998),
a fiduciary duty springs not from a simple duty of
care, but from a duty of loyalty to the party claiming
the fiduciary relationship. A party claiming a
fiduciary relationship must plead a nd prove that the
party it characterizes as a fiduciary had a duty to
represent h is o r h er interests. *Konover Development
Corp. v. Zeller*, 228 Conn. at 206, 218, 635 A.2d
798 (1994). "[A] fiduciary or confidential
relationship is characterized by a unique degree of
trust and confidence between the parties, one of
whom has superior knowledge, skill or expertise
and i s u nder a duty to r epresent the interests of the
other." (Internal quotation marks omitted.) *Beverly
Hills Concepts, Inc. v. Schatz & Schatz Ribicoff &
Kotkin, supra,* 247 Conn. at 57, 717 A.2d 724
(1998).

The plaintiff sufficiently plead a fiduciary d uty a nd
violation of that duty.

Accordingly, the defendant's motion to strike the
fourth count of the plaintiff's complaint is denied.

Sixth Count--Diversion of Corporate Opportunities

[3] In count six, the plaintiff realleges the
formation of the joint venture and that the plaintiff

has suffered the loss of potential customers and
future profits, business reputation and good will.
The plaintiff further alleges that these losses were
caused by the defendant diverting potential home
buyers away from the plaintiff's projects to other
homes in New Canaan in which the defendant had a
financial interest.

In determining whether a cause of action for
usurpation of a corporate opportunity exists, the
Supreme Court held that the dominant inquiry is
whether the corporate opportunity at issue falls
within the corporation's avowed business purpose.
*Ostrowski v. Avery*, 243 Conn. at 355, 367, 703
A.2d 117 (1997). The *Ostrowski* Court adopted a
multi-factor analysis for assessing what activities
fall within a corporation's line of business. The
factors listed by the Court are: (1) whether the
business opportunity was one in which the
complaining corporation had an interest or an
expectancy growing out of an existing contractual
right; (2) whether there was a close relationship
between the opportunity and the corporation's
business purposes and current activities; and, (3)
whether the business areas contemplated by the
opportunity were readily adaptable to the
corporation's existing business, in light of its
fundamental knowledge, practical experience,
facilities, equipment, and personnel. *Ostrowski,
supra,* 243 Conn. at 366, 703 A.2d 117.

The plaintiff in this case has properly alleged the
existence of a corporate opportunity within the
meaning of the corporate line of business test. The
Connecticut Supreme Court held that once a
plaintiff has proven the existence of a corporate
fiduciary relationship and a corporate opportunity,
defendant corporate fiduciaries bear the burden of
proving, by clear and convincing evidence, that they
have not usurped a corporate opportunity. *Katz
Corp. v. T.H. Canty & Co.,* 168 Conn. at 201, 207,
362 A.2d 975 (1975).

*3 This court finds that the allegations in the
complaint sufficiently allege a cause of action for
the diversion of corporate opportunities and the
motion to strike the sixth count is denied.

Seventh Count--Tortious Interference with Business
Expectancy

[4] The plaintiff has alleged that the defendant's
conduct as outlined in the previous count was

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d
(Cite as: 2002 WL 241298 (Conn.Super.))

intentional and maliciously interfered with the plaintiff's business expectancies. The plaintiff further alleges that said conduct caused the defendant to sustain financial losses.

It is well established that the elements of a claim for tortious interference with business expectancies are: (1) a business relationship between the plaintiff and another party; (2) the defendant's intentional interference with the business relationship while knowing of the relationship; and (3) as a result of the interference, the plaintiff suffers actual loss. *Solomon v. Aberman,* 196 Conn. at 359, 364, 493 A.2d 193 (1985).

The allegations in the complaint have established the elements of a cause of action for tortious interference with business expectancies and the motion to strike the seventh count is denied.

### Eighth Count--CUTPA

[5] In this count, the plaintiff has alleged that the defendant's conduct, including failing to d isclose i ts financial interests in other properties and diverting potential customers to other sales constituted unfair or deceptive practices in the conduct of commerce and trade, and was amoral, unethical, oppressive and unscrupulous, and caused substantial injury to consumers, competitors or other businesses.

