UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| CROWN THEATRES, L.P., | ) |
|     Plaintiff, | ) |
| v. | ) Case No. 3:02CV2272AVC |
| | ) Judge Alfred V. Covello |
| MILTON L. DALY, TAYLOR-LEIGH, INC., ANNE E. DALY, JAMES C. CELLA, G.U.S. DEVELOPMENT, INC., JAMES T. MARTINO, JAMES THOMAS MARTINO, ARCHITECT, P.C., and RCD HUDSON, LLC, | ) April 30, 2004 |
|     Defendants. | ) |

**CROWN THEATRES' MEMORANDUM OF LAW IN
SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST
JAMES T. MARTINO AND JAMES THOMAS MARTINO, ARCHITECT, P.C.**

Plaintiff Crown Theatres, L.P., engaged defendants James T. Martino and his firm James Thomas Martino Architects, P.C. (collectively, the "Martino Defendants") to serve as its architect for a major movie theatre construction program. The Martino Defendants, however, failed to perform their contractual and common law duties, and, as a consequence, Crown Theatres suffered substantial financial losses. The material facts regarding the Martino Defendants' breaches of their duties to Crown Theatres are not disputed.

First, the undisputed facts show that the Martino Defendants are liable for breach of contract. Throughout discovery in this case, the Martino Defendants have taken pains to assert that their work for Crown Theatres was governed by a certain letter agreement. Spelled out plainly in that document was the requirement that Martino would visit the job site "at an interval of one (1) per month . . . ." But the undisputed evidence demonstrates that Martino breached this agreement by not visiting the theatre construction sites on a monthly basis. Indeed,

the undisputed facts are that many months -- in some cases, a year or more -- elapsed between his visits.

The undisputed facts also establish that the Martino Defendants are guilty of negligence. Among other things, there is no disagreement -- indeed, Martino admitted at his deposition -- that Martino certified for payment millions of dollars of AIA Applications for Payment by signing stacks of the documents while riding in a car to attend meetings, without reviewing the contents of the applications, without inquiring into their legitimacy and without even checking the names of the contractors requesting payment. He also signed the forms without informing himself of the scope of work for which his client was responsible. Both expert architects in this case, the architect retained by Crown Theatres and the architect retained by the Martino Defendants, agree that the above conduct does not satisfy the standard of care for a professional architect.

In addition, Martino admitted that he paid large referral fees to Robert Beacher, a consultant retained by Crown Theatres. The payments ranged in amount between $10,000 and $30,000. They were not disclosed to Crown Theatres, and they were made in exchange for Beacher's assistance in winning work from Crown Theatres. Also not disclosed was the fact that Martino had been paying Beacher referral fees long before he began working for Crown Theatres, and that he had received much of his business from Beacher over the course of his career. The payments Martino made to Beacher violated applicable state laws governing the conduct of architects and, therefore, constitute negligence per se.

As a consequence of the Martino Defendants' negligence, Crown Theatres has suffered substantial financial losses. For example, many of the Payment Applications which Martino certified for payment were submitted by fictitious entities that performed no work on the

jobs. Even a cursory review of the applications should have alerted Martino to the fact that something was amiss. For the more than $2 million in professional fees that Crown Theatres paid to the Martino Defenfants, it had a right to expect more – much more.

Accordingly, this Court should grant partial summary judgment in favor of Crown Theatres and against the Martino Defendants on the issue of liability with respect to its Count VIII claim for breach of contract and its Count IX claim for professional negligence.

## STATEMENT OF FACTS[1]

Defendant James T. Martino has been a practicing architect for more than twenty years. (Deposition of James T. Martino ("Martino Dep.") at 8-9, attached hereto as Exhibit A.) In 1995 or 1996, plaintiff Crown Theatres retained Martino and his firm, James Thomas Martino, Architect, P.C., to provide architectural services in connection with its movie theatre expansion program. (Id. at 86-87, 93-94.) As part of that program, Martino worked on the six theatre projects that are the subject of this lawsuit: projects located in Annapolis, Maryland; Skokie, Illinois; Trumbull, Connecticut; Hartford, Connecticut; Jupiter, Florida; and Miami, Florida. (Id. at 93-94, 253-56, 311, 359.)

