**01/15/04 CROWN THEATRES vs DALY    WITNESS: JAMES T.MARTINO**

**Diamond Reporting**

**Page 1 to Page 223**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*DIAMOND REPORTING*
*Suite 907*
*16 Court Street*
*Brooklyn, NY    11241*
*Phone:    (718) 624-7200*
*FAX:    (718) 855-1772*

Page 5

(22) A. Do you want the year that it was done?
(23) Q. Approximately.
(24) A. I would say probably around '91.
(25) Q. Let me ask you this: Please state

(1)
(2) your full name for the record.
(3) A. James Thomas Martino.
(4) Q. And Mr. Martino, where do you live?
(5) A. 75 Nassau Avenue, Manhasset, New York.
(6) Q. Where are you employed?
(7) A. James Thomas Martino Architect, P C.
(8) Q. What is the address of that business?
(9) A. 14 Vanderventer Avenue, Port
(10) Washington, New York.
(11) Q. Since you haven't been deposed for a
(12) while, let me remind you of a couple of the ground
(13) rules. You understand that you are under oath?
(14) A. Yes, I do.
(15) Q. I'm going to be asking you questions
(16) throughout the day. If at any time you don't
(17) understand one of my questions, please let me know
(18) and I will rephrase it. Is that okay?
(19) A. Yes, it is.
(20) Q. It's important, because we have a
(21) Court Reporter here, that your answers be audible,
(22) so no nods of the head, shrugs of the shoulder and
(23) so forth. Do you understand?
(24) A. Yes, I do.
(25) Q. If at some point during the day you

Page 6

(1)
(2) would like to take a break, let me know, for any
(3) reason, and we could arrange to take a break.
(4) Okay?
(5) A. Yes.
(6) Q. It's important to remember that the
(7) Court Reporter can take down only one of us at a
(8) time, so we should avoid talking over one another.
(9) Now, Mr. Martino, what is your
(10) educational background?
(11) A. How far back do you want to go?
(12) Q. Well, how about college?
(13) A. Graduated from Syracuse University in
(14) 1977 with a bachelors of architecture degree.
(15) Q. After that?
(16) A. No further college education.
(17) Q. Do you have any professional licenses?
(18) A. Besides architecture?
(19) Q. You have a license in architecture?
(20) A. That's correct.
(21) Q. Who issues the license? I mean
(22) various -- what kind of license in architecture do
(23) you have?
(24) A. I don't understand that question.
(25) MR. SEIDEN: Are you asking whether he

Page 7

(1)
(2) is a registered architect in any states?
(3) Q. Are you a registered architect in any

(4) states?
(5) A. Yes, I am.
(6) Q. How many states?
(7) A. I couldn't tell you off the top of my
(8) head right now. I was at one point in time
(9) licensed in as many as 18 states, but I would say,
(10) over the past two years, I probably let some of
(11) the licenses lapse that I was not doing much
(12) practice in.
(13) Q. After you graduated from Syracuse in
(14) 1977, did you go to work?
(15) A. Yes, I did.
(16) Q. Where did you go to work?
(17) A. The first architectural firm I worked
(18) for was a partnership. The name of the
(19) partnership was Terzis.
(20) Q. Can you spell that?
(21) A. T-E-R-Z-I-S Anastasi A-N-A-S-T-A-S-I.
(22) Q. Where was that located?
(23) A. In Manhattan.
(24) Q. How long were you with Terzis
(25) Anastasi?

Page 8

(1)
(2) A. Approximately a year.
(3) Q. After working for them, where did you
(4) work?
(5) A. I then worked for Angelo Francis Corva
(6) C-O-R-V-A and Associates Architects.
(7) Q. How long did you work for Angelo
(8) Francis Carva?
(9) A. Approximately two and a half to three
(10) years.
(11) Q. After that?
(12) A. Michael Harris Spector, S-P-E-C-T-O-R
(13) and Associates Architects.
(14) Q. How long were you with Michael Harris
(15) Spector?
(16) A. Approximately a year and a half.
(17) After that, the Halandia Group, H-A-L-A-N-D-I-A
(18) Group, and they were located in Oceanside,
(19) New York.
(20) Q. How long were you with Halandia?
(21) A. Approximately a year.
(22) Q. After Halandia?
(23) A. I opened my own practice.
(24) Q. What year was that?
(25) A. Approximately, I think it was 1983.

Page 9

(1)
(2) Q. What was the name of your practice
(3) when you opened it?
(4) A. James Thomas Martino Architect.
(5) Q. Have you worked for your own firm ever
(6) since?
(7) A. Yes.
(8) Q. Are you a member of the American
(9) Institute of Architects?
(10) A. Yes.
(11) Q. How long have you been a member of the

(12) *American Institute of Architects?*
(13)   A.   I believe it's 16 years.
(14)   Q.   *Do you have any other professional*
(15) *affiliations?*
(16)   A.   N.C.A.R.B.
(17)   Q.   *What is that?*
(18)   A.   National Counsel of Architectural
(19) **Registration Boards.**
(20)   Q.   *How long have you been a member of the*
(21) *N.C.A.R.B?*
(22)   A.   I would be guessing. I don't know
(23) exactly.
(24)   Q.   *More than ten years?*
(25)   A.   I believe it's more than ten years,

Page 10

(1)
(2) yes.
(3)   Q.   *Do the American Institute of*
(4) *Architects and the N.C.A.R.B have rules of*
(5) *professional ethics?*
(6)   A.   Yes.
(7)   Q.   *Do you consider yourself bound by*
(8) *those rules?*
(9)   MR. SEIDEN:   Objection. That's a
(10) question of law. That is not a factual
(11) question.
(12)   Q.   *You could answer.*
(13)   A.   Repeat the question, please.
(14)   Q.   *Do you consider yourself bound by the*
(15) *rules of the American Institute of Architecture*
(16) *and the National -- the N.C.A.R.B?*
(17)   MR. SEIDEN:   For the record, the same
(18) objection. The question is asking for a
(19) conclusion of law, not an inquiry of fact.
(20) It's an improper question. If you can know
(21) you could answer.
(22)   A.   Could you please describe for me what
(23) you mean by bound.
(24)   Q.   *Well, what do you understand the word*
(25) *bound to mean?*

Page 11

(1)
(2)   A.   I'm not too sure what that word is
(3) supposed to mean.
(4)   Q.   *Do you understand that you should*
(5) *comply with the rules of the American Institute of*
(6) *Architecture?*
(7)   MR. SEIDEN:   Same objections. It's a
(8) question of law.
(9)   A.   Yes.
(10)   Q.   *What about the rules of the N.C.A.R.B,*
(11) *do you feel that you should comply with those*
(12) *rules?*
(13)   MR. SEIDEN:   The same objection.
(14)   A.   Yes.
(15)   Q.   *Let me show you -- let's mark this as*
(16) *Exhibit Number 1.*
(17)
(18)   (Whereupon, the aforementioned
(19) Document was marked as Martino Exhibit 1 for

(20) identification as of this date by the
(21) Reporter.)
(22)
(23)   Q.   *Mr. Martino, I'm placing before you*
(24) *what's been marked as Martino Exhibit Number 1.*
(25) *Do you recognize this document?*

Page 12

(1)
(2)   A.   Yes, I do.
(3)   Q.   *What is it?*
(4)   A.   It looks like it's a copy of one of
(5) the pages from my website.
(6)   Q.   *Does it appear to layout your*
(7) *background?*
(8)   A.   Yes, it does.
(9)   Q.   *Would you say that this is your CV?*
(10)   A.   Yes, I would.
(11)   Q.   *Take a moment and review it and let me*
(12) *know whether it is accurate?*
(13)   A.   I believe it's accurate, with the
(14) exception of the 18 states, because this has not
(15) been updated to reflect the states that have
(16) possibly been since lapsed.
(17)   Q.   *Other than that --*
(18)   A.   Other than that, I believe it's
(19) accurate.
(20)   Q.   *How large is your architectural firm*
(21) *today?*
(22)   A.   Four people.
(23)   Q.   *Including yourself?*
(24)   A.   That is correct.
(25)   Q.   *Who are the other members -- who --*

Page 13

(1)
(2) *are the four people principals in the firm?*
(3)   A.   No.
(4)   Q.   *Who are the other individuals?*
(5)   A.   A CADD operator.
(6)   Q.   *What is his or her name?*
(7)   A.   Carlos Perrera.
(8)   Q.   *Who are the other employees of your*
(9) *firm?*
(10)   A.   Joseph LaMonte, bookkeeper Patricia
(11) Martino, administrative assistant.
(12)   Q.   *Is Patricia Martino any relation?*
(13)   A.   My wife.
(14)   Q.   *Has your firm, in the past, employed*
(15) *larger numbers of people?*
(16)   A.   That is correct.
(17)   Q.   *What is the maximum number of*
(18) *employees you've had?*
(19)   A.   I believe it was 11.
(20)   Q.   *What year was that?*
(21)   A.   1992 or '93.
(22)   Q.   *Have you ever employed other*
(23) *architects?*
(24)   A.   Yes.
(25)   Q.   *Who?*

Page 14

(1)

(18)  24, 2003?

(19)  A.    That's what the document says.

(20)  Q.    Do you have any reason to disagree?

(21)  A.    No.

(22)  Q.    Mr. Martino, did you have any

(23)  involvement in preparing the answers to Crown

(24)  Theatres first set of interrogatories?

(25)  A.    Could you state that question again,

**Page 79**

(1)

(2)  Counselor, please.

(3)  Q.    Did you participate in preparing the

(4)  answers to Crown Theatres first set of

(5)  interrogatories?

(6)  A.    Yes, I did.

(7)  Q.    Did you review – strike that.

(8)  Are the answers in Defendant's Exhibit

(9)  number – strike that.

(10)  Are the answers in Martino Exhibit

(11)  Number 3 complete and accurate?

(12)  A.    Yes, I believe they are.

(13)  Q.    Turn, please, to page number three.

(14)  Where you see interrogatory number two at the top

(15)  of the page. Are you there?

(16)  A.    Yes, I am.

(17)  Q.    Interrogatory two states separately

(18)  for each the theater projects in which you were

(19)  retained, performed work or provided services,

(20)  state for each visit to the project site and under

(21)  that it says A, the date of your visit and you

(22)  have a response which follows. Below, you've

(23)  provided in response to 2A under Hartford,

(24)  Connecticut upon information and believe Martino

(25)  visited this location on the following dates, do

**Page 80**

(1)

(2)  you see the list?

(3)  A.    Yes, I do.

(4)  Q.    How is this list of dates compiled?

(5)  A.    I believe my bookkeeper put that list

(6)  together for me.

(7)  Q.    What information did your bookkeeper

(8)  use to compile the list of dates on which you

(9)  visited the Hartford, Connecticut site?

(10)  A.    The invoices.

(11)  Q.    Which invoice?

(12)  A.    The invoices we submitted, I believe,

(13)  for those dates when I appeared.

(14)  Q.    And by – your bookkeeper, who are you

(15)  referring to?

(16)  A.    Joseph LaMonte.

(17)  Q.    Did Mr. LaMonte review your invoices

(18)  to compile the information for your visits to the

(19)  Trumbull Connecticut sites, the Jupiter, Florida

(20)  site, the Miami site and Skokie, Illinois site and

(21)  the Annapolis, Maryland site?

(22)  A.    Yes.

(23)  Q.    Mr. Martino, is your answer accurate

(24)  and complete with respect to your site visits for

(25)  each of the Crown Theatres locations?

**Page 81**

(1)

(2)  MR. SEIDEN:    I don't understand the

(3)  question. Objection. Answer complete as to

(4)  what.

(5)  Q.    With respect to the Hartford,

(6)  Connecticut theater project, have you accurately

(7)  and completely listed all of your site visits in

(8)  response to interrogatory number two on page three

(9)  of Exhibit Number 3?

(10)  A.    I can't sit here and say today that

(11)  that is accurate and complete, from what I

(12)  understand what you are saying. I think you are

(13)  asking me did I visit these number of times or

(14)  could there possibly have been more times or less

(15)  times.

