## Page 1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 3:02 CV 2272 AVC


CROWN THEATRES, LP,
    Plaintiff,
vs.
MILTON L. DALY, ANNE E. DALY,
TAYLOR-LEIGH, INC., JAMES C. CELLA, GUS
DEVELOPMENT, INC., JAMES T. MARTINO, JAMES
THOMAS MARTINO, ARCHITECT, PC, and RCD
HUDSON, LLC,
    Defendants.
------------------------x


DEPOSITION OF RICHARD WAAS

    Wednesday, February 4, 2004
    10:30 a.m. - 1:30 p.m.
    2:00 p.m. - 2:35 p.m.
    5582 N.W. 79th Avenue
    Miami, Florida 33166


Reported by: Sherilynn McKay, RMR, CRR
Notary Public, State of Florida
Esquire Deposition Services
North Miami Office  Job No. 606195
Phone (305)651-0706
```

## Page 2

```
             APPEARANCES

For the Plaintiff:
    JENNER & BLOCK, LLP
    By: LAWRENCE S. SCHANER, ESQ.
    One IBM Plaza
    Chicago, Illinois 60611-7603


For the Defendants Daly and Taylor-Leigh:
    WEINSTEIN & WISSER, PC
    By: KERRY MARC WISSER, ESQ.
    Suite 207
    29 South Main Street
    West Hartford, Connecticut 06107

For the Defendants Martino:
    MILBER, MAKRIS, PLOUSADIS & SEIDEN, LLP
    By: MARISA LANZA, ESQ.
    Suite 200
    108 Corporate Park Drive
    White Plains, New York 10604

For the Witness:
    LEIBY, TAYLOR, STEARNS, LINKHORST &
        ROBERTS, P.A.
    By: DOUGLAS J. ROBERTS, ESQ.
    1390 North University Drive
    Fort Lauderdale, Florida 33322


         ALSO PRESENT
         Peter Steffian
         Steffian Bradley Architects
```

## Page 3

```
                INDEX

WITNESS                                     PAGE
RICHARD WAAS
  DIRECT EXAMINATION BY MR. SCHANER            4
  CROSS-EXAMINATION BY MR. WISSER             55
  CROSS-EXAMINATION BY MS. LANZA              99
  REDIRECT EXAMINATION BY MR. SCHANER        118


