LEXSEE 2002 CONN. SUPER. LEXIS 3580

### Digicomm, Inc. v. AR Robinson Printing et al.

### CV000073629S

### SUPERIOR COURT OF CONNECTICUT, JUDICIAL DISTRICT OF ANSONIA - MILFORD, AT MILFORD

*2002 Conn. Super. LEXIS 3580*

**November 5, 2002, Decided**
**November 7, 2002, Filed**

**NOTICE: [*1]** THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

**LexisNexis (TM) HEADNOTES - Core Concepts:**

**JUDGES:** CUTSUMPAS, J.

**OPINIONBY:** CUTSUMPAS

**OPINION:** MEMORANDUM OF DECISION

This matter, which concerns the plaintiffs' claims and the defendants' special defenses and counterclaims, was tried to the court on June 14, 2002. The plaintiff is Digicomm, Inc. (Digicomm), a Connecticut corporation providing copier repair and maintenance services. The defendants are AR Robinson Printing (AR Printing), a company providing printing services to individual and corporate clients, and Alvin Robinson, the owner and sole employee of AR Printing. Both parties filed post-trial briefs, the last of which was filed on June 28, 2002. After considering the evidence and the arguments of the parties, the court issues this decision.

### PROCEDURAL HISTORY

On March 14, 2001, Digicomm filed a two-count complaint against the defendants.

Count one of the complaint alleges that AR Printing breached a general equipment maintenance agreement by failing to make monthly payments as required under the contract. The second count alleges that Robinson breached [*2] a personal guaranty by failing to pay all of AR Printing's contractual obligations. Digicomm seeks money damages, interest, costs, attorneys fees, and any other relief the court deems necessary.

On April 10, 2001, the defendants responded by filing an answer, three special defenses, and three counterclaims. In the first special defense, the defendants allege all monies owed by AR Printing have been paid. In the second special defense, the defendants allege that an accord was reached between Digicomm and Robinson, and that Robinson satisfied the accord by a check, dated May 23, 2000, in the amount of $ 424.50. The final special defense alleges that Digicomm breached the contract with AR Printing thereby excusing the defendants from further performance.

As explained, the defendants also filed three counterclaims. The first counterclaim alleges that Digicomm breached the contract by not providing the copier services required under the contract. The second counterclaim alleges that Digicomm breached the implied covenant of good faith and fair dealing by failing to perform its obligations under the contract. Finally, the third counterclaim alleges that Digicomm violated the Connecticut [*3] Unfair Trade Practices Act (CUTPA) by seeking payment for services that it has not provided.

The defendants seek compensatory damages, punitive damages, attorneys fees, and any other relief the court deems necessary.

On May 23, 2001, Digicomm filed a reply to the defendants' special defenses and an answer to the defendants' counterclaims. No special defenses were pleaded in response to the counterclaims.

Digicomm certified that the pleadings were closed on July 20, 2001. The matter was then placed on the assignment of court cases calendar. Nevertheless, on September 25, 2001, the parties did not appear at the call of the calendar and judgment of dismissal was entered (Alander, J.). On October 16, 2001, Digicomm filed a motion to set aside the judgment and the court granted the motion ten days later on October 26, 2001 (Alander, J.). The case then proceeded to trial before this court on June 14, 2002.

FACTS

The court finds the following facts. On March 30, 1998, Digicomm entered into a General Equipment Maintenance Agreement with AR Printing. (Exhibit 1.) Under the terms of the contract, Digicomm agreed to provide copier maintenance and repair services to AR [*4] Printing for a five-year term, ending in February 2003. (Exhibit 1, P1.) In exchange, AR Printing agreed to pay Digicomm $ 212.25 per month. (Exhibit 1.) Alvin Robinson, the owner and sole employee of AR Printing, personally guaranteed payment of all sums and performance of all obligations of AR Printing. (Exhibit 1, P22.)

On October 8, 1999, Robinson made a service call into Digicomm because his copier, a Kodak 90SS, was making inadequate copies. A serviceman from Digicomm, William Figueroa, arrived to inspect the copier on October 12, 1999. Figueroa, however, was unable to remedy the problem.

The parties agreed that because Digicomm was unable to fix the copier, Digicomm would provide AR Printing with a replacement copier while Digicomm attempted to find AR Printing another Kodak 90SS. On November 12, 1999, exactly one month after Figueroa had inspected AR Printing's copier, Digicomm installed a Cannon 6050 copier in the office of AR Printing. Robinson did not have any difficulties with the Cannon 6050 and found it to be a superior copier to the Kodak 90SS. On December 17, 1999, however, the plaintiff again entered the office of AR Printing and replaced the Cannon 6050 [*5] with a Cannon 8530 copier. The new copier produced inadequate copies. On January 5, 2000, Danzas, a client of AR Printing, terminated its employment of AR Printing because of "poor copier services, incomplete and untimely training manuals, and the printing quality." (Exhibit D.) One day later, on January 6, 2000, AR

Printing purchased a new copier at the cost of $ 13,550. (Exhibit G.) Soon afterwards, on February 16, 2000, the plaintiff, having found a replacement Kodak 90SS for AR Printing, replaced the Cannon 8530 with the Kodak 90SS. (Exhibit F.) The new printer, however, also produced inadequate copies.

AR Printing continued to pay Digicomm any sums owing under the contract until January 2000. In April of 2000, Robinson called Digicomm to put in a service request. Digicomm, through its president, John Skorupinski, refused to provide any services as AR Printing had not paid any invoices since December of 1999. The parties agreed, however, that if AR Printing paid Digicomm $ 424.50, Digicomm would service the copier. On May 23, 2000, Skorupinski arrived at AR Printing's office to service the copier, and at that time, Robinson presented Digicomm with a $ 424.50 check. (Exhibit [*6] K.) Since then, no payments have been made to Digicomm and no services have been rendered to AR Printing.

DISCUSSION

I. Breach of Contract and Breach of Guaranty

Digicomm alleges that AR Printing breached the contract and that Robinson breached the guaranty. Specifically, Digicomm argues that AR Printing breached the contract by not promptly paying invoices for December 1999 and January 2000. Furthermore, Digicomm argues that AR Printing breached the contract because it has failed to pay any invoices since May 2000.

Digicomm also alleges that Robinson breached the personal guaranty contained in the contract. Digicomm argues that Robinson breached the guaranty by refusing to pay the debt owed by AR Printing under the contract.

The defendants, however, allege that Digicomm was the one who breached the contract. Specifically, the defendants argue that Digicomm did not fully perform its obligations because it failed to maintain the original Kodak 90SS and to provide an adequate replacement copier.

In addition, Robinson alleges he has not breached the guaranty. He argues that Digicomm's breach excused him of any duty to pay.

This court must therefore decide [*7] which party, if any, has breached the contract. "In a civil case, the general burden of proof rests upon the plaintiff." (Internal quotation marks omitted.) *Somers v. LeVasseur, 230 Conn. 560, 568, 645 A.2d 993 (1994).* "[A] breach of

contract claim . . . requires proof by a preponderance of the evidence." *Foley v. Huntington Company, 42 Conn. App. 712, 746, 682 A.2d 1026,* cert. denied, *239 Conn. 931, 683 A.2d 397 (1996)* citing *Waicunas v. Macari, 151 Conn. 134, 137, 193 A.2d 709 (1963).* Our Supreme Court has stated that the preponderance of the evidence test "means simply that the evidence must, when considered fairly and impartially, induce a reasonable belief that the fact in issue is true." (Internal quotation marks omitted.) *State v. Warren, 169 Conn. 207, 213, 363 A.2d 91 (1975).* "The key elements of a breach of contract action are: (1) the formation of an agreement; (2) performance by one party; (3) breach of the agreement by the other party and (4) damages." (Internal quotation marks omitted.) *Alcoa Composites, Inc. v. Bonded Technologies, Inc.,* Superior Court, judicial district of Middlesex [*8] at Middletown, Docket No. 093208 (May 2, 2002, Wolven, J.).

The court finds that the defendants have met their burden. The parties do not dispute the existence of a valid agreement. According to the language of the contract, Digicomm agreed to "perform any machine adjustment and/or replacement of parts necessary to repair equipment," and to "perform any necessary periodic maintenance that is required." (Exhibit 1, P1.) In exchange, AR Printing agreed to pay Digicomm $ 212.25 per month. (Exhibit 1.) Additionally, Robinson agreed to guarantee "payment of all sums and performance of all obligations of AR Robinson Printing . . ." (Exhibit 1, P22.)

Furthermore, the evidence and testimony demonstrates that AR Printing fully performed its obligation of paying Digicomm $ 212.25 per month. The plaintiffs do not dispute the fact that AR Printing paid all of its invoices on time through December 1999. In fact, the defendants presented copies of canceled checks from February 1999 through December 1999, which show that AR Printing was paying its invoices in a timely fashion. (Exhibit C.) Furthermore, Robinson made a payment of $ 424.25 to Digicomm on May 23, 2000. (Exhibit K.) These payments [*9] were for invoices covering the months of December 1999 and January 2000.

Although AR Printing has not paid any invoices submitted after February 2000, Digicomm had breached the contract prior to February 2000. Robinson testified that he began having trouble with the original Kodak 90SS in early October 1999. In support of this testimony, the defendants presented copies made by Figueroa when inspecting the Kodak 90SS on October 12, 1999. (Exhibit A.) The copies were blurry and faded. (Exhibit A.) Digicomm did not provide AR Printing with a replacement copier until November 12, 1999--a full

month later. Although the replacement copier, a Cannon 6050, produced adequate copies, Digicomm replaced it with a Cannon 8030 on December 17, 1999. According to Robinson, however, the Cannon 8030 produced inadequate copies. Digicomm did not replace the Cannon 8030 until February 16, 2000--a full two months later. Even when Digicomm did replace the Cannon 8030, the copier needed parts. (Exhibit H.) Moreover, on the day the replacement copier, a Kodak 90SS was installed, Robinson made a notation of the service receipt that the copy quality was inadequate. (Exhibit H.) The court therefore finds [*10] that there was a valid agreement, that AR Printing fully performed its obligations, and that Digicomm breached the contract. n1

> n1 The plaintiff cites to additional evidence that addresses whether the replacement Kodak 90SS produced adequate copies. Invoices reveal that AR Printing made 6,548 copies in March of 2000 and 6,121 copies in May of 2000. (Exhibit 4.) Nevertheless, these invoices do not demonstrate the quality of the copies being produced or the purposes for which the copies were made. Thus, the invoices do not conclusively demonstrate that the replacement Kodak 90SS produced adequate copies.

The defendants, however, are not yet done. They must still prove damages. The defendants argue that they indeed have suffered damages because they lost profits by virtue of the Training and Service Department of Danzas Intercontinental (Danzas) terminating its business relationship with the defendants. Furthermore, the defendants contend that they suffered damages because they were forced to buy a new copier [*11] at a cost of $ 13,515.00.

