FEBRUARY 24, 2004 — DEPOSITION OF JEFF LEE — CROWN THEATERS v DALY, et al.

Case 3:02-cv-02272-AVC    Document 131-16    Filed 04/30/2004    Page 1 of 2

### Page 1

```
UNITED STATES DISTRICT COURT
    DISTRICT OF CONNECTICUT

  CASE NO. 3:02 CV 2272 (AVC)


CROWN THEATERS, L.P.,

             Plaintiff,

vs.

MILTON L. DALY, ANNE E. DALY,
TAYLOR-LEIGH, INC., JAMES C.
CELLA, G.U.S. DEVELOPMENT, INC.,
JAMES T. MARTINO, JAMES THOMAS
MARTINO ARCHITECT, P.C., and
RCD HUDSON, LLC,

             Defendants.
_____/



           DEPOSITION OF JEFF LEE

              February 24, 2004



       Deposition of JEFF LEE, a witness of
lawful age, taken by the Plaintiff, pursuant to
Notice heretofore served, before Amar Kredi,
Registered Professional Reporter, Certified
Shorthand Reporter and Notary Public, State of
Florida, at the offices of Hunton & Williams, 1111
Brickell Avenue, Suite 2500, Miami, Florida, on
Tuesday, February 24, 2004, commencing at 9:50 a.m.
and ending at 12:30 p.m.
```

### Page 2

```
              APPEARANCES:

JENNER & BLOCK
(BY: LAWRENCE S. SCHANER, ESQ.)
One IBM Plaza
Chicago, Illinois, 60611-7603
Attorneys for Plaintiff

WEINSTEIN & WISSER, P.A.
(BY: KERRY MARC WISSER, ESQ.)
29 South Main Street
Suite 207
West Hartford, Connecticut 06107
Attorneys for Daly & Taylor-Leigh, Inc.

MILBER MAKRIS PLOUSADIS & SEIDEN, LLP
(BY: MARISA LANZA, ESQ.)
Three Barker Avenue
Sixth Floor
White Plains, New York 10601
Attorneys for Martino

ALSO PRESENT:  Daniel Crown

                I-N-D-E-X

WITNESS              DIR   CROSS   RED   REC
Jeff Lee
 (By Mr. Schaner)     3      --
 (By Mr. Wisser)             60          114
 (By Ms. Lanza)             102           --

                EXHIBITS
                            Identification
Plaintiff's Exhibit No. 1          8
Plaintiff's Exhibit No. 2         13
Plaintiff's Exhibit No. 3         26
Plaintiff's Exhibit No. 4         30
Plaintiff's Exhibit No. 5 though 11  39
Plaintiff's Exhibit No. 12        57
Plaintiff's Exhibit No. 13        59
Plaintiff's Exhibit No. 14       111
```

### Page 3

1) THEREUPON:
2)     JEFF LEE,
3) having been first duly sworn, was
4) examined and testified as follows:
5)     DIRECT EXAMINATION
6) BY MR. SCHANER:
7)   Q.  Mr. Lee, good morning.
8)   A.  Good morning.
9)   Q.  My name is Larry Schaner. I represent
10) Crown Theaters, plaintiff in this case.
11)     Before we get started, let me tell you a
12) few things about the procedure today.
13)     First of all, you understand that you
14) are under oath?
15)  A.  Yes.
16)  Q.  Have you ever had your deposition taken
17) before?
18)  A.  Yes.
19)  Q.  How many times?
20)  A.  Oh, probably a dozen.
21)  Q.  Well, you're pretty experienced as a
22) witness, but let me remind you of a few of the
23) ground rules.
24)     One is that, because we're having a
25) written record made, only one of us can talk at a

### Page 4

1) time, so we should try to wait for the other one to
2) stop speaking before the other one speaks. Okay?
3)  A.  Okay.
4)  Q.  If at any point in time I ask you a
5) question you don't understand, please let me know.
6) It's important that you only answer questions you
7) understand. If there's one that I garble or mess
8) up, let me know and I'll try to rephrase it. Okay?
9)  A.  Okay.
10)  Q.  If at some point you'd like to take a
11) break, let me know. We'll take breaks from time to
12) time the this morning, but if you'd like to take a
13) break for any reason, just let me know. All right?
14)  A.  Okay.
15)  Q.  One other thing. It's important that
16) you answer my questions audibly, verbally. So no
17) nods of the head or shrugs of the shoulder, that
18) sort of thing. The court reporter can't get that
19) very well.
20)  A.  Okay.
21)  Q.  Please state your full name for the
22) record.
23)  A.  Jeffrey Walker Lee.
24)  Q.  What is your address, Mr. Lee?
25)  A.  7824 Southwest 160th Street, Miami.

