**Steffian Bradley Architects**   Boston • London

Architecture

Urban Design

Planning

Interiors

Lighting

March 2, 2004

Lawrence S. Schaner, Esquire
Jenner & Block, LLC
One IBM Plaza
Chicago, IL 60611-7603

RE:   Crown Theatres, LP v. Milton Daly, et al.
      SBA Project No. 707.000

Dear Attorney Schaner,

The following is a supplement to both my September 25, 2003 and February 13, 2004 reports on the above referenced matter.

### Materials Reviewed Since February 13, 2004

I have reviewed the Depositions of Milton Daly (3 days); Anne E. Daly (with exhibits); Timothy R. Harmon (with exhibits) and the first day deposition of Frederick C. Hamilton.

I have obtained and read the Practice Guidelines for Architects Licensed in New York State published by the Office of the Professions of the New York State Education Department; The State of Illinois Architecture Practice Act of 1989 Section 1150.85, Acts Constituting the Practice of Architecture Pursuant to Section 5 of the Act; Regulations of Connecticut State Agencies Concerning the Practice of Architecture sections on Code of Ethics and Complaints and Adjudication Procedures; The State of Florida Statutes, Title XXXII, Regulations of Professions and Occupations, Chapter 481 Architecture, Interior Design and Landscape Architecture; and the Annotated Code of the State of Maryland, Title 3, Business Occupations and Professions section 09.21.02.01 Rules of Conduct.

I have reviewed the Standard Form of Agreement Between Owner and Contractor AIA Document A101-1997 or equivalent with the General Conditions of the Contract for Construction AIA Document A201-1997 with exhibits, plus the Specifications Manual prepared by James Thomas Martino, Architect, P.C. and the leases with miscellaneous correspondence between Bob Beacher, James Martino, Milton Daly and Glen Garfinkle for Crown Theatres, and their Landlords for all of the following Crown Theatre Projects:

100 Summer Street
Boston, MA
02110.2106

T 617.305.7100
F 617.305.7199

www.steffian.com

Page 2 of 16
Crown Theatres v. Daly



- The Grand, Miami, FL
- Annapolis Mall, Annapolis, MD
- Quarry Road, Trumbull, CT

- Abacoa, Jupiter, FL
- 18 Theatre Complex, Skokie, IL
- New Park Avenue, Hartford, CT

**Observations and Conclusions – Annapolis, MD Project**

The Annapolis, MD facility for Crown Theatres involved the landlord's design and construction of a parking structure and building shell to house the theatre complex on the second floor extension to the existing Annapolis Mall.

Working directly for the landlord, the design and documentation of the garage and second floor theatre's building shell was performed by the architect John Marro III, AIA from Newfoundland, NJ (Steffian Deposition Exhibit 4).

Martino and his office staff were deeply involved in the negotiations and coordination with the Crown Theatres Annapolis Mall landlord (Martino Deposition Exhibits 48, 49 and 50) in developing his designs and documentation of the Crown Theatres tenant fit-out inside the landlords building shell (see also correspondence among Milton Daly, Bob Beacher, Glen Garfinkle and James Martino with the representatives of the Annapolis Mall landlord, containing Bates stamp numbers JTM 121, 681 & 682, 675 & 676, 663 through 669, 555 through 560, 517 through 526, 442 through 444, 15216 & 15217).

Martino's contract documents, and those of his consulting engineers, reflected the division of work between the interior tenant fit-out work, which was the responsibility of Crown Theatres, and the garage and building shell work documented by architect John Marro, that was the landlord's responsibility.

The Martino documents were bid to several general contractors and awarded to Heffner and Weber of Linthicum MD for an original contract sum of $2,590,000. Heffner and Weber submitted monthly Applications and Certificates for Payment, AIA Document G702, for the completed work. (Martino Exhibit 57, Harman Exhibits 4 and 5.) Each Application and Certificate for Payment contained continuation sheets giving a detailed 25-item breakdown of the Description of Work and the corresponding Scheduled Value commonly called a "Trade Payment Breakdown." As back up for the Application and Certificates for Payment, the general contractor's Affidavit & Sworn Statement listed the trades to be performed, the name of the subcontractor performing each trade, and the contract price for each trade.

