## Page 1

```
 1
 2  IN THE UNITED STATES DISTRICT COURT
 3  FOR THE DISTRICT OF CONNECTICUT
 4  -------------------------------X
    CROWN THEATRES, L.P.
 5
 6        Plaintiff
 7        vs.
 8  MILTON L. DALY, TAYLOR-LEIGH,
    INC., ANNE E. DALY, JAMES C.
 9  CELLA, G.U.S. DEVELOPMENT,
    INC., JAMES T. MARTINO and
10  JAMES THOMAS MARTINO,
    ARCHITECT
11
12        Defendants.
    -------------------------------X
13
14
15
16       DEPOSITION OF RONALD P. BERTONE
17            White Plains, New York
18            Wednesday, March 24, 2004
19
20
21
22
23
24  Reported by:
    HOWARD CHAIM CSR
25  JOB NO. 158629
```

## Page 2

```
 1
 2
 3
 4
 5            March 24, 2004
 6            10 a.m.
 7
 8       Deposition of RONALD P. BERTONE,
 9   held at the offices of Milber Makris
10   Plousadis Seiden, 3 Barker Avenue,
11   White Plains, New York, pursuant to
12   Notice, before HOWARD CHAIM, a
13   Certified Shorthand Reporter and Notary
14   Public of the State of New York.
```

## Page 3

```
 1
 2  A P P E A R A N C E S:
 3     JENNER & BLOCK, LLP
 4     Attorneys for Plaintiff
 5        One IBM Plaza
 6        Chicago, Illinois 60611
 7     BY: LAWRENCE S. SCHANER, ESQ.
 8
 9     MILBER MAKRIS PLOUSADIS SEIDEN
10     Attorneys for Defendants
11        3 Barker Avenue - 6th Floor
12        White Plains, New York 10601
13     BY: MARISA LANZA, ESQ.
14
15
16  ALSO PRESENT:
17     PETER STEFFIAN
```

## Page 4

```
 1
 2         IT IS HEREBY STIPULATED AND
 3   AGREED, by and between the attorneys
 4   for the respective parties herein,
 5   that filing and sealing be and the
 6   same are hereby waived.
 7         IT IS FURTHER STIPULATED AND
 8   AGREED that all objections, except as
 9   to the form of the question, shall be
10   reserved to the time of the trial.
11         IT IS FURTHER STIPULATED AND
12   AGREED that the within deposition may
13   be sworn to and signed before any
14   officer authorized to administer an
15   oath, with the same force and effect as
16   if signed and sworn to before the
17   Court.
```

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087   800.708.8087   FAX 312.704.4950

Page 125

1      Ronald P. Bertone
2  any involvement in negotiating the
3  schedules of value?
4      A.  No, I didn't ask him that
5  question. I don't think so.
6      Q.  Looking to the language of the
7  architect certificate for payment -- and
8  there is an example of that language in
9  Exhibit 7 -- for what parts of the
10 architect certificate did Mr. Martino rely
11 on Mr. Beacher?
12         MS. LANZA: I am going to object.
13     I don't understand the question. But
14     if you do.
15     A.  I am reading it again and I may
16 ask the same question.
17         THE WITNESS: Repeat the
18     question, please.
19         (Record read.)
20     A.  The phrase "the contractor is
21 entitled to payment of the amount
22 certified."
23     Q.  Is it your belief that
24 Mr. Martino did not know whether the
25 contractor was entitled to payment of the

Page 126

1      Ronald P. Bertone
2  amount certified?
3      A.  That's correct.
4         MS. LANZA: It mischaracterizes
5      his prior testimony.
6      Q.  Why do you say that is correct,
7  Mr. Bertone?
8      A.  What I said is Martino did not
9  know what each of the contractors were
10 supposed to be getting paid. So if he
11 didn't know what they were getting paid,
12 there is no way he could have known whether
13 the payment was correct or not.
14     Q.  Let me ask you this. If
15 Mr. Beacher handed Mr. Martino a stack of
16 payment applications and said to
17 Mr. Martino sign them and Mr. Martino went
18 ahead and signed them, would Mr. Martino's
19 conduct comply with the standard of
20 reasonable professional care for an
21 architect?
22         MS. LANZA: Just under those very
23     limited facts that you have given him?
24     Nothing else?
25     A.  Repeat the question, please.

Page 127

1      Ronald P. Bertone
2         (Record read.)
3      A.  And there was no discussion
4  preceding that statement?
5      Q.  Yes.
6      A.  And there was no review by
7  Martino of the construction photos or
8  visits to the construction site or anything
9  else involving the compliance with the
10 contract documents?
11     Q.  Yes. If Mr. Beacher simply
12 handed the stack of payment applications to
13 Mr. Martino and said sign them and
14 Mr. Martino based only on that proceeded to
15 sign the architect certificates, would that
16 be acceptable for a professional architect?
17     A.  I would have to say no.
18     Q.  Let's look at page 17 again.
19 Last sentence of item 3. "Beacher was
20 designated by Daly, as construction
21 manager, and performed services consistent
22 with those performed by a construction
23 manager-agent."
24         Was Mr. Beacher the owner's
25 representative on the theater projects?

