UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| CROWN THEATRES, L.P., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 3:02CV2272AVC |
| ) | Judge Alfred V. Covello |
| MILTON L. DALY, TAYLOR-LEIGH, ) | |
| INC., ANNE E. DALY, JAMES C. ) | April 30, 2004 |
| CELLA, G.U.S. DEVELOPMENT, INC., ) | |
| JAMES T. MARTINO, JAMES ) | |
| THOMAS MARTINO, ARCHITECT, ) | |
| P.C., and RCD HUDSON, LLC, ) | |
| ) | |
| Defendants. ) | |

## CROWN THEATRES' MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AGAINST MILTON L. DALY AND TAYLOR-LEIGH, INC.

At his deposition, defendant Milton L. Daly, the former executive vice president and chief operating officer of plaintiff Crown Theatres, L.P., admitted that he entered into a scheme which resulted in Crown Theatres' payment of over $6 million to fictitious entities for construction work that was never performed and for work that was invoiced at inflated rates. Of that $6 million, Daly admitted that he received $4.2 million. He further admitted that the scheme was never disclosed to Crown Theatres, that it constituted "self-dealing," that it was "wrong," and that he breached his fiduciary duties to Crown Theatres.

There are no disputed facts here, only a record of repeated admissions by Mr. Daly of wrongful conduct. On the basis of these admissions and the other undisputed evidence, Crown Theatres is entitled to judgment as a matter of law with respect to Counts VII, X, XIV, XVI and XXI of the Second Amended Complaint. For similar reasons, this Court should also grant summary judgment against defendant Taylor-Leigh, Inc. on Count VII.

## STATEMENT OF FACTS[a]

Defendant Milton L. Daly ("Daly") was the executive vice president and chief operating officer of Crown Theatres, L.P. ("Crown Theatres") from early 1996 until June 2001. (Deposition of Milton L. Daly, May 21, 2003 ("Daly Dep. I") at 15, attached hereto as Exhibit A; Deposition of Milton L. Daly, August 5-6, 2003 ("Daly Dep. II") at 52, 76-77, attached hereto as Exhibit B.)[b] He reported to Daniel Crown, president of Crown Theatres. (Daly Dep. II at 77.) Daly was responsible for implementing the policies and procedures of the company, for negotiating on behalf of the company, and for the financial viability of the company. (Id. at 80.) His duties included overseeing a large movie theatre expansion program, which involved construction projects at sites throughout the United States. (Id. at 87-91.) In that role, he was responsible for approving construction-related expenditures. (Id. at 191-93, 358-60.)

Daly retained Robert Beacher ("Beacher"), a construction consultant, and his firm B.B. Construction Consultants, to provide consulting and construction-related services in connection with the theatre projects. (Id. at 114-15.)

**The Kickback Scheme**

In 1998, Daly and Beacher devised a scheme to steal money from Crown Theatres. The scheme was simple: Beacher, through B.B. Construction and other entities that he controlled (collectively, the "Beacher entities"), submitted sham invoices to Crown Theatres, which Daly approved and caused Crown Theatres to pay. (Daly Dep. II at 204-06; see also Deposition of Robert L. Beacher ("Beacher Dep."), February 25-6, 2004 at 15-16, attached hereto as Exhibit C.) Many of the invoices were submitted on behalf of fictitious entities that

---

[a] The facts set forth herein are undisputed for purposes of this Motion.
[b] All exhibits to this memorandum are contained in Crown Theatres' separate appendix.

2

performed no work. (Beacher Dep. at 15-16.)[c] Others contained inflated charges for the work of actual contractors. (Beacher Dep. at 98.)[d] The proceeds from the Daly/Beacher scheme were divided 70/30, with 70 percent going to Daly and 30 percent going to Beacher. (Id.; Daly Dep. I at 134-36; see also Beacher Dep. at 17; Daly Resp. to 2nd Interrog. No. 15.) Beacher paid Daly his share by writing checks to defendant Taylor-Leigh, Inc., a Connecticut corporation, of which Milton Daly and his wife, defendant Anne Daly, were the officers and Milton Daly was the sole shareholder. (Daly Dep. II at 205-06; Daly Dep. I at 31, 34; Milton Daly and Taylor-Leigh, Inc.'s Responses to Crown Theatres' Second Set of Interrogatories and Requests for Production, dated May 23, 2003 ("Daly Resp. to 2nd Interrog.") No. 1, attached hereto as Exhibit D.)

