Page 1

```
 1              UNITED STATES DISTRICT COURT
 2                DISTRICT OF CONNECTICUT
 3
 4
     ----------------------------x
 5
     CROWN THEATRES, L.P.,              :
 6
               Plaintiff,              :
 7
          -versus-                     : No. 02-CV-2272
 8                                       (AVC)
     MILTON L. DALY; TAYLOR-LEIGH,:
 9   INC.; JAMES C. CELLA;
     G.U.S. DEVELOPMENT, INC.;         :
10   JAMES T. MARTINO; and JAMES
     MARTINO, ARCHITECT, P.C.,         :
11
               Defendants.            :
12
     ----------------------------x
13
14
15
16              Deposition of MILTON L. DALY,
17       taken pursuant to the Federal Rules of
18       Civil Procedure, at the law offices of
19       Pepe & Hazard, 30 Jelliff Lane,
20       Southport, Connecticut, before James A.
21       Martone, L.S.R. #00248, and a Notary Public
22       in and for the State of Connecticut, on
23       May 21, 2003, at 11:10 a.m.
24
25
```

Page 2

```
 1   APPEARANCES:
 2       For the Plaintiff:
 3       JENNER & BLOCK, L.L.C.
         One IBM Plaza
 4       Chicago, Illinois 60611
         By: CRAIG C. MARTIN, ESQ.
 5           (312) 222-9350
 6
         For the Defendant James T. Martino:
 7
         MILBER, MAKRIS,
 8       PLOUSADIS & SEIDEN, L.L.P.
         108 Corporate Park Drive
 9       White Plains, New York 10604
         By: MARISA LANZA, ESQ.
10           (914) 681-8700
11
         For the Defendants Milton Daly and
12       Taylor-Leigh, Inc.:
13       WEINSTEIN & WISSER, P.C.
         29 South Main Street
14       West Hartford, Connecticut 06107
         By: KERRY WISSER, ESQ.
15           (860) 561-2628
16
         For the Defendants James C. Cella,
17       G.U.S. Development and R.C.D. Hudson:
18       LAW OFFICES OF S. DAVID VATTI
         375 Bridgeport Avenue
19       Shelton, Connecticut 06484
         (Not Present)
20           (203) 944-9392
21
     ALSO  PRESENT:
22
         Glen Garfinkle, Esq.
23       General Counsel, Crown Theatres
24       Daniel Crown
25
```

Page 3

```
 1              S T I P U L A T I O N S
 2
 3          IT IS HEREBY STIPULATED AND
 4   AGREED by and between counsel for the
 5   respective parties hereto that all
 6   technicalities as to proof of the official
 7   character before whom the deposition is to
 8   be taken are waived.
 9
10          IT IS FURTHER STIPULATED AND
11   AGREED by and between counsel for the
12   respective parties hereto that the
13   deposition may be signed before any Notary
14   Public.
15
16          IT IS FURTHER STIPULATED AND
17   AGREED by and between counsel for the
18   respective parties hereto that all
19   objections, except as to form, are reserved
20   to the time of trial.
21
22
23              * * * * * *
24
25
```

Page 4

```
 1               WITNESS INDEX
 2                               PAGE
 3   Direct Examination by Mr. Martin      5
 4   Cross-Examination by Mr. Wisser     132
 5   Redirect Examination by Mr. Martin  138
 6   Recross Examination by Mr. Wisser   145
 7   Further Redirect Examination        145
     by Mr. Martin
 8
                  EXHIBIT INDEX
 9
     PLAINTIFF'S      DESCRIPTION        PAGE
10
      1     Amended Notice of Deposition   5
11
      2     Promissory Note, 5/24/02      12
12
      3     Merrill Lynch documents       41
13
      4     Disclosure of Assets, 2/21/03 42
14
      5     Letter dated 3/10/03 and      54
15            attachment
16    6     Order for Prejudgment Remedy  56
17    7     Order for Disclosure of Assets 56
18    8     Letter dated 2/11/03          71
19    9     Letter dated 2/11/03          71
20   10     Copies of checks              74
21   11     Letter dated 10/1/02          83
22   12     Bill of Sale, documents       84
23   13     Binder of documents           90
24   14     Amended Notice of Deposition 127
25   NOTE: Exhibits retained.
```

Page 5

```
 1   M I L T O N   L.  D A L Y,
 2   17075 Perdido Key Drive, Pensacola, Florida,
 3   32507,
 4       called as a witness, having been first duly
 5       sworn by James A. Martone, a Notary Public
 6       in and for the State of Connecticut, was
 7       examined and testified as follows:
 8   DIRECT EXAMINATION
 9   BY MR. MARTIN:
10       Q.  Would you state your name for the
11   record.
12       A.  Milton Daly, D-a-l-y.
13       Q.  And your home address?
14       A.  17075 Perdido Key Drive, Pensacola,
15   Florida.
16       Q.  And --
17       A.  32507.
18           MR. MARTIN:  Let me mark this.
19           (Plaintiff's Exhibit 1 marked
20       for identification.)
21       Q.  Deposition Exhibit 1 is the amended
22   notice of deposition for the deposition of
23   Milton Daly concerning limited issues with
24   regard to your assets, Mr. Daly.  So in terms
25   of -- Have you had an opportunity to see this
```

Page 14

1  the way down to Mr. Abramsky's signature line,
2  that's part of the note?
3      A.  I would say that is accurate.
4          (In the presence of
5      Mr. Garfinkle.)
6      Q.  The reason we got off on that is we
7  were going through your employment with Odyssey,
8  and then your equity interest, and you said that
9  your equity interest was 70 percent.  And you
10  also said that you received payments from
11  Odyssey, interest payments.
12          Now I just want to make sure that
13  we understand your testimony correctly.  The
14  interest payments that you receive from Odyssey
15  are interest payments pursuant to the promissory
16  note, correct?
17      A.  That is correct.
18      Q.  Okay.  With regard to your employment,
19  you receive income as an employee of Odyssey,
20  correct?
21      A.  That is correct.
22      Q.  And then with regard to your 70
23  percent equity interest, do you receive any
24  income from Odyssey?
25      A.  No.

Page 15

1      Q.  Okay.  Other than your income as an
2  employee and the payments under the promissory
3  note, do you receive any other income from
4  Odyssey of any type?
5      A.  No.
6      Q.  Prior to September 1st, 2001, were you
7  employed?
8      A.  Yes.
9      Q.  Where?
10      A.  Crown Theatres in Norwalk, Connecticut.
11      Q.  And what, just so that we get it, what
12  date did you begin at Crown Theatres and what
13  date did you leave?
14      A.  November of '95 to June of 2001.
15      Q.  Other than this lawsuit, do you have
16  any present relationship with Crown Theatres?
17      A.  None.
18      Q.  Okay.
19          MR. MARTIN:  The way I'm going to
20  do this, Mr. Wisser, I'm not going to go through
21  this during this deposition so I'll save Crown
22  Theatres for later on, to try to stay focused on
23  the limited purpose for this deposition.
24          MR. WISSER:  That was my
25  expectation.

Page 16

1      Q.  All right.  With regard to other
2  business interests that you may have, other than
3  your interest in Odyssey, do you have any other
4  business interests in any way?
5          MR. WISSER:  Objection to the
6  form.  Do you understand what he means by
7  business interests?
8      A.  Are you talking about other businesses
9  that I own?
10      Q.  Yes.
11      A.  I own a company called Taylor-Leigh,
12  Inc.
13          MR. MARTIN:  Thank you for
14  objecting to form.
15      Q.  That is my question, other businesses
16  that you own.  Taylor-Leigh, Inc.?
17      A.  Yes.
18      Q.  Are there any others that you have an
19  ownership interest in?
20      A.  No.
21      Q.  Okay.  Do you have a -- so that we
22  understand, are you familiar with a company
23  called Roly-Poly or a restaurant franchise
24  called Roly-Poly?
25      A.  Sure I am.

Page 17

1      Q.  Did you at some point have an
2  ownership interest in Roly-Poly?
3      A.  That's been sold.
4      Q.  Okay.
5      A.  Yes.
6      Q.  The answer is yes?
7      A.  Yes.  I did at one point, yes.
8      Q.  And you've sold that interest?
9      A.  Uh-huh.
10      Q.  You have to speak audibly.
11      A.  Yes.
12      Q.  When did you sell that interest?
13      A.  March or April of 2001.
14      Q.  To whom did you sell it?
15      A.  I don't recall the name of the
16  company.
17      Q.  How much did you sell it for?
18      A.  I don't recall the sale price.
19      Q.  Do you recall approximately how much?
20      A.  A hundred thousand dollars.  $75,000.
21  Seventy-five to a hundred thousand dollars.
22      Q.  Okay.  All right.
23      A.  It was a joint venture with another
24  individual.  It was a small, little store.
25          MR. WISSER:  You've answered the

CROWN THEATRES v. DALY                                                                    May 21, 2003

Page 30

1    A.  Drew Kordas.  K-o-r-d-a-s, I believe.
2    Q.  A lawyer?
3    A.  Yes, in Norwalk.
4    Q.  What's the name of his firm?  Is it
5  Tierney, Zullo?
6    A.  Yes.  Thank you.  Tierney, Zullo.
7    Q.  Who have been officers of Taylor-Leigh
8  over the years?
9    A.  Just myself and my wife.
10   Q.  What is your wife's name?
11   A.  Anne, A-n-n-e.
12   Q.  Does she have a middle name?
13   A.  E., Eva.  E-v-a.
14   Q.  Okay.  Have there been registered
15  agents for Taylor-Leigh?
16   A.  Yes.
17   Q.  Who have the registered agents been
18  over the years?
19   A.  Tierney, Zullo.
20   Q.  Any others?
21   A.  No.
22   Q.  Was William Daly a registered agent?
23   A.  No.
24   Q.  Were any of your children ever
25  registered agents for Taylor-Leigh?

Page 31

1    A.  No.
2    Q.  Did Taylor-Leigh -- Let me see if I
3  can say it like this:  Setting aside the
4  employees that worked at the d/b/a Kangaroo
5  Pouch Kids, were there ever any employees of
6  Taylor-Leigh other than you and your wife, Anne?
7    A.  None.
8    Q.  Did you have a job title at
9  Taylor-Leigh?
10   A.  I was the president.
11   Q.  And what was Anne's job title?
12   A.  Secretary.
13   Q.  Was there a board of directors?
14   A.  No, just Anne and myself.
15   Q.  There was a board of directors?
16   A.  There was a board of directors, yes.
17   Q.  And it was comprised of you and Anne?
18   A.  Comprised of my wife and myself, yes.
19   Q.  Okay.  Did Taylor-Leigh have an
20  accounting firm that it used?
21   A.  No.
22   Q.  Other than Drew Kordas of Tierney,
23  Zullo, and Mr. Wisser, has Taylor-Leigh ever
24  employed any attorneys to represent it?
25   A.  No.

Page 32

1    Q.  Did Taylor-Leigh have any financial
2  advisers over the years?
3    A.  No.
4    Q.  As the president of Taylor-Leigh, what
5  were your job duties and responsibilities?
6    A.  I paid all the bills and I operated
7  the company.
8    Q.  What were Anne's duties and
9  responsibilities?
10   A.  She had no duties and she had no
11  responsibilities.  She was a name title only.
12   Q.  Did you receive income from
13  Taylor-Leigh?
14   A.  No.
15   Q.  Let me --
16   A.  Salary, excuse me.
17   Q.  Did you receive any income as an
18  employee of Taylor-Leigh?
19   A.  Yes.
20   Q.  Yes?
21   A.  Yes.
22       MR. WISSER:  As an employee is
23  the question.
24   A.  As an employee, no.  I'm sorry.  No.
25   Q.  Did you receive any compensation

Page 33

1  from -- Let's do it like this.  Did you receive
2  any compensation from Taylor-Leigh whatsoever?
3    A.  No.
4       MR. WISSER:  Listen to the
5  question.
6       Can I make a suggestion?  Can you
7  ask him if he got any salary as an employee and
8  then ask him about distribution?
9    Q.  Did you receive any money from
10  Taylor-Leigh ever?
11   A.  Yes.
12   Q.  Okay.  And did you receive money from
13  Taylor-Leigh as an employee of Taylor-Leigh?
14       MR. WISSER:  Object to the form.
15  I believe he means salary.
16   A.  No.  If you mean salary, no, I never
17  received a salary.
18   Q.  Okay.  Did you receive any money from
19  Taylor-Leigh as a member of the board of
20  directors?
21   A.  No.
22   Q.  Did you receive any money from
23  Taylor-Leigh as a result of your equity
24  interest?
25   A.  Yes.

