Page 1

```
 1        UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF CONNECTICUT
 2           CASE NO. 3:02CV2272AVC
 3    CROWN THEATRES, L.P.,
 4
              Plaintiff,
 5
          vs.
 6
      MILTON L. DALY, TAYLOR-LEIGH, INC.,
 7    ANNE E. DALY, JAMES C. CELLA, G.U.S.
      DEVELOPMENT, INC., JAMES T. MARTINO and
 8    JAMES THOMAS MARTINO, ARCHITECT, P.C.,
 9
              Defendants.
10    _____/
11
12
13      VIDEOTAPED DEPOSITION OF ROBERT L. BEACHER
14           VOLUME I, PAGES 1 - 124
15
16         Wednesday, February 25, 2004
              10:24 a.m. - 5:19 p.m.
17            Suite 1500
              200 East Broward Boulevard
18            Fort Lauderdale, Florida 33301
19
20
21
22    Reported By:
      Theresa Tomaselli, RPR, RMR
23    Notary Public, State of Florida
      Esquire Deposition Services
24    Fort Lauderdale Office
      Phone - 800.211.3376
25         954.331.4400
```

Page 2

```
 1    APPEARANCES:
 2    On behalf of the Plaintiff:
 3       JENNER & BLOCK, LLP
          One IBM Plaza
 4        Chicago, Illinois 60611
          BY: CRAIG C. MARTIN, ESQUIRE
 5        AND: MATTHEW H. RICE, ESQUIRE
          AND: LAWRENCE S. SCHANER, ESQUIRE
 6
 7    On behalf of the Defendants, Milton L. Daly,
      Anne E. Daly and Taylor-Leigh, Inc.:
 8
          WEINSTEIN & WISSER, P.C.
 9        Suite 207
          29 South Main Street
10        West Hartford, Connecticut 06107
          BY: KERRY M. WISSER, ESQUIRE
11
12    On behalf of the Defendants, James T. Martino, and
      James Thomas Martino, Architect, P.C.:
13
          MILBER, MAKRIS, PLOUSADIS & SEIDEN, L.L.P.
14        Suite 200
          108 Corporate Park Drive
15        White Plains, New York 10604
          BY: MARISA LANZA, ESQUIRE
16
17    ALSO PRESENT:
18        DANIEL CROWN
          GARY FISHER, Videographer
19
20
21
22
23
24
25
```

Page 3

```
 1                    - - -
                    I N D E X
 2                    - - -
 3
      DIRECT (ROBERT L. BEACHER)
 4    BY MR. MARTIN................................... 5
 5
 6                  E X H I B I T S
                    - - -
 7
 8    Deposition I.D. Exhibit No. 1................... 8
 9    Deposition I.D. Exhibit No. 2................... 9
10    Deposition I.D. Exhibit No. 3................... 9
11    Deposition I.D. Exhibit Nos. 4 & 5............ 27
12    Deposition I.D. Exhibit No. 6................. 42
13    Deposition I.D. Exhibit No. 7................. 52
14    Deposition I.D. Exhibit No. 8................. 76
15    Deposition I.D. Exhibit No. 9................. 86
16    Deposition I.D. Exhibit No. 10............... 86
17    Deposition I.D. Exhibit No. 11............... 86
18    Deposition I.D. Exhibit No. 12............... 89
19    Deposition I.D. Exhibit No. 13............... 99
20    Deposition I.D. Exhibit No. 14............... 99
21    Deposition I.D. Exhibit Nos. 15 - 21......... 102
22
23
24
25
```

Page 4

```
 1              P R O C E E D I N G S
 2         THE VIDEOGRAPHER:  We are now going on
 3    the video record.  The time on the monitor is
 4    10:24 a.m.  Today is Wednesday, the 25th day
 5    of February, 2004.
 6         We are here at 200 South Broward
 7    Boulevard, Fort Lauderdale, Florida, for the
 8    purpose of taking the videotaped deposition
 9    of Robert L. Beacher, Crown Theatres versus
10    Daly, et al., which is filed in the United
11    States District Court in Connecticut.
12         The videographer is Gary Fisher of
13    Esquire.  The court reporter is Terry
14    Tomaselli of Esquire.
15         Will counsel announce their appearances
16    for the record and swear in the witness.
17         MR. MARTIN:  Craig Martin, Larry
18    Schaner, and Matthew Rice for Crown Theatres.
19         MR. WISSER:  Kerry Wisser, W-i-s-s-e-r,
20    on behalf of Milt Daly, Anne Daly, and
21    Taylor-Leigh, Inc.
22         MS. LANZA:  Marisa Lanza from Milber,
23    Makris, Plousadis & Seiden for the
24    Defendants, James T. Martino and James Thomas
25    Martino, Architect, P.C.
```

1 (Pages 1 to 4)

Page 9

1  notice, correct?
2      A.   That's correct.
3      Q.   Now, Mr. Beacher, you understand this is
4  a lawsuit brought by Crown Theatres against Milton
5  Daly and others, correct?
6      A.   That's correct.
7      Q.   And have you had the opportunity to
8  review the Complaint in this lawsuit?
9      A.   Yes, I have.
10         (The document was marked Deposition I.D.
11     Exhibit No. 2.)
12  BY MR. MARTIN:
13     Q.   Let me show you what we have marked as
14  Deposition Exhibit Number 2, which is the original
15  Complaint in this lawsuit.
16         If you would take a moment, Mr. Beacher,
17  and look through the original Complaint and let me
18  know if you have reviewed it prior to today's
19  deposition.
20     A.   (Complies.)
21         Without reading this in its entirety, I
22  will say that I do recognize the document and I
23  have seen it in the past.
24         (The document was marked Deposition I.D.
25     Exhibit No. 3.)

Page 10

1  BY MR. MARTIN:
2      Q.   Okay. And, Mr. Beacher, let me show you
3  what we have marked as Deposition Exhibit Number 3,
4  and if you would identify that for us.
5      A.   This was a Declaration that I signed
6  with full knowledge after reading it as to the
7  validity of the statements of my Declaration on
8  January 22nd of 2003.
9      Q.   Okay. And, Mr. Beacher, that
10  Declaration on page 6, that is a copy of your
11  signature?
12     A.   That's my signature.
13     Q.   And you signed it on January 22nd, 2003,
14  correct?
15     A.   Yes, I did, sir.
16     Q.   And are the statements in -- were the
17  statements in your Declaration true when you signed
18  it?
19     A.   One hundred percent truthful.
20     Q.   And are -- is -- have they changed in
21  any way? Are they true today?
22     A.   They are as true today as they were at
23  the time I signed it.
24     Q.   Okay. And this Declaration refers to
25  the Complaint and makes references to various

Page 11

1  paragraphs in the Complaint, correct?
2      A.   That's correct.
3      Q.   And the Complaint that it refers to is
4  what we have marked as Exhibit Number 2, correct?
5      A.   That's correct.
6      Q.   Mr. Beacher, in this lawsuit, you
7  understand that Crown Theatres alleges that
8  Mr. Daly stole at least $4.2 million from Crown
9  Theatres, correct?
10         MR. WISSER: Objection. Leading.
11         THE WITNESS: It's absolutely
12     100 percent correct, that amount of money,
13     $4.2 million.
14  BY MR. MARTIN:
15     Q.   Let me ask you this, Mr. Beacher: What
16  is your understanding, having read the Complaint,
17  having signed your Declaration, of what the
18  allegations are that Crown Theatres makes vis-a-vis
19  Mr. Daly in this lawsuit?
20         MR. WISSER: Objection. Relevance.
21         THE WITNESS: I prepared invoices
22     through several entities for the major
23     portion of the money, including Marlin,
24     Tiger, and Hewlett Construction or
25     Contracting Companies for totally fictitious

