**Citation # 1**
**2000 Conn. Super.LEXIS 2587**

Estate of Egidio Baraglia, Jr. v. Theodore Poulos

CV990497776S

SUPERIOR COURT OF CONNECTICUT, JUDICIAL DISTRICT OF HARTFORD - NEW BRITAIN, AT NEW BRITAIN

2000 Conn. Super. LEXIS 2587

September 18, 2000, Decided

September 18, 2000, Filed

**NOTICE:** [*1] THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

**DISPOSITION:** The court grants the plaintiff's motion for summary judgment on the first two counts of its complaint as to liability alone. The court orders the matter set down for an immediate hearing as to the amount of damages pursuant to Practice Book § 17-50.

**CASE SUMMARY**

**PROCEDURAL POSTURE:** Plaintiff moved for summary judgment regarding the first two counts of its complaint, alleging failure to pay a promissory note and conversion of those funds against the defendant, an attorney who admitted that he had refused to make requested payments on a loan he received from decedent client and had thereby converted the funds for his own use.

**OVERVIEW:** Plaintiff sued defendant, an attorney, for failure to pay a promissory not and conversion of those funds. Defendant admitted that he had refused to make payments on the loan he received from plaintiff, a client, and had thereby converted the funds to his own use. Plaintiff moved for summary judgment. The court granted the motion as to liability only. The affidavit and documentary evidence submitted along with the plaintiff's motion supported the allegations in the plaintiff's complaint that the defendant executed a promissory note, that plaintiff made demands for payment upon the defendant and that the defendant failed to pay the note as demanded. Defendant did not contradict the evidence of the existence of the debt, the amount of the debt, or his failure to pay the debt. Accordingly, there was no genuine issue of material fact as to failure to pay or conversion. However, the court held a genuine issue of material fact existed as to damages. Defendant claimed a set off against the debt for legal work allegedly performed for plaintiff's decedent.

**OUTCOME:** The court granted plaintiff's motion for summary judgment as to liability only, because there was no genuine issue of material fact as to the existence or amount

of the debt or defendant's failure to pay. A genuine issue of material fact existed as to the amount of damages owed, as defendant claimed a set off for legal work allegedly performed by defendant.

**CORE TERMS:** summary judgment, promissory note, conversion, quotation, genuine issue of material fact, failure to pay, genuine issue, converted, decedent, matter of law, maturity, admits, own use, opposing, entitled to judgment, refusal to pay, mutual debts, years past, genuine, movant, special defense, oral argument, per annum, memorandum, calendar, owing

### LexisNexis(TM) Headnotes

*Civil Procedure > Summary Judgment > Summary Judgment Standard*

HN1⭐ Conn. Gen. Practice Book § 17-49 provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. The party seeking summary judgment has the burden of showing the absence of any genuine issue of material facts which, under applicable principles of substantive law, entitle him to a judgment as a matter of law. and the party opposing such a motion must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof*

HN2⭐ When a motion for summary judgment is supported by affidavits and other documents, an adverse party, by affidavit or as otherwise provided by Conn. Gen. Practice Book § 17-45, must set forth specific facts showing that there is a genuine issue for trial, and if he does not so respond, the court is entitled to rely upon the facts stated in the affidavit of the movant. If the opposing affidavits and the other supporting documents are inadequate, then the court is justified in granting the summary judgment, assuming the movant has met his burden of proof.

*Civil Procedure > Summary Judgment > Summary Judgment Standard*

HN3⭐ Recovery on a promissory note requires proof of a written promise to pay a certain sum of money at a certain time and signed by the maker. When examination of the affidavit and exhibits accompanying the plaintiff's motion for summary judgment discloses the unchallenged existence of unpaid debts, summary judgment can be granted. The court may grant a motion for summary judgment on liability only and hold hearing on damages at a later date.

*Commercial Law (UCC) > Secured Transactions (Article 9) > Remedies*

HN4⭐ The law of set off is governed by Conn. Gen. Stat. § 52-139(a), which provides that a set off arises from a due and owing debt between the parties, independent of that on which the plaintiff's complaint is based. A set off is predicated on mutual debts so that one debt may be set off against the other. A set-off is made when the defendant desires to avail himself of that debt, in the existing suit, either to reduce the plaintiff's recovery, or to defeat it altogether, and, as the case may be, to recover a judgment in his own favor for a balance.

*Commercial Law (UCC) > Secured Transactions (Article 9)*

HN5⭐ A debt is defined as an unconditional and legally enforceable obligation for the payment of money.

*Torts > Intentional Torts > Conversion*

HN6⭐ Conversion is an unauthorized assumption and exercise of the right of ownership over goods belonging to another, to the exclusion of the owner's rights. In addition, conversion requires that the owner be harmed as a result of the unauthorized act. Conversion may arise subsequent to an initial rightful possession. This requires a showing that a simple detention was followed by a demand and refusal. Money can clearly be subject to conversion.

**JUDGES:** Hon. Andre M. Kocay, J.

**OPINIONBY:** Andre M. Kocay

**OPINION:** MEMORANDUM OF DECISION

This action comes before the court on the plaintiff's motion for summary judgment regarding the first two counts of its complaint alleging failure to pay a promissory note and conversion of those funds against the defendant, an attorney who admitted that he has refused to make requested payments on a loan he received from his client and has thereby converted the funds for his own use.

The plaintiff, the estate of Egidio Baraglia, Jr., moves for summary judgment in accordance with the debt set out in its submitted affidavit together with treble damages per General Statutes § 52-564 and attorneys fees on counts one and two of its three-count complaint against the defendant, Attorney Theodore Poulos. **[\*2]** Alternatively, the plaintiff moves for summary judgment on the issue of the defendant's liability and, if granted, the plaintiff further moves for an immediate hearing before the court to determine the amount of damages. In the first count, the plaintiff alleges that the defendant failed to make due and requested payments of principal and interest on a loan made to him by the plaintiff, the terms of which are memorialized in a promissory note signed by the defendant. In the second count, the plaintiff alleges that the defendant, as a result of his continued refusal to pay for over three years past maturity, has converted the funds of the loan to his own use. n1 The plaintiff argues that summary judgment on these counts is proper because the defendant admits in his answer to the plaintiff's complaint to the facts contained therein and, therefore, no genuine triable issue of material fact exists.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 In count three, the plaintiff alleges breach of fiduciary duties by the defendant to the plaintiff's decedent, with whom the defendant had an attorney-client relationship, on the basis of the defendant's continued failure to pay on the promissory note. The defendant denied these allegations in his answer. This count is not the subject of the instant motion.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

**[\*3]**

On February 14, 2000, the plaintiff filed its motion for summary judgment ( # 106) together with a supporting memorandum, an affidavit of debt by James Fitzsimons, the executor of the estate and a copy of the promissory note. The defendant failed to file any opposing memorandum and to appear at short calendar on May 15, 2000. The court heard oral argument by the plaintiff at short calendar and now issues this decision.

The pleadings, affidavits and other documents reveal the following undisputed facts. The defendant borrowed $ 150,000 from the plaintiff's decedent, pursuant to the terms and conditions of a promissory note signed by the defendant on April 6, 1995. The terms of the note require the principal to be due and payable, without demand one year after the date of

the note, and for interest to be paid at the rate of 10 percent per annum payable one year in advance together with all court costs and reasonable attorneys fees in the collection of the note. Despite written demand, the defendant has failed and refused to pay the principal balance due under said note and interest from April 6, 1998 to date. Presently there is due and owing on the note the principal sum of $ 138,050 **[\*4]** together with interest from April 6, 1998 through April 6, 1999 in the sum of $ 13,805. Further, interest has continued to accrue from April 6, 1999 through the date of this judgment, the rate of 10 percent per annum, at the daily rate of $ 41.66. The defendant admits that as a result of his continued refusal to pay, for over three years after maturity of the note, he has converted the funds to his own use.

DISCUSSION

*HN1* "Practice Book § 384 [now § 17-49] provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . . In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party . . . The party seeking summary judgment has the burden of showing the absence of any genuine issue of material facts which, under applicable principles of substantive law, entitle him to a judgment as a matter of law . . . and the party opposing such a motion must provide an evidentiary foundation to demonstrate the existence of a genuine issue **[\*5]** of material fact." (Citations omitted; internal quotation marks omitted.) _Rivera v. Double A Transportation, Inc._, 248 Conn. 21, 24, 727 A.2d 204 (1999).

