## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **CROWN THEATRES, L.P.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No. 3:02CV2272AVC** |
| | ) | **Jury Trial Demanded** |
| **MILTON L. DALY, TAYLOR-LEIGH,** | ) | |
| **INC., ANNE E. DALY, JAMES C.** | ) | |
| **CELLA, G.U.S. DEVELOPMENT, INC.,** | ) | **May 20, 2004** |
| **JAMES T. MARTINO AND JAMES** | ) | |
| **THOMAS MARTINO, ARCHITECT,** | ) | |
| **P.C., and RCD HUDSON, LLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### PLAINTIFF CROWN THEATRES' MEMORANDUM OF LAW IN OPPOSITION TO THE MARTINO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Notwithstanding their obvious negligence, defendants James T. Martino ("Martino") and James Thomas Martino, Architect, P.C. (together, the "Martino Defendants") have moved for summary judgment on the grounds that Crown Theatres, L.P. allegedly did not rely on the fact that Martino negligently certified millions of dollars worth of bogus applications for payment submitted on behalf of non-existent construction companies. The Martino Defendants assert that Crown Theatres would have made the payments whether Martino signed or not. But the evidence is to the contrary. Among other things, Crown Theatres' former Chief Financial Officer, its Controller and its Accounts Payable Supervisor all reviewed the payment applications, checked to see whether the architects' certificates had been executed, and relied on Martino's signature in determining whether the payments were proper. Glenn Garfinkel, Crown Theatres' former in-house counsel and Milton Daly, its former Chief Operating Officer each testified that Crown Theatres relied on Martino's certifications. Moreover, Daniel

Crown, Crown Theatre's Chief Executive Officer, confirms that the processing of payment applications by Crown Theatres' accounts payable department required three signatures, including that of the architect.

The Martino Defendants' other arguments are equally without merit. They contend that Crown Theatres' Count IX negligence claim is barred by the economic loss rule. But the doctrine does not apply to negligence or malpractice claims against professionals, particularly those for which malpractice is only likely to produce pecuniary injury, such as architects. The Martino Defendants also assert that under New York law portions of Crown Theatres' claims are time-barred under that state's three-year statute of limitations. However, Connecticut law, not New York law, governs. And, its applicable statute of limitations is seven years. Moreover, even if New York law were to apply (which it does not), Crown Theatres' claims would still be timely.

The Martino Defendants' motion is without merit. Their arguments are flat out wrong. At the very least, there are disputed issues of material fact which may not be decided on a motion for summary judgment.

## STATEMENT OF FACTS

In 1995 or 1996, plaintiff Crown Theatres, L.P. engaged defendants James T. Martino and his firm James Thomas Martino, Architect, P.C. (collectively, the "Martino Defendants") to serve as its architect for a movie theatre construction and renovation program. (Deposition of James T. Martino ("Martino Dep.") at 86-87, 93-94, attached hereto as Exhibit A.) Martino was first hired to perform such services on a trial basis by Milton L. Daly ("Daly"), Crown Theatres' Executive Vice President and Chief Operating Officer. (Id. at 87.) Martino was introduced to Daly by his long-time business associate and friend, Robert Beacher, who was Crown Theatres' construction consultant.

2

(Id. at 84, 87.) Subsequently, Martino was retained to perform services on numerous other theatre construction projects, including the six projects which are the subject of this action. (Id. at 93-94.) The six projects were located in Trumbull, Connecticut; Hartford, Connecticut; Miami, Florida; Jupiter, Florida; Skokie, Illinois; and Annapolis, Maryland. (Id.) At the time that he worked for Crown Theatres, Martino was licensed to practice architecture in eighteen states, including each of the states in which the six theatre projects were located. (Id. at 7.)

According to Martino, he was informed by Daly at a meeting in Crown Theatres' offices that a formal, written contract would not be necessary. (Id. at 88.) To date, no written contract evidencing an agreement for architectural services on the projects pertinent to this action has been produced apart from an unsigned letter agreement between Martino and a third party, which Martino claims contained the essential terms of his agreement with Crown Theatres. (Id. at 93.)[1]

One of Martino's duties as architect of record was to approve invoices submitted by contractors on the construction projects, so-called applications for payment. (Id. at 102.) Each payment application was submitted on American Institute of Architects' standard form G702, which included an Architect's Certificate for Payment, which reads:

> In accordance with the Contract Documents, based on on-site observations and the data comprising the above application, the Architect certifies to the owner that to the best of the Architect's knowledge, information and belief the work has progressed as indicated, the quality of the Work is in accordance with the Contract Documents, and

---

[1] The unsigned letter agreement was addressed to R.D. Scinto, Inc., a developer based in Connecticut. Crown Theatres denies that this writing embodied the terms of the Martino Defendants' agreement with Crown Theatres.

3

> the Contractor is entitled to payment of the AMOUNT
> CERTIFIED.

(An example of a G702 application for payment is attached hereto as Exhibit B.)

The process of getting a payment application approved involved a number of steps. Contractors submitted their payment applications to Robert Beacher, Crown Theatres' owners' representative. Beacher reviewed the applications, stamped them "approved" and delivered them to Martino for his signature on the Architect's Certificate. (Id. at 266.) Beacher handed the payment applications to Martino in stacks, usually in Beacher's car on the way to construction meetings at Crown Theatres' home office or at Crown Theatres' home office in Norwalk, Connecticut. Martino signed the Architect's Certificates without reviewing them. (Id. at 266-69.)

