# 01/15/04 CROWN THEATRES vs DALY    WITNESS: JAMES T. MARTINO

Diamond Reporting

Page 1 to Page 223

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*DIAMOND REPORTING*
*Suite 907*
*16 Court Street*
*Brooklyn, NY   11241*
*Phone:   (718) 624-7200*
*FAX:   (718) 855-1772*

(22) A. Do you want the year that it was done?
(23) Q. Approximately.
(24) A. I would say probably around '91.
(25) Q. Let me ask you this: Please state

Page 5

(1)
(2) your full name for the record.
(3) A. James Thomas Martino.
(4) Q. And Mr. Martino, where do you live?
(5) A. 75 Nassau Avenue, Manhasset, New York.
(6) Q. Where are you employed?
(7) A. James Thomas Martino Architect, P C.
(8) Q. What is the address of that business?
(9) A. 14 Vanderventer Avenue, Port
(10) Washington, New York.
(11) Q. Since you haven't been deposed for a
(12) while, let me remind you of a couple of the ground
(13) rules. You understand that you are under oath?
(14) A. Yes, I do.
(15) Q. I'm going to be asking you questions
(16) throughout the day. If at any time you don't
(17) understand one of my questions, please let me know
(18) and I will rephrase it. Is that okay?
(19) A. Yes, it is.
(20) Q. It's important, because we have a
(21) Court Reporter here, that your answers be audible,
(22) so no nods of the head, shrugs of the shoulder and
(23) so forth. Do you understand?
(24) A. Yes, I do.
(25) Q. If at some point during the day you

Page 6

(1)
(2) would like to take a break, let me know, for any
(3) reason, and we could arrange to take a break.
(4) Okay?
(5) A. Yes.
(6) Q. It's important to remember that the
(7) Court Reporter can take down only one of us at a
(8) time, so we should avoid talking over one another.
(9) Now, Mr. Martino, what is your
(10) educational background?
(11) A. How far back do you want to go?
(12) Q. Well, how about college?
(13) A. Graduated from Syracuse University in
(14) 1977 with a bachelors of architecture degree.
(15) Q. After that?
(16) A. No further college education.
(17) Q. Do you have any professional licenses?
(18) A. Besides architecture?
(19) Q. You have a license in architecture?
(20) A. That's correct.
(21) Q. Who issues the license? I mean
(22) various -- what kind of license in architecture do
(23) you have?
(24) A. I don't understand that question.
(25) MR. SEIDEN: Are you asking whether he

Page 7

(1)
(2) is a registered architect in any states?
(3) Q. Are you a registered architect in any
(4) states?
(5) A. Yes, I am.
(6) Q. How many states?
(7) A. I couldn't tell you off the top of my
(8) head right now. I was at one point in time
(9) licensed in as many as 18 states, but I would say,
(10) over the past two years, I probably let some of
(11) the licenses lapse that I was not doing much
(12) practice in.
(13) Q. After you graduated from Syracuse in
(14) 1977, did you go to work?
(15) A. Yes, I did.
(16) Q. Where did you go to work?
(17) A. The first architectural firm I worked
(18) for was a partnership. The name of the
(19) partnership was Terzis.
(20) Q. Can you spell that?
(21) A. T-E-R-Z-I-S Anastasi A-N-A-S-T-A-S-I.
(22) Q. Where was that located?
(23) A. In Manhattan.
(24) Q. How long were you with Terzis
(25) Anastasi?

Page 8

(1)
(2) A. Approximately a year.
(3) Q. After working for them, where did you
(4) work?
(5) A. I then worked for Angelo Francis Corva
(6) C-O-R-V-A and Associates Architects.
(7) Q. How long did you work for Angelo
(8) Francis Corva?
(9) A. Approximately two and a half to three
(10) years.
(11) Q. After that?
(12) A. Michael Harris Spector, S-P-E-C-T-O-R
(13) and Associates Architects.
(14) Q. How long were you with Michael Harris
(15) Spector?
(16) A. Approximately a year and a half.
(17) After that, the Halandia Group, H-A-L-A-N-D-I-A
(18) Group, and they were located in Oceanside,
(19) New York.
(20) Q. How long were you with Halandia?
(21) A. Approximately a year.
(22) Q. After Halandia?
(23) A. I opened my own practice.
(24) Q. What year was that?
(25) A. Approximately, I think it was 1983.

