```
 1              UNITED STATES DISTRICT COURT
 2                 DISTRICT OF CONNECTICUT
 3
 4
 5   -------------------------------x  VOLUME I
     CROWN THEATRES, L.P.,          :
 6
                Plaintiff,          :
 7
        -versus-                    : No. 02 CV 2272
 8                                    (AVC)
     MILTON L. DALY; TAYLOR-LEIGH,  :
 9   INC.; JAMES C. CELLA; G.U.S.
     DEVELOPMENT, INC.; JAMES        :
10   T. MARTINO; and JAMES T.
     MARTINO ARCHITECT, P.C.         :
11
                Defendants.          :
12   -------------------------------x
13
14
15           Deposition of MILTON L. DALY,
16      taken pursuant to the Federal Rules of
17      Civil Procedure, at the law offices of Pepe
18      & Hazard, 30 Jelliff Lane, Southport,
19      Connecticut, before James A. Martone,
20      L.S.R. #00248, and a Notary Public in and
21      for the State of Connecticut, on August 5,
22      2003, at 10:15 a.m.
23
24
25
```

Page 2

```
 1  APPEARANCES:
 2    For the Plaintiff:
        JENNER & BLOCK, L.L.C.
 3      One IBM Plaza
        Chicago, Illinois 60611
 4      By: CRAIG C. MARTIN, ESQ
 5          ADAM HIRSCH, ESQ.
        (312) 222-9350
 6
 7    For the Defendant James T. Marino:
 8      MILBER, MAKINS, PLOUSADIS & SEIDEN,
        LLP
 9      108 Corporate Park Drive
        White Plains, New York 10604
10      By: MARISA LANZA, ESQ.
        (914) 681-8700
11
12    For the Defendants Milton Daly and
        Taylor-Leigh, Inc.:
13
        WEINSTEIN & WISSER, P.C.
14      29 South Main Street
        West Hartford, Connecticut 06107
15      By: KERRY WISSER, ESQ
        (860) 561-2628
16
17    For the Defendants James Cella and
        G.U.S. Development:
18
        LAW OFFICES OF S. DAVID VATTI
19      375 Bridgeport Avenue
        Shelton, Connecticut 06484
20      By: S. DAVID VATTI, ESQ
        (203) 944-9392
21
22  ALSO PRESENT:
23    Dan Crown
      Lisa Wood
24    Kathleen LaValle
25
```

Page 4

```
 1              WITNESS INDEX
 2                                PAGE
 3  Direct Examination by Mr. Martin    5
 4
 5
 6
 7              EXHIBIT INDEX
 8  PLAINTIFF'S    DESCRIPTION       PAGE
 9     1    Lease dated 6/18/98       95
10     2    Trumbull lease            95
11     3    Building Construction Budget  98
12     4    Letter dated 12/6/95     116
13     5    Building Construction Budget  139
14     6    Building Construction Budget  163
15     7    Notebook                 184
16     8    Black notebook           196
17     9    Black notebook           200
18  NOTE: Exhibits retained.
```

Page 3

```
           STIPULATIONS

       IT IS HEREBY STIPULATED AND
   AGREED by and between counsel for the
   respective parties hereto that all
   technicalities as to proof of the official
   character before whom the deposition is to
   be taken are waived.

       IT IS FURTHER STIPULATED AND
   AGREED by and between counsel for the
   respective parties hereto that the
   deposition may be signed before any Notary
   Public.

       IT IS FURTHER STIPULATED AND
   AGREED by and between counsel for the
   respective parties hereto that all
   objections, except as to form, are reserved
   to the time of trial.


              * * * * * *
```

