Page 1

```
 1      UNITED STATES DISTRICT COURT
 2      FOR THE DISTRICT OF CONNECTICUT
 3  CROWN THEATRES, L.P,         )
 4        Plaintiff,             )
 5    -against-                  ) Case No.
 6  MILTON L. DALY, TAYLOR-LEIGH,) 3:02 CV 2272 (AVC)
 7  INC., ANNE E. DALY, JAMES C. )
 8  CELLA, G.U.S. DEVELOPMENT,   )
 9  INC., JAMES T. MARTINO, JAMES)
10  THOMAS MARTINO, ARCHITECT,   )
11  P.C, and RCD HUDSON, LLC,    )
12        Defendants.            )
13
14       The deposition of GLENN GARFINKEL, called
15  for examination, taken pursuant to the Federal Rules
16  of Civil Procedure of the United States District
17  Courts pertaining to the taking of depositions,
18  taken before ELIZABETH A. HONDROS, a Notary Public
19  within and for the County of Cook, State of
20  Illinois, and a Certified Shorthand Reporter of said
21  state, at Suite 4000, One IBM Plaza, Chicago,
22  Illinois, on the 19th day of January, A.D. 2004, at
23  10:15 a.m.
24
```

Page 2

```
 1  PRESENT:
 2
 3       JENNER & BLOCK, LLP,
 4       (One IBM Plaza,
 5       Chicago, Illinois 60611,
 6       312-222-9350), by:
 7       MR. CRAIG C. MARTIN and
 8       MR. ADAM HIRSCH,
 9          appeared on behalf of the Plaintiff;
10
11       MILBER MAKRIS PLOUSADIS & SEIDEN, LLP,
12       (108 Corporate Park Drive, Suite 200,
13       White Plains, New York 10604,
14       914-681-8700), by:
15       MS. MARISA LANZA,
16          appeared on behalf of Defendants
17          James T. Martino and James Thomas
18          Martino, Architect, P.C.
19
20
21
22
23  REPORTED BY: ELIZABETH A. HONDROS, C.S.R.,
24       Certificate No. 84-4241
```

Page 3

```
 1       (WHEREUPON, the witness was duly
 2       sworn.)
 3       GLENN GARFINKEL,
 4  called as a witness herein, having been first duly
 5  sworn, was examined and testified as follows:
 6       EXAMINATION
 7  BY MS. LANZA:
 8    Q.  Good morning, Mr. Garfinkel. My name is
 9  Marisa Lanza. I'm with the law firm of Milber
10  Makris Plousadis & Seiden, and I represent one of
11  the defendants, James T. Martino and James Thomas
12  Martino Architects in a lawsuit commenced by Crown
13  Theatres that is currently pending in the federal
14  court for the district of Connecticut. I just have
15  a few instructions for you before we begin today,
16  which I know you're an attorney. But I need you to
17  listen to my questions, and unless you tell me
18  otherwise, I'm going to assume that you understand
19  my question and are able to answer it truthfully.
20       I need you to let me finish my question.
21  As you know, the court reporter cannot take us both
22  speaking at the same time. And I also need to ask
23  you to keep all your answers verbally.
24       Do you understand those instructions?
```

Page 4

```
 1    A.  I do.
 2    Q.  Can you give me your full name for the
 3  record?
 4    A.  Glenn Todd Garfinkel.
 5    Q.  Can you give me your present employer?
 6    A.  Grobart and Levick, LLC.
 7    Q.  Where are they located?
 8    A.  Deerfield, Illinois.
 9    Q.  How long have you been with them?
10    A.  Since September 1st. Excuse me -- yes,
11  roughly September. August 24, September 1,
12  something like that.
13    Q.  2003?
14    A.  Yes.
15    Q.  Can you give me your education
16  background from post-high school and on?
17    A.  I attended the University of Illinois at
18  Champagne-Urbana, bachelor of arts and sciences.
19    Q.  What year did you get that degree?
20    A.  1984.
21    Q.  Did you have a bachelor of arts in --
22    A.  Political science was my major.
23       MR. MARTIN: That's why you had to go to law
24  school?
```

