Page 1

```
 1    UNITED STATES DISTRICT COURT
      FOR THE DISTRICT OF CONNECTICUT
 2         CASE NO. 3:02CV2272AVC
 3   CROWN THEATRES, L.P.,
 4
          Plaintiff,
 5
      vs.
 6
     MILTON L. DALY, TAYLOR-LEIGH, INC.,
 7   ANNE E. DALY, JAMES C. CELLA, G.U.S.
     DEVELOPMENT, INC., JAMES T. MARTINO and
 8   JAMES THOMAS MARTINO, ARCHITECT, P.C.,
 9
          Defendants.
10                                           /
11
12
13     VIDEOTAPED DEPOSITION OF ROBERT L. BEACHER
14         VOLUME I, PAGES 1 - 124
15
16       Wednesday, February 25, 2004
         10:24 a.m. - 5:19 p.m.
17       Suite 1500
         200 East Broward Boulevard
18       Fort Lauderdale, Florida 33301
19
20
21
22   Reported By:
     Theresa Tomaselli, RPR, RMR
23   Notary Public, State of Florida
     Esquire Deposition Services
24   Fort Lauderdale Office
     Phone - 800.211.3376
25       954.331.4400
```

Page 2

```
 1   APPEARANCES:
 2   On behalf of the Plaintiff:
 3     JENNER & BLOCK, LLP
       One IBM Plaza
 4     Chicago, Illinois 60611
       BY: CRAIG C. MARTIN, ESQUIRE
 5     AND: MATTHEW H. RICE, ESQUIRE
       AND: LAWRENCE S. SCHANER, ESQUIRE
 6
 7   On behalf of the Defendants, Milton L. Daly,
     Anne E. Daly and Taylor-Leigh, Inc.:
 8
       WEINSTEIN & WISSER, P.C.
 9     Suite 207
       29 South Main Street
10     West Hartford, Connecticut 06107
       BY: KERRY M. WISSER, ESQUIRE
11
12   On behalf of the Defendants, James T. Martino, and
     James Thomas Martino, Architect, P.C.:
13
       MILBER, MAKRIS, PLOUSADIS & SEIDEN, L.L.P.
14     Suite 200
       108 Corporate Park Drive
15     White Plains, New York 10604
       BY: MARISA LANZA, ESQUIRE
16
17   ALSO PRESENT:
18     DANIEL CROWN
       GARY FISHER, Videographer
19
20
21
22
23
24
25
```

Page 3

```
 1                  - - -
                  I N D E X
 2                  - - -
 3
     DIRECT (ROBERT L. BEACHER)
 4   BY MR. MARTIN.................... 5
 5
                    - - -
 6              E X H I B I T S
                    - - -
 7
 8   Deposition I.D. Exhibit No. 1.................... 8
 9   Deposition I.D. Exhibit No. 2.................... 9
10   Deposition I.D. Exhibit No. 3.................... 9
11   Deposition I.D. Exhibit Nos. 4 & 5............ 27
12   Deposition I.D. Exhibit No. 6................... 42
13   Deposition I.D. Exhibit No. 7................... 52
14   Deposition I.D. Exhibit No. 8................... 76
15   Deposition I.D. Exhibit No. 9................... 86
16   Deposition I.D. Exhibit No. 10................. 86
17   Deposition I.D. Exhibit No. 11................. 86
18   Deposition I.D. Exhibit No. 12................. 89
19   Deposition I.D. Exhibit No. 13................. 99
20   Deposition I.D. Exhibit No. 14................. 99
21   Deposition I.D. Exhibit Nos. 15 - 21.......... 102
22
23
24
25
```

Page 4

```
 1           P R O C E E D I N G S
 2       THE VIDEOGRAPHER: We are now going on
 3   the video record. The time on the monitor is
 4   10:24 a.m. Today is Wednesday, the 25th day
 5   of February, 2004.
 6       We are here at 200 South Broward
 7   Boulevard, Fort Lauderdale, Florida, for the
 8   purpose of taking the videotaped deposition
 9   of Robert L. Beacher, Crown Theatres versus
10   Daly, et al., which is filed in the United
11   States District Court in Connecticut.
12       The videographer is Gary Fisher of
13   Esquire. The court reporter is Terry
14   Tomaselli of Esquire.
15       Will counsel announce their appearances
16   for the record and swear in the witness.
17       MR. MARTIN: Craig Martin, Larry
18   Schaner, and Matthew Rice for Crown Theatres.
19       MR. WISSER: Kerry Wisser, W-i-s-s-e-r,
20   on behalf of Milt Daly, Anne Daly, and
21   Taylor-Leigh, Inc.
22       MS. LANZA: Marisa Lanza from Milber,
23   Makris, Plousadis & Seiden for the
24   Defendants, James T. Martino and James Thomas
25   Martino, Architect, P.C.
```

