CHUBB GROUP OF INSURANCE COMPANIES, AS SUBROGEE OF FINANCIAL INSTITUTIONS, INC., PLAINTIFF, -VS- BAISCH MECHANICAL PIPING, INC., DEFENDANT. BAISCH MECHANICAL PIPING, INC., THIRD-PARTY PLAINTIFF, -VS- NEWTON SHERMAN WILLEY, JR. AND SCHLEICHER-SOPER ARCHITECTS, LLP, D/ B/ A ARCHITEAM, THIRD-PARTY DEFENDANTS.

01-CV-6286 CJS

UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF NEW YORK

2002 U.S. Dist. LEXIS 25509

December 23, 2002, Decided

**DISPOSITION:** [*1] Third-party defendants', plaintiff's and defendant's motions for summary judgment denied as moot, and third-party defendants' motion to dismiss third-party complaint denied.

**COUNSEL:** For Plaintiff: James P. Cullen, Jr., Esq., Cozen & O'Connor, Philadelphia, PA.

For Plaintiff: Mark D. Goris, Esq., Law Office of Mark D. Goris, Cazenovia, NY.

For Defendant/ Third-Party Plaintiff: Andrew D. Merrick, Esq., Brown & Kelly, Buffalo, NY.

For Defendant/ Third-Party Plaintiff: Kevin Patrick Smith, Esq., Law Offices of Robert A. Stutman, P.C., New York, NY.

For Third-Party Defendants: George E. De More, Esq., Sugarman Law Firm, LLP, Syracuse, NY.

**JUDGES:** CHARLES J. SIRAGUSA, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** CHARLES J. SIRAGUSA

**OPINION:** DECISION AND ORDER

**INTRODUCTION**

**Siragusa, J.** This diversity action for property damage to a bank building, which resulted from a fire during construction, is now before the Court on the following motions: A. By [*2] plaintiff for partial summary judgment (docket # 31-1);

B. By third-party defendants John Vincent Novelli and Novelli Engineering, for summary judgment (docket # 33-1);

C. By third party defendants Newton Sherman Willey, Jr. and Schleicher-Soper Architects, LLP, for dismissal (docket # 33-2); and

D. By defendant for summary judgment (docket # 36-1).

Third-party defendants Novelli Engineering and John Vincent Novelli have been dismissed from this case by stipulation of the parties. Stipulation and Order (docket # 46) dismissing third-party defendants Novelli Engineering and John Vincent Novelli (Aug. 2, 2002). Therefore, their motion (docket # 33-1) is denied as moot. Immediately prior to oral argument, the Court was notified that plaintiff Chubb Group of Insurance Companies ("Chubb") and defendant Baisch Mechanical Piping, Inc. ("Baisch") settled their claims against one another. Thus, each of their applications (docket ## 31-1 & 36-1) is denied as moot. Finally, for the reasons stated below, the Court denies the application by third-party defendants Newton Sherman Willey, Jr. and Schleicher-Soper Architects, LLP, d/ b/ a Architeam (docket # 33-2) to dismiss the [*3] third-party complaint.

**LEGAL STANDARD FOR A MOTION TO DISMISS**

In considering a motion for dismissal under Rule 12, a defendant must show that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. See *H.J. Inc. v. Northwest Bell Telephone Co.*, 492 U.S. 229, 249, 106 L. Ed. 2d 195, 109 S. Ct. 2893 (1989); *see also* 2 MOORE'S FEDERAL PRACTICE, § 12.34[1][a] (Matthew Bender 3d ed.). The Court must view the complaint, and draw all reasonable inferences, in the light most favorable to the non-moving party. *Id.; see also* 2 MOORE'S FEDERAL PRACTICE, § 12.34[1][b] (Matthew Bender 3d ed.) (court must accept plaintiff's factual allegations as true).

**BACKGROUND**

This case involves a property damage claim resulting from a fire at the National Bank of Geneva ("Bank") branch office in Ovid, New York, which occurred on December 18, 2000. The building that sustained fire

damage was owned by Financial Institutions, Inc., the holding company for the Bank. The fire occurred when an employee of Baisch, Robert Carr ("Carr"), was soldering a pipe located inside a pipe chase. A leak in the pipe had been discovered **[*4]** and Carr was attempting to repair it. The fire evidently was caused by spatter from the soldering that ignited the paper backing of the insulation in the pipe chase and spread rapidly into the roof structure of the building. Financial Institutions, Inc., insured the building through Chubb.

Third-party plaintiff, Baisch Mechanical Piping, Inc. ("Baisch"), admits the fact of the fire, but states only that, "there may be a triable issue of fact with regard to Mr. Carr's ordinary negligence." Baisch claims that the fire was allowed to spread causing substantial damage to the building, because the building lacked adequate, necessary, and required fire stopping and fire containing components and features. Baisch alleges that third-party defendants Newton Sherman Willey, Jr. ("Willey") and Schleicher-Soper Architects, LLP ("Architeam"), were negligent and failed to exercise a reasonable, ordinary and generally acceptable degree of professional care, by failing to conform to generally accepted architectural standards and by failing to comply with the applicable codes and regulations in the design and construction of the building. Baisch further alleges that as a result of Willey's and Architeam's **[*5]** professional malpractice, the fire was caused to spread rapidly and did substantially more damage to the building than would have occurred had the design and construction of the building included adequate, necessary and required fire stopping and fire containing components and features.

### DISCUSSION

Willey and Architeam argue that since the obligations they had were pursuant to a contract between them and the Bank, Baisch is precluded as a matter of law from seeking contribution for economic damages arising out of a breach of contract claim. Thus, they seek dismissal of the third-party complaint pursuant to <u>Federal Rule of Civil Procedure 12(b)(6)</u>.

Under New York State's contribution statute, "two or more persons who are subject to liability for damages for the same personal injury, injury to property or wrongful death, may claim contribution among them whether or not an action has been brought or a judgment has been rendered against the person from whom contribution is sought." <u>Board of Educ. of Hudson City School Dist. v. Sargent, 71 N.Y.2d 21, 23, 517 N.E.2d 1360 (1987)</u> (citation omitted). Is well settled under New York law that,... a simple breach of contract is **[*6]** not to be considered a tort unless a legal duty independent of the contract itself has been violated ... This legal duty must spring from

circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract.<u>Clark-Fitzpatrick, Inc. v. Long Island R. Co., 70 N.Y.2d 382, 389, 521 N.Y.S.2d 653, 516 N.E.2d 190 (1987)</u> (citations omitted). Purely economic loss resulting from a breach of contract does not constitute "injury to property" within the meaning of New York's contribution statute, Civil Procedure Law and Rules 1401. <u>Sargent, 71 N.Y.2d at 23.</u>

"However, in claims against professionals, '[a] legal duty independent of contractual obligations may be imposed by law as an incident to the parties' relationship. Professionals ... may be subject to tort liability for failure to exercise reasonable care, irrespective of their contractual duties.'" <u>Vista Fee Associates v. Teachers Ins. and Annuity Ass'n of America, 259 A.D.2d 75, 83, 693 N.Y.S.2d 554 (N.Y. App. Div. 1st Dept. 1999)</u> (quoting <u>Sommer v. Fed. Signal Corp., 79 N.Y.2d 540, 551, 583 N.Y.S.2d 957, 593 N.E.2d 1365 (1992))</u> **[*7]** (citations omitted in original). Architeam has cited no authority contrary to the holding in <u>Vista Fee Associates</u> and the Court is not persuaded that under the circumstances, Baisch, as third-party plaintiff, could prove no set of facts in support of its claim that would entitle it to relief against Architeam.

### CONCLUSION

In view of the foregoing, third-party defendants John Vincent Novelli's and Novelli Engineering's motion for summary judgment (docket # 33-1) is denied as moot; plaintiff Chubb's motion for partial summary judgment (docket # 31-1) and defendant Baisch's motion for summary judgment (docket # 36-1) are denied as moot; and third-party defendants Willey's and Architeam's motion (docket # 33-2) to dismiss the third-party complaint is denied.

IT IS SO ORDERED.

DATED: DECEMBER 23, 2002

ENTER:

/S/

CHARLES J. SIRAGUSA

UNITED STATES DISTRICT JUDGE

Darien Asphalt Paving, Inc. v. Town of Newtown et al.

CV 9804878

SUPERIOR COURT OF CONNECTICUT, JUDICIAL DISTRICT OF HARTFORD - NEW BRITAIN, AT NEW BRITAIN

1998 Conn. Super. LEXIS 3496

December 3, 1998, Decided
December 7, 1998, Filed

**NOTICE:**

**PUB-STATUS:** [*1] THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

**DISPOSITION:** KBAI's motion to strike counts six, seven, eight and nine on the ground that they are barred by the economic loss doctrine denied. KBAI's motion to strike count eight on the ground that it is legally insufficient and that a CUTPA claim based on professional negligence cannot be brought against KBAI, denied. KBAI's motion to strike count nine on the ground that it is legally insufficient granted.

**JUDGES:** NADEAU, J.

**OPINIONBY:** NADEAU

**OPINION:** MEMORANDUM OF DECISION ON MOTION TO STRIKE BY DEFENDANT KAESTLE BOOS (DOCUMENT # 104)

The plaintiff, Darien Asphalt Paving, Inc., filed a nine-count complaint against the Town of Newtown (the town); O & G Industries, Inc. (OGII), a construction company; and Kaestle Boos Associates, Inc. (KBAI), an architectural firm. The plaintiff alleges that the town and KBAI entered into a design contract to expand and improve the town's high school. The town also entered into a contract with OGII to perform the necessary construction. In a separate contract, the town hired the plaintiff to perform site [*2] work on the project. The plaintiff alleges in count one that the town breached the contract. The plaintiff alleges in count two that OGII was negligent in its role as construction manager in ensuring that the plaintiff was paid for its services. The plaintiff alleges in count three that OGII's actions were willful and malicious. The plaintiff alleges in count four that OGII's actions constitute a violation of the Connecticut Unfair Trade Practices Act (CUTPA). The plaintiff alleges in count five that OGII

intentionally interfered with the plaintiff's contractual relationship with the town. The plaintiff alleges in count six that KBAI was negligent in the performance of its duty to act upon the plaintiff's applications for payment and to act in conjunction with OGII to either issue a certificate of payment or notify the plaintiff of reasons why the certificate was being withheld. The plaintiff alleges in count seven that these actions by KBAI were willful and malicious. The plaintiff alleges in count eight that these actions constitute a violation of CUTPA. The plaintiff alleges in count nine that by virtue of these actions, KBAI intentionally interfered with the plaintiff's contractual [*3] relationship with the town.

KBAI moves to strike counts six through nine of the plaintiff's complaint on the grounds that (1) each is barred by the economic loss doctrine; (2) the allegations in count eight are insufficient to support a CUTPA claim against a professional; and (3) the allegations in count nine do not state a claim for tortious interference with a contract because there are no allegations of improper motives or means. The plaintiff argues in response that the economic loss doctrine does not bar the claims made here, and that the allegations in counts eight and nine sufficiently state causes of action for CUTPA and intentional interference with contractual relations, respectively.

II. DISCUSSION

"The purpose of a motion to strike is to contest . . . the legal sufficiency of the allegations of any complaint . . . . to state a claim upon which relief can be granted . . . [The court] must take as true the facts alleged in the plaintiff's complaint and must construe the complaint in the manner most favorable to sustaining its legal sufficiency . . . If facts provable in the complaint would support a cause of action the motion to strike must be denied." (Citations [*4] omitted; internal quotation marks omitted.) *Peter-Michael, Inc. v. Sea Shell Associates*, 244 Conn. 269, 270-71, 709 A.2d 558 (1998).

A. Economic Loss Doctrine

The first point of inquiry for the court is whether the Connecticut courts recognize the economic loss doctrine. The economic loss doctrine is "a judicially created doctrine which bars recovery in tort where the relationship between the parties is contractual and the only losses alleged are economic." _Frey Dairy v. A.O. Smith Harvestore Products, 886 F.2d 128, 129 (6th Cir. 1989)._ KBAI asserts that although our appellate courts have yet to expressly adopt the economic loss doctrine, several cases indicate that they would do so. The cases relied upon by KBAI, however, are easily distinguishable. First, _UOP v. Andersen Consulting, 1997 Conn. Super. LEXIS 1090,_ Superior Court, judicial district of Stamford/Norwalk at Stamford, Docket No. 145753 (April 24, 1997, _Lewis, J.),_ discusses the economic loss doctrine in the context of _Illinois_ law, and thus cannot be of significance in determining whether Connecticut courts have adopted the doctrine. Second, _in Doyle v. A&P Realty Corp., 36 Conn. Supp. 126, 414 A.2d 204 (1980),_ condominium [*5] owners brought suit against the architect and developers of the project, alleging structural deficiencies. The court noted that if the architect had raised the issue of lack of privity on the part of the plaintiffs as a ground for striking certain counts due to lack of standing, then the outcome may have been different. _Id., 128._ This observation is nothing more than dicta, as the court went on to state that it need not decide this issue since it had not been raised by the parties and was not necessary to a determination of the subject motion to strike. _36 Conn. Supp. at 128-29._ This portion of _Doyle_ has not been commented on by any subsequent court. The third Connecticut case cited by KBAI in its motion to strike is _Verdon v. Transamerica Ins. Co., 187 Conn. 363, 446 A.2d 3 (1982)._ As KBAI points out, however, this was a products liability case, governed by statutes precluding recovery for economic loss in a products liability suit. See _General Statutes 52-572n(c)_ ("As between commercial parties, commercial loss caused by a product is not harm and may not be recovered by a commercial claimant in a product liability claim. An action for commercial loss caused by a product may be [*6] brought only under, and shall be governed by, title 42a, the Uniform Commercial Code"). Therefore, none of the three cases cited by KBAI in its motion to strike provides persuasive authority for the proposition that the economic loss doctrine has been recognized by Connecticut courts.

In a subsequent filing in support of its motion to strike, KBAI cites _DeVillegas v. Quality Roofing, Inc., 1993 Conn. Super. LEXIS 3185,_ Superior Court, judicial district of Fairfield at Bridgeport, Docket No. 294190, 10 CONN. L. RPTR. 487 (November 30, 1993, _Freedman, J.),_ as authority for the proposition that the Connecticut Supreme Court has long recognized the economic loss doctrine. The court in _DeVillegas_ cites _Connecticut Mutual Life Ins. Co. v. N.Y & N.H.R.R. Co., 25 Conn. 265 (1856)._

The facts of _Connecticut Mutual_ include the following. A Dr. Beach had a life insurance policy with the plaintiff. _Id., 266._ Dr. Beach was a passenger in the defendant's train when the car he was riding in derailed and plunged into a stream, killing him. _Id._ Dr. Beach's widow was paid by the plaintiff pursuant to the life insurance policy. _25 Conn. 265, 266-67._ The plaintiff then brought suit against the defendant [*7] on the theory that it had to pay under the policy due to the defendant's negligence. A large portion of the court's opinion is devoted to determining whether there is a common law cause of action for wrongful death. _25 Conn. 265, 271-74._ The court then examined "whether a plaintiff can successfully claim a legal injury to himself from another, because the latter has injured a third person in such a manner that the plaintiffs' contract liabilities are thereby affected." _Id., 274._ The court went on to discuss whether a third party would be able to recover when two parties enter into a contract which results in the third party being monetarily injured. _25 Conn. 265, 275-76._ The court held: "In the absence of any privity of contract between the plaintiffs and the defendants, and of any direct obligation of the latter to the former growing out of the contract or relation between the insured and the defendants, the loss of the plaintiffs, although due to the acts of the railroad company, being brought home to the insurers only through their artificial relation of contractors with the party who was the immediate subject of the wrong done by the railroad company, was a remote and indirect consequence [*8] of the misconduct of the defendants, and not actionable." _25 Conn. at 276-77._ Thus, the thrust of the holding in _Connecticut Mutual_ was to set forth standards by which to assess whether a plaintiff's injury was foreseeable, and therefore, whether that party could recover. The concept of privity was utilized to measure the remoteness of the competing parties' interests to determine whether the injured party's loss was foreseeable.

