## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CROWN THEATRES, LP, | : | CIVIL ACTION NO. |
| | : | 3:02-CV-2272 (AVC) |
| Plaintiff, | : | |
| | : | |
| VS. | : | |
| | : | |
| MILTON L. DALY, ET AL., | : | |
| | : | MAY 21, 2004 |
| Defendants. | : | |

## MEMORANDUM OF LAW
## OF DEFENDANTS MILTON L. DALY AND TAYLOR-LEIGH, INC.
## IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Defendants Milton L. Daly and Taylor-Leigh, Inc. hereby oppose the Motion for Summary Judgment (dated April 30, 2004) that has been filed by the plaintiff. In its motion, the plaintiff seeks judgment against defendant Milton Daly on Counts VII, X, XIV, XVI and XXI of the Second Amended Complaint and against defendant Taylor-Leigh, Inc. on Count VII of the Second Amended Complaint. However, for the reasons that follow, the plaintiff's motion for summary judgment should be denied in its entirety, or alternatively only granted in limited respects, because genuine issues of material fact exist in regard to the liability of these defendants on Counts VII, X, XIV and XVI; because the plaintiff is not entitled to judgment on Count X as a matter of law; and because genuine issues of material fact exist as to Counts VII, X, XIV, XVI and XXI in regard to the amount of damages that are claimed by the plaintiff.

**<u>Preliminary Procedural Matter</u>**

In seeking a summary judgment against defendants Milton Daly and Taylor-Leigh, Inc., the plaintiff has relied, in part, on the Declaration of Frederick C. Hamilton (Exhibit J in the Appendix to the plaintiff's summary judgment brief) and on a so-called "Updated Analysis" (Exhibit H in the Appendix to the plaintiff's summary judgment brief), which documents are intended to provide evidence regarding a purported computation of the amount of the plaintiff's damages.  However, for the reasons set forth in the accompanying Motion to Strike Summary Judgment Materials, the plaintiff cannot rely on the portions of the Declaration of Frederick C. Hamilton, which was executed on April 21, 2004, or on the so-called "Kroll Zolfo Cooper Updated Analysis" to support its claim for damages against these defendants.

Hamilton is the plaintiff's expert witness.  As such, the plaintiff is subject to strict disclosure requirements in regard to his testimony.  <u>See</u> F.R.Civ.P. 26(a)(2).  In addition, the plaintiff is subject to court-imposed deadlines, including this Court's October 21, 2003 scheduling order which stated: "the plaintiff shall designate all trial experts and provide opposing counsel with reports from retained experts on or before November 30, 2003, and depositions of any such experts shall be completed by December 31, 200[3]."  Based on the plaintiff's prior disclosure and Hamilton's accompanying report, Hamilton was deposed on December 23, 2003.  Now, subsequent to his deposition and in contravention of the October 21, 2003 scheduling order, the

plaintiff seeks to "disclose" new opinion testimony from Hamilton through a summary judgment affidavit and the new reports attached thereto.  The deadline for the disclosure of expert reports has long since passed, as has the deadline for conducting discovery.  The parties have heretofore relied on those deadlines in order to prepare this case for dispositive motions (and trial, if necessary).  The plaintiff should not be permitted to ignore those deadlines by filing a new expert report fully 5 months after the court-ordered deadline for such disclosure (and fully 4 months after the expert's deposition, and a month after the close of discovery, and approximately 8 weeks before the case has been ordered to be ready for trial).  The plaintiff's fast and loose play with those court-imposed deadlines, by making its expert's opinion available to the defendant in a piecemeal fashion, should not be tolerated.  For this reason, the substance of the expert's newly formed opinion and his new reports are not properly considered by the Court for purposes of the pending motions for summary judgment, or otherwise.  <u>See Schweizer v. Dekalb Swine Breeders, Inc.</u>, 954 F.Supp. 1495, 1509-11 (D. Kan. 1997) (striking portions of summary judgment affidavit containing opinions that go beyond expert's prior reports); <u>see also</u> <u>Reid v. Lockheed Martin Aeronautics Co.</u>, 205 F.R.D. 655, 661-62 (N.D. Ga. 2001) (District Court entitled to disregard supplemental expert reports produced after court-imposed deadline; even Rule 26(e)(1) duty to supplement does not bestow on litigants a right to rely on supplements produced after court-imposed deadline).  Similar reasoning precludes the plaintiff from relying on the so-

called "Kroll Zolfo Cooper Updated Analysis" (Exhibit H).  In addition, those documents have not been properly presented to the Court for purposes of the pending motion for summary judgment.  <u>See</u> Memorandum of Law in Support of Defendants Milton L. Daly and Taylor-Leigh, Inc.'s Motion to Strike Summary Judgment Materials.

Accordingly, in passing upon the plaintiff's motion for summary judgment, the Court must disregard: (a) Paragraphs 6-12 of the Declaration of Frederick C. Hamilton and Exhibits 2-4 attached thereto (all of which appear as Exhibit J in the Appendix to the plaintiff's summary judgment brief); and (b) the "Kroll Zolfo Cooper Updated Analysis" (which appears as Exhibit H in the Appendix to the plaintiff's summary judgment brief).  The striking of those documents proves an additional reason to conclude that the plaintiff's summary judgment motion is deficient.

### <u>Pertinent Facts</u>

The defendants will now turn to the facts that support their opposition to the pending motion for summary judgment.  As will be demonstrated, the evidence, when viewed most favorably to the defendants (as the Court is required to do in passing upon the plaintiff's motion for summary judgment), shows that there is a genuine issue to be tried regarding the defendants' involvement in the fraudulent invoice scheme on which the plaintiff bases its claim for summary judgment.

Attached to this memorandum of law are the following materials that are relied upon by the defendants in opposing the plaintiff's motion for summary judgment: (1) excerpts from the May 21, 2003 Deposition of Milton L. Daly (hereinafter cited as "Daly Deposition of 5/21/03," followed by an appropriate page reference); and (2) excerpts from the Deposition of Robert L. Beacher (hereinafter cited as "Beacher Deposition," followed by an appropriate page reference[1]).  These documentary materials establish the following facts in opposition to the motion for summary judgment.

First, the defendants rely on the following facts, which are not believed to be in dispute.  Defendant Milton L. Daly ("Daly") was the executive vice president and chief operating officer of plaintiff Crown Theatres, LP ("Crown Theatres") from early 1996 until June, 2001.  (Daly Deposition of 5/21/03 at 15.)  He reported to Daniel Crown, president of Crown Theatres.  However, long before the time that Daly was hired by Crown Theatres, Robert Beacher ("Beacher") individually, and through his company BB Construction Consultants ("BB Construction") worked for Crown Theatres on various theatre construction projects.  (Beacher Deposition at 39, 305.)  From approximately 1975 through 1994, through various companies that he owned, Beacher specialized in

---

[1] The Deposition of Robert L. Beacher took place over two days (February 25 and 26, 2004) and appears in 4 transcript volumes.  However, because those volumes are paginated sequentially from 1 to 555 without regard to the date of the deposition, no distinction will be made herein regarding the date or transcript volume since a page reference alone should suffice to properly identify the portion of the transcript relied upon.

theater construction throughout the United States.  (Beacher Deposition at 34, 35.)  In 1994, Beacher formed BB Construction, engaging in theater construction consulting. (Beacher Deposition at 36.)

Throughout the construction of all of the theater construction projects that are at issue in the instant litigation, BB Construction was Crown Theatre's representative on each and every one of the job sites, negotiating contracts with landlords and general contractors.  (Beacher Deposition at 37.)  Beacher and BB Construction negotiated the various contracts with the general contractors for each construction project through a bidding process.  Once the individual general contractor was selected for each respective theater construction project, Beacher negotiated the final contract documents on behalf of Crown Theatres with the various general contractors.  (Beacher Deposition at 15, 279).

Significantly, it was Beacher who submitted the invoices to Crown Theatres that underlie the claims of the plaintiff in this litigation.  Likewise, it was the invoices submitted by Beacher for the several theater projects that contained the false information that the plaintiff makes the subject of its motion for summary judgment. However, there is no evidence, other than the uncorroborated testimony of Beacher himself, that anyone, **except Robert Beacher**, knew that the invoices were false at the time that the invoices were submitted.  The invoices either contained information regarding purported work that was never performed or, alternatively, inflated the prices

of the work that was performed by others.   Beacher created the various payment applications (invoices) even though he knew that they contained lies and fraudulent information, with the expectation that BB Construction would be paid by Crown Theatres based upon these fraudulent payment applications.  (Beacher Deposition at 271, 272, 276.)  Beacher has admitted that he stole $1.8 million from Crown Theatres in regard to the various construction projects through the submission of the aforesaid fraudulent payment applications and invoices.  (Beacher Deposition at 29.)

Before Beacher agreed to assist Crown Theatres in the prosecution of the instant litigation, Beacher entered into a Settlement Agreement with the plaintiff which only required him to pay back $1.05 million of the $1.8 million that he admitted that he stole from the plaintiff through his fraudulent invoice scheme.  (Beacher Deposition at 28, 29.)  Before Beacher agreed to impugn Daly through his testimony on behalf of Crown Theatres, Beacher made sure he had a settlement agreement in place that would prevent the plaintiff from suing Beacher.  (Beacher Deposition at 278.)  Beacher admitted and acknowleged his awareness that his cooperation with Crown Theatres through his testimony against Daly had saved him more than half of his net worth.  (Beacher Deposition at 286, 289, 291.)

Although the plaintiff has demonstrated, and Beacher has admitted, that Beacher submitted many false payment applications and invoices to Daly, which form the gravamen of the plaintiff's claims against Daly, the evidence also demonstrates that

Beacher provided many valid and appropriate payment applications and invoices to Daly for payment through Crown Theatres, that is, for work that was actually performed and for which no inflated price was charged.  Daly caused Crown Theatres to pay those invoices.  Before those invoices were submitted to Daly for payment by Crown Theatres, BB Construction first stamped each invoice with a stamp entitled "Received."  Then, BB Construction stamped each such invoice with a stamp entitled "Reviewed."  Finally, BB Construction stamped each such invoice as "Approved, BB Consultants."  (Beacher Deposition at 345, 346.)

