# EXHIBIT A

```
                    UNITED STATES DISTRICT COURT
                       DISTRICT OF CONNECTICUT




   CROWN THEATRES, LP                    )
            Plaintiff                    )    3-02-cv-2272 (AVC)
   VS                                    )    SEPTEMBER 18, 2003
            Defendant                    )    Federal Building
   MILTON DALY, ET AL                    )    Hartford, Connecticut





                        PREJUDGMENT REMEDY HEARING
              HELD BEFORE ALFRED V. COVELLO, U.S.D.J.














                          Wendy J. Allen, RPR
                       450 Main Street, Rm #648
                         Hartford, CT  06103
                            (413) 427-9915
```

1  becomes an exhibit. My first objection is this has only been
2  marked for identification. There has been no foundation to
3  establish what this is, what predicate documents it's based
4  upon, those documents are not in evidence, and therefore it's
5  not an admissible summary at this time. I don't even know who
6  created it, Your Honor.
7            MR. MARTIN: Well, maybe I should ask some questions.
8  BY MR. MARTIN:
9  Q    Showing you what we've marked as demonstrative Exhibit
10 number 7, Mr. Hamilton, would you please identify it for the
11 record?
12 A    This exhibit is a document that I prepared along with
13 assistance with one of my colleagues, Ms. Wood, and Mr.
14 Jennings, and I prepared it with the detailed underlying
15 documents that I discussed a few minutes ago, and primarily
16 cancelled checks, bank statements, signatory cards, invoices,
17 and requisition forms, and some miscellaneous other business
18 records.
19 Q    Are you familiar with the substance of the diagram?
20 A    I am since I was the primary preparer.
21 Q    And is the diagram a fair and accurate depiction of the
22 cash transactions and flow of money from three entities to
23 Taylor-Leigh and so forth?
24 A    Yes, it is.
25 Q    Would this diagram assist you in explaining what happened

1  with regard to the flow of money from the Beacher entities to
2  Taylor-Leigh and so forth and any monies that Anne Daly
3  received?
4  A   It would be very helpful. To explain it without the chart
5  would I believe would be very confusing.
6  Q   Would you explain to the Court the series of cash
7  transactions depicted on the diagram?
8  A   I will, and starting at the top, Your Honor, there are
9  four boxes there. The total of those, the amounts in those
10 boxes are 4.2 million. What I referred to earlier as the
11 Beacher entities, these are noted above, and they're called
12 Hewlett Marlin and Tiger. The longer term would be Hewlett
13 Contracting or Marlin Consulting, but I've shortened them here
14 for purposes of the chart. These amounts were paid to
15 Taylor-Leigh, and they represent in the first box, this is the
16 70/30 split I referred to earlier.
17         So in other words, Mr. Daly in his capacity at
18 Taylor-Leigh authorized payments to Beacher, the Beacher
19 entity, or one of these other entities, and then that 70
20 percent of that amount, in the first box were $2 million was
21 sent back to Taylor-Leigh, an account controlled by Mr. Daly.
22         Similarly, in the second box over, going to the
23 right, the 971,000, same identical explanation, however in that
24 case we were not able to determine the exact split, and so it
25 wasn't a 70/30. So I think as the course of this transaction

1    took place between Mr. Beacher and Daly, the, I'll call it the
2    accounting, got a little bit mixed up.  But in any event, those
3    were checks that we reviewed that went into the Taylor-Leigh
4    city bank account.
5         The 302,000 from GUS, GUS was an entity owned or
6    controlled by a Mr. Cella, and the transaction is very similar
7    except there was one more stop in the transaction, if you will.
8    Crown, as I understand it, sent cash to GUS, who then sent it
9    to Beacher, who then sent it to Taylor-Leigh.  So we believe
10   Mr. Cella is also involved in, to this extent, the 302,000, in
11   this series of transactions.
12        And the 936,000, which is the last box on the right,
13   those were checks that were paid directly from Beacher, his own
14   entity, into a Taylor-Leigh, Inc. account.
15        THE COURT:  Could I just ask you where this 2,600,000
16   had come from, sir?  You mentioned a 70/30 split.  Is this the
17   product of that split?
18        THE WITNESS:  It was.  If we're just looking at the
19   $2 million, Crown through Mr. Daly paid Hewlett Marlin and
20   Tiger the amount in excess of 2 million.  So if we divided the
21   2 million by 70, that essentially grows that up to the total
22   amount paid by Crown.  So Crown would have paid --
23        THE COURT:  About $3 million, then.
24        THE WITNESS:  Right.  In fact, it would be exactly
25   2,000,600 divided by 47, Crown would have paid those entities

