# EXHIBIT C

1

```
       IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF CONNECTICUT
                   -  -  -
CROWN THEATRES, L.P.,    :    CIVIL ACTION
        Plaintiff,       :
                         :
        V.               :
                         :
MILTON L. DALY,          :
TAYLOR-LEIGH, INC.,      :
JAMES C. CELLA, G.U.S.   :
DEVELOPMENT, INC.,       :
JAMES T. MARTINO and     :
JAMES THOMAS MARTINO,    :
ARCHITECT, P.C.,         :    CASE NO.
        Defendants.      :    3:02CV2272AVC
                   -  -  -
               December 23, 2003
                   -  -  -

            Oral deposition of
FREDERICK C. HAMILTON, CPA, CFE, held in
the offices of Esquire Deposition
Services, 1880 John F. Kennedy
Boulevard, Philadelphia, Pennsylvania
19103 commencing at 10:05 a.m., on the
above date, before Harvey Krauss, a
Federally-Approved Registered
Professional Reporter and a Commissioner
of the Commonwealth of Pennsylvania.
                   -  -  -


            ESQUIRE DEPOSITION SERVICES
                    15th Floor
            1880 John F. Kennedy Boulevard
            Philadelphia, Pennsylvania 19103
                   (215) 988-9191
```

```
                                                           2
 1   APPEARANCES:
 2   JENNER & BLOCK, L.L.C.
       BY: ADAM HIRSCH, ESQUIRE
 3        and
       LAWRENCE S. SCHANER, ESQUIRE
 4     One IBM Plaza
       Chicago, Ill 60611-7603
 5     (312) 222-9350
       Co-counsel for the Plaintiff
 6
     WEINSTEIN & WISSER, P.C.
 7     BY: KERRY MARK WISSER, ESQUIRE
       29 South Main Street
 8     Suite 207
       West Hartford, Connecticut 06107
 9     (860) 561-2628
       Counsel for the Defendants,
10     Milton Daly and Taylor-Leigh,
       Inc.
11
     MILBER, MAKRIS, PLOUSADIS &
12   SEIDEN, L.L.P.
       BY: MARISA LANZA, ESQUIRE
13     108 Corporate Drive
       Suite 200
14     White Plains, NY 10604
       (914) 681-8700
15     Counsel for the Defendants,
       James Martino and James Thomas
16     Martino, Architect, P.C.
17
18
19
20
21
22
23
24
```

```
                                                           3
 1               - - -
 2              I N D E X
 3   WITNESS                    PAGE NO.
 4   Frederick Hamilton
 5     By Mr. Wisser                6
 6
 7               - - -
 8             E X H I B I T S
 9   NO.     DESCRIPTION         PAGE NO.
10   Exhibit 1   Letter             12
11   Exibit 2    Letter             12
12   Exhibit 3   Letter             12
13   Exhibit 4   Notes              29
14   Exhibit 5   Noes               29
15   Exhibit 6   Notice of deposition 39
16   Exhibit 7   Report             40
17   Exhibit 8   Document           46
18   Exhibit 9   Amended complaint  167
19   Exhibit 10  Document           294
20   Exhibit 11  Document           294
21   Exhibit 12  Document           326
22
23   3
24   4
```

```
 1   5
 2            - - -
```

```
 1           DEPOSITION SUPPORT INDEX
 2
 3   Direction To Witness Not To Answer
 4   Page   Line   Page    Line
 5   None
 6
 7
 8   Request For Production Of Documents
 9   Page   Line   Page    Line
10   None
11
12
13
14
15   Stipulations
16   Page   Line   Page    Line
17   5      2-8
18
19
20   Questions Marked
21   Page   Line   Page    Line
22   None
23
24
```

