# EXHIBIT F

LEXSEE 2000 US APP LEXIS 3083

HUNTSMAN CHEMICAL CORPORATION, a Utah corporation, Plaintiff-Counter-Defendant-Appellee, v. HOLLAND PLASTICS COMPANY, an Iowa corporation, Defendant-Counter-Claimant-Appellant, and J. D. SCHIMMELPHENNIG, Defendant.

No. 98-4157

UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

*2000 U.S. App. LEXIS 3083; 2000-1 Trade Cas. (CCH) P72,807; 2000 Colo. J. C.A.R. 1099*

**February 29, 2000, Filed**

**NOTICE:** [*1] RULES OF THE TENTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:** Reported in Table Case Format at: *2000 U.S. App. LEXIS 10499.*

**PRIOR HISTORY:** (D. Utah). (D.C. No. 94-CV-473-B).

**DISPOSITION:** Judgment of the United States District Court for the District of Utah REVERSED, and REMANDED for further proceedings consistent with this order and judgment.

**LexisNexis (TM) HEADNOTES - Core Concepts:**

**COUNSEL:** For HUNTSMAN CHEMICAL CORPORATION, Plaintiff- Counter-Defendant - Appellee: Russell S. Walker, Reid W. Lambert, Woodbury & Kesler, Salt Lake City, UT.

For HOLLAND PLASTICS COMPANY, Defendant-Counter-Claimant - Appellant: Stephen B. Elggren, Elggren & Van Dyke, Salt Lake City, UT. Michael P. Mallaney, Roger J. Hudson, Jason C. Palmer, Smith, Schneider, Stiles, Hudson, Serangeli, Mallaney & Shindler, Des Moines, IA.

**JUDGES:** Before EBEL, KELLY, and BRISCOE, Circuit Judges.

**OPINIONBY:** David M. Ebel

**OPINION:**

**ORDER AND JUDGMENT** *

* This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[*2]

After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See Fed. R. App. P. 34(a)(2)*; 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

Appellant Holland Plastics Company [hereinafter "Holland"] appeals from an order granting summary judgment in favor of appellee Huntsman Chemical Corporation [hereinafter "Huntsman"] on Holland's counterclaim for price discrimination in violation of the Robinson-Patman Price Discrimination Act, *15 U.S.C. § 13*(a), and for treble damages under Section 4 of the

2000 U.S. App. LEXIS 3083, *; 2000-1 Trade Cas. (CCH) P72,807;
2000 Colo. J. C.A.R. 1099

Clayton Act, *15 U.S.C. § 15*. Our jurisdiction arises under *28 U.S.C. § 1291*, and we reverse.

I. Background Facts and Proceedings

We review the district court's grant of summary judgment de novo. *See McKnight v. Kimberly Clark Corp., 149 F.3d 1125, 1128 (10th Cir. 1998)*. In conducting that review,

> we examine the record to determine whether any genuine issue of material fact was in dispute; if not, we determine [whether] the substantive law was applied [*3] correctly, and in so doing we examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing the motion.

*Id.* (quotation omitted). Viewing the evidence in this light, the record shows the following: Huntsman, a manufacturer of modified expanded polystyrene beads (hereinafter "beads") supplied Holland and one of Holland's primary competitors, Iowa EPS, with beads at the same price until sometime in 1990. Both Holland and Iowa EPS produced foam board from the beads and sold the board to end users. The board price quoted to end users was directly related to and dependent upon bead price, and the greatest factor in competition was board price. In 1990, Huntsman began delivering beads to Iowa EPS at a significantly lower price through a wholesale agreement with a third party, Cellofoam North America. As a result, Iowa EPS passed on the savings by submitting lower board price bids to its customers and potential customers. While Holland had successfully competed against Iowa EPS before 1990 and had a similar market share of the business, Holland's revenues and sales decreased from 1990 until it declared bankruptcy in 1994. During [*4] this same time period, Iowa EPS increased its volume business and its market share. Holland produced testimony that, after 1990, it lost customers, potential customers, and market share because it could not meet the price at which Iowa EPS was able to sell the board to end users.

In 1994, Huntsman sued Holland for breach of an open account and Holland counterclaimed for price discrimination. Huntsman filed a motion for summary judgment in July 1997, alleging that Holland had not produced evidence sufficient to establish a prima facie case of violation of the Robinson-Patman Act; that it had failed to produce evidence of a causal connection between any alleged violation of the Act and its alleged damages; and that its theory of damages was impermissible as a matter of law under *Rose Confections, Inc. v. Ambrosia Chocolate Co., 816 F.2d 381, 394 (8th Cir. 1987)*. n1 *See* Appellant's App., Vol. I at 28. Holland responded with the above-described evidence showing price discrimination, causal connection, proof of losses, and an expert report that estimated actual damages. Huntsman's reply focused on the legal argument that, under *Rose Confections*, Holland could not [*5] prove what its damages were in a violation-free state of affairs by basing them on the assumption that Holland would have received the same discriminatory price as Iowa EPS, and that Holland's expert had improperly based his calculations solely on that assumption. *See* Appellant's App., Vol II at 511-16. In its surreply, which was not produced for this court, Holland apparently asserted that Iowa EPS was Holland's single competitor in Iowa, thus making *Rose Confections* inapplicable. *See id.* at 527, 531. It also apparently argued that the issue was controlled by *Hasbrouck v. Texaco, Inc., 842 F.2d 1034 (9th Cir. 1987), aff'd, 496 U.S. 543, 110 L. Ed. 2d 492, 110 S. Ct. 2535 (1990)*, in which the court permitted consideration of damages based on the disfavored purchaser receiving the discriminatory price. *See* Appellant's App., Vol. II at 545. The court denied the motion in February 1998, concluding that Holland had submitted enough evidence to survive summary judgment. *See id.* at 522.

> n1 In this case, based on the fact that the Clayton Act is a remedial statute whose purpose "is to place the antitrust plaintiff as far as possible in the position it would have occupied but for the [antitrust] violation," the court held that "any calculation of section 4 damages must strive to approximate a violation-free state of affairs." *816 F.2d at 394*. The court held that an expert's damage model whose calculations were based on what profits the disfavored purchaser would have made had it been given the same discriminatory benefit as the favored purchasers was therefore impermissible because if it had also been given the discriminatory price, other disfavored purchasers would have been discriminated against and the violation would continue. *See id. at 394-95*. The court noted that if the disfavored purchaser and the favored purchaser had been the only competitors in the market, it may have been proper to base damages on an assumption that the disfavored purchaser would receive the discriminatory benefit but for the antitrust violation. *See id. at 394*.

[*6]
In March 1998, Huntsman moved for reconsideration of the court's decision. It argued that the record did not support Holland's assertion that Iowa EPS

2000 U.S. App. LEXIS 3083, *; 2000-1 Trade Cas. (CCH) P72,807;
2000 Colo. J. C.A.R. 1099

was the single competitor and claimed that Holland had misstated facts concerning Holland and Iowa EPS's revenues and raw purchases. Demonstrating that Holland had previously stated in its answers to interrogatories that it had other competitors besides Iowa EPS, Huntsman argued that, without support from depositions, interrogatories, admissions, or affidavits, Holland's "new" assertion that Iowa EPS was its sole competitor could not be considered by the court. *See id.* at 531. Huntsman also argued that the court had erred in failing to grant summary judgment on its legal proposition that Holland's expert's report was based on an "irreparably flawed model of damages" and that Holland had failed to produce direct evidence of actual antitrust injury. *Id.* at 533-34.

The court held a hearing on Huntsman's motion for reconsideration on May 12, 1998. The court asked for another briefing on Holland's "case for damages," and told the parties to "attach as exhibits anything else that you think that you need to." *Id.* at 539A. The **[*7]** court asked Holland specifically to demonstrate, if it could, a causal connection between damages and the price differential with anecdotal evidence, and to produce evidence to support its damage theory in regard to the expert report and/or to produce other evidence from which a jury could conclude that Holland suffered economic harm as a result of the price discrimination. *See id.* at 539A-B. On the same day, the court granted Huntsman's motion for an extension of time in which to file its expert report, which it had never submitted as required by *Fed. R. Civ. P. 26(a)(2). See id.* at 541.

On June 2, 1998, Holland filed a motion for additional time to file its supplemental brief, accompanied by a motion for leave to conduct additional discovery of Iowa EPS and Huntsman regarding damage issues and a motion to submit a supplemental expert report that would calculate damages without consideration of the reduction in price component forbidden in *Rose Confections. See id.* at 544-46. Holland noted that Huntsman would suffer no prejudice because it had not yet deposed Holland's expert and still had not submitted its expert's report, and trial had not been set. Huntsman objected **[*8]** to additional discovery and supplementation of the expert's report, arguing that it would incur additional expert expense to rebut any new theories of recovery, that Holland had failed to comply with *Fed. R. Civ. P. 56(f)*, and that it would be prejudiced by further delay. *See id.* at 554-55.

