## 01/15/04 CROWN THEATRES vs DALY    WITNESS: JAMES T.MARTINO

**Diamond Reporting**

**Page 1 to Page 223**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*DIAMOND REPORTING*
*Suite 907*
*16 Court Street*
*Brooklyn, NY    11241*
*Phone:    (718) 624-7200*
*FAX:    (718) 855-1772*

## Page 1

(1)

(2) UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

(3) ------------------------------------------X

CROWN THEATRES, L.P.,

(4)

PLAINTIFF,

(5)

-against-

(6)

MILTON L. DALY, TAYLOR-LEIGH,

(7) INC., ANNE E. DALY, JAMES C.

CELLA, G.U.S. DEVELOPMENT, INC.,

(8) JAMES T. MARTINO AND JAMES

THOMAS MARTINO, ARCHITECT, P.C.,

(9)

DEFENDANTS.

(10) ------------------------------------------X

**DATE:** January 15, 2004

(11) **TIME:** 11:21 a.m.

(12)

(13) EXAMINATION BEFORE TRIAL of the

(14) Defendant, JAMES T. MARTINO, taken by the

(15) Plaintiff, pursuant to a Court Order, held at the

(16) offices of Milber, Makris, Plousadis & Seiden,

(17) L.L.P., 108 Corporate Park Drive, Suite 200, White

(18) Plains, New York 10604, before a Notary Public of

(19) the State of New York.

(20)

(21)

(22)

(23)

(24)

(25)

## Page 2

(1)

(2) A P P E A R A N C E S:

(3)

(4)

(5)

(6) JENNER & BLOCK, L.L.C.

Attorneys for the Plaintiff

(7) One IBM Plaza

Chicago, Illinois 60611-7603

(8) BY: LAWRENCE S. SCHANER, ESQ.

MATTHEW RICE

(9)

(10)

(11)

(12) WEINSTEIN & WISSER, P.C.

Attorneys for the Defendants

(13) Milton L. Daly, Taylor-Leigh,

Inc. and Anne E. Daly,

(14) 29 South Main Street, Suite 207

West Hartford, Connecticut 06107

(15) BY: KERRY MARC WISSER, ESQ.

(16)

(17)

(18)

MILBER MAKRIS PLOUSADIS & SEIDEN, L.L.P.

(19) Attorneys for the Defendants

James T. Martino and James

(20) Thomas Martino, Architect, P.C.

108 Corporate Park Drive, Suite 200

(21) White Plains, New York 10604

BY: MARK SEIDEN, ESQ.

(22) File #: 112163

(23)

(24)

(25) * * *

## Page 3

(1)

F E D E R A L S T I P U L A T I O N S

(2)

(3)

(4) IT IS HEREBY STIPULATED AND AGREED

(5) by and between the counsel for the respective

(6) parties hereto, that the filing, sealing, and

(7) certification of the within deposition shall

(8) be and the same are hereby waived;

(9)

(10) IT IS FURTHER STIPULATED AND AGREED

(11) that all objections, except as to the form

(12) of the question, shall be reserved to the times

(13) of the trial.

(14)

(15) IT IS FURTHER STIPULATED AND AGREED

(16) that the within deposition may be signed before

(17) any Notary Public with the same force and effect

(18) as if signed and sworn to before this court.

(19)

(20)

(21)

(22) * * * *

(23)

(24)

(25)

## Page 4

(1)

(2) J A M E S M A R T I N O, called as a witness,

(3) having been first duly sworn by a Notary Public of

(4) the State of New York, was examined and testified

(5) as follows:

(6) EXAMINATION BY

(7) MR. SCHANER:

(8)    Q.    *Please state your name for the record.*

(9)    A.    **James Martino.**

(10)   Q.    *What is your address?*

(11)   A.    **14 Vanderventer Avenue, Port**

(12) **Washington, New York 11050.**

(13)   Q.    *Mr. Martino, good morning. We are*

(14) *starting late this morning for weather related*

(15) *reasons.*

(16) *Have you had your deposition taken*

(17) *before?*

(18)   A.    **Yes.**

(19)   Q.    *How many times?*

(20)   A.    **Once.**

(21)   Q.    *When was that?*

(2) A. Yes.

(3) Q. What gifts?

(4) A. Holiday gifts.

(5) Q. Anything else?

(6) A. Not that I recall.

(7) Q. When you say holiday gifts, what gifts

(8) do you recall?

(9) A. Hanukkah.

(10) Q. Did you give Mr. Beacher a Hanukkah

(11) gift every year?

(12) MR. SEIDEN: From when to when?

(13) Q. Let's say 1996 to 2001.

(14) A. I don't recall doing that every year.

(15) Q. What Hanukkah gifts do you recall

(16) providing Mr. Beacher?

(17) A. A flower vase.

(18) Q. Anything else?

(19) A. That's the only one that comes to my

(20) mind right now.

(21) Q. Have you or your firm provided

(22) Mr. Beacher with any professional services?

(23) A. Yes.

(24) Q. You mentioned work on his residence in

(25) Florida?

Page 75

(1)

(2) A. Mm-hmm.

(3) Q. Anything else? Your answer was yes?

(4) A. Yes.

(5) Q. Anything else?

(6) A. Professional services on his house in

(7) Woodmere after the explosion that took place

(8) anything else.

(9) A. Not that I recall, no.

(10) Q. Have you or your firm at any time

(11) given cash to Bob Beacher?

(12) MR. WISSER: Objection to the form.

(13) MR. SEIDEN: Objection to the form.

(14) A. Not that I recall.

(15) Q. Have you or your firm at any time

(16) given cash to any business or entity controlled by

(17) Bob Beacher?

(18) MR. SEIDEN: Objection to the form.

(19) A. Not that I recall.

(20) Q. Where does your architectural firm

(21) maintain its bank accounts?

(22) A. I'm sorry. It's what? Accounts?

(23) Q. Bank accounts?

(24) A. I believe it's Citibank.

(25) Q. Which branch?

Page 76

(1)

(2) A. Port Washington.

(3) Q. Has your firm maintained other

(4) accounts over the last five years?

(5) A. No.

(6) Q. What about other the last ten years?

(7) A. I believe we have, yes.

(8) Q. Where?

(9) A. EAB.

(10) Q. Where is EAB based?

(11) A. I don't know.

(12) Q. Which branch?

(13) A. Port Washington.

(14) Q. Anything else?

(15) A. Not that I can recall.

(16) Q. Where do you personally maintain your

(17) banking or checking account?

(18) MR. SEIDEN: Objection to form.

(19) Q. Do you have a personal banking account?

(20) A. Yes.

(21) Q. Where?

(22) A. I don't know.

(23) Q. Why not?

(24) A. My wife knows.

(25) Q. Which bank? Which bank do you use?

Page 77

(1)

(2) You don't know?

(3) A. I don't know.

(4) Q. Does your wife handle your family

(5) finances?

(6) A. That's correct.

(7) Q. How long has she handled your family

(8) finances?

(9) A. Since we are married.

(10) Q. Have you ever had a bank account in

(11) your own name since you were married?

(12) A. No.

(13) Q. In what year were you married?

(14) A. 1983.

(15) Q. Is your – do you have a joint account

(16) with your wife? Do you know?

(17) A. Yes.

(18) Q. You do have a joint checking account?

(19) A. That's correct.

(20) Q. You don't know where it's located?

(21) A. That's right.

(22) MR. SCHANER: Let's mark this as

(23) Martino Exhibit Number 3.

(24)

(25) (Whereupon, the aforementioned

Page 78

(1)

(2) Documents were marked as Martino Exhibit 3 for

(3) identification as of this date by the

(4) Reporter.)

(5)

(6) Q. Mr. Martino, you have before you

(7) Martino Exhibit Number 3. It's a 12 page document

(8) titled Defendants, James T. Martino and James

(9) Thomas Martino, Architects, P.C's answers to

(10) Plaintiff Crown Theatres, P.C's first set of

(11) interrogatories.

(12) A. Yes, I have.

(13) Q. If you turn to page 11 at the top of

(14) the page it says verification. There is a

(15) signature on the page. Is that your signature?

(16) A. That is my signature.

(17) Q. Did you sign that on or about April

Page 81

(1)
(2)     MR. SEIDEN:     I don't understand the
(3)     question. Objection. Answer complete as to
(4)     what.
(5)     Q.     With respect to the Hartford,
(6)     Connecticut theater project, have you accurately
(7)     and completely listed all of your site visits in
(8)     response to interrogatory number two on page three
(9)     of Exhibit Number 3?
(10)    A.     I can't sit here and say today that
(11)    that is accurate and complete, from what I
(12)    understand what you are saying. I think you are
(13)    asking me did I visit these number of times or
(14)    could there possibly have been more times or less
(15)    times.
(16)    Q.     Yes.
(17)    A.     I couldn't answer your question here.
(18)    Q.     Is this your best answer to the
(19)    question on what dates did you visit the Hartford,
(20)    Connecticut theater project?
(21)    A.     That's our best estimate.
(22)    Q.     Same question for the Trumbull
(23)    project. Are the dates reflected in your response
(24)    to Crown Theatres interrogatories, your best
(25)    understanding of the dates on which you visited

Page 82

(1)
(2)     that project?
(3)     MR. SEIDEN:     I'm sorry. Point of
(4)     clarification. When you say you and maybe
(5)     it's a defined term, are you referring to
(6)     Mr. Martino individually or his company.
(7)     MR. SCHANER:     Mr. Martino individually.
(8)     MR. SEIDEN:     Okay. Thank you.
(9)     A.     I relied upon Joseph LaMonte to put
(10)    this together.
(11)    Q.     As you sit here now –
(12)    A.     These are the dates that he had
(13)    recorded on me traveling to these locations.
(14)    Could there have been other dates that I went that
(15)    were not recorded, possibly.
(16)    Q.     As you currently understand the
(17)    situation, these are the dates on which you
(18)    visited the Trumbull Connecticut site, correct?
(19)    A.     Yes.
(20)    Q.     As you currently understand the
(21)    situation, the dates listed for Jupiter, Florida
(22)    in your interrogatory answer are the dates when
(23)    you made site visits to the Jupiter, Florida
(24)    project?
(25)    A.     I believe so, yes.

Page 83

(1)
(2)     Q.     Same thing for Miami, Florida?
(3)     A.     I believe, yes.
(4)     Q.     Also for Skokie, Illinois?
(5)     A.     Yes, I believe so.
(6)     Q.     And Annapolis, Maryland?
(7)     A.     I believe so, yes.

---

(18)    24, 2003?
(19)    A.     That's what the document says.
(20)    Q.     Do you have any reason to disagree?
(21)    A.     No.
(22)    Q.     Mr. Martino, did you have any
(23)    involvement in preparing the answers to Crown
(24)    Theatres first set of interrogatories?
(25)    A.     Could you state that question again,

Page 79

(1)
(2)     Counselor, please.
(3)     Q.     Did you participate in preparing the
(4)     answers to Crown Theatres first set of
(5)     interrogatories?
(6)     A.     Yes, I did.
(7)     Q.     Did you review – strike that.
(8)     Are the answers in Defendant's Exhibit
(9)     number – strike that.
(10)    Are the answers in Martino Exhibit
(11)    Number 3 complete and accurate?
(12)    A.     Yes, I believe they are.
(13)    Q.     Turn, please, to page number three.
(14)    Where you see interrogatory number two at the top
(15)    of the page. Are you there?
(16)    A.     Yes, I am.
(17)    Q.     Interrogatory two states separately
(18)    for each the theater projects in which you were
(19)    retained, performed work or provided services,
(20)    state for each visit to the project site and under
(21)    that it says A, the date of your visit and you
(22)    have a response which follows. Below, you've
(23)    provided in response to 2A under Hartford,
(24)    Connecticut upon information and believe Martino
(25)    visited this location on the following dates, do

Page 80

(1)
(2)     you see the list?
(3)     A.     Yes, I do.
(4)     Q.     How is this list of dates compiled?
(5)     A.     I believe my bookkeeper put that list
(6)     together for me.
(7)     Q.     What information did your bookkeeper
(8)     use to compile the list of dates on which you
(9)     visited the Hartford, Connecticut site?
(10)    A.     The invoices.
(11)    Q.     Which invoice?
(12)    A.     The invoices we submitted, I believe,
(13)    for those dates when I appeared.
(14)    Q.     And by – your bookkeeper, who are you
(15)    referring to?
(16)    A.     Joseph LaMonte.
(17)    Q.     Did Mr. LaMonte review your invoices
(18)    to compile the information for your visits to the
(19)    Trumbull Connecticut sites, the Jupiter, Florida
(20)    site, the Miami site and Skokie, Illinois site and
(21)    the Annapolis, Maryland site?
(22)    A.     Yes.
(23)    Q.     Mr. Martino, is your answer accurate
(24)    and complete with respect to your site visits for
(25)    each of the Crown Theatres locations?

