2001 Conn. Super. LEXIS 2394

## SCHEDULE B
### INSURANCE OVERHEAD PAYMENTS

| Year | Overhead Charge | Compounded at 10% to 9-30-97 |
|------|-----------------|------------------------------|
| 1984 | 451 | 1,673.75 |
| 1985 | 451 | 1,521.59 |
| 1986 | 451 | 1,383.26 |
| 1987 | 451 | 1,257.51 |
| 1988 | 451 | 1,169.78 |
| 1989 | 451 | 1,063.43 |
| 1990 | 451 | 966.76 |
| 1994 | 451 | 586.64 |
| 1995 | 451 | 533.31 |
|      |     | 10,156.03 |

## SCHEDULE B
### INSURANCE OVERHEAD PAYMENTS

| Year | Overhead Charge | Compounded at 10% to 9-30-97 |
|------|-----------------|------------------------------|
| 1984 | 451 | 1,673.75 |
| 1985 | 451 | 1,521.59 |
| 1986 | 451 | 1,383.26 |
| 1987 | 451 | 1,257.51 |
| 1988 | 451 | 1,169.78 |
| 1989 | 451 | 1,063.43 |
| 1990 | 451 | 966.76 |
| 1994 | 451 | 586.64 |
| 1995 | 451 | 533.31 |
|      |     | 10,156.03 |




Federal National Mortgage Association v. Robert Jessup

CV980169417S

SUPERIOR COURT OF CONNECTICUT, JUDICIAL DISTRICT OF STAMFORD - NORWALK, AT STAMFORD

2000 Conn. Super. LEXIS 3373

December 8, 2000, Decided
December 8, 2000, Filed

**NOTICE:**
**PUB-STATUS:** [*1] THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

**DISPOSITION:** Plaintiff's motion for summary judgment is denied and the plaintiff's motion to sever the counterclaim is granted.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff mortgagor filed a foreclosure action against defendant mortgagee, who filed a counterclaim alleging fraudulent, negligent, and innocent misrepresentation. Plaintiff moved to strike defendant's special defenses and its jury demand, to sever the counterclaim, and for summary judgment on the counterclaim.

**OVERVIEW:** After plaintiff, an assignee of the original mortgagor, sued to foreclose its mortgage, defendant mortgagee filed a counterclaim alleging fraudulent, negligent, and innocent misrepresentation, and requested a jury trial. Plaintiff's motion to strike special defenses, including misrepresentation, unclean hands, and equitable estoppel, was denied, as the rule authorizing such a motion was repealed. Plaintiff's motion for summary judgement was denied. Plaintiff stood in the shoes of its assignor and was liable for its torts. The statute of limitations was tolled under the continuing course of conduct doctrine, because plaintiff's assignor's attorney had a fiduciary relationship with and a continuing duty to defendant. Plaintiff's motion to strike defendant's jury demand was denied, as defendant's claims were based on common law, not equity, entitling it to a jury trial under Conn. Const. art. I, § 19. Plaintiff's motion to sever was granted, as defendant had no right to a jury trial in the foreclosure action.

**OUTCOME:** The motion for summary judgment was denied, as plaintiff stood in the shoes of its assignor and was liable for its torts, and the statute of limitations was tolled under the continuing course of conduct doctrine. Plaintiff's motion to sever the counterclaim was granted, as defendant was entitled to a jury trial on its legal claims, but had no right to a jury trial in the foreclosure action.

**CORE TERMS:** counterclaim, jury trial, summary judgment, judicial district, set-off, quotation, foreclosure action, statute of limitations, motion to strike, innocent misrepresentation, mortgage, equitable, common law, duty, fraudulent misrepresentation, negligent misrepresentation, continuous course of conduct, matter of law, motion to sever, fraudulent, constitutional right, special relationship, independent action, causes of action, continuing duty, genuine issue, jury list, fiduciary, tolled, motive

**LexisNexis(TM) Headnotes**

***Civil Procedure > Summary Judgment > Burdens of Production & Proof***

***Civil Procedure > Summary Judgment > Summary Judgment Standard***
[HN1]A motion for summary judgment shall be granted if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Conn. Gen. Prac. Book, R. Super. Ct. § 17-49. Any party may move for summary judgment upon any counterclaim as if it were an independent action. Section § 17-44. The party seeking summary judgment has the burden of showing the absence of any genuine issue of material facts which, under applicable principles of substantive law, entitle him to a judgment as a matter of law. The movant must make a showing that it is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact.

***Governments > Legislation > Statutes of Limitations > Statutes of Limitations Generally***
[HN2]To support a finding of a continuing course of conduct that may toll the statute of limitations there must be evidence of the breach of a duty that remained in existence after commission of the original wrong related thereto. That duty must not have terminated prior to commencement of the period allowed for bringing an action for such a wrong. Where the court has upheld a finding that a duty continues to exist after the cessation of the act or omission relied upon, there has been

  

evidence of either a special relationship between the parties giving rise to such a continuing duty or some later wrongful conduct of a defendant related to the prior act. The continuous course of conduct doctrine is conspicuously fact-bound.

*Governments > Legislation > Statutes of Limitations > Statutes of Limitations Generally*
[HN3]One type of special relationship that has been recognized in the context of the continuous course of conduct doctrine, under which a statute of limitations is tolled, is that of a fiduciary.

*Legal Ethics > Client Relations*

*Contracts Law > Contract Interpretation > Fiduciary Responsibilities*
[HN4]An attorney-client relationship imposes a fiduciary duty on the attorney. A fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other.

*Civil Procedure > Trials > Separate Trials*
[HN5]See *Conn. Gen. Stat. § 52-97.*

*Civil Procedure > Trials > Separate Trials*

*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*
[HN6]The decision to consolidate or sever the trial of different actions is within the sound discretion of the court. Factors to consider are the volume and complexity of the issues, the nature of the evidence involved in each action, and pleading issues.

*Civil Procedure > Trials > Separate Trials*

*Civil Procedure > Jury Trials > Right to Jury Trial*
[HN7]A counterclaim is an independent action for the purposes of determining whether there is a right to a jury trial, and therefore should not be considered as collateral to a foreclosure action. In the interests of preserving both the defendant's right to a jury trial on the counterclaim and the plaintiff's right to expeditious resolution of the foreclosure action, the trial court has discretion to retain the foreclosure portion of the case on the court side list, while placing the counterclaim on the jury list. In exercising that discretion, the trial court will necessarily have to weigh the possible preclusive consequences that may attach to a decision on the merits of the foreclosure action in advance of a jury trial on the counterclaim. The balancing of these various concerns is a matter for full consideration on remand.

*Civil Procedure > Pleading & Practice > Pleadings > Counterclaims & Cross-Claims*
[HN8]Set-offs are classified as either legal or equitable. Legal set-offs are creatures of statute. *Conn.*

*Gen. Stat. § 52-139* permits set-offs for mutual debts between the parties but only if the original action is an action brought for the recovery of a debt. An action for foreclosure of a mortgage is not an action on a debt. Therefore, no legal set-off applies to a foreclosure action.

*Civil Procedure > Jury Trials > Right to Jury Trial*
[HN9]The appropriate method for a challenge to a claim for jury trial is by an objection.

*Civil Procedure > Jury Trials > Actions in Equity*
[HN10]If, upon proper analysis, the trial court determines that a counterclaim is primarily legal, the defendant who asserts it is entitled, as a matter of constitutional right, to a jury trial on the counterclaim.

*Civil Procedure > Jury Trials > Right to Jury Trial*

*Civil Procedure > Jury Trials > Actions in Equity*
[HN11]Conn. Const. art. I, § 19, states that the right of trial by jury shall remain inviolate. This particular provision of the constitution has been consistently construed by Connecticut courts to mean that if there was a right to a trial by jury at the time of the adoption of the provision in 1818, then that right remains intact. The test is whether the issue raised in the action is substantially of the same nature or is such an issue as prior to 1818 would have been triable to a jury. This test requires an inquiry as to whether the course of action has roots in the common law, and if so, whether the remedy involved was one in law or equity. If the action existed at common law and involved a legal remedy, the right to a jury trial exists and the legislature may not curtail that right either directly or indirectly.

*Civil Procedure > Jury Trials > Right to Jury Trial*
[HN12]Fraudulent, negligent and innocent misrepresentation are founded on principles of common law. As such, these causes of action involve legal, not equitable, remedies. Where the nature of the claim is fraudulent misrepresentation, there is a right to a jury trial.

*Civil Procedure > Jury Trials > Right to Jury Trial*
[HN13]The majority of the superior court cases hold that there is no right to a jury trial in a foreclosure action.

**JUDGES:** HICKEY, J.

**OPINIONBY:** Hickey

**OPINION: MEMORANDUM OF DECISION**

The plaintiff Federal National Mortgage Association brought a foreclosure action against the defendants, Robert and Donna Jessup (Jessups), Beverly L. Snyder (Snyder) and the United States of America, Department of Treasury, Internal Revenue Service. Snyder is the owner and in possession of the property. The





Jessups allegedly received a loan for $ 85000 from the original lender, Progressive Consumers Federal Credit Union (Progressive). Snyder's property was security for the loan. Progressive then assigned the mortgage to Foster Mortgage Corporation (Foster) and in or around July of 1994, Foster assigned the mortgage to the plaintiff. The plaintiff alleges that as of May 1, 1992, Snyder is in default as there is an unpaid balance of $ 83630.95, plus interest from April 1, 1992 to the present as well as late charges and collection costs.

Snyder filed [*2] an answer which asserted ten special defenses and a six count counterclaim. In response, the plaintiff brought a motion to strike all the special defenses and all counts of the counterclaim. In a decision by this court, n1 plaintiff's motion to strike the special defenses alleging (1) unclean hands; (2) fraudulent misrepresentation, negligent misrepresentation, and innocent misrepresentation; and (3) equitable estoppel were denied. The plaintiff's motion to strike the first, second, and third count of the counterclaim which alleged (1) fraudulent misrepresentation; (2) negligent misrepresentation; and (3) innocent misrepresentation, respectively, was also denied.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n1 *Federal National Mortgage Assn. v. Jessup, 1999 Conn. Super. LEXIS 2154,* Superior Court, judicial district of Stamford/Norwalk at Stamford, Docket No. 169417 (August 3, 1999) (Hickey, J.).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

On July 10, 2000, Snyder filed a certificate of closed pleadings and requested a jury trial. On July 18, 2000, the plaintiff filed a motion for summary judgment on the counterclaim together [*3] with a memorandum of law. On the same date, the plaintiff filed a motion to strike Snyder's claim for a jury trial, an objection to Snyder's claim for a jury trial and a motion to sever the counterclaim and or separate trials. Snyder filed timely memoranda in opposition to all of the plaintiff's motions.

## I. Motion for summary judgment

[HN1]A motion for summary judgment shall be granted "if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Practice Book § 17-49. "Any party may move for summary judgment upon any counterclaim . . . as if it were an independent action." Practice Book § 17-44. 'The party seeking

summary judgment has the burden of showing the absence of any genuine issue of material facts which, under applicable principles of substantive law, entitle him to a judgment as a matter of law . . ." (Citations omitted; internal quotation marks omitted.) *Appleton v. Board of Education of Stonington,* 254 Conn. 205, 209, 757 A.2d 1059 (2000). "The movant must make a showing that it is quite clear what the truth is, and that [*4] excludes any real doubt as to the existence of any genuine issue of material fact." (Internal quotation marks omitted.) *Witt v. St. Vincent's Medical Center,* 252 Conn. 363, 372 n.7, 746 A.2d 753 (2000).

The plaintiff's motion for summary judgment responds to the three remaining counts of the defendant's counterclaim. The first count alleges fraudulent misrepresentation; the second count alleges negligent misrepresentation; and the third count alleges innocent misrepresentation. The plaintiff argues that the counterclaim fails to allege that the plaintiff was a party to the closing of the note or mortgage, and the counterclaim does not allege that the plaintiff was a tortfeasor. In her opposition to the summary judgment motion, Snyder argues that the plaintiff was the assignee of Progressive and therefore, may be held accountable for Progressive's actions.

This court has previously held that the plaintiff, as an assignee, stood in the shoes of Progressive. "Because the plaintiff stands in the shoes of Progressive, the defendant may assert a counterclaim against the plaintiff if that counterclaim could have been asserted against Progressive." *Federal National Mortgage [*5] Assn. v. Jessup, 1999 Conn. Super. LEXIS 2154,* Superior Court, judicial district of Stamford/Norwalk at Stamford, Docket No. 169417 (August 3, 1999) (Hickey, J.). Therefore, the plaintiff's motion for summary judgment on the basis that it was not a party to the closing of the note or mortgage is denied.

The plaintiff further argues that Snyder's counterclaim is time barred due to the statute of limitations. Snyder argues that the statute of limitations does not apply on the grounds that the statute of limitations was tolled due to the continuous course of conduct doctrine. n2 [HN2]o support a finding of a continuing course of conduct that may toll the statute of limitations there must be evidence of the breach of a duty that remained in existence after commission of the original wrong related thereto. That duty must not have terminated prior to commencement of the period allowed for bringing an action for such a wrong . . . Where we have upheld a finding that a duty continued to exist after the cessation of the act or omission relied upon, there has been evidence of either a special relationship between the parties giving rise to such a continuing duty or some later wrongful conduct of a defendant related to the [*6] prior act." (Internal quotation marks omitted.)





*Blanchette v. Barrett,* 229 *Conn.* 256, 275, 640 *A.2d* 74 *(1994).* The continuous course of conduct doctrine is "conspicuously fact-bound." *Id., 276.*

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n2 Snyder also argues that the statute of limitations does not apply to claims of recoupment and set-off. The court will not address this argument because the plaintiff is not moving for summary judgment on these claims and because resolution of the continuous course of conduct doctrine resolves the question of whether there are any genuine issues of material fact.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[HN3]"One type of special relationship that has been recognized is that of a fiduciary." *Robinson v. Van Dyck Printing Co.,* 2000 *Conn. Super. LEXIS* 1010, Superior Court, judicial district of New Haven at New Haven, Docket No. 360526 (April 25, 2000) (Devlin, J.). [HN4]An attorney-client relationship imposes a fiduciary duty on the attorney. *Beverly Hills Concepts, Inc. v. Schatz and Schatz,* 247 *Conn.* 48, 56, 717 *A.2d* 724 *(1998).* "[A] fiduciary [*7] or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other." (Internal quotation marks omitted.) *Id.* This court has previously stated that Progressive and its attorney were the sophisticated party at the closing and "knew or ought to have known exactly what was going to happen with regard to the defendant's title in the property." *Federal National Mortgage Assn. v. Jessup, supra,* 1999 *Conn. Super. LEXIS* 2154, Docket No. 169417. Snyder and Progressive's attorney were in a fiduciary relationship with a continuing duty and therefore, the statute of limitations as to fraudulent, negligent and innocent misrepresentation may be tolled. Consequently, the plaintiff's motion for summary judgment is denied as a matter of law.

Furthermore, Snyder's allegations of fraud and misrepresentation in her counterclaim raise factual issues surrounding the note and mortgage, including issues of intent and motive. "Summary judgment procedure is particularly inappropriate where the inferences which the parties seek to have drawn deal with questions of motive, [*8] intent and subjective feelings and reactions." *Miller v. Bourgoin,* 28 *Conn. App.* 491, 497, 613 *A.2d* 292, cert. denied, 223 *Conn.* 927, 614 *A.2d* 825 *(1992).* The parties' affidavits, combined with the factual allegations contained in the pleadings, establish that the present action involves complex issues of fact that are not proper for a summary judgment motion. Accordingly, the plaintiff's motion for summary judgment as to the counterclaim is denied.

