UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| CROWN THEATRES, L.P., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 3:02CV2272AVC |
| | ) Jury Trial Demanded |
| MILTON L. DALY, TAYLOR-LEIGH, | ) |
| INC., ANNE E. DALY, JAMES C. | ) |
| CELLA, G.U.S. DEVELOPMENT, INC., | ) November 8, 2004 |
| JAMES T. MARTINO AND JAMES | ) |
| THOMAS MARTINO, ARCHITECT, | ) |
| P.C., and RCD HUDSON, LLC, | ) |
| | ) |
| Defendants. | ) |

## CROWN THEATRES' MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR ENTRY OF A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AGAINST DEFENDANT MILTON L. DALY

Defendant Milton Daly ("Daly") has concocted yet another construction contract scheme to siphon off money rightly belonging to plaintiff Crown Theatres, L.P. ("Crown Theatres") into his own pockets. This particular scheme involves the use of money that Daly stole from Crown Theatres, which was used to acquire a 70% interest in Odyssey Entertainment LLC ("Odyssey"). Odyssey owns and operates a movie theatre in southern Alabama. Daly, over the objection of the 30% stakeholder in Odyssey, intends to embark on a massive construction program to transform a movie theatre into a bar and restaurant that happens to show movies. The project will deplete the approximately $600,000 currently accumulated in Odyssey's cash reserves, and has already resulted in the suspension of payments of approximately $20,000 per month into an escrow account that will ultimately benefit Crown Theatres. Not surprisingly, when that $20,000 was going into Daly's pocket, the payments were never suspended. Crown Theatres asks this Court to enter an order to prevent Milton Daly from taking steps to dissipate assets that he improperly acquired from Crown Theatres.

## BACKGROUND

Crown Theatres instituted this action on December 20, 2002, against Daly and others, seeking equitable relief and damages incurred as a result of a scheme by Daly and construction consultant Robert Beacher ("Beacher") to defraud Crown Theatres. The scheme worked like this: Beacher, through various fictitious companies as well as his consulting firm, submitted invoices to Crown Theatres for work supposedly performed at the sites of Crown Theatres' theatre construction and renovation program. These invoices were either for work that was never performed or were submitted for payment at wildly inflated prices. Daly caused Crown Theatres to pay those invoices, and the proceeds were split between them, with Daly receiving 70% and Beacher receiving 30%. In addition to damages for fraud, RICO violations, conversion, breach of fiduciary duty and violation of the Connecticut Unfair Trade Practices Act, Crown Theatres is seeking equitable relief: claims for unjust enrichment, the avoidance of fraudulent transfers, and the imposition of a constructive trust over the proceeds from Daly's fraud. (2nd Am. Compl. Counts XV, XVI and Prayer for Relief.)

Daly has admitted to receiving $4.2 million as a result of this scheme. (Deposition of Milton L. Daly, August 5-6, 2003 at 207.) Of that $4.2 million, at least $1.2 million of the stolen funds was invested in Odyssey, a Delaware limited liability company. Daly owns 70% of Odyssey, and his business partner, Robert Abramsky, owns a 30% interest. (Declaration of Robert Abramsky ("Abramsky Decl."), dated November 8, 2004, ¶ 1. Mr. Abramsky's Declaration is attached hereto as Exhibit 1.) The principal asset owned by Odyssey is a movie theatre, the Riviera 12, located in Foley, Alabama, which Odyssey also operates. (Id. ¶ 2.)

Daly's investment in Odyssey is secured by a promissory note with an interest rate of 7.75% (the "Note"), which he holds jointly with his wife, defendant Anne E. Daly. (Abramsky

Decl ¶ 4.) The note requires Odyssey to make monthly payments of approximately $20,000 per month in accrued interest and principal to the Dalys. (Id.) Odyssey has approximately $600,000 in cash in its operating accounts above and beyond the funds necessary to satisfy its monthly operating costs and debt servicing. (Id.) This number is likely to increase by approximately $60,000-$80,000 in the coming weeks upon the receipt of insurance payments relating to business interruption caused by Hurricane Ivan. (Id.) Since the filing of this lawsuit, Daly has attempted to siphon funds from Odyssey for his personal use on several occasions. (Id. ¶¶ 7-15.)