"Section 42-110b(a) [of the Connecticut Unfair Trade Practices Act] provides that [n]o p erson shall engage i n u nfair m ethods o f c ompetition a nd u nfair or d eceptive a cts or p ractices i n the c onduct o f a ny trade or commerce. It is well settled that in determining w hether a p ractice v iolates C UTPA w e have adopted the criteria set out in the cigarette rule by the federal trade commission for determining when a practice is unfair: (1)[W]hether the practice, without necessarily having been previously considered unlawful, o ffends p ublic policy as it has been established by statutes, the common law, or otherwise--in other words, it is within at least the penumbra o f so me common l aw, statutory, o r o ther established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other business persons] ... All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all

three ..." *Willow Springs Condominium Assn., Inc. v. Seventh BRT Development Corp.,* 245 Conn. at 1, 43, 717 A.2d 77 (1998).

This court finds that the complaint has sufficiently set forth a cause of action for the violation of CUTPA and the motion to strike the eighth count is denied.

### Ninth Count--Unjust Enrichment

*4 [6] T he plaintiff has a lleged t hat t he defendant's conduct resulted in the defendant being unjustly enriched and that the plaintiff was damaged as a result.

In order to prevail on a claim of unjust enrichment, a party must allege (1) that the defendant was benefited, (2) that the defendant did not pay the plaintiff for that benefit, and (3) that the failure of payment was to the plaintiff's detriment. *Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co.,* 231 Conn. at 276, 282, 649 A.2d 518 (1994). Furthermore, "[u]njust enrichment applies wherever justice requires compensation to be given for services rendered under a contract, and *no remedy is available by an action on the contract* ... [L]ack of a remedy under the contract is a precondition for recovery b ased u pon unjust enrichment." (Emphasis added; internal quotation marks omitted.) *Paulsen v. Kronberg,* 66 Conn.App. at 876, 878, 786 A.2d 453 (2001).

Here, the plaintiff has clearly alleged a detriment, but has failed to clearly allege the defendant's purported benefit. Consequently, the motion to strike the ninth count of the complaint is granted because the plaintiff has not sufficiently alleged a claim for unjust enrichment.

### Tenth Count--Defamation

[7] The plaintiff has alleged that the defendant made injurious and false statements about its business practices, including that Mr. Buzzeo had committed criminal acts involving embezzlement, fraud and incompetence in his business as a builder.

"Defamation is comprised of the torts of libel and slander. Defamation is that which tends to injure reputation in the popular sense; to diminish the esteem, respect, goodwill or confidence in which the plaintiff is held, or to excite adverse,

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d
**(Cite as: 2002 WL 241298 (Conn.Super.))**

derogatory, or unpleasant feelings or opinions against him. Slander is oral defamation. This court has delineated specific categories of speech deemed actionable per se where the defamatory meaning of [the speech] is apparent on the face of the statement. It is a well established principle that an accusation of theft is slander per se." (Internal quotations and citations omitted.) *DeVito v. Schwartz,* 66 Conn.App. at 228, 234, 784 A.2d 376 (2001).

The motion to strike the tenth count is denied because the plaintiff has sufficiently set forth a cause of action for defamation.

The court notes that the defendant also moves to strike paragraphs thirty, thirty two, forty, eighty six, ninety, ninety seven and ninety eight of the plaintiff's complaint. However, "where individual paragraphs standing alone do not purport to state a cause of action, a motion to strike cannot be used to attack the legal sufficiency of those paragraphs ... A single paragraph or paragraphs can only be attacked for insufficiency when a cause of action is therein attempted to be stated." (Internal quotation marks omitted.) *Ledge Associates v. Firestone Building Products Co.,* Superior Court, judicial district of Stamford-Norwalk at Stamford, Docket No. 170167 (October 27, 1999) (Karazin, J.). Therefore, this court will not address the motion to strike as to the individual paragraphs.

\*5 In summary, the defendant's motion to strike as to the second, fourth, sixth, seventh, eighth and tenth counts of the plaintiff's complaint is denied. The motion to strike as to the ninth count, sounding in unjust enrichment is granted.

So Ordered.

2002 WL 241298 (Conn.Super.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works