**The Letter Agreement**

Martino asserts that the terms of his engagement were defined by an unsigned letter agreement (the "Letter Agreement") between himself and R.D. Scinto, the landlord for the theatre project located in Trumbull, Connecticut. (Martino Dep. at 253-54.) The Letter Agreement specified that, among other things, Martino or a representative of his firm was required to make monthly visits to the construction site during the construction phase of the project:

---

[1] The facts contained herein are undisputed for purposes of this motion.

> **Building Construction Phase:** . . . . An authorized representative of James Thomas Martino, Architect, P.C. shall visit the Site at an interval of one (1) per month for the purposes of verifying that the "As-Built" conditions are in full compliance with the Construction Documents. Included in this Agreement is a total of ten (10) site visits. Should Additional Site Visits be required, each si[t]e visit will be billed monthly . . . .

(Letter Agreement, dated July 8, 1998, at 2, attached hereto as Exhibit B.)

The Letter Agreement refers only to the theatre project in Trumbull, Connecticut. Nonetheless, Martino maintains that it was the Martino Defendants' agreement with Crown Theatres for all six of the theatre projects at issue in this case. (Martino Dep. at 253-54.)[2]

**Martino Fails to Make Site Visits**

Martino's visits to the construction sites were sporadic at best. The dates of Martino's visits to the construction sites are set forth in his verified answers to interrogatories. (Martino Defendants' Response to Plaintiff Crown Theatres' First Set of Interrogatories ("Martino Interrog. Resp.") at 3-5, attached hereto as Exhibit C.) Martino confirmed the dates in his deposition testimony. (Martino Dep. at 81-82.)

The evidence is undisputed that, during the course of construction on the six theatre projects, applications for payment were submitted by fictitious contractors that performed no work. (Testimony of Frederick C. "Kip" Hamilton, PJR Hearing, ("Hamilton PJR Testimony"), September 18, 2003, at 24-26.) Although the contractors were not real, Martino signed the Architects' Certificates on many of the fictitious contractors' payment applications, thereby certifying them for payment. As shown below, the phony payment applications were

---

[2]Crown Theatres accepts for purposes of this motion only Martino's assertion that the Letter Agreement constituted the Martino Defendants' contract with Crown Theatres. Crown Theatres disputes that the Letter Agreement was the parties' agreement. However, for this motion, the parties' disagreement does not matter because, as shown below, the Martino Defendants breached the Letter Agreement.

submitted during the periods in which Martino was to have been making visits to the construction sites.

Jupiter, Florida. On the Jupiter, Florida project, construction work ran from early 2000 to summer 2001. (Deposition of Jeff Lee, February 24, 2004 ("Lee Deposition"), at 47, attached hereto as Exhibit Q.) During that time, Marlin Contracting, a fictitious entity that performed no work, submitted seven Payment Applications. Marlin's applications were for periods from May 1, 2000 through September 1, 2000, and requested payments totaling $1,269,400. Martino made no visits to the job site during the period covered by Marlin's Payment Applications. He visited the site on January 11, 1999, and did not return until January 8, 2001. (Martino Interrog. Resp. at 4.) He admits that he certified for payment five of the seven applications submitted by Marlin for work on the Jupiter project: the applications submitted on 02/28/00, 04/03/00, 04/25/00, 05/25/00, and 06/26/00. (Martino Dep. at 191-92, 200-01, 203-04, 207.) The Payment Applications certified by Martino on those five dates were for payments totaling $1,042,500. (The referenced payment applications are attached hereto as Exhibit D.)

Miami, Florida. On the Miami, Florida project, construction spanned from approximately October 1999 to December 2000. (Deposition of Richard Waas, February 4, 2004 ("Waas Dep.") at 8-9, attached hereto as Exhibit E.) In that period, Marlin Contracting, submitted six Applications for Payment for periods from October 1, 1999 to July 1, 2000. The applications totaled $884,325. During the period covered by Marlin's Payment Applications, Martino did not make any visits to the job site. (Martino Interrog. Resp. at 4.) Indeed, he did not make any visits to the site between February 26, 1999 and July 26, 2000. (Id.) Nonetheless, he signed the Architect's Certificates on two payment applications, dated January 27, 2000 ($115,000) and June 28, 2000 ($113,845), respectively. (Exhibit F.)