(16)  Q.    Yes.

(17)  A.    I couldn't answer your question here.

(18)  Q.    Is this your best answer to the

(19)  question on what dates did you visit the Hartford,

(20)  Connecticut theater project?

(21)  A.    That's our best estimate.

(22)  Q.    Same question for the Trumbull

(23)  project. Are the dates reflected in your response

(24)  to Crown Theatres interrogatories, your best

(25)  understanding of the dates on which you visited

**Page 82**

(1)

(2)  that project?

(3)  MR. SEIDEN:    I'm sorry. Point of

(4)  clarification. When you say you and maybe

(5)  it's a defined term, are you referring to

(6)  Mr. Martino individually or his company.

(7)  MR. SCHANER:    Mr. Martino individually.

(8)  MR. SEIDEN:    Okay. Thank you.

(9)  A.    I relied upon Joseph LaMonte to put

(10)  this together.

(11)  Q.    As you sit here now –

(12)  A.    Those are the dates that he had

(13)  recorded on me traveling to these locations.

(14)  Could there have been other dates that I went that

(15)  were not recorded, possibly.

(16)  Q.    As you currently understand the

(17)  situation, these are the dates on which you

(18)  visited the Trumbull Connecticut site, correct?

(19)  A.    Yes.

(20)  Q.    As you currently understand the

(21)  situation, the dates listed for Jupiter, Florida

(22)  in your interrogatory answer are the dates when

(23)  you made site visits to the Jupiter, Florida

(24)  project?

(25)  A.    I believe so, yes.

**Page 83**

(1)

(2)  Q.    Same thing for Miami, Florida?

(3)  A.    I believe, yes.

(4)  Q.    Also for Skokie, Illinois?

(5)  A.    Yes, I believe so.

(6)  Q.    And Annapolis, Maryland?

(7)  A.    I believe so, yes.

(8)   Q.   Mr. Martino, when were you first hired
(9) to perform work for Crown Theatres?
(10)   A.   It was either late December '95 or
(11) early '96.
(12)   Q.   Who hired you?
(13)   A.   Milt Daly.
(14)   Q.   What did Mr. Daly hire you to do?
(15)   A.   I recall it being a lobby alteration
(16) to the Greenwich theater.
(17)   Q.   What work in connection with the lobby
(18) alteration did Mr. Daly request that you perform?
(19)   A.   Architectural and structural
(20) construction drawings.
(21)   Q.   Now, you testified earlier that
(22) Mr. Beacher was involved in introducing you to
(23) Crown Theatres. How did Mr. Beacher introduce you
(24) to Crown Theatres?
(25)   MR. SEIDEN:   Objection to the form to

Page 84

(1)
(2) the extent that it purports to characterize
(3) prior testimony. It speaks for itself.
(4)   A.   Could you repeat that question?
(5)   Q.   Let me see if I could make it clearer.
(6) You testified earlier that Mr. Beacher introduced
(7) you to Crown Theatres; is that right?
(8)   A.   Yes.
(9)   Q.   What did Mr. Beacher do to introduce
(10) you to Crown Theatres? To whom at Crown Theatres
(11) did Mr. Beacher introduce you?
(12)   A.   To Mr. Daly.
(13)   Q.   When was that?
(14)   A.   November or December of '95.
(15)   Q.   Where did the introduction take place?
(16)   A.   In Crown theater's office in South
(17) Norwalk.
(18)   Q.   When you were introduced to Milton
(19) Daly, did you have a meeting with him?
(20)   A.   Yes.
(21)   Q.   How long did your first meeting with
(22) Mr. Daly – had you met Mr. Daly before?
(23)   A.   Yes.
(24)   Q.   When did you first meet Milton Daly?
(25)   A.   I don't recall exactly.

Page 85

(1)
(2)   Q.   Do you have an approximate date?
(3)   A.   1980.
(4)   Q.   Where was Mr. Daly working at the
(5) time?
(6)   A.   United Artists Theaters.
(7)   Q.   Between 1980 and 1995, did you work on
(8) projects which involved Milton Daly?
(9)   MR. WISSER:   Objection to the form.
(10)   MR. SEIDEN:   I join in the objection.
(11)   MR. WISSER:   Just for clarification, do
(12) you mean did he work on projects for a company
(13) in which Milton Daly was an employee?
(14)   MR. SCHANER:   Sure, I will accept that.
(15)   A.   That is what I was interpreting you to

(16) say, but you didn't say that.
(17)   Q.   Okay. With that clarification.
(18)   A.   Yes.
(19)   Q.   Which projects?
(20)   A.   There was an office building for
(21) United Artist Theaters that was being constructed
(22) in East Meadow.
(23)   Q.   Anything else?
(24)   A.   No.
(25)   Q.   That was in approximately 1980?

Page 86

(1)
(2)   A.   1980, yes, 1981, somewhere – no,
(3) 1980.
(4)   Q.   Did you remain in touch with Mr. Daly
(5) after the construction of that office building
(6) conclude?
(7)   A.   No.
(8)   Q.   When you met with Mr. Daly in Crown
(9) Theatres' offices in November or December of 1995,
(10) what did you discuss?
(11)   A.   We discussed the possibilities of me
(12) becoming the architect for Crown Theatres.
(13)   Q.   Did Mr. Daly tell you what work Crown
(14) Theatres wanted done?
(15)   A.   That's a very vague question. I'm not
(16) sure what you are asking me.
(17)   Q.   Did he tell you the Crown Theatres was
(18) about to embark on a substantial theater
(19) construction or renovation program?
(20)   A.   Yes.
(21)   Q.   What did he tell you about the theater
(22) construction or renovation program?
(23)   A.   I can't recall the exact words what
(24) were discussed at that meeting. That's almost
(25) eight years ago.

Page 87

(1)
(2)   Q.   Do you have a general recollection?
(3)   A.   Basically that Crown was going to be
(4) doing an expansion program and they are looking
(5) for sites, in essence.
(6)   Q.   Who else was present at the meeting?
(7)   A.   Bob Beacher.
(8)   Q.   Did Mr. Daly agree to use your
(9) services at the end of that meeting?
(10)   MR. WISSER:   Objection to the form.
(11) When you refer to Mr. Daly in that regard, do
(12) you mean Mr. Daly on behalf of Crown?
(13)   MR. SCHANER:   Sure.
(14)   A.   He agreed, at that point in time, to
(15) try my services out on this first project.
(16)   Q.   Now, the first project was the lobby
(17) alteration for the Greenwich, Connecticut theater,
(18) correct?
(19)   A.   Correct.
(20)   Q.   Did you have a written contract for
(21) that project?
(22)   A.   I don't believe so, no.
(23)   Q.   You went on to work on a number of

(14)    Q.    What was your hourly rate for work
(15)  that you did for Crown Theatres?
(16)       MR. WISSER:    Objection to the form.
(17)  You have years from '96 to '01.
(18)       MR. SCHANER:    Well, if it changed over
(19)  time, I would like the witness to tell me.
(20)    A.    It was $235 an hour.
(21)    Q.    Initially?
(22)    A.    No.
(23)    Q.    The entire period?
(24)    A.    No, it did change at one period of
(25)  time. I don't remember when it changed.

Page 93

(1)
(2)    Q.    In 2001 when your work for Crown
(3)  Theatres ended, were you charging $235.00 an hour?
(4)    A.    Yes.
(5)    Q.    Prior to that time, did you charge by
(6)  the hour at a lower rate?
(7)    A.    Yes.
(8)    Q.    Do you recall the rate?
(9)    A.    No.
(10)   Q.    Now, in connection with the Crown
(11)  Theatres construction projects, what types of work
(12)  did you do?
(13)       MR. SEIDEN:    Any and all projects.
(14)    A.    Yes. Well, I think my –
(15)       MR. SEIDEN:    So the record is clear,
(16)  Mr. Martino, if it differed from project to
(17)  project, make that clear.
(18)    A.    The Trumbull contract speaks to my
(19)  services that I was retained to perform.
(20)    Q.    Were you retained to perform those
(21)  same services on other theater projects you did
(22)  for Crown?
(23)    A.    Yes.
(24)    Q.    Which ones?
(25)    A.    Annapolis, Hartford, Skokie, Jupiter,

Page 94

(1)
(2)  Minneapolis.
(3)    Q.    What about Miami?
(4)    A.    I'm sorry, yes, and Miami.
(5)    Q.    Generally, what were those services?
(6)    A.    Design, preparation of construction
(7)  documents, preparation of construction
(8)  specification book, preparation of bid documents
(9)  and contract administration included responding to
(10)  RFI's, site visits, answering questions from the
(11)  contractors.
(12)    Q.    Now, when you testified that you
(13)  performed design services, was that the design of
(14)  the movie theater?
(15)    A.    Yes.
(16)    Q.    You referred to the preparation of
(17)  construction documents. Which documents?
(18)    A.    Well, under my contract was a
(19)  preparation of the architectural, the structural,
(20)  mechanical, electrical and plumbing.
(21)    Q.    What was the construction spec book

(22)  that you referred to? What was it used for?
(23)    A.    It's an attachment to the construction
(24)  drawings that is issued to the contractors.
(25)    Q.    What were the bid documents used for?

Page 95

(1)
(2)    A.    The bid documents are the documents
(3)  that the contractors would fill in the dollar
(4)  amount that they proposed to do the construction
(5)  that movie theater complex for.
(6)    Q.    What are RFI's?
(7)    A.    Request for information.
(8)    Q.    Did you keep a log of request for
(9)  information that you received or any other record?
(10)       MR. SEIDEN:    Or any other record with
(11)  regard to RFI.
(12)       MR. SCHANER:    Yes.
(13)    Q.    Did you keep track of the RFI's that
(14)  you received?
(15)    A.    Yes.
(16)    Q.    Is there a book that lists them?
(17)    A.    I don't think we had a log.
(18)    Q.    How did you keep track of them?
(19)    A.    In the files.
(20)    Q.    The RFI's come to you in writing?
(21)    A.    Yes.
(22)    Q.    Did you respond in writing?
(23)    A.    Yes.
(24)    Q.    What about the questions from
(25)  contractors, were those in writing?

Page 96

(1)
(2)    A.    No.
(3)    Q.    Did you keep –
(4)    A.    Not always.
(5)    Q.    Did you keep track of the responses to
(6)  questions from contractors –
(7)    A.    Yes.
(8)    Q.    – that you gave?
(9)    A.    Oh, yes.
(10)   Q.    In what form did you give your
(11)  responses?
(12)    A.    Sometimes they would fax us a question
(13)  and we would write back on that fax and send it
(14)  back to the contractor.
(15)    Q.    Did you keep copies of those faxes?
(16)    A.    I believe we did, yes.
(17)    Q.    Did you keep other records of
(18)  questions from contractors that you received?
(19)    A.    Sure, correspondence in terms of
(20)  letters, yes.
(21)    Q.    Was it your understanding that there
(22)  was a division of labor between Crown Theatres
(23)  and its landlords with respect to the construction
(24)  projects?
(25)       MR. WISSER:    Objection to the form.

Page 97

(1)
(2)    A.    No.
(3)    Q.    You didn't understand that the

(10)   A.   No.

(11)   Q.   *Does your practice for handling*

(12) *architect certificates vary from job to job?*

(13)    MR. SEIDEN:   Objection. Your question

(14) assumes that there are architect certificates

(15) on every job. I object. It's an improper

(16) question.

(17)   A.   Most of the projects that I've been

(18) involved with do not have the need for me to sign

(19) pay req's.

(20)   Q.   *For the projects where you were*

(21) *required to sign pay req's, did you have a*

(22) *standard procedure for determining whether or*

(23) *not you signed the architect certificate?*

(24)    MR. SEIDEN:   Asked and answered.

(25)   A.   I really don't understand what you are

Page 107

(1)

(2) asking me.

(3)   Q.   *What steps did you take – what steps*

(4) *would you normally take before signing an*

(5) *architect certificate for payment?*

(6)    MR. SEIDEN:   Objection. Over broad.

(7)   A.   You would either make an on-site

(8) observation, or in this case, we had a

(9) construction manager owners rep who was performing

(10) that service.