              ---


              EXHIBITS
                                            PAGE
Deposition Exhibit No. 1                      7
Deposition Exhibit No. 2                     18
Deposition Exhibit No. 3                     24
Deposition Exhibit No. 4                     27
Deposition Exhibit No. 5                     34
Deposition Exhibit No. 6                     40
Deposition Exhibit No. 7                     41
Deposition Exhibit No. 8                     42
Deposition Exhibit No. 9                     44
Deposition Exhibit No. 10                    46
Deposition Exhibit No. 11                    47
Deposition Exhibit No. 12                    50
Deposition Exhibit No. 13                    51
Deposition Exhibit No. 14                    52
Deposition Exhibit No. 15                    54
Deposition Exhibit No. 16                    76
```

## Page 4

                    RICHARD WAAS
was called as a witness by the Plaintiff, and
having been first duly sworn, testified as
follows:
    THE WITNESS: Yes, I do.
        DIRECT EXAMINATION
BY MR. SCHANER:
   Q   Mr. Waas, good morning. My name is Lawrence
Schaner. I represent Crown Theatres, LP, the plaintiff
in this case. And at the beginning, let me tell you a
few things about today's deposition. You understand
that you are answering questions under oath?
   A   Yes.
   Q   It is important that you understand my
question, so if I ask you a question that you don't
understand, please let me know and I will try to
rephrase it or clear it up for you. Okay?
   A   I understand.
   Q   It is also important, because we're making a
written record, that only one of us speak at a time, so
that the court reporter can get it down. Okay?
   A   (Nods head in the affirmative.) No problem.
   Q   And it's also important that your answers be
audible. No nods of the head or shrugs of the
shoulder, that kind of thing. All right?

Page 5

1  A  No problem.
2  Q  And if at some time today you'd like to take a
3  break, and we will take breaks from time to time, but
4  if there is a time you would like to take a break, just
5  let me know, and we'll take a break.
6  A  I understand.
7  Q  Please, for the record, state your full name.
8  A  Richard Michael Waas, w-A-A-S.
9  Q  How old are you, Mr. Waas?
10 A  Fifty-two.
11 Q  Are you currently employed?
12 A  I'm president of Waas Construction Company,
13 Inc.
14 Q  How long have you been the president of Waas
15 Construction Company?
16 A  I was president of Waas Construction Company,
17 Inc., from 1973 until 1990, when there was a name
18 change, to Waas Phillips Construction Company, Inc.  In
19 1996 I sold that company, and restarted Waas
20 Construction Company, Inc., again, and I've been
21 president until the present.
22 Q  Was Waas Construction formed originally in
23 1973?
24 A  Yes.
25 Q  Where is Waas Construction located?

Page 6

1  A  At 5582 N.W. 79th Avenue, Miami, Florida,
2  33176.
3  Q  What kinds of work does Waas Construction
4  perform?
5  A  Waas Construction Company is a general
6  contractor, performing mostly commercial construction.
7  Q  In what area or areas does Waas Construction
8  Company work?
9  A  We have worked throughout the entire state of
10 Florida.
11 Q  How many years of experience do you, Mr. Waas,
12 have in the construction business?
13 A  Over 30 years.
14 Q  Before forming Waas in 1973, did you have
15 experience in the construction industry?
16 A  Yes.
17 Q  What did you do?
18 A  I started as a laborer, worked myself up to a
19 carpenter, then was a subcontractor for a short period
20 of time, and then became a general contractor.
21 Q  What's your educational background?
22 A  I finished approximately three and a half
23 years at the University of Miami.
24 Q  Now, our lawsuit concerns a case brought by
25 Crown Theatres.  Have you, Mr. Waas, ever done work for

Page 7

1  Crown Theatres?
2  A  Yes, I have.
3  Q  What work have you performed for Crown?
4  A  We were the general contractors that were
5  hired to build the Grand 18 in Miami Lakes.
6  Q  And what was the Grand 18?
7  A  It was an 18-screen movie theater.
8  Q  And where in Miami Lakes was the theater
9  located?
10 A  Approximately --
11 Q  Let me rephrase the question.  Was it in a
12 shopping center?
13 A  It was in a future shopping center site, but
14 it was the first building to be built in that area.
15 Q  Who was the architect for the Miami Lakes
16 theater project?
17 A  James Martino.
18 Q  Was there a landlord or a developer on that
19 project?
20 A  The developer of the property was Benderson
21 Development.
22    MR. SCHANER:  I'd like to mark this as
23 Exhibit 1.
24    (Deposition Exhibit No. 1 was marked
25 for identification.)

Page 8

1  BY MR. SCHANER:
2  Q  Mr. Waas, you have before you what we've