"The general rule in breach of contract cases is that the award of damages is designed to place the injured party, so far as can be done by money, in the same position as that which he would have been in had the contract been performed . . . It has traditionally been held that a party may recover general contract damages for any loss that may fairly and reasonably be considered [as] arising naturally, i.e., according to the usual course of things, from such breach of contract itself . . . This court has consistently applied the general damage formula of *Hadley v. Baxendale, [9 Ex. 341, 354, 156 Eng. Rep. 145 (1854),]* to the recovery of lost profits for breach of contract, and it is our rule that unless they are too speculative and remote, prospective profits are allowable as an element of damage whenever their loss arises directly from and as a natural consequence of the breach." (Internal quotation marks omitted.) *Torosyan v.*

*Boehringer Ingelheim Pharmaceuticals, Inc., 234 Conn. 1, 32, 662 A.2d 89 (1995).* "The usual recovery for breach of a contract is the contract price or the lost profits therefrom." *Gazo v. Stamford, 255 Conn. 245, 265, 765 A.2d 505 (2001).* **[*12]**

The defendants prove that they suffered damages. Robinson testified that AR Printing had been hired by Danzas to produce training manuals for its employees. Robinson further testified that because of Digicomm's failure to repair the Kodak 90SS, AR Printing was terminated by Danzas in January 2000. The termination letter, which was presented at trial, stated that Danzas was terminating AR Printing because of "poor copier service, Incompletion of training Manuals on time, and the printing quality." (Exhibit D.) The defendants also presented invoices showing that AR Printing provided Danzas with $ 17,574.73 in printing services in 1999. (Exhibit E.) Robinson also testified that he expected to receive more work from Danzas in 2000. Finally, Robinson testified that he had to buy a new copier as a result of Digicomm's breach. In support of this testimony, the defendants presented an invoice dated January 6, 2000, which shows that AR Printing paid $ 13,515 for a Canon 6050 copier. (Exhibit G.) The court therefore finds that the defendants have proven damages.

Despite proving damages, AR Printing cannot recover these amounts. The contract expressly provides: "Such damages, for which **[*13]** Digicomm will not be responsible, include but are not limited to, loss of revenue of profit, downtime costs, loss of use of equipment, cost of any substitute equipment, facilities, or services, or claims of your customers for such damages. This limitation of liability will not apply to claims for Injury to persons or damage to property cause by the sole negligence or default of Digicomm by persons under Its direction or control." (Exhibit 1, P16.)

"The contract in this case was a preprinted form. Courts have shown a tendency to hold contracts of this type [to be] against public policy when entered into by professional service providers in the course of dealing with the general public . . . Such provisions have been upheld, however, under appropriate conditions, such as the assent of both parties." (Citation omitted.) *Mattegat v. Klopfenstein, 50 Conn. App. 97, 103-04, 717 A.2d 276,* cert. denied, *247 Conn. 922, 722 A.2d 810 (1998)* (limitation of liability provision unenforceable because parties did not mutually assent). In this case, neither party alleges and no evidence has been presented that supports the proposition that the parties did not mutually **[*14]** assent to the provisions contained in the contract.

Furthermore, our Supreme Court has explained: "Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms." (Internal quotation marks omitted.) *OCI Mortgage Corp. v. Marchese, 255 Conn. 448, 466, 774 A.2d 940 (2001).* "When the intention conveyed by the terms of an agreement is clear and unambiguous, there is no room for construction." (Internal quotation marks omitted.) *Levine v. Massey, 232 Conn. 272, 278, 654 A.2d 737 (1995).* "It is axiomatic that a party is entitled to rely upon its written contract as the final integration of its rights and duties." *Id. at 279.* "Where there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law." (Internal quotation marks omitted.) *Tallmadge Bros. v. Iroquois Gas Transmission System, 252 Conn. 479, 495, 746 A.2d 1277 (2000).*

The defendants have not proven that Digicomm is liable for any damages under the contract. The defendants essentially argue that the loss of business from Danzas **[*15]** resulted in lost profits for AR Printing. The defendants also argue that they have paid monies for a new copier. The contract, however, limits Digicomm's liability for these types of damages. Thus, although the defendants proved each element of their breach of contract claim, Digicomm is not liable for any compensatory damages under the contract.

Digicomm also alleges that Robinson breached the personal guaranty that he made to Digicomm. Nevertheless, because AR Printing is not liable to Digicomm for breach of contract, Robinson accordingly is not liable to Digicomm for breach of guaranty. *Riverbend Executive Center, Inc. v. Modern Telecom,* Superior Court, judicial district of Stamford/Norwalk at Stamford, Docket No. 157888 (June 1, 2000, Mintz, J.).

II. Special Defenses

The defendant also raises three special defenses. Nevertheless, because the court has found that "the plaintiff has failed to sustain [its] burden of proof regarding any of the counts in [its] complaint . . . the court need not consider the special defenses raised by the defendant." *Pendarvis v. Harrison,* Superior Court, judicial district of New Haven, Docket No. 408681 (March 7, 2001, Pittman, **[*16]** J.).

III. Breach of Implied Covenant of Good Faith and Fair Dealing

The defendants further allege that Digicomm breached its implied covenant of good faith and fair dealing. Specifically, the defendants argue that despite having

breached the contract, Digicomm is acting in bad faith by virtue of its seeking extensive payment.

"Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement . . . Subterfuges and evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified. But the obligation goes further: bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. A complete catalogue of types of bad faith is impossible, but the following types are among those which have been recognized in judicial decisions: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

"To prove a claim for bad faith under Connecticut law, the [defendants are] required [*17] to prove that the [plaintiff] engaged in conduct design[ed] to mislead or to deceive . . . or a neglect or refusal to fulfill some duty or some contractual obligation not prompted by an honest mistake as to one's rights or duties . . . Bad faith is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity . . . it contemplates a state of mind affirmatively operating with furtive design or ill will . . . Moreover, bad faith is an indefinite term that contemplates a state of mind affirmatively operating with some design or motive of interest or ill will." (Citations omitted; internal quotation marks omitted.) *Elm St. Builders, Inc. v. Enter. Park Condo. Ass'n, 63 Conn. App. 657, 667-68, 778 A.2d 237 (2001).*

The defendants have not met their burden. The defendants have not provided any evidence to demonstrate that Digicomm consciously or purposely chose to evade its contractual obligations. In fact, this court finds that Digicomm honestly believed that it fulfilled its contractual obligations as it initiated this litigation by filing a breach of contract claim against [*18] the defendants. The court therefore finds that the defendants have not proven that Digicomm breached its duty of good faith and fair dealing.

IV. Connecticut Unfair Trade Practices Act

The defendants next allege that Digicomm has violated CUTPA. Specifically, the defendants contend that the act of Digicomm seeking extensive payments despite having breached the contract constitutes an unfair and deceptive trade practice under *General Statutes § 42-110b* et seq. n2

n2 *General Statutes § 42-110b(a)* provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

"In determining whether a practice violates CUTPA we have adopted the criteria set out in the cigarette rule by the federal trade commission for determining when a practice is unfair: (1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has [*19] been established by statutes, the common law, or otherwise--in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other business persons] . . . All three criteria do not need to be satisfied to support a finding of [a violation of CUTPA]." (Internal quotation marks omitted.) *Macomber v. Travelers Property & Casualty Corp., 261 Conn. 620, 644, 804 A.2d 180 (2002),* quoting *Hartford Electric Supply Co. v. Allen-Bradley Co., 250 Conn. 334, 367-68, 736 A.2d 824 (1999).*

"A majority of Superior Court cases support the claim that [a] simple breach or contract, even if intentional, does not amount to a violation of [CUTPA]; a [claimant] must show substantial aggravating circumstances to recover under the Act." (Internal quotation marks omitted.) *Petro v. K-mart Corporation,* Superior Court, judicial district of Waterbury, Docket No. 123768 (Oct. 6, 1997, Pellegrino, J.) (20 Conn. L. Rptr. 498), citing *Emlee Equipment Leasing Corp. v. Waterbury Transmission, Inc., 41 Conn.Sup. 575, 580, 595 A.2d 951;* [*20] see also *Bonnell v. United Parcel Service,* Superior Court, judicial district of Danbury, Docket No. 315927 (February 7, 1997 Grogins, J.) (18 Conn. L. Rptr. 646); *The Production Equipment Co. v. Blakeslee Arpaia Chapman, Inc.,* Superior Court, judicial district of New Haven at Meriden, Docket No. 247485 (January 3, 1996, Silbert, J.) (15 Conn. L. Rptr. 558); *LoMonte v. Rice,* Superior Court, judicial district of Hartford at New Britain, Docket No. 441735 (January 30, 1991, Aronson, J.) (3 Conn. L. Rptr. 189); *Central Delivery Service of Washington, Inc. v. People's Bank,* Superior Court, judicial district of Hartford at New Britain, Docket No. 438015 (October 1, 1990, Goldberg, S.J.) (2 Conn. L. Rptr. 449); *Jarasek v. Chrysler House Associates Limited Partnership,* Superior Court, judicial district of Hartford, Docket No. 338598 (December 2, 1988, O'Connor, J.) (4 CSCR 73). The court finds this line of cases persuasive.

In order for the defendants to prevail, therefore, they would have to show a substantial aggravating circumstance. The defendants have failed to make such a showing. The defendants simply argue that Digicomm violated CUTPA because it filed a breach [*21] of contract claim in an action in which the court finds that Digicomm had actually breached the contract first. If the court were to adopt such an interpretation, one party would be in violation of CUTPA whenever two parties disagree over who breached a contract first. Such an interpretation is untenable. The court, therefore, finds that the defendants have not presented sufficient evidence to support a finding that Digicomm violated CUTPA.

## V. Punitive Damages

AR Printing also seeks punitive damages under the common law and *General Statutes § 42-110b*. The defendants, however, met their burden only with respect to their common law breach of contract claim. Thus, the court need only decide whether the defendants are entitled to punitive damages for Digicomm's breach of contract. "Punitive damages are not ordinarily recoverable for breach of contract . . . This is so because . . . punitive or exemplary damages are assessed by way of punishment, and the motivating basis does not usually arise as a result of the ordinary private contract relationship. The few classes of cases in which such damages have been allowed contain elements which bring them within [*22] the field of tort." (Citation omitted.) *Triangle Sheet Metal Works, Inc. v. Silver, 154 Conn. 116, 127, 222 A.2d 220 (1966).* "The flavor of the basic requirement to justify an award of punitive or exemplary damages has been repeatedly described in terms of wanton and malicious injury, evil motive and violence . . . The Restatement declares that punitive damages may be awarded only for 'outrageous conduct, that is, for acts done with a bad motive or with a reckless indifference to the interests of others.' Restatement, 4 Torts § 908, comment (b)." *Id. at 128;* see also *L.F. Pace & Sons, Inc. v. Travelers Indemnity Co., 9 Conn. App. 30, 47-48, 514 A.2d 766, cert. denied, 201 Conn. 811, 516 A.2d 886 (1986).*

The defendants have not proven that punitive damages are proper in this case. No evidence has been presented and no testimony given which would bring this case into the field of tort. Furthermore, there has been no evidence presented that demonstrates Digicomm acted with an evil motive. In fact, the evidence and testimony demonstrate that Digicomm, although unable to do so, made a good faith effort to fulfill its contractual [*23] obligations as it provided AR Printing with three replacement copiers. The court, therefore, finds that an award of punitive damages is not appropriate.