Page 45

1) it?
2) A. Yes.
3) Q. Item four is replacement fill and
4) compaction. Did anyone provide those services?
5) A. Under Coastal's contract, no.
6) Q. If while Coastal was performing somebody
7) had come on the site and provided replacement fill
8) and compaction, would you have known about it?
9) A. Yes.
10) Q. The fifth item is aquatic removal and
11) stabilization, and I told you earlier I would show
12) you where that was coming from.
13)    Does looking at this in any way help you
14) understand what is meant by aquatic removal and
15) stabilization?
16) A. I just know that there wasn't any
17) aquatic removal and stabilization done under
18) Coastal's contract.
19) Q. If such work had been done -- and the
20) scheduled value here is $114,000. If such work had
21) been done during the time that Coastal was on-site
22) at the Jupiter project, would you have known about
23) it?
24) A. Yes.
25) Q. Earlier you testified that you had some

Page 46

1) dealings with James Martino. Did you actually meet
2) him in person?
3) A. Yes, sir.
4) Q. When did you first meet Jim Martino?
5) A. It would have been sometime during the
6) year 2000.
7) Q. Had you worked with him on projects
8) other than the Jupiter theater project?
9) A. No, sir.
10) Q. Since the Jupiter theater project --
11) A. No, sir.
12) Q. -- have you worked with him?
13) A. No, sir.
14) Q. Did Mr. Martino make any visits to the
15) Jupiter theater project job site?
16) A. That's when I met him, during the year
17) 2000.
18) Q. How often did Mr. Martino visit the job
19) site?
20) A. I'm only aware of him being on the site
21) a couple of times.
22) Q. Did you speak with him when he was on
23) the site?
24) A. Yes, I did.
25) Q. When you first met with him, what did

Page 47

1) you talk to him about?
2) A. I don't recall.
3) Q. Do you recall the substance of any of
4) your discussions with Mr. Martino when he was on
5) the job site?
6) A. Not specifically, no.
7) Q. Do you have a general recollection?
8) A. It would have been over what I would
9) term typical type construction design related
10) issues.
11) Q. Did you have any meetings with Martino
12) off the job site?
13) A. No, sir.
14) Q. Did you talk to him on the telephone?
15) A. A couple of times.
16) Q. Do you recall anything about the
17) substance of those discussions?
18) A. No, sir.
19) Q. When did your telephone conversations
20) with Mr. Martino occur?
21) A. Would have been during the year 2000 and
22) then 2001. We finished the job the summer of 2001.
23) It would have been during that 18-month period of
24) time.
25) Q. Were other people from Mr. Martino's

Page 48

1) firm on the job site? I think you mentioned that
2) he had an assistant who was working.
3)    MS. LANZA: Objection to form.
4) A. There was a gentleman. I don't recall
5) his name. He was not on the site with any
6) regularity either.
7) BY MR. SCHANER:
8) Q. Was list name Gary Scheidle?
9) A. Yeah, Gary.
10) Q. How often was Mr. Scheidle on the site?
11) You said he wasn't there with any regularity.
12) A. I couldn't attest to how often he was
13) there, but he wasn't there that often.
14) Q. Did you speak with him while he was
15) on-site?
16) A. I probably met Gary on-site maybe a
17) couple of times.
18) Q. Do you recall any of the substance --
19) A. Most of our dealings on the site as it
20) would relate to questions pertaining to the plans
21) and specifications came from directions from Bob
22) Beacher.
23) Q. Not Mr. Scheidle?
24) A. We had some direction from Scheidle;
25) some direction from Martino. I'm just saying the