Each month the trades performing work would submit their individual Application and Certificate for Payment, AIA Document G702, with a detailed breakdown of their particular work all of which would be attached by Heffner and Weber to the monthly Application and Certificate for Payment.

Mr. Martino not only signed and certified the all inclusive Applications and Certificates for Payment from Heffner & Weber, he also signed each Application and Certificate for Payment from every one of a possible



eleven (11) trade sub-contractors, including those submitted by Sagamore Mechanical Construction Inc. and Alason Electrical Contactors Inc.

Not included in the Heffner & Weber monthly Applications and Certificates for Payment were separate Applications and Certificates for Payment from Hewlett Contracting of 640 Barnard Avenue Woodmere, NY, which were also signed and certified by Martino for payment by Crown Theatres.

The Martino signed and certified Applications and Certificates for Payment from Heffner & Weber and their individual sub-contractors, when compared to the Martino signed and certified Applications and Certificates for Payments No. 1, 2 and 3 from Hewlett Contracting, show an obvious duplication in several line items. The two Hewlett Contacting applications are for Item 1, Switch Gear, Controls and Mechanical Devices, for a lump sum Scheduled Value of $516,000 (Martino Exhibits 31, 32 and 33).

The Heffner & Weber monthly Applications and Certificates for Payment contain Alason Electrical Contactors Inc. and Sagamore Mechanical Construction Inc. applications as well. The Alason Electrical Contractors Inc. application breakdown lists Phase No. 89 and 89-1, Switch Gear Material and Switch Gear Labor, for a total of $40,000, plus Phase No. 90 and 90-1, Switch Gear Power Wiring-Material and Switch Gear Labor, for a second total of $45,000.

Martino also received via fax a copy of a 3/13/00 correspondence from Bob Beacher to Tim Harmon of Heffner & Weber noted, Subject: Switch Gear Shop Drawings, which said: (Bates number JTM 00803)

> Dear Tim:
>
> Attached please find the electrical engineers revised comments to the Switch Gear Shop Drawings submittal. Please proceed accordingly.
>
> Bob Beacher
> RLB/da
> Annapolis Switch Gear

By the above 3/13/00 correspondence from Beacher to Harmon at Heffner & Weber, Martino must have or should have known that the cost of the switch gear work was included in the Crown Theatres Agreement with the general contractor, Heffner & Weber.

Sagamore Mechanical Construction Inc. application breakdown lists Items 13 and 14, Controls-Material and Controls-Labor, for a total of $10,000.

Martino signed and certified Hewlett applications No. 2 and 3 claiming he relied of the Owners representative Bob Beacher's prior approval of the documents for their legitimacy. Martino admitted in his deposition that he did not make monthly "...on-site observations..." to determine that "...the work has progressed as indicated...and the contractor is entitled to payment of the AMOUNT CERTIFIED" (AIA



Document G702). Martino also admitted in his deposition that the address used by Hewlett Contracting is the same as Bob Beacher's address in Woodmere NY, where Martino visited often.

Martino also signed and certified Applications for Payment to Hewlett Contracting for five items of remedial work totaling $2,151,000 (Martino Exhibit 34). The Item No. Description of Work and the Scheduled Values are as follows:

| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE |
|---|---|---|
| 1 | Add'l Stadium Steel & Structural Supports For Girders & Beams | 851,500 |
| 2 | Add'l Power Requirements | 385,500 |
| 3 | S.R. Interior Walls | 355,500 |
| 4 | Add'l Stadium Concrete W/Reinforcing | 465,000 |
| 5 | Modify F.A. Panel & Sprinkler Systems | 94,000 |
| | TOTAL | 2,151,000 |

Item No. 1: Additional Stadium Steel & Structural Supports For Girders & Beams, for $851,500 refers to work not documented by Martino and, if legitimate, work that was the responsibility of the landlord as part of the agreed to building shell work.

Item No. 2: Additional Power Requirements, for $385,500 if required, would also be the responsibility of the landlord in the negotiated and agreed to division of work.

Item No. 3: S.R. (sheet rock) Interior Walls for $355,000 could apply to the tenant interior fit-out work, however it should have been designed and documented by Martino. Yet Martino had no knowledge of the need for this remedial work, its documentation, or whether it was actually performed and by whom.

Martino also signed and certified to ±$453,000 of similar sheet rock/drywall work by Leonard A. Kraus Co., Inc., a subcontractor working for Crown Theatres' general contractor, Heffner and Weber.