Page 128

1      Ronald P. Bertone
2      A.  Yes, he was.
3      Q.  Was he designated as a quote
4  "construction manager-agent" close quote?
5      A.  The services he was preforming
6  were aligned or concurrent with those to be
7  performed by a construction manager-agent
8  on the site.
9      Q.  As a result of your investigation
10 did you find evidence that he was informed
11 by somebody at Crown Theatres that his
12 title would be construction manager-agent?
13     A.  I think Mr. Daly even said that
14 in his deposition, that Beacher was
15 construction manager.
16     Q.  He didn't say construction
17 manager-agent, did he?
18     A.  No. He said construction
19 manager.
20     Q.  Is the term construction
21 manager-agent a term of art in the
22 construction industry?
23     A.  Construction manager-agent is a
24 form of construction management project
25 delivery.

32 (Pages 125 to 128)

Page 129

Ronald P. Bertone

Q. Is there any difference between an owner's representative and a construction manager-agent?

A. It depends on the scope of services that are being performed by the entity.

Q. Is it your testimony that based on the work that you saw Mr. Beacher performing that he in effect was a construction manager-agent?

A. Yes.

Q. Does your view that Mr. Beacher was a construction manager agent have any bearing on your conclusion that Mr. Martino conducted himself within the standard of reasonable professional care on the theater projects?

A. Most definitely.

Q. Why is that?

A. Because when the owner has a full-time representative on the site, albeit the construction manager, the owner's representative or whatever they want to call them, they have a tendency to

Page 130

Ronald P. Bertone

make the architect services diminished during the construction administration phase.

I used in my report the word duplicity of services. A lot of times the owner will say if I have got somebody there on a full-time basis doing something why do I need someone else doing exactly the same thing.

So being as frugal as so many of the owners clients are, they will tell the architect not to do certain things because it's being done by the construction manager.

If there were a construction management type agreement between Beacher and Crown, you know, all of those specific duties might have been outlined in there.

But I did not see an agreement. All I saw was what was indicated in Daly's deposition and in what I saw in other depositions as to what was being performed by Beacher.

Q. In your experience how common is

Page 131

Ronald P. Bertone

it for an owner to employ both an architect and a construction manager-agent?

A. It's common.

Q. In those cases is it always the case that the architect's scope of service is reduced?

MS. LANZA: I am going to object to using the word always.

A. Yes, that's the word I am hung up on is always.

I can't think of an instance off the top of my head where the architect services would not be diminished. I am sure that there might be an occasion where it wouldn't be. But just in the outlining of the services to be performed by the entities in that project delivery method it doesn't make sense for two people to do the same thing.

Q. Have you ever worked on a project where there was a construction manager-agent but there was no agreement between the construction manager-agent and the owner?

Page 132

Ronald P. Bertone

A. No.

Q. Did you review any of the owner-contractor agreements in connection with these six theater projects?

A. No, I did not.

Q. Did you make a determination as to whether Mr. Martino reviewed the owner-contractor agreements?

A. No, I did not.

Q. Do you have an opinion regarding whether an architect should in performing his duties review owner-contractor agreements?

A. If it's within the scope of your services you do it. If it's not within the scope of your services you don't do it.

Q. If you are being asked to sign architect certificates should you as an architect review the owner-contractor agreement?

A. No, not necessarily.

Q. In your practice over the years where you have been asked to sign architect certificates have you reviewed

33 (Pages 129 to 132)

Page 153

1  Ronald P. Bertone
2  work was less than indicated in the
3  contract documents?
4      A. That's a function of the amount
5  that they are looking get paid for.
6      Q. So they are related.
7      The architect certificate, the
8  G-702, refers to Contract Documents and the
9  words Contract Documents are in capital
10 letters.
11     What are the Contract Documents
12 that are referred to in the architect
13 certificate?
14     A. Those that are referred to as the
15 contract documents within the agreement
16 between the owner and the contractor.
17     Q. The architect then needs to
18 review the owner-contractor agreement in
19 order to sign the character certificate,
20 correct?
21     A. Not necessarily.
22     Q. He won't know what the contract
23 documents are unless he sees the
24 owner-contractor agreement?
25     A. That is correct. But he can be

Page 154

1  Ronald P. Bertone
2  told what to look for by his particular
3  client.
4      Q. If the client doesn't tell the
5  architect, then the architect needs to see
6  the owner-contractor agreement in order to
7  know what the contract documents are?
8      A. That's correct.
9      Q. Have you determined what
10 documents Mr. Martino reviewed in
11 connection with his signature of architect
12 certificates on the theater projects?
13     A. His drawings and his project
14 manual or technical specification.
15     Q. In your opinion was that
16 sufficient?
17     A. I can't answer that.
18     Q. Why not?
19     A. Because I don't know what, you
20 know, if that's what the -- I would say
21 yes, it was sufficient because that's all
22 the client was asking of him.
23     Q. And how do you know that the
24 client was only asking that he review his
25 drawings and project manuals?