Between approximately 1996 and May 2001, Daly caused Crown Theatres to pay in excess of $6 million to Beacher's companies. (Daly Dep. II at 207.) Of this amount, at least $4.2 million was passed through to Daly by Beacher, by way of defendant Taylor-Leigh, Inc. (Id.; Daly Dep. I at 136-38.)

Kroll Zolfo Cooper, a forensic accounting firm, was engaged by Crown Theatres to trace the route of the stolen money. Their investigation included an examination of the banking records of Taylor-Leigh, Inc. and those of Milton and Anne Daly, as well as records of payments from Crown Theatres to the Beacher entities. Kroll confirmed the mechanics of the

---

[c] Beacher formed three fictitious entities for purposes of submitting false invoices to Crown Theatres: Marlin Consulting, Inc.; Hewlett Consulting, Inc. and Tiger Consulting, Ltd. These entities had no employees and performed no work on any of the theatre projects. Beacher submitted to Daly bills on behalf of these entities for millions of dollars worth of phantom services. (Testimony of Frederick C. "Kip" Hamilton, Prejudgment Remedy Hearing, September 18, 2003 ("Hamilton PJR Testimony") at 24-26, attached hereto as Exhibit E.)

[d] Actual contractors on the theatre projects presented applications for change orders to Beacher, who acted as Crown Theatres' owner's representative. Beacher then, directly or through one of the Beacher entities, created new invoices that inflated the amounts purportedly due, and submitted the inflated invoices to Crown Theatres, which paid the inflated charges. Beacher paid the contractors the amounts that they had invoiced. He and Daly pocketed the difference. (Kroll Change Order Analysis, attached hereto as Exhibit F.)

3

scheme: invoices were paid by Crown Theatres; the checks were deposited into the accounts of B.B. Construction Consultants and the other entities created by Beacher for the perpetration of the scheme; and approximately 70% of the proceeds, at least $4.2 million, were routed to Daly by way of Taylor-Leigh, Inc. In all, Beacher and Daly misappropriated at least $6.016 million. (Frederick C. "Kip" Hamilton's report ("Hamilton Report"), which details methods and findings, is attached hereto as Exhibit G.)[e]

The scheme is generally depicted by the following diagram:



Robert Beacher also corroborates Daly's admissions and Kroll's findings. At his deposition, he stated that he "prepared invoices through several entities . . . for totally fictitious work . . . . Mr. Daly wanted 70 percent of the funds, which I provided to Mr. Daly through Taylor-Leigh." (Beacher Dep. at 11-12.) Beacher continued, "Crown was robbed of approximately $6 million, of which Taylor-Leigh obtained through my entities of [sic] $4.2 million." (Id. at 13; see also Hamilton PJR Testimony at 25-26.)

---

[e] Recently discovered documents disclose that the amount misappropriated from Crown Theatres, in fact, exceeds $6.9 million, approximately $900,000 more than was earlier believed. (Updated Kroll Analysis, attached hereto as Exhibit H.) If this matter proceeds to trial, Crown Theatres will be prepared to prove damages using the $6.9 million figure. However, for the purposes of this motion and to eliminate possible factual disputes, Crown Theatres assumes that the amount taken was $6.016 million. Daly and Beacher each admit that at least $6 million was wrongfully taken. (Daly Dep. II at 207; Beacher Dep. at 14.)

[f] $193,000 was deposited directly to one of the Dalys' personal accounts.

Once at Taylor-Leigh, the funds were distributed across a wide range of Daly and his wife's personal accounts and liabilities. (Declaration of Frederick C. "Kip" Hamilton, dated April 21, 2004, ¶¶ 5-11, attached hereto as Exhibit J.) For example, Daly transferred approximately $3.75 million into personal bank accounts held jointly with his wife Anne. (Id.) From those accounts, Milton transferred approximately $2.4 million into an investment account at Raymond James. (Id. ¶ 12.) In addition, Milton used funds from one of the Dalys' joint accounts to purchase nearly $500,000 of stock in companies such as Philip Morris, Compaq, Monsanto, and WorldCom. (Exhibit 4 to Hamilton Decl.) He used approximately $900,000 to pay down the Dalys' mortgages. (Hamilton Decl. ¶ 12.) Over $1 million of the proceeds have been traced to an investment by the Dalys in a movie theatre business in Alabama. (Hamilton PJR testimony at 28-9.) Day-to-day, Milton used the money taken from Crown Theatres for a wide range of activities that benefited himself and his family, including payments for home renovations, car payments, groceries and credit card bills. (Hamilton Decl. at ¶ 12.)