SANDERS, GALE & RUSSELL                                              (203)624-4157

May 21, 2003

Page 34

1    Q.  What was your equity interest in
2  Taylor-Leigh?
3    A.  A hundred percent ownership.
4    Q.  Did Anne have any equity interest in
5  Taylor-Leigh?
6    A.  No.
7    Q.  So 100 percent ownership means that
8  since it was a corporation, you owned all of the
9  stock at Taylor-Leigh?
10    A.  That's correct.
11    Q.  And we'll go through this in a little
12  more detail with documents, but let me ask you
13  this first:  How much of your -- You were at
14  Taylor-Leigh at the same time, for example, that
15  you were at Crown Theatres.  How much of your
16  time was devoted to Taylor-Leigh in an average
17  week?
18        MR. WISSER:  Object to the form.
19  What year are we talking about?  What month are
20  we talking about?
21    A.  Very little.  One hour a week.
22    Q.  Okay.  And would you -- Withdrawn.
23        Do you know how much compensation
24  you received, let's just say money, how much
25  money you received from Taylor-Leigh as income

Page 35

1  for your equity over the years in total?
2    A.  $4.2 million.
3    Q.  Did you ever receive any money from
4  Taylor-Leigh as a result of the real estate
5  operations?
6    A.  No.
7    Q.  Did you ever receive any money from
8  Taylor-Leigh as a result of the day-care
9  operations?
10    A.  No.
11    Q.  What was the 4.2 million for?
12    A.  Dividends.
13    Q.  Dividends as a result of what business
14  of Taylor-Leigh?
15        MR. WISSER:  Objection to the
16  form.
17        You can answer if you understand
18  it.
19    A.  I don't understand the question.
20    Q.  Well, let me ask you, you said that
21  you didn't receive any compensation from
22  Taylor-Leigh in any form as a result of the real
23  estate business and no compensation from
24  Taylor-Leigh in any form as a result of the
25  day-care business.  So what business was it that

Page 36

1  generated the $4.2 million to return to you in
2  the form of a dividend?
3    A.  I had an arrangement with a company by
4  the name of BB Construction Company.
5    Q.  What was that arrangement?
6    A.  The arrangement was BB Construction
7  Company was going to do construction on various
8  projects that Crown Theatres had contracted
9  for.  Because of BB Construction's expertise in
10  the construction business, in building motion
11  picture theaters, the company, Crown Theatres,
12  was to receive savings in BB Construction
13  handling those aspects of those jobs, and those
14  savings were to be split between BB Construction
15  and myself.
16    Q.  When you say "myself," you mean
17  yourself or Taylor-Leigh?
18    A.  Taylor-Leigh, it was owned by me so
19  it's one and the same.
20    Q.  Okay.
21        MR. WISSER:  Let's use the
22  formality then.
23    A.  Okay.  Taylor-Leigh.
24    Q.  What did Taylor-Leigh do for BB
25  Construction?

Page 37

1    A.  Nothing.
2    Q.  Before we get off this, Taylor-Leigh
3  received approximately $4.2 million from BB
4  Construction, correct?
5    A.  Yes, correct.
6    Q.  And Taylor-Leigh did nothing for that?
7    A.  That is correct.
8    Q.  Taylor-Leigh, I want to shift gears to
9  Taylor-Leigh and its documents.  Are there
10  any -- do you have any documents for the
11  business, Taylor-Leigh?
12    A.  No.
13    Q.  Do you know if anyone has any
14  documents for the business, Taylor-Leigh?
15    A.  I believe Mr. Wisser has some
16  documents.
17        MR. MARTIN:  I assume you have
18  documents.
19        MR. WISSER:  I will indicate for
20  the record that the documents that I have are
21  the documents that were provided to me from
22  Ethan Levin-Epstein, which I have been advised
23  have previously been provided to you, as I've
24  indicated in all of my letters in the discovery
25  responses.

Page 122

1   A.  Because he was my partner and I just
2   wanted to be very up front with him that there
3   might be a complaint filed by Crown. It's a
4   small industry. He would have heard about it.
5   It's better to be forthcoming from me than
6   anyone else.
7       Q.  Did you tell him the claim would have
8   an impact on Odyssey?
9       A.  No. I just told him because he has a
10  relationship with Crown. I believe his Crown
11  sister is -- Dan's sister is the godmother of
12  one of his children or such, and eventually it
13  would have surfaced sooner or later, and I
14  didn't think it was necessary for him to receive
15  it from the outside. I thought it would be
16  better that I tell him of the story, about what
17  was coming down, and that's the only reason it
18  was told to him. Then he just two weeks later
19  went off the deep end and filed a lawsuit, tried
20  to get me out of the theater.
21      Q.  All right.
22      A.  This all happened in a two-week
23  period. I'm sorry I did not -- There were a
24  couple of e-mails.
25      Q.  Do you recall, sitting here today,

Page 123

1   specifically what you told him?
2       A.  I will paraphrase it.
3       Q.  Sure.
4       A.  That there was -- there was a problem
5   at Crown, when I was there. I don't know where
6   it's going to go. Looks like a complaint is
7   going to be filed. I wanted to advise you of
8   this.
9           Apparently from that
10  conversation, he picked up the phone and called
11  Crown, or whomever. He spoke with someone
12  obviously because he got a copy of the complaint
13  here, used it as part of his documentation for
14  the complaint against me. And that's why I said
15  to you I know he obviously has been in touch
16  with Crown, and that's it.
17      Q.  Is there anything else you recall
18  about that conversation with him?
19      A.  I just asked him what he was going to
20  do, and he never answered me, except filed the
21  lawsuit.
22      Q.  Could you search your e-mail to see if
23  you have any e-mail to or from him with regard
24  to those conversations that relate to this
25  lawsuit?

Page 124

1   A.  Sure.
2       Q.  Or what went on at Crown Theatres?
3       A.  Yes. I mean, there was nothing ever
4   transmitted or said to Mr. Abramsky, either
5   e-mail or verbally as to the complaint.
6           MR. WISSER:  As to the contents,
7   you mean?
8       A.  As to the contents of the complaint.
9   I told him there was a financial problem. As I
10  told you before, I'm repeating myself now, a
11  complaint may be filed, it looks like it's going
12  to be filed. Didn't want that to affect our
13  relationship, our operation. He took it, and
14  two weeks later, he filed the lawsuit.
15      Q.  With regard to the Odyssey business,
16  did you resign from Odyssey?
17      A.  Well, one way to dissolve my
18  relationship with Mr. Abramsky, in order to
19  dissolve my relationship with Mr. Abramsky,
20  because it had gotten to the level where he
21  filed the suit, I decided to resign. I was --
22  It was one trigger that would dissolve it.
23          I have subsequently resigned,
24  yes, but the LLC has a large window/small
25  window, depending upon the wind down of the

Page 125

1   business. It could go on for the next couple of
2   years, but I'm operating the business.
3       Q.  I assume that the wind-up and the
4   resignation is tied up in that litigation?
5       A.  Yes.
6       Q.  Okay.
7           (Recess: 2:01 to 2:04 p.m.)
8           MR. MARTIN:  What I'm going to
9   do, if it's okay with Mr. Wisser, we'll collapse
10  the depositions.
11          MR. WISSER:  Yes.
12          MR. MARTIN:  And I'll ask some
13  questions that are specifically related to
14  Taylor-Leigh now. We'll just, for all practical
15  purposes, collapse them.
16  BY MR. MARTIN:
17      Q.  With regard to the disclosure of
18  assets that was filed out, Mr. Daly, you
19  assisted Mr. Wisser in putting together that
20  document, correct?
21      A.  Correct.
22      Q.  Did Anne Daly have any role?
23      A.  None.
24      Q.  So with regard to insofar as
25  Taylor-Leigh is responding to that disclosure of

Page 134

1    Q. Okay.
2    A. Because the mortgage is in the name of
3  Taylor-Leigh and Milton Daly and I'm paying the
4  mortgage on the property.
5    Q. So there are no profits, if you will,
6  from that rent?
7    A. No. The mortgage is $670. The rent
8  we are receiving is $300 a month presently so
9  there's a negative. There's no profits there.
10    Q. Okay. Now you indicated that the
11  arrangement that you had with BB Construction,
12  that generated the 4.$2 million, and these are
13  my notes, I believe you said that BB was to do
14  work on construction projects for Crown, saving
15  money to the company, and Taylor-Leigh got a 70
16  percent split of those savings. Do you remember
17  that being your testimony?
18    A. That is my testimony.
19    Q. Okay. Let me just ask you, sir, if
20  this statement is more accurate in terms of that
21  relationship. Is --
22        MR. MARTIN: I'll object because
23  you're just testifying for him and leading him.
24        MR. WISSER: I'm on
25  cross-examination.

Page 135

1        MR. MARTIN: He is your witness.
2        MR. WISSER: I'm on cross.
3        MR. MARTIN: He is your witness.
4  The Federal Rules -- I'm on cross. I get to
5  treat him adversely, you don't. You have to ask
6  him open-ended questions as opposed to leading
7  questions unless you want to testify.
8        MR. WISSER: Have you completed
9  your --
10        MR. MARTIN: Yes.
11        MR. WISSER: That's a complete
12  misstatement of the rules of evidence, but
13  that's okay. When you look at them, you'll
14  understand that although you called him in, he's
15  an adverse witness, so you can cross-examine.
16  I'm on cross, I can lead. That's the benefit if
17  you call him as your own witness for me, but you
18  have done so. Notwithstanding that, we don't
19  need to argue.
20        The Federal Rules are absolutely
21  clear on that, Counsel, so when you look at
22  them, you'll understand. I'll complete my
23  questioning, please.
24  BY MR. WISSER:
25    Q. Sir, the relationship you've had with

Page 136

1  BB was the expectation that BB Construction was,
2  in fact, going to do work for Crown, with an
3  expectation that that work being performed by BB
4  was going to provide a savings to Crown; is that
5  correct?
6    A. That is exactly correct.
7    Q. Okay. And once that work was
8  performed -- Withdrawn.
9        That work was going to be
10  performed by BB rather than other contractors
11  performing that work for Crown?
12    A. That is what was said to me.
13    Q. Once that work was performed to a
14  savings for Crown, was it your understanding
15  with BB Construction that any profits derived
16  from performing that work were then going to be
17  split 70/30 in accordance with your arrange.
18    A. Yes.
19    Q. So you weren't actually going to
20  receive 70 percent of the savings to Crown but,
21  rather, any profits derived from that
22  relationship that was supposed to save money to
23  Crown; is that correct?
24    A. That is correct. Your statement is
25  correct.

Page 137

1    Q. And that is, in fact, how you have
2  disclosed the relationship in your interrogatory
3  responses, correct?
4    A. That's exactly how I've disclosed
5  them.
6    Q. Okay. So your statements to the
7  contrary here today, if they are contrary, are
8  in error?
9    A. I -- If they are contrary, yes, they
10  are in error.
11    Q. To the extent any of the property that
12  is the subject of the prejudgment remedy is sold
13  in the future, you will sell that property
14  subject to the prejudgment remedy and have the
15  monies retained by me as your counsel subject to
16  the prejudgment remedy; is that correct?
17    A. Yes.
18    Q. It is not your intent to sell any
19  property in violation of the court order; is
20  that correct?
21    A. That is correct.
22    Q. With regard to the $4.2 million that
23  Taylor-Leigh received from the arrangement that
24  you discussed here today, it is your intention
25  to disgorge that $4.2 million through some

Page 138

1   liquidation of some assets you have?
2       A.   Yes.
3       Q.   It is your intent to pay that $4.2
4   million to Crown or any other appropriate
5   individual; is that correct?
6       A.   Yes.
7       Q.   So under those circumstances it's not
8   the intent of Taylor-Leigh to have had any
9   financial grain as a result of receipt of those
10  monies, correct?
11      A.   That is correct.
12      Q.   As you sit here now, can you think of
13  any further amendments to this disclosure of
14  assets that I should make on the record? There
15  were a couple of assets that you had not
16  provided information.
17      A.   No.
18      Q.   There's nothing else you can think of?
19      A.   No.
20      Q.   If you do think of them, you will
21  advise me and we'll do an amendment?
22      A.   Yes.
23          MR. WISSER:  I have nothing
24  further.
25  REDIRECT EXAMINATION

Page 139

1   BY MR. MARTIN:
2       Q.   That leads to some follow-up questions
3   for me. It's your intent to disgorge yourself
4   or repay the $4.2 million?
5       A.   We've been negotiating, Mr. Martin,
6   since --
7       Q.   I'm sorry, that --
8       A.   The answer is yes. I'm willing --
9   The answer is yes.
10      Q.   That's your intent, right?
11      A.   That's the intent, to pay it.
12      Q.   And why is that your intent?
13      A.   Because it is a form of self-dealing,
14  which was wrong. Doesn't belong to me. If I
15  knew it belonged to me, if I knew that this was
16  going on to the level that it came out to be, I
17  would have never done this. It was wrong.
18  We're been talking since September-August of
19  2001 when this surfaced. And --
20          MR. WISSER:  You've answered the
21  question.
22      Q.   Why do you say it's a form of
23  self-dealing?
24      A.   Because I should have never done
25  that. I thought that the company was going to

Page 140

1   derive a lot of savings through Mr. Beecher's
2   companies by taking portions of the jobs, him
3   handling it, saving the company money.
4          I was being paid a salary by
5   Crown Theatres. The arrangement should have
6   never been made. He should have just supervised
7   the jobs, instead of stating that he was going
8   to do the work, which was never done. So
9   therefore, it was wrong. It was the wrong thing
10  to do.
11      Q.   So when you say saving the company
12  money, you mean saving Crown Theatres money?
13      A.   That is correct.
14      Q.   So to the extent that there were
15  savings from whatever arrangement from
16  Mr. Beecher working on this, it's your view that
17  those savings properly belong to Crown Theatres,
18  correct?
19      A.   Well, it's pretty obvious that there
20  were no savings.
21      Q.   Let me put it another way. In other
22  words, the $4.2 million that Beecher gave to
23  Taylor-Leigh, and that you took, you believe
24  that that money belongs to Crown Theatres?
25      A.   Yes. I do now.

Page 141

1       Q.   Right, and you said that, you also
2   said that it was wrong. Why do you think it was
3   wrong?
4       A.   I had a fiduciary responsibility.
5   That fiduciary responsibility was not upheld by
6   self-dealing. Mr. Beecher was to provide a
7   service which he never provided, so therefore,
8   it is wrong, Mr. Martin.
9       Q.   And you also said that if you knew
10  that it would come out to the level it
11  ultimately did, you would have done something
12  different.
13      A.   Well, what I meant to say, if I knew
14  that the work was not going to be done, this
15  would have never occurred. Obviously.
16      Q.   With regard to the relationship,
17  whatever it was, as you've testified a couple
18  different ways on it now, with BB Construction,
19  and Mr. Beecher, by which 70 percent of this
20  money flowed back to Taylor-Leigh and then to
21  you, did you ever tell anyone at Crown Theatres
22  about that?
23      A.   No.
24          MR. WISSER:  Object to the form.
25          You can answer.