Page 12

1      work of which Milt Daly requested me to do.
2         I provided Mr. Daly with a fax copy of
3      the fictitious work prior to submitting the
4      first invoice in each case and agreed upon
5      the description of the work and the total
6      amount.
7         The amount of each one of those invoices
8      were given to me by Milt Daly as to the
9      additional monies that I should charge above
10     the contract amount that was negotiated with
11     the general contractors for the sole purpose
12     of stealing the money from Crown.
13        Mr. Daly wanted 70 percent of the funds,
14     which I provided to Mr. Daly through
15     Taylor-Leigh, which was a corporation that I
16     understand Milt Daly set up to receive these
17     funds.
18        This was done on a continuous basis for
19     approximately 1997, I believe, to 2001,
20     somewhere right in there.
21        You will not find invoices of the larger
22     amounts for the Trumbull project or the
23     Hartford project, inasmuch as those major
24     funds were fraudulently obtained from Crown
25     through a submission of an invoice -- of

Page 13

1    invoices from a company called G.U.S., G-U-S,
2    which were prepared by Mr. Jamie Cella.
3        And Mr. Cella submitted those invoices
4    to me under a different arrangement that
5    Mr. Daly had orchestrated on me getting
6    25 percent, I believe; Mr. Cella getting --
7    or G.U.S. keeping 20 percent, and the balance
8    would have gone to -- would have been paid by
9    one of my entities, most likely with B.B.
10   Construction Consultants to Taylor-Leigh, of
11   which the checks that I wrote to Taylor-Leigh
12   will substantiate what I have just said.
13   BY MR. MARTIN:
14       Q.   Okay.  And is that your basic
15   understanding of what Crown alleges in this
16   lawsuit?
17       A.   Crown --
18           MR. WISSER:  Objection.  Relevance.
19           THE WITNESS:  I'm sorry.  Crown was
20       robbed of approximately $6 million, of which
21       Taylor-Leigh obtained through my entities of
22       $4.2 million.
23   BY MR. MARTIN:
24       Q.   Okay.  Let me make sure I understand
25   what you're saying, Mr. Beacher.  The -- what --

Page 14

1    the two questions that I have just asked you, is
2    that your understanding of what Crown alleges in
3    these lawsuits?
4        A.   Yes.
5            MR. WISSER:  Objection.  Relevance.
6    BY MR. MARTIN:
7        Q.   Okay.  And with regard to the two
8    answers that you just gave me a moment ago about
9    your understanding of what Crown alleges, is it
10   your understanding that what Crown alleges is true?
11       A.   Absolutely.
12       Q.   And so your best testimony is that
13   approximately $6 million was stolen by you,
14   Mr. B. -- you, Mr. Daly, and to some extent,
15   Mr. Cella, correct?
16       A.   Correct.
17       Q.   And your best testimony is that Mr. Daly
18   stole approximately 4.2 million, correct?
19           MR. WISSER:  Objection.  Leading.
20           THE WITNESS:  Correct.
21   BY MR. MARTIN:
22       Q.   Now, explain and describe the basis for
23   your understanding or your testimony that Mr. Daly
24   stole $4.2 million.
25       A.   Can you repeat the question, please?

Page 15

1        Q.   Sure.
2            Explain and describe the basis for your
3    testimony that Mr. Daly stole $4.2 million from
4    Crown Theatres.
5            MR. WISSER:  Object to the form of the
6        question to the utilization of the term
7        "stole."
8    BY MR. MARTIN:
9        Q.   Go ahead.  You can answer.
10       A.   Money was stolen.
11           MR. WISSER:  Move to strike.
12           THE WITNESS:  Mr. Daly devised a scheme
13       of where he wanted -- he was having trouble
14       getting his equity agreement completed with
15       Crown.  And he was very upset about it, and
16       to say it mildly, extremely upset about it.
17       So, Milt felt that he was entitled to
18       have these fees.  After -- when I say "these
19       fees" -- and let me walk you through of how
20       I'm trying to put this into the proper words.
21       After I would negotiate a contract
22       amount through a bidding process with a
23       particular general contractor that was going
24       to be the contractor awarded one of the jobs,
25       I would go back to Milt and tell Milt:  I put

Page 16

1    to bed the contract amount.
2        Hypothetically, let's say $7 million on
3    one of the projects.  Milt would then say to
4    me the very next day:  This is great; you did
5    a good job.  He says:  Give me an invoice for
6    a million-one, million-two, whatever amount
7    he would pick out.
8        At that point in time, I would prepare
9    the invoice.  I would fax it over to him
10   which would have been a continuation sheet on
11   the AIA form for his review, his approval, so
12   that the numbers -- so he could check out how
13   I was going to bill it in the described
14   numbers.  All right.
15       Then in most cases, immediately after it
16   was done, after -- within the next day after
17   the contract was signed, I would submit a
18   bill for a vast amount of work that was never
19   performed.
20       This all leads back to, you know,
21   where -- you know...
22   BY MR. MARTIN:
23       Q.   After you would submit the bill for work
24   that was never performed, let me ask -- well, let
25   me put it like this:  Who would you submit the bill

4 (Pages 13 to 16)

Page 17

1   to for work that was never performed?
2       A.  Milt Daly.
3       Q.  Okay.  And then after you submitted the
4   bill, did you receive any payment for that bill?
5       A.  A very short time later -- the bill
6   would be processed immediately -- I would receive a
7   check for the amount of that requisition.
8       Q.  Okay.  And who would the check be from?
9       A.  Crown Theatres.
10      Q.  Okay.  With the check from Crown
11  Theatres, what would you do with it?
12      A.  I would deposit it in one of my
13  accounts, wait for the money to clear, write the
14  percentage, 70 percent of the ill-gotten funds
15  to -- back to Taylor-Leigh as per Milt Daly's
16  direction.
17      Q.  What was Taylor-Leigh?
18      A.  Taylor-Leigh was a company that I
19  understand was set up by Milt Daly.
20          MR. WISSER:  Objection.  Move to strike.
21      Lack of foundation.
22  BY MR. MARTIN:
23      Q.  Well, how do you understand that it was
24  set up by Milt Daly?
25      A.  He told me.

Page 18

1       Q.  And what did Mr. Daly tell you about his
2   setting up of Taylor-Leigh?
3          MR. WISSER:  Objection.  Leading.
4          THE WITNESS:  He just told me that he
5       has this company called Taylor-Leigh and
6       that's where he wanted the funds to go to.
7   BY MR. MARTIN:
8       Q.  Did he explain to you what the -- what
9   the purpose of setting up Taylor-Leigh was?
10      A.  No, he didn't.
11      Q.  And did you have any understanding as to
12  what activities Taylor-Leigh was engaged in?
13      A.  To the best of my --
14          MR. WISSER:  Objection.  Lack of
15      foundation.
16          THE WITNESS:  To the best of my
17      knowledge, Taylor-Leigh had no -- no purpose
18      whatsoever except to receive the fraudulent
19      money.
20  BY MR. MARTIN:
21      Q.  Did Taylor-Leigh ever perform any
22  services for B.B. Construction?
23          MR. WISSER:  Objection.  Leading.
24          THE WITNESS:  Never.
25

Page 19

1   BY MR. MARTIN:
2       Q.  Did Taylor-Leigh ever perform any
3   services for Crown Theatres?
4          MR. WISSER:  Objection.  Leading.
5          THE WITNESS:  Not that I know of, never.
6   BY MR. MARTIN:
7       Q.  Now, you've testified that Mr. Daly
8   stole $4.2 million from Crown Theatres.  Did you
9   ever discuss with Mr. Daly why he stole $4.2
10  million from Crown Theatres?
11      A.  Yes.
12          MR. WISSER:  Objection to the form.
13  BY MR. MARTIN:
14      Q.  How many times --
15          MR. WISSER:  Utilization of the term
16      "stolen."
17  BY MR. MARTIN:
18      Q.  How many times did you discuss that with
19  Mr. Daly?
20      A.  Numerous.
21      Q.  Sitting here today, are there any
22  conversations that you can recall in particular?
23      A.  There was one conversation that I do
24  recall in particular.
25      Q.  When was that conversation?