*HN2* "When a motion for summary judgment is supported by affidavits and other documents, an adverse party, by affidavit or as otherwise provided by 380 [now § 17-45], must set forth specific facts showing that there is a genuine issue for trial, and if he does not so respond, the court is entitled to rely upon the facts stated in the affidavit of the movant." _Waterbury House Wrecking Co._, 190 Conn. 8, 11-12, 459 A.2d 115 (1983). "If [the opposing] affidavits and the other supporting documents are inadequate, then the court is justified in granting the summary judgment, assuming the movant has met his burden of proof." (Internal quotation marks omitted.) 2830 _Whitney Avenue Corp. v. Heritage Canal Development Associates, Inc._, 33 Conn. App. 563, 569, 636 A.2d 1377 (1994).

A. Count One

The plaintiff moves for summary judgment on the first count of its complaint the ground that there is no genuine issue of material fact regarding the defendant's failure to pay the promissory **[\*6]** note pursuant to the terms of the note.

*HN3* "Recovery on a promissory note requires proof of a written promise to pay a certain sum of money at a certain time and signed by the maker." (Internal quotation marks omitted.) _Ocwen Federal Bank v. Landock_, 1997 Conn. Super. LEXIS 3327, Superior Court, judicial district of Ansonia-Milford at Milford, Docket No. 056885 (December 12, 1997) (Curran, J.). "When examination of the affidavit and exhibits accompanying the plaintiff's motion for summary judgment discloses the unchallenged existence of unpaid debts, summary judgment can be granted . . . The court may grant a motion for summary judgment on liability only and hold hearing on damages at a later date." (Citations omitted; internal quotation marks omitted.) _Id._

The affidavit and documentary evidence submitted along with the plaintiff's motion support the allegations in the plaintiff's complaint that the defendant executed a promissory note in the amount of $ 150,000 plus interest, that it made demands for payment upon the defendant and that the defendant has failed to pay the note as demanded. In addition, the

defendant admits each of these allegations in his answer filed on January 5, 2000. Accordingly, the **[*7]** plaintiff is entitled to payment on the note in question unless the defendant alleges and proves a defense. See <u>Connecticut Bank & Trust Co. v. Dadi, 182 Conn. 530, 531, 438 A.2d 733 (1980).</u>

The defendant submitted no opposing affidavits or other evidence, nor did the defendant oppose the motion by oral argument or brief. The defendant fails to contradict the plaintiff's evidence of the existence of the debt, the amount of the debt, or his failure to pay the debt. Accordingly, since there exists no genuine issue of material fact regarding the existence of the debt, the amount of the debt or the defendant's failure to pay the debt, the plaintiff is entitled to judgment as a matter of law based on these facts.

There is, however, a genuine issue of material fact as to the amount of damages. In his answer to the plaintiff's complaint, the defendant claimed a set off of approximately $ 2,000 for legal work the defendant alleges he performed for the plaintiff's decedent. On February 14, 2000, the plaintiff filed a reply to the defendant's set off denying the allegations and by way of a special defense claimed that the defendant failed to obtain a written fee agreement **[*8]** from the plaintiff and, therefore, the defendant is precluded from seeking payment for same. The plaintiff acknowledges in its summary judgment motion that the defendant's set off is the only possible exception to no existing genuine issue of material facts.

<sup>HN4</sup>The law of set off is governed by <u>General Statutes § 52-139(a)</u>, n2 which provides that a set off arises from a due and owing debt n3 between the parties, independent of that on which the plaintiff's complaint is based. A set off is predicated on mutual debts so that one debt may be set off against the other. See <u>Hope's Architectural Products, Inc. v. Fox Steel Co., 44 Conn. App. 759, 762, 692 A.2d 829,</u> cert. denied, <u>241 Conn. 915, 696 A.2d 985 (1997).</u> "A set-off is made when the defendant . . . desires to avail himself of that debt, in the existing suit, either to reduce the plaintiff's recovery, or to defeat it altogether, and, as the case may be, to recover a judgment in his own favor for a balance." (Internal quotation marks omitted.) <u>Bank of Boston Connecticut v. Avon Meadow Associates, 40 Conn. App. 536, 541, 671 A.2d 1310,</u> cert. denied, <u>237 Conn. 905, 674 A.2d 1329 (1996).</u> **[*9]**

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n2 <u>General Statutes § 52-139(a)</u> provides in pertinent part that "in any action brought for the recovery of a debt, if there are mutual debts between the plaintiff . . . and the . . . defendants, one debt may be set off against the other."

n3 <sup>HN5</sup>"A debt is defined as an unconditional and legally enforceable obligation for the payment of money." (Internal quotation marks omitted.) <u>Petti v. Balance Rock Associates, 12 Conn. App. 353, 362, 530 A.2d 1083 (1987).</u>O

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - - -

The defendant's set off meets the requirements of § 52-139 because the mutual debt claimed is a debt allegedly due the defendant by the plaintiff's decedent and is independent to the transactions described in the plaintiff's complaint. The plaintiff's special defense to the set off raises the issue of the validity of the defendant's claimed debt. Accordingly, the court finds this set off creates a genuine issue of material fact as to damages. Therefore, the court

enters judgment for the plaintiff on the first count as to liability only. **[\*10]**

B. Count Two

The plaintiff moves for summary judgment on the second count of its complaint alleging conversion of funds due on the note by the defendant.

HN6 Conversion is "an unauthorized assumption and exercise of the right of ownership over goods belonging to another, to the exclusion of the owner's rights . . . In addition, conversion requires that the owner be harmed as a result of the unauthorized act." (Citations omitted; internal quotation marks omitted.) Suarez-Negrete v. Trotta, 47 Conn. App. 517, 521, 705 A.2d 215 (1998). "Conversion may arise subsequent to an initial rightful possession." Id. "This requires a showing that . . . a simple detention was followed by a demand and refusal." Prusaczyk v. Kulo, 17 Conn. Supp. 348, 351 (1951). "Money can clearly be subject to conversion"; Omar v. Mezvinsky, 13 Conn. App. 533, 536, 537 A.2d 1039, cert. denied, 208 Conn. 803, 545 A.2d 1101 (1988); as can intangible goods. See, e.g., Healey v. Flammia, 96 Conn. 233, 237-38, 113 A. 449 (1921) (promissory notes).

There is no question that the defendant has refused to make payments due and requested **[\*11]** and has thereby converted the funds. There is also no question that the defendant's continued refusal to repay the loan for three years past maturity of the promissory note has resulted in damage to the plaintiff. See, e.g., Discover Leasing, Inc. v. Murphy, 33 Conn. App. 303, 310-11, 635 A.2d 843 (1993) (the Appellate Court found harm for a conversion cause of action when the defendant deprived the plaintiff of its funds for five to seven months). Accordingly, the plaintiff is granted summary judgment as to the conversion count as to liability only because no genuine issues of material fact exist.

CONCLUSION

The court grants the plaintiff's motion for summary judgment on the first two counts of its complaint as to liability alone. The court orders the matter set down for an immediate hearing as to the amount of damages pursuant to Practice Book § 17-50.

BY THE COURT

Hon. Andre M. Kocay, J.

Back to Summary Report                         1 of 1

Not Reported in A.2d
(Cite as: 1991 WL 50291 (Conn.Super.))

Page 1

C

Only the Westlaw citation is currently available.

NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION IN THE PERMANENT LAW REPORTS. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

Superior Court of Connecticut, Judicial District of Stamford-Norwalk, at Stamford.

Phyllis JOHNSON
v.
Dinyar WADIA.

No. CV 85 0075560 S.

March 28, 1991.

*MEMORANDUM OF DECISION*

LEWIS, Judge.

***1** This action involves a claim by a homeowner in New Canaan that she was defrauded by her builder, the defendant Dinyar Wadia. The case was presented most ably and energetically by counsel both for the plaintiff Phyllis Johnson and for the defendant during some forty-nine separate days of testimony over the course of more than four months. The trial to the court involved some thirty witnesses, approximately 200 exhibits, and over 700 pages of post-trial briefs. The plaintiff made twenty-four specific allegations of fraud arising out of various phases of the construction as performed by defendant Wadia, and each allegation will be analyzed separately.