After Martino signed the applications for payment, they were submitted to Milton Daly. (Martino Deposition at 267.) Daly would approve them and submit them to Crown Theaters' accounts payable department for processing. (Declaration of Suzy Herrera, May 19, 2004, at ¶ 3, attached hereto as Exhibit C.) Ms. Herrera checked to see that the applications had received the proper approvals, which consisted of the signatures of Daly, Beacher and Martino. (Id., ¶ 4.) Ms. Herrera then keyed the invoices into Crown Theatres' accounts payable system and prepared checks to be signed by Crown Theatres' Controller, Cathy Nonnenmacher. (Id., ¶ 2.)

Ms. Nonnenmacher was also responsible for reviewing the invoices to make sure that they had received proper approvals before any check was issued. (Declaration of Catherine Nonnenmacher, May 20, 2004, at ¶¶ 3, 4, attached hereto as Exhibit D.) In particular, Ms. Nonnenmacher checked to make sure that the applications had been signed by Daly, Crown Theatres' architect and Crown Theatres' construction

4

consultant. (Id., ¶ 4.) If a necessary approval was missing, it was Ms. Nonnenmacher's practice not to issue a check to the contractor in question. (Id., ¶ 5.) David Clifford, Crown Theatres' former chief financial officer, also reviewed the payment applications. (Deposition of David Clifford, March 15, 2004, at 276-77, attached hereto as Exhibit E.) He, too, checked to see whether the proper signatures, including that of the architect, were in place. (Id.)

Daniel M. Crown, Crown Theatres' Chief Executive Officer, confirms that three signatures were required for the approval of applications for payment: Martino, Daly and Beacher. (Declaration of Daniel M. Crown ("Crown Decl."), ¶ 2, attached hereto as Exhibit F.) If all three signatures were not on a payment application, the accounts payable department was not to issue a check or otherwise process it for payment. (Id.)

According to Daly, he relied on Martino with respect to the payment applications. For example, Daly testified:

> Q. And did you rely on Mr. Beacher and Mr. Martino to approve payment [ ] applications?
>
> A. Yes.
>
> Q. And why did you rely on them?
>
> A. That was their job. That's what they were hired for.

(Deposition of Milton Daly, August 5, 2003 ("Daly Dep.") at 158, attached hereto as Exhibit G; see also 126-27; 193; 194-96; 199.) Glenn Garfinkel concurred that Martino's signature was required for the issuance of payments. (Deposition of Glenn Garfinkel ("Garfinkel Dep.") at 75, 209-10, attached hereto as Exhibit H.)

5

In approximately 1997, Daly devised a scheme with Beacher and others, to steal millions of dollars from Crown Theatres. Pursuant to their agreement, Beacher submitted phony payment applications, which Daly approved and which Crown Theatres paid. (Deposition of Robert L. Beacher ("Beacher Dep."), February 25-26, 2004, at 15-16, attached hereto as Exhibit I.) Beacher kept approximately 30% of the stolen funds for himself and kicked back approximately 70% to Daly. (Beacher Dep. at 98.) The phony invoices were submitted on behalf of fictitious construction companies created by Beacher for the purpose of stealing money from Crown Theatres. (Beacher Dep. at 15-16.) The fictitious entities did no work. (Id.) In the opinion of Crown Theatres' architectural expert, Peter Steffian, a reasonably diligent architect should have readily discerned that something was very wrong. (Supplemental Report of Peter Steffian, dated February 13, 2004, at 5, attached hereto as Exhibit J.) The "red flags" were numerous and should have been apparent. (Id.)

The Martino Defendants, however, failed to detect the fact that many of the payment applications were false. They fell down on the job because, among other things, Martino failed to make site visits and failed to actually review the payment applications. (Report of Peter Steffian, dated September 25, 2003, at 4, attached hereto as Exhibit K.) Instead, he would simply receive a stack of payment applications from Beacher and sign them. (Martino Deposition at 266-68.) He thus failed to notice that he was signing applications submitted by non-existent contractors, who performed no work and who had no personnel. He missed the fact that two of the fictitious entities shared the same addresses as Beacher's homes in Florida and New York – homes which Martino had visited on numerous occasions. (Id. at 291.) In total, Martino certified, and Crown

6

Theatres paid, fraudulent applications for payment to non-existent entities totaling at least $4,931,598.

## ARGUMENT

### I.    SUMMARY JUDGMENT STANDARD.

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure where, taking the facts and inferences in the light most favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Soares v. Univ. of New Haven, 175 F. Supp. 2d 326, 329 (D. Conn. 2001); Fed. R. Civ. P. 56(c). The moving party bears the burden of demonstrating "that no genuine issue of material fact exists and that the undisputed facts establish her right to judgment as a matter of law." Rodriguez v. City of New York, 72 F.3d 1051, 1060 (2d Cir. 1995). As long as a reasonable factfinder could find for the non-moving party, summary judgment is inappropriate. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); Soares, 175 F. Supp. 2d at 329. Here, disputed issues of material fact abound and serve to preclude the entry of summary judgment in favor of the Martino Defendants.