Page 9

(1)
(2) Q. What was the name of your practice
(3) when you opened it?
(4) A. James Thomas Martino Architect.
(5) Q. Have you worked for your own firm ever
(6) since?
(7) A. Yes.
(8) Q. Are you a member of the American
(9) Institute of Architects?
(10) A. Yes.
(11) Q. How long have you been a member of the

(8) Q. Do you have a best estimate?
(9) A. I'm assuming when you say design, you
(10) are talking about whether it was built or not.
(11) Q. Yes.
(12) A. Well, without looking back on my
(13) master list on the jobs for Crown, I would have
(14) to guess that it was probably another five or six
(15) above this list here.
(16) Q. How many are on this list?
(17) A. Nine.
(18) Q. So, you estimate that you have
(19) designed approximately 15 movie theaters for Crown
(20) Theatres?
(21) A. Asking me to answer that question
(22) while I sit here without my documents in fronts of
(23) you, yes, that's the best estimate I could give
(24) you.
(25) Q. Of the approximately 15, how many were

Page 24

(1)
(2) built?
(3) A. These nine on this list (indicating).
(4) Q. During what years did you perform work
(5) for Crown?
(6) A. '96 to 2001.
(7) Q. You also mentioned that you did work
(8) for K.B Theaters. Did you design theaters for
(9) them?
(10) A. Yes, I did.
(11) Q. How many?
(12) A. Same answer as before counselor,
(13) without being able to go back and look at my
(14) master list of projects, it's very hard to answer
(15) that.
(16) Q. Have you done any work for K.B
(17) Theaters in the last ten years – I'm sorry. Have
(18) you done any work for National Theaters in the
(19) last ten years?
(20) A. No.
(21) Q. During the time you were working for
(22) Crown Theatres, did you have any other movie
(23) theater assignments?
(24) A. Other than Crown Theatres?
(25) Q. Yes.

Page 25

(1)
(2) A. Not that I recall.
(3) Q. From 2001 to the present, have you
(4) performed any work for movie – relating to movie
(5) theaters?
(6) A. Relating to movie theaters, yes.
(7) Q. What work?
(8) A. I have a client that wants to put a
(9) movie theater in his home.
(10) Q. Other than that.
(11) A. No.
(12) Q. During the years 1996 to 2001 when you
(13) were doing work for Crown Theatres, would you
(14) agree that Crown Theatres was an important client
(15) of your's?

(16) A. Yes.
(17) Q. During that time period, would you
(18) agree that they were your most important client?
(19) A. Yes.
(20) Q. What percentage of your firm's annual
(21) revenues during the 1996 to 2001 period was Crown
(22) Theatres responsible for?
(23) A. I couldn't answer that question.
(24) Q. More than half?
(25) A. I would assume, yes.

Page 26

(1)
(2) MR. SEIDEN: Don't – we – no one is
(3) asking you to assume what you know.
(4) Q. Was it more than three-quarters of your
(5) firm's annual revenues?
(6) A. I can't answer that.
(7) Q. Why not?
(8) A. Because I'm not in a position. I
(9) don't know what that answer is. Again, I would be
(10) guessing.
(11) Q. Are there documents that would help
(12) you answer the question?
(13) A. I would assume the tax returns might
(14) be able to tell.
(15) Q. Anything else?
(16) A. (Indicating).
(17) Q. Do you keep records that breakdown
(18) revenues by clients?
(19) A. I don't know if my accountant or my
(20) bookkeeper does or not.
(21) Q. Is it correct that you were the only
(22) architect from your firm who performed design work
(23) that your firm was doing for Crown Theatres?
(24) MR. SEIDEN: Objection. Can you
(25) clarify what you mean by design work?

Page 27

(1)
(2) Q. You were the only architect at your
(3) firm working on Crown Theatres' matters, correct?
(4) MR. SEIDEN: Objection to form. You
(5) could answer.
(6) A. What is your definition of architect?
(7) Q. You were the only architect at your
(8) firm in the year 1996 to 2001 period, correct?
(9) A. What is your definition of architect?
(10) Q. Well, let me turn that back to you and
(11) ask you how you would define architect?
(12) A. If you mean licensed architect with a
(13) seal, yes.
(14) Q. You were the only licensed architect
(15) at your firm during the period 1996 to 2001
(16) working on Crown Theatres' matters?
(17) A. That is correct.
(18) Q. Were there other individuals with
(19) architectural training working on Crown Theatres'
(20) matters?
(21) A. That is correct.
(22) Q. Who were those individuals?
(23) A. Gary Scheide. I don't know if I will

(8) Q. Mr. Martino, when were you first hired
(9) to perform work for Crown Theatres?
(10) A. It was either late December '95 or
(11) early '96.
(12) Q. Who hired you?
(13) A. Milt Daly.
(14) Q. What did Mr. Daly hire you to do?
(15) A. I recall it being a lobby alteration
(16) to the Greenwich theater.
(17) Q. What work in connection with the lobby
(18) alteration did Mr. Daly request that you perform?
(19) A. Architectural and structural
(20) construction drawings.
(21) Q. Now, you testified earlier that
(22) Mr. Beacher was involved in introducing you to
(23) Crown Theatres. How did Mr. Beacher introduce you
(24) to Crown Theatres?
(25) MR. SEIDEN: Objection to the form to

Page 84

(1)
(2) the extent that it purports to characterize
(3) prior testimony. It speaks for itself.
(4) A. Could you repeat that question?
(5) Q. Let me see if I could make it clearer.
(6) You testified earlier that Mr. Beacher introduced
(7) you to Crown Theatres; is that right?
(8) A. Yes.
(9) Q. What did Mr. Beacher do to introduce
(10) you to Crown Theatres? To whom at Crown Theatres
(11) did Mr. Beacher introduce you?
(12) A. To Mr. Daly.
(13) Q. When was that?
(14) A. November or December of '95.
(15) Q. Where did the introduction take place?
(16) A. In Crown theater's office in South
(17) Norwalk.
(18) Q. When you were introduced to Milton
(19) Daly, did you have a meeting with him?
(20) A. Yes.
(21) Q. How long did your first meeting with
(22) Mr. Daly – had you met Mr. Daly before?
(23) A. Yes.
(24) Q. When did you first meet Milton Daly?
(25) A. I don't recall exactly.