Page 5

```
 1  MILTON L. DALY,
 2  17075 Perdido Key, Pensacola, Florida, 32527,
 3    called as a witness, having been first duly
 4    sworn by James A. Martone, a Notary Public
 5    in and for the State of Connecticut, was
 6    examined and testified as follows:
 7  DIRECT EXAMINATION
 8  BY MR. MARTIN:
 9    Q. Would you state your name and spell it
10  for the record, please?
11    A. Milton Daly, D-a-l-y. M-i-l-t-o-n.
12    Q. Mr. Daly, we took your asset
13  deposition a few months ago, and at it we marked
14  Deposition Exhibit 4. Let me just show you that
15  again, which was the disclosure of assets.
16        MR. WISSER: That was modified
17  pursuant to his testimony, for the record.
18        MR. MARTIN: I was getting there.
19        MR. WISSER: Okay.
20    A. Yes.
21    Q. Now at your last deposition, you made
22  a few modifications to that disclosure of
23  assets, correct?
24    A. I believe so, that is correct.
25    Q. Are there any other changes to that
```

Page 122

```
 1    A.  No.
 2    Q.  Why not?
 3    A.  It was in the entire total budget.
 4    Q.  It was part of the budget that was
 5  presented to them?
 6    A.  That's correct.
 7    Q.  But not broken down by this much money
 8  guess the Mr. Beacher?
 9    A.  It was part of the budget,
10  construction budget.
11    Q.  I understand what you're saying, but
12  where is it in the construction budget that
13  Mr. Beacher's compensation or fee would be
14  reflected?
15    A.  I --
16        MR. WISSER: Object to the form.
17  If you're asking about Exhibit 3, he said it's
18  not in here. He's also indicated he doesn't
19  know if this is a final. Are you asking where
20  as a line item it would be shown in a final
21  budget?
22        MR. MARTIN: Right. Where would
23  it be in a final budget?
24    A.  I don't know the exact classification,
25  but it would be under cost of construction. I
```

Page 123

```
 1  don't remember exactly the wording.
 2    Q.  Those budgets would be presented to
 3  the Crown family prior to the approval received
 4  to go ahead and do a theater construction
 5  project?
 6    A.  Yes. That would be the general
 7  procedure.
 8    Q.  So that there would be an estimated
 9  amount that Mr. Beacher would be paid prior to
10  approval?
11    A.  Yes.
12    Q.  With regard to Trumbull, that was a
13  new construction project, right?
14    A.  It was an addition to an existing
15  theater.
16    Q.  Okay. Adding six new theaters to it?
17    A.  Yes.
18    Q.  Did Trumbull, to the best of your
19  recollection, come in over or under budget?
20    A.  I think it came in over budget.
21    Q.  Do you have any understanding as to
22  why Trumbull came in over budget?
23    A.  As I am not a construction individual,
24  I had to rely on my source of expertise which
25  was Bob Beacher, and his comment to me was that
```

Page 124

```
 1  we didn't plan on certain aspects of the project
 2  in the budget. Jim Martino had missed a number
 3  of items in his construction documents that were
 4  not part of the construction bid.
 5        Mr. Beacher's company had done
 6  some work on this project through his own
 7  company, saving the company money. The project
 8  would have been over much more than it was if we
 9  hadn't worked out an arrangement, and that's
10  basically the answer I gave to the Crowns for
11  the additional costs that were not contemplated,
12  which most construction projects do come in over
13  budget because of unknown factors involved.
14    Q.  During the Trumbull project, did you
15  do anything to monitor the progress of where the
16  construction costs were vis-a-vis budget?
17        MR. WISSER: Objection to the
18  form.
19    Q.  Do you understand the question as it's
20  phrased?
21    A.  Yes. There was a schedule prepared
22  monthly as to the budget and the expenditures
23  incurred to date compared to that budget.
24    Q.  Who prepared that schedule?
25    A.  The accounting department and David
```