Page 73

1    After Milt Daly's departure for work in
2 progress, they would then be -- what previously was
3 submitted to Milt Daly and Bob Beacher and Jim
4 Martino for approval, it was submitted to both David
5 Clifford and myself.
6    Q.  So from 1998 to when Mr. Daly left in
7 2001 --
8    MR. MARTIN: He quit on June 1, 2001.
9 BY MS. LANZA:
10   Q.  -- did you have an opportunity to review
11 any payment applications?
12   A.  No, I did not.
13   Q.  Do you know who was responsible for
14 reviewing the payment applications on behalf of
15 Crown?
16   A.  Milt Daly.
17   Q.  Did anyone else review pay applications
18 at Crown?
19   A.  Review in what sense?
20   Q.  In any sense. Who reviewed pay
21 applications for payment?
22   A.  For approval?
23   Q.  For approval at Crown.
24   A.  To the best of my recollection, Milt

Page 74

1 Daly.
2    Q.  And who would review pay applications
3 for payment at Crown?
4    A.  Can you -- well, Milt Daly and the other
5 gentlemen, the other required signatures.
6    Q.  I'm just talking about people at Crown.
7    A.  I understand.
8    MR. MARTIN: By saying Crown, you're excluding
9 Beacher and Martino?
10   MS. LANZA: I'm excluding them for now. I'm
11 just talking about Crown personnel.
12 BY THE WITNESS:
13   A.  Under policy, to the best of my
14 knowledge, after the required signatures for
15 approval as to approval, then it would go down to
16 the accounts payable department. Then the accounts
17 payable clerk would then make payment after all the
18 required approvals were there.
19 BY MS. LANZA:
20   Q.  And whose required approval was
21 necessary to issue payment for the projects at Crown
22 or any other entity?
23   A.  Internally, Milt Daly's would be
24 required.

Page 75

1    Q.  And externally, whose approval would be
2 required?
3    A.  Generally, the construction consultant,
4 Bob Beacher, and the architect, Jim Martino, but,
5 again, I wasn't involved in that. That's just my
6 general recollection of the procedure.
7    Q.  Do you know whether any pay applications
8 were paid by Crown without the approval of either
9 Milt Daly, Bob Beacher, or Jim Martino?
10   MR. MARTIN: Object --
11 BY THE WITNESS:
12   A.  I don't think I can answer that.
13   MR. MARTIN: Object to the form of the
14 question.
15 BY MS. LANZA:
16   Q.  The question is: Do you know if any pay
17 applications were paid by Crown without the approval
18 of Milt Daly, Bob Beacher, or Jim Martino?
19   MR. MARTIN: Object to the form of the
20 question, lack of foundation.
21       In other words, the first question is:
22 Did you review all the pay applications? He's
23 testified that he didn't review all the pay
24 applications, so how could he know that?

Page 76

1    MS. LANZA: He might know that as being
2 in-house counsel to Crown or executive vice
3 president.
4    MR. MARTIN: Not without reviewing all the pay
5 applications.
6    THE WITNESS: Can I ask you a question?
7 BY MS. LANZA:
8    Q.  There's a question pending, so you need
9 to answer my question first.
10   MR. MARTIN: You don't need to answer her
11 question if you don't understand it.
12   MS. LANZA: If he doesn't know, he doesn't
13 know. That's a sufficient answer.
14 BY MS. LANZA:
15   Q.  My question is: Do you know if any
16 payment applications were paid without the approval
17 of Milt Daly, Bob Beacher, or Jim Martino?
18   A.  Whatever analogy I have is only in the
19 scope of a subsequent investigation.
20   Q.  Do you know if any pay applications were
21 paid by Crown?
22   A.  Yes.
23   Q.  Do you know how many?
24   A.  No, I do not.