ESQUIRE DEPOSITION SERVICES (954) 331-4400

Page 13

1    invoices from a company called G.U.S., G-U-S,
2    which were prepared by Mr. Jamie Cella.
3         And Mr. Cella submitted those invoices
4    to me under a different arrangement that
5    Mr. Daly had orchestrated on me getting
6    25 percent, I believe; Mr. Cella getting --
7    or G.U.S. keeping 20 percent, and the balance
8    would have gone to -- would have been paid by
9    one of my entities, most likely with B.B.
10   Construction Consultants to Taylor-Leigh, of
11   which the checks that I wrote to Taylor-Leigh
12   will substantiate what I have just said.
13   BY MR. MARTIN:
14        Q.   Okay. And is that your basic
15   understanding of what Crown alleges in this
16   lawsuit?
17        A.   Crown --
18             MR. WISSER: Objection. Relevance.
19             THE WITNESS: I'm sorry. Crown was
20        robbed of approximately $6 million, of which
21        Taylor-Leigh obtained through my entities of
22        $4.2 million.
23   BY MR. MARTIN:
24        Q.   Okay. Let me make sure I understand
25   what you're saying, Mr. Beacher. The -- what --

Page 14

1    the two questions that I have just asked you, is
2    that your understanding of what Crown alleges in
3    these lawsuits?
4         A.   Yes.
5              MR. WISSER: Objection. Relevance.
6    BY MR. MARTIN:
7         Q.   Okay. And with regard to the two
8    answers that you just gave me a moment ago about
9    your understanding of what Crown alleges, is it
10   your understanding that what Crown alleges is true?
11        A.   Absolutely.
12        Q.   And so your best testimony is that
13   approximately $6 million was stolen by you,
14   Mr. B. -- you, Mr. Daly, and to some extent,
15   Mr. Cella, correct?
16        A.   Correct.
17        Q.   And your best testimony is that Mr. Daly
18   stole approximately 4.2 million, correct?
19             MR. WISSER: Objection. Leading.
20             THE WITNESS: Correct.
21   BY MR. MARTIN:
22        Q.   Now, explain and describe the basis for
23   your understanding or your testimony that Mr. Daly
24   stole $4.2 million.
25        A.   Can you repeat the question, please?

Page 15

1         Q.   Sure.
2              Explain and describe the basis for your
3    testimony that Mr. Daly stole $4.2 million from
4    Crown Theatres.
5              MR. WISSER: Object to the form of the
6         question to the utilization of the term
7         "stole."
8    BY MR. MARTIN:
9         Q.   Go ahead. You can answer.
10        A.   Money was stolen.
11             MR. WISSER: Move to strike.
12             THE WITNESS: Mr. Daly devised a scheme
13        of where he wanted -- he was having trouble
14        getting his equity agreement completed with
15        Crown. And he was very upset about it, and
16        to say it mildly, extremely upset about it.
17             So, Milt felt that he was entitled to
18        have these fees. After -- when I say "these
19        fees" -- and let me walk you through of how
20        I'm trying to put this into the proper words.
21             After I would negotiate a contract
22        amount through a bidding process with a
23        particular general contractor that was going
24        to be the contractor awarded one of the jobs,
25        I would go back to Milt and tell Milt: I put