_Connecticut Mutual_ has been cited almost exclusively for its holding on a common law wrongful death cause of action. The privity concept is cited by only two subsequent Supreme Court decisions. In _Fidelity & Casualty Ins. v. Sears, Roebuck & Co., 124 Conn. 227, 199 A. 93 (1938),_ n1 the plaintiff was the workers' compensation insurer for _Hathaway. 124 Conn. at 229._

Hathaway was employed by the defendant, and in the course of this employment, one of Hathaway's agents was injured by the negligent or intentional act of one of the defendant's agents. *Id.*, 230. Hathaway and the plaintiff paid a workers' compensation claim as a result of the defendant's tortious act. *Id.* The court determined that based upon the lack of privity of contract between [*9] the plaintiff and the defendant, the trial court had properly sustained the defendant's demurrers. *Id.*, 236. In so finding, the court relied expressly upon the holding of *Connecticut Mutual*, as well as *McNary v. Chamberlain*, 34 Conn. 384, 388-89 (1867) (privity shown by defendant's actual intent to injure the plaintiff in his contractual relation by the wrongful act committed) and *Gregory v. Brooks*, 35 Conn. 437, 449 (1868) (wrongful act to a third party sustaining a business relation with the plaintiff done by fraud or malice is actionable and not within the rule). 124 Conn. at 233-35.

- - - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n1 It is interesting to note that Fidelity has been cited subsequently by the Supreme Court only for its discussion regarding the similarities and differences between contribution and indemnification.

- - - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -

The requirement of privity of contract in *Connecticut Mutual* and *Fidelity* does not amount to the adoption by our Supreme Court of the economic loss doctrine. For example, the holding in *Fidelity* was limited [*10] by the court, which noted that the case before it did not involve tortious interference claims, but rather harm springing from a contractual agreement. *Fidelity & Casualty Ins. Co. v. Sears, Roebuck & Co., supra*, 124 Conn. 235-36. As was the case in *Connecticut Mutual*, the *Fidelity* claim arose in the context of insurance law, and both cases therefore are distinguishable from the case at bar. The allegations in counts six through nine of the complaint here are not based in contract, but rather tort. As stated by our Supreme Court in *Coburn v. Lenox Homes, Inc.*, 173 Conn. 567, 574, 378 A.2d 599 (1977), "the requirement of privity should only be applicable to actions growing out of contract theory and should be irrelevant to tort actions." The *Coburn* court went on to hold that the touchstone for recovery by a plaintiff is not a privity relationship with the tortfeasor, but rather whether the injury was foreseeable. *Id.*, 575. The second case relying on the *Connecticut Mutual* privity concept is *Blake v. Levy*, 191 Conn. 257, 464 A.2d 52 (1983). *Blake* involved a claim of tortious interference with a business relationship. *Id.*, 259. In *Blake*, [*11] the court

determined: "The plaintiff argues correctly that the trial court erred in its conclusion that the plaintiff's complaint was insufficient because of the absence of an allegation of privity between the parties. Although this court has required privity of contract in order to sustain a claim for negligent interference with contract obligations; *Fidelity & Casualty Ins. Co. v. Sears. Roebuck & Co.*, 124 Conn. 227, 233-34, 199 A. 93 (1938); *Connecticut Mutual Life Ins. Co. v. N.Y. & N.H.R. Co.*, 25 Conn. 265, 276 (1856); there is no such requirement in cases involving intentional interference with business relations. *Gregory v. Brooks*, 35 Conn. 437, 446 (1868); *McNary v. Chamberlain*, 34 Conn. 384, 388 (1867)." 191 Conn. at 259. No indication is given in *Blake* that the economic loss doctrine has been adopted by our Supreme Court. Rather, the holding of *Blake* merely sets forth the elements for negligent and intentional interference with business relationship causes of action.

Thus, *Connecticut Mutual* and its progeny indicate that the economic loss doctrine has not been adopted by our appellate courts. Only one Superior Court decision, DeVillegas, has [*12] determined that the doctrine is recognized by Connecticut. On the other hand, an earlier Superior Court decision with facts more similar to those here reached the opposite conclusion. In *City of Danbury v. Flaherty Giavara Associates, Inc.*, Superior Court, judicial district of New Haven, Docket No. 245246 (November 3, 1988, *Schaller, J.*) (4 C.S.C.R. 2), then-Judge Schaller found that there were no Connecticut cases where the Supreme Court attempted to draw a distinction between economic and personal or property damages. The court went on to state that a "majority of jurisdictions have held that the absence of privity of contract is not a bar to negligence actions by construction professionals against one another for economic losses where reliance by the plaintiff was reasonably foreseeable." *City of Danbury v. Flaherty Giavara Associates, Inc., supra*, 4 C.S.C.R. 3.

Based upon the foregoing analysis, this court declines to find that the Connecticut courts recognize the economic loss doctrine as a bar to tort actions where the relationship between the parties is contractual and the only losses alleged are economic. The appellate courts have not seen fit to recognize [*13] the doctrine. Therefore, KBAI's motion to strike counts six through nine on the grounds that the claims made therein are barred by the economic loss doctrine is denied.

B. Count Eight--CUTPA

KBAI argues that count eight should be struck for the additional reason that the plaintiff's allegations regarding KBAI's alleged violation of CUTPA are insufficient because they do not satisfy the "cigarette rule." The plaintiff contends that the pleadings are legally sufficient.

"It is well established that in determining whether [an act or] practice violates CUTPA [Connecticut courts] have adopted the criteria set out in the cigarette rule by the federal trade commission for determining when [an act or] practice is unfair: (1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise--whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [competitors or other [*14] businessmen] . . . All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." (Citations omitted; internal quotation marks omitted.) *Jacobs v. Healey Ford-Subaru, Inc.*, 231 Conn. 707, 725, 652 A.2d 496 (1995).

Viewing the allegations in the plaintiff's complaint in their most favorable light, a legally sufficient cause of action under CUTPA has been alleged. The alleged harm caused to the plaintiff due to the alleged negligence of KBAI is substantial, including: severe impairment of the plaintiff's cash flow which hampered the plaintiff's ability to perform its work; damage to the plaintiff's reputation and credit standing; undermining the plaintiff's bonding capacity; and preventing the plaintiff from undertaking other work. (Complaint, Count 6, 15.) It is further alleged that these harms are likely to cause the complete failure and collapse of the company. *Id.* Therefore, the plaintiff's CUTPA allegations satisfy the cigarette rule, and the motion to strike on this ground is denied.

Finally, n2 KBAI moves [*15] to have count eight struck on the ground that CUTPA claims brought against professional parties are limited to the entrepreneurial or commercial aspects of the profession, rather than claims of professional malpractice. The plaintiff argues that its CUTPA claim goes to the commercial aspects of KBAI's relationship with it.

- - - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n2 KBAI also argues that the plaintiff's CUTPA claim should be struck on the ground that a CUTPA claim cannot be based on negligence. Because KBAI has not adequately briefed this issue, it is deemed to have been waived. Commission on Human Rights & Opportunities v. Truelove & Maclean, Inc., 238 Conn. 337, 344 n. 11, 680 A.2d 1261 (1996).

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

The Supreme Court has held that "professional negligence--that is, malpractice--does not fall under CUTPA. Although *physicians and other healthcare providers* are subject to CUTPA, only the entrepreneurial or commercial aspects of the profession are covered, just as only the entrepreneurial aspects of the *practice of law* are covered by CUTPA." (Emphasis [*16] added.) *Haynes v. Yale-New Haven Hospital*, 243 Conn. 17, 34, 699 A.2d 964 (1997). This concept was restated in *Beverly Hills Concepts, Inc. v. Schatz & Schatz*, 247 Conn. 48, 79, 717 A.2d 724 (1998), a case involving allegations of legal malpractice, where the court held: "Accordingly, as in the health care context, 'we conclude that professional negligence--that is, malpractice--does not fall under CUTPA.'"

The Supreme Court has not yet limited the application of CUTPA to other professionals, such as architects. The cases only speak to limits on CUTPA claims brought against healthcare providers and lawyers. The Supreme Court has articulated public policy reasons why CUTPA claims brought against these groups of professionals are limited solely to the entrepreneurial or commercial aspects of the profession. *Haynes v. Yale-New Haven Hospital, supra*, 243 Conn. 34-5.

KBAI advances no law or argument as to why architects should be treated in the same manner as healthcare providers and attorneys. This court declines to make a groundless expansion of the Supreme Court's rule in *Haynes* to other professional groups. KBAI's motion to strike count eight is therefore [*17] denied, as the plaintiff may base a CUTPA claim on KBAI's alleged professional negligence, that is, its alleged malpractice.

C. Count Nine--Tortious Interference

KBAI argues that the plaintiff has failed to allege sufficient facts to support a claim for tortious interference with contractual relations. n3 "For a plaintiff successfully to prosecute such an action it

must prove that the defendant's conduct was in fact tortious. This element may be satisfied by proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation . . . or that the defendant acted maliciously . . . In *Blake [v. Levy, supra,*], we also determined that in an action for intentional interference with business relations . . . the better reasoned approach requires the plaintiff to plead and prove at least some improper motive or improper means." (Citations omitted.) *Wellington Systems, Inc. v. Redding Group, Inc.*, 49 Conn. App. 152, 166-67, 714 A.2d 21 (1998). "To raise an allegation of wilful conduct, the plaintiff must clearly plead that the [harm] was caused by the wilful or malicious conduct of the defendants." (Internal quotation marks omitted.) *Holler v. Buckley [*18] Broadcasting Corp.*, 47 Conn. App. 764, 769, 706 A.2d 1379 (1998).

- - - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n3 KBAI also argues that the plaintiff has failed to allege any privity between it and KBAI. Count nine is an intentional interference with contractual relationship claim. As previously discussed, supra, the plaintiff is not required to allege or prove privity for such a claim.  Blake v. Levy, supra, 191 Conn. 259.

- - - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -

The plaintiff here has not alleged that KBAI's actions were the result of any improper motive or means. As such, the allegations are legally insufficient and KBAI's motion to strike count nine is granted.

III. CONCLUSION

KBAI's motion to strike counts six, seven, eight and nine on the ground that they are barred by the economic loss doctrine is denied. KBAI's motion to strike count eight on the ground that it is legally insufficient and that a CUTPA claim based on professional negligence cannot be brought against KBAI, is denied. KBAI's motion to strike count nine on the ground that it is legally insufficient is granted. [*19]

NADEAU, J.

1999 Conn. Super. LEXIS 2180

Winsted Land Development et al. v. Design Collaborative Architects, P.C. et al.

CV 960071571

SUPERIOR COURT OF CONNECTICUT, JUDICIAL DISTRICT OF LITCHFIELD, AT LITCHFIELD

1999 Conn. Super. LEXIS 2180

August 12, 1999, Decided
August 12, 1999, Filed

**NOTICE:**
**PUB-STATUS:**     [*1]     THIS DECISION IS
UNREPORTED AND MAY BE SUBJECT TO
FURTHER APPELLATE REVIEW. COUNSEL IS
CAUTIONED TO MAKE AN INDEPENDENT
DETERMINATION OF THE STATUS OF THIS
CASE.

**DISPOSITION:** Court awards plaintiffs $ 1,516,716
in damages plus costs.

**JUDGES:** PETER EMMETT WIESE, JUDGE.

**OPINIONBY:** PETER EMMETT WIESE

**OPINION:** Memorandum of Decision

The plaintiffs, the Winsted Land Development (WLD)
and Ledgebrook, L.L.C. (Ledgebrook) commenced an
action against the defendants, Kasper Associates, Inc.
(Kasper) and Design Collaborative Architects, P.C.
(DCA). The plaintiffs allege the defendants: breached
written and oral contracts, breached a fiduciary duty
and an express warranty of workmanship, committed
malpractice, fraudulent concealment and negligent
misrepresentation, and violated the Connecticut Unfair
Trade Practices Act (CUTPA), General Statutes 42-
110 et seq.

Briefly stated, the dispute centers on the filling of
approximately six acres of wetlands during the
construction of a shopping plaza in Winchester,
Connecticut, known as "the Shops at Ledgebrook."
The issue presented is whether Kasper and/or DCA
had the responsibility to notify WLD and Ledgebrook
of the need to obtain and procure on their behalf
United [*2] States Army Corps of Engineers (ACOE)
and Connecticut Department of Environmental
Protection (DEP) permits prior to the disturbance of
wetlands.

The trial was held over twenty days from June 23,
1998 to September 11, 1998. The parties introduced
both lay and expert testimony and 171 exhibits. From

March to May of 1999, the parties filed post-trial briefs
and proposed findings of fact.

FACTS

From the credible evidence presented at trial, the court
finds the following relevant facts. WLD is a
partnership consisting of John Lombard, Robert
Lombard and Frank Lombard. Ledgebrook is a limited
liability company which is owned by three other
limited liability companies. These three companies are
owned by family members of John, Frank and Robert
Lombard with John Lombard's children holding a
majority interest. John Lombard is the manager of
Ledgebrook, L.L.C., and, in this capacity, is aware of
the day-to-day activities and makes business decisions
necessary for its operation.

During all relevant times, Kasper was licensed in the
state of Connecticut to perform land survey and
professional engineering services. DCA is licensed to
perform professional architectural services.     [*3]
Joseph Kasper is a licensed land surveyor and the
principal in both Kasper and DCA.

In 1986, Kasper employed in excess of 100 persons.
Kasper consisted of numerous departments,
concentrating in land survey, civil engineering,
structural engineering, environmental engineering,
mechanical engineering, electrical engineering, traffic
engineering and photo-grammetry. Kasper was
marketed as a full-service, multi-disciplined firm. At
all relevant times, Kasper was experienced in the
development of commercial retail centers. Kasper and
DCA held themselves out as licensed and competent
engineers and architects.

John Lombard is currently employed as a real estate
manager of commercial properties. He is licensed in
the state of Connecticut as a real estate broker. Prior to
this specific project, John Lombard's experience in real
estate was limited to buying and selling apartment
buildings. Frank Lombard, John Lombard's cousin, is
an attorney with offices in Waterbury and Southbury.

Frank Lombard's practice is concentrated in personal injury and workers' compensation law. Robert Lombard, Frank Lombard's brother, is the owner of an automobile dealership in Winchester.

Prior to this [*4] project, the Lombards did not have experience with land use regulations or site development. They had not made applications to federal, state or local agencies regarding land use, including the ACOE or the DEP.

In 1985, approximately eighty-six acres of land located in close proximity to Robert Lombard's automobile dealership became available for purchase. This property had substantial frontage on Route 44, a state highway and thoroughfare. The southerly portion of the property is situated on Route 44 and is zoned for commercial purposes. A portion of the northerly section of the property is zoned for residential use. The Lombards negotiated a purchase price of $ 387,000 with a one-year option for one hundred dollars. The Lombards formed WLD, exercised the option, and purchased the property. Robert and Frank owned 25 percent and John owned the remaining 50 percent of WLD. WLD financed the purchase.

Initially, the Lombards were uncertain of the appropriate use of the property. As a result of their inexperience, the Lombards began discussions with several commercial developers concerning the sale of the site and other possible joint ventures. In addition, they consulted with [*5] Winchester town officials to ascertain the needs of the community. These officials expressed the need for a commercial shopping center. John Lombard conferred with individuals affiliated with the Finast food store chain about expanding its operations on the Winchester property.

In 1985, John Lombard had a meeting with Joseph Kasper and members of his staff. Joseph Kasper introduced himself as the president of Kasper and he advised Lombard his firm could provide comprehensive services for the development. Joseph Kasper told Lombard that his company had superior knowledge, skill and expertise in the development of shopping centers. Kasper's expertise included providing notice to clients of jurisdictional constraints and requirements of all governmental agencies and assisting in determining the need to obtain the necessary permits and approvals for a project. Since the Lombards had no experience in the development and construction of shopping centers, the prospect of Kasper providing all of the relevant services appealed to them.

One of Joseph Kasper's practices was to inform potential clients that he would use his firm's full resources to assist clients on their projects. Kasper [*6] also indicated that he was personally familiar with people associated with state regulatory agencies and that these contacts could be utilized to the client's advantage. Kasper recognized the Lombards were unsophisticated in the field of commercial development. Kasper performed professional services for WLD prior to a contract between the parties. Kasper made inquiries about the Winchester property and produced at least one contour map of the property, which map was dated December 1985. (Plaintiffs' Exhibit 107.)

On January 17, 1986, Kasper and WLD entered into a contract. (Pls.' Ex. 11.) Cathyann Plumer, Kasper's director/landscape architect, signed the agreement as the agent of Kasper. In return for $ 32,200, Kasper agreed to perform a variety of professional services. The scope of the services are identified as " Task 1" and "Task 2" of the agreement. Task 1 provided, in relevant part, for the preparation of a topographical map and the field marking and survey of wetland soils. Kasper did not have a soil scientist on its staff. Accordingly, the agreement indicated Kasper's fee included the cost of procuring professional services from outside sources. Task 2 provided for a feasibility [*7] study to include in part the preparation of a site analysis map and site schematics for both residential and commercial developments. Task 2 also required Kasper to review its development conclusions with WLD.