Significantly, Beacher used the exact same process to receive, review and approve the valid invoices that he utilized to receive, review and approve the invoices that he claims were invalid.  (Beacher Deposition at 349, 355.)  Thus, Beacher filled out the fraudulent invoices in such a way that they would appear to be valid to those at Crown Theatres who ultimately reviewed and approved their payment.  (Beacher Deposition at 351.)  Beacher testified that he could not identify any writing to corroborate his testimony that Daly was aware that these invoices were fraudulent at the time that they were submitted by Beacher and BB Construction or at the time that they were paid by Crown Theatres.  (Beacher Deposition at 357.)

As can be seen from the above recitation, other than Beacher's testimony there is nothing that links defendants Milton Daly and Taylor-Leigh, Inc. to Beacher's fraudulent payment scheme.  In fact, the following further facts of record controvert the

8

plaintiff's claim of such involvement by Milton Daly and Taylor-Leigh, Inc. in any scheme to cause the plaintiff to pay inflated prices for services that were rendered or to cause the plaintiff to pay for services that were not rendered.

It was Milton Daly's understanding and expectation that that BB Construction was going to actually perform work for Crown Theatres on each of the respective theater projects, with the further understanding and expectation that the work being performed by BB Construction was going to provide an overall savings to Crown Theatres in that BB Construction was supposed to charge less for the work performed than any other potentially competing bidders would have charged for the same work. (Daly Deposition of 5/21/03 at 136.) Rather than inflating the price on invoices to be paid by Crown Theatres or having Crown Theatres pay for work that was never performed, it was Daly's understanding that the theatre project work would be performed for Crown by BB Construction at an expected savings for Crown, and that any profits that Beacher and BB Construction might thereby derive from that those contracts would be split between Daly and Beacher on a 70/30 basis. That is the arrangement that Daly had reached with Beacher. (Daly Deposition of 5/21/03 at 136, 143.) During the entire time of his employment with the plaintiff, Daly was never aware that Beacher, or BB Construction or anyone else, was either fraudulently inflating invoices, or submitting invoices for work that was never performed. (Daly Deposition of 5/21/03 at 141.) In Daly's view, then, the work given to Beacher and BB Construction was intended to provide the

plaintiff with the construction services that it needed at a fair price. Likewise, in Daly's view, the money that he received was profits that were earned by Beacher and BB Construction that were then shared with Daly. However, once the instant litigation was commenced, Daly realized, and has admitted, that he was involved in a form of self-dealing, in violation of his fiduciary duty of loyalty to his employer, Crown Theatres. (Daly Deposition of 5/21/03 at 139, 140.)

## **Legal Argument**

The plaintiff's motion for summary judgment is premised, entirely, upon this Court accepting the testimony of Robert Beacher as credible. Beacher says that Daly knew of Beacher's fraud and that Daly participated in it. Daly has denied that claim. Instead, Daly has testified that his arrangement with Beacher was for Beacher to perform work at rates that were less than those of other potential bidders, which was a benefit to the plaintiff, and that Beacher would share his profits from that work with Daly. While that arrangement implicated Daly's fiduciary obligations to the plaintiff as his employer, it was not the type of fraudulent conduct that is necessary to support the plaintiff's remaining claims against Daly and Taylor-Leigh.

A summary judgment is available only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law." F.R.Civ.P. 56(c). Thus, where the summary judgment materials disclose conflicting evidence or conflicting inferences to be drawn from the evidence, a summary judgment may not enter. For this reason, "[i]n determining whether there is a genuine issue as to any material fact, the court must resolve all ambiguities and draw all inferences in favor of the nonmoving party." Peltier v. Apple Health Care, Inc., 130 F. Supp. 2d 285, 287 (D. Conn. 2000). "The function of the district court in considering the motion for summary judgment is not to resolve disputed issues of fact but only to determine whether there is a genuine issue to be tried. Assessments of credibility and choices between conflicting versions of events are matters for the jury, not for the court on summary judgment. Any weighing of the evidence is the prerogative of the finder of fact, not an exercise for the court on summary judgment." Gorman-Bakos v. Cornell Cooperative Extension of Schenectady County, 252 F.2d 545, 558 (2d Cir. 2001) (internal quotation marks omitted). Simply stated, "[o]n a motion for summary judgment, a court cannot try issues of fact; it can only determine whether there are issues to be tried." Peltier, 130 F. Supp. 2d at 288.

Here, Beacher and Daly give conflicting versions of the facts as they relate to the "fraudulent invoice" scheme that is the basis of the plaintiff's claims in this case. Moreover, not only is that evidence in conflict, but there is a substantial additional basis on which to dispute Beacher's credibility in light of his own admission that he had engaged in fraudulent conduct and in light of his agreement to testify favorably to the

plaintiff in exchange for a settlement under which he paid only a fraction of the amount that he claims to have defrauded the plaintiff (and under which he paid no part of the substantial pre-judgment interest that would otherwise have accrued on that sum). Based on this evidence of untruthfulness on the part of Beacher and this evidence that Beacher is testifying favorably to the plaintiff in exchange for his favorable treatment by the plaintiff, the trier of fact is entitled to disregard Beacher's testimony as not worthy of being believed. Clearly, "[w]here an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate." Advisory Committee Note to 1963 Amendment to F.R.Civ.P. 56; United States v. Rem, 38 F.3d 634, 644 (2d Cir. 1994).

## Counts VII and XIV (Liability for Conversion)

As has already been noted, the plaintiff and defendants Milton Daly and Taylor-Leigh, Inc. have presented conflicting versions of the events underlying the plaintiff's causes of action. The plaintiff claims that Milton Daly knowingly conspired with Robert Beacher to submit false construction invoices to be paid by the plaintiff corporation. The evidence submitted by Milton Daly, however, disputes that claim. Instead, Milton Daly states that he did not know that the construction invoices and payment applications submitted by Beacher, through BB Construction, were false or fraudulent. Rather, he believed that he had negotiated less expensive construction contracts with

Beacher, thereby saving the plaintiff (Daly's employer) money on its construction costs. In Daly's view, then, the payments to BB Construction were all for real construction services and at a better price.  Under such circumstances, there is a genuine issue of material fact in regard to the plaintiff's motion for summary judgment as it bears on Counts VII and XIV of the Second Amended Complaint, which sound in conversion. Since Daly was authorized to negotiate the best price for construction services, and since he believed that he had negotiated a good and fair price, he cannot be found liable for conversion.  Under the arrangement between Daly and Beacher as testified to by Daly, all of the funds that were paid to Daly by Beacher came from the profit that Beacher made on the purportedly legitimate, lower price contracts that Daly had negotiated.  As such, the plaintiff cannot establish an essential element of its cause of action for conversion, namely, that the funds taken by the defendant belonged to the plaintiff, because they represented valid payments to Beacher for work performed by Beacher and because they, therefore, represented funds (profit) that belonged to Beacher that was then shared with the defendants and not funds that belonged to the plaintiff.  See Aetna Life & Casualty Co. v. Union  Trust Co., 230 Conn. 779, 790-92 (1994) (where bank did not know of underlying wrongdoing regarding funds, its subsequent exercise of control over those funds was not conversion); Vanguard Engineering, Inc. v. Anderson, 83 Conn. App. 62 (2004) (evidence relevant to defendant's intent regarding payments claimed to constitute conversion of plaintiff's funds must be considered by trier of fact).

**Count XXI (Liability for Breach of Fiduciary Duty)**

The defendant acknowledges, however, that, notwithstanding that he believed the construction services and invoices submitted by Beacher to be legitimate in terms of actual services rendered and at a fair cost to the plaintiff vis-à-vis the market, that argument does not insulate him from a claim that he breached his fiduciary duty to the plaintiff with respect to the distinctly different claim that the arrangement with Beacher represented improper self-dealing. Here, Daly agreed to pay Beacher for construction services at a fair cost. That conduct certainly did not violate any fiduciary duty; in fact, it furthered his duty to his employer. However, in entering that arrangement, Daly also recognized that Beacher, in order to get the plaintiff's business, was, in effect, willing to accept a lower payment (by way of splitting his profits with Daly). Rather than allowing that "discount" to inure to the benefit of his employer, Daly acknowledges that he, unfortunately, used his position to keep that benefit (*70% of Beacher's profits*) for himself. In doing so, his interests conflicted with those of the plaintiff, to whom he owed a fiduciary duty. In accepting the payments for the business that was given to Beacher (what the plaintiff terms a "kickback"), Daly acknowledges that he breached his fiduciary duty to the plaintiff. Consequently, the defendant cannot (and does not) dispute that, on that basis, a judgment of liability may enter against him in regard to the breach of fiduciary duty claim in Count XXI.

**Count XVI (Liability for Unjust Enrichment)**

Consistent with the argument set forth above in regard to the plaintiff's conversion claim, the plaintiff is not entitled to a summary judgment on its claim of unjust enrichment. Unjust enrichment requires the plaintiff to prove that the defendant received a benefit from the plaintiff. Yet, in the absence of any fraud on the plaintiff by Daly, Daly has received no improper benefit from the plaintiff. See Weisman v. Kaspar, 233 Conn. 531, 550-51 (1995); Aetna Life & Casualty Co. v. Union Trust Co., 230 Conn. 779, 790-92 (1994). Since Daly was authorized to negotiate the best price for construction services, and since he believed that he had negotiated a good and fair price in his arrangement with Beacher, he cannot be found liable for unjust enrichment. Under the arrangement between Daly and Beacher as testified to by Daly, all of the funds that were paid to Daly by Beacher came from the profit that Beacher made on the legitimate, lower price contracts that Daly had negotiated. Therefore, because none of those monies belonged to the plaintiff, the plaintiff cannot establish that the defendant received a benefit from the plaintiff, as it is required to do in order to prevail on its claim of unjust enrichment. In addition, because a claim of unjust enrichment turns on an examination of the factual circumstances and considerations of equity; see Weisman, 233 Conn. at 550; Crowell v. Danforth, 222 Conn. 150, 158 (1992); the disputed issues of fact that appear in the record in this case necessarily preclude the Court from rendering a summary judgment on the plaintiff's claim of unjust enrichment in Count XVI.