1  2.8 million. Mr. Beacher kept about 800,000, and then sent
2  2,000,600, which is the amount depicted here, down to
3  Taylor-Leigh. So this chart does not show the amount kept by
4  Mr. Beacher, it's purely focusing on the piece, I'll call it
5  the 70 percent portion that was sent down to Taylor-Leigh.
6              THE COURT: I see.
7              THE WITNESS: That 4.2 million I have verified.
8  BY MR. MARTIN:
9  Q    Mr. Hamilton, may I just interrupt for a moment. The top
10 line of the chart where it says 2,000,600, 971,953.02, 936,650,
11 the monies that came into those entities, where did they come
12 from?
13 A    Those monies, the origin of those monies is Crown.
14 Q    And I think you were about to move on to the third box,
15 but before you get there, there's these payments reflected in
16 the second big gray thing coming down on your chart that says
17 4,211,200 paid to Taylor-Leigh, Inc. In your investigation did
18 you learn whether Taylor-Leigh performed any services for that
19 money?
20 A    My investigation shows that there was, Taylor-Leigh did
21 not perform any services for that 4.2 million.
22 Q    And what do you rely upon for that?
23 A    Well, there are a number of things. The Beacher
24 declaration, Mr. Daly's own testimony, and the actual business
25 records. For example, Your Honor, some of the AIA requisition

```
 1              THE COURT:  I see.
 2              THE WITNESS:  So I mean, this is not in the evidence,
 3   but in my experience in cases a contractor --
 4              MR. WISSER:  Objection, Your Honor.  His experience
 5   in cases cannot be tied into this case.
 6              THE COURT:  All right.  So I understand.  Why don't
 7   you go ahead, sir.
 8   BY MR. MARTIN:
 9   Q    Going back to your, the demonstrative exhibit, Mr.
10   Hamilton, that you prepared.  If I may, it's probably easier to
11   stand here and point to it.  The 4.,211,200 paid to
12   Taylor-Leigh, Inc., do you see that box?
13   A    I do.
14   Q    That box then drops down to a 3,695,400 deposited to
15   Taylor-Leigh Citibank account?
16   A    Correct.
17   Q    What does that represent?
18   A    I would look at two boxes here, Your Honor.  Of the 4.2
19   million deposited by all these various Beacher entities at the
20   top, I'll call them all Beacher for simplicity purposes here,
21   we were able to trace 3.6 million that went into the
22   Taylor-Leigh Citibank account.  There was another 515,000,
23   that's off to the right of that box, that went to other banks
24   that we couldn't trace, either didn't have a bank statement or
25   we didn't have the cancelled check.
```

1             If you add up the 515,800, which is in the second
2   gray area off to the right, and the 3.695, that totals 4.2
3   million.  So what we tried to attempt to do there, of that 4.2
4   million that came in from Beacher, where did it go?  3.695 went
5   directly to the Taylor-Leigh Citibank account.
6   Q    And who had access to the Taylor-Leigh Citibank account?
7   A    Both Mr. and Mrs. Daly were signatories on that account.
8   Q    Then if you look at the next line down, says 3,753.357,
9   TLI check paid to Milt Daly/cash/TLI, what does that represent?
10  A    Once the cash was deposited into the Taylor-Leigh account,
11  Mr. Daly negotiated checks out of that account that were
12  payable either to himself, payable to cash, or payable to TLI.
13  He negotiated those checks and deposited them into three
14  places, essentially three places.
15            The first was, and if you look at that line it has
16  250,000 to the left, 250,000 he deposited directly into an
17  account called Raymond James that was an investment account
18  where he invested in various stocks, and that was an account
19  also in Mr. and Mrs. Daly's names.
20            In addition, there was 3.099 million of those checks
21  that were deposited directly to a Fleet account, which was a
22  joint account in Mr. and Mrs. Daly's names, and there was an
23  additional 403,000 that again because the documentation was not
24  complete, it was deposited into other unknown accounts.
25            So if we added the 403,000, we're not sure where it