46

1  Crown, correct?
2      A.   Correct.
3      Q.   All right. On page one of
4  your report, in the second paragraph,
5  you indicated that the conduct of Mr.
6  Daly in connection with the construction
7  of the six theater projects that we just
8  discussed caused Crown to suffer losses
9  ranging from 8.1 million to 13.8 million
10 dollars, excluding professional fees; is
11 that correct?
12     A.   That's correct.
13     Q.   And those formulated
14 calculations of damages are identified
15 within the report in greater detail,
16 correct?
17     A.   Correct.
18     Q.   We'll go through those in a
19 moment. You also indicate that Anne
20 Daly, and forgive me, it A-n-n-e,
21 there's an E at the end, benefited from
22 the scheme perpetrated by Mr. Daly in
23 the minimum amount of approximately 4.2
24 million dollars, which represented the

47

1  improper payments deposited into a bank
2  account that was owned by the Dalys,
3  correct?
4      A.   Correct.
5      Q.   Now, it's your claim that
6  Anne Daly benefited from the scheme
7  because her name was on the accounts in
8  which money passed through; is that
9  right?
10     A.   That's part of the basis,
11 correct.
12     Q.   What other basis is there
13 for your claim that Anne Daly benefited
14 from this 4.2 million dollar scheme of
15 her husband's?
16     A.   Actually, a few points.
17 Five different points, I believe.
18     Q.   And you're referring to a
19 particular document, correct?
20     A.   I am. It's -- I'll call it
21 a work paper that I've put together
22 during my preparation the last day or
23 two just compiling all the different
24 points that came to mind as part of my

48

1  analysis.
2      Q.   That's not a document
3  that's been disclosed as of this moment
4  in time, correct?
5      A.   Correct.
6      Q.   All right. Let's mark that
7  before you go through it.
8      A.   Sure.
9          (Marked as Exhibit Number 8
10     for identification.)
11 BY MR. WISSER:
12     Q.   All right, sir. And
13 Exhibit 8 for which you claim you have
14 another copy in front of you, this
15 represents a document created in the
16 last few days for the purposes of you
17 identifying the basis for your opinions
18 relating to the benefit conferred upon
19 Anne Daly because of the activities of
20 her husband Milt; is that correct?
21     A.   Well, it includes more than
22 the issues involving Anne Daly. It's
23 issues for the bases for many of my
24 opinions in the report.

49

1      Q.   Okay. And is this some
2  sort of synopsis that assists you in
3  identifying what you rely upon?
4      A.   It is.
5      Q.   Rather than try to commit
6  all of these issues to memory, this is
7  what to say for a better term a little
8  cheat sheet. We'll call it a thumbnail
9  outline, how is that?
10     A.   That works.
11     Q.   I see that there are some
12 yellow lined papers with your notes on
13 them. Does those represent handwritten
14 notes that were utilized to create
15 Exhibit 8?
16     A.   No, these were just some
17 notes I took regarding four of the
18 projects, Annapolis, Jupiter, Skokie and
19 Miami as I was reviewing the AIA forms
20 and the contract documents. You know,
21 again, as part of my analysis just
22 making notes.
23     Q.   All right. May I see that
24 for a moment?

50

1  A. Sure.
2  Q. I understand.
3     Okay. I had asked you a
4  question regarding your opinions as to
5  why Anne Daly benefited from the alleged
6  scheme entered into by her husband Milt.
7  One of them was the fact that her name
8  was on the bank accounts for which these
9  funds passed through, and you said there
10 were other bases and you said there were
11 five of them. Was the name on the
12 account one of those five?
13 A. Actually, that would be in
14 addition. So there are -- I think there
15 are five listed on this Exhibit 8, and
16 there are a couple of others I could
17 probably add to it.
18 Q. On Exhibit 8, show me the
19 ones that are actually listed so that I
20 don't have to in great detail write the
21 notes.
22 A. If you could go over to the
23 specific job category column and go down
24 where there's a notation that says Anne