On June 22, 1998, the district court granted Holland additional time in which to file its brief but denied leave to conduct additional discovery or to supplement its expert's report with the new calculations because it had failed to comply with Rule 56(f) and because it would unjustifiably delay the case. *See id.* Vol. III at 562. On July 2, 1998, Holland filed supplemental answers to interrogatories and a document entitled "Clarification of Facts in Resistance to Motion for Summary Judgment" which included a "clarification affidavit" of Holland's expert, the supplemental answers to Huntsman's second set of interrogatories, and answers to Huntsman's third set of interrogatories. *See id.* at 571-84. Huntsman moved to strike the clarification of facts and supplemental answers to interrogatories, arguing that they were submitted in violation of the court's discovery ruling and its order **[*9]** that Holland could not submit a supplemental expert report. *See id.* at 622. Holland argued that the documents were not additional discovery, that its expert's clarification was not a supplemental report espousing a different theory, and that the supplemental interrogatories were not inconsistent with the previous record. *See id.* at 629.

After a hearing, the court granted the motion to strike and the motion for summary judgment. At the hearing, the court ruled that the clarification of facts and supplemental answers were contrary to his prior order and would not be considered. *See id.* at 814. The court did not rule on the adequacy of the evidence with respect to the fact of damages because that was "a closer question" and it was "not sure there is not a valid underlying case," but that the case was being "thrown out" because of "the way it has been presented in litigation." *Id.* at 815. The court also did not comment on Holland's argument that, even if the expert report could not be used, there was sufficient testimony in the record to raise a genuine issue of material fact regarding the amount of damages arising from price discrimination. *See id.* at 811-16.

II. **[*10]** Discussion

Holland raises three issues for appeal: (1) the district court erred in striking and refusing to consider for summary judgment purposes its clarification of facts and supplemental answers to interrogatories; (2) its expert's damage model was not improper as a matter of law; and (3) apart from the expert report, enough evidence regarding damages had been submitted to survive summary judgment.

A. **Court's refusal to consider supplemental summary judgment evidence.**

Holland does not contest the court's denial of its motion to conduct further discovery or submit a supplemental expert report under Rule 56(f); rather it contends that the court erred in striking its supplemental affidavits and sworn answers that were submitted without the need for additional discovery. Thus, although the parties couch the court's refusal to consider the supplemental evidence as one involving "discovery issues" in which the standard of review is abuse of

Case 3:02-cv-02272-AVC   Document 160-6   Filed 06/01/2004   Page 5 of 20

Page 4

2000 U.S. App. LEXIS 3083, *; 2000-1 Trade Cas. (CCH) P72,807;
2000 Colo. J. C.A.R. 1099

discretion, *see Jensen v. Redevelopment Agency, 998 F.2d 1550, 1553 (10th Cir. 1993)* (affirming denial of Rule 56(f) motion for additional discovery), in resolving the legal issue whether a court has given the non-moving [*11] party a sufficient opportunity under Rule 56 to rebut a motion for summary judgment *absent* additional discovery, we review the submitted summary judgment evidence de novo. *See McKnight, 149 F.3d at 1128* (stating that reviewing court conducts de novo review of record to determine whether a genuine issue of material fact is in dispute); *see, e.g., Adams v. Campbell County Sch. Dist., 483 F.2d 1351, 1353-54 (10th Cir. 1973)* (reversing summary judgment because court "deprived [non-moving party] of an adequate opportunity to be heard and denied them the right to present controverting material" and noting, in concurring opinion, that a non-moving party has the right on summary judgment to explain the record asserted by moving party or to deny its effect by counter-affidavit); *Peck v. Horrocks Eng'rs, Inc., 106 F.3d 949, 955 (10th Cir. 1997)* (conducting de novo review of the affidavit, stating that party has right to submit affidavits only when that affidavit "sets forth specific facts showing that there is a genuine issue for trial" under Rule 56(e), and holding court did not abuse discretion in refusing to consider affidavit that [*12] did not meet that standard (quotation omitted)); *United States v. Mills, 372 F.2d 693, 697 (10th Cir. 1966)* (independently reviewing affidavit submitted by nonmoving party and determining that court erred in refusing to consider it).

We begin by noting that Huntsman did not present evidence that Iowa EPS was not Holland's primary competitor. Rather, one of its key arguments in its motion for reconsideration was its allegation that there was an *absence* of record evidence that Iowa EPS was Holland's primary competitor and that Holland's first interrogatory answers stated that it had many competitors. As stated above, the court invited Holland to attach to its supplemental brief whatever controverting exhibits it needed to support its objections to the motion for reconsideration.

A review of Holland's expert's "clarification affidavit" shows that he explained that his damages model was based on the presumption made in his May 1997 addendum that Holland's primary market was within 100 to 150 miles of Gilman, Iowa; that Iowa EPS was Holland's only other major competitor in that area; and that was why he excluded from the damages model competitors that were outside [*13] that area. *See* Appellant's App., Vol. III at 573. Contrary to Huntsman's assertions, the expert's original presumptions were not "new" allegations made after the close of the discovery period and his "clarification affidavit" explanation of them did not contradict his earlier report. *Cf. id.* Vol. I at 130-31 (May 12, 1997 addendum to expert report noting that Holland and Iowa EPS were the two primary producers in the Iowa market and explaining why the costs were lower for producers within 100 miles of their plants). The "clarification affidavit" also did not espouse a new theory of damages that had been prohibited by the court in its order denying supplementation of the expert's report. In the tendered affidavit, by referring to his previously-submitted reports, Holland's expert also rebutted arguments made in Huntsman's motion for reconsideration regarding alleged misstatements of revenues and market share. *See id.* Vol. III at 573-74. The tendered affidavit therefore set forth facts showing genuine issues for trial.

Likewise, in its supplemental answers to interrogatories Holland did not seek to contradict its first answers to interrogatories, but rather sought to "square" [*14] those answers with its assertions that Iowa EPS was Holland's only competitor in its *primary* market area. The supplemental answers demonstrated to the court the physical location of the other competitors listed in the original answers in relation to Holland and Iowa EPS by referring to its expert's geographical market graph that had been submitted during the discovery period. *See id.* at 577-81. Holland could have submitted the same testimony through simply presenting an affidavit instead of "supplemental answers." The court abused its discretion in refusing to consider Holland's controverting affidavits and sworn supplemental answers and thereby denying it an opportunity to rebut Huntsman's summary judgment motion. *Cf. Adams, 483 F.2d at 1353-54.*

**B. The expert's damage model.** Holland's expert calculated Holland's lost profits on a damages model that assumed that, absent a price discrimination violation, Holland would have received the same bead price as Iowa EPS. The district court determined that the Supreme Court in *J. Truett Payne Co. v. Chrysler Motors Corp., 451 U.S. 557, 68 L. Ed. 2d 442, 101 S. Ct. 1923 (1981)*, prohibited use [*15] of a discriminatory price as a basis to determine damages in price discrimination cases. *See* Appellant's App., Vol. III at 796, 806. The court also believed that allowing the disfavored buyer to assume, for purposes of calculating damages, that it would have received the discriminatory price absent the violation did not "approximate a violation free environment" under *Rose Confections* and concluded that Holland's expert's damage model was "inappropriate." *Id.* at 814. Holland argues that *J. Truett Payne Co.* does not prohibit use of the discriminatory price as an aid in calculating damages, and we agree.