(10) A. No.

(11) Q. Does your practice for handling

(12) architect certificates vary from job to job?

(13) MR. SEIDEN: Objection. Your question

(14) assumes that there are architect certificates

(15) on every job. I object. It's an improper

(16) question.

(17) A. Most of the projects that I've been

(18) involved with do not have the need for me to sign

(19) pay req's.

(20) Q. For the projects where you were

(21) required to sign pay req's, did you have a

(22) standard procedure for determining whether or

(23) not you signed the architect certificate?

(24) MR. SEIDEN: Asked and answered.

(25) A. I really don't understand what you are

Page 107

(1)

(2) asking me.

(3) Q. What steps did you take – what steps

(4) would you normally take before signing an

(5) architect certificate for payment?

(6) MR. SEIDEN: Objection. Over broad.

(7) A. You would either make an on-site

(8) observation, or in this case, we had a

(9) construction manager owners rep who was performing

(10) that service.

(11) Q. Are there any other –

(12) MR. SEIDEN: Were you finished with

(13) your answer?

(14) THE WITNESS: Yes, for that question

(15) I'm finished with that answer.

(16) Q. With respect to the Crown Theatres

(17) construction projects, was it your practice to

(18) make on-site inspection is prior to signing

(19) architect certificates?

(20) A. My responsibilities were to make

(21) on-site inspection is.

(22) Q. Did you, in fact, make on-site

(23) inspections prior to signing architect

(24) certificates for payments on Crown Theatres

(25) construction jobs?

Page 108

(1)

(2) A. Yes and no.

(3) Q. What do you mean by yes?

(4) A. Yes, I was at the sites prior to

(5) signing these payment requisitions.

(6) Q. When you say no?

(7) A. No, I was not there prior to signing

(8) the payment requisition.

(9) Q. In some cases you signed payment

(10) requisitions without making on-site inspections,

(11) correct?

(12) A. That's correct.

(13) Q. How often did that happen?

(14) A. Depending on the project.

(15) Q. Let's talk about the projects

(16) appropriately then. With respect to the Annapolis

(17) project, did you make on-site inspections before

(18) signing architect certificates?

(19) A. Yes.

(20) Q. Trumbull?

(21) A. Yes.

(22) Q. Miami?

(23) A. Yes.

(24) A. Skokie?

(25) A. Yes.

Page 109

(1)

(2) Q. Hartford?

(3) A. Yes.

(4) Q. On which projects did you not make

(5) on-site inspections before signing architect

(6) certificates?

(7) A. Annapolis, Miami and Skokie.

(8) Q. On those projects, if I understand

(9) what your testimony is, it's sometimes you made

(10) on-site inspections before signing architect

(11) certificates and sometimes you didn't; is that

(12) correct?

(13) A. That's correct.

(14) Q. Why didn't you always make on-site

(15) inspections at Annapolis, Miami and Skokie before

(16) signing architect certificates?

(17) A. Because one of the Friday morning

(18) meetings, Mr. Daly made the announcement that

(19) Bob Beacher would be the eyes and ears for Crown

(20) Theatres at the job sites. And therefore, Martino

(21) will not be going because Crown feels it's a

(22) duplication of services. And since Bob is going

(23) to be there, Bob will take care of that service.

(24) Q. The Friday meeting you've just

(25) referred to, when did that take place?

Page 110

(1)

(2) A. I don't recall exactly.

(3) Q. What year?

(4) A. I don't recall.

(5) Q. Do you have a best recollection as to

(6) what year?

(7) A. No.

(8) Q. Who was present at the meeting?

(9) A. Milt Daly, Bob Beacher, myself, Glenn

(10) Garfinkel, Tom Becker, Chris Dugger – I'm not

(11) sure, but maybe Steve Scott.

(12) Q. Steve Scott?

(13) A. Yeah.

(14) Q. After Mr. Daly said that you would not

(15) be making site visits, did you say anything in

(16) response?

(17) A. No.

(18) Q. Did you argue with him?

(19) A. No.

(20) MR. WISSER: Objection to the form.

(21) A. No, I did not.

(22) Q. Did you comply?

(23) MR. SEIDEN: Comply with what?

(24) MR. SCHANER: His request not to make

(25) site visits.

01/16/04 CROWN THEATRES vs DALY   WITNESS: JAMES H. MARINO

Page 111

(1)
(2)  A.  Yes.
(3)  Q.  *After Mr. Daly made this announcement*
(4)  *at a Friday meeting in which he said you should*
(5)  *not make site visits to Annapolis, Miami and*
(6)  *Skokie, did you sign architect certificates on*
(7)  *those jobs without making site visits?*
(8)  A.  Yes.
(9)  Q.  *Did you have any concerns that by*
(10)  *signing architect certificates without making site*
(11)  *visits, you were violating the literal terms of*
(12)  *the architect certificate?*
(13)  MR. SEIDEN:  Objection.
(14)  A.  No.
(15)  Q.  *You didn't have any concerns?*
(16)  A.  I did not have any concerns in the
(17)  literal interpretation. Whose literal
(18)  interpretation.
(19)  Q.  *Did you have any concerns with respect*
(20)  *to the procedure that you were being asked to*
(21)  *follow?*
(22)  A.  No.
(23)  Q.  *Did you discuss the procedure that*
(24)  *Mr. Daly had proposed with anyone outside of the*
(25)  *Friday construction meeting?*

Page 112

(1)
(2)  A.  No.
(3)  Q.  *Did you seek to talk to anybody at the*
(4)  *AIA about it?*
(5)  A.  No.
(6)  Q.  *Did you talk to any of your colleagues*
(7)  *back at your firm about it?*
(8)  A.  No.
(9)  Q.  *Do you have any written record that*
(10)  *Mr. Daly gave you the direction not to make site*
(11)  *visits?*
(12)  A.  No.
(13)  Q.  *Prior to the direction that Mr. Daly*
(14)  *gave you, what was your practice with respect to*
(15)  *making site visits in connection with architect*
(16)  *certificates?*
(17)  MR. SEIDEN:  For any job or these
(18)  jobs?
(19)  Q.  *The Crown Theatres jobs.*
(20)  A.  I'm not following that.
(21)  Q.  *What was your practice before Mr. Daly*
(22)  *told you not to make site visits?*
(23)  MR. WISSER:  Objection to form.
(24)  A.  I don't recall whether I was involved
(25)  with signing pay req's prior to that or not.

Page 113

(1)
(2)  Q.  *In your work for Crown Theatres, who*
(3)  *provided you with copies of the payment*
(4)  *requisitions that you signed?*
(5)  A.  They came to me from Bob Beacher.
(6)  Q.  *When you say they came to you, how did*
(7)  *he transmit them to you?*

(8)  A.  It would either be we would be
(9)  together in the car driving up on a Friday to the
(10)  construction meetings or he would have them in
(11)  his briefcase and then give them to me at the
(12)  construction meetings on Fridays.
(13)  Q.  *Where did you sign the architect*
(14)  *certificates?*
(15)  A.  Either in the car as we were driving
(16)  to the construction meetings on Fridays or in
(17)  Crown's conference room.
(18)  Q.  *And you signed the architect*
(19)  *certificates without making on-site inspections?*
(20)  MR. SEIDEN:  That's not what he said.
(21)  Objection. Mischaracterizes the record.
(22)  A.  That's right, that's not what I said.
(23)  MR. SCHANER:  Explain why I'm wrong.
(24)  MR. SEIDEN:  He has answered your
(25)  questions. Ask a question and he will answer

Page 114

(1)
(2)  it.
(3)  Q.  *After you signed the architect*
(4)  *certificates, what did you do with them?*
(5)  A.  I gave them back to Bob.
(6)  Q.  *Do you understand what Bob did with*
(7)  *them?*
(8)  A.  My understanding is that he gave them
(9)  to Mr. Daly.
(10)  MR. WISSER:  Objection to the form. I
(11)  move to strike based on lack of foundation.
(12)  Q.  *Did you ever witness Mr. Beacher hand*
(13)  *the payment applications with the architect*
(14)  *certificates on them to Mr. Daly?*
(15)  A.  No.
(16)  Q.  *You never -- was there any discussion*
(17)  *of the architect certificates at the Friday*
(18)  *construction meetings?*
(19)  A.  The only discussions that took place
(20)  was Milt's or Mr. Daly's announcement that this
(21)  was going to be the procedure and once Glenn
(22)  Garfinkel raised an objection of concern asking me
(23)  if I was okay with this.
(24)  Q.  *When did Mr. Garfinkel raise that*
(25)  *objection.*

Page 115

(1)
(2)  A.  At one of these construction meetings.
(3)  I don't recall which date.
(4)  Q.  *What did you say in response?*
(5)  A.  I'm comfortable with it.
(6)  Q.  *Did he say anything else?*
(7)  A.  Well, I then said to him, are you
(8)  comfortable with it and Glenn said, Jimmy, if
(9)  you are comfortable with it, I'm comfortable with
(10)  it.
(11)  Q.  *Was anyone else present when the*
(12)  *conversation occurred?*
(13)  A.  The same people that I've described
(14)  before.
(15)  Q.  *On which of your other jobs over the*

1

2            IN THE UNITED STATES DISTRICT COURT

3              FOR THE DISTRICT OF CONNECTICUT

4
   CROWN THEATRES, L.P.,        )
5                               )
                    Plaintiff,  )
6                               )
              vs.               )
7                               )
   MILTON L. DALY, TAYLOR-      )
8  LEIGH, INC., ANNE E. DALY,   )
   JAMES C. CELLA, G.U.S.       )
9  DEVELOPMENT, INC., JAMES     )
   T. MARTINO and JAMES         )
10 THOMAS MARTINO, ARCHITECT,   )
                                )
11                 Defendants.  )
   ---------------------------- )

12

13

14

15        CONTINUED DEPOSITION OF JAMES MARTINO

16                Garden City, New York

17              Tuesday, February 10, 2004

18

19

20

21

22

23

24  Reported by:
    DEBORAH A. HANLON
25  JOB NO. 157283

Page 224

```
 1
 2
 3                    February 10, 2004
 4                    10:05 A.M.
 5
 6
 7        Continued deposition of JAMES
 8    MARTINO, held at the offices of Milber,
 9    Makris, Plousadis & Seiden, LLP, 990
10    Stewart Avenue, Garden City, New York,
11    pursuant to Adjournment, before Deborah
12    A. Hanlon, a Notary Public of the State
13    of New York.
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 225

```
 1
 2    APPEARANCES:
 3
 4    JENNER & BLOCK, LLP
 5    Attorneys for Plaintiff
 6        One IBM Plaza
 7        Chicago, Illinois 60611
 8    BY: LAWRENCE S. SCHANER, ESQ.
 9
10    WEINSTEIN & WISSER, P.C.
11    Attorneys for Milton L. Daly and Anne
12    E. Daly
13        29 South Main Street, Suite 207
14        West Hartford, Connecticut 06107
15    BY: KERRY MARC WISSER, ESQ.
16
17    MILBER, MAKRIS, PLOUSADIS & SEIDEN, LLP
18    Attorneys for James T. Martino
19        108 Corporate Park Drive, Suite 200
20        White Plains, New York 10604
21    BY: MARK SEIDEN, ESQ.
22
23
24
25
```

Page 226