*II. Motion to sever the counterclaim*

The plaintiff argues that its preference for an action in equity should not be denied because of Snyder's pending counterclaim and therefore, the foreclosure action and the counterclaim should be severed. Snyder asserts that severing the two claims precludes Snyder from her right of a set-off, and forces her to shoulder the burden and expense of two trials.

[HN5]"In any case in which several causes of action are joined in the same complaint, or as matter of counterclaim or set-off in the answer, if it appears to the court that they cannot all be conveniently heard together, the court may order a separate trial of any such cause of action . . ." *General Statutes § 52-97;* [*9] *Solomon v. Gilmore,* 248 *Conn.* 769, 772 n.7, 731 *A.2d* 280 *(1999).* [HN6]"The decision to consolidate or sever the trial of different actions is within the sound discretion of the court . . . Factors to consider are the volume and complexity of the issues, the nature of the evidence involved in each action, and pleading issues." *Middletown v. 180 Johnson Road,* 1998 *Conn. Super. LEXIS* 49, Superior Court, judicial district of Middlesex at Middletown, Docket No. 082578 (January 6, 1998) (Fineberg, J.). [HN7]"[A] counterclaim is an independent action for the purposes of determining whether there is a right to a jury trial, and therefore should not be considered as collateral to a foreclosure action." *Dime Savings Bank v. D'Agostino,* 1992 *Conn. Super. LEXIS* 2165, Superior Court, judicial district of New Haven at New Haven, Docket No. 324066 (July 20, 1992) (Celotto, J.) (7 *Conn. L. Rptr.* 133). "In the interests of preserving both the [defendant's] right to a jury trial on the counterclaim and the plaintiff's right to expeditious resolution of the foreclosure action, the trial court has discretion to retain the foreclosure portion of the case on the court side list, while placing the counterclaim on the jury list . . . In exercising [*10] that discretion, the trial court will necessarily have to weigh the possible preclusive consequences that may attach to a decision on the merits of the foreclosure action in advance of a jury trial on the counterclaim. The balancing of these various concerns is a matter for full consideration on remand." *Connecticut National Bank v. Rytman,* 241 *Conn.* 24, 54, 694 *A.2d* 1246 *(1997).*

The court finds Snyder's lack of an opportunity to achieve a set-off unpersuasive. [HN8]"Set-offs are classified as either legal or equitable . . . Legal set-offs are creatures of statute. The only remotely





pertinent set-off statute is *[General Statutes] § 52-139*. That section permits set-offs for mutual debts between the parties but only if the original action is an action brought for the recovery of a debt. An action for foreclosure of a mortgage is not an action on a debt. Therefore, no legal set-off applies . . ." (Internal quotation marks omitted.) *Wojcik v. Wojcik, 1997 Conn. Super. LEXIS 437,* Superior Court, judicial district of Windham at Putnam, Docket No. 054671 (January 30, 1997) (Sferrazza, J.) (18 Conn. L. Rptr. 603). Consequently, despite Snyder's burden of two trials, the plaintiff is entitled to hear **[*11]** its foreclosure action in a court of equity. Therefore, the plaintiff's motion to sever the counterclaim and have two separate trials is granted.

### III. Motion to strike from the jury trial list

"Former Practice Book § 282, authorizing the use of a motion to strike to remove a case from the jury list was repealed effective October 1, 1996." *Wallingford v. Reliance Ins., 2000 Conn. Super. LEXIS 134,* Superior Court, judicial district of New Haven at New Haven, Docket No. 420955 (January 13, 2000) (Silbert, J.) (26 Conn. L. Rptr. 270). Therefore, the plaintiff's motion to strike is denied.

### IV. Objection to claim for a jury trial

[HN9]"The appropriate method for a challenge to a claim for jury trial is by an objection." *Id.* The plaintiff argues that Snyder's counterclaim is equitable and therefore, Snyder has no right to a trial by jury. Snyder asserts the counterclaim is legal in nature and therefore, she may have a jury trial as a matter of constitutional right. "[HN10]If, upon proper analysis, the trial court determines that the counterclaim is primarily legal, the defendant who asserts it is entitled, as a matter of constitutional right, to a jury trial on the counterclaim." *Connecticut National Bank v. Rytman, supra,* 241 Conn. 53. **[*12]** The question for the court, therefore, is whether the nature of Snyder's counterclaim is essentially equitable or legal.

The Connecticut Supreme Court established the standard to determine if a party is entitled to a jury trial. [HN11]"The constitution of Connecticut, article first, § 19, states that "the right of trial by jury shall remain inviolate. This particular provision of our constitution has been consistently construed by Connecticut courts to mean that if there was a right to a trial by jury at the time of the adoption of the provision [in 1818], then that right remains intact." (Internal quotation marks omitted.) *Skinner v. Angliker,* 211 Conn. 370, 373,

559 A.2d 701 (1989). "The test is whether the issue raised in the action is substantially of the same nature or is such an issue as prior to 1818 would have been triable to a jury." (Internal quotation marks omitted.) *Federal Deposit Ins. Co. v. Voll,* 38 Conn. App. 198, 204, 660 A.2d 358, cert. denied, 235 Conn. 903, 665 A.2d 901 (1995). "This test requires an inquiry as to whether the course of action has roots in the common law, and if so, whether the remedy involved was one in **[*13]** law or equity. If the action existed at common law and involved a legal remedy, the right to a jury trial exists and the legislature may not curtail that right either directly or indirectly." *Skinner v. Angliker, supra,* 376.

It is well settled that the three counts of Snyder's counterclaim alleging [HN12]fraudulent, negligent and innocent misrepresentation are founded on principles of common law. See generally 3 *Restatement (Second), Torts* §§ 525 et seq., p. 53 (1977). As such, these causes of action involve legal, not equitable, remedies. *State v. Waterhouse, 1993 Conn. Super. LEXIS 2006,* Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 386011 (August 10, 1993) (Walsh, J.) (9 Conn. L. Rptr. 587) ("[Fraudulent misrepresentation] has its roots in the common law and its remedy is legal rather than equitable . . . Since the nature of the claim is fraudulent misrepresentation, there is a right to a jury trial."); *Milford v. Andresakis, 1998 Conn. Super. LEXIS 3011,* Superior Court, judicial district of Ansonia/Milford at Milford, Docket No. 047124 (October 30, 1998) (Curran, J.) (23 Conn. L. Rptr. 285) ("[A] claim for damages based upon negligent misrepresentation is legal in nature and **[*14]** may involve the right to a jury trial"). Additionally, [HN13]"the majority of the superior court cases . . . have held that there is no right to a jury trial in a foreclosure action . . ." (Internal quotation marks omitted.) *The Cadle Co. v. Batchelor, 1998 Conn. Super. LEXIS 2986,* Superior Court, judicial district of Waterbury at Waterbury, Docket No 127811 (October 21, 1998) (West, J.). Therefore, the plaintiff's objection to Snyder's claim for a jury trial is sustained as to the foreclosure and overruled as to the remaining three counts of the counterclaim.

In conclusion, the plaintiff's motion for summary judgment is denied and the plaintiff's motion to sever the counterclaim is granted. Furthermore, the plaintiff's objection to Snyder's claim for a jury trial as to the foreclosure action is sustained, and the objection as to the counterclaim is overruled.

HICKEY, J.

 


2002 Conn. Super. LEXIS 1892

Gus Efthimiou, Jr., Executor of the Estate of Eleanor C. Smith v. Richard B. Smith

X05CV00180898S

SUPERIOR COURT OF CONNECTICUT, JUDICIAL DISTRICT OF STAMFORD-NORWALK, COMPLEX LITIGATION DOCKET AT STAMFORD

2002 Conn. Super. LEXIS 1892

June 6, 2002, Decided
June 6, 2002, Filed

**NOTICE:**
**PUB-STATUS: [*1]** THIS DECISION IS UNRE-PORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

**SUBSEQUENT HISTORY:** Judgment entered by *Efthimiou v. Smith, 2002 Conn. Super. LEXIS 1924* (Conn. Super. Ct., June 6, 2002)

**DISPOSITION:** Judgment entered against the defendant in the amount of $ 5,173,066.00 plus costs which constitutes damages in the amount of $ 1,044,966.00 for the improper loans to Richard, Bruce and Westport Equities, while Richard was acting as trustee of the Trust, and damages for the $ 5,628,100.00 in trust funds that Richard cannot account for minus the $ 1,500,000.00 (for estate taxes and remediation costs) he demonstrated to be legitimate costs to the Trust.

## CASE SUMMARY

**PROCEDURAL POSTURE:** An action for breach of a settlement agreement and breach of fiduciary duty was brought by plaintiff executor of the estate of the deceased against defendant, the deceased's son. The son brought a counterclaim for breach of the same settlement agreement based on the deceased's failure to execute a will.

**OVERVIEW:** The deceased's son had two brothers. One of those brothers had sued the other two, challenging the management of the trust. The suit was settled pursuant to the terms of a settlement agreement. As part of the agreement, the deceased promised to make a will in favor of the two trustee sons. The two trustee sons agreed to the creation of a new inter vivos trust for the sole benefit of the deceased and the other son. In addition, they agreed to provide a separate bank account, solely in the deceased's name. No separate bank account was ever opened. The court held the executor demonstrated by a preponderance of the evidence that the son failed to fulfill his obligations under the settlement agreement to the deceased. However, the deceased also failed to fulfill her obligation to execute a new will. Both breaches were material and thus neither party was entitled to recover damages.

However, the son also breached his fiduciary relationship towards the deceased when he loaned money to himself, his brother, and a corporation formed by him and his brother for investment purposes in the stock market. The misuse of trust funds was a clear case of self-dealing.

**OUTCOME:** Judgment was entered against the son for damages resulting from the improper loans while the son was acting as trustee, and damages for trust funds that the son could not account for.

**CORE TERMS:** settlement agreement, mortgage, testamentary trust, execute, bank account, annually, individually, breached, lifetime, breach of fiduciary duty, income beneficiary, real estate, co-trustee, remainder, entity, corpus, funded, mutual, beneficiary, unwilling, fulfill, dollar, loaned, opened, fair dealing, power of appointment, financial statement, fiduciary duty, judgment lien, testament

**LexisNexis(TM) Headnotes**

*Contracts Law > Contract Interpretation > Interpretation Generally*
[HN1]A contract is to be construed as a whole and all relevant provisions considered together. Every provision must be given effect if it can reasonably be done, because parties do not ordinarily insert meaningless provisions in their agreements. The Connecticut Supreme Court has frowned on interpreting a contract in a way that renders a clause in the contract mere surplusage and inoperative. In interpreting contract items the language used must be accorded its common, natural, and ordinary meaning and usage.

*Contracts Law > Breach > Causes of Action*
[HN2]The standard of materiality must be applied in the light of the facts of each case in such a way as to further the purpose of securing for each party his expectation of an exchange of performances. A material as opposed to incidental breach of contract has been aptly described as one that is so important that it vitiates or destroys the entire purpose for entering into the contract.

*Contracts Law > Breach > Nonperformance*
[HN3]Where both parties to a contract are prospec-





tively unwilling to perform to a degree that the return performance otherwise owed would be excused, so that both have, in effect, repudiated the contract, neither party can recover from the other. In such a case, the order in which the performances were due by the terms of the contract is wholly immaterial.

*Contracts Law > Consideration > Mutual Obligation*
[HN4]Courts have held that in some instances where both parties are at fault, or in default, neither may recover. Whether this doctrine is described as failure of consideration, failure to satisfy a condition precedent, or mutual breach of contract, it is clear that in proper circumstances a court may refuse to allow recovery to either party to an agreement because of their mutual fault, which in contract terms might be more properly described as mutual default.

*Contracts Law > Consideration > Mutual Obligation*
[HN5]One cannot recover upon a contract unless he has fully performed his own obligation under it, has tendered performance or has some legal excuse for not performing. Mutual assent to abandon an agreement can be inferred from attendant circumstances and conduct of the parties.

*Estate, Gift & Trust Law > Wills > Testamentary Gifts*
[HN6]The promise to devise an interest in property that would occur only at the time of death is enforceable even if promised "outside" a will and/or in lieu of making a will even if the transfer is inconsistent with a prior, but properly executed will.

*Estate, Gift & Trust Law > Trusts > Trustee Duties & Powers*
[HN7]A fiduciary relationship exists where there is a justifiable trust confided in one side and a resulting superiority and influence on the other. The trustees of a trust are required to manage the trust assets so as to protect the interests of the beneficiary by guarding the trust res. Once a fiduciary relationship is found to exist, the burden of proving fair dealing properly shifts to the fiduciary. Furthermore, the standard of proof for establishing fair dealing is not the ordinary standard of fair preponderance of the evidence, but requires proof either by clear and convincing evidence, clear and satisfactory evidence or clear, convincing and unequivocal evidence.

*Estate, Gift & Trust Law > Trusts > Trustee Duties & Powers*
[HN8]It is a thoroughly well-settled equitable rule that anyone acting in a fiduciary relation shall not be permitted to make use of that relation to benefit his own personal interest. This rule is strict in its requirements and in its operation. It extends to all transactions where the individual's personal interests may be brought into conflict with his acts in the fiduciary capacity, and it works independently of the question whether there was fraud or whether there was good intention.

*Estate, Gift & Trust Law > Trusts > Trustee Duties & Powers*
[HN9]The law governing the duties of a trustee respecting investment of trust assets is well settled. Generally, a trustee must act with the care of a prudent investor. A trustee is neither the insurer nor the guarantor of the value of a trust's assets. A trustee's performance is not judged by success or failure, and while negligence may result in liability, a mere error in judgment will not.

*Estate, Gift & Trust Law > Trusts > Trustee Duties & Powers*
[HN10]A trustee who commits a breach of trust is chargeable with the amount required to restore the values of the trust estate and trust distributions to what they would have been if the trust had been properly administered. In addition, the trustee is subject to such liability as necessary to prevent the trustee from benefitting personally from the breach of trust.

**JUDGES:** CHASE T. ROGERS, SUPERIOR COURT JUDGE.

**OPINIONBY:** CHASE T. ROGERS

**OPINION:** MEMORANDUM OF DECISION

This is an action for breach of a settlement agreement and breach of fiduciary duty brought by the Executor of the estate of Eleanor Smith ("Efthimiou"") against Eleanor Smith's son, Richard Smith. The defendant, Richard Smith, has brought a counterclaim for breach of the same settlement agreement based on Eleanor Smith's failure to execute a Will.

FINDINGS OF FACT

I. The Trusts.

The court makes the following findings of fact by a preponderance of the evidence.

Eleanor [*2] C. Smith and Hyman H. Smith had three sons: Richard, Bruce and Ronald. During his lifetime, Hyman accumulated real estate holdings in Connecticut, the management and ultimate disposition of which he provided for through two trusts, the H.H. and E.C. Smith Trust (the "Trust"), an *inter vivos* trust created by Eleanor and Hyman on May 10, 1979, and a testamentary trust (the "Testamentary Trust"), created pursuant to his Last Will and Testament ("Hyman's Will"). Eleanor held a 46.89 percent interest in the Trust, which she was free to dispose of upon her death as she wished. The other 53.11 percent interest in the Trust was held during his lifetime by Hyman, and after





his death by the Testamentary Trust.

The Testamentary Trust provided that Eleanor was to be its sole income beneficiary during her lifetime and gave her a limited power of appointment over the remainder. By the terms of the Testamentary Trust, Eleanor could appoint the remainder only to her three sons or their issue, but in whatever percentages she chose.

Upon Hyman's death in September 1979, Richard was named sole trustee of the Testamentary Trust. Richard and Bruce were named as co-trustees of the Trust from [*3] its inception in 1979.

After the death of Hyman in 1979 and prior to the Settlement Agreement of 1985, Eleanor had become the sole income beneficiary of the Trust, in part, directly, by operation of the terms of the Trust itself and in part, indirectly, by operation of her status as the sole income beneficiary of the Hyman H. Smith Testamentary Trust.