On January 23, 2003, this Court entered a prejudgment remedy pursuant to Connecticut General Statutes § 52-278, *et seq.* and Rule 64 of the Federal Rules of Civil Procedure, finding that:

> [T]here is probable cause that a judgment in the amount of Six Million, Two Hundred Thousand Dollars (6,200,000.00) will be rendered in the matter in favor of Crown Theatres, L.P., or in an amount greater than that, taking into account any known defenses counterclaims or setoffs of the defendants; and that there is a reasonable likelihood that the defendant has fraudulently hidden or withheld money, property or effects which should be liable to the satisfaction of his debts and is continuing to do so . . . .

(Order for Prejudgment Remedy, dated January 23, 2003, at 1-2.) As a result of this finding, this Court authorized Crown Theatres to attach or garnish Daly's assets, including his interest in the Odyssey Note. (Id. at 2-3.) This Court entered a similar order with respect to defendant Anne E. Daly on September 21, 2003.

In accordance with this Court's orders, Plaintiff Crown Theatres requested issuance of a Writ of Garnishment against Odyssey from the United States District Court for the Southern District of Alabama. The writ was issued on October 17, 2003. On December 9, 2003, the parties entered into a settlement agreement and filed an agreed stipulation of dismissal in the Alabama district court. By the terms of the settlement agreement, Crown Theatres withdrew and

voluntarily dismissed without prejudice its Writ of Garnishment. In exchange, Odyssey, Milton Daly and Anne Daly agreed that Odyssey's monthly payments on the Odyssey note would be paid into an escrow account accessible only by signature of the Dalys' counsel and counsel for Crown Theatres. The parties further agreed that any distribution of profits from Odyssey to either of the Daly defendants would be made into the aforementioned escrow accounts until any judgment issuing from this Court was satisfied or otherwise discharged.

This action is currently awaiting trial, and Crown Theatres' Motion for Summary Judgment against defendants Daly and Taylor-Leigh, Inc. is pending before this Court. In his response to Crown Theatres' Motion for Summary Judgment, Daly admitted that he breached his fiduciary duties to Crown Theatres, and that judgment may therefore enter against him on that count:

> In accepting the payments for the business that was given to Beacher (what the plaintiff terms a "kickback"), Daly acknowledges that he breached his fiduciary duty to plaintiff. Consequently, the defendant cannot (and does not) dispute that, on that basis, a judgment of liability may enter against him in regard to the breach of fiduciary duty claim in Count XXI.

(Mem. of Law of Defs. Milton L. Daly and Taylor-Leigh, Inc. in Opp. to Pl.'s Mot. for Summ. J., dated May 21, 2004, at 14.)

**Recent Developments**

On October 28, 2004, counsel for Milton Daly informed counsel for Crown Theatres that Daly, in direct contravention of his earlier representations, would no longer permit Odyssey to make payments on the Odyssey note. (Letter from Kerry M. Wisser to Craig C. Martin, dated October 28, 2004, attached hereto as Exhibit 2.) This is the first time that payments have been suspended on the note. No payments were missed when the funds went directly to the Dalys. The $20,000 monthly payments have been suspended despite more than $600,000 in cash

currently sitting in the Odyssey accounts and the terms of the note which provide for acceleration in the event of nonpayment.[1] Daly has seized upon the tragedy of Hurricane Ivan to excuse making the payments. However, given the existence of large cash reserves and the fact that Odyssey has business interruption insurance, Daly is using the hurricane to hide his true intent, which is to withhold funds that will ultimately benefit Crown Theatres.