Trumbull, Connecticut. G.U.S. Construction, another fictitious entity that performed no work, submitted a Payment Application for work on the Trumbull, Connecticut project for the period ending July 31, 1999. It sought payment of $125,000. Martino signed the Architect's Certificate on July 26, 1999. (Exhibit G.) Martino did not visit the Trumbull, Connecticut job site between September 1, 1998, and August 31, 1999. (Martino Interrog. Resp. at 3.)

Hartford, Connecticut. G.U.S. submitted a payment application in the amount of $451,000 for work on the theatre project in Hartford, Connecticut. The application was for the period to June 4, 1999. Martino signed the Architect's Certificate approving the work on June 9, 1999. (Exhibit H.) At the time he signed the Architect's Certificate, he had not visited the job site since September 23, 1998. (Martino Resp. Interrog. at 3.)

Skokie, Illinois. Construction on the Skokie, Illinois theatre complex ran from approximately March 2000 to May 2001. (Deposition of Paul O'Rourke, February 6, 2004, at 14, attached hereto as Exhibit J.) In that period, an entity called Tiger Contracting, another of the fictitious contractors, submitted five Payment Applications seeking payment of $1,656,753. The following chart shows the dates of Tiger's payment applications and the amounts and dates they were signed by Martino (the referenced applications for payment are attached hereto as Exhibit K):

| Application | Amount | Date Certified by Martino |
|---|---|---|
| Tiger No. 1 | $270,000 | 04/25/2000 |
| 2 | $302,000 | 05/25/2000 |
| 3 | $357,329 | 06/26/2000 |

| | | |
|---|---|---|
| 4 | $545,929 | 07/25/2000 |
| 5 | $181,495 | 09/11/2000 |

Martino made three site visits from January 1, 2000 through the end of September 2000: February 24, 2000; May 16, 2000; and August 29, 2000. His next visit did not occur until October 17, 2000. (Martino Interrog. Resp. at 4.)

Annapolis, Maryland. Hewlett Consulting, Inc., yet another fictitious entity that performed no work, submitted four Payment Applications seeking a total of $1,427,000. The following chart shows the periods covered by Hewlett's applications, the amounts sought, and the dates on which Martino signed the Architect's Certificates (Exhibit M):

| Application | Amount | Date Certified by Martino |
|---|---|---|
| Hewlett No. 1 | $154,000 | 03/02/2000 |
| 2 | $180,000 | 04/04/2000 |
| 3 | $182,000 | 04/26/2000 |
| 1[3] | $911,000 | 08/03/2000 |

Martino made site visits on January 26, 2000, February 8, 2000, March 15, 2000, April 5, 2000, and June 28, 2000. (Martino Interrog. Resp. at 5.)

**Martino Certifies Payment Applications**

Even when Martino was not visiting the construction sites, he was signing pay applications submitted by contractors and subcontractors each month. The process worked like this: contractors submitted their payment applications to Robert Beacher, an outside consultant

---

[3]There were two separate Payment Applications number 1 submitted by Hewlett.

retained by Crown Theatres to act as its owners' representative. The applications were submitted on an American Institute of Architects standard form G702. Beacher reviewed the applications, stamped them "approved" and delivered them to Martino for his signature on the "Architect's Certificate for Payment," which was included on the G702 form. The Architect's Certificate for Payment which appears in the G702 Payment Application reads:

> In accordance with the Contract Documents, based on on-site observations and the data comprising the above application, the Architect certifies to the owner that to the best of the Architect's knowledge, information and belief the Work has progressed as indicated, the quality of the Work is in accordance with the Contract Documents, and the Contractor is entitled to payment of the AMOUNT CERTIFIED.

In order to obtain Martino's signature on the Architect's Certificates, Beacher handed the payment applications to Martino in stacks, usually in Beacher's car on the way to construction meetings at Crown Theatres. (Martino Dep. at 266-67.) As Beacher explained, ". . . I would have the whole stack of pay applications, of which I would give it all to Jimmy to sign. You know, just -- you know, major stacks." (Deposition of Robert L. Beacher, February 25-26, 2004 ("Beacher Dep.") at 82, attached hereto as Exhibit N.) Martino and Beacher did not discuss the pay applications and Martino did not ask any questions about them. (Martino Dep. at 266-67.) Martino "never asked me about any invoice, whether it was legitimate or fictitious. Just sign it off and let's get going because, you know, we have so much work to do." (Beacher Dep. at 84.) Martino remembered Beacher's words slightly differently; "I reviewed them, sign[] the f***ing things," he would say. (Martino Dep. at 267.)