(11)   Q.   *Are there any other –*

(12)    MR. SEIDEN:   Were you finished with

(13) your answer?

(14)    THE WITNESS:   Yes, for that question

(15) I'm finished with that answer.

(16)   Q.   *With respect to the Crown Theatres*

(17) *construction projects, was it your practice to*

(18) *make on-site inspection is prior to signing*

(19) *architect certificates?*

(20)   A.   My responsibilities were to make

(21) on-site inspection is.

(22)   Q.   *Did you, in fact, make on-site*

(23) *inspections prior to signing architect*

(24) *certificates for payments on Crown Theatres*

(25) *construction jobs?*

Page 108

(1)

(2)   A.   Yes and no.

(3)   Q.   *What do you mean by yes?*

(4)   A.   Yes, I was at the sites prior to

(5) signing these payment requisitions.

(6)   Q.   *When you say no?*

(7)   A.   No, I was not there prior to signing

(8) the payment requisition.

(9)   Q.   *In some cases you signed payment*

(10) *requisitions without making on-site inspections,*

(11) *correct?*

(12)   A.   That's correct.

(13)   Q.   *How often did that happen?*

(14)   A.   Depending on the project.

(15)   Q.   *Let's talk about the projects*

(16) *appropriately then. With respect to the Annapolis*

(17) *project, did you make on-site inspections before*

(18) signing architect certificates?

(19)   A.   Yes.

(20)   Q.   *Trumbull?*

(21)   A.   Yes.

(22)   Q.   *Miami?*

(23)   A.   Yes.

(24)   Q.   *Skokie?*

(25)   A.   Yes.

Page 109

(1)

(2)   Q.   *Hartford?*

(3)   A.   Yes.

(4)   Q.   *On which projects did you not make*

(5) *on-site inspections before signing architect*

(6) *certificates?*

(7)   A.   Annapolis, Miami and Skokie.

(8)   Q.   *On those projects, if I understand*

(9) *what your testimony is, it's sometimes you made*

(10) *on-site inspections before signing architect*

(11) *certificates and sometimes you didn't; is that*

(12) *correct?*

(13)   A.   That's correct.

(14)   Q.   *Why didn't you always make on-site*

(15) *inspections at Annapolis, Miami and Skokie before*

(16) *signing architect certificates?*

(17)   A.   Because one of the Friday morning

(18) meetings, Mr. Daly made the announcement that

(19) Bob Beacher would be the eyes and ears for Crown

(20) Theatres at the job sites. And therefore, Martino

(21) will not be going because Crown feels it's a

(22) duplication of services. And since Bob is going

(23) to be there, Bob will take care of that service.

(24)   Q.   *The Friday meeting you've just*

(25) *referred to, when did that take place?*

Page 110

(1)

(2)   A.   I don't recall exactly.

(3)   Q.   *What year?*

(4)   A.   I don't recall.

(5)   Q.   *Do you have a best recollection as to*

(6) *what year?*

(7)   A.   No.

(8)   Q.   *Who was present at the meeting?*

(9)   A.   Milt Daly, Bob Beacher, myself, Glenn

(10) Garfinkel, Tom Becker, Chris Dugger – I'm not

(11) sure, but maybe Steve Scott.

(12)   Q.   *Steve Scott?*

(13)   A.   Yeah.

(14)   Q.   *After Mr. Daly said that you would not*

(15) *be making site visits, did you say anything in*

(16) *response?*

(17)   A.   No.

(18)   Q.   *Did you argue with him?*

(19)   A.   No.

(20)    MR. WISSER:   Objection to the form.

(21)   A.   No, I did not.

(22)   Q.   *Did you comply?*

(23)    MR. SEIDEN:   Comply with what?

(24)    MR. SCHANER:   His request not to make

(25) site visits.

(12) A. They weren't the supers on the job
(13) because they came and went from the jobs. They
(14) are a notch up from the supers because they would
(15) be there and leave and look at other jobs so
(16) whatever title may be attached though that that's
(17) what they were.
(18) Q. Who was the Crown Theater landlord at
(19) *Jupiter Florida?*
(20) MR. SEIDEN: Objection to form.
(21) Q. Do you know?
(22) A. I don't know exactly the name, the
(23) corporate name. That might have been the
(24) landlords.
(25) Q. *Was there any person who represented*

Page 190

(1)
(2) *the landlord that you met with?*
(3) A. Larry Juran.
(4) Q. Can you spell that?
(5) A. J-U-R-A-N.
(6) Q. Was there a division of –
(7) A. Scott Hedge also, H-E-D-G-E.
(8) Q. What was the division of work between
(9) *Crown and the landlord?*
(10) MR. WISSER: Objection to the form.
(11) MR. SEIDEN: Objection to the form.
(12) A. I don't know.
(13) Q. Who hired you to perform architectural
(14) *services at the Jupiter work site?*
(15) A. Crown Theatres.
(16) Q. Was there anyone in particular at
(17) *Crown Theatres who hired you to do the work?*
(18) A. Milt Daly of Crown Theatres.
(19) Q. What work, in connection with the
(20) *Jupiter project, did you perform?*
(21) A. Same work as it's spelled out in my
(22) Trumbull contract.
(23) Q. Who, from your firm, worked on the
(24) *Jupiter project?*
(25) A. Gary Scheide was the lead. I don't

Page 191

(1)
(2) recall who the guys were that were CADD operators
(3) under Gary.
(4) Q. What did Mr. Scheide do on the Jupiter
(5) *project?*
(6) A. He did the construction drawings. He
(7) did the – answered the phone calls, assisted me
(8) in answering RFI's, did explanatory drawings,
(9) reviewed some shop drawings with me.
(10) MR. SCHANER: Let's mark this as
(11) Martino Exhibit Number 18.
(12)
(13) (Whereupon, the aforementioned Document
(14) was marked as Martino Exhibit 18 for
(15) identification as of this date by the
(16) Reporter.)
(17)
(18) Q. *Mr. Martino, you have before you*
(19) *Martino Exhibit 18.*

(20) *For the record, let me introduce it*
(21) *as an application and certificate for payment to*
(22) *Crown Theatres, L.P from Marlin Contracting. The*
(23) *project is Crown Theatres at Abacoa Town Center,*
(24) *Jupiter Florida, via architect James Thomas*
(25) *Martino. It's application number one for the*

Page 192

(1)
(2) *period February 2000 – February 1, 2000; is that*
(3) *correct?*
(4) A. Yes.
(5) Q. *Do you recognize any signatures on the*
(6) *first page of Martino Exhibit 18?*
(7) A. Yeah. It appears to be Bob Beacher's
(8) signature.
(9) Q. *Where?*
(10) A. On the line next to the word by, below
(11) the word architect. Also it appears to be Bob's
(12) signature on the line next to the words amount
(13) certified.
(14) Q. *Do you recognize the signature on the*
(15) *line under the word contractor under the name*
(16) *Marlin Contracting d/b/a Marlin Consulting, Inc?*
(17) A. No.
(18) Q. *There is what appears to be a*
(19) *signature on the continuation sheet which is the*
(20) *second page of the exhibit. Do you recognize that*
(21) *signature or marking?*
(22) A. It appears to be Bob's.
(23) Q. *Did you see a copy of Exhibit 18 on or*
(24) *about January 27, 2000?*
(25) A. No.

Page 193

(1)
(2) Q. *When is the first time you saw Exhibit*
(3) *18?*
(4) A. When I met with counsel in preparation
(5) of this deposition.
(6) MR. SCHANER: Let's mark this as
(7) exhibit – Martino Exhibit 19.
(8)
(9) (Whereupon, the aforementioned
(10) Document was marked as Martino Exhibit 19
(11) for identification as of this date by the
(12) Reporter.)
(13)
(14) Q. *For the record, exhibit Martino*
(15) *Exhibit 19 is an application and certificate for*
(16) *payment from Crown Theatres, L.P from Marlin*
(17) *Contracting, the project is Crown Theatres at*
(18) *Abacoa Town Center, Jupiter Florida via architect*
(19) *James Thomas Martino, P.C. It's application two,*
(20) *the period March 1, 2000. Have I stated that*
(21) *correctly?*
(22) A. Yes.
(23) Q. *Does your signature appear on the*
(24) *first page of Exhibit 19?*
(25) A. Yes.

Page 194

(1)

(18)    Q.    Yes.

(19)    A.    I was certifying that a partial

(20)    payment was being made, the amounts was determined

(21)    by Bob, not by me for the site preparation what

(22)    you see on the back, unsuitable soil, removal,

(23)    encasement of underground utilities, support and

(24)    hanging of underground utilities, replacement fill

(25)    and compaction, aquatic removal and stabilization.

**Page 199**

(1)

(2)    Q.    What as to those descriptions of work

(3)    were you certifying?

(4)    A.    I'm not – your wording –

(5)    Q.    What were you certifying to Crown by

(6)    your signature, what did you certify?

(7)    MR. SEIDEN:    Again, do you want him to

(8)    read it? It says what he certified.

(9)    A.    I was certifying that to the best of

(10)    my knowledge and belief that this work took place.

(11)    Q.    Did you make a site visit prior to

(12)    certifying the work which appears on the

(13)    continuation sheet of Martino Exhibit 19?

(14)    A.    I made numerous site visits.

(15)    Q.    Is it your testimony –

(16)    A.    My contract did not require me to be

(17)    there to certify this document.

(18)    Q.    If you didn't make a site visit, how

(19)    did you know that the work was done?

(20)    A.    Very easy.

(21)    Q.    How?

(22)    MR. SEIDEN:    Objection. His testimony

(23)    was that he did make numerous site visits.

(24)    You just said if you did not, it's

(25)    inconsistent with the testimony.

**Page 200**

(1)

(2)    Q.    Mr. Martino, I would like you to turn

(3)    back to what was marked as Martino Exhibit 3,

(4)    which were your answers to Crown Theatres

(5)    interrogatories. I'm handing you that copy. Do

(6)    you see that, turn please, to page 4 were you

(7)    provided your answer with respect to Jupiter?

(8)    A.    Yes.

(9)    Q.    Looking at your Jupiter answer to

(10)    interrogatories, when did you make a site visit

(11)    last prior to the date that you signed Exhibit 19,

(12)    which is March 2, 2000?

(13)    MR. SEIDEN:    When you say you, are you

(14)    referring to Jim personally or Jim or anyone

(15)    from his office?

(16)    Q.    When did you personally make a site

(17)    visit – let me rephrase it. Mr. Martino, when

(18)    was your last site visit to the Jupiter site prior

(19)    to March 2nd of 2000?

(20)    A.    According to this document, it says

(21)    January 11, 1999.

(22)    Q.    Now, would you agree, sir, that you

(23)    signed Exhibit 19 without making a site visit?

(24)    MR. SEIDEN:    Objection. He just said

(25)    that he made a site visit on 1/199, in the

**Page 201**

(1)

(2)    interrogatory. It's what it says.

(3)    Q.    Did you make a site visit on 1/199 to

(4)    confirm that the work had been performed that is

(5)    reflected on Martino Exhibit 19?

(6)    A.    That work was not performed on that

(7)    date.

(8)    Q.    When was the work performed?

(9)    A.    It was performed for the period of 3/1

(10)    2000.

(11)    Q.    Now, sir, it's true that you did not

(12)    make a site visit to confirm that the work

(13)    reflected in Exhibit 19 had been performed, right?

(14)    A.    Go ahead.

(15)    Q.    Is that right?

(16)    A.    Yes, go ahead.

(17)    Q.    It is correct, my statement is

(18)    correct?

(19)    A.    I made a site visit, yes.

(20)    Q.    But you did not make a site visit to

(21)    confirm that the work had been done that is

(22)    reflected in Exhibit 19, right?

(23)    A.    Correct.

(24)    Q.    Did you rely on input from anybody

(25)    else in deciding whether to sign Exhibit 19 on the

**Page 202**

(1)

(2)    line for the architect certificate?

(3)    A.    Yes.

(4)    Q.    Who?