3  marked as Waas Deposition Exhibit No. 1.  Do you
4  recognize it?
5  A  It appears to be the contract between Waas
6  Construction and Crown Theatres LP.
7  Q  Can you turn to the signature page for me,
8  which appears to be page 7 in the first section.  Are
9  you there?
10 A  Yes.
11 Q  Do you recognize your signature?
12 A  Yes.
13 Q  Can you tell me the date that appeared under
14 that?
15 A  9-28-99.
16 Q  And if you look at the front of the exhibit,
17 it says the agreement was made as of the 28th day of
18 September 1999.  When, Mr. Waas, did you begin
19 performing work under this agreement?
20 A  Approximately October 1st of 1999.
21 Q  And to which project does Exhibit No. 1
22 relate?
23 A  It says the 18-screen multiplex theater on Red
24 Road, Miami Gardens, Florida.
25 Q  That's the Miami Lakes project that you were

Page 29

1   Q   Were you aware of any contract between Crown
2   Theatres and Marlin Contacting?
3   A   No.
4   Q   Did Marlin Contracting perform any site
5   preparation work on the Miami Lakes theater project?
6   A   Not to my knowledge.
7   Q   If someone had performed $700,000 of site
8   preparation work on the Miami Lakes theater project, do
9   you think that you would have known?
10       MR. WISSER: Objection to the form.
11       MS. LANZA: Objection to the form.
12       MR. WISSER: Are we talking within inside
13   the five feet of the envelope of the building
14   that he was working on or outside? Or both?
15       MR. SCHANER: Let's ask both.
16       THE WITNESS: I would have known if there
17   was another contractor or the job.
18  BY MR. SCHANER:
19   Q   Why is that?
20   A   We were there all the time. We knew exactly
21  who was doing business out there, and we were -- if
22  they weren't working for me, we knew exactly who
23  Benderson was working for, because we were in close
24  contact with Benderson at all times, and -- I'm trying
25  to think of the gentleman's name who was the

Page 30

1   representative from Benderson.
2   Q   Was it Bob Spanos?
3   A   Bob Spanos. He informed me of who all his
4   subcontractors were to coordinate with them, and of
5   course we saw who was working on the job. You have to
6   have your trucks, your equipment, whoever, you know,
7   labeled, with the name. And American Engineering did
8   all the site work for Benderson.
9   Q   Mr. Waas, have you ever met James Martino?
10   A   Yes, a few times.
11   Q   And you said before that he was the architect
12  on the Miami Lakes project?
13   A   Yes.
14   Q   Did he visit the Miami Lakes job site?
15   A   A couple of times.
16   Q   What's your best estimate as to the number of
17  times he was there?
18       MR. WISSER: Just objection to the form.
19   You mean Mr. Martino individually?
20       MR. SCHANER: Yes.
21       MR. WISSER: As opposed to anyone from
22   his firm?
23       MR. SCHANER: Yes.
24       THE WITNESS: I would have to say three,
25   maybe four times. My best guesstimate.

Page 31

1   BY MR. SCHANER:
2   Q   Did you ever meet Milton Daly?
3   A   Yes.
4   Q   Who is Mr. Daly?
5   A   My understanding was he was the
6   vice-president, chief operating officer, or CE, or
7   chief executive officer -- I'm not sure which -- for
8   Crown Theatres.
9   Q   Did you have conversations with Mr. Daly
10  regarding work on the Miami project?
11   A   Yes.
12   Q   How many?
13   A   Many of them.
14   Q   How frequently did you speak with Mr. Daly?
15   A   I would say as the project went on, more
16  often, but probably at the beginning maybe once every
17  couple of weeks.
18   Q   What topics did you discuss with Mr. Daly in
19  your conversations?
20   A   Usually my relationship with Bob Beacher.
21   Q   What is it about your relationship with
22  Mr. Beacher that you conveyed to Mr. Daly?
23   A   Well, I would say, to put it nicely, I'd never
24  met an individual like Bob. And especially as the
25  project wore on, I thought he was extremely disruptive

Page 32

1   to the project, and was causing more problems than he
2   was worth out there.
3   Q   Did your discussions with Mr. Daly include
4   details of the work that was being performed on the
5   job?
6   A   Occasionally he would ask me where we stood.
7   Q   And would you update him?
8   A   Yes.
9   Q   Did Mr. Daly make visits to the Miami Lakes
10  theater job sites?
11   A   I believe Mr. Daly came down also three, maybe
12  four times, to my recollection.
13   Q   When Mr. Daily visited, what did he do?
14   A   He came down at the beginning of the project,
15  before we were getting started, and he would walk the
16  site. I know he came down in the middle of the
17  project, I think a couple of times, to walk the site.
18  And then at the grand opening he was there, and that
19  few days prior to the grand opening.