## VII. Attorneys Fees

The defendants also ask the court to grant them attorneys fees. "The general rule of law known as the 'American rule' is that attorneys fees and ordinary expenses and burdens of litigation are not allowed to the successful party absent a contractual or statutory exception . . . This rule is generally followed throughout the country . . . Connecticut adheres to the American rule . . . There are few exceptions. For example, a specific contractual term may provide for the recovery of attorneys fees and costs . . . or a statute may confer such rights." (Citations omitted; internal quotation marks omitted.) *Rizzo Pool Co. v. Del Grosso, 240 Conn. 58, 72-73, 689 A.2d 1097 (1997).* The only claim that the defendants have been successful in proving is their breach of contract claim. Neither the contract, nor guaranty provision contained therein, provides for the payment of attorneys fees to AR Printing or Robinson. Accordingly, this court will not award attorneys fees to the defendants.

## CONCLUSION

For [*24] the foregoing reasons, judgment may enter for the defendants on the first and second counts of the complaint. Furthermore, judgment may enter in favor of the defendants on count one of the counterclaim. Although the court finds in favor of the defendants, the court further finds that Digicomm is not liable for any damages caused by its breach. Finally, judgment may enter in favor of Digicomm on the second and third counts of the counterclaim.

CUTSUMPAS, J.

LEXSEE 2000 CONN. SUPER. LEXIS 2952

### Shemitz Lighting, Inc. v. Hartford Fire Insurance Company

#### CV960052970

### SUPERIOR COURT OF CONNECTICUT, JUDICIAL DISTRICT OF ANSONIA - MILFORD, AT MILFORD

*2000 Conn. Super. LEXIS 2952*

November 9, 2000, Decided
November 9, 2000, Filed

**NOTICE: [*1]** THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

**DISPOSITION:** The plaintiff's motion for summary judgment as to count one is granted because there is no genuine issue of material fact and the plaintiff is entitled to judgment as a matter of law. The defendant's motion for summary judgment as to count one is denied. The defendant's motion for summary judgment as to counts two and three is granted because there is no genuine issue of material fact and the defendant is entitled to judgment as a matter of law.

**LexisNexis (TM) HEADNOTES - Core Concepts:**

**JUDGES:** KAREN NASH SEQUINO, J.

**OPINIONBY:** KAREN NASH SEQUINO

**OPINION:** MEMORANDUM OF DECISION RE: MOTION FOR SUMMARY JDUGEMTN # 122 AND MOTION FOR SUMMARY JUDGMENT # 123

This case, involving cross motions for summary judgment, arises out of a dispute over the scope of insurance coverage for losses the insured incurred as a result of employee theft. The plaintiff, Shemitz Lighting, Inc., a corporation which was engaged in the sale of lighting fixtures, is the insured under a commercial insurance policy issued by the defendant, Hartford Fire Insurance Company. On or about November 1, 1993, the

[*2] defendant issued a policy to the plaintiff for a one-year term that ran from November 1, 1993 to November 1, 1994. In November of 1994, the defendant renewed its policy with the plaintiff for an additional one-year term that ran from November 1, 1994 to November 1, 1995. The policy, entitled "Business Insurance Policy," is a property damage and loss policy. It provided coverage for damage to the building and personal property of the business as well as a number of optional coverages. One of the optional coverages that the plaintiff purchased was for losses that result from employee dishonesty. The declarations page of the policy limited coverage to $ 10,000 for "each occurrence" of employee dishonesty.

Sometime in August 1993, the plaintiff hired Donna Borman (Borman) to work as the company's bookkeeper. Her job duties included keeping books and records, preparing payroll and reconciling bank account statements. On or about July 14, 1995, the plaintiff's principal, Norman Shemitz (Shemitz), discovered that Borman had been writing unauthorized checks. Shemitz learned that, beginning sometime near February 1994 and continuing into 1995, Borman issued sixty-three checks from the plaintiff's [*3] commercial and payroll accounts made payable to herself and to others by forging Shemitz's signature on the checks. On July 21, 1995, Shemitz notified the defendant, its insurer, that the business suffered a $ 146,000 loss due to employee fraud. On September 13, 1995, the plaintiff provided the defendant with proof of the loss caused by Borman's forgeries. Shemitz later discovered that Borman had also diverted to herself over $ 56,000 in third-party checks that had been made payable to the plaintiff and were meant to be deposited into the plaintiff's checking accounts. Accordingly, on September 22, 1995, the plaintiff provided the defendant with a supplemental

proof of loss indicating that its losses now totaled $ 209,605.33.

The plaintiff commenced this action by writ, summons and complaint on December 23, 1995. The complaint is in three counts. Count one sets forth a claim for breach of contract in which the plaintiff alleges that the defendant has failed to meet its obligations to the plaintiff because pursuant to the policy the defendant is required to provide coverage for each incidence of employee dishonesty and the defendant has failed to do so. Count two alleges a violation [*4] of the Connecticut Unfair Trade Practices Act (CUTPA), *General Statutes § 42-110g* et seq. and count three alleges a violation of the Connecticut Unfair Insurance Practices Act (CUIPA), *General Statutes § 38a-815* et seq. The plaintiff alleges that, because the defendant unreasonably delayed paying the plaintiff's claims and because the defendant has a trade practice of failing to promptly process and settle claims and of conducting elaborate investigations for the purpose of delaying or denying payment of meritorious claims, the defendant has violated CUTPA and CUIPA.

On May 30, 1996, the defendant moved to strike counts two and three, the CUTPA and CUIPA claims, for failure to state claims upon which relief can be granted. The plaintiff objected to the defendant's motion and both parties filed supporting memoranda of law. The court, Rush, J., denied the defendant's motion to strike on July 25, 1996, finding that the plaintiff sufficiently alleged facts to sustain causes of action under both CUTPA and CUIPA. On September 12, 1996, the defendant filed an answer and a special defense. In its answer, the defendant denies that it has unreasonably delayed or failed to pay the plaintiff's [*5] claim in accordance with the policy. By way of special defense, the defendant alleges that it satisfied its duty under the policy when it tendered payment of $ 10,000 to the plaintiff, which the defendant claims is the policy limit. On September 26, 1996, the plaintiff replied to the defendant's special defense by denying all of the defendant's allegations. On or about January 22, 1998, the defendant sent the plaintiff a check for $ 10,000, which the defendant claims represents the full amount due the plaintiff pursuant to the policy. The plaintiff agreed to accept the check but at the same time reserved its right to pursue additional amounts from the defendant.

On June 30, 1999, pursuant to Practice Book § 17-44 et seq., the plaintiff filed a motion for summary judgment, along with a supporting memorandum of law. The plaintiff filed a clarified motion for summary judgment on August 3, 1999. The clarified motion adopts the memorandum of law it filed on June 30, 1999 and seeks summary judgment as to count one of the complaint on the ground that there is no genuine issue of material fact that the employee theft provision of the

insurance policy issued by the defendant provides coverage [*6] for losses sustained as a result of each separate act of embezzlement by an employee. The plaintiff attached copies of the following documents to its motion and memorandum: the insurance policy issued by the defendant to the plaintiff for the policy period November 1, 1993 to November 1, 1994; the policy declarations pages for the policy period November 1, 1993 to November 1, 1994; the policy declarations pages and extension schedule of underlying insurance policies for the period November 1, 1994 to November 1, 1995; a preprinted claim form, which was signed by Norman Shemitz, president of the plaintiff corporation, Shemitz Lighting, Inc., and notarized by the plaintiff's counsel, along with supporting documentation of loss; a January 22, 1998 letter from counsel for the defendant to counsel for the plaintiff regarding the $ 10,000 payment; and the June 15, 1999 affidavit of Norman Shemitz in which Shemitz avers that, based on the policy language and the purpose for which he purchased the policy, it was his understanding that the policy would pay up to $ 10,000 for each separate act of embezzlement.

On August 29, 1999, pursuant to Practice Book § 17-44 et seq., the defendant [*7] filed a cross motion for summary judgment as to all claims set out in the plaintiff's complaint. The defendant's motion is accompanied by a supporting memorandum of law. The defendant moves on the ground that there is no genuine issue of material fact and the defendant is entitled to judgment as a matter of law because Borman's acts amount to one occurrence for purposes of coverage, it completely discharged its duty by paying to the plaintiff the $ 10,000 per occurrence limit, and its actions do not provide grounds for recovery under CUTPA or CUIPA. The defendant attached copies of the following documents to its motion and memorandum: the declaration page of the insurance policy for the policy period November 1, 1993 to November 1, 1994; a September 20, 1995 letter from Francis G. Bogdan (Bogdan) of the Hartford's claim department to counsel for the plaintiff; a September 22, 1995 letter from the plaintiff's counsel to Bogdan; a September 27, 1995 letter from Bogdan to the plaintiff's counsel; and portions of the deposition of Bogdan, which was taken on September 18, 1997.

## DISCUSSION

"Summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof [*8] submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law . . . The party seeking summary judgment has the burden of showing the absence of any genuine issue [of] material facts which,

under applicable principles of substantive law, entitle him to judgment as a matter of law . . . and the party opposing such a motion must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact . . ." (Citations omitted; internal quotation marks omitted.) *Miles v. Foley, 253 Conn. 381, 385, 752 A.2d 503 (2000).* Even if the nonmoving party produces no evidence in opposition to the motion, the motion will be denied if the movant's evidence fails to show both that there is no genuine issue of fact and that the movant is entitled to judgment as a matter of law. *Walker v. Lombardo, 2 Conn. App. 266, 269, 477 A.2d 168 (1984).*

"In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party . . ." *Sherwood v. Danbury Hospital, 252 Conn. 193, 201, 746 A.2d 730 (2000).* [*9] Summary judgment "is appropriate only if a fair and reasonable person could conclude only one way. . . ." (Citations omitted; internal quotation marks omitted.) *Morascini v. Commissioner of Public Safety, 236 Conn. 781, 808, 675 A.2d 1340 (1996).* "The test is whether a party would be entitled to a directed verdict on the same facts." (Internal quotation marks omitted.) *Sherwood v. Danbury Hospital, supra, 252 Conn. 201.* "[A] directed verdict may be rendered only where, on the evidence viewed in the light most favorable to the nonmovant, the trier of fact could not reasonably reach any other conclusion than that embodied in the verdict as directed . . ." (Citations omitted; internal quotation marks omitted.) *Morascini v. Commissioner of Public Safety, supra, 809.*

The parties do not dispute that the policy provides coverage for losses sustained due to employee theft, rather, their disagreement arises over the limits of coverage. The parties present this issue as a question of law for the court. On the one hand, the plaintiff claims that, because each individual incidence of employee dishonesty constitutes an "occurrence," [*10] each of Borman's thefts, which span two policy periods, are covered up to $ 10,000 per theft. The defendant, on the other hand, claims that all of the acts of an employee engaged in many thefts over a continuous period of time are a "series of related acts," which is to be considered one "occurrence" pursuant to the policy.