Item No. 4: Additional Stadium Concrete with Reinforcing for $465,000 is like Item No. 1. If required, it would be part of the landlords building shell responsibilities.

Item No. 5: Modify F.A. Panel & Sprinkler System for $94,000 could have been an addition to Crown Theatres scope of work and designed and documented by Martino's consulting engineers. Once more, Martino had no knowledge of the need for this work and he had not instructed his consulting engineers to document or evaluate any such remedial work and, in addition, he did not make on-site observations to determine if the work was actually performed and that Hewlett was entitled to payment of the amount certified.



Martino knew, or should have known, that the added remedial work for $2,151,000 in Hewlett's Applications and Certificates for Payment was either fictitious or the responsibility of someone other than his client, Crown Theatres.

Heffner and Weber, the general contractor, had a contract to build out the entire Crown Theatres interior space for $2,590,000, based upon Martino's contract documents. It is inconceivable that added remedial work could equal 83% of the original contract amount, and that the architect would certify to such amounts with no personal knowledge of its need, its documentation, and if the work had actually been performed and by whom. Also, the Applications and Certificates for Payment from Hewlett accounted for no retainage, where those from Heffner & Weber did. They were also not properly notarized, as required on AIA Document G702 and in general practice.

By signing the Application and Certificate for Payment from Hewlett Contracting for alleged additional or remedial work on the Crown Theatres' Annapolis Mall project (Martino Exhibits 32-33 and 34), Mr. Martino's actions, in my opinion, go well beyond gross negligence. I believe his conduct rose to the level of fraud and the wanton disregard of the interests and rights of his client, Crown Theatres. By these actions, Mr. Martino has certainly not lived up to the standard of care expected of an architect performing similar services in the same location as the Annapolis Mall project for Crown Theatres.

### Observations and Conclusions – Skokie, IL Project

The Skokie, IL facility for Crown Theatres involved the design and construction of a freestanding 18-theatre complex at the Village Crossing Shopping Center, 7000 Carpenter Road, Skokie, IL. The architect for the project was James Thomas Martino, Architect PC, working for Crown Theatres.

The project was bid using Martino's contract documents and awarded by Crown Theatres to the general contractor E. W. Howell Co., Inc. of Rosemont, IL using the Standard Form of Agreement Between Owner and Contractor where the basis of payment is a Stipulated Sum, AIA Document A101-1997. The Agreement is dated 25 February 2000 for the contract sum of $8,925,000. E.W. Howell submitted monthly Applications and Certificates for Payment, AIA Document C702, with a three-page numbered breakdown of the Description of Work with subcontractors listed by name and the scheduled value of work for each trade.

Martino signed and certified the E.W. Howell Co., Inc. all-inclusive monthly Applications for payment, along with accompanying applications for payment from individual subcontractors to E.W. Howell, such as SJN Subsurface, Inc. and Everhard Concrete Construction Inc. (Martino Exhibits 54, 55 and 56).

Concurrent with the E.W. Howell Co., Inc. all-inclusive monthly Applications and Certificates for payment, with attached subcontractors applications, Martino also received, signed and certified Applications and Certificates for Payment from Tiger Contracting against a contract sum of $1,561,000 (Martino Exhibits 4, 35, 36, 37, 38 and 39).



The Tiger Contracting Applications were for the following Items 1 through 9 with Descriptions of Work and Scheduled Values, plus unexplained Change Orders numbered 10 through 18, bringing the total to $1,976,753.

| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE |
|---|---|---|
| 1 | Excavation / Backfill | 159,000 |
| 2 | Footing Reinforcing | 195,000 |
| 3 | Pier & Col Reinforcing | 76,000 |
| 4 | Found Reinforcing | 245,000 |
| 5 | Gravel Base Ftg. | 117,000 |
| 6 | Gravel Base Piers | 68,000 |
| 7 | Gravel Base S.O.G. | 282,000 |
| 8 | Waterproof Found. | 55,000 |
| 9 | Utility Encasement | 364,000 |
| 10 | Change Order #1 | 27,188 |
| 11 | Change Order #2 | 17,170 |
| 12 | Change Order #3 | 47,971 |
| 13 | Change Order #4 | 54,843 |
| 14 | Change Order #5 | 87,086 |
| 15 | Change Order #6 | 36,306 |
| 16 | Change Order #7 | 39,434 |
| 17 | Change Order #8 | 44,235 |
| 18 | Change Order #9 | 61,520 |
| | TOTAL | 1,976,753 |