Page 155

1  Ronald P. Bertone
2      A. Because they didn't complain
3  about what he was doing.
4      Q. So you relied for your opinion
5  that the client didn't expect Mr. Martino
6  to look at more than his drawings and
7  project manuals on the fact that the client
8  didn't complain, right?
9      A. That's correct.
10     Q. Did you rely on anything else?
11     A. The fact that the projects were
12 constructed and received certificates of
13 occupancy goes to show that the buildings
14 were built according to the applicable
15 codes and the documents that were prepared
16 by Mr. Martino.
17     Q. So you rely on the fact that the
18 building ultimately turned out okay, is
19 that what you are saying?
20     A. Yes.
21     Q. Does the fact that Mr. Martino
22 signed architect certificates submitted by
23 sham contractors trouble you?
24     A. He didn't know they were sham
25 contractors when he signed them.

Page 156

1  Ronald P. Bertone
2      Q. Does it trouble you, though, that
3  he signed millions of dollars worth of
4  payment applications submitted by sham
5  contractors?
6      A. Yes.
7      Q. Do you have an opinion as to
8  whether Mr. Martino should have detected
9  that the payment applications that he
10 signed were submitted by sham contractors?
11     A. No, I don't have an opinion on
12 that. My opinion based on the preceding
13 question is predicated on the fact that I
14 am -- what bothers me most is that a client
15 takes advantage of an architect the way
16 they do. The way they did.
17     Q. You don't have an opinion whether
18 Mr. Martino should have detected that the
19 payment applications that he was signing in
20 many cases were submitted by sham
21 contractors?
22     A. No, I don't have an opinion on
23 that.
24     Q. Take a look at the language of
25 the architect certificate. It states that

Page 173

Ronald P. Bertone

1 what would you tell the client?
2 A. That we need to look at the scope
3 of the project more closely, look at the
4 site that the project is going on, evaluate
5 other constrictions that we may have
6 governing this particular project and then
7 we can make a better judgment as to what
8 the potential of cost overrun would be.
9 
10   If it's an addition or an
11 alteration project, that's a lot different
12 than one where you are building a brand new
13 building on a site. If there are the
14 possibility of soil problems later on,
15 that's another possibility.
16   That's what I am saying. You are
17 asking a very nebulous question.
18 Q. In the case of the Crown Theater
19 projects what magnitude of cost overrun
20 would you expect?
21 A. 15 to 20 percent.
22 Q. Why so high?
23 A. It happens. You have
24 contingencies between design issues and
25 construction issues. I would say all in

Page 174

Ronald P. Bertone

1 all you are probably could be looking at 15
2 or 20 percent.
3 Q. In the course of your work on
4 this case have you determined whether the
5 following entities did any work, Marlin
6 contracting, G.U.S. Contracting, Tiger
7 Contracting, Hewlett Contracting?
8 A. No, I was not asked to evaluate
9 that.
10 Q. As you sit here right now do you
11 have an opinion as to whether they did any
12 work on the project?
13 A. No, I do not have an opinion.
14 Q. Have you determined that those
15 entities, Marlin, Tiger, Hewlett and
16 G.U.S., submitted payment applications in
17 connection with the six theater projects?
18 A. Yes, I have seen payment
19 applications from those contractors.
20 Q. And many of those applications
21 were signed by Mr. Martino, you have
22 determined -- you understand that to be the
23 case?
24 A. Yes.

Page 175

Ronald P. Bertone

1 Q. Do you agree that Crown Theatres
2 should not have been caused to pay money to
3 Hewlett, Tiger, Marlin and G.U.S.?
4 A. I can't answer that.
5 Q. Why not?
6 A. Because I haven't evaluated that
7 portion of the project.
8 Q. Do you have an opinion as to
9 whether the payment applications submitted
10 by Marlin, Tiger, Hewlett and G.U.S. were
11 fraudulent?
12 A. No, I don't have an opinion on
13 that.
14 Q. I'd like to ask you some further
15 questions about your meeting with
16 Mr. Martino on January 9, 2004.
17   Do you have handy your original
18 notes from that meeting? And I am asking
19 for them because there are some colored ink
20 on them.
21   MS. LANZA: You mean the actual
22 original originals?
23   MR. SCHANER: Yes.
24 Q. In your meeting with Mr. Martino

Page 176

Ronald P. Bertone

1 did you ask Mr. Martino if he knew that
2 Mr. Daly and Mr. Beacher were stealing
3 money from Crown Theatres?
4 A. No, I did not ask him that
5 question.
6 Q. Did you ask Mr. Martino whether
7 he knew that Mr. Beacher was paying
8 kickbacks to Mr. Daly?
9 A. No, I did not ask him that
10 question.
11 Q. Did you ask him whether he was
12 making payments of any kind to Mr. Daly?
13 A. Martino?
14 Q. Yes.
15 A. No, I did not ask him that
16 question.
17 Q. Did you ask Mr. Martino whether
18 he was making payments of any kind to
19 Mr. Beacher?
20 A. No, I did not.
21 Q. Or to any business that
22 Mr. Beacher had an interest in?
23 A. No, I did not.
24 Q. Did you ask Mr. Martino if he