Milton Daly resigned from Crown Theatres on June 1, 2001. (Daly Dep. II at 20.) His resignation followed Crown Theatres' discovery that the movie theatre renovation and construction projects were experiencing large cost overruns. (Id. at 174-76.) In the weeks following Daly's resignation, Crown Theatres launched an internal investigation to determine the causes of the overruns. (Hamilton Decl. ¶ 2.)[g]

**Daly's Admissions**

Milton Daly has been deposed on two occasions, on May 21, 2003, and August 5-6, 2003. At each of his depositions, Milton made admissions which leave no doubt as to his

---

[g] Shortly after his resignation, Daly contacted Beacher, and offered him $2.8 million to take the fall for the scheme and to tell Crown Theatres that he was not involved. (Beacher Dep. at 24-25.)

5

culpability. In particular, he admitted that he caused Crown Theatres to pay at least $6 million, and that he and his wife received at least $4.2 million of this amount. (Daly Dep. I at 34-37.) In exchange for this money, neither he nor Taylor-Leigh, Inc. performed any work. (Daly Dep. I at 36-37.)

Daly also confessed to many of the particulars of the kickback scheme. Daly admitted that he and Beacher entered into an agreement by which they would split money that Crown Theatres paid Beacher. (Daly Dep. I at 35-6.) He also admitted that the proceeds of the fraud were divided 70/30, with Daly receiving 70%. (Daly Dep. II at 227.) Daly explained that Beacher had wanted to split the proceeds 50/50, but Daly had insisted that Beacher receive only 30%. (Daly Dep. II at 225.) Daly acknowledged that $6 million was taken from Crown Theatres and that 70 percent of this amount, or approximately $4.2 million, wound up in his pocket:

> Q. Between you and Mr. Beacher, you essentially received approximately $6.2 million from Crown Theatres, Right? You getting 70 percent, being 4.2 million, him getting about 30 percent, being a little bit less than another two million, right?
>
> A. Correct.

(Daly Dep. II at 207.)

Daly also admitted that his involvement in the scheme with Beacher was not disclosed to Crown Theatres (Daly Dep. II at 218-19), that his actions were wrong, and that they constituted self-dealing:

> Q: That leads to some follow-up questions for me. It is your intent to disgorge yourself or repay the $4.2 million?
>
> A: We've been negotiating, Mr. Martin, since –
>
> Q: I'm sorry that
>
> A: The answer is yes. I'm willing – The answer is yes.

6

> Q: That's your intent, right?
>
> A: That's the intent, to pay it.
>
> Q: And why is that your intent?
>
> A: Because it is a form of self-dealing, which was wrong. Doesn't belong to me. If I knew it belonged to me, if I knew that this was going on to the level that it came out to be, I would have never done this. It was wrong.

(Daly Dep. II at 139.)

Daly further admitted that he "had a fiduciary responsibility," and that "[t]hat [his] fiduciary responsibility was not upheld by self-dealing." (Daly Dep. I at 141; see also Defendant Milton L. Daly's Memorandum in Opposition to Motion to Compel Production of Documents, dated March 15, 2004, at 2 ("[T]he defendant has admitted, since the inception of this litigation, that he was responsible for "self dealing" and that he violated his fiduciary duty as an officer of the plaintiff.").) Despite his declared intent to repay the money, he has yet to return anything to Crown Theatres.[h]

## ARGUMENT

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure where, taking the facts and inferences in the light most favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Soares v. Univ. New Haven, 175 F. Supp. 2d 326, 329 (D. Conn. 2001); Fed. R. Civ. P. 56(c). The moving party bears the burden of demonstrating "that no

---

[h] Daly has attempted to justify his actions on the grounds that he thought that his scheme was going to save money for the company. (Daly Dep. I at 139-40.) However, he also testified that he was angry at the Crown family because he had not been given equity in Crown Theatres, and decided to take that equity whether it was given freely or not. (Daly Dep. II. at 226; Beacher Dep. at 15-16.) Whatever his reasons, he has admitted to all of the facts necessary for this Court to grant summary judgment on the counts presented in this motion.

7

genuine issue of material fact exists and the undisputed facts establish her right to judgment as a matter of law." Rodriguez v. City of New York, 72 F.3d 1051, 1060-61 (2d Cir. 1995).