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2                DISTRICT OF CONNECTICUT
 3

 4

 5      ----------------------------x VOLUME I
        CROWN THEATRES, L.P.,          :
 6

                  Plaintiff,           :
 7

            -versus-                   : No. 02 CV 2272
 8                                         (AVC)
        MILTON L. DALY; TAYLOR-LEIGH, :
 9      INC.; JAMES C. CELLA; G.U.S.
        DEVELOPMENT, INC.; JAMES       :
10      T. MARTINO; and JAMES T.
        MARTINO ARCHITECT, P.C.        :
11
                  Defendants.          :
12      ----------------------------x
13

14

15                  Deposition of MILTON L. DALY,
16          taken pursuant to the Federal Rules of
17          Civil Procedure, at the law offices of Pepe
18          & Hazard, 30 Jelliff Lane, Southport,
19          Connecticut, before James A. Martone,
20          L.S.R. #00248, and a Notary Public in and
21          for the State of Connecticut, on August 5,
22          2003, at 10:15 a.m.
23

24

25
```

Page 2

```
 1  A P P E A R A N C E S :
 2      For the Plaintiff:
         JENNER & BLOCK, L.L.C.
         One IBM Plaza
 4      Chicago, Illinois 60611
 5      By: CRAIG C. MARTIN, ESQ.
             ADAM HIRSCH, ESQ.
             (312) 222-9350
 6
 7      For the Defendant James T. Marino:
 8      MILBER, MAKINS, PLOUSADIS & SEIDEN,
         L.L.P.
 9      108 Corporate Park Drive
         White Plains, New York 10604
10      By: MARISA LANZA, ESQ.
             (914) 681-8700
11
12      For the Defendants Milton Daly and
         Taylor-Leigh, Inc.:
13
         WEINSTEIN & WISSER, P.C.
14      29 South Main Street
         West Hartford, Connecticut 06107
15      By: KERRY WISSER, ESQ.
             (860) 561-2628
16
17      For the Defendants James Cella and
         G.U.S. Development:
18
         LAW OFFICES OF S. DAVID VATTI
19      375 Bridgeport Avenue
         Shelton, Connecticut 06484
20      By: S. DAVID VATTI, ESQ.
             (203) 944-9392
21
22  A L S O   P R E S E N T :
23      Dan Crown
         Lisa Wood
24      Kathleen LaValle
25
```

Page 3

```
 1              S T I P U L A T I O N S
 2
 3          IT IS HEREBY STIPULATED AND
 4      AGREED by and between counsel for the
 5      respective parties hereto that all
 6      technicalities as to proof of the official
 7      character before whom the deposition is to
 8      be taken are waived.
 9
10          IT IS FURTHER STIPULATED AND
11      AGREED by and between counsel for the
12      respective parties hereto that the
13      deposition may be signed before any Notary
14      Public.
15
16          IT IS FURTHER STIPULATED AND
17      AGREED by and between counsel for the
18      respective parties hereto that all
19      objections, except as to form, are reserved
20      to the time of trial.
21
22
23              * * * * * *
24
25
```

Page 4

```
 1              WITNESS INDEX
 2                                    PAGE
 3  Direct Examination by Mr. Martin      5
 4
 5
 6
 7              EXHIBIT INDEX
 8  PLAINTIFF'S      DESCRIPTION      PAGE
 9      1      Lease dated 6/18/98      95
10      2      Trumbull lease          95
11      3      Building Construction Budget  98
12      4      Letter dated 12/6/95    116
13      5      Building Construction Budget 139
14      6      Building Construction Budget 163
15      7      Notebook                184
16      8      Black notebook          196
17      9      Black notebook          200
18  NOTE: Exhibits retained.
19
20
21
22
23
24
25
```

Page 5