Page 20

1       A.  I believe it was in February of 2000,
2   right about there.  I was in the airport in
3   Baltimore with Milt.
4       Q.  Was anyone else present?
5       A.  Just myself and Milt.
6          And he had just gotten off a telephone
7   conversation with Dan Crown, and he was as mad as I
8   ever seen him.  And he said:  Fuck Dan Crown; I
9   don't need to take this shit; bill me for $100,000
10  worth of dam -- of repairs to the office building,
11  which was the SoNo Regent building.
12          I said:  What -- what's going on, Milt?
13  And Milt responded to me by telling me:  He's not
14  giving me my equity agreement; they're backing out
15  of the deal; they are not living up to what they
16  were supposed to do, and screw them; I'll take it
17  my way.
18      Q.  Okay.  And when he said, tack on an
19  additional hundred thousand dollars to the office
20  bill, what did you understand him to mean?
21      A.  He didn't say tack on $100,000.  He
22  said:  Give me a bill for $100,000.
23      Q.  And what did -- what did you understand
24  that to mean?
25      A.  Milt wanted $100,000 as part of his

Page 21

1  equity just because he had a bad conversation with
2  Dan.
3      Q.   And if -- did you ever give him a bill
4  or bills that added up to $100,000?
5      A.   Yes, I did.
6      Q.   And did Crown -- were the bills for
7  legitimate work that was done?
8      A.   It was for no work that was done.
9      Q.   Did Crown Theatres pay those bills?
10     A.   Every one of them.
11     Q.   And with regard to the money that they
12  paid them to B.B. Consultants --
13     A.   There was no 70/30 split. Milt got a
14  hundred percent of that money.
15     Q.   Okay. So that we have got this clear:
16  Crown Theatres then paid one of your entities,
17  either B.B. or --
18     A.   It was B.B.
19     Q.   Okay. And then B.B. turned around and
20  gave 100 percent of that money to Taylor-Leigh?
21     A.   $100,000. I believe it was over four
22  payments.
23     Q.   Did you ever -- did you have any other
24  conversations that you recall sitting here today in
25  which Mr. Daly explained why he took $4.2 million

Page 22

1  or stole $4.2 million from Crown Theatres?
2          MR. WISSER: Objection to the form.
3          THE WITNESS: With Milt, it was just a
4      matter of greed that he just wanted to take
5      the money. He felt he was entitled to have
6      the money because of his position; and if I
7      didn't do it for him, he was going to get
8      somebody else that was going to do it for
9      him. And he made sure that everybody knew he
10     was the boss. It was his call. He was going
11     to do it and he was going to run the show.
12         MR. WISSER: Objection. Move to strike.
13     Purports to give information regarding what's
14     in the mind of Mr. Daly.
15  BY MR. MARTIN:
16     Q.   Mr. Beacher, just so that we are clear,
17  with regard to Milt telling you -- did Milt tell
18  you that he was taking money from Crown Theatres
19  because he thought he should be making more money?
20         MR. WISSER: Objection. Leading.
21         THE WITNESS: Absolutely, on more than
22     one occasion.
23  BY MR. MARTIN:
24     Q.   After Mr. -- there came a time,
25  Mr. Beacher, that Mr. Daly resigned from his

Page 23

1  employment at Crown Theatres.
2      A.   I remember the day very clearly.
3      Q.   Okay. Did you speak with Mr. Daly on
4  the day that he resigned from Crown Theatres?
5      A.   Yes. I had a call very early in the
6  morning that morning.
7      Q.   Who called who?
8      A.   Milt called me to tell me about a series
9  of events that had occurred, I believe, the evening
10  before.
11     Q.   What did he say to you?
12     A.   Okay. He told me that David Clifford
13  went to Dan and told Dan that there was a money
14  problem once again at Jupiter, which is Abacoa
15  project, and this was shortly after Dan was assured
16  by Milt that there was no further money problems.
17  And I believe that took place at the opening of
18  Skokie.
19     Q.   Then you believe that because Mr. Daly
20  told you that?
21     A.   Oh, absolutely.
22         Furthermore, Milt went on to explain --
23  to tell me -- he was livid that morning. He said
24  to me -- he says: I don't know who the fuck Dan
25  thinks he is; who the hell is he going to tell me;

Page 24

1  he's not going to speak to me like I'm Adam.
2          When he says "I'm Adam," he's referring
3  to Dan's son.
4          He says: I'm not going to take that
5  crap from anybody. He said: This is just -- he
6  says -- he says: We had cost overruns, we had cost
7  overruns; give me a whole litany of stuff that we
8  had our cost overruns.
9          At the same time, he was preparing his
10  letter of resignation. And I said to Milt: Milt,
11  are you sure you want to do this; why don't you let
12  things calm down? I said: Don't go running off
13  like that.
14         And he tells me to go screw myself; he
15  knows what he's doing.
16         And he sent a very vile letter that day,
17  which a copy was sent to me, to Dan Crown basically
18  telling him what he can do with his job and how he
19  can do it.
20     Q.   So that's the day that Mr. Daly
21  resigned?
22     A.   That was the date that he resigned.
23     Q.   And after that conversation when
24  Mr. Daly told you he was going to resign from Crown
25  Theatres, did you have any subsequent conversations

Page 25

1    about this lawsuit with him after he resigned?
2        A.    After he resigned, things, a short time
3    later, became a little bit nasty and an
4    investigation had been undertaken.
5            I received a call on my cell phone
6    from -- it was late in the afternoon, probably
7    around 4:00, 4:30. It was, you know -- I remember
8    it was late in the afternoon, and it was Milt.
9            And Milt said to me these words, I won't
10   forget them: This phone conversation never
11   happened; all right; why don't you just speak with
12   Crown; I'll give you $2.8 million; you take the --
13   tell them you had everything to do with this; I had
14   nothing at all to do with this.
15           And that was the last conversation I
16   ever had with him.
17       Q.    What -- what did you say to Mr. Daly
18   during that conversation?
19       A.    I listened. I didn't respond to him. I
20   just listened.
21       Q.    Did Mr. Daly tell you why he wanted to
22   give Crown or you $2.8 million?
23       A.    Milt wanted the problem to go away. I
24   had already been retained by counsel, so I
25   certainly wasn't going to speak very much with

Page 26

1    Milt.
2            I took his phone call, but Milt said to
3    me and his words were, during the conversation: If
4    we don't get this resolved, you're not going to be
5    playing golf and we are going to be at a place
6    where we really don't want this to be, which I
7    was --
8        Q.    What place did you understand that to
9    be --
10           MR. WISSER: Objection. Relevance.
11   Lack of foundation.
12           THE WITNESS: Can I finish?
13           I was trying to -- you know, he -- he
14           was just trying to tell me that he felt
15           everything was going to go to the Justice
16           Department and he was afraid of going to jail
17           the same as I didn't want to go to jail.
18           MR. WISSER: Move to strike. Lack of
19           foundation
20   BY MR. MARTIN:
21       Q.    And --
22       A.    Money was stolen.
23       Q.    Did Mr. Daly tell you that he was -- he
24   didn't want to go to jail?
25       A.    Yes, he did.

Page 27

1            (The documents were marked Deposition
2    I.D. Exhibit Nos. 4 & 5.)
3            MR. WISSER: Two separate exhibits?
4            MR. MARTIN: Yes.
5    BY MR. MARTIN:
6        Q.    Mr. Beacher, let me show you what I have
7    marked as Deposition Exhibit Number 4 and
8    Deposition Exhibit Number 5, and ask you first to
9    review Deposition Exhibit Number 4 and tell us what
10   it is; and then, to review Deposition Exhibit
11   Number 5 and tell us what it is.
12       A.    (Complies.)
13           Exhibit Number 4 is the Settlement
14   Agreement that I entered into with Crown, Crown
15   Theatres, on November 21st, 2001.
16       Q.    And, Mr. Beacher, while you're still on
17   that exhibit, if you would turn to page 10, and if
18   you would look at the signatures that line up
19   for Rob -- it says Robert Beacher, B.B.
20   Construction Consultants, Marlin Construction,
21   d/b/a Marlin Consulting, Inc., Tiger Contracting,
22   Hewlett Contracting, d/b/a Hewlett Consulting,
23   Inc., and there's a signature under each one.
24           Are each of those your signatures?
25       A.    Yes, they are.