First, however, by way of background, the plaintiff Phyllis Johnson purchased the premises at 1300 Valley Road in New Canaan in June of 1978. The property consists of four acres. At the recommendation of her architect, Victor Christ-Janer of New Canaan, she hired the defendant Wadia to build a contemporary-style house of approximately 5500 square feet on her property. The plaintiff and defendant signed a contract dated April 15, 1979, in which Mr. Wadia agreed to build a home for the plaintiff on a cost plus basis, the plus being a fixed fee limited to $35,000 over and above the cost of construction.

The Johnsons lived in the house for almost ten years, from May 1980 to October 1989, and at the time of trial, the spring and summer of 1990, the property had been listed for sale.

The contract that the plaintiff and defendant signed included, among other things, the following: (i) the defendant warranted that all structural members and systems would be free of defects for one year, and that the basement would be free of water under local average weather conditions, but this guarantee excluded "condensation"; (ii) the architect, Mr. Christ-Janer, drew the plans and specifications pursuant to which the house was to be constructed, and the project was to be supervised by the architect's office; (iii) the contract referred to a document entitled "The Veenstra Estimate" which later played a role in this trial because the plaintiff claims that the actual cost of construction far exceeded the Veenstra estimate; (iv) Mr. Wadia warranted that he would perform his work in a "skillful and workmanlike manner," and that he would also use his best efforts to obtain reasonable prices for all labor and materials; (v) the contract indicated that the plaintiff "reposed confidence" in the defendant Wadia to build the house in a diligent and professional manner; (vi) the plaintiff could terminate her contract with Mr. Wadia at any time if the construction costs were running substantially higher than the original estimates; and (vii) plaintiff agreed that defendant would set up a "trust account" in Mr. Wadia's name as trustee, in which the Johnsons initially deposited $50,000, and from which Mr. Wadia would pay whatever expenses were incurred in connection with the construction of this house.

***2** Over the course of construction, roughly fifteen months from the late spring of 1979 to late fall of 1980, the plaintiff Phyllis Johnson and her husband William Johnson deposited an additional $395,000 in this account, plus they gave Mr. Wadia $15,000 in cash in May 1980 at his request (for reasons I was never able to understand), for a total cost of construction of approximately $460,000. Mr. Wadia submitted monthly statements to the Johnsons indicating what money had been spent, to whom and

for what purpose, how much was left in the trustee account, and how much Mr. Wadia was requesting be deposited in this account to meet his expenses. Mr. Johnson always paid the defendant promptly whatever amount he requested.

This suit, which began in March, 1985, does not involve complaints of faulty or defective workmanship. The complaint sounds in fraud, conversion and theft, not breach of warranty or negligence, with the exception of one count of breach of contract concerning water in in the basement. The total claim of damages for fraud is for $167,000, but in addition the plaintiff seeks (i) exemplary damages by way of an award of (a) legal fees totaling $383,000, doubled to $766,000, and (b) expenses of litigation amounting to $26,750; (ii) statutory interest in accordance with General Statutes S 37-3(a), compounded annually since 1980; and (iii) treble damages for fraud (General Statutes S 52-564) and treble damages on the compound interest, for a total claim of $1,968,000, all relating to a house for which the Johnsons paid Mr. Wadia $460,000 to construct, and in which they lived as indicated previously for almost ten years.

In addition to the claims of fraud, the Johnsons also sue Mr. Wadia in breach of contract for $15,766 with respect to the flooding in their basement in 1983, which they claim obliged them to retain an engineer and another contractor to remedy the problem. This subject will be addressed at the end of this memorandum.

The defendant Wadia denied that he committed fraud, and asserted both a special defense regarding the statute of limitations, as well as a counterclaim alleging that he was owed money for certain work performed at the plaintiff's house in connection with the 1983 basement flooding.

The first issue is the statute of limitations. The parties agree that although the Johnsons moved into the house in the summer of 1980, the plaintiff and defendant terminated their relationship on or about August 22, 1981, when the trustee checkbook was closed out and a small balance was returned to the plaintiff. August of 1981 was thus the last possible time that any fraud could have been perpetrated on the plaintiff. Suit was not brought until March 1985, and the defendant's special defense asserts that General Statutes S 52-577 limits the period in which a suit for a tort such as fraud may be commenced to three years after the commission thereof, i.e., not later than August 1984.

The plaintiff concedes that more than three years elapsed from the last possible date of any fraud to March 1985 when she commenced suit against Mr. Wadia, but Mrs. Johnson claims the benefit of General Statutes S 52-595, which tolls the running of a statute of limitations where the person committing a tort "fraudulently conceals" from a plaintiff "the existence of the cause of action."

*3 This statute was analyzed last year in Connell v. Colwell, 214 Conn. 242, 251, 571 A.2d 116 (1990). It was pointed out that there can be no concealment of a cause of action unless the defendant "... misrepresented ... facts with the intent necessary to constitute fraudulent concealment. The actions of the defendant must be 'directed to the very point of obtaining the delay of which he afterward seeks to take advantage by pleading the statute.' " Moreover, fraud is not to be "presumed" but rather must be "strictly proven," and Puro v. Henry, 188 Conn. 301, 308, 449 A.2d 176 (1982), was cited for the proposition that "[t]he evidence must be clear, precise and unequivocal." Connell, supra, 252.

The Johnsons claim they never knew of any fraud until Mr. Johnson met and conversed with one William Schultz, a carpenter, in December 1983, and therefore the cause of action only began to run on that date. [FN1]

Connell did not decide two important issues that are relevant to the claim of tolling in this case. The first is discussed in footnote 6 on pages 242 and 243. "This court has not yet decided whether affirmative acts of concealment are always necessary to satisfy the requirements of S 52-595." Such affirmative acts are contrasted with "silence" on the part of a defendant. This issue must be faced in this case. I believe that the plaintiff is unable to point to any affirmative act of concealment of her cause of action on the part of Mr. Wadia. We are talking not about fraud as constituting a cause of action, but rather about affirmative acts of concealment of the existence of a cause of action. Plaintiff claims that the acts of fraud that I have found to exist in several instances themselves constitute the affirmative acts of concealment in connection with tolling. I disagree and believe that a plaintiff has to point to some affirmative act or statement by a defendant concealing the cause of action, not mere silence, but something by way of conduct or representation that throws the plaintiff off the scent of fraud.

The necessity of affirmative acts in order to toll a statute of limitations is discussed in 54 C.J.S., Limitations of Actions, S 88, p. 127: "... fraudulent

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

concealment which will toll the running of the statute of limitations does not depend upon the underlying cause of action being inherently fraudulent, but requires independent acts of fraudulent concealment of the events or circumstances constituting the underlying cause of action." This treatise also states in S 90, p. 130, that: "[g]enerally, mere silence or failure to disclose does not constitute such a fraudulent concealment as will suspend operation of the statute of limitations. Some actual trick or artifice to prevent knowledge of the fact or inquiry with respect thereto, some affirmative act of concealment, or some misrepresentation to exclude suspicion and prevent inquiry, must be shown."

To the same effect is 51 AmJur2d, Limitation of Actions, S 148, p. 719, concerning the necessity of affirmative acts, and S 149, p. 721, stressing that mere silence is insufficient to toll a statute of limitations.

*4 The *Connell* case, *supra*, 252, in footnote 8, also refers to the issue of whether there is an obligation on the part of a plaintiff to use "reasonable diligence" to discover fraud, and states that this issue will be left "for another day." [FN2] I believe that this issue of the necessity of reasonable diligence also must be faced squarely in this case and have concluded that there is such an obligation on the part of the plaintiff and her husband, and that it was not fulfilled. This topic is discussed in 51 AmJur2d, S 148, p. 721, which refers to the necessity of reasonable diligence on the part of a plaintiff. "It has accordingly been held that the party seeking to toll the statute of limitations must explain why due diligence did not lead or could not have led to discovery of the facts and the cause of action." To the same effect is 54 C.J.S., Limitations of Actions, S 89, p. 128.

A key factor in the determination of a lack of reasonable diligence on the part of the Johnsons is that in June 1980, about six weeks after they moved into their home, Mr. and Mrs. Johnson sent their accountant, a Mr. Singler, to examine the books and records maintained by Mr. Wadia with respect to this project. As a matter of fact, Mr. Singler physically removed all the records pertaining to this project including ledger books, check books, invoices, deposit slips, and books of account from Mr. Wadia's premises, and kept them more than ten days. He then reported back to Mr. Johnson that he had found several missing invoices and some errors, which were then rectified.