### II.    THIS COURT SHOULD APPLY CONNECTICUT LAW.

The Martino Defendants urge this court to apply New York law to Crown Theatres' breach of contract (Count VIII) and professional negligence (Count IX) claims against the Martino Defendants. However, Connecticut has the more "significant relationship" to this action, and, therefore, Connecticut law should apply.

In Connecticut, courts apply the "significant relationship test" to determine what law governs a particular action. O'Connor v. O'Connor, 201 Conn. 632,

7

150-53, 519 A.2d 13, 23 (1986); Reichold Chemicals, Inc. v. Hartford Accident &
Indemnity Co., 243 Conn. 401, 414 (1997) 703 A.2d 1138, Restatement (Second) of
Conflict of Laws §§ 6, 145, 188 (1971). To determine the state with the most significant
relationship to the action, courts consider: (a) the needs of the interstate and the
international systems; (b) the relevant policies of the forum; (c) the relevant policies of
the other interested states and the relative interests of those states in the determination of
the particular issue; (d) the protection of justified expectations; (e) the basic policies
underlying the particular field of law; (f) certainty, predictability and uniformity of result;
and (g) ease in the determination and application of the law to be applied. Restatement
(Second) of Conflict of Laws § 6.

These general principles are aided by additional factors specific to
particular causes of action. In a negligence action, the factors to be considered in
determining which law to apply include: (a) the place of injury; (b) the place where the
conduct causing the injury occurred; (c) the domicile of the parties; and (d) the place, if
any, where the relationship of the parties is centered. Williams v. State Farm Mut. Auto.
Ins. Co., 229 Conn. 359, 372, 641 A.2d 783 (1994) (applying Restatement (Second) of
Conflict of Laws § 145). "When the injury occurred in a single, clearly ascertainable
state and when the conduct which caused the injury also occurred there, that state will
usually be the state of the applicable law . . . ." Restatement (Second) of Conflict of
Laws § 145 cmt. e.

In contract disputes, the factors examined to determine the most
significant relationship are: (a) the place of contracting; (b) the place of the negotiation of
the contract; (c) the place of performance; (d) the location of the subject matter of the

8

contract; and (e) the domicile, residence, place of incorporation and place of business of the parties. Reichold Chemicals, Inc., 243 Conn. at 409-410, 703 A.2d at 1136. When both parties are required to perform in a single state, the state "will have so close a relationship to the transaction and the parties that it will often be the state of applicable law." Restatement (Second) of Conflict of Laws § 188 cmt. e.

For both the professional negligence and breach of contract actions, Connecticut bears a more significant relationship to the action than New York. Each action will be addressed in turn.

### A.    Connecticut Law Governs the Professional Negligence Claims.

With respect to the negligence action, Connecticut is the place of injury. On the basis of the Martino Defendants' negligent certification of applications for payment, Crown Theatres paid millions of dollars to fictitious entities for work that was never performed or that was invoiced at an inflated rate. The negligently approved payment applications were received by Crown Theatres at its offices in Norwalk, Connecticut. The processing of these payment applications occurred at their offices in Norwalk, Connecticut as well. The checks to the fictitious contractors were issued in Connecticut. The losses resulting from the Martino Defendants' negligence occurred at the company's offices in Connecticut. See Link Group, Int'l. v. Toymax, Inc., No. 3-97-CV-670, 2000 U.S. Dist. LEXIS, at *43 (D. Conn. Mar. 17, 2000).

Connecticut is also the state in which the majority of the negligent conduct occurred. Martino primarily certified the payment applications either at Crown Theatres' offices in Connecticut or in transit to Crown Theatres' offices in Connecticut. (Martino Dep. at 266-68.) He admitted that he signed piles of payment applications while sitting

9

in Crown Theatres' offices at weekly construction meetings. (Id. at 268.) While some of

Martino's design responsibilities were carried out in New York, this case is not about

negligent design; the acts complained of in Crown Theatres' Second Amended Complaint

occurred primarily in the state of Connecticut.

The relationship of the parties is centered in Connecticut. Martino was

first introduced to Crown Theatres at a meeting in Crown Theatres' offices in

Connecticut. (Martino Dep. at 84.) Crown Theatres, during the period relevant to this

action, was Martino's most important client. (Id. at 25.) Martino attended weekly

meetings at Crown Theatres' offices in Connecticut for the purposes of discussing

Martino's work on the projects and receiving input on his drawings. (Id. at 88-89.)

Martino's work product, in the form of his certification of payment applications, was

received by Crown Theatres in their offices in Norwalk, Connecticut.

Finally, Connecticut has a strong interest in the outcome of this action

because both parties conduct business in Connecticut. Crown Theatres' primary place of

business is in Connecticut. Connecticut therefore has an interest in the application of its

law to protect the interests of one of its residents. In addition, the Martino Defendants are

licensed to practice architecture in Connecticut, and Connecticut has a strong interest in

applying its law to claims of misconduct against members of licensed professions. See

Conn. Gen. Stat. § 20-290 (requiring licensure in order to "safeguard life, health and

property").

**B.    Connecticut Law Governs the Breach of Contract Claims.**

Application of the principles of § 188 of the Restatement to the breach of

contract action yields similar results. Connecticut has the most significant relationship to

10

the transaction and the parties in question. The factors outlined in § 188, which the Martino Defendants erroneously describe as rebuttable presumptions, are either ambiguous or favor the application of Connecticut law.