Page 85

(1)
(2) Q. Do you have an approximate date?
(3) A. 1980.
(4) Q. Where was Mr. Daly working at the
(5) time?
(6) A. United Artists Theaters.
(7) Q. Between 1980 and 1995, did you work on
(8) projects which involved Milton Daly?
(9) MR. WISSER: Objection to the form.
(10) MR. SEIDEN: I join in the objection.
(11) MR. WISSER: Just for clarification, do
(12) you mean did he work on projects for a company
(13) in which Milton Daly was an employee?
(14) MR. SCHANER: Sure, I will accept that.
(15) A. That is what I was interpreting you to

(16) say, but you didn't say that.
(17) Q. Okay. With that clarification.
(18) A. Yes.
(19) Q. Which projects?
(20) A. There was an office building for
(21) United Artist Theaters that was being constructed
(22) in East Meadow.
(23) Q. Anything else?
(24) A. No.
(25) Q. That was in approximately 1980?

Page 86

(1)
(2) A. 1980, yes, 1981, somewhere – no,
(3) 1980.
(4) Q. Did you remain in touch with Mr. Daly
(5) after the construction of that office building
(6) conclude?
(7) A. No.
(8) Q. When you met with Mr. Daly in Crown
(9) Theatres' offices in November or December of 1995,
(10) what did you discuss?
(11) A. We discussed the possibilities of me
(12) becoming the architect for Crown Theatres.
(13) Q. Did Mr. Daly tell you what work Crown
(14) Theatres wanted done?
(15) A. That's a very vague question. I'm not
(16) sure what you are asking me.
(17) Q. Did he tell you the Crown Theatres was
(18) about to embark on a substantial theater
(19) construction or renovation program?
(20) A. Yes.
(21) Q. What did he tell you about the theater
(22) construction or renovation program?
(23) A. I can't recall the exact words what
(24) were discussed at that meeting. That's almost
(25) eight years ago.

Page 87

(1)
(2) Q. Do you have a general recollection?
(3) A. Basically that Crown was going to be
(4) doing an expansion program and they are looking
(5) for sites, in essence.
(6) Q. Who else was present at the meeting?
(7) A. Bob Beacher.
(8) Q. Did Mr. Daly agree to use your
(9) services at the end of that meeting?
(10) MR. WISSER: Objection to the form.
(11) When you refer to Mr. Daly in that regard, do
(12) you mean Mr. Daly on behalf of Crown?
(13) MR. SCHANER: Sure.
(14) A. He agreed, at that point in time, to
(15) try my services out on this first project.
(16) Q. Now, the first project was the lobby
(17) alteration for the Greenwich, Connecticut theater,
(18) correct?
(19) A. Correct.
(20) Q. Did you have a written contract for
(21) that project?
(22) A. I don't believe so, no.
(23) Q. You went on to work on a number of

Page 88

(24) other theater projects for Crown Theatres. Did
(25) you have written contracts for any of those
(1)
(2) projects?
(3) A. Yes.
(4) Q. Which ones?
(5) A. Trumbull.
(6) Q. Any others?
(7) A. Not that I recall -- wait,
(8) Minneapolis.
(9) Q. Do you have copies of those contracts
(10) in your files?
(11) A. They should be here.
(12) MR. SEIDEN: I'm sure everything was
(13) produced to you.
(14) Q. Why didn't you have written contracts
(15) for the other theater projects for Crown that you
(16) worked on?
(17) A. Because Mr. Daly stated at one of the
(18) Friday morning construction meetings that there
(19) would be no need for any further contracts.
(20) Q. When did the Friday construction
(21) meeting take place? I know it was on a Friday.
(22) Can you be more specific? Can you tell me the
(23) year or the month?
(24) A. Not off the top of my head, no.
(25) Q. Was it early on in your work for Crown

Page 89

(1)
(2) Theatres?
(3) A. No. I think the first period of time
(4) there was no construction meetings.
(5) Q. At some point you began having regular
(6) construction meetings?
(7) A. That's correct.
(8) Q. What year did the construction
(9) meetings begin?
(10) A. I can't tell you. I don't know.
(11) Q. Were they on Fridays?
(12) A. Yes.
(13) Q. Where did the Friday construction
(14) meetings take place?
(15) A. Crown's corporate offices conference
(16) room on the second floor.
(17) Q. Was there any event that precipitated
(18) the start of the Friday construction meetings?
(19) A. I believe it was because the projects
(20) were starting to gear up for going into design and
(21) Mr. Daly wanted the input of Mr. Becker and
(22) Mr. Dugger to review my drawings the independent
(23) concession stand contractor to review it and have
(24) their input and so forth.
(25) Q. If I understand your testimony, did