Page 125

```
 1  Clifford.
 2    Q.  Did you have any construction meetings
 3  with regard to Trumbull?
 4    A.  Every week.
 5    Q.  Did you have construction meetings
 6  with regard to all of the projects?
 7    A.  Every week, yes.
 8    Q.  Who attended the construction
 9  meetings?
10        MR. WISSER: Objection to the
11  form. The question assumes that each and every
12  meeting would have the same people there.
13    Q.  Who generally attended the
14  construction meetings?
15    A.  Myself, Jim Martino, Bob Beacher, the
16  architect of record, who worked for Martino,
17  Glen Garfinkle, Tom Becker, Chris Dugger.
18    Q.  What was the purpose of the
19  construction meetings?
20    A.  It was to weekly go over where we were
21  in the progress of the construction in each of
22  the locations.
23    Q.  By progress, do you mean the physical
24  progress, how far along the theater is?
25    A.  Yes.
```

Page 126

1  Q. What about the financials, where you
2  are vis-a-vis the budget?
3  A. No. They were not discussed at these
4  meetings.
5  Q. Why not?
6  A. Just were never discussed. I don't
7  know.
8  Q. Okay.
9  A. I mean, there's not much Dugger could
10  do about construction.
11  Q. What was the purpose in your attending
12  these meetings? What was your purpose in your
13  attending those meetings?
14  A. To be informed as to where we stood
15  concerning construction progress of the
16  projects. In case Dan Crown wanted to report to
17  Chicago, he'd ask me, and therefore, he would
18  know. And I would try to give Dan Crown an
19  update weekly where we were.
20  Q. Whose idea was it to have weekly
21  construction meetings?
22  A. Mine.
23  Q. What was your purpose in having
24  Martino attend the construction meetings?
25  A. Well, he was supposed to go to the

Page 127

1  sites to give us approval as to the payment of
2  the requisitions because he would confirm what
3  was submitted for payments, as the architect of
4  record, along with Mr. Beacher, who was the
5  construction manager, and he would have
6  obviously privy information as to what was
7  happening at the location because they had job
8  site meetings supposedly every week.
9  Q. So is it fair to say that you relied
10  on Mr. Martino to go to the sites to inspect the
11  progress of the construction on a weekly basis?
12  MS. LANZA: Objection to form.
13  A. I relied on Martino and Beacher for
14  the entire construction progress of every
15  theater that this company ever built.
16  Q. What was your purpose in having
17  Mr. Beacher at the meetings?
18  A. As the construction manager, he was
19  very, very intimately involved in the bidding of
20  the projects. He knew exactly what had to be
21  done or did not have the be done, and therefore,
22  he would obviously tell us exactly where we
23  were, along with Mr. Martino. It was his
24  responsibility to make sure that the contract
25  was fulfilled to its fullest body of execution.

Page 128

1  Q. Okay.
2  MR. MARTIN: Let's take a moment
3  to have lunch.
4  (Luncheon: 1:00 to 1:12 p.m.)
5  BY MR. MARTIN:
6  Q. Mr. Daly, what was your purpose in
7  having Mr. Garfinkle attend the construction
8  meetings?
9  A. Mr. Garfinkle's functions were not too
10  large, so therefore, it gave him something else
11  to do, in addition to which he signed all of the
12  contracts, the construction documents concerning
13  construction of these projects, and he was privy
14  to some of the negotiations concerning the
15  contracts. I think he negotiated a lot of them
16  with Beacher.
17  Q. What was your purpose in having
18  Mr. Becker attend these meetings?
19  A. Tom was involved with the various
20  aspects of the FF and E of the project. Tom had
21  construction knowledge or has construction
22  knowledge, and he was in charge of special
23  projects for the company.
24  Q. What was your purpose in having
25  Mr. Dugger attend some of these meetings?