Page 205

1  Q. Did Mr. Crown in his discussions with
2  you about the pending litigation ask you for your
3  legal advice?
4      MR. MARTIN: I just instructed him not to
5  answer these questions, including the substance of
6  the conversations.
7      Don't answer the question.
8      MS. LANZA: Well, I'm trying to establish
9  whether they were discussing legal issues.
10     MR. MARTIN: You've already done that. You've
11 already honed in on the litigation, and now you're
12 asking him about the substance of the conversations.
13     Don't answer the question. It's
14 privileged.
15     MS. LANZA: It's privileged only if he --
16     MR. MARTIN: You can argue with me.
17     MS. LANZA: -- if Dan Crown was seeking legal
18 advice from Mr. Garfinkel.
19     MR. MARTIN: I've already instructed him. If
20 you want to take it up somewhere else, take it up.
21     MS. LANZA: You can mark it.
22 BY MS. LANZA:
23  Q. Did you speak to anyone else at Crown
24 after you left in 2003?

Page 206

1   A. About this litigation?
2   Q. No, in general.
3      MR. MARTIN: What does it matter if he's
4  spoken in general?
5  BY MS. LANZA:
6   Q. Well, you spoke to Dan Crown. Have you
7  spoken to anybody else?
8      MR. MARTIN: It's not relevant. How is it
9  relevant? How is it reasonably calculated unless
10 you want to talk about the litigation?
11     MS. LANZA: Well, his connection to Crown
12 after left in 2003.
13     MR. MARTIN: You've already asked him what his
14 connection was.
15     MS. LANZA: I asked him if he spoke to Dan
16 Crown. He said four or five times.
17     MR. MARTIN: Yes. And so what if he spoke to
18 somebody else? What does it matter?
19     MS. LANZA: Then he can answer it.
20     MR. MARTIN: What does it matter? How is it
21 relevant to this litigation?
22     MS. LANZA: His connection to Crown in this --
23     MR. MARTIN: That he talked to somebody?
24     MS. LANZA: I'm not going to discuss it with

Page 207

1  the witness here.
2      MR. MARTIN: I mean did you call Ticket Master
3  today? That's relevant. I mean under your theory
4  of relevance, everything is relevant.
5      MS. LANZA: I'm not going to discuss the
6  relevancy of the question with the witness here in
7  the room, Mr. Martin.
8      MR. MARTIN: Well --
9      MS. LANZA: Why not? Because it goes to
10 whether -- it also goes to his credibility if he's
11 continued to speak to Crown Theatres over issues, if
12 he's still friendly with Mr. Crown.
13     MR. MARTIN: Go ahead. You can answer the
14 question.
15 BY THE WITNESS:
16  A. I have spoken to numerous employees for
17 Crown Theatres.
18 BY MS. LANZA:
19  Q. Can you list those employees that you've
20 spoken with?
21  A. Jeremy Welman, Tom Becker, Chris Douger,
22 Catherine Nonnemacher, Suzie Herrera, Beth Cimino,
23 Gigi Coutermash. I've spoken to every --
24  Q. Any of those individuals that you've

Page 208

1  spoken with, have you discussed the pending
2  litigation with them?
3   A. No.
4   Q. Have you spoken to Milt Daly since you
5  left Crown's employment in 2003?
6   A. No.
7   Q. Have you spoken to Bob Beacher since
8  you've left Crown's employment in 2003?
9   A. No.
10  Q. Have you spoken with Mr. Martino since
11 you left Crown's employment in 2003?
12  A. No.
13     MS. LANZA: Let's take a five-minute break
14 because I think I'm done.
15     (WHEREUPON, a recess was had.)
16 BY MS. LANZA:
17  Q. Mr. Garfinkel, you testified that you've
18 read Crown's complaint against Mr. Martino and his
19 firm, correct?
20  A. And others, yes.
21  Q. During your employment with Crown from
22 '98 until June of 2001, did you expect or was it
23 your knowledge that Mr. Martino was to review each
24 and every lease agreement prior to signing a payment