Page 16

1         to bed the contract amount.
2              Hypothetically, let's say $7 million on
3         one of the projects. Milt would then say to
4         me the very next day: This is great; you did
5         a good job. He says: Give me an invoice for
6         a million-one, million-two, whatever amount
7         he would pick out.
8              At that point in time, I would prepare
9         the invoice. I would fax it over to him
10        which would have been a continuation sheet on
11        the AIA form for his review, his approval, so
12        that the numbers -- so he could check out how
13        I was going to bill it in the described
14        numbers. All right.
15             Then in most cases, immediately after it
16        was done, after -- within the next day after
17        the contract was signed, I would submit a
18        bill for a vast amount of work that was never
19        performed.
20             This all leads back to, you know,
21        where -- you know...
22   BY MR. MARTIN:
23        Q.   After you would submit the bill for work
24   that was never performed, let me ask -- well, let
25   me put it like this: Who would you submit the bill

Page 97

1     down to, I believe, a little over $7 million,
2     I think it was. I'm not a hundred percent
3     sure. But we developed the contract down to,
4     I believe, a little over $7 million for them
5     to construct the building based upon the
6     plans, specifications of the architect, as
7     well as take into consideration the VE work
8     that was included into the contract amount.
9  BY MR. MARTIN:
10    Q.  Let me ask you a few questions. The
11 general contractor was contracting with the
12 landlord; is that correct?
13    A.  The general contractor had a contract
14 directly with the landlord.
15    Q.  Did the general contractor have a
16 contract with Crown Theatres?
17    A.  No, they did not.
18    Q.  Okay. And why was it structured that
19 way?
20    A.  The landlord wanted to control
21 everything on the project; however, this presented
22 a --
23    Q.  Was there work that Crown Theatres was
24 going to do?
25    A.  No.

Page 98

1        Excuse me. Yes, there was work. It
2  would be interior fit-out work, but not general
3  construction.
4     Q.  And why was it -- from Crown Theatres'
5  perspective, why was it structured that way?
6     A.  Crown Theatres didn't like it structured
7  that way.
8     Q.  Why not?
9     A.  Because Milt had no control over the
10 money by having De Guardiola build the building.
11 He then went to George De Guardiola and/or Bruce
12 Rendina, and between him and David Clifford and a
13 gentleman by the name of Pat DiSalvo from
14 De Guardiola, negotiated to have all change orders
15 billed directly to me, meaning B.B., okay, of which
16 then I submitted the change orders to Crown, okay,
17 which that provided Milt with an avenue to steal
18 the money.
19    Q.  Did you and Mr. Daly steal money in
20 connection with the Jupiter project?
21    A.  A lot of money.
22        MR. WISSER: Objection to the form of
23    the question.
24 BY MR. MARTIN:
25    Q.  How much money, approximately?

Page 99

1     A.  I would venture to say at least a
2  million and a half dollars. I'm not -- you know, I
3  would like to see the application. I could better
4  respond.
5        (The document was marked Deposition I.D.
6     Exhibit No. 13.)
7  BY MR. MARTIN:
8     Q.  Okay. Let me show you what we have
9  marked as Deposition Exhibit Number 13, which is
10 right in front of you, Mr. Beacher.
11    A.  I have it.
12    Q.  Would you identify that document?
13    A.  This is the lease agreement between
14 Crown Theatres and North County Land Holdings,
15 which would have been, to my knowledge, Abacoa Town
16 Center.
17       (The document was marked Deposition I.D.
18    Exhibit No. 14.)
19 BY MR. MARTIN:
20    Q.  Okay. And let me show you what we have
21 marked as Deposition Exhibit Number 14.
22    A.  Is there anything specific you want me
23 to see in this first amendment?
24    Q.  No. I would just like you to identify
25 it for the record.

Page 100

1     A.  That's a first amendment to the lease.
2     Q.  Okay. And as Crown's construction
3  consultant, were you familiar with these documents?
4     A.  Some of the terms of the document, yes.
5     Q.  Which terms in particular were you
6  familiar with?
7     A.  The Exhibit E, which would have been the
8  Crown -- description of tenants' work. I prepared
9  that document.
10    Q.  Did you discuss it with anyone?
11    A.  Yes.
12    Q.  Who?
13    A.  Milt Daly.
14    Q.  What did -- what did that discussion
15 entail?
16    A.  It would be just, you know, what -- you
17 know, this was all part of the overall building
18 program, so it would have been the landlord
19 building the buildings. The landlord has
20 everything.
21       These is the work -- this is the work
22 that was negotiated out of the landlord's work that
23 would be the tenant's responsibility in their lease
24 agreement.
25       So the conversation went that I was