The purpose of a feasibility study is to ascertain the suitability of a piece of property for an intended project. Included within this study is the identification of the property's physical constraints and the determination of the required governmental approvals and permits. A site analysis map is prepared during the study. This document depicts the constraints on the property--i.e., zoning, topography and wetlands. At no time did Kasper notify WLD that its research would not address the ACOE and DEP permits.

Plumer left Kasper shortly after the 1986 agreement was executed. She was replaced by James Swift who became the project manager assigned to WLD. In this capacity, Swift provided site design and project management services and he coordinated the work of Kasper's site planning professionals.

In site planning, a team of professionals includes architects, engineers and surveyors. Their role is to design a project which meets the needs of the client and addresses [*8] the constraints of the particular

site. From 1986 to 1990, these site planners interacted with municipal, state and federal agencies regulating land development.

In 1985, Swift became licensed as a landscape architect. Joseph Kasper was not personally involved in the project on a day-to-day basis. Swift played no role in the project prior to the January 17, 1986 agreement; thus, he was not aware of the initial discussions between Kasper and WLD.

Joseph Kasper encouraged his professional staff to market the firm. In accordance with this policy, Swift marketed Kasper as a full service organization capable both of site surveys and construction design. In those instances in which a client required a service that Kasper could not provide, Swift would advise the client such service could be subcontracted out or, in the alternative, the client could make its own arrangements to secure the same.

As a landscape architect and land development professional, Swift was aware clients often relied on him for his technical guidance and his knowledge of government regulations and permit requirements. At trial, Swift acknowledged the services provided by an engineer, surveyor or site [*9] planner often varied depending on the clients' level of sophistication. He knew that WLD was not sophisticated in land development. As Kasper's project manager, it was Swift's responsibility to obtain the necessary permits for the WLD project as designed. n1 Swift testified at trial that "any permits that . . . [Kasper] knew of that were needed for the shopping center, we would have pointed them out to the client." (Transcript, Aug. 4, 1998, p. 84.)

- - - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n1 The Lombards and Kasper have had at one least one other business dealing pertaining to site development and the procurement of a DEP permit. In 1986, Kasper was providing professional services to the Lombard Realty Partnership in connection with the development of retail stores in Waterbury, Connecticut known as the "Reidville Project." An application was made to the DEP for permission to relocate a watercourse and to disturb wetlands. (Pls.' Ex. 29.) The DEP approved the work. (Pls.' Ex. 31.) Swift was aware of Reidville at the time of the WLD project.

- - - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -

From [*10] the earliest stages of the project, it was readily apparent there existed a substantial number of acres of wetlands on the site. Wetlands are a valuable natural resource primarily because they provide food and habitat for wildlife and a natural water storage area during floods and storms. Wetlands also purify water not only by filtering and removing pollutants, but also by assimilating and recycling them. (Pls.' Ex. 103.) Landscape architects and other design professionals are concerned about the environment and preserving wetlands. Wetlands are regulated by numerous government agencies to include the ACOE, DEP, and municipal inland wetlands commissions.

The ACOE and the DEP require those who desire to disturb wetlands to apply for a permit. Failure to comply with that requirement may result in civil or criminal penalties. The federal and state definitions of wetlands are not identical. A state wetland is identified as poorly and very poorly drained soils and all alluvial soils. A federally designated wetland has three characteristics: (a) hydric soils; (b) the presence of wetland vegetation; and (c) wetland hydrology. In approximately 50 percent of the cases, the boundaries of [*11] federal and state wetlands are virtually identical; in the remaining 50 percent, boundaries of federal and state wetlands match to a lesser degree.

The ACOE issues two types of permits: a nationwide permit for one to ten acres of wetlands disturbance and an individual permit for a disturbance of more than ten acres. n2 The ACOE requires applicants to avoid, minimize and mitigate wetland disturbance. In 1986, a DEP 401 water quality certificate was required if wetlands disturbance was more than one acre. At trial, Swift indicated that Kasper could have investigated and obtained the permits utilizing either Kasper's own staff or hiring outside professionals. (Tr., Aug. 4, 1998, pp. 12-14.) At no time during his employment with Kasper from 1977-1997 did Swift ever receive any formal training in ACOE or DEP permit procurement.

- - - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n2 The New England division of the ACOE is located in Waltham, Massachusetts. The ACOE's application form is two pages in length. (Pls.' Ex. 77.) In 1986, the ACOE permitted two alternatives to applicants in lieu of bearing the expense of mapping federal wetlands. First, an applicant could notify the ACOE of the intended work and the ACOE would make its own determination as to the presence of federal wetlands. Alternatively, an applicant could submit

state wetland maps prepared for municipal inland wetlands commissions. Approximately 97 percent of all applications for ACOE permits are approved. The ACOE does not require or recommend that an applicant be represented by an attorney. It is probable that the ACOE and DEP would have issued permits for the site in 1986.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[*12]

In 1986, Swift was aware the ACOE was a federal regulatory body. At this time, he had not personally applied for an ACOE permit but he had assisted co-workers in obtaining an ACOE permit to build a structure within the waterline of a river.

A soil scientist field locates and flags wetlands on a site. Based on those findings, a surveyor prepares maps depicting the wetlands and determines the wetlands acreage. In the spring of 1986, Kasper hired Joyce Raabe, a certified soil scientist in this state, to locate state delineated wetlands at the project site. She was retained in accordance with the terms of the January 17, 1986 agreement.

From January 1986 to approximately April 1986, work progressed in accordance with the parties' contract. After approximately 25 percent of the funds was exhausted on the Task 2 feasibility study, WLD decided to pursue commercial as opposed to residential development of the site. The project entered the next stage which included project design and procuring of the necessary governmental permits and approvals. Although the feasibility study had already identified the desired use of the property, WLD never instructed Kasper to discontinue protect [*13] research or to conclude its site analysis.

In May of 1986, a meeting was held in Kasper's office. Numerous Kasper site planning personnel made presentations concerning two alternative proposals for a retail commercial development. The feasibility of two facilities, one with 130,000 square feet and the other with 200,000 square feet, was discussed. Each facility would provide retail space for the Finast grocery store and other retail shops. State and municipal permits were discussed, including permits from the State of Connecticut Traffic Commission (STC), the Winchester Planning & Zoning Commission (WP&ZC), and the Winchester Inland Wetlands Commission (WIWC).

The two proposals were set forth in a memorandum from Swift to John Lombard dated May 2, 1986. (Pls.' Ex. 12.) Swift proposed that Kasper be compensated on an hourly basis for its work in developing the two alternatives for submission to the planning and zoning commission. WLD decided to proceed with the 200,000 square foot proposal which included a large department store. This 200,000 square foot facility was to become "the Shops at Ledgebrook." It was recognized that the larger facility would necessitate the filling [*14] and disturbance of acres of wetlands and the blasting and removal of a substantial quantity of rock ledge.

Kasper prepared, filed and presented an application to the WP&ZC for site plan approval and to the WIWC for permission to fill six acres of wetlands. Swift and other Kasper employees were aware that six acres represented a substantial area of wetland filling. Kasper also secured STC approval for the shopping center. On May 21, 1986, and June 4, 1986, Swift appeared before the WIWC to present an application for inland wetland approval. (Pls.' Ex. 102; Defendants' Ex. 4.)

On the day of the May 21, 1986 meeting, Raabe met with Swift. Raabe, who had identified approximately ten acres of wetlands at the site, had been instructed to meet with Swift and to deliver a prepared worksheet concerning the wetlands on the site, presumably for use during Swift's presentation to the inland wetlands commission. Raabe prepared a brief memo to Swift and the worksheet. (Pls.' Ex. 70.) She informed Swift her report was not complete and that Ledgebrook would require an ACOE permit. Swift responded that no ACOE permit was necessary. After this encounter, Raabe had no further contact with Swift [*15] or the Ledgebrook project. During this period of time, Swift informed WLD that Kasper had obtained all permits.

The WIWC approved the filling of six acres of wetlands. (Defs.' Ex. 4.) The site plans submitted for the WIWC approval included both the 130,000 square foot and the 200,000 square foot proposals. At the time the municipal permits were sought, Kasper suggested WLD retain a local attorney to attend the WP&ZC meetings. Attorney Richard Lavieri was so retained.

Though Lavieri attended the June 1986 meeting and made his presence known to the members of WP&ZC, it was Swift who presented the WLD application to the Commission. Following the Winchester approvals, Lavieri spoke to members of the Barkhamsted Inland Wetlands Commission and arranged for the matter to be placed on that commission's agenda. Lavieri was in

attendance when the application was presented and approved by the Barkhamsted Inland Wetlands Commission.

Thereafter, Lavieri arranged to have the WLD application rescheduled before the WP&ZC in order to present the Barkhamsted approval. Lavieri did not provide legal advice to WLD or Kasper concerning the ACOE or DEP permits required for the Ledgebrook project. **[*16]** Moreover, Lavieri had no prior experience in obtaining ACOE and DEP permits for wetland filling.

Swift reviewed Winchester's regulations in connection with the preparation of the WLD inland wetlands application. (Pls.' Ex. 100.) Section Eight of the Winchester regulations, entitled "Other Permits and Licenses," provides as follows: "nothing in these regulations shall obviate any requirement for the applicant to obtain any other assent, permit or license required by law or regulation by the Government of the United States or of the State of Connecticut or any other political subdivision thereof. The obtaining of such assents, permits or licenses is solely the responsibility of the applicant." Swift had prior experience in reviewing municipal inland wetland regulations, and section eight of the Winchester regulations was a common provision in municipal regulations at that time.

The WP&ZC approved the 200,000-square-foot commercial development proposal. The WIWC approved the filling of six acres of wetlands subject to two conditions: the approval of the town of Barkhamsted Inland Wetlands Commission and the hiring of an individual to monitor soil erosion control measures required **[*17]** during construction. (Defs.' Ex. 4.) WLD retained Swift to monitor soil and sedimentation control barriers. In this capacity, Swift frequently visited the work site to perform his inspections.

In September 1986, Frank Lombard participated in obtaining approval from the Winchester Water Pollution Control Authority for connection of the Ledgebrook sewer line into the municipal sewer system. (Defs.' Ex. 7.) Frank Lombard had no previous experience obtaining land use permits from federal, state or municipal authorities.

Swift and other Kasper employees prepared numerous documents including site plans in connection with the permit applications. Although the parties' written agreement did not expressly obligate Kasper to pursue planning and zoning, inland wetland or STC permits,

Kasper nevertheless obtained the permits and WLD paid for these services.

On December 18, 1987, WLD accepted Kasper's December 10, 1987 proposal to provide construction design services for the Ledgebrook project. The design was to consist of a 51,230 square foot supermarket, a 70,770-square-foot area for retail stores, and a 67,000-square-foot department store. n3 Under the contract, Kasper was to **[*18]** provide architectural, engineering and contract administration services. Compensation was by lump sum except for contract administration services which were to be paid on an hourly basis.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - 
- - - - - - 

n3 The project was to be completed in two phases: the supermarket and retail stores became known as "Phase 1" and the department store became known as "Phase 2." Phase 2 is located in the northerly portion of the site. This area contained a substantial amount of wetlands. (Pls.' Ex. 14.)

- - - - - - - - - - - - End Footnotes- - - - - - - 
- - - - - - 

Approximately six months later, WLD entered into a contract with DCA dated June 7, 1988, to provide professional architectural and engineering services for the Ledgebrook project. The contract form is entitled "AIA Document B1-41, Standard Form of Agreement Between Owner and Architect." This American Institute of Architects (AIA) form contract was utilized by the parties as a substitute for the December 10, 1987 agreement because it was required by WLD's lenders who were financing the project. The AIA contract provided in part that "the **[*19]** Architect shall assist the Owner in connection with the Owner's responsibility for filing documents required for the approval of governmental authorities having jurisdiction over the Project." (Pls.' Ex. 15, Article 2, 2.4.4.)

The December 10, 1987, contract provided for lump sum payments to DCA for professional services rendered. n4 On at least one occasion, DCA informed WLD of developments in government regulations affecting the property. (Pls.' Ex. 94.) WLD retained Mark Gauger to act as its construction manager for the Ledgebrook project.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - 
- - - - - -

n4 From 1984 to 1995, WLD paid Kasper and DCA approximately $ 541,000 for services rendered.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

Kasper prepared a June 10, 1988, document detailing site improvement specifications for "the Shops at Ledgebrook." The site work specifications included site clearing, rough grading, finish landscaping, paving, storm drainage and sanitary sewage systems. (Pls.' Ex. 76.)

WLD initially hired D&M Construction Company of Torrington (D&M) to perform the site work. The [*20] contract price was $ 2,227,000, but the price was increased to over $ 4 million due to contract change orders. A substantial portion of the change orders related to site work performed on Phase II. The D&M contract required blasting, crushing and removing of a substantial quantity of rock, site grading and other site work.

D&M began site work in late 1988. As the site work progressed, WLD became dissatisfied with D&M's performance and it hired other contractors to perform portions of the site work. The site work continued while the buildings were being constructed. In August of 1988, Swift returned to the WIWC to address sanitary and water service encroachments into wetlands. (Pls.' Ex. 79.)

The town of Winchester issued a certificate of occupancy in September 1989. The Finast supermarket opened on or about September 16, 1989. The landscaping work was incomplete when the certificate of occupancy was issued. At the time of trial, Phase II was still not complete; finish grading, utility installation, paving, and landscaping remained. Throughout the project, there were frequent meetings and numerous communications between Swift, other Kasper representatives, WLD and construction [*21] contractors.

At a September 1, 1988 job meeting, Robert Lombard expressed an opinion that "the site work is completed." (Defs.' Ex. 11.) Robert Lombard testified at trial that he meant the rough site work was completed. The site work continued beyond September 1, 1988, and progressed simultaneously with the construction of the buildings.

Swift was frequently present on the site and continued to act as project manager and soil erosion control officer. In his latter role, it was his duty to inspect and verify proper installation of the filter fabric silt fence. It was also his responsibility to insure that no mud or other debris entered into the wetlands and watercourses.

After 1990, portions of the silt fence were buried as a result of the substantial wetland filling. The actual filling of the wetlands amounted to approximately 6.65 acres; that amount exceeded the WIWC's approval of six acres. Winchester took no action as a result of the overfilling. Approximately five acres of the filling took place in the Phase II portion of the site.

At trial, Swift initially testified at the time of the project, his knowledge of ACOE jurisdiction was limited to coastal wetlands [*22] and large waterways. However, on cross examination, he admitted his awareness of ACOE jurisdiction was greater than he had disclosed. During the course of the project, Swift casually mentioned to the Lombards that the ACOE might have an interest in the site; he never researched this important information nor did he ever specifically advise the Lombards of the importance or applicability of ACOE jurisdiction. (Tr., Sept 9, 1998, afternoon session, pp. 29-31.)

Swift testified "I think I recall stating [to the Lombards] that we hadn't researched the permits, and hadn't done due diligence on what permits would be required." (Tr., Sept. 9, 1998, afternoon Session, p. 20.) Neither Swift nor any other Kasper representative ever determined whether an ACOE permit was required. Swift never advised the Lombards that Kasper could investigate the need for the permit for additional compensation. He justified this in stating, "It was not our task." (Tr., Sept. 9, 1998, afternoon session, p. 31.)

Glen Terk, a licensed attorney in this state, was retained by WLD to provide legal services in obtaining financing for the Ledgebrook Plaza from the Crown Life Insurance Company of Toronto, Canada; [*23] as such, he submitted to the lender an opinion letter dated March 12, 1990, with numerous attachments. (Pls.' Ex. 105.) Included within the documents submitted were numerous representations, one of which was that WLD did not need an ACOE permit for the project. (Pls.' Ex. 105, sec. III-B.) One such representation provided, "the Borrower's statement certifies that the Project will not involve the dredging or filling of surface waters or the discharge of any dredge or fill matter into the waters of the United States. Accordingly, it is our opinion that a Section 404 permit from the [ACOE] is not required for the project." (Pls.' Ex. 105, Section III-B.)

In preparing these documents, Terk relied not upon WLD as a source of technical information, but upon representations made by a Kasper representative during a telephone conversation. Terk did not seek written confirmation because he believed Kasper to be a reputable company.

In the summer of 1993, Great Island Development Company, on behalf of Wal-Mart Stores (Wal-Mart), made an inquiry concerning the purchase of Phase II of the project. Kasper provided to Wal-Mart written materials which included engineering documents pertinent [*24] to Phase II. WLD entered into purchase negotiations with Wal-Mart and numerous draft agreements passed between them. As provided by the agreements, Wal-Mart made several $ 3000 payments to extend the 120-day term of the contract and closing dates. In August of 1994, Wal-Mart and WLD executed a purchase and sale agreement for the Phase II portion of Ledgebrook for an agreed upon price of $ 3 million. (Pls.' Ex. 17.)