## Count X (CUTPA Liability)

The defendant also challenges the plaintiff's claim to liability under CUTPA for several reasons.

First, it is not disputed that all of the acts underlying the CUTPA claim occurred in the course of the defendant's employment relationship with the plaintiff. The Connecticut Supreme Court has concluded that "purely intracorporate conflicts do not constitute CUTPA violations" and instead only "actions outside the scope of the employment relationship designed 'to usurp the business and clientele of one corporation in favor of another . . . fit squarely within the provenance of CUTPA.'" Ostrowski v. Avery, 243 Conn. 355, 379 (1997), quoting Fink v. Golenbock, 238 Conn. 183, 212 (1997). In this case, the conduct of the defendant occurred in the course of his employment relationship with the plaintiff. Nothing at issue here was designed to usurp the business or clientele of the plaintiff in favor of the defendant. The defendant is not alleged to have unlawfully, unfairly or otherwise improperly competed with the business interests of the plaintiff. In Spector v. Konover, 57 Conn. App. 121,133-34, cert. denied, 254 Conn. 913 (2000), the court concluded that a breach of fiduciary duty was actionable under CUTPA only because the conduct at issue amounted to "direct competition" with the business activities of the one to whom the fiduciary duty was owed. That is not alleged here. While the money that was given to Daly by Beacher may breached Daly's fiduciary duty to the plaintiff and thereby harmed the plaintiff, it did

not constitute the kind of unfair competition that is required to establish a CUTPA violation under the aforementioned cases. Accordingly, under the facts of this case, the plaintiff cannot demonstrate that there has been a violation of CUTPA, and the plaintiff is not entitled to a summary judgment in its favor on the CUTPA claim for this reason.

Second, because, as the defendants have already demonstrated, the facts underlying the plaintiff's conversion claim are disputed, and because the plaintiff's conversion claim is, in part, a predicate for the plaintiff's CUTPA claim, there remain disputed issues of fact that are material to the determination of the defendant's liability on the CUTPA claim. For this additional reason, then, summary judgment on the CUTPA claim must be denied.

### Compensatory Damages

The disputed factual contentions discussed above not only prevent the entry of summary judgment as to liability on all but Count XXI (Breach of Fiduciary Duty), but those disputed facts also prevent the Court from determining the issue of damages in regard to all of the plaintiff's claims by way of a summary judgment.

If defendant Daly is ultimately found to have known that the construction invoices were false and fraudulent at the time that he authorized their payment, then the amount of the damages resulting therefrom would, subject to the statute of limitations defense discussed below, be the total amount paid by the plaintiff for all such invoices,

that is, the $6.016 million asserted by the plaintiff.  However, if defendant Daly did not

know that the construction invoices were not for actual construction services rendered

to the plaintiff but instead believed that he was paying Beacher the market rate for

construction services and only keeping any discount that Beacher was offering for his

(Daly's) personal benefit, then the measure of damages is not the total amount paid to

BB Construction but is instead only the lesser amount that Daly had returned to him in

exchange for funneling the business to Beacher in the first place.  Under Daly's version

of the facts, then, and subject to the statute of limitations defense discussed below, the

maximum amount of the judgment that can be entered in favor of the plaintiff on any of

the plaintiff's causes of action is $4.2 million.[2]

In addition to the factual dispute discussed in the preceding paragraph that

affects that amount of the damages to which the plaintiff is entitled, the plaintiff is not

entitled to all of the damages that it seeks by way of summary judgment because of the

applicable statutes of limitation.  This action was commenced on December 20, 2002.  It

is the defendants' position that, to the extent that the plaintiff prevails on any of its

---

[2] These disputed issues of fact undermine the plaintiff's suggestion, in a footnote, that a summary judgment can enter against Daly for the entire $6.016 million based on a theory that Daly aided and abetted Beacher's wrong.  However, liability on that basis would require proof that Daly knowingly assisted Beacher in committing a wrong.  See Slicer v. Quigley, 180 Conn. 252, 259 (1980); Carney v. DeWees, 136 Conn. 256, 262 (1949).  Yet, there is a genuine issue of material fact in regard to whether Daly knew of any wrongdoing by Beacher and participated in the same.

causes of action, the plaintiff's damages are limited to the damages attributable to actions taken within three-years of the filing of the complaint.

Each of the causes of action on which the plaintiff seeks summary judgment has a three-year statute of limitations. The limitations period for breach of fiduciary duty is governed by Conn. Gen. Stat. § 52-577, which provides for a three-year statute of limitations. See, e.g., DeCorso v. Watchtower Bible & Tract Society of New York, 46 Conn. Sup. 386, 400 (2000) ("Actions sounding in breach of trust or breach of fiduciary duty are governed by § 52-577."); Martinelli v. Bridgeport Roman Catholic Diocesan Corp., 196 F.3d 418 (2d Cir. 1999) ("Breach of fiduciary duty claims in Connecticut are ordinarily subject to a three-year statute of limitations under Conn. Gen. Stat. § 52-577.") The limitations period for conversion is likewise governed by Conn. Gen. Stat. § 52-577, which provides for a three-year statute of limitations. See, e.g., D'Occhio v. Connecticut Real Estate Commission, 189 Conn. 162, 182 (1983). As far as the plaintiff's CUTPA claim is concerned, the CUTPA statute itself establishes a three-year limitations period for violations of CUTPA. See Conn. Gen. Stat. § 42-110g(f) (CUTPA action "may not be brought more than three years after the occurrence of a violation"); Timmons v. City of Hartford, 283 F. Supp. 2d 712, 719 (D. Conn. 2003). The CUTPA limitations period, moreover, has been interpreted to be jurisdictional. Avon Meadow Condominium Association, Inc. v. Bank of Boston Connecticut, 50 Conn. App. 688, 699-700, cert. denied, 247 Conn. 946 (1998). Where the plaintiff complains of numerous,

discrete actions, each of which separately violates CUTPA, and which actions occur over a period of time, some more than three years before the filing of the complaint and some less than three years before the filing of the complaint, then the plaintiff's potential damages are necessarily limited to the harm that was suffered by the plaintiff as a result of actions that were taken in violation of CUTPA within the three-year statutory period. Broadway Theatre Corp. v. Buena Vista Pictures Distribution, 2002 WL 32502100, * 6 (D. Conn. September 19, 2002) (copy attached).

In moving for summary judgment, the plaintiff seeks damages for payments that date back more than three years before the filing of the complaint, that is, before December 20, 1999. Exhibit B to the Hamilton Report (dated September 30, 2003), which report is relied on by the plaintiff in support of its motion for summary judgment, sets forth the payments by Beacher to Daly that are the basis for the plaintiff's claims in this case. Thirty-eight (38) of the payments listed there were by checks dated more than three years before the commencement of this action. Those checks total $1,044,700 (with a corresponding "extrapolated amount" of $1,492,429) Thus, notwithstanding the plaintiff's claim of $4,211,200 in damages from 1996 to 2001, the portion of those alleged damages that were incurred within the period allowed by the statutes of limitation (that is, after December 19, 1999) is $3,166,500. Likewise, notwithstanding the plaintiff's claim of $6,016,000 in damages from 1996 to 2001, the portion of those alleged damages that were incurred within the period allowed by the statutes of

limitation (that is, <u>after</u> December 19, 1999) is $4,523,571.  These lesser amounts, then, represent the most that the plaintiff can be entitled to as compensatory damages on the claims for which it seeks summary judgment.[3]

Thus, even if the Court is inclined to grant a summary judgment in regard to the matter of liability concerning one or more counts of the Second Amended Complaint, there are still disputed issues of fact regarding the amount of the damages to which the plaintiff might be entitled.

## Prejudgment Interest

The plaintiff's claim to the contrary notwithstanding, the plaintiff is not entitled to an award of prejudgment interest at the rate of 10% per year as a matter of law. Consequently, it cannot be awarded such interest pursuant Conn. Gen. Stat. § 37-3a through a motion for summary judgment for several reasons.

First, the disputed issues of fact discussed above go directly to the issue of whether the money at issue was "wrongfully detained," as is required in order to

---

[3] Simultaneously herewith, the defendant is filing a Motion to Strike Summary Judgment Materials.  If successful, that motion may preclude the plaintiff from proving some of the damages that it claims by way of its motion for summary judgment.   To the extent that that is the case, it would diminish the potential recovery of the plaintiff, even if it prevails on the pending motion.  In addition, to the extent that any of the damages claimed in the challenged materials were incurred before December 20, 1999, then those damages would be barred by the applicable statutes of limitation for the reasons discussed hereinabove.

authorize an award of prejudgment interest.  Second, while § 37-3a permits an award of prejudgment interest "at the rate of ten per cent a year, and not more," that 10% amount is <u>not</u> a fixed amount but represents a <u>maximum</u> amount that can be adjusted by the trier of fact based on the circumstances of the case.  <u>Sears, Roebuck & Co. v. Board of Tax Review</u>, 241 Conn. 749, 764-766 (1997).  As to both of these arguments – namely, whether and how much prejudgment interest is justified -- it is important to note that Judge Underhill has recently issued a well-reasoned decision that concludes that an award of prejudgment is a question for the jury, not for the court.  <u>Retepromaca Representaciones Tecnicas Proyectos Y Sistemas, C.A. v. The Ensign-Bickford Co.</u>, 2004 WL 722231 (D. Conn. March 30, 2004) (copy attached).  Consequently, based on the foregoing, the plaintiff's claim for prejudgment interest pursuant to Conn. Gen. Stat. § 37-3a is not an issue that may be determined by way of the pending motion for summary judgment.  Instead, it is an issue that must await the trial of the case.