1  went, but it was a check payable to Mr. Daly or cash or TLI,
2  don't know where that went, 3.099 million went into this Fleet
3  account, that was a joint account, again, with Mr. and Mrs.
4  Daly, and 250 went into the Raymond James account, the total of
5  those three, again, is 3.753 million.
6          THE COURT:  Sightly more than came in from -- is TLI
7  something different than Taylor-Leigh, Inc.?
8          THE WITNESS:  It's the same.  We've abbreviated it
9  there.  TLI is Taylor-Leigh, Inc.
10         In answer to your question, it is more, because there
11 were other deposits into the Citibank account.  If you look to
12 the right of the 3695, there was 1.2 million in other deposits,
13 and 1.225 million.  We weren't able to identify all of those
14 deposits.  Again, because we didn't have the specific, what
15 would come with the bank account information is a deposit slip
16 and the copies of all the checks.  You just look at the bank
17 statement you typically get at home, you don't know where that
18 came from.
19         And but the types of amounts that were going in there
20 were $100,000 even deposit, 311,000, there were several hundred
21 thousand dollars, 30,000, and then there were smaller amounts
22 as well, but a lot of even amounts went into that account.  We
23 don't know the source of that right now.  We're continuing that
24 analysis.
25         THE COURT:  But the bottom line is that for the

1  purposes of our hearing, according to your testimony, $4.2
2  million came into a corporation in which this lady had control
3  signatory rights on it.
4          THE WITNESS: That's correct, Your Honor. She was an
5  officer, and she had signatory control on the account, as well
6  as all the other accounts where this money ultimately flowed,
7  at least amounts that we can track as shown on the exhibit.
8          THE COURT: Did you have further of the gentleman?
9          MR. MARTIN: I do have further with the gentleman, if
10 you don't mind.
11         THE COURT: Sure.
12 BY MR. MARTIN:
13 Q   If you continue to take the money down, if you will, on
14 your demonstrative exhibit, Mr. Hamilton, it goes 3,099,858
15 goes to a Fleet joint account, correct?
16 A   That's correct.
17 Q   And then if you drop it down again to the next level,
18 you've traced 2,275,000 deposited into a Raymond James account,
19 correct?
20 A   That's correct.
21 Q   And then if you drop it down to the next level, you have
22 1,087,165 contributed to Odyssey. What does that refer to?
23 A   Odyssey is the company I had mentioned earlier. Odyssey
24 Entertainment, Mr. Abramsky and Mr. Daly were involved in that
25 enterprise, and Mr. Daly loaned Odyssey part of its capital,

1   approximately $2.9 million, basically to capitalize that
2   enterprise.  And the proceeds, part of the proceeds of that
3   loan to Odyssey were the 1.087 million that came from these
4   accounts.  The balance was from primarily the proceeds of the
5   sale of Mr. Daly's residence in Connecticut.
6   Q   Now, Mr. Hamilton, the $2.8 million that went into
7   Odyssey, was there a promissory note associated with that?
8   A   Yes, there was.
9           MR. MARTIN:  Your Honor, Mr. Wisser has no objection
10  to Exhibit 5, which is a copy of the promissory note.
11          MR. WISSER:  That's correct, Your Honor.
12          MR. MARTIN:  For the record, I should note that the
13  line at the top of the promissory note that says, has a fax
14  line to Jenner Block is not part of the original exhibit, and
15  the line at the bottom that has another fax line is also not
16  part of the original exhibit.  The promissory note, Your Honor,
17  is made payable to both Milton and Anne Daly.
18  BY MR. MARTIN:
19  Q   Mr. Hamilton, are you familiar with the promissory note
20  that we've identified as Exhibit number 5?
21  A   Yes.
22          THE COURT:  Sir, are you doing this because you're
23  concerned that I don't believe your witness?
24          MR. MARTIN:  No, I'm sorry, I'm probably being --
25          THE COURT:  I guess I'm not understanding.  This is

1           THE COURT:  The objection's overruled.  Why don't you
2    finish your answer, sir.
3           THE WITNESS:  Mrs. Daly as officer and signatory of
4    the account of Taylor-Leigh, Inc. received 4.2 million, and as
5    a result received the benefit of 4.2 million as result of the
6    70/30 deal set up by Mr. Beacher and Mr. Daly.
7    BY MR. MARTIN:
8    Q    And do you have an opinion as to a reasonable degree of
9    forensic accounting certainty as to whether Anne Daly received
10   monies from Crown Theatres construction program in the Fleet
11   account?
12   A    Yes.  Similarly she received, as the chart shows, 3.099
13   that was deposited into the Fleet account from the Taylor-Leigh
14   account.
15           MR. MARTIN:  If I may have a moment, Your Honor?
16           THE COURT:  Sure.
17           MR. MARTIN:  Your Honor, I have no further questions
18   at this time.
19           THE COURT:  I just want to inquire, sir, in the
20   course of your investigation, what did you learn, if anything,
21   about the business of Taylor-Leigh, Inc.?  Did it have any
22   business, holding company, or?
23           THE WITNESS:  There was a business, a day care
24   center, called Kangaroo Pouch Kids that was doing business, or
25   Taylor-Leigh, doing business as Taylor-Leigh.  So there was a

1   Taylor-Leigh, Inc.'s account?

2   A   Correct.

3   Q   So did Mr. Daly, correct?

4   A   Correct.

5   Q   You're not claiming that the payments to Taylor-Leigh are

6   direct payments to Anne Daly, are you?