51

1  Daly, it's about two-thirds of the way
2  down the page.
3  Q. Yes.
4  A. Those are some items that I
5  picked out.
6  Q. All right. The first one
7  that I see talks about a May 21st, 2003
8  Daly deposition. Did I miss one?
9  A. Actually. The first one
10 under Anne Daly is a second
11 Interrogatory. That's the source right
12 there.
13 Q. Oh, I'm sorry. I see.
14 Okay. All right.
15    And the basis that you are
16 relying upon there to find culpability
17 against Anne Daly is that Taylor-Leigh,
18 Inc., TLI used the money to pay bills
19 and dividends to Milt Daly; is that
20 right?
21 A. Correct.
22 Q. What is that an indication
23 of?
24 A. Well, I think you need to

52

1  go -- what I did is looked at all five
2  of the points together with the fact
3  that both Anne and Milt Daly were
4  signatories to these accounts. That
5  Interrogatory says "TLI used the money
6  to pay bills and dividends to Milt Daly.
7  If you take that to one of the next
8  points Mr. Daly's deposition, he says
9  everything in our name basically belongs
10 to both of us. And he also says later
11 in his deposition it didn't matter to
12 Milt whose name it was in. It was
13 jointly or it was owned jointly, and
14 that is the way their marriage was
15 conducted for 38 years. And Mr. Daly
16 agreed with that. If you kind of tie
17 those statements in to also a second
18 point in the Interrogatory that says any
19 additional funds from TLI were used to
20 pay mortgages and bills, and then along
21 with what I thought was Mr. Daly's own
22 admission that Anne does receive the
23 benefit of the 4.2 million, those facts
24 combined with her signatory authority on

53

1  the accounts, and basically the use of
2  the proceeds according to Mr. Daly,
3  that's my basis.
4  Q. All right. Going back to
5  this second Interrogatory response where
6  it said TLI used the money to pay bills
7  and dividends to Milt Daly. Did you
8  understand that that response to the
9  Interrogatory indicated that monies that
10 went into the TLI account were used to
11 pay TLI bills?
12 A. It's not clear from this
13 Interrogatory, no.
14 Q. Did you make the assumption
15 that those funds in the TLI accounts
16 were utilized to pay personal bills of
17 Mr. Daly?
18 A. That would be correct, yes.
19 Q. What evidence do you have
20 to substantiate that assumption?
21 A. This just this
22 Interrogatory.
23 Q. Okay. So --
24 A. Along with Mr. Daly's

**54**

1  testimony later on that she does or Anne
2  Daly receives the benefit of the 4.2
3  million.
4      Q.  All right. Well, that
5  testimony that you are relying on you
6  read the both question and the answer,
7  didn't you, sir?
8      A.  Yes, I did.
9      Q.  The question was posed to
10 Mr. Daly as to whether or not he
11 believed Anne Daly benefited from these
12 funds, correct?
13     A.  I don't recall
14 specifically. This is -- I know that
15 this is the ultimate response.
16     Q.  Okay. Whether or not Anne
17 Daly actually benefits from these funds
18 under your opinion. Do you believe that
19 is something that is determined by a
20 layperson or something that's determined
21 by either expert opinion or legal
22 opinion, if you know?
23     A.  I was asked to look at the
24 issue, and I think based on, I don't

**55**

1  know if it's my expert opinion or my
2  opinion, looking at the records looking
3  at the flow of funds and the testimony
4  and the Interrogatories, I mean, it's my
5  opinion she had to have the benefit of
6  some of these funds.
7      Q.  All right. Now, the TLI
8  account that you reviewed, you reviewed
9  multiple checks going in and out of that
10 account, correct?
11     A.  Correct.
12     Q.  Do you remember any check
13 that was signed by Anne Daly?
14     A.  No.
15     Q.  In fact, there are no
16 checks out of the TLI account signed by
17 Anne Daly, correct?
18     A.  None that I have reviewed
19 to date, that's correct.
20     Q.  Although, Anne Daly had the
21 ability to sign checks on that account,
22 you have seen no checks in which she
23 exercised that authority regarding the
24 funds that you believed were improperly