In *J. Truett Payne Co.* a car dealership alleged that the manufacturer's refusal to offer it the same incentives as other dealers caused it to pay more for its cars than

Case 3:02-cv-02272-AVC   Document 160-6   Filed 06/01/2004   Page 6 of 20

Page 5
2000 U.S. App. LEXIS 3083, *; 2000-1 Trade Cas. (CCH) P72,807;
2000 Colo. J. C.A.R. 1099

other dealers had to, thus violating the Robinson-Patman Act. It contended that, at a minimum, damages should be measured by the amount of the price difference multiplied by the number of car purchases. *See 451 U.S. at 559-60.* The Fifth Circuit disagreed with the dealer's theory that minimum "automatic damages" flow from the fact of price discrimination and reversed the jury award, [*16] finding that the dealer had failed to introduce substantial evidence of injury attributable to the incentive programs as well as evidence of the amount of any losses suffered because of such injury. *See id. at 560-61.*

The Supreme Court held that proof of Robinson-Patman price discrimination does not automatically entitle a plaintiff to damages under § 4 of the Clayton Act because a violation of Robinson-Patman may be proved without the disfavored purchaser having actually been injured. *See id. at 562.* In determining whether the plaintiff had presented enough evidence to survive a motion for directed verdict on liability, the court noted that the plaintiff had failed to show whether its competitors actually passed on their lower costs to their customers. *See id. at 564.* The plaintiff had only testified generally that price discrimination was one of the causes of the dealership going out of business because it lost sales to competitors; that the discrimination caused him to "force" business by giving more for trade-ins; and that his average gross profit on used car sales was below his competitors' (though the same evidence revealed [*17] that his average profit on new sales was higher). *See id. at 563-64.* Significantly, plaintiff's expert testified regarding what the competitive market may have been like if plaintiff had received the same discriminatory bonuses from the manufacturer. *See id. at 564.* The Court did not question whether this testimony was a permissible assumption. Rather, the Court stated that the expert's evidence of injury was weak because of the plaintiff's failure to show that the favored retailers in fact lowered their retail prices because they received the incentives. *See id. at 564 & n.4, 565.* The Court remanded to the Fifth Circuit to determine whether the evidence supported a causal inference of actual antitrust injury arising from the incentive programs. *See id. at 568.* If sufficient evidence existed to permit such an inference, then the "relaxed damages rules" would apply to permit an award of damages under the "just and reasonable inference" of damage standard. *See id. at 566-67.* Nowhere in the opinion did the Court imply that it is improper for an expert to use in a damages model a comparison of the profits [*18] the disfavored plaintiff would have made had it received the same discriminatory price as his favored competitors. The Court simply held that evidence of the amount of price discrimination, *standing alone*, is not sufficient to prove damages actually suffered from an antitrust injury.

Holland argues that *Hasbrouck v. Texaco, Inc.* buttresses its position that its expert could properly base lost profits on what the disfavored purchaser would have made if it had received the discriminatory price. In this case, twelve service station owners successfully sued their supplier, Texaco, for selling gasoline to their competitors for between 2.5 and 5.75 cents/gallon lower than they paid. *See 842 F.2d at 1037.* On the issue of damages, Texaco made similar arguments as Huntsman does in this case: that the plaintiff failed to prove actual injury that the antitrust laws were designed to prevent; that there was no direct causal connection between any such injury and Texaco's conduct because of the independent, intervening pricing decisions of plaintiff's favored competitors; and that the district court improperly allowed the jury to consider the overcharge to the disfavored [*19] purchasers in its calculation of damages. *See id. at 1042-43.* The Ninth Circuit stated that, to prove actual injury, the plaintiff had to show that he lost sales and profits as a result of Texaco's discriminatory conduct. *See id. at 1042.* The plaintiff had testified as to diverted sales and lost profits, presented evidence of the favored buyer's increase in sales volume over the specific time period, and "testified that they would have recouped the lost revenues had they received a [similar] price break on their purchases of gasoline from Texaco." *Id. at 1043.* Former customers testified that they switched service stations because of lower prices. *Id.* The Ninth Circuit held that this testimony was sufficient to support a finding of both actual antitrust injury and causation. *See id.*

The expert in *Hasbrouck*, like Holland's expert, presented a market analysis that compared the plaintiff's actual prices, volume, and profits to estimated amounts had the price discrimination not occurred. In some analyses, the expert assumed that Texaco had raised its prices to the favored buyers; in others, the expert assumed that Texaco [*20] lowered its prices to the disfavored buyers. *See id.* Answering Texaco's claim that evidence of the overcharge was not a permissible consideration for the amount of damages, the Ninth Circuit stated that the

> various projections simply permitted the jury to compare estimates of damages in different market situations, allowing them to determine what [the plaintiff's] sales and profits would have been in the absence of price discrimination. Obviously, such a determination necessarily entails postulating the elimination of the price differential, either by increasing the favored buyer's price,

Case 3:02-cv-02272-AVC    Document 160-6    Filed 06/01/2004    Page 7 of 20

Page 6
2000 U.S. App. LEXIS 3083, *; 2000-1 Trade Cas. (CCH) P72,807;
2000 Colo. J. C.A.R. 1099

decreasing the disfavored buyer's price, or a combination of the two.

*Id. at 1043-44.* The court stated that any danger that the jury may have awarded "automatic damages" based on the overcharge theory was offset by the district court's oral admonition and the jury instructions. *Id. at 1044.*

On appeal to the United States Supreme Court, although Texaco's petition for certiorari couched the issue as whether a retailer could "predicate injury and recover treble damages on the basis of how much better off he would have been had he, too, received [*21] the wholesaler discount," *see* Robert H. Whaley & Keith B. Leffler, *Private Actions & Proof of Damages in Secondary Line Cases--the Texaco Inc. v. Hasbrouck Experience,* 59 Antitrust L.J. 811, 819 n.34 (1991), the Court addressed only Texaco's contention that legitimate functional discounts do not violate the Clayton Act because a seller is not responsible for its customer's independent resale pricing decisions. *See 496 U.S. at 547.* It left the Ninth Circuit's discussion regarding proper damage models intact. In its discussion, however, the Court noted that the damages expert had estimated what the plaintiffs' profits would have been if they had paid the same prices as their favored competitors and that the jury had based its award on this testimony. *See id. at 552.* The Court later stated that this testimony provided a "sufficient basis for an acceptable estimate of the amount of damages." *Id. at 572.* Under *Hasbrouck*, therefore, the district court in this case improperly prohibited the use of Holland's expert's report.

In the case before us, Holland presented evidence that it and Iowa EPS were the primary competitors [*22] in the Iowa geographic area and that Huntsman had directly delivered beads to Iowa EPS in amounts similar to those delivered to Holland for the discriminatory price over a long period of time. Holland argues that it was reasonable for its expert to assume that Holland would have received the discounted price absent Huntsman's price discrimination because the discriminatory price was obviously an economically viable one for Huntsman. Thus, there was arguably no danger that basing a calculation of lost profits on the lower price given to Iowa EPS would perpetuate an illegal discriminatory pricing scheme as proscribed by *Rose Confections, 816 F.2d at 394.* Whether the price given to Iowa EPS was an economically viable one that Holland could have expected to receive absent the price discrimination is a jury question. While Holland's expert report is certainly subject to criticism in certain areas, those matters are for cross-examination at trial and we cannot say as a matter of law that the theory espoused therein does not have a basis in fact that could sustain a jury award.

**C. Sufficient evidence to support alternative theory.** Holland argues that the court further [*23] erred by granting summary judgment when it had presented sufficient evidence from other witnesses besides its expert to support an award of damages. *See, e.g., J. Truett Payne Co., 451 U.S. at 564 n.4* (stating that "if by reason of the discrimination, the preferred producers have been able to divert business that would otherwise have gone to the disfavored shipper, damage has resulted to the extent of the diverted profits. If the effect of the discrimination has been to force the shipper to sell at a lowered price . . . damage has resulted to the extent of the reduction." (quotation omitted)). Huntsman argues that Holland failed to specifically identify lost sales attributable to the price discrimination and that the testimony presented was insufficient to support an award of damages. This is not an appeal from denial of a motion for directed verdict after a full trial on the merits, however. In a summary judgment motion, a sufficiency inquiry asks only whether there was enough evidence to establish a genuine issue of material fact regarding the issue.

It is well established that a "relaxed" damage rule applies once a plaintiff establishes anticompetitive injury from [*24] a Robinson-Patman Act violation. *See Hasbrouck, 496 U.S. at 572-73.* Antitrust damages are rarely susceptible of concrete, detailed proof and once antitrust injury is shown, antitrust plaintiffs should not face unduly rigorous standards for proving damages. *See id.* The rule is based on the well-established tenet that "it does not come with very good grace for the wrongdoer to insist upon specific and certain proof of the injury which it has itself inflicted." *J. Truett Payne Co., 451 U.S. at 566-67.* Huntsman conceded Robinson-Patman liability for purposes of the summary judgment motion.

Holland presented testimony that it had previously been competitive with Iowa EPS until Iowa EPS received lower prices in 1990 that allowed it to underbid Holland and forced Holland to sustain losses in order to keep customers. *See* Appellant's App., Vol. I at 126, 130-32, 219-20, 232-33, 254; Vol. II at 439-40. It presented testimony from an end user that it bought Iowa EPS board instead of board manufactured by Holland solely because the Iowa EPS board was cheaper, *see id.* Vol. II at 282, and that it would usually buy the cheaper product in most instances, [*25] *see id.* at 321. It also presented testimony that the lower the bead cost, the greater the profitability, *see id.*; Appellant's Supp. App. at 610, and that if Iowa EPS had paid even one or two cents more per pound, it would have made a difference in whether it had profits or losses on its bids. *See* Appellant's App., Vol. II at 346; Appellant's Supp. App. at 604. It produced net income figures showing actual amount of losses during the period from 1990-94. *See* Appellant's App.,

2000 U.S. App. LEXIS 3083, *; 2000-1 Trade Cas. (CCH) P72,807;
2000 Colo. J. C.A.R. 1099

Vol. I at 124. The jury could infer from this evidence that Holland's market share would have remained the same absent illegal price discrimination and that, absent the illegal discrimination, Holland could have made a profit on bids to customers such that its yearly net losses would not have increased to over $ 250,000 in a period of four years. We hold that Holland satisfied its burden of showing genuine issues of material fact in regard to the existence and amount of damages.