```
 1                    Martino
 2    J A M E S  M A R T I N O ,  called as a
 3        witness, having resworn by a Notary
 4        Public, was examined and testified as
 5        follows:
 6    EXAMINATION BY
 7    MR. SCHANER:
 8        Q.  Good morning, Mr. Martino.  This
 9    is the continuation of your deposition
10    which began on January 15, 2004.
11            Since the first day of your
12    deposition, have you done anything to
13    prepare for today's deposition?
14        A.  Yes.
15        Q.  What have you done?
16        A.  I reviewed the contracts that the
17    general contractors submitted, and I
18    reviewed my fees.
19        Q.  Anything else?
20        A.  Not that I can recall.
21        Q.  Have you met with anybody?
22        A.  Mr. Seiden.
23        Q.  When did you do that?
24        A.  Yesterday.
25        Q.  For how long?
```

Page 227

```
 1                    Martino
 2        MR. SEIDEN:  Objection.  The same
 3    as last time.  I deem that privilege,
 4    the length of time the witness meets
 5    with counsel.
 6        MR. SCHANER:  Are you instructing
 7    the witness not to answer?
 8        MR. SEIDEN:  Yes, same as last
 9    time.
10        MR. SCHANER:  Can I have a
11    standing agreement that we're going to
12    instruct the witness not to answer if I
13    were to ask him, will you answer the
14    question, he will say he won't answer?
15        MR. SEIDEN:  I think that's fair.
16        MR. SCHANER:  That way I won't
17    have to keep objecting.
18        MR. SEIDEN:  Just so we're clear,
19    I deem that attorney/client and
20    attorney work product privilege.
21        MR. SCHANER:  As far as our
22    agreement goes so I don't have to go
23    back and ask him some of the questions
24    I asked him last time that you
25    instructed him not to answer, do you
```

2 (Pages 224 to 227)

Page 260

Martino

2 and you see that you need a section on
3 concrete. You need a section on masonry,
4 you need a section on steel, you need a
5 section on roofing. You need a section on
6 electrical, you need a section on HVAC,
7 that sort of stuff.
8    Q. Did you review the lease in order
9 to determine what sections you needed in
10 the spec book?
11    A. I don't recall doing that.
12    Q. Going back to the last section on
13 the first page of Martino Exhibit 25, that
14 paragraph states, "This firm will
15 participate in preparing a construction
16 contract between the general contractor and
17 the developer."
18       What work did you do to prepare
19 the construction contract?
20    A. I didn't do any.
21    Q. Who did the work for your firm?
22       MR. SEIDEN: Objection.
23    A. Nobody on my firm did that work.
24    Q. Did your firm participate in
25 preparing the construction contract?

Page 261

Martino

2    A. No.
3    Q. The agreement states, "This firm
4 will participate in preparing the
5 construction contract."
6    A. Uh-huh.
7    Q. Which firm does this refer to?
8    A. It means my firm.
9    Q. And, in fact -- is it your
10 testimony that your firm, in fact, did not
11 participate in preparing the construction
12 contract?
13       MR. SEIDEN: Objection. Asked and
14 answered.
15       You can answer again.
16    A. Yes.
17    Q. Did your firm participate in
18 preparing the construction contract on any
19 of the contracts with Crown Theatres?
20    A. No, sir.
21    Q. Why not?
22    A. It was made clear that it was not
23 going to be my responsibility.
24    Q. Who made that clear to you?
25    A. Milt Daly.

Page 262

Martino

2    Q. When did he communicate that to
3 you?
4    A. At one of the construction
5 meetings.
6    Q. Did he tell you who would
7 participate in preparing the construction
8 contracts?
9    A. Yes, Bob Beacher.
10    Q. Did you express any concern or
11 disagreement when Mr. Daly told you that
12 Bob Beacher would be preparing the
13 construction contracts?
14    A. No, sir.
15    Q. Please turn to page 2 of Martino
16 25.
17       In the first paragraph second
18 sentence, it states, "An authorized
19 representative of James Thomas Martino
20 Architect, P.C., shall visit the site at an
21 interval of one per month for the purposes
22 of verifying that the as-built conditions
23 are in full compliance with the
24 construction documents."
25       From this, Mr. Martino, you

Page 263

Martino

2 understood that you or someone from your
3 firm was to make one site visit per month,
4 correct?
5    A. Yes, sir.
6    Q. What was the purpose of the site
7 visits?
8    A. To ascertain that the work that
9 was being performed was in accordance with
10 our drawings.
11    Q. But, in fact, you didn't visit
12 the sites once a month, did you?
13       MR. SEIDEN: On which projects are
14 you referring?
15    A. I am assuming you are speaking
16 about this Trumbull project in your
17 question.
18    Q. In this question, sir, let's
19 answer it regarding Trumbull.
20    A. I submitted dates of when I went
21 there. Could there have been dates when
22 someone from my staff might have went there
23 also, yes.
24       So I can't say, sitting here
25 right now, whether we did every month or

Esquire Deposition Services
1-800-944-9454

Page 264

```
1          Martino
2  not. I believe we did.
3       Q.  Mr. Martino, I am handing you
4  what we marked at the first day of your
5  deposition as Martino Exhibit 3 which was
6  your responses to Crown Theatres' first set
7  of interrogatories.
8          Reviewing your responses to Crown
9  Theatres' first set of interrogatories, can
10 you tell me whether you or someone from
11 your firm made monthly visits to the
12 Trumbull site?
13      A.  Not by reviewing this document I
14 cannot, no.
15      Q.  Can you tell me whether you made
16 monthly site visits on the other theater
17 projects that you did for Crown Theatres?
18      A.  Are you asking me now to review
19 the other five projects that are listed
20 here to ascertain whether I made monthly
21 site visits?
22          Is that what you are asking me to
23 do?
24      Q.  I would like you to tell me
25 whether you made monthly visits to each of
```

Page 265

```
1          Martino
2  the Crown Theatres' projects.  And if
3  reviewing your interrogatory answers would
4  help, go ahead.
5       A.  Well, I know that in Jupiter and
6  Miami I did not, or anybody from my office,
7  make specific monthly site visits.
8       Q.  What about the other projects?
9       A.  It appears that Skokie, based on
10 this document in front of me, that monthly
11 site visits were not made.  And looking at
12 the Hartford project, based on this, I
13 think we did make monthly site visits.
14      Q.  What about Annapolis, Maryland?
15      A.  No.  Annapolis, Maryland, monthly
16 site visits were not made.
17      Q.  Let's go back to Martino
18 Exhibit 25 for a moment.
19          On page 2, the last sentence
20 reads, "Should additional site visits be
21 required, each site visit will be billed
22 monthly."
23          Did your firm ever bill for
24 additional site visits?
25      A.  On the Trumbull project?
```

Page 266

```
1          Martino
2       Q.  On the Trumbull project.
3       A.  I can't recall off the top of my
4  head.
5       Q.  Did your firm bill for additional
6  site visits on any of the other site
7  projects?
8       A.  I can't recall that either.
9       Q.  On the first day of your
10 deposition, I believe that you testified
11 that Bob Beacher would hand copies of the
12 payment requisitions to you either in his
13 car on the way to the Friday construction
14 meetings or at the Friday meetings, that
15 you would sign them either in the car or at
16 the Friday meetings.
17          Have I got that right?
18          MR. SEIDEN:  Objection.  The
19 testimony speaks for itself.
20      A.  I think that's a fair synopsis of
21 what I was trying to portray.
22      Q.  Did you discuss the payment
23 requisitions with Mr. Beacher before you
24 signed them?
25      A.  I cannot say that I discussed
```

Page 267