II. The Settlement Agreement

This case arises out of a financial settlement agreement (the "Settlement Agreement") entered into by members of the family of Hyman H. Smith ("Hyman") to resolve federal court litigation concerning the disposition of his estate. Ronald, in a lawsuit brought in Connecticut federal court in 1983 ("the Federal Court Lawsuit"), challenged the management of the Trust by Richard and Bruce. The Federal Court Lawsuit was settled pursuant to the terms of the Family Financial Settlement Agreement, which was dated May 2, 1985. It was signed by Eleanor, individually and as executrix of Hyman's estate, Richard, individually, as co-trustee of the Trust, and as trustee of the Testamentary Trust, Bruce, individually and as co-trustee of the Trust, and Ronald.

A. The Relevant Provisions.

The Settlement [*4] Agreement contains the following provisions that are relevant to the issues presented in this case.

The seventeenth "whereas" clause of the Settlement Agreement provides: "WHEREAS, in order to resolve such disputes and differences Richard B. Smith and Bruce A. Smith as co-trustees of, and Eleanor C. Smith as sole income beneficiary of the H.H. and E.C. Smith Trust desire to amend the May 10, 1979 trust agreement in certain respects hereafter set forth[.]"

Paragraph 1 of the Settlement Agreement provides: "The H.H. and E.C. Smith Trust shall be and is hereby amended, subject to the provisions contained herein, to include the following provisions which provisions shall be contained in a separate Trust document (which the affected parties agree to execute forthwith)."

Section 1A of the Settlement Agreement provides: ". . . if the trustees act as hereafter specified without the prior approval of Eleanor C. Smith, she may discharge and replace said Trustee(s) who so act with a substitute individual trustee(s) of her own choice."

Paragraph 2A provides: "With respect to all acts hereunder where consent of Eleanor C. Smith is required . . . Any notice required to be given [*5] to Eleanor C. Smith shall be deemed sufficient if made in writing and personally delivered or mailed . . . to Eleanor C. Smith at her then current residence address, with a copy to Gus Efthimiou, Jr., Esq . . . or any other attorney of her choice."

Section 2D of the Settlement Agreement provides: "All rights granted hereunder (and throughout this agreement) to Eleanor C. Smith are strictly personal to her and shall not accrue to any fiduciary, assign or other person or entity."

Paragraph 3 provides in relevant part: "The trustees, shall, as requested, promptly provide to Eleanor C. Smith annual unaudited financial statements for the Trust . . ."

Paragraph 4A provides: "The Trustees shall (monthly) pay over to Eleanor C. Smith as income beneficiary of the Hyman H. Smith testamentary trust and as income beneficiary of The H.H. And E.C. Smith Trust at an annual rate which together with income from the Hyman H. testamentary trust will equal or exceed $ 100,000."

Paragraph 4D of the Settlement Agreement provides: "Providing that they survive Eleanor C. Smith, Richard B. Smith and Bruce A. Smith are hereby, each to the extent of an undivided interest of 50 percent, irrevocably [*6] made the remainder men of The H.H. and E.C. Smith Trust; in the event of the death of either Richard B. Smith or Bruce A. Smith prior to the death of Eleanor C. Smith, the survivor shall be the sole remainder man of said Trust; unless Richard B. Smith and Bruce A. Smith shall both predecease Eleanor C. Smith, any interest of any other successor or assign of Eleanor C. Smith is hereby eliminated. If both Richard B. Smith and Bruce A. Smith shall predecease Eleanor C. Smith, then the interest of Richard B. Smith and Bruce A. Smith shall then be extinguished, the Trust shall be deemed terminated, and the assets of the Trust shall revert and be paid to Eleanor C. Smith."





The first sentence of Section 4E of the Settlement Agreement reads: "During their lives, Richard B. Smith and Bruce A. Smith are hereby made income beneficiaries of the Trust to the extent that each shall be entitled to receive income from the Trust equal to income received by Eleanor C. Smith in excess of $ 100,000 annually . . ."

Paragraph 4F provides in relevant part: "Eleanor C. Smith, in addition to the other income of the Trust provided for, she shall be entitled to withdraw annually from the corpus of [*7] the Trust an amount of no more than 5 percent of the fair market value of the Trust Assets . . ."

Paragraph 5 of the Settlement Agreement provides: "In the event of the death or legal incapacity or legal incompetency of either Richard B. Smith or Bruce A. Smith during the existence of the Trust, the surviving trustee shall be the sole trustee . . ."

Paragraph 6A of the Settlement Agreement provides: "As used herein, Restricted Estate shall mean the Eleanor C. Smith's assets consisting of any direct or indirect, legal or beneficial interest in: any trust, real property and improvements thereon (other than 238 Curtis Terrace, Fairfield, Connecticut), or of any existing financial obligation to her by Richard B. Smith and/or Bruce A. Smith or their successors or assigns, which she possesses as of the date hereof; specifically included are all present and prospective interests of Eleanor C. Smith in The H.H. and E.C. Smith Trust, The H.H. Smith Testamentary Trust, The H.H. and E.C. Smith Trust itself, and the power of appointment made and provided by the Last Will and Testament of Hyman H. Smith, dated December 10, 1974. Specifically excluded from the 'Restricted Estate' is [sic]  [*8] the following:

1. The E.C. and R.K. Smith Trust.

2. Any and all bank accounts of Eleanor C. Smith whether checking or saving [sic] or cash on hand . . .

Unless the property and/or property rights of Eleanor C. Smith are expressly excluded herein above, they will be deemed to be part of the 'Restricted Estate.' "

Paragraph 6B of the Settlement Agreement provides: "Upon the death of Eleanor C. Smith, the Restricted Estate of Eleanor C. Smith, real, personal and mixed, of whatever nature and wherever situated, which she now owns, including the power of appointment, shall pass to, and/or be exercised in favor of, Richard B. Smith and Bruce A. Smith in equal undivided shares, or to the survivor of Richard B. Smith and Bruce A. Smith, but this obligation upon Eleanor C. Smith shall

terminate if Richard B. Smith and Bruce A. Smith predecease her."

Section 6C of the Settlement Agreement provides: "Ronald K. Smith, in accepting the terms of this agreement, voluntarily disclaims his rights in and succession to any interest in The H.H. and E.C. Smith Trust, the Estate of Hyman H. Smith, the Hyman H. Smith testamentary trust and the aforesaid 'Restricted Estate' in favor [*9] of his interest in the E.C. and R.K. Smith Trust."

Section 8 of the Settlement Agreement provides: "The termination date provided in the H.H. and E.C. Smith Trust is modified as may be necessary to carry out the purposes of this Agreement so that in no event shall it terminate during the lifetime of Eleanor C. Smith, and in no event shall it extend beyond 15 years of the lifetime of Eleanor C. Smith. The trustees shall have no obligation to extend the existence of the trust beyond the lifetime of Eleanor C. Smith."

Section 9 of the Settlement Agreement provides: "Except as otherwise provided in the agreement, Eleanor C. Smith shall be entitled to give, devise, bequeath and dispose of her estate as she shall determine except for the 'Restricted Estate' as defined herein above [sic] . . ."

Section 10 of the Settlement Agreement provides: "Eleanor C. Smith shall duly and promptly execute a last will and testament exbodying [sic] this Agreement to make a will, and after such execution shall not alter or revoke any of the provisions thereof which embody and/or fulfill the provisions of this Agreement without the written consent of all parties to this Agreement (excepting [*10] that Ronald K. Smith's consent shall not be required with respect to the provisions relating to the H.H. and E.C. Smith Trust). A true duplicate original copy of said last will and testament shall be provided promptly to Richard B. Smith and Bruce A. Smith, together with all codicils or replacements thereof which may be subsequently signed by Eleanor C. Smith . . . This covenant to make a will shall be independent of all other covenants and undertakings contained in this Agreement and shall be independently enforceable, regardless of the claimed or actual invalidity or unenforceability of any other term or provision of this Agreement . . .

2. If any provision of the will of Eleanor C. Smith is invalid or is held illegal or unenforceable then, notwithstanding any invalidity, illegality, or unenforceability of such provision, the remainder of the will shall subsist and shall be in full force and effect as though such invalid, illegal or unenforceable provision had been omitted from the will."



Paragraph 11 of the Settlement Agreement provides: "Simultaneously with the complete execution of this Agreement the co-trustees shall, from the assets of The H.H. and E.C. Smith Trust, **[*11]** transfer $ 1,000,000 in cash, in trust to Eleanor C. Smith and Ronald K. Smith, co-trustees of The E.C. and R.K. Smith Trust.

A. $ 1,000,000. shall be paid in cash or cashier's check endorsed "for deposit only" to the E.C. and R.K. Smith Trust and delivered in trust to Ronald K. Smith at the time of complete execution of this agreement by all of the parties hereto.

Section 13 of the Settlement Agreement provides: "The H.H. and E.C. Smith Trust shall indemnify Ronald K. Smith individually and as trustee of the E.C. and R.K. Smith Trust, and shall hold him completely free and harmless from, attorneys fees up to a maximum limit of $ 200,000 . . ."

Section 15 of the Settlement Agreement provides: "Each party hereto irrevocably assigns and hereby transfers to each other party hereto any property, benefit or asset whatsoever, direct or indirect, tangible or intangible, presently or hereafter received by him or her contrary to the terms and provisions of this Agreement, the assignment and transfer provided herein to consist of that which should have been received by each assignee and transferee had there been compliance with the mandates of this Agreement."

Section 18b. **[*12]** of the Settlement Agreement provides: "This Agreement represents the entire agreement of the parties with respect to the subject matter hereof and may not be changed or terminated orally but must be done, if at all, in writing signed by all of the interested parties (except as provided above in paragraph 10A)."

Section 18s. of the Settlement Agreement provides: "The terms and provisions of the H.H. and E.C. Smith Trust of 1979, to the extent they are not in conflict with the terms and provisions of this agreement shall remain in full force and effect, are incorporated herein by reference and are ratified and affirmed by the parties as if recited at length, this provisions shall apply to the E.C. and R.K. Smith Trust to the extent applicable. If the terms of this agreement shall be in conflict with the terms of the H.H. and E.C. Smith Trust of 1979, the provisions of this agreement shall control and supercede [sic]." *Id.*

Section 18u. of the Settlement Agreement provides: "If any acts occur which would be considered a material breach of this agreement, then the aggrieved party shall give written notice to said trustee(s). Said trustee(s) shall then have 30 days after **[*13]** such notice in which to fully cure said breach, in which event Eleanor C. Smith, if she is the aggrieved party, shall not have any right to replace or substitute said trustee(s). This provision shall not apply to acts of the trustees characterized by malice, fraud, or criminal misconduct."

Section 18v. provides that: "Any and all sums payable under this agreement to Eleanor C. Smith shall be paid to her without prior notice or demand by her. At her request, the H.H. and E.C. Smith Trust shall establish a bank account on which she is the authorized signatory, and shall fund such account with $ 50,000; the trustees shall then deposit any sums due hereunder into said account . . ."

B. The Parties' Lack of Compliance with the Terms of the Agreement

Accordingly, as part of the Settlement Agreement, Eleanor Smith promised to make a will in favor of her sons Richard B. Smith and Bruce A. Smith and to bequeath to Richard and Bruce all of her interest in the Trust and the Testamentary Trust, and to execute her power of appointment under Hyman's Will in favor of Richard and Bruce.

In exchange for this promise, Richard and Bruce agreed to the creation of a new *inter vivos* **[*14]** trust for the sole benefit of Eleanor and Ronald K. Smith ("Ronald") which would be funded with the payment of $ 1,000,000 from the Trust.

The new trust for the sole benefit of Eleanor and Ronald was created and a million dollars was transferred from the Trust to the new trust for Ronald and Eleanor. In addition, Richard and Bruce, as trustees of the Trust, agreed to provide a separate bank account, solely in Eleanor Smith's name, initially funded with fifty thousand dollars. The Settlement Agreement also provided that Eleanor would receive one hundred thousand dollars, prorated monthly, on an annual tax-free basis. Additionally, Eleanor Smith was to receive annual distributions of five percent of the corpus of the Trust.

On or about July 9, 1985, only two months after the Settlement Agreement was signed, Eleanor Smith met with Gus Efthimiou, Jr., at which time she executed a continuing demand letter asking that the separate checking account be set up with the $ 50,000 deposit and that she receive period accountings pursuant to the terms of the Settlement Agreement. She also executed a letter in which she demanded that she receive 5% of the corpus of the trust annually.





On [*15] or about August 23, 1985, Mr. Efthimiou hand-delivered the July 9, 1985 letters to Richard and Bruce Smith in the presence of Eleanor. Richard Smith reacted by yelling at Eleanor that she would never see her grandchildren again and that she would not see him again unless it was in court.

No separate bank account was ever opened for Eleanor. There was also no credible evidence submitted that Eleanor ever received for her personal use the initial fifty thousand dollars, the one hundred thousand dollars annually and the 5% of the corpus of the Trust annually. Richard, as trustee of the Trust, was unable to provide any records evidencing payments to Eleanor. n1

- - - - - - - - - - - - - Footnotes - - - - - - -
- - - - - - - -

n1 There were some checks, totaling approximately $ 200,000 (Eleanor would have been entitled to approximately $ 1,000,000 plus 5% annually of the Corpus under the terms of the Agreement) submitted into evidence which were made payable to E.C. Smith and E.C. Smith executrix for the estate of Hyman Smith. However, they were signed by Richard and deposited into accounts that Richard and Bruce shared with Eleanor. Eleanor's signature does not appear on these checks. Given these circumstances, the court does not find that Eleanor received these payments for her personal use.

- - - - - - - - - - - End Footnotes- - - - -
- - - - - - - -

[*16]

Eleanor Smith never executed a new Will. She told her attorney that she would not execute a new will because Richard and Bruce would not keep their promises. The will submitted to probate in her name in 1995 was instead one that predated the Settlement Agreement. It named Ronald as the sole beneficiary as to all property, including the property that was the subject of the 1985 Agreement. She bequeathed to Richard and Bruce the sum of one ($ 1.00) dollar each.

On January 24, 1996, the Probate Court for the District of Fairfield ordered Eleanor's Will admitted to probate and appointed Attorney Efthimiou as Executor of Eleanor's Estate. These rulings were affirmed on appeal to the Superior Court. The court concluded that the Settlement Agreement could not itself function

as a will, but as only a contract to make a will.

III. The Trustees' handling of the Trust

The court makes the following findings of fact by clear and convincing evidence. The Trust came into existence on May 10, 1979. The purpose of the Trust was to turn over management of various pieces of commercial real estate to the Trustees, Richard and Bruce Smith. n2

- - - - - - - - - - - - - Footnotes - - - - - - -
- - - - - - - -

n2 Bruce Smith died of a self-inflicted gunshot wound in 1996 at which time Richard Smith became the sole remaining trustee of the Trust.

- - - - - - - - - - - End Footnotes- - - - -
- - - - - - - -

[*17]

The value of the real estate at the inception of the Trust was approximately $ 1,500,000 and the mortgages on the property totaled approximately $ 731,000. As of January 1, 1986, the properties had been valued for internal purposes at approximately $ 12,000,000 and the mortgages totaled approximately $ 2,000,000. On or about May 30, 1986, Richard and Bruce Smith, acting as trustees, placed a mortgage for $ 2,100,000.00 on one of the pieces of property in the Trust, 540 New Haven Avenue, Milford, Connecticut. Three days later, on June 2, 1986, Richard and Bruce Smith, acting as Trustees of the H.H. and E.C. Smith Trust purchased real property at 1071 Post Road, Westport, Connecticut for the purchase price of $ 2,100,000.00.

On June 26, 1986, Richard A. Smith "as attorney for and Trustee" executed a quitclaim deed which conveyed from the H.H. and E.C. Smith Trust the property at 1071 Post Road, Westport to the H.H. and E.C. Smith Trust for the life of Eleanor Smith and then to Richard and Bruce Smith individually and as tenants in common.