Despite Daly's unwillingness to make a $20,000 monthly payment, he has decided to plunge Odyssey into the restaurant business, even though Daly has no experience running a restaurant or any food service operation that offers more than popcorn and soda. (Deposition of Milton L. Daly, August 5-6, 2003, at 8-32.) Daly's restaurant will offer full food and alcohol service and will be located right next to three restaurants with considerably more experience than Daly in the food service business -- Applebees, Ruby Tuesdays and Wendy's. (See E-mail from Milton Daly to Stephen Johnson, dated September 2, 2004, attached as Exhibit A to the Abramsky Declaration.)[2] Along the way, the Riviera 12 will become the Riviera 6 with the demolition of six screens to make room for the restaurant businesses. (Id.) What is apparent is that Odyssey's foray into the restaurant business will give Daly an opportunity to get into a business that he is very experienced at — skimming funds from large scale construction projects. Daly plans to use the $600,000 to fund this highly speculative project.[3]

---

[1] The note provides that "if any payment be not promptly and fully paid within thirty days of when the same is demanded, then the whole sum of principal remaining unpaid and accrued interest shall, at the option of the holder hereof, become immediately due and payable and this note collectible without further notice." A copy of the Odyssey note is attached hereto as Exhibit 3.

[2] The proximity of these restaurants to the theatre is displayed prominently on the Riviera 12's website, found at http://www.starcoastcinemas.com/pages/map1.cfm. A copy of this webpage is attached hereto as Exhibit 4. In addition, Daly apparently intends to attempt to lease space to even more restaurants. See Exhibit A to Abramsky Decl.

[3] Daly has not proposed a formal business plan, or at least one detailed enough to satisfy his business partner. (Abramsky Decl. ¶ 17.) He has conducted no market or demographic research

5

## ARGUMENT

This Court should enter a preliminary injunction enjoining Daly, against whom the entry of judgment is virtually certain and whose history in the management of large scale construction projects should give any one pause, from embarking on his speculative business plan with money belonging to Crown Theatres. A plaintiff seeking the imposition of a preliminary injunction must show that: (1) it is likely to suffer irreparable injury if the injunction is not granted and (2) either (a) a likelihood of success on the merits of its case or (b) sufficiently serious questions going to the merits to make them a fair ground of litigation and a balance of hardships tipping decidedly in its favor. Elizabeth Grady Face First, Inc. v. Escavich, 321 F. Supp. 3d 420, 423 (D. Conn. 2004). Based on Daly's own admissions, Crown Theaters is likely to succeed on the merits of its action against Daly. Furthermore, if Daly is allowed to expend funds on this risky scheme, while at the same time causing Odyssey to fail to make monthly payments on the Note, Crown Theatres will be irreparably harmed, because any funds spent on this radical transformation of Odyssey's business model will be difficult, if not impossible, to recover.

The type of injunctive relief sought here is fully within the equitable powers of this Court. See Deckert v. Independence Shares Corp., 311 U.S. 282, 290 (1940). In cases involving claims for both equitable and legal relief, courts have regularly enjoined defendants from dissipating assets that are connected to the claims brought against them. See Republic of the Philippines v. Marcos, 806 F.2d 344, 356 (2d Cir. 1986) (preliminary injunction proper to prevent defendant from dissipating funds allegedly stolen from the Philippines); United States of America ex rel Rahman v. Oncology Assocs., P.C., 198 F.3d 489, 496-97 (4th Cir. 1999) (injunctive relief appropriate where unjust enrichment and fraudulent transfer claims relate to

---

to test the viability of his proposal. (Id.) He has not provided any estimate of the costs associated with retrofitting the theater. (Id.)

funds subject to injunction); Republic of the Philippines v. Marcos; 862 F.2d 1355, 1363-64 (9th Cir. 1988) (same); Nat'l Union Fire Ins. Co. v. Kozeny, 115 F. Supp. 2d 1243, 1250 (D. Colo. 2000) (injunction to prevent dissipation of fraudulently acquired funds proper); Wishnatzki & Nathel, Inc. v. H.P. Island-Wide, Inc., No. 00 Civ. 8051 (JSM), 2000 U.S. Dist. LEXIS 15664, at *4-5 (S.D.N.Y. Oct. 26, 2000) (injunction proper where the funds affected are also the funds at issue in the suit)[4]; F.T. International, Ltd. v. Mason, C.A. No. 00-5004, 2000 U.S. Dist. LEXIS 14979, at *4-5 (E.D. Pa. Oct. 11, 2000) (injunctive relief appropriate to preserve status quo where nexus exists between specific assets controlled by defendant and plaintiff's claim).