Martino admitted that he did not know what his client's scope of work was for the construction projects. (Id. at 96-97.) He signed a payment application even though the contractor had submitted it without signing it. (Id. at 352-53.) He did not notice that at times he signed payment applications out of sequence. (Id. at 293-94.) He also did not notice when the

contractor had the same address as Beacher, his long-time friend and business associate. (Id. at 291.) In fact, two of the contractors, Marlin Consulting, Inc. and Hewlett Consulting, Inc., for which Martino signed payment applications, shared an address with Beacher (Martino Dep. at 294, 316.) These two "contractors," plus Tiger Consulting, Ltd., were fictitious entities formed for purposes of submitting false invoices to Crown Theatres. These entities had no employees and performed no work on any of the theatre projects. (Beacher Dep. at 103-06.) Beacher submitted bills on behalf of these entities for millions of dollars worth of phantom services. (Hamilton PJR Testimony at 24-26) Payment applications were also submitted on behalf of a fourth fictitious entity, G.U.S. (Beacher Dep. at 12-13.)[4]

As Martino hurried to sign the stacks of payment applications on the drives up to Crown Theatres, he certified nineteen fraudulent invoices for payments to non-existent entities, totaling at least $4,931,598. (See Exhibits D, F, G, H, K & M.)

**Martino's Referral Fees**

While serving as Crown Theatres' architect of record, Martino made "seven or eight" payments of what he termed "referral fees" to Beacher's company, B.B. Construction, for the work that he had received from Crown Theatres. (Martino Dep. at 237-38.) Martino estimates that the payments ranged from between $10,000 and $30,000 each. (Id. at 240.)

Martino had known Beacher for twenty-five years, and had received a large amount of his work from Beacher over the course of his career. (Martino Dep. at 60-64, 243.) Martino had been making referral fee payments to Beacher long before he began doing work for Crown Theatres. (Id. at 243.) At the second day of his deposition, Martino authenticated three

---

[4]The false payment applications were submitted as part of a scheme involving defendant Milton L. Daly, non-party Robert Beacher, defendant James C. Cella and others. See Crown Theatres' Memorandum of Law in Support of Its Motion for Summary Judgment Against Milton Daly and Taylor-Leigh, Inc., filed April 30, 2004. See also Exhibit G to that Motion.

checks written to Beacher's business for $27,000, $17,500 and $17,500. (Id. at 279-84.) Martino did not believe that a "dirty term" like "kickback" should apply to these payments. (Id. at 285.) Rather, he asserted that they were "referral fees just like attorneys give other attorneys referral fees." (Id.) Martino did not disclose the payments to his client, Crown Theatres. (Id. at 283.)

## ARGUMENT

Crown Theatres has directed two claims against the Martino Defendants. In Count VIII of the Second Amended Complaint, it alleges that they breached their contract with Crown Theatres. In Count IX, Crown Theatres contends that they are liable for professional negligence. In light of the undisputed evidence, including the concurrence of both parties' experts on crucial points, summary judgment is appropriate on both counts.

### I.   SUMMARY JUDGMENT STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, a court should grant a motion for summary judgment where, taking the facts and inferences in the light most favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Soares v. Univ. of New Haven, 175 F. Supp. 2d 326, 329 (D. Conn. 2001); Fed. R. Civ. P. 56(c). Once the moving party meets its burden of establishing that there is no genuine issue of material fact, the non-moving party may not rest on the mere allegations contained in the pleadings. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). If evidence favoring the non-moving party is "merely colorable . . . or is not significantly probative . . . summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).

II. **SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF CROWN THEATRES ON ITS CONTRACT CLAIM BECAUSE THE UNDISPUTED FACTS SHOW THAT MARTINO BREACHED THE TRUMBULL AGREEMENT BY FAILING TO MAKE MONTHLY SITE VISITS.**

The Martino Defendants maintain that their contractual relationship with Crown Theatres is spelled out by the Letter Agreement. While Crown Theatres disagrees, it does not matter: the Martino Defendants breached the terms of the Letter Agreement by not making monthly site visits.