(5)    A.    I relied on, first of all, the shop

(6)    drawings that were submitted, RFI's that came

(7)    about, progress photographs, discussions that took

(8)    place on the Friday morning construction meetings

(9)    where everybody was there, which gave us the

(10)    description of the work that was being performed

(11)    and based on Bob Beacher's certification that was that

(12)    put in front of me.

(13)    MR. SCHANER:    Let's mark the next

(14)    exhibit. This would be Martino 20.

(15)

(16)    (Whereupon, the aforementioned Document

(17)    was marked as Martino Exhibit 20 for

(18)    identification as of this date by the

(19)    Reporter.)

(20)

(21)    MR. SCHANER:    For the record, Martino

(22)    Exhibit 20 is from is an application and

(23)    certificate for payment from Crown Theatres –

(24)    strike that. The application – it's an

(25)    application an certificate for payment to

**Page 203**

(1)

(2)    Crown Theatres from Marlin Contracting, the

(3)    project is Crown Theatres Abacoa Town Center,

(4)    Jupiter Florida via contract James Thomas

(5)    Martino, P.C. It's application number three

(6)    for the period of January 31, 2000.

(7)    Q.    Mr. Martino; is that correct?

---

Page 198 to Page 203                    (718) 624-7200                    **Diamond Reporting**

(8) A. Yes.

(9) Q. Do you recognize your signature on the

(10) page?

(11) A. Yes, I do.

(12) Q. Is that your signature under the word

(13) architect?

(14) A. Yes, it is.

(15) Q. And next to the date April 4, 2000?

(16) A. Yes, it is.

(17) Q. Do you recognize any of the other

(18) signatures?

(19) A. Yes. I recognize Bob Beacher's

(20) signature on the space between the words amount

(21) certified and the dollar amount.

(22) Q. Do you recognize the signature under

(23) the word contractor and next to that Marlin

(24) Contracting d/b/a Marlin Consulting, Inc?

(25) A. No, I do not.

Page 204

(1)

(2) Q. Do you recognize the signature marking

(3) on the continuation sheet?

(4) A. Yes, that appears to be Bob's

(5) signature.

(6) Q. Mr. Martino, did you sign this

(7) architect certificate without making a site visit

(8) yourself to determine whether the work reflected

(9) on the contractor's application for payment had

(10) been performed?

(11) A. Say that again, please.

(12) MR. SCHANER: Can we have the question

(13) read back.

(14)

(15) (Whereupon, the referred to question

(16) was read back by the Reporter.)

(17)

(18) A. That is correct.

(19) Q. In fact, you did not make any site

(20) visits to the Jupiter Florida project in the

(21) calendar year 2000, did you?

(22) A. If we are just using this as a

(23) reference at this moment, I guess that would be

(24) true.

(25) MR. SCHANER: Let's mark this as

Page 205

(1)

(2) Martino 21.

(3)

(4) (Whereupon, the aforementioned Document

(5) was marked as Martino Exhibit 21 for

(6) identification as of this date by the

(7) Reporter.)

(8)

(9) Q. You have before you, Martino Exhibit

(10) 21. For the record, it is an application and

(11) certificate for payment to Crown Theatres, L.P

(12) from Marlin Contracting. The project is Crown

(13) Theatres at Abacoa Town Center, Jupiter Florida,

(14) via architect James Thomas Martino, P.C,

(15) application number four for the period May 1,

(16) 2000. Is that your signature in the lower

(17) right-hand corner of the document?

(18) A. Yes, it is.

(19) Q. When did you sign it?

(20) A. We don't have any originals of these

(21) documents, do we?

(22) Q. I'm afraid we are working with copies

(23) today. Do you believe that this is not your

(24) signature?

(25) A. No.

Page 206

(1)

(2) Q. When did you sign the document?

(3) A. This document says I signed it on

(4) 4/26/00.

(5) Q. Do you have any reason to doubt that

(6) you signed it on that date?

(7) A. I would prefer to look at the

(8) original.

(9) Q. Do you have any reason to doubt that

(10) you signed on that date?

(11) MR. SEIDEN: Objection to form.

(12) A. I would prefer to look at an original.

(13) Q. Why?

(14) A. Because who knows if somebody made any

(15) changes to this document.

(16) Q. Okay. What is the amount for payment

(17) that you certified?

(18) A. I didn't certify that amount. Bob

(19) Beacher certified that amount.

(20) Q. Do you recognize other signatures on

(21) the first page of Exhibit 21?

(22) A. Bob Beacher's.

(23) Q. That would be just above your

(24) signature; is that right?

(25) A. That is correct.

Page 207

(1)

(2) Q. Do you recognize the signature on the

(3) line for the contractor?

(4) A. No, I do not.

(5) Q. Mr. Martino, you signed Exhibit 21 –

(6) the contractors application for payment that is

(7) reflected in Exhibit 21 without making a site

(8) visit to determine whether the work had been

(9) performed, correct?

(10) MR. SEIDEN: Objection. Again, the

(11) interrogatory answer, counsel, that you showed

(12) to the witness reflected a site visit on

(13) 1/11.99 by Mr. Martino.

(14) Q. Can you answer the question – you

(15) could answer the question.

(16) A. I would have to hear the question.

(17) MR. SCHANER: Please repeat the

(18) question.

(19)

(20) (Whereupon, the referred to question

(21) was read back by the Reporter.)

(22)

(23) A. Well, that is incorrect because I did

1

2         IN THE UNITED STATES DISTRICT COURT

3           FOR THE DISTRICT OF CONNECTICUT

4

    CROWN THEATRES, L.P.,    )
5                     )
             Plaintiff,   )
6                     )
            vs.         )
7                     )
    MILTON L. DALY, TAYLOR-   )
8    LEIGH, INC., ANNE E. DALY,)
    JAMES C. CELLA, G.U.S.   )
9    DEVELOPMENT, INC., JAMES )
    T. MARTINO and JAMES    )
10   THOMAS MARTINO, ARCHITECT,)
                     )
11          Defendants.  )
    -------------------------)

12

13

14

15       CONTINUED DEPOSITION OF JAMES MARTINO

16            Garden City, New York

17         Tuesday, February 10, 2004

18

19

20

21

22

23

24   Reported by:
    DEBORAH A. HANLON
25   JOB NO. 157283

Page 228

```
1              Martino
2    agree that he would have followed your
3    advice whenever you instructed him not
4    to answer?
5         MR. SEIDEN: In the last
6    transcript?
7         MR. SCHANER: Yes.
8         MR. SEIDEN: Yes, we can agree on
9    that.
10        Q.  Mr. Martino, did you review the
11   transcript of the first day of your
12   deposition?
13        A.  No, sir, I did not.
14        Q.  Which general contractors'
15   contracts did you review?
16        A.  The Hartford contract, the
17   Jupiter contract, the Miami contract, the
18   Trumbull contract and the Annapolis
19   contract.
20        Q.  Why did you review those
21   contracts?
22        A.  I wanted to get a better
23   understanding of what their original
24   construction contract costs were.
25        Q.  What did you determine?
```

Page 229

```
1              Martino
2         A.  I determined what their original
3    costs were.
4         Q.  Did you determine your fees on
5    each of the projects?
6         A.  Yes, I did.
7         Q.  What did you look at to determine
8    your fees?
9         A.  I looked at original fee
10   proposal.
11        Q.  Did you determine what your fee
12   was for the Hartford projects?
13        A.  Yes, as a percentage.
14        Q.  How much was it?
15        A.  I don't recall off the top of my
16   head.
17        Q.  Do you recall as a percentage?
18        A.  I don't recall the exact number
19   off the top of my head.
20        Q.  Can you give me an estimate?
21        A.  I believe it was about three
22   percent off the top of my head.
23        Q.  Three percent of what?
24        A.  The original construction costs.
25        Q.  What was the original
```

Page 230

```
1              Martino
2    construction cost on Hartford?
3         A.  I don't recall the exact number.
4         Q.  What was the approximate number?
5         A.  The approximate number, off the
6    top of my head, was about 8.6 million.
7         Q.  What was your fee on the Jupiter
8    contract?
9         A.  $216,000.
10        Q.  What was your fee on the Miami
11   project?
12        A.  $265,000.
13        Q.  What was your fee on the Trumbull
14   contract?
15        A.  I think it was 175.
16        Q.  175,000?
17        A.  That's correct.
18        Q.  What was your fee on the
19   Annapolis project?
20        A.  I was mistaken. I think the
21   Annapolis project was 175.
22        Q.  What was Trumbull?
23        A.  I don't recall.
24        Q.  What about Skokie?
25        A.  I think it was -- I don't recall
```

Page 231

```
1              Martino
2    the exact number while I am sitting here
3    right now.
4         Q.  Do you have an estimate?
5         A.  I think it was 350.
6         Q.  These amounts that you are
7    providing me, are these the flat fee
8    amounts that you were paid?
9         MR. SEIDEN: Paid or -- my
10   understanding of the question,
11   Mr. Schaner, was what was the original
12   fee proposal? I think that's what you
13   asked and what he answered.
14        A.  That was my proposal to Crown
15   Theatres.
16        Q.  Did the amounts that Crown
17   Theatres paid you vary?
18        A.  Yes.
19        Q.  Do you know how much Crown
20   Theatres paid you on each check?
21        A.  I don't know the exact number,
22   no.
23        Q.  Do you know an approximate
24   number?
25        A.  Not right now I don't, no. Not
```

3 (Pages 228 to 231)

Page 232

Martino

1   while I'm sitting here. I can't recall the
2   number.
4       Q.  If I wanted to determine the
5   number, how could I do that?
6       A.  Crown would be able to probably
7   determine it by going back and looking at
8   the checks that they issued to me.
9       Q.  Since January 15, the first day
10  of your deposition, have you had any
11  conversations with Bob Beacher?
12      A.  Yes, sir.
13      Q.  How many?
14      A.  I don't recall how many.
15      Q.  Approximately how many?
16      A.  Five or six.
17      Q.  Have these all been by telephone?
18      A.  Yes.
19      Q.  When did you last speak with
20  Mr. Beacher?
21      A.  This past weekend.
22      Q.  Did you call him, or did he call
23  you?
24      A.  I don't recall.
25      Q.  What did you and Mr. Beacher

Page 233

Martino

2   discuss?
3       A.  Well, besides discussing our
4   families and those other issues, we talked
5   briefly about the depositions that took
6   place of Waas and Tim Harmon.
7       Q.  What did you say to Mr. Beacher
8   and what did he say to you about the
9   depositions of Waas and Tim Harmon?
10      A.  I told Bob that although I didn't
11  know the entire essence of the deposition
12  in its detail, that it is my understanding
13  that both contractors said that Bob was
14  involved with the pay reqs and change
15  orders and not Jim Martino.
16      Q.  What is the basis of your
17  understanding of what took place at the
18  depositions of Mr. Waas and Mr. Harmon?
19      A.  I don't understand what you are
20  asking me.
21      Q.  How do you know about what
22  happened at those two depositions?
23      A.  My attorney Marisa Lanza informed
24  me.
25      Q.  When was that?

Page 234

Martino

2       A.  I believe it was on Friday.
3       Q.  What else did Ms. Lanza tell you
4   about the depositions of Mr. Waas and
5   Mr. Harmon?
6       MR. SEIDEN:  Objection.
7       I instruct the witness not to
8   answer on the grounds of
9   attorney/client privilege.
10      Q.  Did you talk to Mr. Beacher in
11  any of your five or six conversations with
12  him since January 15 about your deposition?
13      A.  No.
14      Q.  You didn't tell him what happened
15  during the first day of your deposition?
16      A.  No.
17      Q.  In your other conversations with
18  Mr. Beacher, what did you and he discuss?
19      A.  I don't recall exactly.
20      Q.  Did those other conversations
21  include discussions of Crown's lawsuit?
22      A.  I don't recall.
23      Q.  Do you recall any topics that you
24  discussed with Mr. Beacher in your other
25  conversations with him?