20   Q   Were you with him when he walked the site?
21   A   Yes and no. Sometimes with him, sometimes he
22  went off with Bob.
23   Q   Did anyone else make the trip when he came
24  down?
25   A   I don't know if they came with him. I know

Esquire Deposition Services - (305)371-2713

Page 117

1  concession stands, except the installation of them.
2      Q  Did Waas Construction place any liens on the
3  property?
4      A  Waas Construction did not place any liens on
5  the property.
6      Q  Do you know of any subs retained by Waas who
7  placed liens on the project?
8      A  Oh, yes.
9      Q  Can you tell me which subs placed liens on the
10 property?
11     A  I'd have to get out a file folder. I believe
12 we probably settled 15, 20 lien cases, if I can defer
13 to my attorney.
14     MR. ROBERTS: I'm not under oath.
15 BY MS. LANZA:
16     Q  Were all those lien cases for nonpayment to
17 subcontractors?
18     MR. ROBERTS: Object to the form.
19     A  Yes, they were looking for money.
20     Q  And when you say about 15 or 20 lien cases
21 were settled, settled by whom?
22     A  Well, they were either settled outright or we
23 had to go to court on those, and Waas Construction
24 resolved those.
25     Q  Did Crown Theatres, did they become involved

Page 118

1  in settling any of those liens.
2      A  They were kept informed on all the lien cases,
3  and where it involved them, and monies that they needed
4  to ante up, they were involved. But that was the only
5  extent. The majority was all handled through Waas
6  Construction.
7      Q  Of the 15 or 20 lien cases that we're speaking
8  about, how many were actually paid by Crown?
9      A  I can't give you a number. I don't know.
10     Q  But at least one was paid directly by Crown?
11     A  I remember there were some funds that came
12 from Crown on maybe one or two of the cases, but I'd
13 have to go back and check my files, because that
14 monies, I don't know if these were additional monies
15 that Crown paid out or it came out of what they owed
16 me. I believe it came out of what they owed me, but
17 they were involved in them.
18     MS. LANZA: I don't have anything else.
19     MR. SCHANER: I have a couple of
20     follow-up questions.
21     (Recess taken.)
22         REDIRECT EXAMINATION
23 BY MR. SCHANER:
24     Q  Mr. Waas, when Mr. Martino made visits to the
25 Miami job site, did you and he have conversations?

Page 119

1      A  Yes.
2      Q  What subjects did you discuss?
3      A  In most instances it was construction related.
4  There was some sort of, you know, talk about, you know,
5  how's the weather up north, you know, that type of
6  thing. But mostly they were construction-related.
7          In some instances it had to do with, you know,
8  Bob Beacher, but I learned my lesson early on, because
9  Jim would immediately run back to Bob and say, "Richard
10 said this and Richard said that," and within 5 minutes
11 after my conversation, you know, I was getting a phone
12 call from Bob Beacher, 'I understand you're talking
13 about me." So I learned to keep my mouth shut. From
14 then on it was strictly construction.
15     Q  Did you go through AIA G702 requisitions with
16 Jim Martino when he was visiting the site?
17     A  No.
18     Q  You mentioned that a guy name Gary Schiede
19 came and made some site visits.
20     A  Yes.
21     Q  Did you and Mr. Schiede go through AIA G702
22 requisition forms?
23     A  No.
24     Q  I'd like to clarify something, because I'm not
25 sure the record is clear on this right now. After

Page 120

1  Mr. Beacher told you about the change order procedure
2  that should be used on the job -- and as I understand
3  it, you were going to send the change orders directly
4  to Mr. Beacher. Is that right?
5      A  Correct.
6      Q  After you had the conversation with him about
7  the procedure, did you mention the procedure to
8  Mr. Daly?
9      A  I don't remember specifically.
10     Q  You said when I asked you questions that
11 Mr. Daly at some point told you that you should do what
12 Mr. Beacher tells you to do. In what context did
13 Mr. Daly make that statement?
14     A  That was at the beginning of the project,
15 during negotiations of the contract, and it was about,
16 you know, the third to halfway through the project he
17 reiterated again when -- when I was having problems
18 with Bob. And he would tell me, "Bob is in charge, Bob
19 is running the show, do you what Bob tells you to do."
20 And I'm paraphrasing. Those aren't his exact words,
21 but that was the gist that I got. I'd say, "Okay, I'll
22 listen to what Bob has to say:
23     MR. SCHANER: That's all I have. Thank
24     you.
25     MR. WISSER: Nothing further. Thank you

30 (Pages 117 to 120)