In support of its motion for summary judgment, the plaintiff argues that, because the policy does not define "occurrence" and because the policy language, "series of related acts," which is meant to explain what constitutes an "occurrence" is ambiguous, the policy should be construed in favor of the plaintiff as a matter of law. The plaintiff further contends that Borman's thefts cannot constitute one "occurrence" because each theft caused a separate and distinct loss to the plaintiff and the courts

have held that losses brought about by separate acts or causes constitute separate "occurrences." The defendant disagrees and asserts that the plaintiff's motion should be denied because the policy language as to what constitutes an "occurrence" is not ambiguous and, therefore, the policy should be enforced according to its terms. The defendant further argues that, [*11] because Borman's entire course of conduct is one "occurrence" pursuant to the policy, the defendant discharged its duty by paying $ 10,000, the per "occurrence" limit, to the plaintiff.

In its motion, the defendant argues that, under the plain language of the policy, the total of the plaintiff's loss was caused by one occurrence. The defendant further contends that a "noncumulation clause" contained within the policy works in conjunction with the "occurrence" provision to limit the defendant's liability to $ 10,000 not just for the policy period, but for the entire two year coverage period. The defendant claims that because it tendered payment of $ 10,000 to the plaintiff, it completely discharged its duty to the plaintiff and is therefore entitled to judgment as a matter of law as to count one. It is the defendant's contention that its motion should also be granted as to counts two and three because, one, the third count of the plaintiff's complaint does not allege the general business practice necessary to prevail on a CUIPA claim, and two, because the plaintiff cannot maintain a CUTPA claim absent an underlying violation of CUIPA. The plaintiff disagrees and argues that it, rather [*12] than the defendant, is entitled to judgment as to count one because the policy language is ambiguous and should be construed against the insurer. The plaintiff further asserts that portions of Bogdan's deposition relating to the defendant's approach to processing claims by its insureds raises a genuine issue of material fact as to whether the defendant has a trade practice of unreasonably delaying or denying meritorious claims and therefore summary judgment should also be denied as to counts two and three.

### I. Count One: Breach of Contract

"It is the function of the court to construe the provisions of the contract of insurance. The interpretation of an insurance policy, like the interpretation of other written contracts, involves a determination of the intent of the parties as expressed by the language of the policy. The determinative question is the intent of the parties, that is, what coverage the [insured] expected to receive and what the [insurer] was to provide, as disclosed by the provisions of the policy . . . It is axiomatic that a contract of insurance must be viewed in its entirety . . . The policy words must be accorded their natural and ordinary meaning . . . [*13] [and] any ambiguity in the terms of an insurance policy must be construed in favor of the insured because the insurance company drafted the

policy . . . A necessary predicate to this rule of construction, however, is a determination that the terms of the insurance policy are indeed ambiguous . . ." (Citations omitted; internal quotation marks omitted.) *Springdale Donuts, Inc. v. Aetna Casualty & Surety Co., 247 Conn. 801, 805-06, 724 A.2d 1117 (1999).* Ambiguous terms are those that, when looked at objectively, are susceptible of two or more equally reasonable interpretations. *Raffel v. Travelers Indemnity Co., 141 Conn. 389, 392, 106 A.2d 716 (1954);* see also 11 S. Williston, Contracts (4th Ed. 1999) § 30.5, pp. 68-69. In deciding among reasonable interpretations, that interpretation which will sustain the claim and cover the loss must be adopted. *Raffel v. Travelers Indemnity Co., 141 Conn. 389 at 392, 106 A.2d 716;* see also 11 S. Williston, Contracts (4th Ed. 1999) § 30.5, pp. 68-69.

Pursuant to the declarations page, the limits of insurance for "each occurrence" of employee dishonesty is $ 10,000. The policy also contains [*14] a provision entitled "Limit of Insurance," which provides: "(1) The most we will pay for loss or damage in any one occurrence is the Limit of Insurance for Employee Dishonesty shown in the Declarations. (2) All loss or damage:

(a) Caused by one or more persons; or (b) involving a single act or series of related acts; is considered one occurrence." The very next paragraph, which the defendants refers to as a noncumulation clause," is entitled "Additional Conditions," and provides in pertinent part: "(1) We will pay only for loss or damage you sustain through acts committed or events occurring during the Policy Period. Regardless of the number of years this policy remains in force or the number of premiums paid, no Limit of Insurance cumulates from year to year or period to period."

The policy at issue covers employee theft but monetarily limits an insured's potential recovery on a per "occurrence" basis. Resolution of this case, therefore, turns on whether Borman's thefts are more properly characterized as a single "occurrence" or multiple "occurrences." Although the policy elaborates on the company's limits of liability per "occurrence," it does not define the term "occurrence." [*15] Where a policy term is undefined, an interpretation by law, rather than an interpretation by contractual language, shall apply. 2D J. Appleman & J. Appleman, Insurance Law and Practice § 6.5, p. 247 (1996). There are very few Connecticut cases that have addressed the issue as to what constitutes an "occurrence" for purposes of insurance coverage. See, e.g., *Metropolitan Life Insurance Company v. Aetna Casualty & Surety Company, 1999 Conn. Super. LEXIS 1000,* Superior Court, judicial district of New London at Norwich, Docket No. 115305 (April 16, 1999) (Koletsky, J.) (24 Conn. L. Rptr. 381, 384) (An

omission, the alleged failure to publicize asbestos exposure, which lasted decades cannot constitute a single occurrence for purposes of insurance coverage. "The last link in the causal chain is the exposure to asbestos and not the alleged failure to publish . . . The 'event of unfortunate character' must . . . be each claimant's separate exposure to asbestos; the injuries arise from multiple occurrences."); *Mohawk Mountain Ski Area Inc. v. American Home Assurance Co., 1995 Conn. Super. LEXIS 269,* Superior Court, judicial district of Litchfield, Docket No. 056905 (January 30, 1995) (Pickett. J.) (where a policy contains no definition of [*16] "occurrence," damage from two tornados which strike at separate times but within forty-five minutes of one another cannot, as a matter of law, be considered to be one occurrence).

Many other jurisdictions, however, have interpreted policies which limit an insurers' liability on an "occurrence" basis, in a variety of contexts, with varying results. Some cases center on the meaning of "occurrence" in the context of employee theft. See, e.g., *Slater v. U.S. Fidelity and Guaranty Co, 379 Mass. 801, 806-09, 400 N.E.2d 1256 (1980)* (where a policy covers amounts not exceeding $ 250 in any "one occurrence" and does not define the word "occurrence" or give any indication as to what it means, the words give rise to an ambiguity which must be construed against the insurer and therefore each act of employee theft was a separate "occurrence" pursuant to the policy). But see *Christ Lutheran Church v. State Farm Fire and Casualty, 122 N.C. App. 614, 471 S.E.2d 124, 125-26 (1996)* (where the policy provides "all loss involving a single act, or series of related acts, caused by one or more persons is considered one occurrence," employee's issuance of twenty-four separate [*17] checks to himself on various occasions constitutes one "occurrence") Other cases deal with the meaning of "occurrence" in the context of professional malpractice liability, also with inconsistent results. See *Ariz. Prop. & Cas. Ins. Guar. Fund v. Helme, 153 Ariz. 129, 735 P.2d 451, 456-58 (Ariz. 1987)* (claim that two physicians were negligent for failing to look at a patient's X-rays before surgery alleged two "occurrences," rather than one, under a medical malpractice policy because the definition of "occurrence" as a "series of related acts" is ambiguous); *Illinois St. Med. Inter-Insurance, 234 Ill. App. 3d 129, 599 N.E.2d 983, 988-89, 174 Ill. Dec. 899 (1992)* (insured doctor's numerous acts of negligence, as to one patient, during the policy period were all covered "occurrences" because the "related acts" provision of the policy was ambiguous). But See *Bay Cities Paving & Grading v. Lawyers' Mut., 5 Cal. 4th 854, 21 Cal. Rptr. 2d 691, 693-702, 855 P.2d 1263 (1993)* (allegations that an attorney had committed two separate acts of legal malpractice in handling one transaction for the same client constitutes just one

"claim" for purposes [*18] of a policy which limits liability on a "per claim" basis, because even if acts were separate, they would still be "related" for purposes of coverage limitations).

Different jurisdictions take different approaches to interpreting "occurrence" language but a significant number of cases turn on the issue of causation. See, e.g., *Ariz. Prop. & Cas. Ins. Guar. Fund v. Helme, supra, 735 P.2d 455-58; Bay Cities Paving & Grading v. Lawyers Mut., supra, 21 Cal. Rptr. 2d 695-98; Stonewall Ins. Co. v. Asbestos Claims Management Corp., 73 F.3d 1178, 1212-14 (2nd Cir. 1995).* Courts generally find that there is one occurrence where there is one, uninterrupted cause that results in more than one loss or injury. See *Christ Lutheran Church v. State Farm Fire and Casualty Company, supra, 471 S.E.2d 126* (The plaintiff's loss due to one employee's thefts was caused, not by new and individual acts of dishonesty, but by the continued dishonesty of one employee. A continuumm of dishonesty is one "occurrence."); *Olsen v. Moore, 56 Wis. 2d 340, 202 N.W.2d 236, 241 (1972)* (where the insured never regained control [*19] of his vehicle prior to hitting a second vehicle, there was one "accident" or "occurrence").

Courts also generally find that there is more than one occurrence when a cause is interrupted, either by an independent cause or by the actor regaining control of the situation. *Liberty Mut. Ins. Co. v. Rawls, 404 F.2d 880 (5th Cir. 1968)* (where the insured's automobile collided with rear of an automobile in which the plaintiffs were riding and two to five seconds later the insured's automobile collided with a second automobile, there were two distinct "accidents" pursuant to the policy); *Slater v. U.S. Fidelity and Guaranty Co., supra, 379 Mass. 809* (The "occurrence" which caused plaintiff's losses was not a scheme of dishonesty because "the scheme, without more, could not have caused the losses." Instead, it was each act of embezzlement that caused each loss.).

Other cases interpreting the applicable limits of "occurrence" language, both with and without a "noncumulation clause," turn on the doctrine of upholding the reasonable expectations of the insured because of ambiguities inherent in the contract language. See, e.g., *Penalosa Co-op v. Farmland Mut. Ins., 14 Kan. App. 2d 321, 789 P.2d 1196, 1200 (1990)* [*20] (because the provision limiting liability on an "occurrence" basis when read together with a provision that states that regardless of the number of years the policy remains in force, the limit of liability is the "occurrence" limit and shall not be cumulative was undoubtedly meant to limit the company's liability for all losses caused by a single employee, but because it could be read to mean that liability under the current policy

does not attach to losses of prior periods, the ambiguity must be resolved in favor of the insured). But see *Reliance Ins. v. Treasure Coast Travel Agency, Inc., 660 So. 2d 1136, 1137-38 (1995)* ("occurrence" language contained in limits of liability provision when taken in conjunction with general conditions section providing that the most the company would pay is the larger of the amount recoverable under this policy or a prior policy, limits insured's recovery to one policy despite the fact that the employee's embezzlement spanned four policy periods).