The Tiger Contracting Applications, Items 1 through 7 for a total value of $1,178,000, is for the same work as scheduled in the Martino signed and certified applications from Everhard Concrete Construction Inc., included in the monthly Applications and Certificates for Payment from E.H. Howell Co. Inc., general contractor for Crown Theatres (Martino Exhibit 54, Bates JTM 15237 and JTM 15238). Tiger Contracting Applications Item 8, Waterproofing Found (foundations) for a value of $55,000, was never necessary due to the type of construction and lack of below-grade space, except for the elevator pit. Also, the Martino Crown Theatres Village Crossing Shopping Center, 18 Theatre Complex Specifications section 07100 – Waterproofing and Dampproofing provided for the waterproofing of the foundation walls and footings of the elevation pit. The elevator pit waterproofing work was included in E.W. Howell Co., Inc.'s contract through its subcontractor All Sealants, Inc.

Martino was certainly aware that he had specified Waterproofing and Dampproofing in his specifications and that it was included in E.W. Howell Co., Inc.'s contract with Crown Theatres, since Martino had personally signed and certified to both E.W. Howell Co., Inc. application No. 1 (Martino Exhibit 56 – Bates



JTM 15321 and 15322) and the Application and Certificate for Payment from E.W. Howell Co., Inc.'s subcontractor, All Sealants, Inc. (Martino Exhibit 56 Bates JTM 1533 and 1534).

Tiger Contracting Applications, Item 9 Utility Encasement for a value of $364,000, could have been added concrete work, however it would have been the responsibility of the landlord as described in Martino's Specifications Section 02210, Site Clearing and Grading, as follows:

SECTION 02210
SITE CLEARING AND GRADING

PART 1 – GENERAL

    1.01    SCOPE

    A. The Scope of Work is to fall under the requirements of the Landlord's Site Development Contractor. The Landlord is to provide a pad for this building within 10" of the finished floor slab elevation. The 10" dimensions is derived from a 4" thick concrete slab and either 6" of clean granular fill as described on page 02200-2, or the Section 02200 Earthwork, or 6" of crushed stone gravel.

        2. The Landlord will be responsible for bringing all utilities to within 5 feet of the building. Provided as part of these Contract Documents are the Site Development Drawings for reference. This Contractor is responsible for connecting all utilities at the designated stopping point of the Landlord's work and bringing these utilities within the building.

        3. The Landlord will be installing all concrete curbs around the theatre building. Additionally, the Landlord will be installing a paved asphalt vehicular traffic bearing surface around the building and up to these concrete curbs. Provided as part of these Contract Documents are the Site Development Drawings for reference.

        4. This Contractor is responsible for providing and installing the concrete sidewalks around the theatre building as described on Architectural Drawing SDWK.

END OF SECTION

The Martino Specification Section 02210, Part 1-General, Item 1.01 Scope, paragraph A.1 calls for the Landlord to "...bring all utilities to within five feet of the building" which is an industry standard. Should there by an added requirement for Crown Theatres to encase their required utilities for the last five feet as they enter the building the cost to encase the water, sewer, electric and gas lines servicing the Crown Theatres complex would be no more than $10,000.



Mr. Martino knew or should have known that the Tiger Contracting Applications, Items 1 through 7, were for work that was duplicative of the work contracted for by Crown Theatres through E.W. Howell; that the dollar values were excessive for the alleged Scope of Work covered; and the work was the responsibility of the Landlord, not Crown Theatres.

Change Orders 1 through 9, totally $415,753, are listed with no descriptions of the required added work or a breakdown of the scheduled values. Plus, the Applications and Certificates for Payment from Tiger Contracting accounted for no retainage, where those from E.W. Howell did. They were also not properly notarized as required on AIA Document G702 and in general practice and Application No. 3 was not even signed by someone from Tiger Contracting, the applicant.

Martino should never have signed and certified any of Tiger Contracting's Applications and Certificates for Payment. Martino should have rejected all of them for not being notarized, not including retainage and Tiger Contracting's Application No. 3 for also being unsigned by anyone from the applicant, Tiger Contracting.