Once the moving party meets its burden of establishing that there is no genuine issue of material fact, the non-moving party may not rest on the mere allegations contained in the pleadings. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The non-moving party's response, "by affidavits or as otherwise provided . . . must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Fed. R. Civ. P. 56(e). If evidence favoring the non-moving party is "merely colorable . . . or is not significantly probative . . . summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986) (citations omitted).

## I.   Count XXI:  Breach of Fiduciary Duty

Crown Theatres is entitled to judgment as a matter of law on Count XXI, which states a claim against Daly for breach of fiduciary duty. Daly has admitted repeatedly that he abused his position and breached his fiduciary responsibility to Crown Theatres by causing Crown Theatres to pay invoices submitted by Beacher for construction work that was never performed. The undisputed facts demonstrate that Daly owed fiduciary duties to Crown Theatres, and that he violated those duties by -- at the very least -- self-dealing.

To establish a claim for breach of fiduciary under Connecticut law, the plaintiff has the burden of showing that the defendant owed a fiduciary duty to it. The burden then shifts to the defendant, who must prove by clear and convincing evidence that he dealt fairly with the plaintiff. Ostrowski v. Avery, 243 Conn. 355, 361-62, 703 A.2d 117, 121 (2003); Konover Dev. Corp. v. Zeller, 228 Conn. 206, 219, 635 A.2d 798, 805 (1994).

JZG/32310/2/677019v1
04/30/04-HRT/

Daly's position as executive vice president and chief operating officer made him a fiduciary to Crown Theatres. It is well settled that a corporate officer is a fiduciary to his or her corporation as a matter of law. Chanoff v .United States Surgical Corp., 857 F. Supp. 1011, 1020 (D. Conn. 1994) (applying Connecticut law); Ostrowski, 243 Conn. at 363, 243 A.2d at 121-22; Katz Corp. v. T.H. Canty & Co., 168 Conn. 201, 207, 362 A.2d 975, 978-79 (1975). Indeed, Daly admits that he owed a fiduciary duty to Crown Theatres, and that he violated that duty:

> Q: Let me put it another way. In other words, the $4.2 million that Beacher gave to Taylor-Leigh, and that you took, you believe that that money belongs to Crown Theatres?
>
> A: Yes. I do now.
>
> Q: Right, and you said that, you also said that it was wrong. Why do you think it was wrong?
>
> A: I had a fiduciary responsibility. That fiduciary responsibility was not upheld by self-dealing.

(Daly Dep. I at 140-41.)

Having established that Daly was Crown Theatres' fiduciary, the burden shifts to Daly to demonstrate by clear and convincing evidence that the transactions at issue were fair. Ostrowski, 243 Conn. at 361-62. Daly cannot do so. A fiduciary breaches his duty when he uses the relationship to benefit personally, so-called "self-dealing." Murphy v. Wakelee, 247 Conn. 396, 401-02, 721 A.2d 1181, 1184 (1998). Daly admits that he is guilty of "self-dealing." (Daly Dep. II at 139, 218-19; Daly Dep. I at 140-41.) Moreover, the undisputed facts demonstrate that Daly did not deal fairly with his former employer. The transactions at issue were never disclosed to Crown Theatres (Daly Dep. II at 218-19.) Moreover, Daly derived enormous personal

9

benefits at Crown Theatres' expense. (Hamilton Declaration, ¶ 12.) And he has admitted repeatedly that he benefited personally, to the detriment of Crown Theatres:

> Q: At the previous deposition, you testified that you received through Taylor-Leigh approximately $4.2 million, correct?
>
> A: Yes, sir.
>
> Q: And that $4.2 million, as we trace the money, if you will, you can -- the tracing of the money shows that it came from Crown Theatres through BB Consulting, or one of Mr. Beacher's entities, and then was paid to Taylor-Leigh, correct?
>
> A: Yes.
>
> Q: And then out of the funds that were paid to Taylor-Leigh, those funds were in turn paid to you personally, correct?
>
> A: Yes.

(Daly Dep. II at 205.)