```
 1  M I L T O N   L.   D A L Y ,
 2  17075 Perdido Key, Pensacola, Florida, 32527,
 3      called as a witness, having been first duly
 4      sworn by James A. Martone, a Notary Public
 5      in and for the State of Connecticut, was
 6      examined and testified as follows:
 7  DIRECT EXAMINATION
 8  BY MR. MARTIN:
 9      Q.  Would you state your name and spell it
10  for the record, please?
11      A.  Milton Daly, D-a-l-y.  M-i-l-t-o-n.
12      Q.  Mr. Daly, we took your asset
13  deposition a few months ago, and at it we marked
14  Deposition Exhibit 4.  Let me just show you that
15  again, which was the disclosure of assets.
16          MR. WISSER:  That was modified
17  pursuant to his testimony, for the record.
18          MR. MARTIN:  I was getting there.
19          MR. WISSER:  Okay.
20      A.  Yes.
21      Q.  Now at your last deposition, you made
22  a few modifications to that disclosure of
23  assets, correct?
24      A.  I believe so, that is correct.
25      Q.  Are there any other changes to that
```

Page 18

1    Q.  Would you select which movies to play?
2    A.  Yes.
3    Q.  Okay.  After Northeast Amusements,
4  what was your next job?
5    A.  Rehired by United Artists.
6    Q.  This is approximately 1972?
7    A.  Sometime around there, yes.  Close to
8  that.
9    Q.  And how long were you then at United
10  Artists?
11    A.  Until 1985.
12    Q.  So approximately 1972 to 1985?
13    A.  Yes.
14    Q.  Okay.  After you left United Artists
15  in 1985, where did you go next?
16    A.  I was self-employed.
17    Q.  Self-employed doing what?
18    A.  I owned a card-gift store, some real
19  estate.  Income-producing properties.
20    Q.  When did you become employed again for
21  an employer or company?
22    A.  1987, I think.  Yeah, 1987, with
23  United Artists theaters again.
24    Q.  And how long were you again with
25  United Artists?

Page 19

1    A.  1990.  These are all approximate dates
2  again, Mr. Martin.  I don't have the months.
3  Just approximations.
4    Q.  Right.  I understand.
5    And then after 1990, when you
6  left United Artists, where were you employed?
7    A.  Warner Brothers International.
8    Q.  For how long?
9    A.  Nine months to a year.
10    Q.  So about 1990 to 1991?
11    A.  1991, yes.
12    Q.  Approximately?
13    A.  Uh-huh.
14    Q.  What was the business of Warner
15  Brothers International?
16    A.  Same thing, motion picture theaters,
17  over in Europe.
18    Q.  And then 1991, where did you go?
19    A.  Cobb Theatres.
20    Q.  Could you spell that?
21    A.  C-o-b-b.
22    Q.  And how long were you at Cobb
23  Theatres?
24    A.  '91 to '95-96.
25    Q.  And after Cobb Theatres?

Page 20

1    A.  Crown Theatres.
2    Q.  Crown Theatres.  Could you tell us the
3  date that you became employed again at Crown?
4    A.  At Crown, well, there's a little gap.
5  We were hired on a consultancy basis in '95 and
6  then formally hired in '96.
7    Q.  Okay.  Just so we have it, Crown
8  Theatres, you terminated employment with Crown
9  Theatres on what date?
10    A.  June 1st, 2001.
11    Q.  Okay.  Now let me just make sure I
12  understand your employment history.  With the
13  exception of 1985 to 1987 when you were
14  self-employed, you've been in the movie theater
15  business from 1963 to really the present, right?
16    A.  That's correct.
17    Q.  So that's about 28 years of experience
18  in the movie theater business?
19    A.  No, a little longer than that.
20    Q.  How long?
21    A.  Thirty-eight years.
22    Q.  Your math is better than mine.
23  So 38 years of experience in the movie theater
24  business.
25    Let's go back and take your

Page 21

1  employment at United Artists from 1972 to 1985
2  and then 1987 to 1990.  From '72 -- I'm sorry,
3  let me just start and have you explain the
4  business of United Artists.
5    MR. WISSER:  Objection to the
6  form.  Can you be more specific?
7    Q.  Sure.  Would you just generally
8  explain the business that United Artists was in
9  from 1972 to '85 and then '87 to '90?
10    A.  In the business of exhibiting motion
11  pictures in a confined building with a screen
12  and projector that charges admissions to people
13  so you could go and see or anybody else can go
14  see a motion picture that is independently
15  produced and manufactured by outside sources of
16  investors, distributed by a major film company
17  and distributed to the theaters.
18    Q.  And how many screens did United
19  Artists have, for example, in 1972?
20    A.  In '72, I don't know.  It grew
21  exponentiously.  When I was first hired, there
22  were 68 screens.  When I left, there were
23  sixteen hundred screens.  I can't tell you what
24  the amount was, but it was ludicrous.
25    Q.  What jobs did you hold at United

Page 50

1 expense side of the equation on your pro formas,
2 and see a certain expense factor for
3 construction, or lease, would you compare it to
4 what your cost factors were for existing
5 theaters to see if it was in the right ballpark?
6 A. Yes.
7 Q. So if I understand what you would do,
8 you --
9 A. Don't say I. I did not personally do
10 that. I didn't say I did that. I said it was a
11 committee.
12 Q. Right. What you would do at Cobb
13 Theatres is you'd go ahead and make sure that it
14 was in the right ballpark to make sure it was
15 close to market?
16 A. That's correct, based upon the
17 parameters that had been set forth by the Cobb
18 family.
19 Q. So for example, you had an existing
20 movie theater at Cobb that was, just to give a
21 hypothetical, $10 a square foot, for the
22 property, and you were constructing a theater at
23 $40 a square foot, that would not be a wise
24 investment, right?
25 A. Depending upon again, the marketplace,

Page 51

1 what you were trying to accomplish,
2 what-have-you, but based upon the normal
3 practice, your assumption is correct.
4 Q. Right. At Cobb, was there a
5 construction department?
6 A. Yes.
7 Q. Who was in charge of the construction
8 department?
9 A. Rod Kurlet.
10 Q. And at Cobb, was there a film-buying
11 department?
12 A. Yes.
13 Q. Who was in charge of that?
14 A. Jerry Brand.
15 Q. And with regard to the construction
16 department, and the film-buying department, to
17 whom did they report at Cobb?
18 A. Rod reported to Cobb, the Cobb family,
19 and Jerry Brand reported to Cobb and myself.
20 Q. Okay. Now jumping ahead, you left
21 Cobb on what date?
22 A. I believe it was November of 1995.
23 Q. And you formally -- You said earlier
24 that you had a consulting arrangement with Crown
25 to begin with, and then you formally became an

Page 52

1 employee at Crown Theatres. When was your --
2 When did you formally become an employee at
3 Crown Theatres?
4 A. First part of '96.
5 Q. And when did you have -- when were you
6 consulting for Crown Theatres?
7 A. November of '95 to that period.
8 Q. Okay. At Cobb, did you work with
9 Mr. Martino?
10 A. No.
11 Q. At Cobb did you work with Mr. Beacher?
12 A. No.
13 Q. How did you first come to speak with
14 anyone from the Crown organization prior to your
15 being hired?
16 A. The chief financial officer, David
17 Clifford, was fired by Cobb Theatres, and again,
18 I'm going to give you approximate dates because
19 I just don't remember. As you get older, your
20 memory starts to zap away a little bit. I think
21 it was in July of 1995, or maybe a little
22 earlier.
23        At that time Cobb was trying to
24 do some outside financing, did a bond deal, and
25 because Mr. Clifford was so much involved with

Page 53

1 the dog-and-pony show, as it is called, they
2 asked him if he -- if he would stay on and do
3 the presentation along with me in order to sell
4 the bonds. That was done.
5        David Clifford had come to me and
6 said, "You know, everybody in the industry,
7 you're an icon, get me a job, I need a job." I
8 proceeded to put my feelers out to the
9 industry.
10        The industry is a small
11 industry. It's only six, seven, or eight
12 billion dollar industry today. I put my feelers
13 out, and a friend in New York told me that Crown
14 was looking for a CFO. I proceeded to tell
15 Mr. Clifford that Crown was looking for -- I
16 didn't know who the hell Crown was because I had
17 never heard of them before, they had bought
18 Translux Theatres, who was the predecessor to
19 Crown.
20        Anyway, I told David about it,
21 and he proceeded to have a meeting with Dan
22 Crown and Jim Crown in New York. The gist was,
23 "Okay, we like you. When can you start? We
24 would like you to run the company," and David
25 says, "I can't do that, I don't know anything

CROWN THEATRES v. DALY                                                                August 5, 2003

Page 74

1  remember about this meeting with the members of
2  the Crown family in Chicago?
3      A.   Only that Lester Crown told me to
4  teach Dan Crown whatever I knew.
5      Q.   Okay.  Do you recall anything else?
6      A.   That's it.
7      Q.   Do you have any notes of that meeting?
8      A.   No.
9      Q.   What's your best recollection of the
10 date of that meeting?
11     A.   As I said to you, it was
12 October-November of '95.  It could have been
13 December.  I'm not sure.
14     Q.   Okay.
15     A.   I really don't remember.  I'm sorry.
16 It was fall.
17     Q.   Okay.  After that meeting and prior to
18 the time that you became an employee of Crown
19 Theatres, did you have any further meetings with
20 any members of the Crown family?
21         MR. WISSER:  Relative to
22 employment, I assume?
23         MR. MARTIN:  Relative to
24 anything.  I can't imagine there's --
25     A.   No.  At that point it was roll up your

Page 75

1  sleeves and go to work.
2      Q.   Okay.  And then you ultimately became
3  an employee of Crown Theatres in February of '96?
4      A.   Could have been.
5      Q.   Is that your best recollection?
6      A.   March '96.  I don't know.
7      Q.   Early 1996?
8      A.   Early '96, as I stated to you.
9      Q.   Okay.  And after -- you became an
10 employee at about the same time that
11 Mr. Clifford was hired?
12     A.   Simultaneously.
13     Q.   When you became an employee, what was
14 your salary, when you began?
15     A.   Like I told you before, it was 150.  I
16 think it was 150.  I'm not sure.  I really don't
17 remember.
18     Q.   Okay.  What was your salary when you
19 left?
20     A.   225.
21     Q.   Did you receive any bonuses --
22     A.   Yes.
23     Q.   -- during the time you were at Crown
24 Theatres?
25     A.   Yes.

Page 76

1      Q.   Do you recall the bonuses that you
2  received?
3      A.   $50,000.
4      Q.   $50,000 per year?
5      A.   Something like that.
6      Q.   Is that your best recollection?
7      A.   Yes, best recollection.
8      Q.   Did you receive any equity in Crown
9  Theatres?
10     A.   No.
11     Q.   And I suppose you didn't receive any
12 what you would call pure equity, nor did you
13 receive any phantom equity?
14     A.   You can just ask me if I received any
15 equity and the answer is no, no, no.
16     Q.   Okay.  After you were hired by Crown
17 Theatres -- Strike.
18         As you were hired by Crown
19 Theatres, you became president of Crown
20 Theatres, correct?
21     A.   No.
22     Q.   What was your job title?
23     A.   I never became president of Crown
24 Theatres.
25     Q.   What was your job title when you were

Page 77

1  hired?
2      A.   Executive vice president.
3      Q.   And chief operating officer?
4      A.   Chief operating officer.
5      Q.   Okay.  And to whom did you report?
6      A.   Dan Crown.
7      Q.   Did you report to any other members of
8  the Crown family?
9      A.   No.  I did not directly report to.
10 Spoke to them, yes, but I was responsible for
11 Dan Crown.  He was my immediate supervisor.  He
12 was the president of Crown Theatres.
13     Q.   Okay.  So Dan was president, you were
14 chief operating officer.  David Clifford was
15 CFO?
16     A.   Yes.
17     Q.   And David Clifford reported to you?
18     A.   No.
19     Q.   Who did he report to?
20     A.   Dan Crown.
21     Q.   Dan Crown.  Glen Garfinkle was the
22 general counsel, correct?
23     A.   Not when we were hired.
24     Q.   When was he hired?
25     A.   About a year and a half, probably two

SANDERS, GALE & RUSSELL                                          (203)624-4157

CROWN THEATRES v. DALY

Page 78

1  years after we were employed. I don't remember
2  exact, the exact date he came on board.
3      Q. So in 1996-97?
4      A. 1998. '97-98.
5      Q. Okay. And he reported to you or to
6  Dan Crown?
7      A. No, Dan Crown.
8      Q. Who reported to you while you were at
9  Crown Theatres?
10     A. David Clifford -- I'm sorry, Chris
11 Dugger. You want the names of everyone?
12     Q. Yes, your direct reports.
13     A. My direct reports. Tom Becker. We
14 had a quasi-reporting system for the film
15 buyer. This was an outside service, that was
16 Larry Lapidus, and his crew. Nick Guadino,
17 subsequently replaced by Lesser Theatre
18 Services, Steve Gould.
19     Q. What was his job title?
20     A. He was in charge of marketing.
21 Semi-marketing, whatever. He was marketing.
22     Q. Did each of the theater managers
23 report to you?
24     A. Indirectly. Primarily through Chris
25 Dugger. He was the district manager and

Page 79

1  operating guy in the field, so they reported to
2  him.
3      Q. What was Becker's responsibilities?
4      A. Special projects, construction.
5  Information services. He was a -- I guess the
6  proper title was special projects, would be more
7  appropriate.
8      Q. So the theater managers didn't report
9  to Becker, they reported through Dugger?
10     A. Yes.
11     Q. Did Dan have any other direct reports
12 other than Garfinkle, Clifford and you?
13     A. Kathleen Nonemacher reported to him
14 indirectly also because she was the controller.
15 Even though she reported to David, I know she
16 had many conversations with Tom. So I don't
17 know if she directly reported to him.
18     Q. Any other direct reports to Dan Crown?
19     A. Not to my knowledge.
20     Q. Any other direct reports to you other
21 than Mr. Dugger or Mr. Becker, Lapidus, Steve
22 Gould?
23     A. Not to my knowledge.
24     Q. As chief operating officer, how
25 would -- what were your duties and

Page 80

1  responsibilities at Crown Theatres?
2      A. It was to implement policies and
3  procedures. Handle the marketing. Oversee the
4  film buying and booking indirectly, with the
5  film service. Handle negotiations for various
6  components of the company. Concession deals.
7  Coca-Cola, Pepsi deals. General operation of
8  the company. Responsible for the P&L
9  performance of the company.
10         I guess that would probably
11 adequately describe the duties. Be responsible
12 for the financials of the company, to the point
13 of profit and loss.
14     Q. When you say policies, what do you
15 mean? You've used that a number of times, at
16 different companies that you worked for, where
17 you've said you were responsible for
18 implementing the policies and procedures of the
19 company.
20         With regard to Crown Theatres in
21 particular, what policies were you responsible
22 for implementing?
23     A. Admission prices, concession prices,
24 specials for admission prices. Tie-ins with
25 companies to have specials on the concessions.

Page 81

1  Operating policies, operating hours. There are
2  many other things that go into operating the
3  company, but -- Payroll in the theaters.
4  Operating expenses in the theaters.
5         MR. WISSER: Off the record.
6         (Discussion off the record.)
7      A. There's a lot of additional things in
8  there.
9      Q. Right. And --
10     A. It's like running any other business.
11 Costs. I mean, there's costs to run a business,
12 to make sure that they don't get out of line.
13     Q. I understand. And I guess when you
14 just went through the litany of policies that
15 you were responsible for implementing, is there
16 any difference in your mind between policies and
17 procedures or are those the same thing?
18     A. Same thing.
19     Q. Okay.
20     A. Procedures is just language.
21     Q. Now with regard to overseeing film
22 buying, the film buying and booking, overseeing
23 the buying and booking with the film service,
24 what did you do in that regard at Crown
25 Theatres?

SANDERS, GALE & RUSSELL

August 5, 2003.

Page 86

1　came in at 10:30 in the morning, met Dan Crown
2　at 11:00, went to the gym until three o'clock
3　and went home at 4:00.
4　　Q.　What were you told his job duties and
5　responsibilities were going to be?
6　　A.　That he would handle all the pro
7　formas and financials of the company. Handle
8　the accounting end of the company because it was
9　in total disarray when we got there, a job that
10　would have been done in three months but took a
11　year and a half to get to the point where it was
12　adequately good.
13　　Q.　Okay. With regard to Mr. Garfinkle,
14　what did you understand his job duties and
15　responsibilities to be?
16　　A.　Again, in the mode of trying to
17　operate the company properly, we were spending a
18　considerable amount of money in attorneys' fees,
19　in reviewing leases through the firm that Glen
20　worked, and it was my suggestion to Mr. Crown
21　that maybe we should bring him on board to
22　handle all of our internal legal affairs in
23　addition to all the leases that were being drawn
24　to save the company a considerable amount of
25　money on an annualized basis.

Page 87

1　　　　Mr. Garfinkle was presented an
2　offer, and he subsequently came on board to join
3　Crown Theatres as general counsel, which handled
4　all the legal of the company.
5　　Q.　Okay. And at the company, what were
6　his duties and responsibilities?
7　　A.　Primarily, again, any legal matters
8　that came before the company, the lawsuits or
9　what-have-you from falls. Insurance, he took
10　care of the insurance side of the equation, took
11　it from -- I believe Kathy Nonemacher was in
12　charge of insurance.
13　　　　In addition, he drew the leases,
14　oversaw the construction contracts that he and
15　Mr. Beacher and Mr. Martino negotiated with the
16　general contractors, signed the contracts of
17　these construction deals, but he handled, as I
18　said to you, all the legal matters, such as
19　anyone in his profession would do.
20　　Q.　Did you have an opinion on whether he
21　was doing a good job or not?
22　　A.　Glen was doing a good job.
23　　Q.　Okay. Now as chief operating officer,
24　did you have any involvement, any duties and
25　responsibilities as it related to Crown

Page 88

1　Theatres' expansion and construction program?
2　　A.　Yes.
3　　Q.　What were your duties and
4　responsibilities in that regard?
5　　A.　In conjunction with Dan Crown and
6　David Clifford and people in general in the
7　office, Chris Dugger, Tom Becker, we selected
8　locations for theaters to be built and looked at
9　various acquisitions over the time frame I was
10　there.
11　　　　MR. MARTIN:  Do you mind if we
12　take a five-minute break?
13　　　　MR. WISSER:  That's fine.
14　　　　(Recess: 11:55 a.m.)
15　BY MR. MARTIN:
16　　Q.　Mr. Daly, when you arrived at Crown
17　Theatres, how many screens did Crown Theatres
18　have?
19　　A.　I think I said 28 previously.
20　　Q.　And when you left, how many screens
21　did they have?
22　　A.　103. A hundred. A little over a
23　hundred.
24　　Q.　How much invested capital did Crown
25　have when you arrived?

Page 89

1　　A.　30 million.
2　　Q.　And how much invested capital when you
3　left?
4　　A.　A hundred. 110. I'm not sure.
5　　Q.　When you arrived, what was the cash
6　flow or profits?
7　　A.　Negative 250.
8　　Q.　Negative $250,000?
9　　A.　Yes.
10　　Q.　Per year?
11　　A.　Yes.
12　　Q.　And when you left?
13　　A.　I don't recall. I know it was
14　positive. Cash flow was positive. I just don't
15　remember the exact number. The reason I can't
16　is because we were opening theaters at that time
17　frame of two years, so it was -- you know, it
18　was not really apples to apples. You weren't
19　comparing the same period of time with the same
20　number of screens.
21　　Q.　All right. Now let's focus, if you
22　don't mind, on the construction program at Crown
23　Theatres. You can call it the expansion through
24　construction. What theater complexes were
25　constructed or under construction while you were

CROWN THEATRES v. DALY

August 5, 2003

Page 90

1  at Crown Theatres?
2    A.  The Majestic Theater in Stamford,
3  Connecticut.  The Trumbull Theater in Trumbull,
4  Connecticut.  The grand in Miami Lakes,
5  Florida.  Annapolis mall in Annapolis,
6  Maryland.
7    Q.  All right.
8    A.  The Jupiter complex, Jupiter 16, and
9  the Hartford theater.  I think it was called the
10  Hollywood, I'm not sure.
11    Q.  Any others that you remember?
12    A.  That's it.
13    Q.  Was Skokie under construction?
14    A.  Excuse me, the Skokie complex in
15  Skokie, Illinois.
16        MR. WISSER:  What did you call
17  the Grand?
18        THE WITNESS:  I believe that was
19  in Miami.
20    Q.  The Miami Lakes Grand.
21    A.  I believe so.  I don't remember names.
22    Q.  What were the net revenues -- I'm
23  sorry, gross revenues of Crown Theatres when you
24  arrived?
25    A.  I don't remember.

Page 91

1    Q.  Do you remember the gross revenues
2  when you left?
3    A.  No, I don't.
4    Q.  What was your understanding of the
5  purpose of the construction program at Crown
6  Theatres?
7    A.  What was the purpose of the
8  construction of these theaters?
9    Q.  What was your understanding of the