Page 28

1        Q.    Now, if you would take a look at what we
2    have marked as Deposition Exhibit Number 5.
3        A.    (Complies.)
4            This was a letter that was -- Exhibit
5    Number 5 was a letter prepared by my attorney,
6    Michael Washor, as part of the Settlement Agreement
7    on November 21st, 2001 that was addressed to you,
8    Mr. Martin, and an associate of yours, Mr. Franch.
9        Q.    Okay.
10       A.    At Jenner & Block.
11       Q.    And, Mr. Beacher, is it your
12   understanding that Exhibit 4 and Exhibit 5 taken
13   together comprise the settlement, your settlement
14   with Crown Theatres in this matter?
15       A.    Yes, it is.
16       Q.    Would you explain to us your
17   understanding of the settlement that you reached
18   with Crown Theatres?
19       A.    The settlement that was ultimately
20   reached between my entities, myself and Crown
21   Theatres, was an accumulation of negotiations
22   between my attorney and the attorneys at
23   Jenner & Block in which I agreed to testify
24   truthfully, honestly, and without any reservations
25   as to the illegal activities that took place during

Page 97

1    down to, I believe, a little over $7 million,
2    I think it was. I'm not a hundred percent
3    sure. But we developed the contract down to,
4    I believe, a little over $7 million for them
5    to construct the building based upon the
6    plans, specifications of the architect, as
7    well as take into consideration the VE work
8    that was included into the contract amount.
9    BY MR. MARTIN:
10    Q. Let me ask you a few questions. The
11    general contractor was contracting with the
12    landlord; is that correct?
13    A. The general contractor had a contract
14    directly with the landlord.
15    Q. Did the general contractor have a
16    contract with Crown Theatres?
17    A. No, they did not.
18    Q. Okay. And why was it structured that
19    way?
20    A. The landlord wanted to control
21    everything on the project; however, this presented
22    a --
23    Q. Was there work that Crown Theatres was
24    going to do?
25    A. No.

Page 98

1        Excuse me. Yes, there was work. It
2    would be interior fit-out work, but not general
3    construction.
4    Q. And why was it -- from Crown Theatres'
5    perspective, why was it structured that way?
6    A. Crown Theatres didn't like it structured
7    that way.
8    Q. Why not?
9    A. Because Milt had no control over the
10    money by having De Guardiola build the building.
11    He then went to George De Guardiola and/or Bruce
12    Rendina, and between him and David Clifford and a
13    gentleman by the name of Pat DiSalvo from
14    De Guardiola, negotiated to have all change orders
15    billed directly to me, meaning B.B., okay, of which
16    then I submitted the change orders to Crown, okay,
17    which that provided Milt with an avenue to steal
18    the money.
19    Q. Did you and Mr. Daly steal money in
20    connection with the Jupiter project?
21    A. A lot of money.
22        MR. WISSER: Objection to the form of
23    the question.
24    BY MR. MARTIN:
25    Q. How much money, approximately?

Page 99

1    A. I would venture to say at least a
2    million and a half dollars. I'm not -- you know, I
3    would like to see the application. I could better
4    respond.
5        (The document was marked Deposition I.D.
6        Exhibit No. 13.)
7    BY MR. MARTIN:
8    Q. Okay. Let me show you what we have
9    marked as Deposition Exhibit Number 13, which is
10    right in front of you, Mr. Beacher.
11    A. I have it.
12    Q. Would you identify that document?
13    A. This is the lease agreement between
14    Crown Theatres and North County Land Holdings,
15    which would have been, to my knowledge, Abacoa Town
16    Center.
17        (The document was marked Deposition I.D.
18        Exhibit No. 14.)
19    BY MR. MARTIN:
20    Q. Okay. And let me show you what we have
21    marked as Deposition Exhibit Number 14.
22    A. Is there anything specific you want me
23    to see in this first amendment?
24    Q. No. I would just like you to identify
25    it for the record.

Page 100

1    A. That's a first amendment to the lease.
2    Q. Okay. And as Crown's construction
3    consultant, were you familiar with these documents?
4    A. Some of the terms of the document, yes.
5    Q. Which terms in particular were you
6    familiar with?
7    A. The Exhibit E, which would have been the
8    Crown -- description of tenants' work. I prepared
9    that document.
10    Q. Did you discuss it with anyone?
11    A. Yes.
12    Q. Who?
13    A. Milt Daly.
14    Q. What did -- what did that discussion
15    entail?
16    A. It would be just, you know, what -- you
17    know, this was all part of the overall building
18    program, so it would have been the landlord
19    building the buildings. The landlord has
20    everything.
21        These is the work -- this is the work
22    that was negotiated out of the landlord's work that
23    would be the tenant's responsibility in their lease
24    agreement.
25        So the conversation went that I was

*Defendant's Response to ...*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

CROWN THEATRES, L.P.,                )
                                     )
        Plaintiff,                )
                                     )
        v.                        )    Case No. 3:02CV2272AVC
                                     )    Jury Trial Demanded
MILTON L. DALY, TAYLOR-LEIGH,        )
INC., JAMES C. CELLA, G.U.S.         )
DEVELOPMENT, INC., JAMES T.          )
MARTINO AND JAMES THOMAS             )
MARTINO, ARCHITECT, P.C.,            )
                                     )
        Defendants.              )

## PLAINTIFF CROWN THEATRES' SECOND SET OF INTERROGATORIES AND REQUESTS FOR THE PRODUCTION OF DOCUMENTS TO DEFENDANTS MILTON L. DALY AND TAYLOR-LEIGH, INC.

Pursuant to Rules 33 and 34 of the Federal Rules of Civil Procedure, plaintiff

Crown Theatres, L.P. ("Crown Theatres") propounds the following interrogatories and requests

for the production of documents to defendants Milton L. Daly and Taylor-Leigh, Inc., the

answers and responses to be served on or before May 27, 2003.

## DEFINITIONS AND INSTRUCTIONS

1.       Crown Theaters incorporates by reference the Definitions and

Instructions set forth in Plaintiff Crown Theatres' First Set of Interrogatories and Requests for

the Production of Documents to Defendants Milton L. Daly and Taylor-Leigh, Inc., served

March 11, 2003.

2.       The term "Answer" means Daly and Taylor-Leigh's Answer to Crown

Theatres' Amended Complaint, filed March 27, 2003.

3.    The term "Affirmative Defense" refers to those affirmative defenses alleged by Daly and Taylor-Leigh in the Answer.

## INTERROGATORIES

1.    Identify all past and present shareholders, officers, and employees of Taylor-Leigh. For each, state: MILTON DALY and ANNE DALY.

a.    the start and end dates of their employment or service; still employed

b.    their compensation; none.

c.    their job title; MILTON DALY - President    ANNE DALY - Secretary

d.    their job description and duties; and Taylor-Leigh has no active business other than owning certain real estate, so there are**

e.    the total amount of money they received from Taylor-Leigh during

each year of their employment or service. No monies were paid to Anne or Milton Daly for employment or service at any time.

2.    State whether Anne Daly performed any work for or on behalf of Taylor-Leigh, and if she did state: None.

a.    the start and end dates of her work; N/A

b.    her compensation; N/A

c.    her job title; N/A

d.    a description of her job duties; N/A

e.    a description of the work performed; and N/A

f.    the total amount of money she received from Taylor-Leigh during

each year in which she performed work. N/A

3.    State whether Traci Daly performed any work for or on behalf of Taylor-Leigh, and if she did state: Manager - Kangaroo Pouch Kids, which is a d/b/a of Taylor-Leigh

a.    the start and end dates of her work; Approximately 1998 to 1999.