In addition, Mrs. Johnson and her husband were never denied access to the documents such as the invoices that they later used to pursue their case of fraud. Mr. Wadia never advised the Johnsons, for example, that any of his books or records pertaining to this case were unavailable. The invoices were not destroyed or said to be missing, but rather were preserved by the defendant and later introduced into evidence in this trial.

There was further testimony that Mr. Johnson, an engineer by training, a successful businessman in the electrical supply field, and a person familiar with plans and specifications and home construction, apparently never asked to see the invoices or bills from the various subcontractors and suppliers, which were the basis of Mr. Wadia's expenditures from the trustee account.

Moreover, Mr. Johnson regularly received cost updates from Mr. Wadia, as well as monthly statements about what person or company had been paid, how much, and for what reason. These updates include the original budget figure, all costs to date, and anticipated future costs. In her brief the plaintiff indicates that these updates "were full of false representations" but they were not utilized by the plaintiff to commence her suit before the statute ran.

The Johnsons had the opportunity between August 1981 and August 1984 to examine Mr. Wadia's books and records again but chose not to do so. Hence the plaintiff failed to exercise "reasonable diligence."

*5 Because the statute of limitations had expired when suit was begun, and had not been tolled both because the plaintiff cannot show any affirmative acts of concealment, and also because the plaintiff did not exercise reasonable diligence, judgment is entered in favor of the defendant. However, it has been my experience that a good deal of what is decided in the Superior Court, or at least here in Stamford, is later reviewed by an appellate tribunal. Therefore I want to go on to analyze the various claims of fraud on their merits. If an appellate court should determine that the defendant Wadia had fraudulently concealed plaintiff's cause of action, and/or that the Johnsons were not obliged to use "reasonable diligence" to discover the fraud (*Connell, supra*, 252, footnote 8), and/or that affirmative acts of concealment on the part of the defendant are not required (*Connell, supra*, 250, footnote 6), and thus remand the case for a new trial, the parties should be spared the burden and expense of again presenting this same evidence.

Reviewing each claim of fraud on its merits, one starts with the proposition, of course, that fraud must be proved by "clear, precise and unequivocal"

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

evidence, and that fraud is not to be "presumed." *Connell v. Colwell, supra*, 252.

Generally, I have concluded that with some exceptions, the plaintiff has failed to present sufficient evidence of fraud. The plaintiff argues that if fraud is found in any one of her twenty-four claims, then the court is entitled to, and should assume or infer that fraud existed in other aspects of this case. To the contrary, I believe that each aspect of the construction process must be analyzed separately and a decision made on the facts of each particular claim of fraud.

Our anlaysis of the various counts of fraud will in general follow the order in which they were presented by the plaintiff, but first some general observations. The essence of the claim of fraud is that Mr. Wadia used the Johnson money from the trustee account which was, of course, earmarked only for the Johnsons' house, to pay for material and subcontractors working on either his own home on Brushy Ridge Road in New Canaan, which was under renovation more or less at the same time, or on other homes being built by the defendant during that period. It is also claimed that the defendant overcharged the plaintiff for goods and services and pocketed the difference between what he said the subcontractors or suppliers charged and what in fact they actually charged. However, the Johnsons do not accuse any of the subcontractors or suppliers of fraud, only Mr. Wadia. [FN3]

Secondly, a prime vehicle for the alleged fraud was the cost updates that were sent regularly by Mr. Wadia to Mr. Johnson. These monthly updates always advised the plaintiff of the estimated cost of completion at that point in time, and of course it soon became readily apparent that the cost of completion would exceed the Veenstra estimate and Mr. Wadia's original budget which was in large part based on this estimate, and would ultimately approach the $460,000 range. The Johnsons, however, never complained and never sought to terminate the contract even though there was a provision in the document for doing so. Moreover, Mr. Johnson concedes that the final estimates for the cost of completion contained in the cost updates did match up with the final actual costs. The evidence also indicated that Mr. Johnson was frequently on the job site, that he participated in conferences with Mr. Wadia and the architect Christ-Janer on at least a monthly basis, that he voluntarily paid into the trustee account whatever Mr. Wadia sought, and that he later moved into the house. The Johnsons' only complaint about their home and the cost thereof until suit was brought in 1985 was the basement flooding in 1983.

*6 Thirdly, at the beginning of the trial the plaintiff moved to amend her complaint to add a count alleging breach of a fiduciary duty on the part of the defendant Wadia and a resulting "constructive trust" upon the money allegedly taken by Wadia from the Johnsons. Decision on this motion was reserved, and I am now denying the request because I find no evidence that a fiduciary duty ever arose in this case in the first place. The plaintiff points to the use of the word "trustee" in the bank account that Mr. Wadia maintained for the Johnson money, and also that the Johnsons trusted Mr. Wadia implicitly. I do not believe that this gives rise to a fiduciary relationship. The plaintiff had an architect to supervise Mr. Wadia's work, and his books were examined by plaintiff's accountant, so I do not sense the trust and reliance that are found, for example, in the lawyer-client, priest-penitent or doctor-patient relationships.

I recognize that our Supreme Court in *Dunham v. Dunham*, 204 Conn. 303, 320, 528 A.2d 1123 (1987), indicated that a fiduciary relationship could arise in other circumstances, viz., "... situations in which there is a justifiable trust confided on one side and a resulting superiority and influence on the other." As has been pointed out, Mr. Johnson acknowledged that he was familiar with plans and specifications and was trained as an engineer. He said that he trusted Wadia and he undoubtedly did, but not enough for him to dispense with a written contract, nor did he trust Wadia enough not to hire an architect to supervise him, or not enough to prevent him from sending an accountant to examine Wadia's books. While the contract did say that the plaintiff "reposed confidence" in Wadia to build the house in a diligent and professional manner, Mrs. Johnson has not been able to point to a case that finds a fiduciary relationship existing between a homeowner and his builder.

As was said in *Dunham, Id.*, 322, "[a] fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other ... The superior position of the fiduciary or dominant party affords him great opportunity for abuse of the confidence reposed in him." I do not believe any such relationship existed between these parties in this case, nor that a constructive trust ever came into existence.

Fourthly, William F. Veenstra, now deceased, was

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

retained by the architect Christ-Janer to prepare an estimate of construction costs. This was done in February 1979 before the contract was signed that April. The estimate was $300,000. Although the Veenstra estimate was greatly exceeded by the actual expenditure or approximately $460,000, the estimate was always considered to be only an approximation ("not an upset or limit figure"). Even the plaintiff characterized the estimate as a "ballpark" figure. Moreover, it was based at least to some extent on prints and plans that were not actually utilized in the construction of the Johnson home. Therefore, I have not given too much weight in terms of finding fraud to the fact that the Veenstra estimate was substantially exceeded by the actual cost of construction.

*7 The first of the so-called "mini-trials" involved rough carpentry by one Liam King. The Johnsons claim they were defrauded by Wadia in the amount of $7000, representing the difference between the $22,695 paid to Mr. King and the budget estimate of $15,695. Mr. Johnson claims that, in effect, the $7000 must have been paid to King for his work either on Wadia's own home or on the several other houses defendant was building around the same time.

This claim is also based on the fact that King received some checks from the Wadia trust account in the fall of 1979 when the house had already been closed in by July of 1979.

Mr. King, on the other hand, testified that he did in fact do $22,695 worth of work on the Johnson home, that he did not give any kind of "kickback" to Mr. Wadia, and that the reason the actual cost was more than the estimate was because the plans were changed in several respects during the course of construction. He also claimed that he did some exterior trim at the direction of Mr. Wadia which also accounted for an increase over the original estimates. Mr. King also testified that he often sent bills to Mr. Wadia, not precisely when he finished the work, but later on after the work had been done and he needed money.

To sum up, the claim of fraud is based on the actual cost exceeding the estimates, and payments to the carpenter several months after he had completed his work. One might conclude that this was somewhat suspicious, but like so many of the items of alleged fraud, suspicion does not amount to the clear, unequivocal and precise evidence of fraud that is required.

Roughing-in lumber was the subject of a mini-trial.