First, the place of contracting is in Connecticut. According to Martino, he was first hired by Milton Daly in Crown Theatres' offices in Norwalk, Connecticut, and it was in Norwalk, Connecticut that Martino and Daly allegedly dispensed with the need for written contracts. The place of the negotiation of the contracts is unclear from the record, but at least some of the negotiation occurred in Crown Theatres' offices in Connecticut.

Second, the situs of the subject matter of the contract – the theatres to be designed – are in Connecticut and other states, not in New York. Two of the six projects at issue are in Connecticut. The others are in Florida, Illinois and Maryland.

> When the contract deals with a specific physical thing . . . . [t]he state where the thing or the risk is located will have a natural interest in transactions affecting it . . . . Indeed, when the thing or the risk is the principal subject of the contract, it can often be assumed that the parties, to the extent that they thought about the matter at all, would expect that the local law of the state where the thing or risk was located would be applied to determine many of the issues arising under the contract.

Restatement (Second) of Conflict of Laws § 188 cmt. e. The location of the theatres is critically important to the performance of the contract, as in order to perform Martino would be required to be licensed to practice in the states where the theatres were to be built and be familiar with state building codes and regulations governing design and construction. Furthermore, Martino was required to visit the sites regularly, further indicating the importance not just of Martino's design responsibilities, but of their application, on the ground, with respect to local conditions and the work of local contractors. For these reasons, any state where one of Crown Theatres' theatre projects was located would bear a more significant relationship to this action than New York.

11

And Connecticut, where two theatres were built and other contracts exist as well, has by far the most significant relationship of them all.

Furthermore, the majority of performance occurred in Connecticut. Martino regularly visited Crown Theatres for weekly construction meetings, where the progress of construction and his drawings were discussed. (Martino Dep. at 88-89.) Payment applications were certified in Connecticut. (Martino Dep. at 266-60.) The certified payment applications were submitted to Crown Theatres in Connecticut. Martino made some site visits to the construction sites in Hartford and Trumbull, Connecticut. Martino submitted invoices for architectural services to Crown Theatres in Connecticut. And, perhaps most significantly, all of Crown Theatres' performance under the contract took place in Connecticut. When both parties' performance takes place in one state, there is presumption in favor of the application of the laws of the state. Restatement (Second) of Conflict of Laws § 188 cmt. e.

The Martino Defendants claim that since the majority of the design work occurred in Martino's New York offices, that New York has an overriding interest in the application of its laws. But New York's interest is diminished by the fact that the performance of architectural design work was for the purpose of erecting buildings in other states where Martino's professional activities would be governed by the licensure requirements of those states.

The residence of the parties is a wash. The Martino Defendants reside and have their principal place of business in New York. Crown Theatres has its principal place of business in Connecticut.

12

Finally, the Martino Defendants assert that policy considerations argue in favor of applying New York law because to do otherwise would "unduly impose liability on the Martino Defendants" where the majority of the architectural work was performed in New York. (Martino Br. at 24.) To the contrary, New York has very little interest in regulating architectural work that is being performed for the purpose of construction in other states. Every state in which a Martino-designed theatre relevant to this action was built – Connecticut, Florida, Illinois and Maryland – has a greater interest in applying their law to this action against Martino than New York does, because the buildings he designed were constructed in those states, not in New York. Contrary to Martino's assertion, application of Connecticut law would have no impact on interstate commerce – Martino's ability to conduct business in Connecticut is already heavily regulated by Connecticut's licensure requirements.

In short, all of the pertinent factors in the Restatement relating to choice of law for contract actions; the place of contract; the place of negotiation; the place of situs of the contract; and the place of performance all urge the application of Connecticut law.

## III. THERE ARE DISPUTED ISSUES OF MATERIAL FACT AS TO CAUSATION.

The Martino Defendants contend that they are entitled to summary judgment because their alleged conduct was not the proximate cause of Crown Theatres' injury. (Martino Br. 5-20.) In making this argument, they acknowledge that "typically proximate cause is a question of fact" that is therefore not appropriate for summary judgment. (Id. at 7.) They insist that this case is an exception and that summary judgment in their favor is warranted. (Id.) The Martino Defendants are mistaken.

13

**A.    Disputed Issues of Material Fact Preclude Determination of Whether Martino's Negligence Was a Substantial Factor in Causing Injury to Crown Theatres.**

The Martino Defendants argue that their negligent certification of the payment applications did not cause Crown Theatres' injury because Crown Theatres' accounts payable department looked only for Milton Daly's signature, and thus would have paid even if Martino had not signed. (Martino Br. 9-11.) They base their argument heavily on selected testimony from the deposition of David Clifford, Crown Theatres' former chief financial officer. The evidence, however, shows that Crown Theatres did rely on the Martino Defendants. Moreover, to the extent that the evidence is in conflict, summary judgment is not appropriate.

In the first place, the Martino Defendants exclude significant portions of Clifford's testimony which show that Clifford personally reviewed the payment applications, that he checked specifically for Martino's signature and that he relied on Martino's signature. For example, he expressly stated that he conducted his review to make sure that "all the signatures were on there," and further that if Martino's signature was not on a payment application, he would not approve it for payment. (Clifford Dep. at 276-77.) Any invoice approved without Martino's signature, Clifford testified, "would be a mistake." (Clifford Dep. at 277.)