Page 90

(1)
(2) you not have a written contract for work on
(3) theater project in Skokie, Illinois; is that
(4) correct?
(5) A. That is correct.
(6) Q. And you didn't have a written contract
(7) for the theaters in Annapolis, Maryland, Jupiter,
(8) Florida or Miami, Florida, correct?
(9) MR. SEIDEN: Objection. It calls for
(10) a conclusion of law. You could answer.
(11) A. There was no different or specific
(12) written contract for those projects. It was
(13) understood that the contract that was used for
(14) Trumbull would hold the same for those other
(15) projects.
(16) Q. Hartford, Connecticut as well?
(17) A. Yes, sir.
(18) Q. What were the terms of your
(19) compensation for the projects where you did not
(20) have a separate written contract?
(21) A. Mr. Daly just asked me to submit in
(22) writing what my fee would be for those projects.
(23) Q. Were you paid a flat fee for your
(24) services on the theater projects where you did
(25) not have a specific separate written contract?

Page 91

(1)
(2) MR. WISSER: Objection to the form.
(3) MR. SEIDEN: Objection to the form.
(4) Q. Was it a flat fee arrangement?
(5) MR. WISSER: Objection to the form.
(6) A. It was a flat fee arrangement, but it
(7) also had provisions in there for revisions.
(8) Q. How was the flat fee determined?
(9) A. I determined it in my office.
(10) Q. And you submitted your proposed flat
(11) fee to Mr. Daly, correct?
(12) A. Yes.
(13) Q. And did Mr. Daly negotiate with you
(14) over the flat fee?
(15) A. Yes.
(16) Q. He advocated reducing the flat fee?
(17) A. Mm-hmm.
(18) MR. WISSER: Wait. Is that a yes?
(19) THE WITNESS: I'm sorry. That's a yes.
(20) I apologize.
(21) MR. SEIDEN: For clarity. Can you
(22) kindly read back the last question and answer.
(23)
(24) (Whereupon, the referred to question
(25) and answer were read back by the Reporter.)

Page 92

(1)
(2)
(3) Q. Did you ever charge for your services
(4) at a specific hourly rate?
(5) A. Yes.
(6) Q. I'm talking about Crown Theatres?
(7) A. Yes.
(8) Q. Under what circumstances did you
(9) charge Crown Theatres an hourly rate?
(10) A. For revisions and changes.
(11) Q. Were your hourly rate charges in
(12) addition to your flat fee?
(13) A. Yes.

(14) Q. What was your hourly rate for work
(15) that you did for Crown Theatres?
(16) MR. WISSER: Objection to the form.
(17) You have years from '96 to '01.
(18) MR. SCHANER: Well, if it changed over
(19) time, I would like the witness to tell me.
(20) A. It was $235 an hour.
(21) Q. Initially?
(22) A. No.
(23) Q. The entire period?
(24) A. No, it did change at one period of
(25) time. I don't remember when it changed.

Page 93

(1)
(2) Q. In 2001 when your work for Crown
(3) Theatres ended, were you charging $235.00 an hour?
(4) A. Yes.
(5) Q. Prior to that time, did you charge by
(6) the hour at a lower rate?
(7) A. Yes.
(8) Q. Do you recall the rate?
(9) A. No.
(10) Q. Now, in connection with the Crown
(11) Theatres construction projects, what types of work
(12) did you do?
(13) MR. SEIDEN: Any and all projects.
(14) A. Yes. Well, I think my –
(15) MR. SEIDEN: So the record is clear,
(16) Mr. Martino, if it differed from project to
(17) project, make that clear.
(18) A. The Trumbull contract speaks to my
(19) services that I was retained to perform.
(20) Q. Were you retained to perform those
(21) same services on other theater projects you did
(22) for Crown?
(23) A. Yes.
(24) Q. Which ones?
(25) A. Annapolis, Hartford, Skokie, Jupiter,

Page 94

(1)
(2) Minneapolis.
(3) Q. What about Miami?
(4) A. I'm sorry, yes, and Miami.
(5) Q. Generally, what were those services?
(6) A. Design, preparation of construction
(7) documents, preparation of construction
(8) specification book, preparation of bid documents
(9) and contract administration included responding to
(10) RFI's, site visits, answering questions from the
(11) contractors.
(12) Q. Now, when you testified that you
(13) performed design services, was that the design of
(14) the movie theater?
(15) A. Yes.
(16) Q. You referred to the preparation of
(17) construction documents. Which documents?
(18) A. Well, under my contract was a
(19) preparation of the architectural, the structural,
(20) mechanical, electrical and plumbing.
(21) Q. What was the construction spec book

(22) that you referred to? What was it used for?
(23) A. It's an attachment to the construction
(24) drawings that is issued to the contractors.
(25) Q. What were the bid documents used for?