Page 129

1  A. Again, he was the district manager for
2  all of these theaters and it was just a good
3  learning process for him to find out what was
4  going on with construction as a general
5  educational process, my two cents' worth.
6  Q. Did there ever come a time when you
7  excluded Mr. Becker from these meetings?
8  A. Never to my knowledge.
9  Q. Did there ever come a time you
10  excluded Mr. Garfinkle or Mr. Dugger from these
11  meetings?
12  A. Never. I did Mr. Beacher, though. I
13  fired him.
14  MR. WISSER: Milt, just answer
15  the question that's posed to you, please.
16  Q. You just had to get that out, didn't
17  you?
18  A. I did. I sure did, Mr. Martin.
19  Q. When did you fire Mr. Beacher?
20  A. I couldn't give you the exact date,
21  but it was during the Hartford project, so it
22  was probably 1999-2000.
23  Q. Why did you fire him?
24  A. Because the nature of his decorum, the
25  nature of his character was such that some of

Page 154

1   Q. Did you participate in the site
2   selection for the Miami theater?
3   A. Yes.
4   Q. And why did you locate or why did
5   Crown Theatres decide to locate to Miami Grand
6   in the location that it located it?
7       MR. WISSER: Can we incorporate
8   what he said and just go from there?
9   Q. Yes. Just finish your answer.
10  Wal-Mart stores --
11  A. In addition to the Crown family having
12  interests in Florida, in Pinellas Park,
13  what-have-you, that's how we got into Florida,
14  primarily, and I being with Cobb, having known
15  the marketplace, we investigated the proposal,
16  we liked the proposal, we liked the location.
17  When I say "we," that was the selection
18  committee of Crown, Dale and Clifford, and I
19  don't know if Garfinkle was involved at that
20  time, he would have been if he was there, and we
21  decided that this was a location that a theater
22  could do very well.
23  Q. Was this the theater that's located
24  right near railroad tracks?
25  A. No. That's Hartford, just to answer

Page 155

1   your question.
2   Q. Okay. With regard to the Miami Grand
3   project, did you and Dan and Mr. Clifford and
4   perhaps Mr. Garfinkle seek approval from the
5   Crown family to make the capital expenditures to
6   do the construction project?
7   A. Yes.
8   Q. And do you recall a specific meeting
9   or telephone call in which you sought approval?
10  A. No.
11  Q. What was the business case for making
12  the investment in Miami Grand?
13      MR. WISSER: Object to the form.
14      You can answer if you understand.
15  A. Profits.
16  Q. And what was that? I assume your
17  answer is you mean that it would be a profitable
18  theater and return a reasonable return on
19  investment; is that correct?
20  A. That is correct.
21  Q. What type of return on investment did
22  you consider reasonable at Crown Theatres?
23  A. If memory serves me correctly, they
24  wanted 30 percent return on all their projects.
25  Q. 30 percent return, and did you think

Page 156

1   that that was reasonable?
2   A. No, I personally didn't, and I advised
3   them many times. Yes, unrealistic.
4   Q. And why did you think it was
5   unrealistic?
6   A. Because it's almost impossible to get
7   a 30 percent return on an investment like that.
8   I mean, you put in $10 million, 30 percent
9   return is a $3 million profit. It's impossible
10  to do. It's ridiculous.
11  Q. With regard to the Miami Grand
12  project, who was the general contractor?
13  A. Can't think of his name.
14  Q. Waas Construction?
15  A. Yes.
16  Q. Richard Waas, W-a-a-s?
17  A. He was the principal, yes.
18  Q. And who was the architect?
19  A. James Martino.
20  Q. And was this a project Beacher was
21  involved in?
22  A. Yes.
23  Q. Did he get a flat fee on this project
24  as well?
25  A. I believe so.