Page 209

1  application?
2      MR. MARTIN: Do you mean -- so that the
3  question is clear, do you mean was it his
4  expectation that Mr. Martino would review the big,
5  thick lease document --
6      MS. LANZA: Prior to signing the payment
7  application.
8      MR. MARTIN: -- prior to each payment
9  application? So before he signed each one, he'd
10 read it again?
11     MS. LANZA: Yes.
12 BY THE WITNESS:
13     A.  I don't know what custom and practice is
14 for architects.
15     MR. MARTIN: So you did not have any
16 expectations?
17     THE WITNESS: I have an expectation that he
18 would absolutely be familiar with the scope of our
19 work on an ongoing basis in the review of any and
20 all -- anything in connection with the project.
21 BY MS. LANZA:
22     Q.  What was the basis for your expectation
23 that Mr. Martino would be familiar enough with the
24 construction projects?

Page 210

1      A.  Based on my general understanding of a
2  request for payment documentation and a
3  certification that is signed by the architect,
4  just -- and in my general knowledge of what an
5  architect is to review, my expectation would be that
6  the architect would be extremely familiar, if not
7  intimately familiar, with the scope of the work and
8  who did what.
9      Q.  Now, the AIA contract or the AIA
10 documents that you keep referring were never part of
11 Mr. Martino's agreement with Crown because there was
12 no written agreement with Crown except for the
13 Minnesota project?
14     MR. MARTIN: Object to the form of the
15 question. That's a teratology.
16 BY MS. LANZA:
17     Q.  Was the AIA documents you were referring
18 to referenced in any sort of documents as being part
19 of Mr. Martino's scope of work?
20     A.  There is no --
21     MR. MARTIN: Objection to the form of the
22 question.
23 BY THE WITNESS:
24     A.  Again, there's no agreement.

Page 211

1      MR. MARTIN: There's no written agreements?
2      THE WITNESS: Right, a written agreement.
3  BY MS. LANZA:
4      Q.  Is it your understanding that the AIA
5  general conditions were part of any sort of verbal
6  agreement between Crown and Mr. Martino?
7      MR. MARTIN: Object to the form of the
8  question. It's been asked and answered. He
9  testified -- we went through this earlier. He
10 testified that it was custom and practice. He
11 testified about AIA. He testified about his
12 knowledge of architects. I mean, there's no reason
13 to go through this again.
14 BY MS. LANZA:
15     Q.  What about Mr. Daly? Did you have an
16 expectation that he would review the lease
17 agreements before approving each and every pay
18 application?
19     A.  No, I would not have that expectation.
20 But, again, Mr. Daly was intimately -- was familiar
21 with who did what, again, because he was involved in
22 the original discussions between the landlords who
23 did -- as to what party is responsible for what
24 work.

Page 212

1      Q.  Did you have knowledge of what the
2  responsibilities for what the various parties were
3  for each project?
4      A.  Yes.
5      Q.  Do you know why the payment applications
6  were never submitted to you also for approval?
7      A.  It was not within the purview of my job.
8      Q.  Who else would have had knowledge of
9  what was within the various parties' scope or
10 responsibilities at Crown?
11     MR. MARTIN: Objection, calls for speculation.
12 BY MS. LANZA:
13     Q.  Would Tom Becker have knowledge of what
14 the responsibilities to various parties were?
15     MR. MARTIN: Same objection, calls for him to
16 speculate. Ask Becker.
17     MS. LANZA: He testified that Mr. Martino
18 should have had it. So I'm asking should Tom Becker
19 have had the same knowledge?
20     MR. MARTIN: Same objection. Ask Tom Becker.
21 BY MS. LANZA:
22     Q.  You can still answer the question. He
23 made his objection.
24     A.  You'll have to ask Tom Becker. I don't