The agreement contained two important provisions. First, WLD was required to provide Wal-Mart with all the permits and approvals for the wetland filling. Second, Wal-Mart was to obtain from an existing tenant, Rite-Aid Pharmacy (Rite-Aid), a release of that tenant's exclusive right to operate a pharmacy at Ledgebrook. n5 Rite-Aid agreed to release its exclusive right in return for which WLD would pay $ 800,000 and to construct a stand-alone pad store for Rite-Aid's use. WLD would retain ownership of the store and Rite-Aid would pay rent.



- - - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n5 The agreement also provided that WLD would provide approvals to Wal-Mart in order to allow Wal-Mart to build a store of approximately 93,000 square feet. (Pls.' Ex. 17.)

- - - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -

[*25]

To consummate the transaction with Wal-Mart, WLD was obligated to pay a $ 200,000 sales commission. During negotiations, Wal-Mart informed WLD that the ACOE and DEP permits required for the filling of wetlands were missing. When the Lombards inquired of Swift regarding these permits, he indicated that these permits were not necessary.

After numerous discussions between WLD and Kasper, the two parties decided to apply for a

nationwide wetland permit and a DEP 401 water quality certificate. The law firm of Pullman & Comley in Bridgeport was retained to assist in obtaining these permits. n6 (Pls.' Ex. 20.) There was no written agreement between the parties covering these professional services. However, the work was performed and WLD paid for the legal services.



- - - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n6 Permits which are obtained from governmental agencies after the regulated activity has commenced are generally referred to as "after-the-fact" permits.

- - - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -

Both the ACOE and the DEP rejected the applications for after-the-fact permits. (Pls. [*26] ' Ex. 23, 24.) In rejecting the permits, both agencies stressed the negative impact wetland filling had on the site. Specifically, the ACOE indicated, "if we had had the opportunity to review your project prior to construction we would have discussed avoiding and minimizing the wetland fill areas along Route 44 . . . we are concerned with impacts to Mallory Brook and adjacent wetlands, which provide valuable functions such as flood storage, water quality renovation, and wildlife habitat." (Pls.' Ex. 23.) The DEP stated "the loss of 6.65 acres of wetlands at the site is unacceptable" and "an experienced, qualified environmental consultant should be retained . . ." (Pls.' Ex. 24.)

The ACOE, by letter dated February 3, 1995, notified WLD the filling of federal wetlands in violation of section 404 of the Clean Water Act could result in the imposition of criminal and civil penalties. (Pls.' Ex. 21.) Although WLD had informed the ACOE in its after-the-fact permit application that 6.65 acres had been filled, the ACOE expressed concern about only 1.37 of these acres. The ACOE's determination was based largely upon the identification of visible federal wetlands on the southern portion of [*27] the site running along Route 44 and adjacent to Mallory Brook.

The wetlands in the northern portion of the Phase II site were destroyed by the substantial filling. These wetlands were no longer visible without excavating test pits. It is probable that an inspection of the Ledgebrook site prior to the filling would have disclosed a greater number of federal wetlands. Because the ACOE's concern was limited to only 1.37 acres, WLD decided not to challenge the ACOE's determination.

In a letter dated April 4, 1995, Wal-Mart notified WLD of its intention to exercise the right to extend the term of the contract to August 26, 1995, and it paid $ 3000 for that extension. (Defs.' Ex. 21.) During that time, WLD successfully negotiated the release of the Rite-Aid's exclusive right to operate a pharmacy. WLD never obtained the ACOE and DEP permits.

In the fall of 1995, Wal-Mart secured a site for its store in Torrington, Connecticut, and that site is now completed. WLD terminated the services of Kasper and DCA. (Defs.' Ex. 18.) In September 1995, WLD conveyed the portions of the property earlier identified as Phase I and Phase II by quitclaim deed to Ledgebrook.

At the time [*28] of trial, WLD was an existing business entity. WLD and its successor in title, Ledgebrook, have tried unsuccessfully to market the Phase II portion of the property. Wal-Mart had expressed renewed interest in the Phase II portion of the site for a proposed sale price of $ 1,817,000. Under this proposal, Ledgebrook would not be obligated to pay a broker's fee. This sale cannot be completed, however, because Ledgebrook can longer provide Wal-Mart a release of Rite-Aid's exclusive pharmacy rights.

Ledgebrook retained Leonard Engineering to assist Pullman & Comley in Ledgebrook's efforts to obtain the ACOE and DEP permits. By letter dated May 31, 1996, the ACOE granted a nationwide permit for Ledgebrook. (Pls.' Ex. 33.) That authorization was made contingent upon the performance of certain remedial work, the cost of which would be approximately $ 20,000.

The ACOE additionally mandated a DEP 401 water quality certificate be obtained. At the time of trial, the DEP permit application was pending. It is probable that this permit will be obtained in the near future.

Leonard Engineering has billed $ 11,416 and Pullman & Comley $ 5300 for professional services rendered in connection [*29] with the after-the-fact permits. John Lombard's opinion is that the fair market value of the Phase II property without final permit approvals is $ 500,000. WLD and Ledgebrook have spent approximately $ 15 million on the development of the Ledgebrook Shopping Plaza, which was intended to be a 200,000 square foot building. As built, the structure is 101,000 square feet and there is an additional 4,000 square foot pad site leased to a bank.

Approximately $ 1.5 million was paid to D&M for Phase 2 site work. At the time of trial, site work on Phase II had not been completed. (Pls.' Ex. 111.) These funds would not have been expended if WLD had known that the Phase II portion of the site could not be leased or sold.

There was expert testimony that a feasibility study conducted by a site planner requires the evaluation of the applicability of governmental land use regulations and permits to include ACOE and DEP permits. The duty of care owed to a client regarding the identification of wetland permit requirements was the same for all site planning professionals. The prevailing standard of care among site planning professionals required that they advise their clients of these constraints [*30] and permit requirements and of the potential consequences of not complying with ACOE jurisdiction. A reasonable and prudent site planning professional would be aware of the need to investigate and address wetland permit requirements.

There was further expert testimony that it is a deviation of the standard of care for site planning professionals not to be aware of the existence of the ACOE and its jurisdiction over inland wetlands. At all relevant times, information concerning the ACOE's jurisdiction over wetlands was available to the public from a variety of sources; i.e., publications prepared by the ACOE, notices in the Federal Register, public notices placed in newspapers, and informational mailings to municipalities and individuals. (Pls.' Ex. 77, 103, 104.) Information was also available from the DEP, public libraries, and by direct contact with ACOE in Waltham, Massachusetts.

Expert testimony established the prevailing standard of care requires a site planning professional to convey to the client information learned from a soil scientist regarding the need for an ACOE permit. A site planning professional has a continuing duty to be aware of land use regulations and [*31] to advise the client of these regulations throughout the entire period of the project.

DISCUSSION

STANDING

Although the defendants did not allege standing as a special defense, both parties briefed the issue in their post-trial memoranda. Therefore, the court will address the issue. "Standing is the legal right to set judicial machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless he has, in an individual or representative capacity, some real interest in the cause of action, or a legal or equitable right, title or interest in the subject matter of the controversy."

_Lawrence Brunoli, Inc. v. Branford_, 247 Conn. 407, 411, 722 A.2d 271 (1999).

The contracts entered into were between WLD, Kasper and DCA. In September 1995, WLD conveyed a portion of the property to Ledgebrook by quitclaim deed. The property conveyed includes the areas referred to as Phase I and Phase II. Ledgebrook is a successor in title to WLD. The plaintiffs filed their initial complaint in 1996. Both plaintiffs claim damages as a result of the defendant's alleged conduct.

At the time of trial, WLD was an existing business entity and Ledgebrook was an [*32] existing limited liability company. Both WLD and Ledgebrook are Lombard family business ventures. In view of the fact that WLD and Ledgebrook have real interests in their causes of action, the court finds the plaintiffs have standing.

Counts One & Two--Breach of Contract

In counts one and two of the amended complaint dated May 23, 1998, the plaintiffs allege the defendants breached both written and oral contracts. The plaintiffs contend these contracts obligated the defendants to obtain and/or provide notice of the need to obtain all necessary government permits and approvals. Specifically, the plaintiffs allege an ACOE permit and a DEP 401 water quality certificate were required as a result of the filling and disturbance of a substantial area of wetlands. The defendants contend the contracts were not executed by the parties. (Defs.' Eighth Special Defense.)

In order to ascertain the totality of the contractual obligations created by the parties, the court is required to evaluate written documents, verbal representations and the parties' course of conduct. "Contracts may be express or implied. These terms, however, do not denote different kinds of contracts, but have reference [*33] to the evidence by which the agreement between the parties is shown. If the agreement is shown by the direct words of the parties, spoken or written, the contract is said to be an express one." _Boland v. Catalano_, 202 Conn. 333, 336-37, 521 A.2d 142 (1987). "If [an] agreement can only be shown by the acts and conduct of the parties, interpreted in the light of the subject matter and of the surrounding circumstances, then the contract is an implied one." _Id., 337._

"A contract is to be construed as a whole and all relevant provisions will be considered together." _HLO Land Ownership Associates Ltd. v. Hartford_, 248 Conn. 350, 356, 727 A.2d 1260 (1999). "[A] contract

must be construed to effectuate the intent of the contracting parties. The intention of the parties to a contract is to be determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction." _Id._ at 356-57. "All relevant evidence is admissible on the issue of contract interpretation, and any determination of the meaning or ambiguity should only be made in the light of the relevant [*34] evidence of the situation and relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties." _Foley v. Huntington Company_, 42 Conn. App. 712, 733-34, 682 A.2d 1026, cert. denied, 239 Conn. 931, 683 A.2d 397 (1996).

The facts establish the defendants were under no express obligation to provide notice to the plaintiffs of the need to obtain the two permits in question. However, the facts demonstrate that the defendants had an implied contractual obligation to provide such notice. In 1985, Joseph Kasper advised John Lombard that his firm could provide comprehensive services for the Ledgebrook project. These services included providing notice to potential clients of jurisdictional constraints and requirements of all governmental agencies and assisting in determining the need for obtaining all permits and approvals.

In 1986, Kasper employed in excess of one hundred site planning professionals. Throughout the period of 1986-1990, these professionals had experience with federal, state, and municipal land regulation agencies. Both Kasper [*35] and DCA held themselves out as licensed and competent site planning professionals. Kasper was experienced in the development of commercial retail centers, while the Lombards had no prior experience with either land use regulations or site development.

Kasper performed professional services for WLD prior to the parties' first written agreement. The services included making inquiries about the property and producing a site contour map. (Pls.' Ex. 107.) On January 17, 1986, the parties entered into their first written agreement. (Pls.' Ex. 11.) In consideration of the sum of $ 32,200, Kasper agreed to perform a variety of professional services as set forth in "Task 1" and "Task 2" of the agreement. Included within the provisions is the requirement that wetlands be located and marked on the site. Thereafter, the identified areas of wetlands were to be surveyed and depicted on a topographical map.

In addition, Kasper contracted to conduct a feasibility study which included the preparation of a site analysis map and schematics for both residential and commercial development. In the field of site planning professionals, it is understood that the primary purpose of a feasibility [*36] study is to ascertain the suitability of a particular piece of property for intended use. The study includes the identification of the property's physical constraints and the determination of the necessary governmental approvals and permits. A site analysis map is prepared during the course of the study and depicts constraints on the property. These constraints include zoning, topography, and wetlands.

The intended role of the defendants, as demonstrated by the evidence, was to design a project which met the needs of the plaintiffs and the constraints of the site. It was evident from the outset of the project that the property contained a substantial amount of wetlands. Site design professionals are concerned about the environment and the need to preserve wetlands. Information pertaining to ACOE jurisdiction was readily available to the public from a variety of sources and should have been known by experienced site design professionals.

In accordance with the terms of the January 1986 agreement, Kasper retained soil scientist Joyce Raabe to field mark state delineated wetlands, and Raabe identified the presence of approximately ten acres of wetlands. Swift met with Raabe [*37] on May 21, 1986, at which time Raabe informed Swift an ACOE permit would be required for the project. Swift responded no permit was necessary.

Kasper's work progressed pursuant to the January 1986 agreement for several months. When approximately 25 percent of the contract price had been expended on the feasibility study, WLD determined the project would consist solely of commercial development. Although the feasibility study had identified the appropriate use of the property, the study was also intended to identify physical constraints of the property and necessary permits and approvals. At no time did WLD instruct Kasper to conclude its research and analysis of the site.

In May of 1986, the parties met to discuss two alternative proposals for retail commercial development. Those proposals were set forth in a memorandum from Swift to John Lombard. (Pls.' Ex. 12.) At that meeting, the participants discussed the need to obtain various land use permits. WLD concluded it would proceed with the design and development of the 200,000 square foot proposal. Kasper was aware the larger proposal would result in the filling and disturbance of a larger wetland area.

In accordance [*38] with Swift's proposal, Kasper was paid on an hourly basis for its professional services. Those services included the preparation and presentation of applications to the WP&ZC and WIWC, both of whom granted approvals. Kasper also applied for and obtained an STC permit. During this time, Swift informed WLD Kasper had obtained all permits.

Swift reviewed the Town of Winchester's regulations in connection with his preparation of the inland wetlands application. These regulations contained a provision which placed individuals on notice that other governmental agencies may have jurisdiction over a site. Swift had prior experience in reviewing municipal regulations. This notice was a common provision within municipal regulations during that period of time.

In 1986, Kasper was also providing professional design services to the Lombards in connection with the development of retail stores in the city of Waterbury. During that project, application was made to the DEP for permission to relocate a watercourse and disturb wetlands; that application was approved. Swift was aware of the Waterbury project at the time of his involvement in the Ledgebrook project.

The parties thereafter [*39] entered into two written contracts wherein the defendants agreed to provide construction design services for the Ledgebrook project. (Pls' Ex. 14, 15.) In the latter of the two agreements, DCA was contractually obligated to assist the WLD in its "responsibility for filing documents required for the approval of governmental authorities having jurisdiction over the project." (Pls.' Ex. 15, Art. 2 2.4.4.)

Swift knew the ACOE might have jurisdiction over the wetlands on this site. However, neither he nor any other Kasper representative made any attempt to convey effectively this relevant information to the Lombards. The Lombards were not even advised Kasper could further pursue the need for the additional permits for extra compensation. Swift expressed his justification for not advising the Lombards by stating, "it was not our task." (Tr., Sept. 9, 1998, afternoon session, p. 31.)

Yet, notwithstanding this, Kasper did in fact notify WLD of the need for municipal inland wetland and planning and zoning approvals, as well as the need for an STC permit. Further, by Swift's own admission, he indicated "any permits that [Kasper] knew of that were needed for the shopping center, we [*40] would have

pointed them out to the client." (Tr., Aug. 4, 1998, p. 84.) Swift also acknowledged Kasper could have investigated and obtained the permits by utilizing either its own staff or outside professionals. Despite there being no specific written contractual requirement to obtain the municipal and STC permits, Kasper nevertheless addressed these permits and approvals and WLD paid for the professional services.

In addition, the defendants assisted in the initial attempt to secure the ACOE and DEP permits on an after-the-fact basis. This was consistent with the parties' prior course of dealing though, here again, there was no express written obligation that Kasper perform these professional services.

The court finds the defendants had an implied contractual duty to notify the plaintiffs of the need to investigate the applicability of the ACOE and DEP permits to the project. The intent of the parties has been demonstrated by their written and oral agreements as well as their course of dealing throughout the Ledgebrook project. Further, the defendants' expertise in commercial site development makes clear they were in a superior position to know of the need to investigate [*41] the applicability of the ACOE and DEP requirements and to act on that knowledge.

The intended purpose of the contracts was to design a 200,000 square foot commercial retail facility which met all permit requirements. The plaintiffs paid the defendants approximately $ 541,000 for the professional design services. To date, the plaintiffs have expended approximately $ 13 million on the project which remains incomplete as a result of the defendants' breach of contract. Surely, no business entity would spend $ 541,000 for site planning services for a project that could not be completed because of missing permits, the need for which Kasper and DCA were contractually obligated to address.

Count Three--Breach of Express Warranty of Workmanship

The plaintiffs rely heavily on the case of *Johnson v. Healy,* 176 Conn. 97, 405 A.2d 54 (1978), in support of their claim that Kasper breached an express warranty of workmanship by not providing the ACOE and DEP permits. In that case, the defendant Healy warranted to the plaintiff Johnson that he built a particular home with quality materials and that there was nothing wrong with the home. "Express warranty encompasses material [*42] representations which are false, without regard to the state of mind or the due care of the person making the representation." *Johnson*

*v. Healy, supra,* 176 Conn. 100. Kasper maintains that breach of warranty is more appropriate to product liability claims and that it does not apply to design professionals. (Defs.' First Sp. Def.)