In addition, to the extent that the statute of limitations argument above bars the plaintiff from recovering a portion of the damages that it claims, then necessarily the plaintiff's claim for prejudgment interest on its damages will have to be reduced accordingly.

## Conclusion

Based on the foregoing, it is clear that genuine issues of material fact abound in this case, precluding the Court from rendering a summary judgment in favor of the plaintiff. The plaintiff's motion for summary judgment should be denied in its entirety, or alternatively only granted in the limited manner discussed above, because genuine issues of material fact exist in regard to the liability of the defendants on Counts VII, X, XIV and XVI; because the plaintiff is not entitled to judgment on Count X as a matter of law; and because genuine issues of material fact exist as to Counts VII, X, XIV, XVI and XXI in regard to the amount of damages and prejudgment interest that are claimed by the plaintiff.

DEFENDANTS,
MILTON L. DALY and
TAYLOR-LEIGH, INC.


By_____
    Kerry M. Wisser of
    WEINSTEIN & WISSER, P.C.
    29 South Main Street, Suite 207
    West Hartford, CT 06107
    Telephone No. (860) 561-2628
    Facsimile No. (860) 521-6150
    Federal Bar No. ct01205

## **CERTIFICATION**

This is to certify that on the 20th day of May, 2004, a copy of the foregoing was served upon the following counsel of record by way of First Class Mail, postage prepaid:

Harold James Pickerstein, Esquire
Jodi Zils Gagne, Attorney
Pepe & Hazard
30 Jelliff Lane
Southport, CT 06890-4000

Craig C. Martin, Esquire
Lawrence S. Schaner, Esquire
Jenner & Block
One IBM Plaza
Chicago, IL 60611-7603

Mark Seiden, Esquire
Marisa Lanza, Attorney
Milber Makris Polusadis & Seiden, LLP
108 Corporate Park Drive, Suite 200
White Plains, NY 10604

Robert M. Frost, Jr., Esquire
Zeldes, Needle & Cooper
1000 Lafayette Boulevard
Bridgeport, CT 06601

_____
Kerry M. Wisser

# UNREPORTED DECISIONS CITED IN MEMORANDUM OF LAW

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Slip Copy
**(Cite as: 2002 WL 32502100 (D.Conn.))**

Only the Westlaw citation is currently available.

United States District Court,
D. Connecticut.

**BROADWAY THEATRE CORP.**
**v.**
**BUENA VISTA PICTURES DISTRIBUTION, et**
**al.**

**No. Civ.A. 3:00CV706 (SR.**

Sept. 19, 2002.

Peter C. Spodick, New Haven, CT, for Plaintiff.

Benjamin A. Solnit, Elizabeth K. Andrews, Richard W. Bowerman, Tyler, Cooper & Alcorn, New Haven, CT, for Defendant.

Jonathan H. Beamon, New Haven, CT, for Movant.

*RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT*

UNDERHILL, J.

**\*1** Plaintiff Broadway Theater Corporation ("Broadway") owns and operates the York Square Cinema ("York Square"), a medium-size, three-screen movie theater in downtown New Haven, Connecticut. Broadway sued a number of major motion picture distributors [FN1] ("the Distributors"), claiming that their practice of licencing certain "first-run" films exclusively to the suburban New Haven movie theaters Showcase Cinema Orange and/or Showcase Cinema North Haven (the "Showcases"), violates the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen.Stat. §§ 42-110a *et seq.* The Distributors have moved for summary judgment, arguing that the challenged distribution practice, known in the motion picture industry as giving "clearance" over particular theaters, is a "reasonable, customary, pro-competitive business practice" and therefore does not violate CUTPA. Distributors further contend that Broadway's complaint is based on defective antitrust allegations, that any CUTPA challenge to the Distributors' policy is preempted by the federal Copyright Act and that CUTPA's three-year statute of limitations bars Broadway's claims. For the following reasons, the Distributors' motion is denied.

FN1. Defendants in this action are Buena Vista Pictures Distribution, Columbia Pictures Industries Inc., Dreamworks Distribution L.L.C., Lions Gate Films Inc., Metro-Goldwyn-Mayer Distribution Co., Miramax Film Corp., New Line Cinema Corp., Paramount Pictures Corp., Sony Pictures Releasing Corp., Universal Firm Exchanges Inc., Warner Bros. Distributing, and USA Films L.L.C.

*STANDARD OF REVIEW*

Summary judgment is appropriate when the evidence demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc..,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

When ruling on a summary judgment motion, the court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson,* 477 U.S. at 255; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158-59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *see also Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 523 (2d Cir.), *cert. denied,* 506 U.S. 965, 113 S.Ct. 440, 121 L.Ed.2d 359 (1992). When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not rest upon the conclusory allegations or denials of the pleadings, but rather must present sufficient probative evidence to establish a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995). To present a genuine issue of material fact, there must be contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party." *Anderson,* 477 U.S. at 248.

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he bears the burden of proof at trial, then summary judgment is appropriate. *Celotex,*

477 U.S. at 322. In such a situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23; *accord, Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (movant's burden satisfied if it can point to an absence of evidence to support an essential element of nonmoving party's claim). In short, if there is no genuine issue of material fact, summary judgment may enter. *Celotex,* 477 U.S. at 323.

*DISCUSSION*

Clearances as Unfair Practices

**\*2** Broadway brought a one-count complaint alleging violation of CUTPA and requesting monetary and injunctive relief. CUTPA prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce." Conn. Gen.Stat. § 42-110b. It is a broad statute enacted in response to "legislative concern that the existing pattern of common-law, legislative and administrative standards is insufficient to avoid unfairness in commercial relations." 1 Robert M. Langer, John T. Morgan & David L. Belt, *The Connecticut Unfair Trade Practices Act* 27 (1994) (*"CUTPA Treatise"* ). Liability under CUTPA is established using three criteria to determine if a business practice is unfair or deceptive:

(1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise--whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [competitors or other businessmen].

*Sporty's Farm LLC v. Sportsman's Market, Inc.,* 202 F.3d 489, 501 (2d Cir.2000). "All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Id.*

The Distributors' motion for summary judgment challenges Broadway's CUTPA claims on several grounds. The Distributors claim that their granting of clearances over the York Square cannot offend public policy because the granting of such clearances is a rational business decision--distributors prefer to license films to the higher-grossing Showcases than

to smaller venues like the York Square. The Distributors, however, have not shown they would be harmed by offering first-run films to *both* the York Square and the Showcases, or even that they gain an economic advantage from the use of clearances. Indeed, some evidence in the record suggests that licensing the same movie to both the York Square and the Showcases might actually benefit the Distributors by increasing their total revenues for the film. In any event, the Distributors' purported preference  [FN2] for exhibiting films in the larger Showcases over the York Square does not shield the practice of granting clearances against a CUTPA claim.

> FN2. The record does not suggest that the Distributors prefer clearances over the York Square, but rather that clearances are a required condition of the Showcases' bids to license certain movies available through the Distributors; the Distributors apparently acquiesce to the Showcases' demands for clearances. These circumstances certainly affect the degree of unfairness of Distributors' actions, but do not eliminate the possibility of CUTPA liability against the present defendants.

The Distributors also claim that the practice of granting clearances generally does not offend public policy and therefore cannot violate CUTPA. The use of clearances, the Distributors argue, does not offend public policy because other cases challenging clearances have upheld the practice. The Distributors cite several cases in which antitrust challenges to clearances have failed. *See Theee Movies of Tarzana v. Pacific Theaters,* 828 F.2d 1395 (9th Cir.1987); *Soffer v. National Amusements,* 1996 WL 194947 (D.Conn.1996). The Distributors contend that, because these antitrust decisions have found clearances to be pro-competitive, the use of clearances cannot be an unfair practice under CUTPA. This argument fails for at least two reasons: the existence of genuine issues of material fact concerning the level of competition among the relevant theaters and the differing standards governing antitrust and CUTPA cases.

**\*3** Notwithstanding the Distributors' arguments, the practice of granting clearances may violate public policy if the theater over which a clearance is granted is not in substantial competition with the licensed theater. If the theaters are in substantial competition, the clearances at issue would not violate public policy; if the theaters are not in substantial competition, the clearances might well violate public

policy. In the landmark antitrust decision *United States v. Paramount,* 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948), the Supreme Court held that "there should be no clearance between theaters not in substantial competition." *Id.* at 146. In *Theee Movies of Tarzana v. Pacific Theaters,* 828 F.2d 1395 (9th Cir.1987), the Ninth Circuit elaborated on the reasoning behind *Paramount.* The court explained that clearances between theaters in substantial competition are pro-competitive. This is because theaters that are denied a licence to a certain movie will show alternative movies, thus providing consumers more movies to choose among and encouraging competition among movies for box office dollars. *Id.* at 1339- 1401. Nothing in *Paramount* or *Theee Movies,* however, suggests that a clearance between theaters not in substantial competition would be consistent with the antitrust laws or with public policy in general.

There are genuine issues of material fact whether the York Square and the Showcases serve substantially the same geographic market and whether they are in substantial competition. Broadway presents evidence that the York Square services, at least in part, a discrete urban population. Spodick deposition, Defs.' Ex. 2 at 76.17-77.11, Pl.'s Ex. 12. Much of that population does not drive. Koch Declaration, Pl.'s Ex. 25. Because public transportation to suburban theaters is sparse and inconvenient, Broadway argues that a significant portion of New Haven's population has no access to first-run films that play only in suburban New Haven theaters. *Id.* Additionally, because New Haven's urban center contains a high proportion of racial minorities, senior citizens, students and individuals with disabilities, Broadway alleges that the Distributors' practice disadvantages these populations. *Id.,* Pl.s Ex. 17. In contrast, the Distributors' offer evidence that the theaters service the same population. Hoover Declaration (the York Square and Showcase North Haven are 6.8 miles apart). [FN3] Based on the evidence presented in connection with the motion for summary judgment, a genuine issue of material of fact exists regarding whether or not Broadway and the Showcases are in substantial competition, whether they service substantially the same geographic market and, consequently, whether the practice of granting clearances over the York Square offends public policy. [FN4] Resolution of these issues may require expert testimony and certainly will require a more fully developed factual record than the one now before the court.