7   A   No, that was not my testimony.

8   Q   Then you've traced the funds from Taylor-Leigh to a

9   Citibank Taylor-Leigh account, is that correct?

10  A   Yes.  That's really, that is the Taylor-Leigh account, the

11  Citibank account.  So when we say in the second box the 4.2 is

12  paid to Taylor-Leigh, Inc., that was paid to Taylor-Leigh,

13  Inc., the difference, the 3.695 is what we were able to trace

14  specifically to the TLI account, and there's another 515 off to

15  the right which we couldn't trace to a specific account.

16  Q   Okay.  So Taylor-Leigh received in its bank account

17  3,695,400, correct?

18  A   Correct.

19  Q   And is this bank account that we talked about that is

20  owned by the corporate entity, correct?

21  A   Correct.

22  Q   With signature authority by both Anne and Milt, correct?

23  A   Correct.

24  Q   And you understand that signature authority allows either

25  of them to withdraw all of the money, correct?

```
 1   A    I don't recall that, I just know they were both
 2   signatories.
 3   Q    Okay.  But you know --
 4   A    Certainly that infers that they can both.
 5   Q    But you know the ownership of the money is in this
 6   corporate entity, correct?
 7   A    Correct.
 8   Q    And the corporate entity is required by law to file a tax
 9   return, correct?
10   A    Correct.
11   Q    And one of the assets of that corporate entity would be
12   the cash in this account, correct?
13   A    That would be correct.
14   Q    That would not be an asset of Anne Daly, correct?
15   A    Correct.
16   Q    Thank you.  Okay.  And as we trace this money, somehow you
17   have more money coming out of the Citibank account from
18   Taylor-Leigh being paid to Milt Daly directly, cash, or paid
19   back to Taylor-Leigh, do I understand this correctly?
20   A    No.  The second box there, the 3.753 million, those were
21   checks that were negotiated by Milt Daly, and they were payable
22   either to cash, to Milt Daly, or to TLI, and then he would
23   endorse them.
24   Q    These were all checks written by Milt Daly, correct?
25   A    Correct.
```

```
 1   Q    And these funds flowed to either Milt Daly, correct?
 2   A    Well, the payee on the check would have been Milt Daly,
 3   but then he deposited that into either the Fleet account or the
 4   Raymond James account.
 5   Q    Okay, we'll get to that.  But the checks were either made
 6   payable to Milt Daly, correct?
 7   A    Correct.
 8   Q    Cash, correct?
 9   A    Correct.
10   Q    Or Taylor-Leigh, Inc., correct?
11   A    Correct.
12   Q    Not one check to Anne Daly, correct?
13   A    That's correct.
14   Q    And then as we follow that flow of money again, you have
15   3,099,000 and change going into a Fleet account that is a joint
16   account, correct?
17   A    Correct.
18   Q    Has Milt Daly's name on it as well as Anne Daly's name on
19   it, correct?
20   A    Correct.
21   Q    Both of them having signature authority, correct?
22   A    Correct.
23   Q    That's a Connecticut account, correct?
24   A    I don't recall.
25   Q    Okay.  The Raymond James account, you have $2,275,000
```

```
 1   going into that account, of the original 4.2, correct?
 2   A    Correct.
 3   Q    Also a joint account owned jointly and severally by Anne
 4   Daly and Milt Daly, correct?
 5   A    Correct.
 6   Q    And out of that Ramond James account there were market
 7   losses that resulted in about 1.87 million left, is that right?
 8   A    Correct.
 9   Q    And that 1.87 million represents a little more than
10   one-third of the $2.9 million promissory note that is currently
11   due and payable to Milt Daly and Anne Daly, correct?
12   A    Correct.
13   Q    That's the promissory note in evidence here, correct?
14   A    Correct.
15   Q    And you have discerned through your thorough investigation
16   that the remaining funds that represent that promissory note
17   were generated from the sale of Mr. and Mrs. Daly's home that
18   they had in Connecticut, correct?
19   A    Correct.
20   Q    They bought that home in 1996, correct?
21   A    Correct.
22   Q    You were able to discover that home was purchased for
23   $600,000, correct?
24   A    Correct.
25   Q    There had not been a flow of $600,000 from Crown to any of
```

```
 1  to Anne Daly, did you?
 2          THE COURT:  Asked and answered, sir.
 3  BY MR. WISSER:
 4  Q   The Fleet account, did you answer as to?
 5          THE COURT:  Do you have any testimony other than what
 6  your chart indicates as to who were the payees of these checks?
 7          THE WITNESS:  As I testified earlier, these checks
 8  were payable, as it says right on the chart, to Milt Daly in
 9  cash, and he negotiated them into the accounts, they weren't
10  made payable to Anne Daly specifically.
11  BY MR. WISSER:
12  Q   So if all the money came into an account that Anne Daly
13  had the right to access but she never touched it, it's still
14  your testimony that she had the benefit of all those funds, is
15  that correct?
16  A   Well, in my opinion, she did touch it.  I mean in the same
17  way, I mean my wife and I have a joint account.
18  Q   Just answer my questions.
19  A   This is the answer.
20  Q   I didn't ask about your wife and you, and I have no
21  interest in that.
22          THE COURT:  Let him answer, sir.
23          THE WITNESS:  This is the answer.  We have a joint
24  account.  I'm earning a salary right now.  I deposit it.  It is
25  our funds, and it gets used in the normal course of business.
```