**56**

1  taken from Crown, correct?
2      A.  To date we have not.
3  That's correct.
4      Q.  Okay.
5      A.  But our investigation is
6  still ongoing.
7      Q.  Well, you know, I keep
8  hearing this, that your investigation is
9  still ongoing. How is it ongoing
10 regarding the TLI checks?
11     A.  Well, I received a large
12 packet of checks and statements this
13 week or, actually, I think Thursday or
14 Friday of last week and other bank
15 information has been provided.
16     Q.  From Taylor-Leigh, Inc.?
17     A.  You know, I'm not certain,
18 but bank information that we had
19 requested looking at different account
20 numbers.
21     Q.  All right. As you sit here
22 now, having testified once, rendered a
23 report and now testifying in this
24 deposition, does the fact that Anne

**57**

1  Daly, to your knowledge, as you sit here
2  now, never signed any checks from TLI
3  regarding the funds that you believe
4  improperly went into that account. Does
5  that still lead you to believe that she
6  benefited from the mere fact that she
7  was a signatory on the account?
8      A.  Yes, because obviously
9  there's transfers into other accounts to
10 which Anne Daly had signature authority.
11     Q.  How is it that Anne Daly's
12 ability to sign checks on a
13 Taylor-Leigh, Inc. account, although she
14 signed none, how does that represent a
15 benefit to her if she never signed any
16 checks?
17     A.  Well, as Mr. Daly
18 testified, basically what's mine is
19 hers. This is the way we conduct our
20 marriage. So, if he signed the check
21 and those funds were used for whatever,
22 the household, you know, the groceries
23 and mortgage on the home, I mean, in the
24 simple terms, that's the benefit to her.

58

1  The same way I get a salary and I write
2  the checks there's -- my wife derives a
3  benefit from that and that I believe --
4  I mean, that's how I analyze and look at
5  this situation. She doesn't necessarily
6  have to write a check to derive a
7  benefit.
8      Q.  So then, sir, taking your
9  opinion to its fullest logical
10 conclusion, if you engaged in illegal
11 activity in your business and took money
12 from your business that your wife had no
13 idea about, because you would deposit
14 money in your account that your wife has
15 signature authority on and because you
16 would pay some of the household bills,
17 it would be your opinion that your wife
18 would be responsible for the monies that
19 you took from your business; is that
20 correct?
21     A.  Well, no, two different
22 things. In that scenario my wife would
23 benefit. She ate the meat loaf and she
24 lived, you know, she was -- we pay the

59

1  heating bill and she kept warm. Whether
2  there's responsibility I believe will be
3  a legal issue. I'm just making the
4  connection of the benefit. I'm not
5  addressing the responsibility or the
6  liability issue.
7      Q.  Okay. So, it is not your
8  opinion that Anne Daly bears any
9  responsibility for this 4.2 million
10 dollars; is that correct?
11     A.  Well, I'll make sure that I
12 was clear in my report. I believe what
13 I said is, in my opinion Anne Daly
14 benefitted from this scheme. I don't
15 believe I said responsible. I think
16 that is a legal issue. My opinion is as
17 to the benefit.
18     Q.  Okay. You have no
19 knowledge and you've reviewed no
20 evidence or documentation that suggests
21 that Anne Daly had any knowledge about
22 the activities that Mr. Daly was
23 engaging in that you claim to be
24 improper, correct?

60

1      A.  I have not reviewed
2  anything, correct.
3      Q.  Now, again, these five or
4  six things that you mentioned represent
5  your opinion as to why Anne Daly
6  benefited; one, that her name is on
7  accounts where money passed through,
8  correct?
9      A.  Right. And more clearly
10 shown in the chart that I used at my
11 PJR, the flow of funds into the various
12 accounts, not just the TLI account.
13     Q.  And the statements from Mr.
14 Daly that TLI used the money it received
15 to pay bills and dividends to Milt Daly.
16 That's something else you relied upon,
17 correct?
18     A.  Correct.
19     Q.  And the fact that Mr. Daly
20 said, "Everything in our name basically
21 belongs to both of us," referring to his
22 wife; is that correct?
23     A.  Correct.
24     Q.  And the fact that Mr. Daly