The judgment of the United States District Court for the District of Utah is REVERSED, and we REMAND for further proceedings consistent with this order and judgment.

Entered for the Court

David M. Ebel

Circuit Judge [*26]

LEXSEE 37 FED APPX 730

MICHAEL MCHUGH, Plaintiff-Appellee, v. OLYMPIA ENTERTAINMENT, INCORPORATED; RICHARD WARD; JAMES DUFFIN; AL GLAZEWSKI; ROBERT BARRETT; THEATER OPERATORS, LIMITED; JESSE HARRIS; WILLIAM GRACE; GREGORY PALMER, Defendants-Appellants, THE CITY OF DETROIT; JOHN DOE, certain unknown security guards at the Fox Theater; JOHN DOE, certain unknown officers of the Detroit Police Department; RONALD COOPER; JEFF SHASHEEN, Defendants.

Nos. 00-1956, 00-2195, 00-2234

UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

37 Fed. Appx. 730; 2002 U.S. App. LEXIS 10312

May 28, 2002, Filed

**NOTICE:** [**1] NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 28(g) LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 28(g) BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**PRIOR HISTORY:** On Appeal from the United States District Court for the Eastern District of Michigan. 97-73176. Tarnow. 07-21-00, 09-15-00.

**DISPOSITION:** AFFIRMED.

**LexisNexis (TM) HEADNOTES - Core Concepts:**

**JUDGES:** Before: GUY and BATCHELDER, Circuit Judges; WALTER, District Judge. *

* The Honorable Donald E. Walter, United States District Judge for the Western District of Louisiana, sitting by designation.

**OPINION:** [*732]

PER CURIAM. Defendants, Jesse Harris and William Grace, appeal from a judgment in favor of plaintiff, Michael McHugh, claiming reversible error in the denial of their motion for judgment notwithstanding the verdict or for a new trial. They also argue the district court erred in denying their motion for remittitur and in granting in total plaintiff's motion for attorney fees and expenses. Defendants, Olympia Entertainment, Incorporated; Theater Operators, Limited; Richard Ward; James Duffin; Al Glazewski; [**2] and Robert Barrett (the Olympia defendants), appeal the denial of their motions for sanctions, attorney fees, and costs. Defendant, Gregory Palmer, appealed the denial of his motion for costs. n1 After review, we affirm.

n1 Defendant Palmer's appeal was dismissed on December 12, 2001, upon his motion to dismiss pursuant to Fed. R. App. P. 42(b).

I.

Plaintiff attended a Black Crowes concert at the Fox Theatre in Detroit, Michigan, on October 18, 1996. Olympia Entertainment, Inc., owns and operates the Fox. Theater Operators, Inc., provides security guards or crowd managers for concerts at the Fox under contract with Olympia Entertainment. Robert Barrett, Al Glazewski, Richard Ward, and James Duffin were employed by Theater Operators as security guards at the Black Crowes concert. Jesse Harris and William Grace were Detroit police officers. Gregory Palmer was a reservist with the Detroit police department.

Plaintiff attended the concert with Nicole Weidenfeller. During the concert, security guards

ordered [**3] plaintiff to take his seat when he began dancing in the aisle. When he failed to do so, the security guards removed him from the theater. Plaintiff testified that the guards grabbed his head and arms and forcibly dragged him up the aisle while repeatedly pushing his face into the floor.

Plaintiff has no memory of the following events. Weidenfeller, however, was present and testified that plaintiff was seized by a reservist and police officer when he was ejected from the theater. The officer [*733] grabbed him by the head and neck and began beating him. Plaintiff was thrown onto a police car, grabbed by his hair, and thrown to the ground striking his head on the cement.

After the assault, plaintiff and Weidenfeller waited in a parking lot until the end of the concert. Friends took plaintiff to the hospital when they observed bruises on his face. Plaintiff also had lacerations on his face and a broken nose. He was placed in cervical traction and later had fusion surgery. Plaintiff claimed the surgery was required because the assault caused an acute subluxation in his neck. The subluxation put him in danger of further dislocation of his vertebrae with resulting paralysis or death. The defendants [**4] argued that the traction and surgery were required because of an os odontoideum (a preexisting or old fracture in his neck).

Plaintiff brought this action against the City of Detroit; police officers William Grace and Jesse Harris; police reservists Ronald Cooper, Jeff Shasheen, and Gregory Palmer; and the Olympia defendants alleging violations of *42 U.S.C. § 1983* and state law claims of assault and battery, gross negligence and negligence, and failure to supervise and train. n2 During the 23-day jury trial, 31 witnesses and nine expert witnesses were called.

> n2 The case was originally filed in Wayne County Circuit Court and removed by defendants to federal court.

The jury returned a verdict against plaintiff in favor of the Olympia defendants and the police reservists. The jury returned a verdict in favor of plaintiff against the police officers, Grace and Harris. The jury found that Grace and Harris (1) committed an assault and battery upon plaintiff; (2) were grossly negligent or recklessly [**5] indifferent to any injury to plaintiff in their detention and physical restraint of him; (3) violated plaintiff's constitutional right to be free from excessive use of force; (4) violated his constitutional right to be free from unreasonable detention; and (5) failed to protect or intercede to protect plaintiff from excessive force by the crowd managers, police reservists, or other police officers. The jury awarded zero dollars in actual damages and $ 1,200,000 in punitive damages. The jury found that plaintiff was 60% comparatively negligent, and that Grace and Harris were each 20% comparatively negligent. The jury was then instructed over objection from defendants Grace and Harris that comparative negligence does not apply to civil rights claims. The jury then found $ 200,000 in noneconomic damages for the civil rights claims. On March 16, 2000, the district court entered judgment against Grace and Harris in the amount of $ 1,400,000 plus pre- and post-judgment interest.

The district court denied a motion for judgment notwithstanding the verdict or new trial and a motion for remittitur filed by Grace and Harris. The district court granted plaintiff's motion for attorney fees and [**6] costs, but denied the motions for attorney fees and costs filed by the Olympia defendants and Palmer. This appeal followed.

II.

A. Motion for Judgment Notwithstanding the Verdict or for New Trial

We review *de novo* the denial of a motion for judgment notwithstanding the verdict. We do not weigh the evidence, evaluate the credibility of the witnesses, or substitute our judgment for that of the [*734] jury. Instead, we must view the evidence in a light most favorable to the party against whom the motion is made, and give that party the benefit of all reasonable inferences. We will reverse the denial of the motion only if reasonable minds could not come to a conclusion other than one in favor of the movant. *Wehr v. Ryan's Family Steak Houses, Inc., 49 F.3d 1150, 1152 (6th Cir. 1995).*

A new trial is warranted under *Fed. R. Civ. P. 59(a)* when a jury has reached a seriously erroneous result as evidenced by (1) the verdict being against the weight of the evidence, (2) the damages being excessive, or (3) the trial being unfair to the moving party. *See Holmes v. City of Massillon, 78 F.3d 1041, 1045-46 (6th Cir. 1996).* We review the grant or denial [**7] of a motion for new trial under an abuse of discretion standard. *Slayton v. Ohio Dep't of Youth Servs., 206 F.3d 669, 675 (6th Cir. 2000).*

Defendants Grace and Harris argue that they were prejudiced by the exclusion of the treating physician's testimony, the admission of plaintiff's expert witness's testimony, and the reinstruction of the jury after it returned its initial verdict.

### 1. Exclusion of Testimony of Treating Physician

Grace and Harris argue that the district court erred when it ruled that defendants could not question plaintiff's treating physician, Dr. Daniel Elskens, on whether the fracture in plaintiff's neck preexisted the

1996 incident, and whether Dr. Elskens would have performed surgery upon plaintiff regardless of any acute injury sustained on October 18, 1996. A review of the record shows that defendants ultimately were given the opportunity to ask Dr. Elskens these questions.

Dr. Elskens was listed as an expert witness by the defendant police officers, but a written report under *Fed. R. Civ. P. 26(a)(2)* was never submitted. Plaintiff filed a motion *in limine* to exclude the testimony of certain experts, including Dr. Elskens. The district [**8] judge initially denied the motion. In a subsequent motion *in limine*, plaintiff again asked the court to exclude or limit Dr. Elskens's testimony. The district court held that the motion was moot because the parties had resolved the issues raised in the motion *in limine* at a pretrial conference. The record does not indicate how the issue was resolved.