```
1          Martino
2  specifically each payment requistion before
3  I signed them, no.
4       Q.  What would Mr. Beacher say to you
5  when he gave you the payment requisitions?
6       A.  I reviewed them, signed the
7  fucking things.
8          Excuse my mouth, ma'am.
9       Q.  And after you signed them, what
10 did you do with them?
11      A.  Gave them back to Bob.
12      Q.  What did Mr. Beacher do with the
13 payment applications after you signed them
14 and gave them back to him?
15      A.  I believe he then gave them to
16 Mr. Daly.
17      Q.  Mr. Martino, do you understand
18 the terms payment requistion and payment
19 application to mean the same thing?
20      A.  Yes, I do.
21      Q.  Do you remember that you met with
22 investigators for Crown Theatres on July
23 11, 2003?
24      A.  I don't remember that specific
25 date, but I do remember meeting with people
```

12 (Pages 264 to 267)

Page 268

Martino

1   from Kroll.
2   Q.   They were from Kroll and they
3   were two gentlemen, Bill Jennings and Mike
4   Pace.
5   Do you remember that?
6   A.   Yes, I do.
7   Q.   Do you remember telling them that
8   at the construction meetings Mr. Beacher
9   would slide a stack of payment requisitions
10  to you and you would sign them?
11  A.   I don't remember specifically
12  that statement, no.
13  Q.   Does that statement -- is that
14  statement accurate?
15  A.   If we arrived -- if we were at
16  the construction site meeting -- at the
17  Friday morning meetings, and he put them
18  down in front of me, I think that's what we
19  were talking about.
20  Q.   Do you remember you also told the
21  investigators from Kroll that you believed
22  in your heart that the AIA architects'
23  certification form required the architect
24  to make an on-site inspection before
25

Page 269

Martino

1   signing?
2   A.   I don't recall exactly saying
3   that either.
4   Q.   You agree with that statement,
5   don't you?
6   MR. SEIDEN:   Objection to form.
7   A.   Say it again, please.
8   Q.   You believe in your heart that
9   the AIA architects' certification form
10  required the architect to make an on-site
11  inspection before signing?
12  A.   If it was the architect's
13  responsibility, yes.
14  Q.   You also told Mr. Jennings and
15  Pace that other than your work for Crown,
16  if you were required by another client to
17  sign payment requistion certifications, you
18  would make an on-site inspection of the
19  work and an independent determination that
20  the work had been completed, correct?
21  A.   I don't recall exactly saying
22  that, counselor. But I don't recall. I
23  don't recall exactly saying that.
24  Q.   Do you agree with that statement?
25

Page 270

Martino

1   MR. SEIDEN:   I'm sorry. Can I
2   hear the statement back?
3   MR. SCHANER:   Would the court
4   reporter please read it back.
5   (A portion of the record was read.)
6   MR. SEIDEN:   You can answer.
7   A.   If I was in the role of the full
8   responsibility, yes.
9   Q.   You would also compare the prior
10  payment requests to the current payment
11  requests to confirm that the prior amount
12  was paid, correct?
13  MR. SEIDEN:   Objection to the
14  form.
15  A.   If it was my role and
16  responsibility to do so.
17  Q.   In addition, you would confirm
18  that all necessary lien waivers had been
19  obtained, right?
20  MR. SEIDEN:   Objection to form.
21  A.   If it was my responsibility to do
22  so.
23  Q.   And in the case of the Crown
24  Theatres' projects, it was your
25

Page 271

Martino

1   responsibility, correct?
2   MR. SEIDEN:   What was his
3   responsibility? Lien waivers?
4   Q.   Do you understand the question?
5   A.   No.
6   Q.   You were the architect of record
7   on the Crown Theatres' construction
8   projects, correct?
9   A.   Yes, sir, I was.
10  Q.   It was your responsibility as the
11  architect of record to make on-site
12  inspections of the work and an independent
13  determination that the work had been
14  completed, correct?
15  MR. SEIDEN:   Objection to form.
16  A.   That was a long question.
17  Could you restate that, please.
18  MR. SCHANER:   Can we have the
19  question read back, please.
20  (A portion of the record was read.)
21  A.   It was my responsibility to
22  verify that the work was completed in
23  accordance with my drawings.
24  Q.   It was also your responsibility
25

13 (Pages 268 to 271)

**EXHIBIT B**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **CROWN THEATRES, L.P.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | Case No. 3:02CV2272AVC |
| | ) | Jury Trial Demanded |
| **MILTON L. DALY, TAYLOR-LEIGH,** | ) | |
| **INC., JAMES C. CELLA, G.U.S.** | ) | |
| **DEVELOPMENT, INC., JAMES T.** | ) | |
| **MARTINO AND JAMES THOMAS** | ) | |
| **MARTINO, ARCHITECT, P.C.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## PLAINTIFF CROWN THEATRES' FIRST SET OF
## INTERROGATORIES TO DEFENDANTS JAMES MARTINO
## AND JAMES THOMAS MARTINO, ARCHITECT, P.C.

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, plaintiff Crown

Theatres, L.P. propounds the following interrogatories to defendants James Martino and James

Thomas Martino, Architect, P.C., the answers to be served on or before April 21, 2003.

### DEFINITIONS AND INSTRUCTIONS

1.      The term "Crown Theatres" means Crown Theatres, L.P., its current or

former officers, directors, employees and agents, as well as its past or present parents,

subsidiaries, or affiliates.

2.      The terms "you," or "your" mean defendant James Martino and all of his

past and present employees, servants or agents, and defendant James Thomas Martino, Architect,

P.C. and its current or former officers, directors, employees and agents, as well as its past or

present parents, subsidiaries or affiliates.

3.    The term "person" means all entities of any description, including without limitation all natural persons, firms, associations, corporations, partnerships, joint ventures, trusts, subsidiaries, parents, agencies, and any other form of business, governmental, or legal entity.

4.    The singular and plural form shall be construed interchangeably so as to bring within the scope of these requests any information which might otherwise be construed as outside their scope.  Gender-specific words and forms shall be construed to refer to both genders.

5.    "And" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of these requests any information which might otherwise be construed as outside their scope.

6.    When asked to "identify" a document, indicate the type of document (e.g., letter, memorandum, etc.), the title or label of the document, the date of the document, the identity of each person who authored the document, the identity of each recipient of the document, and the subject matter of the document.

7.    When asked to "identify" a person, indicate that person's full name, present or last known residential and business addresses, telephone number, employer and business title.

8.    The term "Theatre Projects" refers to Crown Theatres' theatre construction or renovation projects in Hartford, Connecticut; Trumbull, Connecticut; Jupiter, Florida; Miami, Florida; Skokie, Illinois; and Annapolis, Maryland; and as specified in paragraphs 56, 57, 75, 91, 111 and 132 of the Amended Complaint.  For purposes of these interrogatories, the term "Theatre Projects" also includes Crown Theatres' theatre construction or renovation project in Minneapolis, Minnesota.

2

9.    When asked to "identify" a lawsuit or legal proceeding, indicate the title or caption of the case, the court or tribunal in which it was (or is) pending, the docket number, the nature of the proceedings, the claims asserted, the lawyers for the parties, and the disposition, if any. The term "legal proceeding" includes all civil, criminal, bankruptcy or administrative proceedings, as well as arbitrations, mediations, or any other adversarial proceeding.

10.    If you assert an objection or privilege as a ground for not answering an interrogatory in full, set forth the facts and legal basis upon which the objection or privilege is based.

11.    These interrogatories shall be construed as continuing in nature and are to be supplemented if and as additional information becomes available.

12.    These interrogatories call for information created during or relating to the period 1995 to the present.

## INTERROGATORIES

1.    Identify all persons with knowledge of or input into your decisions to approve work on the Theatre Projects, including without limitation your decision to provide executed architect's certificates.

2.    Separately for each of the Theatre Projects on which you were retained, performed work or provided services, state for each visit to the project site:

      a.    The date of your visit;

      b.    The purpose of your visit;

      c.    The name of any person accompanying you; and

      d.    The name of each person with whom you met.

3

3.    Identify all persons with knowledge of your work on behalf of Crown Theatres.

4.    Separately for each theatre project, identify all persons with knowledge relating to the allegations in your Second Counterclaim that Crown Theatres wrongfully failed and refused to pay you for work in connection with theatres in Minneapolis, Minnesota; Jupiter, Florida; Skokie, Illinois; and Hartford, Connecticut.

5.    Identify all persons with knowledge relating to the allegations in your Third Counterclaim that Crown Theatres, its agents, servants, or employees have been unjustly enriched at your expense in connection with work on Crown Theatres' offices in New York, New York or Daniel M. Crown's homes in New York, New York or Connecticut.

6.    For any work for which you contend that you have not been paid by Crown Theatres, state (a) the project on which you claim not to have been paid; (b) the specific task that you allege you performed; (c) the date of the work; (d) the date of any invoice or bill reflecting or relating to the work; and (e) the amount of money you contend you are owed.

7.    For all work you allege you performed on behalf of Daniel M. Crown for which you contend you wrongfully were not paid, state (a) the project on which you claim not to have been paid; (b) the specific task that you allege you performed; (c) the date of the work; (d) the date of any invoice or bill reflecting or relating to the work; and (e) the amount of money you contend you are owed.

8.    Identify all lawsuits to which you are or have been a party, witness, deponent, or for which you have been subpoenaed.

4

9.    Identify all persons with knowledge relating to invoices submitted to

Crown Theatres for work performed or allegedly performed in connection with the Theatre

Projects.

CROWN THEATRES, L.P.

By:_____
Craig C. Martin
Bar No. CT12198

Craig C. Martin
JENNER & BLOCK, LLC
One IBM Plaza
Chicago, IL 60611
(312) 222-9350
(312) 840-7776 (fax)
cmartin@jenner.com

H. James Pickerstein
PEPE & HAZARD LLP
30 Jelliff Lane
Southport, CT 06490
(203) 319-4000
(203) 259-0251 (fax)
hpickerstein@pepehazard.com

Dated:  March 17, 2003

5

## CERTIFICATE OF SERVICE

I, the undersigned, an attorney with Jenner & Block, L.L.C., do hereby certify that I have

served all counsel of record in this action with a copy of **Plaintiff Crown Theatres' First Set of**

**Interrogatories to Defendants James Martino and James Thomas Martino, Architect, P.C.**

by mailing a copy of the same by United States Mail, postage prepaid, to the following parties:

Kerry M. Wisser
Weinstein & Wisser, P.C.
29 South Main Street
Suite 207
West Hartford, CT 06107

Thomas H. Kukowski
Milber, Makris, Plousadis & Seiden, L.L.P.
108 Corporate Park Drive
Suite 200
White Plains, NY 10604

S. Dave Vatti
Law Office of S. Dave Vatti
375 Bridgeport Ave., Third Floor
Shelton, CT 06484

Adam Hirsch

Dated: March 17, 2003

6

EXHIBIT C

## Page 1

1
2  IN THE UNITED STATES DISTRICT COURT
3  FOR THE DISTRICT OF CONNECTICUT
4  --------------------------X
   CROWN THEATRES, L.P.
5
6          Plaintiff
7          vs.
8  MILTON L. DALY, TAYLOR-LEIGH,
   INC., ANNE E. DALY, JAMES C.
9  CELLA, G.U.S. DEVELOPMENT,
   INC., JAMES T. MARTINO and
10 JAMES THOMAS MARTINO,
   ARCHITECT
11
12         Defendants.
   --------------------------X
13
14
15
16      DEPOSITION OF RONALD P. BERTONE
17          White Plains, New York
18          Wednesday, March 24, 2004
19
20
21
22
23
24 Reported by:
   HOWARD CHAIM CSR
25 JOB NO. 158629

## Page 2

1
2
3
4
5              March 24, 2004
6              10 a.m.
7
8          Deposition of RONALD P. BERTONE,
9      held at the offices of Milber Makris
10     Plousadis Seiden, 3 Barker Avenue,
11     White Plains, New York, pursuant to
12     Notice, before HOWARD CHAIM, a
13     Certified Shorthand Reporter and Notary
14     Public of the State of New York.
15
16
17
18
19
20
21
22
23
24
25

## Page 3

1
2  A P P E A R A N C E S :
3      JENNER & BLOCK, LLP
4      Attorneys for Plaintiff
5         One IBM Plaza
6         Chicago, Illinois 60611
7      BY: LAWRENCE S. SCHANER, ESQ.
8
9  MILBER MAKRIS PLOUSADIS SEIDEN
10     Attorneys for Defendants
11        3 Barker Avenue - 6th Floor
12        White Plains, New York 10601
13     BY: MARISA LANZA, ESQ.
14
15
16 ALSO PRESENT:
17     PETER STEFFIAN
18
19
20
21
22
23
24
25

## Page 4

1
2          IT IS HEREBY STIPULATED AND
3  AGREED, by and between the attorneys
4  for the respective parties herein,
5  that filing and sealing be and the
6  same are hereby waived.
7          IT IS FURTHER STIPULATED AND
8  AGREED that all objections, except as
9  to the form of the question, shall be
10 reserved to the time of the trial.
11         IT IS FURTHER STIPULATED AND
12 AGREED that the within deposition may
13 be sworn to and signed before any
14 officer authorized to administer an
15 oath, with the same force and effect as
16 if signed and sworn to before the
17 Court.
18
19
20
21
22
23
24
25

1 (Pages 1 to 4)

RONALD P. BERTONE, MARCH 24, 2004

Page 125

1        Ronald P. Bertone
2  any involvement in negotiating the
3  schedules of value?
4        A.  No, I didn't ask him that
5  question.  I don't think so.
6        Q.  Looking to the language of the
7  architect certificate for payment -- and
8  there is an example of that language in
9  Exhibit 7 -- for what parts of the
10 architect certificate did Mr. Martino rely
11 on Mr. Beacher?
12       MS. LANZA:  I am going to object.
13    I don't understand the question.  But
14    if you do.
15       A.  I am reading it again and I may
16 ask the same question.
17       THE WITNESS:  Repeat the
18    question, please.
19       (Record read.)
20       A.  The phrase "the contractor is
21 entitled to payment of the amount
22 certified."
23       Q.  Is it your belief that
24 Mr. Martino did not know whether the
25 contractor was entitled to payment of the

Page 126

1        Ronald P. Bertone
2  amount certified?
3        A.  That's correct.
4        MS. LANZA:  It mischaracterizes
5     his prior testimony.
6        Q.  Why do you say that is correct,
7  Mr. Bertone?
8        A.  What I said is Martino did not
9  know what each of the contractors were
10 supposed to be getting paid.  So if he
11 didn't know what they were getting paid,
12 there is no way he could have known whether
13 the payment was correct or not.
14       Q.  Let me ask you this.  If
15 Mr. Beacher handed Mr. Martino a stack of
16 payment applications and said to
17 Mr. Martino sign them and Mr. Martino went
18 ahead and signed them, would Mr. Martino's
19 conduct comply with the standard of
20 reasonable professional care for an
21 architect?
22       MS. LANZA:  Just under those very
23    limited facts that you have given him?
24    Nothing else?
25       A.  Repeat the question, please.

Page 127

1        Ronald P. Bertone
2     (Record read.)
3        A.  And there was no discussion
4  preceding that statement?
5        Q.  Yes.
6        A.  And there was no review by
7  Martino of the construction photos or
8  visits to the construction site or anything
9  else involving the compliance with the
10 contract documents?
11       Q.  Yes.  If Mr. Beacher simply
12 handed the stack of payment applications to
13 Mr. Martino and said sign them and
14 Mr. Martino based only on that proceeded to
15 sign the architect certificates, would that
16 be acceptable for a professional architect?
17       A.  I would have to say no.
18       Q.  Let's look at page 17 again.
19 Last sentence of item 3.  "Beacher was
20 designated by Daly, as construction
21 manager, and performed services consistent
22 with those performed by a construction
23 manager-agent."
24       Was Mr. Beacher the owner's
25 representative on the theater projects?

Page 128

1        Ronald P. Bertone
2        A.  Yes, he was.
3        Q.  Was he designated as a quote
4  "construction manager-agent" close quote?
5        A.  The services he was preforming
6  were aligned or concurrent with those to be
7  performed by a construction manager-agent
8  on the site.
9        Q.  As a result of your investigation
10 did you find evidence that he was informed
11 by somebody at Crown Theatres that his
12 title would be construction manager-agent?
13       A.  I think Mr. Daly even said that
14 in his deposition, that Beacher was
15 construction manager.
16       Q.  He didn't say construction
17 manager-agent, did he?
18       A.  No.  He said construction
19 manager.
20       Q.  Is the term construction
21 manager-agent a term of art in the
22 construction industry?
23       A.  Construction manager-agent is a
24 form of construction management project
25 delivery.

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087   800.708.8087   FAX 312.704.4950

Page 153

Ronald P. Bertone

1 work was less than indicated in the
2 contract documents?
3
4    A. That's a function of the amount
5 that they are looking get paid for.
6    Q. So they are related.
7       The architect certificate, the
8 G-702, refers to Contract Documents and the
9 words Contract Documents are in capital
10 letters.
11      What are the Contract Documents
12 that are referred to in the architect
13 certificate?
14   A. Those that are referred to as the
15 contract documents within the agreement
16 between the owner and the contractor.
17   Q. The architect then needs to
18 review the owner-contractor agreement in
19 order to sign the character certificate,
20 correct?
21   A. Not necessarily.
22   Q. He won't know what the contract
23 documents are unless he sees the
24 owner-contractor agreement?
25   A. That is correct. But he can be

Page 154

Ronald P. Bertone

1
2 told what to look for by his particular
3 client.
4    Q. If the client doesn't tell the
5 architect, then the architect needs to see
6 the owner-contractor agreement in order to
7 know what the contract documents are?
8    A. That's correct.
9    Q. Have you determined what
10 documents Mr. Martino reviewed in
11 connection with his signature of architect
12 certificates on the theater projects?
13   A. His drawings and his project
14 manual or technical specification.
15   Q. In your opinion was that
16 sufficient?
17   A. I can't answer that.
18   Q. Why not?
19   A. Because I don't know what, you
20 know, if that's what the -- I would say
21 yes, it was sufficient because that's all
22 the client was asking of him.
23   Q. And how do you know that the
24 client was only asking that he review his
25 drawings and project manuals?

Page 155

Ronald P. Bertone

1
2    A. Because they didn't complain
3 about what he was doing.
4    Q. So you relied for your opinion
5 that the client didn't expect Mr. Martino
6 to look at more than his drawings and
7 project manuals on the fact that the client
8 didn't complain, right?
9    A. That's correct.
10   Q. Did you rely on anything else?
11   A. The fact that the projects were
12 constructed and received certificates of
13 occupancy goes to show that the buildings
14 were built according to the applicable
15 codes and the documents that were prepared
16 by Mr. Martino.
17   Q. So you rely on the fact that the
18 building ultimately turned out okay, is
19 that what you are saying?
20   A. Yes.
21   Q. Does the fact that Mr. Martino
22 signed architect certificates submitted by
23 sham contractors trouble you?
24   A. He didn't know they were sham
25 contractors when he signed them.

Page 156

Ronald P. Bertone

1
2    Q. Does it trouble you, though, that
3 he signed millions of dollars worth of
4 payment applications submitted by sham
5 contractors?
6    A. Yes.
7    Q. Do you have an opinion as to
8 whether Mr. Martino should have detected
9 that the payment applications that he
10 signed were submitted by sham contractors?
11   A. No, I don't have an opinion on
12 that. My opinion based on the preceding
13 question is predicated on the fact that I
14 am -- what bothers me most is that a client
15 takes advantage of an architect the way
16 they do. The way they did.
17   Q. You don't have an opinion whether
18 Mr. Martino should have detected that the
19 payment applications that he was signing in
20 many cases were submitted by sham
21 contractors?
22   A. No, I don't have an opinion on
23 that.
24   Q. Take a look at the language of
25 the architect certificate. It states that

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087   800.708.8087   FAX 312.704.4950

Page 173

1      Ronald P. Bertone
2  what would you tell the client?
3      A.  That we need to look at the scope
4  of the project more closely, look at the
5  site that the project is going on, evaluate
6  other constrictions that we may have
7  governing this particular project and then
8  we can make a better judgment as to what
9  the potential of cost overrun would be.
10     If it's an addition or an
11 alteration project, that's a lot different
12 than one where you are building a brand new
13 building on a site.  If there are the
14 possibility of soil problems later on,
15 that's another possibility.
16     That's what I am saying.  You are
17 asking a very nebulous question.
18     Q.  In the case of the Crown Theater
19 projects what magnitude of cost overrun
20 would you expect?
21     A.  15 to 20 percent.
22     Q.  Why so high?
23     A.  It happens.  You have
24 contingencies between design issues and
25 construction issues.  I would say all in

Page 174

1      Ronald P. Bertone
2  all you are probably could be looking at 15
3  or 20 percent.
4      Q.  In the course of your work on
5  this case have you determined whether the
6  following entities did any work, Marlin
7  contracting, G.U.S. Contracting, Tiger
8  Contracting, Hewlett Contracting?
9      A.  No, I was not asked to evaluate
10 that.
11     Q.  As you sit here right now do you
12 have an opinion as to whether they did any
13 work on the project?
14     A.  No, I do not have an opinion.
15     Q.  Have you determined that those
16 entities, Marlin, Tiger, Hewlett and
17 G.U.S., submitted payment applications in
18 connection with the six theater projects?
19     A.  Yes, I have seen payment
20 applications from those contractors.
21     Q.  And many of those applications
22 were signed by Mr. Martino, you have
23 determined -- you understand that to be the
24 case?
25     A.  Yes.

Page 175

1      Ronald P. Bertone
2      Q.  Do you agree that Crown Theatres
3  should not have been caused to pay money to
4  Hewlett, Tiger, Marlin and G.U.S.?
5      A.  I can't answer that.
6      Q.  Why not?
7      A.  Because I haven't evaluated that
8  portion of the project.
9      Q.  Do you have an opinion as to
10 whether the payment applications submitted
11 by Marlin, Tiger, Hewlett and G.U.S. were
12 fraudulent?
13     A.  No, I don't have an opinion on
14 that.
15     Q.  I'd like to ask you some further
16 questions about your meeting with
17 Mr. Martino on January 9, 2004.
18     Do you have handy your original
19 notes from that meeting?  And I am asking
20 for them because there are some colored ink
21 on them.
22     MS. LANZA:  You mean the actual
23 original originals?
24     MR. SCHANER:  Yes.
25     Q.  In your meeting with Mr. Martino

Page 176

1      Ronald P. Bertone
2  did you ask Mr. Martino if he knew that
3  Mr. Daly and Mr. Beacher were stealing
4  money from Crown Theatres?
5      A.  No, I did not ask him that
6  question.
7      Q.  Did you ask Mr. Martino whether
8  he knew that Mr. Beacher was paying
9  kickbacks to Mr. Daly?
10     A.  No, I did not ask him that
11 question.
12     Q.  Did you ask him whether he was
13 making payments of any kind to Mr. Daly?
14     A.  Martino?
15     Q.  Yes.
16     A.  No, I did not ask him that
17 question.
18     Q.  Did you ask Mr. Martino whether
19 he was making payments of any kind to
20 Mr. Beacher?
21     A.  No, I did not.
22     Q.  Or to any business that
23 Mr. Beacher had an interest in?
24     A.  No, I did not.
25     Q.  Did you ask Mr. Martino if he

Page 197