On September 9, 1986, Richard B. Smith and Bruce A. Smith as Trustees of the H.H. and E.C. Smith Trust mortgaged the real property at [*18] 1071 Post Road, Westport, Connecticut to First Federal Bank for $ 1,900,000.00. The same day the Trustees mortgaged the property at 540 New Haven Avenue, Milford, Connecticut from First Federal for $ 2,400,000.00

By mortgaging the property at 1071 Post Road, Westport for $ 1,900,000.00 and on the same day mort-





gaging the property at 540 New Haven Avenue, Milford, Connecticut for $ 2,400,000.00, the Trustees received $ 4,300,000.00 of mortgage proceeds. After deducting the price of the Westport property of $ 2,100,000.00, the Trustees received net mortgage proceeds of $ 2,200,000.00. Richard Smith, as trustee of the Trust, was unable to provide records of what happened to these proceeds.

Webster Bank instituted foreclosure proceedings on 1071 Post Road East, Westport, Connecticut on May 20, 1996. This property was ultimately lost in foreclosure.

By December 31, 1987, the value of the real estate in the Trust was listed at approximately $ 3,700,000 and the mortgages on the properties totaled approximately $ 4,200,000. The 1987 financial statement also reflects an asset listed as "due from beneficiary" in the amount of $ 2,909,313. This "asset" constitutes excess distribution [*19] over the income to the Trust to some person or entity. Richard Smith, as trustee and record keeper for the Trust, could not account for this money.

On February 1, 1988, Richard and Bruce Smith, acting as trustees placed a $ 750,000 mortgage on another piece of Trust property, 1602 Boston Post Road, Milford, Connecticut. Ultimately, this property at 1602 Boston Post Road, was sold in lieu of foreclosure on September 3, 1996.

Richard and Bruce Smith, acting as trustees, placed the following mortgages on another piece of Trust property, 65-145 Furniture Row, Milford, Connecticut: $ 1,000,000 mortgage Colonial Bank; $ 1,250,000 mortgage First Federal Bank (now known as Webster Bank); $ 2,250,000 mortgage First Federal Bank; $ 1,500,000 mortgage Bank of Boston; and $ 4,500,000 mortgage All American Life Insurance. Ultimately, this property was lost in foreclosure on December 31, 1996 to All American Life Insurance.

Richard and Bruce Smith, acting as trustees, also placed a $ 500,000 mortgage on 20 Furniture Row, Milford, Connecticut from Bank of New Haven.

Finally, Richard Smith and Bruce Smith allowed Eleanor Smith to place a $ 200,000 mortgage on 238 Curtis Terrace, [*20] on July 19, 1990. The proceeds were placed in the Trust. 238 Curtis Terrace, Fairfield, Connecticut was Eleanor Smith's family home that she owned, individually; free and clear of encumbrances. This property was ultimately foreclosed on in 1996.

The 1994 financial statement for the Trust reflects the properties' value at $ 4,509,681 and the mortgages

payable at $ 8,482,869. n3

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n3 Between May 2, 1985 and February 19, 1994, Mrs. Smith did communicate with her sons, Richard and Bruce Smith, concerning trust business and did execute written consents to certain transactions being carried out (e.g. mortgages) concerning trust properties.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

The Trust, during the period 1985-1994, incurred expenses of between $ 700,000 and $ 900,000 on account of Hyman Smith's estate taxes. The Trust, during the period 1985-1994, incurred expenses of between $ 400,000 and $ 600,000 in pollution remediation expenses.

By 1994 the "asset" listed as "Due from beneficiary" which was an excess distribution to some entity or person [*21] by the Trust had ballooned to approximately $ 5,628,100. This distribution still could not be accounted for by Richard Smith.

In sum, between 1985 and 1994, Richard put mortgages on all of the properties in the Trust. As of 2002, the only property that has not been foreclosed upon, lost in legal proceedings, or sold in lieu of foreclosure is located at 20 Furniture Row. It is currently valued at approximately $ 250,000 without taking into account liens and pollution problems. The Trust has minimal cash funds.

C. Loans to NEIT Trust

New England Investment Trust (NEIT) is an entity that was created and operated by Richard and Bruce Smith. Richard and Bruce Smith, as trustees, of the H.H. & E.C. Smith Trust loaned $ 2,389,150.00 to New England Investment Trust. Richard Smith also acted as the trustee of the New England Investment Trust in obtaining these unsecured loans from the H.H. and E.C. Smith Trust. The New England Investment Trust was supposed to be an investment vehicle for the H.H. and E.C. Smith Trust. Richard Smith never received a written consent from Eleanor to use the Trust funds for this purpose. Richard Smith also never sought or received permission from [*22] the Probate Court to make loans on behalf of H.H. and E. C. Smith Trust to NEIT.

 LexisNexis™     LexisNexis™     LexisNexis™

NEIT participated in a series of transactions, including making loans directly to Richard Smith and Bruce Smith in the amount of $ 388,203.17 and $ 273,000 respectively. The NEIT trust also loaned to Westport Equities the amount of $ 383,763.20. Westport Equities, Inc. was a corporation formed by Richard and Bruce Smith to invest Trust monies in the stock market. Eleanor Smith never consented in writing to the Trust indirectly making loans to Richard and Bruce or making loans to their corporation, Westport Equities.

The four investment entities, NEIT, Westport Equities, Richard Smith and Bruce Smith individually invested in risky positions in the market. The Trust financial statement of December 31, 1994 reflects an outstanding balance on the loan receivable from NEIT to the Trust in the approximate amount of $ 1.8 million. Richard Smith testified that the monies loaned to NEIT could have come from mortgages placed on the properties at 65-145 Furniture Row and 540-550 New Haven Avenue, Milford, as well as 1071 Post Road East, Westport. No interest on the loans from the H.H. and E.C. Smith Trust [*23] to NEIT was ever paid or reported.

D. The Westville Trust

On or about April 21, 1993, Richard Smith established the Westville Trust with his then wife, Jody Smith, acting as Trustee. Upon the death of Eleanor Smith on February 19, 1994, a portion of the proceeds of her life insurance in the approximate amount of $ 450,000.00 was transferred to the Westville Trust.

On January 12, 1995 through September 19, 1995, Richard Smith, as Trustee of the H.H. & E.C. Smith Trust, borrowed the principal sum of $ 407,250.00 from the Westville Trust. These loans were evidenced in a series of sixteen (16) unsecured promissory notes from The H.H. and E.C. Trust to the Westville Trust. No payment was made by the Trust on any of the sixteen (16) notes. The loans were not repaid because the Trust lacked the cash to repay them.

On October 16, 1996, Jody Smith, as Trustee of the Westville Trust, brought an action against Richard B. Smith Trustee of the Hyman H. Smith and Eleanor C. Smith Trust to collect the sixteen (16) loans. As part of this action, Jody Smith secured a real estate attachment on four parcels of Trust land including the entire parcel of land at 540 and 550 New Haven [*24] Avenue, Milford.

Richard Smith did not contest this action because the Trust did not have any defense, and on December 16, 1996, the Superior Court for the Judicial District of Fairfield, defaulted the H.H. and E.C. Smith Trust for failure to disclose a defense.

On March 6, 1997, the Westville Trust secured a judgment in the amount of $ 407,250.00 in damages, $ 72,745.94 in interest, $ 2,115.00 in attorneys fees and $ 467.40 in costs against the H.H. and E.C. Smith Trust.

Jody and Richard were divorced in November of 1997.

On February 16, 1998, Jody caused Vorlon Holding LLC to be formed and on March 4, 1998, she assigned the judgment lien on the Trust property to Vorlon. From January 1998 through June 1998, in anticipation of Vorlon taking title to the property, Jody Smith advanced monies to fund the renovation of 540 New Haven Avenue for the construction of self-storage units. Jody Smith drew multiple checks on her personal checking account in the total amount of approximately $ 500,000.00. Richard Smith worked as a general contractor for Vorlon Holdings, LLC and Deep Space 1, LLC, another limited liability company of which Jody Smith is the only member, in the [*25] construction and management of the self storage facility, Easy Access Storage. Deep Space 1, doing business as Easy Access Storage or Access Storage opened its doors to the public on June 29, 1998.

One month later, on July 24, 1998, Jody Smith, acting as Trustee of the Westville Trust and as a member of Vorlon Holding, LLC, entered into a settlement agreement with Richard B. Smith, Trustee of the H.H. and E.C. Smith Trust, in connection with the judgment obtained by the Westville Trust. She negotiated and compromised the judgment lien by agreeing to take title to only two of the four liened parcels. By the terms of the Settlement Agreement of July 24, 1998, the H.H. and E.C. Smith Trust conveyed the property located at 540 and 550 New Haven Avenue, Milford, Connecticut to Vorlon. Vorlon Holdings, L.L.C. also received title to 15 Old Gate Lane, Milford, Connecticut in satisfaction of this judgment lien. n4

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n4 In 1999, the Milford Tax Assessor estimated the appraisal value of 540 New Haven Avenue to be $ 2,100,000.00 and the assessed value to be $ 1,420,090. However, the property is subject to City of Milford taxes in the amount of $ 558,688.92 for 540 New Haven Avenue and $ 20,131,98 for 550 New Haven Avenue. It is also subject to a mortgage in the amount of $ 300,000.00 to the Webster Bank, and it





also has possible serious environmental remediation costs. In addition, Jody Smith invested approximately $ 500,000 of her own money to improve the property. The court finds that actual value of this property with its liens and pollution problems is significantly below the existing amount of the judgment.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[*26]

Jody Smith or her companies currently derive net income of approximately $ 70,000 to $ 80,000 per year.

Richard B. Smith presently resides at 550 New Haven Avenue. He receives use of the property and does work for Easy Access Self Storage in lieu of paying rent.

Discussion of Law

I. Breach of the Settlement Agreement

Both the plaintiff, Efthimiou, as executor of Eleanor's estate, and the Defendant, Richard Smith, have brought claims for breach of the Settlement Agreement. Specifically, plaintiff claims that Richard failed to provide Eleanor with a separate bank account of her own and that he failed to deposit into this account an initial $ 50,000 and then $ 100,000 annually thereafter. In addition, he claims that Eleanor was not given 5% of the corpus trust annually as demanded by her beginning in August of 1985. Richard Smith counterclaims that Eleanor failed to execute a new will that would have left all of her interest in the Trust to him.

Plaintiff has demonstrated by a preponderance of the evidence that Richard failed to fulfill his obligations under the Settlement Agreement to his mother.

[HN1]"A contract is to be construed as a whole and all relevant [*27] provisions considered together . . ." (Internal quotation marks omitted.) *HLO Land Ownership Associates Ltd. Partnership v. Hartford, 248 Conn. 350, 356 (1999).* "Every provision must be given effect if it can reasonably be done, because parties do not ordinarily insert meaningless provisions in their agreements." (Internal quotation marks omitted.) *Plikus v. Connecticut Light and Power Co., 42 Conn.App. 299, 303, 679 A.2d 401 (1996).* "Our Supreme Court has frowned on interpreting a contract in a way that renders a clause in the contract mere surplusage and inoperative." *Patron v. Konover, 35 Conn.App. 504, 518, 646 A.2d 901, cert. denied, 231 Conn. 929, 648 A.2d 879 (1994).* "In interpret-

ing contract items the language used must be accorded its common, natural, and ordinary meaning and usage . . ." (Internal quotation marks omitted.) *HLO Land Ownership Associates Ltd. v. Hartford, supra, 248 Conn. 357.*

Section 18v of the Settlement Agreement clearly provided that Eleanor was to have her own bank account and that it was to be funded with substantial and regular disbursements from the Trust. Given the [*28] history of feuding among her children regarding money, it is no surprise that she wanted the independence of her own bank account and her own private source of funds. The court finds that these provisions were a material obligation under the contract. n5 In this regard, [HN2]"the standard of materiality must be applied in the light of the facts of each case in such a way as to further the purpose of securing for each party his expectation of an exchange of performances." *669 Atlantic Street Associates v. Atlantic-Rockland Stamford Associates, 43 Conn.App. 113, 128 (1996).* "A material as opposed to incidental breach of contract has been aptly described as one that is 'so important that it vitiates or destroys the entire purpose for entering into the contract.' " *Carlyle Johnson Machine Co., LLC v. April, 2000 Conn. Super. LEXIS 403, 2000 WL 234311 (February 10, 2000) (Shortall, J.),* quoting *A. Prete & Son Construction v. Madison,* Superior Court., J.D. of New Haven at New Haven, Docket No. 3103073 (October 4, 1994) (Healey, J.). Here the failure to set up the $ 50,000 checking account and to fund it as provided under the Agreement was material.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n5 The payment of the $ 1,000,000 was also a material obligation under the agreement that was fulfilled by Richard. However, it was only one of several obligations and it primarily inured to the benefit of Ronald who is not a party to this lawsuit. (Eleanor already was the beneficiary of this $ 1,000,000 when it was in the Trust.) The obligations of payments directly to Eleanor also constituted material obligations under the Settlement Agreement.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[*29]

The court also finds that Eleanor was unwilling to execute a new will because she did not believe that Richard was going to fulfill his obligations to her under the





Settlement Agreement. She was correct in this belief. Although she lived for nine years after the Settlement Agreement was signed, Richard never opened a separate account for her and he never funded it.

Defendant, Richard, has also proven by a preponderance of the evidence his counterclaim that Eleanor failed to fulfill her obligation to execute a new Will consistent with the terms of the Settlement Agreement. This was also a material obligation under the Settlement Agreement.

Richard's testimony that he never checked to see if she executed a new Will and that he did not want to bother his mother about this was not credible. He was entitled to a copy of the Will upon its execution under the terms of the Settlement Agreement. Richard and his brother Ronald had fought for years over money and it was only after federal litigation was instituted that the parties entered into the Settlement Agreement which was supposed to resolve once and for all these financial issues. Instead, the court finds that Richard believed [*30] that his mother was not going to fulfill her obligation under the Agreement to execute a new Will. In fact, he testified that he believed a Will would have been of no consequence because Eleanor could have changed it. Additionally, it is clear from Richard's conduct that he did what he could to make sure that some assets that were initially funded by Trust money passed to him outside of the Trust. Examples of this conduct include the Westport property, which if it had not been foreclosed upon, would have passed directly to him outside of the Trust upon Eleanor's death. Likewise, he personally received funds that had been loaned from the Trust to the NEIT Trust for his personal investment.

In sum, both Eleanor and Richard were unwilling to perform their obligations under the Settlement Agreement. Unlike some cases where the issue for the court to decide is which party materially breached first, the court does not believe that would be appropriate here for several reasons. First, the Settlement Agreement did not address whether the Will was to be executed before the bank account for Eleanor was opened and initially funded. n6

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n6 The will was to be executed "promptly" pursuant to Section 10 and the prorated share of the annual 100,000 was to be paid monthly pursuant to Section 4A. The bank account was to be opened upon demand which demand occurred on August 24, 1985. Any and all sums payable to her were to be

without prior notice or demand pursuant to 18v. However, if the court had to determine which party breached first it would find that the defendant breached first by not opening the account and funding it and that Eleanor was therefore unwilling to execute a new Will.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

[*31]

More importantly, the question of which party breached first appears to be immaterial. [HN3]Where both parties to a contract are prospectively unwilling to perform ". . . to a degree that the return performance otherwise owed would be excused, so that both have, in effect, repudiated the contract, neither party can recover from the other. In such a case, the order in which the performances were due by the terms of the contract is wholly immaterial." See 15 Williston, Contracts § 43:31 (4th ed. 2000).