I.   **This Court Should Enter a Temporary Restraining Order Enjoining the Dissipation of Funds Accumulated in the Odyssey Bank Accounts.**

   A.   **Crown Theatres has a Likelihood of Success on the Merits of its Claims.**

Milton Daly's history running construction projects is by now well known to this Court. In January 2003, this court found that there was probable cause that judgment would be entered against him on claims relating to his scheme to defraud Crown Theatres through the payment of phony invoices on construction projects while he served as its chief operating officer. Since that time, information and admissions gathered during the course of discovery have made the entry of judgment against Milton Daly not merely probable, but nearly inevitable. By his own admission, Milton Daly has received at least $4.2 million of funds that belong to Crown Theatres. By his own admission, it was "wrong" to receive kickbacks that should have inured to the benefit of his employer. Indeed, by his own admission both at his deposition and in his opposition to Crown Theatres' motion for summary judgment, receipt of those funds constituted a breach of his fiduciary duties. In addition to Daly's admissions, Crown Theatres is likely to succeed on the merits of its claims based on the strength of the undisputed evidence showing the path of the

---

[4] All unpublished opinions cited in this memorandum are attached hereto as Exhibit 5.

stolen funds from where they left Crown Theatres to where they ended up — in accounts controlled by Milton Daly. (See, e.g. Testimony of Frederick C. Hamilton, Prejudgment Remedy Hearing, September 18, 2003.)

### B.  Absent Injunctive Relief, Crown Theatres Will Suffer Irreparable Injury.

Once the seemingly inevitable judgment is entered against him, Crown Theatres will be placed in the position of attempting to obtain either the funds that Daly has either wrongfully obtained or the assets that Daly has acquired with the wrongfully obtained funds. The principal asset, of course, will be Daly's interest in Odyssey. But this will be next to impossible if Daly embarks on a massive construction project, attempting to build a second business with the same improperly obtained funds that he used to capitalize Odyssey in the first place. Daly's "retrofitting" plans will place his most valuable asset at risk. First, the funds may be simply wasted on a speculative business scheme that has no proven track record in Southern Alabama or elsewhere.[5] This type of boutique cinema venture is most certainly not appropriate when the very business that is being transformed is likely to change ownership in the immediate future. Milton Daly has already speculated with money that did not belong to him by capitalizing Odyssey in the first place; he should not be allowed to do so again.

Second, Daly's scheme would place the funds at risk of being skimmed by Daly himself. Daly has substantial experience manipulating the payment of construction invoices for his own personal benefit, and he is setting up a similar opportunity here. He intends to go forward with a massive construction project, entirely under his control and without the input of his business partner. (Abramsky Decl. ¶ 17-19.) He will be in the position to negotiate deals with contractors

---

[5] The "cinema bistro" model has been tried and ultimately abandoned in major metropolitan areas, such as Washington D.C. See http://www.visionsdc.com (Washington D.C. cinema bistro announcing closure.)

that could result in similar 70/30 style kickbacks to those he received while working for Crown Theatres. He will also be in the position to approve payment of fraudulent invoices. Odyssey has already served as a conduit for Milton Daly's attempts to continue to profit from his scheme to defraud Crown Theatres. Indeed, he has, on several occasions, attempted to transfer thousands of dollars out of the company to himself. (Abramsky Decl. ¶¶ 8-15.) And nothing about Daly's current behavior lends credence to the notion that he is acting with the interests of Odyssey in mind. Given Daly's checkered history in this regard, which by this time is undoubtedly well understood by this Court, he does not deserve the benefit of the doubt.