Under Connecticut law, to prevail on a claim for breach of contract, the plaintiff must show: (1) formation of an agreement; (2) performance by one party; (3) breach of the agreement by the other party; and (4) damages. Digicom, Inc. v. AR Robinson Printing, No. CV000073629S, 2002 Conn. Super. LEXIS 3580, at *7-8 (Nov. 7, 2002) (This case and all other unpublished opinions are attached hereto as Exhibit O.) For purposes of this motion, Crown Theatres accepts the Martino Defendants' assertion that the Letter Agreement was the parties' agreement. The Martino Defendants acknowledge that Crown Theatres performed by paying the Martino Defendants for their services. (Martino Dep. at 231-32.) Crown Theatres seeks summary judgment as to liability only; thus, the issue of damages does not come into play. The only real question, therefore, is whether the Martino Defendants breached the Letter Agreement. The undisputed evidence demonstrates that the answer is "yes."

The Letter Agreement requires that Martino or his authorized representative "shall visit the Site at an interval of (1) per month . . . ." (Letter Agreement at 2.) But Martino admits that he did not visit the theatre construction sites on a monthly basis. The dates of his visits are set out in his sworn answers to interrogatories, and they leave no doubt that Martino did not visit the job sites each month. Martino confirmed that he did not make monthly visits in his deposition testimony. For example, he admitted that he did not make monthly site visits on the

Jupiter, Miami, Annapolis and Skokie projects. (Martino Dep. at 264-65.) General contractors on the job sites confirmed that Martino's site visits were irregular and infrequent. The Jupiter project general contractor, Jeff Lee of Coastal Construction, said that Martino visited the site "a couple of times." (Lee Dep. at 46.) The Miami general contractor testified that Martino visited the site three or four times, and that they never talked about pay requisitions while Martino was on site. (Waas Dep. at 30, 119.)

There are no issues of material fact regarding Martino's failure to make site visits. This Court should grant summary judgment on the issue of liability on Crown Theatres' claim for breach of contract. See Giannecchini v. Hosp. of St. Raphael, 47 Conn. Supp. 148, 163, 780 A.2d 1006, 1014 (Super. Ct. 2000) (granting plaintiff's motion for summary judgment as to liability on breach of contract claim); Shemitz Lighting v. Hartford Fire Ins. Co., No. CV960052970, 2000 Conn. Super. LEXIS 2952 at *23-24 (Nov. 9, 2000) (summary judgment for plaintiff proper in contract action where there was no genuine issue of material fact) (Exhibit O).

III.  **THIS COURT SHOULD ALSO GRANT SUMMARY JUDGMENT IN FAVOR OF CROWN THEATRES ON ITS PROFESSIONAL NEGLIGENCE CLAIM.**

To say that the Martino Defendants "let their client down," would be to put it mildly. Martino, and, thus, his firm, failed to perform in accordance with the standards of their profession. The cavalier manner in which Martino signed architect's certificates – certifying the payment of millions of dollars to non-existent, fictitious entities – was plainly negligent. And, his payment of tens of thousands of dollars of under the table "referral fees" to a Crown Theatres' consultant in order to win work from Crown Theatres was a breach of his duties to his client and constitutes negligence per se.

To prevail on a claim for professional negligence, the plaintiff must show: (1) The relevant standard of care; (2) a deviation from the standard care; and (3) harm caused by the deviation. Gambardella v. Fine, No. CV960253914, 1999 Conn. Super. LEXIS 2865, at *7 (Oct. 20, 1999) (Exhibit O). To sufficiently show the first two elements, the plaintiff must elicit "positive evidence of an expert nature from which the jury could reasonably conclude that the defendant was negligent . . . ." Puro v. Henry, 188 Conn. 301, 305-06, 449 A.2d 176, 178 (1982). See also Stowe v. McHugh, 46 Conn. App. 391, 397, 699 A.2d 279, 282 (1997). An exception to this rule exists where "there is manifest such gross want of care or skill as to afford, of itself, an almost conclusive inference of negligence that the testimony of an expert is not necessary." Puro, 188 Conn. at 305-06, 449 A.2d at 171. As shown below, in light of the undisputed facts and the admissions by the Martino Defendants' expert witness, this is an appropriate case for the entry of summary judgment on liability as to the Martino Defendants' negligence.