Page 235

Martino

2       A.  No.
3       Q.  Since this lawsuit was filed,
4   Mr. Martino, how many conversations about
5   this lawsuit have you had with Mr. Beacher?
6       A.  It is impossible to tell.
7       Q.  Why is that?
8       A.  I can't put a number on it.
9       Q.  Can you give me an estimate?
10      A.  No, I don't like giving
11  estimates.
12      Q.  How frequently have you spoken
13  with Mr. Beacher about this lawsuit since
14  it was filed?
15      A.  I can't tell you that either.
16      Q.  Why not?
17      A.  Because you are asking me to give
18  you a guess, and I can't do that.
19      Q.  Too many times for you to guess?
20      MR. SEIDEN:  Objection.  That
21  mischaracterizes his testimony.
22      Q.  You can answer.
23      A.  I can't guess, sir.
24      Q.  Do you have any business ventures
25  of any kind with Mr. Beacher?

4 (Pages 232 to 235)

Page 236

Martino

1    Martino
2    A.  I don't understand that question.
3    Q.  What about the question don't you
4  understand?
5    A.  What do you mean by "business
6  ventures"?
7    Q.  Again, I don't understand why you
8  don't understand business ventures.
9    MR. SEIDEN: OK.
10    Q.  Do you have any business dealings
11  with Mr. Beacher today?
12    A.  No.
13    Q.  Are you working on any projects
14  together?
15    A.  No.
16    Q.  Do you invest any money together?
17    A.  No.
18    Q.  At any time in the last five
19  years, have you invested money with
20  Mr. Beacher?
21    A.  I think you need to clarify what
22  you mean by invested money.
23    Q.  Why?
24    A.  Because I'm not too sure what
25  invested money means with Mr. Beacher.

Page 237

1    Martino
2    Q.  Is there something that you have
3  done jointly with Mr. Beacher that might
4  involve investing money?
5    MR. SEIDEN: Objection, form.
6    A.  I am not following, Mr. Schaner,
7  what you mean by "investing money."
8    Q.  Have you given any of your money
9  to Mr. Beacher so that he could invest it
10  in any business?
11    A.  Have I given any money to
12  Mr. Beacher so he could invest it?  Is that
13  what you are asking me?
14    Q.  Yes.
15    A.  I don't know if any of the money
16  I have given to Mr. Beacher he has used for
17  investments.
18    Q.  You have given money to
19  Mr. Beacher in the last five years?
20    A.  Yes.
21    Q.  How much money did you give him?
22    A.  I don't know what amount.
23    Q.  For what purpose?
24    A.  I gave him money as a referral
25  fee for the work that came to me from Crown

Page 238

1    Martino
2  Theatres.
3    Q.  On how many occasions did you
4  give money to Mr. Beacher as a referral
5  fee?
6    A.  I don't know the exact number on
7  that either.
8    Q.  What is your best estimate?
9    A.  Seven to eight times.
10    Q.  Did you pay him a referral fee
11  for each theater project that you worked
12  on?
13    A.  No.
14    Q.  In what years did you pay the
15  referral fees?
16    A.  1999 and 2000.
17    Q.  How did you make the payments?
18    A.  By check.
19    Q.  Did you ever give him cash?
20    A.  For the Crown Theatre projects,
21  no.
22    Q.  How was the amount of the
23  referral fee determined?
24    A.  It was never really determined.
25    Q.  What do you mean?

Page 239

1    Martino
2    A.  You are asking me how was it
3  determined.
4    Q.  How did you know how much to pay
5  Mr. Beacher as a referral fee?
6    A.  It was an understanding between
7  me and Bob that this work was given to me
8  from Crown, and I gave him what I felt was
9  appropriate.
10    Q.  Did Beacher suggest to you the
11  amount you should give him?
12    A.  No.
13    Q.  Did he tell you how much to give
14  him?
15    A.  No.
16    Q.  How did you determine what amount
17  was appropriate?
18    A.  I honestly don't recall.
19    Q.  Did you look at the overall size
20  of the engagement and pay Mr. Beacher a
21  percentage?
22    A.  No. It was not a percentage.
23    Q.  Did you tell Crown Theatres that
24  you were paying referral fees to
25  Mr. Beacher?

5 (Pages 236 to 239)

Martino

1
2      A.  No, I did not.
3      Q.  Is there anything in writing
4  regarding your payment of referral fees?
5      A.  No, there is not.
6      Q.  You don't have a written
7  agreement with Mr. Beacher concerning
8  payment of referral fees?
9      A.  No, sir.  There is none.
10     Q.  Were the payments the same dollar
11  amount?
12     A.  No.
13     Q.  Did they range in dollar amounts?
14     A.  Yes.
15     Q.  What was the range?
16     A.  I was waiting to see if he was
17  objecting.  I am sorry.
18     MR. SEIDEN:  No.  I was scratching
19  my head.  I did not object to that
20  question.
21     A.  I would be giving an estimate of
22  the range.
23     Q.  What's the estimate?
24     A.  I think it was between 10,000 and
25  30,000.

Martino

1
2  not.
3      Q.  Why don't you know?
4          Is that something for your
5  bookkeeper?
6      A.  Yes.
7      Q.  Did you pay Mr. Beacher referral
8  fees for work on projects you did for
9  clients other than Crown Theatres?
10     A.  Yes.
11     Q.  Which clients?
12     A.  I don't recall off the top of my
13  head.
14     Q.  Did you pay him referral fees for
15  work you did for other movie theater
16  clients?
17     A.  Yes.
18     Q.  Did you pay Mr. Beacher referral
19  fees for all projects that he referred to
20  you?
21     A.  In one form or another, yes.
22     Q.  When did you begin paying
23  referral fees to Mr. Beacher?
24     A.  I don't recall.
25     Q.  Over the years, how much in

Martino

1
2      Q.  Did you pay the referral fees
3  before work began on the projects?
4      A.  I don't know what you mean by
5  before the work began.  Which work?  My
6  work, construction work?  I am sorry.
7      MR. SEIDEN:  Objection to form on
8  the grounds the witness articulated.
9      Q.  Did you pay the referral fees
10  before your work began?
11     A.  No.
12     Q.  Did you pay before the
13  construction work began?
14     A.  To the best of my knowledge, yes.
15  I believe that was true.
16     Q.  Which account or accounts did you
17  use to pay the referral fees?
18     A.  My business account.
19     Q.  Was that an account with EAB?
20     A.  I don't recall if it was EAB at
21  the time or not.
22     Q.  Did you provide Mr. Beacher with
23  any tax records regarding your payment of
24  referral fees?
25     A.  I don't know if that was done or

Martino

1
2  referral fees have you paid to Mr. Beacher?
3      A.  I don't recall that either.
4      Q.  Did you ever discuss the payment
5  of referral fees with Mr. Beacher?
6      A.  In what sense are you asking
7  that?  I am not following that question.
8      Q.  Did you have any conversations
9  with Mr. Beacher concerning your payment to
10  him of referral fees?
11     A.  Yes.
12     Q.  How many discussions did you have
13  with him?
14     A.  I can't – I don't recall that.
15     Q.  Did you have discussions with him
16  about the payment of referral fees on the
17  Crown Theatres projects?
18     A.  It was understood.  We worked
19  together for 25 years.  I have always
20  compensated Bob in one fashion or another
21  for the work that he has brought to me.
22     Q.  In addition to paying him
23  referral fees, did you compensate him in
24  other ways?
25     A.  Yes.

6 (Pages 240 to 243)

Page 244

```
 1            Martino
 2      Q.  How?
 3      A.  Bought him dinner, depending on
 4  the size of the project.
 5      Q.  Any other ways?
 6      A.  Not that I can think of off the
 7  top of my head.
 8      Q.  At any time in the past five
 9  years, have you entered into any
10  partnership with Mr. Beacher?
11      A.  Not that I recall.
12      Q.  Over any time in the past five
13  years, have you entered into any joint
14  ventures with Mr. Beacher?
15      A.  Not that I recall.
16      Q.  On which of the Crown Theatre
17  projects did you pay referral fees to
18  Mr. Beacher?
19      A.  I did not pay Mr. Beacher
20  specific referral fees for a specific
21  project.
22      Q.  When you made a payment of a
23  referral fee to him, how did you do it?
24      A.  By check.
25      Q.  Did you hand it to him?  Did you
```

Page 245

```
 1            Martino
 2  put it in the mail?
 3      A.  I don't recall.
 4      Q.  When Mr. Beacher received the
 5  check, did you make clear to him that it
 6  was for a particular project?
 7      A.  No.
 8      Q.  Did you communicate to him that
 9  it was for -- withdrawn.
10         Did you make the payments of
11  referral fees on a regular basis?
12      A.  What's a regular basis,
13  counselor?
14      Q.  For example, did you make the
15  payments on a monthly basis?
16      A.  I don't think it happened that
17  regularly, no.
18      Q.  Was there a schedule for making
19  the payments?
20      A.  No.
21      Q.  How did you determine when you
22  should make them?
23      A.  When cash flow permitted me to do
24  so.
25      Q.  Did Mr. Beacher ever encourage
```

Page 246

```
 1            Martino
 2  you to make payments?
 3      A.  He would ask if I could make a
 4  payment, how my cash flow was, if that's
 5  what you are asking me.
 6      Q.  Yes.
 7         And when Mr. Beacher would make
 8  that request, what would you do?
 9      A.  I would discuss with my
10  bookkeeper to see if in fact whether we
11  could make a payment.
12      Q.  If your cash flow would permit
13  it, what did you do?
14      A.  I wrote him a check.
15      Q.  And if your cash flow would not
16  permit making a payment, what would you do?
17      A.  I would inform Bob I couldn't pay
18  him.
19      Q.  Under those circumstances, what
20  would Bob say?
21      A.  "When you can, you can, Jimmy."
22      Q.  I am going to turn back to an
23  exhibit we looked at last time which was
24  Martino Exhibit 2, and this was a section
25  from your firm's web site.
```

Page 247

```
 1            Martino
 2         If you recall in the back
 3  section, there was a division called, Body
 4  of Work."
 5      A.  Uh-huh.
 6      Q.  I would like to turn you to the
 7  last page of the exhibit entitled, "Single
 8  Family Residences."
 9         Do you see that Mr. Martino?
10      A.  Yes.
11      Q.  There are eight projects listed
12  on this page.
13         Did you charge any of the people
14  who received your services that are listed
15  on this page for your services?
16      A.  Yes.
17      Q.  Of the eight projects listed
18  under single-family residences, for which
19  ones did you charge for your services?
20      A.  All except for Beacher and Daly.
21      Q.  Did you, in fact, get paid for
22  your work on all of the projects except for
23  Beacher and Daly?
24      A.  Yes.
25      Q.  Mr. Beacher's house is listed in
```

7 (Pages 244 to 247)

Page 252

Martino

1
2    And absent that, I have to presume that
3    these questions are in bad faith and
4    bear no relevance to the case and are
5    outside the scope of permissible
6    discovery in the federal rules.
7        Q.  Will you answer the question,
8    Mr. Martino?
9        A.  I have a stockbroker.
10       Q.  What is his or her name?
11           MR. SEIDEN:  Objection.
12       A.  I am not going to give you that.
13       Q.  Why not?
14       A.  There is a motion right now that
15    affects that.
16       Q.  All right.
17           We may then come back here on
18    another time and ask you questions in the
19    future.
20           MR. SEIDEN:  Understood.
21           MR. SCHANER:  Off the record for a
22    minute.
23           (Document marked Martino 25 for
24    identification, this date.)
25       Q.  Do you recognize Martino 25?

Page 253

Martino

1
2        A.  Yes, I do.
3        Q.  This is the written contract that
4    you said you had for the Trumbull,
5    Connecticut, theater contract.
6        A.  Yes.
7        Q.  It is dated July 8, 1998, and it
8    is between your firm and R.D. Scinto, Inc.
9        A.  That's correct.
10       Q.  Now, the re line on the document
11    says, "Agreement for Architectural
12    Services."  The document we are looking at,
13    Martino Exhibit 25, was not with Crown
14    Theatres, correct?
15       A.  This document was originally
16    submitted to Robert Scinto, and he was
17    going to assume my responsibilities.  It
18    was transferred, then, to Crown Theatres.
19       Q.  What was Mr. Scinto's role with
20    respect to the Trumbull, Connecticut,
21    theater?
22       A.  He was the owner of the property.
23       Q.  When you say the agreement was
24    transferred, how was that
25    done?