The doctrine of reasonable expectations is applied in Connecticut. *Agosto v. Aetna Casualty and Surety Company, 239 Conn. 549, 552 n.3, 687 A.2d 1267 (1996).* This is so [*21] because in interpreting the contract, it is not only the language of the instrument that must be considered, but the situation of the parties and the subject-matter of their transactions as well. *Foley v. Huntington Company, 42 Conn. App. 712, 729, 682 A.2d 1026,* cert. denied, *239 Conn. 931, 683 A.2d 397 (1996).* "In arriving at the intent of the parties . . . it is always admissible to consider the situation of the parties and the circumstances connected with the transaction, and every part of the writing should be considered with the help of that evidence." *Id.* "It is a basic principle of insurance law that policy language will be construed as laymen would understand it and not according to the interpretation of sophisticated underwriters . . ." *O'Brien v. United States Fidelity & Guaranty Co., 235 Conn. 837, 843, 669 A.2d 1221 (1996).* The test of coverage is not what the insurer intended its words to mean, but what a reasonable person in the position of the insured would have understood them to cover. *Clinton v. Aetna Life & Surety Co., 41 Conn. Supp. 560, 563, 594 A.2d 1046 (1991).*

The court finds that coverage under [*22] the defendant's policy was probably meant to be limited in some circumstances but based on the policy language, it is difficult for an insured to tell what those circumstances might be. An insured may reasonably interpret a policy which limits liability based on "each occurrence" to mean that their recovery is limited to: $ 10,000 for each act of dishonesty; $ 10,000 for each employee; $ 10,000 for each policy period; or $ 10,000 for each coverage period. The court therefore concludes that because the policy terms restricting the defendant's liability for "each occurrence" are susceptible of more than one reasonable interpretation, the terms are ambiguous, and are to be construed against the insurer and in favor of the insured as a matter of law. The very fact that so many jurisdictions have considered the same, or similar, policy language in so many different contexts supports the court's conclusion that the terminology employed by the defendant is ambiguous. Further, a determination of the

number of "occurrences" under a causation theory would lead to the same conclusion. Each of the plaintiff's losses were caused by a separate act of embezzlement because it was always within Borman's [*23] control to stop stealing from her employer and because it was Borman's individual acts of thefts that caused the plaintiff's losses, not her underlying dishonesty.

Additionally, the court finds that the "noncumulation clause" when read together with the provision limiting recovery to "any one occurrence," also leads to ambiguity because the two provisions can reasonably be read to either provide coverage or not provide coverage. The defendant claims that the "noncumulation clause" clearly limits its liability for the entire coverage period, of two years. The plaintiff's interpretation, on the other hand, is that the clause merely means that insurance which is unused during one policy period cannot be carried over to a subsequent policy period. The court finds that the plaintiff's interpretation is reasonable and is more in keeping with the reasonable expectations of the insured. The court determines that, because the language of the "noncumulation clause" is, like the "occurrence" language, susceptible of more than one reasonable interpretation, the interpretation which covers the plaintiff's losses must by adopted as a matter of law.

Accordingly, the plaintiff's motion for summary [*24] judgment as to count one is granted because there is no genuine issue of material fact and the plaintiff is entitled to judgment as a matter of law. The court concludes that each act of embezzlement constitutes an "occurrence" covered by the defendant's insurance policy up to the $ 10,000 per "occurrence" limit. The defendant's motion for summary judgment is denied as to count one.

## II. Counts Two and Three: CUTPA "and/or" CUIPA

The defendant moves for summary judgment as to counts two and three, the CUTPA and CUIPA claims respectively, on the ground that its conduct in processing the plaintiff's claim does not provide grounds for recovery under CUTPA and CUIPA because isolated instances of unfair settlement practices cannot support a CUTPA "and/or" CUIPA claim. The plaintiff argues that the defendant's motion should be denied because the defendant has not met its burden of proving, based on all of the evidence submitted, both that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. Further, the plaintiff contends that it has raised a genuine issue of material fact that the defendant has a trade practice of mishandling claims [*25] because it has submitted evidence, the deposition of Bogdan, the defendant's claims adjuster, in which he states the following: that the defendant has no formal policies in place for processing

or reviewing the type of claim at issue here; that the defendant has no policy manuals and no formal training on handling claims; that the defendant made no effort to settle the plaintiff's claim until after this lawsuit was filed; and that it is the defendant's position that the insured's duty to put together its own claim.

CUTPA and CUIPA prohibit persons from engaging in unfair insurance or other trade practices. See *General Statutes § § 42-110b* et seq.; 38a-815 et seq. CUTPA provides that: "Any person who suffers any ascertainable loss of money or property . . . as a result of [an unfair trade practice] . . . may bring an action . . ." *General Statutes § 42-110g(a)*. CUIPA does not expressly provide a plaintiff with a private right of action; however, in *Mead v. Burns, 199 Conn. 651, 663, 509 A.2d 11 (1986)*, the Supreme Court held that a private right of action does exist under CUTPA to enforce unfair insurance practices under CUIPA. Thus, in order to establish a cause [*26] of action against an insurer under CUTPA, the plaintiff must prove that the insurer has violated CUIPA. *Mead v. Burns, supra, 199 Conn. 663*.

An allegation of unfair claim settlement practices under subsection (6) of § 38a-816 requires a "showing of more than a single act of insurance misconduct." *Mead v. Burns, supra, 199 Conn. 659*. Where the gist of the plaintiff's claim is that the defendant unfairly failed to settle only the plaintiff's claim, there has been no CUIPA violation. *Lees v. Middlesex Ins. Co., 229 Conn. 842, 849, 643 A.2d 1282 (1994)*. Isolated instances of unfair insurance settlement practices will not sustain a CUIPA claim; it requires proof that an insurer has engaged in unfair practices "with such frequency as to indicate a general business practice." (Internal quotation marks omitted.) *Id.* Further, "the court may not presume that . . . [the defendant] treats other similarly situated insureds the same." *Webster Bank v. Travelers Casualty. & Surety., 1999 Conn. Super. LEXIS 1218*, Superior Court, judicial district of New Britain, Docket No. 476078 (April 30, 1999) (Graham, J.) (24 Conn. L. Rptr. 530, 534).

Although the plaintiff [*27] alleges that the defendant has engaged in unfair settlement practices in processing claims other than its own claim, the plaintiff has not presented any evidence which substantiates that allegation. Rather, the plaintiff invites the court to assume, based on Bogdan's deposition testimony, that the defendant has unfairly settled other claims simply because it has no written procedure in place for processing claims. The court finds that the plaintiff's CUIPA claim fails because the plaintiff has not produced evidence sufficient to show that the defendant's alleged unfair claim settlement practices constitute a "general business practice." Further, because one cannot maintain a CUTPA claim against an insurer absent an underlying CUIPA claim, the plaintiff's CUTPA claim fails as well.

*Lees v. Middlesex Ins. Co., supra, 229 Conn. at 849; Mead v. Burns, supra, 199 Conn. 659.* Accordingly, the court concludes that, because the plaintiff has failed to produce the evidence necessary for CUTPA and CUIPA claims, the defendant's motion for summary judgment is granted as to counts two and three.

## CONCLUSION

The plaintiff's motion for summary judgment as [*28] to count one is granted because there is no genuine issue of material fact and the plaintiff is entitled to judgment as a matter of law. Accordingly, the defendant's motion for summary judgment as to count one is denied.

The defendant's motion for summary judgment as to counts two and three is granted because there is no genuine issue of material fact and the defendant is entitled to judgment as a matter of law.

So ordered. November 9, 2000.

BY THE COURT

KAREN NASH SEQUIN0, J.

LEXSEE 1999 CONN. SUPER LEXIS 2865

**Joanne Gambardella v. Emily Fine**

**CV 960253914**

**SUPERIOR COURT OF CONNECTICUT, JUDICIAL DISTRICT OF NEW HAVEN, AT MERIDEN**

*1999 Conn. Super. LEXIS 2865*

**October 20, 1999, Decided**
**October 20, 1999, Filed**

**NOTICE: [*1]** THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

**DISPOSITION:** Judgment for Defendant.

**LexisNexis (TM) HEADNOTES - Core Concepts:**

**JUDGES:** Beach, J.

**OPINIONBY:** BEACH

**OPINION:** MEMORANDUM OF DECISION

This is a case sounding in medical malpractice, tried to the court in approximately ten sessions. The plaintiff Joanne Gambardella claims, essentially, that the defendant gynecologist, Emily Fine, deviated from the applicable standard of care in treating a post-surgical infection. The defendant disagrees, and claims that she did adhere to the standard of care and advances other claims, including lack of causation, as well. Both sides presented expert testimony and a number of learned treatises, texts and articles.

The factual background may be summarized as follows. n1 The defendant is a licensed physician board certified in gynecology. The plaintiff began seeing Dr. Fine on January 10, 1991. In January 1994, Gambardella reported menorrhaghia, or abnormally heavy menstrual discharge. Various treatment options were discussed; after some hesitation, Gambardella decided to have a vaginal hysterectomy performed, because there was assurance [*2] that that procedure would be sure to solve the immediate problem. A pelvic ultrasound prior to surgery showed a fibroid, and on May 18, 1994, the vaginal hysterectomy was performed. Gambardella had signed an informed consent form which alerted her to the possibility of postsurgical infection. The surgery was uneventful and routine follow-up ensued.

> n1 The facts, though not undisputed, especially as to the issue of the plaintiff's compliance in taking prescribed medication, are largely a matter of documentation. Because the evidence was presented in great detail, I do not include in this decision every iota.

On May 27, 1994, Gambardella presented with diarrhea, vomiting, chills, an elevated temperature and reportedly some spiking to 103 degrees. Fine examined her and took a history; she suspected possible food poisoning or, as a secondary diagnosis, infection following surgery. She prescribed floxin, an antibiotic, to address infection. Floxin is known to be effective against enterococcus, the sort of bacteria [*3] which turned out to be the culprit

The patient felt better temporarily, but was seen again on May 30 with a recurrence of symptoms. Dr. Fine referred her to Dr. LaGarde, a gastroenterologist and switched her to flagyl, a medication which apparently is also effective against intestinal "bugs."

On May 31, 1994, the patient saw Dr. Ruffolo, her primary care physician. She reported vomiting and severe diarrhea, so she stopped taking antibiotics. n2 Dr.

Ruffolo administered a steroid. n3 On June 1 and June 2 Gambardella was reportedly feeling somewhat better, but she did see Dr. LaGarde, the gastroenterologist, on June 3, 1994. As it developed, there was no food poisoning (or if there were, it was coincidental and it resolved). Dr. LaGarde communicated with Dr. Fine, and they decided that infection was the best diagnosis of the current difficulties.

> n2 It is not clear to me which medications, if any, Gambardella actually did stop taking.

> n3 Dr. Fine and Dr. Horowitz, the defendant's expert witness, rather severely criticize the administration of steroids to a post surgical patient. Apparently steroids, while frequently allowing a patient to feel better not only mask the symptoms of infection but also adversely affect the body's immune system.