Martino admits in his deposition that he did not know what added work was covered in the Applications and Certificates for Payment from Tiger Contracting, nor did he make concurrent on-site observations to confirm that the work had been performed and Tiger Contracting was entitled to payment of the amount certified by Martino.

By signing and certifying the Applications and Certifications for Payment to Tiger Contracting, again Martino broke faith with his client, Crown Theatres. He did not perform the expected careful review and conformation that the work was necessary, had actually been performed, was of a reasonable value and the responsibility of his client, Crown Theatres. In fact, Martino ignored many obvious signs that the work was either fictitious, overstated in value or the responsibility of the landlord. Again, Mr. Martino's actions were unprofessional and with wanton disregard for the rights and interests of his client Crown Theatres. Mr. Martino did not live up to the Standards of Care expected of an architect performing similar services in the location of the Crown Theatres in Skokie, IL.

### Observations and Conclusions – Hartford, CT Project

The Hartford, CT facility involved the design and construction of a freestanding 17 Theatre Complex called "The Palace" located on New Park Avenue, Hartford, CT. The architect for the project was James Thomas Martino, Architect PC, working for Crown Theatres.

The Project was bid using Martino's Contract Documents and awarded by Crown Theatres to the general contractor, R.C.D. Hudson, LLC of New York, NY using the Standard Form of Agreement Between Owner and Contractor where the basis for payment is a Stipulated Sum, AIA Document A101-1997. The Agreement is dated 14 May 1999 for the Contract Sum of $8,450,900. The Owner Contractor Agreement contained a page entitled Palace Theatre Complex List of Qualifications where Item 10 states "All site work is excluded."



The Owner Contractor Agreement also contains the Table of Contents from the Martino Specifications book, which references Section 02210 – Site Clearing and Grading, which reads as follows:

SECTION 02201
SITE CLEARING AND GRADING

PART 1 – GENERAL

1.01 Scope – The Scope of Work is to fall under the requirements of the Site Development Contractor. The developer is to provide a pad for this building.

END OF SECTION

The Owner Contractor Agreement further included the List of Drawings prepared by Martino and his engineering consultants, as does Martino's project Specification in Appendix 'A' to Section 00100, Instructions to Bidders, pages 00100-4 through 00100-7. Neither of the above two lists of drawings includes any drawing prepared by Martino or his engineering consultants that is entitled Site Preparation Plan or any other indication of site work.

In a review of the Construction Contract Plans, prepared by James Thomas Martino, Architect, P.C. and his engineering consultants, which took place on January 26, 2004 at the offices of Crown Theatres in South Korwalk, CT, I personally confirmed that no plans showing site work beyond the immediate footprint of the Crown Theatres building and adjacent sidewalk were created by Martino or his engineering consultants for Bidding and Construction of Crown Theatres "The Palace" complex in Hartford, CT.

Martino was also sent a copy of the lease between Crown Theatre and the Hartford landlord for his review (Martino Exhibit 57). Included in the lease is, among other things, EXHIBIT "E" entitled LANDLORD'S WORK. ATTACHMENT 2 and ATTACHMENT 3 to EXHIBIT "E" are as follows:

ATTACHMENT 2 TO EXHIBIT 'E'

Description of Site Improvement Work

The Landlord shall provide and install without any cost to the Tenant all site development including but not limited to the following:

The Landlord will provide complete site development and landscaping plans and specifications, traffic studies and all associated work to obtain the building permits. The Landlord's scope of work will include but not be limited to site excavation, cuts and fill, paved driveway and parking areas in accordance with the geotechnical report, striping of parking lot. The telephone service, electric and gas service, sanitary and storm sewer systems and water mains are to be terminated five feet (5') from the Building. Fire hydrants, irrigation system, site lighting, sidewalks (other than sidewalks around the Building), curbs, retaining walls, legal access entrances and exits, off-site



roadwork, traffic controls, curb cuts, all D.O.T. requirements, dewatering, purchase and placement of any off site work. The Landlord will be responsible for the removal of any underground obstructions, blasting or rock removal, fencing or special Amtrak requirements.