Daly has admitted every element of Crown Theatres' claim for breach of fiduciary duty: he owed fiduciary obligations to Crown Theatres; his scheme with Beacher constituted self-dealing in violation of his fiduciary duty, and, as a result of the abuse of his fiduciary position, he and Beacher received $6 million belonging to Crown Theatres. Given these admissions and the other undisputed facts, a reasonable jury could not find that Daly had established fair dealing by clear and convincing evidence. Therefore, this Court should grant Crown Theatres' motion for summary judgment on Count XXI, in the amount of $ 6,016,000 plus $2,485,367 in prejudgment interest.[i] See Select Creations, Inc. v. Paliafito Am., Inc., 911 F. Supp. 1130, 1153-56 (E.D. Wis. 1995).

---

[i] The calculation of prejudgment interest is discussed in section V, below.

10

## II.  Counts VII and XIV:  Conversion

This Court should grant summary judgment against both Milton Daly and Taylor-Leigh on Count VII of the Second Amended Complaint and against Milton Daly on Count XIV. Both counts state claims for conversion.  In Count VII, Crown Theatres alleges that Milton Daly and Taylor-Leigh converted Crown Theatres' funds by means of the Daly/Beacher kickback scheme.  Under the scheme, Daly caused checks for over $6 million to be paid to fictitious entities for work that was never performed or that was invoiced to Crown at an inflated rate. Through his collaboration with Beacher, 70% of the proceeds were then directed into Daly's Taylor-Leigh account.  Daly and Taylor-Leigh, Inc. further converted Crown Theatres' funds when they received the proceeds of the scheme, and retained them without authorization from Crown Theatres.  Count XIV also states a claim for conversion, pleading essentially the same allegations as those in Count VII against Milton Daly and his wife Anne Daly.[j]

To prove a claim for conversion, the plaintiff has the burden of showing:  (1) the funds taken by the defendant belonged to the plaintiff; (2) the defendant deprived the plaintiff of its funds for an indefinite period of time; (3) the defendant's conduct was unauthorized; and (4) the defendant's conduct harmed the plaintiff.  Aubin v. Miller, 64 Conn. App. 781, 796, 781 A.2d 396, 407 (2001).  The intent to exercise dominion or control over property is the only intent required for the tort of conversion.  Plikus v. Plikus, 26 Conn. App. 174, 180, 599 A.2d 392, 395 (1991).  Where no genuine issues of material fact exist, summary judgment in favor of the plaintiff is appropriate on a conversion claim.  Estate of Egidio Baraglia, Jr. v. Poulos, 2000 Conn. Super. LEXIS 2587, No. CV990497776S, at *10-11 (Sept. 18 2000) (this case, and all

---

[j] Crown Theatres has filed a separate motion for summary judgment against Anne Daly. (See Crown Theatres' Cross-Motion for Summary Judgment against Anne E. Daly on Counts XIV and XVI of the Second Amended Complaint, filed April 21, 2004.)

11

other unpublished opinions cited in this memorandum are attached hereto as Exhibit K); see also Cedarapids, Inc. v. Spezzano, No. CIV.3:96CV937 (AWT), 1998 WL 229844, at *2 (D. Conn. March 25, 1998) (granting summary judgment to plaintiff on conversion claim where it was uncontroverted that property was taken without authorization).

There are no disputed material facts. Daly admits that the funds taken through the 70/30 arrangement belonged to Crown Theatres. (Daly Dep. I at 140.) When Daly and Beacher took the funds, they intended to keep them indefinitely. (Daly Dep. I at 35-6; Daly Dep. II at 205-07.)[k] Furthermore, Daly's conduct was unauthorized. The 70/30 arrangement was secret, and was never disclosed to Crown Theatres. (Daly Dep. II at 218-19.) Finally, Crown Theatres has been harmed. Daly and Taylor-Leigh colluded with Beacher to take over $6.016 million of Crown Theatres' money.[l]

---

[k] Daly has stated that he intends to disgorge himself of the money taken from Crown Theatres (Daly Dep. I at 137-39), but Daly has returned nothing and has kept the money for years—more than enough to satisfy the indefinite time requirement. See Discover Leasing, Inc. v. Murphy, 33 Conn. App. 303, 310-11, 635 A.2d 843 (1993) (conversion found where funds were withheld from plaintiff for 5-7 months).