10  purpose of the construction program at Crown
11  Theatres?
12    A.  To continue the growth of Crown
13  Theatres, LP.
14    Q.  Continue growth, make more money?
15    A.  Make more money.
16    Q.  Make more profits?
17    A.  Hopefully.
18    Q.  Who was responsible for the
19  construction program at Crown Theatres?
20    A.  I was, along with Dan Crown.
21    Q.  Now let's focus for a second on the
22  Majestic theater in Stamford, Connecticut.  When
23  you arrived at Crown Theatres, was there already
24  construction proceeding on the Majestic theater
25  in Stamford?

Page 92

1    A.  No.
2    Q.  And with regard to the Majestic
3  theater in Stamford, was it a new theater or was
4  it renovations to an existing theater?
5    A.  New theater.
6    Q.  Who was the general contractor?
7    A.  I don't remember.
8    Q.  Who was the architect?
9    A.  Jim Martino.
10    Q.  Okay.  And approximately when did the
11  construction of Majestic begin and when did it
12  end?
13    A.  I don't have any specific dates.  I
14  believe it was 1998.
15    Q.  All right.
16    A.  '98, '99.
17    Q.  All right.
18    A.  I want to correct a statement.  You
19  asked was there any construction.  There was a
20  theater being renovated at the time I came to
21  the company.
22    Q.  What theater was that?
23    A.  It was the Landmark theater in
24  Stamford.
25    Q.  All right.

Page 93

1    A.  It was already under construction.
2    Q.  Was that being renovated?
3    A.  It was an additional theater to the
4  existing theater.  It's really new construction.
5    Q.  Who was the general?
6    A.  I don't remember.
7    Q.  Who was the architect?
8    A.  I don't remember.
9    Q.  Okay.
10    A.  Vallus & Carpenter.
11    Q.  Was that the general or the architect?
12    A.  Vallus & Carpenter had some
13  involvement in it.  I'm not sure.  There was a
14  firm out of New York who I don't remember.
15    Q.  Okay.  Now with regard to the Trumbull
16  theater, the Miami Grand, the Annapolis,
17  Jupiter, Hartford, Skokie, which of those
18  theaters did you first -- which of those
19  construction projects did you first work on at
20  Crown Theatres?
21    A.  The Majestic.
22    Q.  I'm sorry, that wasn't on my list.
23    A.  I'm sorry.
24    Q.  That's okay.  Just to kind of get you
25  on the right page, there's six that I'm

24 (Pages 90 to 93)

SANDERS, GALE & RUSSELL

(203)624-4157

Page 114

1  theaters were already opened when I arrived.
2  There were some litigation going on at the
3  region theater. That's when I met him. They
4  obviously needed his expertise to get this
5  litigation resolved.
6        He was the day-to-day operations
7  guy or construction guy on the job. He had more
8  knowledge of the project than anyone else. He
9  was just a kind of -- kind of embraced him
10  because of the litigation that was there. He
11  was already there.
12     Q. And Crown Theatres continued to use
13  Mr. Beacher as a consultant on its construction
14  projects, correct?
15     A. Yes.
16     Q. Now what's your understanding as to
17  why Crown Theatres continued to use Mr. Beacher
18  as a consultant?
19     A. I don't know -- Could you read that
20  question back again?
21        (Record read.)
22     A. The reason for his continuation as
23  consultant to the company is that I was not
24  knowledgeable enough, first of all, to take over
25  that responsibility of the company. There was

Page 115

1  nobody in the company that was knowledgeable
2  enough to take over that aspect of the company.
3  He was already there, and therefore, it made all
4  the sense in the world, based upon his
5  reputation in the industry, having built a
6  number of theater complexes, that he would stay
7  on.
8     Q. So taking this discussion back to the
9  Trumbull theater, the -- with regard to the
10  Trumbull theater, Mr. Martino did the plans and
11  specifications, correct?
12     A. Yes.
13     Q. Mr. Beacher was a construction
14  consultant for the Trumbull theater, correct?
15     A. He handled the construction of the
16  entire project. That was part of his
17  construction consultancy.
18     Q. Okay. You'd agree --
19     A. He was construction manager,
20  construction consultant. He was responsible for
21  construction of all the theaters, in addition to
22  the Trumbull.
23     Q. You would agree that Mr. Beacher was a
24  construction consultant for Crown Theatres in
25  connection with Trumbull, correct?

Page 116

1     A. Yes, and construction manager.
2     Q. Did Mr. Beacher report to you?
3     A. Yes.
4     Q. How did Crown Theatres compensate
5  Mr. Beacher?
6     A. He was paid a fee for each job that
7  he -- that we undertook.
8     Q. And how was his fee determined for
9  each job you undertook?
10     A. I don't remember.
11     Q. Did you pay him on an hourly rate?
12     A. No. It was agreed to -- it was an
13  agreed-to flat figure for each project.
14     Q. Did you ever pay him on an hourly
15  rate?
16     A. I don't recall. We might have.
17     Q. How did you -- Let me first show you
18  this.
19        (Deposition Exhibit 4 marked
20         for identification.)
21     Q. With regard to Deposition Exhibit 4,
22  Mr. Daly, would you identify it?
23     A. It's a letter to me from Robert
24  Beacher, president of B&B Construction
25  Consultants, concerning an invoice he submitted

Page 117

1  December 1st, 1995, I believe, telling him that
2  I wouldn't pay him more than $20 per hour.
3     Q. Is that your signature?
4     A. Yes, it is.
5     Q. Is that a letter that you sent to
6  Mr. Beacher?
7     A. Yes.
8     Q. Did you have a dispute with
9  Mr. Beacher in late 1995 with regard to his
10  hourly rate?
11     A. I don't remember. Obviously something
12  triggered this letter to him. He was already on
13  the payroll, as I said to you, with Crown. This
14  is 1995. I told you I became involved with
15  Crown as a consultant in '95, so therefore, I
16  must have seen an invoice from him and told him
17  that we weren't going to pay him 60 or 90
18  dollars an hour, more than what Tom Becker had
19  agreed to already.
20     Q. In fact, you say you want to advise
21  him that you wouldn't pay him or anyone else 90
22  bucks an hour for consulting work, let alone 60,
23  right?
24     A. That's what it says.
25     Q. So at the time you arrived at Crown

Page 138

1  have a written contract with Mr. Beacher along
2  the same lines?
3      A.  No.
4      Q.  No?
5      A.  No.
6      Q.  Why not?
7      A.  To be very honest with you, I didn't
8  know a damn thing about construction, so
9  whatever he said I basically went along with.  I
10  mean, I've never built a theater or built
11  anything in my life.
12      Q.  In your 38 years in the construction
13  industry, had you ever participated in the
14  construction of a theater where there wasn't a
15  contract with the general contractor?
16      MR. WISSER:  Objection to the
17  form.  If you read that back, it didn't make
18  sense.  You said 38 years in the construction
19  industry.
20      Q.  I'm sorry, I meant 38 years in the
21  movie industry.
22      A.  I opened and closed more theaters, but
23  I never physically built a theater in my life.
24      Q.  My question is:  In your 38 years of
25  experience in the movie theater industry, are

Page 139

1  you aware of any situation in which there was no
2  contract with the general contractor other than
3  the one with Mr. Beacher?
4      A.  Oh, sure.  Absolutely.
5      Q.  Give me one of the examples.
6      A.  I couldn't give you one, but
7  there's -- I'm sure there are many in my 38
8  years.  There were many deals whereby
9  contractors did work without a contract.
10      Q.  Can you tell me one?
11      A.  No, I can't tell you one.
12      MR. MARTIN:  Can you mark this.
13      (Deposition Exhibit 5 marked
14      for identification.)
15      MR. WISSER:  I should state for
16  the record that while I cannot be 100 percent,
17  given the thousands of documents that were in
18  your conference room, I don't believe Exhibit 4
19  was a document that was in those boxes either.
20  So I'm beginning to get a little bit concerned.
21  As I see Exhibit 5, I know this definitely was
22  not in the boxes.
23      MR. MARTIN:  I think --
24      MS. LANZA:  We have to agree with
25  that statement, because we looked through all 50

Page 140

1  boxes you produced and those three documents so
2  far were not included, and I believe those are
3  considered part of the records and those two
4  budgets were specifically requested in my
5  original D and I.
6      MR. MARTIN:  Well, they're
7  available for inspection.
8      MR. WISSER:  But where?
9      MR. MARTIN:  At Crown Theatres.
10  I believe, and I don't want to have a big
11  argument, but I do believe that this document
12  was produced in Chicago.  I'm not sure about the
13  other two.
14      MR. WISSER:  And again, I
15  can't --
16      MR. MARTIN:  I can't tell you
17  either, but in any event, I do believe that this
18  document, Exhibit 4, was produced in Chicago.
19  I'm not sure about the other two.
20      MS. LANZA:  I can't see from this
21  end of the table.
22      MR. WISSER:  The December 6, '95
23  letter between Milt Daly and Bob Beacher about
24  hourly expenses.
25      MS. LANZA:  That was included in

Page 141

1  what file?  In the accounting records that were
2  produced?
3      MR. WISSER:  Rather than getting
4  into a long discussion, the only thing I'd
5  mention, I was very specific as to things that
6  piqued my interest and things that did not.
7  This would clearly have been one because it's
8  got Milt's name on it and it's addressed to
9  Beacher.
10      MR. MARTIN:  That may well be,
11  but that document, I believe, was produced in
12  Chicago.  Let's go to Deposition Exhibit 5.
13      MR. WISSER:  One other quick
14  thing:  Do we know from what type of file budget
15  box -- I'm sorry, file box or folder these
16  budgets are coming out of, how they would have
17  been categorized within the Crown documents such
18  that they're coming out?
19      MR. MARTIN:  Mr. Daly might be
20  able to answer that question.
21      THE WITNESS:  How would I be able
22  to answer that?
23      MR. WISSER:  Because again, we
24  have a budget for Trumbull, now we have a budget
25  for Hartford.  And again, nothing was

CROWN THEATRES v. DALY                                                      August 5, 2003

Page 174

1   the theater projects were coming in at budget?
2   A.  I -- Say that again.  Rephrase that
3   again.
4        (Record read.)
5   A.  I don't remember.
6   Q.  After your meeting at the theater
7   opening in Skokie, did you have a discussion
8   with Dan Crown during May of 2001 and prior to
9   the time that you quit, about how the theater
10  projects were coming in over budget?
11  A.  I had -- I remember specifically in
12  Jupiter, I had told Dan I thought the projects
13  would be on budget, and it might be I had
14  conversation with him prior to that, that I
15  thought that hopefully the projects would come
16  in on budget.  I thought they would.
17  Q.  Approximately when was that
18  conversation?
19  A.  I don't remember.
20  Q.  And in May of 2001, did you tell Dan
21  that the theater projects were coming in over
22  budget?
23  A.  No.
24  Q.  Did you have any discussions with Dan
25  within a month before you left about whether the

Page 175

1   projects were coming in under or over budget?
2   A.  I was totally convinced, in one of the
3   conversations I had with Dan as I told you a
4   couple months before the opening of Jupiter,
5   that all indications were that the theater was
6   coming in under budget.
7   Q.  And prior to the time that you quit
8   Crown Theatres on June 1st, were you totally
9   convinced that the projects were coming in under
10  budget, under or on budget?
11  A.  Yes.  Overall, yes.
12  Q.  Said earlier that you quit, you gave
13  us a couple of reasons.  One was that you
14  were -- you had a proud work ethic, you were an
15  abject failure as to performance.  What were you
16  failing in with regard to performance?
17  A.  That the projects were over budget.
18  There were six projects, and every one of them
19  came in over budget.
20  Q.  Maybe I misunderstood your testimony.
21       MR. MARTIN:  Could you just go
22  back and read the previous question.
23       (Record read.)
24  Q.  So let's go back to why you thought
25  you were an abject failure as to performance.

Page 176

1   A.  You have to understand, just looking
2   at the six projects, we as a company did not
3   know where they stood financially for 60 days
4   after the fact.  Schedules never came to us as
5   to whether they were over budget or under budget
6   until the accounting department processed the
7   payments that were made.
8        So I would not know where we
9   stood for two months or better, thinking that
10  based upon the last schedule that I had received
11  from the accounting department, that the last
12  two projects which you were of reference, the
13  Jupiter and Skokie, whether they were under
14  budget, they looked very good, but at the end,
15  they came in over budget also.
16       I had never done anything like
17  this in my life, being so wrong.  I just could
18  not take the pressure any further, and I decided
19  I was going to leave, and I left.
20  Q.  So prior to the time -- Let me see if
21  I understand this.  Each of the projects,
22  Hartford, Annapolis, Jupiter, Skokie, Trumbull
23  and Miami, came in over budget, correct?
24  A.  Yes.
25  Q.  Okay.  And prior to the time that you

Page 177

1   left Crown Theatres, did you know if any of
2   those projects were over budget?
3   A.  Yes.  I've already testified to that.
4   I told you that all of them were over budget.  I
5   explained why Trumbull was over budget.  The
6   others, the reasons behind all of them -- but
7   the theaters were open at least 90 days before
8   the final tabulation was done by the accounting
9   department, to understand if they were over or
10  under budget.
11  Q.  Right.  So prior to the time you left,
12  you knew that Hartford had come in over budget,
13  correct?
14  A.  I believe so.
15  Q.  And prior to the time you left, you
16  knew Annapolis had come in over budget, correct?
17  A.  Yes.
18  Q.  And --
19  A.  I believe so.
20  Q.  And prior to the time you left, you
21  knew that Jupiter had come in over budget,
22  correct?
23  A.  Yes.  I believe Jupiter was also, yes.
24  Q.  And prior to the time you left, you
25  knew that Trumbull had come in over budget,

SANDERS, GALE & RUSSELL                                          (203)624-4157

CROWN THEATRES v. DALY                                      August 5, 2003

Page 190

1  of $965, right?
2      A.  965, correct.
3      Q.  And it's your signature; we
4  established that, correct?
5      A.  Right.
6      Q.  And what about the other writing on
7  the page?
8      A.  That looks like Susie, the accounts
9  payable.  I guess this is the account number
10  where she charged it.
11      Q.  So that's not your handwriting?
12      A.  No.  This is mine.  That's my only
13  signature, and this was for the Crown Majestic
14  theater.
15      Q.  Okay.  Now turning back to the check,
16  you can see the 965 was then picked up as part
17  of check number 113806, correct?
18      A.  Yes.
19      Q.  Now in terms of Mister -- or in terms
20  of BB Construction Consultants being paid, why
21  are you signing off on it?
22      A.  It had to have a signature for the
23  work being performed.  I assume -- I'm not
24  assuming, but I have to gather that this is
25  labor and material, equipment to perform field

Page 191

1  survey, foundation, that he had called me from
2  the job site and said that, you know, he had to
3  do this, and I probably gave him the verbal okay
4  to get the work done, something additional on
5  the job site.
6      Q.  And under the policies, procedures and
7  practices of Crown Theatres, did you need to
8  approve invoices from BB Consultants for payment
9  prior to them being paid?
10      A.  I approved every invoice that came
11  into that whole company.
12      Q.  So the answer is yes?
13      A.  The answer is yes.
14      Q.  And are there -- in terms of what you
15  see, I think you identified Susie's handwriting
16  from accounts payable.
17      A.  Yes.
18      Q.  Is that a substantive approval or a
19  procedural approval, if you will?
20      A.  I would say --
21          MR. WISSER:  Object to the form.
22  Do you understand?
23          THE WITNESS:  Yes, I do
24  understand.
25      A.  I would say that was a procedural.

Page 192

1      Q.  So basically the only person that
2  needed to approve one of these invoices from BB
3  Consultants for payment was you, and then it
4  would be paid by Crown Theatres, right?
5      A.  No.  It could have been approved by
6  Dan Crown, David Clifford.  Could have been
7  approved by Kathy Nonemacher.
8      Q.  With your approval, it would be paid,
9  to put it another way?
10      A.  Yes.  There were four signatures that
11  could handle that.
12      Q.  Now I'm sure Mr. Wisser will be kind
13  enough to go through the entire notebook and
14  stipulate that it's your signature on each one
15  of these and it's authentic, right?  When you
16  get an opportunity to actually look through it?
17          MR. WISSER:  Sure.
18          MR. MARTIN:  We'll try to do that
19  with a number of documents.
20          MR. WISSER:  Right.
21      Q.  So that we don't have to go through
22  each and every one of these, but let me -- I
23  mean, it almost doesn't matter which one I pick,
24  okay.  Let me just give you an example.  I
25  turned to Crown Theatres check number 118248 in

Page 193

1  the amount of $3,500, and then I have a document
2  that's attached to it that is an invoice from BB
3  Construction Consultants for professional
4  services of Paul Morgan Lighting Design Company,
5  and this invoice is for thirty-five hundred
6  dollars.
7          What -- In connection with
8  approving an invoice, this invoice or any
9  invoice like it, Mr. Daly, did you conduct any
10  investigation to make sure that Mr. Beacher had
11  actually done this work?
12      A.  No.  I relied on Mr. Martino to tell
13  me that.
14      Q.  Did you rely on Mr. Beacher too?
15      A.  Yes.
16      Q.  How did you rely on Mr. Martino to
17  tell you that Mr. Beacher had done the work
18  that's represented in these invoices?
19      A.  He was at the job sites, or his
20  architect of record was at the job sites to
21  confirm that these were okay to pay.
22      Q.  There's only one signature on these,
23  in terms of one substantive approval signature,
24  and it's yours.
25      A.  Yes.

49 (Pages 190 to 193)

Page 202

1    So as to his veracity, it was
2 already attached by the town, by Arundel
3 county. I don't know where the invoice is, but
4 it's missing here.
5    Q.  So you think that that document is
6 incomplete in the sense --
7    A.  That's correct.
8    Q.  In the sense that your recollection --
9    A.  Every permit that this company ever
10 applied for, there was an invoice for it, and
11 this is one of them.
12    Q.  Okay. So --
13    A.  So I'm certain there's one someplace.
14    Q.  So your best recollection is that
15 attached to a document like this, there would be
16 an actual invoice from the county attached?
17    A.  It would be on file. You had to have
18 them on file, Mr. Martin, and they were posted
19 obviously on the job site and also in our
20 office, so this particular invoice that you
21 chose has backup somewhere.
22    Q.  Okay.
23    A.  So I obviously would call Martino.
24    MR. MARTIN:  Off the record.
25    (Discussion off the record.)

Page 203

1    (Recess:  3:00 to 3:23 p.m.)
2 BY MR. MARTIN:
3    Q.  Mr. Daly, back to --
4    MR. WISSER:  This is the services
5 only exhibit?
6    Q.  Back to Deposition Exhibit 8, did you
7 have a chance to look at it while we were taking
8 a break?
9    A.  Sure did.
10    Q.  And having looked at it, does that
11 change your testimony in any way with regard to
12 whether you spoke with Mr. Martino?
13    A.  It doesn't one iota. As a matter of
14 fact, it solidifies it even more so.
15    Q.  In looking through there, were there
16 any examples that you were able to see where you
17 think you didn't speak to Mr. Martino?
18    A.  I didn't say that I spoke to
19 Mr. Martino on every invoice. I told you where
20 I thought there was a problem, I would talk --
21 especially on large amounts, I would talk to
22 Mr. Martino.
23    There was also large amounts
24 payable to various cities and counties that were
25 permit fees and what-have-you, which I told you

Page 204

1 they were -- there was documentation to back
2 those up. There's a lot of invoices in here
3 that are very detailed as to Mr. Beacher's
4 expenses incurred for flights and what-have-you.
5    Q.  So with regard to what I called the
6 services notebook, Exhibit 9, did you have a
7 chance to look at that one?
8    A.  No, but I'm sure the answer is the
9 same.
10    Q.  So basically --
11    A.  Different invoices for different jobs,
12 basically for work that was performed by
13 Mr. Beacher's companies, and company, BB
14 Construction, but he was approved.
15    Q.  So basically to make sure we have your
16 testimony clear on these invoices from BB, you
17 approved them, correct?
18    A.  Yes.
19    Q.  You relied on Mr. Beacher's veracity,
20 correct?
21    A.  I relied on his veracity as the