**no job descriptions or duties for Milton Daly or Anne Daly.

2

b.   her compensation;  $600.00 per week.

c.   her job title;  Manager.

d.   a description of her job duties;  Running a daycare service.

e.   a description of the work performed; and  Running a daycare service.

f.   the total amount of money she received from Taylor-Leigh during

each year in which she performed work.  $600.00 per week for approx
imately one year.

4.      State whether William Daly performed any work for or on behalf of

Taylor-Leigh, and if he did state: None, however, on occasion, William performed odd menial
jobs on behalf of Taylor-Leigh.

a.   the start and end dates of his work;  N/A

b.   his compensation;  N/A

c.   his job title;  N/A

d.   a description of his job duties;  N/A

e.   a description of the work performed; and  N/A

f.   the total amount of money he received from Taylor-Leigh during

each year in which he performed work.  N/A, however, on occasion,
William was reimbursed for expenses he advanced.

5.      State whether Anne Daly, Traci Daly or William Daly ever received

money from Taylor-Leigh. If they did, state separately for each person: None, other than Traci, who
acted as manager of Kangaroo Pouch Kids and received a weekly salary of $600.00. ***

a.   the date of the payments;  Approximately 1998 to 1999.

b.   the amount of the payments;  $600.00 per week.

c.   if the payments were by check, the account on which the checks

were drawn and the check numbers; and  Unknown.

d.   the reasons for each payment.  Salary.

*** At times, Traci and William received reimbursement for expenses they advanced.

3

6.    Identify all real property presently or formerly owned by Taylor-Leigh.

For each piece of real property, state: This information has already been supplied to the
                                       Plaintiff.

     a.    the location of the property;

     b.    the date the property was acquired;

     c.    the date it was sold;

     d.    the purchase price;

     e.    the sale price;

     f.    the identity of the seller;

     g.    the identity of the buyer; and

     h.    Taylor-Leigh's activities on, use of and development of the

        property.

7.    Identify all of Taylor-Leigh's sources of income.  For each, state:

     a.    the source of the income; The current income of Taylor-Leigh is
        for rental of a townhome.  The plaintiff already has information
     b.    the dates on which the income was received;    regarding the **
        Monthly.
     c.    the amount of income received; and
        $300.00 per month.
     d.    the reasons the income was received.
        Rent.

8.    State whether Taylor-Leigh performed any work on the Theatre Projects.

If so, provide a detailed description of the work performed and state: None.

     a.    the dates of the work;  N/A

     b.    the identities of the personnel performing the work;  N/A

     c.    the amount of compensation paid for the work;  N/A

     d.    the identity of the person who paid for the work;  N/A

** historical payments that are the subject of this lawsuit.

    e.    the manner by which the payment was made (e.g., check, cash or wire transfer); and   N/A

    f.    if the payments were by check, the account on which the check was drawn, the check number, and the account, if any, into which the check was deposited.  N/A

9.    State whether Anne Daly, Traci Daly or William Daly performed any work on the Theatre Projects.  If so, for each separately, provide a detailed description of the work performed and state:  None

    a.    the dates of the work;   N/A

    b.    the amount of compensation paid for the work;   N/A

    c.    the identity of the person who paid for the work;   N/A

    d.    the manner by which the payment was made (e.g., check, cash or wire transfer); and   N/A

    e.    if the payments were by check, the account on which the check was drawn, the check number, and the account, if any, into which the check was deposited.  N/A

10.    State whether Taylor-Leigh performed any work for Beacher, B.B. Construction, James Martino, the Martino Firm, Cella, GUS, RCD Hudson, Hewlett, Marlin, or Tiger.  If so, provide a detailed description of the work performed and state:  None.

    a.    the dates of the work;   N/A

    b.    the identities of the personnel performing the work;   N/A

    c.    the amount of compensation paid for the work;   N/A

    d.    the individual or entity for whom the work was performed;   N/A

    e.    the identity of the person who paid for the work;  N/A

    f.    the manner by which the payment was made (e.g., check, cash or wire transfer); and   N/A

    g.    if the payment was by check, the account on which the check was drawn, the check number, and the account, if any, into which the check was deposited.  N/A

11.     State whether Anne Daly, Traci Daly, or William Daly performed any work for Beacher, B.B. Construction, James Martino, the Martino Firm, Cella, GUS, RCD Hudson, Hewlett, Marlin, or Tiger. If so, for each separately, provide a detailed description of the work performed and state:  None.

    a.    the dates of the work;  N/A

    b.    the amount of compensation paid for the work;   N/A

    c.    the individual or entity for whom the work was performed; N/A

    d.    the identity of the person who paid for the work;  N/A

    e.    the manner by which the payment was made (e.g., check, cash or wire transfer); and   N/A

    f.    if the payment was by check, the account on which the check was drawn, the check number, and the account, if any, into which the check was deposited.  N/A

12.     For each check payable to Taylor-Leigh listed on the schedules attached hereto as Exhibit A (identified therein in Columns G, H, and I) and Exhibit B, state:

    a.    whether Taylor-Leigh performed any work in exchange for the payment;  No.

6

b.    if so, describe the work performed in detail; N/A

c.    the reason Taylor-Leigh received the payment; A split of the business profits derived from Beacher performing construction work**

d.    where Taylor-Leigh deposited the payment; CitiBank, Norwalk, CT.

e.    what Taylor-Leigh did with the funds after depositing the payment; Paid bills and paid dividends to Milton Daly. and

f.    if Taylor-Leigh disbursed the funds by check after depositing the

payment, for each such check, state to whom the check was

written, the date of the check, the check number, and the amount. Defendant has no recollection regarding the requested payment history and has no ***

13.    Provide a detailed description of the business of Kangaroo Pouch Kids,

including: Childcare

a.    identify all past and present shareholders and officers; None

b.    state Kangaroo Pouch Kids' date of incorporation, the state in

which it was incorporated and its principal place of business; None

c.    identify each of Kangaroo Pouch Kids' lines or types of business; Child daycare

d.    identify all of Kangaroo Pouch Kids' assets, including all accounts; None and

e.    identify all of Kangaroo Pouch Kids' corporate relationships,

including without limitation its past and present parents, affiliates,

and subsidiaries. It is a d/b/a of Taylor-Leigh, but ceased doing business in September, 2001.

14.    State each fact concerning the circumstances by which Crown Theatres

engaged Beacher and B.B. Construction, including:

a.    when Crown Theatres made the decision to engage Beacher and

B.B. Construction; Beacher was engaged by Dan Crown prior to the employment of Milton Daly.

** for the plaintiff.

*** records regarding payments other than what has already been provided to the plaintiff

b.    who at Crown Theatres made that decision; `Dan Crown.`

c.    the activities which Beacher and B.B. Construction were engaged

to perform;  `Construction supervision.`

d.    whether any agreements were signed between Crown Theatres,

Beacher or B.B. Construction;  `Unknown.`

e.    the terms of any agreements between Crown Theatres, Beacher or

B.B. Construction; and  `Unknown.`

f.    for each agreement, the amount of compensation to be paid to

Beacher or B.B. Construction.  `Unknown.`

15.    In paragraph 46 of your Answer, you admit the following: "Daly and

Beacher generally agreed to split the proceeds from Crown Theatres on an approximate

70%/30% basis over the relevant period of time from 1996 to 2001, with Beacher retaining

approximately 30% of the funds he received and remitting approximately 70% to Taylor-Leigh,

who in turn provided those funds to Daly (hereinafter the '70/30 Agreement')." You make

similar admissions in paragraphs 77, 85, 93, 104, 113, 121, 125, 134 and 146 of your Answer.