Plaintiff's claim of fraud is in the amount of $14,783 and is based on the theory that more lumber was ordered for the Johnson house and paid for out of the Wadia trustee account than was actually used in the course of construction. In addition, plaintiff points to some fifteen invoices for lumber paid after mid-July of 1979 when the house had been closed in and no more roughing-in lumber would have been required.

The plaintiff offered the testimony of Mr. Frank Buccino, who estimated the cost per lineal foot multiplied by the number of lineal feet he estimated were used at the Johnson house, and arrived at a figure of $21,600. Approximately $36,300 was actually paid for roughing-in lumber from the trustee account. The plaintiff did not offer any witnesses on this subject other than Mr. Johnson himself and Mr. Buccino, or any evidence as to where the allegedly excessive lumber went to if it did not go into the Johnson house. There were no witnesses, for example, from any lumber yard to testify where the various loads of roughing-in lumber actually were delivered.

The defendant, on the other hand, offered the testimony again of Liam King, who actually did the roughing-in carpentry. King stated that Buccino's estimate was based on the original plans which did not take into account various changes, nor could his on-site inspection actually enable Buccino to visualize certain lumber that was used, for example, in bracing. Again, the plaintiff claims fraud based on the testimony of an estimator who came to the site many years after the alleged fraud and gives his opinion that more lumber was paid for than could have been used. This is not the kind of evidence, in my opinion, that suffices to prove fraud.

*8 There is a claim by plaintiff of $1147 relating to interior trim, on the basis that lumber in this amount was ordered after the Johnsons moved into their home in June 1980, and when there was no longer any need for lumber. Also, the claim is based on certain categories of interior trim that Mr. Johnson claims could not have been used in his home, and therefore must have been used in someone else's home. There was testimony, however, that many of the items, material for lolly columns, joist hangers and sona tubes, were in fact used on this project. The proof of fraud in this regard did not meet the required standards.

Another mini-trial related to the subject of fill, and involves a claim of fraud in the approximate amount of $17,000 based on invoices for 4700 cubic yards of

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

fill that were paid for by Mr. Wadia out of the trustee account. Mr. Johnson claims that no fill needed to be brought in for his project and therefore that it must have gone elsewhere. His counsel claims that "[i]t was probably used by Wadia in building the large driveway to access his own subdivision on Brushy Ridge Road ... Phyllis Johnson paid for that access road to Wadia's subdivision."

Plaintiff presented Johann Gross, a construction estimator, who testified that with minor exceptions all the fill excavated from the foundation, the driveway and the tennis courts could be reused and that no fill had to be trucked in from off-site. There was much testimony, however, from other witnesses that a good deal of the fill removed from the Johnsons' house was wet and not of a proper quality to be reused on the premises, and therefore it had to be removed and new fill brought in.

The plaintiff also introduced photographs depicting a number of piles of dirt removed from the construction areas on the property, and argues that this dirt was all that was needed for backfilling. However, the $17,000 paid from the trustee account was based on actual invoices received by Wadia, and some of the people who brought in the fill said they did in fact bring it to the Johnson project. It also was brought out that plaintiff's estimator did not actually know the exact depth of certain cuts and how much fill was removed. I can not find that fraud has been proven by the requisite standard because there was much evidence on both sides relative to the wetness of the soil and the necessity of bringing in new fill.

Another mini-trial involved machine time for moving dirt around. Approximately $24,000 was paid from the trustee account for this purpose. Mr. Johnson claims that only $10,000 worth of machine time could possibly have been spent on his project, and therefore claims fraud in the amount of $14,000. Mr. Gross made various calculations based on certain types of equipment Mr. Johnson told him were used on the project. However, both James Whipple, who did much of the backfilling, trenching and drainage, and Robert Morris, whose machines were actually used in the project, testified that the machines which were actually used were different from those which formed the basis of the Gross estimate. Both men also testified that their bills were accurate and represented work done and machinery used solely at the Johnson house and not elsewhere. Fraud was not, in my opinion, proved in this particular mini-trial either.

*9 There is a claim of fraud in the amount of $3127 relating to gravel based on Mr. Johnson's estimate of the maximum amount of gravel that could conceivably have been used at his home. The invoices indicated a total of 830 cubic yards of gravel was brought to the premises. Mr. Johnson concedes that about 290 cubic yards were used for his driveway, but denies any use or need for the remaining 540 cubic yards.

Four invoices were presented totaling 830 cubic yards and these invoices were the basis of Mr. Wadia's payments from the trustee account. The subcontractor who installed the tennis court said that he used a good deal of gravel at the tennis court. Several witnesses testified that some of the soil was wet and that gravel was needed not only under the tennis court and the driveway, but also for the house foundation. A witness testified that he did in fact deliver gravel from off-site to the Johnson premises, and in summary I do not find the requisite proof of fraud.

Although I was always watching for the so-called "smoking gun" throughout the trial, it first appeared in connection with the finish or interior carpentry performed by one William Schultz, and is the subject of a claim of fraud in the amount of $12,664. Mr. Schultz's deposition was read into the record, and his former wife and bookkeeper Barbara Schultz testified at the trial. Mr. Schultz indicated that the defendant Wadia came to him at one point and said that the total finish carpentry on the Johnson job was about $20,000 and he asked Schultz to give him a bill in that amount.

The evidence disclosed, however, that Schultz actually charged the defendant Wadia $8210 but Wadia sent him $20,873. This latter figure ultimately appeared in a cost update but under the label of exterior or finished trim, whereas Schultz actually did very little of the exterior work. Barbara Schultz testified, and I believe her, that the defendant asked William Schultz to prepare a second set of invoices for the total amount paid but attributing it all to the Johnson house, even though Schultz was performing carpentry services for Wadia on six or seven other projects, including Mr. Wadia's own home. Barbara Schultz did prepare a second set of invoices at Wadia's direction attributing $20,873 to the Johnson house. Subsequently, Wadia instructed Schultz to prepare a third set of invoices, again claiming that approximately $20,000 of work was done on the Johnson home.

It seems clear that Wadia spent over $12,000 of Johnson money from the trustee account for work

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

that was not performed on the Johnson house, and that he attempted to cover this up by obtaining new invoices and creating a new category of exterior or finished trim some four months after the exterior trim had been completed. I believe the evidence presented in this connection and in the several other instances where fraud was found to exist satisfies the elements of fraud as discussed in many cases, including *Bernard v. Gershman*, 18 Conn.App. 652, 656, 559 A.2d 1171 (1989). "The essential elements of an action in fraud are (1) that a false representation was made as a statement of fact, (2) that it was untrue and known to be untrue by the party making it, (3) that it was made to induce the other party to act on it, and (4) that the latter did so act on it to his injury. *Miller v. Appleby*, 183 Conn. 51, 54- 55, 438 A.2d 811 (1981)."

*10 The next mini-trial involved heating, ventilating and air-conditioning as installed by Encon (Environmental Control Corp.). The Johnsons claim fraud in the amount of $7000. The original estimate from Veenstra and the original budget estimate by Mr. Wadia were for $15,000, but the actual payment to Encon from the trustee account was $22,000, and Mr. Johnson claims that this difference represents the amount he was defrauded. The plaintiff implies that this allegedly extra HVAC equipment went into Mr. Wadia's own house and the brief claims that Encon was "in collusion with Wadia's fraud.'

There was evidence, however, that the original plans by a Mr. Hugh Sweeney had been changed from three zones to four zones, and that a through-the-wall heater pump for the garage studio constituted a change from the original plans. Regis Cleary, a consulting engineer, testified that the job was not bid on the basis of the original Sweeney plans but rather on amended HVAC requirements. Mr. Cleary also pointed out that a good deal of HVAC work is often done before the house is completely closed in, which happened to be another basis for Mr. Johnson's claim of fraud in this regard, i.e., the timing of the invoices. The total amount of $22,411 was based on actual invoices from Encon. There was testimony that the invoices were accurate and reflected the material sent and the work done on the Johnson job. Encon billed Wadia $22,411 and that is what was received from the trustee account. I find that fraud was not proved.

The matter of hardwood floors was also the subject of a claim of fraud by the plaintiff in the amount of $4936. The floors were installed by one Albert Svindland, who testified that he had been in the flooring business for over thirty years before his recent retirement, that he had billed the defendant Wadia $10,036 for work at the Johnson house, that this was the money that had been paid to him, and to which he was entitled.