In additional testimony ignored by the Martino Defendants, Clifford was emphatic that he, and by extension Crown Theatres, relied on Martino's signature on the payment applications "100 percent":

Q.    With regard to the – in making payment for the construction program using the AIA documents submitted to Crown Theatres did Crown Theatres rely upon the approvals of Beacher, Martino and Daly?

14

OBJECTION

A.     Yes.

Q.     And with regard to Mr. Martino, how did you rely – how did
       Crown Theatres rely on Mr. Martino?

OBJECTION

A.     He is a licensed architect.

Q.     Did Crown Theatres rely on Mr. Martino's signature on the AIA
       documents?

A.     100 percent.

Q.     Why?

A.     Because he has to – he is a licensed architect and we trusted him.

Q.     As the CFO did you personally rely on Mr. Martino's signature on
       the AIA documents?

A.     100 percent.

Q.     And why?

A.     Because I trusted him and he is a licensed architect.

(Clifford Dep. at 271-73.)

        Second, Crown Theatres' accounts payable department did, in fact, look

for Martino's signature, and, if there was no signature on the line for the architect's

certificate, their practice was not to process the application for payment. Suzy Herrera,

Crown Theatres' Accounts Payable Supervisor, was responsible for preparing checks for

signature and sending checks to vendors once they had been signed. During the theatre

expansion and renovation program, she looked to make sure that the payment

applications had received the proper approvals, including the signature of Martino:

                Prior to drawing a check to a contractor, I checked to make
                sure that the payment application had received the
                necessary approvals. In particular, I checked to see that the

15

> application had been approved by: Jim Martino, Crown
> Theatres' architect; Bob Beacher, Crown Theatres'
> construction consultant; and Milton Daly, Crown Theatres'
> Chief Operating Officer.

(Herrera Decl. at ¶ 4.) Moreover, Herrera believed that each of the three approvals was

required for the processing of payment applications, and she did not knowingly approve

any payment applications without checking to ensure that such applications had received

the necessary approvals. (Id. at ¶ 5.)

Cathy Nonnenmacher, Crown Theatres' Controller, supervised the

accounts payable department and was responsible for the final review of invoices and the

signing of checks that were issued to contractors during Crown Theatres' expansion and

renovation program. (Nonnenmacher, Decl. at ¶¶ 2, 3.) As part of that process, she was

instructed to check that Crown Theatres' architect, Crown Theatres' construction

consultant and Milton Daly had all signed off on the payment applications. (Id., ¶ 4.) If

one of the required signatures was missing, it was Ms. Nonnenmacher's practice not to

issue the check. (Id. ¶ 5.)

Dan Crown, Crown Theatre's CEO, confirms that three signatures,

including the signature of Martino, were required for approval of the payment

application, and, unless all three signatures were on a payment application, the accounts

payable department was not to issue a check. (Crown Decl. ¶ 2.)

At his deposition, Milton Daly testified repeatedly that he relied on

Martino in connection with the approval of the payment applications. (Daly Dep. at 126-

27, 158, 193, 195-96, 199.) Glen Garfinkel, Crown Theatre's former in-house counsel,

agreed that Martino's approval was required to issue payments. (Garfinkel Dep. 74-85,

239.)

16

Furthermore, Crown Theatres did not merely rely on Martino's signature; it also relied on his silence. As David Clifford explained, Crown Theatres did not uncover the fraud earlier, in part because it trusted Martino to keep tabs on the individual projects and report any problems. (Clifford Deposition at 215-16.) While the Martino Defendants may disagree, their disagreement merely creates an additional issue of disputed fact which precludes summary judgment.[2]

## B.   **Daly and Beacher's Scheme to Defraud Crown Theatres Does Not Relieve the Martino Defendants of Their Liability for Negligence.**

The Martino Defendants assert that Milton Daly and Robert Beacher's scheme to defraud Crown Theatres is a "superseding cause" of the injury in this case, which "severs the chain of proximate causation." (Martino Br. 13.) The Martino Defendants do not articulate precisely how Daly or Beacher's conduct constituted a superseding cause. In any event, their argument is erroneous and, at a minimum, disputed issues of material fact abound.

When addressing the issue of superseding cause, Connecticut courts have adopted the standard set forth in the Restatement, which provides:

> Where the negligent conduct of the actor creates or increases the risk of a particular harm and is a substantial factor in causing that harm, the fact that the harm is brought about through the intervention of another force does not relieve the actor of liability, except where the harm is

---

[2] Martino also claims that the fact that several payment applications were processed without his signature is evidence that the fraud would have succeeded with or without his negligence. (Martino Br. 11-12.) However, the fact that these applications were paid proves little, if anything. Of the approximately twenty-three fraudulent payment applications, only five were processed without Martino's signature. Of the five payment applications that do not appear to have been executed by Martino, each application has a signature on the line reserved for the architect's signature. At most, these payments raise issues of fact, which preclude entry of the Martino Defendants' motion for summary judgment.

17

> intentionally caused by third person and is not within the scope of the risk
> created by the actor's conduct.