Page 95

(1)
(2) A. The bid documents are the documents
(3) that the contractors would fill in the dollar
(4) amount that they proposed to do the construction
(5) that movie theater complex for.
(6) Q. What are RFI's?
(7) A. Request for information.
(8) Q. Did you keep a log of request for
(9) information that you received or any other record?
(10) MR. SEIDEN: Or any other record with
(11) regard to RFI.
(12) MR. SCHANER: Yes.
(13) Q. Did you keep track of the RFI's that
(14) you received?
(15) A. Yes.
(16) Q. Is there a book that lists them?
(17) A. I don't think we had a log.
(18) Q. How did you keep track of them?
(19) A. In the files.
(20) Q. The RFI's come to you in writing?
(21) A. Yes.
(22) Q. Did you respond in writing?
(23) A. Yes.
(24) Q. What about the questions from
(25) contractors, were those in writing?

Page 96

(1)
(2) A. No.
(3) Q. Did you keep –
(4) A. Not always.
(5) Q. Did you keep track of the responses to
(6) questions from contractors –
(7) A. Yes.
(8) Q. – that you gave?
(9) A. Oh, yes.
(10) Q. In what form did you give your
(11) responses?
(12) A. Sometimes they would fax us a question
(13) and we would write back on that fax and send it
(14) back to the contractor.
(15) Q. Did you keep copies of those faxes?
(16) A. I believe we did, yes.
(17) Q. Did you keep other records of
(18) questions from contractors that you received?
(19) A. Sure, correspondence in terms of
(20) letters, yes.
(21) Q. Was it your understanding that there
(22) was a division of labor between Crown Theatres
(23) and its landlords with respect to the construction
(24) projects?
(25) MR. WISSER: Objection to the form.

Page 97

(1)
(2) A. No.
(3) Q. You didn't understand that the

(20) question like that.
(21) Q. Was there a standard format for the
(22) meetings?
(23) A. Mr. Daly chaired the meetings.
(24) Q. How long did the Friday meetings
(25) typically last?

Page 102

(1)
(2) A. About an hour and a half.
(3) Q. Did you ever sign architect
(4) certificates at the Friday construction meetings?
(5) A. Absolutely.
(6) Q. Mr. Martino, are you familiar with the
(7) American Institute of Architects form that is
(8) titled application and certificate for payment?
(9) A. Yes, I am.
(10) Q. It's also known as an AIA document
(11) G702; is that right?
(12) A. Yes.
(13) Q. It's a document that you worked with
(14) extensively over the years?
(15) A. I would not use the word extensively.
(16) Q. Frequently, regularly?
(17) MR. SEIDEN: What is the question?
(18) Q. Have you worked with the document
(19) regularly, the G702?
(20) A. No.
(21) Q. Had you worked with it prior to your
(22) work for Crown Theatres?
(23) A. Yes.
(24) MR. SCHANER: Let's mark this as
(25) Martino Exhibit Number 4.

Page 103

(1)
(2)
(3) (Whereupon, the aforementioned
(4) Document was marked as Martino Exhibit 4 for
(5) identification as of this date by the
(6) Reporter.)
(7)
(8) Q. Mr. Martino, do you recognize Martino
(9) Exhibit Number 4 as an application and certificate
(10) for payment, an AIA document G702?
(11) A. Yes, I do.
(12) Q. You understand that it includes an
(13) architect certificate for payment?
(14) A. Yes, I do.
(15) Q. There is also a contractor's
(16) application for payment on the form?
(17) A. Yes.
(18) Q. Under the heading architect's
(19) certificate for payment, it states, In accordance
(20) with the contract documents, based on on-site
(21) observations and the data comprising this
(22) application, the architect certifies to the owner
(23) that to the best of the architect's knowledge,
(24) information and belief the work has progressed
(25) as indicated, the quality of the work is in

Page 104

(1)
(2) accordance with the contract documents and the
(3) contractor is entitled to payment of the amount
(4) certified. Have I read that correctly?
(5) A. Yes, you did.
(6) Q. Do you have an understanding of the
(7) purpose of the architect's certificate?
(8) MR. SEIDEN: Objection. In what
(9) context, any job in the world ever? I object.
(10) I think that's a question that can't be
(11) answered.
(12) MR. SCHANER: I think it can be.
(13) A. I don't understand question.
(14) Q. Do you have an understanding of an AIA
(15) document G702 architect certificate for payment
(16) document?
(17) MR. SEIDEN: Objection.
(18) A. You need to be more specific.
(19) Q. What is it about the question that you
(20) don't understand?
(21) A. It sounds too global for me from what
(22) I'm understanding what you are saying.
(23) Q. What is the purpose for an architect
(24) certificate?
(25) MR. SEIDEN: Same objection.