Page 157

1   Q. What's your best recollection as to
2   his flat fee on this project?
3   A. I don't remember.
4   Q. 50 to 75 thousand dollars?
5   A. I don't remember. I believe so. I
6   don't recall.
7   Q. Was this project competitively bid?
8   A. Yes, it was.
9   Q. What was the arrangement between Crown
10  Theatres -- Let me ask you this first: Who was
11  the landlord on the Miami project?
12  A. Binderson Development.
13  Q. And what was the arrangement between
14  Crown Theatres and Binderson with regard to the
15  construction of the building and the FF and E?
16  A. We would do the FF and E, and we would
17  receive a contribution, I believe, from
18  Binderson to construct the theater.
19  Q. So Crown Theatres had to pay for all
20  of the FF and E but would get a monetary
21  contribution from the landlord to construct the
22  building?
23  A. That is to the best of my recollection.
24  Q. And Crown Theatres let a general
25  contract out to Waas to do all of that work; is

Page 158

1  that correct?
2    A.  That's my general recollection.
3    Q.  Did the landlord have any
4  responsibilities with regard to site
5  preparation?
6    A.  I don't remember that.
7    Q.  Did you have weekly construction
8  meetings on Miami, the construction of the Miami
9  Grand as well?
10   A.  Yes.
11   Q.  And did you rely on Mr. Beacher and
12 Mr. Martino to approve payment of applications?
13   A.  Yes.
14   Q.  And why did you rely on them?
15   A.  That was their job. That's what they
16 were hired for.
17   Q.  With regard to -- Now the project at
18 Miami Grand was after the project at Hartford,
19 correct?
20   A.  Mr. Martin, I don't know exactly how
21 the horses came in, how the theaters came on
22 line. I mean, there were a number of projects.
23 I think most of the projects were occurring at
24 the same time.
25   Q.  After you hired and fired

Page 159

1  Mr. Beacher -- I guess you fired and rehired
2  Mr. Beeper, did you have similar problems with
3  him on the projects after that?
4    A.  They would flare-up occasionally, yes,
5  but they weren't as frequent.
6    Q.  Did the Miami Grand project come in
7  under or over budget?
8    A.  Over budget.
9    Q.  And why did it come in over budget?
10   A.  Again, there are many, many problems,
11 according to Mr. Beacher, cost overruns on items
12 that were not projected properly. I'm just
13 going on hearsay at this point. I don't
14 remember specifically, but just a plethora of
15 reasons.
16   Q.  And do you remember any of the
17 specific reasons?
18   A.  A lot of rain.
19   Q.  Any others?
20   A.  Couldn't work. The project was
21 delayed.
22   Q.  Delayed because of rain?
23   A.  Yes.
24   Q.  Any other reasons for cost overruns
25 with regard to Miami?

Page 160

1    A.  A lot of items were not on the
2  drawings, which were not budgeted. Martino
3  missed a lot of items on the drawings. What I'm
4  eliciting right now is the same for all the
5  projects. This wasn't done, this was missing,
6  that was missing.
7    Q.  Right. In other words, the same types
8  of reasons for cost overruns on all the
9  projects, you're saying?
10   A.  Yes.
11   Q.  One of those reasons being Mr. Martino
12 didn't adequately specify all the work that
13 needed to be done, correct?
14   A.  That -- that is what Mr. Beeper said,
15 yes.
16   Q.  Another --
17   A.  I wouldn't know that to be a fact
18 because I'm not a construction person, but
19 that's what I understood.
20   Q.  Another reason being Mr. Beacher's,
21 what you described as attitude and demeanor on
22 the job?
23   A.  One of the reasons.
24   Q.  Another reason that I've heard you say
25 is weather conditions?

Page 161

1    A.  Yes.
2    Q.  Are there any other reasons that cut
3  across all of the projects, that caused budget
4  overruns?
5    A.  No.
6    Q.  During the Hartford, Annapolis,
7  Jupiter, Skokie, Miami, they all came ever over
8  budget; is that correct?
9    A.  To my knowledge, yes.
10   Q.  Were there any changes made to any of
11 the procedures, policies, practices that you
12 implemented as chief operating officer to try to
13 cure that issue?
14       MR. WISSER: Objection to the
15 form.
16       You can answer if you understand.
17   A.  There was a half-ass approach to hire
18 Tishman Spire out of New York to look at the
19 budgets. They didn't do anything. I mean, the
20 horse was out of the gate on all the projects
21 too far down the line for anything to be done.
22 It was a half-ass approach, if I should use
23 those words. It was like trying to -- you know,
24 the bleeding had already occurred, and the
25 projects were almost finished. It was too late.