The court finds that the defendants' representations do not rise to the level of an express warranty to obtain or to notify the plaintiffs of the need to obtain ACOE and DEP permits. The court has determined that the defendants had an obligation to notify the plaintiffs of the need to obtain ACOE and DEP permits pursuant to an implied contractual obligation. This obligation flowed from written and oral representations as well as from the course of conduct between the parties. The court finds the defendants did not breach an express warranty of workmanship and the plaintiffs cannot prevail on this claim.

Count Four--Negligence

In the fourth count, the plaintiffs allege the defendants breached a duty to exercise the degree of reasonable care required of architects, engineers and other site planning professionals. The defendants allege [*43] that the plaintiffs failed to identify the specific standard or custom of professional practice which has not been complied with. (Defs.' Second Sp. Def.)

The plaintiffs contend Kasper and DCA, as site planning professionals, provided engineering, architectural and survey services to the plaintiffs pursuant to their contracts. The plaintiffs alleged the defendants negligently performed these contracts by failing to advise them of the need to obtain ACOE and DEP permits and/or by not obtaining the permits.

"The essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury." *RK Constructors, Inc. v. Fusco Corp.,* 231 Conn. 381, 384, 650 A.2d 153 (1994). "Duty is a legal conclusion about relationships between individuals, made after the fact, and imperative to a negligence cause of action. The nature of the duty, and the specific persons to whom it is owed, are determined by the circumstances surrounding the conduct of the individual." (Internal quotation marks omitted.) *Lodge v. Arett Sales Corp.,* 246 Conn. 563, 571, 717 A.2d 215 (1998). In determining the existence of a duty, [*44] "the threshold inquiry has always been whether the specific harm alleged by the plaintiff was foreseeable to the defendant." *Id.,* 572 n. 7. A party "may be liable in negligence for the breach of a duty which arises out of a contractual relationship." *Neiditz v. Morton S. Fine Associates, Inc.,* 199 Conn. 683, 688, 508 A.2d 438 (1986).

"Malpractice is commonly defined as the failure of one rendering professional services to exercise that degree of skill and learning commonly applied under all the circumstances in the community by the average prudent reputable member of the profession with the result of injury, loss, or damage to the recipient of those services." (Internal quotation marks omitted.) _Davis v. Margolis_, 215 Conn. 408, 415, 576 A.2d 489 (1990). "In a [malpractice] case against an engineer, it is incumbent upon the plaintiff to produce evidence as to what a skilled engineer of ordinary prudence engaged in the same line of business would have exercised in the same or similar circumstances." (Internal quotation marks omitted.) _Matyas v. Minck_, 37 Conn. App. 321, 327, 655 A.2d 1155 (1995). The court finds [*45] that this principle of law is equally applicable to architects and other site planning professionals.

Expert testimony established the duty of care owed to a client to identify inland wetland permit requirements was the same for all site planning professionals. A feasibility study undertaken by a site planner requires the evaluation of governmental land use regulations and permits including ACOE and DEP permits. The prevailing standard of care among site planning professionals mandates they advise clients of constraints and permitting requirements. It is a deviation from the standard of care for site planning professionals not to be aware of ACOE and DEP jurisdiction over inland wetlands.

The prevailing standard of care for site planning professionals requires they notify clients of government jurisdiction over wetlands and the potential ramifications for failure to comply with permitting requirements. The standard of care additionally requires a site planning professional to convey to a client information learned from a soil scientist regarding the need for a wetland permit. A site planning professional has a continuing duty to be aware of land use regulations and to advise [*46] the client of them throughout the duration of the project.

The defendants breached the standard of care by failing to:

a) address the potential need for ACOE and DEP permits during the feasibility study;

b) be aware of the potential ACOE and DEP jurisdiction over the site;

c) notify the plaintiffs of the likely ramifications of not complying with governmental inland wetlands

permitting requirements; and d) notify the plaintiffs of information learned from soil scientist Joyce A. Raabe and other sources regarding ACOE jurisdiction over the site.

Having determined that the defendants breached certain duties, the court must evaluate whether the defendants' conduct proximately caused the plaintiffs' alleged injuries. The test for proximate cause is "would the ordinary person in the defendant's position, knowing what he knew or should have known, anticipate that harm of the general nature of that suffered was likely to result?" _Lodge v. Arett Sales Corp., supra_, 246 Conn. 572 n.7.

The defendants were well aware the plaintiffs intended to use the property for a retail commercial purpose. They knew the plaintiffs expended substantial sums of money [*47] for design and site work. They knew the Phase II portion of the project was designated for use by a large department store. They knew or should have known that the failure to consider all necessary permits would thwart the project's completion. Additionally, they knew or should have known the plaintiffs could not sell or lease at full value an incomplete project that was not in compliance with federal and state inland wetlands regulatory requirements. Finally, the defendants knew or should have known that the inability to sell or lease the Phase II portion of the project would result in economic loss to the plaintiffs and in fact they have sustained economic damages as a proximate result of the defendants' conduct.

Accordingly, the defendants are liable to the plaintiffs in negligence.

Count Five--Breach of Fiduciary Duty

The law on the obligations of a fiduciary is well settled. "A fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other. The superior position of the fiduciary or dominant party [*48] affords him great opportunity for abuse of the confidence reposed in him." _Murphy v. Wakelee_, 247 Conn. 396, 400, 721 A.2d 1181 (1998). "[A] breach of fiduciary duty implicates a duty of loyalty and honesty." _Beverly Hills Concepts, Inc., v. Schatz & Schatz, Ribicoff & Kotkin_, 247 Conn. 48, 57, 717 A.2d 724 (1998).

Kasper maintains that a fiduciary duty does not exist in the context of a design professional and client. (Defs.' Fourth Sp. Def.) The fact that the defendants had

superior knowledge in site planning and development does not, by itself, give rise to a fiduciary relationship. The defendant's obligations to these plaintiffs grew out of a business relationship which did not impose on the defendants the level of loyalty or invoke in them the kind of trust which characterizes a fiduciary relationship.

The Connecticut appellate courts have found breaches of fiduciary duties where fraud, self-dealing or conflicts of interest were present although the absence of these elements does not preclude a finding of such breach. See *Murphy v. Wakelee, supra,* 247 Conn. 400. The plaintiffs have not carried their burden of establishing [*49] that there existed a fiduciary relationship between the parties and the court finds none existed.

Count Six--Negligent Misrepresentation

"One who, in the course of his or her business, profession or employment supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he or she fails to exercise reasonable care or competence in obtaining or communicating the information." *Beverly Hills Concepts, Inc., v. Schatz & Schatz, Ribicoff & Kotkin, supra,* 247 Conn. 57. "Even an innocent misrepresentation of fact may be actionable if the declarant has the means of knowing, ought to know, or has the duty of knowing the truth." *Williams Ford, Inc. v. Hartford Courant Co.,* 232 Conn. 559, 575, 657 A.2d 212 (1995).

The defendants argue that the plaintiffs did not establish that Kasper provided false information. (Defs.' Third Sp. Def.) In the planning stages of the project in 1986, Swift informed WLD that all permits had been obtained. Based upon this representation, WLD entered into additional contracts with Kasper [*50] and DCA, and WLD expended funds for the subsequent phases of the development of the project. In addition, the defendants informed the plaintiffs that an ACOE permit for Ledgebrook was not necessary. Clearly, this information was inaccurate.

The defendants did not exercise reasonable care in determining whether the ACOE and DEP permits were necessary. The plaintiffs relied upon these negligent misrepresentations to their detriment. The court finds that the defendants are liable under count six of the amended complaint.

Count Seven--Fraudulent Concealment

Although the plaintiffs designated their seventh cause of action "fraudulent concealment," the plaintiffs are, in fact, alleging a claim for fraudulent nondisclosure.

"The essential elements of an action in common law fraud are that: (1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon the false representation to his injury." *Parker v. Shaker Real Estate, Inc.,* 47 Conn. App. 489, 493, 705 A.2d 210 (1998). "For a nondisclosure to amount [*51] to fraud, there must be a failure to disclose known facts and, in addition thereto, a request or an occasion or a circumstance which imposes a duty to speak. Internal quotation marks omitted.) *Kenney v. Healey Ford-Lincoln-Mercury, Inc.,* 53 Conn. App. 327, 333, 730 A.2d 115 (1999).

The claim is that Raabe provided information to Swift that an ACOE permit would be required and that Swift's failure to so inform the plaintiffs constituted fraudulent concealment. The court finds that, absent a showing Swift knew and believed such permit was necessary, his conduct did not rise to the level of fraudulent conduct because an intent to deceive has not been established. Such conduct is more appropriately a failure to pursue the information and, therefore, sounds in negligence. Accordingly, the defendants are not liable to the plaintiffs for the tort of fraudulent nondisclosure.

Count Eight--CUTPA

The plaintiffs allege in count eight of its amended complaint that Kasper and DCA committed CUTPA violations. The defendants allege CUTPA does not apply to design professionals. (Defs.' Fifth Sp. Def.) "General Statutes 42-110g(a) affords a cause of action to any person who [*52] suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b." *Beverly Hills Concepts, Inc., v. Schatz & Schatz, Ribicoff & Kotkin, supra,* 247 Conn. 78-79.

General Statutes 42-110g(f) provides, "an action under this section may not be brought more than three years after the occurrence of a violation of this chapter." "Where . . . a specific time limitation is contained within a statute that creates a right of action that did not exist at common law, then the remedy exists only during the prescribed period and not thereafter." *Avon Meadow Condominium Association, Inc. v. Bank of Boston Connecticut,* 50 Conn. App. 688, 699-700, 719

A.2d 66, cert. denied, 247 Conn. 946, 723 A.2d 320 (1998). When a statute creates a cause of action and prescribes its procedural limitations, the statute must be strictly complied with. See, e.g., *Pittsburgh Plate Glass v. Dahm*, 159 Conn. 563, 565, 271 A.2d 55 (1970). "The courts of Connecticut have repeatedly held that, under such circumstances, the time limitation is a substantive and jurisdictional [*53] prerequisite, which may be raised at any time, even by the court sua sponte, and may not be waived." *Avon Meadow Condominium Association, Inc., v. Bank of Boston Connecticut, supra,* 700.

Although Kasper did not specify which statute of limitations applied in its special defenses, the court must address 42-110g(f) because the statute implicates the court's jurisdiction. The parties briefed 52-584a, however 42-110g(f) is the operative statute of limitations for CUTPA.

In this regard, "the legislature is presumed to be aware and to have knowledge of all existing statutes and effect which its own action or nonaction may have on them." *Windham First Taxing District v. Windham,* 208 Conn. 543, 554, 546 A.2d 226 (1988). The legislature must have enacted both statutes with the intention that both statutes could exist in harmony. See, e.g., *Lees v. Middlesex Insurance Co.,* 219 Conn. 644, 653-54, 594 A.2d 952 (1991) (holding that 38-98 did not confer a one-year statute of limitations on a CUTPA claim because 42-110g(f) provides for three years).

In their complaint, the plaintiffs do not specifically allege when Kasper and DCA committed [*54] CUTPA violations. However, in their March 15, 1999 post-trial brief, the plaintiffs articulate the basis of the claim. They state Kasper and DCA violated CUTPA by offering to provide architectural and engineering services without having the required licenses and misrepresenting their licensing and professional abilities to induce WLD into entering into a contractual relationship thereby causing substantial injury.

Given the plaintiffs' allegations, any claim of deceptive or unfair trade practices would have occurred no later than 1988. The plaintiffs filed their complaint against Kasper and DCA in 1996, well beyond CUTPA's three-year statute of limitations. General Statutes 42-110g(f) is an "occurrence" statute. See *Fichera v. Mine Hill Corp.,* 207 Conn. 204, 212-13, 541 A.2d 472 (1988). The last occurrence of a CUTPA violation would have been in 1988, some eight years before WLD filed its complaint. Accordingly, 42-110a(f) bars the plaintiffs' CUTPA claim.

## DEFENDANTS' ADDITIONAL SPECIAL DEFENSES

As set forth below, the court will examine the defendants' special defenses that were not addressed above.

Sixth and Seventh Special Defenses

The defendants [*55] allege that the plaintiffs' claims are barred by the statute of limitations. As discussed earlier, the defendants did not specify which statute of limitations applies. With regards to the CUTPA claim, 42-110g(f) applies. For all other claims, 52-584a is the applicable statute of limitations. n7 General Statutes 52-584a(c) provides, "for purposes of subsections (a) and (b) of this section, an improvement to real property shall be considered substantially complete when (1) it is first used by the owner or tenant thereof or (2) it is first available for use after having been completed in accordance with the contract or agreement covering the improvement, including any agreed changes to the contract or agreement, whichever occurs first." "In the ordinary case, therefore, [the seven-year statute of limitations in 52-584a] begins to run from the date of the substantial completion of the improvement for which the architect or engineer performed the services." *Grigerik v. Sharpe,* 247 Conn. 293, 307-08, 721 A.2d 526 (1998).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n7 General Statutes 52-584a(a) provides, in pertinent part, "(a) No action or arbitration, whether in contract, in tort, or otherwise, (1) to recover damages (A) for any deficiency in the design, planning, contract administration, supervision, observation of construction or construction of, or land surveying in connection with, an improvement to real property; (B) for injury to property, real or personal, arising out of any such deficiency; . . . or (2) for contribution or indemnity which is brought as a result of any such claim for damages shall be brought against any architect, professional engineer or land surveyor performing or furnishing the design, planning, supervision, observation of construction or construction of, or land surveying in connection with, such improvement more than seven years after substantial completion of such improvement."

- - - - - - - - - - - - End Footnotes- - - - - - -
- - - - - -

[*56]

Kasper prepared the site work specifications, dated June 10, 1988, for the Shops at Ledgebrook. The site for the approximate 200,000 square foot structure was to be completed in two phases. The site work began in late 1988 and continued while the Phase 1 buildings were being constructed.

The site work on the Phase II portion of the site was still not complete at the time of trial. The uncompleted work included finish grading, utility installation, paving, and landscaping. This work had not been completed as a result of the lack of permits and the stop work orders of the ACOE and DEP.

Therefore, the breach of contract, malpractice and negligent misrepresentation causes of action are not barred by 52-584a because the Phase II portion of Ledgebrook is not substantially complete.

Ninth Special Defense

The defendants allege the proposed Wal-Mart development could not have been constructed pursuant to local approval, but would require extensive additional filling and ACOE and DEP approvals in addition to supplemental local approvals.

The 1994 WLD and Wal-Mart purchase and sale agreement for the Phase II portion of Ledgebrook included a condition that WLD was to [*57] provide Wal-Mart with the necessary approvals to allow Wal-Mart to build a department store of approximately 93,000 square feet. (Pls.' Ex. 17.) WLD received approvals to construct a 200,000 square foot shopping plaza. As built, the structure without the Phase II portion is 101,000 square feet in size with the addition of a 4,000 square foot pad site utilized as a bank. The court finds the defendants have not proven that the town's authorizations would not accommodate Wal-Mart's proposals.

Tenth through Fourteenth Special Defenses

The tenth through the fourteenth special defenses are as follows:

Tenth Special Defense--The plaintiffs relied on their counsel, not upon the defendants for advice as to required governmental approvals;

Eleventh Special Defense--DCA had no involvment with any permitting activities or efforts;

Twelfth Special Defense--The plaintiffs exceeded the area of authorized wetland filling by more than one acre;

Thirteenth Special Defense--A section of the June 7, 1988, contract between WLD and DCA provides that architect may be required to provide additional services, but such services were never requested of the defendants; and

Fourteenth [*58] Special Defense--The determination as to required approvals is a legal matter to be determined by legal consultants, and not by design professionals. (Defs.' Answer and Sp. Defs., pp. 7-8.)

These five special defenses have been addressed in the facts found and the court finds the defenses unpersuasive.

DAMAGES

Having determined the defendants are liable for breach of contract, negligence and negligent misrepresentation, the court must calculate and award fair, just and reasonable damages.

"To authorize a recovery of more than nominal damages, facts must exist and be shown by the evidence which affords a reasonable basis for measuring the plaintiffs' loss. The plaintiff has the burden of proving the nature and extent of loss. Mathematical exactitude in the proof of damages is often impossible, but the plaintiff must nevertheless provide sufficient evidence for the trier of fact to make a fair and reasonable estimate." *Willow Springs Condominium Assn., Inc. v. Seventh BRT Development Corp.,* 245 Conn. 1, 59, 717 A.2d 77 (1998).