FN3. Plaintiff's exhibits are numbered according to the tab number they appear after in Plaintiff's Exhibits and Declarations in Opposition to Defendants' Motion for Summary Judgment. At times these numbers differ from the number listed for the same exhibit in Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment.

FN4. The Distributors cite evidence that both the York Square and the Showcases advertise in the *New Haven Register* newspaper as support for the proposition that the cinemas draw from the same, greater New Haven market. The *Register* also includes listings for movie theaters throughout Connecticut and carries ads for movie theaters in Fairfield County. Additionally, both the Showcases and the York Square list show times in the *Connecticut Post,* a newspaper with a readership drawn primarily from Fairfield County. Evidence of ad placement in the same Connecticut papers provides little, if any, support for the Distributors' contentions that the York Square and Showcases serve the same geographic market and that they are in substantial competition.

**\*4** In addition, antitrust laws and CUTPA outlaw different types of conduct. A practice may be violative of an "established concept of unfairness" even if it is not violative of any statute or the common law. Thus, the fact that a practice is not outlawed by the antitrust laws does not necessarily preclude that practice from CUTPA's reach as otherwise "unfair." *See Sorisio v. Lenox, Inc.,* 701 F.Supp. 950, 963 (D.Conn.), *aff'd,* 863 F.2d 195 (2d Cir.1988) (plaintiff's claim of a violation of public policy failed because antitrust law had not been violated and defendant's conduct was not otherwise unfair); 1 *CUTPA Treatise* 23 ("[T]here may be some instances in which CUPTA could be a significant addition to antitrust law."). The fundamental purpose of antitrust laws is to protect competition, *Brunswick Corp. v. Pueblo Bowl-O- Mat, Inc.,* 429 U.S. 477, 488, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) ("The antitrust laws, however, were enacted for the protection of *competition,* not *competitors."* ) (internal quotation omitted), while the purpose of CUTPA is to protect consumers, competitors and businesses. *See Salmon Bros. Realty Corp. v. Yost,* 2001 WL 1232054 at \*2 (Conn.Super.Sept.26, 2001) ("purpose of CUTPA is to protect ... competitors and other business people from unfair competition") (citing *Larsen Chelsey Reality Co. v. Larsen,* 232 Conn. 480, 496-98, 656 A.2d 1009 (1995)). Thus, an

3

antitrust claim will fail if the plaintiff can show only harm to a competitor, while that harm would be sufficient to sustain a CUTPA claim if the other elements of CUTPA have been met.

The Distributors also contend that Broadway's CUTPA claim must fail because there is no substantial injury to consumers, competitors or other businesses. *See Sporty's Farm,* 202 F.3d at 501. The record before the court contains evidence from which a jury could conclude that the Distributors' use of clearances causes substantial injury within the scope of CUTPA. If the York Square and the Showcases have different primary markets, then the challenged use of clearances may injure consumers by denying a specific population access to many first-run movies. Furthermore, the practice may unfairly disadvantage the York Square, vis-a-vis its competitors, as well as other businesses. Broadway offers evidence that, when viewed in Broadway's favor, indicates that the Distributors use clearances to harm independent or small theaters. For example, while the Distributors provide the Showcases clearances over the York Square and the only other independently owned movie theater in New Haven County, they do not grant clearances over competing, chain-owned movie theaters in Connecticut. In Westbrook and Old Saybrook, the Distributors license the same, first-run movies simultaneously to two, nationally owned multiplexes within six miles of one another. Pl.'s Ex. 8. In Branford, the Distributors had traditionally granted the Showcases clearances over a local, independently owned theater. When the locally owned Branford theater closed and was replaced with a nationally owned Hoyts theater, the Distributors ended their practice of granting the Showcases clearance over Branford. Spodick deposition, Defs.' Ex. 2 at 286.12-24. A jury could find that, although the Distributors are willing to license films at the same time to the New Haven suburban Showcases and Hoyt theaters, they persist in granting clearances over the York Square. A jury could also find that the Distributors' use of clearances is an unfair practice aimed at promoting large, national-chain movie theaters over smaller or independently owned theaters, regardless of whether the independent theater is in substantial competition with the national theater and regardless of whether the independent theater can provide the Distributors revenues equivalent to the national multiplexes. Thus, a genuine issue of material fact remains whether the challenged business practice causes injury to consumers, competitors and/or other businesses.

**\*5** Additionally the Distributors argue that the challenged clearances cannot violate CUTPA because the practice is not immoral, unethical, oppressive, unscrupulous or deceptive. As discussed above, a business practice can be an unfair *or* deceptive practice under CUTPA based on the degree it meets any or all of the following criteria: (1) it offends public policy; (2) is immoral, unethical, oppressive or unscrupulous; (3) it causes substantial injury to consumers, competitors or other businesses. *Id.* Consequently, even if the Distributors' practices are not immoral, unethical, oppressive, unscrupulous or deceptive, summary judgment must be denied because a genuine issue of material fact exists regarding whether, under the circumstances of this case, the challenged practices are unfair, offend public policy, and/or cause substantial injury to consumers, competitors and/or other businesses.

Copyright Preemption

The Distributors argue that, even if Broadway can sufficiently satisfy all of the elements of CUTPA, the claim should be dismissed because it is preempted by federal copyright law. Most of the precedent cited by the Distributors involves the dismissal of redundant state law claims in cases where the plaintiff brought federal copyright claims and state law claims based on the same facts.  [FN5] Those cases have no relevance to the case at hand, in which plaintiff has not, and could not, allege a copyright violation.

> FN5. The Distributors cite, *inter allia, Computer Associates v.. Altai,* 982 F.2d 693, 716 (2d Cir.1992); *Harper & Row v. Nation Enterprises,* 723 F.2d 195, 200 (2d Cir.1983); *Titan Sports v. Turner Broadcasting Systems,* 981 F.Supp. 65, 69 (D.Conn.1997).

The Distributors do cite one related, though distinguishable, case, *Orson Inc. v. Miramax Film Corp.,* 189 F.3d 377 (3d Cir.1999). In *Orson* the Third Circuit, sitting en banc, reviewed the Pennsylvania Feature Motion Picture Fair Business Practices Law. That Pennsylvania statute contained a number of restrictions on motion picture licensing, including a prohibition on blind bidding and a ban on the use of minimum guarantees. [FN6] The court upheld the vast majority of the Pennsylvania law. The panel, however, ruled that the Copyright Act preempted a provision prohibiting a licensing agreement, "which grants an exclusive first-run for more than 42 days without providing for expansion in the same geographical area." *Id.* at 381. The court reasoned that the provision interfered with a copyright owner's right to refuse to license to a given party, because in order to license at anyone after the

4

initial 42 days, the distributor had to license to a second, competing party. *Id.* 385-86.

> FN6. In blind bidding a distributor licenses a film "prior to its completion and without offering exhibitors a chance to trade screen the final product." *Orson,* at 384. Minimum guarantees are the minimum return an exhibitor agrees to pay a distributor, regardless of what the film grosses.

Broadway's CUTPA claim does not interfere with the Distributors' copyright rights to distribute to whom they choose. Broadway challenges the Distributors' use of clearances in the New Haven vicinity as unfair. If Broadway were to succeed on its claim and the Distributors were enjoined from including clearances over the York Square in license agreements with the Showcases, the Distributors would still have the right to distribute and license only to parties of their choosing. Even without clearances, were Broadway and a distributor unable to reach a mutually satisfactory licensing arrangement on a given film, neither party would be required to enter into such an arrangement. As the court noted in *Orson,*

> **\*6** The right to transfer or license copyrighted material for use by others under ... the Copyright Act has never encompassed a right to transfer the work at all times and at all places free and clear of all regulations; it has meant that the copyright owner has the *exclusive right* to transfer the material for a consideration to others.

*Id.* at 386 (emphasis in original) (quoting *Warner Bros. v. Wilkinson,* 533 F.Supp. 105 (D.Utah 1981)).

The Copyright Act does not prohibit regulation of unfair competition, even if the competition touches upon copyrighted material. *See* 1 *CUTPA Treatise* 81. Indeed, the federal Copyright Act preempts any state law creating "rights that are equivalent to any of the exclusive rights within the general scope of copyright." 17 U.S.C. § 301(a). CUTPA does not create rights equivalent to those established by the Copyright Act. Nor would restraining the granting of clearances requested by a competing theater necessarily interfere with the right to license a copyright work. Accordingly, the Distributors' preemption argument fails.

Statute of Limitations

Connecticut General Statutes section 42-110g(f) provides that a CUTPA action "may not be brought more than three years after the occurrence of a violation." The Distributors contend that Broadway's claim is barred by the statute of limitations because the Distributors have granted clearances over the York Square for decades and Broadway has had notice of this practice since the beginning. Broadway counters that each license is a separate contract that starts the statute anew. Consequently, Broadway bases its claim only on those licenses entered into during the statutory period. Pl.'s Opposition to Summary Judgment at 14.

Broadway's reasoning comports with this District's holding in *Duprey v. Connecticut DMV,* 191 F.R.D. 329, 342 (D.Conn.2000). In *Duprey,* a group of handicapped citizens brought an action under the Americans with Disabilities Act against the Connecticut Department of Motor Vehicles for charging a fee on handicap parking permits, a practice that had been going on for much longer than the three-year statutory period. The court concluded that each time the Department of Motor Vehicles charged plaintiffs for a handicapped parking permit "there was a separate violation of the ADA, which started the running of the statute of limitations." *Id.* A similar result is appropriate in this case. Because each license constituted a discrete alleged CUTPA violation, Broadway's claims based on license agreements entered into within the three years prior to the filing of the complaint are not time barred. To conclude otherwise would insulate standardized or repeated unfair trade practices from challenge once they had been instituted for three years. Such a result would run counter to CUTPA's broad mandate to eliminate "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen.Stat. § 42-110b. Because of the statute of limitations, however, Broadway's potential damages are limited to harm suffered as a result of actions taken by the Distributors within the three-year statutory period.