1  Just because that check out of there doesn't, or is not made
2  payable to Anne Daly doesn't mean she doesn't get a benefit.
3  Mr. and Mrs. Daly live together.  Mr. Daly testified that, you
4  know, all of their assets are joint assets, were theirs
5  together.  That's the way they live.  This is the way they did
6  things.  They had an investment account which was a Raymond
7  James, it all went in there.  To me that means there was a
8  benefit there.  It didn't have to have a check payable to her
9  to make the benefit occur.
10 BY MR. WISSER:
11 Q    So equally, then, sir, following your logic and your
12 belief regarding what you do with your wife, all that money
13 also benefited Mr. Daly one hundred percent, correct?
14 A    It benefited them both equally.
15 Q    So then it can't be $4.2 million against Anne Daly because
16 that would be doubling the amount of money, right?
17         MR. MARTIN:  Your Honor, I object.  This is just
18 argumentative.
19         MR. WISSER:  That's all right, Your Honor, this all
20 supports my belief, yeah, so I might not have much more.
21 BY MR. WISSER:
22 Q    I guess you made a point, sir, to establish that Anne Daly
23 paid $35,000 to my firm, do you see that?
24 A    That is on the board, yes.
25 Q    Who asked you to put that on the board?

1  A    No one. What Mr. Jennings, Ms. Wood and I decided in
2  preparing and showing this transaction, we needed to show
3  everything from this account, and there was 35,000 that was
4  paid to the Weinstein Wisser firm.
5  Q    And you realize that I represent Anne Daly, correct?
6  A    I do.
7  Q    You don't claim this to be some sort of fraudulent
8  transaction, do you?
9         MR. MARTIN: Objection, Your Honor. He's an expert
10  witness testifying --
11         THE COURT: Sustained.
12         MR. WISSER: Very well.
13         Nothing further at this time.
14         THE COURT: You can step down, sir, thank you. Do
15  you have further, sir?
16         MR. MARTIN: Very briefly, Your Honor.
17         THE COURT: Not of this witness.
18         MR. MARTIN: Yes, just out of this witness, very
19  briefly.
20
21         REDIRECT EXAMINATION BY MR. MARTIN:
22
23  Q    Mr. Hamilton, during Attorney Wisser's examination you
24  testified about deposition testimony from Mr. Daly that you
25  reviewed and relied upon, and you quibbled about what some of

```
 1  the testimony was.  Looking at what is on this board at page
 2  126, lines 21 through 23, the question, but she, Anne Daly in
 3  brackets, does receive the benefit of the 4.2 million that you
 4  got from Taylor-Leigh, answer, yes.  Is that some of the
 5  testimony you reviewed and relied upon?
 6  A    It is, yes.
 7          MR. MARTIN:  Thank you.  I have nothing further, Your
 8  Honor.
 9
10              RECROSS EXAMINATION BY MR. WISSER:
11
12  Q    Sir, do you understand Mr. Daly to have any legal
13  background?
14  A    I'm not aware of any legal background that he has, no.
15          MR. WISSER:  Okay, nothing further.
16          THE COURT:  You can step down, sir, thanks.  Do you
17  have further, sir?
18          MR. MARTIN:  Yes, Your Honor.  At this time, Your
19  Honor, we would offer the deposition testimony which is marked
20  as deposition, or trial exhibit or hearing exhibit number 10 of
21  Milton Daly dated May 21st, 2003, and August 5th, 2003.  Your
22  Honor, we've designated the portions of this particular
23  deposition, if I may approach and just file our designations.
24          THE COURT:  Sure.
25          MR. WISSER:  Your Honor please, I object to the offer
```