61

1  testified that it didn't matter to him
2  whose name was on any of the accounts.
3  If it was owned it was owned jointly and
4  that was the way their marriage was
5  conducted for 38 years; is that correct?
6      A.  Correct.
7      Q.  Is there anything else that
8  you relied upon for the purposes of
9  claiming that Anne Daly benefitted from
10 the activities that Mr. Daly allegedly
11 engaged in?
12     A.  Just the last item on there
13 which is also Mr. Daly's own testimony
14 or admission that Anne basically
15 received the benefit of the 4.2 million.
16     Q.  Okay. All right. That's
17 the universe we're dealing with in
18 regard to the background information
19 that you are relying upon to form your
20 opinions in regard to Anne Daly,
21 correct?
22     A.  Currently that is the
23 population, yes.
24     Q.  Okay. The theory that is

62

1  based on, or that opinion that is based
2  upon those five or six matters that we
3  just discussed, has that theory or
4  opinion been tested in the forensic
5  accounting community, to your knowledge?
6      A.  Not to my knowledge.
7      Q.  Okay. Has that theory --
8  I'm sorry, is there more?
9      A.  Yeah. I mean, not to my
10 knowledge. There is thousands of cases
11 and -- and I'm sure these types of
12 things don't get published, but, no, I'm
13 not aware of any.
14     Q.  Okay. Do you know whether
15 that theory or opinion has been subject
16 to peer review or publication, to your
17 knowledge?
18     A.  This very specific opinion?
19     Q.  Yes.
20     A.  Not to my knowledge, no.
21     Q.  Okay. Has there been an
22 identified or known potential rate of
23 error regarding this particular opinion
24 or theory?

63

1      A.  Has there been a rate or --
2  a rate in other cases? I'm not sure I
3  understand the question.
4      Q.  Ordinarily, theories that
5  are utilized for the purposes of expert
6  testimony can be subject to a plus or
7  minus rate of error, that notwithstanding
8  the fact that all of these factors
9  exist, in some instances plus or minus,
10 you can be accurate or inaccurate, even
11 if you keep those norms. This may not
12 even apply regarding this particular
13 theory, but I want to ask the question
14 is there any rate of error that you're
15 aware of that has been applied to this
16 type of theory, that being a signature
17 on accounts being treated as a single
18 unit in a marriage? Having a claim that
19 you're the benefit of funds that your
20 husband had, is there any rate of error
21 that's been applied to that type of
22 theory to determine whether the
23 conclusion reached is accurate or
24 inaccurate based on those circumstances?

64

1      A.  I have not seen one.
2      Q.  So, there are no standards
3  or controlling techniques that exist
4  regarding this type of theory as it
5  relates to the benefit conferred upon
6  Anne Daly; is that correct?
7      A.  Not that I'm aware of.
8      Q.  All right. And this theory
9  that Anne Daly benefitted under the
10 circumstances that you indicated or that
11 any spouse would benefit under the
12 circumstances that you indicated, is
13 that theory generally accepted in the
14 forensic accounting community, to your
15 knowledge?
16     A.  I'm not sure I understand
17 the question. I mean --
18     Q.  Can you read in a book
19 somewhere in a publication, a treatise,
20 a journal, an article, are you taught
21 anything that establishes that this type
22 of theory that a spouse can benefit
23 under the circumstances that you have
24 identified of wrongdoing of another

65

1  spouse, is that generally accepted as a
2  theory that exists in the forensic
3  accounting community?
4      A.  No. All of the
5  publications and the treatise, what have
6  you, I'm aware of are much more in a
7  general nature, and I'm really not
8  authoritative. So, I have not seen
9  anything at this detailed level.
10     Q.  As far as you know, there
11 is no place that I can go to read any
12 document, book, treatise, article,
13 journal that you deem to be
14 authoritative, that would support this
15 theory that you have rendered in regard
16 to the benefit conferred upon Anne Daly
17 by virtue of the factors that you have
18 taken into account; is that correct?
19     A.  Not that I'm aware of.
20     Q.  Okay. Is it fair to say,
21 sir, then that this is your subjective
22 opinion regarding Anne Daly based on
23 your experience?
24     A.  Yeah, it's based on my --