At trial, the Olympia defendants called Dr. Elskens. The Olympia defendants had listed Dr. Elskens as a witness but not an expert witness. When asked whether plaintiff had a fractured neck, Dr. Elskens testified that plaintiff had os odontoideum, which he described as a healed or old fracture. When asked to explain the plaintiff's condition, Dr. Elskens testified that the first cervical vertebra (C1) was separated from the second cervical vertebra (C2). Upon plaintiff's objection, the district court refused to allow defendants to ask Dr. Elskens when the separation occurred. The district court also refused to allow Dr. Elskens to testify whether he would have done the surgery even without the 1996 injury because Dr. Elskens could not offer expert opinion testimony when an expert report was not provided under Rule 26.

The Olympia [**9] defendants later made an offer of proof that Dr. Elskens would have testified that the 1996 injury brought to light the need for the surgery on the os odontoideum. After a recess, the district judge said that his notes showed that he ruled at the second pretrial conference that the treating physician's notes were comparable to a formal Rule 26 report. The district judge then informed defense counsel that he could recall Dr. Elskens [*735] and "ask the questions that call for his opinion."

When Dr. Elskens was recalled, however, he was only asked why he operated on the plaintiff. Dr. Elskens testified: "I operated on him to stabilize the spine for the os odontoideum." He was asked no further questions by any party.

The record shows, therefore, that the district court modified the original ruling, which defendants challenge in this appeal, to allow the expert opinion testimony of Dr. Elskens. Defendants, however, elected not to ask Dr. Elskens whether he would have performed the surgery upon plaintiff regardless of any injury sustained in 1996.

### 2. Admission of Plaintiff's Expert Testimony

Defendants Grace and Harris argue the district court erred when it allowed Dr. Albert I. King [**10] to testify beyond his Rule 26 report as to the mechanical forces necessary to cause subluxation in an individual with a preexisting fracture. Defendants argue that Dr. King's report was focused on the forces necessary to cause an odontoid fracture, and that the district court should have excluded his testimony because plaintiff did not supplement his report to cover subluxation.

Rule 26 requires a party to supplement an expert report "by the time the party's disclosures under Rule 26(a)(3) are due." *FED. R. CIV. P. 26(e)(1)*. Nothing in Rule 26, however, precludes an expert from revising or further clarifying opinions, particularly in response to points raised in the presentation of a case. *See Johnson v. H.K. Webster, Inc., 775 F.2d 1, 7 (1st Cir. 1985)*. See also *Phil Crowley Steel Corp. v. Macomber, Inc., 601 F.2d 342, 344 (8th Cir. 1979)* (noting trial judge has wide discretion to allow expert testimony even though it was revised shortly before trial). Rule 26 must be read in light of its dual purposes of narrowing the issues and eliminating surprise. We need to balance fairness to the opposing party with the realities of adversarial litigation. [**11] *Johnson, 775 F.2d at 7*. We review evidentiary decisions under Rule 26 for abuse of discretion. *See King v. Ford Motor Co., 209 F.3d 886, 900 (6th Cir. 2000);* and *United States v. Talley, 194 F.3d 758, 765 (6th Cir. 1999)*.

Dr. King's report stated in pertinent part: "Three sets of x-rays taken over the next day or so revealed a fracture of the odontoid process near its base with anterior displacement of the odontoid along with the arch of C1." In his report, Dr. King opined that: "Mr. Michael McHugh sustained an odontoid fracture with anterior displacement of C1 over C2." He further opined that: "There is no biomechanical basis to assert that he had a chronic os odontoideum prior to the assault because he would have been killed or paralyzed if his odontoid process was not intact before the assault."

At trial, Dr. King changed his opinion and stated that there was a preexisting fracture or os odontoideum at the time of the assault. n3 The district court ruled that Dr. King could testify as to the forces necessary to cause subluxation:

> The motion is denied. And the motion is denied for several reasons, but the key reason is [**12] what Mr. Hecht just said; that anterior displacement, as I recall the testimony of the neuroradiologist, can

be described as an anterior displacement or a fracture. Obviously, when [*736] somebody talks about a broken neck, a layperson, they may not be very careful. And his definition of subluxation is not any different than anterior displacement.

   n3 No one claims that Dr. King changed his opinion before trial. Nor does anyone claim that plaintiff deliberately concealed or evaded disclosing his changed opinion on the existence of the os odontoideum.

Plaintiff clearly identified Dr. King as a biomechanical expert who would testify as to the mechanical forces necessary to cause injury to a neck. His report indicated that he was opining as to a fracture and an anterior displacement. Expert testimony showed that an anterior displacement was the same thing as subluxation. n4 The change in his position on the preexisting fracture did not constitute unfair surprise as to the nature of Dr. King's testimony. His testimony [**13] was not a departure from the general scheme of his report. See Johnson, 775 F.2d at 8.

   n4 Subluxation is defined as "an incomplete or partial dislocation." Dorland's Illustrated Medical Dictionary 1488 (25th ed. 1974). Dislocation is defined as "the displacement of any part, more especially of a bone . . . . Called also *luxation*." *Id.*, at 465. Anterior is defined as "situated . . . toward the head end of the body." *Id.*, at 103.

Moreover, defendants have not identified how they were prejudiced by Dr. King's testimony beyond baldly asserting that they were prejudiced. Obviously, any error that might arise was harmless when the same facts were presented to the jury through other witnesses. Plaintiff's other witness, Dr. William Sanders, also testified the subluxation occurred in 1996. Furthermore, defendants were able to rebut Dr. King's testimony through their own experts who testified as to the preexisting nature of the fracture and the subluxation. Finally, defendants were able to [**14] impeach Dr. King's testimony by questioning him about his changed opinion. Under these circumstances, we cannot find that the district court abused its discretion in allowing Dr. King's testimony or in denying the motion for new trial.

### 3. Reinstruction of the Jury

The district judge did not immediately excuse the jury after the original verdict was read. Instead, he sent the jury back to the jury room and asked counsel whether the comparative negligence rule applied to punitive damages. Counsel for the police officers responded that the rule did apply. The record does not reflect how the district judge answered this question. Comparative negligence, however, does not apply to damages for federal constitutional rights violations. *See Quezada v. County of Bernalillo*, 944 F.2d 710, 721 (10th Cir. 1991); *Clappier v. Flynn*, 605 F.2d 519, 530 (10th Cir. 1979). n5

   n5 We also reject defendants' argument that Michigan's comparative fault statute applies to plaintiff's civil rights claims under 42 U.S.C. § 1988(a). Section 1988 authorizes a federal court to use state law to facilitate but not to hinder proceedings in the vindication of civil rights. *Lefton v. City of Hattiesburg*, 333 F.2d 280, 284 (5th Cir. 1964). A state law should be disregarded if it is inconsistent with the policy underlying § 1983: deterrence and compensation. *See Board of Regents v. Tomanio*, 446 U.S. 478, 489, 64 L. Ed. 2d 440, 100 S. Ct. 1790 (1980). The protection afforded under § 1983 was not intended to differ from state to state, and federal, not state, common law governs the determination of damages in a § 1983 action. *Busche v. Burkee*, 649 F.2d 509, 518 (7th Cir. 1981). To apply comparative fault statutes in civil rights actions would result in the protection afforded under § 1983 to differ from state to state and would be inconsistent with the underlying policy of deterrence and compensation.

[**15]
Counsel for the police officers then raised the issue of whether punitive damages can be awarded without actual damages. The district judge said that issue could be addressed without involvement of the jury. In fact, punitive damages may be recovered in civil rights cases even in the absence of actual loss to the plaintiff. [*737] *See Beauford v. Sisters of Mercy-Province, Inc.*, 816 F.2d 1104 (6th Cir. 1987) (§ 1981); *Davis v. Locke*, 936 F.2d 1208 (11th Cir. 1991) (§ 1983).

Plaintiff then argued that a previous instruction on comparative fault in tort actions under Michigan law may have improperly caused the jury not to award noneconomic damages for the civil rights claims because they found that plaintiff was 60% comparatively negligent. n6 The first sentence of the instruction given to the jury at the close of arguments on comparative

negligence referenced to "Plaintiff's claim of negligence only." After describing the law on comparative negligence and the burden of proof, the court then instructed the jury that: "The Plaintiff, however, is not entitled to noneconomic damages if he is more than 50% at fault for his injuries." On the written instructions [**16] that were provided to the jury, this sentence appears by itself on a separate page (page 42) from the rest of the instruction on comparative negligence.

> n6 *Michigan Compiled Laws Annotated § 600.2959* (West 2000) provides: "In an action based on tort or another legal theory seeking damages for personal injury . . . the court shall reduce damages by the percentage or comparative fault of the person upon whose injury . . . the damages are based . . . . If that person's percentage of fault is greater than the aggregate fault of the other person . . . noneconomic damages shall not be awarded."