```
1          Ronald P. Bertone
2   paragraph on the page. I'd like to read to
3   you that language. Hold on a second.
4          MR. SCHANER: Mark this please as
5   Exhibit 8.
6          (Bertone Exhibit 8, copy of
7       Mr. Steffian's March 2, 2004 letter,
8       was marked for identification as of
9       this date.)
10      Q.  Handing you what has been marked
11  as Bertone Exhibit 8, which is a copy of
12  Mr. Steffian's March 2, 2004 letter.
13  Please turn to page 12. And on page 12
14  Mr. Steffian has quoted from the New York
15  Rules of the Board of Regents.
16         Section 29.1, general provisions,
17  Section B3 reads "Unprofessional conduct"
18  includes quote "directly or indirectly
19  offering, giving, soliciting or receiving
20  or agreeing to receive, any fee or other
21  consideration to or from a third party for
22  the referral of a patient or client or in
23  connection with the performance of
24  professional services."
25         In page 16 of your report,
```

Page 198

```
1          Ronald P. Bertone
2   Mr. Bertone, you state that quote, "The
3   money given by Martino to Beacher was not a
4   fee."
5          I'd like to understand why it is
6   that you believe that the money given by
7   Mr. Martino to Mr. Beacher was not a fee?
8       A.  Because my definition of the word
9   fee would be a predetermined amount or item
10  that is given for this particular
11  consideration.
12      Q.  If it was a fixed percentage, if
13  Mr. Beacher said to Mr. Martino you need to
14  pay me in order to get this work 10 percent
15  of your contract price would that
16  constitute a fee?
17      A.  Yes, it would.
18      Q.  What if there was a fixed amount,
19  say $15,000, if Mr. Beacher said to
20  Mr. Martino you want this work, it's going
21  to cost you $15,000, would that be a fee?
22      A.  I would say yes.
23      Q.  Now, if you look back at 29.1.b.3
24  of the New York rules, it bars directly or
25  indirectly giving any fee or other
```

Page 199

```
1          Ronald P. Bertone
2   consideration to or from a third party.
3       Q.  Would the money that Martino paid
4   to Beacher constitute other consideration
5   under Rule 29.1.b.3?
6       A.  It also says in connection with
7   the performance of professional services.
8       Q.  Let's take this one part at a
9   time.
10         Would the payment by Martino to
11  Beacher be other consideration? I know
12  it's your view that it's not a fee. But
13  would it be other consideration?
14      A.  I can't make that -- I can't
15  answer that because I -- you know, other
16  consideration might be an interpretation of
17  law. And I can't give that interpretation.
18      Q.  If I asked you to provide me with
19  examples of other considerations could you
20  do it?
21      A.  No. That's why I made the
22  statement only with regard to the word fee.
23      Q.  Now, in your report, and like you
24  said just a moment ago, at page 16, I am
25  quoting from your report, "Further, the
```

Page 200