This is a case where both parties are in mutual breach of the Settlement Agreement and therefore are not entitled to recover damages. [HN4]"Courts have held that in some instances where both parties are at fault (or in default) neither may recover . . . whether this doctrine is described as failure of consideration, failure to satisfy a condition precedent, or mutual breach of contract, it is clear that in proper circumstances a court may refuse to allow recovery to either party to an agreement because of their mutual fault, which in contract terms might be more properly described as mutual default."(Citations omitted.) *Westinghouse Electric Corp. v. Garrett Corp.*, 601 F.2d 155 (4th Cir. 1979). [*32] See also, *Restatement (Second) of Contracts* § 244.

Additionally, it is well-settled Connecticut law that [HN5]"one cannot recover upon a contract unless he has fully performed his own obligation under it, has tendered performance or has some legal excuse for not performing." *Automobile Insurance Co. v. Model Family Laundries, Inc.*, 133 Conn. 433, 437, 52 A.2d 137 (1947). Finally, mutual assent to abandon an agreement can be inferred from attendant circumstances and conduct of the parties. *Jazlowiecki v. Nicoletti*, 34 Conn.Sup. 670, 672, 387 A.2d 1081 (1970).

The circumstances of this case demonstrate that because of a mutual distrust between mother and son, both were unwilling to perform their obligations under the Settlement Agreement. Accordingly, the court





finds that both the plaintiff and the defendant are not entitled to recover on their claims for breach of the Settlement Agreement. n7

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n7 Defendant claims that even if there was a breach by Richard and/or Bruce, this did not excuse Eleanor from making a will that conformed to her promises in the Agreement, for that obligation was "independent of all other covenants and undertakings contained in this Agreement." This clause, however, addresses the situation where certain terms in the Agreement may be found invalid. It does not address or pertain to the present situation where the court has found that the defendant failed to perform his obligations and therefore cannot recover under the Agreement.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - -

[*33]

II. Breach of Fiduciary Duties Based on the Trust.

The sole remaining claim is whether the defendant, Richard Smith, breached his fiduciary duty under the Trust. n8

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n8 The court has already found that plaintiff cannot recover under the Settlement Agreement. Accordingly, plaintiff cannot pursue a breach of fiduciary duty claim based on the settlement agreement either. Plaintiff specifically alleged, however, that he was also claiming breach of fiduciary duty to the plaintiff by acting in a manner contrary to the provisions of the Trust. The court notes that if the settlement agreement was enforceable by the plaintiff, the Trust property remained in Eleanor's estate and the Trust continued to exist both after the settlement agreement was signed and after Eleanor's death. Defendant claims that the Agreement irrevocably made Richard and Bruce Smith the remainder men of the Trust, such that the Trust assets never became part of Eleanor Smith's estate. As a result, defendant claims that the Executor of the Estate cannot complain about the management of these assets. Plain-

tiff claims that the settlement agreement makes clear that the Trust property was only intended to pass to Richard by will and since Eleanor never executed a new will the Trust property remained in her estate. [HN6]The promise to devise an interest in property that would occur only at the time of death is enforceable even if promised "outside" a will and/or in lieu of making a will even if the transfer is inconsistent with a prior, but properly executed will. *See Bowen v. Morgillo, 127 Conn. 161, 14 A.2d 724 (1940)* ("One may transfer property in such a way that interests in it will arise only at his death, and he may transfer it in contemplation of his death, in lieu of making a will; but to be valid such transfers must convey a present interest"). "The intent of the transferrer, whether to convey a present interest or to make a disposition of his property to take effect only at his death, is the controlling element in determining the validity of a transfer." *Id. at 167* (citations omitted). The agreement is ambiguous as to whether Eleanor was attempting to convey a present interest in the Trust to Richard or whether she planned to have this interest pass only through a will. (See paragraphs 1, 4D, 6A, 6B, 8, 9, 10, 15.) Accordingly, the court must turn to parol evidence to determine the intent of the parties. After the Settlement Agreement was signed, Richard continued to place mortgages on trust property in his capacity as trustee of the Trust. After Eleanor's death, Richard continued to treat the parcels of real estate as property still belonging to the Trust and Eleanor's estate. By way of example, he signed the sixteen promissory notes to the Westville Trust as Trustee of the Trust. Additionally, he quitclaimed the deed that was the subject of the judgment lien as "Richard Smith, Trustee." This conduct makes clear that Richard understood that the Trust property remained in the Trust after Eleanor's death.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - -

[*34]

As trustees of the Trust, Richard and Bruce had a fiduciary relationship with Eleanor who was the sole beneficiary under the Trust. [HN7]Such a relationship





exists where there is "a justifiable trust confided in one side and a resulting superiority and influence on the other." *Dunham v. Dunham, 204 Conn. 303, 320, 528 A.2d 1123 (1987).* As trustees of the Trust, Richard Smith and Bruce Smith were required to manage the trust assets so as to protect the interests of the beneficiary (Eleanor) by guarding the trust res. *New Haven Savings Bank v. LaPlace, 66 Conn.App. 1, 9, 783 A.2d 1174 (2001).* "Once a [fiduciary] relationship is found to exist, the burden of proving fair dealing properly shifts to the fiduciary . . . Furthermore, the standard of proof for establishing fair dealing is not the ordinary standard of fair preponderance of the evidence, but requires proof either by clear and convincing evidence, clear and satisfactory evidence or clear, convincing and unequivocal evidence." (Citations omitted.) *Dunham v. Dunham, supra, 204 Conn. 322.*

Applying these standards in this case, the court concludes that the defendant Richard **[*35]** Smith breached his fiduciary duty when he loaned money to himself, his brother and a corporation formed by him and his brother for investment purposes in the stock market. "Our Supreme Court has stated that [HN8]"it is a thoroughly well-settled equitable rule that any one acting in a fiduciary relation shall not be permitted to make use of that relation to benefit his own personal interest. This rule is strict in its requirements and in its operation. It extends to all transactions where the individual's personal interests may be brought into conflict with his acts in the fiduciary capacity, and it works independently of the question whether there was fraud or whether there was good intention . . ." *Spector v. Konover, 57 Conn.App. 121, 127, 747 A.2d 39 (2000).*

Richard's misuse of Trust funds is a clear case of self-dealing and a misuse of his fiduciary responsibility. Richard acted as both the trustee of the Trust in loaning the funds and the trustee of the NEIT Trust in borrowing the funds. He then proceeded to personally borrow funds from the NEIT Trust. This was all done without any written consent from Eleanor. Richard did nothing to protect the Trust such as **[*36]** provide for interest payments. Finally, Richard, who had the burden of proving by clear and convincing evidence that this transaction constituted fair dealing, never presented evidence or attempted to present evidence of repayment. n9 *Oakhill Associates v. D'Amato, 228 Conn. 723, 727, 638 A.2d 31-29, n.3 (1994).*

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n9 The record does not support defendant's argument that he was somehow precluded

from presenting evidence of fair dealing regarding the loans or the unexplained disbursements. In fact, the court repeatedly allowed evidence regarding these transactions *over defendant's objection* as long as the transaction initially occurred during Eleanor's lifetime.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

In addition, as sole trustee of the Trust, Richard breached his fiduciary duty by not being able to credibly account for the $ 5,628,100 that was borrowed by someone or some entity and due to the Trust. When questioned during trial, Richard repeatedly stated that he did not know what this category was even though his accountant testified that **[*37]** Richard and Bruce supplied the financial information used for the yearly financial statement. He was also unable to provide any records explaining the disbursement of these funds that came out of the Trust.

A statute of limitations defense is not available for these two breaches of fiduciary duty by Richard. Both the loans to and through NEIT and the unexplained "due from beneficiary" funds constituted continuing courses of conduct that continued to occur after August 13, 1993. The Complaint was filed on August 13, 1996 and was therefore timely. n10

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n10 The other special defenses were either not pursued by defendant at the time of trial or the evidence presented was insufficient to support them.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

With regard to the real estate transactions which ultimately resulted in almost all of the property being foreclosed upon, the court finds that there was no breach of fiduciary duty. [HN9]"The law governing the duties of a trustee respecting investment of trust assets is well settled. Generally, a trustee must act **[*38]** with the care of a prudent investor . . . A trustee is neither the insurer nor the guarantor of the value of a trust's assets. A trustee's performance is not judged by success or failure, and while negligence may result in liability, a mere error in judgment will not." *United States Trust Co. v Bohart, 197 Conn. 34, 48, 495 A.2d 1034 (1985).*

With respect to the mortgaging of Trust properties dur-



ing the time frame between May 2, 1985 and February 19, 1994, the evidence established that there were some refinancings of existing mortgages which resulted in the release of prior encumbrances. It is a common practice in the management of commercial real estate to refinance mortgages and/or take out new mortgages for legitimate purposes (e.g. repairs, pollution expenses, better interest rates, and the like). In connection with the management of this particular Trust, there were some additional expenses that required financing, such as estate taxes owed by the Estate of Hyman Smith and the funding of the E.C. & R.K. Smith Trust under the 1985 Agreement.

In addition, there was a decline in the commercial real estate market from a peak in approximately 1986 up to and [*39] including the date of Eleanor Smith's death in 1994. In addition, Mrs. Smith discussed business issues with Bruce and Richard Smith during the relevant time period. Finally, Eleanor consented in writing to the remortgaging and purchasing of property in the Trust.

The court also specifically finds that the transaction involving the Westville trust did not constitute a breach of Richard's fiduciary duty. In order to manage the real estate in the Trust Richard needed to perform maintenance work on the properties and needed to borrow money in order to do so. In doing so he was acting with prudent care in trying to protect the res of the Trust. Additionally, the court finds that there was no breach of fiduciary duty in his subsequent settlement of the notes case with Vorlon given the Trust had no legitimate defense and only two of the four liened Trust properties were ultimately transferred to Vorlon as part of the settlement.

II Remedy for Breach of Fiduciary Duty

[HN10]"A trustee who commits a breach of trust is . . . (b) chargeable with the amount required to restore the values of the trust estate and trust distributions to what they would have been if the trust had been properly [*40] administered. In addition, the trustee is subject to such liability as necessary to prevent the trustee from benefitting personally from the breach of trust." *Restatement (3rd) of Trusts § 205.* Judgment shall enter against the defendant in the amount of $ 5,173,066.00 plus costs which constitutes damages in the amount of $ 1,044,966.00 for the improper loans to Richard, Bruce and Westport Equities, while Richard was acting as trustee of the Trust, and damages for the $ 5,628,100.00 in trust funds that Richard cannot account for minus the $ 1,500,000.00 (for estate taxes and remediation costs) he demonstrated to be legitimate costs to the Trust. *Oakhill, supra,* 228 Conn. 723 at 727-29. n11

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n11 The court will not award an accounting given that it would be a waste of time and expense. Defendant has already testified that all records of the transactions at issue have already been produced or no longer exist.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

CHASE T. ROGERS

SUPERIOR COURT JUDGE

  

2004 U.S. Dist. LEXIS 5552

RETEPROMACA REPRESENTACIONES TECNICAS PROYECTOS Y SISTEMAS, C.A., Plaintiff, v. THE ENSIGN-BICKFORD COMPANY, Defendant.

CIVIL ACTION NO., 3:98cv1857 (SRU)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT

2004 U.S. Dist. LEXIS 5552

March 30, 2004, Decided

**DISPOSITION:** Defendant's motion judgment as matter of law denied. Defendant's motion for new trial denied. Plaintiff's motion asking court to grant prejudgment interest on its award denied.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff sales representative sued defendant manufacturer for breach of an exclusive sales representative contract. The jury found in favor of the representative. The manufacturer moved for judgment as a matter of law, or, in the alternative, for a new trial. The representative sought prejudgment interest on its award.

**OVERVIEW:** After the representative had acted as the manufacturer's exclusive sales representative in a foreign country, the manufacturer acquired another company but sold the acquired company's products in the foreign country through other sales representatives. The jury could find from the parties' agreement, and their course of dealing, that the manufacturer appointed the representative as its exclusive representative for all products, including those made by the acquired company. The representative offered evidence of sales of the acquired company's products in the foreign country when the representative was entitled to those sales and of the commissions it received for comparable products. A jury could infer that the representative's expenses would not have increased if it had made these sales, so damages were adequately shown. The representative's complaint and the evidence allowed the court to instruct the jury on oral and implied contracts, as the manufacturer had adequate notice of a possible oral or implied contract claim. The court was not authorized to award the representative pre-judgment interest under *Conn. Gen. Stat. § 37-3a*, as that was the jury's function.

**OUTCOME:** The manufacturer's motions for judgment as a matter of law and new trial were denied, as was the representative's motion for pre-judgment interest.

**CORE TERMS:** prejudgment interest, matter of law, overhead, jurors, implied contract, new trial, course of dealing, explosive, trier of fact, oral contract, calculated, inferred, award prejudgment interest, recoverable, marginal, notice, exclusive representation, competitive, calculation, binding, booster, merger, trips, oil, Federal Rules, award of prejudgment interest, discretion to award, prejudiced, confusing, favorable

**LexisNexis(TM) Headnotes**

*Civil Procedure > Trials > Judgment as Matter of Law*
[HN1]A defendant seeking judgment as a matter of law pursuant to *Fed. R. Civ. P. 50* has a significant burden. Judgment as a matter of law may not be granted unless the evidence, viewed in the light most favorable to the plaintiff, is insufficient to permit reasonable jurors to find in plaintiff's favor. Put another way, the court must deny the motion unless the evidence - viewed in the light most favorable to the plaintiff, without weighing the credibility of the witnesses, and without otherwise considering the weight of the evidence - permits only one conclusion. It does not matter that the evidence supporting the plaintiff's case may be weak; in order to grant judgment as a matter of law the evidence must compel acceptance of the defendant's view by reasonable jurors.

*Contracts Law > Contract Interpretation > Interpretation Generally*
[HN2]The law is clear that an agreement will not be rejected for missing terms when the terms can be ascertained, either from the express terms of the agreement or by fair implication. More specifically, when an agreement is silent with respect to the amount of compensation, a jury can find that a reasonable fee was intended and it can ascertain this fee, among other things, by reference to the parties' course of dealing.

*Contracts Law > Remedies > Foreseeable Damages*
[HN3]An award of total profits need not be reduced by expenses if the evidence tends to show that the plaintiff would have incurred no additional expenses in making the future sales. In such a case net profits are gross profits, because the marginal cost of an additional sale is zero.

*Contracts Law > Remedies > Foreseeable Damages*
[HN4]Under Connecticut law, overhead expenditures are recoverable as an element of damages. Thus, even if profit is reduced by overhead this is offset by the overhead being recoverable as damages.

*Contracts Law > Remedies > Foreseeable Damages*





[HN5]A defendant cannot merely assert the existence of a category of expenses and then argue that, since the plaintiff did not prove the amount of those expenses, the jury's verdict awarding the plaintiff lost gross profits must be set aside.

*Contracts Law > Remedies > Foreseeable Damages*
[HN6]It is incumbent on a plaintiff in a contract action to prove his damages with all the certainty which is reasonably possible, but where exactness is not possible, he is not therefore to be precluded from a recovery, and the best approximation to certainty is all that is required.

*Civil Procedure > Relief From Judgment > Motions for New Trial*
[HN7]A new trial is required if errors in instructing the jury, considered as a whole, prejudiced the objecting party.

*Civil Procedure > Pleading & Practice > Pleadings > Interpretation*
[HN8]Whether a complaint is sufficient to raise a claim for relief is determined by *Fed. R. Civ. P. 8.*

*Civil Procedure > Pleading & Practice > Pleadings > Interpretation*
[HN9]It is well established that *Fed. R. Civ. P. 8* only requires simplified notice pleading that gives a defendant fair notice of what a plaintiff's claim is and the grounds upon which it rests. All pleadings shall be so construed as to do substantial justice. *Fed. R. Civ. P. 8(f).* Moreover, the federal rules abandon so called "theory pleading," whereby a complaint must proceed upon some definite theory, and on that theory the plaintiff must succeed, or not succeed at all.