Third, Daly proposes to use funds for this project that should instead be earmarked for Odyssey's debt servicing. Each month, Odyssey is bound to pay approximately $20,000 on the Note into an escrow account created by agreement between Crown Theatres, Odyssey and the Dalys. It is understandable why Daly would want to stop these payments — they are being held ultimately for the benefit of Crown Theatres. But Daly should not be allowed to redirect those funds elsewhere. If Daly is allowed to ignore Odyssey's obligations under the Odyssey note, the funds will be unavailable to satisfy the presumed judgment and may, if history is any judge, ultimately end up in his pocket. Should Daly skim any of the funds purportedly earmarked for the massive construction project, it will be nearly impossible for Crown Theatres to collect.

Therefore, in order to protect Crown Theatres' ability to be made whole upon the entry of judgment against Milton Daly, Crown Theatres requests that this Court enter an order enjoining Daly from making any extraordinary capital expenditures prior to the conclusion of this action. Specifically, Daly should be enjoined from embarking on his "business plan" to transform the Riviera 12 into an untested restaurant/theatre hybrid. There is no urgency here: if at a later date, once this litigation is completed, it becomes necessary to fully renovate the theater, the party

controlling the theater will be able to take whatever action is necessary. There is simply no reason to take such a substantial risk at a time when the future ownership of the company is uncertain.

## CONCLUSION

For the foregoing reasons, Crown Theatres' Motion for Entry of a Temporary Restraining Order and Preliminary Injunction Against Defendant Milton L. Daly should be granted. Specifically, this Court should enter an order:

A.  restraining Milton Daly from causing Odyssey Entertainment LLC to expend funds on any construction project, renovation project, retrofitting project or otherwise, involving the Starcoast Riviera 12 Cinemas in Foley, Alabama, including but not limited to any steps to transform the theater into a "cinema bistro" including any alternation of the food service facilities and the construction of stadium seating;

B.  ordering Milton Daly to cause Odyssey Entertainment LLC to make monthly interest payments on the promissory note held by Milton L. Daly and Anne E. Daly into the escrow account maintained by counsel for the Dalys as trustee.[6]

---

[6] A proposed order is attached hereto as Exhibit 6.

Respectfully submitted,

CROWN THEATRES, L.P.

By: _____ — WITH AUTHORITY
H. James Pickerstein (Bar No. Ct 05094)
Calvin K. Woo (Bar No. Ct 24951)
PEPE & HAZARD, LLP
30 Jelliff Lane
Southport, CT 06490
(203) 319-4000
(203) 259-0251 (fax)
hpickerstein@pepehazard.com
cwoo@pepehazard.com

and

Craig C. Martin (Bar No. Ct 12198)
Lawrence S. Schaner (Bar No. Ct 24756)
JENNER & BLOCK LLP
One IBM Plaza
Chicago, IL 60611
(312) 222-9350
(312) 840-7776 (fax)
cmartin@jenner.com
lschaner@jenner.com

## CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that I have served all counsel of record in this action with a copy of **Crown Theatres' Motion for Entry of a Temporary Restraining Order and Preliminary Injunction and the Memorandum of Law in Support of Its Motion,** by mailing a copy of the same by United States Mail, postage prepaid, to the following:

>Kerry M. Wisser
>Weinstein & Wisser, P.C.
>29 South Main Street
>Suite 207
>West Hartford, CT  06107
>
>Mark Seiden
>Marisa Lanza
>Milber, Makris, Plousadis & Seiden, L.L.P.
>3 Barker Ave.
>6th Floor
>White Plains, NY  10601
>
>Robert M. Frost
>Zeldes, Needle & Cooper
>1000 Lafayette Blvd.
>P.O. Box 1740
>Bridgeport, CT 06601-1740

_____ /s/ with authority

Dated: November 10, 2004