### A. Martino's Handling of the Architect's Certificates for Payment Deviated From the Relevant Standard of Care.

The facts concerning the procedure that Martino employed in signing Architect's Certificates for Payment are not in dispute. Martino signed stacks of Architect's Certificates without reviewing the substance of the contractors' payment applications, without making site inspections and without consideration of the relevant contract documents. Even though the applications were for payments of many hundreds of thousands of dollars, Martino signed off on the Architect's Certificates without bothering to check the identity of the contractor submitting the application, whether the contractor had signed the application or to determine whether the work allegedly performed was the responsibility of Crown Theatres. The process came down to

this: Beacher would hand Martino a stack of payment applications and demand that Martino "sign[] the f***ing things." (Martino Dep. at 267.) And Martino would comply.

In his carelessness, Martino certified the payment of no less than nineteen payment applications submitted by fictitious entities that performed no work on the projects. The nineteen applications were for payments totaling $4,931,598 – money that Crown Theatres paid. Among other things, Martino somehow failed to notice that two of the fictitious contractors had the same address as Robert Beacher, Martino's long-time friend and business associate.

Martino's conduct deviated from the standard of professional care expected of an architect in Martino's position. To assist in this matter, Crown Theatres retained the services of Peter Steffian, a licensed professional architect with more than 40 years of relevant experience. According to Mr. Steffian:

> [Martino] did not perform the expected careful review and confirmation that the work was necessary, had actually been performed, was of a reasonable value and the responsibility of his client, Crown Theatres. In fact, Martino ignored many obvious signs that the work was either fictitious, overstated in value or the responsibility of the landlord.

(Second Supplement to Report of Peter Steffian, Dated March 2, 2004, at 8, attached hereto as exhibit R.)

The Martino Defendants' architectural expert, Ronald P. Bertone, concurred that Martino's method of "review," did not discharge an architect's duty of care:

> Q: If Mr. Beacher simply handed the stack of payment applications to Mr. Martino and said sign them and Mr. Martino based only on that proceeded to sign the architect certificates, would that be acceptable for a professional architect?
>
> A: I would have to say no.

(Deposition of Ronald P. Bertone, March 24, 2004 ("Bertone Dep.") at 127, attached hereto as Exhibit S.)

Moreover, the evidence is uncontroverted that an architect in Martino's position who exercised reasonable care should have detected the false invoices. Mr. Steffian's report and testimony in this regard are very clear. (Supplement to Peter Steffian's Report, dated February 13, 2004, at 5-6, attached hereto as Exhibit T.) At the same time, Mr. Bertone, the Martino Defendants' expert, has punted on the subject. When asked whether he believed that Martino should have noticed that the fictitious invoices were fraudulent, he stated that he did not have an opinion. (Bertone Dep. at 156.) He further stated that he had not "evaluated that portion of the project." (Id. at 175.) Mr. Bertone's lack of an opinion speaks volumes -- and it leaves Mr. Steffian's opinion unrebutted.[5]

In sum, neither the facts nor the relevant standard of care are in dispute. Martino ignored the contents of the payment applications, and signed stacks of them because Beacher told him to do so. He signed them without making even a minimum inquiry into the legitimacy of the invoiced items. Both Crown Theatres and Martino's experts agree that this procedure was a deviation from the standard of care expected of a professional architect. Moreover, the opinion that Martino should have detected the false invoices through the exercise of reasonable care is not disputed, and the conclusion, based on the undisputed evidence, is abundantly clear. Therefore, Crown Theatres is entitled to partial summary judgment on liability against the Martino Defendants on its Count VIII claim for professional negligence.

---

[5] Of course, the reason Mr. Bertone did not evaluate the issue is that if he had he would have reached the obvious conclusion that Martino should have known that he was signing off on improper payment applications. Given the undisputed facts, no other conclusion is even remotely plausible.

> **B.     Martino's Admitted Payment of Referral Fees Violates Applicable State Law and Constitutes Negligence Per Se.**

There are no issues of material fact regarding Martino's payment of referral fees to his long-time benefactor, Robert Beacher. Martino admits that he made the payments, that they were for the purpose of securing work through Beacher's contacts, and that they were undisclosed to Crown Theatres. (Martino Dep. at 237-46, 286-87.) Specifically, Martino testified that he "gave [Beacher] money as a referral fee for the work that came to me from Crown Theatres." (Id. at 237-38.)