Page 254

Martino

1
2        A.  I'm not too sure.  That's really
3    a basis between Crown and R.D. Scinto how
4    that was done.
5        Q.  Is it your understanding that the
6    terms of your agreement with R.D. Scinto
7    became the terms of your agreement with
8    Crown Theatres?
9        A.  Yes.
10       Q.  These were the terms for your
11    agreement on the Trumbull project, correct?
12       A.  Yes.
13       Q.  And on the other theater projects
14    that you did for Crown Theatres; is that
15    right?
16       A.  That's what I recall, yes.
17       Q.  Why is it you are of the view
18    that the R.D. Scinto project also was to
19    apply to the other projects that you worked
20    on for Crown Theatres?
21       A.  Because I recall Mr. Daly stating
22    at one of the construction meetings that
23    this would then be the basis by which my
24    services would be rendered on the other
25    projects.

Page 255

Martino

1
2        Q.  Take a look at the second
3    paragraph of the first page under the
4    heading, "Basic Services" where it says,
5    "Note.  This agreement specifically
6    excludes any site development work, i.e.,
7    site drainage, site lighting, landscaping,
8    contour designs, et cetera."
9        Do you have an understanding as
10    to the reason why the agreement excluded
11    site development work?
12       A.  Yes, I do.  Because the site work
13    outside of the footprint of the building
14    was to still be done by R.D. Scinto
15    separately.
16       Q.  And the work within the footprint
17    of the building was to be done by whom?
18       A.  Well, when this was done, it was
19    going to be R.D. Scinto.
20       Obviously, when Crown took it
21    over, then Crown was doing that work.
22       Q.  Now I'm not quite sure I follow.
23    What work was Crown going to be doing when
24    Crown took it over?
25       A.  The building footprint.

9 (Pages 252 to 255)

Page 256

Martino

1
2   Q.  With respect to site development
3   work, was Crown doing any?
4   A.  Outside of the footprint of the
5   building, no.
6   Q.  Look at the next paragraph
7   preconstruction phase.
8   It states, "This firm shall
9   prepare bid documents in accordance with
10  Crown Theatres' lease requirements and
11  shall assist R.D. Scinto, Inc., in
12  providing information and assistance to all
13  bidders during the bidding process."
14  What were the bid documents that
15  are referred to in what I just read you?
16  A.  My drawings, a specification book
17  and an invitation to bid.  That's what I
18  recall.
19  Q.  The passage I read to you refers
20  to Crown Theatres' lease requirements.
21  Were those the requirements set
22  out in the Crown Theatres' lease with the
23  project landlord?
24  A.  I'm not too sure.  I believe so.
25  Q.  What is your understanding of

Page 257

Martino

1
2   what the lease requirements that the
3   passage I read to you refers to?
4   A.  I don't recall.
5   Q.  Did you review Crown Theatres'
6   lease requirements in preparing the bid
7   documents?
8   A.  I don't recall that either.
9   Q.  It says that your firm would
10  prepare bid documents in accordance with
11  Crown Theatres' lease requirements.
12  Did you do that?
13  A.  I don't recall if I myself did
14  that.
15  Q.  Somebody at your firm did?
16  A.  I would think so.
17  Q.  Who did on the Trumbull project?
18  A.  I don't recall which one of my
19  staff members was working on the Trumbull
20  project.
21  Q.  In order to prepare the bid
22  documents in accordance with Crown
23  Theatres' lease requirements, somebody at
24  your firm would need to have reviewed Crown
25  Theatres' lease, correct?

Page 258

Martino

1
2   A.  I would think so.
3   Q.  In fact, it was you, right?
4   A.  No.  I don't know that.
5   Q.  Did you work on the drawings on
6   the Crown Theatres' projects?
7   A.  When you say did I work on them,
8   what do you mean did I work on them?
9   Q.  Did you have anything to do with
10  their preparation?
11  A.  Yes.
12  Q.  What about the spec book?
13  A.  Yes.
14  Q.  The invitation to bid?
15  A.  Yes.
16  Q.  Did you review these documents to
17  ensure that they were in conformity to
18  Crown Theatres' lease requirements?
19  A.  I don't recall.
20  Q.  Do you think you did?
21  MR. SEIDEN:  Objection.  Asked and
22  answered.
23  A.  I answered the question, counsel.
24  Q.  You can answer the question.
25  Do you think that you reviewed

Page 259

Martino

1
2   the lease requirements?
3   MR. SEIDEN:  Asked and answered.
4   A.  Again, I don't recall.
5   Q.  Did you have an ordinary practice
6   with respect to the preparation of bid
7   documents?
8   A.  Mr. Schaner, what do you mean by
9   ordinary practice?
10  Q.  As part of your ordinary practice
11  in preparing bid documents, did you review
12  lease requirements?
13  A.  I don't know.
14  Q.  To prepare the bid documents,
15  what work did you do?
16  A.  I would frequently review the
17  drawings that were being produced by my
18  staff.  I would ascertain what sections
19  needed to be in the specification book.
20  That's what I recall off the top of my
21  head.
22  Q.  How did you determine what
23  sections needed to be in the specification
24  book?
25  A.  Well, you look at the drawings,

10 (Pages 256 to 259)

Page 264

Martino

1  not. I believe we did.
2  Q.  Mr. Martino, I am handing you
3  what we marked at the first day of your
4  deposition as Martino Exhibit 3 which was
5  your responses to Crown Theatres' first set
6  of interrogatories.
7  Reviewing your responses to Crown
8  Theatres' first set of interrogatories, can
9  you tell me whether you or someone from
10  your firm made monthly visits to the
11  Trumbull site?
12  A.  Not by reviewing this document I
13  cannot, no.
14  Q.  Can you tell me whether you made
15  monthly site visits on the other theater
16  projects that you did for Crown Theatres?
17  A.  Are you asking me now to review
18  the other five projects that are listed
19  here to ascertain whether I made monthly
20  site visits?
21  Is that what you are asking me to
22  do?
23  Q.  I would like you to tell me
24  whether you made monthly visits to each of
25

Page 265

Martino

1  the Crown Theatres' projects. And if
2  reviewing your interrogatory answers would
3  help, go ahead.
4  A.  Well, I know that in Jupiter and
5  Miami I did not, or anybody from my office,
6  make specific monthly site visits.
7  Q.  What about the other projects?
8  A.  It appears that Skokie, based on
9  this document in front of me, that monthly
10  site visits were not made. And looking at
11  the Hartford project, based on this, I
12  think we did make monthly site visits.
13  Q.  What about Annapolis, Maryland?
14  A.  No. Annapolis, Maryland, monthly
15  site visits were not made.
16  Q.  Let's go back to Martino
17  Exhibit 25 for a moment.
18  On page 2, the last sentence
19  reads, "Should additional site visits be
20  required, each site visit will be billed
21  monthly."
22  Did your firm ever bill for
23  additional site visits?
24  A.  On the Trumbull project?
25

Page 266

Martino

1  Q.  On the Trumbull project.
2  A.  I can't recall off the top of my
3  head.
4  Q.  Did your firm bill for additional
5  site visits on any of the other site
6  projects?
7  A.  I can't recall that either.
8  Q.  On the first day of your
9  deposition, I believe that you testified
10  that Bob Beacher would hand copies of the
11  payment requisitions to you either in his
12  car on the way to the Friday construction
13  meetings or at the Friday meetings, that
14  you would sign them either in the car or at
15  the Friday meetings.
16  Have I got that right?
17  MR. SEIDEN:  Objection. The
18  testimony speaks for itself.
19  A.  I think that's a fair synopsis of
20  what I was trying to portray.
21  Q.  Did you discuss the payment
22  requisitions with Mr. Beacher before you
23  signed them?
24  A.  I cannot say that I discussed
25

Page 267

Martino

1  specifically each payment requisition before
2  I signed them, no.
3  Q.  What would Mr. Beacher say to you
4  when he gave you the payment requisitions?
5  A.  I reviewed them, signed the
6  fucking things.
7  Excuse my mouth, ma'am.
8  Q.  And after you signed them, what
9  did you do with them?
10  A.  Gave them back to Bob.
11  Q.  What did Mr. Beacher do with the
12  payment applications after you signed them
13  and gave them back to him?
14  A.  I believe he then gave them to
15  Mr. Daly.
16  Q.  Mr. Martino, do you understand
17  the terms payment requisition and payment
18  application to mean the same thing?
19  A.  Yes, I do.
20  Q.  Do you remember that you met with
21  investigators for Crown Theatres on July
22  11, 2003?
23  A.  I don't remember that specific
24  date, but I do remember meeting with people
25

12 (Pages 264 to 267)

Page 276

Martino

1
2    Did you make payments to B.B.
3    Construction?
4    A. I am sorry. I misunderstood.
5    Yes. I did make payments to B.B.
6    Construction.
7    Q. What were those for?
8    A. The referral fees and the
9    consulting fees.
10    Q. How much in addition to the
11    referral fees did you pay in consulting
12    fees?
13    A. It is not an easy thing to
14    subdivide.
15    Q. Were the payments separate?
16    MR. SEIDEN: Objection. Vague.
17    A. I think I testified earlier that
18    I made, like, seven or some odd number of
19    payments. That's all I can tell you.
20    Q. Do the seven or eight payments
21    that you referred to before include both
22    referral fee payments and payments for
23    reviewing your drawings?
24    A. Yes.
25    Q. Did you make any payments to

Page 277

Martino

1
2    Marlin Consulting?
3    A. No.
4    Q. Hewlett Consulting?
5    A. No.
6    Q. Hewlett Contracting?
7    A. No.
8    Q. Tiger Contracting?
9    A. No.
10    MR. SCHANER: Mark that as 26,
11    please.
12    (Document marked Martino 26 for
13    identification, this date.)
14    Q. Mr. Martino, I have had placed
15    before you Martino Exhibit 26. This is the
16    monthly statement from Marlin Consulting's
17    Nations Bank account for the period
18    September 1, 1999, through September 30,
19    1999?
20    MR. SEIDEN: Let me just make an
21    objection for the record. I don't
22    believe that's what this exhibit says.
23    It says Marlin Consulting, Inc., care
24    of B.B. Construction Consultants, LTD.
25    Q. Under deposits and credits on the

Page 278

Martino

1
2    first page of the exhibit, and the exhibit
3    is Bates numbered BOA 3 through BOA 4,
4    there is an entry for September 20, 1999
5    showing a wire transfer from James Thomas
6    Martino in the amount of $21,500.
7    Does this refresh your
8    recollection that you made a wire transfer
9    in the amount of $21,500?
10    A. No, sir.
11    Q. Does it refresh your recollection
12    that on September 20, 1999 you made a wire
13    transfer to Bob Beacher or a business that
14    Bob Beacher owned?
15    A. No, sir.
16    Q. Does this refresh your
17    recollection that you made a wire transfer
18    on September 20, 1999 in the amount of
19    $21,500?
20    A. No, sir.
21    Q. Did Marlin Consulting do any work
22    for you --
23    A. No.
24    Q. -- or your firm?
25    A. No.

Page 279

Martino

1
2    Q. Did you ever make any wire
3    transfers to Mr. Beacher?
4    A. Not that I am aware of.
5    MR. SCHANER: Mark this as Martino
6    27.
7    (Document marked Martino 27 for
8    identification, this date.)
9    Q. Mr. Martino, Martino Exhibit 27
10    is two pages in length. The Bates numbers
11    are F 16 through F 17. The first page is a
12    copy of a deposit ticket dated March 25,
13    1999 for the deposit of $27,000 into B.B.
14    Construction Consultants' Fleet Bank
15    account.
16    The second page shows copies of
17    the front and back of a check, check number
18    1697, in the amount of $27,000 drawn on the
19    EAB account of James Thomas Martino,
20    Architect, P.C., and made payable to B.B.
21    Construction Consultants.
22    Is that your signature on check
23    number 1697?
24    A. Yes, sir, it is.
25    Q. What was this check for?