[*4]

On June 5, Gambardella reported purulent discharge and she was seen in the office on a Sunday by Dr. Fine. Fine was able to drain more fluid. She thought this was a good sign, as the vaginal cuff collection explained the prior symptoms, and drainage was an optimal treatment in itself. She prepared to culture some of the fluid and prescribed augmentin, a wide-range antibiotic, until she knew what the precise bacteria were.

On June 7, the patient returned to Dr. Ruffolo, who discontinued augmentin because she apparently had a reaction to it, and switched her to floxin and lomotril. By June 8, Dr. Fine had received the culture results and, in a telephone call, wanted to switch her to floxin. Of course, she already had switched. In any event, Dr. Fine saw Gambardella on June 9, and she reportedly felt better. She prescribed blood work and noted that she had been essentially afebrile for 72 hours.

On June 24, Dr. Fine reviewed the results of the bloodwork and determined that it showed few, if any, signs of infection. At that point, Dr. Fine thought that Gambardella was doing well; at no point had any of the physicians found any sign of a tender abdomen or other specific symptom [*5] of a pelvic abscess.

On June 30, Dr Fine saw Ms. Gambardella again, and at that point she thought the episode was concluded. She thought the patient had a resolved vaginal cuff collection, or an infected hematoma. Although there is nothing in the records to support an additional follow up appointment, Dr. Fine testified that her plan was to do repeat bloodwork in three to four weeks.

Ms. Gambardella saw Dr. Ruffolo in August and September 1994 for several apparently minor complaints such as ear infection and cough. He did, however, administer at least two more steroid shots for one thing or another. On September 27, however, Dr. Ruffolo found a tender mass in the right abdomen and prescribed cipro. On October 4, she had an ultrasound, which confirmed a mass. Ruffolo referred her to Dr. Amodio, a general surgeon, and on October 8 a CT scan confirmed the mass. Dr. Amodio insisted that she return to Dr. Fine, who had done the first surgery. Ms. Gambardella had apparently become dissatisfied with Dr. Fine and was somewhat reluctant to return to her. On October 11 Dr. Fine examined her and confirmed the pelvic abscess. An informed consent was obtained and on October 12 the abscess [*6] was surgically addressed. At first Dr. Fine tried to drain the abscess vaginally, but that procedure was unsuccessful. n4 She called in Dr. DeVito, a urologist, and together they opened the abdomen and removed the abscess, which was approximately 8-10 centimeters in diameter. The operation was difficult, partly because the abscess adhered to several organs. The operation ultimately was successful, although the appendix had to be removed because it could not readily be separated from the abscess and because it is Dr. Fine's procedure to remove the appendix in any event, when the occasion presents itself.

> n4 There is some question as to whether the bladder was punctured in this effort. Apparently the mucosa was, at least, disturbed.

Recovery was difficult. To guard against complications involving the bladder a catheter was used for several days. She also had a collapse of some lung tissue with a suggestion of pneumonia, and diarrhea from the antibiotics, an insulted bowel from the surgery and a yeast infection [*7] from the antibiotics. The bacteria from the abscess proved to be enterococcus, but was apparently sensitive to different antibiotics from that gathered from the vaginal cuff site.

Dr. Fine saw Ms. Gambardella several more times after the surgery, and the recovery was relatively uneventful. She claims localized numbness and loss of sensation and fear of AIDS as a result of a blood transfusion.

In a medical malpractice action, or, perhaps more appropriately, a professional negligence action, the plaintiff has the burden to prove three elements: the relevant standard of care in the circumstances; a deviation from the standard of care; and harm caused by the deviation. *Pisel v. Stamford Hospital 180 Conn. 314,*

*430 A.2d 1 (1980).* Expert testimony is, as a general proposition, required to establish the elements. *Mather v. Griffin Hospital 207 Conn. 125, 130-31, 540 A.2d 666 (1988).*

The first element, as stated above, is the establishment of the applicable standard of care. The statutory definition appears in *52-184c of the General Statues*: "the prevailing professional standard of care for a given health care provider shall be that [*8] level of care, skill and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers." Treatment does not have to be perfect to meet the standard of care; rather, the standard is that degree of care ordinarily exercised by reasonably careful providers in the same circumstances. *Wasfi v. Chaddha, 218 Conn. 200, 205 n.7, 588 A.2d 204 (1991).* The applicable standard of care does not necessarily prescribe only one course of conduct in a set of circumstances: there may be several choices which meet the standard of care, and, so long as the standard is met, there is no liability if the path chosen results in an unfortunate outcome. *Wasfi, 218 Conn. at 208-10.* n5

> n5 The determination of the appropriate standard of care can be vexing in some circumstances, particularly in rapidly advancing fields of medicine. Methods of treatment may process fairly rapidly from the theoretical to the experimental to "cutting edge" to routine. Traditional concepts of negligence may be of some assistance. An examination of the circumstances is critical, and the inquiry is whether the choice made at the time, with the knowledge then reasonably available, was prudent.

[*9]

In her complaint, the plaintiff alleged the following deviations from the applicable standards of care: the vaginal hysterectomy should not have been performed; a vasoconstrictor was improperly used during surgery; the patient's blood was not cultured at the end of May, sample antibiotics which were given to the patient had expired; intravenous antibiotics were not timely administered; imaging procedures were not used (presumably during the late May to early June period of time); the site of infection was not determined during the same period; oral antibiotics were switched without proper diagnostic procedures having been utilized; and no effective follow-up was carried out after June 30, 1994.

Dr. Henry Jacobs offered expert testimony on behalf of the plaintiff. He identified several areas which he felt the appropriate care had not been given. His primary concern was that the infection should have been treated "systemically" with intravenous antibiotic therapy at the end of May and beginning of June; he also thought the imaging, most likely ultrasound, should have been utilized as of June 5, the day the vaginal cuff collection drained. n6 Somewhat less critically, he was [*10] not happy with the choice of the hysterectomy to begin with, as he felt it was more invasive than other available alternatives; he felt that the incision which was made in the October surgery should have been vertical rather than transverse; and he felt that the probing with the needle prior to the laparotomy of October 12 was excessive and perhaps should not have been done by anyone except a trained radiologist. He felt that she should not have been effectively discharged after the June 30 appointment.

> n6 Dr. Jacobs' premise is that the vaginal cuff collection of late May and early June and the ovarian abscess of late September and October were, speaking loosely, manifestations of the same continuing infection process. Had the enterococcus been effectively controlled early, the abscess would not have appeared.
>
> The defendant questions the superficial continuity of the infection process. She believes it likely that the level of enterococcus organisms returned to usual levels after the draining in June, and the abscesss was perhaps caused by the ovulation, in that the surface of the ovary would thereby be exposed to bacteria. She also raises questions regarding noncompliance and the intervening use of steroids; these issues may be relevant to the element of causation.
>
> The precise mechanism of the course of infection cannot be known with certainty, and the resolution of the issue is not necessary to this opinion.

[*11]

Copies of articles from medical journals and texts were introduced into evidence by both sides. I have reviewed the literature presented. The points of view vary somewhat, perhaps partly as a function of the time written, but there is certainly not a consensus supporting the positions of Dr. Jacobs. For example, Sweet and Gibbs, *Infectious Diseases of the Female Genital Tract* 90 (2d Ed.) in a discussion of posthysterectomy pelvic abscesses, states that "although they may, on occasion, respond to antimicrobial therapy, our recommendation

for the management of posthysterectomy adnexal abscess(es) is to initiate antimicrobial therapy, which includes coverage for resistant anaerobes such as *Bacteroides fragilis* and to promptly proceed to exploratory laparotomy for extirpation and/or drainage of infected tissues." n7 The text also discusses (at 89) vaginal cuff collections and states that they "can be easily drained per vagina with resultant prompt response." The text does not suggest anything about a need for an aggressive course of systemic IV therapy, and is consistent with the defendant's assertion that the primary treatment mode is drainage. Similarly, in Gershenson, DeCherney [*12] and Curry, *Operative Gynecology* 49 (1993), the authors note that a pelvic abscess may be a secondary complication in hematomas, that imaging can be helpful in locating an abcess, and that "standard therapy for intra-abdominal abscess is surgical evacuation and drainage combined with appropriate parenteral antibiotics." The text suggests that drainage can often be achieved through a vaginal approach. Antibiotic therapy is also recommended.

> n7 The text also states that vaginal drainage, such as was attempted in the case at hand, is frequently not successful.

There is a suggestion in some of the literature that subsequent abscesses may be caused, in part, by the use of antibiotics. n8 See Ledger, et al. *Adnexal Abscess as a Late Complication of Pelvic Operations,* and Ledger, *Postoperative Pelvic Infections,* 278-80

> n8 Perhaps the use of prophylactic antibiotics may reduce the numbers of less virulent bacteria or those less able to penetrate various tissues. The use of prophylactic antimicrobial medication would certainly appear to be within the standard of care, of course.

[*13]

In Schaefer and Graber, *Complications in Obstetric and Gynecological Surgery* 121, 121 (1981), the authors suggest in general terms that "the cornerstone of therapy in pelvic infections is the use of systemic antibiotics," but the use of intravenous, in-patient treatment is not specifically recommended to the exclusion of other approaches. The use of "systemic" antibiotics also receives some support in Te Linde's *Operative Gynecology,* but not to the extent urged by Dr. Jacobs.

Dr. Benson Horowitz, a Hartford gynecologist, testified for the defendant. He stated that the standard of care for

treatment of vaginal cuff infections, as a general proposition, is not IV therapy, but rather incision and drainage. Patients are not necessarily followed up with ultrasound imaging. He believed that the performance of the hysterectomy was, in the circumstances, within the standard of care. He testified that, in the circumstances, it was appropriate to have Ms. Gambardella seen by a gastroenterologist (Dr. LaGarde) in early June. He felt that the drainage procedure on June 5 was precisely the course to be followed, and he thought that it was appropriate to prescribe augmentin while [*14] awaiting the results of the culture. He testified that oral antibiotics have recently been essentially as effective as those administered intravenously in an in-patient setting. He believed that he probably would have followed up after June 30, but that there was no requirement, as she could well be considered benign at that point. n9 He believed that it was not inappropriate to try to drain the abscess vaginally in October, with the understanding that the procedure did not have a great likelihood of success.

> n9 Even if Dr. Fine had seen Ms. Gambardella after June 30, the literature suggests that the surgical procedure which in fact was used may well have been unavoidable. There are several reported cases in which intravenous antibiotics were used to address cuff collections and ovarian abscesses developed anyway, and there are cases in which ovarian abscesses occurred after surgery with no indication of prior cuff collection.

I find the reasoning and conclusions of Dr. Horowitz to be the more persuasive. [*15] n10 Ms. Gambardella undoubtedly experienced trying times, and her anguish is not to be trivialized. Nonetheless, it is clear to me that Dr. Fine exercised a degree of skill, treatment and care which was well within the standard of similarly situated health care providers, and, at a minimum, the plaintiff's burden of proof on the issue of standard of care has not been met. n11

> n10 I have considered all of the alleged deviations from the standard of care.
>
> n11 I wish to commend the care and professionalism exercised by attorneys for both sides. Both advocated their clients' positions effectively and their assertions were well researched. Both treated the court and each other with respect.