The Landlord will include in this scope of work at no cost to the Tenant all site lighting, including but not limited to primary electric service to the transformer, transformer pad, ballard's and encasement of any utility line. The Landlord will also provide the secondary conduits from the transformer to five feet (5') from the Building, along with the required feeders. The Landlord will provide all conduit and wiring of all site lighting, site exit signs, site entrance signs, pylon sign, or any illuminate site signage from the Tenant's panel board to final termination at the fixture.

Landlord will provide and install all grease traps.

Landlord will demolish and remove all existing building and improvements and shall abate, remediate and remove all asbestos and other Hazardous Substances.

Additionally, Landlord will provide all requisite off-site improvements including roadway widenings, pavings, pavement curbing, overlays, road lighting, striping, directional signage, utility relocations, grading, traffic control, landscaping, bonds, traffic signals, and pedestrian crossings.

### ATTACHMENT 3 TO EXHIBIT "E"

Description of Soil Condition Work

1. Clear and grub existing vegetation and reclaim existing asphalt and concrete in accordance with geotechnical engineers' recommendations, so as to permit proper compaction and proper bearing for all improvements.

2. Rough grade the site to proposed subgrades in accordance with the requirements of the site development plans and specifications, geotechnical report, and all governmental codes, ordinances and regulations applicable to the Project.

3. Preparation of Tenant's building pad in accordance with all Construction Drawings, Site Improvement Drawings, landscaping plans, Landlord's geotechnical reports and all governmental codes, ordinances and regulations. Landlord in preparation of the earth work will use a method of control fill, compaction and achieve ninety-five percent (95%) Modified Proctor Density as determined from laboratory text ASTMD1557.

EXHIBIT "E" -- LANDLORD'S WORK, with Attachments 2 and 3 clearly describes the site improvement work to be provided and installed by the Landlord without any cost to the Tenant Crown Theatres. The Landlord's work included plans and Specifications; all associated work to obtain the building permits; excavation cuts and fill, paved driveways and parking areas with striping; sanitary and storm sewer systems and water mains to within 5 feet of the building; fire hydrants, irrigation systems, site lighting and sidewalks,



other than the sidewalk around the building plus other Landlord obligations. The Landlord's work also included clearing and grubbing of existing vegetation; rough grading and the preparation of the tenant's building pad in accordance with all Construction Drawings.

In the normal course of business R.C.D. Hudson, LLC, Crown Theatres general contractor, submitted monthly Applications and Certificates for Payment, AIA Document G702 with individual subcontractors Applications and Certificates for Payment attached. Mr. Martino signed and certified the R.C.D. Hudson, LLC applications, as well as those from individual subcontractors to R.C.D. Hudson LLC, each containing retainage from the amount being applied for. Martino also separately received, signed and certified an Application and Certificate for Payment, No. 1, from G.U.S. Development, Inc. for Site Preparation Work for the Original Contract Sum of $451,500 (Martino Exhibit 40). The G.U.S. Development, Inc. Application No. 1 was for the entire $451,500 and did not reflect any retainage against the amount being applied for, where the Applications from R.C.D. Hudson and his individual subcontractors did.

The G.U.S. Development, Inc.'s Application No. 1 contained a 5 Item, Description of Work and Scheduled Value on the Continuation Sheet as follows:

| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE |
|---|---|---|
| 1 | Excavation to – 10" | $226,500.00 |
| 2 | Purchase of Gravel | $84,700.00 |
| 3 | Placement of Gravel | $73,500.00 |
| 4 | Site Grading | $51,800.00 |
| 5 | Permits | $15,000.00 |
|   | GRAND TOTALS | $451,500.00 |

Martino signed and certified the G.U.S. Development, Inc. Application and Certification for Payment by Crown Theatres knowing that he and his engineering consultants had not designed or documented any Site Preparation Work; that R.D.C. Hudson LLC, the general contractor, had excluded all Site Work from his Agreement with Crown Theatres; and that the lease between Crown Theatres and their landlord clearly indicated in EXHIBIT "E" LANDLORD'S WORK that the Landlord would provide and install without any cost to the Tenant, Crown Theatres, all site development work including permits, excavation cuts and fell (purchase and placement of gravel) and site grading including preparation of the Tenant's building pad.

Mr. Martino admits in his Deposition that he had not made the required on-site observations to inform himself that the work had in fact progressed as indicated and the contractor, G.U.S. Development, Inc., of whom he had no knowledge, was entitled to payment in the amount certified by Martino.