[l] Due to their collaboration with Beacher, Daly and Taylor-Leigh are liable for conversion of the entire $6.016 million even though only $4.2 million was transferred to the Taylor-Leigh account. See Aeroglide Corp. v. Zeh, 301 F.2d 420, 422 (2d Cir. 1962) ([E]very person is liable who personally or by agent commits an act of conversion, or who participates by instigating, aiding, or assisting another. Court affirmed, in part, lower court's holding that directors of cooperative were jointly and severally liable for authorization of a transaction wrongfully transferring ownership interest in chattel to a bank.); In re Ipswich Bituminous Concrete Prods., Inc., 79 B.R. 511, 519 (Bankr. D. Mass. 1987) ([W]hen two or more individuals commit a conversion, they are jointly and severally liable for the damages.); Refrigeration Discount Corp. v. Catino, 330 Mass. 230, 235, 112 N.E.2d 790, 793 (1953) (All parties engaged in committing a conversion of the goods of another may be held jointly or severally for the wrong. ). See also Lamb v. Peck, 183 Conn. 470, 472, 441 A.2d 14,16 (1981) (where evidence supports the conclusion that there was concerted action, each participant is vicariously liable for the entire injury caused by the concerted action); Gutowski v. City of New Britain, 165 Conn. 50, 54, 327 A.2d 552, 555 (1973) (The law permits the party injured to treat all concerned in the injury as constituting one party who by their joint cooperation accomplished certain injurious results and who are liable to respond to the plaintiff in a gross sum as damages.); Gionfriddo v. Gartenhaus Cafe, 15 Conn.

Again, Daly has admitted his wrongdoing. There are no disputed material facts. This Court should enter summary judgment in favor of Crown Theatres on Count VII against Milton Daly and Taylor-Leigh, Inc., and against Milton Daly on Count XIV in the amount of $6,016,000 plus $2,485,367 in prejudgment interest.

### III. Count X: Violation of the Connecticut Unfair Trade Practices Act

In Count X, Crown Theatres alleges that Milton Daly engaged in prohibited unfair trade practices under the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110, and that Crown Theatres suffered an ascertainable loss of money as a result of those practices. The acts that form the basis of this Count have already been discussed, and have been repeatedly admitted by the defendant. Daly entered into a scheme with Beacher by which Daly caused Crown Theatres to pay fictitious invoices submitted by Beacher and the Beacher entities. (Beacher Dep. at 11-13.) The proceeds of this scheme were split among Beacher and Daly, with Daly receiving 70%. (Daly Dep. I at 142.) Daly did not disclose this arrangement to his employer, Crown Theatres. (Daly Dep. II at 218-19). He has admitted that this conduct was not in the best interests of Crown Theatres, and that it was a breach of his fiduciary duty. (Daly Dep. I at 140-41.)

CUTPA provides a private cause of action to "[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a [prohibited] method, act or practice . . . ." Conn. Gen. Stat. § 42-110g(a). The practice complained of must be the proximate cause of the plaintiff's injury. Abrahams v. Young & Rubicam, Inc., 240 Conn. 300, 306, 692 A.2d 709, 712 (1997). The act prohibits "unfair

---

App. 392, 398-99, 546 A.2d 284, 289 (1988) (joint tortfeasors are those whose acts combine or coalesce to form one harm, and they may be held jointly and severally liable).

13

methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a). Trade or commerce is broadly defined as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state." Conn. Gen. Stat. § 42-110a(4). The terms of the act are to be liberally construed in favor of those whom the legislature intended to benefit. Concept Assocs., Ltd. v. Bd. of Tax Review, 229 Conn. 618, 623, 642 A.2d 1186 (1994).

Factors courts have applied to determine whether an act is prohibited by CUTPA include:

(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise – whether, in other words, it is within the penumbra of some common law, statutory, or other established concept of unfairness;

(2) whether it is immoral, unethical, oppressive or unscrupulous; and

(3) whether it causes substantial injury to consumers.

Jacobs v. Healey Ford-Subaru, 231 Conn. 707, 725, 652 A.2d 496, 505 (1995). No one factor is dispositive. Id., 652 A.2d at 506. Furthermore, a plaintiff need not prove an intent to deceive in order to show that a trade practice is unfair. Id. at 726, 652 A.2d at 506. Civil actions under CUTPA are not limited to claims brought by or causing injury to consumers. Larsen Chelsey Realty Co. v. Larsen, 232 Conn. 480, 497-98, 656 A.2d 1009, 1020 (1995).

If it prevails on this count, Crown Theatres will be entitled to actual damages, attorneys' fees and costs. Conn. Gen. Stat. § 41-110g(a)(d). In addition, this Court may, at its discretion, award punitive damages. Id. § 41-110(a).