22 construction manager for Crown Theatres,
23 correct.
24    Q.  And generally as a general matter, you
25 spoke with Mr. Martino with regard to the BB

Page 205

1 invoices as well?
2    A.  That is correct, and all construction
3 applications that were submitted to Crown
4 Theatres.
5    Q.  Now with regard to -- At the previous
6 deposition, you testified that you received
7 through Taylor-Leigh approximately $4.2 million,
8 correct?
9    A.  Yes, sir.
10    Q.  And that $4.2 million, as we trace the
11 money, if you will, you can -- the tracing of
12 the money shows that it came from Crown Theatres
13 through BB Consulting, or one of Mr. Beacher's
14 entities, and then was paid to Taylor-Leigh,
15 correct?
16    A.  Yes.
17    Q.  And then out of the funds that were
18 paid to Taylor-Leigh, those funds were in turn
19 paid to you personally, correct?
20    A.  Yes.
21    Q.  And that, we --
22    MR. WISSER:  Objection to the
23 form. There were distributions, I believe, is
24 what he testified to.
25    Q.  Money went from --

52 (Pages 202 to 205)

Page 206

1      MR. WISSER: It went there.
2      Q.  Money went from Taylor-Leigh to you,
3  in the amount of about $4.2 million was your
4  testimony?
5      A.  Correct.
6      Q.  And then you also testified that you
7  and Mr. Beacher had approximately a 70/30 split,
8  correct?
9      A.  Yes.
10     Q.  Where you got 70 percent, Mr. Beacher
11 got 30 percent.  Is that correct?
12     A.  Yes.
13     Q.  Now I think -- I have your deposition
14 here.  I actually don't think, but you testified
15 that this represented what you and Mr. Beacher
16 believed would be savings to Crown Theatres,
17 based on things that he would do in connection
18 with the construction projects, right?
19     MR. WISSER: Objection to the
20 form, only as to what Mr. Beacher thought.
21     Q.  Is that right, with that modification?
22     A.  Yes, with that modification.
23     Q.  So as I understand it, let me see if I
24 do understand it.  For any given construction
25 project, you and Mr. Beacher would have an

Page 207

1  initial discussion at some point about how much
2  money Mr. Beacher could save Crown Theatres in
3  connection with the construction project, right?
4      MR. WISSER: Objection to the
5  form.
6      A.  No.
7      Q.  Well, let me ask it, see if I can get
8  at this a different way.  Between you and
9  Mr. Beacher, you essentially received
10 approximately $6.2 million from Crown Theatres,
11 right?  You getting 70 percent, being 4.2
12 million, him getting about 30 percent, being a
13 little bit less than another two million, right?
14     A.  Correct.
15     Q.  And how did you come to the number,
16 roughly 6.1 or 6.2 million?
17     A.  That was the number that just came
18 about, based upon what he was supposed to
19 perform on behalf of Crown Theatres, and we were
20 going to share the -- share in the profits of
21 the savings that he was going to derive by
22 handling all of the items that were, A, not
23 being -- not in the plans, and, B, in the
24 contingency and additional work that had to be
25 done.  There was no special figure of $6 million.

Page 208

1      Q.  Well, how did you know what the
2  savings would be?
3      A.  I didn't.  I relied on Mr. Beacher to
4  handle all the accounting and all the processing
5  of invoices, and I received my portion that he
6  basically felt was saved by the company.
7      Q.  Let me take an example.
8      A.  Sure.
9      Q.  On any particular construction
10 project, you and Dan and some of the others at
11 Crown Theatres would go through this process in
12 which you'd come up with a budget for what the
13 construction was supposed to cost, right?
14     A.  Yes.
15     Q.  Let's just use a hypothetical.
16 Suppose the budget that you came up with was $10
17 million.  Okay?
18     A.  Yes.
19     Q.  And after that, you went out to
20 general contractors and you had bids, right?
21     A.  Yes.
22     Q.  Competitive bids?
23     A.  Yes.
24     Q.  And let's suppose the bid came in at
25 $10 million.

Page 209

1      A.  Okay.
2      Q.  So whatever general contractor bids
3  $10 million.  Now you and Mr. Beacher had agreed
4  that you and he would take a certain amount of
5  money, call it savings, profits, call it
6  whatever you want to call it, but you and he
7  would take a certain amount of money out of the
8  money that Crown Theatres was paying for that
9  particular construction project, right?
10     A.  No.
11     MR. WISSER: Object to the form.
12     A.  No.
13     Q.  Well, how would you and he come to any
14 consensus on how much money to take from a
15 particular construction project?
16     A.  I didn't.
17     MR. WISSER: Object to the form.
18     Q.  Well, explain to me how you think it
19 worked.
20     A.  Well, how it worked was there was a
21 budget of $10 million.  Again, this is only
22 going on the basis of how I thought it was going
23 to work, or how I -- how it ended up.
24     Q.  Tell me how -- tell me how you thought
25 it was going to work.

CROWN THEATRES v. DALY

Page 214

1   construction program ultimately?
2       A. Ultimately I am responsible for the
3   construction program, along with Mr. Crown.
4       Q. And Mr. Crown didn't participate in
5   the selection of general contractors, you just
6   told him who they were?
7       A. He was very well aware of what was
8   going on.
9       Q. So in our hypothetical, you then get a
10  bid for $9 million.
11      A. Right.
12      Q. Then what's the next step?
13      A. Well, the budget set already was 10,
14  so the budget is short a million dollars. So
15  Mr. Beacher obviously took out some of the --
16  I'm just assuming this again, I have to assume
17  that he took out the various work that his
18  companies was going to do of that $10 million.
19  He couldn't possibly have a budget of $10
20  million prepared here and then come in with a $9
21  million budget. It had to be the fact that he
22  pulled out certain work that his companies were
23  going to do on behalf of Crown Theatres and
24  saved them money.
25      Q. Okay. So let's be simplistic about

Page 215

1   it. If there were 10 things to do and each
2   thing cost a million dollars, your belief going
3   in was that Mr. Beacher would take a million
4   dollars of contract work and give it to himself
5   and that's why this general contractor came in
6   at $9 million?
7       A. I believe so.
8       Q. Okay. Now then, you'd have a general
9   contractor out there doing $9 million worth of
10  work, and then you'd have Mr. Beacher, or BB
11  Consultants, whatever company he was using,
12  doing a million dollars' worth of work?
13      A. Whatever the numbers were. Again,
14  this was all hypothetical.
15          And in addition to that, there's
16  a contingency line in there also that he was
17  going to handle on any particular problems that
18  would come up. Case in point: Stuff that
19  Martino didn't have on the plans. That would
20  come out of the contingency budget. He would
21  handle that also.
22      Q. Let's keep our hypothetical simple
23  right now.
24      A. I am.
25      Q. With regard to the million dollars of

Page 216

1   work that Mr. Beacher was going to do.
2       A. Right.
3       Q. Is it your understanding, going into
4   this, going into this -- I don't know what to
5   call it, agreement that you and Mr. Beacher
6   struck, that out of that million dollars that
7   Crown Theatres would be paying to BB
8   Consultants, or Beacher's entities, that some of
9   that money would be -- would come back to you
10  and come back directly to Mr. Beacher?
11      A. We would share in the profits of the
12  savings to the company, yes.
13      Q. You'd share in the -- if Mr. Beacher
14  was able to do the work for less than a million
15  dollars, you and Mr. Beacher would individually
16  share in the proceeds?
17          MR. WISSER: Objection to the
18  form.
19      A. Rephrase that again. I'm not quite
20  sure I understand.
21          MR. WISSER: Can I take a break
22  and talk to you for a minute?
23          MR. MARTIN: Sure.
24          (Recess: 3:40 to 3:44 p.m.)
25  BY MR. MARTIN:

Page 217

1       Q. Okay. I think where we were is the
2   notion that in our hypothetical, understanding
3   it just as that, that we're using hypothetical
4   numbers, Mr. Beacher would cut out say a million
5   dollars of the contract price, and then he would
6   go ahead through his company, BB, or through one
7   of these other companies, Marlin or Tiger, or
8   whatever, and your understanding was that he,
9   through one of these companies, would actually
10  do work on the construction project, right?
11      A. Yes.
12      Q. And he would do the work on the
13  construction project for less than the million
14  dollars, right?
15      A. Hopefully, yes.
16      Q. That would be the theory going in?
17      A. Yes.
18      Q. Okay. Your understanding, so just to
19  take a hypothetical now. So assume that he does
20  the work and he really does do the work and it
21  comes in at -- his cost is $800,000. Okay.
22      A. Yes.
23      Q. Then you're going to have $800,000
24  that is cost to Beacher or one of his companies,
25  and you're going to have $200,000 which you

CROWN THEATRES v. DALY                                                                    August 5, 2003

Page 218

1  could call profit, you could call it savings,
2  you could call it anything but it's money,
3  right?
4      A.  Yes.
5      Q.  And of that $200,000, you and
6  Mr. Beacher would split it 70/30?
7      A.  Yes.  That is exactly the
8  understanding that was purported to occur.
9      Q.  Okay.  So that was your understanding
10 prior to going into -- prior to making this
11 arrangement with Mr. Beacher?
12     A.  Yes.
13     Q.  And this arrangement was an
14 arrangement that you had just with Mr. Beacher,
15 correct?
16     A.  Yes.
17     Q.  You didn't tell Dan Crown or anyone at
18 Crown Theatres about this arrangement?
19     A.  No.
20     Q.  You didn't tell anyone in the Crown
21 family about this arrangement?
22     A.  No.
23     Q.  Did you tell Mr. Martino about this
24 arrangement?
25     A.  No.

Page 219

1      Q.  So the only -- to your knowledge, the
2  only two people that knew about this arrangement
3  were you and Mr. Beacher?
4      A.  That's correct.
5      Q.  Did you tell your wife about this
6  arrangement?
7      A.  No.
8      Q.  Now that was your -- Withdrawn.
9          Now in terms of figuring out, if
10 you will, the money that you and Mr. Beacher
11 would wind up splitting at the end of the day in
12 our hypothetical, this $200,000, when would you
13 be in a position to figure out how much money
14 you would get and how much money he would get?
15     A.  I never got involved.  I left it up to
16 him.  I never kept any records.  I just let him
17 handle it.
18     Q.  Let me ask it a different way:  Did
19 you wait until a project was over before making
20 this split?
21     A.  He did it as he did invoicing, as far
22 as I can recall.
23     Q.  So during a project, he would go ahead
24 and send you money?
5      A.  Yes.

Page 220

1      Q.  Send Taylor-Leigh money?
2      A.  On the basis that the work was
3  completed for what he said he was doing, yes.
4      Q.  And you'd agree, sitting here today,
5  that you wouldn't be able to tell what the
6  savings were, savings, profits or whatever money
7  to be split up between you and he until after
8  the project was over, right?
9      A.  I would never know what the actual
10 savings were.
11     Q.  Or if there were any actual savings?
12     A.  Or if there were any savings.
13     Q.  So did you ever do any kind of
14 accounting with Mr. Beacher after a particular
15 project ended to make sure that you got your 70
16 percent and he got his 30 percent?
17     A.  No.
18     Q.  Okay.  So that was your understanding
19 prior to entering into this arrangement with
20 Mr. Beacher?
21     A.  Yes.
22     Q.  Now sitting here today, and reflecting
23 back upon it, what's your understanding of how
24 it actually worked?
25     A.  That Mr. Beacher might have or might

Page 221

1  not have performed certain work on these
2  projects.  I'm inclined to believe, based upon
3  the 20/20 hindsight, that probably a lot of it
4  was not done, as that is the only way he could
5  have possibly come up with these numbers that we
6  participated in.
7      Q.  So sitting here today, one of the
8  differences in your understanding is that
9  Mr. Beacher may or may not have done the work
10 that you thought he was going to do?
11     A.  That is correct.
12     Q.  Okay.  And with regard to -- Sitting
13 here today, you know that each of the projects
14 that you and Mr. Beacher had this sharing
15 arrangement on came in over budget, right?
16     A.  Yes.
17     Q.  And if each of those projects came in
18 under budget, would you agree that there were no
19 savings or profit or money that should have been
20 split up, even under your arrangement?
21         MR. WISSER:  Objection to the
22 form.
23     A.  If the budget -- if the theaters had
24 come in under budget, obviously I think the
25 arrangements were done properly.

SANDERS, GALE & RUSSELL                                              (203)624-4157

CROWN THEATRES v. DALY                                                                August 5, 2003

---

Page 222

1    Q.  But if they came in over budget --
2    A.  You said under budget.
3    Q.  I'm sorry, I misspoke.  Would you
4    agree that you and he wouldn't have any money to
5    split up if they came in over budget?
6    A.  Yes.
7    Q.  Under what you understood to be your
8    arrangement?
9    A.  That's correct.
10   Q.  Now prior to the time --  Withdrawn.
11        You and Mr. Beacher had this
12   70/30 split going on all the way until the time
13   you left Crown Theatres, correct?
14   A.  Yes.
15   Q.  And prior to the time that you left
16   Crown Theatres, you knew that projects had come
17   in over budget, correct?
18   A.  Yes.
19   Q.  Why didn't you stop the 70/30
20   arrangement, given that projects were coming in
21   over budget?
22        MR. WISSER:  Objection to the
23   form.  You mean stop on a subsequent project
24   because a prior project had come in over?
25   Q.  Yes, or stop midstream?

Page 223

1    A.  Only because he came up with logical
2    answers as to the reason why we were over budget
3    and he was putting the blame on Jim Martino,
4    that we had to spend thousands of thousands of
5    dollars in additional work that he did not have
6    on the plans.  In addition to, you know, various
7    comments, the project took 18 months instead of
8    12 months.
9    Q.  Why did you and Mr. Beacher --
10   Withdrawn.
11        When did you start, come to an
12   agreement with Mr. Beacher on this arrangement?
13   A.  I believe it was sometime in 1998.
14   Q.  In 1998?
15   A.  Yes.
16   Q.  And --
17   A.  Or December of '97, in that time
18   frame.
19   Q.  You don't specifically recall the
20   exact dates sitting here today?
21   A.  No, except for the fact that it was
22   December because I had a very serious argument
23   with Mr. Crown.
24   Q.  Okay.  What was the argument with
25   Mr. Crown?

Page 224

1    A.  Well, for two years he was going to go
2    to Chicago and get an employment contract on my
3    behalf in addition to getting the equity
4    position resolved, and he did not come back.
5        After a meeting that particular
6    week, the week of our Christmas party, and he
7    and I got into it very heatedly in his office at
8    the Christmas party, and obviously, to say that
9    I was in a very nasty mood that evening would be
10   putting it mildly and I shared my sentiments
11   with Mr. Beacher at that time, and Mr. Beacher
12   stated, "I know how to get your equity if you
13   want to listen to me."
14   Q.  And what did Mr. Beacher -- did you
15   say, "Yeah, I want to listen to you," or, "No, I
16   don't want to," or did you just drink more?
17   A.  I wasn't drinking.
18   Q.  You weren't?
19   A.  No.
20   Q.  It was Christmas?
21   A.  Yes.
22   Q.  Why not?
23   A.  Because I don't drink that much.
24   Q.  Oh, okay, whatever.  The -- Sorry,
25   but the -- in terms of your conversation with

Page 225

1    Mr. Beacher, he said, "I know how to get your
2    equity if you want to get your equity, if you'll
3    listen to me"?
4    A.  That's correct.
5    Q.  Did you then have a subsequent
6    conversation about how you could get your equity
7    with Mr. Beacher?
8    A.  Yes.
9    Q.  What did he say and you say?
10   A.  He said he wanted to do additional
11   work.  We could go into a partnership together,
12   nothing in writing, but we could save the
13   company thousands and thousands of dollars if I
14   would allow his companies to do a lot of the
15   work.  We could share in the savings of 50/50.
16        And I said no, I'm not interested
17   in doing anything 50/50.  It would be 70/30, not
18   thinking that this would occur, and just
19   proceeded it to this occurring.
20   Q.  Okay, so you had this conversation.
21   He said -- And I suppose it was his idea?  The
22   details of this were his idea?
23   A.  He controlled --
24   Q.  In terms of how to do it?
25   A.  It was his conversation.  It was his

SANDERS, GALE & RUSSELL                                              (203)624-4157

CROWN THEATRES v. DALY

August 5, 2003

---

Page 226

1  idea. And it was his execution.
2      Q. Okay. And what you wanted out of it
3  was you wanted another way, to put this in not
4  too fine of a point, you were annoyed with Dan
5  Crown and the Crown family for not giving you
6  equity in Crown Theatres, correct?
7      A. Yes.
8      Q. You believed that they had gone back
9  on their word?
10     A. That's correct.
11     Q. So you decided to take equity in a
12  different way from Crown Theatres, correct?
13     A. In the theory of thinking, yes.
14     Q. And the way you did that was through
15  this 70/30 arrangement with Mr. Beacher,
16  correct?
17     A. Yes.
18     Q. And that was of the principal reason
19  that you entered into this agreement with
20  Mr. Beacher, right?
21     A. Yes. You know, in recalling the
22  entire situation, I didn't believe that the
23  situation would even materialize, but it did.
24  And --
25     Q. And --

---

Page 227

1      A. That's why we're here today.
2      Q. That's why we're here today. One
3  thing I don't quite understand is that you don't
4  believe that the situation would materialize.
5         Let me see if I understand this
6  correctly. You and Mr. Beacher have a series of
7  conversations, and you agree that you would have
8  a 70/30 split on whatever you want to call it,
9  extra money.
10     A. I said I did not think it would
11  materialize in the original conversation.
12     Q. You mean in the original conversation?
13     A. Original conversation.
14     Q. But in subsequent conversations, you
15  realized it was going to materialize?
16     A. There was more than one, and I
17  realized he wanted to put this together.
18     Q. And after you and he, after you
19  realized he wanted to put this together, you and
20  he came to an agreement or understanding that
21  you would do it in a way that you described, and
22  you would split it 70/30?
23     A. That's correct.
24     Q. And he agreed to that split?
25     A. Absolutely.

---

Page 228

1      Q. Why didn't you put your agreement in
2  writing?
3      A. Again, I didn't expect this to
4  happen. I really didn't expect the entire thing
5  to develop into a program that we were talking
6  about. I didn't believe -- I thought it was a
7  lot of idle conversation.
8      Q. During the time you were engaged in
9  the 70/30 split with Mr. Beacher, did you have
10  any second thoughts as to whether what you were
11  doing was right or proper?
12     A. Of course.
13     Q. And what were those thoughts?
14     A. I was still very angry at the entire
15  Crown family and justified it basically in my
16  mind that that's what we were doing, and I
17  never -- I never envisioned that it would be the
18  numbers that we're talking about today.
19         Anger was driving the entire
20  process more than anything else. Out of control
21  basically, I would say, not my normal demeanor
22  concerning things like that, had never done
23  anything -- even thought of anything, such an
24  arrangement as such.
25         Once I got to the level it did,

---

Page 229

1  it was too late. It wasn't too late, but it
2  just continued.
3      Q. With regard to the -- We've talked
4  about the cost overruns on these six theater
5  projects.
6      A. Yes.
7      Q. With regard to the cost overruns, have
8  you done any type of accounting or mathematical
9  calculations to see if the money you and
10  Mr. Beacher took and split among yourselves had
11  it not been taken would have accounted for the
12  entire cost overruns?
13     A. No.
14     Q. Do you have any view on that one way
15  or another?
16         MR. WISSER: Don't guess or
17  speculate.
18     A. I have no view.
19     Q. In connection with the projects, the
20  six projects, and the competitive bidding on
21  them, did the bidding -- We've talked about
22  this hypothetical of the Beacher budget being
23  $10 million, and then we've talked about how the
24  bid, competitive bid, might come in under.
25         In reality, did any of the

---

SANDERS, GALE & RUSSELL

(203)624-4157