With respect to your agreement with Beacher,

a.    state the date on which the 70/30 Agreement was entered into;
`Around December, 1998.`

b.    state the purpose of the 70/30 Agreement;
`Please see response attached hereto on Page 8A.`

c.    identify any documents evidencing or reflecting the 70/30

**Agreement;**  `The agreement was verbal.  The checks previousl`
`provided to the plaintiff evidence the 70/30 split.`

d.    state the reason Taylor-Leigh received approximately 70% of the

proceeds Beacher received from Crown Theatres; `Beacher wanted a`
`50/50 split.  However, since he was being paid a fee to supervise the projects,`
`his 50% split was reduced to 30%.  From the inception, the payments were made`
`payable to Taylor-Leigh.`

**8**

RESPONSE TO INTERROGATORY #15 (b)

b. state the purpose of the 70/30 Agreement;

When a project was budgeted for a set price, Beacher and Martino would create bid documents for distribution to bidders. Those documents would not include certain aspects of work that Beacher determined that his company would perform. When that work was performed and paid for, the profits for said work were split 70/30. Milton Daly was advised by Beacher that the performance of work by Beacher, would, in fact, save money for the plaintiff because Beacher claimed that he would charge less for those services than other contractors would charge for the same services.

8A

       e.     state the work or services, if any, Taylor-Leigh performed or

provided in exchange for receiving 70% of the proceeds paid by

Crown Theatres to Beacher;  None.

       f.     state the reason Taylor-Leigh transferred its share of the proceeds

from Crown Theatres to Daly; and  Distribution of dividends.

       g.     state each and every use to which the proceeds received by Taylor-

Leigh or Daly were put;  Payment of bills and distribution of divi-
dends.

16.    State the date for each payment by Beacher to Taylor-Leigh pursuant to

the 70/30 Agreement, and for each such payment provide:  See response to Interrogatory #12(f).

       a.     the method of payment (e.g., cash, check, wire transfer);

       b.     the amount of the payment;

       c.     the account, if any, into which the payment was deposited;

       d.     identify all documents concerning or reflecting the payment; and

       e.     identify all documents concerning the uses to which the payment

was put, including without limitation any and all transfers of the

funds constituting the payment.

17.    State the date for each payment by Beacher to Taylor-Leigh on any basis

other than the 70/30 Agreement and for each such payment state:  None.

       a.     the method of payment (e.g., cash, check, wire transfer);  N/A

       b.     the amount of the payment;  N/A

       c.     the account, if any, into which the payment was deposited;  N/A

       d.     identify all documents concerning or reflecting the payment; and  N/A

9

e.    identify all documents concerning the uses to which the payment was put, including without limitation any and all transfers of the funds constituting the payment.  N/A

18.    For each payment identified or referenced in response to Interrogatories 16 and 17, state the current location of the funds, and if you are no longer in possession of the funds, state:  See response to Interrogatory #12(f).

a.    the date on which the funds were transferred from Taylor-Leigh;

b.    the method by which the funds were transferred;

c.    the amount transferred;

d.    the person to whom the funds were transferred; and

e.    identify all documents concerning the uses to which the payment was put, including without limitation any and all transfers of the funds constituting the payment.

19.    In paragraph 66 of your Answer, you admit that B.B. Construction paid Taylor-Leigh $302,000, by a check in the amount of $225,000 dated June 25, 1999, check number 4517, and a check in the amount of $77,000 dated August 5, 1999, check number 4630. With respect to these payments,

a.    state whether Taylor-Leigh performed any work in exchange for this money, and, if so, identify the work performed in detail; No.

b.    state the reasons for the payments;  See response to Interrogatory #15(b).

c.    state what Taylor-Leigh did with the payments;  Paid bills and distributed dividends.

d.    state the current or last known location of the funds constituting

the payments; and Approximately 3 to 3.5 million dollars was placed into Daly's brokerage account with Raymond James. Said accoun lost substantial money. When it was liquidated, only 1.2 million remained. Those funds were then loaned to Odyssey. Any additional funds received by Taylor-Leigh were used to pay mortgages and bills.

10

e.    identify all documents concerning the payments and the uses to

which they were put, including without limitation any and all

transfers of the funds constituting the payments. See response to
Interrogatory #12(f).

20.    In paragraph 82 of your Answer, you admit that Beacher caused Marlin to

pay Taylor-Leigh approximately 70% of the $155,000 payment Marlin received from Crown

Theatres at your direction. Similarly, in paragraph 99 of your answer, you admit that Beacher

caused Marlin to pay Taylor-Leigh approximately 70% of the $160,000 payment Marlin received

from Crown Theatres at your direction. With respect to these payments,

a.    state whether Taylor-Leigh performed any work in exchange for

this money, and, if so, identify the work performed in detail; No.

b.    state the reasons for the payments; See response to Interrogatory
#15(b).

c.    state what Taylor-Leigh did with the payments; Paid bills and dividend

d.    state the current or last known location of the funds constituting

the payments; and See response to Interrogatory #19(d).

e.    identify all documents concerning the payments and the uses to

which they were put, including without limitation any and all

transfers of the funds constituting the payments. See response to
Interrogatory #12(f).

21.    In paragraph 82 of your Answer, you admit that, at your direction, Crown

Theatres paid Marlin $155,000. Similarly, in paragraph 99 of your answer, you admit that, at

your direction, Crown Theatres paid Marlin $160,000. State whether Marlin did any work in

exchange for these payments, and, if so, identify the work performed in detail, including without

limitation:

a.    a description of the work; Milton Daly has no personal knowledge.
He relied on representations from Beacher and all applicable
architect certificates.

11

b.    the location of the work;  Unknown.

c.    the dates of the work;  Unknown.

d.    the reasons for the payments to Marlin;  See response to Interrogator #21(a).

e.    identify all documents concerning the payments; and Unknown.

f.    identify all documents concerning the decision by Crown Theatres

to make these payments.  Requisitions submitted by Beacher.

22.    In paragraph 120 of your answer, you admit that, at your direction,

Crown Theatres issued a check to Tiger in the amount of $270,000. State whether Tiger did any

work in exchange for this payment, and, if so, identify the work performed in detail, including

without limitation:

a.    a description of the work; Milton Daly has no personal knowledge. He relied on representations from Beacher and all applicable architect certificat

b.    the location of the work;  Unknown.

c.    the dates of the work;  Unknown.

d.    the reasons for the payment to Tiger;  See response to Interrogatory #22(a).

e.    identify all documents concerning the payment; and Unknown.

f.    identify all documents concerning the decision by Crown Theatres

to make the payment. Requisitions submitted by Beacher.

23.    In paragraphs 141, 144, and 145 of your answer, you admit that, at your

direction, Crown Theatres issued checks to Hewlett, including a check in the amount of

$911,000. State whether Hewlett did any work in exchange for these payments, and, if so,

identify the work performed in detail, including without limitation:

a.    a description of the work;  Milton Daly has no personal knowledge. He relied on representations from Beacher and all applicable architect certificates

b.    the location of the work;  Unknown.

12

c.    the dates of the work;   Unknown.

d.    the reasons for the payments to Hewlett; See response to 23(a).

e.    identify all documents concerning the payments; and Unknown.

f.    identify all documents concerning the decision by Crown Theatres

to make these payments.    Requisitions submitted by Beacher.

24.    State whether Marlin performed any work on the Theatre Projects.  If so,

identify the work performed in detail, including without limitation:

a.    a description of the work; Milton Daly has no personal knowledge.
       He relied on representations from Beacher and all applicable
b.    the location of the work;                    architect certificates
       Unknown.
c.    the dates of the work; and
       Unknown.
d.    the amount Crown Theatres paid for the work. See response to
                                      Interrogatory #24(a).

25.    State whether Tiger performed any work on the Theatre Projects.  If so,

identify the work performed in detail, including without limitation:

a.    a description of the work; Milton Daly has no personal knowledge.
       He relied on representations from Beacher and all applicable
b.    the location of the work;                    architect certificat
       Unknown.
c.    the dates of the work; and
       Unknown.
d.    the amount Crown Theatres paid for the work.
       See response to Interrogatory #25(a).