A Mr. Dilley, a hardwood floor contractor, testified for the plaintiff that he had inspected the Johnson house and determined that there were 2972 square feet of flooring at a cost of $1.75 per square foot for a cost of approximately $5200. The difference between that figure and the Svindland bill of $10,030 constituted fraud in Mr. Johnson's opinion. In addition, Mr. Johnson pointed to the Veenstra estimate of approximately $5000 as again indicating fraud. Mr. Svindland explained in detail why his bill was approximately $10,000. He did many more things than Mr. Dilley assumed he did, including three coats of polyurethane, rather than the normal two coats, plus a lot of hand sanding. He referred to some tough angles in the Johnson house, some stepdowns and an open stairway that required a good deal of extra work.

This claim of fraud, like many of the others, really comes down to whether I believe the artisan who actually did the work, explained what he did and why, testified that his bill was fair, sent his invoice to Wadia, and was paid in accordance with his bill, or whether I should believe that fraud was committed on the basis of an original estimate by Mr. Veenstra and the testimony of someone who came to the Johnson premises a number of years after the house was built, did some measurements, and calculated what he though the job should cost. Yes, it is possible that the latter witness may be more accurate than the former, but this is not, in my opinion, the clear, unequivocal and precise evidence required to constitute fraud. I might add here that the monthly cost estimates sent by Wadia to Johnson indicated that the cost for hardwood floors was well over $5000 and approaching $10,000, but again there were no complaints from the Johnsons.

*11 The next claim by the plaintiff relates to the electrical subcontractor, Lawrence Shrobar, and an allegation of fraud in the amount of $5506. Mr. Johnson targets two sets of invoices for $4000 in 1979 and $1500 paid on or about June 1, 1980. He argues that there could not have been any electrical work in the summer and fall of 1979 because the house was not closed in at that time, and that the invoices and payments on or about June 1, 1980 must be fraudulent because Mr. and Mrs. Johnson moved into the home on May 30, 1980, and that no electrical work was done after that date. This claim also involves the Veenstra estimate for electrical work of $9000 which includes both labor and material,

whereas Mr. Johnson testified that he himself provided most of the electrical fixtures and supplies.

Mr. Shrobar's bill was for $10,905 for labor alone. The cost update as of December 1979 sent to Mr. Johnson without subsequent complaint by him indicated that the charges for electrical work would be around $11,000. Mr. Johnson conceded that some electrical work was done after he moved into the house. Mr. Wadia testified that some of the electical work, holes for subsequent wiring and some distribution boxes and panels, was done before the house was closed in, and that some of the funds paid in 1979 were paid to the electrician in advance or on account in order to ensure his commitment to the job. I find this testimony sufficiently credible to defeat the allegations of fraud.

Another aspect of the alleged fraud by the defendant Wadia involves Mario and Sal Vento, masons, and a claim in the amount of $7900. Mario was deceased at the time of trial but his deposition was read into evidence. He appeared to indicate that he billed Wadia $20,283 on the Johnson job but that he received approximately $28,000. The plaintiff claims that this difference, $7900, is the basis of her fraud claim. Under a heading in her brief of "what probably happened" is an allegation that Wadia owed the Ventos on another project that they had done for him, and that Wadia helped himself to the Johnson trustee account in order to pay the Ventos for the other job.

Sal Vento, Mario's brother, who actually performed the masonry work at the Johnson home, testified that he actually performed $28,000 worth of work, that is what was billed and that is what was paid by Wadia for the masonry work. This witness testified that he performed more work than was originally anticipated, including an increase in the number of courses, an extension of the patio and some outside steps, as examples, and that Wadia was billed for all the extra work. Sal Vento certainly did not agree with plaintiff's claim that he and his brother received Johnson money for work on another job. Rather, he said the invoices were proper. There does appear to be a contradiction between the testimony of the deceased brother and that of Sal Vento, but I give more credence to the man who actually did the work and took the witness stand and explained what he did and why.

*12 The subject of another mini-trial was a claim of fraud of $3876 and involved Danbury Drywall Co., which installed the wallboards plus the suspended ceiling in the basement. Its owner, a Mr. Clavette, testified that he sent four invoices to the defendant totaling $14,655. This was paid, but Mr. Wadia sent Danbury Drywall an additional $3395 on December 12, 1979, and Mr. Clavette acknowledged receiving this money. He testified, however, that a careful review of his records indicated that the total cost for his work was $14,655. The invoice relative to the $3395 in dispute is mysterious. Mr. Clavette said the receipt stamp was different from the one his company normally used, and also that the billhead was not his company's standard one. The so-called "smoking gun" appeared when Mr. Clavette testified that he was owed $3395 for work that he had performed on Mr. Wadia's own home on Brushy Ridge Road. Mr. Wadia had a tortured explanation for this $3395, which I found to be essentially fanciful. Therefore, I find that the plaintiff did prove by the requisite standards that a fraud was committed on her with respect to this check for $3395 paid from the Johnson trustee account. This claim also includes $325 paid to a Mr. Berube for some drywall work he performed, but I find this aspect of the claim was not proven adequately because Berube testified that he did perform some work at the Johnson house.

A mini-trial on the subject of bay windows and a roofer named Bob Smith took place. The amount was negligible but the facts indicate fraud on the part of Mr. Wadia. Mr. Smith was deceased by the time of the trial but his deposition was read into evidence, including reference to a paid invoice in the amount of $172 for work on a bay window. The problem is, however, that there is no bay window in the Johnson house, and Mr. Smith indicated in his deposition that he believed that this $172 related to another job on another house that he was doing for Wadia. Mr. Wadia's attempts to characterize two windows near the front door of the Johnson house as bay windows did not stand up at all.

The next claim of fraud relates to tree work done by a Robert Hutchinson and is in the amount of $2295. Mr. Hutchinson sent Wadia an invoice containing two charges, $240 and $2055, totaling $2295. Mr. Hutchinson explained that the $240 was work he did in 1979, but forgot to bill at that time. The $2055 was for work done in 1980, and he combined both charges for a bill of $2295. He explained that the $2055 bill involved cutting down some branches near the property line between the Johnson property and an adjacent reservoir. Mr. Hutchinson was positive that he did this work in 1980 after the house had been constructed, the windows were in place, and he was asked to make a "vista cut" to provide a nice view from the windows of the Johnson house.

Mrs. Johnson claims that "what probably happened" is that the $2295 was for work performed by Hutchinson on some other Wadia job. Hutchinson, however, denied this and said that nothing underhanded occurred, and that his bill for $2295 was legitimate and was for work done in 1980. He specifically remembered getting the superintendent of the reservoir property to open a gate during that year so that he could cut down some branches to enhance the view from the Johnson house. I do not find that the requisite proof of fraud was established.

*13 Another claim of fraud involved plumbing performed by Automatic Plumbing Company. This allegation is based on Invoice # 3037 sent by Automatic Plumbing to Wadia in the amount of $2000 and paid on January 11, 1980. The Johnsons characterized this as "a phony bill to support a payment unrelated to the Johnson job." However, Mr. Johnson conceded that the plumber performed work not specified in the original contract including hook-ins for a water fountain at the tennis court, an ice machine and a drain in the basement, to give several examples. The plaintiff did not prove fraud in this regard.

A claim in the amount of $800 involves Darien Asphalt Paving and was the subject of another mini-trial. The original contract price was $4230 but the company charged Mr. Wadia an extra $800 because of a second driveway to a garage which, according to some of the testimony, this company failed to take into account when it prepared the original contract price of $4320. The asphalt company billed this as an extra and Mr. Wadia paid $800 from the Johnson trustee account. I find that fraud was not proved by the requisite standards.

Television installation by Rowayton T.V. and Paul Helfer T.V. is the subject of a claim of fraud in the amount of $600. Paul Helfer was paid $1120 from the trustee account, and plaintiff claims that the $600 paid to Rowayton T.V. was for work already performed by Helfer. I do not find fraud to have been proven because there was evidence to the effect that the two television companies performed different functions: Rowayton did prewiring and Helfer actually installed some outlets.

A claim of $107 relates to two separate bills for $56 and $51 from Sharp Contractors. The first bill was for trimming of doors some four months after the Johnsons moved into their home, and the other bill really contained no reference at all to what had been done. In the absence of any explanation by the defendant, I find that fraud has been proven in this regard. There could be no trimming of doors that long after occupancy, and as indicated, the smaller bill was not earmarked for anything.