Restatement (Second) of Torts § 442B; Stewart v. Federated Dep't Stores, Inc., 234

Conn. 597, 608, 662 A.2d 753, 759 (1995). Thus, for the superseding cause doctrine to

apply, there must be (1) an intervening force, (2) the harm must be intentionally caused

by a third person, and (3) the harm must not be within the scope of the risk created by the

actor's conduct.

The evidence shows that there was no superseding cause because there

was no "intervention of another force" between the Martino Defendants' negligence and

the harm to Crown Theatres. After Martino negligently certified the payment

applications, Daly approved them for payment. But that was not the end of the story.

After Daly signed off on the payment applications, they went to Crown Theatres'

accounts payable department where Suzy Herrara and Cathy Nonnenmacher each

independently reviewed them to make sure that all of the proper signatures were present

including Martino's. The checks were processed and signed only after Herrera and

Nonnenmacher had determined that Martino had executed the architect's certificate.

After their review, the requests for payment were reviewed again by David Clifford, who

also checked to be sure that the architect's certificate had been executed. The Martino

Defendants' negligence, thus, continued on beyond any acts of Beacher or Daly. In the

absence of any intervening conduct, the Martino Defendants' argument fails.

The Martino Defendants' argument fails for an additional reason: the type

of harm that occurred was plainly "within the scope of the risk created by" the Martino

Defendants' conduct. That Martino's negligence could result in the payment of

fraudulent payment applications was eminently foreseeable. The whole purpose of

18

requiring that the architect certify payment applications is to protect the project owner against fraud. Whether the Martino Defendants could foresee the precise nature of the fraud is not the point. The question is whether the harm is simply of the same "general type" as that of the foreseeable risk created by the defendant's negligence. Doe v. Manheimer, 212 Conn. 748, 764, 663 A.2d 699, 707 (1989).

Here, Daly and Beacher's scheme to defraud Crown Theatres by submitting payment applications for work that was never performed is precisely the general type of harm that diligent review of payment applications was designed to prevent. Therefore, the Martino Defendants should not be relieved of liability for their negligence because Daly and Beacher took advantage of their laxity to steal from Crown Theatres. Bd. of Educ. v. St. Paul Fire & Marine Ins. Co., 261 Conn. 37, 46-47, 801 A.2d 752, 758 (2002) (no superseding cause where defendant's negligence was "instrumental in providing the opportunity" for the intentional tort to occur); see also Merhi v. Becker, 164 Conn. 516, 521-22, 325 A.2d 270, 273-74 (1973).

The Martino Defendants cite The Lusitania, Petition of Cunard S.S. Co., Limited, 251 F. 715, 732-37 (S.D.N.Y. 1918), in an apparent effort to illustrate the concept of a superceding cause. But the wholly unexpected – indeed, unprecedented – torpedoing of an unarmed civilian passenger liner by a German U-Boat is nothing like the case at bar. In The Lusitania, the court ruled that the ship owner was not responsible for the deaths of the passengers, notwithstanding its negligence, because the intervening act was not foreseeable. The reason it was not foreseeable is that nothing like it had ever happened before. By contrast, kickback schemes – especially in the construction industry

– are all too common. (Testimony of Frederick C. "Kip" Hamilton, Prejudgment

Remedy Hearing, September 18, 2003 at 24-26, attached hereto as Exhibit L.)

             At the very least, there is a disputed issue of material fact as to the chain

of causation. Whether a superseding cause is "of such a character as to prevent an act of

negligence of the defendant from being a substantial factor in producing a plaintiff's

injury is ordinarily a question of fact." Wagner v. Clark Equip. Co., 243 Conn. 168, 180,

700 A.2d 38, 45 (1997). Thus, whether a superseding cause breaks the chain of causation

can be decided at the summary judgment stage only where "the mind of a fair and

reasonable [person] could only reach one conclusion." B & D Assocs. v. Russell, 73

Conn. App. 66, 77, 807 A.2d 1001, 1008-09 (2002). This is not such a situation.

## IV.    CROWN THEATRES' PROFESSIONAL NEGLIGENCE CLAIM IS NOT BARRED BY THE EXISTENCE OF A CONTRACTUAL RELATIONSHIP WITH THE MARTINO DEFENDANTS.

             The Martino Defendants assert that Crown Theatres' negligence claim

should be dismissed as "an unjustified attempt to transform the underlying breach of

contract action into a tort claim." (Martino Br. 20.) The basis for their argument is the

so-called "economic loss" rule of Clark-Fitzpatrick, Inc. v. Long Island RR Co., 70

N.Y.2d 382, 516 N.E.2d 190 (1987). The Martino Defendants cite the case for the

proposition that parties to a contract seeking recovery of only economic loss may not

bring an action in tort that arises from the violation of contractual duties. The Martino

Defendants, however, fail to mention that Clark-Fitzpatrick did not involve claims for

professional negligence. Likewise, none of the other authorities cited by the Martino

Defendants addressed claims for negligence or malpractice against professionals. The

distinction is crucial because the economic loss rule does not apply to services provided

by professionals such as architects. The conclusion is the same whether the Court applies

New York or Connecticut law.

Under New York law, it is well-settled that claims for negligence or

malpractice may be brought against professionals irrespective of contractual duties of

care. 17 Vista Fee Assocs. v. Teachers Ins. & Annuity Ass'n. of America, 693 N.Y.S.2d

554, 559-60 (App. Div. 1999). That Crown Theatres alleges only economic loss is

irrelevant, as many malpractice claims will result only in economic loss. See id. at 560.