Page 105

(1)
(2) A. Repeat the question again, please.
(3) MR. SCHANER: Please read back the
(4) question.
(5)
(6) (Whereupon, the referred to question
(7) was read back by the Reporter.)
(8)
(9) MR. SEIDEN: Objection. It's vague,
(10) over broad and calls for an opinion. You
(11) could answer subject to my objection.
(12) A. The architect certificate for payment
(13) in this case relates to work that was performed.
(14) Q. What is the purpose of the architect
(15) certificate?
(16) MR. SEIDEN: Same objection.
(17) Q. In general, what is the purpose of an
(18) architect certificate?
(19) MR. SEIDEN: Now it's even more broad
(20) and calling for opinions. Objection.
(21) A. The purpose is the architect's
(22) certification.
(23) Q. That's the purpose of the architect
(24) certificate? Do you have an understanding as to
(25) why an architect certificate is a requirement on

Page 106

(1)
(2) AIA document G702?
(3) MR. SEIDEN: Objection.
(4) A. For the processing of the payment
(5) application.
(6) Q. Mr. Martino, do you have a standard
(7) practice for handling architect certificates?
(8) A. No.
(9) Q. You don't?

```
 1

 2         IN THE UNITED STATES DISTRICT COURT

 3           FOR THE DISTRICT OF CONNECTICUT

 4
    CROWN THEATRES, L.P.,      )
 5                             )
                  Plaintiff,   )
 6                             )
               vs.             )
 7                             )
    MILTON L. DALY, TAYLOR-    )
 8  LEIGH, INC., ANNE E. DALY, )
    JAMES C. CELLA, G.U.S.     )
 9  DEVELOPMENT, INC., JAMES   )
    T. MARTINO and JAMES       )
10  THOMAS MARTINO, ARCHITECT, )
                               )
11                Defendants.  )
    ---------------------------)
12

13

14

15       CONTINUED DEPOSITION OF JAMES MARTINO

16              Garden City, New York

17            Tuesday, February 10, 2004

18

19

20

21

22

23

24  Reported by:
    DEBORAH A. HANLON
25  JOB NO. 157283
```

Page 264

```
1       Martino
2   not. I believe we did.
3       Q. Mr. Martino, I am handing you
4   what we marked at the first day of your
5   deposition as Martino Exhibit 3 which was
6   your responses to Crown Theatres' first set
7   of interrogatories.
8       Reviewing your responses to Crown
9   Theatres' first set of interrogatories, can
10  you tell me whether you or someone from
11  your firm made monthly visits to the
12  Trumbull site?
13      A. Not by reviewing this document I
14  cannot, no.
15      Q. Can you tell me whether you made
16  monthly site visits on the other theater
17  projects that you did for Crown Theatres?
18      A. Are you asking me now to review
19  the other five projects that are listed
20  here to ascertain whether I made monthly
21  site visits?
22      Is that what you are asking me to
23  do?
24      Q. I would like you to tell me
25  whether you made monthly visits to each of
```

Page 265

```
1       Martino
2   the Crown Theatres' projects. And if
3   reviewing your interrogatory answers would
4   help, go ahead.
5       A. Well, I know that in Jupiter and
6   Miami I did not, or anybody from my office,
7   make specific monthly site visits.
8       Q. What about the other projects?
9       A. It appears that Skokie, based on
10  this document in front of me, that monthly
11  site visits were not made. And looking at
12  the Hartford project, based on this, I
13  think we did make monthly site visits.
14      Q. What about Annapolis, Maryland?
15      A. No. Annapolis, Maryland, monthly
16  site visits were not made.
17      Q. Let's go back to Martino
18  Exhibit 25 for a moment.
19      On page 2, the last sentence
20  reads, "Should additional site visits be
21  required, each site visit will be billed
22  monthly."
23      Did your firm ever bill for
24  additional site visits?
25      A. On the Trumbull project?
```

Page 266

```
1       Martino
2       Q. On the Trumbull project.
3       A. I can't recall off the top of my
4   head.
5       Q. Did your firm bill for additional
6   site visits on any of the other site
7   projects?
8       A. I can't recall that either.
9       Q. On the first day of your
10  deposition, I believe that you testified
11  that Bob Beacher would hand copies of the
12  payment requisitions to you either in his
13  car on the way to the Friday construction
14  meetings or at the Friday meetings, that
15  you would sign them either in the car or at
16  the Friday meetings.
17      Have I got that right?
18      MR. SEIDEN: Objection. The
19  testimony speaks for itself.
20      A. I think that's a fair synopsis of
21  what I was trying to portray.
22      Q. Did you discuss the payment
23  requisitions with Mr. Beacher before you
24  signed them?
25      A. I cannot say that I discussed
```

Page 267

```
1       Martino
2   specifically each payment requistion before
3   I signed them, no.
4       Q. What would Mr. Beacher say to you
5   when he gave you the payment requisitions?
6       A. I reviewed them, signed the
7   fucking things.
8       Excuse my mouth, ma'am.
9       Q. And after you signed them, what
10  did you do with them?
11      A. Gave them back to Bob.
12      Q. What did Mr. Beacher do with the
13  payment applications after you signed them
14  and gave them back to him?
15      A. I believe he then gave them to
16  Mr. Daly.
17      Q. Mr. Martino, do you understand
18  the terms payment requistion and payment
19  application to mean the same thing?
20      A. Yes, I do.
21      Q. Do you remember that you met with
22  investigators for Crown Theatres on July
23  11, 2003?
24      A. I don't remember that specific
25  date, but I do remember meeting with people
```