Page 190

1  of $965, right?
2  A. 965, correct.
3  Q. And it's your signature; we
4  established that, correct?
5  A. Right.
6  Q. And what about the other writing on
7  the page?
8  A. That looks like Susie, the accounts
9  payable. I guess this is the account number
10 where she charged it.
11 Q. So that's not your handwriting?
12 A. No. This is mine. That's my only
13 signature, and this was for the Crown Majestic
14 theater.
15 Q. Okay. Now turning back to the check,
16 you can see the 965 was then picked up as part
17 of check number 113806, correct?
18 A. Yes.
19 Q. Now in terms of Mister -- or in terms
20 of BB Construction Consultants being paid, why
21 are you signing off on it?
22 A. It had to have a signature for the
23 work being performed. I assume -- I'm not
24 assuming, but I have to gather that this is
25 labor and material, equipment to perform field

Page 191

1  survey, foundation, that he had called me from
2  the job site and said that, you know, he had to
3  do this, and I probably gave him the verbal okay
4  to get the work done, something additional on
5  the job site.
6  Q. And under the policies, procedures and
7  practices of Crown Theatres, did you need to
8  approve invoices from BB Consultants for payment
9  prior to them being paid?
10 A. I approved every invoice that came
11 into that whole company.
12 Q. So the answer is yes?
13 A. The answer is yes.
14 Q. And are there -- in terms of what you
15 see, I think you identified Susie's handwriting
16 from accounts payable.
17 A. Yes.
18 Q. Is that a substantive approval or a
19 procedural approval, if you will?
20 A. I would say --
21    MR. WISSER: Object to the form.
22 Do you understand?
23    THE WITNESS: Yes, I do
24 understand.
25 A. I would say that was a procedural.

Page 192

1  Q. So basically the only person that
2  needed to approve one of these invoices from BB
3  Consultants for payment was you, and then it
4  would be paid by Crown Theatres, right?
5  A. No. It could have been approved by
6  Dan Crown, David Clifford. Could have been
7  approved by Kathy Nonemacher.
8  Q. With your approval, it would be paid,
9  to put it another way?
10 A. Yes. There were four signatures that
11 could handle that.
12 Q. Now I'm sure Mr. Wisser will be kind
13 enough to go through the entire notebook and
14 stipulate that it's your signature on each one
15 of these and it's authentic, right? When you
16 get an opportunity to actually look through it?
17    MR. WISSER: Sure.
18    MR. MARTIN: We'll try to do that
19 with a number of documents.
20    MR. WISSER: Right.
21 Q. So that we don't have to go through
22 each and every one of these, but let me -- I
23 mean, it almost doesn't matter which one I pick,
24 okay. Let me just give you an example. I
25 turned to Crown Theatres check number 118248 in

Page 193

1  the amount of $3,500, and then I have a document
2  that's attached to it that is an invoice from BB
3  Construction Consultants for professional
4  services of Paul Morgan Lighting Design Company,
5  and this invoice is for thirty-five hundred
6  dollars.
7      What -- In connection with
8  approving an invoice, this invoice or any
9  invoice like it, Mr. Daly, did you conduct any
10 investigation to make sure that Mr. Beacher had
11 actually done this work?
12 A. No. I relied on Mr. Martino to tell
13 me that.
14 Q. Did you rely on Mr. Beacher too?
15 A. Yes.
16 Q. How did you rely on Mr. Martino to
17 tell you that Mr. Beacher had done the work
18 that's represented in these invoices?
19 A. He was at the job sites, or his
20 architect of record was at the job sites to
21 confirm that these were okay to pay.
22 Q. There's only one signature on these,
23 in terms of one substantive approval signature,
24 and it's yours.
25 A. Yes.