The evidence demonstrated that the plaintiffs have thus far expended approximately $ 1.5 million for site work performed [*59] on the Phase II portion of the site. These monies were spent with the expectation the site would accommodate a large department store, the presence of which would increase the size of the Shops at Ledgebrook to an approximate 200,000 square foot commercial retail shopping center. As the project designers, the defendants knew the intended use of the Phase 2 portion of the property.

The plaintiffs have spent approximately $ 15 million on the construction of the shops at Ledgebrook. In lieu of the planned 200,000 square foot building, the existing structure is 101,000 square feet with an additional 4,000 square foot pad site. The fair market

value of Phase 2 property without final permit approval is $ 500,000.

The defendants posit that the plaintiffs' damages, if any, are limited to the resultant diminution in the value of the property which they claim is determined by the cost of repair. (Defs.' Post-Trial Brief, Apr. 27, 1999, pp. 20-23.) The defendants cite numerous cases in support for their position including *Willow Springs Condominium Assn., Inc. v. Seventh BRT Development Corp., supra, 245 Conn. 1 (1998).* These cases establish that the proper measure [*60] of damages for injury to land is the cost of repair.

The defendants maintain that the recoverable costs associated with restoring the property are as follows: engineering costs--$ 11,416; legal fees--$ 5300; remedial site work--$ 20,000; total damages--$ 36,716.

Contrary to the defendants' assertions, however, this case at its core is not exclusively an injury to land case. Rather, this case is about the failure to address governmental inland wetlands approvals properly, the expenditures of monies to develop a site and a lost business expectation. Therefore, the determination of what is fair, just and reasonable is not limited to damages for injury to land. n8

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n8 At the time of trial the defendants' counsel objected to the admissibility of evidence which related to alleged damages not pertaining to the cost of repair. The parties agreed the court would rule upon the objection in its memorandum of decision. For reasons stated above, the court overrules the defendants' objection.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

The plaintiffs' [*61] damage expert, Thomas Ferreira, suggested two alternative models for the calculation of damages. In the first model, damages are based upon: lost rental income; additional interest paid on the mortgage note; out of pocket expenses incurred in attempting to secure the permits; and additional property taxes paid on the Phase II portion of the property. In the second model, Ferreira states a profit of $ 2 million would have resulted had the property originally been sold to Wal-Mart. Adjusted for the time value of money, the profit would equal $ 2.8 million. From this figure, he deducted $ 1.4 million which he concludes is the plaintiffs' profit if they sell to Wal-Mart under the terms of its most recent offer.

Ferreira's two models are based on numerous speculative assumptions and inaccurate projections. For example, Ferreira assumed, without a factual basis, that a decrease in rental income derived from other Ledgebrook tenants was caused by the absence of the Wal-Mart store on the site. In addition, he projected the lost profit on the sale to Wal-Mart was $ 2 million, and, in so doing, he did not consider the development costs of Phase II.

"A damage theory may be based on [*62] assumptions so long as the assumptions are reasonable in light of the record evidence." *Beverly Hills Concepts, Inc. v. Schatz & Schatz, Ribicoff & Kotkin, supra, 247 Conn. 70.* An award of damages cannot be based upon guess, conjecture or surmise. Considering Ferreira's testimony and analysis as a whole, the court finds his calculations too speculative to be given weight and are not adopted by the court as the appropriate measures of damages.

As a general proposition, "in awarding damages upon a breach of contract, the prevailing party is entitled to compensation which will place him in the same position he would have been had the contract been properly performed." *Levesque v. D&M Builders, Inc., 170 Conn. 177, 181, 365 A.2d 1216 (1976).* "The plaintiff is entitled to recover all damages proximately caused by the defendant's negligent performance of the contract whether or not the results were reasonably to be anticipated." *Mattegat v. Klopfenstein, 50 Conn. App. 97, 104, 717 A.2d 276, cert. denied, 247 Conn. 922, 722 A.2d 810 (1998).*

In this regard, "the proximate cause test for negligence applies when assessing [*63] damages for negligent performance of a contract. The requirement of proximate cause is a less severe limitation of liability than the requirement of anticipation or foreseeability in breach of contract cases. A proximate cause is [an] actual cause that is a substantial factor in the resulting harm." *Mattegat v. Klopfenstein, supra, 50 Conn. App. 105;* see also *Neiditz v. Morton S. Fine & Association, Inc., supra, 199 Conn. 689.*

Since the plaintiffs have proven the defendants' liability under both contract and tort theories, the proper measure of damages are those which were proximately caused by the defendants' negligent conduct.

The plaintiffs claim damages for lost profits. "Damages for losses of profits are recoverable only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty." *Humphrys v. Beach, 149 Conn. 14, 21, 175 A.2d 363 (1961).* "Mere uncertainty as to the amount

of lost profits may be dispelled by the same degree of proof as is required in other civil actions, that is, the amount may be determined approximately upon reasonable inferences and estimates." [*64] *Burr v. Lichtenheim, 190 Conn. 351, 360, 460 A.2d 1290 (1983).* The burden is upon the plaintiff to "present sufficiently accurate and complete evidence for the trier of fact to be able to estimate these profits with reasonable certainty." *Beverly Hills Concepts, Inc. v. Schatz & Schatz, Ribicoff & Kotkin, supra, 247 Conn. at 70.*

The plaintiffs have proven entitlement to damages for both lost profits and out of pocket expenses in the total amount of $ 1,516,716. The court has calculated this figure in the following manner:

a) Lost profits

In 1994 Wal-Mart agreed to purchase the property for $ 3 million. The sale would have been consummated but for the lack of the ACOE and DEP permits. The plaintiffs' costs which must be subtracted from the sales price include $ 1.5 million expended for site work, $ 800,000 to be paid to Rite-Aid pharmacy, and $ 200,000 as a sales commission. This results in total costs of $ 2.5 million, leaving $ 500,000 in lost profit.

b) Out of Pocket Expenses

The plaintiffs have expended $ 1.5 million to develop the site. In addition, they have spent $ 5300 for legal fees and $ 11,416 for engineering costs in an effort [*65] to obtain the after-the-fact permits. The total expenses are $ 1,516,716. The current fair market value of the property is $ 500,000, which results in a loss of $ 1,016,716,

The plaintiffs have sustained their burden of proving damages in the total amount of $ 1,516,716 ($ 500,000 in lost profits plus $ 1,016,716 in out-of-pocket expenses).

CONCLUSION

The court finds that the defendants are liable to the plaintiffs for breach of contract, negligence and negligent misrepresentation. The court awards the plaintiffs $ 1,516,716 in damages plus costs.

So Ordered.

BY THE COURT

PETER EMMETT WIESE, JUDGE

Reynolds, Pearson & Company, LLC et al. v. Irvin J. Miglietta et al.

CV000801247

SUPERIOR COURT OF CONNECTICUT, JUDICIAL DISTRICT OF HARTFORD, AT HARTFORD

2001 Conn. Super. LEXIS 952

March 27, 2001, Decided
March 27, 2001, Filed

**NOTICE:**
**PUB-STATUS:**    [*I]    THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

**DISPOSITION:** The defendants' motion to strike counts seven and thirteen is granted. The defendants' motion to strike counts nine and ten is denied.

**JUDGES:** Berger, J.

**OPINIONBY:** Berger

**OPINION:** MEMORANDUM OF DECISION ON MOTION TO STRIKE

Introduction and Factual Background

On August 25, 2000, the plaintiffs, Richard Reynolds and Reynolds, Pearson & Company, LLC (RP&C), filed a complaint against the defendants, Irvin Miglietta and The Allied Group, Inc.-DEL (Allied). Reynolds is a member of RP&C and a licensed certified public accountant, and Miglietta was the President and largest shareholder of Allied at the time the allegations occurred. The complaint alleges the following facts.

On or about July 3, 1997, Allied and Reynolds entered into an employment agreement whereby Reynolds agreed to serve as chief financial officer of Allied. Because of the defendants' promises and incentives, Reynolds curtailed his full time accounting practice. In particular, Miglietta told Reynolds that he would receive share certificates reflecting a 20 [*2] percent ownership interest in Allied, but Reynolds never received the certificates as promised. Thereafter, Reynolds sought legal representation in an effort to obtain the promised share certificates, and, by the summer of 1999, Miglietta and Reynolds negotiated the final language of a proposed employment agreement and shareholders agreement. Miglietta

terminated Reynolds, however, in September 1999. Prior to Reynolds' termination, Miglietta jointly transferred share certificates representing 40 percent of the common stock in Allied to two employees in exchange for their agreement to oppose issuance of share certificates to Reynolds and to support Reynolds' termination.

The complaint further alleges that on or about October 19, 1999, Reynolds negotiated a severance package with Allied's representatives, and, in return, Reynolds agreed to release Allied from claims he would have against it under the employment agreement. On November 5, 1999, Allied provided Reynolds with the initial draft of the settlement agreement between Allied and Reynolds. In March 2000, the plaintiffs maintained that certain inaction by Allied constituted a repudiation of the settlement agreement. In response, [*3] Allied denied a repudiation occurred because it maintained that no settlement agreement existed.

The plaintiffs commenced this lawsuit against the defendants alleging, against Allied, breach of the settlement agreement (count one), breach of the covenant of good faith and fair dealing implied in the settlement agreement (count two), unjust enrichment as to the settlement agreement (count three), breach of the employment agreement (count four), breach of the covenant of good faith and fair dealing implied in the employment agreement (count five), unjust enrichment as to the employment agreement (count six) and promissory estoppel as to the employment agreement (count seven). In addition, the plaintiffs allege, against both defendants, a claim for wages pursuant to <u>General Statutes § 31-72</u> (count eight), intentional misrepresentation (count nine), negligent misrepresentation (count ten) and violation of CUTPA (count thirteen). The plaintiffs further allege, against Miglietta, tortious interference with contractual relations (count twelve) and personal liability (count fourteen). n1 Finally, RP&C makes a claim against Allied for rent (count eleven).

- - - - - - - - - - - - - -Footnotes - - - - - - - - -
- - - - - -

n1 The fourteenth count of the plaintiffs'
complaint, alleging personal liability of
Miglietta, is incorrectly labeled in the
complaint as count thirteen.

- - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -

**[\*4]**

The defendants have now filed a motion to strike
counts seven, nine, ten and thirteen of the plaintiffs'
complaint.

## DISCUSSION

"The purpose of the motion to strike is to contest . . .
the legal sufficiency of the allegations of any
[complaint] . . . to state a claim upon which relief can
be granted." (Internal quotation marks omitted.) *Peter-
Michael, Inc. v. Sea Shell Associates*, 244 Conn. 269,
270, 709 A.2d 558 (1998). "In ruling on a motion to
strike, the court is limited to the facts alleged in the
complaint." (Internal quotation marks omitted.) *Waters
v. Autuori*, 236 Conn. 820, 825, 676 A.2d 357 (1996).
"The court must construe the facts in the complaint
most favorably to the plaintiff." (Internal quotation
marks omitted.) *Faulkner v. United Technologies
Corp.*, 240 Conn. 576, 580, 693 A.2d 293 (1997).

## A

The defendants first move to strike count seven
alleging promissory estoppel. Specifically, the
defendants argue that the plaintiffs are precluded from
asserting a claim for promissory estoppel when a
written employment contract exists. The plaintiffs
argue in opposition that count seven is a legally
sufficient **[\*5]** claim because it is permissible to plead
alternative causes of action. Because the defendants
have not admitted that either the employment
agreement or its terms are enforceable by the plaintiffs
they argue that count seven is a legally permissible
alternative claim to their contract claim pleaded in
count four. See, e.g., *De La Concha of Hartford, Inc. v.
Aetna Life Ins. Co.*, 1999 Conn. Super. LEXIS 1776,
Superior Court, judicial district of Hartford at Hartford,
Docket No. 580129 (July 2, 1999) (Sullivan, J.)
(denying motion to strike alternative claim of
promissory estoppel where defendant had not yet filed
answer and unclear whether defendant would contest
enforceability of contract); *Clock Tower Mill
Development v. Cambridge Development Corp.*, 1996
Conn. Super. LEXIS 1047, Superior Court, judicial
district of Hartford-New Britain at Hartford, Docket
No. 555348 (April 23, 1996) (Lavine, J.) (same).

"A fundamental element of promissory estoppel . . . is
the existence of a clear and definite promise which a
promisee could reasonably have expected to induce
reliance." *D'Ulisse-Cupo v. Board of Directors of
Notre Dame High School*, 202 Conn. 206, 213, 520
A.2d 217 (1987). Where a "valid contract exists, the
**[\*6]** remedy of promissory estoppel, which is a theory
inconsistent with the existence of a contract, is
precluded." *Moukarzel v. Oxygen Electronics, LLC*,
1999 Conn. Super. LEXIS 2207, Superior Court,
judicial district of Fairfield at Bridgeport, Docket No.
359965 (August 12, 1999) (Melville, J.); *Johnson v.
Bridgeport*, 1999 Conn. Super. LEXIS 1761, Superior
Court, judicial district of Fairfield at Bridgeport,
Docket No. 321129 (June 3, 1999) (Nadeau, J.) ("when
valid contracts exist, recovery cannot be obtained
under the doctrine of promissory estoppel"); *Lark v.
Post Newsweek Stations Connecticut, Inc.*, 1995 Conn.
Super. LEXIS 2332, Superior Court, judicial district of
Hartford-New Britain at Hartford, Docket No. 705326
(August 9, 1995, Wagner, J.) ("An action for
promissory estoppel generally lies when there is no
written contract, or the contract cannot be enforced for
one reason or another").

The plaintiffs insist upon their right to plead in the
alternative, claiming that count seven "alleges that
because the defendants' promises induced him to act
upon them, the defendants should now be estopped
from claiming that the Employment Agreement is
either   invalid   or   unenforceable."   (Plaintiff's
Memorandum, p. 2.) The plaintiffs subsequently claim
that count seven **[\*7]** "assumes that there is no valid
contract but, alternatively, that the defendants'
promises to Mr. Reynolds should be enforced
nonetheless." (Plaintiff's Memorandum, p. 2.)

Contrary to the plaintiffs' claims, count seven does not
allege or assume what the plaintiffs represent it does. It
is true that "under our pleading practice, a plaintiff is
permitted to advance alternative and even inconsistent
theories of liability against one or more defendants in a
single complaint." *Dreier v. Upjohn Co.*, 196 Conn.
242, 245, 492 A.2d 164 (1985); see also Practice Book
§ 10-25. Construing the complaint in the light most
favorable to the plaintiffs, however, the plaintiffs have
not pleaded in the alternative as they claim. Count
seven contains numerous incorporated paragraphs in
which the plaintiffs specifically plead the existence and
terms of an employment contract. Significantly, count
seven alleges no promises other than those specifically
alleged to be "set forth in the Employment
Agreement." (Count seven, PP55-58.) Moreover, there
is no indication in any of the allegations contained in
count seven that the alleged contract is invalid or

unenforceable for any reason, **[*8]** and the court will not assume facts not pleaded. "A party does not have a cause of action for promissory estoppel *where an existing contract . . . is alleged and appears to be enforceable.*" (Emphasis added.) *Lark v. Post Newsweek Stations Connecticut, Inc., supra,* 1995 Conn. Super. LEXIS 2332, Superior Court, Docket No. 705326. If the plaintiffs meant for count seven to be pleaded in the alternative, i.e. to assume the invalidity or unenforceability of the contract, they may take advantage of their opportunity pursuant to Practice Book § 10-44 to replead the count to allege such. For present purposes, however, because count seven alleges the existence of a written contract containing the alleged promises, it is not pleaded as an alternative claim of promissory estoppel. Therefore, the defendants' motion to strike count seven is granted.

**B**

The defendants next move to strike counts nine and ten alleging intentional and negligent misrepresentation. Specifically, the defendants argue that, pursuant to the "economic loss doctrine," Connecticut courts bar claims for liability in tort when the loss is merely economic and does not involve physical harm or injury to property. They argue that because **[*9]** the plaintiffs' claims arise entirely out of the employment contract, there is no injury to person or property and that, therefore, the plaintiffs' alleged injury is purely economic, barring any claim in tort. In opposition, the plaintiffs, citing *D'Ulisse-Cupo v. Board of Directors of Notre Dame High School, supra,* 202 Conn. 218, argue that the ninth and tenth counts should not be stricken because the Connecticut Supreme Court recognizes a tort cause of action for misrepresentation in the context of an employer-employee relationship. The defendants respond that the issue is not whether a misrepresentation claim may be brought in the context of an employer-employee relationship, which they do not dispute, but rather whether such a tort claim may be brought by a plaintiff claiming purely economic damages. As the defendants correctly point out, the plaintiff in *D'Ulisse-Cupo v. Board of Directors of Notre Dame High School, supra,* 202 Conn. 206, was not claiming purely economic damages; see 202 Conn. at 209; thus, the defendants argue, the case is not dispositive of the issue.