*CONCLUSION*

**\*7** For the forgoing reasons, Defendants' Motion For Summary Judgment [Doc. # 33] is DENIED.

It is so ordered.

2002 WL 32502100 (D.Conn.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Slip Copy
**(Cite as: 2004 WL 722231 (D.Conn.))**

Only the Westlaw citation is currently available.

United States District Court,
D. Connecticut.

**RETEPROMACA REPRESENTACIONES
TECNICAS PROYECTOS Y SISTEMAS, C.A.,
Plaintiff,
v.
THE ENSIGN-BICKFORD COMPANY,
Defendant.**

**No. Civ.A. 398CV1857SRU.**

March 30, 2004.

Christine E. Corriveau, Francis A. Miniter, Miniter & Associates, Hartford, CT, for Plaintiff.

Bradford S. Babbitt, Elizabeth R. Leong, Eric D. Daniels, James A. Wade, Robinson & Cole, Hartford, CT, for Defendant.

*RULING ON POST-TRIAL MOTIONS*

UNDERHILL, J.

**\*1** Retepromaca Representaciones Technicas Proyectos Y Sistemas C.A. ("Retepromaca") brought this action against The Ensign-Bickford Company ("EBCo") for breach of an alleged contract to have Retepromaca serve as EBCo's exclusive sales representative in Venezuela. Following a three-day trial, the jury returned a verdict in favor of Retepromaca for $249,079. Judgment entered on April 4, 2003. EBCo now moves for judgment as a matter of law--arguing that Retepromaca did not prove the existence of a contract or the amount of damages. In the alternative, EBCo moves for a new trial--arguing that the court improperly instructed the jury that it could find an oral or implied contract. Retepromaca has made its own motions, asking the court to grant pre-judgment interest on its award. For the reasons set forth below, all these motions are denied.

I. Facts

The following facts were either agreed to by the parties or could reasonably have been found by the jury on the evidence presented at trial.

EBCo manufactures and sells explosive products used in commercial mining and oil exploration. Its mining products are used to destroy rocks in order to expose and extract ore. In oil exploration, EBCo's seismic products are used to create explosions that facilitate the identification of drill spots likely to yield oil. (Tr.1 64-65; Tr.2 152-56) [FN1]

> FN1. The following notations are used to refer to the transcripts of the three trial days: "Tr.1" for the transcript of March 31, 2003; "Tr.2" for the transcript of April 1, 2003; and "Tr.3" for the transcript of April 2, 2003.

Retepromaca is located in Venezuela and is wholly owned by its president, Antonio Cordoba ("Cordoba"). (Tr.1 34-35) Starting in 1981, Retepromaca began to act as EBCo's agent for the sale of certain explosive devices. (Tr.1 36, 79) In 1992 this arrangement was formalized in a letter from EBCo to Cordoba, appointing Retepromaca as EBCo's exclusive agent in Venezuela. (Defendant's Exhibits 1, 2) A second, similar letter of appointment was sent in 1995. (Plaintiff's Exhibit 1)

As EBCo's exclusive agent, Retepromaca performed a number of functions. It served as a liaison between EBCo and various Venezuelan governmental agencies whose approval was needed for sales of explosives. (Tr.1 40, 84-85, Tr.2 150) It hired people to test several of the products sold by EBCo. (Tr.1 69-70) It promoted and distributed information concerning EBCo's products. (Tr.1 76-77) Most importantly, however, Retepromaca had a base of clients--including the Venezuelan army--that it kept informed about EBCo's products and ultimately put in touch with EBCo to effectuate sales. (Tr.2 127-29, 149) When sales were completed, Retepromaca received a commission of between 12 and 17 percent of the sale price, depending on the product sold. (Tr.2 73)

In 1995 EBCo acquired the assets of Trojan, another company engaged in the sale of explosive products. Although Trojan was entirely subsumed into EBCo, Trojan-branded products were still sold in Venezuela through Trojan's former representatives, and not through Retepromaca. (Tr.2 25, 34-35)

Retepromaca complained to EBCo, contending this arrangement violated the terms of its exclusive engagement. (Tr.2 25-28) Retepromaca's concern arose from the fact that some of the Trojan-branded products were apparently more desirable than other, similar EBCo products--in particular, Trojan had manufactured a type of "booster" explosive called a GeoPrime booster, that was more desirable than the standard boosters sold by EBCo. (Tr.2 15-16; Defendant's Exhibit 9) Consequently, by being denied the opportunity to sell Trojan products, Retepromaca was limited to offering its clients less than the full panoply of EBCo products. Retepromaca could--in certain cases--obtain these products through a third-party but could then only offer them at a higher price, a price not competitive with that offered by the agents who obtained the Trojan products directly from EBCo. (Tr.1 92; Tr.2 23, 167-68; Tr.3 25)

**\*2** The question whether the parties' agreement applied to the sale of Trojan products in Venezuela was never resolved and, in 1997, EBCo terminated its relationship with Retepromaca.

## II. Motion for Judgment as a Matter of Law

### A. *Legal Standard*

A defendant seeking judgment as a matter of law pursuant to Rule 50 of the Federal Rules has a significant burden. Judgment as a matter of law may not be granted unless the evidence, viewed in the light most favorable to the plaintiff, is insufficient to permit reasonable jurors to find in plaintiff's favor. *Caldieri-Ambrosini v. National Realty & Development Corp.,* 136 F.3d 276, 289 (2d Cir.1998). Put another way, the court must deny the motion unless the evidence--viewed in the light most favorable to the plaintiff, without weighing the credibility of the witnesses, and without otherwise considering the weight of the evidence--permits only one conclusion. *Sir Speedy, Inc. v. L & P Graphics, Inc.,* 957 F.2d 1033, 1038-39 (2d Cir.1992). It does not matter that the evidence supporting the plaintiff's case may be weak; in order to grant judgment as a matter of law the evidence must *compel* acceptance of the defendant's view by reasonable jurors. *This is Me. Inc. v. Taylor,* 157 F.3d 139, 142 (2d Cir.1998).

### B. *Agreement*

EBCo argues that the evidence was legally insufficient to establish the existence of a contract between EBCo and Retepromaca giving Retepromaca the exclusive right to act as EBCo's representative for

the distribution of Trojan products. EBCo argues that the 1995 letter agreement was not a contract giving Retepromaca exclusive representation of EBCo in Venezuela, but instead was either a legally non-binding "agreement to agree" or an unenforceable writing that lacks material terms. EBCo's view of the evidence is one, but not the only, possible view that reasonable jurors could have taken. Consequently, it cannot support judgment as a matter of law.

### 1. *"Agreement to Agree"*

EBCo contends that Cordoba "admitted" at trial that the letter was only an agreement to agree. EBCo points to the following testimony:

Q.... In the letter it says that you, Retepromaca, you're going to undertake to establish common criteria in order to create a single binding criteria for both parties. What does that mean? What does that sentence mean?
A. What does this mean? That we have to work together, share arguments and to reach for every step we do, not only for pricing but for goals.
Q. You have to agree to agree, right?
A. Yes.
Q. Sometime in the future you're going to work out those details and you're going to agree to agree on what you're entitled to, right?
A. In everything.

(Tr.2 184) Cordoba's answers, according to EBCo, would compel reasonable jurors to conclude that the letter was nothing more than an agreement to agree. If this bit of testimony were the only evidence given to the jury on the subject, EBCo's argument might be persuasive. The jury, however, had a much more evidence to consider.

**\*3** If nothing else, the jury was free to simply reject Cordoba's testimony and read the document on its own, a document that states EBCo "appoints Retepromaca as their exclusive representative for the entire territory of Venezuela." (Plaintiff's Exhibit 1) Based on the contents of that document, the jury could have found that the letter granted Retepromaca exclusive representation of EBCo in Venezuela for the sale of *all* EBCo products.

Even if the jury did not wish to rely solely on the text of the letter, it was free to disregard the statements of Cordoba quoted above, [FN2] and instead rely on his other statements--statements that supported a finding that the parties intended by the 1995 letter to enter into a binding exclusive representation agreement. These would have included, for example, statements by Cordoba that,

subsequent to the signing of the 1995 agreement, EBCo treated him as their exclusive representative for all products, directed all sales through him (prior to the Trojan merger), and never informed him that, or acted as if, the letter agreement was subject to limitation. (Tr.1 55-56; Tr.2 176; Tr.3 31)

> FN2. It is worth noting that Cordoba was not a native English speaker and, though he did use an interpreter for parts of the trial, the jury was in the best position to judge how well he understood the questions put to him by counsel and what he intended by his answers. This determination is much harder to make on the bare trial transcript.

2. *Lack of Material Terms*

Alternatively, EBCo contends that the 1995 agreement was not enforceable because it lacked a material term. EBCo argues that it is clearly material whether or not the parties intended to extend their agreement to cover Trojan products, and, because the 1995 letter does not include this material term, the agreement is legally insufficient to bind EBCo with respect to Trojan products.

The problem with EBCo's argument is that it attempts to characterize the application of the 1995 agreement to Trojan products as an "extension." If Retepromaca had claimed--or at least, if it had only claimed--that the 1995 agreement was *extended* to cover Trojan products, EBCo's argument might have some merit. As it stands, however, Retepromaca claimed--and the jury could have found--that the 1995 agreement (and all prior agreements) gave Retepromaca the right to distribute *all* EBCo products in Venezuela. All EBCo products reasonably includes products EBCo came to sell following its acquisition of another company's product line as well as products EBCo developed itself-- however those products may have been branded.

As a preliminary matter, the undisputed evidence showed that Trojan was completely absorbed into EBCo. That is, all Trojan's assets were assumed by EBCo, and Trojan ceased to exist as a separate entity. The only vestige of Trojan that remained following the merger was the label "Trojan," which remained on some products. (Tr.2 41-43) Consequently, there was little room for the jury to conclude anything other than that Trojan-branded products, after the merger, were as much EBCo products as any other EBCo product, and so, an agreement to distribute *all* EBCo products would include Trojan-branded

products as well.