17 (Pages 62 to 65)

66

1  it's my opinion based on my experience
2  and based on the review of the documents
3  and information.
4      Q.   Okay. Now, looking at the
5  back of page one of your report, which
6  is Exhibit 8, you indicated that it's
7  your opinion that Mr. Martino's
8  negligence in connection with the
9  certification of the architect's
10 certificates for payment submitted on
11 six theater projects caused Crown to
12 suffer a loss at least in the amount of
13 5.6 million dollars. Is that correct?
14     A.   That's correct.
15     Q.   And it's your opinion that
16 Crown relied upon those architect
17 certificates, for the most part, in
18 paying invoices or bills that you deemed
19 to be improper, correct?
20     A.   I would assume that Mr.
21 Daly relied on those certificates, yes.
22     Q.   All right. And it's your
23 opinion that because of Mr. Martino's
24 negligence, Mr. Daly was capable of

67

1  continuing the fraud until May of 2001;
2  is that right?
3      A.   Correct.
4      Q.   Why is it that it's Mr.
5  Martino's negligence that allowed Mr.
6  Daly to continue this fraud through May
7  2001?
8      A.   Well, in simple terms the
9  negligence issue, of course, is, as I
10 mentioned in the report, is addressed by
11 Mr. Stefion, assuming this is the
12 negligence taken that opinion and
13 applied it to the documents and the
14 review that we've done, if those AIA
15 forms hadn't been approved, presumably
16 Crown, or wouldn't have been approved,
17 Crown wouldn't have paid them and these
18 funds wouldn't have been paid improperly
19 to Tiger, Hewlett and Marlin and
20 ultimately back to TLI.
21     Q.   Okay. If Crown were
22 permitted to rely on those AIA
23 certificates for payment, so then should
24 Mr. Daly been able to rely on them,

68

1  correct?
2      A.   Not in this case.
3      Q.   Why not?
4      A.   Perhaps just because in
5  this case the evidence that there was a
6  scheme between Mr. Daly and Mr. Beacher
7  is just so overwhelming, I don't think
8  I've ever had such overwhelming evidence
9  that even, you know, a defense, I guess,
10 or an excuse by Mr. Daly that he was
11 relying on those just basically isn't --
12 I mean, it doesn't hold water.
13     Q.   The evidence of the scheme
14 that you discuss that statement made to
15 you by Mr. Beacher, correct?
16     A.   No. It's a whole host of
17 issues starting with admissions in the
18 Interrogatories. The depositions taken.
19 Interviews of contractors on the
20 projects who said, you know, these
21 entities were never out there. Just,
22 you know, pure basic logic in terms of
23 the explanation of savings that just --
24 it's illogical.

69

1      Q.   I'm not sure you understand
2  that correctly, but we'll get to that
3  later. Let me ask you a question.
4      A.   Okay.
5      Q.   In regard to the
6  contractors that said that other
7  contractors such as Hewlett, Tiger and
8  Marlin were never on the job sites, it's
9  not your expectation or your opinion
10 that Mr. Daly as COO would have been out
11 on those job sites that were located in
12 various other states, is it?
13     A.   No, I don't see any
14 information that indicated Mr. Daly
15 visited the sites.
16     Q.   It wouldn't be your
17 expectation that it would be part of his
18 job description as COO of the company
19 that he would make consistent site
20 visits, correct?
21     A.   Correct.
22     Q.   So, if Tiger, for example,
23 purportedly was doing work on a job, you
24 wouldn't expect that Mr. Daly would know

18 (Pages 66 to 69)