During deliberations, the jury sent a note to the district judge that said: "At page 42, what does this sentence mean?" The district judge identified the sentence on page 42 as the one stating that plaintiff is not entitled to noneconomic damages if he is more than 50% at fault. After discussion with counsel, the district court instructed the jury as follows:

> The Court and counsel agree that this question is asking for [**17] a definition of noneconomic damages. And if you will refer to page seven of the verdict form, number 5(A), which is also repeated - that's in terms of present injuries, injuries up to the present, which obviously includes the past - and page 11, which is 6(B), which talks about future injuries, noneconomic damages may be defined as pain and suffering, embarrassment, humiliation, outrage, mental anguish, fright and shock - and you don't have to write these because I'm reading from 5(A) - denial of social pleasure, disfigurement, disability and aggravation of conditions.

After receiving the jury's verdict and discussing the parties' concerns, the district court reinstructed the jury, over the defendant police officers' objection, as follows: "Comparative negligence's 50 percent rule does not apply to civil rights claims. The question then for you is should any noneconomic damages be awarded to Michael McHugh for the civil rights claims? If so, how much?" n7 After approximately one hour of deliberation, the jury returned and answered that there were noneconomic damages for the civil rights claims in the amount of $ 200,000.

> n7 No one challenges the other question submitted to the jury after the original verdict was rendered--whether plaintiff's comparative negligence was attributable to his intoxication.

[**18]
Defendants Grace and Harris argue that there was no apparent confusion or mistake on the part of the jury with their original verdict and that, therefore, the district court did not have authority to resubmit the issue to the jury. Defendants also argue that the jury may have been coerced to award noneconomic damages by the district court's reinstruction.

This case used a general verdict with interrogatories. Rule 49(b) governs general [*738] verdicts accompanied by interrogatories and specifically allows resubmission:

> When the answers are consistent with each other but one or more is inconsistent with the general verdict, judgment may be entered pursuant to Rule 58 in accordance with the answers, notwithstanding the general verdict, or the court may return the jury for further consideration of its answers and verdict or may order a new trial.

*FED. R. CIV. P. 49(b).*

We should be deferential to the determination of inconsistency made by a district judge "who has observed the jury during the trial, prepared the questions and explained them to the jury" because he "is in the best position to determine whether the answers reflect confusion or uncertainty." *Richard v. Firestone Tire & Rubber Co., 853 F.2d 1258, 1260 (5th Cir. 1988).* [**19] *See also Veranda Beach Club v. Western Sur. Co., 936 F.2d 1364, 1381 (1st Cir. 1991)* (trial court must be given substantial latitude in determining whether the jury response to the verdict form is clear and free from ambiguity.)

In the present case, the district judge did not just resubmit the original questions and verdict form. He reinstructed the jury and submitted clarifying questions. In *McLaughlin v. The Fellows Gear Shaper Company, 786 F.2d 592 (3d Cir. 1986),* the district court gave the jury further instructions and submitted to the jury two supplemental interrogatories in order to clarify an

inconsistency in the answers to the original interrogatories. The Third Circuit held:

> Although the *Stanton* case involves resubmission to the jury of the same questions and the case under review presently involves resubmission of supplemental interrogatories, the underlying purpose of both options is identical: namely, to obtain clarification from a still-empaneled jury of the meaning of its answers and verdict. Interestingly, we did identify and endorse in *Stanton* the option of submitting supplemental interrogatories to harmonize inconsistent [**20] jury responses.

*Id.* at 597. See also *Riley v. K-Mart Corp.*, 864 F.2d 1049 (3d Cir. 1988) (while the district court's original jury instructions were comprehensive and correct, the district court had sufficient cause to believe that the jury was somewhat confused).

In this case, the verdict form had sets of questions on different pages. The sets were numbered one through ten. Numbers one through four asked the jury to find whether each defendant had committed the separate acts alleged by the plaintiff. In number four, the jury stated that the police officers had committed assault and battery; were grossly negligent or recklessly indifferent in their detention and physical restraint of plaintiff; had violated plaintiff's constitutional right to be free from excessive use of force and from unreasonable detention; and had failed to protect or intercede to protect plaintiff from excessive force by the crowd managers, police reservists, or other police officers. Numbers five and six asked the jury to state the amount of present and future actual damages (economic and noneconomic) suffered by plaintiff. It did not ask the jury to distinguish the [**21] damages suffered from the separate acts committed by the police officers, *i.e.*, the damages for the constitutional violations were not distinguished from the damages for the negligence. Numbers seven through nine asked about plaintiff's comparative negligence. Number ten asked the jury whether punitive damages should be awarded against any of the parties. Again, no distinction was made between the negligence and the constitutional rights violations.

[*739] The jury found that defendants Grace and Harris used excessive force and unlawfully detained plaintiff in violation of his constitutional rights but did not award any noneconomic damages. Under these circumstances, we cannot find that the district court abused its discretion under Rule 49(b) in finding that the answers reflected confusion and were inconsistent. The district court could have reasonably been concerned that there was confusion on the part of the jury given the layout of the instruction on the 50% rule and comparative fault, the jury's question on this instruction, the form of the questions on the verdict form, and the finding of constitutional violations. Defendants offered nothing more than mere speculation that the [**22] reinstruction was coercive. The court's reinstruction simply clarified that the comparative fault rule did not apply to civil rights claims. The district judge did not instruct the jury that it had to award noneconomic damages. The instruction simply asked for the amount *if* the jury found that there were noneconomic damages for the civil rights claims. Because the district court did not redetermine the findings made by the jury, we find no error in using a reinstruction and supplemental questions to obtain clarification of a jury's original answers and verdict.

### B. Remittitur

We review the district court's denial of a motion for remittitur *de novo. See Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 149 L. Ed. 2d 674, 121 S. Ct. 1678 (2001); *EEOC v. Harbert-Yeargin, Inc.*, 266 F.3d 498, 514 (6th Cir. 2001).

Defendants argue that the punitive damages were excessive. Grossly excessive damages are prohibited by the due process clause of the Fourteenth and Fifteenth Amendments. *See BMW of North Am., Inc. v. Gore*, 517 U.S. 559, 134 L. Ed. 2d 809, 116 S. Ct. 1589 (1996). Determination of whether an award [**23] is grossly excessive requires analysis of three factors: (1) reprehensibility of the wrongful conduct, (2) disparity between the harm or potential harm and the amount of the award, and (3) comparison of the punitive award with other penalties imposed in similar cases. *Id.* at 575.

In determining the reprehensibility of a defendant's wrongful conduct, an important factor is whether violence has occurred. *See Id.* at 576. The jury found that the police officers used excessive force and intentionally assaulted plaintiff. The plaintiff presented evidence that plaintiff was grabbed by the head and neck and beaten by police officers. Plaintiff was also thrown onto a police car, grabbed by his hair, and thrown to the ground striking his head on the cement. The assault continued while plaintiff's friend, Nicole Weidenfeller, pleaded with the officers to stop. This conduct was clearly violent and exhibited reprehensibility.

Defendants rely heavily on the ratio of punitive damages to actual damages in arguing that the punitive damages were excessive. The ratio of punitive damages to actual damages was six to one. The Supreme Court has consistently rejected the [**24] notion that the constitutional line is marked by a simple mathematical

formula, even one that compares actual and potential damages to the punitive award. *BMW, 517 U.S. at 582-83.* The jury could have believed that potential damages were much larger than $ 200,000, given the evidence of the assault upon plaintiff. The ratio, therefore, could be even lower than the already reasonable ratio of six to one.

When considering the final *BMW* factor, the court may look to the amount of punitive damages award necessary to deter similar misconduct in the future. [\*740] *BMW, 517 U.S. at 584-85.* Given the evidence of the intentional assault upon plaintiff, the punitive damages were not an inappropriately large deterrent amount.

### C. Award of Attorney Fees and Costs to Plaintiff

Defendants Grace and Harris argue that the attorney fees awarded to plaintiff were unreasonable in both the number of hours and the hourly rates. We review an award of attorney fees, including the fee rate, for abuse of discretion. *Hadix v. Johnson, 65 F.3d 532, 534 (6th Cir. 1995).*

Defendants argue that plaintiff's Chicago attorney rates were unreasonably high in [\*\*25] comparison to the Detroit market rates. Plaintiff offered two affidavits stating that the rates were reasonable in national and Chicago markets. Plaintiff also relied on affidavits submitted by the Olympia defendants in support of their motion for attorney fees, which stated that $ 350 is an appropriate hourly rate in the Detroit market. This is the same top rate billed by plaintiff's Chicago attorneys. In opposing plaintiff's motion for attorney fees, defendants Harris and Grace did not offer any evidence on reasonable rates in any market.