```
1          Ronald P. Bertone
2   moneys issued by Martino to Beacher were
3   not in connection with the performance of
4   professional services."
5          Why weren't the payments by
6   Martino to Beacher in connection with the
7   performance of professional services?
8       A.  Because Beacher wasn't doing
9   anything to receive those fees.
10      Q.  Wasn't Mr. Martino performing
11  architectural services?
12      A.  For Crown Theatres. Not for
13  Mr. Beacher.
14      Q.  So under your reading of Rule
15  29.1.b.3 the performance of professional
16  services refers to services being performed
17  by the party receiving the fee or other
18  consideration?
19      A.  That would be my reading of it.
20      Q.  So because Mr. Beacher wasn't
21  performing professional services?
22      A.  Beacher was not performing
23  services for Martino. Martino was not
24  performing services for Beacher.
25      Q.  And for that reason, you know, in
```

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087   800.708.8087   FAX 312.704.4950

Page 201

Ronald P. Bertone

1     Ronald P. Bertone
2  addition to the other reason you stated you
3  believe that 29.1.b.3 does not apply?
4     A.  That is correct.
5     Q.  Look at New York Rule 29.3.a.1
6  and 2 which are set out on page 13 of
7  Mr. Steffian's March 2, 2004 letter which
8  is Exhibit 8.
9        Let's skip to New York Rule 29.3.
10 And that also is set out on page 13 of
11 Steffian's March 2 letter.
12      The rule provides that
13 "Unprofessional conduct shall include, in
14 the profession of architecture"...
15 "Certifying by affixing the licensee's
16 signature and seal to documents for which
17 the professional services had not been
18 performed by, or thoroughly reviewed by the
19 licensee."
20      Do you see that?
21    A.  Yes, I do.
22    Q.  Do you have an opinion regarding
23 whether Mr. Martino's signature of
24 architect certificates violated this
25 provision of the New York Rules?

Page 202

1     Ronald P. Bertone
2     A.  I do not think that the
3  performance of Martino's services violated
4  the this rule.
5     Q.  Why not?
6     A.  Well, first of all, I think this
7  particular rule is referring to an
8  architect signing construction drawings or
9  design drawings that he did not prepare.
10      But in reference to what you're
11 referring it to, which is the certificate
12 of an application for payment, Mr. Martino
13 signed the application predicated on what
14 his agreement was with his client.  He was
15 performing the duties that were
16 contractually obligated by him.
17    Q.  Now, Mr. Martino worked on two
18 projects for Crown Theatres in Connecticut,
19 right, the Trumbull, Connecticut project
20 and the Hartford, Connecticut project?
21    A.  Correct.
22    Q.  And Mr. Martino was licensed to
23 practice architecture in Connecticut; did
24 you determine that during your rearview?
25    A.  Yes.

Page 203

1     Ronald P. Bertone
2     Q.  Would you agree that he was
3  subject to Connecticut's Codes of Ethics?
4     A.  Yes.
5     Q.  If you look at Mr. Steffian's
6  March 2, 2004 letter, Exhibit 8, at page 13
7  you see section 22.89-10 of the Connecticut
8  Code of Ethics and if you look at
9  subsection 2(a) it reads quote "If an
10 architect has any business association or
11 direct or indirect financial interest which
12 may influence his judgment in connection
13 with the performance of professional
14 services, the architect shall fully
15 disclose in writing to the client(s) or
16 employer(s) the nature of the business
17 association or financial interest, and if
18 the client(s) or employer(s) objects to
19 such association or financial interest, the
20 architect will either terminate such
21 association or interest, or offer to give
22 up the commission or employment."
23      Have you formed, Mr. Bertone, any
24 opinions regarding whether Mr. Martino
25 violated this provision of the Connecticut

Page 204

1     Ronald P. Bertone
2  Code of Ethics?
3     A.  Yes, I have.
4     Q.  What are your opinions?
5     A.  He did not violate this provision
6  of the Code of Ethics of the State of
7  Connecticut.
8     Q.  What is the basis for that
9  opinion?
10    A.  He did not have a business
11 association or direct or indirect financial
12 interest which may have influenced his
13 judgment in connection with the performance
14 of his professional services.
15    Q.  In your opinion what kinds of
16 business association mandate disclosure
17 under Connecticut Rule 22.89-10?
18    A.  Let's say you are the architect
19 and you recommend that a particular steel
20 contractor be used on the site, and you
21 happen to own that particular steel
22 construction firm and don't tell your
23 client that.
24    Q.  Would working with someone for 25
25 years amount to a business association?

51 (Pages 201 to 204)

EXHIBIT D

**JENNER&BLOCK**

March 5, 2004

**VIA FACSIMILE**

Jenner & Block LLP    Chicago
One IBM Plaza    Dallas
Chicago, IL 60611-7603    Washington, DC
Tel 312 222-9350
www.jenner.com

Mark Seiden
Milber, Makris, Plousadis & Seiden, L.L.P.
108 Corporate Park Drive, Suite 200
White Plains, NY 10604

Lawrence S. Schaner
Tel 312 923-2689
Fax 312 840-7689
lschaner@jenner.com

Re:    Crown Theatres, L.P. v. Milton L. Daly, et al.

Dear Mark:

I am writing in response to your letter of March 4, 2004, in which you purport to "reject and return" Peter Steffian's supplemental report of March 2, 2004 (the "March 2 Supplement"). However, Mr. Steffian's March 2 Supplement is entirely proper under Rule 26(e) of the Federal Rules of Civil Procedure. Moreover, the March 2 Supplement cannot come as a surprise. In his initial report and in his supplemental report of February 13, 2004, Mr. Steffian stated that he was in the process of reviewing additional information, and he expressly reserved the right to amend and supplement his report. He also testified at his deposition that he was continuing to obtain information and that he intended to issue a further supplement to his report.

As I told you previously, the short time between the deposition of your client, James Martino, on February 10, 2004, and Mr. Steffian's deposition, on February 17, 2004, was insufficient to enable Mr. Steffian to complete the task of fully supplementing his initial report. (This was especially so given that Mr. Steffian was on vacation the week of February 9, and did not return home until February 16.) You elected to proceed with Mr. Steffian's deposition any way. You and I did not have an agreement that Mr. Steffian would only issue one supplement to his report.

Mr. Steffian is available to be deposed further if you feel that you need to ask him additional questions. Moreover, your expert has ample opportunity in which to take Mr. Steffian's March 2 Supplement into account. If for some reason you need additional time in that regard, please let us know.

Very truly yours,

Lawrence S. Schaner

LSS:rap

cc:    Kerry M. Wisser
       Robert M. Frost, Jr.

```
MODE = MEMORY TRANSMISSION          START=MAR-05 17:08      END=MAR-05 17:09

FILE NO.= 210

STN   COMM.    ONE-TOUCH/   STATION NAME/EMAIL ADDRESS/TELEPHONE NO.    PAGES    DURATION
NO.            ABBR. NO.