*Civil Procedure > Costs & Attorney Fees > Judgment Interest*
[HN10]The question of whether to award prejudgment interest pursuant to *Conn. Gen. Stat. § 37-3a* must be decided by the trier of fact.

*Civil Procedure > State & Federal Interrelationships > Choice of Law*

*Civil Procedure > Costs & Attorney Fees > Judgment Interest*
[HN11]The question of prejudgment interest in a diversity case is governed by the law of the forum state.

*Civil Procedure > Jury Trials > Province of Court & Jury*

*Civil Procedure > Costs & Attorney Fees > Judgment Interest*
[HN12]When a case is tried before a jury, Connecticut courts announce a rule that prejudgment interest, as an element of damages, is a factual question within the province of the jury. More specifically, Connecticut courts hold that it is improper for a trial court to award

prejudgment interest after a jury verdict that does not include it.

*Civil Procedure > Trials > Bench Trials*

*Civil Procedure > Costs & Attorney Fees > Judgment Interest*
[HN13]When cases are tried without a jury, Connecticut courts state the allowance of interest as an element of damages is primarily an equitable determination and a matter within the discretion of the trial court.

COUNSEL: [*1] For Retepromaca Representaciones Technicas Proyectos Y Sistemas C.A., Plaintiff: Christine E. Corriveau, Francis A. Miniter, Miniter & Associates, Hartford, CT.

For The Ensign-Bickford Company, Defendant: Bradford S. Babbitt, Elizabeth R. Leong, Eric D. Daniels, James A. Wade, Robinson & Cole, Hartford, CT.

JUDGES: Stefan R. Underhill, United States District Judge.

OPINIONBY: Stefan R. Underhill

OPINION: RULING ON POST-TRIAL MOTIONS

Retepromaca Representaciones Technicas Proyectos Y Sistemas C.A. ("Retepromaca") brought this action against The Ensign-Bickford Company ("EBCo") for breach of an alleged contract to have Retepromaca serve as EBCo's exclusive sales representative in Venezuela. Following a threeday trial, the jury returned a verdict in favor of Retepromaca for $ 249,079. Judgment entered on April 4, 2003 . EBCo now moves for judgment as a matter of law - arguing that Retepromaca did not prove the existence of a contract or the amount of damages. In the alternative, EBCo moves for a new trial - arguing that the court improperly instructed the jury that it could find an oral or implied contract. Retepromaca has made its own motions, asking the court to grant pre-judgment [*2] interest on its award. For the reasons set forth below, all these motions are denied.

I. Facts

The following facts were either agreed to by the parties or could reasonably have been found by the jury on the evidence presented at trial.

EBCo manufactures and sells explosive products used in commercial mining and oil exploration. Its mining products are used to destroy rocks in order to expose and extract ore. In oil exploration, EBCo's seismic products are used to create explosions that facilitate the identification of drill spots likely to yield oil. (Tr.1 64-65; Tr.2 152-56) n1

- - - - - - - - - - - - - - Footnotes - - - - - - -





- - - - - - - -

n1 The following notations are used to refer to the transcripts of the three trial days: "Tr.1" for the transcript of March 31, 2003; "Tr.2" for the transcript of April 1, 2003; and "Tr.3" for the transcript of April 2, 2003 .

- - - - - - - - - - - End Footnotes- - - - - - - - - - - -

Retepromaca is located in Venezuela and is wholly owned by its president, Antonio Cordoba ("Cordoba"). (Tr.1 34-35) Starting in 1981, Retepromaca began to act as EBCo's agent for the sale of certain [*3] explosive devices. (Tr.1 36, 79) In 1992 this arrangement was formalized in a letter from EBCo to Cordoba, appointing Retepromaca as EBCo's exclusive agent in Venezuela. (Defendant's Exhibits 1, 2) A second, similar letter of appointment was sent in 1995. (Plaintiff's Exhibit 1)

As EBCo's exclusive agent, Retepromaca performed a number of functions. It served as a liaison between EBCo and various Venezuelan governmental agencies whose approval was needed for sales of explosives. (Tr.1 40, 84-85, Tr.2 150) It hired people to test several of the products sold by EBCo. (Tr.1 69-70) It promoted and distributed information concerning EBCo's products. (Tr.1 7677 ) Most importantly, however, Retepromaca had a base of clients - including the Venezuelan army - that it kept informed about EBCo's products and ultimately put in touch with EBCo to effectuate sales. (Tr.2 127-29, 149) When sales were completed, Retepromaca received a commission of between 12 and 17 percent of the sale price, depending on the product sold. (Tr.2 73)

In 1995 EBCo acquired the assets of Trojan, another company engaged in the sale of explosive products. Although Trojan was entirely subsumed into EBCo, Trojan-branded [*4] products were still sold in Venezuela through Trojan's former representatives, and not through Retepromaca. (Tr.2 25, 34-35)

Retepromaca complained to EBCo, contending this arrangement violated the terms of its exclusive engagement. (Tr.2 25-28) Retepromaca's concern arose from the fact that some of the Trojan-branded products were apparently more desirable than other, similar EBCo products - in particular, Trojan had manufactured a type of "booster" explosive called a GeoPrime booster, that was more desirable than the standard boosters sold by EBCo. (Tr.2 15-16; Defendant's Exhibit 9) Consequently, by being denied the opportunity to sell Trojan products, Retepromaca was limited to offering its clients less than the full panoply of EBCo products.

Retepromaca could - in certain cases - obtain these products through a third-party but could then only offer them at a higher price, a price not competitive with that offered by the agents who obtained the Trojan products directly from EBCo. (Tr.1 92; Tr.2 23, 167-68; Tr.3 25)

The question whether the parties' agreement applied to the sale of Trojan products in Venezuela was never resolved and, in 1997, EBCo terminated its relationship with [*5] Retepromaca.

## II. Motion for Judgment as a Matter of Law

A. Legal Standard [HN1]A defendant seeking judgment as a matter of law pursuant to *Rule 50* of the Federal Rules has a significant burden. Judgment as a matter of law may not be granted unless the evidence, viewed in the light most favorable to the plaintiff, is insufficient to permit reasonable jurors to find in plaintiff's favor. *Galdieri-Ambrosini v. National Realty & Development Corp., 136 F.3d 276, 289 (2d Cir. 1998)*. Put another way, the court must deny the motion unless the evidence - viewed in the light most favorable to the plaintiff, without weighing the credibility of the witnesses, and without otherwise considering the weight of the evidence - permits only one conclusion. *Sir Speedy, Inc. v. L & P Graphics, Inc., 957 F.2d 1033, 1038-39 (2d Cir. 1992)*. It does not matter that the evidence supporting the plaintiff's case may be weak; in order to grant judgment as a matter of law the evidence must *compel* acceptance of the defendant's view by reasonable jurors. *This is Me, Inc. v. Taylor, 157 F.3d 139, 142 (2d Cir. 1998)*.

B. Agreement EBCo argues [*6] that the evidence was legally insufficient to establish the existence of a contract between EBCo and Retepromaca giving Retepromaca the exclusive right to act as EBCo's representative for the distribution of Trojan products. EBCo argues that the 1995 letter agreement was not a contract giving Retepromaca exclusive representation of EBCo in Venezuela, but instead was either a legally non-binding "agreement to agree" or an unenforceable writing that lacks material terms. EBCo's view of the evidence is one, but not the only, possible view that reasonable jurors could have taken. Consequently, it cannot support judgment as a matter of law.

### 1. "Agreement to Agree"

EBCo contends that Cordoba "admitted" at trial that the letter was only an agreement to agree. EBCo points to the following testimony:Q. . . . In the letter it says that you, Retepromaca, you're going to undertake to establish common criteria in order to create a single binding criteria for both parties. What does that





mean? What does that sentence mean?A. What does this mean? That we have to work together, share arguments and to reach for every step we do, not only for pricing but for goals. **[*7]** Q. You have to agree to agree, right?A. Yes.Q. Sometime in the future you're going to work out those details and you're going to agree to agree on what you're entitled to, right?A. In everything.(Tr.2 184) Cordoba's answers, according to EBCo, would compel reasonable jurors to conclude that the letter was nothing more than an agreement to agree. If this bit of testimony were the only evidence given to the jury on the subject, EBCo's argument might be persuasive. The jury, however, had a much more evidence to consider.

If nothing else, the jury was free to simply reject Cordoba's testimony and read the document on its own, a document that states EBCo "appoints Retepromaca as their exclusive representative for the entire territory of Venezuela." (Plaintiff's Exhibit 1) Based on the contents of that document, the jury could have found that the letter granted Retepromaca exclusive representation of EBCo in Venezuela for the sale of *all* EBCo products.

Even if the jury did not wish to rely solely on the text of the letter, it was free to disregard the statements of Cordoba quoted above n2, and instead rely on his other statements - statements **[*8]** that supported a finding that the parties intended by the 1995 letter to enter into a binding exclusive representation agreement. These would have included, for example, statements by Cordoba that, subsequent to the signing of the 1995 agreement, EBCo treated him as their exclusive representative for all products, directed all sales through him (prior to the Trojan merger), and never informed him that, or acted as if, the letter agreement was subject to limitation. (Tr.1 55-56; Tr.2 176; Tr.3 31)2. *Lack of Material Terms*Alternatively, EBCo contends that the 1995 agreement was not enforceable because it lacked a material term. EBCo argues that it is clearly material whether or not the parties intended to extend their agreement to cover Trojan products, and, because the 1995 letter does not include this material term, the agreement is legally insufficient to bind EBCo with respect to Trojan products.

- - - - - - - - - - - - - - Footnotes - - - - - - -
- - - - - - - -

n2 It is worth noting that Cordoba was not a native English speaker and, though he did use an interpreter for parts of the trial, the jury was in the best position to judge how well he understood the questions put to him by counsel and what he intended by his answers. This determination is much harder to make on the bare trial transcript.

- - - - - - - - - - - End Footnotes- - - - -
- - - - - - - -

**[*9]**

The problem with EBCo's argument is that it attempts to characterize the application of the 1995 agreement to Trojan products as an "extension." If Retepromaca had claimed - or at least, if it had only claimed - that the 1995 agreement was *extended* to cover Trojan products, EBCo's argument might have some merit. As it stands, however, Retepromaca claimed - and the jury could have found - that the 1995 agreement (and all prior agreements) gave Retepromaca the right to distribute *all* EBCo products in Venezuela. All EBCo products reasonably includes products EBCo came to sell following its acquisition of another company's product line as well as products EBCo developed itself - however those products may have been branded.

As a preliminary matter, the undisputed evidence showed that Trojan was completely absorbed into EBCo. That is, all Trojan's assets were assumed by EBCo, and Trojan ceased to exist as a separate entity. The only vestige of Trojan that remained following the merger was the label "Trojan," which remained on some products. (Tr.2 41-43) Consequently, there was little room for the jury to conclude anything other than that Trojan-branded products, after the merger, **[*10]** were as much EBCo products as any other EBCo product, and so, an agreement to distribute *all* EBCo products would include Trojan-branded products as well.

There was plenty of evidence to support a finding that the 1995 agreement gave Retepromaca the exclusive right to sell *all* products. The letter itself is ambiguous n3 and probably amenable to either interpretation. That fact alone would suggest that judgment as a matter of law is inappropriate, because, when deciding the matter, all inferences must be drawn in Retepromaca's favor. Even putting the text of the letter aside, there was much more evidence from which the jury could have inferred that the agreement covered all EBCo products.

- - - - - - - - - - - - - - Footnotes - - - - - - -
- - - - - - - -

n3 The fact that the 1995 letter did not specify other arguably material terms - particularly commission rates - is also not fatal to its enforcement, particularly given the large amount of evidence about the parties' history of interactions.  **[HN2]**The law is clear that an agreement will not be rejected for missing terms when the terms  .  can be ascertained, either from the express terms of the agreement or by fair implica-

  

tion. *Augeri v. C.F. Wooding Co., 173 Conn. 426, 430, 378 A.2d 538 (1977).* More specifically, when an agreement is silent with respect to the amount of compensation, a jury can find that a reasonable fee was intended and it can ascertain this fee, among other things, by reference to the parties' course of dealing. See *Presidential Capital Corp. v. Reale, 231 Conn. 500, 506, 652 A.2d 489 (1994)* ("defendant's promise to pay a commission is not made unenforceable merely because he did not include the amount of the commission"); *Restatement (Second) Contracts* § 223 (course of dealing may be used to interpret parties' expressions and other conduct).

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

**[*11]**

Cordoba testified that he had, from 1981 to 1996, engaged in the unrestricted, unlimited sale of EBCo products in Venezuela. He testified that this included sales of products similar to those manufactured by Trojan. (Tr.1 95) He testified that, over the course of their fifteen-year relationship, EBCo and Retepromaca had established commission rates for various categories of products. (Tr.2 73; Tr.3 77-78) And, as noted above, he testified that EBCo had never attempted to, or expressed any desire to, limit the scope of Retepromaca's representation. (Tr.1 55-56; Tr.2 176; Tr.3 31) Moreover, he testified that, when new products were added to EBCo's line, Retepromaca was always allowed to sell them. (Tr.3 60)

Similarly, Frank Lucca, EBCo's manager of Venezuelan operations from 1994 to 1996, testified that Retepromaca was EBCo's exclusive agent in Venezuela (Tr.3 164) and that, as far as he knew, no sales went through anyone other than Retepromaca (Tr.3 169).

On the basis of this evidence - the letter coupled with the extensive course of dealing between the parties - the jury could have concluded that Retepromaca and EBCo had an actual agreement providing that Retepromaca was EBCo's **[*12]** exclusive agent for the sale of all products - including Trojan products - in Venezuela. Consequently, EBCo's argument, that the jury was compelled to conclude that there was no binding agreement, fails, and EBCo's motion for judgment as a matter of law on that ground is denied.

C. Damages EBCo next argues that, even if a contract was proven, Retepromaca did not offer evidence of its actual damages sufficient to allow the jury to award

an amount that was anything other than speculative. Specifically, EBCo contends that, although Retepromaca offered evidence tending to establish the amount of lost sales and the rate of commission it would have earned on those sales, it did not offer any evidence to establish the expenses it would have incurred in making those sales. EBCo concludes that, on the record evidence, there was no way the jury could have arrived at a calculation of Retepromaca's expected *net* gain on the contract. Consequently, EBCo asks for judgment as a matter of law or, in the alternative, a reduction of the jury's award to nominal damages.

EBCo does not dispute that there was sufficient evidence from which the jury could have calculated EBCo's lost commissions. **[*13]** Retepromaca offered documentary and testimonial evidence establishing the amount of sales of Trojan products made by other EBCo representatives in Venezuela during the time when Retepromaca was entitled to those sales. (Tr.2 78-86) Additionally, Retepromaca offered evidence of the commission rates that it ordinarily received for sales of comparable products. Id. Multiplying the first number (lost sales) by the second (rate of commission) would have given the jury the amount of Retepromaca's lost commissions.

EBCo argues that this number alone does not permit a damage calculation because it only represents gross profits, whereas an award of damages can only be an award of net profits. Net profits, EBCo contends, can only be calculated by reducing the sales commission amount by the expenses that would have been incurred in making those sales. Evidence of the amount of these expenses, however, was not presented to the jury, and so, EBCo concludes, there is no possible way the jury could have calculated net profits.