"[T]he violation of a valid administrative regulation constitutes negligence per se." Heritage Village Master Ass'n v. Heritage Village Water Co., 30 Conn. App. 693, 704, 622 A.2d 578, 585 (1993) (citing Citerella v. United Illuminating Co., 158 Conn. 600, 608, 266 A.2d 382 (1969)). See also Shackles v. Pfizer, No. 565313, 2003 Conn. Super. LEXIS 3237, at *12-13 (Dec. 1, 2003) (violation of a statute is negligence per se where the plaintiff is part of the population designed to be protected by the statute, and the harm alleged is the type that was sought to be prevented) (Exhibit O).

The Regulations of Connecticut State Agencies Concerning the Practice of Architecture provides that:

> If an architect has any business association or direct or indirect
> financial interest which may influence his judgment in connection
> with the performance of professional services, the architect shall
> fully disclose in writing to the client(s) or employer(s) the nature
> of the business association or financial interest, and if the client(s)
> or employer(s) object to such association or financial interest, the
> architect will either terminate such association or interest, or offer
> to give up the commission or employment.

Section 20-289-10(2)(b) (1998). Martino is licensed to practice architecture in Connecticut and worked on at least two theatre projects in Connecticut for Crown Theatres.

The payments to Beacher clearly violate this regulation. Martino has a direct and indirect financial interest in his relationship with Beacher that could influence his judgment in connection with his performance of his duties for his client, Crown Theatres. He admitted that he and Beacher have been doing business together for twenty-five years, and that over the years Beacher has referred to Martino a high percentage of all of Martino's work. (Martino Dep. at 243.) Clearly, Martino places a high premium on his relationship with Beacher and the work that he is able to bring to Martino's doorstep. If he is beholden enough to Beacher to pay him tens of thousands of dollars in referral fees, then he may be tempted into a situation where Beacher and Crown Theatres' interests are not aligned – for example, look the other way while Beacher and Daly stole millions of dollars from Crown Theatres. Moreover, the relationship was undisclosed. Even if there is only a possibility of impropriety, the architect is required to "fully disclose" the relationship to their client.

Furthermore, Martino's payment of referral fees to Beacher violates section 29.1.b.3 of the New York Rules of the Board of Regents, the code that governs the profession of architecture in New York State, the jurisdiction in which Martino resides. The pertinent portion of the regulation prohibits:

> directly or indirectly offering, giving, soliciting or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services.

Martino has repeatedly admitted that he paid large "referral fees" to Robert Beacher in connection with his introduction of Martino to Crown Theatres, and has therefore admitted that he violated this regulation. (Martino Dep. at 237-246.)

Martino's violations of the foregoing regulations constitute negligence per se. See Heritage Village Master Ass'n, 30 Conn. App. at 704, 622 A.2d at 578; Shackles, 2003

Conn. Super. LEXIS, at *23-24. Crown Theatres is entitled to judgment as a matter of law with respect to liability on Count IX.

## CONCLUSION

WHEREFORE, for the foregoing reasons, this Court should enter partial summary judgment on the issue of liability in favor of Crown Theatres and against James T. Martino and James Thomas Martino, Architect, P.C. on Counts VIII and XI of the Second Amended Complaint.

CROWN THEATRES, L.P.

By: _____
H. James Pickerstein (Bar No. Ct 05094)
Jodi Zils Gagné (Bar No. Ct 24376)
PEPE & HAZARD, LLP
30 Jelliff Lane
Southport, CT 06490
(203) 319-4000
(203) 259-0251 (fax)
hpickerstein@pepehazard.com
jgagne@pepehazard.com

and

Craig C. Martin (Bar No. Ct 12198)
Lawrence S. Schaner (Bar No. Ct 24756)
JENNER & BLOCK LLP
One IBM Plaza
Chicago, IL 60611
(312) 222-9350
312) 840-7776 (fax)
cmartin@jenner.com
lschaner@jenner.com

April 30, 2004

## CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that I have served all counsel of record in this action with a copy of the foregoing by mailing a copy of the same by United States Mail, postage prepaid, to the following parties:

>Kerry M. Wisser
>Weinstein & Wisser, P.C.
>29 South Main Street
>Suite 207
>West Hartford, CT  06107
>
>Marisa Lanza
>Milber, Makris, Plousadis & Seiden, L.L.P.
>108 Corporate Park Drive
>Suite 200
>White Plains, NY  10604
>
>Robert M. Frost
>Zeldes, Needle & Cooper P.C.
>1000 Lafayette Blvd.
>P.O. Box 1740
>Bridgeport, CT  06601

>_____
>Jodi Zils Gagne

Dated:  April 30, 2004