15 (Pages 276 to 279)

Page 280

Martino

1                 Martino
2     A.  It was part of the referral or
3 consulting fee that I paid Mr. Beacher.
4     Q.  You gave this check to
5 Mr. Beacher?
6     A.  That's correct.
7     Q.  Are there any records showing
8 what this payment was for?
9     A.  No.
10  . Q.  B.B. Consultants didn't submit a
11 bill?
12    A.  No.
13    Q.  It didn't submit an invoice?
14    A.  No.
15    Q.  You never received time records
16 from Mr. Beacher?
17    A.  No.
18     Can we take a break for a minute?
19 I have to use the boy's room.
20    MR. SCHANER:  Sure.
21    (A recess was taken.)
22    (Document marked Martino 28 for
23 identification, this date.)
24    Q.  Mr. Martino, this is a copy of
25 Martino Exhibit 28.  It is two pages long.

Page 281

Martino

1                 Martino
2 The Bates numbers are F 19 and F 20.
3     The first page bears copies of a
4 check and a deposit ticket.  The check is
5 1789.  It is in the amount of $17,500 and
6 it is made payable to B.B. Construction
7 Consultants.  It is drawn on the EAB bank
8 account of James Martino, Architect, P.C.
9     The deposit ticket shows a
10 deposit of $17,500 into B.B. Construction
11 Consulting LTD's Fleet Bank account. Page
12 2 shows copies of the back sides of the
13 check and deposit ticket.
14    Mr. Martino, is that your
15 signature on check 1789?
16   .A.  Yes, sir, it is.
17    Q.  Did you give a copy of check 1789
18 to B.B. Construction Consultants?
19    A.  Did I give a copy?
20    Q.  Did you give the check to Bob
21 Beacher?
22    A.  Yes.
23    Q.  If you look on the first page in
24 the box under the words, "Remittance
25 Visit," says, "Consulting Miami Gardens."

Page 282

Martino

1                 Martino
2    Do you see that?
3    A.  Yes, I do.
4    Q.  What does that refer to?
5    A.  To the best of my knowledge, it
6 refers to me paying Mr. Beacher for
7 consulting on Miami Gardens.
8    Q.  What consulting work did
9 Mr. Beacher do?
10    A.  I don't recall right now.
11    Q.  Is there anything that would help
12 refresh your recollection?
13    A.  I am not following what you are
14 asking me.
15    Q.  You said you don't recall right
16 now.  I would like to know if there is
17 anything that would help you recall?
18   ·A.  I don't know.
19    Q.  Is there any document that you
20 could look at that would help you recall?
21    A.  I don't know.
22    Q.  Would talking with anyone help ·
23 you recall?
24    A.  I don't know that either.
25    Q.  Did Mr. Beacher submit an invoice

Page 283

Martino

1                 Martino
2 for the consulting work -- withdrawn.
3    Did you receive an invoice from
4 Mr. Beacher in exchange for a check number
5 1789?
6    A.  To the best of my knowledge, no.
7    Q.  Did you tell Crown Theatres that
8 you paid Mr. Beacher 17,500 for consulting
9 on the Miami Gardens' project?
10    A.  No.
11    Q.  Did you disclose to Crown
12 Theatres that you made any payments to
13 Mr. Beacher for consulting work?
14    MR. SEIDEN:  Objection.  Asked and
15 answered.
16    A.  No.
17    Q.  And you never disclosed to Crown
18 Theatres that you paid Mr. Beacher a
19 referral fee, correct?
20    A.  That is correct.
21    MR. SCHANER:  Mark this as
22 Exhibit 29, please.
23    (Document marked Martino 29 for
24 · identification, this date.)
25    Q.  Mr. Martino, Martino Exhibit 29

16 (Pages 280 to 283)

Page 284

1          Martino
2  is a two-page document Bates labeled F 21
3  through F 22.
4          The first page shows a deposit
5  ticket dated May 26, 1999, and it shows a
6  deposit of $17,500 into B.B. Construction
7  Consulting LTD's Fleet Bank account.
8          The second page is the front and
9  back of a check in the amount of $17,500.
10  It is check number 1870, and it is drawn on
11  EAB account of James Thomas Martino
12  Architect, P.C., and it is made payable to
13  B.B. Construction.  In the description box
14  on the page, on the second page, which
15  shows the check, there is the word "Miami."
16          Mr. Martino, is that your
17  signature on check number 1870?
18      A.  Yes, sir, it is.
19      Q.  Did you give this check to
20  Mr. Beacher?
21      A.  Yes, I did.
22      Q.  What was this check for?
23      A.  I believe it was part of the
24  referral fee.
25      Q.  When you say a referral fee, what

Page 285

1          Martino
2  exactly did Mr. Beacher do to earn the
3  referral fee?
4      A.  He brought me into Crown
5  Theatres.
6      Q.  Anything else?
7      A.  No.
8      Q.  Did Mr. Beacher submit a bill in
9  exchange for the $17,500 reflected on check
10  number 1870?
11      A.  Not that I recall.
12      Q.  Would it be fair to say,
13  Mr. Martino, that your payments of referral
14  fees and consulting fees to Mr. Beacher
15  were in reality kickbacks?
16      MR. SEIDEN:  Objection.
17      A.  I wouldn't use that terminology
18  in this case.
19      Q.  Why not?
20      A.  Because kickback has a dirty term
21  to it.  It is a referral fee just like
22  attorneys give other attorneys referral
23  fees.
24      Q.  Wasn't this really a kickback?
25      MR. SEIDEN:  Objection.  Asked and

Page 286

1          Martino
2  answered.
3      A.  No.
4      Q.  Would it be fairer to call this a
5  bribe?
6      MR. SEIDEN:  Objection.
7      A.  No, sir.
8      Q.  Wouldn't you agree that the
9  payments that you were making to
10  Mr. Beacher were done under the table?
11      MR. SEIDEN:  Objection.
12      A.  No.
13      Q.  They weren't disclosed to anyone,
14  were they?
15      A.  So why does that make it under
16  the table?
17      Q.  Who in your office knew about the
18  payments you were making to Mr. Beacher?
19      A.  My bookkeeper.
20      Q.  What did you tell your bookkeeper
21  the payments were for?
22      A.  Referral fee.
23      Q.  What is your bookkeeper's name?
24      A.  Joseph Lomonte.
25      Q.  How long has he been with you?

Page 287

1          Martino
2      A.  I don't know when he first
3  started.
4      Q.  Has he been working for you since
5  you began working for Crown Theatres?
6      A.  I'm not too sure if that's true
7  or not.
8      Q.  What year did he start working?
9      A.  I don't recall.
10      Q.  Did you discuss the referral fees
11  and consulting fees you paid to Mr. Beacher
12  with Gary Sheide?
13      A.  No.
14      Q.  Did you discuss them with
15  Marciano Stanco?
16      A.  No.
17      Q.  Did you discuss the payments with
18  Mr. Beacher's wife, Brenda Beacher?
19      A.  No.
20      Q.  Other than you, Mr. Beacher and
21  your bookkeeper, who else knew about the
22  referral fees and consulting fees that you
23  were paying?
24      A.  I have no idea.
25      Q.  Do you keep a check register in

17 (Pages 284 to 287)

Page 288

Martino

1
2  your office?
3      A.  I'm not too sure if he does or he
4  doesn't.
5      Q.  Mr. Lomonte would know?
6      A.  Yes.
7      Q.  How do you spell Mr. Lomonte's
8  last name?
9      A.  L-o-m-o-n-t-e.
10     Q.  Mr. Martino, I would like to
11 refer you back to Exhibit 22, which we
12 looked at the first day of your deposition.
13         Exhibit 22 is payment application
14 number 5 submitted by Marlin Contracting
15 for work on the Jupiter, Florida, job; and
16 it is for the period June 1, 2000.
17         Did Marlin Contracting do any
18 work on the Jupiter, Florida, project?
19     A.  I don't know.
20     Q.  Did you ever meet any Marlin
21 employees on the Jupiter project job site?
22     A.  I don't recall meeting anybody.
23     Q.  Did you ever speak with any
24 Marlin personnel regarding the Jupiter
25 project?

Page 289

Martino

1
2      A.  I don't recall that either.
3      Q.  If you look at the contractor's
4  signature line, it looks like it says Jerry
5  M. Marlin.
6         Did you ever meet a Mr. Marlin?
7      A.  I don't recall meeting a
8  Mr. Marlin, no.
9      Q.  Look at the address for Marlin
10 Contracting.  It says 123 Orchid Kay Drive,
11 Palm Beach Gardens, Florida.  Zip code is
12 33420.
13         Now, Mr. Martino, Marlin's
14 address is the same as Mr. Beacher's
15 address, isn't it?
16     A.  Yes, it is.
17     Q.  You knew that when you signed
18 this architect certificate, didn't you?
19     A.  No, I did not.
20     Q.  Why not?
21     A.  How could you draw that
22 conclusion?
23     Q.  I asked you why you didn't know.
24     A.  I wasn't paying attention to it.
25     Q.  You signed the architect's

Page 290

Martino

1
2  certificate on June 1, 2000, correct?
3      A.  That's what it states.
4      Q.  As of that date, you knew that
5  Mr. Beacher lived at 123 Orchid Kay Drive,
6  correct?
7      A.  I don't recall that.
8      Q.  When did you learn where
9  Mr. Beacher lived?
10     A.  I don't recall that either.
11     Q.  You have been to Mr. Beacher's
12 house before you signed this, didn't you?
13     A.  Mr. Schaner, I don't recall that
14 either.
15     Q.  Mr. Martino, Marlin Contracting,
16 according to the payment applications here,
17 had a contract in the amount of $1.070,000,
18 correct?
19     A.  That's what it states.
20     Q.  You knew, sir, that by signing
21 this architect's certificate you were
22 approving a payment that was going to
23 Mr. Beacher, correct?
24         MR. SEIDEN:  Objection to form.
25     A.  No, sir, I did not.

Page 291

Martino

1
2      Q.  Why not?
3      A.  How would you draw that
4  conclusion?
5      Q.  You knew that Mr. Beacher and
6  Marlin Contracting were the same thing,
7  correct?
8      A.  No, sir, I did not.
9      Q.  Why not?
10     A.  How would I know that?
11     Q.  Same address, correct?
12     A.  So.
13     Q.  Did you review Marlin
14 Contracting's pay applications before you
15 signed them?
16     A.  This exhibit you are speaking of?
17     Q.  Yes.
18         Did you review Exhibit 22 before
19 you signed it?
20     A.  I reviewed it in terms of the
21 scope of work on the second page.
22     Q.  Did you review the first page?
23     A.  No, I did not.  Not in its
24 entirety.
25     Q.  Which parts didn't you review?