Judgment may enter for the defendant.

1999 Conn. Super. LEXIS 2865, *

Beach, J.

LEXSEE 2003 CONN. SUPER. LEXIS 3237

Celeste Shackles et al. v. Pfizer, Inc. et al.

565313

SUPERIOR COURT OF CONNECTICUT, JUDICIAL DISTRICT OF NEW
LONDON, AT NEW LONDON

*2003 Conn. Super. LEXIS 3237*

December 1, 2003, Decided
December 1, 2003, Filed

NOTICE: [*1]  THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

LexisNexis (TM) HEADNOTES - Core Concepts:

JUDGES: D. Michael Hurley, JTR.

OPINIONBY: D. Michael Hurley

OPINION: MEMORANDUM OF DECISION
BACKGROUND

In June 2003, the plaintiffs, Celeste Shackles and her husband, James Shackles, filed a twelve-count amended complaint against Pfizer, Inc., Cynthia Morris, and Steve Levis, alleging negligence, negligence per se, wrongful discharge, intentional and negligent infliction of emotional distress, recklessness, and loss of consortium. n1

> n1 While both Celeste and James Shackles are plaintiffs in this case, the latter limits his claims to count twelve. For the sake of convenience, this opinion uses the designation "plaintiff" in reference to Celeste alone.

The plaintiff, Morris and Levis are employees of Pfizer. This action stems from an email that Morris and Levis sent to the plaintiff on March 7, 2002. The plaintiff alleges that Morris, the plaintiff [*2]  and Levis' immediate supervisor, directed Levis to send, from his workstation, a harassing email to the plaintiff from his workstation. The plaintiff received this email on her work computer. The plaintiff, who had a known history of angina attacks, alleges that the receipt of this email caused her to suffer severe shock to her nervous system, emotional distress, embarrassment and nervousness. The plaintiff alleges that these injuries forced her to seek medical and psychological treatment, and prevented her from performing her occupational duties as a records management specialist. The plaintiff further alleges that Pfizer refused to accommodate these injuries and subsequently terminated her employment on February 7, 2003.

The defendants filed two timely motions to strike all twelve counts of the complaint when considered together. n2 First, the defendants move to strike the entire complaint on the grounds that the *Workers' Compensation Act* provides an exclusive remedy for the alleged harm. Second, the defendants move to strike counts one, six, and ten, negligence claims against all three defendants, on the grounds that the complaint fails to allege that the defendants owed the plaintiff [*3]  a duty of care. Third, the defendants move to strike count two, seven and eleven, the negligence per se claims against all three defendants, on the grounds that the statute neither creates a legal duty for the defendants nor applies to Pfizer as a corporation. Fourth the defendants move to strike count three, a wrongful discharge claim against Pfizer only, on the grounds that plaintiff has an adequate statutory remedy that bars her from bringing the common law cause of action. Fifth, the defendants move to strike count four and nine, intentional infliction of emotional distress claims against Pfizer and Morris,

on the grounds that the complaint fails to present extreme and outrageous conduct, a necessary element of the cause of action. Sixth, the defendants move to strike count eight, a recklessness claim against Morris only, on the grounds that Morris does not owe the plaintiff a duty of care to avoid reckless misconduct, and that the complaint fails to sufficiently allege conduct that supports a recklessness claim. Seventh, the defendants move to strike count five, a claim of negligent infliction of emotional distress against Pfizer, on the grounds that the complaint does not allege [*4] conduct capable of supporting an action for negligent infliction of emotional distress in the employment context. Last, the defendants move to strike count twelve, the loss of consortium claim, a derivative cause of action brought by the plaintiff's husband, as legally insufficient because the underlying claims are barred by the Workers' Compensation Act.

> n2 On June 30, 2003, the defendants filed a motion to strike counts one through four and counts six through twelve of the plaintiff's amended complaint. On July 11, 2003, the defendants filed a motion to strike count five of the plaintiff's amended complaint.

This court grants the motion to strike with respect to count three only. The motions to strike are denied with respect to all other counts of the complaint.

## DISCUSSION

"A motion to strike challenges the legal sufficiency of a pleading, and, consequently, requires no factual findings by the trial court . . . We take the facts to be those alleged in the complaint . . . and we construe the complaint [*5] in the manner most favorable to sustaining its legal sufficiency." (Internal quotation marks omitted.) *Fort Trumbull Conservancy, LLC v. Alves, 262 Conn. 480, 498, 815 A.2d 1188 (2003).* "All well-pleaded facts and those facts necessarily implied from the allegations are taken as admitted." (Internal quotation marks omitted.) *Gazo v. Stamford, 255 Conn. 245, 260, 765 A.2d 505 (2001).* "If facts provable in the complaint would support a cause of action, the motion to strike must be denied." (Internal quotation marks omitted.) *Fort Trumbull Conservancy, LLC v. Alves, supra, 262 Conn. 498.*

### A. Workers' Compensation Act

The defendants move to strike all the claims in complaint because the Workers' Compensation Act provides the exclusive remedy for the plaintiff's alleged injuries. The proper procedural vehicle by which to

present the court with the defense of exclusivity of the Workers' Compensation Act is the pleading of a special defense, not a motion to strike. n3 *Schuster v. Amity School District # 5, 2003 Conn. Super. LEXIS 1608,* Superior Court, judicial district of New Haven, Docket No. CV 02 0470849 (May 28, 2003, Gilardi, J.); *Bourne v. Mori Seiki* [*6] *USA, Inc., 2002 Conn. Super. LEXIS 2316,* Superior Court, judicial district of Fairfield at Bridgeport, Docket No. CV 01 0382138 (July 12, 2002, Gallagher, J.). The court will not grant the defendants' motion to strike on the grounds that all the claims are barred by the Workers' Compensation Act because the defendants should raise this argument as a special defense, not a motion to strike.

> n3 The purpose of a special defense is to plead facts that are consistent with the allegations of the complaint but demonstrate, nonetheless, that the plaintiff has no cause of action. (Internal quotation marks omitted.) *Danbury v. Dana Investment Corp., 249 Conn. 1, 17, 730 A.2d 1128 (1999).* "[A] claim that an injured plaintiff has made an exclusive election of workers' compensation is properly raised by special defense. *Grant v. Bassman, 221 Conn. 465, 472, 604 A.2d 814 (1992).*

### B. Counts One, Six, and Ten: Negligence

Counts one, six, and ten assert negligence claims against Pfizer, Morris, and Levis, respectively. [*7] The defendants move to strike these counts on the grounds that they are legally insufficient because "there exists no legal duty to avoid startling a coworker." The court disagrees and finds that the complaint sufficiently alleges facts supporting the conclusion that the defendants owed the plaintiff a duty of care.

"The essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury." (Internal quotation marks omitted.) *Baptiste v. Better Val-U Supermarket, Inc., 262 Conn. 135, 138, 811 A.2d 687 (2002).* "There can be no actionable negligence, however, unless there exists a cognizable duty of care." *Waters v. Autuori, 236 Conn. 820, 826, 676 A.2d 357 (1996).* "The test for the existence of a legal duty of care entails (1) a determination of whether an ordinary person in the defendant's position, knowing what the defendant knew or should have known, would anticipate that harm of the general nature of that suffered as likely to result, and (2) a determination, on the basis of a public policy analysis, of whether the defendant's responsibility for its negligent conduct should extend to [*8] the particular

consequences or particular plaintiff in the case." (Internal quotation marks omitted.) *Zamstein v. Marvasti, 240 Conn. 549, 558, 692 A.2d 781 (1997).*

The defendants argue that no reasonable person could have foreseen that the plaintiff's alleged injuries would have resulted from the transmission of the email. However, the inquiry into whether an injury was foreseeable hinges, not on what a reasonable person could have foreseen, but rather on what a person *in the defendant's position,* knowing what the defendant knew or should have known, could have foreseen.

The complaint alleges the following facts in counts one, six and ten that, if proven, support the conclusion that the defendants could have foreseen the injury. Pfizer not only employed the plaintiff Morris, and Levis, but also controlled, possessed, managed and/or maintained the computers and premises on which the email was sent and received. Morris had immediate supervisory authority over both the plaintiff and Levis, and had a familiarity with Pfizer's written policies on the use of electronic systems. Morris knew both the plaintiff's medical history of suffering from angina attacks and the [*9] manner by which plaintiff operated her computer in close proximity to herself Levis knew the manner by which the plaintiff operated her computer in close proximity to herself, and knew Pfizer's written policies on business conduct.

"The final step in the duty inquiry, then, is to make a determination of the fundamental policy of the law, as to whether the defendant's responsibility should extend to such results." (Internal quotation marks omitted.) *Murillo v. Seymour Ambulance Ass'n, Inc., 264 Conn. 474, 480, 823 A.2d 1202 (2003).* The defendants argue that finding a legal duty in this case is "nonsensical as a matter of public policy." The court may rely on the following four factors to determine the extent of a legal duty as a matter of public policy: "(1) the normal expectations of the participants in the activity under review; (2) the public policy of encouraging participation in the activity, while weighing the safety of the participants; (3) the avoidance of increased litigation; and (4) the decisions of other jurisdictions." *Id.*

Review of these factors reveals that public policy could support a determination that the defendants had a legal duty to the plaintiff [*10] based on the facts alleged in the complaint. The complaint alleges that Pfizer had office polices prohibiting the conduct ascribed to the defendants. If true, those policies would have shaped the normal expectations of the parties in this case and support the finding that a legal duty existed. Accordingly, establishing a legal duty would neither discourage the public policy of proper electronic systems usage nor result in increased litigation. Because neither

party alerts the court's attention to decisions from other jurisdictions and the other factors of our public policy analysis do not counsel against establishing a legal duty, the court finds that one could exist based on the circumstances alleged in the complaint.

The defendants' motion to strike is denied with respect to counts one, six, and ten.

C. Counts Two, Seven, and Eleven: Negligence Per Se

Counts two, seven, and eleven assert negligence per se claims against Pfizer, Morris and Levis, respectively, based on a violation of *General Statutes § 53a-183.* n4 The defendants move to strike these counts on grounds that they are legally insufficient for two reasons. First, defendants assert that [*11] *General Statutes § 53a-183,* a penal provision, does not establish a legal duty on which to base a negligence per se claim. Second, the motion asserts that a negligence per se claim against Pfizer, a corporation, cannot exist because only persons, not corporations, can violate *General Statutes § 53a-183.* n5 These arguments ignore the requisite showing for a negligence per se claim. The complaint alleges facts that satisfy this showing.