Martino signed and certified the G.U.S. Development, Inc. Application No. 1 on June 9, 1999 and reported in his Deposition that the last time he had visited the Hartford site was September 23, 1998, more than eight months before the Application No. 1 from G.U.S. Development, Inc. was submitted to him.



In my opinion, Mr. Martino's actions in signing and certifying the G.U.S. Development, Inc. Application No. 1 represents gross negligence in the performance of his professional duties for his client, Crown Theatres, as well as wanton disregard for Crown Theatres' rights and interests.

Mr. Martino has not lived up to the Standards of Care expected of an architect performing services on a similar project in the general location of Hartford, CT.

### State Laws, Rules and Regulations

In reviewing the laws, rules, regulations and Codes of Ethics and Professional Conduct for the states of New York, Connecticut, Illinois, Maryland and Florida, where James Thomas Martino, AIA, worked and practiced architecture, I believe that his actions while providing services to his client, Crown Theatres, violated the requirements of each sate and its local Board of Registration for the Practice of Architecture.

By making secret referral fee payments to Crown Theatres' Owner Representative, Robert Beacher, for his aiding Martino in securing architectural commissions from Crown Theatres for the six theatre projects and by signing and certifying applications and certificates for payment by Crown Theatres for G.U.S. Development Inc., on the Hartford, CT project; for Tiger Contracting on the Skokie, IL Project; for Hewlett Contracting on the Annapolis, MD project; and for Marlin Contracting on the Miami and Jupiter, Florida projects; Martino violated the provisions of state law and the requirements of each state Board of Registration of Architects in the following states:

#### New York

#### Rules of the Board of Regents, Part 29, Unprofessional Conduct

29.1 General Provisions

a. Unprofessional conduct shall be the conduct prohibited by this section. The provisions of these rules applicable to a particular profession may define additional acts or omissions as unprofessional conduct and may establish exceptions to these general prohibitions.

b. Unprofessional conduct in the practice of any profession licensed, certified or registered pursuant to title VIII of the Education Law, except for cases involving those professions licensed, certified or registered pursuant to the provisions of Article 131 or 131-B of such law in which a statement of charges of professional misconduct was not served on or before July 26, 1991 the effective date of Chapter 606 of the Laws of 1991, shall included:

> 3. directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services;

> 4. permitting any person to share in the fees for professional services, other than: a partner, employee, associate in a professional firm or corporation, professional subcontractor or consultant authorized to practice the same profession, or a legally

Page 13 of 16
Crown Theatres v. Daly



authorized trainee practicing under the supervision of a licensed practitioner. This prohibition shall include any arrangement whereby the amount received in payment for furnishing space, facilities, equipment or personnel services used by a professional licensee constitutes a percentage of, or is otherwise dependent upon, the income or receipts of the licensee from such practice, except as otherwise provided by law with respect to a facility licensed pursuant to Article 28 of the Public Health Law.

29.3 General Provisions for design professions.

a. Unprofessional conduct shall also include, in the professions of architecture and landscape architecture, engineering and land surveying:

> 1. being associated in a professional capacity with any project or practice known to the licensee to be fraudulent or dishonest in character, or not reporting knowledge of such fraudulence or dishonesty to the Education Department;
>
> 2. failing to report in writing to the owner or to the owner's designated agent any unauthorized or improperly authorized substantial disregard by any contractor of plans or specifications for construction or fabrication, when professional observation or supervision of the work is provided for in the agreement between the owner and the design professional or when supervision of the work is under the control of the design professional;
>
> 3. certifying by affixing the licensee's signature and seal to documents for which the professional services have not been performed by, or thoroughly reviewed by, the licensee;

<u>Connecticut</u>

Sec. 20-289-10 Code of Ethics

> (1) Competence
>
> (a) In practicing architecture, an architect shall act with reasonable care and competence, and shall apply the technical knowledge and skill which is ordinarily applied by architects of good standing.
>
> (2) Conflict of Interest
>
> (a) If an architect has any business association or direct or indirect financial interest which may influence his judgment in connection with the performance of professional services, the architect shall fully disclose in writing to the client(s) or employer(s) the nature of the business association or financial interest, and if the client(s) or employer(s) object to such association or financial interest, the architect will either terminate such association or interest, or offer to give up the commission or employment.