14

Daly's actions constitute prohibited unfair trade practices. First, Daly's actions offend public policy. He abused his position as a senior executive at Crown Theatres to enrich himself through the commercial activities of the Crown Theatres' construction program. He authorized fraudulent invoices which, when paid by Crown Theatres, resulted in a loss to Crown Theatres of over $6 million in exchange for which it received nothing. Breach of a fiduciary duty can constitute a proscribed act of unfair competition under CUTPA when, as here, the defendant's actions went "well beyond governance of the corporation, and placed him in direct competition with the interests of the corporation." Fink v. Golenbock, 238 Conn. 183, 213, 650 A.2d 1243, 1260 (1996). Daly diverted corporate funds, through a commercial activity, to an entity he controlled.

The case of Spector v. Konover, 57 Conn. App. 121, 133-34, 747 A.2d 39, 46 (2000), is instructive. In Spector, the managing partner of a shopping mall was responsible for running the day-to-day operations for the partnership. Id. at 124. In that role, the partner diverted funds from partnership accounts into other accounts owned by the partner's outside business ventures. Id. at 125-26, 747 A.2d at 41. After transferring the funds, the partner used them to cover expenses for his other properties, diminishing the assets of the partnership and failing to credit interest earned on the partnership's money to its accounts. Id. The Appellate Court of Connecticut held that the managing partner's actions were a violation of CUTPA, because he diverted partnership funds to benefit himself. Id. at 133-34, 7474 A.2d at 46. The facts are nearly identical here. Daly diverted funds from Crown Theatres to benefit an entity he controlled and himself. As a result, Crown Theatres lost the use of its assets and the ability to earn interest from them. Daly's interests in pursuing the 70/30 scheme with Beacher were in conflict with Crown Theatres' interests, and therefore violated CUTPA.

JZG/32310/2/677019v1
04/30/04-HRT/

Crown Theatres has suffered an ascertainable loss of over $6 million. (Hamilton Report at 10.) In addition, Daly's unfair trade practices were the proximate cause of Crown Theatres' loss. Daly's agreement with Beacher to submit invoices and split the "profits" was the root of Crown's loss. In addition, Daly was necessary to the day-to-day operation of the scheme. As chief financial officer, he was responsible for overseeing the expansion program and the corresponding construction-related expenditures. (Daly Dep. II at 80, 87-91.) He approved the invoices submitted by the Beacher entities for payment. (Id. at 191-93, 358-60.) He signed many of the checks. (Id.) Ultimately, he admitted that, as a result of his actions, Crown Theatres was caused to pay over $6 million for work that was never performed. (Daly Dep. II at 207.)

Accordingly, this Court should enter summary judgment in favor of plaintiff Crown Theatres, L.P. on Count X in the amount of $6,016,000 plus attorneys' fees and costs.

## IV.   Count XVI:  Unjust Enrichment

In Count XVI, Crown Theatres contends that Milton Daly was unjustly enriched as a result of his receipt of at least $4.2 million as result of the 70/30 kickback scheme. Under Connecticut law, a claim for unjust enrichment requires the plaintiff to prove: (1) the defendant received a benefit from the plaintiff; (2) the defendant did not pay for that benefit; and (3) the failure to make payment was to the plaintiff's detriment. Fitzpatrick v. Scalizi, 72 Conn. App. 779, 786-87, 806 A.2d 593, 599 (2002). Unjust enrichment is a very broad and flexible doctrine that relies on the principle that it is contrary to equity and good conscience for a defendant to retain a benefit that has to come to him at the expense of the plaintiff. Gagne v. Vaccaro, 255 Conn. 390, 409, 766 A.2d 416, 427-28 (2001).

The facts are not in dispute. Milton Daly has admitted that he received at least $4.2 million from Crown Theatres by way of the Beacher entities and Taylor-Leigh, Inc. (Daly Dep. I at 34-37, 126.) He has admitted that Taylor-Leigh did no work for this money. (Daly

16

Dep. I at 36-37.) Daly has not paid Crown Theatres for this enormous benefit. The failure to make such payment was to Crown Theatres' detriment, because it lost the use of $4.2 million of its money. Therefore, this Court should enter summary judgment against Milton L. Daly on Count XVI in the amount of $4,211,000 plus prejudgment interest.