```
 1              UNITED STATES DISTRICT COURT
 2                DISTRICT OF CONNECTICUT
 3

 4

 5    ----------------------------x VOLUME II
      CROWN THEATRES, L.P.,          :
 6

                Plaintiff,           :
 7

                -versus-            : No. 02 CV 2272
 8                                     (AVC)
      MILTON L. DALY; TAYLOR-LEIGH, :
 9    INC.; JAMES C. CELLA; G.U.S.
      DEVELOPMENT, INC.; JAMES       :
10    T. MARTINO; and JAMES T.
      MARTINO ARCHITECT, P.C.        :
11

                Defendants.         :
12    ----------------------------x
13

14

15              Continued Deposition of MILTON
16       L. DALY, taken pursuant to the Federal
17       Rules of Civil Procedure, at the law
18       offices of Pepe & Hazard, 30 Jelliff Lane,
19       Southport, Connecticut, before James A.
20       Martone, L.S.R. #00248, and a Notary Public
21       in and for the State of Connecticut, on
22       August 6, 2003, at 10:00 a.m.
23

24

25
```

CROWN v. DALY                                                    August 6, 2003

---

**Page 232**

```
 1   APPEARANCES:
 2     For the Plaintiff:
 3     JENNER & BLOCK, L.L.C.
       One IBM Plaza
 4     Chicago, Illinois  60611
       By: CRAIG C. MARTIN, ESQ.
 5        ADAM HIRSCH, ESQ.
          (312) 222-9350
 6
 7     For the Defendant James T. Marino:
 8     MILBER, MAKINS, PLOUSADIS & SEIDEN,
       L.L.P.
 9     108 Corporate Park Drive
       White Plains, New York  10604
10     By: MARISA LANZA, ESQ.
          (914) 681-8700
11
12     For the Defendants Milton Daly and
       Taylor-Leigh, Inc.:
13
       WEINSTEIN & WISSER, P.C.
14     29 South Main Street
       West Hartford, Connecticut  06107
15     By: KERRY WISSER, ESQ.
          (860) 561-2628
16
17     For the Defendants James Cella and
       G.U.S. Development:
18
       LAW OFFICES OF S. DAVID VATTI
19     375 Bridgeport Avenue
       Shelton, Connecticut  06484
20     By: S. DAVID VATTI, ESQ.
          (203) 944-9392
21
22   ALSO  PRESENT:
23     Dan Crown
       Lisa Wood
24     Jody Gagne
25
```

---

**Page 233**

```
 1        S T I P U L A T I O N S
 2
 3        IT IS HEREBY STIPULATED AND
 4   AGREED by and between counsel for the
 5   respective parties hereto that all
 6   technicalities as to proof of the official
 7   character before whom the deposition is to
 8   be taken are waived.
 9
10        IT IS FURTHER STIPULATED AND
11   AGREED by and between counsel for the
12   respective parties hereto that the
13   deposition may be signed before any Notary
14   Public.
15
16        IT IS FURTHER STIPULATED AND
17   AGREED by and between counsel for the
18   respective parties hereto that all
19   objections, except as to form, are reserved
20   to the time of trial.
21
22
23            * * * * * *
24
25
```

---

**Page 234**