26.    State whether Hewlett performed any work on the Theatre Projects.  If so,

identify the work performed in detail, including without limitation:

a.    a description of the work; Milton Daly has no personal knowledge.
       He relied on representations from Beacher and all applicable
b.    the location of the work;                    architect certificate
       Unknown.
c.    the dates of the work; and
       Unknown.
d.    the amount Crown Theatres paid for the work.
       See response to Interrogatory #26(a).

27.    Identify the account into which you deposited or caused to be deposited the checks attached hereto as Exhibits C-1 to C-11. For each check, provide the following information regarding the account into which it was deposited:

    a.    the name of the institution; Fleet Bank.

    b.    the location of the institution or the branch of the institution into

        which the deposit was made;
        New Fairfield, CT.

    c.    the account number;
        The account numbers are referenced on the backs of the various

    d.    the name of the account holder; and        checks.
        Milton Daly and Anne Daly.

    e.    the names of all persons authorized to withdraw from the account.
        Milton Daly and Anne Daly.

28.    State each fact supporting the contention in your First Affirmative Defense that "some or all of the plaintiff's claims alleged in Count I and Count II of the Complaint are barred by the four-year statute of limitations set forth under RICO." OBJECTION PENDING.

29.    State each fact supporting the contention in your Second Affirmative Defense that "some or all of the plaintiff's claims under Count III, Count IV and Count V, sounding in fraud, are barred by Connecticut General Statutes § 52-577." OBJECTION PENDING.

30.    State each fact supporting the contention in your Third Affirmative Defense that "some or all of the plaintiff's claims under Count IV, sounding in civil conspiracy, are barred by Connecticut General Statutes § 52-577." OBJECTION PENDING.

31.    State each fact supporting the contention in your Fourth Affirmative Defense that "some or all of the plaintiff's claims under Count VII, sounding in conversion, are barred by Connecticut General Statutes § 52-577." OBJECTION PENDING.

32.    State each fact supporting the contention in your Fifth Affirmative Defense that "some or all of the plaintiff's claims under Count X, sounding in CUTPA, are barred by Connecticut General Statutes § 42-110g(f)."  OBJECTION PENDING.

33.    State each fact supporting the contention in your Sixth Affirmative Defense that "some or all of the plaintiff's claims under Count XI, sounding in theft, are barred by Connecticut General Statutes § 52-577."  OBJECTION PENDING.

34.    State each fact supporting the contention in your Seventh Affirmative Defense that "some or all of the plaintiff's claims are barred by the Business Judgment Rule." OBJECTION PENDING.

35.    State each fact supporting the contention in your Eighth Affirmative Defense that any damages sustained by plaintiff "resulted in whole or in part, on [sic] the reckless, wanton or negligent conduct of the plaintiff."  OBJECTION PENDING.

36.    Identify all communications, including without limitation, conversations, email or other correspondence, between Daly and Robert Abramsky regarding Crown Theatres' allegations or any potential, alleged or actual criminal, tortuous, improper or wrongful act or conduct by Daly or Taylor-Leigh.  Milton Daly advised Mr. Abramsky, on or about December, 2002, that the plaintiff was going to file a civil complaint against him. No other discussion occurred

## REQUESTS FOR THE PRODUCTION OF DOCUMENTS

1.    All documents concerning your response to above Interrogatory #1. These documents were provided through a Subpoena recently served by the plaintiff.

2.    All documents concerning your response to above Interrogatory #2. None.

3.    All documents concerning your response to above Interrogatory #3. None.

4.    All documents concerning your response to above Interrogatory #4. None.

5.    All documents concerning your response to above Interrogatory #5. None.

6.    All documents concerning your response to above Interrogatory #6. These documents were previously provided to the plaintiff.

7.    All documents concerning your response to above Interrogatory #7. None, in that the lease is an oral month-to-month agreement.

15

8.      All documents concerning your response to above Interrogatory #8.   None.

9.      All documents concerning your response to above Interrogatory #9.   None.

10.     All documents concerning your response to above Interrogatory #10.   None.

11.     All documents concerning your response to above Interrogatory #11.   None.

12.     All documents concerning your response to above Interrogatory #12.   None.

13.     All documents concerning your response to above Interrogatory #13.   None.

14.     All documents concerning your response to above Interrogatory #14.   None.

15.     All documents concerning your response to above Interrogatory #15.   None.

16.     All documents concerning your response to above Interrogatory #16.   None.

17.     All documents concerning your response to above Interrogatory #17.   None.

18.     All documents concerning your response to above Interrogatory #18.   None.

19.     All documents concerning your response to above Interrogatory #19.   None.

20.     All documents concerning your response to above Interrogatory #20.   None.

21.     All documents concerning your response to above Interrogatory #21.   None.

22.     All documents concerning your response to above Interrogatory #22.   None.

23.     All documents concerning your response to above Interrogatory #23.   None.

24.     All documents concerning your response to above Interrogatory #24.   None.

25.     All documents concerning your response to above Interrogatory #25.   None.

26.     All documents concerning your response to above Interrogatory #26.   None.

27.     All documents concerning your response to above Interrogatory #27.   None.

28.     All documents concerning your response to above Interrogatory #28.   OBJECTION
                                                                             PENDING.

29.     All documents concerning your response to above Interrogatory #29.
        OBJECTION PENDING.

30.     All documents concerning your response to above Interrogatory #30.
        OBJECTION PENDING.

16

31. **All documents** concerning your response to above Interrogatory #31.
OBJECTION PENDING.

32. **All documents** concerning your response to above Interrogatory #32.
OBJECTION PENDING.

33. **All documents** concerning your response to above Interrogatory #33.
OBJECTION PENDING.

34. **All documents** concerning your response to above Interrogatory #34.
OBJECTION PENDING.

35. **All documents** concerning your response to above Interrogatory #35.
OBJECTION PENDING.

36. All documents concerning your response to above Interrogatory #36.  NONE.

37. All documents concerning the incorporation of Taylor-Leigh, including

without limitation all documents concerning the incorporation of Taylor-Leigh in states other

than the state of its original incorporation.    The defendant has no other documents than were
previously provided.

**CROWN THEATRES, L.P.**


By:_____
Craig C. Martin
Bar No. CT12198


Craig C. Martin CT12198
JENNER & BLOCK, LLC
One IBM Plaza
Chicago, IL 60611
(312) 222-9350
(312) 840-7776 (fax)
cmartin@jenner.com

H. James Pickerstein CT05094
Jodi Zils Gagne CT24376
PEPE & HAZARD, LLP
30 Jelliff Lane
Southport, CT 06490
(203) 319-4000
(203) 259-0251 (fax)
hpickerstein@pepehazard.com
jgagne@pepehazard.com