Interior painting by one Micklos Devald was the subject of a mini-trial and a claim of fraud in the amount of $6800. Wadia paid Devald a total of $12,892 from the Johnson trustee account. Invoices in the amounts of $1800 and $3000 rendered in February 1980, and one for $2000 in May 1980 are at issue. Mr. Johnson argues that the interior of the house was still under construction in April 1980, and that the painting could not have been performed as early as the previous February when he was billed $4800 for painting.

Plaintiff also asserts that the painting bill of $12,892 was much higher than the original Veenstra estimate which was in the $6000 range. Plaintiff again offered the testimony of Mr. Gross who said that the interior painting should have cost about $7000 rather than almost $13,000.

Mr. Wadia testified that, contrary to Mr. Gross' assumption that one primer coat and then one sealer coat were applied, two primer coats and then two finish coats were actually applied. The painter was never called by either party. I see no reason why or how $4800 could have been charged for painting before the wallboards were up and the taping completed. I have no criticism of the bill for $2000 on the May invoice, but I do find fraud to have been proven with respect to $4800.

*14 Plaintiff claims fraud of $7000 in connection with deck carpentry performed by Karl Westerbach for Krest Construction. Defendant concedes that he paid Westerbach this amount of money in June 1980 out of the Johnson trustee account, and he further concedes that Westerbach never performed any work at all on the Johnson house. The deck on the Johnson house was actually built by someone else and paid for out of the trustee account. Moreover, the invoice for $7000 was dated well after the money had been paid to Westerbach. At first Mr. Wadia appeared to claim that there was some confusion because Westerbach had built a deck for him on another house on the same street. However, the deposition of Westerbach, who is now deceased, was read into evidence and revealed that Westerbach said he never built a deck for Wadia on any house on Valley Road. Moreover, the other house on Valley Road, where Wadia claimed that a deck had been built by Westerbach, had been sold a year and one half before the money was paid to Westerbach. A possible explanation is that Wadia forgot that

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Westerbach never did any work on the Johnson house when he paid him $7000 of Mr. Johnson's money, but I do not believe this. Mr. Wadia, a graduate of the Columbia School of Architecture, impressed me as being an intelligent and experienced builder who would not forget the identity of his subcontractors, and hence I believe the claim for fraud for $7000 has been adequately proved.

Glazed Mexican tile installed by the Genuario Tile Company was the subject of a claim of fraud for approximately $5000. This claim has two elements, one of which I accept, and the other which I reject. The first part is an invoice for $1158 for tile on the hearth. The plaintiff says there was no tile on the hearth, but rather only stucco and flagstone, and this seems to be the case.

Mr. Wadia testified that tile had originally been placed around the hearth, but that it was later removed at the direction of the architect and for safety reasons. Mr. Christ-Janer, the architect, denied that any tile was removed from the hearth at his direction. I have concluded that the charge of $1158 for tile on the hearth was fraudulent because tile had never been installed in this area in the first place. The balance of plaintiff's claim, roughly $3647, is disallowed because there was evidence to the effect that the installation of Mexican tile is more difficult than originally assumed in the Veenstra estimate and that quite a bit of breakage is to be expected.

A claim by plaintiff in the amount of $3177 revolves around the alleged removal of topsoil from the Johnson premises. Plaintiff claims that approximately 410 cubic yards of topsoil were removed by Wadia and either sold by him or "placed in a 'fill bank' with his friend Morris, the Excavator, to be bartered at a later date." The basis for this estimate is the testimony of Mr. Buccino who calculated the amount of topsoil that should have remained on the Johnson premises but had been removed. Mr. Wadia's explanation was that some topsoil was removed only because it was too wet to be usable on the Johnson premises. I am disallowing this claim of fraud because of inadequate proof.

*15 There is also a claim of fraud in the amount of $9500 labelled "general conditions" which refers to money taken from the Johnson trustee account and paid by the defendant Wadia to himself. The first element of this claim is that Wadia made a profit at Mr. Johnson's expense because he paid his own laborers only $4 an hour but charged $8 an hour to Johnson, whereas the contract between the parties provided that Wadia's profit from this construction was restricted to the $35,000 fee. This claim also involves charges by Wadia for the use of his pickup truck at the rate of $15 an hour. There may well have been some overcharging for both the men and the truck, but insufficient proof of fraud was offered, except for the overcharging on the laborers' hourly rate which totals $3710. The balance of the claim is disallowed.

The last remaining mini-trial concerns a claim of $25,000 that the plaintiff refers to as an "Accounting Overcharge" in the August 14, 1980 cost update. This amount is comprised of $15,000 in cash payments allegedly made to various subcontractors and for labor and trucking, as well as approximately $10,000 for "unexplained" charges. Very poor records of cash disbursements were kept by Wadia and his bookkeeper, Gulestan DeBoo, who the evidence disclosed was being paid $130,000 a year by Wadia to be his bookkeeper. Neither party was very convincing as to what happened to this money. The plaintiff in effect says to the defendant: prove to me that you spent this money on my house. The defendant says: prove to me that I did not. The defendant ultimately in 1985 gave Mr. Johnson a report of his cash disbursements to nine or so subcontractors, plus $3000 to himself for "general labor and truck." This whole subject matter is too vague to award money to plaintiff for fraud in the light of the burden of proof required.

In summary, then, I have determined that for the most part the Johnsons failed to prove their various claims of fraud. I did find fraud, however, in some instances, which total $33,006. [FN4] To this amount prejudgment interest for the "wrongful" detention of money should be added. *Paine Webber Jackson & Curtis, Inc. v. Winters*, 22 Conn.App. 640, 651-52, 579 A.2d 545 (1990) ("... a substantive law that requires an analysis of the underlying claim"). Conversion of funds has been held to constitute "wrongful" detention or use of money. *Alderman v. RPM of New Haven, Inc.*, 20 Conn.App. 566, 571, 568 A.2d 1068 (1990). Interest has been calculated from August 22, 1981, when the trustee checkbook was finally closed out, to today, March 28, 1991. General Statutes S 37-3a provided for interest at 8% to October 1, 1983 and thereafter at 10%. Interest therefore amounts to $30,287.71. I do not believe that compounding interest annually is proper because the cases cited by plaintiff (*The State ex rel. Raskin v. Schachat*, 120 Conn. 337, 344, 180 Atl. 502 (1935), and *McDonald v. Hartford Trust Co.*, 104 Conn. 169, 175, 132 Atl. 902 (1926)) both involved an administrator of a decedent's estate, and not a

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

homeowner and a builder, a situation in which I have determined, for the reasons stated previously, that no fiduciary relationship exists.

*16 General Statutes S 52-564 provides for trebling of damages where a person "steals" property of another or "knowingly receives and conceals stolen property." Although this statute can be applied in the event of fraud, Alaimo v. Royer, 188 Conn. 36, 43, 448 A.2d 207 (1982), I have concluded that it is not appropriate in this case because in terms of money damages awarded, slightly less than 20% of the claims of fraud were substantiated. This also applies to the request to treble prejudgment interest.

However, punitive or exemplary damages for attorney's fees are being awarded because the evidence in some respects indicates "... a reckless indifference to the rights of others or an intentional and wanton violation of those rights." Alaimo v. Royer, supra, 42. $ 11,000, one-third of the proven amount of fraud, is allowed as legal fees in this case. Because plaintiff's counsel indicated that he took this case on a contingency basis he also seeks, under the heading in the brief of "Double or Nothing", a doubling of the legal fees from $383,000 to $766,000. The reason for this request is: "... because of the contingent nature of this employment, the value of legal services should be doubled to properly reflect the true value of the services and the method of payment". [FN5]

Punitive damages also include expenses of litigation, and plaintiff claims that $26,750 was spent for a number of items including transcripts, expert witness fees and preparation of charts.

The total claim of money damages was $175,000, and since I found $33,000 to have been proved, 19%, I am awarding this same percentage of the costs, or $5000. Thus the total amount of damages for fraud, including interest, attorney's fees and costs of this litigation, is $79,293.71, which sum is awarded to the plaintiff in the event that the analysis of the running of the statute of limitations is determined by an appellate court to have been erroneous.