Accordingly, New York courts have refused to bar claims for malpractice against

professionals whose services are commonly defined by contract, particularly architects:

> To hold otherwise would eliminate the availability of
> malpractice claims against professionals such as architects
> where the damages are essentially pecuniary in nature. We
> conclude that the contractual and professional relationship
> of plaintiff and defendants gave rise to two distinct wrongs,
> one contractual and the other grounded in professional
> malpractice, recoverable at law.

Robinson Redevelopment Co. v. Anderson, 547 N.Y.S.2d 458, 460 (App. Div. 1989).

See also Chubb Group of Ins. Cos. v. Baisch Mech. Piping, Inc., No. 01-CV-6286 CJS,

2002 U.S. Dist. LEXIS 25509, at *6-*7 (W.D.N.Y. Dec. 23, 2002) (following Vista

Team with respect to architects).

Connecticut law similarly permits simultaneous claims against

professionals for both breach of contract and negligence. See, e.g., Darien Asphalt

Paving, Inc. v. Town of Newtown, No. CV 9804878, 1998 Conn. Super. LEXIS 3496 at

*12-*13 (Dec. 7, 1998) (refusing to apply economic loss doctrine to bar professional

negligence action against architect); Winsted Land Dev., et al. v. Design Collaborative

Architects, P.C., No. CV 960071571, 1999 Conn. Super LEXIS 2180 at *41, *42-*47

(Aug. 12, 1999) (finding architect liable for both breach of contract and negligence).

Furthermore, there is no consensus among Connecticut courts that

Connecticut has even adopted the economic loss doctrine for any types of cases, much

less those involving the independent duties of professionals. See Reynolds, Pearson &

Co, LLC v. Miglietta, No. CV000801247, 2001 Conn. Super. LEXIS 952, at *8-*18

(March 27, 2001) (refusing to apply economic loss doctrine, noting lack of guidance from

Connecticut appellate courts and split among superior courts); see also Scap Motors, Inc.

v. Pevco Systems Inter'l, Inc., No. CV 970348461S, 1999 Conn. Super. LEXIS 2230 at

*5 -*6 (Aug. 12, 1999) (refusing to apply economic loss doctrine to bar tort causes of

action against parties to contract); Reiner & Reiner, P.C. Intertown Realty Co. v. Conn.

Natural Gas Corp., No. CV 95 0551260, 1995 Conn. Super. LEXIS 3470, at *4 - *5 (Dec.

12, 1995) (refusing to bar negligence action claiming direct economic loss under

economic loss doctrine).[3]

Thus, the Martino Defendants have gotten the law wrong. Even if the

economic loss rule applies under Connecticut law (which is unsettled at best), it does not

apply to claims for negligence or malpractice against professionals such as architects.

The doctrine is equally inapplicable to claims against professionals under the law of New

York.

---

[3]The Martino Defendants' reliance on Clark-Fitzpatrick and its progeny also fails because
the bar on tort claims that sound in implied contractual duties applies specifically to
situations where there is a "valid written agreement, the existence of which is undisputed,
and the scope of which clearly covers the dispute between the parties . . . ." Clark-
Fitzpatrick, 70 N.Y.2d at 388-89. Here, there is no undisputed written agreement, and,
thus, the Martino Defendants cannot show that Martino's contractual duties extend to
cover the full gamut of Crown Theatres' professional negligence claims.

## V.   CROWN THEATRES' CLAIMS ARE NOT TIME-BARRED.

In their Motion, the Martino Defendants assert that Crown Theatres'
claims based on four of the payment applications are barred under the New York statute
of limitations which requires that contract and tort actions against professionals be
brought within three years of the time in which the cause of action accrues. (Martino Br.
30.) The four payment applications at issue were approved for payment on or about June
6, 1999, July 26, 1999, October 1, 1999, and October 28, 1999. The Martino Defendants
contend that Crown Theatres' claims based on these payments are barred because Crown
Theatres did not file this action until December 20, 2002. They are incorrect.

The Martino Defendants' argument misses the mark because the
governing law is not that of New York but Connecticut. Under the Connecticut statute of
limitations, any action against an architect for "any deficiency in the design, planning,
contract administration, supervision, [or] observation of construction," whether in
contract or in tort, is subject to a seven year limitations period, which begins to run "after
substantial completion" of the project. Conn. Gen. Stat. §52-584a(a).[4]  A project is
substantially complete when it is first used by the owner or tenant or when it is first
available for use after having been completed, whichever is first. Conn. Gen. Stat. § 52-

---

[4] Conn. Gen. Stat. §52-584a(a) reads: "No action or arbitration, whether in contract, in
tort, or otherwise, (1) to recover damages (A) for any deficiency in the design, planning,
contract administration, supervision, observation of construction or construction of, or
land surveying in connection with, an improvement to real property; (B) for injury to
property, real or personal, arising out of any such deficiency; (C) for injury to the person
or for wrongful death arising out of any such deficiency, or (2) for contribution or
indemnity which is brought as a result of any such claim for damages shall be brought
against any architect, professional engineer or land surveyor performing or furnishing the
design, planning, supervision, observation of construction or construction of, or land
surveying in connection with, such improvement more than seven years after substantial
completion of such improvement."