Page 268

1  **Martino**
2  **from Kroll.**
3  Q. They were from Kroll and they
4  were two gentlemen, Bill Jennings and Mike
5  Pace.
6  Do you remember that?
7  **A. Yes, I do.**
8  Q. Do you remember telling them that
9  at the construction meetings Mr. Beacher
10 would slide a stack of payment requisitions
11 to you and you would sign them?
12 **A. I don't remember specifically**
13 **that statement, no.**
14 Q. Does that statement -- is that
15 statement accurate?
16 **A. If we arrived -- if we were at**
17 **the construction site meeting -- at the**
18 **Friday morning meetings, and he put them**
19 **down in front of me, I think that's what we**
20 **were talking about.**
21 Q. Do you remember you also told the
22 investigators from Kroll that you believed
23 in your heart that the AIA architects'
24 certification form required the architect
25 to make an on-site inspection before

Page 269

1  Martino
2  signing?
3  **A. I don't recall exactly saying**
4  **that either.**
5  Q. You agree with that statement,
6  don't you?
7  MR. SEIDEN: Objection to form.
8  **A. Say it again, please.**
9  Q. You believe in your heart that
10 the AIA architects' certification form
11 required the architect to make an on-site
12 inspection before signing?
13 **A. If it was the architect's**
14 **responsibility, yes.**
15 Q. You also told Mr. Jennings and
16 Pace that other than your work for Crown,
17 if you were required by another client to
18 sign payment requistion certifications, you
19 would make an on-site inspection of the
20 work and an independent determination that
21 the work had been completed, correct?
22 **A. I don't recall exactly saying**
23 **that, counselor. But I don't recall. I**
24 **don't recall exactly saying that.**
25 Q. Do you agree with that statement?

Page 270

1  Martino
2  MR. SEIDEN: I'm sorry. Can I
3  hear the statement back?
4  MR. SCHANER: Would the court
5  reporter please read it back.
6  (A portion of the record was read.)
7  MR. SEIDEN: You can answer.
8  **A. If I was in the role of the full**
9  **responsibility, yes.**
10 Q. You would also compare the prior
11 payment requests to the current payment
12 requests to confirm that the prior amount
13 was paid, correct?
14 MR. SEIDEN: Objection to the
15 form.
16 **A. If it was my role and**
17 **responsibility to do so.**
18 Q. In addition, you would confirm
19 that all necessary lien waivers had been
20 obtained, right?
21 MR. SEIDEN: Objection to form.
22 **A. If it was my responsibility to do**
23 **so.**
24 Q. And in the case of the Crown
25 Theatres' projects, it was your

Page 271

1  Martino
2  responsibility, correct?
3  MR. SEIDEN: What was his
4  responsibility? Lien waivers?
5  Q. Do you understand the question?
6  **A. No.**
7  Q. You were the architect of record
8  on the Crown Theatres' construction
9  projects, correct?
10 **A. Yes, sir, I was.**
11 Q. It was your responsibility as the
12 architect of record to make on-site
13 inspections of the work and an independent
14 determination that the work had been
15 completed, correct?
16 MR. SEIDEN: Objection to form.
17 **A. That was a long question.**
18 **Could you restate that, please.**
19 MR. SCHANER: Can we have the
20 question read back, please.
21 (A portion of the record was read.)
22 **A. It was my responsibility to**
23 **verify that the work was completed in**
24 **accordance with my drawings.**
25 Q. It was also your responsibility

13 (Pages 268 to 271)

Page 288

1  Martino
2  your office?
3  A. I'm not too sure if he does or he
4  doesn't.
5  Q. Mr. Lomonte would know?
6  A. Yes.
7  Q. How do you spell Mr. Lomonte's
8  last name?
9  A. L-o-m-o-n-t-e.
10 Q. Mr. Martino, I would like to
11 refer you back to Exhibit 22, which we
12 looked at the first day of your deposition.
13     Exhibit 22 is payment application
14 number 5 submitted by Marlin Contracting
15 for work on the Jupiter, Florida, job; and
16 it is for the period June 1, 2000.
17     Did Marlin Contracting do any
18 work on the Jupiter, Florida, project?
19 A. I don't know.
20 Q. Did you ever meet any Marlin
21 employees on the Jupiter project job site?
22 A. I don't recall meeting anybody.
23 Q. Did you ever speak with any
24 Marlin personnel regarding the Jupiter
25 project?

Page 289

1  Martino
2  A. I don't recall that either.
3  Q. If you look at the contractor's
4  signature line, it looks like it says Jerry
5  M. Marlin.
6     Did you ever meet a Mr. Marlin?
7  A. I don't recall meeting a
8  Mr. Marlin, no.
9  Q. Look at the address for Marlin
10 Contracting. It says 123 Orchid Kay Drive,
11 Palm Beach Gardens, Florida. Zip code is
12 33420.
13    Now, Mr. Martino, Marlin's
14 address is the same as Mr. Beacher's
15 address, isn't it?
16 A. Yes, it is.
17 Q. You knew that when you signed
18 this architect certificate, didn't you?
19 A. No, I did not.
20 Q. Why not?
21 A. How could you draw that
22 conclusion?
23 Q. I asked you why you didn't know.
24 A. I wasn't paying attention to it.
25 Q. You signed the architect's