Page 194

1    Q. On these documents I'll tell you that
2  I've gone through them and I don't see
3  Mr. Martino's signature on them. Why did you
4  have him sign off on the payment applications?
5  Do you understand what I'm referring to?
6    A. Yes.
7    Q. Why did you have him sign off on the
8  payment applications and not have him sign off
9  on the invoices from Mr. Beacher?
10   A. No particular reason. It was just the
11 way it was set up. That's all.
12   Q. And is it your best testimony that in
13 connection with each of the invoices from
14 Mr. Beacher, that you spoke with Mr. Martino to
15 make sure that the work had been performed by
16 Mr. Beacher?
17   A. Well, it is my best recollection, but
18 looking at this particular invoice, there's a
19 contract amount of 10,000, so there has to be a
20 contract outstanding that Mr. Beacher entered
21 into with another contractor, Paul Morgan
22 Lighting Design.
23   Q. You don't know that, though, sitting
24 here today?
25   A. No, I don't know that sitting here

Page 195

1  today.
2    Q. And you have never seen that contract?
3    A. I'm not saying I haven't. I don't
4  really remember it, but I'm just telling you it
5  was a contract for $10,200. There was a deposit
6  of $200 -- I'm sorry, $2,000. There was a
7  current billing of thirty-five hundred and there
8  was a balance due Mr. Morgan of forty-seven
9  hundred dollars.
10   Q. That's what it says on the document.
11   A. Yes.
12   Q. Okay. And what did you do -- not to
13 pick on this particular example, but while we're
14 on it, what did you do to make sure that that
15 actually was true?
16   A. I just relied on Mr. Beacher's
17 veracity, that this was correct, and this was
18 done, along with Mr. Martino.
19   Q. And how did you rely on Mr. Martino
20 again?
21   A. If there was a contract as such, and I
22 would say -- For instance, Paul Morgan Lighting
23 Services, preparation of interior and exterior
24 lighting, to the box office, apparently this was
25 not on the plans, and I would pick up the phone

Page 196

1  and ask Mr. Martino, he would verbally tell me
2  that "It's correct, does the figure of ten
3  thousand two sound reasonable to you?"
4      "Yes, it does."
5      "Okay, Bob, go ahead and get it
6  done."
7    Q. Okay.
8      MR. MARTIN: Let me mark this.
9      (Deposition Exhibit 8 marked
10     for identification.)
11   Q. Let me show you what we've marked as
12 group Exhibit 8, and it is a group of documents
13 that contains invoices from Crown Theatres --
14 I'm sorry, checks from Crown Theatres to BB
15 Construction Consultants, along with invoices
16 from BB to Crown Theatres, and again, if you
17 were to look through these documents, you'd see
18 that at least I believe you've signed off on
19 each of these, and there's various backup
20 documents.
21     MR. WISSER: What represents the
22 difference between this exhibit and the last?
23     MR. MARTIN: This is a subset of
24 the one that I just showed him.
25     MR. WISSER: Okay.

Page 197

1    Q. A subset.
2      MR. MARTIN: Essentially this
3  subset of documents is those documents for which
4  generally it is -- they purport to be expenses,
5  if you will, incurred by Mr. Beacher, okay?
6    A. Same as those.
7    Q. No. These, I'll show you, these
8  actually have some services in there. So let's
9  just take this example. The check number
10 127946, which is followed by an invoice, March
11 15th, 2000, from BB, and an invoice March 16th,
12 2000, from BB, each of those invoices have, at
13 least one of them has a Milton Daly signature on
14 it. Do you see that?
15   A. Yes.
16   Q. And the invoice for March 16, 2000, is
17 for $21,380, and it says that it represents the
18 purchase of interior step lights for 16
19 auditoriums, for auditoriums, entranceways in
20 the Odyssey 1570 auditorium.
21     Now with regard to this and these
22 types of documents, Mr. Daly, this purports to
23 be a document in which Mr. Beacher, through BB
24 Consultants, went out and spent money, correct?
25   A. I have to assume that, correct.