"The thrust of the common law economic loss rule is that **[*10]** in the absence of privity of contract between the plaintiff and the defendant, or, in the absence of an injury to the plaintiff's person or property, the plaintiff may not recover in tort for a purely economic loss." *Amity Regional School District # 5 v. Atlas Construction Co.,* 2000 Conn. Super.

LEXIS 1897, Superior Court, judicial district of Waterbury, Complex Litigation Docket No. 153388 (July 26, 2000) (McWeeny, J.) (27 Conn. L. Rptr. 605). "The economic loss doctrine is a judicially created doctrine which bars recovery in tort where the relationship between the parties is contractual and the only losses alleged are economic. *Scap Motors, Inc. v. Pevco Systems International, Inc.,* 1999 Conn. Super. LEXIS 2230, Superior Court, judicial district of Fairfield at Bridgeport, Docket No. 348461 (August 12, 1999) (Melville, J.) (25 Conn. L. Rptr. 283). The rationale for this rule appears in *Princess Cruises, Inc. v. General Electric Co.,* 950 F. Supp. 151, 156 (E.D.Va. 1996): "Almost every breach of contract involves actions that can be conceived of as a negligent or intentional tort. If left unchecked, the incessant tide of tort law **[*11]** would erode and eventually swallow contract law. This Court believes that if tort law and contract law are to fulfill their distinctive purposes, they must be distinguished where it is possible to do so. The economic loss doctrine serves as a basis for such a distinction." The court further explained: "When, through the negligence of one of the parties, the subject of the transaction physically injures a person, or damages the property of someone not a party to the contract, the law of tort properly provides a cause of action. But to permit a party to a broken contract to proceed in tort where only economic losses are alleged would eviscerate the most cherished virtue of contract law, the power of the parties to allocate the risks of their own transactions." *Id.,* 155.

There is inconsistency in the decisions of Superior Court judges regarding the applicability of the economic loss doctrine in Connecticut. One line of authority holds that the economic loss doctrine has been accepted and applied by Connecticut courts. See, e.g., *Amity Regional School District # 5 v. Atlas Construction Co.,* 2000 Conn. Super. LEXIS 2031, Superior Court, judicial district of Waterbury, Complex Litigation Docket No. **[*12]** 153388 (August 4, 2000) (McWeeny, J.) ("this court recognizes the economic loss rule, barring claims for liability in tort when, as in this case, the loss is merely economic and does not involve physical harm or injury to property"); *Amity Regional School District # 5 v. Atlas Construction Co.,* 2000 Conn. Super. LEXIS 1897, 27 Conn. L. Rptr. 605 (motion to strike negligence claim granted on ground claim barred by economic loss doctrine); *DeVillegas v. Quality Roofing, Inc.,* 1993 Conn. Super. LEXIS 3185, Superior Court, judicial district of Fairfield at Bridgeport, Docket No. 294190 (December 1, 1993) (Freedman, J.) (10 Conn. L. Rptr. 487) (motion to strike negligence claim granted on ground economic loss doctrine bars claim for economic damages absent

allegations of privity of contract and of injury to person or property). In contrast, the other line of authority rejects the proposition that the economic loss doctrine has been adopted by the appellate courts and allows tort claims despite the fact that only economic losses are claimed. See, e.g., _Carolina Casualty v. 60 Gregory Boulevard_, 2000 Conn. Super. LEXIS 739, Superior Court, judicial district of Stamford-Norwalk at Stamford, Docket No. 169383 (March 20, 2000) (Hickey, J.) (26 Conn. [*13] L. Rptr. 685) (motion to strike plaintiff contractor's claim against defendant architectural firm hired by owner for negligent provision of inaccurate plans and specifications denied on ground majority of jurisdictions hold economic loss doctrine does not bar negligence actions by construction professionals against one another where reliance by plaintiff reasonably foreseeable); _Scap Motors, Inc. v. Pevco Systems International, Inc._, 1999 Conn. Super. LEXIS 2230, Superior Court, judicial district of Fairfield at Bridgeport, Docket No. 348461 (August 12, 1999) (Melville, J.) (25 Conn. L. Rptr. 283) (in action alleging breach of agreement settling dispute concerning sale and installation of pneumatic tube transport system, motion to strike fraud claim for economic losses denied on ground appellate courts have not recognized economic loss doctrine and court likewise would not); _Darien Asphalt Paving, Inc. v. Newtown_, 1998 Conn. Super. LEXIS 3496, Superior Court, judicial district of New Britain at New Britain, Docket No. 4878 (December 7, 1998) (Nadeau, J.) (23 Conn. L. Rptr. 495) (motion to strike tort claims denied, declining to recognize the economic loss doctrine); _Reiner & Reiner, P.C. v. Connecticut Natural Gas Corp._, 1995 Conn. Super. LEXIS 3470, Superior [*14] Court, judicial district of Hartford-New Britain at Hartford, Docket No. 551260 (December 12, 1995) (Hennessey, J.) (motion to strike negligence claims denied, rejecting argument that economic loss doctrine bars action for direct economic losses resulting from defendant's negligence); _Eremita v. Stein_, 1995 Conn. Super. LEXIS 3096, Superior Court, judicial district of Hartford-New Britain at New Britain, Docket No. 463210 (November 2, 1995) (Arena, J.) (judgment for plaintiff on negligent misrepresentation claim not barred by fact only economic losses claimed).

The former line of authority accepting the economic loss doctrine cites _Flagg Energy Development Corp. v. General Motors Corp._, 244 Conn. 126, 709 A.2d 1075 (1998), and/or _Connecticut Mutual Life Ins. Co. v. New York & New Haven R. Co._, 25 Conn. 265 (1856), as authority for the proposition that the economic loss doctrine has been adopted and applied in Connecticut. This court's own reading of these cases finds, however, that neither _Flagg_ nor _Connecticut Mutual_ provides

support for the proposition that the economic loss doctrine has been conclusively adopted as precluding all tort claims such as those in the [*15] present case. The holding in _Flagg_ may fairly be read as holding that where a plaintiff claims commercial losses suffered as a result of defective performance of a contract for the sale of goods, such losses are governed by the UCC, which in turn preserves common law actions for fraud and misrepresentation only as long as such actions are consistent with the particular provisions of the UCC. See _Flagg Energy Development Corp. v. General Motors Corp., supra_, 244 Conn. at 154-55. The Connecticut Supreme Court specifically found that one such provision, General Statutes § 42a-2-721, was in fact intended "to make actions for fraud or misrepresentation presumptively inconsistent with post-acceptance claims for breach of warranty." (Emphasis omitted.) _Id._, 155. Therefore, the court's affirmance of the trial court's granting of the defendant's motion to strike the plaintiffs' misrepresentation claim was not expressly premised on the economic loss doctrine but rather on the fact that such a claim was incompatible with and thus displaced by the provisions of the UCC.

Connecticut Mutual involved an action by an insurance company against a railroad after the insurer became liable to pay the proceeds of a life insurance policy to the estate of its insured, who died after the train he was riding in derailed due to the negligence of the railroad. Connecticut Mutual Life Ins. Co. v. New York & New Haven R. Co., supra, 25 Conn. 271. The court directed judgment for the defendant, holding that "in the absence of any privity of contract between the plaintiffs and defendants, and of any direct obligation of the latter to the former growing out of the contract or relation between the insured and the defendants, the loss of the plaintiffs, although due to the acts of the railroad company. . . was a remote and indirect consequence of the misconduct of the defendants, and not actionable." _Id._, 276-77. The court reached this conclusion after finding neither a public law charging the railroad with a duty to insurers of its passengers nor that the insured exacted any obligation from the railroad toward his insurer when he contracted for carriage. _Id._, 276.

The above quoted language from _Connecticut Mutual_ is presumably the [*16] portion of the case relied on as articulating the concepts of the economic loss doctrine. This language, however, does not articulate the economic loss doctrine, but rather illustrates an early application of the concepts of privity of contract and foreseeability, which the court utilized in holding that the injury to the insurer was too remote and indirect a consequence to hold the railroad liable therefore.

Nevertheless, even if *Flagg* and *Connecticut Mutual* do stand for the general adoption of the economic loss doctrine, the Connecticut Supreme Court has indicated that where the tort alleged is an intentional tort, the doctrine would not apply to bar the cause of action. See *Connecticut Mutual Life Ins. Co. v. New York & New Haven R. Co., supra*, 25 Conn. 276 ("Had the life of [the insured] been taken with intent to injure the plaintiffs through their contract liability, a different question would arise, inasmuch as every man owes a duty to every other not intentionally to injure him"). In addition, the Connecticut Supreme Court has expressly rejected the economic loss doctrine as a bar to a claim for negligent misrepresentation. See *Williams Ford, Inc. v. Hartford Courant Co.*, 232 Conn. 559, 579, 657 A.2d 212 (1995). [*17] In that case, the defendant argued that the tort of negligent misrepresentation did not apply to the facts of the case on the ground that "where the controversy concerns purely economic losses allegedly caused by statements made during the course of a contractual relationship between businesses, it is contract law, rather than tort law, that should apply." *Id.* The court rejected this argument, relying on its prior decision of *D'Ulisse-Cupo v. Board of Directors of Notre Dame High School, supra*, 202 Conn. 218, to support its conclusion that "a remedy on the contract is independent of a remedy for negligent misrepresentation." *Williams Ford, Inc. v. Hartford Courant Co., supra*, 579. The court's reliance on *D'Ulisse-Cupo* for this proposition also would seem to imply that its allowance of a negligent misrepresentation claim in *D'Ulisse-Cupo* was not dependent on the nature of the damages alleged by the plaintiff. See also *Eremita v. Stein, supra*, 1995 Conn. Super. LEXIS 3096, *15, Superior Court, Docket No. 463210 ("a claim of negligent misrepresentation, based on statements made during the course of a contractual relationship, may be brought even though purely economic losses [*18] are alleged"). Thus, whatever the viability of the economic loss doctrine in Connecticut, the Connecticut Supreme Court has not, in at least some cases, barred claims for intentional torts or for negligent misrepresentation despite the fact purely economic damages are claimed.

Based on the foregoing, the court declines to apply the economic loss doctrine to bar the plaintiffs' claims for intentional and negligent misrepresentation. Therefore, the defendants' motion to strike counts nine and ten is denied.

C

Finally, the defendants move to strike count thirteen alleging a violation of CUTPA. Specifically, the defendants argue that employer-employee relationships do not constitute trade or commerce within the context of CUTPA. In opposition, the plaintiffs argue that the substance of their CUTPA claim arises out of a dispute over the ownership structure of Allied and not out of anything within the narrow confines of the employer-employee relationship that existed between Reynolds and the defendants.

In *Quimby v. Kimberly Clark Corp.*, 28 Conn. App. 660, 613 A.2d 838 (1992), the Appellate Court held that "the actual employment relationship is not itself trade or commerce [*19] for the purpose of CUTPA." (Internal quotation marks omitted.) *Id.*, 670. In reliance on *Quimby v. Kimberly Clark Corp., supra*, 670, numerous Superior Court judges have stricken CUTPA claims when the allegations arise out of or are closely related to an employer-employee relationship. See, e.g., *Jablonski v. Sheldon Precision Co.*, 2000 Conn. Super. LEXIS 959, Superior Court, judicial district of Waterbury, Docket No. 145784 (April 10, 2000) (Doherty, J.); *Shah v. Cover-It, Inc.*, 2000 Conn. Super. LEXIS 946, Superior Court, judicial district of Ansonia-Milford at Milford, Docket No. 68182 (April 10, 2000, Arnold, J.); *Bishop v. Paine Webber, Inc.*, 1999 Conn. Super. LEXIS 2029, Superior Court, judicial district of Danbury, Docket No. 331709 (July 28, 1999, Moraghan, J.) (25 Conn. L. Rptr. 173, 175); *D'Aquila v. Environmental Systems Products, Inc.*, 1993 Conn. Super. LEXIS 3132, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 455259 (November 18, 1993) (Berger, J.); see also *United Components, Inc. v. Wdowiak*, 239 Conn. 259, 264-65, 684 A.2d 693 (1996).

The plaintiffs are correct, however, in their assertion that it is not the relationship between the parties that is dispositive but the conduct of the defendants. [*20] *Fink v. Golenbock*, 238 Conn. 183, 214, 680 A.2d 1243 (1996); *Larsen Chelsey Realty Co. v. Larsen*, 232 Conn. 480, 491, 656 A.2d 1009 (1995). This court thus focuses on the conduct of the defendants alleged to be in violation of CUTPA. The allegations show that the complained of activities of the defendants all arise out of or are related to, first, the defendants' refusal to honor the terms of Reynolds' employment contract by giving him an ownership interest in the company and, then, the defendants' subsequent refusal to honor an agreement settling the dispute over the ownership structure of the company.

The court finds that these allegations of the complaint bear little similarity to the kind of anticompetitive activity conducted outside of the employment relationship held to have violated CUTPA in *Larsen Chelsey Realty Co. v. Larsen, supra*, 232 Conn. 480, and *Fink v. Golenbock, supra*, 238 Conn. 183. As the court explained in *Fink*: "In *Larsen Chelsey Realty Co. v. Larsen, supra*, 232 Conn. 480 . . . the defendant,

who was president of [the plaintiff], accepted employment with a competing firm. [*21] *Id.*, 485. He sent notices to clients and business contacts, falsely informing them that [the plaintiff] was being taken over by the competing firm and that they should take their business to that firm. *Id.*" *Fink v. Golenbock, supra,* 238 Conn. at 213. "We concluded that by falsely informing clients and business contacts that [the plaintiff] was going out of business, by taking that client base to a competitor and by taking [the plaintiff's] employees to a competitor, the defendant had engaged in unfair trade practices in violation of CUTPA." *Id.*, 214.

Similar circumstances were present in *Fink v. Golenbock, supra,* 238 Conn. 183. In that case, the plaintiff and the defendant had formed a corporation in which each owned 50 percent. After the relationship between the parties deteriorated, the defendant "using threats . . . forced the plaintiff first to leave the practice and then to leave town. [The defendant] informed clients that the corporation had changed and that they should take their business and pay their bills to a new corporation. [The defendant] took over the corporation's assets, equipment and employees, [*22] using them to establish his new practice, which provided the same type of services. Because the original corporation had neither been dissolved . . ., nor extinguished . . . these acts amounted to competitive moves designed to co-opt all of the corporation's operations." *Id.*, 214. The defendant characterized the action as a "dispute over the internal governance of the corporation," to which CUTPA did not apply. *Id.*, 213. The court rejected his argument, concluding that his "actions went well beyond governance of the corporation, and placed him in direct competition with the interests of the corporation." *Id.*

No such allegations are made in the present case. Instead, the allegations all arise out of or are related to an alleged breach of the terms of an employment contract and the subsequent activities of the parties to resolve the dispute. It is hard to imagine anything more closely arising out of an employment relationship than the formation and terms of the employment. This court thus finds that these allegations cannot support a cause of action under CUTPA. See *Quimby v. Kimberly Clark Corp., supra,* 28 Conn. App. 670; see [*23] also *Jablonski v. Sheldon Precision Co., supra,* Superior Court, Docket No. 145784 (allegations that plaintiff accepted employment with defendant in reliance on representations of terms of that employment, which included control over enforcement of quality control standards, and that plaintiff was later discharged for failing to approve poor quality goods arise out of employer-employee relationship and do not implicate CUTPA).

The plaintiffs' characterization of their claims as a dispute over the ownership structure does not save their CUTPA claim. Numerous Superior Court decisions hold that such intra-organizational disputes do not fall within the purview of CUTPA. See, e.g., *Chila v. Chila,* 1995 Conn. Super. LEXIS 1056, Superior Court, judicial district of Stamford-Norwalk at Stamford, Docket No. 140570 (April 3, 1995) (D'Andrea, J.) (motion to strike CUTPA claim granted on ground allegation that defendants agreed to transfer ownership in corporation in return for plaintiff's continued employment concerns dispute over ownership of corporation not within purview of CUTPA); see also *Sector Management, Inc. v. Taurus Advisory Group, Inc.,* 1998 Conn. Super. LEXIS 1043, Superior Court, judicial district of Stamford-Norwalk at Stamford, Docket No. 154033 (April 15, 1998) (D'Andrea, J.) (intra-organizational [*24] dispute concerning resource contribution in formation of company does not implicate CUTPA); *Diette v. Dental Group of Norwalk,* 1998 Conn. Super. LEXIS 512, Superior Court, judicial district of Stamford-Norwalk at Stamford, Docket No. 158747 (February 27, 1998) (Lewis, J.) (allegations that defendant offered ownership interest in corporation to plaintiff involve internal workings of corporation to which CUTPA is inapplicable).