There was plenty of evidence to support a finding that the 1995 agreement gave Retepromaca the exclusive right to sell *all* products. The letter itself is ambiguous [FN3] and probably amenable to either interpretation. That fact alone would suggest that judgment as a matter of law is inappropriate, because, when deciding the matter, all inferences must be drawn in Retepromaca's favor. Even putting the text of the letter aside, there was much more evidence from which the jury could have inferred that the agreement covered all EBCo products.

> FN3. The fact that the 1995 letter did not specify other arguably material terms--particularly commission rates--is also not fatal to its enforcement, particularly given the large amount of evidence about the parties' history of interactions. The law is clear that an agreement will not be rejected for missing terms when the terms can be ascertained, either from the express terms of the agreement or by fair implication. *Augeri v. C.F. Wooding Co.,* 173 Conn. 426, 430, 378 A.2d 538 (1977). More specifically, when an agreement is silent with respect to the amount of compensation, a jury can find that a reasonable fee was intended and it can ascertain this fee, among other things, by reference to the parties' course of dealing. *See Presidential Capital Corp. v. Reale,* 231 Conn. 500, 506, 652 A.2d 489 (1994) ("defendant's promise to pay a commission is not made unenforceable merely because he did not include the amount of the commission"); Restatement (Second) Contracts § 223 (course of dealing may be used to interpret parties' expressions and other conduct).

**\*4** Cordoba testified that he had, from 1981 to 1996, engaged in the unrestricted, unlimited sale of EBCo products in Venezuela. He testified that this included sales of products similar to those manufactured by Trojan. (Tr.1 95) He testified that, over the course of their fifteen-year relationship, EBCo and Retepromaca had established commission rates for various categories of products. (Tr .2 73; Tr.3 77-78) And, as noted above, he testified that EBCo had never attempted to, or expressed any desire to, limit the scope of Retepromaca's representation. (Tr.1 55-56; Tr.2 176; Tr.3 31) Moreover, he testified that, when new products were added to EBCo's line, Retepromaca was always allowed to sell them. (Tr.3

8

60)

Similarly, Frank Lucca, EBCo's manager of Venezuelan operations from 1994 to 1996, testified that Retepromaca was EBCo's exclusive agent in Venezuela (Tr.3 164) and that, as far as he knew, no sales went through anyone other than Retepromaca (Tr.3 169).

On the basis of this evidence--the letter coupled with the extensive course of dealing between the parties--the jury could have concluded that Retepromaca and EBCo had an actual agreement providing that Retepromaca was EBCo's exclusive agent for the sale of all products--including Trojan products--in Venezuela. Consequently, EBCo's argument, that the jury was compelled to conclude that there was no binding agreement, fails, and EBCo's motion for judgment as a matter of law on that ground is denied.

C. *Damages*

EBCo next argues that, even if a contract was proven, Retepromaca did not offer evidence of its actual damages sufficient to allow the jury to award an amount that was anything other than speculative. Specifically, EBCo contends that, although Retepromaca offered evidence tending to establish the amount of lost sales and the rate of commission it would have earned on those sales, it did not offer any evidence to establish the expenses it would have incurred in making those sales. EBCo concludes that, on the record evidence, there was no way the jury could have arrived at a calculation of Retepromaca's expected *net* gain on the contract. Consequently, EBCo asks for judgment as a matter of law or, in the alternative, a reduction of the jury's award to nominal damages.

EBCo does not dispute that there was sufficient evidence from which the jury could have calculated EBCo's lost commissions. Retepromaca offered documentary and testimonial evidence establishing the amount of sales of Trojan products made by other EBCo representatives in Venezuela during the time when Retepromaca was entitled to those sales. (Tr.2 78-86) Additionally, Retepromaca offered evidence of the commission rates that it ordinarily received for sales of comparable products. *Id.* Multiplying the first number (lost sales) by the second (rate of commission) would have given the jury the amount of Retepromaca's lost commissions.

EBCo argues that this number alone does not permit a damage calculation because it only represents gross

profits, whereas an award of damages can only be an award of net profits. Net profits, EBCo contends, can only be calculated by reducing the sales commission amount by the expenses that would have been incurred in making those sales. Evidence of the amount of these expenses, however, was not presented to the jury, and so, EBCo concludes, there is no possible way the jury could have calculated net profits.

**\*5** EBCo is correct that the jury was required to award net profits; it is incorrect that the only way the jury could have calculated net profits was by subtracting expenses from sales commissions. An award of total profits need not be reduced by expenses if the evidence tends to show that the plaintiff would have incurred no *additional* expenses in making the future sales. In such a case net profits are gross profits, because the marginal cost of an additional sale is zero. [FN4] *See, e.g. Barnard v. Compugraphic Corp.,* 35 Wash.App. 414, 418, 667 P.2d 117 (1983); *Automatic Vending Co. v. Wisdom,* 182 Cal.App.2d 354, 358, 6 Cal.Rptr. 31 (1960).

> FN4. Arguably overhead must always be deducted from gross profits, even if a given sale has a marginal cost of zero, because overhead is properly allocated on an average basis to each sale. Thus, one could argue, even the profit on these hypothetical sales should be reduced by the *average* cost required to make the sale (as opposed to the *marginal* cost). The use of this analysis would not change anything because, under Connecticut law, overhead expenditures are recoverable as an element of damages. *See Coast Industries, Inc. v. Noonan,* 4 Conn. Cir. Ct. 333, 337, 231 A.2d 663 (1967). Thus, even if profit was reduced by overhead this would be offset by the overhead being recoverable as damages. *See generally Overhead Expense as Recoverable Element of Damages,* 3 A.L.R.3d 689 §§ 3, 5.

EBCo, of course, claims that the sale of additional products would have required Retepromaca to incur additional expenses. This is a possible inference from the evidence, but it is not the only one.

Cordoba did testify that in order to make sales of Trojan products he would have been required to make phone calls, book flights and hotel rooms for EBCo employees, and arrange for meals. (Tr.2 157-58, Tr.3 19-21) He testified that in some cases he would pay for these expenses out of his own pocket.

The jury could have inferred from this testimony that, had Retepromaca been allowed to sell Trojan products, it would have incurred additional expenses of this nature. However, a jury could just as easily have inferred that those expenses were essentially the fixed costs of routine sales trips made by Retepromaca during which a number of products were sold, and that the ability to sell Trojan products would simply have increased the number of products that could have been offered during those trips and not increased the number of trips. On this view of the evidence, the addition of new products to Retepromaca's "catalog" would not have required it to incur new expenses. This view is consistent with the evidence tending to show that the Trojan products in question were simply enhanced versions of products already offered by Retepromaca, indicating that it would have taken little or no additional effort or expense to offer these additional products to Retepromaca's existing customers. (Tr.1 95)

Similarly, the jury could have found that Retepromaca did offer Trojan products through a third-party--and thus incurred the expense of offering them--only it could not consummate sales, because, lacking the ability to sell directly from EBCo, Retepromaca could not offer competitive prices. (Tr.1 92; Tr.2 23, 69-75, 167-68; Tr.3 25, 47) On this view of the evidence, Retepromaca's expenses would also have remained constant; it simply would have been more competitive if it had been able to make direct sales of Trojan- branded products.

Moreover, Cordoba testified that he continued to pay all the overhead costs associated with his business, e.g., rent, salaries, and utilities. (Tr.2 75-76) Nothing in his testimony suggested that these expenses would have increased had he been permitted to offer Trojan products along with the other products he sold.

**\*6** Accordingly, there was a good deal of evidence from which reasonable jurors could have concluded that Retepromaca would have incurred no additional expense had it been permitted to offer Trojan products for sale directly from EBCo.

In short, EBCo starts with the premise that there would have been incremental costs associated with the sale of Trojan products. It then argues that, because the amount of these costs was not proved, Retepromaca did not prove its case. The fatal flaw in this argument is that reasonable jurors would not be compelled to accept EBCo's premise. A defendant cannot merely assert the existence of a category of expenses and then argue that, since the plaintiff did not prove the amount of those expenses, the jury's

verdict must be set aside. *See, e.g., Katz Communications, Inc. v. Evening News Assoc.,* 705 F.2d 20, 26 (2d Cir.1983) ("Nor is there merit in appellants' contention that Katz's recoverable damages should be diminished by the amount of salaries, wages, and other overhead or indirect or fixed costs ... the burden is on the appellants to prove any potential item in mitigation of damages inasmuch as it is *pro tanto* a defense to the claim of the wronged party."). Because reasonable jurors could have found that the expenses EBCo assumes existed did not exist, there is no reason to set aside the jury's award.

"It is incumbent on a plaintiff in a contract action to prove his damages with all the certainty which is reasonably possible, but where exactness is not possible, he is not therefore to be precluded from a recovery, and the best approximation to certainty is all that is required." *Southern New England Contracting, Co. v. Connecticut,* 165 Conn. 644, 661, 345 A.2d 550 (1974). Because Retepromaca gave the jury enough evidence to make a reasonably certain damage calculation, EBCo's motion for judgment as a matter of law on the ground of insufficient proof of damages is denied.

III. Motion for New Trial

EBCo argues that errors in the jury instructions require a new trial. EBCo has less of a burden in seeking a new trial than it does in asking for judgment as a matter of law; however, it also has a less compelling argument. A new trial is required if errors in instructing the jury, considered as a whole, prejudiced the objecting party. *Jocks v. Tavernier,* 316 F.3d 128, 137 (2d Cir.2003).