330

1  Q. And, again, for the reasons
2 that you testified before, correct?
3  A. Correct.
4  Q. I don't have one with me,
5 but are you aware that there's a similar
6 AIA document in regard to contractor's
7 obligations to owners?
8  A. Is that A101?
9  Q. I don't know its number,
10 but I believe that there's a similar one
11 for -- I've seen it for contractors?
12  A. I believe there is as well.
13  Q. And are you generally
14 familiar with the same certification
15 that a contractor is supposed to make to
16 an owner regarding the work that he or
17 she has performed and certifying that he
18 or she he is due payment at the time
19 that the application for payment is
20 made?
21  A. No. I mean, I haven't read
22 one in a long time, so I can't say.
23  Q. All right. But you would
24 agree with me that the AIA certificates

331

1 and applications for payment clearly
2 impose upon the contractor the
3 obligation to certify that the payment
4 application represents work that has
5 been performed, is for the benefit of
6 the owner under the contract, correct?
7  A. Correct.
8  Q. Okay. In regard to your
9 theories as to why Anne Daly benefited
10 that we discussed, is there still an
11 ongoing investigation as it relates to
12 her and how she may have benefited?
13  A. To the extent that other
14 available bank statement information to
15 help us trace that forensic trail, yes,
16 or -- I'm sorry, I'll restate that.
17 Yes, in the fact that we are still
18 pursuing various bank statements and
19 cancelled checks to trace the flow of
20 funds that went from TLI got to various
21 accounts controlled by Mr. and Mrs. Daly
22 or Mrs. Daly or Mr. Daly individually.
23  Q. Okay. But again, to date
24 you haven't found anything more than

332

1 what you have already identified,
2 correct?
3  A. What I have testified to
4 date, correct.
5  Q. That will never change the
6 number of your claim against her, or
7 would that also change your basis for
8 the theory behind why she benefited?
9  A. Until I have a chance -- if
10 this information becomes available until
11 I have a chance to review that I can't
12 answer that.
13   MR. WISSER: Okay. I have
14  nothing further. Actually, yes, I
15  do.
16 BY MR. WISSER:
17  Q. For this deposition I have
18 to pay you. Som your fee for the
19 deposition per hour is what?
20  A. My hourly rate is $330.
21  Q. Okay. And we started at
22 10:00?
23  A. 10:00.
24  Q. We're completing roughly at

333

1 5:00.
2  A. Correct.
3  Q. And there was 45 minutes
4 for lunch.
5   MR. SCHANER: You know that
6  would be approximate, right?
7   MR. WISSER: So --
8  A. Make it an hour.
9  Q. Okay. So, you're giving me
10 a bill for six hours for your
11 time?
12  A. Yes.
13   MR. WISSER: Very good.
14   MS. LANZA: Before we go off
15  the record, I just want to state
16  we're going to just adjourn the
17  deposition until a later date,
18  perhaps the first or second week
19  in January so the Martino
20  defendants can question Mr.
21  Martino in connection with his
22  report.
23   MR. SCHANER: Yes. We agree
24  that we will adjourn the

84 (Pages 330 to 333)

```
 1        IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF CONNECTICUT
 2                        - - -
      CROWN THEATRES, L.P.,        : CASE NO.
 3          Plaintiff,             : 3:02CV2272(AVC)
            V.                     :
 4    MILTON L. DALY, DALY         :
      TAYLOR-LEIGH, INC.,          :
 5    JAMES C. CELLA, G.U.S.       :
      DEVELOPMENT, INC., JAMES T.  :
 6    MARTINO, JAMES THOMAS        :
      MARTINO, ARCHITECT, P.C.,    :
 7    and RCD HUDSON, L.L.C.       :
      ----------------------------------
 8    JAMES T. MARTINO and         :
      JAMES THOMAS MARTINO,        :
 9    ARCHITECT, P.C.              :
         Third-Party Plaintiffs,   :
10          V.                     :
      B.B. CONSTRUCTION            :
11    CONSULTANTS, LTD., DAVID     :
      CLIFFORD, and GLENN          :
12    GARFINKEL,                   :
         Third-Party Defendants.   :
13                        - - -
                    January 26, 2004
14                        - - -
                  Continued oral deposition
15    of FREDERICK C. HAMILTON, CPA, CFE, held
      in the offices of Esquire Deposition
16    Services, 1800 John F. Kennedy
      Boulevard, 11th Floor, Philadelphia,
17    Pennsylvania 19103 commencing at 1:00
      p.m., on the above date, before Joseph
18    Calavetta, a Federally-Approved
      Registered Professional Reporter and a
19    Commissioner of the Commonwealth of
      Pennsylvania.
20                        - - -
21
             ESQUIRE DEPOSITION SERVICES
22                    15th Floor
           1880 John F. Kennedy Boulevard
23         Philadelphia, Pennsylvania 19103
                   (215) 988-9191
24
```