Generally district courts are free to look to national markets, an area of specialization, or any other market they believe is appropriate to fairly compensate attorneys in individual cases. *See Louisville Black Police Officers Org. v. City of Louisville, 700 F.2d 268, 278 (6th Cir. 1983).* A court's choice not to apply local market rates for attorney fees is not an abuse of discretion. *See Wayne v. Vill. of Sebring, 36 F.3d 517, 533 (6th Cir. 1994).* All the evidence in the record shows that the rates charged by plaintiff's Chicago attorneys were reasonable in national, regional, and local markets. The district [\*\*26] court did not abuse its discretion in refusing to reduce the amount of attorney fees based on the hourly rates charged. n8

---

n8 Defendants also argue that plaintiff could have found a less expensive attorney in Detroit and did not have to retain a Chicago attorney. A party is free to choose whatever attorney it desires. The question is the reasonableness of the rate. Defendants also argue that the rates charged for travel time should have been reduced. Defendants offered no proof on reasonable rates for travel time in any market.

---

Defendants argue that since plaintiff did not prevail against all the parties, the amount of fees should have been reduced. Defendants also claim that plaintiff did not keep accurate records to account for fees incurred against the other defendants. A party seeking an award of attorney fees must establish entitlement to an award and document the appropriate hours expended. *Hensley v. Eckerhart, 461 U.S. 424, 437, 76 L. Ed. 2d 40, 103 S. Ct. 1933 (1983).* When claims are [\*\*27] based on related legal theories, they should not be treated as distinct claims for the purpose of calculating attorney fees. The cost of litigating related claims, therefore, should not be reduced. *Thurman v. Yellow Freight Sys., Inc., 90 F.3d 1160, 1169 (6th Cir. 1996).* Nor should the fees be reduced when the suit is successful against some of the defendants but not others if the theories of recovery are related. *See Wayne, 36 F.3d at 532.*

Plaintiff in this case provided the district court with itemized, contemporaneous time records. Plaintiff reduced the fees for work relating to the Olympia defendants. The theories and proofs against the police officers and the reservists were similar if not the same. Some of the theories and proofs against all of the defendants, including the Olympia defendants, overlapped. Based on the documentation provided by plaintiff, we cannot find that the district [\*741] court abused its discretion in awarding the attorney fees requested by plaintiff. Given the "district court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters," an award [\*\*28] of attorney fees under § 1988 is entitled to substantial deference. *Hadix, 65 F.3d at 534.*

### D. Denial of Attorney Fees to Olympia Defendants

At the conclusion of trial, the Olympia defendants moved for an award of attorney fees and costs under *28 U.S.C. § 1927, Fed. R. Civ. P. 37(c),* and *Fed. R. Civ. P. 26(g)(3).* The Olympia defendants argue that plaintiff persistently pursued the groundless claim that he did not have a preexisting fracture in his neck (the os odontoideum).

We review the denial of attorney fees under *28 U.S.C. § 1927, Fed. R. Civ. P. 37(c),* and *Fed. R. Civ. P. 26(g)(3)* for abuse of discretion. *See Holmes v. City of Massillon, 78 F.3d 1041, 1049 (6th Cir. 1996) (§ 1927);*

*Bradshaw v. Thompson*, 454 F.2d 75, 81 (6th Cir. 1972) (Rule 37(c)); and *Martin v. LaBelle*, 7 Fed. Appx. 492, 2001 U.S. App. LEXIS 5396, No. 00-1157, 2001 WL 345791 (6th Cir. March 27), *cert. denied*, 151 L. Ed. 2d 34, 122 S. Ct. 67 (2001) (unpublished disposition) (Rule 26(g)(3)).

An attorney "who so multiples the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy [**29] personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." *28 U.S.C. § 1927*. An award is warranted if an attorney engaged in conduct from an objective standpoint that "falls short of the obligations owed by a member of the bar to the court and which, as a result, causes additional expense to the opposing party." *Holmes, 78 F.3d at 1049* (internal quotation marks omitted). While a showing of bad faith is not required, the attorney's conduct must amount to more than inadvertence or negligence. *Id.*

Rule 37(c) allows a party to request reasonable expenses, including attorney fees, incurred in proving the truth of a matter the other party refused to admit in response to a request for admissions. The court "shall make the order [for reasonable expenses] unless it finds that (A) the request was held objectionable pursuant to Rule 36(a), or (B) the admission sought was of no substantial importance, or (C) the party failing to admit had reasonable ground to believe that the party might prevail on the matter, or (D) there was other good reason for the failure to admit." FED. R CIV. P. 37(c)(2).

Rule 26 [**30] requires discovery-related filings to be signed by the attorney of record. The signature certifies that the filing conforms to the discovery rules, is made for a proper purpose, and does not impose undue burdens on the opposing party in light of the circumstances of the case. FED. R. CIV. P. 26(g)(2). Sanctions under Rule 26(g)(3) are not discretionary if the district court finds that a discovery filing was signed in violation of the rule.

Plaintiff's complaint stated that his neck was broken as a result of the defendants' actions. In response to Requests for Admissions, plaintiff stated as follows:

> REQUEST NO. 4: That when Plaintiff alleged he sustained a broken neck, Plaintiff was referring to the fracture at the odontoid process.
>
> RESPONSE: Denied. Plaintiff was referring generically to injuries he sustained in the neck area. Mr. McHugh was not advised of the specific nature of his injuries other than reference by Dr. Elskins and others to a "broken neck." [*742] Indeed, Dr. Elskins and others advised Mr. McHugh that his neck was broken.
>
> REQUEST NO. 5: That the incident at the Fox Theatre on or about October 18, 1996 did not cause the odontoid [**31] fracture.
>
> RESPONSE: Denied. Plaintiff's expert has concluded that the fracture at the odontoid process as well as other injuries sustained by Mr. McHugh were consistent with his beating by security guards and police.

The expert referred to by plaintiff in his response to Request No. 5 was Dr. Albert King. Dr. King opined in his expert report and during his deposition that the fracture was not preexisting to plaintiff's 1996 injuries. At trial, however, Dr. King changed his opinion. Plaintiff's other expert, William Sanders, also testified at trial that there was a preexisting fracture:

> Well, he had another condition in his neck, which is what's kind of confusing in this case, I think, to some of the people involved. He has a condition in which part of the bone of C2 is not fused to the rest of the bone of C2. It's called os odontoideum.

The Olympia defendants argue that plaintiff should have been aware that the fracture was preexisting when it obtained a copy of a dental x-ray in April 1999. Defendants assert that Plaintiff's expert, Dr. Sanders, admitted the dental x-ray taken in 1988 showed a preexisting fracture. In fact, Dr. Sanders testified:

> Q. [**32] Looking at those - I thought I heard you say today that there is a suggestion of the OO condition in those?
>
> A. I did not say that.
>
> Q. Is there any hint at all in those 1988 x-rays of the OO condition?
>
> A. It's very difficult to say. The x-ray was not performed to look at the neck. So, the quality wasn't that great. And on just a

single lateral view, that can actually be a very difficult diagnosis to make.

Q. I appreciate that answer, Doctor. And that's why I didn't ask that question. That's why I - what I did say is, is there any hint of the OO condition in 1988?

A. There might be a hint, yes.

In denying the Olympia defendants' motion for attorney fees and costs under § 1927, Rule 37(c), and Rule 26(g)(3), the district court held:

I find that there is no bad faith on the part of the Plaintiffs.

> . . . I am denying the request for attorney fees and costs both under statute 28 USC Section 1927 and under the court rules cited by Mr. Seward, *Federal Rules of Civil Procedure 26(b)* and *Federal Rules of Civil Procedure 37(c)(2)*.
>
> . . . .
>
> I think that at least before the trial started, the OO, the question of the OO condition was a subject [**33] of dispute by the experts. And again, I find there was no basis for awarding costs and attorney fees.

On this record, we cannot find that the district court abused its discretion in finding that, at least until the trial, the fracture was a condition subject to dispute by the experts. n9 In preparing the complaint and responding to the Request for Admissions, plaintiff relied on the statements [*743] made by his treating physician and his retained expert. Dr. Sanders's testimony showed that it was not reasonable to expect plaintiff to detect the fracture from the 1988 dental x-ray.

> n9 Defendants argue that the district court applied the wrong standard under § 1927. While the district court noted no bad faith, it applied an objective standard as required under § 1927 when it concluded that the fracture was the subject of dispute between the experts.

Defendants do not allege that Dr. King changed his opinion prior to trial, or that plaintiff should have conceded the existence of the fracture before trial because [**34] of Dr. King's or Dr. Sanders's opinions. Other than the dental x-rays, defendants rely on contradictory statements made in closing arguments to support their claim for attorney fees and costs. The statements in closing argument are not relevant to the question of whether plaintiff needlessly multiplied the proceedings by forcing defendants to prove the os odontoideum. The relevant and determining fact is that plaintiff had reasonable grounds to dispute the existence of the fracture until his expert changed his opinion *at trial*.