001    OK      ≛            919146818709---4125910014                  002/002   00:00'54"

                                                  -JENNER AND BLOCK LLP        -

*************************************** -46E      - ***** -        312 527 0484- *********
```

## FAX TRANSMITTAL

# JENNER&BLOCK

Jenner&Block, LLC
One IBM Plaza
Chicago, Il. 60611-7603
Tel 312 222-9350
www.jenner.com

Chicago
Dallas
Washington, DC

Date:      March 5, 2004

To:        **Mark Selden**           Fax:    (914) 681-8709
                                      Voice:  (914) 681-8700

From:      Lawrence S. Schaner
           (312) 923-2689 (Direct No.)
           (312) 840-7689 (Fax No.)

Client Number: 41259-10014

**Important:** This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is attorney work product, privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone, and return the original message to us at the above address via postal service. Thank you.

**Message:** Please see attached.

| Total number of pages including this cover sheet: 2 | Time Sent: | |
|---|---|---|
| If you do not receive all pages, please call: (312) 222-9350 | Sent By: | Ruth Ann Ponton |
| Secretary: Ruth Ann Ponton | Extension: | 6688 |

18 of 29 DOCUMENTS

NATIONAL UTILITY SERVICE, INC. v. J.R. SEXTON, INC.

Civil No. N-88-324(JAC)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT

*1989 U.S. Dist. LEXIS 18320*

November 3, 1989, Decided
November 3, 1989, Filed

LexisNexis(R) Headnotes

JUDGES: [*1] CABRANES

OPINIONBY: JOSE A. CABRANES

OPINION:

RULING ON PENDING MOTIONS

JOSE A. CABRANES, District Judge:

This case involves a contract between plaintiff National Utility Service, Inc. ("N.U.S."), a utility analyst and consulting service, and defendant, J.R. Sexton, Inc. ("Sexton"). Under this agreement N.U.S. undertook to analyze Sexton's utility usage and submit recommendations of means to effect utility cost savings. If Sexton implemented any such recommendation, in addition to an initial fee of $ 5,000 it was to transmit its utility bills to N.U.S. so that resulting savings could be determined. After the amount of $ 5,000 in savings was realized, defendant was to pay plaintiff 50% of its utility bill savings for 60 months. Plaintiff alleges that defendant implemented plaintiff's recommendations but failed to fulfill its obligations under the contract to pay its fees and to transmit its utility bills to plaintiff to allow a determination of amounts of money owed.

Plaintiff alleges breach of contract (Count 1), unjust enrichment (Count 2), and violation of the Connecticut Unfair Practices Act (CUTPA), *C.G.S. § § 42-110(a)* et seq. (Count 3). Plaintiff seeks compensatory and punitive damages, [*2] attorney's fees, a declaratory judgment, and specific performance.

Currently before the court are two motions, Plaintiff's Motion for Summary Judgment (filed Sept. 15, 1989) and Defendant's Motion for Summary Judgment Against Plaintiff, National Utility Service, Inc. (filed Sept. 15, 1989). The latter motion is addressed solely to the CUTPA claim in Count 3 of the complaint and is thus deemed a motion for partial summary judgment.

For the reasons stated below, plaintiff's motion for summary judgment is granted in part, as to liability for Count 1 (breach of contract) and denied in all other respects. Defendant's motion for partial summary judgment as to the CUTPA claim is granted. These claims shall be addressed, in turn, below.

DISCUSSION

Summary Judgment Standards

The court may grant summary judgment where the moving party has demonstrated that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*; see also *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)* ("The mere existence of some alleged factual dispute between the parties will not defeat [*3] an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."). A motion for summary judgment thus is the appropriate vehicle "to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).*

In making a summary judgment determination, the court must resolve all ambiguities and draw all reasonable inferences in favor of the plaintiff. *Anderson v. Liberty Lobby, Inc., 477 U.S. at 255; Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986)* (Feinberg,

C.J.), cert. denied, *480 U.S. 932 (1987)*. The court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)*. However, a party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co., 804 F.2d at 12*. Mere conclusory allegations and denials in legal [*4] memoranda or oral argument are not evidence and cannot by themselves create a genuine issue of material fact where none would otherwise exist. See *Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 445 (2d Cir. 1980); British Airways Bd. v. Boeing Co., 585 F.2d 946, 952 (9th Cir. 1978)*, cert. denied, *440 U.S. 981 (1979)*. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita, 475 U.S. at 586*.

## Claim of Breach of Contract

Plaintiff claims it is entitled to judgment as a matter of law as to the claim of breach of contract. Defendant responds by alleging that the contract between the parties is ambiguous in relevant part and therefore a genuine issue of material fact exists as to whether Sexton's actions in refusing payment constituted a breach of that contract. In particular, defendant claims that a disputed question exists as to whether Sexton adopted N.U.S.' recommendation regarding utility usage.

It is not disputed that Sexton made a change identical to that recommended by N.U.S., namely, it arranged to purchase natural [*5] gas under an "interruptible rate." It is also undisputed that this change was made subsequent to the receipt of the N.U.S. report. In fact, Sexton's letter to the utility company requesting the interruptible rate was identical, save for the substitution of Sexton's letterhead, to the suggested letter enclosed for this purpose in the N.U.S. report. Sexton claims that this does not constitute an adoption of the recommendation in the N.U.S. report envisaged by the agreement because the same change of service was previously recommended to them by their utility company and it was the recommendation of the utility company, and not of N.U.S., that caused Sexton to make the change.

The relevant language in the contract provides that,

> any [N.U.S.] recommendation acted on by [Sexton] shall be deemed accepted. . . . [N.U.S.] will not share in any reductions or savings effected solely by the lowering of rate schedules of any public utility corporation which they voluntarily apply to [Sexton's] bills and which are not

influenced by [N.U.S.'s] prior recommendations to [Sexton]. [Sexton] will pay [N.U.S.] only for savings which actually become effective on [Sexton's] bills after [N.U.S.'] [*6] recommendation is implemented.

(emphasis added).

Sexton claims that this language is ambiguous and permits more than one fairly reasonable interpretation. See *Aetna Casualty & Surety Co. v. Geiesow, 412 F.2d 468, 471 (2d Cir. 1969)*. See also, e.g., *Grand Union Co. v. Cord Meyer Development Corp., 735 F.2d 714 (2d Cir. 1984)*. N.U.S. interprets the contract to mean that all recommendations made by N.U.S. that were subsequently acted upon by Sexton give rise to obligations under the contract. Sexton proposes that the contract can also be interpreted to mean that only "exclusive" recommendations by N.U.S., i.e., those not available from any other source, if adopted by Sexton, give rise to contractual obligations.

The court finds that the language of the contract is unambiguous. The contract states that any recommendation acted on shall be deemed accepted. This language unambiguously means that if N.U.S. recommends a course of action and Sexton subsequently takes that course and achieves utility bill savings as a result, Sexton is obligated to compensate N.U.S. The contract [*7] nowhere suggests or envisages an inquiry into the state of mind of Sexton or its officials to determine the degree to which they were influenced by factors other than the N.U.S. report to adopt the course of action recommended by N.U.S.

The court finds that, in light of the undisputed facts of this case, there are no genuine issues of material fact as to Sexton's obligations under the contract. It is also undisputed that Sexton did not forward its utility bills to N.U.S. for determination of amounts owed or make payments of any kind to N.U.S. Summary judgment is thus appropriate as to defendant's liability for breach of contract.

The court finds, however, that genuine issue of material fact exists as to the amount of damages. Plaintiff has the burden of proof on the issue of the amount of its damages. N.U.S. claims damages in the amount of $ 58,764.75. See Affidavit in Support of Plaintiff's Motion for Summary Judgment (filed Sept. 15, 1989) at 7. This number is not explained and no basis for the calculation used to reach it is provided. In view of the current state of the pleadings, summary judgment

EXHIBIT E

is not appropriate as to damages due to N.U.S. for Sexton's breach **[*8]** of contract.

Claim of Unjust Enrichment

Neither the plaintiff's nor the defendant's motion makes any reference to this claim. Thus summary judgment is not appropriate on this issue.

CUTPA Claim

Defendant seeks summary judgment as to the claim of violation of CUTPA, *C.G.S. § § 42-110(a)*, et seq. Sexton argues that plaintiff cannot maintain a private right of action under CUTPA because the alleged conduct of defendants does not rise to the level of being offensive to public policy, immoral, unethical, oppressive, or unscrupulous, and it does not cause substantial injury to consumers.

The relevant section of CUTPA provides that "no person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." *C.G.S. § 42-110b*. The Supreme Court of Connecticut has defined "unfairness" as

> (1) whether the practice . . . offends public policy as it has been established by statutes, the common law, or otherwise . . . (2) whether it is immoral, unethical, oppressive or unscrupulous; (3) whether it causes substantial injury to consumers (competitors or other businessmen).

*Ivey, Barnum & O'Mara v. Indian Harbor Properties, Inc., 190 Conn. 528, 539 n.13 (1987)* **[*9]** (citations omitted). Nevertheless, a practice may be "unfair" even if all three criteria are not met. See *McLaughlin Ford,*

*Inc. v. Ford Motor Co., 192 Conn. 558 (1984); Gibbs v. Mace, 11 Conn.App. 289, 296 (1987).*

N.U.S. concedes that Sexton's breach of contract alone is not sufficient to establish a CUTPA violation. See Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Partial Summary Judgment (filed Oct. 6, 1989) at 3. However, it claims that "the totality of Sexton's egregious conduct," id., renders it liable under CUTPA. The court finds this argument unpersuasive. The "totality" of Sexton's conduct, as it emerges from the undisputed facts of this case, constitutes merely breach of contract and persistence in that breach in face of demands for performance by the other party to the contract. N.U.S. offers no evidence to indicate that the breach of contract at issue violated any "established concept of fairness." See *Sorisio v. Lenox, Inc., 701 F.Supp. 950, 963 (D.Conn. 1988)* (Burns, J.). Summary judgment on this count is thus appropriate.

CONCLUSION

For the reasons stated above **[*10]** and upon a full review of the record, Plaintiff's Motion for Summary Judgment (filed Sept. 15, 1989) is GRANTED IN PART, as to liability on Count 1 (breach of contract) and DENIED in all other respects. Judgment as to liability only on Count 1 shall enter in due course for plaintiff. Defendant's Motion for [Partial] Summary Judgment Against Plaintiff, National Utility Service, Inc. (filed Sept. 15, 1989) is GRANTED. Judgment for defendant shall enter in due course on Count 3 of the complaint.

It is so ordered.

Dated at New Haven, Connecticut, this 3d day of November, 1989.

Jose A. Cabranes

United States District Judges

LEXSEE 1998 U.S. DIST. LEXIS 14702

**RICKY BAKER, Plaintiff, -v- DAVID ALAN DORFMAN, Defendant.**

**97 CIV. 7512 (DLC)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1998 U.S. Dist. LEXIS 14702*

**September 17, 1998, Decided
September 17, 1998, Filed**

**DISPOSITION: [*1]** Plaintiff's motion for partial summary judgment granted as to the plaintiff's claim for declaratory judgment and the defendant's liability for legal malpractice.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff client filed a malpractice action against defendant attorney. The client brought an motion before the court for partial summary judgment as to his claims for declaratory judgment and legal malpractice.

**OVERVIEW:** The client hired the attorney to represent him in an action against a city regarding its negligence in providing the client with an incorrect blood test result that showed that he had the human immunodeficiency virus (HIV). The attorney filed a notice of claim against the city 90 days after the client learned that he was HIV-negative because the attorney believed that the cause of action accrued on the date that the client learned of the misdiagnosis. This was wrong and the client replaced the attorney with new counsel, but his action against the city was dismissed as time-barred. The client then brought this action and contended that he was entitled to partial summary judgment. The court agreed and granted the motion. The court found that the client's action against the city would not have been dismissed but for the attorney's negligence. The attorney failed to file the action within the statute of limitations even though he had time to do so. The court found that the attorney's failure to conduct a minimal investigation necessary to determine the relevant statute of limitations for filing the client's action constituted negligence as a matter of law.

**OUTCOME:** The court granted the client's motion for partial summary judgment on his claims for declaratory judgment and legal malpractice against the attorney.

**CORE TERMS:** late notice, summary judgment, ninety, leave to serve, statute of limitations, misdiagnosis, deposition, General Municipal Law, failure to file, notice of claim, one year, undisputed, accrual, matter of law, moving party, municipality, legal malpractice, specimen, lawsuit, genuine issue of material fact, reasonable excuse, actual damages, genuine issue, material fact, fact finder, non-moving, possessed, favorable, tolled, timing

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Summary Judgment Standard*
[HN1] Summary judgment is only appropriate when the submissions of the parties, taken together, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Fed. R. Civ. P. 56(c).* The moving party bears the burden of informing the court of the basis for its motion, and identifying those portions of the pleadings and other submissions which it believes demonstrate the absence of a genuine issue of material fact. When deciding a motion for summary judgment, a court must view the evidence in a light most favorable to the non-moving party and draw all reasonable inferences in its favor.

*Civil Procedure > Summary Judgment > Burdens of Production & ProofCivil Procedure > Summary Judgment > Summary Judgment Standard*

[HN2] When the moving party has met its burden under *Fed. R. Civ. P. 56(c)*, a non-moving party must do more than simply show that there is some metaphysical doubt as to the material facts. The opposing party must set forth specific facts showing that there is a genuine issue for trial, and cannot rest on mere allegations or denials of the facts asserted by the movant. *Fed. R. Civ. P. 56(e)*. A bald assertion that is completely unsupported by evidence is not sufficient to overcome a motion for summary judgment. If no rational fact finder could find in the non-movant's favor, there is no genuine issue of material fact, and summary judgment is appropriate.

*Torts > Malpractice Liability > Attorneys*
[HN3] Under New York law, a claim for legal malpractice requires proof of three elements: (1) negligence of the attorney; (2) that the attorney's negligence was the proximate cause of the plaintiff's loss; and (3) proof of actual damages. The relevant standard of care adopted by courts in this state is the ordinary and reasonable skill and knowledge commonly possessed by a member of the profession.

*Civil Procedure > Summary Judgment > Summary Judgment StandardTorts > Malpractice Liability > Attorneys*
[HN4] While the question of whether an attorney acted negligently normally requires a factual determination by a jury, a plaintiff will be entitled to summary judgment in a case where there is no conflict at all in the evidence, the defendant's conduct fell below any permissible standard of due care, and the plaintiff's conduct was not really involved. Courts also resolve such cases on summary judgment where the ordinary experience of the fact finder provides a sufficient basis for judging the adequacy of the professional service rendered.

*Torts > Procedure > Statutes of LimitationsGovernments > Local Governments > Claims By & Against*
[HN5] Under *N.Y. Gen. Mun. Law § 50-i*, all tort claims against a city must be preceded by a notice of claim served in compliance with *N.Y. Gen. Mun. Law § 50-e*, that is, within 90 days after the claim arises. Section 50-i requires further that the action itself shall be commenced within 1 year and 90 days after the happening of the event upon which the claim is based. *N.Y. Gen. Mun. Law § 50-i(c)*. The courts may grant a plaintiff leave to serve a late notice of claim, however, if application for such leave is made within the statute of limitations under § 50-i(c). *N.Y. Gen. Mun. Law § 50-e(5)*.

*Torts > Procedure > CommencementTorts > Negligence > Negligence Generally*

[HN6] Negligence claims accrue at the time of injury. On its face, New York State's limited "discovery rule" statute, which allows the accrual of a claim at the moment the plaintiff discovers her injury, applies only to those claims for personal injury or injury to property caused by the latent effects of exposure to any substance or combination of substances. *N.Y. C.P.L.R. 214-c*.

*Governments > Local Governments > Claims By & Against*
[HN7] Under *N.Y. Gen. Mun. Law § 50-e*, courts consider all relevant factors, including, among other things, whether the applicant has a reasonable excuse for the delay and whether the defendant public corporation acquired actual knowledge of the essential facts constituting the claim within 90 days after the claim arose or within a reasonable time thereafter.

**COUNSEL:** Gregory Antollino, New York, NY, for Plaintiff.

David Dorfman, Pro Se, New York, NY.

**JUDGES:** DENISE COTE, United States District Judge.

**OPINIONBY:** DENISE COTE

**OPINION:**

OPINION & ORDER