EBCo is correct that the jury was required to award net profits; it is incorrect that the only way the jury could have calculated net profits was by subtracting expenses **[*14]** from sales commissions. **[HN3]**An award of total profits need not be reduced by expenses if the evidence tends to show that the plaintiff would have incurred no *additional* expenses in making the future sales. In such a case net profits are gross profits, because the marginal cost of an additional sale is zero. n4 See, e.g. *Barnard v. Compugraphic Corp., 35 Wn. App. 414, 418, 667 P.2d 117 (1983)*; *Automatic Vending Co. v. Wisdom, 182 Cal. App. 2d 354, 358, 6 Cal. Rptr. 31 (1960).*

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n4 Arguably overhead must always be deducted from gross profits, even if a given sale has a marginal cost of zero, because





overhead is properly allocated on an average basis to each sale. Thus, one could argue, even the profit on these hypothetical sales should be reduced by the *average* cost required to make the sale (as opposed to the *marginal* cost). The use of this analysis would not change anything because, [HN4]under Connecticut law, overhead expenditures are recoverable as an element of damages. See *Coast Industries, Inc. v. Noonan, 4 Conn. Cir. Ct. 333, 337, 231 A.2d 663 (1967).* Thus, even if profit was reduced by overhead this would be offset by the overhead being recoverable as damages. See generally Overhead Expense as Recoverable Element of Damages, *3 A.L.R.3d 689 §§ 3, 5.*

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[*15]

EBCo, of course, claims that the sale of additional products would have required Retepromaca to incur additional expenses. This is a possible inference from the evidence, but it is not the only one.

Cordoba did testify that in order to make sales of Trojan products he would have been required to make phone calls, book flights and hotel rooms for EBCo employees, and arrange for meals. (Tr.2 157-58, Tr.3 19-21) He testified that in some cases he would pay for these expenses out of his own pocket. The jury could have inferred from this testimony that, had Retepromaca been allowed to sell Trojan products, it would have incurred additional expenses of this nature. However, a jury could just as easily have inferred that those expenses were essentially the fixed costs of routine sales trips made by Retepromaca during which a number of products were sold, and that the ability to sell Trojan products would simply have increased the number of products that could have been offered during those trips and not increased the number of trips. On this view of the evidence, the addition of new products to Retepromaca's "catalog" would not have required it to incur new expenses. This view is consistent [*16] with the evidence tending to show that the Trojan products in question were simply enhanced versions of products already offered by Retepromaca, indicating that it would have taken little or no additional effort or expense to offer these additional products to Retepromaca's existing customers. (Tr.1 95)

Similarly, the jury could have found that Retepromaca did offer Trojan products through a third-party - and thus incurred the expense of offering them - only it could not consummate sales, because, lacking the ability to sell directly from EBCo, Retepromaca could not offer competitive prices. (Tr.1 92; Tr.2 23, 69-75, 167-68; Tr.3 25, 47) On this view of the evidence, Retepromaca's expenses would also have remained constant; it simply would have been more competitive if it had been able to make direct sales of Trojan-branded products.

Moreover, Cordoba testified that he continued to pay all the overhead costs associated with his business, e.g., rent, salaries, and utilities. (Tr.2 75-76) Nothing in his testimony suggested that these expenses would have increased had he been permitted to offer Trojan products along with the other products he sold.

Accordingly, there was a good deal [*17] of evidence from which reasonable jurors could have concluded that Retepromaca would have incurred no additional expense had it been permitted to offer Trojan products for sale directly from EBCo.

In short, EBCo starts with the premise that there would have been incremental costs associated with the sale of Trojan products. It then argues that, because the amount of these costs was not proved, Retepromaca did not prove its case. The fatal flaw in this argument is that reasonable jurors would not be compelled to accept EBCo's premise. [HN5]A defendant cannot merely assert the existence of a category of expenses and then argue that, since the plaintiff did not prove the amount of those expenses, the jury's verdict must be set aside. See, e.g., *Katz Communications, Inc. v. Evening News Assoc., 705 F.2d 20, 26 (2d Cir. 1983)* ("Nor is there merit in appellants' contention that Katz's recoverable damages should be diminished by the amount of salaries, wages, and other overhead or indirect or fixed costs . . . the burden is on the appellants to prove any potential item in mitigation of damages inasmuch as it is *pro tanto* a defense to the claim of the wronged party."). [*18] Because reasonable jurors could have found that the expenses EBCo assumes existed did not exist, there is no reason to set aside the jury's award.

[HN6]It is incumbent on a plaintiff in a contract action to prove his damages with all the certainty which is reasonably possible, but where exactness is not possible, he is not therefore to be precluded from a recovery, and the best approximation to certainty is all that is required." *Southern New England Contracting, Co. v. Connecticut, 165 Conn. 644, 661, 345 A.2d 550 (1974).* Because Retepromaca gave the jury enough evidence to make a reasonably certain damage calculation, EBCo's motion for judgment as a matter of law on the ground of insufficient proof of damages is denied.

## III. Motion for New Trial



2004 U.S. Dist. LEXIS 5552

EBCo argues that errors in the jury instructions require a new trial. EBCo has less of a burden in seeking a new trial than it does in asking for judgment as a matter of law; however, it also has a less compelling argument. [HN7]A new trial is required if errors in instructing the jury, considered as a whole, prejudiced the objecting party. *Jocks v. Tavernier, 316 F.3d 128, 137 (2d Cir. 2003)*.The [*19] jury instruction at issue read as follows:Although Retepromaca alleges that there was a written contract, it is not necessary for there to have been a written contract. Retepromaca could prevail by showing that it had an oral contract to serve as the exclusive distributor for Ensign-Bickford in Venezuela. An oral contract can either be express or implied. An express contract is expressed, or stated, in words. To determine if there was an express contract, you should consider the words exchanged between the parties as well as any written documents relating to the subject matter of the alleged contract.A contract can also be implied. The material terms and conditions of an implied contract are implied or inferred from the facts and circumstances, or from the conduct of the parties, rather than expressed in words. An implied contract is an agreement that depends on some act or conduct by the party against whom the contract is sought to be enforced - here, Ensign-Bickford. And it arises by inference or implication from circumstances which, according to the ordinary course of dealing and the common understanding of people, show a mutual intent on the part of the parties [*20] to contract with each other at that time. The test for determining if there is an implied contract is whether the acts and conduct the parties show agreement.

(Jury Charge Transcript 14-15)

EBCo does not dispute that this charge was a correct statement of Connecticut contract law; rather it argues that neither an oral contract nor an implied contract claim was present in the complaint or the evidence, and so neither claim was part of the case. Consequently, argues EBCo, these issues should not have been charged to the jury, and the charge was prejudicial. I am not persuaded

Properly analyzed, EBCo is raising two issues- (1) did the complaint preclude this instruction, and (2) did the evidence at trial preclude this instruction.

A. Complaint The first issue is governed by *Rule 8 of the Federal Rules of Civil Procedure*. EBCo's argument is that, because no implied or oral contract claim was in the complaint, neither claim was in the case. [HN8]Whether a complaint is sufficient to raise a claim for relief is determined by *Rule 8*. n5

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n5 EBCo cites to Connecticut state law cases in support of its claim that Retepromaca's case is circumscribed by its complaint. The Second Circuit, however, has unequivocally held that the specificity of pleadings is governed by the Federal Rules. See *Stirling Homex Corp. v. Homasote Co., 437 F.2d 87, 88 n.2 (2d Cir. 1971)*.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[*21]

[HN9]It is well established that *Rule 8* only requires simplified notice pleading that gives a defendant "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson, 355 U.S. 41, 47, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1975)*. "All pleadings shall be so construed as to do substantial justice." *Fed. R. Civ. P. 8(f)*. Moreover, the federal rules have abandoned so called "theory pleading," whereby "a complaint must proceed upon some definite theory, and on that theory the plaintiff must succeed, or not succeed at all." C. Wright & A. Miller, Federal Practice and Procedure, § 1219 at 188 (2d ed. 1990).

The essence of Retepromaca's claim is contained in two statements in the complaint: (1) that, as of 1980, Retepromaca was appointed by EBCo to be its exclusive agent in Venezuela, and (2) that EBCo breached its contractual duties. n6 This was sufficient to state a cause of action and to put the defendant on notice that it was being sued for breaching the representation agreement - either as written, orally stated, or implied.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n6 The complaint also discusses that this relationship was "evidenced" by two written agreements (First Amended Complaint P9), but this does not in any way negate the above statements, particularly as the first written agreement was dated seven years after the alleged beginning of the representation.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[*22]

Moreover, EBCo can hardly claim that it was not given notice that the case included a possible oral or implied contract claim. In my written opinion denying EBCo's motion for summary judgment (doc. # 104), issued June 4, 2002, I found a genuine issue of material fact





regarding whether a contract had been formed, based in part on the authority of, accompanied with extensive quotes from, cases describing how an agreement can be implied in fact or by express words. I also noted that, in this case, a contract could be found to exist based on the letters, *past performance, and course of dealing*. At the very least, EBCo had actual notice from the time of the summary judgment ruling - nearly ten months before trial - that the issue of breach of an oral or implied in fact contract was in the case.

B. Evidence EBCo also argues that there was no evidence at trial to support a charge on an oral or implied contract. This is an odd argument; after all, if there was no evidence to support the charge, it is unlikely that the jury found for Retepromaca on the basis of that charge, and so, hard to see how the charge prejudiced EBCo.

In any event, EBCo's contention is simply not correct. **[*23]** As discussed above in the section addressing EBCo's motion for judgment as a matter of law, there was ample evidence concerning past actions and course of dealing from which a jury could have found the existence of an oral or implied in fact contract with respect to all or part of the terms of Retepromaca's representation of EBCo.

Accordingly, because the jury instruction was a correct statement of the law governing the case, EBCo's motion for a new trial is denied.

### IV. Motions for Pre-Judgment Interestn7



- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n7 Retepromaca made both a motion for prejudgment interest and a related motion to modify the judgment to include prejudgment interest.

- - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

Retepromaca has moved for an award of prejudgment interest on the judgment pursuant to *Connecticut General Statutes* § 37-3a. The issue of prejudgment interest was not raised until after judgment had entered, and so, was not charged to the jury. Retepromaca argues that this is immaterial because an award of prejudgment interest lies within **[*24]** the discretion of the court. It is understandable how Retepromaca could have come to this conclusion. The case law on prejudgment interest is confusing and, sometimes, inconsistent. Nevertheless, after a thorough review of relevant state and federal cases, I conclude that [HN10]the question of whether to award prejudgment interest pursuant to *sec-*

*tion 37-3a* must be decided by the trier of fact - in this case the jury. Because I have no discretion to make such an award, Retepromaca's motions are denied.

[HN11]The question of prejudgment interest in a diversity case, such as this one, is governed by the law of the forum state - in this case, Connecticut. *Trademark Research Corp. v. Maxwell Online Inc., 995 F.2d 326, 342 (2d Cir. 1993)*. Accordingly, it is the law as established by Connecticut courts, or as I predict they would establish it, that controls.

A. Connecticut Law There are two distinct lines of Connecticut cases on the subject of prejudgment interest, reflecting differences between bench trials and jury trials.

[HN12]When a case is tried before a jury, the Connecticut courts have announced the rule - ultimately dispositive of this case - that prejudgment interest, **[*25]** as an element of damages, is a factual question within the province of the jury. See *John T. Brady & Co. v. City of Stamford, 220 Conn. 432, 445, 599 A.2d 370 (1991); Iseli Co. v. Connecticut Light and Power Co., 211 Conn. 133, 143, 558 A.2d 966 (1989)*. More specifically, Connecticut courts have dealt with the exact issue presented in this case, holding that it was improper for a trial court to award prejudgment interest after a jury verdict that did not include it. See *Foley v. Huntington Co., 42 Conn. App. 712, 738, 682 A.2d 1026 (1996); Iseli, 211 Conn. at 143-44*.

[HN13]When cases are tried without a jury, the Connecticut courts state a slightly different rule. In such cases "the allowance of interest as an element of damages is primarily an equitable determination and a matter within the discretion of the trial court." *Middlesex Mutual Assurance Co. v. Walsh, 218 Conn. 681, 701-02, 590 A.2d 957 (1991); The Nor'easter Group, Inc. v. Colossale Concrete, Inc., 207 Conn. 468, 482, 542 A.2d 692 (1988)*. The reference to "the trial court" is confusing, as it can be read as a reference **[*26]** to the judge in his legal, rather than fact-finding, capacity. Recently, Connecticut appellate courts have attempted to clarify this by changing the reference to the "trier of fact." See, e.g., *Ceci Bros. v. Five Twenty-One Corp., 82 Conn. App. 419, 427, 840 A.2d 578 (2004); Advanced Financial Servies, Inc. v. Associated Appraisal Services, Inc., 79 Conn. App. 22, 31, 830 A.2d 240 (2003); Maloney v. PCRE, LLC, 68 Conn. App. 727, 755, 793 A.2d 1118 (2002)*.

In Retepromaca's case, any ambiguity in the decisions of Connecticut courts has no practical import - it is settled that the judge in a jury trial has no ability to award prejudgment interest.

B. Federal Court In light of the ambiguous language

  

used by the Connecticut courts, it is not surprising that some confusion has dogged federal courts attempting to apply Connecticut law in diversity cases.

In *Neptune Group, Inc. v. MKT Inc., 205 F.R.D. 81 (D. Conn. 2002)*, Judge Droney confronted essentially the same situation as the one here and concluded - as I do - that the question of prejudgment interest was for the jury, and not the judge. Similarly, Judge Eginton, in [*27] *Winnick v. Alvin and Co., 1998 U.S. Dist. LEXIS 15958, 1998 WL 696015 (D. Conn. )*, noted that the question of prejudgment interest was one for the trier of fact (in that case, the court).

A few other district court decisions, however, set forth the opposite conclusion, holding - with little or no discussion - that the question of prejudgment interest was one for the "court" - meaning the judge - and not the jury. n8 See, e.g., *Gilmore v. Bergin, 1998 U.S. Dist. LEXIS 22918, 1998 WL 1632526, *12 (D. Conn. Sept. 22, 1998)* (holding trial court in jury trial had discretion to award prejudgment interest); *Kregos v. The Latest Line, Inc., 1998 U.S. Dist. LEXIS 17954, 1998 WL 696007 (D. Conn. Aug. 31, 1998)* (holding interest award for the court, not jury, but declining to award it); *Brandewiede v. Emery Worldwide, 890 F. Supp. 79, 82 (D. Conn. 1994)* (holding not within the jury's discretion to award prejudgment interest, rather that was a question for the court).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n8 It is possible that these courts relied on the Second Circuit's statement in *Prime Management Co. v. Steinegger, 904 F.2d 811, 817 (2d Cir. 1990)*, that under Con-

necticut law prejudgment interest was left to the discretion of the court. Not surprisingly, that case involved a bench trial where "the court" was the trier of fact. The Connecticut case cited by the Second Circuit was *Nor'easter* (discussed above), also a bench trial.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[*28]

Given this line of federal cases, Retepromaca may have been led astray in understanding how prejudgment interest is awarded under Connecticut law. Based on my review of binding decisions of the Connecticut Supreme Court and Appellate Court, however, I conclude that Retepromaca's request for prejudgment interest must be denied, because prejudgment interest is an issue to be decided by the jury.

## V. Conclusion

For the aforementioned reasons, the Ensign-Bickford Company's motion for judgment as a matter of law or new trial (doc. # 170) is DENIED, and Retepromaca's motion for prejudgment interest (doc. # 159) and motion to modify the judgment (doc. # 164) are DENIED.It is so ordered.Dated at Bridgeport, Connecticut, this 30th day of March 2004.

/s/ Stefan R. Underhill

Stefan R. Underhill

United States District Judge





LEXSEE 2001 CONN.SUPER.LEXIS 1225

**Coregis Insurance Company v. Fleet National Bank**

**CV980580210**

**SUPERIOR COURT OF CONNECTICUT, JUDICIAL DISTRICT OF HARTFORD, AT HARTFORD**

**2001 Conn. Super. LEXIS 1225**

**May 4, 2001, Decided**
**May 4, 2001, Filed**

**NOTICE:** [*1]  THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

**DISPOSITION:** Judgment is entered for the plaintiff in the amount of $50,000, together with prejudgment interest calculated from the date the check was honored by the defendant at the rate of 10% per annum.