18 (Pages 288 to 291)

Page 292

```
1              Martino
2       A. The parts I did review was that
3    it was approved already by Bob Beacher, and
4    I looked at the second page to ascertain
5    the work that was being performed.
6       Q.  Here is a copy of Martino Exhibit
7    21 that we looked at the first day of
8    your deposition.
9          It has got your signature on it,
10   correct?
11      A. It has my signature on it, yes.
12      Q.  Did you review Exhibit 21 before
13   you signed it?
14      A. Yes, I did.
15      Q.  Did you review the whole thing?
16      A. I reviewed it in the same fashion
17   I reviewed the previous one.
18      Q.  You signed it even though Marlin
19   Contracting's address is the same as Bob
20   Beacher's, correct?
21      A. That's correct.
22      Q.  I am handing you what we marked
23   at your deposition earlier as Martino
24   Exhibit 18.
25          That's a copy of Marlin
```

Page 293

```
1              Martino
2    Contracting's pay application Number 1 for
3    work on the Jupiter project, correct?
4       A. That's what it states.
5       Q.  And you testified that that's not
6    your signature on this document, correct?
7       A. That is correct. I testified to
8    that.
9       Q.  I am handing you now Martino
10   Exhibit Number 19, which is a copy of
11   Marlin's second pay application for work on
12   the Jupiter project.
13          Correct?
14      A. That's what it claims, yes.
15      Q.  And you signed that one?
16      A. Yes, I did.
17      Q.  From payment application Number 2
18   submitted by Marlin, you knew that there
19   was a payment application Number 1,
20   correct?
21      A. Did not realize it.
22      Q.  If you had noticed that it was
23   application Number 2, you would have known
24   that there must have been an application
25   Number 1, correct?
```

Page 294

```
1              Martino
2       A. That's fair to say.
3       Q.  And Exhibit 19, Marlin
4    application Number 2, shows that there was
5    a previous payment to Marlin for $155,000,
6    correct?
7       A. That's what it states.
8       Q.  If you had been paying attention,
9    you would have known from Exhibit 19 that
10   on application Number 1 payment had been
11   approved for $155,000, correct?
12          MR. SEIDEN: Objection to the
13       form.
14      A. Could you rephrase that, please.
15      Q.  You knew from Exhibit 19 that
16   $155,000 had been paid on requisition Number
17   1 submitted by Marlin?
18      A. Not necessarily true.
19      Q.  Why not?
20      A. Dollars were not my
21   responsibility.
22      Q.  If you had been looking at
23   dollars, you would have known that $155,000
24   was paid on application Number 1, correct?
25          MR. SEIDEN: Objection.
```

Page 295

```
1              Martino
2    Hypothetical.
3       A. Yes.
4       Q.  And when you say dollars were not
5    your responsibility, why was that?
6       A. Because it was the responsibility
7    of Bob Beacher.
8       Q.  Would it be fair to say that you
9    did not pay attention to dollars on the
10   payment requisitions that you signed?
11          MR. SEIDEN: Objection to form.
12      A. Are you speaking specific about
13   Jupiter now?
14      Q.  No, all of them. All of them for
15   Crown.
16      A. Restate that, please.
17      Q.  Would it be fair to say that you
18   did not pay attention to the dollar amounts
19   on the payment requisitions that you
20   signed?
21      A. No. That is not a true
22   statement.
23      Q.  In some cases you did pay
24   attention to the dollar amounts?
25      A. When it was my responsibility.
```

19 (Pages 292 to 295)

Page 308

```
1            Martino
2      A.  Yes, when it became my
3  responsibility.
4      Q.  And that was somewhere in the
5  January and February 2001 time frame?
6      A.  That is correct.
7      Q.  When you assumed responsibility
8  for the payment applications, did you
9  review the prior payment applications that
10 had been approved earlier?  I didn't say
11 that very well.  Let me restate that.
12     In January or February 2001, did
13 you look back at the earlier pay
14 requisitions for the Jupiter job?
15     (Interruption in proceedings.)
16     A.  I would say what I did was once I
17 took over responsibility at that point in
18 time, when the first pay reqs came in, I
19 contacted Bob to find out where he left
20 off.
21     MR. SEIDEN: Let's take a break
22 for a second.
23     (A recess was taken.)
24     Q.  Did you ever have any discussions
25 about payment requisitions on the Miami
```

Page 309

```
1            Martino
2  project with Richard Waas?
3      A.  I don't recall, no.
4      Q.  Do you remember any discussions
5  with Richard Waas regarding the Miami
6  project?
7      A.  Sure.
8      Q.  How many conversations did you
9  have with Mr. Waas?
10     A.  I don't recall that, Mr. Schaner.
11     Q.  How often did you talk with
12 Mr. Waas about the Miami project?
13     A.  I don't recall that either.
14     Q.  Did you have conversations with
15 him throughout the process?
16     A.  Yes.
17     Q.  Did you have conversations with
18 anybody at Coastal regarding the Jupiter
19 projects?
20     A.  Yes.
21     Q.  Who at Coastal?
22     A.  I remember speaking to a Jeff
23 Lee.  I remember speaking to a Goran
24 Justina.  Don't ask me to spell his last
25 name.  There was a Chuck Dennis and a
```

Page 310

```
1            Martino
2  Dennis Jardan.  Those are the individuals
3  from Coastal that I recall that I spoke to.
4      Q.  How often did you speak to
5  Mr. Lee?
6      A.  Mr. Jeff Lee?
7      Q.  Yes.
8      A.  I don't recall.
9      Q.  Did you speak with him throughout
10 the course of the project?
11     A.  No.  I don't think he was
12 involved at the beginning of the project.
13     Q.  Did you speak with him about the
14 payment applications?
15     A.  Yes.  When it became my
16 responsibility, yes.
17     Q.  What did you and Mr. Lee discuss
18 regarding the payment applications?
19     A.  I don't recall exactly what we
20 discussed.
21     Q.  Do you recall any of your
22 discussions with Mr. Lee?
23     A.  We discussed a lot of change
24 orders.
25     Q.  Do you recall discussing anything
```

Page 311

```
1            Martino
2  else with Mr. Lee?
3      A.  Not off the top of my head, no.
4      Q.  Did you discuss payment
5  applications with Mr. Waas on the Miami
6  job?
7      A.  I don't recall doing that, no.
8      Q.  You did architectural work for
9  Crown Theatres on a project in Annapolis
10 Maryland, correct?
11     A.  Yes, sir.
12     Q.  What was the project?
13     A.  It was an addition to the mall.
14     Q.  Was it in what was called the
15 Annapolis Mall?
16     A.  That is correct.
17     Q.  Was the landlord on the projects
18 Westfield Corporation?
19     A.  Yes.
20     Q.  And Crown Theatres had a general
21 contractor?
22     A.  Yes.
23     Q.  Who was Crown Theatres' general
24 contractor for the Annapolis contract?
25     A.  Heffner & Weber.
```

23 (Pages 308 to 311)

Page 352

```
1              Martino
2      identification, this date.)
3      Q.  We are back from lunch.
4          Mr. Martino, you have before you
5  Exhibit 36.
6          Is that your signature on the
7  bottom right-hand corner of the document?
8      A.  On this photocopy, yes, that's my
9  signature.
10     Q.  You signed on July 6, 2000,
11 correct?
12     A.  That is correct.
13     Q.  This is an application for
14 payment from Tiger Contracting for work on
15 the Skokie project for the period July 1,
16 2000, correct?
17     A.  Yes.
18     Q.  It certifies payment in the
19 amount of $357,329, correct?
20     A.  Yes.
21     Q.  Mr. Martino, you will note that
22 the signature line for the contractor is
23 blank, correct?
24     A.  Yes.
25     Q.  Why did you sign the document in
```

Page 353

```
1              Martino
2  light of the fact that the signature line
3  for the contractor is blank?
4      A.  Because I relied upon the
5  signature from Bob Beacher that he executed
6  it and authorized it.
7      Q.  Would it be fair to say that it
8  was not proper for you to sign Exhibit 36
9  given that the contractor had not signed?
10         MR. SEIDEN:  Objection to the
11 form.
12         MR. WISSER:  Objection to the
13 form.
14     A.  No, it would not be fair to say
15 that.
16     Q.  Has it been your practice as an
17 architect to sign payment requisitions
18 where the contractor submitting the payment
19 application has not signed the document?
20         MR. SEIDEN:  Objection to form.
21     A.  Could you ask that question
22 again, please?
23         MR. SCHANER:  Can we have the
24 question read back.
25         (A portion of the record was read.)
```

Page 354

```
1              Martino
2      A.  No.
3          MR. SCHANER:  Let's mark this as
4  Martino Exhibit 37.
5          (Document marked Martino 37 for
6  identification, this date.)
7          MR. SEIDEN:  The witness has
8  pointed out with respect to Martino 36,
9  as with certain other exhibits, it is a
10 single page without any continuation
11 sheet; and we don't know whether there
12 was a continuation sheet or not with
13 respect to this document, whether 36 is
14 a true and correct copy of what was
15 Tiger application Number 3.
16     Q.  You signed Exhibit 37, correct?
17     A.  This photocopy has my signature
18 on it, yes.
19     Q.  And you signed it on August 2nd,
20 2000?
21     A.  Yes.
22     Q.  Exhibit 37 is a payment
23 requisition submitted by Tiger Contracting.
24 It is application Number 4 for the period
25 August 1, 2000, correct?
```

Page 355

```
1              Martino
2      A.  Yes.
3      Q.  It certifies payment in the
4  amount of $54,929?
5      A.  No.
6      Q.  What amount does Exhibit 37
7  certify payment in?
8      A.  $545,929.
9      Q.  If I misspoke I apologize.
10     A.  You did.
11     Q.  Now, you signed on August 2nd,
12 2000.
13         When was your last visit to the
14 Skokie site before signing Exhibit 37?
15     A.  Referring to this document, it
16 says May 16, 2000.
17     Q.  And you are referring to Exhibit
18 3?
19     A.  Yes, sir.
20         MR. SCHANER:  Mark this please as
21 Exhibit 38.
22         (Document marked Martino 38 for
23 identification, this date.)
24     Q.  Exhibit 38 is Tiger Contracting's
25 application Number 5 for payment for work
```

34 (Pages 352 to 355)

Page 356

1          Martino
2  on the Skokie project, correct?
3       A. Yes.
4       Q. And it is for the period to
5  September 1, 2000?
6       A. Yes.
7       Q. That's your signature in the
8  lower right-hand corner?
9       A. On this photocopy, yes.
10      Q. And you signed on September 7,
11 2000?
12      A. Yes.
13      MR. SCHANER: Let's mark this as
14 Exhibit 39.
15      A. I would like to point out again
16 it is a single page.
17      (Discussion off the record.)
18      (Document marked Martino 39 for
19      identification, this date.)
20      Q. Mr. Martino, did you sign Exhibit
21 39 on the front page in the lower
22 right-hand corner?
23      A. That's my signature on this
24 photocopy, yes.
25      Q. And you signed Exhibit 39 on

Page 357

1          Martino
2  September 14, 2000?
3       A. That is correct.
4       Q. Exhibit 39 is application Number
5  5-A for payment submitted by Tiger
6  Contracting for work on the Skokie project,
7  correct?
8       A. Correct.
9       Q. It is for the period September 1,
10 2000?
11      A. Yes.
12      Q. Exhibit 39 certifies payment to
13 Tiger of $181,495?
14      A. Yes.
15      Q. Turn to the continuation sheet
16 which is the second page.
17      There are nine change orders
18 listed under the description of work.
19      A. Yes.
20      Q. Who approved these change orders?
21      A. Bob did.
22      Q. Bob Beacher?
23      A. Yes.
24      Q. Did you have any involvement in
25 the approval of change orders on the Skokie

Page 358

1          Martino
2  project?
3       A. Yes.
4       Q. What was your involvement?
5       A. Around January or February of
6  2001, I assumed the responsibilities for
7  the Jupiter and Skokie projects, and that's
8  when I had involvement in terms of change
9  orders to the end of the project.
10      Q. Did you have involvement with
11 change orders on the Jupiter or Skokie
12 project before January or February of 2001?
13      A. No.
14      Q. The nine change orders that are
15 referenced on Exhibit 39, what are they
16 for?
17      A. I don't know.
18      Q. Did you make a determination as
19 the work had progressed as indicated with
20 respect to the nine change orders?
21      A. Yes, I did.
22      Q. How did you make that
23 determination?
24      A. I can't answer that today.
25      Q. Who did the work that is

Page 359

1          Martino
2  reflected in the nine change orders on
3  Exhibit 39?
4       A. I don't know that either.
5       Q. Do you know if any work was in
6  fact performed?
7       A. Not while I am sitting here
8  today.
9       Q. Did you ever discuss Tiger's
10 payment applications with Bob Beacher?
11      A. I don't recall.
12      Q. Did you ever discuss Tiger's
13 payment applications with Milton Daly?
14      A. I don't recall that either.
15      Q. Did you discuss Tiger's payment
16 applications with anybody from E.W. Howell?
17      A. I don't recall that either.
18      Q. You performed architectural
19 services in connection with a movie theater
20 project of Crown Theatres in Hartford,
21 Connecticut?
22      A. Yes, sir, we did.
23      Q. What was the project?
24      A. It was a new free-standing
25 multi-movie theater complex.

35 (Pages 356 to 359)