> n4 *General Statutes § 53a-183(a)* provides: "A person is guilty of harassment in the second degree when: (1) By telephone, he addresses another in or uses indecent or obscene language; or (2) with intent to harass, annoy or alarm another person, he communicates with a person by telegraph or mail, by electronically transmitting a facsimile through connection with a telephone network, by computer network, as defined in section 53a-250, or by any other form of written communication, in a manner likely to cause annoyance or alarm; or (3) with intent to harass, annoy or alarm another person, he makes a telephone call, whether or not a conversation ensues, in a manner likely to cause annoyance or alarm." [*12]

> n5 The memorandum of law supporting the motion to strike quotes language from *General Statutes § 53a-3,* the definitions provision of the penal code, that states "person means a human being, and where appropriate, a public or private corporation . . ." The memorandum then states that *§ 53a-183,* on its face, cannot appropriately apply to corporations because a corporation cannot engage in harassment with intent to annoy. The memorandum neither describes why a

corporation cannot engage in such harassment, nor cites any case law supporting this assertion.

"Negligence per se operates to engraft a particular legislative standard onto the general standard of care imposed by traditional tort law principles, i.e., that standard of care to which an ordinarily prudent person would conform his conduct. To establish negligence, the [trier of fact] in a negligence per se case need not decide whether the defendant acted as an ordinarily prudent person would have acted under the circumstances. [The trier of fact] merely decides whether the relevant statute or regulation has been [*13] violated." (Internal quotation marks omitted.) *Gore v. People's Savings Bank*, 235 Conn. 360, 376, 665 A.2d 1341 (1995). "In order to establish liability as a result of a statutory violation, a plaintiff must satisfy two conditions. First the plaintiff must be within the class of persons protected by the statute . . . Second, the injury must be of the type which the statute was intended to prevent." (Citations omitted; internal quotation marks omitted.) *Id.*, 375.

The complaint sufficiently alleges facts that, if proven true, could establish liability under a negligence per se theory. The complaint alleges that the plaintiff was at all relevant times in the class of persons intended to be protected by § 53a-183. On its face this provision protects against harassment, annoyance, and alarm. The complaint alleges injuries that, if proven, could fall within the purview of harm that the statute intends to prevent.

The defendants' motion to strike is denied with respect to counts one, six, and ten.

### D. Count Three: Wrongful Discharge

Count three of the complaint alleges that Pfizer wrongfully discharged the plaintiff in violation of Connecticut public [*14] policy embodied in *General Statutes § § 31-49 and 53a-183*. The defendant correctly asserts that the availability of statutory remedies precludes this wrongful discharge claim.

"[The Supreme Court has] recognized that it is a general proposition that contracts of permanent employment, or for an indefinite term, are terminable at will . . . However [the Supreme Court] recognized a common law cause of action in tort for the discharge of an at-will employee if the former employee can prove a demonstrably *improper* reason for dismissal, a reason whose impropriety is derived from some important violation of public policy." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Burnham v. Karl & Gelb, P.C.*, 252 Conn. 153, 158-59, 745 A.2d 178 (2000). "The public policy exception to the general rule allowing unfettered termination of an at-will

employment relationship is a narrow one . . . Consequently, [the courts] have rejected claims of wrongful discharge that have not been predicated upon an employer's violation of an important and clearly articulated public policy." (Citations omitted; internal [*15] quotation marks omitted.) *Thibodeau v. Design Group One Architects, LLC*, 260 Conn. 691, 701, 802 A.2d 731 (2002).

"The mandate of public policy that [*General Statutes § 31-49* embodies] gives a Connecticut employee a cause of action for wrongful discharge against an employer transacting business in Connecticut if the employee is discharged for refusing to work under conditions that pose a substantial risk of death, disease or serious physical harm within the scope of the employee's duties." *Parsons v. United Technologies Corp.*, 243 Conn. 66, 80, 700 A.2d 655 (1997). However, "the existence of a statutory remedy precludes the plaintiff from bringing a common-law wrongful discharge action." *Burnham v. Karl & Gelb, P.C.*, supra, 252 Conn. 162.

"[*Section*] 31-49 is expressly included among those employment regulation statutes that the labor commissioner has a statutory duty to enforce." *Perille v. Raybestos-Manhattan-Europe, Inc.*, 196 Conn. 529, 545, 494 A.2d 555 (1985) (Shea, J., concurring). *General Statutes § 31-50* provides: "The commissioner [*16] shall enforce the provisions of part I of this chapter and Sections 31-23 to 31-49, inclusive, by giving proper orders or notices to the persons or corporations owning, operating or managing the factories or buildings inspected by him and shall make complaint to the state's attorneys of any violation of said provisions."

This court grants the defendants' motion to strike count three of the complaint because the plaintiff has a statutory remedy, described in § 31-50, by which to address her claim of wrongful discharge based on the public policy embodied in *General Statutes § 31-49*.

The wrongful termination claim cannot survive simply because the complaint also alleges a violation of the public policy embodied in § 53a-183. The plaintiff cannot prove that Pfizer dismissed her in violation of the public policy that undergirds this penal provision. This court will not expand the narrowly available wrongful termination claim to include the public policy embodied in *General Statutes § 53a-183*, a provision of Connecticut's penal code.

The defendants motion to strike is granted with respect to count three only.

### B. Counts Four and [*17] Nine: Intentional Infliction of Emotional Distress

Counts four and nine assert intentional infliction of emotional distress claims against Pfizer and Morris, respectively. The defendants move to strike these counts on the grounds that they "are legally insufficient because the alleged conduct is neither extreme nor outrageous."

"In order for the plaintiff to prevail in a case for liability under . . . [intentional infliction of emotional distress], four elements must be established. It must be shown: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." (Internal quotation marks omitted.) *Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 442-43, 815 A.2d 119 (2003).

"Liability for intentional infliction of emotional distress requires conduct exceeding all bounds usually tolerated by decent society, of a nature which is especially calculated to cause, and does cause, [*18] mental distress of a very serious kind." (Internal quotation marks omitted.) *Muniz v. Kravis*, 59 Conn.App. 704, 708, 757 A.2d 1207 (2000). "Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine . . . Only where reasonable minds disagree does it become an issue for the jury." (Citation omitted.) *Appleton v. Board of Education*, 254 Conn. 205, 210, 757 A.2d 1059 (2000). "A review of recent Connecticut decisions on the issue of extreme and outrageous conduct within the context of a claim for intentional infliction of emotional distress reveals that there is no bright line rule to determine what constitutes extreme and outrageous conduct sufficient to maintain this action. The court looks to the specific facts and circumstances of each case in making its decisions . . . The motion to strike must be denied if reasonable people could differ as to whether the defendants' conduct was extreme and outrageous." *Knight v. Southeastern Council on Alcoholism & Drug Dependency*, 2001 Conn. Super. LEXIS 2732, judicial district of New London, Docket No. CV 01 0557182 (September 21, 2001, Hurley, [*19] J.).

Because reasonable people could differ as to whether the defendants' conduct was extreme and outrageous, this court denies the defendants' motion to strike with respect to counts four and nine.

F. Count Five: Negligent Infliction of Emotional Distress

Count five asserts a negligent infliction of emotional distress claim against Pfizer. The defendant moves to strike this count on the grounds that it is legally

insufficient because it fails to allege facts about the termination process that would support a negligent infliction of emotional distress claim in the employment context.

"Negligent infliction of emotional distress in the employment context arises only where it is based upon unreasonable conduct of the defendant in the termination process." (Internal quotation marks omitted.) *Parsons v. United Technologies Corp., supra*, 243 Conn. 88 (1997). In *Perodeau v. Hartford*, 259 Conn. 729, 762-63, 792 A.2d 752 (2002), the Supreme Court distinguished between negligent infliction of emotional distress claims based on "conduct occurring within a continuing employment context" and such claims based on "conduct occurring in the termination [*20] of employment." The Supreme Court determined that "the societal costs of allowing claims for negligent infliction of emotional distress in the context of ongoing employment are unacceptably high." *Id.*, 762.

Count five of the plaintiff's complaint sufficiently alleges the following "conduct occurring in the termination of employment" and accordingly survives the defendants' motion to strike. The complaint alleges that Pfizer terminated the plaintiff because she did not return to her former position after allowing her to take disability leave to recover from the post traumatic stress syndrome. Moreover, Pfizer terminated her for not returning to that position after it represented to her that it would accommodate her injuries. The complaint further alleges that Pfizer knew that the plaintiff was incapable of performing her former position. These factual allegations describe conduct that occurred during the process of Pfizer terminating the plaintiff.

The defendants' motion to strike count five is denied because the complaint sufficiently alleges conduct occurring during the termination process that is capable of supporting the negligent infliction of emotional distress [*21] claim.

G. Count Eight: Recklessness

Count eight of the complaint alleges that Morris engaged in intentional and malicious conduct with reckless disregard of the effect that such conduct would have on the plaintiff. The defendants move to strike count eight on the grounds that it is legally insufficient because of "the absence of legal duty" and the complaint fails to sufficiently allege conduct that would support a claim of recklessness.

In order to establish Morris' duty on the recklessness claim, the complaint alleges essentially the same facts that it alleged to establish Morris' duty on the negligence claim. For the same reasons discussed above, this court finds that the complaint sufficiently pleads facts to

support the allegation that Morris owed the plaintiff a duty of care.

"To determine whether the plaintiff's amended complaint states a cause of action sounding in recklessness, [the courts] look first to the definitions of wilful, wanton and reckless behavior. Recklessness is a state of consciousness with reference to the consequences of one's acts . . . The state of mind amounting to recklessness may be inferred from conduct. But in order to infer it, there must [*22] be something more than a failure to exercise a reasonable degree of watchfulness to avoid danger to others or to take reasonable precautions to avoid injury to them . . . Wanton misconduct is reckless misconduct . . . It is such conduct as indicates a reckless disregard of the just rights or safety of others or of the consequences of the action." (Internal quotation marks omitted.) *Craig v. Driscoll, 262 Conn. 312, 342, 813 A.2d 1003 (2003).* "Although there is a difference between negligence and a reckless disregard of the rights or safety of others, a complaint is not deficient so long as it utilizes language explicit enough to inform the court and opposing counsel that both negligence and reckless misconduct are being asserted." *Id., 343.* "[This court recognizes] that the allegations in the counts alleging the negligent and reckless infliction of bystander emotional distress essentially mirror one another. Rather than adopting the defendants' conclusion that the allegations are not sufficient to state a cause of action for recklessness, however, we suggest that the plaintiff['s] allegations of negligence were overinclusive." *Id., 343 n.22.* [*23]

In this case, the complaint alleges facts that, if proven, could establish Morris' liability under both negligence and reckless standards of misconduct. Moreover, the complaint sufficiently notifies the defendant and the court that the plaintiff makes claims under both theories.

The defendants' motion to strike is denied with respect to count eight.

## H. Count Twelve: Loss of Consortium

In count twelve of the complaint, the plaintiff's husband asserts a loss of consortium claim against all three defendants. The defendants move to strike this count on the grounds that it is legally insufficient because it asserts a derivative claim that must fail once the underlying claims fail.

Because the motion to strike is denied with respect to all the counts except count three, the wrongful termination claim, the motion to strike count twelve is also denied.

## CONCLUSION

For the reasons articulated, above the motion to strike is denied with respect to counts one, two, four, five, six, seven, eight, nine, ten, eleven and twelve. The motion to strike is granted with respect to count three, the wrongful termination claim.

D. Michael Hurley, JTR