Case 3:02-cv-02272-AVC  Document 131-17  Filed 04/30/2004  Page 14 of 16

Page 14 of 16
Crown Theatres v. Daly



(5) Professional Conduct

(b) An architect shall neither offer nor make any gifts with the intent of influencing the judgment of an existing or prospective client in connection with a project in which the architect is interested.

## Illinois

Section 1150.90 Standards of Professional Conduct

In order to safeguard life, health and property, to promote the public welfare, and to establish and maintain a high standard of integrity in the practice of architecture, the following Standards of Professional Conduct shall be binding on every person applying for or holding a license as an architect and on all partnerships and corporations authorized to practice architecture in this State.

a) Competence

2) An architect engaging in the practice of architecture shall act with reasonable care and competence, and shall apply the technical knowledge and skill which are ordinarily applied by licensed architects of good standing, practicing in the same locality.

b) Conflict of Interest

2) If an architect has any business association or direct or indirect financial interest which is substantial enough to influence the architect's judgment in connection with the architect's performance of professional services, the architect shall fully disclose in writing to the architect's client or employer the nature of the business association or financial interest, and if the client or employer objects to such association or interest, the architect will either terminate such association or interest or offer to give up the commission or employment.

c) Professional Conduct

4) An architect shall neither offer nor make any payment or gift, other than gifts of nominal value (including, but not necessarily limited to reasonable entertainment and hospitality), with the intent of influencing the judgment of an existing or prospective client in connection with a project in which the architect is interested.

5) An architect shall not engage in conduct involving fraud or wanton disregard of the rights of others.

## Maryland

09.21.02.01



.01 Rules of Conduct.

A. Competence

(1) In practicing architecture, an architect shall act with reasonable care and competence, and shall apply the technical knowledge and skills which are ordinarily applied by architects of good standing, practicing in the same locality.

B. Conflict of Interest.

(2) If an architect has a business association or direct or indirect financial interest which is substantial enough to influence the architect's judgment in connection with the architect's performance of professional services, the architect shall fully disclose in writing to the architect's client or employer the nature of the business association or financial interest. If the client or employer objects to the association or financial interest, the architect shall either terminate the association or interest, or offer to give up the commission or employment.

D. Compliance with Laws.

(2) An architect shall comply with the licensing laws and regulations governing architectural professional practice in this or other jurisdictions in which the architect practices architecture.

E. Professional Conduct.

(2) An architect may not either offer or make any gifts, other than gifts of nominal value, including, for example, reasonable entertainment and hospitality, with the intent of influencing the judgment of an existing prospective client in connection with a project in which the architect is interested.

(3) An architect may not engage in conduct involving fraud or wanton disregard of the rights of others.

Florida

455.227 Grounds for discipline; penalties; enforcement.--

(1) The following acts shall constitute grounds for which the disciplinary actions specified in subsection (2) may be taken:

(a) Making misleading, deceptive, or fraudulent representation in or related to the practice of the licensee's profession.

(l) Making or filing a report which the licensee knows to be false, intentionally or negligently failing to file a report or record required by state or federal law, or willfully impeding or obstructing



another person to do so. Such reports or records shall include only those that are signed in the capacity of a licensee.

(m) Making deceptive, untrue or fraudulent representations in or related to the practice of a profession or employing a trick or scheme in or related to the practice of a profession.

(n) Exercising influence on the patient or client for the purpose of financial gain of the licensee or a third party.

(p) Delegating or contracting for the performance of professional responsibilities by a person when the licensee delegating or contracting for performance of such responsibilities knows, or has reason to know, such person is not qualified by training, experience, and authorization when required to perform them.

In conclusion, it is my opinion that James Thomas Martino, AIA, acted unprofessionally, committed fraud, practiced gross negligence and exercised wanton disregard for the rights and interests of his client, Crown Theatres, while in the performance of his architectural services in connection with the Crown Theatres' projects described herein.

I further believe that Mr. Martino violated the laws, rules and regulations including the Codes of Ethics and Professional Conduct, promulgated by the states in which he worked and practiced for Crown Theatres.

I am in the process of receiving other information and reserve the right to amend and supplement this report should I learn further information that might be relevant to this matter.

Respectfully Submitted,

*Peter Steffian*

Peter Steffian, FAIA, NCARB
Principal