## V.     Prejudgment Interest

Prejudgment interest may be awarded for the detention of money after it becomes payable. Conn. Gen. Stat. § 37-3a(a). The determination of whether to award interest hinges on "whether the detention of the money is or is not wrongful under the circumstances." Alderman v. RPM of New Haven, Inc., 20 Conn. App. 566, 569, 568 A.2d 1068, 1070 (1990). A trial court must make two determinations under §37-3a when awarding prejudgment interest: (1) whether the party against whom interest is sought has wrongfully detained money due the other party; and (2) the date upon which the wrongful detention began in order to determine the time from which to calculate interest. Blakeslee Arpaia Chapman, Inc., 239 Conn. 708, 736, 687 A.2d 506, 523 (1997). Courts regularly award prejudgment interest in cases like this one. See, e.g. Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co., 231 Conn. 276, 282, 287, 649 A.2d 518 (1994) (affirming judgment including prejudgment interest for plaintiff in unjust enrichment action); see also Alderman, 20 Conn. App. at 570-71, 568 A.2d at 1070-71 (abuse of discretion not to award interest on conversion claim); Johnson v. Wadia, No. CV850075560S, 1991 WL 50291, at *15 (Conn. Super. Ct. Mar. 28, 1991) (conversion of funds constitutes "wrongful" detention of money) (Exhibit K).

This Court should award Crown Theatres compensatory prejudgment interest with respect to amounts due and owing to it on each of the counts for which it seeks summary judgment, with the exception of Count X. As explained previously, Milton L. Daly has

wrongfully detained money due to Crown Theatres. The amount owed to Crown Theatres can be ascertained by tracing the improper payments that Daly caused Crown Theatres to make to the Beacher entities. (Exhibit B to Hamilton Report.) Crown Theatres' accounting expert, Kip Hamilton, has calculated simple interest on the $6,016,000, at 10% per annum, which is the rate provided for by statute. Conn. Gen. Stat. §37-3a(a).

As shown in Mr. Hamilton's report, as of September 30, 2003, interest on the $6,016,000 was $2,134,343. Mr. Hamilton further determined that interest accrues on the principal amount at a rate of $1,648 per day. As of the date this motion was filed, April 30, 2004 (213 days after September 30, 2003), the amount of prejudgment interest due and owing was $2,485,367. (($1,648/day x 213 days = $351,024) + $2,134,343 = $2,485,367)).

## CONCLUSION

WHEREFORE, for the foregoing reasons, this Court should enter judgment in favor of Crown Theatres on:

A.  Count VII against Milton L. Daly in the amount of $6.016 million plus prejudgment interest.[m]

B.  Count VII against Taylor-Leigh, Inc. in the amount of $6.016 million plus prejudgment interest.

C.  Count X against Milton L. Daly in the amount of $6.016 million plus attorneys' fees and costs.

D.  Count XIV against Milton L. Daly in the amount of $4.211 million plus prejudgment interest.

E.  Count XXI against Milton L. Daly in the amount of $6.016 million plus prejudgment interest.

---

[m] Prejudgment interest on $6.016 million equals $2,485,367 + ($1,648/day x the number of days from April 30, 2004 until the date on which judgment is entered). See Section V, supra.

CROWN THEATRES, L.P.

By: _____
H. James Pickerstein (Bar No. Ct 05094)
Jodi Zils Gagné (Bar No. Ct 24376)
PEPE & HAZARD, LLP
30 Jelliff Lane
Southport, CT 06490
(203) 319-4000
(203) 259-0251 (fax)
hpickerstein@pepehazard.com
jgagne@pepehazard.com

and

Craig C. Martin (Bar No. Ct 12198)
Lawrence S. Schaner (Bar No. Ct 24756)
JENNER & BLOCK LLP
One IBM Plaza
Chicago, IL 60611
(312) 222-9350
(312) 840-7776 (fax)
cmartin@jenner.com
lschaner@jenner.com

Dated: April 30, 2004

19

JZG/32310/2/677019v1
04/30/04-HRT/

## CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that I have served all counsel of record in this action with a copy of the foregoing Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment by mailing a copy of the same by United States Mail, postage prepaid, to the following parties:

Kerry M. Wisser
Weinstein & Wisser, P.C.
29 South Main Street
Suite 207
West Hartford, CT  06107

Marisa Lanza
Milber, Makris, Plousadis & Seiden, L.L.P.
108 Corporate Park Drive
Suite 200
White Plains, NY  10604

Robert M. Frost
Zeldes, Needle & Cooper P.C.
1000 Lafayette Blvd.
P.O. Box 1740
Bridgeport, CT  06601

_____
Jodi Zils Gagne

Dated: April 30, 2004