```
 1              WITNESS INDEX
 2                              PAGE
 3   Continued Direct Examination      236
     by Mr. Martin
 4
               EXHIBIT INDEX
 5
     DEPOSITION    DESCRIPTION    PAGE
 6
 7    10   Copy of check 731      253
 8    11   Copies of four checks   257
 9    12   Crown Theatres employment  262
          agreement
10    13   Black notebook         269
11    14   Copies of checks       283
12    15   Copies of checks       283
13    16   2/15 letters and attachments 283
14    17   Fax dated 1/10/00 and   283
          attachments
15
16    18   Memo dated 11/16/00    283
17    19   Correspondence dated 2/3/00  283
18    20   Correspondence dated 2/3/00  283
19    21   Correspondence dated 2/7/00  283
20    22   Memo dated 4/6/00      283
21    23   Correspondence dated 1/25/00  283
22    24   Carpet Square Footages  283
23    25   Transmittal dated 3/20/00  283
24    26   Transmittal dated 4/27/00  283
25    27   Fax cover sheet dated 4/1  283
```

---

**Page 235**

```
 1              EXHIBIT INDEX
 2   DEPOSITION    DESCRIPTION         PAGE
 3    28   Memo dated 6/28/00      283
 4    29   Fire Damage Estimate    283
 5    30   Fax dated 2/6/00 and    283
          attachments
 6
 7    31   Estimate Fire Damage    301
 8    32   Zoning Permit           301
 9    33   Building Permit         301
10    34   Crown Theatres Second Set  304
          of Interrogatories and
11        Requests for Document
          Production
12    35   E-mail dated 12/23/02    306
13    36   E-mails dated 12/31/02   306
14    37   Second Amended Complaint  315
15    38   Building construction budget 351
16    39   Building construction budget 363
17    40   Building Construction Budget  374
18    41   Black notebook          376
19    42   Crown Theatres invoices  385
20    43   Memo dated 11/9/99 and   395
          attachments
21
22    44   Project meeting documents  395
          and attachments
23   NOTE: Exhibits retained.
24
25
```

---

2 (Pages 232 to 235)

Page 244

1    exercised.
2           MR. MARTIN: Fine, and he
3    exercised them. If he wants to make the same
4    implication, that's fine.
5           THE WITNESS: I do.
6           MR. MARTIN: Okay.
7       Q. And then just to make sure that our
8    record is clear, with regard to the money that
9    Taylor-Leigh paid you, did you report or pay
10   taxes on it?
11      A. I invoke my Fifth.
12      Q. Okay. Now yesterday we also spoke
13   about your -- the fact that you quit Crown
14   Theatres on June 1st, 2001. Right?
15      A. Yes.
16      Q. After you quit Crown Theatres on June
17   1st, 2001, did you learn that Crown Theatres was
18   investigating Taylor-Leigh, yourself and
19   Mr. Beacher?
20      A. Yes.
21      Q. How did you learn that?
22      A. Through a conversation with David
23   Clifford.
24      Q. When, approximately, was that
25   conversation?

Page 245

1       A. It could have been late June.
2       Q. Was it by telephone?
3       A. Yes.
4       Q. Who called who?
5       A. He called me.
6       Q. What did he say and what did you say?
7       A. I don't remember the specifics of the
8    conversation.
9       Q. What --
10      A. Basically it was that something very
11   serious was wrong with the construction overruns
12   in the theaters. "Looks like Beacher whacked
13   Crown. You're going to be brought into the
14   case. Go talk to Crown." That's basically the
15   general conversation.
16      Q. Mr. Clifford asked you if you would be
17   willing to talk to Crown or the Crown lawyers?
18      A. Yes.
19      Q. What did you say in response to that?
20      A. I think my response was that "I think
21   I better get an attorney."
22      Q. And why did you think you needed to
23   get an attorney?
24          MR. WISSER: Object to the form.
25          You can answer if you

Page 246

1    understand.
2       A. Well, when someone says attorneys want
3    to talk to you, I think I better be represented
4    by counsel, to protect my interests.
5       Q. Did you subsequently retain an
6    attorney?
7       A. I subsequently did.
8       Q. And who did you retain?
9       A. Ethan Epstein.
10      Q. Levin-Epstein?
11      A. Whatever.
12          MR. WISSER: It's Ethan
13   Levin-Epstein?
14      A. Ethan Levin-Epstein.
15      Q. Okay. When did you retain him?
16      A. Immediately thereafter that call. I
17   don't remember the exact date.
18      Q. Late June?
19      A. Late June.
20      Q. 2001?
21      A. That is correct.
22      Q. And Mr. Levin-Epstein represented you
23   from late June 2001 until you parted ways with
24   him or discharged him, right?
25      A. We parted ways, or any way you want to

Page 247

1    put it.
2       Q. Any way you want to phrase it, he
3    stopped being your attorney?
4       A. He stopped being my attorney.
5       Q. When did he stop being your attorney?
6       A. I don't remember the exact timing and
7    dates. Upon his termination with me, I hired
8    Mr. Wisser. So I don't know the exact date that
9    I hired Mr. Wisser. I discharged -- we
10   terminated -- I terminated Epstein and I hired
11   Mr. Wisser. I don't remember the exact date.
12      Q. December 2002?
13      A. I really don't know.
14          THE WITNESS: When did we get
15   together?
16          MR. WISSER: I'm not here to
17   answer questions.
18      A. I don't remember. I'm a potted plant
19   as some Senator -- I'm sorry, counsel to a
20   Senator said once. I don't remember the exact
21   timing.
22      Q. Okay. Was there any time lapse
23   between your discharging Mr. Levin-Epstein?
24      A. It was December 2002, maybe. I'm --
25      Q. So your best recollection is that you

CROWN v. DALY                                                                        August 6, 2003

Page 356

1    between the two of you?
2        A.  No.
3        Q.  So your only involvement would
4    literally be sitting in your office and
5    receiving a check for Taylor-Leigh?
6        A.  My involvement was that he was going
7    to do construction work on these projects,
8    saving the company money, and that his companies
9    would do this work that had to be done to get
10   the projects complete, and his companies -- his
11   company would share in the profits with me, and
12   that's exactly what it was.  If something
13   came -- I didn't question it.  I just took it
14   for the fact that it had to be done.  It was
15   part of the contract, part of his work.
16       Q.  And in cases where 100 percent of the
17   invoice price was split, so the one that we
18   looked at where it was $226,000, you had no idea
19   that this was an invoice you were approving that
20   would then be split between you and Mr. Beacher?
21       A.  I assumed, based upon the contracts
22   that say Marlin, the contractors, that that was
23   work that he was doing on behalf of Crown
24   Theatres, and therefore, there would be some
25   remuneration to me.  How much of that total of

Page 357

1    that particular application would be split, I
2    had no idea.
3        Q.  Given the total scope of the Crown
4    Theatres construction projects, and the
5    construction budget, did it ever strike you at
6    any point that you were receiving a high
7    percentage of money?
8        A.  No.  Only because the total accurate
9    amount of construction projects, I think, was in
10   excess of $70 million.  These checks were coming
11   through on occasion.  I didn't keep track of
12   them.  I just deposited them.
13       Q.  So let's use your numbers.
14       A.  I believe it was -- I'm just using
15   that figure.  This project here was nine million
16   five.
17       Q.  The actual price was about $50 million
18   for the construction.
19       A.  Okay.
20       Q.  But in terms of those numbers, you and
21   Mr. Beacher received approximately six million
22   out of about 50 million, right?
23       A.  If you say so.  I gave you my number.
24   I took your number.
25       Q.  Let's say six million out of 70

Page 358

1    million.
2        A.  Whatever it is.
3        Q.  Which is about 9 percent.
4        A.  Okay.
5        Q.  And what percentage of the work would
6    Mr. Beacher's companies supposedly be doing in
7    connection with each project?
8        A.  You'd have to ask Mr. Beacher.
9        Q.  10 percent, 90 percent?
10       A.  I have no idea.  You would have to ask
11   him.  He was in charge of construction.  You
12   fail to understand that he was in charge of
13   construction.
14           MR. WISSER:  You've answered the
15   question.
16       Q.  He was in charge of construction and
17   you were in charge of approving payment
18   applications, right?
19       A.  That is correct, sir, although I was
20   not the only one who paid and approved those.
21       Q.  We can go through the notebook in
22   which you approved each and ever one of BB
23   Construction invoices.
24       A.  BB.  I don't know that to be a fact.
25       Q.  Do you want to look at it?

Page 359

1            MR. WISSER:  I thought we went
2    through one before that he had not approved.
3            MR. MARTIN:  I'm talking about
4    the BB invoices.
5        Q.  I'll show you.  Deposition Exhibit 7.
6    Maybe I've misread it.  It's entirely possible,
7    but I mean, can you tell me if there's a single
8    one that you didn't approve?
9        A.  You want to go through each page right
10   now, okay.  I'm saying, approved most of them.
11   I'm not saying I approved most of them.  I don't
12   know for a fact that I did.
13           MR. MARTIN:  I think it's a waste
14   of time to go through it.  We'll agree that
15   they're going to be authenticated and we can
16   work this out off the record.
17           MR. WISSER:  It appears to me to
18   the extent -- this is just my opinion as to what
19   Mr. Daley's signature looks like, but it looks
20   like an "M."
21           MR. MARTIN:  That's what it looks
22   like.  A "W" and an "M."  Doesn't look like
23   James Hewlett.
24           MR. WISSER:  To the extent that
25   those exist, yes, we will authenticate all of

SANDERS, GALE & RUSSELL                                            (203)624-4157

CROWN v. DALY                                                        August 6, 2003

| Page 360 | Page 362 |
|---|---|
| 1 them. | 1     Q.  And why in your opinion did the |
| 2         MR. MARTIN: Okay. | 2 Annapolis project come in over budget? |
| 3     Q.  Let's shift focus to the Annapolis | 3     A.  The answer I received from Bob Beacher |
| 4 project. What was the Annapolis project? | 4 was again, a lot of the construction items were |
| 5     A.  It was a brand-new complex of | 5 not on the plans, and inherent problems with the |
| 6 theaters. Fourteen screens, I believe. If I'm not | 6 contractor. |
| 7 certain. | 7     Q.  Do you think the Annapolis project -- |
| 8     Q.  It was located in Annapolis? | 8 Is one of the reasons that the Annapolis project |
| 9     A.  Annapolis, Maryland, yes. | 9 came in over budget, the fact that you and |
| 10     Q.  In a mall? | 10 Mr. Beacher were splitting monies that you took |
| 11     A.  In a mall. | 11 from Crown Theatres on a 70/30 basis as you |
| 12     Q.  And with regard to the Annapolis | 12 talked about? |
| 13 project, who was the general contractor? | 13         MR. WISSER:  Objection to the |
| 14     A.  I don't remember. | 14 form. |
| 15     Q.  Heffner? | 15     A.  I don't know. |
| 16     A.  Yes. | 16     Q.  You'd agree that if the two of you |
| 17     Q.  Was the architect Martino? | 17 didn't have that arrangement, that the project |
| 18     A.  Yes. | 18 would have been closer to on budget? |
| 19     Q.  Was it competitively bid? | 19     A.  I don't know.  Speculation on my |
| 20     A.  To my knowledge. | 20 part. |
| 21     Q.  And prior to commencing the Annapolis | 21     Q.  Do you think the arrangement that you |
| 22 project, did you and Dan Crown seek approval | 22 and Mr. Beacher had had any negative impact on |
| 23 from the Crown family in Chicago? | 23 the Crown Theatres construction program? |
| 24     A.  Dan Crown, David Clifford and I seeked | 24         MR. WISSER:  Objection to the |
| 25 approval, yes. | 25 form. |

| Page 361 | Page 363 |
|---|---|
| 1     Q.  And was the process the same as it was | 1     A.  I don't know. |
| 2 with regard to the other projects that you | 2     Q.  Do you think it had any positive |
| 3 sought approval on? | 3 impact on the Crown Theatres construction |
| 4     A.  I believe so. | 4 program? |
| 5     Q.  You prepared pro forma financials, | 5         MR. WISSER:  Objection to the |
| 6 correct? | 6 form. |
| 7     A.  Yes. | 7     A.  I don't know. |
| 8     Q.  You prepared budgets? | 8     Q.  Do you think it had any impact at all? |
| 9     A.  Yes. | 9     A.  I don't know. |
| 10     Q.  You sought approval from the Crown | 10         MR. MARTIN:  Can you mark this. |
| 11 family to go forward with the capital | 11         (Deposition Exhibit 39 marked |
| 12 expenditure? | 12     for identification.) |
| 13     A.  Yes. | 13     Q.  If you would identify Deposition |
| 14     Q.  And you received approval? | 14 Exhibit 39? |
| 15     A.  Yes. | 15     A.  Building construction budget for the |
| 16     Q.  And during the approval process, you | 16 Annapolis.  I stand corrected, it's not 14. |
| 17 didn't disclose to anyone the secret | 17     Q.  It was actually 11 screens, not 14? |
| 18 relationship that you and Mr. Beacher had? | 18     A.  Yes, 11 screens. |
| 19     A.  I've already testified to that. | 19     Q.  And with regard to this particular |
| 20     Q.  The answer is yes? | 20 budget, on the first page, look under management |
| 21     A.  Yes. | 21 fee.  It says zero. |
| 22     Q.  Did the Annapolis project come in | 22     A.  Yes, sir. |
| 23 under or over budget? | 23     Q.  Do you have any understanding as to |
| 24     A.  I believe it came in over budget, as | 24 why it says zero there? |
| 25 all the projects did. | 25     A.  No.  I don't remember anything |

SANDERS, GALE & RUSSELL                                    (203)624-4157