Dated: April 23, 2003

Plaintiff Crown Theatres' Response to Defendants' Interrogatories
Exhibit 1

| A Invoice Date | B Author | C Amount | D Crown Check Date | E Crown Check No. | F Crown Check Amount | G Date of Payment to Daly | H Daly Payment Check No. | I Daly Payment Amount | J Work Identified on Invoice |
|---|---|---|---|---|---|---|---|---|---|
| 5/12/2000 | BB Construction | $ 48,281 | 5/17/2000 | 128667 | $ 385,847 | 5/22/2000 | 5405 | $ 17,500 | Sprinkler room, Grills & diffusers, wall sconce fixtures, Fire alarm system (Annapolis) |
| 5/14/2000 | BB Construction | $ 21,635 | 5/17/2000 | 128667 | $ 385,847 | 5/22/2000 | 5405 | $ 7,000 | Invoice step lights (Annapolis) |
| 5/17/2000 | BB Construction | $ 41,456 | 5/24/2000 | 128782 | $ 48,760 | 6/1/2000 | 5436 | $ 14,000 | Fiber optic ceiling (Miami) |
| 5/18/2000 | BB Construction | $ 16,500 | 5/31/2000 | 128833 | $ 345,422 | 6/9/2000 | 5468 | $ 7,000 | Water color rendering (Miami) |
| 5/19/2000 | BB Construction | $ 31,144 | 5/31/2000 | 128833 | $ 345,422 | 6/9/2000 | 5468 | $ 7,000 | Doors, frames, hardware (Annapolis) Electrical, Toilet accessories, Finish hardware (Jupiter) |
| 5/18/2000 | BB Construction | $ 120,128 | 5/31/2000 | 128833 | $ 345,422 | 6/9/2000 | 5468 | $ 35,000 | |
| 5/22/2000 | BB Construction | $ 14,648 | 5/31/2000 | 128833 | $ 345,422 | 6/9/2000 | 5468 | $ 7,000 | Wall sconce fixtures (Annapolis) |
| 5/22/2000 | BB Construction | $ 43,853 | 5/31/2000 | 128833 | $ 345,422 | 6/9/2000 | 5468 | $ 14,000 | THX baffle walls (Miami) |
| 5/23/2000 | BB Construction | $ 39,779 | 5/31/2000 | 128833 | $ 345,422 | 6/9/2000 | 5468 | $ 14,000 | Fiber optic ceiling (Hartford) |
| 5/23/2000 | BB Construction | $ 43,956 | 5/31/2000 | 128833 | $ 345,422 | 6/9/2000 | 5468 | $ 11,200 | Fiber optic ceiling (Hartford) |
| 5/25/2000 | BB Construction | $ 47,252 | 6/7/2000 | 128915 | $ 124,044 | 6/9/2000 | 5468 | $ 7,000 | THX baffle walls (Hartford) |
| 6/1/2000 | BB Construction | $ 37,788 | 6/7/2000 | 128915 | $ 124,044 | 6/9/2000 | 5468 | $ 7,000 | Electrical changes (Miami) |
| 6/12/2000 | BB Construction | $ 15,718 | 6/21/2000 | 129182 | $ 117,853 | 7/5/2000 | 5538 | $ 7,000 | Box office revisions (Hartford) |
| 8/15/2000 | BB Construction | $ 49,057 | 8/21/2000 | 129182 | $ 117,853 | 7/5/2000 | 5538 | $ 21,000 | Projection booth revisions, Retaining wall, Concrete tie columns (Jupiter) |
| 8/16/2000 | BB Construction | $ 17,500 | 8/28/2000 | 129298 | $ 87,145 | 7/28/2000 | 5538 | $ 7,000 | Additional drywall (Hartford) |
| 8/18/2000 | BB Construction | $ 30,511 | 8/28/2000 | 129298 | $ 87,145 | 7/3/2000 | 5538 | $ 14,000 | Additional revision (Hartford) Drywall revision (Hartford) |
| 8/23/2000 | BB Construction | $ 18,953 | 7/6/2000 | 129405 | $ 84,262 | 7/17/2000 | 5587 | $ 7,000 | Rain leader covers (Hartford) |
| 6/29/2000 | BB Construction | $ 65,309 | 7/6/2000 | 129405 | $ 84,262 | 7/17/2000 | 5587 | $ 21,000 | Concrete, HVAC, Paint, Sonic Fixtures (Hartford) |

**Plaintiff Crown Theatres' Response to Defendants' Interrogatories**
**Exhibit 1-A**

| A | B | C |
|---|---|---|
| Check Date | Check # | Amount |
| 10/7/1996 | 1988 | $ 4,000 |
| 12/5/1996 | 2126 | $ 5,000 |
| 9/23/1997 | 2843 | $ 7,500 |
| 7/22/1997 | 2683 | $ 3,500 |
| 2/24/1998 | 3244 | $ 27,300 |
| 3/5/1998 | 3263 | $ 36,500 |
| 3/16/1998 | 3291 | $ 19,750 |
| 3/30/1998 | 3326 | $ 16,450 |
| 8/4/1998 | 3653 | $ 25,000 |
| 9/15/1998 | 3759 | $ 5,000 |
| 10/19/1998 | 3848 | $ 5,000 |
| 11/5/1998 | 3894 | $ 10,000 |
| 11/23/1998 | 3936 | $ 10,000 |
| 12/21/1998 | 4012 | $ 5,000 |
| 1/14/1999 | 4077 | $ 11,200 |
| 2/2/1999 | 4133 | $ 1,600 |
| 3/1/1999 | 4201 | $ 4,500 |
| 4/1/1999 | 4276 | $ 55,000 |
| 4/27/1999 | 4348 | $ 10,000 |
| 5/20/1999 | 4416 | $ 10,000 |
| 7/17/2000 | 5587 | $ 14,000 |





1000285

C-1





**1000291**

C-2





1000293

C-3





1000297

C-4





1000304

C-5





1000311

C-6





1000301

C-7





1000305

C-8





1000313

C-9





1000314

C-10



DEFENDANT,
MILTON L. DALY

By_____

Kerry M. Wisser of
WEINSTEIN & WISSER, P.C.
29 South Main Street, Suite 207
West Hartford, CT 06107
Telephone No. (860) 561-2628
Facsimile No. (860) 521-6150
Federal Bar No. ct01205

## **CERTIFICATION**

This is to certify that on the 23rd day of May, 2003, a copy of the foregoing was

served upon the following counsel of record by way of First Class Mail, postage prepaid:

Harold James Pickerstein, Esquire
Jodi Zils Gagne, Attorney
Pepe & Hazard
30 Jelliff Lane
Southport, CT 06890-4000

Craig C. Martin, Esquire
Lawrence S. Schaner, Esquire
Jenner & Block
One IBM Plaza
Chicago, IL 60611-7603

Thomas H. Kukowski, Esquire
Milber Makris Polusadis & Seiden, LLP
108 Corporate Park Drive, Suite 200
White Plains, NY 10604

Marisa Lanza, Attorney
Milber Makris Polusadis & Seiden, LLP
108 Corporate Park Drive, Suite 200
White Plains, NY 10604

S. Dave Vatti, Esquire
375 Bridgeport Avenue, 3rd Floor
Shelton, CT 06484-3961

Kerry M. Wisser

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

CROWN THEATRES, LP,                    :    CIVIL ACTION NO.
                                       :         3:02-CV-2272 (AVC)
       Plaintiff,                    :
                                       :
VS.                                    :
                                       :
MILTON L. DALY, ET AL.,                :
                                       :    May 23, 2003
       Defendants.                   :

## PLAINTIFF'S NOTICE OF COMPLIANCE AND RESPONSE
## TO DEFENDANT'S DISCOVERY REQUESTS

This is to certify that on the 22nd day of May, 2003, the defendant, Milton L. Daly, in the above-entitled action has served upon all counsel of record compliance with the Plaintiff Crown Theatres' Second Set of Interrogatories and Requests for Production dated April 23, 2003, to Defendant Milton L. Daly. On or about April 30, 2003, the defendant filed objections to Interrogatory Nos. 28, 29, 30, 31,32, 33, 34 and 35. The defendant now provides responses to the interrogatories and production requests that have not been objected to as per the attached responses.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CROWN THEATRES, LP, | : | CIVIL ACTION NO. |
| | : | 3:02-CV-2272 (AVC) |
| Plaintiff, | : | |
| | : | |
| VS. | : | |
| | : | |
| MILTON L. DALY, ET AL., | : | |
| | : | May 23, 2003 |
| Defendants. | : | |

### VERIFICATION OF DEFENDANT MILTON DALY'S
### COMPLIANCE AND RESPONSE TO PLAINTIFF'S DISCOVERY REQUESTS

The undersigned, Milton L. Daly, having read the interrogatory responses filed in the above-entitled action under date of April 23, 2003, to the Plaintiff's Second Set of Interrogatories and Requests for Production, hereby certifies that said responses are true and accurate to the best of my knowledge and belief.

_____
Milton L. Daly

STATE OF Alabama )
                 ) ss.     May 27 , 2003
COUNTY OF Baldwin )

On the _____ day of May, 2003, then and there personally appeared Milton L. Daly, who subscribed the foregoing and swore to the truth of the statements contained in those interrogatory responses before me, the undersigned authority.

_____
Notary Public
My Commission Expires: _____

My Commission Expires
March 2, 2005