I have two further thoughts on this case. The first concerns the burden of proof. The Johnsons have claimed that they had a fiduciary relationship with Wadia. I have rejected this assertion for reasons stated previously. However, if this claim of fiduciary relationship had been accepted, and the burden of proof shifted to Wadia, there would have been a markedly different result in this case. Even if the burden of proof required of the Johnsons was the usual civil standard of preponderance of evidence, a different outcome in some instances would have ensued. This is another way of saying that the plaintiff had a difficult burden of proof in trying to prove fraud. I do have some genuine suspicions about the manner in which Mr. Wadia handled the trustee account while building the Johnson house. There may well have been pervasive fraud in this case, but, unfortunately for the Johnsons, suspicion is not enough. The evidence of fraud must be clear and unequivocal, and this level of proof was lacking for the most part despite herculean efforts by Mr. Johnson and the plaintiff's attorney.

*17 The second thought is that in some ways I feel sorry for the Johnsons because of the scent of fraud in this case. [FN6] In another sense, however, I wonder why someone of Mr. Johnson's intelligence and sophistication could have conducted his business in such a naive fashion. He kept handing money over to Mr. Wadia, $460,000, without checking where it was going. He could have studied the monthly reports and registered complaints early on in the process. The Johnsons could also have taken advantage of the contract and terminated the relationship as soon as it was determined that the building costs were going far over the original Veenstra estimate and Wadia budget.

One only has to look at the incredibly detailed graphs and charts, the various "court aids" and the detailed financial analyses prepared by Mr. Johnson in preparation for this trial, to question why he did not use the same amount of energy and acumen to stay on top of this project as it was being built, instead of doing all this work eight to ten years later. Mr. Johnson's explanation for his "trust," that Mr. Wadia was from India and that Mr. Johnson had a particular affinity for all things Indian, appears artful and disingenuous.

Thus having concluded the discussion of the fraud aspect of this case, we now turn to the matter of flooding in the Johnsons' basement in 1983. The Johnsons claim that $15,765 was spent to cure their water problem, and they sued Mr. Wadia in breach of contract. This water problem is also the subject of a counterclaim by Mr. Wadia for $897.50 for work he performed at the time of this flooding including installation of sump pumps.

The Johnsons presented credible evidence to the effect that this flooding was caused by one or more of the following defects or unworkmanlike construction: (i) there was a so-called monolithic pour of concrete by Wadia of the footings and floor, rather than

separate pours as the architect testified was the proper procedure; (ii) the footing drains were not dug sufficiently deep; (iii) the northeast side footing drain was either missing or nonfunctioning; and (iv) the footings should have been put on the inside of the east wall where the water was coming into the basement, rather than on the outside.

The Johnsons paid an engineer, R.C. Sharp, to draw new plans for footing drains, and Bruno Contractors to install a new footing drain along the east wall, after which the basement was dry. There were also some additional expenses for the replacement of carpet and for the removal of furniture, all totaling $15,765.

The defendant does not dispute the fact that there was a major water problem in 1983, but he claims he is not responsible because there were no flooding problems until March 1983, when the weather conditions were abnormal, whereas the contract stated that Mr. Wadia was responsible for water damage only in the event of "local average weather conditions."

Mr. Johnson produced photographs which indicated that he and Mrs. Johnson had ongoing water problems before 1983, although he never asked Mr. Wadia to come back until the flooding became acute in March of that year. I have concluded that the Johnsons had some flooding problems in their basement all along, which became magnified during some heavy rains in March 1983. Therefore, defendant, I believe, is responsible for defective workmanship in connection with the basement, which in turn caused flooding, and that he is liable in damages to the Johnsons in this regard.

*18 Thus, in conclusion, judgment hereby enters for the defendant on the fraud claim on the basis that the statute of limitations for bringing a fraud action had expired. If it is decided by an appellate tribunal that the statute was tolled because the defendant fraudulently concealed the plaintiff's cause of action, and/or that a plaintiff need not exercise reasonable diligence and/or that affirmative acts of concealment are not required, then the plaintiff is awarded $79,293.71.

In addition, the plaintiff is awarded $15,766, without interest, for breach of contract damages incurred for the faulty and unworkmanlike construction of the drains around the house and resulting basement flooding.

Defendant's counterclaim for work performed in connection with the basement flooding is based on a bill from Drenckhahn Excavating Co. for $897.50 sent to Wadia for digging two trenches in the slab in order to drain off water from the basement. This amount was expended by the defendant in response to a call from the Johnsons to investigate flooding, and I believe he should be reimbursed. Thus the defendant is awarded $897.50, without interest, on his counterclaim, and hence is entitled to a credit against the $15,766 awarded plaintiff in this regard.

Costs are not awarded to either party.

So Ordered.

FN1. I refer from time to time to both Mr. and Mrs. Johnson as the plaintiffs although technically the action was brought solely in the name of Phyllis Johnson because title to the property was in her name alone. However, Mr. Johnson managed the project and was basically the only person dealing with Mr. Wadia. Moreover, it was his money that went into the trustee account. Mrs. Johnson never testified in this case or ever appeared at any of the many trial dates except briefly on one occasion when counsel introduced her. Mr. Johnson testified that his wife was too ill to get involved in the case. The defendant asks us to presume that Phyllis Johnson did not acquiesce in this suit and/or that her testimony would be favorable to the defendant pursuant to the rule for absent witnesses discussed in *Secondino v. New Haven*, 147 Conn. 672, 675, 165 A.2d 598 (1960). However, I have concluded that the facts in this case do not warrant such a presumption, not only because of the reference to Mrs. Johnson's illness, but most importantly because William Johnson obviously played by far the major role in this case. In fact, he testified that he had been working virtually full time for the last two or three years in preparation for this trial. Thus, I believe that the fact that Mrs. Johnson did not testify is essentially meaningless because Mr. Johnson is in effect the real party in interest, whether one labels him as his wife's agent or not.

FN2. "In light of our conclusion that the plaintiff has not set forth facts sufficient to establish any fraudulent concealment on the part of the defendant, we leave for another day the question of whether the trial court

correctly concluded that there is a duty imposed on a plaintiff to discover, by the exercise of reasonable diligence, a cause of action that does not accrue, by reason of fraudulent concealment, until the 'person entitled to sue thereon first discovers its existence.' General Statutes S 52-595."

FN3. Plaintiff's counsel stated in final argument: "I should make it very clear that our investigation failed to reveal any that I can think of right now, and probably there are none, subcontractors or suppliers that were involved in any fraud. They may have covered up and it is our contention that some of them may have covered up for Wadia later on and some of them may have come in here and perjured themselves but one thing I can say is we never found a single subcontractor or supplier that got a dollar of ill-gotten gains." In her brief the plaintiff adds "... to set the record straight, the Plaintiff has not claimed in written or verbal form that any subcontractor or supplier to Dinyar Wadia in the construction of the Johnson house was involved in Wadia's fraud, except possibly The Encon Company."

FN4. Fraud was found in the following mini-trials: (i) finish carpentry, $12,664; (ii) Danbury Drywall, $3395; (iii) bay windows, $172; (iv) Sharp Contractors, $107; (v) painting, $4800; (vi) deck, $7000; (vii) tile, $1158; and (viii) laborers, $3710.

FN5. This fee should not be misinterpreted. I realize the plaintiff's counsel spent many hundreds and hundreds of hours, well over one thousand, on this case and that his post-trial briefs are of the highest quality. The detailed analysis of all these complicated subjects and the various payments from the trustee account is outstanding. However, I believe the legal fees should be proportionate to the recovery and reflect the fact that the plaintiff made only a partial recovery of the amount she sought by way of damages.

FN6. Mr. Johnson was also the target of some emotive language on the part of defendant's counsel who referred to him, among other things, as "Billy Boy"; as "paranoid"; as a man whose "hatred (was) just spewing out of his face as he talked"; that Mr. Johnson "hates, deep abiding hate" and "lies" every time the truth is mentioned to him. I should add that the term liar was used with great frequency by each party to describe the other. Counsel for the plaintiff was not to be outdone as Wadia was described variously as "vindictive", a "thief", a "perjurer", a man with "criminal intent," a "fraud", and finally there was a reference to "the tens of millions of dollars, (perhaps in excess of a hundred million dollars over the last ten years) that hard work, perseverance and deceit have brought into Wadia's coffers."

1991 WL 50291 (Conn.Super.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works