23

584(c). The theatres to which the four payments pertain opened in late 1999 (Trumbull) and late 2000 (Hartford and Miami).[5] Accordingly, there is no question that Crown Theatres' lawsuit, filed on December 20, 2002, easily satisfied the seven-year limitations period.

The result is the same even if this Court were to apply New York law. Contrary to the assertions of the Martino Defendants, the limitations period on Crown Theatres' claims did not begin to run on the date that Martino negligently approved each individual payment application. Rather, it is well-settled that a cause of action against an architect under New York law accrues at the termination of the relationship between the architect and the client. See Board of Education v. Celotex Corp., 451 N.Y.S.2d 290, 291 (App. Div. 1982); see also County of Broome v. Vincent J. Smith, Inc., 358 N.Y.S.2d 998, 1002 (Sup. Ct. 1974). As the court in County of Broome explained:

> Fairness and justice dictate that a cause of action of this nature accrues only after the professional relationship has been terminated so as to afford the client an opportunity, unhampered by possible concealment, delay or unintended misguidance by the architect, to discover any possible acts or omissions constituting malpractice.

Id. at 1002. See also Energy Services, Inc. v. EnergyPro Constr. Partners, 714 N.Y.S.2d 764, 765 (App. Div. 2000) (cause of action against architect for professional negligence and breach of contract accrues upon fulfillment of architect's contractual obligations); Methodist Hosp. v. Perkins & Will Partnership, 610 N.Y.S.2d 572, 573 (App. Div. 1994) (same); Kohn Pedersen Fox Assocs., v. FDIC, 592 N.Y.S.2d 16, 17 (App. Div. 1993) (same).

---

[5] The Hartford Majestic opened on or around October 27, 2000. The Trumbull Marquis opened on or around December 22, 1999. The Miami Lakes Grand opened on or around October 22, 2000. (Crown Decl., ¶ 3.)

The four payment applications were submitted on three of the theatre

projects: Hartford, Connecticut; Trumbull, Connecticut; and Miami, Florida. (The

payment applications in question are attached hereto as Exhibit N.) On the Hartford

project, the Martino Defendants provided architectural services through at least October

2000. (James Thomas Martino Architect, P.C. Invoice for Architectural Services, dated

November 20, 2000, attached hereto as Exhibit O.) On the Trumbull project, they were

on the job through at least July 2000. (James Thomas Martino Architect, P.C. Invoice for

Architectural Services, dated August 1, 2000, attached hereto as Exhibit P.) And, on the

Miami project, the Martino Defendants were working through at least October 2000.

(James Thomas Martino Architect, P.C. Invoice for Architectural Services, dated

November 20, 2000, attached hereto as Exhibit Q.) In each case, the Martino Defendants

were still performing their contractual obligations to Crown Theatres within three years

of the December 20, 2002 date on which this action was commenced.

In addition, Crown Theatres' knowledge of its claims was concealed as the

result of the massive fraud perpetrated against it. The theft of its funds was concealed.

As a consequence, Crown Theatres did not learn of the facts which support its claims

against the Martino Defendants until Spring 2001, at the earliest, and only after it

launched an internal investigation in an effort to explain mysterious cost overruns on the

theatre projects. For the same reason that the statute of limitations for actions based on

fraud is told until the fraud is discovered, N.Y. CPLR § 213(8), the statute should not

start to run until Crown Theatres discovered Martino's negligence.[6]

## CONCLUSION

For the foregoing reasons, the Martino Defendants' motion for summary

judgment should be denied.

CROWN THEATRES, L.P.

By:_____

H. James Pickerstein (Bar No. Ct 05094)
Jodi Zils Gagné (Bar No. Ct 24376)
PEPE & HAZARD, LLP
30 Jelliff Lane
Southport, CT 06490
(203) 319-4000
(203) 259-0251 (fax)
hpickerstein@pepehazard.com
jgagne@pepehazard.com

and

Craig C. Martin (Bar No. Ct 12198)
Lawrence S. Schaner (Bar No. Ct 24756)
JENNER & BLOCK LLP
One IBM Plaza
Chicago, IL 60611
(312) 222-9350
312) 840-7776 (fax)
cmartin@jenner.com
lschaner@jenner.com

---

[6] Moreover, even if the Martino Defendants were to argue that Crown Theatres could or
should have discovered its causes of action earlier, at most they would create issues of
disputed fact which would preclude the entry of summary judgment.

## CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that I have served all counsel of

record in this action with a copy of the **Memorandum of Law in Opposition to the**

**Martino Defendants' Motion for Summary Judgment,** by mailing a copy of the same

by United States Mail, postage prepaid, to the following:

> Kerry M. Wisser
> Weinstein & Wisser, P.C.
> 29 South Main Street
> Suite 207
> West Hartford, CT  06107

> Mark Seiden
> Marisa Lanza
> Milber, Makris, Plousadis & Seiden, L.L.P.
> 3 Barker Ave.
> 6th Floor
> White Plains, NY  10601

> Robert M. Frost
> Zeldes, Needle & Cooper
> 1000 Lafayette Blvd.
> P.O. Box 1740
> Bridgeport, CT 06601-1740

_____

Jodi Zils Gagné

Dated:  May 20, 2004

27