Page 290

1  Martino
2  certificate on June 1, 2000, correct?
3  A. That's what it states.
4  Q. As of that date, you knew that
5  Mr. Beacher lived at 123 Orchid Kay Drive,
6  correct?
7  A. I don't recall that.
8  Q. When did you learn where
9  Mr. Beacher lived?
10 A. I don't recall that either.
11 Q. You have been to Mr. Beacher's
12 house before you signed this, didn't you?
13 A. Mr. Schaner, I don't recall that
14 either.
15 Q. Mr. Martino, Marlin Contracting,
16 according to the payment applications here,
17 had a contract in the amount of $1.070,000,
18 correct?
19 A. That's what it states.
20 Q. You knew, sir, that by signing
21 this architect's certificate you were
22 approving a payment that was going to
23 Mr. Beacher, correct?
24    MR. SEIDEN: Objection to form.
25 A. No, sir, I did not.

Page 291

1  Martino
2  Q. Why not?
3  A. How would you draw that
4  conclusion?
5  Q. You knew that Mr. Beacher and
6  Marlin Contracting were the same thing,
7  correct?
8  A. No, sir, I did not.
9  Q. Why not?
10 A. How would I know that?
11 Q. Same address, correct?
12 A. So.
13 Q. Did you review Marlin
14 Contracting's pay applications before you
15 signed them?
16 A. This exhibit you are speaking of?
17 Q. Yes.
18    Did you review Exhibit 22 before
19 you signed it?
20 A. I reviewed it in terms of the
21 scope of work on the second page.
22 Q. Did you review the first page?
23 A. No, I did not. Not in its
24 entirety.
25 Q. Which parts didn't you review?

18 (Pages 288 to 291)

Page 292

1       Martino
2       A. The parts I did review was that
3   it was approved already by Bob Beacher, and
4   I looked at the second page to ascertain
5   the work that was being performed.
6       Q. Here is a copy of Martino Exhibit
7   21 that we looked at at the first day of
8   your deposition.
9           It has got your signature on it,
10  correct?
11      A. It has my signature on it, yes.
12      Q. Did you review Exhibit 21 before
13  you signed it?
14      A. Yes, I did.
15      Q. Did you review the whole thing?
16      A. I reviewed it in the same fashion
17  I reviewed the previous one.
18      Q. You signed it even though Marlin
19  Contracting's address is the same as Bob
20  Beacher's, correct?
21      A. That's correct.
22      Q. I am handing you what we marked
23  at your deposition earlier as Martino
24  Exhibit 18.
25          That's a copy of Marlin

Page 293

1       Martino
2   Contracting's pay application Number 1 for
3   work on the Jupiter project, correct?
4       A. That's what it states.
5       Q. And you testified that that's not
6   your signature on this document, correct?
7       A. That is correct. I testified to
8   that.
9       Q. I am handing you now Martino
10  Exhibit Number 19, which is a copy of
11  Marlin's second pay application for work on
12  the Jupiter project.
13          Correct?
14      A. That's what it claims, yes.
15      Q. And you signed that one?
16      A. Yes, I did.
17      Q. From payment application Number 2
18  submitted by Marlin, you knew that there
19  was a payment application Number 1,
20  correct?
21      A. Did not realize it.
22      Q. If you had noticed that it was
23  application Number 2, you would have known
24  that there must have been an application
25  Number 1, correct?

Page 294

1       Martino
2       A. That's fair to say.
3       Q. And Exhibit 19, Marlin
4   application Number 2, shows that there was
5   a previous payment to Marlin for $155,000,
6   correct?
7       A. That's what it states.
8       Q. If you had been paying attention,
9   you would have known from Exhibit 19 that
10  on application Number 1 payment had been
11  approved for $155,000, correct?
12          MR. SEIDEN: Objection to the
13      form.
14      A. Could you rephrase that, please.
15      Q. You knew from Exhibit 19 that
16  $155,000 had been paid on requistion Number
17  1 submitted by Marlin?
18      A. Not necessarily true.
19      Q. Why not?
20      A. Dollars were not my
21  responsibility.
22      Q. If you had been looking at
23  dollars, you would have known that $155,000
24  was paid on application Number 1, correct?
25          MR. SEIDEN: Objection.

Page 295

1       Martino
2       Hypothetical.
3       A. Yes.
4       Q. And when you say dollars were not
5   your responsibility, why was that?
6       A. Because it was the responsibility
7   of Bob Beacher.
8       Q. Would it be fair to say that you
9   did not pay attention to dollars on the
10  payment requisitions that you signed?
11          MR. SEIDEN: Objection to form.
12      A. Are you speaking specific about
13  Jupiter now?
14      Q. No, all of them. All of them for
15  Crown.
16      A. Restate that, please.
17      Q. Would it be fair to say that you
18  did not pay attention to the dollar amounts
19  on the payment requisitions that you
20  signed?
21      A. No. That is not a true
22  statement.
23      Q. In some cases you did pay
24  attention to the dollar amounts?
25      A. When it was my responsibility.

19 (Pages 292 to 295)