Page 198

1   Q. That's what the document purchase
2 purports to be?
3   A. Purports to be, right.
4   Q. And you approved that particular
5 document for payment?
6         MR. WISSER: You said spent
7 money. He could have incurred an expense
8 without actually having written his own check.
9         MR. MARTIN: That's fine.
10        MR. WISSER: Okay.
11  Q. Incurred an expense.
12  A. Yes.
13  Q. And that's what it purports to be,
14 that he incurred an expense of 21,000 some-odd
15 dollars, correct?
16  A. Yes.
17  Q. And with regard to -- and you go ahead
18 and approve it, and obviously, as you testified
19 before, you're relying upon Mr. Beacher's
20 veracity, that he actually incurred this
21 expense, correct?
22  A. Yes.
23  Q. As opposed to simply making it up out
24 of thin air, correct?
25  A. Yes.

Page 199

1   Q. But you're also relying on Mr. Martino
2 in the sense that when you saw invoices where
3 Mr. Beacher, through BB, had incurred expenses
4 in connection with the construction, you called
5 Mr. Martino to verify that those expenses were
6 actually incurred, correct?
7   A. Yes.
8   Q. And that was your practice with regard
9 to all of these invoices?
10  A. Most invoices.
11  Q. Okay.
12  A. Obviously not all of them. Too
13 voluminous to go through all of them, but that
14 was --
15  Q. That was the general practice, correct?
16  A. That was the general practice, correct.
17  Q. Now let me show you one other group
18 exhibit. We're going to take a break in a few
19 minutes, but what I'm going to ask you to do is
20 look through that notebook, the thin one, and
21 then I'll come back, when we go back on the
22 record, to ask you whether it was your practice
23 with regard to that thin notebook to make
24 telephone calls to Mr. Martino to ask if the
25 expenses were actually incurred, but meanwhile,

Page 200

1 let's mark this notebook.
2         (Deposition Exhibit 9 marked
3 for identification.)
4   Q. Okay, Deposition Exhibit 9 is again a
5 subset of Deposition Exhibit 7, except for it is
6 a subset that contains invoices for things that
7 are more related to services performed by BB
8 Consultants.
9         MR. WISSER: At the risk of
10 sounding too simple, is it fair to say that 8
11 and 9 together equal 7?
12        MR. MARTIN: I would hope so.
13        MR. WISSER: Okay.
14        MR. MARTIN: I would hope so.
15        MR. WISSER: Thank you.
16  Q. That's what I believe to be the case.
17 Crown Theatres check number 125522, and the
18 attached invoice is September 22, 1999, as well
19 as a number of other attached invoices. An
20 example of this is on the second page, September
21 22, 1999 invoice, complete the expediting
22 services for the interior permit submission to
23 Arundel County, et cetera, et cetera.
24         This invoice is again approved by
25 you, correct?

Page 201

1   A. Yes.
2   Q. That is your signature?
3   A. That's correct.
4   Q. And it -- and Susie is procedurally
5 approving it?
6   A. That's correct.
7   Q. Okay. Now this invoice is more along
8 the lines of Mr. Beacher performing services for
9 Crown Theatres, going and getting permits
10 approved, correct?
11  A. Okay.
12  Q. In connection with invoices like this
13 that are approving services that Mr. Beacher was
14 performing for Crown Theatres, did you rely on
15 Mr. Beacher's veracity that he actually did it?
16  A. Yes.
17  Q. Did you rely on Mr. Martino as well on
18 these types of invoices?
19  A. Not as often. In this particular
20 invoice, if I remember, only because it applied
21 to all the projects when we went to get building
22 permits from the towns and obviously a plethora
23 of permits required, there were invoices on
24 these. There's an invoice that should be
25 attached to this for this service.