For the foregoing reasons, the defendants' motion to strike count thirteen is granted.

CONCLUSION

The defendants' motion to strike counts seven and thirteen is granted. The defendants' motion to strike counts nine and ten is denied.

Berger, J.

Scap Motors, Inc. v. Pevco Systems International, Inc.

CV 970348461S

SUPERIOR COURT OF CONNECTICUT, JUDICIAL DISTRICT OF FAIRFIELD, AT BRIDGEPORT

1999 Conn. Super. LEXIS 2230

August 12, 1999, Decided
August 12, 1999, Filed

**NOTICE:**

**PUB-STATUS:** [*1] THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

**DISPOSITION:** Defendant's motions to strike DENIED.

**JUDGES:** MELVILLE, J.

**OPINIONBY:** MELVILLE

**OPINION:** MEMORANDUM OF DECISION RE: MOTION TO STRIKE (DOCKET ENTRY NO. 109)

On February 17, 1998, the plaintiff, Scap Motors, Inc., filed a four-count revised complaint against the defendant, Pevco Systems International, Inc. Count one alleges a breach of the settlement agreement, count two alleges a breach of the implied covenant of good faith and fair dealing, count three alleges fraud and count four alleges a CUTPA violation. The plaintiff alleges the following facts. In 1994, the plaintiff filed a suit against the defendant due to a dispute concerning the sale and installation of a pneumatic tube transport system. Subsequently, in June 1995, the parties signed a settlement agreement whereby the defendant promised to provide the plaintiff with a fully-functional, fully-installed pneumatic tube transport system in exchange for the plaintiff withdrawing its pending 1994 action against the defendant. Despite the defendant's purported completion of [*2] the system, the plaintiff began experiencing problems with the system. After experiencing numerous malfunctions with the system in 1995 and 1996, the plaintiff, based upon the defendant's suggestions, authorized the defendant to upgrade the system at an additional cost of $ 13,500. The plaintiff has yet to be given possession of a fully-functional, fully-installed system and therefore has brought the present lawsuit against the defendant for breach of the aforementioned settlement agreement.

The defendant moves to strike counts two, three and four and the corresponding claims for punitive damages and attorneys fees on the ground that the common-law economic loss doctrine and the Connecticut Product Liability Act; General Statutes 52-572n(c); bar the plaintiff from asserting claims for tortuous breach of contract, common-law fraud, and violation of CUTPA in a dispute between commercial parties where only economic losses are at issue. Specifically, the defendant moves to strike on the ground that, because the plaintiff only alleges commercial loss, it is limited to the remedies available under the Uniform Commercial Code (UCC). The defendant further argues that count two for "tortious [*3] breach of contract" is not a distinct cause of action in Connecticut.

The plaintiff first claims that the defendant's motion to strike is untimely filed. Secondly, the plaintiff contends that the claims raised in counts two, three and four are not simple warranty claims covered by the UCC and Connecticut Product Liability Act. Thirdly, the plaintiff contends that the claims raised in counts two, three and four do not arise from the sale of goods but from the defendant's actions in entering into a settlement agreement, having no intention of fulfilling its obligations pursuant to the agreement. Lastly, the plaintiff contends that count two is a claim for the recognized cause of action of breach of the implied covenant of good faith and fair dealing.

The plaintiff's argument that the defendant's motion to strike is untimely should be addressed first. The plaintiff argues that, in response to the defendant's request to revise, the plaintiff filed a revised complaint on February 11, 1998. The plaintiff further alleges that it was not until September 23, 1998 that the defendant filed its motion to strike. It should, however, be noted that the court, *Nadeau, J.*, sustained plaintiff's [*4] objection to the defendant's motion for order of compliance on August 24, 1998.

Pursuant to Practice Book 10-8, "any subsequent pleadings, motions and requests shall advance at least one step within each successive period of fifteen days . . ." Therefore, pursuant to Practice Book 10-8, the defendant should have filed the motion to strike by September 8, 1998, fifteen days after the court sustained the plaintiff's objection to the defendant's motion for order of compliance. However, although a motion to strike may appear untimely on its face, the court has discretion to permit a late pleading where the parties have both submitted arguments on the matter. See *People's Bank v. Scarpetti*, 1998 Conn. Super. LEXIS 351, Superior Court, judicial district of Fairfield at Bridgeport, Docket No. 345123 (February 5, 1998) (*Skolnick, J.*) (21 CONN. L. RPTR. 357); see also *Margolis v. Sweet Life Foods, Inc.*, 1993 Conn. Super. LEXIS 2876, Superior Court, judicial district of New Haven at New Haven, Docket No. 345004 (October 29, 1993) (*Meadow, S.T.R.*) (court overlooked forty day lapse between filing of pleading and motion to strike where parties fully briefed merits of motion).

Based on the foregoing analysis and because both parties [*5] have submitted arguments, this court will exercise its discretion to allow the defendant's motion to strike to be filed approximately fifteen days late. Accordingly, the plaintiff's objection to the untimely filing of the instant motion to strike is overruled, and the court will now determine the present motion to strike on its merits.

The defendant's first theory for striking counts two, three and four of the plaintiff's complaint is the economic loss doctrine. It therefore must be determined whether the Connecticut courts recognize this doctrine. The economic loss doctrine is a judicially created doctrine which bars recovery in tort where the relationship between the parties is contractual and the only losses alleged are economic. *Darien Asphalt Paving, Inc. v. Town of Newtown*, 1998 Conn. Super. LEXIS 3496, Superior Court, judicial district of New Britain, Docket No. 04878 (December 7, 1998) (*Nadeau, J.*) (23 CONN. L. RPTR. 495, 495, 497). The appellate courts have not seen fit to recognize the doctrine. *Id.*, 497. Additionally, in *Darien Asphalt Paving, Inc. v. Town of Newtown, id.*, the court declined to find that the Connecticut courts recognize the economic loss doctrine as a bar to tort [*6] actions where the relationship between the parties is contractual and the only losses alleged are economic.

Based upon the foregoing, this court likewise declines to recognize the economic loss doctrine as a bar to the plaintiff's tort causes of actions in counts *two, three* and *four* where the relationship between the plaintiff

and the defendant is contractual and the only losses alleged by the plaintiff are economic.

The defendant's second theory for striking counts two, three and four of the plaintiff's complaint is the Connecticut Product Liability Act, 52-572n(c); which precludes recovery under the act of a commercial loss caused by a product by a commercial claimant in a product liability claim. An action for commercial loss caused by a product may be brought only under, and shall be governed by, title 42a, the Uniform Commercial Code. Section 52-572n(a) and (c) of the General Statutes discuss product liability claims. Pursuant to 52-572m(b), a "Product liability claim" includes "all claims or actions brought for personal injury, death or property damage caused by the manufacture, construction, design, formula, preparation, assembly, installation, testing, warnings, [*7] instructions, marketing, packaging or labeling of any product. Here, the plaintiff has not brought any claims or actions for personal injury, death or property damage. Rather, the plaintiff has brought a claim for economic damages caused by the defendant's breach of its part of a settlement agreement to provide the plaintiff with a fully-functional, fully-installed pneumatic tube transport.

General Statutes 52-572n is titled "Product liability claims." Based on the definition of "product liability claim" and the foregoing analysis, the present lawsuit does not concern a product liability claim and therefore 52-572n is inapplicable. Accordingly, defendant's motion to strike counts two, three and four on this theory is also *denied.*

The defendant's third theory for striking these three counts of the plaintiff's complaint is that where a mere commercial loss is alleged, the only remedies available are pursuant to the UCC. Article 2 of the UCC applies to transactions involving the *sale of goods*. See General Statutes 42a-2-102; see also *Sun Hill Industries, Inc. v. Kraftsman Group, Inc.*, 27 Conn. App. 688, 693, 610 A.2d 684, cert. denied, 223 Conn. 913, 614 A.2d 831 (1992) [*8] (where case involves sale of goods, it is governed by Article 2 of the UCC); *Roy v. Stephen Pontiac-Cadillac, Inc.*, 15 Conn. App. 101, 104, 543 A.2d 775 (1988) (same); *Franklin Quilting Co., Inc. v. Orfaly*, 1 Conn. App. 249, 251, 470 A.2d 1228 (1984) (same).

Here, although the initial agreement between the parties was for the sale and installation of a pneumatic transport tube, which would be considered merchandise under the UCC, the present lawsuit does not deal with a transaction in the sale of goods. Rather, the present lawsuit, as already pointed out, deals with

the breach of a settlement agreement. Consequently, the UCC is not applicable to this case. n1 Accordingly, defendant's motion to strike counts two, three and four on this theory is also *denied*.

- - - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n1 Although in Flagg Energy Development v. General Motors Corp., 244 Conn. 126, 709 A.2d 1075 (1998), the Supreme Court considered a settlement agreement resulting from a dispute over a contract for the sale of goods, the Supreme Court there concluded that the settlement agreement "modified and incorporated, but [did] not extinguish the terms of the [original] purchase agreement." Id., 146. Here, the settlement agreement, by the following express terms, extinguished the original contract: "This agreement constitutes the full and complete understanding and agreement of the parties and shall supersede all prior understandings and agreements relating to the subject matter of the action entitled Scap Motors, Inc. v. Pevco Systems International, Inc. between the parties to this Agreement, except for the releases to be executed pursuant to the terms of this Agreement." (Plaintiff's Exhibit B, p. 4-5, 11.) Consequently, this agreement is independent of the original contract for the sale of goods.

- - - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -

[*9]

The defendant's final argument involves only count two. The defendant argues that count two is a claim for tortious breach of the settlement agreement which is not a distinct cause of action in Connecticut. In Connecticut, there is no cause of action for tortious breach of contract. *Connecticut Environmental Associates, Inc. v. Connecticut Resources Recovery Act,* 1997 Conn. Super. LEXIS 2050, Superior Court, judicial district of New Haven, Docket No. 393991 (July 23, 1997) (*Zoarski, J.*) (20 CONN. L. RPTR. 174, 174). However, the plaintiff has not brought a cause of action for tortuous breach of contract. Count two, paragraph fourteen of the plaintiff's complaint states that "the defendant Pevco has engaged in conduct constituting a bad faith, tortuous breach of the Settlement Agreement existing between Pevco and Scap Motors, Inc." (Complaint, Count two, 14.) Furthermore, the concluding paragraph of count two states that "as a direct and proximate result of the

defendant's breach of its implied covenant of good faith and fair dealing, the plaintiff has sustained, and will continue to sustain, substantial monetary damages and losses." (Complaint, Count two, 15.) Count two is a claim for breach of the [*10] implied covenant of good faith and fair dealing. Every contract carries an implied covenant of good faith and fair dealing requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement. *Gupta v. New Britain General Hospital,* 239 Conn. 574, 598, 687 A.2d 111 (1996).

Based on the foregoing analysis, the defendant's motion to strike counts two of the plaintiff's complaint is denied as well.

As to the plaintiff's demands for punitive damages and attorneys fees, the defendant argues they should be stricken because they correspond to the causes of action outlined above in counts two, three and four. Because the court has declined to strike counts two, three and four, the plaintiff's demands for punitive damages and attorneys fees should remain. Accordingly, the defendant's motion to strike these demands is also *denied*.

In summary, for the reasons hereinbefore stated, all of defendant's motions to strike are hereby DENIED.

MELVILLE, J.

REINER & REINER, P.C. INTERTOWN REALTY COMPANY v. CONNECTICUT NATURAL GAS
CORPORATION, HUBBLE CONSTRUCTION CORPORATION

NO. CV95 0551260

SUPERIOR COURT OF CONNECTICUT, JUDICIAL DISTRICT OF HARTFORD - NEW BRITAIN, AT
HARTFORD

1995 Conn. Super. LEXIS 3470

December 12, 1995, Decided
December 12, 1995, FILED

**NOTICE:**
**PUB-STATUS:**    [*1]    THIS DECISION IS
UNREPORTED AND MAY BE SUBJECT TO
FURTHER APPELLATE REVIEW. COUNSEL IS
CAUTIONED TO MAKE AN INDEPENDENT
DETERMINATION OF THE STATUS OF THIS
CASE.

**DISPOSITION:** Denied.

**JUDGES:** M. Hennessey, J.

**OPINIONBY:** M. Hennessey

**OPINION: MEMORANDUM OF DECISION**

The defendant Connecticut Natural Gas Corporation's
("CNG") moves to strike counts two and four of the
complaint on grounds that the plaintiffs cannot recover
for economic loss in a common law negligence action
absent a showing of contractual privity, personal injury
or property damage.

On June 15, 1995, the plaintiffs, Reiner & Reiner, P.C.
("Reiner") and Intertown Realty Company
("Intertown"), filed a four count complaint against the
defendants, Connecticut Natural Gas Corporation
("CNG") and Hubble Construction Corporation
("Hubble"), alleging that the defendants negligently
caused a gas leak near the plaintiffs' respective offices.
The plaintiffs contend that defendant Hubble was
negligent in the excavation and installation of a sewer
system in an area directly adjacent to the plaintiffs'
place of business. Plaintiffs further contend that
defendant CNG was negligent in improperly marking
the location of [*2] its gas pipes and in failing to
provide Hubble with accurate maps of the gas pipes.

In count two of the complaint, plaintiff Reiner alleges
that on May 17, 1994 CNG negligently caused a gas
leak adjacent to the plaintiff's place of business. Reiner
further alleges that the gas leak resulted in the
evacuation of the building and forced the plaintiff to
shut down its office for more than six hours. As a
result, Reiner claims to have incurred economic

damages, including wages paid to employees for time
not worked, overhead and lost business. In count four
of the complaint, plaintiff Intertown makes similar
allegations concerning its business operations and also
seeks recovery for its economic damages.

The defendant CNG filed a motion to strike on July 25,
1995 claiming that counts two and four of the
complaint fail to state a cause of action upon which
relief can be granted. Specifically, CNG asserts that
these counts seek to recover indirect economic
damages which are not recoverable absent contractual
privity between the parties, or a showing by the
plaintiffs of personal injury or property damage.

The motion was presented to the court on September 5,
1995. On August 24, 1995, the [*3] plaintiffs filed
papers in opposition to defendant CNG's motion to
strike.

"The purpose of a motion to strike is to contest . . . the
legal sufficiency of the allegations of any complaint . .
. to state a claim upon which relief can be granted. In
ruling on a motion to strike, the court is limited to the
facts alleged in the complaint. The court must construe
the facts in the complaint most favorably to the
plaintiff." (Citation and internal quotation marks
omitted. Novametrix Medical Systems v. BOC Group,
Inc., 224 Conn. 210, 214-15, 618 A.2d 25 (1992). "If
facts provable in the complaint would support a cause
of action, the motion to strike must be denied."
Westport Bank & Trust Co. v. Corcoran, Mallin &
Aresco, 221 Conn. 490, 496, 605 A.2d 862 (1992).

In its motion to strike, defendant CNG argues that "the
long established common law rule in this state is that
in the absence of privity of contract between the
plaintiff and defendant, or of an injury to the plaintiff's
person or property, a plaintiff may not recover in
negligence for a purely economic loss." (Citations
omitted.) DeVillegas v. Quality Roofing, Inc., 1993
Conn. Super. LEXIS 3185, Superior Court, judicial
[*4] district of Fairfield at Bridgeport, Docket No.
294190 (December 1, 1993, Freedman, J.). CNG

argues that both Reiner and Intertown have failed to allege contractual privity with CNG, personal injury, or property damage from the incident. As a result, CNG contends that no cause of action exists. According to CNG, Reiner and Intertown have merely alleged "indirect" economic losses, which are not recoverable. CNG contends that a plaintiff cannot recover for economic harm that "is simply too tenuous to impose liability for such collateral consequences." RK Constructors, Inc. v. Fusco Corp., 231 Conn. 381, 388, 650 A.2d 153 (1994).

A review of the facts in the complaint leads the court to the conclusion that, although the plaintiffs have failed to allege the requisite privity of contract, they have successfully alleged direct damages. The plaintiffs were forced to evacuate their offices due to a gas leak caused by the alleged negligence of CNG. The evacuation of the premises resulted in a shut down of their business. Consequently, the plaintiffs incurred damages in the form of payment of wages and benefits to employees who were unable to work, overhead expenses, and lost business. [*5] Construing the facts in the complaint most favorably to the plaintiffs, the court finds that the plaintiffs' economic losses are not too remote to be chargeable to the defendant.

For the foregoing reasons, CNG's motion to strike is denied.

M. Hennessey, J.