The jury instruction at issue read as follows:
Although Retepromaca alleges that there was a written contract, it is not necessary for there to have been a written contract. Retepromaca could prevail by showing that it had an oral contract to serve as the exclusive distributor for Ensign-Bickford in Venezuela. An oral contract can either be express or implied. An express contract is expressed, or stated, in words. To determine if there was an express contract, you should consider the words exchanged between the parties as well as any written documents relating to the subject matter of the alleged contract.
**\*7** A contract can also be implied. The material terms and conditions of an implied contract are implied or inferred from the facts and circumstances, or from the conduct of the parties, rather than expressed in words. An implied

contract is an agreement that depends on some act or conduct by the party against whom the contract is sought to be enforced--here, Ensign-Bickford. And it arises by inference or implication from circumstances which, according to the ordinary course of dealing and the common understanding of people, show a mutual intent on the part of the parties to contract with each other at that time. The test for determining if there is an implied contract is whether the acts and conduct of the parties show agreement.

(Jury Charge Transcript 14-15)

EBCo does not dispute that this charge was a correct statement of Connecticut contract law; rather it argues that neither an oral contract nor an implied contract claim was present in the complaint or the evidence, and so neither claim was part of the case. Consequently, argues EBCo, these issues should not have been charged to the jury, and the charge was prejudicial. I am not persuaded

Properly analyzed, EBCo is raising two issues(1) did the complaint preclude this instruction, and (2) did the evidence at trial preclude this instruction.

### A. *Complaint*

The first issue is governed by Rule 8 of the Federal Rules of Civil Procedure. EBCo's argument is that, because no implied or oral contract claim was in the complaint, neither claim was in the case. Whether a complaint is sufficient to raise a claim for relief is determined by Rule 8. [FN5]

> FN5. EBCo cites to Connecticut state law cases in support of its claim that Retepromaca's case is circumscribed by its complaint. The Second Circuit, however, has unequivocally held that the specificity of pleadings is governed by the Federal Rules. *See Stirling Homex Corp. v. Homasote Co.,* 437 F.2d 87, 88 n. 2 (2d Cir.1971).

It is well established that Rule 8 only requires simplified notice pleading that gives a defendant "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1975). "All pleadings shall be so construed as to do substantial justice." Fed.R.Civ.P. 8(f). Moreover, the federal rules have abandoned so called "theory pleading," whereby "a complaint must proceed upon some definite theory, and on that theory the plaintiff must succeed, or not succeed at all." C. Wright & A. Miller, *Federal Practice and Procedure,* § 1219 at 188 (2d ed.1990).

The essence of Retepromaca's claim is contained in two statements in the complaint: (1) that, as of 1980, Retepromaca was appointed by EBCo to be its exclusive agent in Venezuela, and (2) that EBCo breached its contractual duties. [FN6] This was sufficient to state a cause of action and to put the defendant on notice that it was being sued for breaching the representation agreement--either as written, orally stated, or implied.

> FN6. The complaint also discusses that this relationship was "evidenced" by two written agreements (First Amended Complaint ¶ 9), but this does not in any way negate the above statements, particularly as the first written agreement was dated seven years after the alleged beginning of the representation.

Moreover, EBCo can hardly claim that it was not given notice that the case included a possible oral or implied contract claim. In my written opinion denying EBCo's motion for summary judgment (doc. # 104), issued June 4, 2002, I found a genuine issue of material fact regarding whether a contract had been formed, based in part on the authority of, accompanied with extensive quotes from, cases describing how an agreement can be implied in fact or by express words. I also noted that, in this case, a contract could be found to exist based on the letters, *past performance, and course of dealing.* At the very least, EBCo had actual notice from the time of the summary judgment ruling-- nearly ten months before trial--that the issue of breach of an oral or implied in fact contract was in the case.

### B. *Evidence*

**\*8** EBCo also argues that there was no evidence at trial to support a charge on an oral or implied contract. This is an odd argument; after all, if there was no evidence to support the charge, it is unlikely that the jury found for Retepromaca on the basis of that charge, and so, hard to see how the charge prejudiced EBCo.

In any event, EBCo's contention is simply not correct. As discussed above in the section addressing EBCo's motion for judgment as a matter of law, there was ample evidence concerning past actions and course of dealing from which a jury could have found the existence of an oral or implied in fact contract with respect to all or part of the terms of Retepromaca's representation of EBCo.

Accordingly, because the jury instruction was a correct statement of the law governing the case, EBCo's motion for a new trial is denied.

IV. Motions for Pre-Judgment Interest [FN7]

> FN7. Retepromaca made both a motion for prejudgment interest and a related motion to modify the judgment to include prejudgment interest.

Retepromaca has moved for an award of prejudgment interest on the judgment pursuant to Connecticut General Statutes § 37-3a. The issue of prejudgment interest was not raised until after judgment had entered, and so, was not charged to the jury. Retepromaca argues that this is immaterial because an award of prejudgment interest lies within the discretion of the court. It is understandable how Retepromaca could have come to this conclusion. The case law on prejudgment interest is confusing and, sometimes, inconsistent. Nevertheless, after a thorough review of relevant state and federal cases, I conclude that the question of whether to award prejudgment interest pursuant to section 37-3a must be decided by the trier of fact--in this case the jury. Because I have no discretion to make such an award, Retepromaca's motions are denied.

The question of prejudgment interest in a diversity case, such as this one, is governed by the law of the forum state--in this case, Connecticut. *Trademark Research Corp. v. Maxwell Online Inc.,* 995 F.2d 326, 342 (2d Cir.1993). Accordingly, it is the law as established by Connecticut courts, or as I predict they would establish it, that controls.

A. *Connecticut Law*

There are two distinct lines of Connecticut cases on the subject of prejudgment interest, reflecting differences between bench trials and jury trials.

When a case is tried before a jury, the Connecticut courts have announced the rule--ultimately dispositive of this case--that prejudgment interest, as an element of damages, is a factual question within the province of the jury. *See John T. Brady & Co. v. City of Stamford,* 220 Conn. 432, 445, 599 A.2d 370 (1991); *Iseli Co. v. Connecticut Light and Power Co.,* 211 Conn. 133, 143, 558 A.2d 966 (1989). More specifically, Connecticut courts have dealt with the exact issue presented in this case, holding that it was improper for a trial court to award prejudgment interest after a jury verdict that did not include it. *See Foley v. Huntington Co.,* 42 Conn.App. 712, 738, 682

A.2d 1026 (1996); *Iseli,* 211 Conn. at 143-44, 558 A.2d 966.

**\*9** When cases are tried without a jury, the Connecticut courts state a slightly different rule. In such cases "the allowance of interest as an element of damages is primarily an equitable determination and a matter within the discretion of the trial court." *Middlesex Mutual Assurance Co. v. Walsh,* 218 Conn. 681, 701-02, 590 A.2d 957 (1991); *The Nor'easter Group. Inc. v. Colassale Concrete, Inc.,* 207 Conn. 468, 482, 542 A.2d 692 (1988). The reference to "the trial court" is confusing, as it can be read as a reference to the judge in his legal, rather than fact-finding, capacity. Recently, Connecticut appellate courts have attempted to clarify this by changing the reference to the "trier of fact." *See, e.g., Ceci Bros. v. Five Twenty-One Corp.,* 82 Conn.App. 419, 427 (2004); *Advanced Financial Servies, Inc. v. Associated Appraisal Services, Inc.,* 79 Conn.App. 22, 31, 830 A.2d 240 (2003); *Maloney v. PCRE, LLC,* 68 Conn.App. 727, 755, 793 A.2d 1118 (2002).

In Retepromaca's case, any ambiguity in the decisions of Connecticut courts has no practical import--it is settled that the judge in a jury trial has no ability to award prejudgment interest.

B. *Federal Court*

In light of the ambiguous language used by the Connecticut courts, it is not surprising that some confusion has dogged federal courts attempting to apply Connecticut law in diversity cases.

In Neptune *Group. Inc. v. MKT Inc.,* 205 F.R.D. 81 (D.Conn.2002), Judge Droney confronted essentially the same situation as the one here and concluded--as I do--that the question of prejudgment interest was for the jury, and not the judge. Similarly, Judge Eginton, in *Winnick v. Alvin and Co.,* 1998 WL 696015 (D.Conn. July 15, 1998), noted that the question of prejudgment interest was one for the trier of fact (in that case, the court).

A few other district court decisions, however, set forth the opposite conclusion, holding--with little or no discussion--that the question of prejudgment interest was one for the "court"--meaning the judge--and not the jury. [FN8] *See, e.g., Gilmore v. Bergin,* 1998 WL 1632526, *12 (D.Conn. Sept.22, 1998) (holding trial court in jury trial had discretion to award prejudgment interest); *Kregos v. The Latest Line, Inc.,* 1998 WL 696007 (D.Conn. Aug.31, 1998) (holding interest award for the court, not jury, but declining to award it); *Brandewiede v. Emery*

*Worldwide,* 890 F.Supp. 79, 82 (D.Conn.1994) (holding not within the jury's discretion to award prejudgment interest, rather that was a question for the court).

> FN8. It is possible that these courts relied on the Second Circuit's statement in *Prime Management Co. v. Steinegger,* 904 F.2d 811, 817 (2d Cir.1990), that under Connecticut law prejudgment interest was left to the discretion of the court. Not surprisingly, that case involved a bench trial where "the court" was the trier of fact. The Connecticut case cited by the Second Circuit was *Nor'easter* (discussed above), also a bench trial.

Given this line of federal cases, Retepromaca may have been led astray in understanding how prejudgment interest is awarded under Connecticut law. Based on my review of binding decisions of the Connecticut Supreme Court and Appellate Court, however, I conclude that Retepromaca's request for prejudgment interest must be denied, because prejudgment interest is an issue to be decided by the jury.

V. Conclusion

For the aforementioned reasons, the Ensign-Bickford Company's motion for judgment as a matter of law or new trial (doc. # 170) is DENIED, and Retepromaca's motion for prejudgment interest (doc. # 159) and motion to modify the judgment (doc. # 164) are DENIED.

**\*10** It is so ordered.

2004 WL 722231 (D.Conn.)

END OF DOCUMENT

# DEPOSITION EXCERPTS RELIED ON IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

# DEPOSITION OF MILTON L. DALY

# DEPOSITION OF
# ROBERT L. BEACHER