533

1  or unorthodox about the techniques that
2  you used in forming your opinion that
3  Anne Daly benefited from money stolen
4  from Crown Theatres?
5      A.   Nothing unorthodox at all.
6  They are standard basic, forensic,
7  accounting procedures.
8      Q.   Are you familiar with
9  techniques and procedures used by other
10 forensic accountants?
11     A.   I am.
12     Q.   The techniques that you
13 used in reaching your conclusion
14 regarding Anne Daly benefitting from the
15 stolen monies, are those techniques
16 similar to the techniques used by other
17 forensic accountants?
18     A.   They are used by
19 practically every other forensic
20 accounting firm or person that does
21 fraud analysis.
22     Q.   Mr. Hamilton, do you have
23 an opinion as to whether stolen money
24 flowed to accounts or investments that

534

1  Anne Daly owned or controlled?
2      A.   I do and as I opined
3  previously funds did flow into those
4  accounts.
5      Q.   When you say opined
6  previously when did you do that?
7      A.   Both in my report and in my
8  prior deposition. I believe through
9  some discussion with Mr. Wisser.
10     Q.   Did you also talk about
11 this at the preliminary, the prejudgment
12 remedy hearing?
13     A.   I did. I had the same
14 opinion at that time.
15     Q.   Have you created a chart
16 that shows the flow of stolen funds?
17     A.   I had and I used that at
18 the PJR hearing.
19     Q.   And sitting here today what
20 does your chart show?
21     A.   It shows that funds flowed
22 from the Crown organization through
23 various methods into accounts controlled
24 by Mr. and/or Mrs. Daly and then all the

535

1  way down through and in some instances
2  to accounts owned only by Mrs. Daly.
3  There was a whole series of transactions
4  that I provided an opinion on along with
5  a chart at the PJR hearing.
6      Q.   I would like to turn you to
7  a subject you testified about today and
8  it is just as a matter of clarification.
9  You were asked by Mr. Seiden whether you
10 had seen a contract between -- involving
11 -- withdrawn. You were asked by Mr.
12 Seiden whether you had seen a contract
13 for Mr. Martino's services, do you
14 recall that?
15     A.   Yes.
16     Q.   Do you have a copy of that
17 contract with you today?
18     A.   I do.
19     Q.   Can you look at that to see
20 if it refreshes your recollection as to
21 which projects the contract relates?
22     A.   That contract is for the
23 Trumbull Connecticut project.
24     Q.   You also were asked some

536

1  questions about who the participants
2  were in the scheme to embezzle from
3  Crown. Do you recall that?
4      A.   Yes.
5      Q.   In your report do you have
6  any discussion of the role of Mr. Cella?
7      A.   Yes, I do.
8      Q.   What was Mr. Cella's role?
9      A.   Mr. Cella was also involved
10 in the scheme similar to Mr. Beacher and
11 Daly however, it was only on the
12 Hartford and Trumbull projects.
13         MR. SCHANER: I have no
14     further questions.
15         MR. SEIDEN: Nothing
16     further.
17              - - -
18         (Deposition ends at 6:00
19     p.m.)
20
21
22
23
24