Moreover, defendants were not required to incur unnecessary expense in discounting the claim of a broken neck. Defendants had to present evidence not only that the fracture but also the subluxation preexisted the 1996 injuries suffered by plaintiff. The plaintiff never conceded that, in layman's terms, his neck was not broken in 1996 or that the subluxation did not occur in 1996.

### E. Denial of Costs under *Fed. R. Civ. P. 54(d)(1)*

The Olympia defendants also challenge the district court's refusal to grant them costs under *Fed. R. Civ. P. 54(d)(1)*. We review for abuse of discretion. *White & White, Inc. v. Am. Hosp. Supply Corp.*, 786 F.2d 728, 730 (6th Cir. 1986). [**35]

Costs are generally awarded to a prevailing party as a matter of course. The district court, however, may in its discretion deny a request for costs. *Jones v. Cont'l Corp.*, 789 F.2d 1225, 1233 (6th Cir.1986). The district court's discretion is more limited than it would be if the rule were nondirective. The unsuccessful party must show circumstances sufficient to overcome the presumption favoring an award of costs to the prevailing party. *Goostree v. Tennessee*, 796 F.2d 854, 863-64 (6th Cir.1986). On appeal, the party seeking reversal of a denial of costs must show that the district court committed error in applying the criteria for the denial of costs. *White & White, Inc.*, 786 F.2d at 732.

A district court's denial of costs is a proper exercise of discretion when the case is "close and difficult." *Id.* at 730 (quoting *United States Plywood Corp. v. Gen. Plywood Corp.*, 370 F.2d 500, 508 (6th Cir. 1966)). The closeness of a case is determined by the refinement of perception required to recognize, sift through, and organize relevant evidence and by the difficulty of discerning the law of the case. [**36] *White & White, 786 F.2d at 732-33*. A case can be characterized as difficult based on the length of the trial, the number of witnesses, and the amount of evidence submitted to the jury. *Id. at 732*.

In denying costs to the Olympia defendants, the district court held:

> And the fourth factor is the one that I do think applies, and that is where the case is a close and difficult one. And I

37 Fed. Appx. 730, *; 2002 U.S. App. LEXIS 10312, **

think we are not talking about the legal theories, and I fear I would agree with Mr. Hecht when he says that--and agree with Mr. Seward when they both say that this factually and conceptually was not an overwhelmingly difficult case, such as Mr. Seward referred to the Microsoft case.

Although there was some complexity injected and came into play in terms of the alternative theory of liability which required some extra work and extra instructions [*744] to clarify to the Jury, but I think Mr. Hecht has the better of the arguments in terms of the closeness of the case when we're talking about a difference between the slam dunk, and I guess the extreme slam dunk would be a motion for summary judgment having been granted, and the other extreme, the perhaps ultimate close case [**37] would be a hung jury where the facts were that close that reasonable minds could and would and did differ.

On that continuum, this case is a close case, and I'm exercising my discretion in denying Rule 54 costs.

The Olympia defendants argue they are entitled to costs because the district court did not find that the case was difficult. While the district court concluded that the case was not as difficult as the Microsoft case, it did find that there were complex issues presented on the alternative theory of liability requiring extra instructions to the jury. We also find that the case was difficult on the question of causation. The trial in this matter lasted 23 days, and the jury was presented with the testimony of 31 witnesses and nine expert witnesses. The jury was required to recognize, sift through, and organize all of this evidence to determine the parties' respective liability and to understand complex medical testimony on fractures and subluxation to determine the legal issue of causation. The district court did not abuse its discretion in finding that the case was close and difficult and denying the Olympia defendants' request for costs.

**AFFIRMED**.

LEXSEE 1998 U.S. DIST LEXIS 20102

JUNE DeBARI, ARTHUR DeBARI, GERARD DeBARI and LAWRENCE DeBARI, Plaintiffs,-against-TOWN OF MIDDLETON, NEW YORK; VILLAGE OF MARGARETVILLE, NEW YORK; JOHN MATHIESEN; WALTON HELEY, JR. and CARL WALLMAN, Defendants.

97-CV-1422

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF NEW YORK

*1998 U.S. Dist. LEXIS 20102*

**December 22, 1998, Decided
December 23, 1998, Filed**

**DISPOSITION:** [*1] Defendants' motions for reconsideration DENIED.

**LexisNexis (TM) HEADNOTES- Core Concepts:**

**COUNSEL:** MICHAEL A. JACOBS, ESQ., JACOBS & JACOBS, Stamford, New York, for plaintiffs.

D. SCOTT BASSINSON, ESQ., WHITEMAN, OSTERMAN & HANNA, Albany, New York, for Town of Middleton, Mathiesen, Heley and Wallman, defendants.

DAVID L. POSNER, ESQ., MCCABE AND MACK, LLP, Poughkeepsie, New York, for Village of Margetville, defendant.

**JUDGES:** Hon. Thomas J. McAvoy, Chief U.S. District Judge.

**OPINIONBY:** Thomas J. McAvoy

**OPINION:**

### DECISION & ORDER

**McAVOY, CHIEF JUDGE:**

This action, brought pursuant to *42 U.S.C. § 1983,* arises from the demolition by defendants n1 of plaintiffs' building. Plaintiffs claim a number of constitutional violations.

> n1 The individual defendants have been sued in their official capacities only.

Defendants now seek reconsideration of certain aspects of the Court's Memorandum–Decision and Order of May 22, 1998, which granted in part and denied in part defendants' motions for summary judgment. Specifically, defendants seek reconsideration of that [*2] part of the decision denying their motion seeking dismissal of plaintiffs' claims of procedural due process and a Fourth Amendment seizure.

A motion for reconsideration is addressed to the sound discretion of the district court, and is generally limited to those circumstances in which the movant shows either (1) an intervening change of controlling law; (2) the availability of new evidence; and/or (3) the need to correct a clear error or prevent manifest injustice. See, e.g., *Virgin Atlantic Airways Ltd. v. National Mediation Bd., 956 F.2d 1245, 1255 (2d Cir. 1992).*

In the present case, the defendants rely on the third factor—a clear error of law—as the basis for reconsideration. Specifically, defendants assert that the Court erred in relying upon several affidavits submitted by plaintiffs in opposition to summary judgment, which the Court found created issues of material fact that prevented the granting of summary judgment with respect to plaintiffs' claims of procedural due process and a Fourth Amendment seizure. Specifically, defendants assert that the affidavits did not satisfy *FED. R. CIV. P. 56(e)* because "the affidavits do not state that they are based upon personal [*3] knowledge, make conclusory allegations without factual support, and state opinions and conclusions without demonstrating that the affiants are competent to testify as to such matters." See Defendants' Memorandum of Law, at 8.

*Rule 56(e) of the Federal Rules of Civil Procedure* requires that "supporting and opposing affidavits . . . be made on personal knowledge, . . . set forth such facts as would be admissible in evidence, and . . . show af-

firmatively that the affiant is competent to testify to the matters stated therein. See also *Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 526 (2d Cir. 1994); Union Ins. Society of Canton, Ltd. v. William Gluckin & Co., 353 F.2d 946, 952 (2d Cir. 1965); Christopher-Ketchum v. Agway Energy Products, 988 F. Supp. 610, 615 (N.D.N.Y. 1997)*.

In this case, plaintiffs submitted in opposition to summary judgment the affidavits of Damon Stewart and Richard Fairburn. Stewart opines that for the past twenty years, he has performed site excavation work and has torn down many buildings. Steward states that as a result of the flood, "the Debari building was picked up by water and was moved around." Stewart Aff., P 4. Steward continues that **[*4]** in his opinion, "the DeBari building was structurally sound." Id., P 6.

Fairburn opines that he has been in the construction business for the past forty years. He continues that he salvaged several buildings in Margaretville. He states that "the DeBari building had no wallboard damage and there was no outside damage that amounted to anything. That the only thing required on the DeBari building was foundation repair." Fairburn Aff., P 5-6. Thus, he concludes that the DeBari building was not in danger of collapse.

After consideration, the Court holds that it did not make a clear error of law in relying upon the Stewart and Fairburn affidavits in denying summary judgment. The affidavits are based upon personal knowledge, set forth admissible evidence, and show affirmatively that the affiants are competent to testify to the matters at issue. Although admittedly neither affidavit is a paragon of clarity and substance, both, nonetheless, satisfy the requirements of Rule 56(e).

For the reasons stated, defendants' motions for reconsideration are DENIED

**IT IS SO ORDERED.**

Dated December 22, 1998
at Binghamton, New York

    Hon. Thomas J. McAvoy

    Chief U.S. District Judge **[*5]**