DENISE COTE, District Judge:

In this action, filed on October 9, 1997, the plaintiff Ricky Baker ("Baker") alleges that his former counsel, the defendant David Alan Dorfman ("Dorfman"), committed malpractice by failing to pursue Baker's claims against the City of New York (the "City") in a timely fashion. Baker has moved for partial summary judgment as to his claims for declaratory judgment and legal malpractice. For the reasons set forth below, Baker's motion is granted.

**BACKGROUND**

The undisputed facts are as follows. On or about April 1, 1993, the plaintiff Baker was tested for the human immunodeficiency virus ("HIV") by his physician, Dr. Michael Mullen, at Cabrini Hospital in Manhattan. Dr. Mullen sent the blood sample to a laboratory operated by the Department of Health of the City of New York ("DOH") for testing, and on or about [*2] April 20, 1993, Baker was informed that he was HIV-positive based upon DOH's analysis. For approximately seven months, Baker believed that he was so afflicted.

In early January 1994, Baker's physician called him to request that he make an appointment to be retested. Baker provided a new blood sample to DOH, and was informed through his physician on or about January 17, 1994, that he was in fact HIV-negative.

According to Joanne Candela, the nurse at Cabrini Hospital who discovered DOH's error in processing Baker's blood specimen, Baker's specimen, as well as those of other patients, had been confused in the laboratory during the testing process. In late 1993, after Candella had notified DOH of her concern, DOH asked her to apprise those patients who had been tested of the need to be retested. Candela then contacted Baker's physician accordingly.

On or about February 3, 1994, Baker met with and retained the defendant, an attorney, to prosecute a case against the City based upon DOH's alleged negligence in providing him with an incorrect result. Dorfman filed a notice of claim in New York State Supreme Court against the City on April 12, 1994, within 90 days after Baker learned that [*3] he was HIV-negative. Dorfman believed that Baker's cause of action accrued on the date he learned of the misdiagnosis in January 1994. Dorfman did not file a complaint against the City until March 31, 1995.

After substantial discovery in Baker's action against the City, in early 1997 Baker replaced Dorfman with his current counsel. Baker then moved for summary judgment. In response, the City also moved for summary judgment on two grounds, both based on the dilatory filing of Baker's action. First, the City argued that New York State's General Municipal Law § 50-e requires that "a Notice of Claim against a public corporation or an employee of such corporation be served within ninety (90) days of the accrual of the claim," which occurred at the time of the misdiagnosis itself. Although under certain circumstances a court may allow the filing of a late notice of claim, the City noted, the prospective plaintiff must seek leave to file a late notice within one year and ninety days of the claim's accrual, or by approximately July 20, 1994. General Municipal Law § 50-i. At no time did Dorfman seek such leave to file a late notice of claim.

The City also pointed to the fact that the complaint [*4] itself was not timely. *New York General Municipal Law § 50-i*, the statute of limitations for negligence actions against municipalities in New York State, renders untimely any such action filed later than one year and ninety days after the plaintiff's injury, unless the statute is tolled. Since the injury occurred when Baker received his first test result in the middle of April 1993, the City argued, the action had to be filed by mid-July 1994. As

Dorfman did not file Baker's complaint until March 1995, the City argued that it should be dismissed.

The Supreme Court of the County of New York dismissed Baker's complaint based upon his failure to serve a timely notice of claim or seek leave to serve a late notice of claim, and his failure to file his complaint within the applicable statute of limitations period. In doing so, the court rejected Baker's arguments that the continuous treatment doctrine should apply to toll the statute of limitations and that the City should be estopped from asserting the statute of limitations because it had not raised it earlier and on grounds of fairness. Agreeing that "the accrual doctrine often yields inequitable results in cases involving misdiagnosis [*5] or failure to diagnose," the court nonetheless concluded that "the statutory and case law precedent are abundantly clear and this court is obligated to abide by the law." On appeal, the Appellate Division unanimously affirmed the dismissal of Baker's action on timeliness grounds.

## DISCUSSION

Baker seeks summary judgment on the first and second claims in his complaint. [HN1] Summary judgment is only appropriate when the submissions of the parties, taken together, "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed.R.Civ.P. 56(c)*. The moving party bears the burden of "informing the court of the basis for its motion," and identifying those portions of the pleadings and other submissions which it believes demonstrate the absence of a genuine issue of material fact. *Fed'l Deposit Ins. Corp. v. Giammettei, 34 F.3d 51, 54 (2d Cir. 1994)*, citing *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*. When deciding a motion for summary judgment, a court must "view the evidence in a light most favorable to the non-moving party and draw all reasonable inferences in its [*6] favor." *American Casualty Co. of Reading, PA v. Nordic Leasing, Inc., 42 F.3d 725, 728 (2d Cir. 1994)*.

[HN2] When the moving party has met its burden under *Rule 56(c) of the Federal Rules of Civil Procedure*, a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)*. The opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts asserted by the movant. *Rule 56(e), Fed. R. Civ. P.*; accord *Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994)*. A "bald assertion" that is completely unsupported by evidence is not sufficient to overcome a motion for summary

judgment. *Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991)*. If no rational fact finder could find in the non-movant's favor, there is no genuine issue of material fact, and summary judgment is appropriate. See *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*.

[HN3] Under New York law, a claim [*7] for legal malpractice requires proof of three elements: (1) negligence of the attorney; (2) that the attorney's negligence was the proximate cause of the plaintiff's loss; and (3) proof of actual damages. *Davis v. Klein, 224 A.D.2d 196, 637 N.Y.S.2d 137, 139 (1st Dep't 1996)*. The relevant standard of care adopted by courts in this state is the "ordinary and reasonable skill and knowledge commonly possessed by a member of the profession." *Bernstein v. Oppenheim & Co., 160 A.D.2d 428, 554 N.Y.S.2d 487, 489 (1st Dep't 1990)*.

[HN4] While the the question of whether an attorney acted negligently normally requires a factual determination by a jury,

> a plaintiff will be entitled to summary judgment in a case where there is no conflict at all in the evidence, the defendant's conduct fell below any permissible standard of due care, and the plaintiff's conduct was not really involved.

*Logalbo v. Plishkin, Rubano & Baum, 163 A.D.2d 511, 558 N.Y.S.2d 185, 187 (2d Dep't 1990)*. Courts in this state have also resolved such cases on summary judgment where "the ordinary experience of the fact finder provides a sufficient basis for judging the adequacy of the professional service [*8] rendered." *Deitz v. Kelleher & Flink, 232 A.D.2d 943, 649 N.Y.S.2d 85, 87 (3d Dep't 1996)*.

It is undisputed that Dorfman both failed to seek leave to serve a late notice of claim to preserve Baker's underlying claims against the City and failed to file Baker's complaint until approximately eight months after the applicable statutory window for such claims against a municipality had closed. It is also undisputed that Dorfman had approximately five months after assuming the representation of Baker to seek such leave and to file the complaint. Dorfman does not contend in this proceeding that the state courts erred in deciding that the accrual date for Baker's negligence action was in April 1993, or in dismissing the lawsuit for the failure to file both an application for leave to serve a late notice of claim and the lawsuit itself within the statute of limitations period. Moreover, Dorfman acknowledges that it was entirely his "mistake for not having requested the late notice of claim." In his deposition, Dorfman

admitted that he had not done any research into the filing of a late notice of claim. Nor does Dorfman offer any excuse for these failures. To the contrary, Dorfman agreed [*9] with Baker's counsel that an attorney's failure to serve a timely notice of claim in a personal injury action constitutes a failure to exercise that degree of skill commonly exercised by ordinary members of the legal community.

[HN5] Under General Municipal Law § 50-i, all tort claims against a city must be preceded by a notice of claim served in compliance with Section 50-e, i.e., "within ninety days after the claim arises." Section 50-i requires further that the action itself "shall be commenced within one year and ninety days after the happening of the event upon which the claim is based." General Municipal Law § 50-i(c). The courts may grant a plaintiff leave to serve a late notice of claim, however, if application for such leave is made within the statute of limitations under Section 50-i(c). General Municipal Law § 50-e(5).

Apparently, Dorfman believed that the statute of limitations would be tolled because Baker did not discover the City's error until early 1994. If this were true under New York law, then the notice of claim served by Dorfman would have been timely as it was served within ninety days after Baker learned of the City's misdiagnosis.

Dorfman's understanding, however, [*10] contradicts two clear rules of New York law. First, as the New York State Supreme Court made clear in dismissing Baker's complaint, it is well established that [HN6] negligence claims accrue at the time of injury. *Jackson v. L.P. Transportation, Inc., 72 N.Y.2d 975, 976, 534 N.Y.S.2d 362, 530 N.E.2d 1282 (1988); Board of Managers of Yardarm Beach Condominium v. Vector Yardarm Corp., 109 A.D.2d 684, 487 N.Y.S.2d 17, 18 (1st Dep't 1985)*. On its face, New York State's limited "discovery rule" statute, which allows the accrual of a claim at the moment the plaintiff discovers her injury, applies only to those claims "for personal injury or injury to property caused by the latent effects of exposure to any substance or combination of substances." C.P.L.R. § 214-c (emphasis added). As already noted, Dorfman does not suggest otherwise in this action, or point to any support for any other understanding of the law.

More important is the fact that General Municipal Law Section 50-i clearly states that actions against municipalities "shall be commenced within one year and ninety days after the happening of the event upon which the claim is based." (Emphasis supplied). Even a cursory [*11] reading of this provision would have suggested to Dorfman that Baker's claim should be filed within one year and ninety days of the City's misdiagnosis in April

1993, and that he had approximately five months after assuming the representation of Baker to do so.

The Court finds that Dorfman's failure to conduct the minimal investigation necessary to determine the relevant statutory limitations for filing Baker's claims, and to file those claims in a timely manner, constitutes negligence as a matter of law. *Deitz, 649 N.Y.S.2d at 87* (failure to commence action or seek court order); *Stanski v. Ezersky, 210 A.D.2d 186, 621 N.Y.S.2d 18, 19* (1st Dep't 1994) (finding negligence as matter of law where attorney failed to effect proper service in client's action and statute of limitations subsequently barred further action); *Deb-Jo Construction, Inc. v. Westphal, 210 A.D.2d 951, 620 N.Y.S.2d 678, 679* (4th Dep't 1994) (failure to file financing statement to perfect security interest); *Logalbo, 558 N.Y.S.2d at 188* (failure to adhere to longstanding rule concerning timing of notices of cancellation); *Shaughnessy v. Baron, 151 A.D.2d 561, 542 N.Y.S.2d 341, 342* (2d Dep't 1989) **[\*12]** (failure to comply with procedural requirements of tenant client's property lease); *Katsaris v. Scelsi, 115 Misc. 2d 115, 453 N.Y.S.2d 994, 996 (Sup. Ct. 1982)* (failure to file client's appeal within time allotted).

Furthermore, there can be no question that the court would not have dismissed Baker's complaint against the City but for Dorfman's negligence. The Supreme Court dismissed the action solely on the grounds that Baker had failed to comply with the General Municipal Law's limitations as to timing. The Appellate Division unanimously affirmed the lower court's order in a brief opinion reiterating those statutory limitations.

If Dorfman had sought leave to serve a late notice of claim, moreover, there can be little doubt but that a court would have granted such leave under Section 50-e(5). [HN7] Under that provision, courts consider all relevant factors, including, among other things, whether the applicant has a reasonable excuse for the delay and whether the defendant public corporation "acquired actual knowledge of the essential facts constituting the claim within [ninety days after the claim arose] or within a reasonable time thereafter." See *Diallo v. City of New York,* **[\*13]** *224 A.D.2d 339, 638 N.Y.S.2d 58, 59* (1st Dep't 1996). Clearly, Baker had a reasonable excuse for his delay in serving a notice because he did not learn of the City's error until January 1994. Furthermore, the City learned of its error and the related circumstances substantially before Baker. If the City would have opposed Baker's application for leave to serve late notice, it could not have credibly argued any prejudice from the delay. It is thus more than likely that the court would have granted Baker leave to serve a late notice of claim to allow his action to proceed. In the end, Dorfman failed not only to seek such leave, but also to file Baker's complaint itself within the period defined by New York

law. Whatever value Baker's action promised vanished solely as the direct result of Dorfman's negligent failure to follow the law.

Dorfman counters n1 that

plaintiff counsel Antollino prosecuted plaintiff's underlying claim after he became substitute counsel. The fact that he may have prosecuted the case in a different manner or estimated a higher settlement value does not arise to an undisputed proof of negligence.

Dorfman appears to suggest that his own actions **[\*14]** did not produce the dismissal of Baker's action, or that Baker's malpractice claims amount to a dispute over legal strategy or "manner" of litigation. Nowhere in his submissions to this Court or in his deposition, however, has Dorfman suggested any intervening cause or explanation for the dismissal. The time by which Baker had to seek leave to serve a late notice of claim and by which he had to file the lawsuit had run long before he replaced Dorfman with new counsel. Dorfman's naked denial of negligence at this stage neither creates a disputed issue of material fact nor undermines the obvious conclusion that his negligence caused the dismissal of Baker's action.

n1 Dorfman's entire opposition to this motion is contained in a brief affirmation.

Dorfman's suggestion that the underlying case should have been settled is at best irrelevant. Indeed, Dorfman's negligence substantially reduced (and indeed eliminated) both the chances that the City would settle and the value to the plaintiff that the City placed on the **[\*15]** suit. In any event, the failure to settle the case is not an intervening cause of the dismissal.

As to Baker's actual damages, it is clear that Dorfman's negligence precluded Baker from recovering potentially substantial damages from the City. Dorfman does not dispute, and indeed admits, that Baker had a meritorious claim against the City. See *Harvey v. Cramer, 235 A.D.2d 315, 653 N.Y.S.2d 3, 4* (1st Dep't 1997); *Schulman v. Prudential, 226 A.D.2d 164, 640 N.Y.S.2d 112, 112* (1st Dep't 1996). It is also undisputed that Baker had obtained the favorable testimony of Joanne Candela, the nurse who investigated the City's mishandling of Baker's specimen, evidence that would have gone far toward proving the City's negligence.

In his brief affirmation submitted in opposition to Baker's motion, Dorfman denies that Baker suffered damage. Dorfman cannot use his affidavit, submitted in

opposition to this motion for summary judgment, to contest facts he conceded in his deposition. See *Buttry v. General Signal Corp., 68 F.3d 1488, 1493 (2d Cir. 1995).* In his deposition, Dorfman acknowledged not only that Baker had been damaged, but also that his claims against the City held value. Specifically, **[*16]** Dorfman stated his belief that the case should have been settled for $ 15,000 because "Ricky Baker really did suffer some damages, because he is a sympathetic individual, [and] because the City really did make a mistake." Dorfman admitted as well that he had made a settlement demand of $ 359,000 at one time during the pendency of Baker's case, although his ultimate assessment of the case was substantially lower.

In Baker's deposition during his action against the City, he testified to the injurious effects of believing that he was HIV-positive. Baker testified that he suffered serious depression, and stopped working because of the stress associated with his perceived state of health. Even after learning that he was HIV-negative in January 1994, Baker claims to have suffered nightmares, skin disorders, and required counseling as a result. While the parties may dispute the value of Baker's underlying action,

therefore, Dorfman cannot now deny that it possessed some value. Thus, Baker's loss of the ability to pursue his action, whether to settlement or to a jury verdict, constitutes actual damage caused by Dorfman's negligence alone.

## CONCLUSION

For the reasons set forth above, **[*17]** the plaintiff's motion for partial summary judgment is granted as to the plaintiff's claim for declaratory judgment and the defendant's liability for legal malpractice. The Scheduling Order filed simultaneously with this Opinion and Order shall govern the further conduct of pretrial proceedings in this action.

SO ORDERED:

Dated: New York, New York

September 17, 1998

DENISE COTE

United States District Judge