**LexisNexis (TM) HEADNOTES– Core Concepts:**

**JUDGES:** Bryant, J.

**OPINIONBY:** Bryant

**OPINION:** MEMORANDUM OF DECISION

This matter is before the court on a hearing in damages. The plaintiff seeks damages in the amount of $50,000 for a wrongfully honored check plus prejudgment interest for money wrongfully detained pursuant to General Statutes § 37-3a.

The court finds the following facts. The plaintiff drew a check on its account at the defendant's bank. The check was made out to "TRUDY AVANTS ATTORNEY FOR MINOR CHILD JOSEPH WALTON MOTHER DELORES CARPENTER." Trudy Avants fraudulently endorsed the check "Joseph Walton Delores Carpenter Trudy Avants for Deposit Only Trudy Avants," and embezzled the $50,000 proceeds.

The plaintiff brought suit claiming that the check was wrongfully honored by the defendant because of the superfluous and forged endorsements [*2] of Joseph Walton and Delores Carpenter. The court granted summary judgment for the plaintiff on July 15, 1999 (25

Conn. L. Rptr. 141). The defendant appealed the decision to the Appellate Court, which dismissed the case for want of jurisdiction due to the fact that a final judgment of damages had not been entered by the Superior Court.

The defendant argues that the court should not award prejudgment interest because the defendant believes that the court erred in granting summary judgment.

The court has the power to make an equitable determination to award prejudgment interest. *Stephan v. Pennsylvania General Ins. Co.*, 224 Conn. 758, 765, 621 A.2d 258 (1993); *Middlesex Mutual Assurance Co. v. Walsh*, 218 Conn. 681, 701–02, 590 A.2d 957 (1991). The court's determination regarding the award of interest "should be made in view of the demands of justice rather than through the application of any arbitrary rule." *Middlesex Mutual Assurance Co. v. Walsh*, *supra*, 218 Conn. 702. There is a two–pronged test for determining whether to award interest under General Statutes § 37-3a. The court must determine:  [*3]  first, whether the defendant wrongfully detained funds of plaintiff; and second, when the funds were first wrongfully detained. *Blakeslee Arpaia Chapman, Inc. v. EI Constructors, Inc.*, 239 Conn. 708, 735, 687 A.2d 506 (1997); see also *White Oak Corp. v. Dept. of Transportation*, 217 Conn. 281, 302, 585 A.2d 1199 (1991). This court has already determined that the detention of money was wrongful; and therefore, under existing law, the only issue remaining for this court to decide is when the money was wrongfully detained.

The defendant contends that the court should consider a third factor. That factor is whether the defendant has a good faith basis to appeal the judgment of liability. Essentially, the defense has asked the court to reconsider the merits of its prior ruling on the issue of liability.

Reconsideration of the issue of liability would frus-

 LexisNexis™     LexisNexis™     LexisNexis™

trate both judicial efficiency and the legislative intent of General Statute § 37-3a. It would frustrate the judicial process not only because this court has already decided the issue, but also because, for purposes of the issue at hand, the appellate court has the exclusive [*4] power to review the decision. General Statutes § 51-197b(d). Reconsideration of the wrongfulness of the detention would be duplicative and wasteful since one party would be dissatisfied with any decision the court made and the matter would ultimately be appealed to the appellate court. In fact, the defendant has stated its intent to appeal after this judgment is entered. Reconsideration by this court would only delay the judicial process to no avail.

The court has an interest in the stability and finality of judgments. *Walsh v. Stonington Water Pollution Control Authority*, 250 Conn. 443, 460-61, 736 A.2d 811 (1999); *Ancona v. Manafort Bros., Inc.*, 56 Conn. App. 701, 706-07, 746 A.2d 184 cert. denied, 252 Conn. 954, 749 A.2d 1202 (2000). When an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit. *Id.* Applying that principal to the issue at hand, the stability and finality required for judicial efficiency persuades this court that it should not reconsider the merits of the defendant's claim. [*5]

The approach suggested by the defendant also undermines the legislative intent of empowering the court to award prejudgment interest. If prejudgment interest is not awarded and the trial court decision is affirmed the court would lack jurisdiction to award prejudgment in-

terest because the there is no right to further review except to our Supreme Court. General Statutes § 51-197b(e). That being the case, the legislative intent of General Statute § 37-3a would be frustrated if the court failed to award interest at this time as there would be no opportunity to do so at a later time. An axiomatic rule of statutory construction is that "we are initially guided by well defined principles of statutory interpretation. The court's "fundamental objective is to ascertain and give effect to the apparent intent of the legislature." *Edelstein v. Dept. of Public Health & Addiction Services*, 240 Conn. 658, 664, 692 A.2d 803 (1997), quoting *State v. Metz*, 230 Conn. 400, 409, 645 A.2d 965 (1994). Moreover, principles of statutory construction require the court to construe a statute in a manner that will not frustrate [*6] its intended purpose or lead to an absurd result. *Turner v. Turner*, 219 Conn. 703, 712, 595 A.2d 297 (1991). The court "must avoid a construction that fails to attain a rational and sensible result that bears directly on the purpose of the Legislature." *General Accident Ins. Co. v. Powers, Bolles, Houlihan & Hartline, Inc.*, 50 Conn. App. 701, 708, 719 A.2d 77 (1998), aff'd, 251 Conn. 56 (1999)

Accordingly, this court declines to reconsider the issue of liability and it declines to risk the chance that the plaintiff will be foreclosed from obtaining prejudgment interest should the appellate court affirm the trial court finding of liability. Judgment is entered for the plaintiff in the amount of $50,000, together with prejudgment interest calculated from the date the check was honored by the defendant at the rate of 10% per annum.

Bryant, J.

  

**EXHIBIT B**

```
 1              UNITED STATES DISTRICT COURT
 2                 DISTRICT OF CONNECTICUT
 3
 4
        ----------------------------x
 5
    CROWN THEATRES, L.P.,          :
 6
              Plaintiff,           :
 7
        -versus-                   : No. 02-CV-2272
 8                                   (AVC)
    MILTON L. DALY; TAYLOR-LEIGH,:
 9  INC.; JAMES C. CELLA;
    G.U.S. DEVELOPMENT, INC.;      :
10  JAMES T. MARTINO; and JAMES
    MARTINO, ARCHITECT, P.C.,      :
11
              Defendants.          :
12
        ----------------------------x
13
14
15
16              Deposition of MILTON L. DALY,
17      taken pursuant to the Federal Rules of
18      Civil Procedure, at the law offices of
19      Pepe & Hazard, 30 Jelliff Lane,
20      Southport, Connecticut, before James A.
21      Martone, L.S.R. #00248, and a Notary Public
22      in and for the State of Connecticut, on
23      May 21, 2003, at 11:10 a.m.
24
25
```

CROWN THEATRES v. DALY

May 21, 2003

Page 138

1  liquidation of some assets you have?
2       A.  Yes.
3       Q.  It is your intent to pay that $4.2
4  million to Crown or any other appropriate
5  individual; is that correct?
6       A.  Yes.
7       Q.  So under those circumstances it's not
8  the intent of Taylor-Leigh to have had any
9  financial grain as a result of receipt of those
10  monies, correct?
11      A.  That is correct.
12      Q.  As you sit here now, can you think of
13  any further amendments to this disclosure of
14  assets that I should make on the record? There
15  were a couple of assets that you had not
16  provided information.
17      A.  No.
18      Q.  There's nothing else you can think of?
19      A.  No.
20      Q.  If you do think of them, you will
21  advise me and we'll do an amendment?
22      A.  Yes.
23           MR. WISSER:  I have nothing
24  further.
25  REDIRECT EXAMINATION

Page 139

1  BY MR. MARTIN:
2       Q.  That leads to some follow-up questions
3  for me.  It's your intent to disgorge yourself
4  or repay the $4.2 million?
5       A.  We've been negotiating, Mr. Martin,
6  since --
7       Q.  I'm sorry, that --
8       A.  The answer is yes.  I'm willing --
9  The answer is yes.
10      Q.  That's your intent, right?
11      A.  That's the intent, to pay it.
12      Q.  And why is that your intent?
13      A.  Because it is a form of self-dealing,
14  which was wrong.  Doesn't belong to me.  If I
15  knew it belonged to me, if I knew that this was
16  going on to the level that it came out to be, I
17  would have never done this.  It was wrong.
18  We're been talking since September-August of
19  2001 when this surfaced.  And --
20           MR. WISSER:  You've answered the
21  question.
22      Q.  Why do you say it's a form of
23  self-dealing?
24      A.  Because I should have never done
25  that.  I thought that the company was going to

Page 140

1  derive a lot of savings through Mr. Beecher's
2  companies by taking portions of the jobs, him
3  handling it, saving the company money.
4           I was being paid a salary by
5  Crown Theatres.  The arrangement should have
6  never been made.  He should have just supervised
7  the jobs, instead of stating that he was going
8  to do the work, which was never done.  So
9  therefore, it was wrong.  It was the wrong thing
10  to do.
11      Q.  So when you say saving the company
12  money, you mean saving Crown Theatres money?
13      A.  That is correct.
14      Q.  So to the extent that there were
15  savings from whatever arrangement from
16  Mr. Beecher working on this, it's your view that
17  those savings properly belong to Crown Theatres,
18  correct?
19      A.  Well, it's pretty obvious that there
20  were no savings.
21      Q.  Let me put it another way.  In other
22  words, the $4.2 million that Beecher gave to
23  Taylor-Leigh, and that you took, you believe
24  that that money belongs to Crown Theatres?
25      A.  Yes.  I do now.

Page 141

1       Q.  Right, and you said that, you also
2  said that it was wrong.  Why do you think it was
3  wrong?
4       A.  I had a fiduciary responsibility.
5  That fiduciary responsibility was not upheld by
6  self-dealing.  Mr. Beecher was to provide a
7  service which he never provided, so therefore,
8  it is wrong, Mr. Martin.
9       Q.  And you also said that if you knew
10  that it would come out to the level it
11  ultimately did, you would have done something
12  different.
13      A.  Well, what I meant to say, if I knew
14  that the work was not going to be done, this
15  would have never occurred.  Obviously.
16      Q.  With regard to the relationship,
17  whatever it was, as you've testified a couple
18  different ways on it now, with BB Construction,
19  and Mr. Beecher, by which 70 percent of this
20  money flowed back to Taylor-Leigh and then to
21  you, did you ever tell anyone at Crown Theatres
22  about that?
23      A.  No.
24           MR. WISSER:  Object to the form.
25           You can answer.

36 (Pages 138 to 141)

**EXHIBIT C**

```
 1              UNITED STATES DISTRICT COURT
 2                 DISTRICT OF CONNECTICUT
 3
 4
 5    ---------------------------x VOLUME II
      CROWN THEATRES, L.P.,            :
 6
                   Plaintiff,          :
 7
         -versus-                      : No.  02 CV 2272
 8                                         (AVC)
      MILTON L. DALY; TAYLOR-LEIGH, :
 9    INC.; JAMES C. CELLA; G.U.S.
      DEVELOPMENT, INC.; JAMES         :
10    T. MARTINO; and JAMES T.
      MARTINO ARCHITECT, P.C.          :
11
                   Defendants.         :
12    ---------------------------x
13
14
15              Continued Deposition of MILTON
16       L. DALY, taken pursuant to the Federal
17       Rules of Civil Procedure, at the law
18       offices of Pepe & Hazard, 30 Jelliff Lane,
19       Southport, Connecticut, before James A.
20       Martone, L.S.R. #00248, and a Notary Public
21       in and for the State of Connecticut, on
22       August 6, 2003, at 10:00 a.m.
23
24
25
```

CROWN v. DALY                                                August 6, 2003

<table>
<tr><td>

Page 240

1  we've talked about, but you said during
2  subsequent conversations or subsequent meetings,
3  you reached that agreement.
4        Approximately when did you reach
5  the agreement with Mr. Beacher to enter into
6  this 70/30 sharing arrangement?
7     A.  I don't remember.
8     Q.  Is your best recollection January of
9  '98, February of '98, or is it '99 or 2000?
10    A.  No.  It was '98, but I don't remember
11 when it was reached.
12    Q.  Would you say it was the first half of
13 '98?
14    A.  I'm not going to repeat myself,
15 Mr. Martin.  I told you I don't remember.
16    Q.  How many conversations did you have
17 with Mr. Beacher, conversations or meetings,
18 prior to actually reaching agreement on the
19 70/30 split?
20    A.  I don't remember.  It would be all
21 speculation.
22    Q.  And we don't want you to speculate,
23 right?
24    A.  I don't think so.
25    Q.  During the conversation, do you have

</td><td>

Page 242

1     A.  Yes.
2     Q.  Why did you -- why is it that Beacher
3  or the Beacher entities paid Taylor-Leigh
4  instead of paying you directly?
5     A.  Beacher felt it would be more
6  appropriate that it be paid to a corporation
7  that I had, Taylor-Leigh, which was a
8  functioning company, had profits and losses, and
9  that it was his suggestion, he wanted to know
10 what the corporation was that I had, in one of
11 those conversations, and I told him I was
12 incorporated as Taylor-Leigh, Inc., and he said,
13 "Fine, we'll pay Taylor-Leigh."
14    Q.  And did he explain why he was making
15 that suggestion?
16    A.  No.
17    Q.  Did you ask him why he was making that
18 suggestion?
19    A.  No.  The company was owned by myself,
20 so it didn't make any difference to me.  I was
21 the only shareholder.
22    Q.  Did you consider whether it had any
23 tax implications for Taylor-Leigh?
24    A.  No, not at the time of the
25 conversation.

</td></tr>
<tr><td>

Page 241

1  any recollection of the specific conversation in
2  which you reached the 70/30 agreement?
3     A.  No, I don't.
4     Q.  Do you have any general recollection
5  of it?
6     A.  No, I don't.
7     Q.  Other than the fact that you came to
8  that agreement?
9     A.  Yes.
10    Q.  Another topic that we talked about
11 before, during the asset deposition that we
12 took, we went through some documents that
13 essentially showed that the payments flowed from
14 Crown Theatres to BB Construction or a Beacher
15 entity, Marlin Tiger, and then BB or Marlin
16 Tiger or Hewlett wrote a check to Taylor-Leigh,
17 Inc., and then Taylor-Leigh in turn made a
18 distribution or paid money to you, right?
19    A.  Yes.
20    Q.  When you reached the 70/30 agreement
21 with Mr. Beacher, the two of you decided that of
22 the money, however you want to characterize the
23 money, but of the money that the two of you were
24 going to split, that you would get 70 percent,
25 Mr. Beacher would get 30 percent, right?

</td><td>

Page 243

1     Q.  Did the two of you discuss that the
2  money would be harder to trace if it went
3  through Taylor-Leigh?
4     A.  No, Mr. Martin.  It's very, very --
5        MR. WISSER:  You've answered the
6  question.
7     Q.  Did Taylor-Leigh pay any taxes on the
8  income that it received from the B&B or the
9  Beacher entities?
10       MR. WISSER:  Hold on, please.
11 Let's go outside.
12       (Witness confers with counsel.)
13       MR. WISSER:  I'm going to direct
14 him not to answer in that this was previously
15 asked and answered in the asset deposition.
16       MR. MARTIN:  Actually, it's not
17 asked and answered in the asset deposition.
18 It's asked, or a similar question was asked.
19       MR. WISSER:  And he asserted a
20 privilege.
21       MR. MARTIN:  And you instructed
22 him not to answer based on the Fifth Amendment
23 question similar to this.
24       MR. WISSER:  I didn't instruct
25 him.  I advised him of his rights which he

</td></tr>
</table>

4 (Pages 240 to 243)

SANDERS, GALE & RUSSELL                                (203)624-4157